Judge: O'Meara, John Corbett
MJ: Patti, Anthony P.
Filed: 08-29-2016 At 02:41 PM
HC Deonte Howard v Mackie (wh)

241
(Rev. 10/07)

DET 095505

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF**
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: Eastern District - Michigan |
|---|---|
| Name (under which you were convicted):<br>Deonte Howard | Docket or Case No.:<br>10-005562-01-FJ |
| Place of Confinement : Oaks Correctional Facility<br>1500 Caberfae Hwy<br>Manistee, Mi. 49660 | Prisoner No.:<br>793937 |
| Petitioner (include the name under which you were convicted)<br>Deonte Howard | Respondent (authorized person having custody of petitioner)<br>v. Thomas Mackie (Warden) |
| The Attorney General of the State of Michigan | (Bill Schuette) |

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

    3rd Circuit Court of Wayne County - Frank Murphy Hall of Justice 1441 St. Antoine, Detroit, Mi. 48226

    (b) Criminal docket or case number (if you know): 10-005562-01-FJ

2. (a) Date of the judgment of conviction (if you know): January 2011

    (b) Date of sentencing: May 27th, 2011

3. Length of sentence: Non-Parolable Life

4. In this case, were you convicted on more than one count or of more than one crime? ☒ Yes ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case:

    Assault With Intent To Do great Bodily harm (MCL 750.84) (Sentenced on 2-9-11 to 23 months to 120 months) Felony Firearm (MCL 750.227b) (2 years Mandatory Consecutive) First Degree Murder (MCL 750.316) Life (Sentenced 5-27-11)

6. (a) What was your plea? (Check one)

    ☒ (1)  Not guilty       ☐ (3)  Nolo contendere (no contest)

    ☐ (2)  Guilty            ☐ (4)  Insanity plea

241
(Rev. 10/07)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? _____ N.A _____

~~(lines crossed out)~~

(c) If you went to trial, what kind of trial did you have? (Check one)

&#9746; Jury    &#9744; Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

&#9744; Yes    &#9746; No

8. Did you appeal from the judgment of conviction?

&#9746; Yes    &#9744; No

9. If you did appeal, answer the following:

(a) Name of court: **Michigan Court of Appeals**

(b) Docket or case number (if you know): **COA # 311169**

(c) Result: **Affirmed convictions, but remanded for resentencing.**

(d) Date of result (if you know): **October 16, 2014**

(e) Citation to the case (if you know): **People v. Howard (COA # 311169)**

(f) Grounds raised: **1). Prosecution failed to present legally Sufficient Evidence That Howard was The person who committed offense, And Insufficient evidence of premeditation. 2). Denial of Effective Assistance of Counsel 3). Entitled to New Trial Where He was Denied Due Process & Where Conviction was obtained through the Use of FAlse/Perjured Testimony. 4). Miller v. Alabama argument-granted**

(g) Did you seek further review by a higher state court? &#9746; Yes   &#9744; No

If yes, answer the following:

(1) Name of court: **Michigan Supreme Court**

(2) Docket or case number (if you know): **SC# 150604**

(3) Result: **Application of Leave To Appeal DENIED**

(4) Date of result (if you know): **6-30-2015**

AO 241
(Rev. 10/07)

(5) Citation to the case (if you know): _____

(6) Grounds raised: _Same grounds raised with exception to the Miller v. Alabama argument which was granted by Court of Appeals._

(h) Did you file a petition for certiorari in the United States Supreme Court?      ☐ Yes    ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions

concerning this judgment of conviction in any state court?      ☐ Yes    ☒ No

11.    If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised:

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

AO 241
(Rev. 10/07)

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court: _____

    (2) Docket or case number (if you know): _____

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _____

    (5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

        ☐ Yes    ☐ No

    (7) Result: _____

    (8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court: _____

    (2) Docket or case number (if you know): _____

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _____

    (5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

AO 241
(Rev. 10/07)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition: ☐ Yes ☐ No

(2) Second petition: ☑ Yes ☐ No

(3) Third petition: ☐ Yes ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: Deonte Howard's Conviction For First Degree Murder Must Be VACATED WHERE THE PROSECUTION FAILED To PRESENT Legally Sufficient Evidence That He is who Committed the Offense and No Evidence that he had Premeditation and Deliberation.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The main focus point on appeal on this issue is Howard had not the element of premeditation which is necessary to substantiate a finding of guilt or to charge for first degree Murder. Arguendo, if Howard was the shooter of the victim, he was violently assaulted by the deceased upon returning to search for his cell-phone. The heat of rage that resulted from that unprovoked attack carried on throughout the entire course of the event, thus negating 1st Dg. Murder

(b) If you did not exhaust your state remedies on Ground One, explain why:

Issue Properly Exhausted.

_____

_____

_____

AO 241
(Rev. 10/07)

(c)     **Direct Appeal of Ground One:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?     ☒ Yes     ☐ No

    (2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ☐ Yes     ☒ No

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

_____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

    (3) Did you receive a hearing on your motion or petition?     ☐ Yes     ☐ No

    (4) Did you appeal from the denial of your motion or petition?     ☐ Yes     ☐ No

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☐ Yes     ☐ No

    (6) If your answer to Question (d)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

_____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

    (7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241
(Rev. 10/07)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** Howard was denied his state and federal right to Effective Assistance of Counsel, where defense counsel failed to call Sgt. Martel as a defense witness, failed to submit a critical stipulation at 1st trial, And failed to cross-exam prosecutor's

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Key witness.

If counsel would have called Sgt. Martel, he would have clairified that Audrey Allen was coherent when he identified another person as the shooter, thus making Allen's testimony (which was vital) that he was on Morphine—thus not coherent questionable and possible less credible. A Stipulation was entered at Defendant's first trial which would have significantly impacted witness Frederick McFadden's identification claim, attorney Moore did not move to have this same Stipulation entered at Second trial. (See Brief.)

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

_____

(c)     **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☒ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

O 241
(Rev. 10/07)

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?          ☐ Yes   ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☐ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you :

have used to exhaust your state remedies on Ground Two

_____

_____

_____

_____

**GROUND THREE:** Howard is entitled to a New Trial where he was denied his State and Federal Due Process Rights where his conviction was obtained through

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Use of False/Perjured testimony.

Frederick McFadden testified at the second trial that a few days after the shooting, he viewed an array of three photographs, and made two identifications. McFadden testified that he identified Petitioner Howard as the shooter. He testified he was "positive" that he identified Howard in the photo array, yet Howard was not even included in the photo array submitted to this witness.

AO 241
(Rev. 10/07)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)    **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☒ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes    ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

AO 241
(Rev. 10/07)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

_____

(c)     **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☐ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

AO 241
(Rev. 10/07)

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                          ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?                     ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

AO 241
(Rev. 10/07)

13.    Please answer these additional questions about the petition you are filing:

(a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court

having jurisdiction?    ☐ Yes    ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them:   _____

_____

_____

_____

(b)    Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

that you challenge in this petition?         ☐ Yes    ☐ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

of any court opinion or order, if available.   _____

_____

_____

_____

_____

_____

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

the judgment you are challenging?         ☐ Yes    ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

raised.   _____

_____

_____

_____

AO 241
(Rev. 10/07)

16.    Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: _____

_____

(b) At arraignment and plea: _____

_____

(c) At trial: _____

_____

(d) At sentencing: _____

_____

(e) On appeal: _____

_____

(f) In any post-conviction proceeding: _____

_____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

_____

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      ☐ Yes    ☐ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?      ☐ Yes    ☐ No

AO 241
(Rev. 10/07)

Therefore, petitioner asks that the Court grant the following relief: Grant Habeas relief, vAcate Petitioner Howards conviction of First Degree Murder and grant relief this court deems just.

or any other relief to which petitioner may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on _____ (date).

_____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____

_____

_____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

DEONTE HOWARD

            Petitioner,

-v-

THOMAS MACKIE

            RESPONDENT.

Deonte Howard
In Pro Per.

Fed No. _____

LC No.  10-005562-01-FJ

COA No.  311169

SC No.  150604

## MEMORANDUM OF LAW

    Defendant Howard was convicted of Assault With Intent to Murder [MCL 750.83], Felony Firearm [MCL 750.227b] and First degree Murder [MCL 750.316]. For purpose of his appeal and this petition, Petitioner encourages the Court to focus on his First Degree Murder Conviction. Additionally, Petitioner encourages this court to take note that his first trial resulted in a hung jury.

1.

Petitioner contends that he is entitled to Habeas relief pursuant to Title 28 U.S.C § 2254 (3)(d)(1)&(2). Petitioner contends that the Court of Appeals decision denying him relief with respect to issues (1)-(3) was clearly contrary to a decision rendered by the federal courts and "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

The Due Process Clause of the Federal Constitution prohibit a criminal conviction unless the prosecution establishes guilt of the essential elements of a criminal charge beyond a reasonable doubt. This requirement was also established in re Winship, 397 US 358, 361-362 (1970)

Furthermore, a defendant has the right under the Federal and State Constitution to the effective assistance of counsel. The United States Supreme Court guaranteed this right in Strickland v. Washington, 466 US 668, 687 (1984

The Court also ruled that a defendant who demonstrates that his counsel was constitutionally ineffective and who was not functioning as counsel guaranteed by the Sixth Amendment is entitled to a new trial.

Petitioner effectively demonstrates that he was unconstitutionally convicted and deprived a fair trial in his Brief attached herewith and also submitted to the State of Michigan's lower courts, yet he was still arbitrarily denied relief.

Wherefore, Petitioner prays this Court grant relief with regards to his issues presented in his Brief attached herewith and grant Habeas relief this Court deems just.

3,

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................................................................. i

STATEMENT OF JURISDICTION...................................................................................v

STATEMENT OF QUESTIONS PRESENTED....................................................... vi

STATEMENT OF FACTS ............................................................................................1

JUDGMENT APPEALED FROM AND RELIEF SOUGHT......................................12

STANDARD OF REVIEW ............................................................................13, 21, 30

I.      DEONTE HOWARD'S CONVICTION FOR FIRST-DEGREE MURDER MUST BE
        REVERSED WHERE THE PROSECUTION FAILED TO PRESENT LEGALLY
        SUFFICIENT EVIDENCE THAT DEONTE HOWARD WAS THE PERSON WHO
        COMMITTED THE OFFENSE, AND WHERE THERE WAS INSUFFICIENT
        EVIDENCE OF PREMEDITATION AND DELIBERATION. ............................................13

II.     DEONTE HOWARD WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL
        RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE
        COUNSEL FAILED TO CALL SGT.  MARTEL AS A DEFENSE WITNESS, FAILED
        TO SUBMIT A CRITICAL STIPULATION THAT HAD BEEN ENTERED AT
        DEFENDANT'S FIRST TRIAL, AND FAILED TO CROSS-EXAMINE A KEY
        PROSECUTION WITNESS.....................................................................................................21

III.    DEONTE HOWARD IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED HIS
        STATE AND FEDERAL DUE PROCESS RIGHTS WHERE HIS CONVICTION WAS
        OBTAINED THROUGH THE USE OF FALSE AND/OR PERJURED TESTIMONY.....30

SUMMARY AND RELIEF REQUESTED ...............................................................39

Attachment #1 (*People v Deonte Howard,* unpublished, CA #311169, 10/16/14)
Attachment #2 (T 1/12/2001, 189-195)

## INDEX OF AUTHORITIES

### CASES

*Austin v United States*, 127 US App DC 180; 382 F 2d 129 (1967)............................................. 17

*Berger v United States*, 295 US 78 (1935) ................................................................................. 32

*Bigelow v. Haviland*, 576 F.3d 284 (6th Cir.2009)..................................................................... 22

*Blackburn v Foltz*, 828 F 2d 1177 (CA 6, 1987) ......................................................................... 22

*Brady v Maryland*, 373 US 83 (1963) ......................................................................................... 32

*California v Trombetta*, 467 US 479 (1984)................................................................................. 35

*Couch v Booker*, 632 F3d 241 (CA 6, 2011) ......................................................................... 23, 28

*Evitts v Lucey*, 469 US 387; 105 S Ct 830; 83 L Ed 2d 821 (1985) ............................................ 42

*Giglio v United States*, 405 US 150 (1972) ............................................................... 32, 33, 35, 36

*Horton v Zant*, 941 F 2d 1449 (CA 11, 1991) ............................................................................ 22

*In re Winship*, 397 US 358 (1970) ............................................................................................. 13

*Mooney v Holohan*, 294 US 103 (1935) ............................................................................... 32, 33

*Napue v Illinois*, 360 US 264 (1959) ...................................................................... 32, 33, 35, 36

*Nye v People*, 35 Mich 16 (1876) ............................................................................................... 19

*People v Anderson*, 44 Mich App 222 (1972) ....................................................................... 34, 35

*People v Atkins*, 397 Mich 163 (1976)........................................................................................ 35

*People v Barbara*, 400 Mich 352 (1977)..................................................................................... 35

*People v Barclay*, 208 Mich App 670 (1995) .............................................................................. 21

*People v Cassell*, 63 Mich App 226 (1975).................................................................................. 34

*People v Conklin*, 118 Mich App 90 ; 324 NW2d 537 (1982) ..................................................... 18

*People v Davis,* 241 Mich App697, 700 (2000) ........................................................................... 37

*People v Dalessandro*, 165 Mich App 569 (1988) ....................................................................... 22

*People v Gill*, 43 Mich App 598 (1972) ...................................................................................... 16

*People v Grant*, 445 Mich 535 (1994) ................................................................. 21

*People v Grant*, 470 Mich 477 (2004) .......................................................... 22, 28

*People v Hampton*, 407 Mich 354 (1979) ........................................................... 13

*People v Henry*, 239 Mich App 140 (1999) ....................................................... 21

*People v Hoffmeister*, 394 Mich 155 (1975) ........................................ 16, 17, 18

*People v Johnson*, 451 Mich 115 (1996) ........................................................... 28

*People v Johnson*, 99 Mich App 547 (1980) ..................................................... 16

*People v Kern*, 6 Mich App 406 (1967) ............................................................ 15

*People v LaVearn*, 448 Mich 207 (1995) .......................................................... 21

*People v Lester*, 232 Mich App 262 (1998) ...................................................... 32

*People v Meier*, 47 Mich App 179 ; 209 NW 2d 311 (1973) ........................... 18

*People v Morrin*, 31 Mich App 301 (1971) ........................................... 15, 19, 20

*People v Nimeth*, 236 Mich App 616 (1999) ..................................................... 38

*People v Oster*, 67 Mich App 490 (1976) ............................................. 17, 18, 19

*People v Plummer*, 229 Mich App 293 (1998) ...................................... 18, 19, 20

*People v Savvides*, 1 NY2d 554; 154 NYS2d 885, ; 136 NE2d 853, ............... 32

*People v Stewart*, 163 Mich 1 (1910) ............................................................... 15

*People v Sullivan*, 290 Mich 414 (1939) ........................................................... 15

*People v Thornton*, 80 Mich App 746 (1978) .................................................... 35

*People v Tilley*, 405 Mich 38 (1979) ...................................................... 16, 19

*People v Vinunzo*, 212 Mich 472 ; 180 NW 502 (1920) .................................... 17

*People v White*, 212 Mich App 298 (1995) ....................................................... 38

*People v Wiese*, 425 Mich 448 (1986) ............................................................... 35

*People v Wilson*, 230 Mich App 590 (1998) ...................................................... 38

*People v Wolfe*, 440 Mich 508 (1992) ............................................................... 13

*People v Woods*, 416 Mich 581 (1982).......................................................................... 35

*Pyle v Kansas*, 317 US 213 (1942) ......................................................................... 32, 33

*Ramonez v Berghuis*, 490 F3d 482 (CA 6, 2007) ......................................................... 28

*Roe v Flores-Ortega*, 528 US 470 (2000)..................................................................... 22

*Rompilla v Beard*, 545 US 374 (2005)......................................................................... 22

*Strickland v Washington*, 466 US 668 (1984) ....................................... 21, 22, 23, 28

*Towns v Smith*, 395 F3d 251 (CA 6, 2005)........................................................... 22, 28

*United States v Agurs*, 427 US 97 (1976)......................................................... 32, 33, 36

*United States v Bagley*, 473 US 667 & n 8 (1985) ....................................................... 32

*United States v Barham*, 595 F2d 231 (CA 5, 1979).................................................... 36

*United States v Leon,* 534 F 2d 660 (CA 6, 1975) ....................................................... 14

*United States v Saunders*, 325 F 2d 840 (CA 6, 1964) ................................................. 14

*Washington v Hofbauer*, 228 F3d 689 (CA 6, 2000)..................................................... 22

*Wiggins v Smith*, 539 US 510 (2003).......................................................................... 22

## CONSTITUTIONS, STATUTES, COURT RULES

MCL 750.227b ................................................................................................................ 1

MCL 750.316 ........................................................................................................... 1, 15

MCL 750.83 .................................................................................................................... 1

MCL 750.84 .................................................................................................................... 1

Mich Const 1963, art 1, § 20.................................................................................. 21, 23

Mich Const 1963, art 1, §17.................................................................................... 13, 32

US Const, Am VI ......................................................................................................... 21

US Const, Am XIV ................................................................................................. 21, 32

## <u>STATEMENT OF QUESTIONS PRESENTED</u>

I.   MUST DEONTE HOWARD'S CONVICTION FOR FIRST-DEGREE MURDER MUST BE REVERSED WHERE THE PROSECUTION FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE THAT DEONTE HOWARD WAS THE PERSON WHO COMMITTED THE OFFENSE, AND WHERE THERE WAS INSUFFICIENT EVIDENCE OF PREMEDITATION AND DELIBERATION?

> Trial Court made no answer.
> Court of Appeals answers, "No".
> Defendant-Appellant answers, "Yes".

II.  WAS DEONTE HOWARD DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE COUNSEL FAILED TO CALL SGT.  MARTEL AS A DEFENSE WITNESS, FAILED TO SUBMIT A CRITICAL STIPULATION THAT HAD BEEN ENTERED AT DEFENDANT'S FIRST TRIAL, AND FAILED TO CROSS-EXAMINE A KEY PROSECUTION WITNESS?

> Trial Court made no answer.
> Court of Appeals answers, "No".
> Defendant-Appellant answers, "Yes".

III. IS DEONTE HOWARD IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED HIS STATE AND FEDERAL DUE PROCESS RIGHTS WHERE HIS CONVICTION WAS OBTAINED THROUGH THE USE OF FALSE AND/OR PERJURED TESTIMONY?

> Trial Court made no answer.
> Court of Appeals answers, "No".
> Defendant-Appellant answers, "Yes".

## STATEMENT OF FACTS

Defendant-Appellant DEONTE HOWARD, age 16, was charged with first-degree murder, MCL 750.316, assault with intent to murder, MCL 750.83, and felony firearm, MCL 750.227b. After a jury trial in January 2011, he was convicted of assault with intent to commit great bodily harm, MCL 750.84, and felony firearm, but the jury hung with regard to the murder charge. On February 9, 2011, Defendant Howard was sentenced to 23-120 months for the assault and two years for felony firearm. After a second trial in May 2011, a jury found Mr. Howard guilty of first-degree murder. On May 27, 2011, Judge Morrow sentenced Mr. Howard to mandatory, non-parolable life imprisonment.

**Pre-trial Motions**

Prior to trial, Defendant's motion to quash the first-degree murder count was denied on August 19, 2010 (MT 8/19/10, 14). The defense also filed a motion to suppress the in-court and out of court identification by Aundrey Allen as being tainted. After taking testimony, the motion was denied (MT 8/19/10, 91-93).

**Trial Testimony**

The instant case involved the death of Tyrone Simpson (a/k/a "Ant"), age 19, during the afternoon hours of April 10, 2010 in the parking lot of the Smokehouse restaurant/convenience store (a/k/a Garden Café) at 16228 Tireman in the city of Detroit. Simpson accused Deonte Howard, age 16, of taking his Cartier glasses and they argued in front of a group of people outside the store. The argument escalated into Simpson attacking Howard and repeatedly punching Howard in the face. The prosecution alleged that Deonte Howard then fired multiple

1

shots at Simpson. The defense maintained that Mr. Howard was not the shooter, or alternatively, that he "lost his mind" and fired during an emotional event.

**Testimony of Witnesses Present at the Restaurant/Store**

**Bobby Bailey** was the owner of the Smokehouse restaurant/convenience store in 2010. He testified that when he returned to his store on April 10 about 5:00 p.m. he observed a regular customer, "Ant" and a group of guys in front of his store and they appeared to be hostile. "Ant" was upset and angry. He told Bailey that someone had just stolen his glasses and he wanted the glasses back. During this conversation, Bailey observed another regular customer, "Tay", pull up in a SUV. Tay exited the SUV and he was looking for his phone. He had a black hat in his hand. Ant accused Tay of stealing his glasses. Tay said, "I ain't got nothing to do with your glasses," and he kept looking for his phone (T II, 55-64, 95-97).[1] Bailey identified Defendant Howard as the person he knew as Tay (T II, 60).

More guys showed up, as Ant and Tay were circling each other. Ant started punching Tay in the face, and Tay fell back. The guys standing behind Ant tried to join in, but Bailey tried to stop them. Bailey then heard 4-5 gunshots; he got down on the ground until the shots stopped, and then he ran inside his store and went to the back. About a minute later, he heard about 6-7 more gunshots (T II, 65-70). After the shooting stopped, Bailey looked outside and saw Ant on the ground. He also saw another neighborhood customer, who was inside the store and injured. The police arrived within minutes (T II, 70-74). Bailey did not see a gun during the incident, he did not see Tay with a weapon, and he did not know who did the shooting (T II, 87, 90-91).

---

[1] The trial transcripts of the second trial are designated as follows: T I – 5/9/2011; T II – 5/10/2011; T III – 5/11/2011; T IV – 5/12/2011.

2

Bailey admitted that he initially told the police he did not see anything because he did not want to be involved.  When the police questioned him a couple days later at the precinct, they threatened to charge him as an accessory to murder.  They showed him some photographs, but none of them matched Tay (T II, 74-76). During an interview with Investigator Simon on April 13, Simon threatened to get Bailey's federal probation violated.  When Bailey tried to explain, Simon told him, "Just shut up, shut up.  It happened this way." (T II, 90, 93-94).  She accused Bailey of calling the shooter up to the scene, and that Defendant Howard was the shooter (T II, 90-91). He told Simon what she wanted to hear because she was threatening to charge him and to violate his probation (T II, 94).  He maintained that his identification of Defendant Howard as Tay was accurate (T II, 94).

During a third police interview at the precinct, Bailey was shown a cell phone photograph and a photographic lineup (Exhibit 48); he identified Tay as the person in the cell phone photograph, and he identified Tay in the photographic lineup (T II, 76-79).

During one of his statements to the police, Bailey mentioned a guy named Freak (T II, 87).  Bailey made three statements prior to trial: the first statement to the police was on April 10, the second interview was on April 13, and a third was in September (T II, 92-95).

**Aundrey Allen,** age 19, was friends with Tyrone Simpson.  Simpson's nickname was "Ant" (T III, 42).  Allen lived two houses down from the Smokehouse store/restaurant. About 11:00 a.m. or noon on April 10, 2010, Allen and Simpson were eating at the Smokehouse. At this time, Simpson had a pair of Cartier sunglasses. When they finished eating, they split up, and Allen walked home (TIII, 43-45). A couple hours later, Allen saw a commotion at the Smokehouse.  When he arrived at the Smokehouse, he saw Simpson, Tyrell, Defendant Howard, Freak, and people from the store. He identified the vehicles at the Smokehouse as follows:

3

Simpson's vehicle was the burgundy Suburban, and Allen's vehicle was the Buick (T III, 49-51). Simpson and Freak were arguing and yelling for 5-10 minutes; the argument was "kind of" about Allen's sister. Allen was ready to fight, but Freak ran away from him. Defendant Howard was present during this argument, but he was not involved (T III, 45-53). Freak was about 30 years old and a little taller than Defendant Howard (T III, 83-84).

Simpson resumed looking for his Cartier sunglasses. Defendant Howard, Freak and two other left. Allen's neighborhood friends also left. When the store owner pulled up, Simpson was telling him that someone had taken his glasses (T III, 52-55). A few minutes later, Howard and two others returned in a silver Mountaineer. When they exited the vehicle, Howard was looking for his phone. Simpson and Howard argued over whether Howard had Simpson's glasses. Simpson then hit Howard 4-5 times in the face, and Howard fell back (T III, 55-60).

As Simpson continued to move towards Howard, Allen saw Defendant Howard pull a gun out of his jacket pocket. After Allen heard two gunshots, Allen ran towards the store. Simpson's fist was still raised when he got hit by the shots. Allen heard three more shots. Allen was shot in the leg before he got into the store. Allen could not see what occurred after he got into the store (T III, 61-65, 91). After Bailey ran into the store, Allen heard about eight more shots. He could hear Simpson. There was a pause, and then a final shot. Allen then heard a vehicle being floored (T III, 65-70).

Allen testified that the keys in Exhibit 40 were Simpson's keys, and that the cell phone found on the back bumper of the Suburban (Exhibit 17) belonged to Simpson (T III, 71-72).

While Allen was in the hospital on April 11, 2010, he viewed a group of photographs and identified someone who was not Defendant Howard. Allen picked number 6 and wrote, "This is the man who shot me and my friend." (T III, 97). He admitted at trial that number 6 was not

Deonte Howard, and that number 6 was not the shooter (T III, 73-74, 95-97). Allen testified that

he viewed the photo array after surgery and while he was on morphine (T III, 72-73). He picked

number 6 because "he looked like him to me" (T III, 74).

About a month later, Allen attended a live lineup. Allen claimed he saw him right away,

but he admitted that it took him 15 minutes to tell the police the shooter was Defendant Howard

(T III, 74-76, 98, 101-102). The police had already told him they had arrested somebody (T III,

98).

On cross, Allen confirmed that when Howard returned, he was asking about his phone.

Simpson confronted him about the glasses, they argued, and Simpson busted Howard in the face

4-5 times (T III, 86-87). After Howard fell back, Simpson was still walking up on Howard (T

III, 89). Allen gave the police the following description of the shooter: 17 or 18 years old, 5'7"

to 5'8", no more than 130 pounds, short tapered haircut, small goatee, and wearing a black coat,

no hat, and blue jeans (T III, 87-88, 92-94, 105). Allen admitted that Defendant Howard did not

have a goatee, and that he was a little shorter than 5'7" or 5'8" (T III, 108). On redirect, Allen

maintained that he was not confusing Defendant Howard for Freak. He testified that Freak was

not the shooter (T III, 107).


**Testimony of Neighbors**

**Frederick McFadden**, age 51, testified that his parents used to live on the corner of St.

Marys and Tireman Streets (T II, 100). On April 10, 2010, during the mid-afternoon, McFadden

was outside working on his mother's car when he heard arguing at the barbecue place that was

about 50-75 feet away. When he looked, he saw a physical confrontation. About 5-10 minutes

later, he heard three gunshots and he saw two guys who appeared to be wrestling. When he went

III, 127-128). Love could not recall the exact day of the photo array, but he believed it was regarding the first suspect (T III, 126-127). Defense counsel's cross-examination of Love was as follows:

"BY MR. MOORE:

Q      Regarding this photo array, Mr. Howard was not in the photo array, is that correct?

A      I'm not really positive. I know I was part of the first one and I think it was two individuals that they wound up looking at.

Q      Okay. Would the name Deonte Miller be, sound familiar?

A      To me, no, sir.

Q      Okay. Do you have anything, any paperwork anywhere in the world to suggest Mr. McFadden picked out Mr. Howard in the photo array?

A      No, sir.

Q      Okay. And had Mr. McFadden picked out Mr. Howard, you would have documentation of the same, is that correct?

A      Yes." (T III, 128).

**Marcario Harris** testified that in April 2010 he lived at 16215 Tireman, which is directly across the street from the Smokehouse. On April 10, he was watching television in his living room when he heard a couple of gunshots. When he looked outside, he saw one guy getting into a silver SUV, and another guy on the ground by the rear of a maroon Suburban. As the silver SUV started to pull off, the guy on the ground started pulling himself up. The silver SUV then slammed on its brakes, and a guy exited the SUV with a gun and started shooting at the guy getting up. The shooter chased the guy and fired shots. After the guy fell by the sidewalk, the shooter continued to shoot at him; as the guy was lying on the ground, the shooter walked over to

SUV (T II, 38). Simpson's red hooded sweatshirt was located on the sidewalk. A baggie containing suspected marijuana was found in the pocket (T II, 37, 42-43). Several spent .40 caliber shell casings were recovered (T II, 45-52, 136). A fired bullet was also recovered (T II, 47-48). A pair of broken sunglasses was found (T II, 49-51). Officer McNairy identified Exhibit 49 as the sketch of the scene she prepared (T III, 117-118). She also identified Exhibits 50-63 as the shell casings that she seized from the scene (T III, 120-122). She identified Exhibits 64-67 as the bullet fragments she seized (T III, 122-123). Officer Fitzhugh processed and collected prints from a 1997 GMC Suburban. The prints were obtained from the hood of the vehicle and the driver's door above the door handle (T II, 146-148).

Sgt. Mackie, the officer in charge of this case, confirmed that two cell phones were recovered from the scene. The phone found across the street by the curb was registered through Metro PCS to Deonte Miller (T II, 156-157, 164). Mackie subsequently located computer records for Deonte Miller. His photograph was placed in a photographic array on April 11 and shown to Aundrey Allen (T II, 157-160). A search warrant was then obtained and executed at Deonte Miller's address. Mackie then learned that Miller did not live in Michigan anymore, and that he stayed in Ohio (T II, 160-161).

The photograph found on the home screen of the same cell phone was shown around the neighborhood, but with no success (T II, 161-166). Mackie then ran the nickname of Tay through a computer database and obtained a list of names and photographs. He opined that one of the photos for Deonte Howard matched the photograph on the cell phone. Mackie then prepared a photo array (Exhibit 48) and it was shown to Bobby Bailey. He identified Deonte Howard (T II, 166-169). Howard was then brought in for a live lineup at the youth home, which was viewed by Allen (T II, 169-170). During the live lineup, the subjects were seated to even

9

out the tops of their heads (T III, 138-139). Allen identified number two (Deonte Howard) as the shooter (T III, 139, 144). On cross, Mackie could not recall who owned the other cell that was found on the bumper of a vehicle at the scene (T II, 174). Mackie confirmed that the photograph of Deonte Howard did not show a tattoo around his neck (T II, 181).

Barbara Simon testified that she used to work for the Detroit Police Department, and that she was currently employed with the Attorney General's Office (T III, 129). On April 10, 2010, she went to the scene of the instant shooting. She interviewed witnesses, including Mr. Harris and Mr. Bailey (T III, 130-131). She later brought Mr. Bailey in to the Homicide Department for a second interview. She denied threatening him, yelling at him, or saying she would charge him with conspiracy if he did not comply. Mr. Bailey made a statement during this interview (T III, 131-133). Defense counsel did not cross examine Simon (T III, 133).

Lt. Jeff Crump of the MSP Grand Rapids forensic lab testified that he examined the fired cartridge cases and fired bullets in this case. He did not receive a firearm (T III, 8-9). He opined that the 14 fired .40 Smith & Wesson caliber cartridge cases had matching breachface marks and that they were all fired from the same firearm (T III, 13-17). He opined that four of the spent bullets were consistent with being .40 caliber or 10mm caliber metal jacketed fired bullet, and they had the same exact characteristics (T III, 15-20). The remaining two spent bullets were either too damaged or too small to classify (T III, 20). Crump also examined a pair of jeans for gunshot residue. He found a bullet hole on the right hip area of the jeans between the back pocket and the front pocket. He did not see any gunshot residue around it (T III, 21-24). He also examined a Bugle boy white T-shirt. He found three holes on the front of the shirt, and one hole on the back of the shirt. He did not find any evidence of gunshot residue on three of the holes. However, on one hole on the front he found a large amount of vaporous lead, which is

10

one form of gunshot residue. He opined that generally it suggested that the firearm was discharged 3-4 feet away (T III, 24-27).

Dr. Leigh Hlavaty, the Deputy Chief Medical Examiner in Wayne County, testified that her office conducted the autopsy on Tyrone Simpson on April 11, 2010. The autopsy was performed by Dr. Tally, under the supervision of Dr. Loewe. However, at the time of trial they no longer were employed with Wayne County (T III, 31). Dr. Hlavaty reviewed the autopsy report and the photographs in the file. Simpson was 5'5" tall and weighed about 150 pounds. He sustained nine gunshot wounds that ranged from the head to the ankle (T III, 32-35). The cause of death was the totality of the gunshot wounds (T III, 36).

Officer Wieneck arrested Deonte Howard in May 2010 at 7480 Mansfield in Detroit (T III, 113-114).

**Stipulations by the Parties**

The parties stipulated to the following:  1) Exhibit 73, the lab report by MSP Det. Sgt. Haywood, indicated that the firearms evidence was processed with no latent prints being developed;  2) Exhibit 74 indicating that the latent prints taken from the GMC Suburban by Officer Fitzhugh were submitted to the DPD latent print section and no usable prints were found; and 3) Exhibit 75 indicating that the Samsung cell phone found at the scene across the street from 16228 Tireman on April 10, 2010, was registered to Deonte Miller by Metro PCS. Both parties further stipulated that the same cell phone, upon investigation of its contents and records, belonged to Defendant Deonte Howard (T III, 146-149).

After closing arguments by both parties, and instructions by the court, the jury deliberated and returned with a verdict of guilty of first-degree murder (T IV, 28-29).

On May 27, 2011, Judge Morrow sentenced Mr. Howard to the mandatory sentence of non-parolable life imprisonment (ST 4).

## JUDGMENT APPEALED FROM AND RELIEF SOUGHT

After appealing as of right, the Court of Appeals affirmed Defendant's first-degree murder conviction, but remanded for resentencing, in an unpublished opinion dated October 16, 2014 (Wilder, PJ, and Fort Hood and Servitto, JJ) (Opinion attached as Attachment #1).

Defendant submits that the portion of the Court of Appeals' opinion that affirms his first-degree murder conviction is clearly erroneous and will cause material injustice. MCR 7.302(B)(5). Defendant is not appealing the grant of resentencing.

Defendant asks this Court to peremptorily reverse his first-degree murder conviction, grant leave to appeal, or any other relief this Court deems just.

12

I.      **DEONTE HOWARD'S CONVICTION FOR FIRST-DEGREE MURDER MUST BE REVERSED WHERE THE PROSECUTION FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE THAT DEONTE HOWARD WAS THE PERSON WHO COMMITTED THE OFFENSE, AND WHERE THERE WAS INSUFFICIENT EVIDENCE OF PREMEDITATION AND DELIBERATION.**

**Standard of Review**

The standard of review is de novo. *People v Wolfe,* 440 Mich 508, 515 (1992); *People v Hampton,* 407 Mich 354, 368 (1979).

**Discussion**

The Due Process Clauses of the state and federal Constitutions prohibit a criminal conviction unless the prosecution establishes guilt of the essential elements of a criminal charge beyond a reasonable doubt. US Const, Ams V, XIV; Mich Const 1963, art 1, §17; *In re Winship,* 397 US 358, 361-362 (1970); *People v Wolfe, supra,* 515; *People v Hampton, supra,* 368. The reasonable doubt requirement is a due process safeguard which was developed to protect citizens from "dubious and unjust convictions, which result in improper forfeitures of life, liberty and property." *Winship, supra,* 362. A conviction must be reversed if the evidence introduced was insufficient to satisfy a rational juror that each element of the offense had been proven beyond a reasonable doubt. *Jackson v Virginia, supra.* "Some evidence" on an element is not enough. Rather, that evidence must be sufficient to prove each essential element beyond a reasonable doubt. *People v Hampton, supra,* 368, 377.

In reviewing a claim based upon the sufficiency of the evidence, this Court views the evidence in a light most favorable to the prosecution and determines whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hampton, supra,* 368; *People v Wolfe, supra,* 513. Stated another way, where the proofs, taken most favorably to the prosecutor, present no more than a choice between competing probabilities, a

judgment of acquittal must enter. *United States* v *Saunders*, 325 F 2d 840 (CA 6, 1964); *United States v Leon,* 534 F 2d 660 (CA 6, 1975).

Defendant Howard was charged with first-degree murder in the death of Tyrone Simpson. The medical examiner testified that the cause of death was multiple gunshot wounds. Prosecution witnesses testified that there was an argument over glasses that escalated into a fight where Simpson attacked Howard and repeatedly punched Howard in the face. The prosecution alleged that Howard then fired two separate series of shots at Simpson, with the last shot being fired into Simpson's head, after Howard exited the SUV. The following witnesses identified Defendant Howard as the shooter:

> Aundrey Allen told the police the shooter was 17-18 years old, 5'7" to 5'8", no more than 130 pounds, short tapered haircut, small goatee, and wearing a black coat, no hat, and blue jeans (T III, 92-94, 105). Allen initially identified someone else at a photographic array (T III, 73-74, 92-97, 105). A month later, Allen identified Howard in a live lineup, but it took him 15 minutes to make the identification (T III, 74-76, 98, 101-102). Allen admitted that Howard was shorter and did not have a goatee (T III, 108);

> Frederick McFadden told the police the shooter was 5'11" to 6', 20-24 years old, with tattoos on his neck and arms, and wearing a white T-shirt, beige pants and red tennis shoes (T II, 119-120). McFadden claimed he identified Defendant Howard as the shooter and another subject as the driver in a photographic array a few days after the incident, even though Officer Love could not recall if Howard was part of the array and he had no documentation that indicated McFadden had identified Howard in the photo array (T II, 124-127; T III, 125-128); Officer Mackie conceded that Deonte Howard did not have a tattoo around his neck (T II, 181);

> Marcario Harris described the shooter to the police as a black male, 5'10", mid 20's, and thin build (T II, 198);

> Kimberly Thompson described the shooter to the police as a black male, late 20's or early 30's, 5'9" or 5'10", thin build, 160-170 pounds, medium brown complexion, short afro, no facial hair, no visible scars, marks or tattoos, a thin, skinny face, and he was wearing a white T-shirt and dark jeans (T II, 212-213).

The defense maintained that Deonte Howard was not the shooter, and alternatively, that he "lost his mind" and fired during an emotional event. The defense did not deny that Howard returned to the store to look for his phone or that Simpson attacked him. However, the defense maintained that Howard was not the shooter (T III, 172-183).

The identity of the defendant as the perpetrator of the charged offense is an essential element of any offense that the prosecution must establish beyond a reasonable doubt. *People v Kern,* 6 Mich App 406, 409-10 (1967). The prosecution may establish identity by either direct testimony or circumstantial evidence. *Kern, supra,* at 409-10, citing *People v Sullivan,* 290 Mich 414, 418-19 (1939); *People v Stewart,* 163 Mich 1, 8 (1910). While the prosecution presented some evidence of identity, the evidence of identification presented at trial was rife with problems, and it does not satisfy the prosecution's burden of proving beyond a reasonable doubt that Defendant Howard was the shooter. The prosecution failed to present enough evidence to permit a reasonable trier of fact to find guilt. Therefore, the evidence was insufficient to convict Defendant Howard and his conviction must be reversed and dismissed.

Defendant Howard also submits that, even assuming arguendo that he was the shooter, the circumstances in this case do not allow for the inference of a premeditated, deliberate intent to kill Tyrone Simpson. The evidence was insufficient to support his conviction of first-degree premeditated murder.

First-degree murder is a statutory offense, MCL 750.316. It is distinguished from second-degree murder by the added element of premeditation and deliberation. Numerous Michigan cases have discussed the definition of the elements of premeditation and deliberation. Perhaps the best known definition is that in *People v Morrin,* 31 Mich App 301, 329-330 (1971):

> "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation

characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a `second look'." (citations omitted)

Sufficient evidence of premeditation is not presented by evidence of a motive alone, without proof of some degree of planning or a preconceived design. *People v Gill,* 43 Mich App 598 (1972). The reviewing court should look at such factors as the prior relationship of the parties, the accused's actions both before and after the alleged offense, and the circumstances of the offense itself. *People v Johnson,* 99 Mich App 547 (1980). See also *People v Hoffmeister,* 394 Mich 155 (1975); *People v Tilley,* 405 Mich 38 (1979).

In *People v Hoffmeister, supra,* the decedent and a man alleged to be the defendant were seen in separate cars driving into a parking area. Shortly thereafter, the decedent, suffering from numerous stab wounds, drove to a friend's house, but later died from the wounds. The defendant was charged and convicted of premeditated murder, but on appeal this Court reversed that conviction, finding insufficient evidence in support of the premeditation element. In its ruling, the Court stated:

"Hoffmeister moved for a directed verdict, arguing that `there is no evidence from any witness that (Hoffmeister) did form or did any act with premeditation.'
The prosecutor responded that `the nature of the wounds, (and) the number of wounds' inflicted on the deceased together with his `several moments with' her were sufficient facts from which the jury could reasonably infer premeditation and deliberation.
The brutality of a killing does not itself justify an inference of premeditation and deliberation. `The mere fact that the killing was attended by much violence or that a great many wounds were inflicted *is not relevant [on the issue of premeditation and deliberation], as such a killing is just as likely (or perhaps more likely) to have been on impulse.'*
*There is no basis on this record for an inference that between the successive, potentially lethal blows the killer calmly, in a cool state of mind, `measure[d] and evaluate[d]' and subjected `the nature of his response to a "second look."'*

16

`It is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation.' *People* v *Anderson, supra,* [70 Cal 2d 15; 447P 2d 942; 73 Cal Rptr 550 (1968)] p. 24.

`* * * [M]any murders most brutish and bestial are committed in a consuming frenzy or heat of passion, and that these are in law only murder in the second degree. The Government's evidence sufficed to establish an intentional and horrible murder--the kind that could be committed in a frenzy or heat of passion. However the core responsibility of the court requires it to reflect on the sufficiency of the Government's case. * * *

`The violence and multiple wounds, while more than ample to show an intent to kill, cannot standing alone support an inference of a calmly calculated plan to kill requisite for premeditation and deliberation, as contrasted with an impulsive and senseless, albeit sustained, frenzy.' *Austin v United States,* 127 US App DC 180, 190; 382 F 2d 129, 139 (1967).

While the murder weapon was never found, it appears to have been a knife. The use of a lethal weapon is supportive of a finding of second-degree murder. But alone it is not sufficient to support a conviction of first-degree murder:

`"The use of a lethal weapon is not in itself sufficient evidence to warrant a verdict of murder in the first degree but in addition to this there must be evidence in the case, as to circumstances surrounding the killing or the manner in which the weapon is used, from which a logical inference may be drawn that there was willfulness, deliberation and premeditation."' *People v Vinunzo,* 212 Mich 472, 475; 180 NW 502 (1920).

No motive for the crime was shown. It was not suggested that Hoffmeister and decedent had met before and there was no evidence that he had a larcenous or sexual purpose.

Some time span between initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation. The testimony that Hoffmeister and decedent were together for a short period of time leaves open the possibility of premeditation and deliberation. There is no basis, however, on this record for concluding that adequate time for reflection, for a 'second look', intervened between formation of the homicidal intent and commission of the crime." 394 Mich at 159-161. (Emphasis added). (Footnotes omitted).

The Court of Appeals in *People v Oster,* 67 Mich App 490 (1976), used similar reasoning in finding insufficient evidence of premeditation:

"Reviewing the evidence presented at the preliminary examination and weighing it against the above guidelines, we can only conclude that the magistrate's finding of premeditation or deliberation was clearly erroneous. There was no evidence of planning or motive; indeed, it appears that defendant and Goodman were total strangers. The fact that a knife was used and that wounds were inflicted upon vital parts of the victim's body do not raise an inference of premeditation. *People v Hoffmeister*, 394 Mich 155, 159; 229 NW 2d 305 (1975), and the fact that defendant cleaned the knife soon after the stabbing does not suggest that there was a plan or scheme to kill. Nor does the fact that defendant was carrying a knife suggest premeditation, since evidence was presented that defendant carried the knife with him long before the stabbing.

Probably the strongest argument of the prosecutor is that premeditation could be inferred from the evidence that defendant, while lying on the stairs, made a conscious decision to murder the victim, produced the knife, opened it up, leaped upon the victim and stabbed him. It is extremely doubtful, however, that the inference could be drawn in this case. Five seconds may well be sufficient time for a `second look' during which one could premeditate murder, but we must view such lapse of time in light of the circumstances surrounding the killing. *People v Meier,* 47 Mich App 179, 191-192; 209 NW 2d 311 (1973). Further, *that time span necessary to establish premeditation and deliberation must occur between the initial homicidal intent and the ultimate action. People v Hoffmeister, supra.* In the instant case, the testimony was that the defendant was getting his knife out of his pouch and opening it during those five seconds. It would require too great a stretch of the imagination for one to infer that under those circumstances he was thinking over his intention to kill the victim. Besides the improbability of there being sufficient time to take a second look, there is no evidence that defendant in fact did so. We, therefore, must conclude that the examining magistrate abused his discretion in binding the defendant over to the circuit court on an open murder charge." 67 Mich App at 497-498. (Emphasis added).

In *People* v *Plummer*, 229 Mich App 293 (1998), the Court reiterated that the proofs on the essential element of premeditation require more than merely a showing of an intentional killing:

"Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation. *People v Conklin,* 118 Mich App 90, 94; 324 NW2d 537 (1982).

A pause *between the initial homicidal intent and the ultimate act* may, in the appropriate circumstances, be sufficient for premeditation and deliberation. See *People v Tilley,* 405 Mich 38, 45; 273 NW2d 471 (1979). However, the Legislature's use of the words `willful,' `deliberate,' and `premeditated' in the first-degree murder statute indicates its intent to require as an element of that offense substantially more reflection on and comprehension of the nature of the act than the mere amount of thought necessary to form the intent to kill. As the Supreme Court has stated, `when a homicide occurs during a sudden affray . . . it would be "a perversion of terms to apply the term deliberate to any act which is done on a sudden impulse."' *Tilley, supra* at 44-45, quoting *Nye v People,* 35 Mich 16, 18 (1876). To speak of premeditation and deliberation being instantaneous, or taking no appreciable time, destroys the statutory distinction between first- and second-degree murder. See *Morrin, supra* at 329; LaFave & Scott, Criminal Law (2d ed), § 7.7, p 643." 229 Mich App at 301. (Emphasis added).

The principles expressed in the cited cases are directly applicable to Defendant Howard's prosecution. The only evidence alleged to show premeditation and deliberation was the allegation that Howard exited the vehicle and said he wasn't dead yet, that the second round of shots was fired as Howard allegedly chased Simpson around the SUV, and that the last shot was fired into Simpson's head. However, this ignores that Howard returned to the store to find his cell phone, that Simpson attacked him and repeatedly punched him in the face while accusing him of stealing his sunglasses, and that Simpson was still coming at Howard when the first shots were fired. Given this alleged scenario, Defendant Howard did not have sufficient time to subject his actions to a cool-headed second look. The prosecution did not present any evidence alleging that Defendant Howard knew Simpson, or had ever threatened to do any harm to Simpson. There was no evidence of planning.

The case law cited above makes it clear the premeditation and deliberation must occur "between" the formulation of the specific intent to kill and the acts which cause the death. *Oster, supra; Plummer, supra.* There was insufficient evidence that Defendant Howard premeditated

an intent to kill prior to the acts which caused the death.  As in *Hoffmeister* and *Oster,* the record in the case at bar is insufficient to support the prosecution's burden to prove there was premeditation rather than merely negligent, rash or impulsive action.  Even viewed in a light most favorable to the prosecution, this record would not allow a rational trier of fact to find proof beyond a reasonable doubt that the killing was committed as part of a "thought process undisturbed by hot blood." *Morrin, supra.*  Absent any record support, the prosecution had only "mere speculation" that there was "a pause between the initial homicidal intent and the ultimate act * * * sufficient for premeditation and deliberation." *Plummer, supra.*

Defendant Howard's conviction for first-degree murder must be reversed.

**II.     DEONTE HOWARD WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE COUNSEL FAILED TO CALL SGT. MARTEL AS A DEFENSE WITNESS, FAILED TO SUBMIT A CRITICAL STIPULATION THAT HAD BEEN ENTERED AT DEFENDANT'S FIRST TRIAL, AND FAILED TO CROSS-EXAMINE A KEY PROSECUTION WITNESS.**

**Standard of Review**

Mr. Howard did not raise this issue in the trial court. However, a defendant may raise ineffective assistance of counsel for the first time on appeal, because it involves a claim of constitutional error which could have been decisive of the outcome. *People v Grant*, 445 Mich 535, 547 (1994); *People v Henry*, 239 Mich App 140, 146 (1999) (defendant may raise ineffective assistance of counsel for the first time on appeal, with review limited to mistakes apparent in the existing record). The de novo standard of review applies to the existing record. See, e.g., *People v Barclay*, 208 Mich App 670, 672 (1995); *People v Henry, supra*.

**Discussion**

A defendant has the right under the Federal and State Constitutions to the effective assistance of counsel. US Const, Am VI, XIV; Mich Const 1963, art 1, § 20; *Strickland v Washington*, 466 US 668, 687 (1984). To prevail on an ineffective assistance of counsel claim, a defendant must first "show that counsel's performance was deficient, that is, "outside the wide range of professionally competent assistance." *Strickland, supra* at 690. In so doing, the defendant must rebut a presumption that counsel's performance was the result of sound trial strategy. *Id.* at 690. Second, the defendant must show the deficient performance was prejudicial. *Id.* at 687. Prejudice is established where there is a reasonable probability that, but for the error,

21

the result of the proceeding would have been different. *Id.* at 694; *People v LaVearn,* 448 Mich 207, 216 (1995).

As to the reasonableness prong, defense counsel must at a minimum take reasonable steps to investigate, prepare, and present evidence to exculpate the defendant. *Strickland, supra* at 691; *People v Grant,* 470 Mich 477 (2004). "American Bar Association standards . . . also mandate counsel's duty to investigate all leads relevant to the merits of the case." *Blackburn v Foltz,* 828 F 2d 1177, 1183 (CA 6, 1987); see also *Rompilla v Beard,* 545 US 374, 387 (2005). "This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v Smith,* 395 F3d 251, 258 (CA 6, 2005).

Strategic decisions certainly are given deference; but simply labeling an action "strategic" does not shield a mistake from Sixth Amendment scrutiny. *People v Dalessandro,* 165 Mich App 569, 574 (1988); *Washington v Hofbauer,* 228 F3d 689, 704 (CA 6, 2000). Even when making strategic decisions, counsel's conduct must be reasonable. See *Roe v Flores-Ortega,* 528 US 470, 481 (2000); *Wiggins v Smith,* 539 US 510, 522-23 (2003). "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns v Smith,* 395 F3d 251, 258 (CA 6, 2005) (quoting *Horton v Zant,* 941 F 2d 1449, 1462 (CA 11, 1991). As the Sixth Circuit explained:

> Competent counsel can be expected to undertake a "thorough investigation of law and facts relevant to plausible options" for the defense. [*Strickland,* 466 U.S. at 690, 104 S.Ct. 2052]. And while this does not require counsel to investigate every conceivable defense, any limitation on counsel's investigation must be supported by a "reasonable professional judgment[ ]." *Id.* at 691, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.... To make a reasoned judgment about whether evidence is worth presenting, one must know what it says. While the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel's strategic

decisions, a lawyer cannot make a protected strategic decision
without investigating the potential bases for it. See *id.* at 690–91, 466
U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; see also *Bigelow v.
Haviland,* 576 F.3d 284, 288 (6th Cir.2009).
*Couch v Booker,* 632 F3d 241, 246 (CA 6, 2011).

In the instant case, Defendant Howard was represented by defense attorney Susan Rock

at the first jury trial conducted in January 2011.  After the jury hung on the first-degree murder

charge, the second trial was conducted four months later in May 2011, and Defendant Howard

was represented by defense attorney W. Frederick Moore.

Defendant Howard maintains he was deprived of his state and federal constitutional right

to the effective assistance of counsel, where Mr. Moore failed to call Sgt. Martel as a defense

witness, failed to submit a critical stipulation that had been entered at the first trial, and failed to

cross-examine Investigator Simon. US Const, Ams VI, XIV; Mich Const 1963, art 1, §20;

*Strickland v Washington, supra.*

### Regarding Aundrey Allen's identification of someone else at the photo array

At trial, Aundrey Allen tried to justify his identification of someone else at the photo

array by saing that it was made while he was in the hospital, after surgery, and while he was on

morphine (T III, 72-73).

*At the first trial,* attorney Rock called Sgt. Michael Martel as a defense witness. Martel

was present for part of the photo array conducted with Aundrey Allen in his hospital room in

April 2010 (T 1/13/2011, 58-62).  Martel testified that he interviewed Aundrey Allen prior to the

photo array and took a two–page statement (T 1/13/2011, 59). Martel's testimony made it clear

that Allen was coherent, and that based on his identification of Deonte Miller, Martel prepared

an affidavit for a search warrant of Miller's home (T 1/13/2011, 59-61).

*At the second trial,* attorney Moore did not call Sgt. Martel as a defense witness.

23

*At the second trial,* Investigator Love appeared at trial and testified that McFadden identified three people from an array that contained six photographs, even though there was only one target individual in the array (T III, 127-128). Love could not recall the exact day of the photo array, but he believed it was regarding the first suspect (T III, 126-127). Defense counsel's cross-examination of Investigator Love was as follows:

"BY MR. MOORE:

Q       Regarding this photo array, Mr. Howard was not in the photo array, is that correct?

A       I'm not really positive. I know I was part of the first one and I think it was two individuals that they wound up looking at.

Q       Okay. Would the name Deonte Miller be, sound familiar?

A       To me, no, sir.

Q       Okay. Do you have anything, any paperwork anywhere in the world to suggest Mr. McFadden picked out Mr. Howard in the photo array?

A       No, sir.

Q       Okay. And had Mr. McFadden picked out Mr. Howard, you would have documentation of the same, is that correct?

A       Yes." (T III, 128).

There was no discussion regarding the stipulation that was made at the first trial.

**Regarding alleged threats by Investigator Simon with regard to Bobby Bailey**

*At the first trial,* attorney Rock thoroughly cross-examined Investigator Barbara Simon about the testimony by Bobby Bailey that she had brought him down to Homicide for a second

interview and that she threatened him, his children and his business (T 1/12/2011, 189-195)(See Attachment #2).[2]

*At the second trial,* attorney Moore declined to cross examine Investigator Simon (T III, 133).

It is abundantly clear that attorney Moore's performance was deficient in all three instances noted above. Attorney Rock's performance at the first trial was stellar, and a clear example of an attorney vigorously representing her client. On the other hand, attorney Moore's performance was grossly lacking. Aundrey Allen's identification of Defendant Howard as the shooter was critically important to the prosecution's case. However, his identification of someone else at the photo array in the hospital was problematic for the prosecution. In trying to explain this identification in the hospital, Allen tried to suggest it was due to being on morphine and was after his surgery (T III, 72-73). Yet, by calling Sgt. Martel as a defense witness at the first trial, attorney Rock provided crucial testimony by a police officer that Allen was coherent at the time of the photo array (T 1/13/2011, 58-62). Attorney Moore's decision not to call Sgt. Martel at the second trial left Allen's claim unchallenged and constitutes deficient performance.

In addition, Frederick McFadden's identification of Defendant Howard at trial was another critical portion of the prosecution's case. McFadden's claim at trial that he had identified Defendant Howard as the shooter during a photo array held a few days after the shooting

---

[2] Bobby Bailey admitted at the second trial that he initially told the police he did not see anything because he did not want to be involved. When the police questioned him a couple days later at the precinct, they threatened to charge him as an accessory to murder. They showed him some photographs, but none of them matched Tay (T II, 74-76). During an interview with Investigator Simon on April 13, Simon threated to get Bailey's federal probation violated. When Bailey tried to explain, Simon told him, "Just shut up, shut up. It happened this way." (T II, 90, 93-94). She accused Bailey of calling the shooter up to the scene, and that Defendant Howard was the shooter (T II, 90-91). He told Simon what she wanted to hear because she was threatening to charge him and to violate his probation (T II, 94).

buttressed his in-court identification. However, this claim was clearly false and needed to be thoroughly addressed. At the first trial, attorney Rock left absolutely no doubt that McFadden's claim of a prior identification was false by entering into a stipulation with the prosecutor that Deonte Howard's photo was not in the photo array that McFadden viewed (T 1/13/2011, 63). At the second trial, attorney Moore made a very weak attempt by cross-examining Investigator Love about his lack of documentation, but attorney Moore failed miserably in this regard, as Investigator Love only testified that he was not positive about whether Deonte Howard's photo was in the photo array (T III, 128). At no point did attorney Moore enter a stipulation with the same assistant prosecutor that Deonte Howard's photo was not in the array that McFadden viewed. This clearly left the jury with the possibility that Howard's photo may have been in the array, and that McFadden's in-court identification of Howard was buttressed with his out of court identification of Howard.

Finally, Investigator Simon's alleged threats with regard to Bobby Bailey were an important piece of the defense theme that the police had engaged in misconduct. At the first trial, attorney Rock thoroughly cross-examined Simon about the threats that Bobby Bailey had testified to at the first trial (T 1/12/2011, 189-195)(See Attachment #2). Yet, at the second trial attorney Moore had absolutely no cross-examination of Simon (T III, 133).

It is apparent that attorney Moore gave short shrift to the defense presented at the second trial. Although attorney Moore was certainly not required to duplicate attorney Rock's efforts, he was required to present a defense and to attack the prosecution's case. His failure to at least do what attorney Rock had done to attack the identifications by Allen and McFadden and to dent the credibility of Investigator Simon constitutes deficient performance. Defense counsel's failure to do so was objectively unreasonable, as it was an abrogation of his duty to investigate and call

27

favorable defense witnesses. *Couch, supra* at 241; *Towns, supra* at 258; see also *Grant, supra* at 486-87 (failure to investigate or present medical evidence showing victim injured in bicycle accident rather than sexual assault was ineffective); *People v Johnson,* 451 Mich 115 (1996)(failure to investigate and call witnesses in murder case to support defense that decedent had been firing shots and was shot by someone other than defendant unreasonable).

Attorney Moore's failures cannot be excused as trial strategy. "Constitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of "strategy"— based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of an investigation." *Ramonez v Berghuis,* 490 F3d 482, 489 (CA 6, 2007).

The prejudice prong of the *Strickland* test is also met as attorney Moore's above failures deprived Deonte Howard of key support for his theory and likely affected the trial's outcome. *Grant, supra* at 486-87 (failure to investigate or present medical evidence showing victim was injured by bicycle accident rather than sexual assault was ineffective assistance); *People v Johnson, supra* (failure to call witnesses in murder case to support defense that the decedent had been firing shots and was shot by someone other than defendant held unreasonable). Identity was critical in this case. Allen was close to the fight before he got shot and ran into the store. McFadden claimed that he was a mere 20 feet away from the shooting. Their identifications of Defendant Howard as the shooter provided powerful inculpatory evidence for the prosecution. Attorney Moore's failures allowed the jury to assume that the identifications by Allen and McFadden were solid. There is a reasonable probability that but-for counsel's failures, the trial's outcome would have been different. *Strickland, supra* at 694.

Defendant Howard submits that his claim of ineffective assistance of counsel is clear from the existing record. However, if this Court deems that a remand for an evidentiary hearing is warranted, Defendant asks this Court to remand for an evidentiary hearing.

Defendant Howard is entitled to a new trial.

III.   **DEONTE HOWARD IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED HIS STATE AND FEDERAL DUE PROCESS RIGHTS WHERE HIS CONVICTION WAS OBTAINED THROUGH THE USE OF FALSE AND/OR PERJURED TESTIMONY.**

**Standard of Review**

This claim of false and perjured testimony is a constitutional claim. Appellate courts address constitutional issues under a *de novo* standard of review. *People v McRunels,* 237 Mich App168, 171 (1999).

**Discussion**

Frederick McFadden testified that a few days after the shooting, he viewed an array of three photographs, and made two identifications. McFadden testified that he identified Defendant Howard as the shooter, and he identified another person as the driver of the vehicle (T II, 124-125, 127). McFadden was "positive" that he identified Defendant Howard in the photo array (T II, 127).

*As part of the defense case at the first trial,* attorney Rock entered the following stipulation:

> "MS. ROCK: Your Honor, at this time, we're, the prosecutor and I, are entering into a stipulation as to what Detective Myron Love's testimony would be.
>
> And it is stipulated between Mr. Prasad and myself that if Detective Myrone Love showed, the testimony would be Detective Myron Love showed Frederick McFadden a photographic line-up regarding the shooting of Tyrone Simpson. In front of Detective Love, Frederick McFadden picked out three people. Detective Love does not remember who Frederick McFadden identified, ~~but Deonte Howard~~ was not one of those people.
>
> MR. PRASAD: He was no [sic] in the line-up.
>
> MS. ROCK: What?
>
> MR. PRASAD: He was not even in the line-up.

30

MS. ROCK:  Right.  Deonte Howard was not in the photographic line-up that was shown to Frederick McFadden. Detective Love did not keep the photographic line-up shown by Frederick McFadden and he did not take notes. Detective Love did not tell the officer charge, Samuel Mackie, that he had conducted that photographic line-up with Frederick McFadden.

MR. PRASAD:  That's correct, Judge. And I've sign [sic] the document to that effect." (T 1/13/2011, 63).

*At the second trial,* Investigator Love appeared at trial and testified that McFadden identified three people from an array that contained six photographs, even though there was only one target individual in the array (T III, 127-128).  Love could not recall the exact day of the photo array, but he believed it was regarding the first suspect (T III, 126-127).  Defense counsel's cross-examination of Investigator Love was as follows:

"BY MR. MOORE:

Q      Regarding this photo array, Mr. Howard was not in the photo array, is that correct?

A      I'm not really positive.  I know I was part of the first one and I think it was two individuals that they wound up looking at.

Q      Okay.  Would the name Deonte Miller be, sound familiar?

A      To me, no, sir.

Q      Okay.  Do you have anything, any paperwork anywhere in the world to suggest Mr. McFadden picked out Mr. Howard in the photo array?

A      No, sir.

Q      Okay.  And had Mr. McFadden picked out Mr. Howard, you would have documentation of the same, is that correct?

A      Yes." (T III, 128).

31

There was no discussion regarding the stipulation that was made at the first trial.

Defendant Howard submits that he was denied his state and federal constitutional right to due process where his conviction was obtained through the use of false and/or perjured testimony. US Const, Am XIV; Mich Const 1963, art 1, §17.

Due process requires that criminal prosecutions comport with prevailing notions of fundamental fairness. *Napue v Illinois,* 360 US 264, 269 (1959); *People v Lester,* 232 Mich App 262, 276 (1998). "'A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.'" *Napue, supra* at 269-270 *quoting People v Savvides,* 1 NY2d 554, 557; 154 NYS2d 885, 887; 136 NE2d 853, 854-855. The United States Supreme Court has clearly established that the Fourteenth Amendment Due Process Clause requires that a criminal defendant receive a new trial when his convictions are obtained through the use of material false and perjured testimony, which the prosecutor knew or should have known was perjured. See *Mooney v Holohan,* 294 US 103 (1935); *Berger v United States,* 295 US 78, 85-86 (1935); *Pyle v Kansas,* 317 US 213 (1942); *Napue v Illinois, supra; Brady v Maryland,* 373 US 83, 86-88 (1963); *Giglio v United States,* 405 US 150, 153-154 (1972); *United States v Agurs,* 427 US 97, 103-105 (1976); *United States v Bagley,* 473 US 667, 679 & n 8 (1985).

The "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v Illinois,* 360 US at 269; *Giglio v United States,* 405 US at 153. Furthermore, the prosecutor has a duty to correct perjured testimony not only going to the elements of the charged offense, but anything that affects the credibility of a witness. *Napue v Illinois,* 360 US at 269; *Giglio v United States,* 405 US at 153-155.

A new trial is warranted if there was any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Napue*, 360 US at 273; *Giglio*, 405 US at 154; *United States v Agurs*, 427 US at 103.

In *Giglio v United States*, 405 US at 154-155, the Supreme Court reversed the conviction where the prosecutor failed to disclose a promise of immunity. The Court explained its ruling as follows:

> "Here the Government's case depended almost entirely on [the alleged coconspirator's] testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [The coconspirator's] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."

The Court reversed even though the government's action might only have been negligent. The Court reversed stating:

> As long ago as *Mooney v Holohan*, 294 US 103, 112, 79 LEd 791, 794, 55 S Ct, 98 ALR 406 (1935), this Court made clear that *deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice."* This was reaffirmed in *Pyle v Kansas*, 317 US 213, 87 LEd 214, 63 S Ct 177 (1942). In *Napue v Illinois*, 360 US 264, 3 LEd 2d 1217, 79 S Ct 1173 (1959), we said, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*, at 269, 79 S Ct at 1177.
>
>             \* \* \*
>
> When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. *Napue, supra,* at 269, 79 S Ct at 1177.
>
>             \* \* \*
>
> A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Napue, supra,* at 271, 79 S Ct at 1178.
>
> *Giglio*, 405 US at 153-154. (Emphasis added).

Michigan Courts have also condemned the use of false and perjured testimony to convict a defendant. In *People v Anderson,* 44 Mich App 222 (1972), the defendant was charged with larceny from a building. He raised as part of his defense, the fact that he had made a recent withdrawal from the bank and that is why he was found with a particular sum of money. The prosecutor called the bank manager as a rebuttal witness and obtained testimony indicating that the defendant never maintained an account with that particular bank. The prosecutor stressed this fact to the jury in his closing argument. His testimony proved false as defendant did have such an account. On appeal, the defendant questioned whether a conviction obtained through the use of false testimony could stand. The Court of Appeals held:

> "We are constrained to rule that even though the testimony ... may have been obtained by the prosecutor innocently and given by (the witness) in good faith it was not true, and in fact was used improperly to discredit defendant and obtain his conviction." *People v Anderson, supra,* 229.

In *People* v *Cassell*, 63 Mich App 226 (1975), a witness lied about his involvement with a narcotics unit. It was later stipulated by the parties that the prosecution's chief investigative officer, who was seated at the prosecutor's table at trial, had knowledge that the witness was lying. The prosecutor did not inform the trial judge or the jury that the witness was lying when he denied being an agent of the Metro Narcotics Unit. Furthermore, in his closing argument, the prosecutor treated the testimony of the witness as if it were completely true and urged the jury to believe it. In reversing the defendant's conviction, the Court of Appeals held that the officer's knowledge must be imputed to the prosecutor; however, the Court further found that reversal was compelled under *Anderson, supra,* even if the officer's knowledge was not imputed to the prosecutor:

"On the strength of *Anderson,* therefore, we would feel compelled to reverse this defendant's conviction even were the prosecution totally unaware of the falsehood.

***The jury had a right to know that the witness was lying on the witness stand. The fact that the witness had not been called by the prosecution was likewise of no importance. The prosecution's duty to prevent lies from entering the evidence in the guise of truth stems not from any particular role in the adversary process; rather, it is derived from the prosecution's duty to represent the public interest, and to place the pursuit of truth and justice above the pursuit of conviction.

We cannot speculate in light of this substantial error whether or not the jury gave consideration to the erroneous testimony in reaching its verdict. A new trial is required. See *People v Anderson, supra,* at 44 Mich App pp 228-229; 205 NW2d pp 84-85." *People v Cassell, supra,* 229.

See also *People* v *Wiese,* 425 Mich 448, 453-454 (1986); *People v Woods,* 416 Mich 581, 601-604 (1982); *People v Atkins,* 397 Mich 163, 173-174 (1976); *People v Barbara,* 400 Mich 352, 363 (1977); *People v Thornton,* 80 Mich App 746 (1978).

The burden of disclosure is on the prosecutor, not on the witness or the defense attorney. "Whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Giglio,* 405 US at 154. See also *People v Wiese, supra,* 455. Prosecutors have a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath. *California v Trombetta,* 467 US 479, 485 (1984); *Napue v Illinois,* 360 US at 269-272; *People v Lester, supra,* 276.

In the instant case, both Frederick McFadden and Investigator Love gave false and/or perjured testimony. McFadden's testimony that he identified Defendant Howard as the shooter in the photographic array was clearly false. Investigator Love's testimony that he was not positive as to whether Howard's photo was in the array was also false. Furthermore, the assistant prosecutor was clearly aware that the testimony was false, as he was the same assistant

prosecutor who had entered the stipulation in the first trial that Deonte Howard's photo was not in the photo array that McFadden viewed (T 1/13/2011, 63). The assistant prosecutor had a duty to correct this false testimony.

Defendant Howard submits that he was denied due process, as it is clear that McFadden and Investigator Love testified falsely at Howard's trial and that this constitutes knowing use of false and perjured testimony, as the prosecution was well aware that this claim was false.

Furthermore, as noted above, the "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Giglio, supra,* at 153. There were no attempts by the prosecution to correct this false and perjured testimony in Defendant Howard's case.

A new trial is warranted if "there was any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v Agurs,* 427 US at 103; *Napue,* 360 US at 271; *Giglio,* 405 US at 154. As the Fifth Circuit has explained, the "reasonable likelihood" standard is a low one:

> "There is no doubt that the evidence in this case was sufficient to support a verdict of guilty. But the fact that we would sustain a conviction untainted by the false evidence is not the question. After all, we are not the body which, under the Constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, and again under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all of its ramifications." *United States v Barham,* 595 F2d 231, 242 (CA 5, 1979).

The false testimony at Defendant Howard's trial buttressed McFadden's identification of Defendant Howard as the shooter. The purpose of the *Giglio/Napue* rule is to prevent the prosecution from presenting to the jury a theory of the case that is false or misleading; a new trial is required here to allow the jury to undertake informed and meaningful deliberations. There is a

reasonable likelihood that it would have affected the judgment of the jury.  Mr. Howard is entitled

to a new trial.

# APPENDIX 1.

# COURT OF APPEALS DECISION

Appendix 1 — COA op.

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEONTE HOWARD,

        Defendant-Appellant.

UNPUBLISHED
October 16, 2014

No. 311169
Wayne Circuit Court
LC No. 10-005562-01-FJ

Before: WILDER, P.J., and FORT HOOD and SERVITTO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first degree murder, MCL 750.316.[1]  He was sentenced to a mandatory term of life imprisonment, with credit for 382 days served.  We therefore affirm defendant's conviction, but remand for resentencing pursuant to MCL 769.25(1)(b)(i).

Defendant was charged with first degree premeditated murder, assault with intent to murder and felony firearm in connection with the shooting death of 19-year-old Tyrone Simpson on April 10, 2010.  The shooting occurred in front of a combination convenience store/barbecue restaurant on the 1600 block of Tireman Street in the city of Detroit shortly after 4:00 p.m.  An argument broke out between defendant, who was 16 years old at the time, and Simpson when Simpson accused defendant of taking his Cartier sunglasses.  Defendant denied taking them and a verbal argument ensued.  Simpson then punched defendant in the face several times, at which point defendant drew a weapon and fired at Simpson, injuring him and one of Simpson's friends, Aundrey Allen.  Simpson attempted to run away from defendant, but defendant chased Simpson around a vehicle, shooting at and striking him with several shots until Simpson collapsed in the

---

[1] Defendant was initially charged with first degree murder, assault with intent to murder, MCL 750.83, and felony firearm, MCL 750.227b.  At trial, the jury convicted defendant of felony firearm and the lesser included offense of assault with intent to do great bodily harm, MCL 750.84, but was hung with respect to the first degree murder charge, leading to retrial on that charge only.  Defendant's retrial on the first degree murder charge is the focus of this appeal and we do not address his trial or, convictions, or sentences for felony firearm or assault with intent to do great bodily harm.

-1-

street. An SUV driven by an unidentified friend of defendant's then pulled up and defendant jumped into the back seat. The vehicle started to leave, and then abruptly slammed on its breaks. Defendant got back out of the vehicle and shot Simpson in the head. Defendant then got back into the vehicle and it sped away. Simpson was dead when police arrived on the scene a short time later. The medical examiner noted that Simpson had a total of nine gunshot wounds, including one to his head.

On appeal, defendant first contends that there was insufficient evidence to support his conviction. We disagree.

We review a challenge to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the prosecution, to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the [trier of fact's] verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Circumstantial evidence and reasonable inferences arising from the evidence may constitute satisfactory proof of the elements of the offense. *People v Warren (After Remand)*, 200 Mich App 586, 588; 504 NW2d 907 (1993).

Defendant challenges the sufficiency of the evidence on two grounds. First, he contends there was insufficient evidence identifying him as the shooter. The prosecution must prove the identity of the defendant as the perpetrator of a charged offense beyond a reasonable doubt. *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976); *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). Circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to identify the accused as the perpetrator. *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999). The credibility of identification testimony is a question for the trier of fact that this Court will not decide over again. *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). And, a positive identification by witnesses may be sufficient to support a conviction of a crime. *Id.*

In this case, defendant was identified by no less than four eyewitnesses to the shooting. Frederick McFadden testified that he had an unobstructed view of the scene from approximately 20 feet away, and saw defendant shoot Simpson several times. His testimony was unequivocal that defendant was the only person with a gun and that defendant shot Simpson several times, including once in the head. As pointed out by defendant, McFadden testified at trial that he picked out defendant and the driver of a car from a photo array, which was different from his testimony in a prior trial that he picked out the shooter and two drivers. McFadden also described the shooter to the police as 20 to 24 years of age and 5"11 to 6" tall when defendant was 16 at the time of the shooting and is less than 5'6". However, the credibility of identification testimony is a question for the trier of fact. *Davis*, 241 Mich App at 700.

Marcario Harris and Kimberly Thompson, who live across the street from the store/restaurant where the shooting occurred, also identified defendant as the shooter. Both testified that they had a clear view of the shooting through their front living room window, which faced the store and they could clearly see defendant in the broad daylight. Both testified that defendant was only person they saw with a gun during the incident. Neither was asked to view a

photo array or participate in a live lineup, but identified defendant for the first time at trial. Both Harris and Thompson described the shooter to the police immediately after the event as around 5"9 or 5'10", thin, and in his mid-20's. This description is not so far off as to be a misidentification and moreover, the jury is responsible for both credibility and evidentiary weight determinations. *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

Aundrey Allen also identified defendant as the shooter. He had been standing with Simpson while Simpson was arguing with defendant about his glasses and when Simpson punched defendant in the face. Allen testified that he was also standing behind and somewhat to the side of Simpson when defendant pulled a gun out of his pocket and started shooting at Simpson. Allen was shot in the leg as he tried to run. Allen described the shooter to the police as being around 5'7" or 5'8" and around 17 or 18 years old. Allen also told the police that several people at the incident called the shooter "Tay," which others witnesses confirmed was defendant's nickname. At the hospital after his surgery, Allen did view a photo array and identify another person as the shooter. Allen explained, however, that he was under the influence of morphine at the time of that identification. Allen thereafter participated in a live line up and identified defendant out of the lineup as the shooter.

The above was sufficient for a reasonable jury to find beyond a reasonable doubt that defendant was identified as the shooter.

Defendant next argues that the evidence was insufficient to establish that there was a premeditated, deliberate intent to kill such that his first degree murder conviction cannot stand. MCL 750.316(1)(a) provides:

> (1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:

> (a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

The elements of premeditated murder are (1) an intentional killing of a human being (2) with premeditation and deliberation. *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). With regard to premeditation and deliberation, this Court has explained:

> To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look." *[People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (citation omitted).]

"Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *Id.* at 301. There is no specific period of time that must pass for premeditation to be found; however, "[o]ne cannot instantaneously premeditate a murder." *Id.* at 305. Neither premeditation nor

deliberation need be established by direct evidence; the required state of mind can be inferred from all of the facts and circumstances on the record. *People v Boose*, 109 Mich App 455, 473; 311 NW2d 390 (1981). These elements may also be shown by consideration of the following factors: " '(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and, (4) the defendant's conduct after the homicide.' " *People v Orr*, 275 Mich App 587, 591; 739 NW2d 385 (2007), quoting *People v Schollaert*, 194 Mich App 158, 170; 486 NW2d 312 (1992).

No one disputes that Simpson approached defendant accusing him of stealing his glasses. It also appears that Simpson escalated the verbal altercation to a physical level by punching the defendant and that defendant did not punch him back. However, by all accounts, defendant was the only one with a weapon and the only one who shot. Most important to our analysis, several distinct rounds of shooting occurred. First, after Simpson punched defendant several times in the face and was approaching to punch him again, defendant shot at Simpson at least twice. Allen, who was standing next to Simpson at the time the first shots were fired, testified that defendant initially shot at Simpson twice.

The second round of shots came almost immediately thereafter. Allen testified that after the first two initial shots, he ran toward the store. As he ran, he heard three more shots. Bobby Bailey, another witness, also ran to the store after the initial shots.

The next round of shots occurred when both Bailey and Allen were inside the store. Bailey testified that he heard six or seven more shots while he was in the store. Allen testified that, he too, heard additional shots while he was in the store. Allen testified that he heard eight or nine shots right in a row, then a several second pause occurred. Allen testified that he next heard Simpson begging for his life and a final, single shot. According to Allen, he thereafter heard the sound of a car being floored and taking off.

McFadden similarly testified to distinct rounds of shots. He testified the he heard three initial shots, and then his attention was drawn to an elderly lady getting out of her car in the street. McFadden had time to help the woman to her home before he heard the next shot, which he testified he heard while at the same time seeing Simpson stumble backward. McFadden testified that he then heard several more shots and Simpson was lying in the street. According to McFadden, the defendant fired two more shots at Simpson as he lay in the street then got into an SUV. Defendant then got back out of the SUV, said "This m—f—n--- isn't dead yet" and shot defendant several more times, including once in the head. Defendant then got back in the SUV and left.

Witness Harris, testified that he saw defendant chasing Simpson around a Suburban, shooting at him. After Simpson fell to the ground, defendant walked toward him and shot at him several more times. Harris testified that defendant shot at Simpson approximately 15 times. Witness Thompson testified that defendant first shot at Simpson while both were in the street and Simpson fell to the ground. Defendant then got into an SUV and started to take off, then abruptly got back out of the vehicle when Simpson started to get up. Thompson testified that defendant chased Simpson around shooting at him. She heard Simpson begging for his life and saw defendant walk up to Simpson, shoot him in the head, and then get back into the SUV and leave.

-4-

The prosecution presented sufficient evidence of premeditation and deliberation to support defendant's first degree premeditated murder conviction. The first shots fired by defendant could qualify as being brought about by "hot blood" without an opportunity to take a second thought. Simpson had just punched defendant in the face several times and was advancing toward him again. Allen testified that at that point, defendant started reaching for his pocket "real crazy like." Were those the only shots fired, defendant's argument that his actions were rash, impulsive or a hot-blooded reaction to the circumstances would have some merit. However, the testimony establishes that after the initial few shots, there was a minimum of a several second pause as Allen and others fled the scene. The pause was long enough, if McFadden's testimony is to be believed, for him to assist an elderly lady from her car parked in the street up to her house and for him to then return to the street and witness the next round of shots. Allen testified that he could see Simpson's hand go toward his stomach as though he had been shot in that area. McFadden also testified that after one of the first several shots, he saw Simpson stumble backward. By all witness accounts, then, Simpson was still alive after the first shots were fired. Assuming defendant did not possess the requisite intent (premeditation or deliberation) to murder at the time the first shots were fired, he could have left at that point and the incident perhaps would have been over.

However, after a pause, more shots were fired and, by all witness accounts, Simpson was still alive. According to Harris and Thompson, it was at that point that defendant got into an SUV and appeared to be about to leave the scene, but when Simpson started to get up out of the street, the SUV slammed on its brakes and defendant got back out. According to these witnesses, defendant chased Simpson around a vehicle, firing more shots at him until he fell back into the street, then walked up to him and fired a final shot into his head. While McFadden made no mention of defendant chasing Simpson around a vehicle as he fired shots at him, he did testify that defendant got into an SUV, then got back out, said "This m—f—n--- isn't dead yet" and shot defendant several more times, including once in the head. The medical examiner testified that when the shot to his head was delivered, Simpson was still alive.

A reasonable jury could find that between the apparently non-fatal first shots and the final shot to Simpson's head, there was sufficient time for defendant to take a second look at the nature of his actions. Defendant may have had no prior relationship with Simpson and may not have initially gone to the store/restaurant for anything other than his stated purpose of finding his phone. Nevertheless, the circumstances of the killing itself show that defendant thought about taking Simpson's life before the he took the acts which actually caused the death and pondered the acts for some, albeit small, amount of time. Defendant then got into an SUV and the vehicle started to leave. But it then stopped as Simpson started to get up and defendant elected to shoot Simpson several more times while at least one witness testified that defendant made a statement concerning an intent to kill Simpson and while other witnesses testified they heard Simpson pleading with defendant for his life. Defendant then stood over Simpson while he lay in the street and shot him in the head. The location of this final shot, the positions of the parties, and the fact that defendant halted and got out of vehicle to deliver the final shots adequately suggest that although defendant had time to take a second look and perhaps leave Simpson injured, defendant deliberately chose to ensure that he killed Simpson. Thus, even if defendant did not form a homicidal intent until he stopped the SUV and got back out to deliver the final round of shots, the time span between that moment and the time the initial shots were fired would be of a

sufficient amount to allow defendant to take a second look. There was thus sufficient evidence of premeditation and deliberation to support defendant's first degree murder conviction.

Defendant next argues that he was deprived of the right to the effective assistance of counsel. We disagree. Defendant did not bring a motion for a new trial on the basis of ineffective assistance of counsel, and failed to request a *Ginther* hearing (*People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973)) before the trial court. Accordingly, defendant's claim of ineffective assistance of counsel is unpreserved and we review his claim for mistakes apparent on the record. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

An ineffective assistance claim "is a mixed question of fact and constitutional law. A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." *People v Grant*, 470 Mich 477, 484; 684 NW2d 686 (2004). To merit a new trial because of ineffective assistance of counsel, the defendant has the heavy burden of demonstrating that defense counsel's performance was so deficient that he was not functioning as constitutionally guaranteed "counsel" and that defense counsel's performance prejudiced the defendant to the extent that it is reasonably probable that the outcome of the proceedings would have been different. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), quoting *Strickland v Washington*, 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To prevail on a claim of ineffective assistance of counsel, then, defendant must prove two components: (1) that counsel's performance was deficient and that, under an objective standard of reasonableness, counsel made an error so serious that he was not performing as the attorney guaranteed by the constitution and (2) prejudice. *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994); *Strickland*, 466 US at 687. To satisfy the first component, defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, *supra* at 687. The second component requires the defendant to show "the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin*, 463 Mich at 600. Defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy and must further show that he was prejudiced by the error in question. *Pickens*, 446 Mich at 312-314. That a particular trial strategy does not work does not necessarily constitute ineffective assistance of counsel. *Id.* at 61.

Defendant directs us to three instances that he claims amount to ineffective assistance on trial counsel's part. First, defendant asserts that counsel was deficient in failing to call Sergeant Martel as a witness at trial to refute Allen's testimony that when he identified someone other than defendant as the shooter in a photo array while he was in the hospital, it was because he was under the influence of morphine. According to defendant, at his first trial, which resulted in a hung jury (and a mistrial) on the first degree murder charge, Martel's testimony had made it clear that Allen was coherent when he identified a Deonte *Miller* as the shooter and that based on Allen's identification, Martel prepared a search warrant for Miller's home. Defendant contends that Allen's identification of him as the shooter was critical to the prosecution's case and, as such, it was critically important for defense counsel to properly challenge Allen's testimony through Martel.

At defendant's first trial Allen testified that on the date of the incident, when he first had contact with the police, he was in the hospital and "had like a lot of morphine inside me." Allen

-6-

testified that he was unable to write at that time and the officers asked him to explain what had happened. Allen testified that officers also showed him six photographs and that he was able to identify someone in the photographs but that he does not know who he identified because "at the time . . . I was so out of it." Allen testified that he identified the person who looked closest to defendant because he really did not know defendant. It is undisputed that Allen identified someone other than defendant as the shooter in the photo array.

Martel testified that he was not in the room when Allen made an identification of someone in the photo lineup. He testified that he also took a statement from Allen. He testified that Allen may have been on some medication or painkillers when he gave the statement to Martel, but that Allen seemed coherent. Martel testified that he would not have taken his statement had he not believed Allen to be coherent.

It is true that Martel's testimony would have placed doubt on Allen's testimony that he mistakenly identified someone other than defendant in the photo lineup due to drug intoxication. However, decisions on whether to call or question witnesses are presumed to be matters of trial strategy that will not be second-guessed on appeal. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Even if counsel's failure to call Martel as a witness was in error, it cannot be said to have been outcome determinative. This is necessarily so, as Allen participated in a live lineup after being released from the hospital and identified defendant, who was irrefutably part of that lineup, as the shooter. Thus, Allen's later positive identification of defendant as the shooter would likely have negated any effect of his initial photo identification of another person as the shooter. Thus, counsel did not render ineffective assistance in failing to call Martel as a witness.

Defendant next contends that counsel was ineffective for failing to enter a stipulation that was entered at his first trial—that Detective Myron Love would testify that he showed McFadden a photo lineup; that defendant's picture was not included in the photo lineup; that McFadden picked out three people, and; that Love did not remember who McFadden picked out.

It is not clear from the record why the above stipulation was entered. However, it is clear that Love appeared at defendant's second trial and testified. Thus, a stipulation as to what he would have testified to was obviously not an option at that point. Defendant has also provided nothing to indicate that defense counsel failed to request the same stipulation, rather than that he perhaps sought the same stipulation and was denied the opportunity to present it at trial instead of Love's live testimony. Given the above, it cannot be found that counsel was ineffective for failing to procure the stipulation.

Moreover, the only way in which Love's testimony at trial differed from the stipulation was that at defendant's trial, Love testified that he *was unsure* whether defendant's photo was included in the photo array and the stipulation provided that defendant's photo *was not* in the photo array. While defendant makes much of this distinction and contends that the difference was significant in undermining McFadden's testimony at trial that he was positive he picked defendant's photo out of the photo array, defense counsel elicited from Love that had McFadden picked defendant out of a photo array they would have had documentation of the same and they did not. Thus, counsel effectively undermined McFadden's credibility in asserting that he had picked defendant out of a photo lineup despite the difference between the stipulation and the live

-7-

testimony.  Defense counsel was thus not ineffective in failing to procure the same stipulation regarding Love's testimony that was presented at his first trial.

Defendant also argues that counsel was ineffective in declining to cross-examine investigator Simon.  At his first trial, defendant points out that his trial counsel cross-examined Simon regarding her treatment of people she has interrogated.  Counsel elicited that Simon had lied to suspects during interrogations, had cursed at them, and had told them if they did not talk they were going to jail.  Counsel asked Simon if she had threatened witness Bobby Bailey during her questioning of him and Simon denied threatening him, telling him to shut up, or threatening to ruin his business because he did not tell her what she wanted to know.  While defendant argues that Simon's alleged threats were an important piece of the defense theory that the police engaged in misconduct, defendant has identified no other alleged acts of misconduct on the part of the police or further explained how any theory of misconduct was conveyed to the jury and influenced or was intended to influence his case.  And, any admissions that first trial counsel elicited form Simon about any untoward treatment of persons she questioned was limited to treatment of *suspects*—not of witnesses such as Bailey.

Additionally, because Simon unequivocally denied making any threat in any form to Bailey in the first trial, it was reasonable for defense counsel at defendant's second trial to conclude she would testify consistently and deny any wrongdoing.  And on direct examination by the prosecution, she, in fact, did.  Thus, it would be a reasonable trial strategy to elicit from Bailey, as defense counsel did, that Simon had threatened him and that Bailey had just agreed to whatever she said due to the threats, that Simon told him to shut up and would not let him talk and just wanted to make the shooter defendant, and let those accusations stand unanswered by Simon to the greatest degree possible.  Though the prosecutor asked Simon on direct whether she had threatened Bailey during her questioning of him and she again denied making any threats, there would be nothing gained by defense counsel again asking her the same questions and having her reiterate her denials.  This Court will not substitute its judgment for trial counsel's in matters of trial strategy.  *People v Avant*, 235 Mich App 499, 508; 597 NW2d 864 (1999).

Defendant's next argument on appeal is that his conviction was obtained through the use of false and/or perjured testimony, thus denying him his due process rights.  Specifically, defendant contends that witness McFadden testified at the second trial that he was positive he identified defendant in a photo array and that this testimony is contrary to the stipulation entered in the first trial of Detective Love that defendant was not in the photo array and of Love's testimony in the second trial that if McFadden had identified defendant, there would have been documentation of the same.  Defendant asserts that, similarly, Love's testimony at the second trial that he was unsure whether defendant's photo was in the array was false and/or perjured as it contrasted with the stipulation in the first trial that defendant's photo was not in the array.  We review this unpreserved allegation of constitutional error for plain error affecting the defendant's substantial rights.  *People v Carines*, 460 Mich 750, 763–764; 597 NW2d 130 (1999).

A conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment.  *Mooney v Holohan*, 294 US 103, 112; 55 S Ct 340; 79 L Ed 791 (1935); *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959); *People v Aceval*, 282 Mich App 379, 389-390; 764 NW2d 285 (2009).  If there is any reasonable likelihood that the false testimony could have affected the

-8-

judgment of the jury, the conviction must be set aside. *Aceval*, 282 Mich App at 389-390. Stated differently, a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment. *Id*.

Michigan courts have also recognized that the prosecutor has a duty to correct false evidence. See *People v Herndon*, 246 Mich App 371, 417; 633 NW2d 376 (2001). But the mere fact that a witness's testimony conflicts with earlier statements does not establish that a prosecutor knowingly presented perjured testimony. *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998). Perjury requires a material, willful false statement. *In re Contempt of Henry*, 282 Mich App 656, 677–678; 765 NW2d 44 (2009).

There is no indication in the record that the prosecutor, who was the same person for both trials, concealed any prior contradictory statements or elicited and allowed perjured testimony to stand, or even that the statements were, in fact contradictory or perjured. With respect to Love, as previously indicated, a stipulation was entered in the first trial that ". . . if Detective Myron Love showed, the testimony would be Detective Myron Love showed Frederick McFadden a photographic line-up regarding the shooting of Tyrone Simpson. In front of Detective Love, Frederick McFadden picked out three people. Detective Love does not remember who Frederick McFadden identified, but Deonte Howard was not one of those people." The prosecutor added, "He was no[t] in the line-up." At this point defense counsel stated, "Right. Deonte Howard was not in the photographic line-up that was shown to Frederick McFadden . . . ." The prosecutor stated, "That's correct, Judge. And I've sign[ed] the document to that effect."

At defendant's second trial, Love appeared as a witness and testified that he showed a photo array with six photos to McFadden. When advised that there were two different suspects involved in the case, Love indicated that he believed he was involved with the first suspect [Deonte Miller]. Love testified that when shown the photo array, McFadden picked out three people that he indicated he recognized. Love further testified that he was "not really positive" if defendant's photo was in the photo array. Love testified that he did not have a copy of the photo array and he had no documentation to show that McFadden had picked defendant out of the photo array. Love testified that had McFadden picked out defendant, they would have had documentation of the same.

Clearly, Love was not in charge of what the prosecutor and defense counsel in the first trial placed on the record as far as the stipulation that defendant was not part of the photo array shown to McFadden. The prosecutor was the individual who volunteered this information as part of the stipulation so likely had a basis for making such a statement, but that would be bare speculation at this point. In any event, Love's live testimony at defendant's second trial does not *contradict* this stipulation. Instead, Love simply stated he was "not positive" whether defendant's photo was or was not part of the array, indicating a lapse of memory, not a material, willful false statement. See *In re Contempt of Henry*, 282 Mich App at 677-678.

Concerning McFadden, at defendant's first trial McFadden testified that he was shown three pages of pictures and that he picked out "the shooter and two drivers." At defendant's second trial, McFadden testified that he saw three pictures and that he picked out two people. McFadden specifically testified that he picked out defendant and the driver. He testified that he was "positive" that he picked out defendant in the photos. Notably, the prosecution did not ask

McFadden any questions about the photo identification on direct examination—it was defense counsel who elicited this information on cross-examination. In any event, comparing the testimony at the two trials, while there are some differences, the significant factor is the absence of any mention of defendant in McFadden's first testimony. McFadden did not testify at the first trial that he picked defendant out of the photo array; he testified that he picked out the shooter. Thus there is no conflict with respect to defendant in his testimony at defendant's second trial.

According to defendant, McFadden's testimony that he identified defendant as the shooter in the photo array is nevertheless clearly false. However, all inconsistencies were disclosed to the jury and it was for the jury to determine whether McFadden's trial testimony, including his alleged identification of defendant in a photo array, was credible. *People v Davis*, 241 Mich App at 700.

Were we to find that the testimony was, in fact, false, it cannot be concluded that the admission of the testimony affected the jury's verdict and thus the outcome of the trial. Not only did McFadden identify defendant in court as the shooter, several other eyewitnesses, whose credibility defendant does not challenge, also unequivocally identified defendant as the shooter.

Defendant's final argument on appeal is that the Supreme Court's ruling in *Miller v Alabama* __ US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012) prohibits a sentence of life without the possibility of parole imposed under a statutory scheme that requires mandatory life for those, such as defendant, who were juveniles at the time of the offense. We review this unpreserved constitutional issue for plain error affecting defendant's substantial rights. See *Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

To avoid issue forfeiture under the plain-error rule, defendant must prove the following: (1) there was an error, (2) the error was plain, and (3) the plain error affected substantial rights, i.e., the outcome of the lower-court proceedings. *Id.* at 763. Once defendant has established these requirements, this Court "must exercise its discretion in deciding whether to reverse." *Id.* Reversal is warranted only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings or resulted in the conviction of an actually innocent person. *Id.*

In *Miller*, 132 S Ct 2455, the United States Supreme Court held that mandatory life imprisonment without the possibility of parole for those under the age of 18 when they committed a crime violated the Eighth Amendment's prohibition against cruel and unusual punishment. Looking to its precedents, the Supreme Court noted that it had historically treated juveniles differently from adults and, because of their lesser culpability, has barred capital punishments for juveniles and barred life imprisonment without the possibility of parole in non-homicide cases as violative of the Eighth Amendment's protection against cruel and unusual punishment. *Id.* at 2463-2465. The *Miller* Court further stated:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or

-10-

dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, e.g., *Graham*[*v Florida*], 560 US 48, [at 78], 130 S Ct [2011], at 2032 [176 L Ed 2d (2010)] ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J.D.B. v North Carolina*, 564 US ——, 131 S Ct 2394, 2400–2401, 180 L Ed 2d 310 (2011) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. *Id.* at 2468.

In holding that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, the *Miller* Court specifically declined to hold that the Eighth Amendment requires a categorical bar on life without parole for juveniles. *Id.* at 2469. The *Miller* Court did, however require a sentencing court in juvenile homicide cases to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

A panel of this Court recently considered the applicability of *Miller* to Michigan juvenile homicide cases. In *People v Eliason*, 300 Mich App 293, 295; 833 NW2d 357 (2013), this Court reviewed a 14- year-old's appeal of his conviction for first degree premeditated murder and the mandatory sentence of life imprisonment without the possibility of parole that was imposed. Referencing *Miller*, this Court held that because the defendant's case was pending on direct review at the time *Miller* was decided, "therefore, *Miller* applies and defendant's mandatory sentence of life imprisonment without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment." *Eliason*, 300 Mich App at 309. The *Eliason* Court also explained that a prior published Court of Appeals case discussing the effect of the *Miller* decision, *People v Carp*, 298 Mich App 472, 526–527; 828 NW2d 685 (2012), only determined that the "limited holding in *Miller* was that a juvenile cannot be *automatically* subjected to a punishment of life imprisonment without the possibility of parole" and that the actual holding in *Carp* was "that *Miller* did not apply retroactively to collateral challenges to sentences." *Eliason*, 300 Mich App at 309. The *Eliason* Court explained the remedy for juveniles convicted of homicide and sentenced to mandatory life in prison without parole after *Miller* as thus:

> However, contrary to defendant's assertions, he is not entitled to a remand at which the trial court has unfettered discretion to impose a sentence for any term of years. In fact, he could still receive the same sentence on remand, as the *Miller* Court did not "foreclose a sentencer's ability" to sentence a juvenile in a homicide case to life imprisonment without parole, so long as the sentence "take[s] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at ——, 132 S Ct at 2469. In other words, a trial court can still sentence a juvenile who committed a homicide to life in prison without the possibility of parole, so long as that sentence is an individualized one that takes into consideration the factors outlined

-11-

in *Miller*. *Id.* at ——, 132 S Ct at 2466–2467, 2471.  We recognized as much in *Carp*, 298 Mich App at 525, where we opined in dicta that the rule from *Miller* "does not . . . imply that a sentencing court has unfettered discretion when sentencing a juvenile.  Rather, the focus is on the discretion of the sentencer to determine whether to impose the harshest penalty of life without the possibility of parole on a juvenile convicted of a homicide offense."

Therefore, the only discretion afforded to the trial court in light of our first-degree murder statutes and *Miller* is whether to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole.  *Carp*, 298 Mich App at 527.  In deciding whether to impose a life sentence with or without the possibility of parole, the trial court is to be guided by the following nonexclusive list of factors:

(a) the character and record of the individual offender [and] the circumstances of the offense, (b) the chronological age of the minor, (c) the background and mental and emotional development of a youthful defendant, (d) the family and home environment, (e) the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected [the juvenile], (f) whether the juvenile might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth, and (g) the potential for rehabilitation. [ *Id.* at 532, citing *Miller*, 567 US at ——, 132 S Ct at 2467–2468 (quotation marks and citations omitted).]

However, in response to *Miller*, and after *Eliason* was decided, the Legislature enacted MCL 769.25 and MCL 769.25a which "significantly altered Michigan's sentencing scheme for juvenile offenders convicted of crimes that had previously carried a sentence of life without parole."  *People v Carp*, 496 Mich 440, 456; 852 NW2d 801 (2014).  These statutes became effective on March 4, 2014, and apply to a criminal defendant who is less than 18 at the time he or she committed an offense either after the effective date of the amendatory act added the statutes or was less than 18 prior to that effective date and (1) either the case was still pending in the trial court or the applicable time periods for direct appellate review had not yet expired or (2) on June 25, 2012, (the day before *Miller* was decided) the case was pending in the trial court or the applicable time period for direct appellate review had not yet expired.  MCL 769.25(1)(a)(i) and (ii).  The effect of MCL 769.25 is that juveniles who commit even the most serious of offenses are no longer sentenced under the same fixed sentences as adults who commit the same offenses may be sentenced.  Under this new law, absent a motion by the prosecutor seeking a sentence of life without parole, "the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years."  MCL 769.25(4) and (9); *Carp*, 496 Mich at 458.  If the prosecutor files a motion seeking life imprisonment without the possibility of parole for the allowed enumerated offenses, the trial court must hold a hearing, at which it must consider the factors listed in *Miller* and shall specify on the record any reasons supporting the sentence imposed.  MCL 769.25(6) and (7).  *Carp*, 496 Mich at 458-459.

More recently, in *Carp*, our Supreme Court considered the *Eliason* decision.  That case, when consolidated with *People v Carp*, unpublished opinion per curiam of the Court of Appeals

-12-

issued November 15, 2012, (Docket No. 307758) and *People v Davis*, unpublished order of the Court of Appeals, entered June 15, 2000, (Docket No. 224046), called upon our Supreme Court to determine whether *Miller* should be applied retroactively to cases in which the defendant's sentence became final for purposes of direct appellate review before *Miller* was decided and (2) whether the Eighth Amendment of the United States Constitution or Const 1963, art 1, § 16 categorically bars the imposition of a life-without-parole sentence on a juvenile homicide offender.  Our Supreme Court decided both questions in the negative.  Relevant to the instant matter, however, the Supreme Court determined that while resentencing was indeed the proper directive in *Eliason*, the trial court was not, as the Court of Appeals in *Eliason* indicated, afforded with only the discretion to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole.  Instead, because the defendant's case was on direct review at the time *Miller* was decided, he was entitled to resentencing pursuant to MCL 769.25(1)(b)(ii).  The Supreme Court noted that:

> Under MCL 769.25(9), the default sentence for a juvenile convicted of first-degree murder is a sentence of a term of years within specific limits rather than life without parole.  A juvenile defendant will only face a life-without-parole sentence if the prosecutor files a motion seeking that sentence and the trial court concludes following an individualized sentencing hearing in accordance with *Miller* that such a sentence is appropriate.  MCL 769.25(2) through (7). *Carp*, 496 Mich at 528.

In this case, defendant committed the crime at issue when he was 16 years old and was sentenced on May 27, 2011, when he was 17 years of age.  Due to a court error, it became necessary for the trial court to enter an order to reinstate his claim of appeal on May 31, 2012.[2]  Defendant thereafter filed his timely claim of appeal on July 5, 2012.  Because defendant's time for filing an appeal had not expired when *Miller* was decided (June 25, 2012), he is entitled to resentencing pursuant to MCL 769.25(1)(b)(i).  See, *Carp*, supra.

We therefore affirm defendant's convictions, but remand for resentencing pursuant to MCL 769.25(1)(b)(i).  We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Karen M. Fort Hood
/s/ Deborah A. Servitto

Deonie Howard 8-24-16

---

[2] Defendant signed a written request for appellate counsel on May 31, 2011, but, for reasons unknown, this form request was not processed by Wayne County.  In January 2012, defendant wrote to the trial judge, again requesting the appointment of appellate counsel.  His request and appeal were properly pursued at that point and his appeal, though now technically untimely through no fault of his own, was regarded as a claim of appeal.

-13-

~~~~~r o 793937

~~RRECTION FACILITY

~~er foe HWY

~~~ MI 49660



UNITED STATES DISTRICT COURT EASTERN DIST

231 W. Lafayette AVe

DEE MI 48226



RECEIVED
AUG 2 9 2016
CLERK'S OFFICE
DETROIT



# CIVIL COVER SHEET FOR PRISONER CASES

| | |
|---|---|
| Case No. <u>16-13131</u> | Judge: <u>John Corbett O'Meara</u>   Magistrate Judge: <u>Patricia T. Morris</u> |

| Name of 1st Listed Plaintiff/Petitioner: | Name of 1st Listed Defendant/Respondent: |
|---|---|
| Deonte Howard | Thomas Mackie |

| Inmate Number: 793937 | Additional Information: |
|---|---|
| **Plaintiff/Petitioner's Attorney and Address Information:** | |
| **Correctional Facility:** Oaks Correctional Facility 1500 Caberfae Highway Manistee, MI 49660 MANISTEE COUNTY | |

**BASIS OF JURISDICTION**
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question

**NATURE OF SUIT**
- ☒ 530 Habeas Corpus
- ☐ 540 Mandamus
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions

**ORIGIN**
- ☒ 1 Original Proceeding
- ☐ 5 Transferred from Another District Court
- ☐ Other:

**FEE STATUS**
- ☐ IFP *In Forma Pauperis*
- ☒ PD Paid

## PURSUANT TO LOCAL RULE 83.11

1. **Is this a case that has been previously dismissed?**
   ☐ Yes      ☒ No
   ➤ If yes, give the following information:

   Court: _____

   Case No: _____

   Judge: _____

2. **Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)**
   ☐ Yes      ☒ No
   ➤ If yes, give the following information:

   Court: _____

   Case No: _____

   Judge: _____