UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEONTE HOWARD,

     Petitioner,

v.                                                    CASE NO. 5:16-cv-13131

                                      HON. JOHN CORBETT O'MEARA

THOMAS MACKIE,

     Respondent.                                MAG. ANTHONY P. PATTI

_____

**ANSWER IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**

# TABLE OF CONTENTS

Introduction ................................................................................. 1

    Statements in Compliance with Habeas Rule 5(b) ......................... 3

    A.   Statute of Limitations ............................................... 3

    B.   Exhaustion ................................................................ 3

    C.   Procedural Default .................................................... 3

    D.   Non-retroactivity Doctrine ....................................... 3

Statement of the Case ................................................................. 4

    A.   Trial Facts ................................................................ 4

    B.   Procedural History ................................................... 5

Standard of Review Pursuant to AEDPA ................................... 8

Argument ................................................................................... 15

I.    Howard's claim that there was insufficient evidence to support his conviction of first-degree premeditated murder is meritless.  The Michigan Court of Appeals' determination that the evidence supported conviction was not objectively unreasonable. ......................................................................... 15

    A.   The standard by which sufficiency claims are analyzed on habeas review is doubly deferential. ............................... 16

    B.   Howard has not met AEDPA's stringent standard because ample evidence was presented to support his premeditated actions in killing Tyrone Simpson after the two men had an altercation. ........................................... 19

II.    To show ineffective assistance of counsel, a habeas petitioner must establish that trial counsel performed deficiently and that counsel's performance resulted in prejudice.  Where Howard has failed to demonstrate that the Michigan Court

of Appeals unreasonably adjudicated either prong of
Strickland, relief is not warranted. ...............................................33

A.   Strickland Test. ......................................................33

B.   Howard's claims of ineffective assistance of counsel are
meritless.  The Michigan Court of Appeals' rejection of
these individual subclaims was not contrary to, or an
unreasonable application of, clearly established
Supreme Court law. ...............................................36

1.   Howard's claim that his counsel was ineffective
for failing to call Sergeant Michael Martel to
testify at trial is meritless. ...........................36

2.   Howard's claim that his counsel was ineffective
for failing to stipulate that Detective Myron Love
would have testified that McFadden identified
three people in a photo lineup that did not
contain a photo of Howard is meritless. ....................42

3.   Howard's claim that his counsel was ineffective
for failing to cross-examine Investigator Barbara
Simon is meritless. .....................................46

III.   Howard's claim that the prosecutor committed misconduct
by knowingly presenting perjured testimony from Detective
Myron Love about what occurred during a photo lineup
procedure is procedurally defaulted and that default has not
been excused.  In the alternative, the claim is meritless.  The
Michigan Court of Appeals' rejection of this claim was not
objectively unreasonable. ...............................................51

A.   Howard's claim of prosecutorial misconduct was
deemed to be procedurally defaulted because he failed
to contemporaneously object to the alleged error and
that default has not been excused. ....................................51

B.   Even if this Court bypasses or otherwise excuses the
default, Howard's claim of prosecutorial misconduct is

meritless because the Michigan Court of Appeals
reasonably determined that there was no evidence that
Det. Love or McFadden's testimonies were perjured. .......... 55

Conclusion ............................................................................. 67

Relief ...................................................................................... 72

Certificate of Service ............................................................. 73

# INTRODUCTION

Petitioner, Deonte Howard, took a bit of a beating from Tyrone Simpson who thought Howard had stolen something from him. Howard, though wronged by the allegations of theft, responded disproportionately by pulling a gun, chasing Howard around a car, and firing several shots at Simpson.  Realizing that Simpson was not dead from the two waves of shots fired, Howard approached Simpson, who was laying in the street following the other shots, and fired one more shot directly into his head.

As a result of his Wayne County jury conviction of first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a), assault with intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.83, and felony firearm, Mich. Comp. Laws § 750.227b, the State now holds Howard in custody in the Michigan Department of Corrections.  He is currently serving a non-parolable life sentence for

the murder conviction,[1] 1 year, 11 months-to-10 years for the assault

conviction, and 2 years for the firearm conviction.

Howard commenced this action under 28 U.S.C. § 2254 by filing a

petition with this Court.  The State understands the petition to be

raising the following claims:

    I.    Howard's conviction for first-degree murder must be vacated where the prosecution failed to present legally sufficient evidence that he is who committed the offense and no evidence that he acted with premeditation and deliberation.

    II.    Howard was denied his state and federal right to effective assistance of counsel where defense counsel failed to call a police officer as a defense witness, failed to submit a critical stipulation at the first trial, and failed to cross-examine the prosecutor's key witness.

    III.    Howard is entitled to a new trial where he was denied his state and federal due process rights where his conviction was obtained through use of false and perjured testimony.

Should the Court interpret the petition to be raising different

claims, the State requests an opportunity to file a supplemental

pleading.  The State now answers the petition and requests that it be

denied.

---

[1] Currently in the process of resentencing at the trial court level due to the United States Supreme Court decision in *Miller v. Alabama*, 132 U.S. 2455, 2475 (2012).

## STATEMENTS IN COMPLIANCE WITH HABEAS RULE 5(b)

With respect to the bars that preclude habeas review, the State asserts the following in conformance with Habeas Rule 5(b):

### A.    Statute of Limitations

The State is not arguing that any of Howard's habeas claims are barred by the statute of limitations.

### B.    Exhaustion

The State is not arguing that any of Howard's habeas claims are barred by the failure to exhaust a claim for which a state court remedy exists.

### C.    Procedural Default

The State asserts that Howard has procedurally defaulted Claim III (Detective Myron Love and witness Frederick McFadden gave perjured testimony), as more fully discussed below.

### D.    Non-retroactivity Doctrine

The State is not arguing that any of Howard's claims are barred by the non-retroactivity doctrine.

# STATEMENT OF THE CASE

## A.    Trial Facts

The Michigan Court of Appeals accurately summarized the facts

adduced at trial as follows:

> Defendant was charged with first-degree premeditated murder, assault with intent to murder and felony firearm in connection with the shooting death of 19-year-old Tyrone Simpson on April 10, 2010.  The shooting occurred in front of a combination convenience store/barbeque restaurant on the 1600 block of Tireman Street in the city of Detroit shortly after 4:00 p.m.  An argument broke out between defendant, who was 16 years old at the time, and Simpson when Simpson accused defendant of taking his Cartier sunglasses.  Defendant denied taking them and a verbal argument ensued.  Simpson then punched defendant in the face several times, at which point defendant drew a weapon and fired at Simpson, injuring him and one of Simpson's friends, Aundrey Allen.  Simpson attempted to run away from defendant, but defendant chased Simpson around a vehicle, shooting at and striking him with several shots until Simpson collapsed in the street.  An SUV driven by an unidentified friend of defendant's then pulled up and defendant jumped into the back seat.  The vehicle started to leave, and then abruptly slammed on its breaks.  Defendant got back out of the vehicle and shot Simpson in the head.  Defendant then got back into the vehicle and it sped away.  Simpson was dead when police arrived on the scene a short time later.  The medical examiner noted that Simpson had a total of nine gunshot wounds, including one to his head.

*People v. Howard*, No. 311169, 2014 WL 5305997, at *1 (Mich. Ct. App.

Oct. 16, 2014).  This recitation of the facts is entitled to the presumption

of correctness under § 2254(e)(1), and Howard has not demonstrated through clear and convincing evidence that this summary is incorrect.

The presumption of correctness extends to factual findings made by state appellate courts on the basis of their review of trial court records. *Treesh v. Bagley*, 612 F.3d 424, 430 n.1 (6th Cir. 2010); *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)).

The State opposes any factual assertions made by Howard that are not directly supported by—or consistent with—the state court record, because he has failed to overcome the presumption of factual correctness under 28 U.S.C. § 2254(e)(1) or meet the requirements of 28 U.S.C. § 2254(e)(2).

## B.    Procedural History

Howard was convicted in two separate trials of first-degree premeditated murder, assault with intent to do great bodily harm less than murder, and felony firearm.  The trial court sentenced him to life for the murder conviction, 1 year, 11 months-to-10 years for the assault conviction, and an additional 2 years for the firearm conviction.  Again, Howard is currently in the process of being resentenced in light of the

United States Supreme Court's decision in *Miller v. Alabama*, 132 U.S. 2455, 2475 (2012), which prohibited juvenile defendants from being sentenced to mandatory, non-parolable life.

Following his conviction and sentence, Howard filed a claim of appeal in the Michigan Court of Appeals, which raised the same claims currently before this Court, as well as the following:

> IV. The United States Supreme Court ruling in *Miller v. Alabama*, prohibits a sentence of life without parole imposed under a statutory scheme that requires mandatory life for those who were juveniles at the time of the offense. *Miller* requires resentencing for Deonte Howard because he was sentenced under precisely that kind of scheme, in violation of both his Eighth Amendment and Fourteenth Amendment rights to a sentence that is proportionate and individualized.

The Michigan Court of Appeals affirmed Howard's conviction in an unpublished opinion, but remanded for resentencing in light of the *Miller* decision. *Howard*, 2014 WL 5305997, at *1, 14.

Howard subsequently filed an application for leave to appeal in the Michigan Supreme Court, which raised the same claims as in the Michigan Court of Appeals, sans the sentencing claim wherein he was in the midst of obtaining relief. The Michigan Supreme Court denied the application because it was not persuaded that the questions

6

presented should be reviewed by the Court.  *People v. Howard*, 865

N.W.2d 18 (Mich. 2015) (unpublished table decision).

Howard did not appeal to the United States Supreme Court or

seek collateral review before the trial court.  Rather, he filed the instant

petition for habeas relief.

## STANDARD OF REVIEW PURSUANT TO AEDPA

Congress mandated the standards of review in federal habeas proceedings in 1996 in the Antiterrorism and Effective Death Penalty Act (AEDPA). Recognizing the foundational principle that "[s]tate courts are adequate forums for the vindication of federal rights," "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 134 S. Ct. 10, 15, 16 (2013); 28 U.S.C. § 2254(d).

Congress has limited the availability of federal habeas corpus relief "with respect to any claim" the state courts "adjudicated on the merits." 28 U.S.C. § 2254(d). Habeas relief may not be granted to a habeas petitioner under § 2254(d) unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

With respect to § 2254(d)(1), a state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of

materially indistinguishable facts." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 n.2 (2013) (internal quotation marks and citation omitted). A state court decision involves an unreasonable application of clearly established Federal law pursuant to § 2254(d)(1) if "the state-court decision identifies the correct governing legal principle in existence at the time," but "unreasonably applies that principle to the facts of prisoner's case." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (internal quotation marks and citation omitted). Where "[n]o precedent of [the Supreme Court] clearly forecloses" a state court's ruling, it simply cannot be an unreasonable application of Supreme Court precedent. *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016) (per curiam).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta," of the Supreme Court's decisions. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotations and citations omitted). "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Id*.

Moreover under § 2254(d)(1), the relevant Supreme Court precedent includes only the decisions in existence "as of the time the

state court renders its decision." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (internal quotation marks and emphasis omitted); *see also Pinholster*, 563 U.S. at 182 ("State-court decisions are measured against [the Supreme] Court's precedents as of the time the state court renders its decision.") (internal quotation marks omitted).

Under § 2254(d)(2), the "unreasonable determination" clause, "a state-court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Titlow*, 134 S. Ct. at 15 (internal quotation marks and citation omitted). "Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed." *Hardy v. Cross*, 565 U.S. 65, 72 (2011) (per curiam).

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted). This means that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* Instead, the state court's "application must be

10

objectively unreasonable." *Id.* That distinction creates "a substantially higher threshold" to obtain relief than de novo review. *Id.* A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Etherton*, 136 S. Ct. at 1152.

"It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted). And federal court of appeals precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curiam) (citation omitted); *see also Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (providing that absent a decision by the Supreme Court addressing "the specific question presented by [a] case" a federal court cannot reject a state court's assessment of claim). And, as the Supreme Court recently held, where no Supreme Court cases confront "the specific question presented" by the habeas petitioner, "the state court's decision [cannot]

11

be contrary to any holding from this Court." *Woods v. Donald*, 135 S.

Ct. 1372, 1377 (2015) (per curiam) (internal quotation marks and

citation omitted).

Further, the Supreme Court has specifically warned habeas courts

that, "[b]y framing [Supreme Court] precedents at [too] high [a] level of

generality, [it] could transform even the most imaginative extension of

existing case law into 'clearly established Federal law, as determined by

the Supreme Court.'" That "approach would defeat the substantial

deference that AEDPA requires" be given to state-court decisions.

*Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013) (per curiam).

Moreover, pursuant to § 2254(d), "a habeas court must determine

what arguments or theories supported or . . . could have supported, the

state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are

inconsistent with the holding in a prior decision" of the Supreme Court.

*Richter*, 562 U.S. at 102. This standard protects against intrusion of

federal habeas review upon "both the States' sovereign power to punish

offenders and their good-faith attempts to honor constitutional rights."

*Id.* at 103 (internal quotation marks and citation omitted).

A federal court must refrain from issuing a writ "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (internal quotation marks and citation omitted). To clear the § 2254(d) hurdle, a habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. "If this standard is difficult to meet, that is because it was meant to be." *Id*. at 102.

The burden of providing a petitioner a new trial "should not be imposed unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA." *Wetzel v. Lambert*, 565 U.S. 520, 525 (2012).

The Supreme Court has also instructed habeas courts to apply a rebuttable presumption that a "federal claim was adjudicated on the merits" even "[w]hen a state court rejects a federal claim without expressly addressing that claim." *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). *See also Kernan v. Hinojosa*, 136 S. Ct. 1603, 1606 (2016) (per curiam) ("Containing no statement to the contrary, the Supreme

Court of California's summary denial of Hinojosa's petition was therefore on the merits."). "[S]tate-court decisions [must] be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (internal quotation marks and citation omitted). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunction in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03 (internal quotation marks and citation omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citation omitted).

Finally, the petitioner's burden is made even heavier by the fact that a federal court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

## ARGUMENT

I.  **Howard's claim that there was insufficient evidence to support his conviction of first-degree premeditated murder is meritless.  The Michigan Court of Appeals' determination that the evidence supported conviction was not objectively unreasonable.**

In his first claim, Howard argues that there was insufficient evidence presented to support his conviction of first-degree premeditated murder.  Specifically, he asserts that there was not enough evidence that he was the person who killed Tyrone Simpson, or that the murder was done with premeditation.  Instead, he maintains that the evidence presented from the witnesses was spotty and, at best, ambiguous.

Howard is not entitled to relief because ample evidence was presented to support the Michigan Court of Appeals' determination that he shot and killed Howard with plenty of time for circumspection.  His ardent disagreement with the state appellate court's interpretation of the evidence is not enough to overturn his conviction.

**A.    The standard by which sufficiency claims are analyzed on habeas review is doubly deferential.**

Clearly established Supreme Court law holds that the Due Process Clause protects a criminal defendant from being convicted of a crime without proof beyond a reasonable doubt of every element of an offense.  *In re Winship*, 397 U.S. 358, 361 (1970).  With respect to sufficiency claims, the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), held that the critical inquiry on sufficiency claims must determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.

The inquiry is not whether the reviewing court itself believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, "the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*.  Thus, under *Jackson*, a habeas petitioner is entitled to relief on a sufficiency claim "if it is found that upon the record evidence adduced at the trial that no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Id*. at 324.

The Supreme Court emphasized that all of the evidence is to be considered in the light most favorable to the prosecution. *Id.* at 319. This standard was to be applied whether the evidence of guilt was direct or circumstantial. Circumstantial evidence is entitled to equal weight as direct evidence, and the prosecution may meet its burden entirely through circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *Holland v. United States*, 348 U.S. 121, 140 (1954).

Moreover, in *Jackson* the Supreme Court stated that the prosecutor did not have an affirmative duty to rule out every hypothesis except that of guilt. *Jackson*, 443 U.S. at 326. It is the province of the fact-finder—in Howard's case, the jury—to weigh the probative value of the evidence and resolve any conflicts in testimony. *Id.* at 318-19. And "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not appear affirmatively in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Federal habeas courts reviewing sufficiency claims are cautioned not to reweigh the evidence or redetermine the credibility of witnesses whose demeanor had been observed by the finder of fact. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

The scope of habeas review of the sufficiency of evidence was extremely limited, even before the enactment of AEDPA. 28 U.S.C. § 2254(d) created additional limits on a federal habeas court's review. In reviewing a sufficiency claim, deference is now required at two levels: first, to the jury's verdict as contemplated by *Jackson*, and second, to the state court's consideration of the jury's verdict as dictated by AEDPA. *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

To determine whether a state court's application of clearly established law was unreasonable, the Supreme Court has stated, as noted above, that "the range of reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The standard for sufficiency claims constitute a general rule which requires the federal courts to allow the states more leeway in its application. *Id*. at 663-64.

The Supreme Court has cautioned federal courts against too readily granting habeas relief because of disagreement with the State court adjudication. The Supreme Court has stated that "[a] federal court's collateral review of a state court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The Supreme Court has explained that 28 U.S.C. § 2254(d) imposes a "highly deferential standard" and "demands that state-court decisions be given the benefit of the doubt" and a "readiness to attribute error is inconsistent with the presumption that State courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

The Michigan Court of Appeals did not unreasonably apply this standard to the facts of this case.

**B.     Howard has not met AEDPA's stringent standard because ample evidence was presented to support his premeditated actions in killing Tyrone Simpson after the two men had an altercation.**

Again, Howard was convicted of shooting Simpson several times— once in the head—because Simpson punched him, thinking Howard had stolen his designer glasses.

19

The crux of Howard's argument is that the prosecutor did not prove that he was the person who shot and killed Simpson, and even if he did, that he acted with premeditation. Instead, Howard argues that the eyewitnesses' testimonies were ambiguous or contradictory. The problem with Howard's contention is that the jury—as the finder of fact—interpreted the significance of the evidence presented differently than he did.

The Michigan Court of Appeals rejected this claim of insufficient evidence on direct review by applying the correct constitutional standard:

> On appeal, defendant first contends that there was insufficient evidence to support his conviction. We disagree.

> We review a challenge to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the prosecution, to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v. Hawkins,* 245 Mich. App. 439, 457; 628 NW2d 105 (2001). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the [trier of fact's] verdict." *People v. Nowack,* 462 Mich. 392, 400; 614 NW2d 78 (2000). Circumstantial evidence and reasonable inferences arising from the evidence may constitute satisfactory proof of the elements of the offense. *People v. Warren (After Remand),* 200 Mich. App. 586, 588; 504 NW2d 907 (1993).

> Defendant challenges the sufficiency of the evidence on two grounds. First, he contends there was insufficient

evidence identifying him as the shooter.  The prosecution must prove the identity of the defendant as the perpetrator of a charged offense beyond a reasonable doubt.  *People v. Oliphant,* 399 Mich. 472, 489; 250 NW2d 443 (1976); *People v. Kern,* 6 Mich. App. 406, 409-410; 149 NW2d 216 (1967).  Circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to identify the accused as the perpetrator.  *People v. Nelson,* 234 Mich. App. 454, 459; 594 NW2d 114 (1999).  The credibility of identification testimony is a question for the trier of fact that this Court will not decide over again.  *People v. Davis,* 241 Mich. App. 697, 700; 617 NW2d 381 (2000).  And, a positive identification by witnesses may be sufficient to support a conviction of a crime.  *Id.*

In this case, defendant was identified by no less than four eyewitnesses to the shooting.  Frederick McFadden testified that he had an unobstructed view of the scene from approximately 20 feet away, and saw defendant shoot Simpson several times.  His testimony was unequivocal that defendant was the only person with a gun and that defendant shot Simpson several times, including once in the head.  As pointed out by defendant, McFadden testified at trial that he picked out defendant and the driver of a car from a photo array, which was different from his testimony in a prior trial that he picked out the shooter and two drivers.  McFadden also described the shooter to the police as 20 to 24 years of age and 5″11 to 6″ tall when defendant was 16 at the time of the shooting and is less than 5′6″.  However, the credibility of identification testimony is a question for the trier of fact. *Davis,* 241 Mich. App. at 700.

Marcario Harris and Kimberly Thompson, who live across the street from the store/restaurant where the shooting occurred, also identified defendant as the shooter.  Both testified that they had a clear view of the shooting through their front living room window, which faced the store and they could clearly see defendant in the broad daylight.  Both testified that defendant was only person they

saw with a gun during the incident.  Neither was asked to view a photo array or participate in a live lineup, but identified defendant for the first time at trial.  Both Harris and Thompson described the shooter to the police immediately after the event as around 5″9 or 5′10″, thin, and in his mid–20's.  This description is not so far off as to be a misidentification and moreover, the jury is responsible for both credibility and evidentiary weight determinations. *People v. Bennett,* 290 Mich. App. 465, 472; 802 NW2d 627 (2010).

Aundrey Allen also identified defendant as the shooter. He had been standing with Simpson while Simpson was arguing with defendant about his glasses and when Simpson punched defendant in the face.  Allen testified that he was also standing behind and somewhat to the side of Simpson when defendant pulled a gun out of his pocket and started shooting at Simpson.  Allen was shot in the leg as he tried to run.  Allen described the shooter to the police as being around 5′7″ or 5′8″ and around 17 or 18 years old.  Allen also told the police that several people at the incident called the shooter "Tay," which others witnesses confirmed was defendant's nickname.  At the hospital after his surgery, Allen did view a photo array and identify another person as the shooter.  Allen explained, however, that he was under the influence of morphine at the time of that identification. Allen thereafter participated in a live line up and identified defendant out of the lineup as the shooter.

The above was sufficient for a reasonable jury to find beyond a reasonable doubt that defendant was identified as the shooter.

Defendant next argues that the evidence was insufficient to establish that there was a premeditated, deliberate intent to kill such that his first degree murder conviction cannot stand.  MCL 750.316(1)(a) provides:

22

(1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:

(a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

The elements of premeditated murder are (1) an intentional killing of a human being (2) with premeditation and deliberation.  *People v. Gayheart,* 285 Mich. App. 202, 210; 776 NW2d 330 (2009).  With regard to premeditation and deliberation, this Court has explained:

To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem.  As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood.  While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look."  [*People v. Plummer,* 229 Mich. App. 293, 300; 581 NW2d 753 (1998) (citation omitted).]

"Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation."  *Id.* at 301.  There is no specific period of time that must pass for premeditation to be found; however, "[o]ne cannot instantaneously premeditate a murder."  *Id.* at 305.  Neither premeditation nor deliberation need be established by direct evidence; the required state of mind can be inferred from all of the facts and circumstances on the record.  *People v. Boose,* 109 Mich. App. 455, 473; 311 NW2d

23

390 (1981).  These elements may also be shown by consideration of the following factors: "'(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and, (4) the defendant's conduct after the homicide.'"  *People v. Orr,* 275 Mich. App. 587, 591; 739 NW2d 385 (2007), quoting *People v. Schollaert,* 194 Mich. App. 158, 170; 486 NW2d 312 (1992).

No one disputes that Simpson approached defendant accusing him of stealing his glasses.  It also appears that Simpson escalated the verbal altercation to a physical level by punching the defendant and that defendant did not punch him back.  However, by all accounts, defendant was the only one with a weapon and the only one who shot.  Most important to our analysis, several distinct rounds of shooting occurred.  First, after Simpson punched defendant several times in the face and was approaching to punch him again, defendant shot at Simpson at least twice.  Allen, who was standing next to Simpson at the time the first shots were fired, testified that defendant initially shot at Simpson twice.

The second round of shots came almost immediately thereafter.  Allen testified that after the first two initial shots, he ran toward the store.  As he ran, he heard three more shots.  Bobby Bailey, another witness, also ran to the store after the initial shots.

The next round of shots occurred when both Bailey and Allen were inside the store.  Bailey testified that he heard six or seven more shots while he was in the store.  Allen testified that, he too, heard additional shots while he was in the store.  Allen testified that he heard eight or nine shots right in a row, then a several second pause occurred.  Allen testified that he next heard Simpson begging for his life and a final, single shot.  According to Allen, he thereafter heard the sound of a car being floored and taking off.

McFadden similarly testified to distinct rounds of shots. He testified the he heard three initial shots, and then his attention was drawn to an elderly lady getting out of her car in the street. McFadden had time to help the woman to her home before he heard the next shot, which he testified he heard while at the same time seeing Simpson stumble backward. McFadden testified that he then heard several more shots and Simpson was lying in the street. According to McFadden, the defendant fired two more shots at Simpson as he lay in the street then got into an SUV. Defendant then got back out of the SUV, said "This m—f—n—isn't dead yet" and shot defendant several more times, including once in the head. Defendant then got back in the SUV and left.

Witness Harris, testified that he saw defendant chasing Simpson around a Suburban, shooting at him. After Simpson fell to the ground, defendant walked toward him and shot at him several more times. Harris testified that defendant shot at Simpson approximately 15 times. Witness Thompson testified that defendant first shot at Simpson while both were in the street and Simpson fell to the ground. Defendant then got into an SUV and started to take off, then abruptly got back out of the vehicle when Simpson started to get up. Thompson testified that defendant chased Simpson around shooting at him. She heard Simpson begging for his life and saw defendant walk up to Simpson, shoot him in the head, and then get back into the SUV and leave.

The prosecution presented sufficient evidence of premeditation and deliberation to support defendant's first degree premeditated murder conviction. The first shots fired by defendant could qualify as being brought about by "hot blood" without an opportunity to take a second thought. Simpson had just punched defendant in the face several times and was advancing toward him again. Allen testified that at that point, defendant started reaching for his pocket "real crazy like." Were those the only shots fired, defendant's argument that his actions were rash, impulsive or a hot-blooded reaction to the circumstances would have

some merit.  However, the testimony establishes that after the initial few shots, there was a minimum of a several second pause as Allen and others fled the scene. The pause was long enough, if McFadden's testimony is to be believed, for him to assist an elderly lady from her car parked in the street up to her house and for him to then return to the street and witness the next round of shots.  Allen testified that he could see Simpson's hand go toward his stomach as though he had been shot in that area.  McFadden also testified that after one of the first several shots, he saw Simpson stumble backward.  By all witness accounts, then, Simpson was still alive after the first shots were fired. Assuming defendant did not possess the requisite intent (premeditation or deliberation) to murder at the time the first shots were fired, he could have left at that point and the incident perhaps would have been over.

However, after a pause, more shots were fired and, by all witness accounts, Simpson was still alive.  According to Harris and Thompson, it was at that point that defendant got into an SUV and appeared to be about to leave the scene, but when Simpson started to get up out of the street, the SUV slammed on its brakes and defendant got back out. According to these witnesses, defendant chased Simpson around a vehicle, firing more shots at him until he fell back into the street, then walked up to him and fired a final shot into his head.  While McFadden made no mention of defendant chasing Simpson around a vehicle as he fired shots at him, he did testify that defendant got into an SUV, then got back out, said "This m—f—n—isn't dead yet" and shot defendant several more times, including once in the head.  The medical examiner testified that when the shot to his head was delivered, Simpson was still alive.

A reasonable jury could find that between the apparently non-fatal first shots and the final shot to Simpson's head, there was sufficient time for defendant to take a second look at the nature of his actions.  Defendant may have had no prior relationship with Simpson and may

not have initially gone to the store/restaurant for anything
other than his stated purpose of finding his phone.
Nevertheless, the circumstances of the killing itself show
that defendant thought about taking Simpson's life before
the he took the acts which actually caused the death and
pondered the acts for some, albeit small, amount of time.
Defendant then got into an SUV and the vehicle started to
leave.  But it then stopped as Simpson started to get up and
defendant elected to shoot Simpson several more times while
at least one witness testified that defendant made a
statement concerning an intent to kill Simpson and while
other witnesses testified they heard Simpson pleading with
defendant for his life.  Defendant then stood over Simpson
while he lay in the street and shot him in the head.  The
location of this final shot, the positions of the parties, and
the fact that defendant halted and got out of vehicle to
deliver the final shots adequately suggest that although
defendant had time to take a second look and perhaps leave
Simpson injured, defendant deliberately chose to ensure that
he killed Simpson.  Thus, even if defendant did not form a
homicidal intent until he stopped the SUV and got back out
to deliver the final round of shots, the time span between
that moment and the time the initial shots were fired would
be of a sufficient amount to allow defendant to take a second
look.  There was thus sufficient evidence of premeditation
and deliberation to support defendant's first degree murder
conviction.

*People v. Howard*, No. 311169, 2014 WL 5305997, at *1-5 (Mich. Ct.

App. Oct. 16, 2014).  This determination was not objectively

unreasonable.

Under Michigan law, first-degree premeditated murder requires

proof that the defendant intentionally killed the victim and that the act

27

of killing was premeditated and deliberate.  *People v. Kelly*, 588 N.W.2d 480, 488 (Mich. 1998); Mich. Comp. Laws § 750.316(1)(a). Premeditation and deliberation may be established by evidence of "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide."  *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. 1992).  "Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of the crime," *People v. Jolly*, 502 N.W.2d 177, 180 (Mich. 1993).

Here, there was extensive evidence of Howard's identity as Simpson's killer, and his premeditation in carrying out that crime.

Simpson's friend, Aundrey Allen, identified Howard as the man who argued with Simpson outside of a restaurant and then shot them both.  (5/11/11, Trial Tr. at 46, 55-66.)  Although Allen identified someone who had similar features as Howard in a photo array he viewed when on morphine in the hospital after surgery, he later identified Howard in a live lineup.  (*Id*. at 72-76); *Howard*, 2014 WL 5305997, at *2.

28

Three other eyewitnesses also identified Howard as the shooter. Frederick McFadden was working on his mother's car nearby when he heard an argument, looked up, and saw the shooting.  He identified Howard as the shooter.  (5/10/11, Trial Tr. at 99-113); *Howard*, 2014 WL 5305997, at *2.  Marcario Harris and Kimberly Thompson heard several gunshots and looked out the window of their home located across the street from the restaurant.  They too identified Howard as the shooter. (5/10/11, Trial Tr. at 183-93, 200-10); *Howard*, 2014 WL 5305997, at *2. These identifications were supported by the testimony of Bobby Bailey, the owner of the restaurant.  While Bailey did not see a gun in Howard's hand, he knew Howard, and identified him as the person with whom the victim argued and who was struck by Simpson before the shots rang out.  (5/10/11, Trial Tr. at 57-68, 90.)

In addition to the several eyewitnesses who identified Howard as the shooter—Howard's cell phone was also found at the crime scene. (5/11/11, Trial Tr. at 149.)

Based on the eyewitness testimony alone, there was sufficient evidence for a reasonable jury to determine that Howard was the person who shot and killed Tyrone Simpson.  Further, the jury's determination

on the credibility of these witnesses, is entirely within its purview. *Marshall*, 459 U.S. at 434.  It clearly credited the witnesses' testimonies about the identity of the shooter.

There was also extensive evidence of Howard's premeditation in carrying out Simpson's murder.

The evidence showed that Howard shot Simpson, but then fired several more shots after Simpson stumbled backward.  *See Howard*, 2014 WL 5305997, at *3-4.  Then after a pause, Howard approached Simpson and fired even more shots.  *Id.*  Simpson fell to the ground and Howard got into an SUV driven by a friend.  But, instead of leaving, he said "this MF N isn't dead yet," got out, approached Simpson, and shot him in the head as he lay on the ground.  (5/10/11, Trial Tr. at 64-69, 104-113, 116, 183-91, 200-209; 5/11/11, Trial Tr. at 60-70); *Howard*, 2014 WL 5305997, at *4, 5.  Howard's act of pausing between the volleys of shots, as well as his action of getting out of the SUV to fire a shot into Simpson's head, both support the jury's finding of premeditation because both actions required more than the "mere[] seconds" required.  *People v. Berthiaume*, 229 N.W.2d 497 (Mich. Ct. App. 1975).  Indeed, during the seconds after Howard exited the SUV

and approached Simpson, Simpson was begging for his life until the
final shot was fired.  *Howard*, 2014 WL 5305997, at *4.

Further, the number of shots Howard fired, and the location of
Simpson's wounds supported an inference of premeditation.  *Schollaert*,
486 N.W.2d at 318; *Jolly*, 502 N.W.2d at 180; *see also Turner*, 233
N.W.2d 617, 619 (Mich. 1975) (Use of a lethal weapon supports an
inference of an intent to kill).  There were fourteen fired cartridges
found at the scene and Simpson was shot nine times—once in the head
(behind the right ear), once in the back right upper arm, once in the
back left shoulder, once in the back left elbow, twice in the right lower
leg, and three times in the left lower leg.  (5/11/11, Trial Tr. at 13-17,
33-35, 121.)  Deputy Chief Medical Examiner Leigh Hlavaty confirmed
that the shot to the head was the most immediately lethal, but Simpson
would have died as a result of the other wounds as well.  (*Id.* at 36-38.)

In reviewing the record evidence in a light most favorable to the
prosecution, the prosecutor clearly presented evidence that would allow
a rational jury to determine that Howard killed Simpson and that he
was driven by his anger with Simpson for attacking him and accusing
him of stealing.  Simpson collapsed on the street after Howard put eight

31

bullets in him while giving chase around a vehicle.  Again, from the time Howard paused in his shots while chasing Simpson around the car—and then again when he realized Simpson was still alive and exited his friend's SUV to put a final bullet in Simpson's head—he had time to think about what he was going to do.  The Michigan Court of Appeals' decision that there was sufficient evidence to support the murder conviction was, therefore, not objectively unreasonable. *Howard*, 2014 WL 5305997, at *1-5.

Accordingly, Habeas Claim I should be denied.

**II.    To show ineffective assistance of counsel, a habeas petitioner must establish that trial counsel performed deficiently and that counsel's performance resulted in prejudice.  Where Howard has failed to demonstrate that the Michigan Court of Appeals unreasonably adjudicated either prong of *Strickland*, relief is not warranted.**

In his second claim, Howard argues that his trial counsel was ineffective for (1) failing to call Sergeant Michael Martel as a defense witness, (2) failing to stipulate that Detective Myron Love would have testified that McFadden identified three people in a photo lineup that did not contain a photo of Howard—a stipulation that was made at the first trial—and (3) failing to cross-examine Investigator Barbara Simon. The state appellate court's rejection of these claims was not objectively unreasonable.

### A.    *Strickland* Test.

Claims of ineffective assistance of counsel are governed by the law set forth in *Strickland v. Washington,* 466 U.S. 668 (1984).

Under *Strickland*, a petitioner must establish that his counsel's performance was deficient *and* that he was prejudiced by his counsel's deficient performance.  *Id.* at 687-88 ("there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the

[petitioner] makes an insufficient showing on one." *Strickland*, 466 U.S. at 697). Regarding the performance prong, judicial scrutiny of counsel's performance must be "highly deferential" and a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Beyond the general requirement of reasonableness, "specific guidelines are not appropriate." *Id.* at 688. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions . . . ." *Id.* at 688-89 (It is rare that constitutionally competent representation will require any one technique or approach. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Harrington v. Richter,* 562 U.S. 86, 89 (2011)). The Supreme Court has said that there "are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

Regarding the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at

694.  Notably, the "likelihood of a different result must be substantial,

not just conceivable." *Richter*, 562 U.S. at 112.

The Supreme Court has said that "[s]urmounting *Strickland*'s

high bar is never an easy task." *Padilla v. Kentucky*, 130 S. Ct. 1473,

1485 (2010).  In other words, "under de novo review, the standard for

judging counsel's representation is a most deferential one." *Richter*, 562

U.S. at 105.

Moreover, because the *Strickland* standard is a general standard,

a State court "has even more latitude to reasonably determine that a

defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556

U.S. 111, 123 (2009); *Renico v. Lett*, 130 S. Ct. 1855, 1864 (2010);

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating

whether a rule application was unreasonable requires considering the

rule's specificity. The more general the rule, the more leeway courts

have in reaching outcomes in case-by-case determinations.").

According to the Supreme Court, "[t]he standards created by

*Strickland* and § 2254 are both 'highly deferential,'" and "when the two

apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105

(quoting *Strickland*, 466 U.S. at 689); *Richter*, 562 U.S. at 105 (quoting

*Knowles*, 556 U.S. at 113).

> **B.  Howard's claims of ineffective assistance of counsel
> are meritless.  The Michigan Court of Appeals'
> rejection of these individual subclaims was not
> contrary to, or an unreasonable application of, clearly
> established Supreme Court law.**

As noted above, Howard asserts his defense counsel was

ineffective throughout trial.  Specifically, he argues that his counsel was

ineffective for (1) failing to call Sgt. Martel as a defense witness, (2)

failing to stipulate that Detective Myron Love would have testified that

McFadden identified three people in a photo lineup that did not contain

a photo of Howard—a stipulation that was made at the first trial—and

(3) failing to cross-examine Investigator Simon.  These claims fail.

> **1.  Howard's claim that his counsel was ineffective
> for failing to call Sergeant Michael Martel to
> testify at trial is meritless.**

In a portion of Claim II, Howard asserts that his counsel was

ineffective for failing to call Sgt. Martel to testify at trial.  Howard

asserts that Sgt. Martel would have contradicted Allen's testimony that

he was doped up on painkillers when he initially identified another

person as the shooter.  When Sgt. Martell spoke to Allen, he appeared

coherent.

The Michigan Court of Appeals considered and rejected this claim,

holding that any benefit to Martel testifying would have been upended

by Allen's second identification of Howard when he was not under the

effect of medications:

> An ineffective assistance claim "is a mixed question of
> fact and constitutional law.  A judge must first find the facts,
> then must decide whether those facts establish a violation of
> the defendant's constitutional right to the effective
> assistance of counsel." *People v. Grant,* 470 Mich. 477, 484;
> 684 NW2d 686 (2004).  To merit a new trial because of
> ineffective assistance of counsel, the defendant has the
> heavy burden of demonstrating that defense counsel's
> performance was so deficient that he was not functioning as
> constitutionally guaranteed "counsel" and that defense
> counsel's performance prejudiced the defendant to the extent
> that it is reasonably probable that the outcome of the
> proceedings would have been different.  *People v. Carbin,*
> 463 Mich. 590, 600; 623 NW2d 884 (2001), quoting
> *Strickland v. Washington,* 466 U.S. 668; 104 S. Ct 2052; 80
> L. Ed 2d 674 (1984).  To prevail on a claim of ineffective
> assistance of counsel, then, defendant must prove two
> components: (1) that counsel's performance was deficient
> and that, under an objective standard of reasonableness,
> counsel made an error so serious that he was not performing
> as the attorney guaranteed by the constitution and (2)
> prejudice.  *People v. Pickens,* 446 Mich. 298, 302-303; 521
> NW2d 797 (1994); *Strickland,* 466 U.S. at 687.  To satisfy
> the first component, defendant must show that "counsel
> made errors so serious that counsel was not functioning as
> the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Strickland, supra* at 687.  The second component requires the defendant to show "the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin,* 463 Mich. at 600.  Defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy and must further show that he was prejudiced by the error in question. *Pickens,* 446 Mich. at 312-314.  That a particular trial strategy does not work does not necessarily constitute ineffective assistance of counsel. *Id.* at 61.

Defendant directs us to three instances that he claims amount to ineffective assistance on trial counsel's part. First, defendant asserts that counsel was deficient in failing to call Sergeant Martel as a witness at trial to refute Allen's testimony that when he identified someone other than defendant as the shooter in a photo array while he was in the hospital, it was because he was under the influence of morphine.  According to defendant, at his first trial, which resulted in a hung jury (and a mistrial) on the first degree murder charge, Martel's testimony had made it clear that Allen was coherent when he identified a Deonte *Miller* as the shooter and that based on Allen's identification, Martel prepared a search warrant for Miller's home.  Defendant contends that Allen's identification of him as the shooter was critical to the prosecution's case and, as such, it was critically important for defense counsel to properly challenge Allen's testimony through Martel.

At defendant's first trial Allen testified that on the date of the incident, when he first had contact with the police, he was in the hospital and "had like a lot of morphine inside me."  Allen testified that he was unable to write at that time and the officers asked him to explain what had happened. Allen testified that officers also showed him six photographs and that he was able to identify someone in the photographs but that he does not know who he identified because "at the time ... I was so out of it."  Allen testified that he identified the person who looked closest to defendant because he really

did not know defendant.  It is undisputed that Allen identified someone other than defendant as the shooter in the photo array.

Martel testified that he was not in the room when Allen made an identification of someone in the photo lineup. He testified that he also took a statement from Allen.  He testified that Allen may have been on some medication or painkillers when he gave the statement to Martel, but that Allen seemed coherent.  Martel testified that he would not have taken his statement had he not believed Allen to be coherent.

It is true that Martel's testimony would have placed doubt on Allen's testimony that he mistakenly identified someone other than defendant in the photo lineup due to drug intoxication.  However, decisions on whether to call or question witnesses are presumed to be matters of trial strategy that will not be second-guessed on appeal.  *People v. Horn,* 279 Mich. App. 31, 39; 755 NW2d 212 (2008).  Even if counsel's failure to call Martel as a witness was in error, it cannot be said to have been outcome determinative.  This is necessarily so, as Allen participated in a live lineup after being released from the hospital and identified defendant, who was irrefutably part of that lineup, as the shooter. Thus, Allen's later positive identification of defendant as the shooter would likely have negated any effect of his initial photo identification of another person as the shooter.  Thus, counsel did not render ineffective assistance in failing to call Martel as a witness.

*Howard,* 2014 WL 5305997, at *6-7.  This determination was not

objectively unreasonable.

Decisions as to what evidence to present are presumed to be

matters of trial strategy and the failure to present evidence constitutes

39

ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

Again, Howard first criticizes counsel for not calling Sgt. Martel as a witness to testify about the nature of his interaction with Aundrey Allen at the time Allen viewed the first photo array while he was hospitalized. At the first trial, Sgt. Martel testified that Allen "may have been on some sort of medication or painkillers. I'm not sure. But he seemed coherent enough to me to—if I had believed he wasn't coherent, I would not have taken his statement." (1/13/11, Trial Tr. at 60.)

The State submits that Howard's criticism is not warranted. Defense counsel chose to address Allen's explanation for his initial misidentification during cross-examination as part of an overall effort to discount the more problematic live lineup in which Allen *did* identify Howard. That live lineup was at a time when Allen was unquestionably not under the effect of painkillers. Indeed, at the second trial, defense counsel was able to elicit Allen's admission that he never disclosed to the police that he was woozy or under the influence of drugs at the time

of the first photo array. (5/11/11, Trial Tr. at 94.) Thus, counsel was able to cast doubt on the lineup and in-court identifications through cross-examination of Allen himself—instead of through one of the police officers who interviewed him. (*Id.* at 92-102, 107-108.) Armed with knowledge of Allen's prior testimony, defense counsel could easily have decided to rely on the jury's ability to evaluate Allen's credibility and weigh his testimony rather than calling Sgt. Martel as a witness. Counsel's tactic constituted reasonable trial strategy. *Strickland*, 466 U.S. at 689.

Further, Howard cannot show he was prejudiced by that tactic because the live lineup procedure that Allen participated in, would have negated any error of counsel failing to call Martel. *Howard*, 2014 WL 5305997, at *7.

Accordingly, the Michigan Court of Appeals' rejection of this claim was not objectively unreasonable. This portion of Claim II should be denied.

41

### 2. Howard's claim that his counsel was ineffective for failing to stipulate that Detective Myron Love would have testified that McFadden identified three people in a photo lineup that did not contain a photo of Howard is meritless.

In another portion of Claim II, Howard asserts that his counsel was ineffective for failing to stipulate that Detective Myron Love would have testified that McFadden identified three people in a photo lineup that did not contain a photo of Howard.

The Michigan Court of Appeals considered and rejected this claim, holding that any action by defense counsel would have been futile because Det. Love testified in person at the second trial—a decision entirely within the discretion of the prosecutor:

> An ineffective assistance claim "is a mixed question of fact and constitutional law. A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." *People v. Grant,* 470 Mich. 477, 484; 684 NW2d 686 (2004). To merit a new trial because of ineffective assistance of counsel, the defendant has the heavy burden of demonstrating that defense counsel's performance was so deficient that he was not functioning as constitutionally guaranteed "counsel" and that defense counsel's performance prejudiced the defendant to the extent that it is reasonably probable that the outcome of the proceedings would have been different. *People v. Carbin,* 463 Mich. 590, 600; 623 NW2d 884 (2001), quoting *Strickland v. Washington,* 466 U.S. 668; 104 S. Ct 2052; 80 L. Ed 2d 674 (1984). To prevail on a claim of ineffective

assistance of counsel, then, defendant must prove two components: (1) that counsel's performance was deficient and that, under an objective standard of reasonableness, counsel made an error so serious that he was not performing as the attorney guaranteed by the constitution and (2) prejudice. *People v. Pickens,* 446 Mich. 298, 302-303; 521 NW2d 797 (1994); *Strickland,* 466 U.S. at 687. To satisfy the first component, defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra* at 687. The second component requires the defendant to show "the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin,* 463 Mich. at 600. Defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy and must further show that he was prejudiced by the error in question. *Pickens,* 446 Mich. at 312-314. That a particular trial strategy does not work does not necessarily constitute ineffective assistance of counsel. *Id.* at 61.

* * *

Defendant next contends that counsel was ineffective for failing to enter a stipulation that was entered at his first trial—that Detective Myron Love would testify that he showed McFadden a photo lineup; that defendant's picture was not included in the photo lineup; that McFadden picked out three people, and; that Love did not remember who McFadden picked out.

It is not clear from the record why the above stipulation was entered. However, it is clear that Love appeared at defendant's second trial and testified. Thus, a stipulation as to what he would have testified to was obviously not an option at that point. Defendant has also provided nothing to indicate that defense counsel failed to request the same stipulation, rather than that he perhaps sought the same stipulation and was denied the opportunity

43

to present it at trial instead of Love's live testimony.  Given the above, it cannot be found that counsel was ineffective for failing to procure the stipulation.

Moreover, the only way in which Love's testimony at trial differed from the stipulation was that at defendant's trial, Love testified that he *was unsure* whether defendant's photo was included in the photo array and the stipulation provided that defendant's photo *was not* in the photo array. While defendant makes much of this distinction and contends that the difference was significant in undermining McFadden's testimony at trial that he was positive he picked defendant's photo out of the photo array, defense counsel elicited from Love that had McFadden picked defendant out of a photo array they would have had documentation of the same and they did not.  Thus, counsel effectively undermined McFadden's credibility in asserting that he had picked defendant out of a photo lineup despite the difference between the stipulation and the live testimony.  Defense counsel was thus not ineffective in failing to procure the same stipulation regarding Love's testimony that was presented at his first trial.

*Howard*, 2014 WL 5305997, at *6, 7-8.  This determination was not

objectively unreasonable.

First, he cannot show that his counsel's performance was outside

"the wide range of reasonable professional assistance."  *Strickland*, 466

U.S. at 689.  Defense counsel would not have been able to seek a

stipulation because Det. Love was available to testify at the second

trial.  *Howard*, 2014 WL 5305997, at *7.  Additionally, counsel would

not have been able to anticipate that Love would be unable to recall for

sure whether Howard's photo was in the array.  (5/11/11, Trial Tr. at 128.)  Counsel's actions were entirely proper under the circumstances. *Strickland*, 466 U.S. at 689.

Further, Howard cannot show prejudice.  Love did, in fact, testify that that he showed the array to McFadden a few days after the shooting and believed the array pertained to the first suspect, which other testimony clearly established to be Deonte *Miller*.  (5/10/11, Trial Tr. at 157-62; 5/11/11, Trial Tr. at 124-27.)  Further, while Love said that he was "not really positive" whether Howard was in the array, he confirmed that had McFadden identified Howard, he would have made note of it.  (5/11/11, Trial Tr. at 128.)  And there was nothing in Love's file to indicate such an identification.  (*Id.*)  Thus, defense counsel was able to undermine Det. Love's testimony in any event.  *Howard*, 2014 WL 5305997, at *8.

Accordingly, the Michigan Court of Appeals' rejection of this claim was not objectively unreasonable.  This portion of Claim II should be denied.

### 3.   Howard's claim that his counsel was ineffective for failing to cross-examine Investigator Barbara Simon is meritless.

In another portion of Claim II, Howard asserts that his counsel was ineffective for failing to cross-examine Investigator Barbara Simon on her general tactics in conducting interviews.

The Michigan Court of Appeals considered and rejected this claim, holding that there was nothing to be gained by defense counsel asking the same questions of Simon that the prosecutor did and having her reiterate her denials of mistreating a witness.

> An ineffective assistance claim "is a mixed question of fact and constitutional law.  A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel."  *People v. Grant,* 470 Mich. 477, 484; 684 NW2d 686 (2004).  To merit a new trial because of ineffective assistance of counsel, the defendant has the heavy burden of demonstrating that defense counsel's performance was so deficient that he was not functioning as constitutionally guaranteed "counsel" and that defense counsel's performance prejudiced the defendant to the extent that it is reasonably probable that the outcome of the proceedings would have been different.  *People v. Carbin,* 463 Mich. 590, 600; 623 NW2d 884 (2001), quoting *Strickland v. Washington,* 466 U.S. 668; 104 S. Ct 2052; 80 L. Ed 2d 674 (1984).  To prevail on a claim of ineffective assistance of counsel, then, defendant must prove two components: (1) that counsel's performance was deficient and that, under an objective standard of reasonableness, counsel made an error so serious that he was not performing

as the attorney guaranteed by the constitution and (2) prejudice. *People v. Pickens,* 446 Mich. 298, 302-303; 521 NW2d 797 (1994); *Strickland,* 466 U.S. at 687. To satisfy the first component, defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra* at 687. The second component requires the defendant to show "the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin,* 463 Mich. at 600. Defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy and must further show that he was prejudiced by the error in question. *Pickens,* 446 Mich. at 312-314. That a particular trial strategy does not work does not necessarily constitute ineffective assistance of counsel. *Id.* at 61.

\* \* \*

Defendant also argues that counsel was ineffective in declining to cross-examine investigator Simon. At his first trial, defendant points out that his trial counsel cross-examined Simon regarding her treatment of people she has interrogated. Counsel elicited that Simon had lied to suspects during interrogations, had cursed at them, and had told them if they did not talk they were going to jail. Counsel asked Simon if she had threatened witness Bobby Bailey during her questioning of him and Simon denied threatening him, telling him to shut up, or threatening to ruin his business because he did not tell her what she wanted to know. While defendant argues that Simon's alleged threats were an important piece of the defense theory that the police engaged in misconduct, defendant has identified no other alleged acts of misconduct on the part of the police or further explained how any theory of misconduct was conveyed to the jury and influenced or was intended to influence his case. And, any admissions that first trial counsel elicited form Simon about any untoward treatment

of persons she questioned was limited to treatment of *suspects*—not of witnesses such as Bailey.

Additionally, because Simon unequivocally denied making any threat in any form to Bailey in the first trial, it was reasonable for defense counsel at defendant's second trial to conclude she would testify consistently and deny any wrongdoing.  And on direct examination by the prosecution, she, in fact, did.  Thus, it would be a reasonable trial strategy to elicit from Bailey, as defense counsel did, that Simon had threatened him and that Bailey had just agreed to whatever she said due to the threats, that Simon told him to shut up and would not let him talk and just wanted to make the shooter defendant, and let those accusations stand unanswered by Simon to the greatest degree possible.  Though the prosecutor asked Simon on direct whether she had threatened Bailey during her questioning of him and she again denied making any threats, there would be nothing gained by defense counsel again asking her the same questions and having her reiterate her denials.  This Court will not substitute its judgment for trial counsel's in matters of trial strategy.  *People v. Avant,* 235 Mich. App. 499, 508; 597 NW2d 864 (1999).

*Howard*, 2014 WL 5305997, at *6, 8.  This determination was not

objectively unreasonable.

Again, under *Strickland* a court must presume that decisions by

counsel as to whether to call or question witnesses—and to what

extent—are matters of trial strategy.  *Hutchison*, 303 F.3d at 749.

Here, defense counsel made a calculated decision to not question Inv.

Simon about the same material the prosecutor just did.  Instead,

counsel concentrated his efforts on Bobby Bailey's allegations that he

48

was mistreated.  Namely, defense counsel elicited from Bailey that Simon threatened to get him "violated" on his probation/parole, told him to shut up when he tried to explain, and accused him of calling "the shooter up there." (5/10/11, Trial Tr. at 89-91.)  When Inv. Simon testified, she merely denied Bailey's accusations during her questioning by the prosecutor.  (5/11/11, Trial Tr. at 132.)  Faced with that denial, counsel reasonably could have determined that providing Simon with another opportunity to deny the allegations—just as she did when cross-examined at the first trial—would only increase the likelihood that the jury would credit her testimony on the subject instead of Bailey's.  (*See* 1/12/11, Trial Tr. at 189-195.); *Howard*, 2014 WL 5305997, at *8.  Counsel's calculated decision was reasonable and Howard has failed to present any legitimate argument to the contrary.

Howard has similarly failed to present any evidence to support his claim that he was prejudiced by defense counsel's chosen tactic when he was faced with four eyewitnesses to the crime who all identified Howard as the shooter.  As outlined above, to show prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

49

different." *Id.* at 694.  Notably, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.  Howard has made no such showing.

Accordingly, the Michigan Court of Appeals' rejection of this claim was not objectively unreasonable.  This portion of Claim II should be denied.

III.   **Howard's claim that the prosecutor committed misconduct by knowingly presenting perjured testimony from Detective Myron Love about what occurred during a photo lineup procedure is procedurally defaulted and that default has not been excused.  In the alternative, the claim is meritless.  The Michigan Court of Appeals' rejection of this claim was not objectively unreasonable.**

In his third claim, Howard argues that the prosecutor committed misconduct when he knowingly presented perjured testimony from Det. Myron Love and witness McFadden about what occurred during a photo lineup procedure.  Howard is not entitled to relief because the claim is procedurally defaulted and that default has not been excused. Moreover, the Michigan Court of Appeals' determination that there was no error was not objectively unreasonable.

A.     **Howard's claim of prosecutorial misconduct was deemed to be procedurally defaulted because he failed to contemporaneously object to the alleged error and that default has not been excused.**

"[P]rocedural default results where three elements are satisfied: (1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim." *Willis v. Smith*, 351 F.3d 741,

51

744 (6th Cir. 2003) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).  Here, Howard's claim that the prosecutor committed misconduct when he presented perjured testimony from both Det. Love and witness McFadden is procedurally defaulted because he failed to contemporaneously object to the alleged error.

The last state court to issue a reasoned opinion on this claim was the Michigan Court of Appeals, which denied relief because he failed to preserve it in the trial court.  *Howard*, 2014 WL 5305997, at *9.  When it addressed the issue, it found that the issue was "unpreserved;" therefore, its review was limited to whether plain error occurred.  *Id*. The ground for this decision constitutes a procedural default.  *Taylor v. McKee*, 649 F.3d 446, 450-51 (6th Cir. 2011).  And the contemporaneous-objection rule is an adequate and independent state ground for the state court's decision because the rule was "firmly established and regularly followed" before Howard's trial.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

Because the elements of procedural default have been satisfied, Howard must show "cause" for failing to follow state procedure and "actual prejudice" as a result of the alleged violation of federal law.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Alternatively, he must demonstrate that a fundamental miscarriage of justice will occur as a result of the Court's failure to consider the substantive merits of the claim. *Id.*

A petitioner must present a substantial reason to excuse the default. *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Amadeo v. Zant*, 486 U.S. 214, 222-23 (1988) (reviewing a claim that a document was concealed by officials). One recognized reason includes attorney error rising to the level of ineffective assistance of counsel. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000); *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). Here, though, Howard has failed to establish cause to excuse his default.

While a claim of ineffective assistance of counsel may sometimes qualify as cause to excuse a procedural default, that ineffective assistance of counsel claim must, too, be exhausted in the state courts. *Edwards*, 529 U.S. at 451. Howard has not argued to the state courts— or to this Court—that his counsel was ineffective for failing to object to the prosecutor's use of allegedly perjured testimony from Det. Love and witness McFadden.

The narrow exception for fundamental miscarriages of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). A claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

To show that his case is the "extraordinary" one warranting application of this exception, Howard must demonstrate "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*. at 321, 327. But he has presented no new, reliable evidence in support of a claim of actual innocence. Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider the substantive merits of this claim of error.

Accordingly, Claim III is procedurally barred from review. It fails on this basis alone.

**B.**   **Even if this Court bypasses or otherwise excuses the default, Howard's claim of prosecutorial misconduct is meritless because the Michigan Court of Appeals reasonably determined that there was no evidence that Det. Love or McFadden's testimonies were perjured.**

As an initial matter, the Sixth Circuit has recently held that when a habeas claim is procedurally defaulted due to the state court's use of plain-error review, but that default is overcome by a showing of cause and prejudice, review of the underlying claim is de novo, even if the plain-error review discussed the merits of the claim. *Frazier v. Jenkins*, 770 F.3d 485, 496 n. 5 (6th Cir. 2014). This Court should follow *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009), and give deference to the state court's plain error discussion.

*Frazier* is in direct conflict with *Fleming*. Because a panel of the Sixth Circuit may not overrule a prior published decision, 6th Cir. R. 32.1(b), lower courts faced with conflicting holdings from the Sixth Circuit must follow the earlier-decided holding. *Habich v. City of Dearborn*, 331 F.3d 524 n. 2 (6th Cir. 2003). The *Frazier* majority cites a number of published Sixth Circuit decisions that preceded *Fleming*, but none of them support the proposition that a merits discussion contained within a plain-error analysis is not entitled to AEDPA

deference.  All of the cited cases, rather, hold that a plain-error analysis constitutes a procedural default, even if there is a merits discussion along with it.  As Judge Sutton, concurring in *Frazier*, correctly pointed out, whether a claim is procedurally defaulted and whether a claim was adjudicated by the state court on the merits are not mutually exclusive.  770 F.3d at 485 (Sutton, J., concurring).

But in the event this Court bypasses or otherwise excuses Howard's default, the claim still fails because it is meritless.

In order to establish prosecutorial misconduct, Howard must show that the statements in question "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012). This is a high burden.  When reviewing the statements, a habeas court must focus on "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The mere presence of prosecutorial misconduct is not enough, "[r]eversal is required only if the prosecutor's misconduct is 'so pronounced and persistent that it permeates the entire atmosphere of the trial or so

gross as probably to prejudice the defendant.'" *Lundgren v. Mitchell,* 440 F.3d 754, 778 (6th Cir. 2006) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).

Further, claims of prosecutorial misconduct are subject to harmless error analysis. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). Thus, "[e]ven if the prosecutor's conduct was improper or even universally condemned, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003) (internal quotations and citations omitted). Also, "state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645).

The Michigan Court of Appeals rejected this claim in a manner that was not objectively unreasonable. It rested its holding on the face that Det. Love's and McFadden's testimonies were not perjured in any way. Indeed, any discrepancies were, at most, mere inconsistencies:

> Defendant's next argument on appeal is that his
> conviction was obtained through the use of false and/or

perjured testimony, thus denying him his due process rights. Specifically, defendant contends that witness McFadden testified at the second trial that he was positive he identified defendant in a photo array and that this testimony is contrary to the stipulation entered in the first trial of Detective Love that defendant was not in the photo array and of Love's testimony in the second trial that if McFadden had identified defendant, there would have been documentation of the same.  Defendant asserts that, similarly, Love's testimony at the second trial that he was unsure whether defendant's photo was in the array was false and/or perjured as it contrasted with the stipulation in the first trial that defendant's photo was not in the array.  We review this unpreserved allegation of constitutional error for plain error affecting the defendant's substantial rights. *People v. Carines,* 460 Mich. 750, 763-764; 597 NW2d 130 (1999).

A conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment. *Mooney v. Holohan,* 294 U.S. 103, 112; 55 S. Ct 340; 79 L. Ed 791 (1935); *Napue v. Illinois,* 360 U.S. 264, 269; 79 S. Ct 1173; 3 L. Ed 2d 1217 (1959); *People v. Aceval,* 282 Mich. App. 379, 389-390; 764 NW2d 285 (2009).  If there is any reasonable likelihood that the false testimony could have affected the judgment of the jury, the conviction must be set aside.  *Aceval,* 282 Mich. App. at 389-390.  Stated differently, a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment.  *Id.*

Michigan courts have also recognized that the prosecutor has a duty to correct false evidence.  See *People v. Herndon,* 246 Mich. App. 371, 417; 633 NW2d 376 (2001). But the mere fact that a witness's testimony conflicts with earlier statements does not establish that a prosecutor knowingly presented perjured testimony.  *People v. Parker,* 230 Mich. App. 677, 690; 584 NW2d 753 (1998).  Perjury

requires a material, willful false statement. *In re Contempt of Henry,* 282 Mich. App. 656, 677-678; 765 NW2d 44 (2009).

There is no indication in the record that the prosecutor, who was the same person for both trials, concealed any prior contradictory statements or elicited and allowed perjured testimony to stand, or even that the statements were, in fact contradictory or perjured. With respect to Love, as previously indicated, a stipulation was entered in the first trial that "... if Detective Myron Love showed, the testimony would be Detective Myron Love showed Frederick McFadden a photographic line-up regarding the shooting of Tyrone Simpson. In front of Detective Love, Frederick McFadden picked out three people. Detective Love does not remember who Frederick McFadden identified, but Deonte Howard was not one of those people." The prosecutor added, "He was no[t] in the line-up." At this point defense counsel stated, "Right. Deonte Howard was not in the photographic line-up that was shown to Frederick McFadden...." The prosecutor stated, "That's correct, Judge. And I've sign[ed] the document to that effect."

At defendant's second trial, Love appeared as a witness and testified that he showed a photo array with six photos to McFadden. When advised that there were two different suspects involved in the case, Love indicated that he believed he was involved with the first suspect [Deonte Miller]. Love testified that when shown the photo array, McFadden picked out three people that he indicated he recognized. Love further testified that he was "not really positive" if defendant's photo was in the photo array. Love testified that he did not have a copy of the photo array and he had no documentation to show that McFadden had picked defendant out of the photo array. Love testified that had McFadden picked out defendant, they would have had documentation of the same.

Clearly, Love was not in charge of what the prosecutor and defense counsel in the first trial placed on the record as

far as the stipulation that defendant was not part of the photo array shown to McFadden.  The prosecutor was the individual who volunteered this information as part of the stipulation so likely had a basis for making such a statement, but that would be bare speculation at this point.  In any event, Love's live testimony at defendant's second trial does not *contradict* this stipulation.  Instead, Love simply stated he was "not positive" whether defendant's photo was or was not part of the array, indicating a lapse of memory, not a material, willful false statement.  See *In re Contempt of Henry,* 282 Mich. App. at 677-678.

Concerning McFadden, at defendant's first trial McFadden testified that he was shown three pages of pictures and that he picked out "the shooter and two drivers."  At defendant's second trial, McFadden testified that he saw three pictures and that he picked out two people.  McFadden specifically testified that he picked out defendant and the driver.  He testified that he was "positive" that he picked out defendant in the photos.  Notably, the prosecution did not ask McFadden any questions about the photo identification on direct examination—it was defense counsel who elicited this information on cross-examination.  In any event, comparing the testimony at the two trials, while there are some differences, the significant factor is the absence of any mention of defendant in McFadden's first testimony.  McFadden did not testify at the first trial that he picked defendant out of the photo array; he testified that he picked out the shooter.  Thus there is no conflict with respect to defendant in his testimony at defendant's second trial.

According to defendant, McFadden's testimony that he identified defendant as the shooter in the photo array is nevertheless clearly false.  However, all inconsistencies were disclosed to the jury and it was for the jury to determine whether McFadden's trial testimony, including his alleged identification of defendant in a photo array, was credible. *People v. Davis,* 241 Mich. App. at 700.

> Were we to find that the testimony was, in fact, false, it cannot be concluded that the admission of the testimony affected the jury's verdict and thus the outcome of the trial. Not only did McFadden identify defendant in court as the shooter, several other eyewitnesses, whose credibility defendant does not challenge, also unequivocally identified defendant as the shooter.

*Howard*, 2014 WL 5305997, at *9-10.  This determination was not objectively unreasonable.

With respect to a claim that the prosecutor knowingly presented perjured testimony, the Supreme Court has been clear.  The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"  *Giglio v. United States,* 405 U.S. 150, 153 (1972) (citation omitted).  The result is the same when the State allows false evidence to go uncorrected.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  A habeas petitioner bears the burden of proving that the disputed testimony constituted perjury.  *Id*. at 270.  To prevail on a claim that the prosecutor used false testimony, a petitioner must show that (1) the testimony was actually false, (2) that the false statements were material, and (3) that the prosecutor knew the testimony was false.  *Coe v. Bell,* 161 F.3d 320, 343 (6th Cir. 1998).

However, a habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000). Mere inconsistencies in a witness' testimony do not establish the knowing use of false testimony by the prosecutor. *Coe*, 161 F. 3d at 343. Additionally, the fact that a witness contradicts himself or changes his story does not establish perjury either. *Malcum v. Burt*, 276 F. Supp. 2d 664, 684 (E.D. Mich. 2003). A habeas petition should be granted if perjury by a government witness undermines the confidence in the outcome of the trial. *Id*.

Here, the record demonstrates that, at most, there was inconsistent or mistaken testimony—not perjured.

Regarding McFadden, at the first trial, he testified that he picked out the shooter and two drivers in the first array. He was not asked if he picked Howard and did not say that he identified Howard in the array. (1/11/11, Trial T. at 200.) At the second trial, he testified he viewed three pictures and picked out two people, Howard and the driver of the SUV. (5/10/11, Trial Tr. at 124-25.) McFadden said he looked at

the photographs a day or two after the shooting and was "positive" he picked out Howard.  (*Id*. at 127.)  This testimony does not show that McFadden willfully intended to provide false testimony during the second trial.  It suggests nothing other than he truly believed that he identified Howard in the array.  A mistake in that regard does not establish perjury.  *Coe*, 161 F. 3d at 343; *Malcum*, 276 F. Supp. 2d at 684.

Similarly, a careful reading of Love's testimony shows that his memory was faulty, not that he perjured himself.  Unlike McFadden, Love did not testify at the first trial.  At the second trial he testified that McFadden picked out three people in the photo array.  He estimated that he showed the array to McFadden a few days after the shooting and "believe[d]" that the array concerned the first suspect.  (5/11/11, Trial Tr. at 126-27.)  On cross-examination, he testified that he was "not really positive" that Howard was not in the array.  Love said he knew Howard "was part of the first one" and though "it was two individuals that they wound up looking at."  The name Deonte Miller did not sound familiar and he did not have copy of the array.  He had no paperwork to suggest McFadden picked out Howard and would have

had documentation if he had.  (*Id*. at 128.)  Fairly read, Love's testimony shows that Love simply had no clear memory of the array, not that he intended to provide false testimony, which is required for relief.  *Coe,* 161 F.3d at 343.

But, even if Howard could make that showing, he still would not be entitled to relief.  The shooting occurred on April 10.  The officer-in-charge, Sgt. Samuel Mackie, testified that he obtained a photo of Deonte Miller, the photo was included in an array, and other officers showed arrays to Allen on April 11 and Baily on April 13.  (5/10/11, Trial Tr. at 157-62.)  McFadden testified that he too looked at an array two or three days after the shooting.  (*Id*. at 127-28.)  But, it is clear that Howard was not a suspect at that time.  According to Sgt. Mackie, only after determining that Miller was not involved did he use cell phone records and a photo on the cell phone found at the scene to connect Howard to the phone.  He then obtained a photo of Howard, placed it in an array, and showed that array to Bailey.  Bailey then identified Howard.  (*Id*. at 162-70.)

Defense counsel used that testimony to discredit McFadden.  He

argued the evidence as a factor demonstrating that McFadden's

identification was not credible:

> And Mr. McFadden says, oh, yes.  I identify him out of
> a line-up.  Now, sergeant, or Investigator Love said there's
> no evidence that he identified my client Mr. Howard.  Mr.
> Howard wasn't even the subject matter of the investigation
> at that point in time because they were looking at a Deonte
> Miller.  Mr. Howard didn't come up for a while.  So, Mr.
> McFadden says, I identified Mr. Howard.  But we know
> there's no evidence of that.

(5/11/11, Trial Tr. at 174.)

The prosecutor similarly never claimed that McFadden identified

Howard when viewing the array.  Instead, he only discussed

McFadden's testimony about what he observed at the time of the

shooting.  (*Id.* at 157-60, 188-89.)

A jury considering those arguments and the testimony of

McFadden and Love would not be left with the belief that McFadden

actually identified Howard's photo in the array.  A reasonable jury

would not consider the array as a factor supporting McFadden's in-court

identification of Howard.  Nor would a jury rest its verdict on

McFadden's identification testimony.  Three other eyewitnesses

identified Howard as the shooter, and a fourth witness (Bailey), who

65

knew Howard, identified him as the man was involved in the physical altercation with Simpson seconds before the shots.  Because McFadden's testimony regarding the array did not affect the jury's verdict, any error was harmless.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

## CONCLUSION

Howard procedurally defaulted Claim III (Det. Love and witness McFadden gave perjured testimony). He has not shown cause and prejudice to excuse the default. In addition, he has not shown failure to review the claim would result in a fundamental miscarriage of justice. Accordingly, as detailed above, habeas review of Claim III should be barred.

The state courts' rejection of Howard's claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts. Howard was "entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953); *see also United States v. Hajal*, 555 F.2d 558, 569 (6th Cir. 1977) ("[W]e have yet to review a perfect jury trial."). The state-court decision in this case was not "so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. The formidable threshold for granting habeas relief has not been met because fairminded jurists could disagree on the correctness of the state court's decision.

*Yarborough*, 541 U.S. at 664.  Consequently, habeas relief should be denied.

Additionally, the State opposes any requests for bond, oral argument, or any other relief, including a certificate of appealability. And the State asserts that Howard is not entitled to habeas relief because he has not established that the alleged errors had a substantial and injurious effect on the verdict in this matter.  *Brecht*, 507 U.S. at 637-38.

The State also contends that Howard has not demonstrated entitlement to discovery.  Unlike typical civil litigants, "[h]abeas petitioners have no right to automatic discovery."  *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).  Rule 6(a) permits district courts to authorize discovery in habeas corpus proceedings under the Federal Rules of Civil Procedure only "for good cause."  R. Governing 2254 Cases in the U.S. Dist. Cts. 6(a).  "Rule 6 embodies the principle that a court must provide discovery in a habeas proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'"  *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir.

2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'" *Williams*, 380 F.3d at 974 (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)); Habeas Rule 6(a). "Conclusory allegations are not enough to warrant discovery under Rule 6; the petitioner must set forth specific allegations of fact." *Williams*, 380 F.3d at 974 (internal quotation marks and citation omitted). Howard has not met this burden.

If this Court denies the petition, the State asserts that Howard is also not entitled to a certificate of appealability (COA) so as to proceed further. In order to obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the petitioner is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate

69

whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (citations omitted).

When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack*, 529 U.S. at 483-84. Likewise, when a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claims, a COA should issue, and an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* at 484.

When a plain procedural bar is present, and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or

70

that the petition should be allowed to proceed further.  In such a

circumstance, no appeal would be warranted.  *Id.*

**RELIEF**

For the reasons stated above, this Court should deny the petition. The Court should also deny Howard any requested discovery, evidentiary hearings, bond, oral argument, and any other relief he seeks in this action, including a certificate of appealability.

Respectfully submitted,

Bill Schuette
Attorney General

<u>s/Andrea M. Christensen-Brown</u>

Assistant Attorney General
Criminal Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
christensena1@michigan.gov
P71776

Dated: March 6, 2017
2016-0148937-A/Howard, Deonte/Answer

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2017, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

HONORABLE JOHN CORBETT O'MEARA
MAGISTRATE JUDGE ANTHONY P. PATTI

and I hereby certify that Cristina R. Dowker has mailed by United States Postal Service the papers to the following non-ECF participant:

793937 DEONTE HOWARD
OAKS CORRECTIONAL FACILITY
1500 CABERFAE HIGHWAY
MANISTEE, MI 49660

Respectfully submitted,

Bill Schuette
Attorney General

s/Andrea M. Christensen-Brown

Assistant Attorney General
Criminal Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
christensena1@michiga.gov
P71776

73