STATE OF MICHIGAN

PT
7-19
Monroe

IN THE 36TH DISTRICT COURT FOR THE CITY OF DETROIT

PEOPLE OF THE STATE OF MICHIGAN,

    -vs-

DISTRICT COURT
CASE NO. 10-59500

DEONTE HOWARD,

10-5562

               Defendant:
_____/

**PRELIMINARY EXAMINATION**

BEFORE THE HONORABLE KATHERINE L. HANSEN

36TH District Court Judge

Detroit, Michigan - Wednesday, May 26, 2010

APPEARANCES:

For the People:

        RAJESH PRASAD, ATTORNEY, P-68519
        Wayne County Prosecutor's Office
        1441 St. Antoine, 12th Floor
        Detroit, Michigan 48226-2302
        (313) 224-5777

For Defendant:

        SUSAN K. ROCK, ATTORNEY, P-34497
        P.O. Box 39287
        Redford, Michigan 48239
        (313) 937-4444

Court Reporter:      BETH A. TOMASI, CSR-3098
                    Certified Shorthand Reporter
                    (313) 965-6564

6-28-10 (4)

2

1                           I N D E X

2                            WITNESS

3

     AUNDREY ALLEN
4          Direct Examination by Mr. Prasad              11
           Cross-Examination by Ms. Rock                 29
5          Re-Examination by Mr. Presad                  51
           Re-Examination by Ms. Rock                    52
6
     BOBBY BAILEY
7          Direct Examination by Mr. Prasad              54
           Cross-Examination by Ms. Rock                 64
8
     MACARIO ANDREW HARRIS
9          Direct Examination by Mr. Prasad              73
           Cross-examination by Ms. Rock                 79
10

11                          EXHIBITS

12                        NONE MARKED

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1                          Detroit, Michigan

2                          May 26, 2010

3                          Approximately 2:05 a.m.

4                    *       *       *

5                          THE COURT:  This is 10-59500,

6       People versus Deonte Howard.  Mr. Howard is charged

7       with Count I, homicide, murder, first degree,

8       premeditated, felony, life offense, Count II, assault

9       with intent to murder, felony, life offense, Count III,

10      weapons, felony firearm, two years consecutively,

11      preceding any term of imprisonment and felony or

12      attempted felony conviction.  This is the day and time

13      for preliminary examination.  Good afternoon.

14                         MR. PRASAD:  Raj Prasad for the

15      people.

16                         MS. ROCK:  Susan Rock on behalf of

17      Deonte Howard.  Your Honor, I would make a motion to

18      sequester witnesses.

19                         THE COURT:  The court would do

20      that.

21                         MR. PRASAD:  Your Honor, we have

22      sequestered witnesses.  We ask for exception for

23      Sergeant Mackie, the officer in charge of the case.

24                         THE COURT:  Could you spell the

25      last name for the court reporter?
```

4

1                    MR. PRASAD: M-a-c-k-i-e.

2                    MS. ROCK: I have no objection, as

3    long as he's not going to testify. If he's going to

4    testify, I ask that he testify first.

5                    MR. PRASAD: He's not testifying

6    today, in these proceedings.

7                    THE COURT: The court would enter

8    sequestration order, make that order mutual, direct the

9    attorneys to tent to their own witnesses, enter

10    exception for the officer in charge, sergeant so

11    identified. Miss Rock, have your client have a seat.

12                    MS. ROCK: Thank you.

13                    THE COURT: Call your first

14    witness.

15                    MR. PRASAD: Prior to calling our

16    witness, two stipulations if I may, to read into the

17    record.

18                    THE COURT: You may.

19                    MR. PRASAD: First, Judge, that on

20    April 10th, of 2010, the body of Tyrone Simpson,

21    S-i-m-p-s-o-n, was identified at the Wayne County

22    Medical Examiner's Office by his mother and

23    grandmother. His mother's name, your Honor, I'll spell

24    them both, mother's name is D-e-l-f-e-r-a, last name

25    Hunt, H-u-n-t and the grandmother's name is Brenda

1    Conway, last name spelled C-o-n-w-a-y.  They identified

2    the body of Tyrone Simpson.

3                    Your Honor, the second stipulation

4    for exam purposes is taht that report of Wayne County

5    Medical Examiner's Office, that on April 11, the next

6    day on 2010, the body of Tyrone Simpson, just

7    mentioned, was, in fact, examined by the Wayne County

8    Medical Examiner's Office and examiner case number

9    10-3487 by Dr. Cheryl Loewe, L-o-e-w-e, Deputy Chief

10   Medical Examiner and if I may read the summary and

11   opinion into the record, please?

12                    THE COURT:  You may.

13                    MR. PRASAD:  And then for the

14   court's information, the total report is a six page

15   report.

16                    THE COURT:  A text portion only?

17                    MR. PRASAD:  It is the text portion

18   only.  I do not have either toxicology nor a diagram at

19   this point.

20                    MS. ROCK:  Your Honor, we have

21   stipulations for exam purposes only.

22                    MR. PRASAD:  Correct.

23                    THE COURT:  Okay.  Take both of

24   them, Miss Rock, each of them for exam purposes?

25                    MS. ROCK:  Yes, that's correct,

6

1      each for exam purposes only.  Other thing, I would like

2      to put on the record before we continue, if there is

3      any jurisdiction issue with my client, in other words,

4      if he wasn't properly waived, we are not waiving that

5      issue.

6                      MR. PRASAD:  Judge, I believe that

7      by the nature of the defendant's age and actual count I

8      charge in this case, I think it's automatic waiver,

9      pursuant to the statute.  That's what was done in this

10     caes.

11                     THE COURT:  Is there some dispute

12     about the birth -- date of birth that the people list

13     for him?

14                     MS. ROCK:  Not that I have at this

15     time, your Honor.  I'm just placing that on the record.

16                     THE COURT:  Thank you.

17                     MR. PRASAD:  May I proceed?

18     Reading from page one, case number 348710, Tyrone

19     Simpson, a 19 year old black male died of multiple

20     gunshot wounds.  There were nine gunshot wounds to the

21     right head, upper and lower extremities and left

22     shoulder.  No soot or gun powder stipling noted on the

23     skin surrounding any of the gunshot wounds.  Six of

24     these gunshot wounds were through and through.  Three

25     jacketed bullets were recovered from the skull, left

7

1    elbow and left posterior leg and contained.  The

2    gunshot wound number one, there was a gunshot wound of

3    entrance to the right side of the head.  The wound

4    track proceeded from the injury, from the right

5    parietal bone, right parietal lobe, right occipital

6    lobe, right cerebellum, left occipital lobe and left

7    occipital fossa of the skull.  A deformed jacketed

8    bullet was recovered from the end of the wound track

9    and retained.

10            Gunshot wound number 2.  There was

11   a through and through gunshot wound of entrance to the

12   posterior right arm.  The wound track proceeded from

13   this injury through the soft tissue of the right arm,

14   caused a closed fracture in the shaft of the right

15   humerous and exited from an exit wound on the anterior

16   right arm.

17            Gunshot wound number 3.  There

18    was a through and through gunshot wound of entrance to

19    the anterior right leg.  The wound track proceeded

20    from this injury to the soft tissue of the right leg

21   and exited from an exit wound on the posterior right

22   leg.

23            Gunshot wound number 4.  There was

24   a through and through gunshot wound of entrance to the

25   posterior left leg.  The wound track proceeded from

8

1    this injury through the soft tissue of the left leg and

2    exited from an exit wound on the posterior left leg.  A

3    jacketed deformed bullet was recovered from the left

4    calf and retained.

5                     Gunshot wound number 5, there was a

6    through and through gunshot wound of entrance to the

7    anterior left leg.  The wound track proceeded from this

8    injury through the soft tissue of the left leg and

9    exited from the posterior left thigh.  No bullet was

10   recovered from the wound track.

11                    Gunshot wound number 6.  There was

12   a gunshot wound of entrance to the posterior left

13   elbow.  Subsequent internal examination revealed that

14   the wound track proceeded from this injury through the

15   left elbow.  A jacketed deformed bullet was recovered

16   from the medial side of the left elbow and retained.

17                    Gunshot Wound number 7, there was a

18   through and through gunshot wound of entrance to the

19   left posterior shoulder, located 3.5 inches below the

20   left shoulder on the posterior axillary line.

21   Subsequent internal examinaiton revealed that the wound

22   track proceeded from this injury through the soft

23   tissue of the back left scapula, anterior intercostal

24   space and left --

25                    MS. ROCK:  I'm sorry, first --

9

1          MR. PRASAD:  I'm sorry, first

2     anterior intercostal space on the left and exited from

3     a wound track on the left upper chest.  A graze wound

4     was present medial to this exit gunshot wound.  No

5     bullet was recovered from the wound track.

6          Gunshot wound number 8.  There was

7     a through and through gunshot wound of entrance of the

8     anterior left leg.  Subsequent internal examination

9     revealed that the wound track proceeded from this

10    injury through the soft tissue of the left leg and

11    exited from the left anterior leg.  No bullet was

12    recovered from the wound track.

13         Gunshot wound number 9.  There was

14    a through and through gunshot wound of entrance to the

15    right anterior leg.  The wound track proceeded from

16    this injury through the soft tissue of the right leg

17    and exited from the medial side of the right leg.  No

18    bullet was recovered from the wound track.  Three

19    groups of psuedostippling wounds were present in the

20    left forearm, left neck and left flank.  In addition, a

21    closed fracture in the shaft of the right humerous, a

22    laceration on the anterior left knee and an abrasion on

23    the right chest were identified.

24         In consideration of the autopsy

25    findings and the circumstances surrounding this, the

1    manner of death is classified as homicide by Dr. Loewe

2    on April 11th, 2010.  Also signed by -- I'm going to

3    have to spell it, Mojgan Kaveh-Talley, Forensic

4    Pathologist, Fellow, as well as Chief Medical Examiner.

5                    Your Honor, may I approach with the

6    exhibit?

7                    THE COURT:  You may.  Miss Rock,

8    other than the one indication where you stop the

9    reading, otherwise, satisified with the recitation?

10                   MS. ROCK:  I am, your Honor.  Thank

11   you.

12                   THE COURT:  You're welcome.

13                   MR. PRASAD:  May I call my first

14   witness, your Honor?

15                   THE COURT:  You may.

16                   MR. PRASAD:  Your Honor, may I

17   place on the record, I mentioned to Ms. Rock there is a

18   typographical error on Count II, as it's currently

19   formulated on the information.  It has Mr. Allen's last

20   name as Andre Simpson.  It's acutally correct on the

21   top, where it says complainant and it has Andre Allen,

22   but in the Count II, in the body it has Andre Simpson.

23   I would like to amend that to Andre Allen, if I may.

24                   MS. ROCK:  No objection, your

25   Honor.

1                         THE COURT:  The court would allow

2       the amendment as to that communication.  Thank you.

3       Now you can have a seat.

4                      MR. PRASAD:  May I proceed?

5                      THE COURT:  You may.

6             A  U N D R E Y    A L L E N,

7       after having been first duly sworn, to tell the truth,

8       the whole truth and nothing but the truth, was examined

9       and testified as follows:

10                   THE WITNESS:  Yes.

11                 DIRECT EXAMINATION

12    BY MR. PRASAD:

13    Q    State your name for the record.

14    A    Aundrey Allen.

15    Q    How old are you?

16    A    Eighteen.

17    Q    Mr. Allen, do you know a person by the name of Tyrone

18         Simpson?

19    A    Yes.

20    Q    How do you know Tyrone Simpson?

21    A    That's my man.

22    Q    Is he a friend of your's, sir?

23    A    Uh-hum.

24    Q    Is that a yes?

25    A    Yes.

12

1                  THE COURT:  I can barely hear you.

2                  MR. PRASAD:  Two things, you need

3  to speak up loudly and everything you say must be out

4  loud, all right?  Is that a yes?

5                  THE WITNESS:  Yes.

6                  MR. PRASAD:  That's what I mean,

7  you can't nod your head.  You have to speak up out

8  loud, okay?

9                  THE WITNESS:  Okay.

10                  THE COURT:  Mr. Allen, see the lady

11  sitting next to you and you'll see how fast her hands

12  are moving?  Can you see that, from where you're

13  sitting?

14                  THE WITNESS:  Yes.

15                  THE COURT:  Okay.  Her job

16  everyday, all day long is to take down what happens in

17  the courtroom, but she's not permitted to look at

18  people and make a decision based on how their head is

19  moving about, what the answer is.  She's only permitted

20  to use her ears in order to make the decision about

21  what the answers are, so you need to speak up and not

22  nod your head, 'cuz she needs you to use words, okay?

23                  THE WITNESS:  Okay.  Thank you.

24                  MR. PRASAD:  Thank you, your Honor.

25  BY MR. PRASAD:

13

1    Q    Mr. Allen, I want to take you back to April 10th, of

2         this year, 2010.  Do you remember that day?

3    A    Yes.

4    Q    Do you remember at some point on that day being at a

5         place on Tireman?

6    A    Yes.

7    Q    And specifically a restaurant on Tireman?

8    A    Yes.

9    Q    Where is that restaurant, sir, if you remember?

10   A    It's between St. Mary's and Minnatoe on Tireman Street.

11   Q    What city is that in, sir?

12   A    Detroit, Michigan.

13   Q    Is taht here in Wayne County, as well?

14   A    Yes.

15   Q    And do you remember about what time you went to that

16        restaurant, sir?

17   A    No.

18   Q    Could you give us an approximate time?

19   A    Three.

20   Q    In the afternoon or at night?

21   A    Afternoon.

22   Q    Afternoon.  Okay.  And, sir, who else was with you at

23        that time, at that restaurant?

24   A    Just Tyrone.  It was a couple of my other friends there

25        too.

14

1   Q   What were their names?

2   A   Tyrell was there, Tyrone, me and that was about it.

3   Q   Okay.  And at some point did something happen involving

4       Tyrone Simpson?

5   A   Yes, his glasses had got took.

6   Q   He was wearing glasses earlier that day?

7   A   Yes.

8   Q   And did Tyrone -- something happen with Tyrone that

9       causes his glasses to get taken?

10  A   Yes.  He was fighting.

11  Q   And who was he fighting with, if you know?

12  A   Some dude named Freak.

13  Q   And do you know this gentleman named Freak?

14  A   No.

15  Q   Had you ever met that gentleman named Freak before?

16  A   No.

17  Q   At some point did the fight between Freak and Tyrone

18      end?

19  A   Yes.

20  Q   What happened next, sir?

21  A   I was approaching Freak.  I was about to fight him too,

22      'cuz he was, like, stalking my sister or whatever, so

23      that was my whole purpose of being up there.

24  Q   At that restaurant?

25  A   Yes.

1   Q    Are you familiar with that restaurant?

2   A    Yes.

3   Q    Had you been there before?

4   A    Yes.

5   Q    About how many times?

6   A    Probably all my life.

7   Q    All your life?

8   A    Yes.

9   Q    You lived in this same area at that restaurant?

10  A    Yes.

11  Q    Did you, in fact, get in a fight with this gentleman

12       named Freak?

13  A    No, he was running.

14  Q    He ran away?

15  A    Yes.

16  Q    Okay.  What happens next?

17  A    Tyrone told me not to fight him, 'cuz he won't --

18                         MS. ROCK:  Your Honor, I'm going to

19       object as to hearsay.

20                         MR. PRASAD:  Judge, I'll instruct

21       the witness if I may.

22                         THE COURT:  I'll let you do that,

23       but the court will keep this portion, that is what

24       Tyrone told me and strike the balance.

25                         MR. PRASAD:  Thank you.  I don't

1     want to know what Tyrone told you.

2  BY MR. PRASAD:

3  Q    I want to know what's the next thing that happened?

4  A    We was just talking about -- I was asking, like, why

5       was he up here if you already had fought and everything

6       and he was saying 'cuz his glasses was missing.

7  Q    Hold on.  DOn't go into what Tyrone went into.  What

8       were you saying to Tyrone and what were you saying to

9       him?

10 A    Why was we still here.

11 Q    Okay.  And what happened next, sir?

12 A    Then we was still just sitting there.  I'm wondering

13      why I'm here and his glasses gone?  And so I figured

14      out everybody start leaving, but I ain't left, 'cuz I

15      don't want to leave him up there by his self.

16 Q    How long were you out there with Tyrone after this

17      gentleman, Freak, had ran away?

18 A    I give about 15 minutes, tops.

19 Q    Okay.  What happened next, sir?

20 A    They had came back up there.

21 Q    You say they, how many people had come back?

22 A    It was three people.

23 Q    Okay.  These three people that came back, how did they

24      get there?  Did they walk, drive?  Were they on bikes?

25      How did they get there?

17

```
1    A    They got there in the truck.

2    Q    In the truck.  Did you recognize this vehicle?

3    A    Yes.

4    Q    And how did you recognize this vehicle?

5    A    It was a Jeep Liberty -- I mean, it was a Mountaineer.

6    Q    Had you seen this vehicle before?

7    A    No.

8    Q    And were all these -- all three of these individuals in

9         that vehicle, in the Mountaineer?

10   A    Yes.

11   Q    What happened next?

12   A    They got out the truck and Tay or whatever his name

13        was, came over there asking about his phone.

14   Q    You just indicated someone in this courtroom?

15   A    Yes.

16   Q    Do you see that person in the courtroom?

17   A    Yes.

18   Q    Can you please point to him and let us know what he's

19        wearing?

20   A    He's wearing blue and white shoes.

21                        MR. PRASAD:  Your Honor, may the

22        record reflect that the witness identified the

23        defendant?

24                        THE COURT:  The record will so

25        reflect.
```

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

1                          MR. PRASAD:   Thank you.

2    BY MR. PRASAD:

3    Q   You just said Tay or whatever his name is; is that

4        right?

5    A   Yes.

6    Q   Did you know that person's name?

7    A   Not before this.

8    Q   Not before this incident.   Had you ever met this person

9        before this incident?

10   A   No.

11   Q   How do you know his name was Tay?

12   A   I kept hearing him at the store call his name, saying

13       tell Tay to bring the glasses back.

14                         MS. ROCK:   Well, your Honor, I'm

15       going to object as to hearsay.

16                         THE COURT:   I'll let you back up.

17       I'm not sure whether it's admissible or not.   I'll let

18       you back up and try.

19                         MR. PRASAD:   And Judge, honestly,

20       identification has already been made.   I'll move on.

21       It's really not that important.

22                         THE COURT:   As you choose.

23                         MR. PRASAD:   Thank you.

24   BY MR. PRASAD:

25   Q   But the individual that you identified in court here

```
 1            today, the defendant, you saw him, was he one of the

 2            three individuals in that Mountaineer?

 3    A       Yes.

 4    Q       Okay.  And when the defendant got out of that

 5            Mountaineer, did he do or say anything?

 6    A       He was asking for his phone.  He said he had lost his

 7            phone.

 8    Q       Okay.  And did Tyrone do anything at that point?

 9    A       No.

10    Q       What happened next, sir?

11    A       The store owner, I believe his name, Bobby, was like --

12    Q       Hold on.  don't go into what anyone else said.  Did

13            Bobby come to that scene?

14    A       Yeah.

15    Q       What happened when Bobby came to that scene?

16    A       He was telling him to get -- give back Tyrone's

17            glasses.

18    Q       So what happened --

19                        MS. ROCK:  Your Honor, again, I'm

20            going to object, ask it be stricken, hearsay.

21                        THE COURT:  Wish to back up?

22                        MR. PRASAD:  I'll back up.  I have

23            no objection to it.

24                        THE COURT:  If there is a

25            conversation in the back row, then the conversation
```

20

1    needs to go out in the hallway.  If you wish to stay in

2    the back row, then the conversation needs to wait,

3    okay?  Thank you.

4    BY MR. PRASAD:

5    Q    You said the store owner, Bobby came to the scene,

6         right?

7    A    Yes.

8    Q    He said something, right?

9    A    Yes.

10   Q    Who was Bobby talking to?

11   A    Tay.

12   Q    To Tay.  And then after Bobby said something, what

13        happened next?

14   A    Tay was screaming, like yelling, like I ain't got no

15        glasses.  He like I ain't got no glasses and then

16        Tyrone hit him.

17   Q    Okay.  I want you to stop right there.  Where are you,

18        physically, at this point?  Where were you?

19   A    Like two feet away from Tyrone.

20   Q    And I need -- 'cuz none of us were here, you need to

21        explain to the Judge how everyone was, how far people

22        were away from each other at this point?

23   A    Well, I was, like, two feet away from him and it was

24        movement going on so he was moving back' cuz he wasn't

25        fighting back.

21

1    Q    Okay.  Let me stop you right there, sir.  There's a lot

2         of male individuals involved.  As best you can, instead

3         of using words like he or him, try to use their names,

4         okay?

5    A    Well, Tyrone was hitting Tay.

6    Q    Okay.

7    A    And he wasn't fighting back.  He was just backing back.

8    Q    The defendant was not fighting back?

9    A    No.

10   Q    Okay.  Where are you in relation to the front of the

11        restaurant?

12   A    I believe I'm like five feet away from the door of the

13        store.

14   Q    The front door of it?

15   A    Yeah.

16   Q    And how far away are Tyrone and the defendant from the

17        front of the store?

18   A    I'd say about, like, within ten feet.

19   Q    Okay.  And you had told us that you were about how far

20        away from Tyrone and the defendant?

21   A    Like two to three feet.

22   Q    Okay.  And you see Tyrone punching the defendant?

23   A    Yes.

24   Q    Do you know how many times he punched him?

25   A    Probably, like five times.

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

| | | |
|---|---|---|
| 1 | Q | Okay. What happens next? |
| 2 | A | Tyrone stop hitting him and then I think before he even |
| 3 | | got the gun out of his pocket or whatever, he had |
| 4 | | already shot it. Then Tyrone hands went in the air. |
| 5 | Q | I'm sorry? |
| 6 | A | I didn't hear that. I apologize. |
| 7 | Q | You have to repeat what you just said a little bit |
| 8 | | louder. |
| 9 | A | When Tyrone stopped, his hands went in the air, like he |
| 10 | | just -- like stopped and that's when he was pulling out |
| 11 | | the gun, but I think before he even got it out, it |
| 12 | | already had went off, so he was like -- Tyrone was like |
| 13 | | froze and then I think he shot him and once the shots |
| 14 | | started going off, I took off running. |
| 15 | Q | I'm going to stop you there and go over a little more |
| 16 | | detail. You saw Tyrone stop punching the defendant, |
| 17 | | right? |
| 18 | A | Yes. |
| 19 | Q | How far away from you are Tyrone and the defendant when |
| 20 | | you see Tyrone stop punching the defendant? |
| 21 | A | Still like two feet behind. |
| 22 | Q | Behind Tyrone? |
| 23 | A | (shaking head) |
| 24 | Q | Is that a yes? |
| 25 | A | Yes. |

23

1   Q   When Tyrone stops punching the defendant, is there any

2        separation between Tyrone and the defendant?

3   A   Yes.

4   Q   About how much -- how far apart are Tyrone and the

5        defendant at this point?

6   A   Like two feet.

7   Q   Two feet apart, okay.  At this point you saw Tyrone

8        hands go up?

9   A   Yes.

10   Q   What do you see the defendant doing at that point?

11   A   Going crazy, reaching in the coat.

12   Q   For the record, you're moving your right hand; is that

13        correct?

14   A   Yes.

15   Q   Is that what you saw the defendant do on that day?  Was

16        he moving his right hand?

17   A   Yes.

18   Q   How was he moving his right hand?

19   A   It was just -- he was just freakingly moving it crazy,

20        trying to get this gun out the pocket.

21   Q   Did you actually see the defendant pull a gun out of

22        his pocket?

23   A   Yes.

24   Q   Can you tell me what kind of gun it was?

25   A   I hardly know guns like that, but it was a handgun,

24

1    like a 45 or a 40, something like that.

2  Q  Do you know the difference between a revolver and a

3    semi-automatic handgun?

4  A  Yes.

5  Q  Was this a revolver or semi-automatic handgun?

6  A  Semi-automatic handgun.

7  Q  You say you sawt the defendant pull the gun out of his

8    pocket; is that correct?

9  A  Yes.

10  Q  What did he do with it at that point?

11  A  Started shooting.

12  Q  And could tell which way the gun was -- how was --

13    where was -- tell us how the defendant was pointing the

14    gun when he was shooting?

15  A  Like I'm saying before, he got it out, he was shooting

16    crazy and then he, like, straighten up and start

17    pointing at us.

18  Q  That's what I wanted to know.  When he straightened up,

19    where was the gun pointed?

20  A  It was pointing at, like, directly in our direction.

21  Q  You say our direction, what do you mean by our?

22  A  My direction and Tyrone direction.

23  Q  Did you see or hear gunshots?

24  A  Yes.

25  Q  How many gunshots did you see or hear?

25

| | | |
|---|---|---|
| 1 | A | I saw about, like four or five. |
| 2 | Q | Okay. What happened at that point? |
| 3 | A | I took off running. |
| 4 | Q | Where did you run to? |
| 5 | A | Inside the store. |
| 6 | Q | Once you got inside the store, could you see what was |
| 7 | | happening outside anymore? |
| 8 | A | From a little bit, yeah. |
| 9 | Q | What could you see from inside the store? |
| 10 | A | I can still see shooting going on. |
| 11 | Q | Who is shooting? |
| 12 | A | Tay. |
| 13 | Q | The defendant? |
| 14 | A | Correct. |
| 15 | Q | Okay. The defendant? |
| 16 | A | Yes. |
| 17 | Q | Who was he shooting at? |
| 18 | A | Tyrone. |
| 19 | Q | How many more gunshots did you see? |
| 20 | A | I already seen too many after that, 'cuz I thought they |
| 21 | | was going to come in the store and try to kill me, so I |
| 22 | | scooted back. |
| 23 | Q | Scooted back, what do you mean? |
| 24 | A | Like away from the glass door, 'cuz the door was glass. |
| 25 | Q | Okay. Sir, at some point did you realize you were |

1    injured?

2  A  Yes.

3  Q  Where were you injured?

4  A  In my -- like my leg area.

5  Q  In which leg are we talking about, right leg or left

6    leg?

7  A  My right leg.

8  Q  What part of your right leg was injured?

9  A  My -- like my upper thigh.

10  Q  Did you go to the hospital?

11  A  Yes.

12  Q  Which hospital did you go to?

13  A  Sinai Grace.

14  Q  And what did you -- what happened to you?  What did you

15    find out?

16  A  I was -- I'm on a bag for, like, six months to a year.

17  Q  What kind of bag is that?

18  A  Colostomy bag.

19  Q  Where are your injuries now?

20  A  Just, like, in my stomach area.

21  Q  Sir, and listen to my question carefully, if you know,

22    do you know where you were shot, what part of your

23    body?

24  A  Between my -- like thigh and my -- I mean like in my

25    thigh and my upper thigh.

27

1          MR. PRASAD:  Your Honor, may I have

2    the witness stand up?  He's trying to indicate

3    something and I can't see.

4          THE COURT:  You can, however, the

5    way the witness stand is and there is that small ledge.

6    If you, instead of just standing up, push the door open

7    and step down in front of where you are.

8          THE WITNESS:  Like down here in

9    this area.

10          MR. PRASAD:  Tilt your body so the

11    judge can see.

12          THE COURT:  Miss Rock, if you want

13    to come around this way so -- thank you.

14    BY MR. PRASAD:

15    Q    Mr. Young, where were you shot?

16    A    In this area right here.

17          MR. PRASAD:  For the record, he's

18    indicating the front right area of his right leg, top

19    area.

20          THE COURT:  Fair description from

21    where the defendant's hand is?

22          MS. ROCK:  Right, yeah.  I think

23    that's a fair statement from top to -- on the side of

24    it.

25          THE WITNESS:  Yes.

28

```
 1                         MR. PRASAD:  Thank you.

 2                         THE COURT:  You're welcome.  Have a

 3        seat again.  Thank you.

 4   BY MR. PRASAD:

 5   Q    Mr. Allen, did you ever go back outside?

 6   A    Not til the ambulance came.

 7   Q    Sir, thinking back to that time on that afternoon, did

 8        you see anyone else with a gun besides the defendant?

 9   A    No.

10   Q    Did you see anyone with any other weapon besides the

11        defendant?

12   A    No.

13   Q    When Tyrone initially was punching the defendant, did

14        Tyrone have any weapons on him?

15   A    No.

16   Q    Sir, you said it was, approximately, some time after 3

17        in the afternoon?

18   A    Yes.

19   Q    Was there anything blocking your vision or preventing

20        you from seeing what was happening?

21   A    No.

22   Q    And last question, Mr. Allen, are you sure it's the

23        person you identified here in court today, as a person

24        who shot Tyrone Simpson and yourself?

25   A    Yes.
```

29

1    MR. PRASAD:  Thank you, very much.

2    CROSS-EXAMINATION

3    BY MS. ROCK:

4    Q    Mr. Allen, I understand your statement to the court,

5         you and Tyrone went up to that store to fight?

6    A    Tyrone was already at the store.  He was already at the

7         store earlier in the day eating.

8    Q    Okay.  But was he there already when you joined him?

9    A    Yes, he was alraedy up there.

10   Q    So you -- but you had talked to him via phone, I would

11        think?

12   A    No.

13   Q    You didn't talk to him at all?

14   A    No.

15   Q    Did you know he was gonna be there when you went there?

16   A    No.

17   Q    Well, but when you got there, he -- that's when he

18        started fighting Freak?

19   A    No.  I got there after they fight.

20   Q    You didn't see them fight?

21   A    I didn't see him and Freak fight.

22   Q    He told you they fought?

23   A    Yeah.

24   Q    Okay.  And then -- but you went up there, specifically,

25        to fight Freak?

1    A    No.  I was asking him about why he -- 'cuz he had came

2         at my house and I was asking him why was he there.

3    Q    But you thought he was stalking your sister?

4    A    He was.

5    Q    Okay.  Well he was stalking your sister and you knew

6         that Freak was going to be up there?

7    A    I didn't know he was up there, 'cuz my boys had called

8         me down there and so when I got there I knew he was

9         there.

10   Q    Okay.  Who's your boys?

11   A    My boy Terrell had called me up there.

12   Q    And who else?

13   A    That was about it.  He was the one waving me down,

14        flagging me down.

15   Q    You said your boys?

16   A    It was just him.

17   Q    Tyrell?

18   A    Yes.

19   Q    And Tyrone has a phone?

20   A    Yes.

21   Q    I mean he had one, yes?

22   A    Yes.

23   Q    Did you talk to him at all that day?

24   A    No.

25   Q    Okay.  So Tyrell says hey, Freak's up here, right?

```
1    A    Yes.

2    Q    'Cuz he knows you're looking for Freak, right?

3    A    No, I'm not looking for him.  My house is two houses

4         down from the store, so everything that is going on

5         down the store, I see.

6    Q    Okay, but he called you?

7    A    Yes.

8    Q    To let you know Freak was there?

9    A    Yes.

10   Q    'Cuz you want to confront Freak about stalking your

11        sister?

12   A    Yes.

13   Q    And in fact, you do confront Freak, right?

14   A    Yes.

15   Q    You fought him?

16   A    No.

17   Q    You didn't fight him, you chased him?

18   A    Yes.

19   Q    And you said -- what's your date of birth?

20   A    Nine, nine, ninety-one.

21   Q    Nine, nine, ninety-one?

22   A    Yes.

23   Q    Okay.  You said that Tyrone started hitting Deonte

24        Howard; is that right?

25   A    Yes.
```

32

| | | |
|---|---|---|
| 1 | Q | Okay. Where? |
| 2 | A | He was punching him in the face. |
| 3 | Q | All his punches went to the face? |
| 4 | A | Yes. |
| 5 | Q | And his nose, eyes, mouth? |
| 6 | A | Yes. |
| 7 | Q | Is that yes? |
| 8 | A | Yes. |
| 9 | Q | Just all over? |
| 10 | A | Just all over the face. |
| 11 | Q | Really fast? |
| 12 | A | Yes. |
| 13 | Q | Really hard? |
| 14 | A | Yes. |
| 15 | Q | Okay. And where did this take place at, inside or |
| 16 | | outside the store? |
| 17 | A | Outside. |
| 18 | Q | Now you said that at one point after he was hitting |
| 19 | | Tay, Tyrone put his hands up? |
| 20 | A | Yes. |
| 21 | Q | How did he -- what do you mean just I give up or |
| 22 | | what -- |
| 23 | A | No, he still had his fist balled, but his hand was just |
| 24 | | up like this. |
| 25 | Q | So he was still ready to fight? |

| 1  | A | Yes. |
| 2  | Q | So his fists are balled? |
| 3  | A | Not both of them, just one. |
| 4  | Q | Which one, do you know? |
| 5  | A | His right one. |
| 6  | Q | His right one? |
| 7  | A | Yes. |
| 8  | Q | Then you said that Tay started -- his hands started |
| 9  |   | going crazy? |
| 10 | A | Yeah.  He had backed up and then his hands started |
| 11 |   | going crazy. |
| 12 | Q | What does that mean when you say his hands started |
| 13 |   | going crazy? |
| 14 | A | He was reaching in his pocket. |
| 15 | Q | What? |
| 16 | A | He was reaching in his pocket. |
| 17 | Q | Do you see anything at that point? |
| 18 | A | Not at that point. |
| 19 | Q | But what do you think is happening? |
| 20 | A | I already know what's happening.  I figure he was |
| 21 |   | reaching for a gun. |
| 22 | Q | You don't run, though? |
| 23 | A | No. |
| 24 | Q | You just stay there? |
| 25 | A | Yes. |

34

```
1    Q    And the statement that you made to the police officer,
2         that's not your handwriting, correct?
3    A    No.
4    Q    Okay.  Why didn't you write out your own statement?
5    A    'Cuz I was real weak at the time.
6    Q    Were you on medication?
7    A    Yes.
8    Q    Okay.  You signed your statement?
9    A    Yes, I signed it.
10   Q    Did you read it before you signed it?
11   A    Yes.
12   Q    Was it a truthful statement?
13   A    Yes.
14   Q    Okay.  Did you know what you wee doing when you made
15        the statement?
16   A    Yes.
17   Q    Did you -- and I'm sorry, I didn't catch your answer,
18        were you on medication when you made that statement?
19   A    Yes.
20   Q    Do you know what kind?
21   A    Morphine.
22   Q    Morphine and at any time were you threatened by the
23        police at all when you made that statement?
24   A    No.
25   Q    Before you made the statement?
```

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

35

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Have you ever been in special education? |
| 3 | A | No. |
| 4 | Q | Are you still in school? |
| 5 | A | Yes. |
| 6 | Q | What grade? |
| 7 | A | Twelfth. |
| 8 | Q | And this was a Saturday? |
| 9 | A | All I remember is 4-10 and I don't remember nothing |
| 10 | | else. |
| 11 | Q | Had you had any alcohol, beer, wine? |
| 12 | A | No. |
| 13 | Q | Had you smoked any marijuana or weed? |
| 14 | A | No. |
| 15 | Q | Did you take any type of drugs? |
| 16 | A | No. |
| 17 | Q | When was the last time you drank beer or wine or smoked |
| 18 | | marijuana? |
| 19 | A | None this year. |
| 20 | Q | None this year, you said? |
| 21 | A | Yeah. |
| 22 | Q | Okay. And have you ever been convicted of a felony or |
| 23 | | misdemeanor involving truth, dishonesty or falsehood? |
| 24 | A | No. |
| 25 | Q | And so when you're -- when you arrive at Smokehouse -- |

36

1        is the name of the store Smokehouse?

2   A   Yes.

3   Q   When you arrive at Smokehouse, is Tay already there?

4   A   Yeah.

5   Q   Okay.  He's already there and did he ever leave and

6        come back while you were there?

7   A   Yes.

8   Q   When?

9   A   'Um after -- they had left, like 15 minutes after I was

10       there.

11   Q   Tay did?

12   A   Yes.

13   Q   Okay.  And but prior to him leaving 15 minutes after

14       you were there, there had been no confrontation between

15       Tyrone and Tay at that point?

16   A   Not at all.

17   Q   And so then Tay returns; is that right?

18   A   Yes.

19   Q   How many people are up there besides you, Tyrone and

20       Tay and Tyrell?

21   A   Tyrell wasn't up there at the time.

22   Q   How many people were up there?

23   A   It was just me, Tyrone, and people who work at the

24       store.

25   Q   Okay.  So you -- so there -- so it was just the three

1       of you and when you say -- is that correct?

2   A   He had people with him when he returned.  There was two

3       other people with them.

4   Q   Two other people.  Do you know their names?

5   A   No.

6   Q   The people inside the store were inside the -- there

7       were people inside the store; is that correct?

8   A   They all was inside?  They all wasn't inside the

9       store.

10  Q   They all wasn't.  Who was inside and who was outside?

11  A   I believe the owner was outside and there was a few --

12      I think it was a cashier outside too.  It was more than

13      just --

14  Q   What -- Do you know the cashier's name?

15  A   No.

16  Q   And did the owner -- was the owner out there before or

17      after the fight?

18  A   He came after the fight, but he came before they pulled

19      back up.

20  Q   When you say fight, we're talking really about Tyrone

21      punching Tay, right?

22  A   Oh -- no, I was talking about Freak.

23  Q   That's what I thought.  So when you say what the fight,

24      was he there -- what fight are you talking about?

25  A   He -- the owner was there when they -- when Tyrone was

38

```
 1            punching him, but the Freak fight, the owner wasn't

 2            there.

 3      Q    Okay.  Well, how do you know?  You weren't there.  You

 4            said you didn't see the Freak fight?

 5      A    I wasn't there either.

 6      Q    So you don't know that, right?

 7      A    Right.

 8      Q    You don't know whether the owner was there when Tyrone

 9            fought Freak, right?

10      A    I do because the owner -- when the owner came up, they

11            was saying, like, I guess he and Freak got in a fight

12            there before and he said Freak got whooped again up

13            there or whatever.

14      Q    So Tyrone and Freak had fought before?

15      A    No.  Freak had multiple fights up there, I guess.

16      Q    Okay.  So but you weren't present during the Freak and

17            Tyrone fight?

18      A    No.

19      Q    Now how long would you say that Tyrone was punching

20            Tay?

21      A    Probably, like, not even a whole 20 seconds.

22      Q    But when you say he hit him five times, is that a

23            guess?

24      A    No, he hit him about -- exactly about five times.

25      Q    Okay.  You weren't -- were you counting?
```

```
 1   A    No, I wasn't counting.

 2   Q    But it was several times, correct?

 3   A    Yeah.

 4   Q    And did you see any injuries on Tay or any bleeding

 5        or --

 6   A    No.

 7   Q    Were you looking for it?

 8   A    No, I wasn't looking for it.

 9   Q    Okay.  And the punch took place right in the front of

10        the smokehouse?

11   A    Yes.

12   Q    Okay.

13   A    That's where it started.

14   Q    And you're standing behind them?

15   A    I guess behind Tyrone.

16   Q    Tyrone.  You don't try to stop Tyrone from hitting Tay?

17   A    No.

18   Q    Why not?

19   A    'Cuz he took his glasses.

20   Q    Did you see him take his glasses?

21   A    No.

22   Q    And Tyrone was pretty angry that day?

23   A    Yes, 'cuz his glasses was missing.

24   Q    Okay.  So he was swearing, who took my mother fucking

25        glasses?
```

1   A   No.

2   Q   He didn't swear at all?

3   A   No -- honestly, he didn't say nothing.  He was sitting

4       there quiet.

5   Q   But you could tell he was angry?

6   A   Yes.

7   Q   Okay.  How could you tell he was angry?

8   A   'Cuz just the look on his face.

9   Q   And what was the -- you said Tay, describe the clothing

10      that he was wearing.

11  A   'Um, I remember he had on, I think it was like some

12      blue jeans.

13  Q   I'm not asking you to guess.  I want you to tell me

14      what you remember he was wearing?

15  A   I know he had on a black coat, that's all, you know, he

16      had on for sure was a black coat.

17  Q   What about his pants?

18  A   I don't remember, either blue jeans or black.

19  Q   But you don't remember?

20  A   No.

21  Q   Shoes?

22  A   Don't remember the shoes.

23  Q   Shirt?

24  A   Don't remember the shirt.

25  Q   Was he -- when you say black coat, was it a leather

41

| | | |
|---|---|---|
| 1 | | coat, a cloth coat, a hoodie? |
| 2 | A | Like an Al-Wissan. |
| 3 | Q | I'm not hearing you. |
| 4 | A | Al-Wissan. |
| 5 | Q | Al-Wissan? |
| 6 | A | Yes. |
| 7 | Q | Is that a brand? |
| 8 | A | Yes. |
| 9 | Q | Okay.  Does it have a hood with it? |
| 10 | A | No. |
| 11 | Q | Was he wearing a hat at all? |
| 12 | A | No. |
| 13 | Q | Do you wear glasses at all? |
| 14 | A | No. |
| 15 | Q | Do you need glasses? |
| 16 | A | No. |
| 17 | Q | Do you -- how long were you up at the Smokehouse, from |
| 18 | | what time to what time? |
| 19 | A | I don't remember exactly the time, but I know it was, |
| 20 | | like, around 3:00. |
| 21 | Q | Okay.  How do you know it was around 3:00? |
| 22 | A | 'Cuz I was just leaving the basketball court to come |
| 23 | | get my shorts around two something or -- so I knew it |
| 24 | | had to be around 3. |
| 25 | Q | Okay.  So you arrived there around 3.  What basketball |

42

```
1          court were you at?

2     A    Right around the corner.

3     Q    What is it called?

4     A    'Um, it's just behind the school.  Well, it's Massey

5          Jamison now.

6     Q    And so you're up there, approximately, 3:00 and how

7          soon before Mr. Howard or Tay arrives?

8     A    He was alraedy there when I got to the store, when I

9          first got to the store.

10    Q    Okay.  He's already there and then you said he left?

11    A    Yeah.

12    Q    And then what time does he come back?

13    A    When he left, he came back, like, within ten, ten

14         minutes, ten, 15 minutes.

15    Q    Okay.  And during that time how many times had you been

16         to the Smokehouse that day?

17    A    Once earlier.

18    Q    Were you there earlier?

19    A    Yeah, like 11:00.

20    Q    What were you doing there earlier?

21    A    I was getting some food.

22    Q    Okay.  And what had you done before that?

23    A    I just woke up when I went there.

24    Q    So you woke up about 10ish, 10 -- between 10 and 11,

25         you went and got some food, then you go play
```

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

43

```
 1          basketball; is that right?
 2     A    Yeah, then I went to my mother house.
 3     Q    Your other house, what's your other house?
 4     A    My home, my new home.
 5     Q    Your new home?
 6     A    Yeah.
 7     Q    What's the difference between your old home and your
 8          new home?
 9     A    My grandma stay on Tireman.  That's where I had been
10          staying.
11     Q    Oh, okay.  And who's at the new home?
12     A    My mom.
13     Q    Okay.  So you went to your mom's home and then you came
14          back?
15     A    Yes.
16     Q    Okay.  Where's your mom's home?
17                         MR. PRASAD:  Objection to relevance
18          of the address of the mother's home.
19                         MS. ROCK:  I don't necessarily want
20          the address, but he says that he sees everything he was
21          on Tireman and he was at the grandma's house.
22     BY MS. ROCK:
23     Q    Did you write -- didn't you say you were at the
24          grandma's house?
25     A    Yes.
```

1  Q  Then you said at some point you went to your mom's

2     house?

3  A  Yes.

4  Q  Then mom doesn't live over on Tireman?

5  A  No.

6  Q  You went from mom's home to Smokehouse?

7  A  No, I left on Tireman, went to the Smokehouse and then

8     I left the Smokehouse and went home.

9  Q  Went to your mom's house?

10 A  Yes.

11 Q  Then where do you go from there?

12 A  Back to -- I went straight to the basketball court

13    after that.

14 Q  And then from the basketball court you go to --

15 A  The Smokehouse.

16 Q  The Smokehouse; is that right?

17 A  Yes.

18                    THE COURT:  The Court concurs that

19    the specific address is not relevant.  I mean, you

20    know, I know you went to clarify, the court concurs

21    that the address of the new house wasn't relevant.

22                    MS. ROCK:  I wasn't really --

23                    THE COURT:  I don't -- I don't know

24    that you were seeking a specific number, but I concur.

25                    MS. ROCK:  It's not relevant.  I'll

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

1  move on.

2 BY MS. ROCK:

3 Q How many shots did you say you heard?

4 A I saw five, four or five.

5 Q You say four or five?

6 A Four or five?

7 Q Four or five.

8 A I heard -- like at the same time I heard a lot more.

9 Q Okay. So you say four or five. When you say four or

10  five, does that mean that's when you were out front?

11 A Yes.

12 Q Okay. And then you went inside and you heard a lot

13  more, I guess?

14 A Yes.

15 Q How many more?

16 A It sounds like a whole other clip went off.

17 Q And you said you don't have any experience with guns?

18 A No.

19 Q Okay. Now at any time did you see -- did you see --

20  was -- did you and -- did you see any guys or your boys

21  circle Tay at all?

22 A No.

23 Q Do you ever see him go to the ground?

24 A No.

25 Q When you gave your statement to the police, did you

46

1    talk to anybody -- I'm sorry, let me strike that.

2    Prior to testifying today, did you talk to anybody

3    about this case?

4   A   'Um, no.

5   Q   You haven't talked to the family, you haven't talked to

6    the prosecutor?

7   A   To the prosecutors?

8   Q   You talked to the prosecutor, anybody else about the

9    case?

10  A   No.

11  Q   But right now you're wearing a t-shirt, rest in piece,

12    Tyrone, anthony Simpson, correct?

13  A   Yes.

14  Q   Who gave you that t-shirt?

15  A   I bought it.

16  Q   You bought it from --

17  A   A store that makes t-shirts.

18  Q   Okay.  Did you have it made up?

19  A   Yes.

20  Q   Just you alone?

21  A   Yes -- no, I got it off Facebook.

22  Q   You got it off of Facebook?

23  A   Yes.

24  Q   Where on Facebook?

25                    MR. PRASAD:  I object to the

47

```
1      relevance of this line of questioning.

2                      THE COURT:  Miss Rock?

3                      MS. ROCK:  Well, I was just trying

4      to -- I thought that his influence were important in

5      this particular case.

6                      THE COURT:  The court will allow

7      the question.  Where on Facebook?

8                      MS. ROCK:  Thank you.

9                      THE COURT:  It's a new media,

10     counsel.

11                     MR. PRASAD:  Thank you.

12  BY MS. ROCK:

13  Q    Where on Facebook?

14  A    Off a profile picture, I believe off of somebody's

15       profile picture.

16  Q    Who's --

17  A    My sister had it on her page.

18  Q    Now where -- were you ever shown a picture of the

19       person of the shooter or Tay?

20  A    Yes.

21  Q    Were you ever shown any single pictures of Tay or --

22  A    No.

23  Q    And --

24                     THE COURT:  While you pause,

25       Ms. Rock, let me back up and add to the ruling about
```

48

1    the relevance and that is given the standard for what

2    relevance is and it's definition Facebook being the

3    size that it is, a particular question about where on

4    Facebook gives tendency one way or the other. The

5    court would find it relevant.

6                 MS. ROCK:  Thank you, your Honor.

7                 THE COURT:  You're welcome.

8                 MS. ROCK:  Excuse me for just a

9    second.

10               THE COURT:  Take the time that you

11    need.

12  BY MS. ROCK:

13  Q    You said that you were behind -- during the shooting,

14       you were behind Tyrone; is that correct?

15  A    Yes.

16  Q    Okay.  Where was the owner?

17  A    He was, like, standing, like, close to the door.  If

18       you walk past the door, you see the store.  There's a

19       window.  They got the open sign and he was up under it.

20  Q    Okay.  And so would he have been between Tyrone and

21       Tay?

22  A    Not in between 'em.  Not like directly in between 'em,

23       but he was, like, up against the wall and they was like

24       on the sidewalk.

25  Q    Well, that's what I'm saying, I know he was against the

| | | |
|---|---|---|
| 1 | | wall, but if you have Tyrone here and you have -- |
| 2 | | you're saying Tay in front of Tyrone; is that right? |
| 3 | A | Yes. |
| 4 | Q | Where's the owner? Is he between -- not between them |
| 5 | | but is he -- |
| 6 | A | Off to the side. |
| 7 | Q | Is he in front of Tyrone or behind Tyrone? |
| 8 | A | He like in the middle of him, but like off to the side. |
| 9 | Q | Okay. So he's in the middle but off to the side, right |
| 10 | | where the cashier-- |
| 11 | A | I'm not too sure. I think he was like in the -- on the |
| 12 | | steps of the store. |
| 13 | Q | You're guessing? |
| 14 | A | Yeah, 'cuz he wasn't nowhere in my sight, so he had to |
| 15 | | be behind the -- |
| 16 | Q | So you don't know if he was there or not? |
| 17 | A | No, he was there. It was more than just them there. |
| 18 | | There was other people there too. |
| 19 | Q | Who was there? |
| 20 | A | I don't know. |
| 21 | Q | How many people were there? |
| 22 | A | I don't know how many people was there, but there was |
| 23 | | more than just what it seem now, I can tell you that. |
| 24 | Q | How many people behind Tyrone and you? |
| 25 | A | About two or three. |

| | | |
|---|---|---|
| 1 | Q | Two or three, besides you and Tyrone; is that right? |
| 2 | A | Yeah. |
| 3 | Q | Did you know him? |
| 4 | A | No. |
| 5 | Q | Okay. Had you seen him before? |
| 6 | A | No. |
| 7 | Q | Had you ever seen Tay before -- |
| 8 | A | No. |
| 9 | Q | I'm sorry, can you just let me finish? Had you ever |
| 10 | | seen Tay before? |
| 11 | A | No. |
| 12 | Q | So this would have been the first time seeing him? |
| 13 | A | Yes. |
| 14 | Q | And you said that Tay was with two other guys; is that |
| 15 | | right? |
| 16 | A | Yes. |
| 17 | Q | Where are they during the shooting? |
| 18 | A | They behind Tay. |
| 19 | Q | So they're just standing there behind him? |
| 20 | A | Yes. |
| 21 | Q | And no one tries to break up the punching? |
| 22 | A | No. |
| 23 | Q | And at any time when Tyrone is punching Tay is Tyrone |
| 24 | | saying anything? |
| 25 | A | No. |

51

```
1    Q    Doesn't say anything?

2    A    Not saying nothing the whole time.

3    Q    Silent the whole time?

4    A    No response.

5    Q    Is that yes or no?

6    A    Yes.

7                      MS. ROCK:  I don't have any further

8         questions of Mr. Allen.

9                      THE COURT:  So that I'm clear, the

10        cashier is a man?

11                     THE WITNESS:  Yes.

12                     THE COURT:  Thank you.

13                     MR. PRASAD:  Just briefly, your

14        Honor.

15                     REDIRECT EXAMINATION

16   BY MR. PRASAD:

17   Q    Sir, you mentioned how there were two people standing

18        behind Tay and the defendant at the time of the fight?

19   A    Yes.

20   Q    Were these the same two people that came with him in

21        the vehicle?

22   A    Yes.

23   Q    And these are the same two people you do not know?

24   A    Yeah.

25                     MR. PRASAD:  Okay.  No other
```

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

1    questions.

2                         MS. ROCK:   Well, I just have a

3    question.

4                         RE-EXAMINATION

5    BY MS. ROCK:

6    Q    Would you agree that a fight involved two people

7         fighting, right?

8    A    Yes.

9    Q    Tay wasn't fighting, right?

10   A    No.

11   Q    So -- I mean -- no -- was Tay fighting?

12   A    No, he wasn't fighting.

13   Q    So he was being attacked?

14   A    Yeah, 'cuz he had a gun.

15   Q    Well, who knew he had a gun before he was punching --

16        punched?

17   A    Well, I'm saying it was a fight.

18   Q    Okay, but what fight?  Tay wasn't fighting back.

19                        MR. PRASAD:   I object.  Beyond the

20        scope of my redirect at this point.

21                        THE COURT:   I think you opened the

22        door.  Go ahead, Miss Rock.

23                        MS. ROCK:   Thank you, your Honor.

24   BY MS. ROCK:

25   Q    So you said a fight is between two people fighting

53

1          back, correct?

2     A    Right.

3     Q    Tay wasn't fighting back?

4     A    No.

5     Q    Okay.  He was being attacked by Tyrone?

6     A    Yes.

7                          MS. ROCK:  I don't have any further

8          questions.

9                          THE COURT:  All your's.

10                         MR. PRASAD:  Nothing else, Judge.

11                         THE COURT:  All right.  Thank you.

12         You can step down.

13                         MR. PRASAD:  Your Honor, we're

14         going to call Bobby Bailey.

15                         MS. ROCK:  Just ask that witnesses

16         be sequestered.

17                    B O B B Y   B A I L E Y,

18         after having been first duly sworn, to tell the truth,

19         the whole truth and nothing but the truth, was examined

20         and testified as follows:

21                         THE WITNESS:  Yes.

22                         MR. PRASAD:  May I?

23                         THE COURT:  You may.

24                         DIRECT EXAMINATION

25    BY MR. PRASAD:

| | | |
|---|---|---|
| 1 | Q | Sir, if you would state your name? |
| 2 | A | Bobby Bailey. |
| 3 | Q | Mr. Bailey, how old are you? |
| 4 | A | Thirty-nine. |
| 5 | Q | Mr. Bailey, are you familiar with an address of 16228 |
| 6 | | Tireman in the City of Detroit? |
| 7 | A | Yes. |
| 8 | Q | How do you know that address? |
| 9 | A | I'm the owner of the property. |
| 10 | Q | What is it? |
| 11 | A | It's a store/restaurant. |
| 12 | Q | And you indicated you're the owner of that property? |
| 13 | A | Yes. |
| 14 | Q | How long have you owned that property, sir? |
| 15 | A | Roughly ten years. |
| 16 | Q | Okay.  I want to draw your attention to April 10th, of |
| 17 | | 2010.  At some point, sir, were you called to come to |
| 18 | | your store that day? |
| 19 | A | Yes. |
| 20 | Q | Dont' go into the conversation, but who were you called |
| 21 | | by, by whom? |
| 22 | A | My brother. |
| 23 | Q | Did you go to your store on that day? |
| 24 | A | Yes. |
| 25 | Q | About, approximately, what time was it? |

| | | |
|---|---|---|
| 1 | A | I guess between five and six. |
| 2 | Q | Okay. And you're talking a.m. or p.m.? |
| 3 | A | P.m. |
| 4 | Q | Okay. When you get to -- did you go to your store? |
| 5 | A | Yes. |
| 6 | Q | What do you see when you get there? |
| 7 | A | When I get to the store, I seen the guy they call Ant. |
| 8 | | He was outside. Him and some other guys all standing |
| 9 | | outside talking about the incident that happened |
| 10 | | earlier. |
| 11 | Q | How many guys do you see out there in front of the |
| 12 | | store? |
| 13 | A | Almost, like, five or six. |
| 14 | Q | This gentleman that you call Ant, did something -- |
| 15 | | jumping ahead -- |
| 16 | A | Okay. |
| 17 | Q | But did something happen to him later that day or later |
| 18 | | on? |
| 19 | A | Later on that day yes. |
| 20 | Q | What happened? |
| 21 | A | He was killed. |
| 22 | Q | Okay. So Ant is the -- Ant is the name you know, the |
| 23 | | person who died? |
| 24 | A | Right. |
| 25 | Q | Let's go back. You heard Ant out there. Who else was |

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

| | | |
|---|---|---|
| 1 | | out there? |
| 2 | A | I don't know all the guys.  The neighborhood guys. |
| 3 | Q | Okay.  Anyone else that you recognize? |
| 4 | A | That was out there when I pulled up, yes, sir. |
| 5 | Q | I don't know by name.  Was there any fight or any |
| 6 | | argument going on when you first got there? |
| 7 | A | No. |
| 8 | Q | What happened next, sir? |
| 9 | A | Ant was saying about his phone? |
| 10 | Q | Hold on.  Don't go into what Ant said what happened. |
| 11 | A | What happened? |
| 12 | Q | Was Ant talking to anyone? |
| 13 | A | To the other guys out there, yeah, all them out there |
| 14 | | talking, yes. |
| 15 | Q | Okay.  And did something happen as a all of the |
| 16 | | conversation? |
| 17 | A | A fight broke out. |
| 18 | Q | Okay.  That's what I wanted to ask you about.  Take us |
| 19 | | through how this fight broke out. |
| 20 | A | Um, one guy came up.  He asked for his phone, looking |
| 21 | | for his phone.  Ant walk up to him, swung on him. |
| 22 | Q | Okay.  Let me stop you.  Are you -- the guy who was |
| 23 | | asking for his phone, do you see that person in court |
| 24 | | today? |
| 25 | A | Yes. |

1    Q    Can you please point to him, let us know what he's

2         wearing?

3    A    Blue.

4                        MR. PRASAD:  Let the record reflect

5         that the witness identifed the defendant.

6                        THE COURT:  I'm sorry, what's he

7         wearing?

8                        THE WITNESS:  Blue.

9                        THE COURT:  The record would so

10        reflect.

11                       MR. PRASAD:  Thank you.

12   BY MR. PRASAD:

13   Q    The person -- the defendant, he was the one asking for

14        his phone?

15   A    Yes.

16   Q    Had you ever seen the defendant before?

17   A    Yes.

18   Q    How did you see -- where had you seen the defendant

19        before?

20   A    He comes in the store.

21   Q    Okay.

22   A    And he patronizes the store.

23   Q    Okay.  Then you said after the defendant asks for his

24        phone, what did Ant do?

25   A    Hit him in the eye or hit him -- hit him in the face

58

1   somewhere.

2  Q   I want you to take us there, sir.  Where is this thing

3      happening?  Where are you now?

4  A   Standing right in front of the store.

5  Q   Okay.  And who else is around besides Ant and the

6      defendant and yourself?

7  A   A whole lot of other guys.  I don't know, guys -- a

8      whole lot of guys.  I don't know who they are.

9  Q   As Ant and the defendant are fighting, is anyone else

10     joining in this fight?

11 A   Some other guys try to join in.  I turned around and

12     stopped them from --

13 Q   From joining into the fight?

14 A   Right.

15 Q   So as far as you know, the only two people that were

16     actually in this fight were Ant and the defndant?

17 A   Correct.

18 Q   Sir, do you know a person by the name of Aundrey Allen?

19 A   No.

20 Q   Do you see -- did you see someone else out in the

21     hallway that you recognize, a young individual?

22 A   Yes.

23 Q   Who is that person?

24 A   He live a ocuple doors down from the restaurant.

25 Q   Okay.  And did you recognize him?

| 1 | A | Yeah, today. |
| 2 | Q | Yes. |
| 3 | A | Yes. |
| 4 | Q | Was he out there on that day? |
| 5 | A | Yes. |
| 6 | Q | Okay. Where were you standing, sir in relation to |
| 7 | | where Ant and the defendant were? |
| 8 | A | Right in front of them at first. |
| 9 | Q | At first and then -- what do you mean? What were you |
| 10 | | doing when you were right between them? |
| 11 | A | Try to stop them from turning into a fight. |
| 12 | Q | What did you say? |
| 13 | A | I said if you have the glasses, give the glasses back. |
| 14 | | I don't need this up in my restaurant, my place of |
| 15 | | business. |
| 16 | Q | I'm sorry, I didn't catch the rest. |
| 17 | A | I was telling him if he had the glasses, give the |
| 18 | | glasses back so -- I don't need this problem up here at |
| 19 | | the restaurant. |
| 20 | Q | When you say him, you mean the defendant? |
| 21 | A | Right. |
| 22 | Q | And you say you were in between them at first? What |
| 23 | | happened -- did you move? Were you no longer in |
| 24 | | between them? |
| 25 | A | Once he swung and hit him, I turned around and stopped |

60

1    the other guys from trying to get into it.

2                       MS. ROCK:  Your Honor, I'm going to

3    ask for clarification as to who he is.  He's using the

4    pronoun.

5                       THE COURT:  Mr. Bailey, it seems to

6    me that everybody outside was male.  Is that fair to

7    say, he was a man?

8                       THE WITNESS:  Yeah, I think --

9                       THE COURT:  So there are a lot of

10   him's and he's and his.

11                      THE WITNESS:  Okay.

12                      THE COURT:  So can you use the

13   names that you know people by?

14                      THE WITNESS:  Well see, I don't

15   know all the names.  I didn't know neighborhood guys.

16   I didn't know them personally.

17                      THE COURT:  Well, let us know that.

18   You didn't know the name of who you're talking about?

19                      THE WITNESS:  Okay.

20                      THE COURT:  Because otherwise all

21   men standing out there, we'll get lost in which he is.

22   BY MR. PRASAD:

23   Q    When you said he was punching, who was punching whom?

24        Who started punching?

25   A    Ant start punching Tay.

61

1    Q    Okay. And Tay is the person you identified in court as

2        the defendant?

3    A    Correct.

4    Q    Okay. When Ant started punching Tay, what did you do?

5    A    I turned around and tried to stop the other guys from

6        getting into it.

7    Q    Okay. Getting into -- joining into the fight?

8    A    Right.

9    Q    What happened next?

10   A    Heard gunshots, got down to the ground.

11   Q    How many gunshots did you hear?

12   A    Roughly three, three or four at first, I guess.

13   Q    Okay. At any point did you look back to Ant and Tay?

14   A    When they first swung and glanced up and when I heard--

15       as I glanced, I heard the gunshot.

16   Q    When you glanced back, did you see any weapon or

17       anything ususual that you saw at that point?

18   A    No, I didn't see no gun. No.

19   Q    You didn't see a gun?

20   A    No.

21   Q    Did you see anything in Ant's hands?

22   A    I can't say I did.

23   Q    Did you see anything in Tay's hands?

24   A    I don't know. Like I say, it was like a black object,

25       we saw so I don't know whose hands it was but I did see

62

1        a black object, but I can't say I seen the weapon.

2   Q    Okay.  At that point was there anybody else involved in

3        the fight besides Ant and Tay?

4   A    I couldn't tell.  I seen the gunshots started right

5        then so we just got down on the ground.

6   Q    No, I understand that.  I'm trying -- right before the

7        gunshots, you were holding --

8   A    No, just two people, just them two.

9   Q    Just these two people?

10  A    Uh-huh.

11  Q    Is that a yes?

12  A    Yes.

13  Q    You heard three to four gunshots?

14  A    Uh-huh.

15  Q    Is that a yes?

16  A    Yes.  I'm sorry.

17  Q    Everything has to be out loud.

18  A    Oh, yes.

19  Q    What happened next?

20  A    I got down on the ground.

21  Q    Okay.

22  A    I got down on the ground.

23  Q    And then what happened?

24  A    A few seconds later I ran back into the store.

25  Q    Did you ever hear any more gunshots?

1   A   Yes, I heard more gunshots.

2   Q   When --

3   A   When we was inside the store.

4   Q   When you were inside the store?

5   A   Yes.

6   Q   Was there a time gap between the first set of gunshots

7       that you heard and the gunshots you heard inside the

8       store?

9   A   Yeah, maybe few seconds.  Time for me to run back into

10      the store.

11  Q   There was a gap in time when there was no gunshots?

12  A   Correct and I jumped.

13  Q   There were no gunshots in a gap?

14  A   Yes.  Yeah, when I ran back in the store.

15  Q   Mr. Bailey, when you went back out did you go back

16      outside and see what happened?

17  A   Yes.

18  Q   What did you see?

19  A   I saw Ant on the ground.

20  Q   Where was he on the ground?

21  A   Right on the curb in front of the store.

22  Q   Was he in the same location he was when he was fighting

23      Tay?

24  A   No.

25  Q   How far away was he from there?

64

1   A    Roughly, from this box to your seat.

2   Q    From where you're sitting to this chair here?

3   A    Yes.

4                           MR. PRASAD:  Counsel, about 12

5        feet?

6                           MS. ROCK:  I would say that's

7        correct.

8                           THE COURT:  For exam purposes, 12

9        feet?

10                          MS. ROCK:  Yes, for exam purposes,

11       your Honor.  Thank you.

12                          MR. PRASAD:  Thank you.

13  BY MR. PRASAD:

14  Q    And how was -- what kind of condition was Ant in at

15       that point?

16  A    Dead.  Deceased.

17                          MR. PRASAD:  Thank you.  Pass the

18       witness.

19                          THE COURT:  Miss Rock.

20                          CROSS-EXAMINATION

21  BY MS. ROCK:

22  Q    Sir, would you define a fight where two people fight?

23  A    Yes.

24  Q    Okay.  But where one person is just pinching, would you

25       consider that an attack?

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | Okay.  So would you agree that Ant attacked Tay? |
| 3 | A | Yeah.  It was an attack. |
| 4 | Q | Okay.  So he started punching Tay? |
| 5 | A | Uh-huh. |
| 6 | Q | Or pinching Tay? |
| 7 | A | Uh-huh. |
| 8 | Q | Is that yes or no? |
| 9 | A | Yes. |
| 10 | Q | Okay.  And Tay didn't fight back? |
| 11 | A | Not that I was aware of. |
| 12 | Q | Okay.  You didn't see him fight back? |
| 13 | A | No. |
| 14 | Q | Okay.  And in fact, Ant, at some point when -- went |
| 15 | | rushing or running towards Tay? |
| 16 | A | Uh-hum. |
| 17 | Q | Is that yes or no? |
| 18 | A | Yes. |
| 19 | Q | And so then he -- that's when he start punching Tay? |
| 20 | A | Correct, yes. |
| 21 | Q | Okay.  And is that when you intervened? |
| 22 | A | Yes. |
| 23 | Q | Or when you got involved? |
| 24 | A | Yeah.  That's when I try to stop the other guys from -- |
| 25 | Q | Oh, stop the other guys? |

| | | |
|---|---|---|
| 1 | A | Yeah, from rushing in. |
| 2 | Q | That's when Ant was punching Tay; is that right? |
| 3 | A | Yes. |
| 4 | Q | Where were the other guys that you tried to stop from |
| 5 | | getting involved?  Where were they behind Ant or behind |
| 6 | | -- |
| 7 | A | Behind Ant. |
| 8 | Q | So they were behind Ant.  They had tried to get |
| 9 | | involved? |
| 10 | A | Yep. |
| 11 | Q | Okay.  Had you ever -- did you see them circle Tay at |
| 12 | | all, the other guys? |
| 13 | A | Yeah, everybody was circling around.  Yes. |
| 14 | Q | Everybody was circling around? |
| 15 | A | Uh-hum. |
| 16 | Q | Did you see Tay go to the ground at one point? |
| 17 | A | That's when I turned around, so I couldn't say whether |
| 18 | | he hit the ground or not, but I heard he had got |
| 19 | | knocked down to the ground. |
| 20 | Q | What was that? |
| 21 | A | Yeah, I heard he had got knocked down to the ground. |
| 22 | Q | Oh, I see. |
| 23 | A | Yeah. |
| 24 | | MR. PRASAD:  Judge, I move to |
| 25 | | strike.  I object and move to strike as to hearsay. |

1                    THE COURT: Miss Rock?

2                    MS. ROCK: If I can just try to

3    figure out when he heard --

4                    THE COURT: Court will let you

5    backtrack.

6  BY MS. ROCK:

7  Q    When did you hear that Tay had got knocked down to the

8      ground?

9  A    Well, all the guys out there was talking like he

10     knocked Tay out and knocked Tay down.

11  Q    Was that after the shooting or before the shooting or

12     during the shooting -- I'm sorry. Was that before the

13     attack or after the attack?

14  A    After the attack.

15  Q    Okay. So after the attack, these guys were saying that

16     he knocked Tay down?

17  A    Uh-hum.

18                    MR. PRASAD: Objection, your Honor,

19    to all testimony here.

20                    THE COURT: Anything further?

21                    MS. ROCK: The only thing --

22                    THE COURT: Not all I'm

23    interpreting. I'm not interpreting all testimony, just

24    this piece.

25                    MS. ROCK: I see. If I could just

1    ask one more question?

2                    THE COURT:  Sure.

3    BY MS. ROCK:

4    Q    Was the statement that he -- that Tay was knocked down,

5         was it said during the punching?

6    A    I can't remember if it was during the punching, 'cuz

7         everything happened so quickly, I didn't know he was

8         rushing in on Tay and Tay was going back in defense

9         area, like he was defending himself.

10   Q    Moving back?

11   A    No response.

12   Q    Is that yes?

13   A    Yes.

14                   MS. ROCK:  Your Honor, I would call

15        it an excited utterance.  It almost sounds like it's an

16        excited utterance.

17                   MR. PRASAD:  Judge, we would need

18        to have testimony comparing from that statement that

19        they were an excited statement.  We don't even know who

20        the speaker is and what state that person's in.

21                   THE COURT:  I'm not sure that the

22        case law requires who, but it certainly requires more

23        than what I just have.  Would you wish to go back and

24        try again?

25                   MS. ROCK:  Thank you.

1    BY MS. ROCK:

2    Q    Do you know who made those statements that he was

3         knocked down?

4    A    No, it was all the guys out there, like I don't know

5         them.

6    Q    Was it an excited statement?  Did the person seem

7         excited, upset?

8    A    I don't know whether he was upset.

9    Q    Were they excited?  Was it said loudly?

10   A    Yeah.  It was said loudly, for everybody to hear.

11   Q    Okay.

12   A    And they, like, laughing oh, he knocked him out.  He

13        knocked him out.

14   Q    Okay.  And it sounded like they were excited?

15   A    Yes.

16   Q    Yes?

17   A    Yes.

18                        MS. ROCK:  Your Honor, I would say

19        it was an excited utterance.

20                        MR. PRASAD:  I would call it a joke

21        and laughing out loud, a comradarie afterward,

22        retelling a story.  This is not excited utterance of

23        fear, it's not excited utterance of anger.  It's not

24        excited in any of those terms.  I think that Miss Rock

25        is stretching.

1          THE COURT:  Anything further before

2     ruling?

3          MS. ROCK:  No.  That's it, your

4     Honor.

5          THE COURT:  Rule 803.2 requires

6     excited utterance, a statement made relating to a

7     startling event or condition made by the declarent was

8     under the stress or excitement caused by the event or

9     condition.  I don't think that you've met your burden.

10    I'm not saying you couldn't on some other day, but you

11    haven't now.

12         MS. ROCK:  Okay.  Thank you, your

13    Honor.

14         THE COURT:  I'm not sure you could

15    on another day, but I'm not going to say you couldn't.

16         MS. ROCK:  Right.  Thank you, your

17    Honor.

18 BY MS. ROCK:

19 Q    Tyrone, is he taller than Tay?

20 A    Tyrone, who is Tyrone?

21 Q    I'm sorry, Ant.

22 A    Oh, is he taller than Tay?

23 Q    Yes.

24 A    They might be about the same height.

25 Q    Is he heavier than Tay?

71

| 1 | A | He might be a little heavier, yeah. |
| 2 | Q | So he's heavier? |
| 3 | A | Yeah, Tay be heavier. |
| 4 | Q | Who's heavier, Tay or Ant? |
| 5 | A | Ant. |
| 6 | Q | Ant was, okay. Was Ant swearing or saying anything, |
| 7 | | yelling? |
| 8 | A | When we pulled up he was yelling. |
| 9 | Q | He was yelling? |
| 10 | A | Yeah. |
| 11 | Q | Did he swear at all? |
| 12 | A | Swear? |
| 13 | Q | Or do you remember? |
| 14 | A | I can't remember that. |
| 15 | Q | You just don't remember? |
| 16 | A | Yeah. |
| 17 | Q | What about when he was punching Tay, was he saying |
| 18 | | anything? |
| 19 | A | Not that I can remember. |
| 20 | Q | What's that? |
| 21 | A | Not that I can remember. |
| 22 | Q | He was punching him pretty hard? |
| 23 | A | Yes. |
| 24 | Q | Is that yes? |
| 25 | A | Yes. |

```
1   Q   And in the face?

2   A   I looked that way.  Like I said, once the punching got

3       started.  It looked that way, but I then I turned

4       around and stopped the other guys, but I know the first

5       would be.

6   Q   Did you stop Mr. -- you know the guy who's out in the

7       hallway?

8   A   Yes.

9   Q   Was he one of the guys that tried to get involved in

10      the punching?

11  A   I don't know.  Yeah.

12  Q   What's that?

13  A   I don't know.  I couldn't tell you.  Everything

14      happened so fast, so --

15  Q   So your back was turned so you don't know if other

16      people jumped or punched Tay?

17  A   Right.

18  Q   How long was your back turned, do you know?

19  A   Long enough for me -- a few seconds.  Long enough for

20      gunshots to start and I just jump down to the ground.

21              MS. ROCK:  Your Honor, I don't have

22      any further questions.

23              MR. PRASAD:  I don't have anything

24      else.

25              THE COURT:  Thank you, sir, you can
```

1     step down.

2                         MR. PRASAD:  Your Honor, finally,

3     people are going to call Mr. Harris, who's first name

4     is Andrew, Andrew Harris.

5                         MS. ROCK:  I also ask Mr. Bailey

6     not to discus his testimony and be sequestered.

7                         MR. PRASAD:  Did you hear that,

8     Mr. Bailey, do not say anything about questions or the

9     testimony, do you understand?

10                        THE WITNESS:  I'm free to go now?

11                        THE COURT:  Miss Rock, are you

12    willing to release him as well, from today's hearing?

13                        MS. ROCK:  Your Honor, I would say

14    yes.  Thank you.

15        M A C A R I O   A N D R E W   H A R R I S,

16    after having been first duly sworn, to tell the truth,

17    the whole truth and nothing but the truth, was examined

18    and testified as follows:

19                        THE WITNESS:  Yes.

20                        DIRECT EXAMINATION

21    BY MR. PRASAD:

22    Q    Please state your name for the record.

23    A    Macario Andrew Harris.

24    Q    How old are you, sir?

25    A    I'm fifty-eight.

74

| 1 | Q | Mr. Harris, I don't want your exact house number, but |
| 2 | | do you live on Tireman, here in the City of Detroit? |
| 3 | A | Yes. |
| 4 | Q | Do you live near a business establishment, a restaurant |
| 5 | | located at 16228 Tireman? |
| 6 | A | Yes. |
| 7 | Q | Okay.  About how far is your hosue from that |
| 8 | | restaurant? |
| 9 | A | About 40, 50 feet. |
| 10 | Q | Okay.  I want to take you back to April 10th, of 2010. |
| 11 | | Do you remember that day, sir? |
| 12 | A | Yes. |
| 13 | Q | I want to take you to the afternoon, going into the |
| 14 | | early evening hours.  Did something unusual happen that |
| 15 | | brings you to court here today? |
| 16 | A | Yes. |
| 17 | Q | Okay.  What's the first thing that you remember about |
| 18 | | this incident that brings you here to court today? |
| 19 | A | Hearing gunshots. |
| 20 | Q | You heard gunshots? |
| 21 | A | Yes. |
| 22 | Q | And about how many gunshots did you hear, sir? |
| 23 | A | Four or five. |
| 24 | Q | And where were you when you heard these gunshots? |
| 25 | A | In my living room watching television. |

```
 1    Q    Okay. From your living room, sir.  Does your living
 2         room look out onto Tireman?
 3    A    Yes, it does.
 4    Q    Do you have any windows in your living room, sir?
 5    A    Yes.
 6    Q    Can you explain to the judge what kind of windows you
 7         have in the living room?
 8    A    I have a picture window in my living room.
 9    Q    How big is your picture window?
10    A    Oh, about five by eight.
11    Q    Okay.  Once you heard those gunshots, what did you do?
12    A    I went to the window to see what was going on.
13    Q    What did you see?
14    A    I saw somebody jumping in a car and I saw a guy getting
15         up off the ground and the car taking off.
16    Q    You want to break that down?  First let's talk about
17         this car.  What kind of car was it, if you remember?
18    A    A gray SUV.
19    Q    A gray SUV.  You said you saw a person getting into the
20         SUV?
21    A    Yes.
22    Q    Where was that person getting into--
23    A    The driver side.
24    Q    Okay.  And then were there other people in that SUV
25         that you could tell, sir?
```

1   A   I couldn't tell at that point.

2   Q   At some point later were you able to tell if there were

3       other people in the SUV?

4   A   Yes.  Yes.

5   Q   Okay.  And we'll get to that when testimony comes.

6       Besides that gray SUV, you said you also saw a person

7       getting up off the ground?

8   A   Yes.

9   Q   Where was that person at?

10  A   He was laying in the street, next to a truck.

11  Q   Okay.

12  A   A Suburban, I think it was.

13  Q   How was this person getting up?

14  A   Slowly.  He was -- and he got up limping, yeah.

15  Q   Okay.  What happened next, sir?  What did you see?

16  A   Then I saw the gray SUV pull off from behind him and

17      pull up next to him and I saw the door open and the

18      passenger jump out and start shooting the guy once he

19      got up off the ground.  He's chasing the guy around the

20      truck shooting him.

21  Q   Let me stop you there.  I'm going to stop you just a

22      second.  I'm going to break you down a little bit.  You

23      indicate just a second ago you said the SUV had pulled

24      off?

25  A   Yeah.

1    Q    How far had it gotten before --

2    A    It pulled just about ten feet.  As soon as they --

3          whoever it was saw the guy get up off the ground.  They

4          stopped, slammed on the brakes.

5    Q    And then what happened?

6    A    Then somebody jumping out the passenger side with a gun

7          and started shooting at the guy and chasing him around

8          the car and he was limping trying to get out of way the

9          bullet and he was going back and forth around the car

10        and the guy was chasing him around the car, shooting at

11        him.

12    Q   The person who got out of the SUV was chasing after the

13        person?

14    A   Yes.

15    Q   Who was limping?

16    A   Yes.

17    Q   The person who you had earlier seen get up?

18    A   Get up, right.

19    Q   Okay.  And you said you saw the person chasing after

20        the person limping, shooting?

21    A   Yeah.

22    Q   About how many more time -- how many times did you see

23        the person shooting the person that was limping?

24    A   Well, he shot him about five times, before he hit him

25        and then he hit him once in the side and the guy went

78

1    down and when the guy went down, he walks up on him and

2    he shot him maybe seven, eight more times and just

3    popping him and then he walked up and shot him in the

4    head.

5  Q  Okay.  This person -- after he shot -- after the shot

6    -- I'm going to call this person a shooter, okay?  When

7    the shooter shot the person who was shot on the side

8    and the person shot in the side fell down, where did

9    the shooter go?

10  A  He stood over him.

11  Q  He stood over the person that was shot?

12  A  Yes.

13  Q  And how many more gunshots did the shooter fire at that

14    point?

15  A  A lot.  I don't know, seven, eight.  A lot.

16  Q  And then you said the last gunshot was in the head?

17  A  (shaking head)

18  Q  Is that yes?

19  A  Yes.

20  Q  Everything has to be out loud.

21  A  Yes.  I'm sorry.

22  Q  Sir, had you ever seen that person who was the shooter

23    before?

24  A  No.

25  Q  Could you describe him for us, please?

1   A   Just a brown skinned black man, about five-ten, young

2       guy.

3   Q   Do you remember what he was wearing that day?

4   A   I think it was a white t-shirt.  He had a head rag on

5       and I believe jeans but I'm not sure.

6   Q   DO you know if he had anything on his white t-shirt?

7   A   No, just the white t-shirt.

8   Q   Besides the driver of that vehicle and the shooter, was

9       there anyone else in that vehicle?

10   A   No, not that I could tell.

11                     MR. PRASAD:  Pass the witness.

12                     THE COURT:  Miss Rock.

13                     CROSS-EXAMINATION

14  BY MS. ROCK:

15   Q   Good afternoon.

16   A   Good afternoon.

17   Q   Did you say the gentleman had a rag on?

18   A   He had a dew rag on.

19   Q   A dew rag.  What color was it?

20   A   White.

21   Q   A white dew rag on his head?

22   A   (shaking head)

23   Q   Is that yes?

24   A   Yes.

25                     MS. ROCK:  Your Honor, I don't

80

 1          think I have any questions for Mr. Harris.

 2                         THE COURT:  Any redirect, based on

 3          the defendant's questions?

 4                         MR. PRASAD:  No, Judge.

 5                         THE COURT:  Thank you, sir.  You

 6          can step down.  Please be careful there.

 7                         THE WITNESS:  Yes.

 8                         MR. PRASAD:  Judge, can the witness

 9          be excused as well?

10                         THE COURT:  Miss Rock, any reason

11          to call him?

12                         MS. ROCK:  Are you calling any

13          other witnesses?  No, your Honor.

14                         THE COURT:  No, he cannot be

15          excused?

16                         MS. ROCK:  Oh, no, I don't have any

17          objection to him being released.

18                         THE COURT:  Can he be released

19          then, counsel?

20                         MR. PRASAD:  Thank you.  At this

21          point the people rest and I don't know if Miss Rock

22          have any witnesses?

23                         MS. ROCK:  I don't have any

24          witnesses, your Honor.

25                         MR. PRASAD:  Can I make my motion,

1    Judge?

2                    THE COURT:  Yes.

3                    MR. PRASAD:  Your Honor, at this

4    time the people would ask to bind over the motion.  The

5    only change in the original complaint, of course, is

6    what I previously stated, in terms of victim's name in

7    Count II.

8                    In terms of my argument, your

9    Honor, obviously she, Miss Rock, is going to argue that

10   the vic -- the defendant was somehow acting in self

11   defense towards an aggressor.  I think that the court

12   is well aware that first off, self-defense is a defense

13   that has to be asserted and self-defense for deadly

14   force requires more than just being assaulted by being

15   punched.  What we have in this case, your Honor, is the

16   defendant firing four to five times, straight in a

17   close range at the victim.  Also the defendant hitting

18   another person, the victim in the Count Number II.  The

19   specific intent to Count Number II, is actually

20   transferred intent.  I'm not arguing that the defendant

21   specifically intended to hit Mr. Allen but what I am

22   suggesting to the court is and I think what the

23   evidence does show is that the defendant intentionally

24   had a sepcific intent to kill the victim, Mr. Simpson

25   and by also hitting Mr. Allen, Count II is met with the

1    assault with intent to murder with specific intent

2    being shown.  We got a gun, we got close range firing,

3    we got multiple shots, close range firing in a very

4    close span and then what we have, your HOnor, is the

5    additional testimony which is provided in part by

6    Mr. Bailey of what he heard and timie gap of what he

7    heard and in the testiomnoy of Mr. Harris, from what he

8    observed from afar. Judge, what we have in terms of

9    those two individusals oging back into that SUV the SUV

10   being -- pulling off and then when the victim getting

11   up trying to get up and is S"UV coming back, you have

12   one of two things, and either of these two things both

13   show culpability of this defendant either you have this

14   defendant coming back outside and fishing off the

15   victim or this defendant having one of the other two

16   individuals that he came with originally and aiding and

17   abetting that individual by driving that individual

18   back to the scene and that other individual coming out

19   and fishing off the victim.  Either way, there is

20   nothing you can look at at what happened inthe second

21   series of gunfire as anything but an additional

22   evidence of premeditated and deliberate murder, taking

23   it all together as a whole, you have clearly in this

24   case, your Honor, first degree premeditated deliberate

25   murder.  This defendant bringing to the scene a gun,

83

1    carrying a gun, pulling out a gun, firing four to five

2    shorts right at the victim.  In addition to hitting

3    other people, you also have -- I'm sorry, your Honor.

4                   THE COURT:  No need to be sorry.

5                   MR. PRASAD:  I was just getting

6    some advice from co-counsel -- Mr. -- from the

7    sergeant.  You also have the testimony of Mr. Allen,

8    where he does say that the one observation that he was

9    able to make inside the store before he took for cover,

10   when he was inside the store is seeing this defendant

11   firing additional shots when Mr. Allen had gotten

12   inside the store and the final piece of evidence that I

13   would like  the court to consider when the court's

14   making decisions on bind-over, is the medical

15   examiner's testimony where you have nine gunshot wounds

16   that took effect.  You have four gunshot wounds that

17   were anterior gunshot wounds, uncorroborating the

18   direct testimony, you have Mr. Allen, you have four

19   gunshot wounds that were possibly gunshot wounds

20   corroborating the testimony of Mr. Harris, of the

21   victim being chased around and shot and you have the

22   final killing shot that Mr. Allen told you about --

23   excuse me, that Mr. Harris told you about with the

24   gunshot wounds to the individual's head.  Thank you.

25                   MS. ROCK:  The only person that

84

1    actually identified, allegedly, Deonte Harris (sic)

2    with a gun was a person, Mr. Allen, who's wearing a

3    t-shirt into the courtroom, rest in peace, Tyrone

4    Simpson, who he called his -- my man, as he took the

5    witness stand. He said that Mr. Harris (sic)--

6    Mr. Howard came up there and Tyrone Simpson went after

7    him and started hitting him in the face hard and at

8    least five times when he backed up -- first, sounds

9    like his hands were up, but we find out that his fist

10   is still balled up and that's when, allegedly, Deonte

11   Howard is supposed to have shot this person.

12                    Then we hear Mr. Bailey who -- and

13   he agrees with Mr. Allen agrees that it was an attack,

14   that it wasn't a fight, as the prosecutor keeps trying

15   to characterize it, but it was an attack. Then when

16   Mr. Bailey gets on he also agrees that it was an

17   attack, that Mr. Howard was punched several times and

18   he had rushed at him, rushed at him and was attacking

19   him. Then you have Mr. Harris who there's no

20   connection to what the prosecutor is saying, in terms

21   of alleging that somehow there was a person aiding and

22   abetting, but it certainly clearly shows it's a totally

23   different person that did the shooting. So I don't --

24   what the prosecutor is trying to infer is way out there

25   and there is nothing connecting it where you can make a

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

1    reasonable inference that somehow this person with the

2    white dew-rag on his head, wearing a white t-shirt, is

3    somehow connected to Deonte Howard.  This is an

4    individual who came up there, who had already been in a

5    fight with somebody name Freak and then Mr. Allen was

6    already up there and he was gonna come up there and

7    challenge Freak for stalking his sister.  So this is

8    somebody who is bent over fighting people and who was

9    in a hostile aggressive violent mood.  Clearly the

10   evidence -- this case should be dismissed, based on the

11   fact that the evidence presented that my client acted

12   in self-defense.  There is no connect that my client

13   shot any further.  No one else, even Mr. Bailey when he

14   was asked, he said I saw something black, but I don't

15   know whose hand it was in.  So this case needs to be

16   dismissed, your Honor, in alternative, it's

17   manslaughter case.

18                    THE COURT:  It's the people's

19   motion.  People have a response?

20                    MR. PRASAD:  Judge, dismissal in a

21   question of fact, makes no sense.  I mean, counselor

22   is arguing a question of fact from the evidence as to

23   self-defense and counsel keeps missing the one main

24   point for self-defense with deadly force.  There needs

25   to be both an objective and subjective reasoning for

86

1   the deadly force to be used.  In this case, he's tagged

2   by a person -- being punched by a person is never a

3   deadly force in and of itself was attacked by one

4   person.  All the evidence is clear there is only one

5   person attacking him.  He has no right to pull out a

6   gun and gun down someone.  That's just not what self

7   defense used of deadly force is permitted in this state

8   and that's why it's -- counsel's argument are wrong.

9                THE COURT:  Court would make the

10  following brief findings in binding the defendant over,

11  move to amendment to Count II, which had no objection

12  as to the victim's last name, so it's a bind-over,

13  almost as charged, but with amendment from Simpson to

14  Allen.  In Count II, and that is a review of the

15  reading of the recitation, I should say of the medical

16  examiner's report, let me -- initially at the beginning

17  of this hearing, I was somewhat perplexed, how I was

18  going to have a single deceased victim with nine

19  gunshot wounds, when the first of those is a gunshot

20  wound to the right side of the head, particularly when

21  then the rest of those gunshot wounds are both anterior

22  and posterior to, primarily to the legs and I should

23  say legs in plural or that the record show that I mean

24  legs, plural, but also to the other extremities.  With

25  the testimony that I've heard today, this is a

1    preliminary examination hearing. At best, Ms. Rock,

2    what you created is a question of fact and that is a

3    question of fact for the finder of fact. Court

4    certainly sees that this is sufficient and beyond that,

5    to bind the defendant over as charged, while I

6    appreciate that people's giving me the option of

7    inferring that the defendant could either have been the

8    driver or the passenger, it's my belief that,

9    nonetheless, the option, nonetheless, the option the

10   court would believe that the defendant is the shooter

11   and so bind the defendant over.

12                   AOI is June 3rd, 2010. That ability

13   to find that then fully explains the medical examiner's

14   report.

15                   MS. ROCK: I'm sorry, what was

16   that, your Honor?

17                   THE COURT: That finding that fully

18   explains the medical examiner's report, extremities,

19   head shot, posterior, anterior.

20                   (Proceedings concluded at

21   approximately 3:35 p.m. )

22

23

24

25

88

1

2                    CERTIFICATE OF COURT REPORTER

3

4    STATE OF MICHIGAN )

5                     ) SS

6    COUNTY OF WAYNE  )

7

8           I, BETH A. TOMASI, CSR-3098, Official Court

9        Reporter in and for the 36th District Court for the

10       City of Detroit, State of Michigan, do hereby certify

11       that the foregoing pages, 1  through 88,

12       inclusive, comprises a true and accurate transcript

13       of the proceedings had in the above-entitled cause.

14

15

16

17                   BETH A. TOMASI, CSR-3098

18                   CERTIFIED SHORTHAND REPORTER

19

20          Mechanically reproduced copies of this transcript

21       are not certified unless the certificate page bears

22       an original signature.

23       DATED:  June 24, 2010

24

25

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)