STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN

v                        Case Number

10-5562-01


DEONTE HOWARD

                              Defendant.


_____/

MOTION

PROCEEDINGS HELD BEFORE THE HONORABLE BRUCE U. MORROW,

Judge, Third Circuit Court, Detroit, Michigan, on

August 19, 2010.

APPEARANCES:

              RAJ PRASAD P68519
              Assistant Prosecuting Attorney
              Wayne County Prosecutor's Office
              1441 St. Antoine
              Detroit, MI 48226
              (313) 224-6804

              SUSAN ROCK P34497
              Attorney for the Defendant.
              P.O Box 39287
              Redford MI 48239
              (313) 937-4444


SEAN E. ALLEN
Official Court Reporter
CSMR 5265
(313) 224-7044

-1-

TABLE OF CONTENTS

WITNESSES:
AUNDREY ALLEN
        Direct Examination by Ms. Rock.............17
        Cross-Examination by Mr. Prasad............34
        Redirect Examination by Ms. Rock...........44
        Recross-Examination by Mr. Prasad..........50

SERGEANT SAMUEL MACKIE
        Direct Examination by Ms. Rock.............56
        Cross-Examination by Mr. Prasad............69
        Redirect Examination by Ms. Rock...........77

OFFICER GARY DIAZ
        Direct Examination by Ms. Rock.............71

EXHIBITS:
People's Exhibits One and Two....................57
Defendant's Exhibit A............................59

1           Detroit, Michigan.

2           August 19, 2010.

3           (At 10:09 a.m.)

4           THE COURT:  Mr. Howard step up, please.  We

5      will begin hearing some motions on case 10 5562, People

6      of the state of Michigan versus Deonte Howard.

7           MR. PRASAD:  Good morning, your Honor.  Raj

8      Prasad for the People.

9           MS. ROCK:  Good morning, your Honor.  Susan

10     Rock representing Mr. Howard.

11           Your Honor, I filed a motion to quash today,

12     a motion to quash the first degree murder charge.  I

13     know that the Court read the transcript.  And the

14     essence of my argument is that this was a situation of

15     hot blood, or alleged hot blood, and that was testified

16     to by the witnesses, that my client was hit in the face

17     five times hard, fast, rapidly and the deceased had his

18     hand up in the air balled as if he was going to

19     continue.  A witness, Aundrey Allen, testified that he

20     saw my client then grab crazily for a gun and shoot the

21     gun and fire it at him and the deceased.

22           With regard to -- Another witness testified

23     that they saw someone get out of a truck, point a gun

24     and fire it at the deceased while he was laying on the

25     ground.  There isn't any testimony connecting that

-3-

1    person to my client.

2              Based on the case law that I cited, your

3    Honor, I'm arguing that the prosecution did not show

4    premeditation or deliberation even with the probable

5    cause standard.  The gaps in evidence cannot be filled

6    in by assumptions, which are unsupported by substantive

7    testimony.  The mere act of killing alone, without proof

8    of more, will not support a finding of premeditation and

9    deliberation.  So, we're asking your Honor to quash the

10   charge of first degree murder.

11             THE COURT:  Your response, please?

12             MR. PRASAD:  Thank you, your Honor.  Your

13   Honor, the defense's arguments can be boiled down to

14   three.  And I'd like to take them one at a time, if I

15   may.

16             First is the argument that there's a self-

17   defense that was presented at exam.  Self-defense is an

18   affirmative defense.  It establishes a question of fact

19   for the trier of fact.  Therefore, in terms of the

20   bindover decision and an abuse of discretion, there is

21   no abuse of discretion for disregarding the self-defense

22   aspect of it.  And I don't think the Court disregarded

23   it.  I think the Court felt that, as I argued repeatedly

24   throughout the argument stage of the exam, that we have

25   clearly a situation, as all the evidence showed in the

-4-

1     exam, of one armed person fighting and unarmed person.

2               And we all agree, and I don't think there's

3     any question, that the unarmed person initiated the

4     aggression. It was the armed person who overstepped any

5     boundaries of self-defense or self-defense with deadly

6     force and fired four to five shots initially.

7               Now, the second argument by defense counsel

8     is that, what I'm understanding from defense counsel, is

9     what she describes is an argument that there is no

10    specific intent to kill by her analysis of the actual

11    circumstances of when the defendant pulled out the gun

12    and fired the initial four to five shots.  Judge, I

13    think that is incorrect as well.

14              In terms of looking specifically at the exam

15    transcript, Mr. Allen testified on pages twenty-four and

16    twenty-five of the exam transcript to the fact that as

17    the defendant was pulling out the gun that the initial

18    shots were, he pulling 'em [sic] out and then he pointed

19    straight shots at both the two, the two victims in this

20    case, the deceased, Mr. Simpson, and at Mr. Allen, who

21    was standing two feet behind him.  That is clearly

22    evidence of a specific intent to kill.

23              In fact, what's interesting is that the

24    medical examiner's testimony that was stipulated to on

25    pages six through eight of the exam transcript

 1      correspond or corroborate the description of Mr. Allen's

 2      analysis of the, or description of how the shooting

 3      occurred because the victim, the deceased victim, Mr.

 4      Simpson, had anterior leg shots as well as shots that

 5      went up his body in the front.  And I will get back to

 6      the medical examiner's testimony in a second, Judge.

 7                  The third argument that -- So, in essence,

 8      your Honor, my argument to defense counsel is that

 9      there's ample evidence for a specific intent to kill in

10      the initial four to five shots.  And I disagree with

11      defense counsel.

12                  Counsel's third argument is that there was

13      no premeditation or deliberation shown.  And she also

14      argues in regards to the evidence regarding the

15      testimony of Mr. Harris and how that corresponds to this

16      case.

17                  Judge, there's two aspects to it.  One, in

18      terms of premeditation and deliberation.  There's the

19      first argument that the four to five shots, the number

20      of shots alone the Court can analyze that it is a proper

21      jury question for premeditation and deliberation at that

22      point.  And the Court, and the Magistrate did not abuse

23      her discretion in binding over on that count.

24                  But there's a second argument.  And this is

25      where I strongly disagree with defense counsel, that

1      there is no linking of Mr. Harris' testimony to the

2      testimony of Mr. Allen.  I think clearly there is a link

3      to Mr. Allen's testimony and Mr. Harris' testimony.

4              Mr. Allen's testimony, in conjunction with

5      Mr. Bailey's testimony and Mr. Harris' testimony,

6      evidence a clear scenario in which three individuals

7      come out of the Jeep Mountaineer, which is an SUV, and

8      that these three individuals were the defendant and his

9      two people that were with him and that these were the

10     same individuals that Mr. Harris later described -- And

11     let me give you some cites for the record to be clear.

12             Mr. Allen describes the SUV or the Jeep

13     Mountaineer on pages seventeen and eighteen, actually

14     all the way going to page nineteen.  Page seventeen

15     starting at line five and going all the way to page

16     nineteen, line three.  Describing that that is, in fact,

17     the same Jeep Mountaineer which the defendant came out

18     of with the two other individuals.

19             Mr. Harris hears the four to five gunshots,

20     which is corroborated by all the other witnesses, and

21     then goes and looks out his picture window. And then

22     what he describes on page seventy-five and seventy-six

23     as seeing the passenger coming out of the gray SUV.

24     First seeing the driver of the gray SUV stop it,

25     returning back to the scene and then seeing the

1    passenger come out of the gray SUV and then finishing

2    off the defendant [sic].  That is also ample evidence

3    corroborative of premeditation and deliberation.

4             That takes us back to the medical examiner's

5    testimony at pages six through eight that was stipulated

6    to which shows the posterior shots that took effect into

7    the victim's body and the killing shot in the head.

8             So, in essence, your Honor, my argument is

9    that the analysis of the whole transcript and putting

10    the evidence together, as the District Court Judge ably

11    did, does find that there is probable cause and it was

12    sufficient evidence and there's no abuse of discretion.

13    Thank you.

14             THE COURT:  Thank you.  Any response you'd

15    like to make, Ms. Rock?

16             MS. ROCK:  Your Honor, I think I've made my

17    argument with regard to -- I think it's clear that there

18    -- I've made in my written argument and I disagree with

19    the prosecutor's analysis.

20             THE COURT:  Okay.  Just as a legal argument,

21    what should a District Court Judge do, let's just say if

22    the offense was carrying a concealed weapon and, you

23    know, the testimony of the witnesses is that the

24    defendant, you know, had a concealed weapon.  And then

25    the second witness, let's say it's just called by the

-8-

1    prosecution, says that when they were going through the

2    defendant's wallet they saw a CCW permit.  What should

3    the Magistrate do?

4                    MR. PRASAD:  I mean, I don't understand the

5    Court's--

6                    THE COURT:  (Interposing)  Okay.

7    Preliminary examination--

8                    MR. PRASAD:  (Interposing)  Right.

9                    THE COURT:  The question is, the charge is

10   CCW, carrying a concealed weapon.  One witness testifies

11   that they stopped the defendant.  He had a weapon on him

12   and it was concealed.  And the second witness says,

13   well, after we arrested him I looked through his wallet

14   and I saw a valid CCW permit in his wallet.

15                   MR. PRASAD:  Right.

16                   THE COURT:  So, what would the Magistrate's

17   job be?

18                   MR. PRASAD:  That would be different than

19   the self-defense--

20                   THE COURT:  (Interposing)  I understand

21   that.  What would the Magistrate's job be?

22                   MR. PRASAD:  Oh, they'd have to take that

23   into account.  There's no--

24                   THE COURT:  (Interposing)  Okay.  But what

25   do you imagine the outcome would be?

                              -9-

1              MR. PRASAD:  A dismissal, Judge. I mean--

2              THE COURT:  (Interposing)  Okay.  Would you

3    agree though that a CCW permit is an affirmative

4    defense?

5              MR. PRASAD:  No.  That's what I was, that's

6    what I--

7              THE COURT:  (Interposing)  You don't think

8    so?

9              MR. PRASAD:  No, sir.

10             THE COURT:  Okay.

11             MR. PRASAD:  I think -- Isn't it one of the

12   elements of the crime that we have to prove that's

13   usually--

14             THE COURT:  (Interposing)  No.  You don't

15   have to prove that he doesn't have a CCW.

16             MR. PRASAD:  The defense has to prove he

17   does have it.

18             THE COURT:  It's an affirmative defense,

19   though.  And here the affirmative defense would be

20   presented in the People's case.

21             MR. PRASAD:  Correct.

22             THE COURT:  Okay.  So, there's--

23             MR. PRASAD:  (Interposing)  But see the--

24             THE COURT:  (Interposing)  But you're saying

25   that--

1                    MR. PRASAD:  (Interposing)  The CCW permit

2      situation's very different because--

3                    THE COURT:  (Interposing)  But it's an

4      affirmative defense, right?

5                    MR. PRASAD:  No.  I understand what the

6      Court's suggesting, but the situation's very different

7      because -- And I just know this from signing warrants.

8      Is that we do, the officers, before the submit a

9      warrant, will run a LEIN to confirm the CCW is valid.

10     So, therefore, even if they see a CCW permit by another

11     witness, in order for us to proceed on the case, we

12     would have had to have had an officer testify or show

13     through the Magistrate that the CCW permit is invalid or

14     not currently valid.

15                   THE COURT:  No.  CCW is a, that's an

16     affirmative defense, that you have a valid permit.

17                   MR. PRASAD:  No.  No.  It's valid at the

18     time, sir.  It's--

19                   THE COURT:  (Interposing)  But it's a

20     defense to the crime.  Yes.  You committed the crime.

21     But you shouldn't be -- It's just like self-defense.

22     You have to prove the crime, but then you have to prove

23     self--

24                   MR. PRASAD:  (Interposing)  No.  I

25     understand what the Court's saying.  I just--

                              -11-

1              THE COURT:  (Interposing)  And so, and if a
2    person shoots a person legally, then they haven't
3    committed the crime.
4              MR. PRASAD:  No.  I understand -- And what's
5    why we, and that's -- I understand what the Court's
6    saying.  That's why my argument had always been at exam
7    and why this is a question of fact is that if this was
8    an unarmed man being shot by an armed man and that the--
9              THE COURT:  (Interposing)  No.  I gotcha.
10             MR. PRASAD:  Yeah.  I know.
11             THE COURT:  I don't care about that
12   argument.
13             MR. PRASAD:  I know.
14             THE COURT:  I'm asking you something
15   completely different.
16             MR. PRASAD:  Yes, sir.  No.  No.  To answer
17   the Court's question, if he has a valid CCW permit and
18   the prosecutor presents that testimony at exam, then I
19   agree.  The Magistrate should dismiss the charge.
20             THE COURT:  Right.  And you agree that a
21   valid permit is an affirmative defense?
22             MR. PRASAD:  I'm not sure.  That's why I'm
23   glad you're looking it up.  I mean, that's why we run
24   the CCW LEINs before we charge.
25             THE COURT:  Okay.  It says the prosecution

-12-

 1    has the burden of proving beyond a reasonable doubt that

 2    the defendant did not have a license or was carrying a

 3    pistol in violation of the restrictions.

 4              MR. PRASAD:  So, it's not an affirmative

 5    defense, your Honor.  It's an element that we'd have to

 6    prove.

 7              THE COURT:  I have never, at an exam, heard

 8    any testimony offered by the police that we ran his name

 9    and there was no valid CCW permit.

10              MR. PRASAD:  It's never an issue, Judge.  I

11    mean, but I know--

12              THE COURT:  (Interposing)  But I'm just

13    saying if it is considered an element that you have to

14    prove that they, at the exam, then it's not even

15    addressed.

16              MR. PRASAD:  But I think in the statute

17    there's a presumption.  I don't have the statute--

18              THE COURT:  (Interposing)  They're listed as

19    exceptions, you know.  The hunting knife exception.  The

20    pistol carried by licensees.  The weapon carried in

21    home, place of business or land possessed.  But it all

22    says -- Again, you would arrest a person and it's on the

23    person to argue that they were a resident in the home

24    and that they had a right.  And they would have to show

25    affirmatively some affiliation with the residence.

                          -13-

1          But my suggestion is that Magistrates can

2      listen to affirmative defenses and make judgements about

3      it.  And just because it's a self-defense claim doesn't

4      mean that the Magistrate should ignore that testimony

5      and just say, okay.  I mean that's how we make

6      distinctions sometimes between if there was an abuse

7      binding somebody over on first degree or second degree.

8          MR. PRASAD:  No.  And I agree, sir.  That's

9      why the focus of my argument at exam on the merits of

10     the self-defense argument in addition to the fact that

11     it was a self-defense argument.

12         THE COURT:  The case that Ms. Rock cites as

13     it relates to, you know, presumptions -- And you're

14     absolutely right.  The Court should never be in a

15     position where they make presumptions.  But there's a

16     difference in the way that I see the law.  Because the

17     law does provide and ask people to make reasonable

18     inferences.  And I think a reasonable inference is a lot

19     different than just presumptions.  You know, it has to

20     be reasonably related to some fact.

21         And when I read the transcript, I read it in

22     conjunction with what was included in your motion.  And

23     I've listened to your arguments.  And I don't believe

24     that there has been abuse of discretion.  And so, I'm

25     going to deny the motion to quash.

-14-

```
 1              MR. PRASAD:  Thank you, Judge.  Judge, the
 2     civilian that Ms. Rock requested that we both agreed on
 3     is present.  So, we are ready to proceed on the next
 4     part of the motion.
 5              THE COURT:  Okay.  Why don't we begin then?
 6              MS. ROCK:  Your Honor, I would make a motion
 7     to sequester witnesses.  I don't know if we have any
 8     witnesses out in the--
 9              THE COURT:  (Interposing)  Okay.  I don't
10     know if I have a witness list so that I would even know
11     who to ask to -- Have you provided everybody with a--
12              MR. PRASAD:  (Interposing)  No, Judge.  I
13     haven't.  I can be very clear why I haven't.  Sergeant
14     Mackie, being very thorough that he is, provided me with
15     a fifty-four-person witness list.  And actually, I'm
16     adding people to that.  But I know that this Court's
17     very particular about how the Court wants the witness
18     list, so I have not finalized it because--
19              THE COURT:  (Interposing)  Okay.  And it is
20     only because I'm trying to avoid trial--
21              MR. PRASAD:  (Interposing)  Yes, sir.
22              THE COURT:  Issues with who's supposed to be
23     here, who was called, what they would testify to.
24     Because, certainly, as you're aware, I know you want to
25     speak to them to see what they might say or what they
```

-15-

```
 1      might not say as well as I'm sure with fifty-four
 2      people--
 3                  MR. PRASAD:  (Interposing)  Yes, sir.
 4                  THE COURT:  I don't want to have to give
 5      them an investigator to track down fifty-four people--
 6                  MR. PRASAD:  (Interposing)  No.  No.  And--
 7                  THE COURT:  (Interposing)  To try to find
 8      out what they saw or didn't see--
 9                  MR. PRASAD:  (Interposing)  Sergeant
10      Mackie's fifty-four people are all listed in his
11      investigator's report that I know Ms. Rock has.  The
12      only additional witnesses that I have are the reports
13      that I provided Ms. Rock for MSP and stuff like that.
14                  THE COURT:  So, do you know if any of those
15      possible fifty-four people are there?
16                  MR. PRASAD:  Mr. Allen's in the witness
17      room.  Where did Sergeant Diaz go?  Sergeant Diaz is--
18                  THE COURT:  (Interposing)  Okay.  So, that
19      would be the only ones --  Okay.
20                  MR. PRASAD:  Yes, sir.  You want him to wait
21      in the witness room, Susan?
22                  MS. ROCK:  Yeah.  I would prefer it.
23                  MR. PRASAD:  Okay.
24                  THE COURT:  Okay.  Why don't you call your
25      first witness then, please?
```

1                    MR. PRASAD:  Your Honor, procedurally, and I

2          think Ms. Rock agrees with this because I think I read

3          it in her motion as well.  The line-up of the, the live

4          line-up in this case was with counsel.  The burden,

5          therefore, is on the defense.

6                    THE COURT:  Right.  Right.  Moving party and

7          the burden.

8                    MR. PRASAD:  Right.  So, I would let Ms.

9          Rock call her first witness.

10                   MS. ROCK:  Mr. Allen, could you go to the

11         court reporter there and raise your -- Be sworn in?

12                   THE COURT:  Raise your right hand, please,

13         young man.

14                   (At 10:27 a.m. witness AUNDREY ALLEN

15                   was sworn.)

16                   THE COURT:  Do you promise to tell the truth

17         today?

18                   THE WITNESS:  Yes, sir.

19                   THE COURT:  Okay.  Please have a seat in

20         that black chair.  Thank you, sir.

21                   DIRECT EXAMINATION

22    BY MS. ROCK:

23    Q    Okay.  Young man, could you please state your name?

24    A    Aundrey Allen.

25    Q    Okay.  And, sir -- Excuse me just for a second, your

                              -17-

1    Honor.  On April 10th, you were present at a location
2    called the Smokehouse, is that correct?
3 A  Yes.
4 Q  Okay.  And thereafter, you were shot while you were at
5    that location, is that correct?
6 A  Yes.
7 Q  Okay.  And when you went to the hospital, you gave a
8    statement to the police, is that correct?
9 A  Yes.
10 Q  Okay.  And when you gave that statement to the police,
11    you would say that you knew what you were doing?
12 A  Yes.
13 Q  Okay.  You weren't out of it?
14 A  A little bit.  Yeah.
15 Q  Did you -- Well, when you say a little bit, what do you
16    mean?
17 A  Like I was drugged up.
18 Q  Do you remember -- But you knew, you knew what you were
19    doing and you knew what you were saying, is that
20    correct?
21 A  Yeah.
22 Q  Is that yes?
23 A  Yes.
24 Q  Okay.  And while you were -- In fact, in your statement,
25    you made very specific statements, is that correct?

1  A     Yes.

2  Q     Okay.  And, in fact, you talked about the shooter

3        driving a silver Mercury Mountaineer?

4  A     Yes.

5  Q     Okay.  And were those your words?

6  A     Yes.

7  Q     Okay.  And you, in your statement, used the word

8        shooter, was that your word?

9  A     Yes.

10 Q     Okay.  And, in fact, you said at some point that the

11       shooter took a handgun from his jacket with his right

12       hand, right?

13 A     Yes.

14              MR. PRASAD:  Judge, I'd just object to the

15       form of the questioning.  I think this is both leading

16       and--

17              THE COURT:  (Interposing)  Okay.  But I'm

18       going to guess the reason that it's leading is because

19       the witness might not necessarily be a defense witness,

20       as it were.  And so, we can just move to the point.

21              MR. PRASAD:  Okay.  And the other form of

22       the question, objection, Judge, is that she's just

23       reading the statement.  She's not even offering him to

24       look at it--

25              MS. ROCK:  (Interposing)  He's agreeing with

                              -19-

1       me, so I'm not -- Why do I need to impeach him?

2                   THE COURT:  Right.  If it's not for

3       impeachment, you don't really have to show him the

4       writing anymore.  You can ask him questions.  If he

5       doesn't remember -- Young man, if you don't remember,

6       say you don't remember.  They might show you something

7       to help you remember.

8                   MR. PRASAD:  Thank you, Judge.

9    Q  (By Ms. Rock, continuing):  So, young man, as a matter

10      of fact, or Mr. Allen, in your statement to the police

11      you described the shooter as a black male, right?

12   A  Yes.

13   Q  Age seventeen to eighteen?

14   A  Yes.

15   Q  5'7" to 5'8"?

16   A  Yes.

17   Q  No more than a hundred and thirty pounds, correct?

18   A  Yes.

19   Q  Short, tapered hair like yours?

20   A  Yes.

21   Q  A small goatee, right?

22   A  Yes.

23   Q  And just shaved the side of his head, right?  Is that

24      yes or no?

25   A  Yes.

```
 1  Q    Okay.  So, you gave that detailed description to the

 2       police, right?

 3  A    Yes.

 4  Q    Okay.  And then you -- And, in fact, you even gave a

 5       description of a person by the name of Freak, right?

 6  A    Yes.

 7  Q    Okay.  Now, you were shown a photo line-up at the

 8       hospital, right?  You were shown pictures?

 9  A    Yes.

10  Q    And there was no attorney there, right?

11  A    No.

12              MS. ROCK:  Okay.  And I'm going to show you

13       what's been marked -- I don't think this one has been

14       marked.

15              MR. PRASAD:  You want to use mine?

16              MS. ROCK:  Sure.  Thank you.

17  Q    (By Ms. Rock, continuing):  I'm going to show you People

18       Exhibit Number Two--

19              MR. PRASAD:  (Interposing)  And, Judge, I

20       have no objection to the exhibit.

21              MS. ROCK:  Thank you.

22  Q    (By Ms. Rock, continuing):  And ask you if you recognize

23       this?

24  A    Yes.

25  Q    Okay.  Those were the photos that you were initially
```

1      shown at the hospital?

2  A   Yeah.

3  Q   Okay.  And, in fact, it has your signature on it,

4      correct?

5  A   Yes.

6  Q   Okay.  And in that photo line-up, you said--

7                  THE COURT:  (Interposing)  Excuse me for

8      just two seconds.

9                  MS. ROCK:  Okay.  Thank you, your Honor.

10 Q   (By Ms. Rock, continuing):  And during that photo show-

11     up that you were shown, you were asked did you recognize

12     anybody and you said yes, is that correct?

13 A   No.  I said, no.  I didn't recognize him, but that was

14     the closest person to me.

15 Q   So, when your signature is on here and the question

16     says:

17                  "Do you see anybody you recognize?"

18     And it says answer:

19                  "Yes."

20                  You're saying that's not your response?

21 A   That was my response, but to the closest person on here.

22 Q   But you just said yes, right?

23 A   Yeah.  I just said yeah.

24 Q   Okay.

25 A   Because I wanted him out of my face because I was tired.

```
 1  Q    What's that?

 2  A    I was tired.  I wanted him out of my face.

 3  Q    You what?

 4            THE COURT:  He wanted him out of his face.

 5            MS. ROCK:  Okay.

 6  Q    (By Ms. Rock, continuing):  And you said, or the answer

 7       was -- The question to number one was yes.  Identify by

 8       number the photo or photos you recognize, right?

 9  A    Yes.

10  Q    And you put, you said number six, right?

11  A    Yes.

12  Q    Okay.  And then you said:

13            From where do you recognize the person

14            identified?"

15       And your answer was:

16            "The shooting."

17            Right?

18  A    Yes.

19  Q    Okay.  And then you said, the police asked you:

20            "Do you have any additional comments?"

21       And you said:

22            "This is the man who shot me and my friend."

23            Right?

24  A    Yup.

25  Q    That was your statement?
```

1  A    Yup.

2  Q    Okay.  So, this line-up was conducted on April 11th,

3       2010?

4  A    Yeah.

5  Q    Okay.  So, then a month and three days later, you go to

6       a live line-up?

7  A    Yes.

8  Q    Okay.  Why do you go to a live line-up if you've already

9       identified the guy who did the shooting?

10              MR. PRASAD:  Objection to personal

11       knowledge.

12              THE COURT:  He can't answer that question.

13              MS. ROCK:  I'm sorry.  What was that, your

14       Honor?

15              THE COURT:  He can't answer why he went

16       somewhere.

17              MS. ROCK:  Okay.

18  Q    (By Ms. Rock, continuing):  Well, you identified the guy

19       who did the shooting, right?  On April 11th, right?

20  A    Yes.

21  Q    Okay.  So, then you go to a live line-up, right?

22  A    Yes.

23  Q    Okay.  And then you view a live line-up?

24  A    Yes.

25  Q    And this is on May 13th, 2010, right?

1  A    Yes.

2  Q    Okay.  And at the live line-up, you're looking for

3       somebody who fits your description, right?

4  A    Yes.

5  Q    Okay.  Seventeen to eighteen years of age, right?

6  A    Yes.

7  Q    5'7", 5'8", right?

8  A    Yes.

9  Q    No more than a hundred and thirty pounds, right?

10 A    Yes.

11 Q    So, when you look at this live line-up, you're looking

12      for a small person, right?

13 A    Yes.

14 Q    Okay.  And the smallest person there was Deonte Howard,

15      right?

16 A    Yes.

17 Q    And at that line-up, you then say about Deonte Howard,

18      he's the one who pulled out the gun and started

19      shooting, is that what you said?

20 A    Yes.

21 Q    When you talked to -- How long did you take to identify

22      -- When you looked at the photo line-up that you have in

23      your hand, how long did you take to identify that

24      individual?

25 A    It took me a while, like...

1  Q    How long?

2  A    I don't know.  About like ten minutes.

3  Q    It took ten minutes?  What was the officer saying while

4       you were taking ten minutes to identify that individual

5       in the photo line-up?

6  A    He was just telling me take my time.

7  Q    Anything else?

8  A    No.

9  Q    What did the officer say before showing you that photo

10      line-up?

11  A   I can't remember.

12  Q   You can't remember?  What did he say after you selected

13      that person, or she or he?

14  A   I can't remember that either.

15  Q   You can't remember what the officer said?

16  A   No.

17  Q   At any time, did you say, geeze, I'm not sure that's the

18      guy?

19  A   Well, yup.

20  Q   You told the officer--

21  A   (Interposing)  No.  I ain't tell him like that.  I was

22      like I ain't see him on here.

23  Q   You said what?

24  A   I told him I ain't see him on here.

25  Q   Okay.  So, you said I didn't, I don't see the shooter on

```
1      this photo line-up?

2  A   It was more than just this though.

3  Q   There were other photos shown?

4  A   Yeah.

5  Q   How many other photos?

6  A   Probably a couple more pages.

7  Q   A couple more pages?

8  A   Like this.

9  Q   Okay.  But when you're shown this one, what did you say?

10 A   This was the closest person that looked like--

11 Q   (Interposing)  That was your wording?  This is the

12     closest person?

13 A   Yup.

14 Q   Did you say anything else in describing--

15 A   (Interposing)  No.

16 Q   In describing the person that you observed in the photo?

17 A   No.

18 Q   Okay.  So, you said to the officer this is the closest

19     person?  Is that yes or no?

20 A   Yes.

21 Q   What did the officer say?

22 A   I can't remember.

23 Q   Then you go to a live line-up, right?

24 A   Yes.

25 Q   I'm sorry?  What did...
```

1  A    Yes.

2  Q    Okay.  And how long did it take you to identify the

3       person in that live line-up?

4  A    I knew right off the top, but I ain't say nothing.

5  Q    Okay.  Why didn't you say something?

6  A    Because I had to look for a minute.

7  Q    Okay.  So, how long did it take you?

8  A    About fifteen minutes.

9  Q    It took you fifteen minutes to identify the person who

10      shot you and your friend?

11 A    Yes.

12 Q    Okay.  And what was the officer saying while it took you

13      fifteen minutes to identify you and your friend?

14 A    Take your time.  But they already probably knew I knew

15      who it was when I first walked in there.

16 Q    How do you know that?

17 A    Because they saw me looking at him the whole time.

18 Q    Did they say that?

19 A    No.

20 Q    What would they say, what did they say that would

21      indicate that they thought you knew who it was?

22              MR. PRASAD:  Objection to what they thought.

23      I mean, this is speculation at this point.

24              THE COURT:  He's already answered the

25      question really.

-28-

1             MS. ROCK:  I'm sorry, your Honor.  Does that

2        mean you want me to move on or does that mean--

3             THE COURT:  (Interposing)  Well, he's

4        answered the question, number one.  So, it's really been

5        asked and answered.  And number two, it really calls for

6        him to guess as to why somebody might have known, why he

7        thought somebody might know.

8             MS. ROCK:  Well, I thought maybe there was

9        some statement that they made that indicated to him that

10       they knew he knew.

11   Q   (By Ms. Rock, continuing):  Did they make any statement

12       that indicated that they--

13   A   (Interposing)  No.

14   Q   Okay.  How do you know it took fifteen minutes?

15   A   It's the time I'm guessing.

16   Q   You're guessing?  Well, did you look at a clock?

17   A   No.

18   Q   But it took a long time?

19   A   Yeah.  It took a while.

20   Q   Took a while before you identified the person who was

21       the shooter?

22   A   Yeah.

23   Q   Okay.  And this is at the live line-up?

24   A   Yes.

25   Q   How do you know it took ten minutes when you were at the

                              -29-

```
 1       hospital to identify that person on April 11th, 2010?
 2  A    Because I was just going through so much, like sheets
 3       like this, a couple of sheets like this they had me go
 4       through, look at all that.
 5  Q    Okay.  So, you had just gone through sheets?
 6  A    Mm-hmm.
 7  A    Yeah.
 8  Q    Is that yes or no?
 9  A    Yes.
10  Q    How many sheets did you go through?
11  A    I think about like two or three.
12  Q    Two or three?  And then when you go through the sheets,
13       that's when you identified that person who you circled
14       on your lap?
15  A    No.  They actually turned to this page.
16  Q    Okay.  They turned to that page.  And what happens?
17  A    Then that's when I just said that one right there.
18  Q    You said that one right there?
19  A    Yeah.
20  A    Yeah.
21  Q    Is that yes?
22  A    Yes.
23  Q    Okay.  And those were your exact words/
24  A    Yeah.
25  A    Yeah.
```

-30-

1  Q     Is that yes?

2  A     Yes.

3  Q     Okay.  And when you talked to the -- You talked to the

4        emergency medical services, is that right?  EMS?

5  A     I don't remember all that.

6  Q     Well, did some medical personnel show up and try to give

7        you assistance and then take you downtown in the

8        ambulance?

9  A     No.

10 Q     Nobody took you in an ambulance?

11 A     No.  I was took in an ambulance, but I don't remember

12        none of that.

13 Q     Did you tell EMS that you thought it was a drive-by

14        shooting?

15 A     No.

16 Q     With regard to the live line-up when you picked that

17        person out, Deonte Howard, you had never seen Deonte

18        Howard before, had you?

19 A     Not before the shooting.

20 Q     Okay.  So, the first time you ever saw Deonte Howard was

21        on April 11th?

22 A     April 10th.

23 Q     April 10th?  On that day, were you taking valium or

24        Xanex?

25 A     No.

-31-

1  Q    You weren't taking -- Okay.  You weren't taking any

2       medication or drugs?

3  A    No.

4  Q    Did the officer tell you at any time, any of the

5       officers ever tell you that you selected the wrong

6       person?

7  A    Yes.

8  Q    When?

9  A    I can't think what it was called.  I don't know.

10  Q   Well, then?  Was it what?  At the hospital?  Was it at

11      the--

12  A   (Interposing)  No.  It was, I think we had a court date

13      that day, that first time--

14  Q   (Interposing)  So, at the preliminary examination?

15  A   Yeah, that.

16  Q   You mean the first hearing where you testified?

17  A   Yeah.  Right before that.

18  Q   Okay.  Was it before that hearing that you--

19  A   (Interposing)  Yeah.

20  Q   That they told you, hey, you selected the wrong person?

21  A   Yes.

22  Q   Okay.  What did they say about the line-up, the live

23      line-up that you were going to view?

24  A   They ain't say nothing.  They just said, the one you

25      seen, pick.

-32-

 1  Q    Did they indicate that they had the person, that they

 2       arrested the person who they thought did the shooting?

 3  A    Yes.

 4  Q    Okay.  And that was before you went to the live line-up?

 5  A    Yes.

 6  Q    Okay.  Did they indicate to you after the line-up that

 7       you had selected the right person this time?

 8  A    No.

 9  Q    When you -- Once you were shot, you ran inside the

10       store, is that right?  You went for cover?

11  A    I didn't know I was shot until I got into the store.

12  Q    Okay.  But once the shots were being fired, you ran into

13       the store, right?

14  A    Yes.

15  Q    Okay.  And after that, you didn't see who was doing the

16       shooting, you just heard, correct?

17  A    I was like by the glass, it's a glass door in there.

18       And I was right there.

19  Q    Okay.  But you didn't see who was doing the shooting?

20  A    Not at that point I wasn't, no.

21  Q    What?

22  A    At that point, I wasn't.

23  Q    Right.  You didn't see who was doing the shooting after

24       you ran into the store?

25  A    Right.

 1                    MS. ROCK:  I don't have any further

 2        questions of Mr. Allen.

 3                    MR. PRASAD:  Thank you, your Honor.

 4                    CROSS-EXAMINATION

 5    BY MR. PRASAD:

 6    Q    Mr. Allen, please spell your first name for the court

 7         reporter.  I know it's a bit of an unusual spelling.

 8    A    A-U-N-D-R-E-Y.

 9    Q    Thank you.  Mr. Allen, I want to take you back to April

10         10th, 2010, the day of the shooting.  About what time

11         did you approximately get out there to the area of where

12         the shooting actually occurred?

13    A    I can't like remember the exact time.  But it was around

14         like 1:00, 1:00, 1:30.

15    Q    Now, we're talking about the a.m. or the p.m.?

16    A    P.M.

17    Q    P.M.  Was it sunlight out?

18    A    Yeah.

19    Q    How was the -- Was there anything about the weather that

20         was blocking from what you were seeing?  Was it raining,

21         snowing, anything like that?

22    A    No.

23    Q    Okay.  Could you clearly see on that day?

24    A    Yes.

25    Q    Do you wear glasses?

                              -34-

1  A    No.

2  Q    Do you have any problems with your vision?

3  A    No.

4  Q    When you first got out there, was the person that you

5       later identified as the shooter, was he out there?

6  A    Yes.

7  Q    And how long was he there before he left?

8  A    About ten minutes.

9  Q    And did you get a good look at him at that point for

10      those ten minutes?

11 A    Yes.

12 Q    Were you close to him?

13 A    Yes.

14 Q    How far away from him were you?

15 A    About five feet.

16 Q    Okay.  At some point, did that person who you later

17      identified as the shooter return?

18 A    Yes.

19 Q    And how close to him were you when he returned?

20 A    About the same distance, about five feet.

21 Q    And was this the time where the shooter and Tyrone

22      Simpson, the deceased, is that when they got into the

23      physical fight?

24 A    No.  Not at that time.  The owner asked him--

25                 MS. ROCK:  (Interposing)  Your Honor, I'm

```
 1        going to object to the mischaracterization by the

 2        prosecutor of physical fight.  My client didn't fight

 3        back.  He got pummeled.

 4                    MR. PRASAD:  Judge, I'll rephrase if that

 5        will--

 6                    THE COURT:  (Interposing)  Answer the

 7        question.

 8                    MR. PRASAD:  Thank you.

 9                    THE COURT:  That's fine.

10   Q    (By Mr. Prasad, continuing):  You were telling us that

11        he actually came back and the owner was talking to him?

12   A    Yeah.

13   Q    Okay.  How long was the shooter back at the scene before

14        any physical altercation took place?

15   A    About two minutes.  It was like the owner was asking for

16        the glasses back.  And he was like he ain't have no

17        glasses.  And then that's when--

18   Q    (Interposing)  Okay.  In those two minutes before the

19        fight started, how far away from the shooter were you?

20   A    I was right behind Tyrone.  So, I was close.

21   Q    Okay.  And did you have any problems seeing who the

22        shooter was then?

23   A    No.

24   Q    Same question as before.  There was nothing about the

25        weather or the sunlight or anything that was blocking
```

```
 1      your view?

 2  A   No.

 3  Q   Nothing wrong with your vision on that day?

 4  A   No.

 5  Q   Okay.  And then after about two minutes, the fight broke

 6      out where Tyrone was punching the shooter?

 7  A   Yes.

 8  Q   Is that right?  And how long did that part take where

 9      Tyrone was punching the shooter?

10  A   About thirty seconds to a minute.

11  Q   Okay.  And at that point, sir, is that when you

12      described the shooter pulled out the gun after the five

13      punches?

14  A   Yes.

15  Q   And how long were you out there when you saw the shooter

16      shoot the gun?

17  A   About like the same time, about thirty seconds to a

18      minute.

19  Q   And in those two minutes, the minute of the fight and

20      the minute of the shooting of the gun, how far away from

21      the shooter were you?

22  A   Well, Tyrone had to be about like a foot from him and I

23      had to be like right behind him.

24  Q   Okay.

25                  MS. ROCK:  I'm going to object as to the
```

1   speculation.

2           THE COURT:  Well, he's been speculating the

3   entire time on cross-examination relative to time

4   periods.  I don't think it's speculative in terms of how

5   he answered.  So, I'll allow it.

6           MR. PRASAD:  Thank you, Judge.  Thank you.

7   Q   (By Mr. Prasad, continuing):  And, sir, was there

8       anything blocking your view of the shooter?  Like, was

9       there anybody in, any person in your way or anything

10      like that?

11  A   No.

12  Q   Was there anything disguising the shooter's face?  For

13      example, was he wearing a mask or was he wearing a scarf

14      or anything like that?

15  A   No.

16  Q   Did you have a clear view of the shooter's face?

17  A   Yes.

18  Q   Okay.  Okay.  Let's talk about going to the hospital.

19      You said an ambulance took you to the hospital that day?

20  A   Yes.

21  Q   What kind of injuries did you suffer, sir?

22  A   I'm on a colostomy bag.

23  Q   You're on a colostomy bag?

24  A   Yes.

25  Q   Okay.  How long a stay did you have in the hospital, all

-38-

```
 1      tolled?

 2  A   About eleven days.

 3  Q   Eleven days?  Do you know, sir, if you had any surgeries

 4      performed on you?

 5  A   Yes.

 6  Q   And where was the surgery performed, sir?

 7  A   They cut my stomach open.

 8  Q   Okay.  And if you know, sir, did they do that the day of

 9      the shooting or was that after the day of the shooting?

10  A   They did that the day of the shooting.

11  Q   The day of the shooting.  Do you know if you were on any

12      pain medication, sir?

13  A   Yes.

14  Q   What kind of pain medications were you on?

15  A   Morphine.

16  Q   Morphine?  Okay.  Now, let's talk about the next day,

17      April 11th.  The day that you spoke to the police

18      officers?

19  A   Yes.

20  Q   You said that you were tired?

21  A   Yes.

22  Q   Tell me about that.  Why would you say you were tired?

23  A   I had so much morphine in me.

24  Q   Okay.  And I believe Ms. Rock asked you about whether

25      you were out of it.  And you said you were a little bit,
```

-39-

1      right?

2  A    Yeah.

3  Q    What do you mean by that?

4  A    Like I was just tired.  I didn't want nobody in my face.

5  Q    Okay.  Did you try to be cooperative with the police

6      officers?

7  A    At first, not really.

8  Q    Why not?

9  A    I was just really, I was asleep.  I ain't want to see

10      nobody.

11  Q    Okay.  And you said the police officer that showed you

12      the police officer said, told you to take your time?

13  A    Yeah.

14  Q    Okay.  And the person that you identified in People's

15      Exhibit Number Two is the person you identified in

16      People's Exhibit Number Two is the person you thought

17      looked closest to the shooter?

18  A    Yeah.

19  Q    All right.  I want to take you now to, I want to take

20      you to the live line-up in May.  Show you -- May I

21      approach, your Honor?

22              THE COURT:  You may.

23  Q    (By Mr. Prasad, continuing):  I'm going to show you

24      People's Exhibit Number One, Proposed Exhibit.  Do you

25      see that document, sir?

```
 1  A   Yes.

 2  Q   Do you recognize your signature anywhere on that

 3      document, sir?

 4  A   Yes.

 5  Q   And where is it?

 6  A   Between the 9 and 8.

 7  Q   And did you write that sentence that's right above the

 8      signature?

 9  A   Yes.

10  Q   Okay.  And you can read it.  What is the part that you

11      wrote?

12  A   That he's the one that pulled the gun out and started

13      shooting.

14  Q   And then you signed it right there?

15  A   Yeah.

16  Q   Okay.  At that live line-up, sir, you said that you

17      immediately recognized who the shooter was?

18  A   Yes.

19  Q   Let's back up a step before we talk about that.  When

20      you looked at the live line-up, how were the people in

21      the live line-up situated?  Were they standing?  Were

22      they sitting?

23  A   I think they was, I think they was sitting.

24  Q   They were sitting?

25  A   Yeah.
```

1  Q    All six of them?

2  A    Yup.

3  Q    Okay.  And when you said you immediately recognized the

4       shooter, what about the shooter stood out for you?  What

5       made you immediately recognize the person?

6  A    I just knew who he was when I seen him.

7  Q    Okay.  Did you recognize his face?

8  A    Yeah.

9  Q    Did you recognize his body?

10  A    Yeah.

11  Q    Was there any doubt in your mind?

12  A    No.

13  Q    Now, you say that you were staring at him?

14  A    Yeah.

15  Q    What was going through your head while you were staring

16       at him?

17  A    A lot.

18  Q    I know.  What was going through your head when you were

19       staring at him?

20  A    Well, just thinking about like knowing who the person

21       was.

22  Q    Okay.  And you said you -- And the other thing I was

23       going to ask you about, you told Ms. Rock that you had

24       to look for a minute.  Why would you want to look for a

25       minute?

1  A    I just did.  I just was -- Stuff was just running

2        through my mind.

3  Q    And that's what I'm trying to get at.  What kind of

4        stuff was running through your mind?

5  A    I don't know, just -- I ain't understand why.

6  Q    You didn't understand why what?

7  A    Why kill somebody of they glasses?

8  Q    That's what was going through your mind?

9  A    Yeah.

10  Q    Now, you told us that, when Ms. Rock was asking you

11        questions, that at the preliminary examination when you

12        testified across the street at 36th District Court,

13        that's when the police officers told you you had made a

14        wrong selection?

15  A    Yeah.

16  Q    Okay.  They never said that before then, like at the

17        live line-up or anything else?

18  A    No.

19  Q    Oh, you did tell us -- Hold on.  Before the live line-

20        up, was there a comment the police made about them

21        arresting somebody they thought was the shooter?

22  A    Yes.

23  Q    What was that comment?

24  A    That, they just said they found the guy in the house

25        exactly how I described what he had on.

1  Q    What do you mean?

2  A    Like the clothes he was wearing.

3  Q    Okay.  This is a month later, right?

4  A    Yeah.

5  Q    Okay.  Did you describe to the police that you saw the

6       shooter again?

7  A    No.  I ain't see him after that.

8  Q    Okay.  The only day you saw him was the day of the

9       shooting?

10  A    Yes.

11  Q    Okay.  Did they tell you who to pick at the live line-

12       up?

13  A    No.

14  Q    Did they give you any indication whatsoever?

15  A    No.

16            MR. PRASAD:  I don't have anything else,

17       your Honor.  Thank you.

18            THE COURT:  Anything more?

19            MS. ROCK:  I do, your Honor.  Thank you.

20            REDIRECT EXAMINATION

21  BY MS. ROCK:

22  Q    You said that you made a immediate identification when

23       you went to the live line-up, right?

24  A    Yes.

25  Q    Okay.  But do you remember testifying or giving

-44-

```
 1       testimony at the prosecutor's office on May 13th, 2010?
 2  A    Yeah.
 3  Q    Okay.  So, you came down and you talked to Mr. Prasad
 4       and also a Ms. Siringas?
 5  A    I don't remember her.
 6  Q    All right.  But you gave testimony under oath?
 7  A    Yes.
 8  Q    Okay.  Didn't you testify that--
 9              MR. PRASAD:  (Interposing)  What page?
10              MS. ROCK:  That would be page five.
11              MR. PRASAD:  Thank you.
12  Q   (By Ms. Rock, continuing):  Didn't you go to that
13       hearing and testify that, after seeing him today, he
14       looked a little younger than that?  Didn't you say that?
15  A    Say what?
16  Q    When you were under oath at the prosecutor's office and
17       they said -- They were asking you about the description
18       of the shooter, right?
19  A    Yes.
20  Q    Okay.  And you said, after seeing him today, he looked a
21       little younger than that, right?
22  A    Yes.
23  Q    Okay.  And then you said:
24              "Yeah.  Yeah.  Now, I seen him today and he
25              looks shorter than that."
```

```
 1              Right?

 2  A    Yup.

 3  Q    So, the description that you gave, 5'7", 5'8", didn't

 4       fit the person you saw in the live line-up, right?

 5  A    No.

 6  Q    Did it fit your description?  You said the person who

 7       did the shooting was 5'7", 5'8", right?

 8  A    Right.

 9  Q    The person you identified in the live line-up isn't

10       5'7", 5'8", is he?

11  A    No.  But I know 5'7", 5'8" is short.

12  Q    What?

13  A    I know 5'7", 5'8" is short.

14  Q    You think that's short?

15  A    Yup.  It's shorter than me.

16  Q    How tall are you?

17  A    6'2".

18  Q    But you said you were five feet away from him, right?

19  A    Yup.  I mean, I can't just look at you and say how tall

20       you is.  I'm going to guess.  So, that's what I did.

21  Q    So -- Okay.  And what was the shooter wearing that day?

22  A    I know he had on a coat.  I can't remember now, but I

23       know he had on a coat.

24  Q    Color?

25  A    Black.
```

1   Q    Anything else?

2   A    Black and I think it was Al Wasson (sp.).

3   Q    I'm sorry.  Are you guessing?

4   A    It was an Al Wasson.

5   Q    Alex San?  I'm sorry.  What was it, sir?

6   A    Al Wasson.

7   Q    Okay.  Al Wasson?

8   A    Mm-hmm.

9   Q    Okay.  You know it was an Al Wasson.  Anything else?

10       Shoes?  Pants?  Shirt?

11  A    I can't remember now.

12  Q    Anything on his head?

13  A    I can't remember.

14  Q    Okay.  Facial hair?

15  A    Yup.

16  Q    What facial hair?

17  A    Just like the one he got now.

18  Q    You're saying right now with the little bit of hair

19       underneath his nose you're saying?

20  A    Yeah.

21  Q    And -- Can you put your face up?  There's no goatee,

22       right?

23  A    No.  But I, I mean, I don't know what to call it.l  It's

24       a little -- Whatever.

25  Q    Well, there's no goatee on Mr. Howard's face.

-47-

```
 1  A    You talking about this?  I mean, I don't know--

 2  Q    (Interposing)  Yes.

 3  A    I just know what I see.

 4  Q    Okay.  But you agree there's no goatee?

 5  A    Yup.

 6  Q    Okay.  And you said, when you're, when Mr. -- You're

 7       saying that when the shooter's out there, there's this -

 8       - Isn't your adrenalin pumping at some point because

 9       there's this excitement where your friend is punching

10       Mr. Howard?  Is that right?

11  A    Right.

12  Q    So, there's lots of excitement going on, right?

13  A    Yup.

14  Q    Okay.  Is that yes?

15  A    Yes.

16  Q    Okay.  And so, you would say that your, probably your

17       adrenalin is going?

18  A    Yup.

19  Q    And there's lots of people up there, right?

20  A    Yup.

21  Q    Lots of people surrounding all of you, right?

22  A    Not surrounding.

23  Q    Well, they're behind you, right?  Or are they behind Mr.

24       Howard?

25  A    Well, they was up against the store and we was on the
```

```
1        opposite side.

2   Q    Okay.  So, there's lots of people along the side, in

3        front of the store, right?

4   A    Yup.

5   Q    Yes?

6   A    Yes.

7   Q    The photo here that you saw at the hospital, did they

8        help you pick out the person in this photo line-up?

9   A    Yes.

10  Q    They did?

11  A    Yes.

12  Q    What did they say?

13  A    They like, they kept like wanting me to look towards

14       that photo.

15  Q    How did they do that?

16  A    They kept saying, you sure it ain't him?  Like stuff

17       like that.

18  Q    And what were you saying when they said you sure it

19       ain't him?

20  A    I was like, it don't look like him.  And they kept

21       asking and kept asking.  And I was like, yup.

22  Q    Okay.  So, finally you said yes?

23  A    Yup.

24  Q    Is that yes?

25  A    Yes.
```

1 Q    Okay.  And so, that's when you say this is the man who

2      shot me and my friend?

3 A    Yup.

4 Q    Yes?

5 A    Yup.

6 Q    Is that yes or no?

7 A    Yes.

8             MS. ROCK:  I don't have any further

9      questions, your Honor.

10            THE COURT:  Anything more?

11            MR. PRASAD:  Just briefly, your Honor.

12            RECROSS-EXAMINATION

13 BY MR. PRASAD:

14 Q    I'm confused, sir.  In People's Exhibit Two, the one

15      where you circled at the hospital?

16 A    Yes.

17 Q    You're saying -- When did they say this to you, are you

18      sure it's not him?  Was it after you already picked him

19      out or...

20 A    No.  It was before I picked it out.

21 Q    And what was being said to you?

22 A    They kept like asking me like was it, am I sure that it

23      wasn't him.

24 Q    Number six specifically?

25 A    Yes.

1          MR. PRASAD:  Okay.  Thank you.  I don't have

2     anything else, Judge.

3          THE COURT:  Mr. Allen, thank you.  You can

4     step down.

5          (At 11:04 a.m. witness excused.)

6          THE COURT:  This is what I understand the

7     law to be.  That you have the burden if there is no

8     attorney.  They have the burden if there is an attorney.

9          MR. PRASAD:  Correct.

10          THE COURT:  And I understand that you all

11     want to, are arguing both of the identifications, the

12     photo line-up as well as the live line-up?

13          MR. PRASAD:  One second.  Mr. Allen, you

14     want to wait in the witness room, please?

15          THE WITNESS:  All right.

16          MR. PRASAD:  Thank you.

17          THE COURT:  And if that's the case, then you

18     have the burden of proving that it wasn't an

19     impermissible with the photo and she has the burden with

20     the live line-up where there was a lawyer.

21          MR. PRASAD:  The funny thing about the photo

22     line-up, Judge, is it was an improper ID.  The

23     defendant's photograph is not in the photographic line-

24     up.  So, it would be fodder for cross-examination--

25          THE COURT:  (Interposing)  So, my question

-51-

```
 1    is, how come we spent so much time with it?  On

 2    something that has no relevance to the hearing.

 3                THE COURT:  That would be my argument.

 4                MS. ROCK:  Well, can I first tell, can we

 5    tell him not to discuss his testimony with the other

 6    witnesses or the--

 7                THE COURT:  (Interposing)  There's only one

 8    other witness that's even here.

 9                MS. ROCK:  I just don't want him talking it

10    over with the police.

11                THE COURT:  The police -- Do we even know if

12    the police are in there?

13                MR. PRASAD:  They should be, Judge.  But I

14    will gladly instruct him if the Court wants me to.

15                THE COURT:  The question still is, why did

16    we spend all of that time on something that's not being

17    suppressed on a motion to suppress?

18                MS. ROCK:  Well, your Honor, I can explain.

19    Because I think the fix is in.  I think that when he

20    said that someone showed him this photo, I believe that

21    this person's name is going to turn out, I don't know if

22    it's true.  I'm just kind of -- I think that it might be

23    Deonte.  I think the fix is in.  The only way they have

24    a case is through Aundrey Allen.

25                So, I think that it's like the totality of
```

1          the circumstances that the prosecutor always uses.  They

2          were pointing this out saying, are you sure it's not

3          him?  Are you sure it's not him?  Supposedly, according

4          to the witness.  Now, we have a live line-up a month

5          later with a new Deonte or a new, a suspect in the line-

6          up.  Lo and behold, who's the smallest guy in the line-

7          up.  And--

8                    THE COURT:  (Interposing)  It doesn't matter

9          if they're seated.

10                    MS. ROCK:  Well--

11                    THE COURT:  (Interposing)  It has absolutely

12         no bearing if they're seated.

13                    MS. ROCK:  Your Honor, he is the smallest

14         person.  And that was acknowledged by this witness.

15                    THE COURT:  Okay.  Who also acknowledged

16         that he guesses at height and weight, as does everybody.

17                    MS. ROCK:  Well, I understand he's guessing

18         at height -- Oh.  I'm sorry.

19                    THE COURT:  The point of the matter is that

20         right now I don't see why we spent all of that time on

21         something that's not being suppressed, that's for cross-

22         examination value as to identification as to weight, not

23         as to impermissibility.  This has nothing to do with

24         impermissibility affecting your client being picked out

25         if the police are directing him to pick out somebody

                              -53-

1      else.

2                  MS. ROCK:  I believe that goes to

3      impermissibility.  I think that goes to -- And I think

4      that the rest of the -- I think it goes to the

5      impermissibility of the line-up and how it was set up.

6      Even if they were seated, I'm suggesting to the Court

7      that even if you're seated you can see who the bigger

8      guys are.  You can tell by their legs.  You can tell by

9      their body.  So, I guess I would just disagree with the

10     Court in terms of--

11                 THE COURT:  (Interposing)  That's fine.  And

12     you can disagree--

13                 MS. ROCK:  (Interposing)  Yeah.  I mean, I'm

14     just surprised--

15                 THE COURT:  (Interposing)  That's absolutely

16     all right.

17                 MS. ROCK:  Because I think that, you know,

18     if the fix is in, then it's an impermissible line-up

19     that -- I think that, you know, in this particular case

20     not only did they select all big guys and the defense

21     attorney had to tell them to have them seated.  But the

22     fix is in.

23                 THE COURT:  And that's fine.  And we haven't

24     heard anything to suggest that yet, have we?

25                 MS. ROCK:  No.  I disagree with you.  I

-54-

1       think when he says they keep saying to him are you sure

2       that's not him, are you sure that's not him with the

3       first line-up and then, all of a sudden, miraculously he

4       selects my client at the live line-up... No.  I disagree

5       with the Court, you know.

6                    It's just outrageous to me in terms of the

7       police misconduct in this particular case, in terms of

8       trying to identify somebody--

9                    THE COURT:  (Interposing)  And that's fine.

10      And this is all your opinion and how you feel.  But we

11      haven't heard any testimony to substantiate anything as

12      it relates to your client.  All we've heard is

13      allegations by Mr. Allen that they wanted him to pick

14      out somebody else and that he did pick out the person.

15                   MS. ROCK:  Okay.  And then we're going to be

16      calling, hopefully, the officer in charge--

17                   THE COURT:  (Interposing)  Okay.  Well, call

18      your witnesses.

19                   MS. ROCK:  All right.

20                   THE COURT:  But I'm just saying what he

21      testified to as it relates to a photo line-up, I don't

22      think it's relevant.  So, you have a witness, call your

23      witness, please.

24                   MS. ROCK:  Thank you, your Honor.

25                   (At 11:11 a.m. witness SERGEANT SAMUEL

```
 1                    MACKIE was sworn.)

 2                    THE COURT:  Young man, do you promise to

 3        tell the truth today?

 4                    THE WITNESS:  Yes, sir.

 5                    THE COURT:  Please have a seat, then, in the

 6        witness chair.

 7                    DIRECT EXAMINATION

 8  BY MS. ROCK:

 9  Q    Would you state your name, for the record, please?

10  A    Sergeant Samuel Mackie.

11  Q    And were you part of a line-up conducted on April, or

12        May 13th, 2010?

13  A    I'm not sure of the exact date, but I did take part in a

14        live line-up conducted at the youth home.  I don't know

15        if that was the exact date.

16  Q    All right.  Well, okay.  Did you want me to -- Okay.

17        I'm going to give you the prosecutor's Proposed Exhibit

18        One.

19  A    Yes.  It was May 13th.

20  Q    All right.  I'm going to ask you, were you responsible

21        for filling in this line-up sheet?

22  A    Yes.

23                    MS. ROCK:  Okay.  Your Honor, I would move

24        for the -- Well, it's the People's exhibit--

25                    MR. PRASAD:  (Interposing)  No objection.
```

-56-

```
 1                    MS. ROCK:  But I would join it.
 2                    THE COURT:  It will be received then,
 3         without objection.
 4                    (Whereupon People's Exhibit Number
 5                    One was received into evidence.)
 6                    MS. ROCK:  And, your Honor, we also have a
 7         People's Exhibit Two.  Move to admit.
 8                    MR. PRASAD:  No objection, your Honor.
 9                    THE COURT:  And Two will be received without
10         objection.
11                    (Whereupon People's Exhibit Number Two
12                    was received into evidence.)
13  Q    (By Ms. Rock, continuing):  The -- You didn't conduct
14         the photo line-up at the hospital, right?  That was
15         Detective Diaz?
16  A    Correct.
17  Q    Okay.  Now, you're the officer in charge?
18  A    Yes.
19  Q    Okay.  And as part of being the officer in charge, you
20         received several different descriptions of the person
21         who did the shooting, is that right?
22  A    I don't know if they were different descriptions, but
23         there was descriptions given.  Yes.
24  Q    Okay.  Well, you're -- Andrew Harris described the
25         shooter as tall.
```

-57-

1  A    I don't know.  I don't recall how they described them.

2           MS. ROCK:  If I may approach the witness,

3       your Honor?

4           THE COURT:  Sure.

5           MS. ROCK:  Thank you.

6  Q    (By Ms. Rock, continuing):  If you'd just hang onto

7       that.  Okay.  I've kind of marked them.  And, as officer

8       in charge, I assume that you recognize the statements,

9       right?

10  A    Yes.

11  Q    Okay.  So, looking over Andrew Harris' statement, he's

12       described the shooter as tall, correct?

13  A    He says 5'10", tall, 5'10".

14  Q    Tall, right?  Okay.  And then you have Fred McFadden who

15       made a statement that the shooter was 6'5", right?

16  A    I'm sorry.  Could you say that again?

17  Q    Fred McFadden, didn't he describe him as 5'11", to 5'6",

18       or 6'0"?  Excuse me.

19  A    Yes.

20  Q    All right.  And then you have Kimberly Thompson who

21       described the shooter as 5'9", 5'10"?

22  A    I don't see where you're citing at.  What page?  Or what

23       paragraph?  Oh, I see it.  5'9" to 5'10".

24  Q    Okay.  So, you're putting together a line-up.  And at

25       some point, you decide that Deonte Howard is the

-58-

1    suspect, is that right?

2  A    That's correct.

3  Q    Okay.  And I'm going to show you what's been marked as

4       Defense Exhibit A.  And I'm going to ask you to just

5       kind of -- If you can go through these.  I'm going to

6       take those from you, please, if I may.  Thank you.  Just

7       kind of go through those photos.  Any objection to the

8       admission of those photos or the exhibit?

9             MR. PRASAD:  No.

10            THE COURT:  They will be received.

11            (Whereupon Defendant's Exhibit A

12            was received into evidence.)

13            THE COURT:  Just tell me how many photos are

14      in the little packet.

15            MS. ROCK:  There's approximately -- I'm

16      going to have to count it myself.  I think it's five,

17      plus the line-up sheet.

18            THE WITNESS:  I saw six photos, unless

19      there's a duplicate.

20  Q    (By Ms. Rock, continuing):  All right.  So, I think I

21      gave you my sheet that I want to work along with you on

22      this.  Thank you.  So -- Because I wasn't smart enough

23      to make another, second copy.  So, the first person that

24      you have in your line-up is Deshawn Harris, right?

25  A    That's correct.

-59-

1 Q   Show him to be age sixteen, 5'8", 150, right?

2 A   Well, I can't -- This is what he told me.  I don't know

3     if he was sixteen, 5'8" or 150.  That's what I was told.

4 Q   Okay.  But according to the sheet that I gave you where

5     it says intake summary, does it indicate that he's 5'6",

6     125 pounds as of June 21st, 2010?

7 A   Okay.  I see it.  It is -- I've never seen one of these

8     sheets before.  But according to this, that's what it

9     says.

10 Q   Okay.  And then Deonte Howard's you've got listed as age

11     16, 5'5", is that right?

12 A   Correct.

13 Q   Okay.

14 A   Again, that's what he told me.

15 Q   On this sheet, it would be, he indicated, it's indicated

16     that he's 5'4", a hundred and--

17 A   (Interposing)  20 pounds.

18 Q   20 pounds.  Okay.  And then we have Brendon Hainus

19     (sp.), I think that's how he spelled his name.  And you

20     have him listed at -- This is the picture for him.

21     There's no weight and height on that.  You have him

22     5'9", 130 pounds?

23 A   Correct.

24 Q   Okay.

25 A   And, again, that's what he told me.  I don't, wouldn't

1     know.

2  Q   Okay.  What about Antoine Sims?  You have him listed as

3     16, 5'4".  But in this intake sheet, he's listed as

4     5'6", 120 pounds, right?

5  A   On this sheet.  Yes.

6  Q   Okay.

7  A   And, again, he told me -- The numbers that I wrote down

8     are what he told me.

9  Q   Then you have Kenyatta O'Neil, age 16, 5'7", 130 pounds,

10    right?

11  A   That's what he told me.  Yes.

12  Q   Okay.  And June 4th, 2010, he's listed as 70 inches

13    tall, right?  In that photo?

14  A   It would be after the line-up date.  This says--

15  Q   (Interposing)  Well, I understand that. But doesn't it

16    indicate he's 70 inches tall in that photo?

17  A   I'm not sure if that's inches on the left or on the

18    right.  I don't know how this is set up.  There's two

19    sets of numbers.  I don't know--

20  Q   (Interposing)  Isn't he standing up right directly under

21    the 70?

22  A   But I'm saying I don't know if that's inches.

23  Q   What do you think?  What else do you think it could be?

24  A   I have no idea how they -- I don't know have it set up.

25  Q   All right.  And then for Alise Watson (sp.), on your

1      sheet, it indicates that he's 5'7", 135 pounds, right?

2  A   5'7" -- He told me 5'7", 135 pounds, 15 years old.

3  Q   Okay.  And on the intake sheet, he's 5'8", 170 pounds in

4      April?

5  A   According to the intake sheet.

6  Q   Is that right?

7  A   Correct.

8  Q   Okay.  Why didn't you take a photo of the line-up?

9  A   We weren't allowed to.  Cameras aren't allowed past the

10     front security center when you first walk into the

11     building at the youth home across the street.  There's

12     like lockers on both sides.  You walk straight, there's

13     two deputies.  You have to check in your firearms, your

14     camera, or if you have a camera, and your cell phone.

15     So, you're not allowed to take anything past that booth.

16     And then they take you into a room that's set up to do

17     line-ups.

18 Q   Did you try to take a camera in?

19 A   Yes.

20 Q   You did?

21 A   Yes.

22 Q   And do you know who told you couldn't take one in?

23 A   Whoever the deputies were at the desk.

24 Q   And did you ask to speak his supervisor?

25 A   No.  Because that's the -- I knew that was the practice

```
 1        at the county jail for adults.  They don't allow us to
 2        take cameras inside there either, or cell phones or
 3        anything.  So, when they told me this, I figure it's the
 4        same policy.
 5  Q     And it was the -- Who selected the participants for the
 6        line-up?
 7  A     There's an officer that, that's his role.  One of his
 8        functions at the youth home is he goes around picking
 9        the candidates for the line-up, Officer Paul Smith.
10        He's actually a Detroit Police Officer, but he's
11        assigned to the youth home.
12  Q     And the person who weighs the less is Deonte Howard?
13  A     Well, according to what he told me.  Yes.
14  Q     Yeah.  Well, okay.  So--
15  A     (Interposing)  But I didn't believe he was a hundred
16        pounds, but according to him--
17  Q     (Interposing)  You didn't put that on the line-up sheet,
18        you didn't believe it, right?
19  A     No.  Because I have no way of knowing one way or the
20        other.
21  Q     Okay.  So, he says he was a hundred pounds, right?
22  A     Yes.
23  Q     Okay.  And then everybody else is, Mr. Harris is 150,
24        right?
25  A     Correct.
```

-63-

1  Q   Mr. Hainus is 130?

2  A   Yes.

3  Q   Mr. Sims 136?

4  A   Yes.

5  Q   O'Neal 130?

6  A   Yes.

7  Q   Watson 135?

8  A   And, again, that's what they told me.  I had no way of

9      confirming if that's how much they weighed.

10  Q   All right.  And you -- So, now at any time like when he

11      brings down this group of really tall guys or tall guys

12      -- Clearly taller than Mr. Howard, right?  All the guys

13      are taller than Mr. Howard, right?

14  A   Well, according to this, what people told me, yes.  Or

15      no.  One of them is shorter, Antoine Sims.  He's listed

16      as 5'4".

17  Q   That's the one who was listed as 5'6" on his intake

18      sheet?

19  A   I don't remember what he's listed as.

20  Q   Well, here.  I'll show it to you.

21  A   Yes.  On his intake sheet, it says 5'6".

22  Q   Okay.  But is that who you -- Who was the shortest?  Do

23      you remember?

24  A   No.  I don't remember.

25  Q   Okay.  And so, it was -- There was an attorney present,

1      right?

2  A    Correct.

3  Q    And the attorney asked you to seat everyone, correct?

4  A    No.  Actually, that was my suggestion because there were

5      variances in everyone's height.  And in my experience in

6      doing this, to have people just sitting down really

7      levels them.  I'd say almost ninety-five percent will be

8      level right across the board.  So, that was my

9      recommendation and the -- So, we had them sit down and

10      the show-up attorney agreed and said that was a better

11      way of doing it.

12  Q    Okay.  How long did it take Mr. Allen to identify Mr.

13      Howard?

14  A    You know, I couldn't tell you for certain.  I don't

15      recall.

16  Q    You didn't write it down?

17  A    Well, I have the beginning time being from 12:40 and

18      ending time being 12:50.  So, that's the amount of time

19      for everybody to come in, for me to get their

20      information, have them seated and then bring him in, the

21      witness in to view the line-up and then make the

22      identification, write down, have him sign and like that

23      was the conclusion.

24  Q    So, you don't know how long it took him to identify?

25  A    No.  But I know at 12:49 is when he made the

1       identification.

2   Q   Okay.  And what did they sit down on?  Was it a bench or

3       a bunch of chairs?

4   A   Chairs.

5   Q   What type of chairs?

6   A   Like the regular courtroom chairs.

7   Q   With the cushion?

8   A   That I don't know.  I don't remember.

9   Q   And what did you tell Mr. Allen before he looked at the

10      line-up?

11  A   Nothing.

12  Q   Okay.  Well, you knew he had picked out somebody else

13      prior to this line-up, right?

14  A   Yes.

15  Q   Okay.  And that turned out to be somebody who you

16      decided wasn't the suspect, right?

17  A   Yes.

18  Q   Okay.  So, did you explain to him why he's picked out a

19      suspect and now he's coming to look at another line-up?

20  A   Actually, he didn't know this was all going on that day.

21      We told him as we were picking him up we had some things

22      we had to do.  And those was one of the things, was

23      taking him down to the youth home to view the line-up.

24      And then after the line-up, we did an investigative

25      subpoena.

-66-

1  Q    So, no explanation to him why he's going to, what he's

2       viewing?

3  A    No.

4  Q    Nothing like -- No introduction?  We're asking you to

5       view this line-up?

6  A    Well, he -- Yes.  When we were at the youth home, I let

7       him know that you're going to be viewing a line-up.  But

8       as to who's being, who's in the line-up and what their

9       role is in the crime, he had no idea.

10 Q    He knew it was about the shooting?

11 A    Yes.

12 Q    You told him it was about the shooting?

13 A    Yes.  Well, he knew because he knew me from the

14      shooting.  All my dealings with him are about this

15      shooting.

16 Q    About the shooting.  Okay.

17 A    I never met him before.

18 Q    All right.  And so, you don't know how long it took him.

19      And his words are he's the one who pulled out the gun

20      and started shooting?

21 A    Right.

22 Q    Does he say anything else?

23 A    No.  That's what I wrote down and had him sign.

24 Q    Okay.  I mean, he doesn't say, hey wait a minute, I

25      picked out the wrong guy at the last line-up?

-67-

1  A  No.

2  Q  Do you ever tell him he picked out the wrong guy?

3  A  No.

4  Q  Do you ever tell him, hey, we've got the shooter in the

5     line-up?

6  A  No.  Never.

7  Q  Were you ever present when another officer told him that

8     the shooter was in this live line-up?

9  A  I've never heard any officer tell him that.  No.

10  Q  What did you tell him after he selected Mr. Howard?

11  A  That we have to go across the street for him to meet

12     with the prosecutor.

13  Q  Why would he have to do that, for what reason?

14  A  An investigative subpoena.

15  Q  The guy who, Paul Smith, when he goes and gets people,

16     do you give him instructions on what you're looking for?

17  A  No.

18  Q  You don't say try to find somebody who matches the

19     height or the weight of the defendant?

20  A  No.  I don't have any conversation with him other than

21     giving him the suspect's name that we're going to be

22     doing the line-up for.

23  Q  Did any of the other officers have any of that, have

24     that duty at all?

25  A  No.  Just him.  We're not allowed in the lock-up area.

```
 1  Q    I'm not asking if you're allowed up there.  But just did
 2       you give him any advice or whether anybody else did?
 3  A    No.  They were already selected when we got there.
 4  Q    And you didn't -- And I apologize.  I hope I'm not
 5       repeating myself.  But you didn't have any conversation?
 6       There wasn't any agonizing over the fact that he
 7       selected the wrong person initially?
 8  A    No.
 9  Q    Why did you do a live line-up?
10  A    He was in custody.
11  Q    That's the only reason you did a live line-up?
12  A    With Mr. Howard?
13  Q    Yes, sir.
14  A    At this time?
15  Q    Yes, sir.
16  A    Because he was in custody.  We can't do a photo line-up,
17       unless there's characteristics about him that we can't
18       find suitable stand-ins for the line-up.
19                 THE COURT:  And you learned that in what law
20       school?
21                 MS. ROCK:  Your Honor, I don't have any
22       other questions for Mr. Mackie.
23                 CROSS-EXAMINATION
24  BY MR. PRASAD:
25  Q    Just briefly, sergeant.  At the time of the live line-up
```

```
 1        on May 13th, looking at those six individuals, did

 2        anyone stand out as obese or as very different from the

 3        others?  No white kid amongst five black kids or

 4        anything like that?

 5   A    No.  They were all wearing -- They all had similar

 6        builds because they were wearing the youth home

 7        jumpsuits.  So, it's not like they're clothes that are

 8        tight fitting that would distinguish one being, you

 9        know, skinnier than the other.  They all look to be the

10        same.  That's why we don't harp on how much do you weigh

11        or how tall you are.  They're all seated, so they all

12        basically are the same height and they all have the same

13        jumpsuits on.  If it wasn't even listed as weight on

14        these old line-up sheets, it should just say build being

15        slim, medium or heavy.

16   Q    Okay.  And so, and I'm just asking -- And I know this is

17        only based on your observation.  But in your

18        observation, did Mr. Howard stand out in any way

19        compared to the others he was with?

20   A    No.

21   Q    And finally, sir, when did Deonte Howard become a

22        suspect specifically?

23   A    He was identified previously on a photo array line-up by

24        somebody that was at the scene and had known him.

25   Q    Okay.  And had that been after the initially attempts at
```

1      the hospital with the other witness, with Mr. Allen?

2  A   Yes.

3  Q   Okay.  So, it was at some point later after that time

4      that Mr. Allen--

5  A   (Interposing)  Correct.  Correct.

6                  MR. PRASAD:  Thank you.  I have nothing

7      else.

8                  THE COURT:  Anything else?

9                  MS. ROCK:  None, your Honor.

10                  THE COURT:  Thank you, sir.  You can step

11     down.

12                  (At 11:31 a.m. witness excused.)

13                  (Qt 11:32 a.m. witness OFFICER GARY DIAZ

14                  was sworn.)

15                  THE COURT:  Do you promise to tell the truth

16     today, sir?

17                  THE WITNESS:  Yes.  I do.

18                  THE COURT:  Please have a seat in the

19     witness chair.

20                  DIRECT EXAMINATION

21 BY MS. ROCK:

22  Q   Would you state your name, for the record, please?

23  A   Gary Diaz.

24  Q   Okay.  Officer Diaz, did you participate in a photo

25      show-up on April 11th, 2010?

-71-

1  A    Yes.

2  Q    Okay.  You were in charge of that photo show-up?

3  A    Yes.

4  Q    Okay.  And when you presented that photo show-up to --

5       You presented that photo show-up to Mr. Allen?

6  A    Yes.

7  Q    Okay.  Besides these six pictures, did you show him any

8       other pictures?

9  A    No.

10 Q    Okay.  Did you -- Prior to -- How long did he take to

11      identify this individual in this photo?

12 A    A few seconds, thirty seconds maybe.

13 Q    Thirty seconds?

14 A    Maybe.

15 Q    And at any time did he indicate to you that it was the

16      closest person?

17 A    I don't recall any words that he had spoken without

18      looking at -- I kind of jotted down what he had said.

19 Q    I'm going to show you -- Okay.  Do you write down

20      everything he says about the identification?

21 A    Yes.

22 Q    Okay.  Because that's important, right?

23 A    Correct.

24 Q    Okay.  So, you didn't write down that he said this is

25      the closest person?

1  A     No.

2  Q     Okay.  So, you described that he was positive that

3        number six was the person who did the shooting?

4  A     According to this, yes.

5  Q     What about your memory?

6  A     I remember him.  He was in the hospital, kind of

7        sedated, sort of groggy.

8  Q     Oh.  You think he was groggy?

9  A     He appeared to be.  Yeah.

10 Q     Did you put that in the report?

11 A     No.

12 Q     Did you tell him, did you say to him are you about this

13       guy?  I mean, did he -- He didn't hesitate, according to

14       you.

15 A     Well, according to this, no.  But I -- I don't recall

16       him hesitating.  No.

17 Q     Oh.  Okay.  And did you, at any time, did you indicate

18       to him that number six was the guy?

19 A     I didn't know who the guy was.

20 Q     Well, do you know the names of these individuals?

21 A     I don't know any of these people.

22 Q     You don't know who number six is?

23 A     No.

24 Q     Oh.  Okay.  So, you didn't know who the guy was, right?

25 A     No.

1  Q    And you never said to him, what about him?  What about

2       him?

3  A    No.

4  Q    Okay.  You just showed him the photos.  Can you tell me

5       what the procedure was?

6  A    I had come in that morning.  Sergeant Mackie and I,

7       we're not squad members or anything like that.  And the

8       commanding officer, Lieutenant Blackmon (sp.) ordered me

9       to go to the hospital with his photo array and present

10      it to Mr. Allen, who was at the hospital.  I didn't know

11      anything about the case, actually.  My job was to just

12      go there and present this because I guess they had

13      worked an excessive amount of time on it.  So, I don't

14      really know any of the people in this.  They said

15      present this to him.

16 Q    And then what did you do when you were there?

17 A    I presented it to him and asked him if he recognized

18      anyone in this line-up.  And he indicated yes.  Number

19      six.  And that's the man who shot him and his friend.

20 Q    Okay.  No hesitation?

21 A    There was some hesitation.  He was sort of groggy.  He

22      was still -- I remember him being bandaged up and

23      everything.  He was kind of, a little groggy.

24 Q    Okay.  But you said he did it in thirty seconds?

25 A    About that.  Yeah.

1  Q    Okay.  Did you time it?  Did you write it down at all?

2  A    No.

3  Q    Okay.  But you said there was some hesitation.  You mean

4       he was thinking about who to select?

5  A    No.  I don't think he was -- He took his time to look at

6       each photo.  That's what I recall.  I mean, I don't, I

7       know he didn't look at the paper and immediately point

8       to number six.

9  Q    But he took his time and looked at each photo?

10 A    Appeared to.  Yeah.

11 Q    Okay.  And when you say hesitation, what part of the

12      hesitation are you talking about?

13 A    What part of the hesitation?

14 Q    Yeah.

15 A    I don't know--

16 Q    (Interposing)  Well, is that -- Let me finish.  Because

17      that was a bad question.  I agree.  When you're talking

18      about he hesitated, is that what you're saying when he

19      hesitated, he looked at each photo?

20 A    Yeah.  That appeared to be it.  Yeah.  He took his time

21      and looked at each photo.

22 Q    Okay.  Did he express any doubt about the photo?

23 A    No.

24 Q    Because you would have wrote that down, right?

25 A    Yes.

-75-

1  Q    Did you also show the photo line-up to Bobby Bailey

2       (sp.)?

3  A    Not that I recall.

4  Q    What did you tell him after he made a selection?

5  A    I don't remember telling him anything.  I don't think I

6       did.  I didn't know anything about the case.  I came in.

7       I was never presented a file or anything like that.  I

8       was given the photo array by my commanding officer and I

9       went to the hospital as directed.

10 Q    And what did you say before he looked at the photo line-

11      up?

12 A    I can't remember verbatim, but pretty much standard for

13      me is take your time, take a look at all the photos and

14      see if there's anyone in there you recognize.

15           MS. ROCK:  Okay.  Your Honor, I don't have

16      any further questions of Officer Diaz.

17           MR. PRASAD:  I have none, your Honor.  Thank

18      you.

19           THE COURT:  Thank you, sir.  Appreciate your

20      help.

21           (At 11:38 a.m. witness excused.)

22           THE COURT:  Anymore witnesses?

23           MS. ROCK:  Your Honor, I just have, I just

24      want to recall Officer Mackie.

25           MR. PRASAD:  Susan, are you done with

-76-

1      Sergeant Diaz?

2                    MS. ROCK:  Yes.

3                    MR. PRASAD:  Okay.  Thank you.

4                    MS. ROCK:  Excuse me.  Can I -- I'm sorry.

5      I apologize, your Honor.  I just have a few more

6      questions of Officer Diaz.  Before you go up there, I

7      just want to check...  Never mind.  I'm sorry.  False

8      alarm.

9                    THE WITNESS:  Okay.

10                   MS. ROCK:  Thank you, your Honor.

11                   (At 11:41 a.m. witness SERGEANT SAMUEL

12                   MACKIE resumed the stand.)

13                   DIRECT EXAMINATION

14 BY MS. ROCK:

15 Q    Officer Mackie, as the officer in charge, what's the

16     name of this individual in this photo line-up that was

17     circled?

18 A    That's -- The first name is Deonte.  I can't remember

19     the last name.  I want to say--

20 Q    (Interposing)  Isn't it Miller?  Deonte Miller?

21 A    That sounds right.

22 Q    Okay.  What did Officer Diaz know about the case when he

23     took this photo line-up in?  Do you know?

24 A    I have no idea.

25 Q    Were you the officer in charge at that time?

1  A   Yes.  I was.

2  Q   You didn't send him in with the photo line-up?

3  A   No.  That was our supervisor's decision.

4  Q   Had you seen Mr. Allen that day?

5  A   No.

6  Q   You didn't see him at all?

7  A   With the line-up?  No.

8  Q   No.  In the hospital on April 11th.

9  A   I did go to the hospital.  I don't remember what day it

10     was.  But not to show him the line-up or anything, just

11     to talk to him.

12          MS. ROCK:  All right.  I don't have any

13     further questions of Officer Mackie.

14          MR. PRASAD:  None.  Thank you, Judge.

15          THE COURT:  Who was your targeted person on

16     that day?

17          THE WITNESS:  On the day of the photo array?

18     Deonte Miller.

19          THE COURT:  Number six?

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.  Thank you.

22          (At 11:42 a.m. witness excused.)

23          MS. ROCK:  Your Honor, I don't have any

24     further witnesses.  Thank you.

25          THE COURT:  Okay.

1              MR. PRASAD:  I don't have any witnesses,

2      Judge.

3              THE COURT:  Great.  So...

4              MS. ROCK:  Your Honor, I think in this

5      particular case, the complaining witness, Aundrey Allen,

6      testified that Deonte Howard was the smallest person he

7      observed.

8              Now, Officer Mackie got on the witness stand

9      and testified that the jumpsuits somehow magically make

10     everybody the same size, weightwise and then when

11     they're all seated they all look alike.  But in this

12     particular case, Aundrey Allen specifically testified

13     that Deonte Howard was the smallest.

14             Now, I find it unusual, I never have known

15     young men to say that they're shorter than they are

16     versus taller.  And in this particular case, magically

17     enough, again, we have an Anton Sims who's marked as

18     5'4" when, in fact, according to intake sheet from the

19     juvenile detention facility he's 5'6".  That would make

20     Deonte Howard the shortest person in the line-up, and

21     also weighing the less out of all the other individuals.

22             In this particular case, the officer didn't

23     do anything to participate in the selection of the

24     individuals, didn't do anything to try to make it so

25     that Deonte Howard didn't stand out.  And I can't

-79-

1     imagine that an officer can go through the juvenile

2     detention facility and the only individuals he can pick

3     out are 5'8", 5'9".  It says 5'4", but I believe he's

4     5'6", according to intake.  5'7" and 5'7".  And the

5     shortest person is Deonte Howard.  And the smallest

6     person is Deonte Howard weighing at a hundred pounds on

7     that date.

8             The other problem -- Your Honor, you know

9     what?  It just occurred to me.  I apologize.  I wanted

10    Bobby Bailey here as well.  I had made a demand for him

11    to be present for this motion.  We tried to locate him.

12    And we were not able to locate him.

13            THE COURT:  Mr. Bailey's role would be what?

14            MS. ROCK:  Well, he also observed the line-

15    up. But I feel that he would shed some light onto the

16    misconduct by the police in this particular case.

17            THE COURT:  Okay.  Which police?

18            MS. ROCK:  Well, the Detroit Police, the

19    homicide unit.

20            THE COURT:  Okay.  I got that.  Misconduct

21    as it relates to the photo array would have to be what

22    I'm concerned about.

23            MS. ROCK:  Well, that's what it was,

24    misconduct by the, as far as a photo line-up.

25            THE COURT:  And what is your allegation?

-80-

```
1                MS. ROCK:  Well, my allegation is during the
2        photo, during his testimony to the prosecution, during
3        this investigative subpoena, he says that--
4                THE COURT:  (Interposing)  No.  No.  No.
5        No.  As it relates to--
6                MS. ROCK:  (Interposing)  Right.  Right.
7                THE COURT:  No.  No.  You haven't heard me
8        finish.
9                MS. ROCK:  Oh, I'm sorry, your Honor.  I
10       apologize.
11               THE COURT:  He needs to say that somehow the
12       live line-up conducted by Mr. Mackie was impermissibly
13       suggestive and that he saw it and that he had some
14       information bearing on it.  Because, if not -- That's
15       what you're asking to suppress, the live line-up based
16       on impermissibility, impermissible conduct by the
17       Detroit Police Department.
18               So, if he doesn't have anything to add to
19       that then his, whatever he has to say isn't relevant to
20       today's hearing.
21               MS. ROCK:  I understand the Court's
22       position.  But this is why I would want--
23               THE COURT:  (Interposing)  Okay.  So, if you
24       understand my position--
25               MS. ROCK:  (Interposing)  Yes, sir.
```

1          THE COURT:  Then that's my position.

2          MS. ROCK:  May I just make a record just

3     briefly?  It won't take long.

4          THE COURT:  Can you address the question

5     that I have relative to how anything he has to say has

6     any bearing on the live line-up that Mr. Mackie

7     conducted?

8          MS. ROCK:  I think, I think it would, your

9     Honor, because I think it shows that there's been an

10    ongoing thread of misconduct through this case where he,

11    I believe, was also shown the same photo line-up as Mr.

12    Allen and a police officer got in an argument with him

13    saying, no, that's him, that's him, that's him.  And he

14    was saying, no.  It's not, you know.  That's not Deonte

15    Howard.  That's not -- But he gets in an argument with

16    the police officer over it.  And, to me, that kind of is

17    the totality of the circumstances showing the

18    misconduct.

19         THE COURT:  Okay.  Well, your record has

20    been made.

21         MS. ROCK:  Thank you.  I appreciate it.

22         THE COURT:  No problem.

23         MS. ROCK:  Your Honor, just to continue my

24    argument, I think that we have Mr. Allen testifying, you

25    know, they told me who -- Isn't that him?  Isn't that

-82-

1      him?  For the photo line-up.  And then lo and behold,

2      and lo and behold the person that he picks out, as the

3      Court described him, the target of the investigation was

4      Deonte Miller.

5              A month later, then he's shown a line-up of

6      Deonte Howard.  And he picks him out.  We don't know how

7      long.  But he's not given any instructions other than

8      this is a line-up we want to show you.  Now, all of a

9      sudden, he says this is the person.  And there's no

10     discussion that, geeze, you know, you picked out the

11     wrong person.

12             It's very treacherous and dangerous that --

13     And the problem is it's not like a Perry Mason movie

14     where somebody stands up and says, yes I did that.  I

15     think what the police did is they have this target,

16     Deonte Miller.  They then have a second Deonte and lo

17     and behold he gets picked out.

18             If the Court -- You know, they didn't bother

19     to take a photo of the line-up, which I think is a

20     violation of Mr. Howard's due process rights in that

21     there--

22             THE COURT:  (Interposing)  Do we have any

23     cases to support that a person's due process rights are

24     violated if there's no photo taken?

25             MS. ROCK:  Can I provide it after this

1          hearing?  Is that okay if I provide it within a day?
2                    THE COURT:  Do you think there is one?
3                    MS. ROCK:  I think I -- Yeah.  I have a case
4          where they say, if they don't adequately document--
5                    THE COURT:  (Interposing)  No.  No.  No.
6          No.  If there is no photo taken was my question.  Is
7          there a case that requires that a photo be taken and, if
8          not, then violates somebody's due process rights?
9          That's my question.
10                   MS. ROCK:  Can I provide you the case that I
11         think is material after this hearing?
12                   THE COURT:  Do you think that that case
13         directly goes to the point that I'm asking about?
14                   MS. ROCK:  Not specifically to--
15                   THE COURT:  (Interposing)  Okay.  Well,
16         then--
17                   MS. ROCK:  (Interposing)  Taking a photo.
18                   THE COURT:  Okay.  Well, then that's what
19         I'm concerned about, if there is a case to that specific
20         point.  And you're saying no.  Okay.  Continue, please.
21                   MS. ROCK:  The police department has an
22         obligation to document the line-up because then it makes
23         it difficult for the defendant to try to attack or
24         observe [sic] whether there was a fair.
25                   But I think, in this particular case, where

-84-

```
 1       you have a witness saying that he's the smallest one in

 2       the group and -- I think there's problems in this

 3       particular case.  He didn't know him before.  That was

 4       the first time seeing him on the day of the alleged

 5       shooting.  He makes the identification on April the

 6       11th.  Then almost more than a month later on April, or

 7       May 13th, he supposedly identifies Mr. Howard as the

 8       shooter.

 9                I think that the Court needs to take into

10       consideration the prior relationship with or the

11       knowledge that he had, the opportunity to observe the

12       offense.  He says he was five feet away, but he doesn't

13       remember what he was wearing.  He was just wearing

14       allegedly a black coat, which is different from the

15       exam, by other witnesses--

16                THE COURT:  (Interposing)  Which I'm sure

17       isn't evidence that was admitted into today's hearing.

18                MS. ROCK:  No.  No.  That's true, your

19       Honor.

20                THE COURT:  Oh.  Okay.  So -- All right.

21                MS. ROCK:  I'm sorry.

22                THE COURT:  Just wondering what are we going

23       to be arguing.

24                MS. ROCK:  I'm sorry, your Honor.

25                THE COURT:  Okay.
```

1          MS. ROCK:  Okay.  The length of time between

2     the offense and the disputed identification, the

3     accuracy or discrepancies in the pre-line-up or show-up

4     description and defendant's actual description.  He was,

5     you know, describing the person with a goatee and 5'7",

6     5'8", no more than 130 pounds.

7          Any previous proper identification or

8     failure to identify the defendant.  Any identification

9     prior to the line-up or show-up or another person as the

10    defendant.  And then also what's critical, your Honor,

11    is the strong emotion in this particular experience.

12          I think the evidence is clear that the Court

13    has to suppress the identification as it being

14    suggestive, unduly impermissible, you know.  It was

15    unduly suggestive by the fact that my client was the

16    smallest in this particular case.  And I think that

17    we've got a witness testifying that the police acted,

18    they were engaged in misconduct in this case by telling

19    him which photo to pick out.  I would ask the Court to

20    suppress the identification.

21          THE COURT:  Sir?

22          MR. PRASAD:  Thank you your Honor.  Your

23    Honor, I'm going to briefly address the photo array with

24    Sergeant Diaz.  If counsel wants to take the totality of

25    the circumstances, then she cannot ignore the fact that

1        the man had surgery the day before and was on morphine

2        and was, as Sergeant Diaz described groggy, and as the

3        witness himself described as a bit out of it.

4                    That's why when Sergeant Diaz would describe

5        a one-minute discrepancy, the witness would describe it

6        as a ten-minute discrepancy--

7                    THE COURT:  (Interposing)  Yeah.  Well, we

8        know people on morphine still can pick out their wives.

9                    MR. PRASAD:  Right.

10                   THE COURT:  And people that are a little bit

11       groggy and have drank still go home with their husband's

12       and wives.  So what does that have to do with anything?

13                   MR. PRASAD:  My point is it's the totality

14       of the circumstances as far as those specifics.  I'm not

15       willing to concede or acknowledge that there was any

16       impropriety to that.

17                   But either way, as the Court's already seen,

18       this defendant, Deonte Howard, was not in that photo

19       array.  So, that photo array really has no bearing on

20       the propriety or impropriety of the line-up or whether

21       that was unduly suggestive or affected the witness in

22       his later, a month later line-up procedures involved in

23       this case.

24                   And that's the crux of what defense counsel

25       is trying to argue and somehow dovetail a supposed

                              -87-

1    impropriety on one situation to a situation that was

2    sanitized and clean.  I mean, it was a proper line-up

3    procedure with an attorney present in which the playing

4    field was leveled by having everyone seated.

5              THE COURT:  Come on now.  Every time an

6    attorney is present doesn't mean it's sanitized.  But

7    let's just say the appropriate parties were there.

8              MR. PRASAD:  Right.

9              THE COURT:  Okay.

10             MR. PRASAD:  Right.  And, you know, one

11   thing that Ms. Rock keeps alluding to about the height

12   and weight and everything, I find it interesting that

13   she picks and chooses which facts she wants to use.  At

14   times, she would like to use the self-reporting facts

15   when they benefit her.  At times, she would like to

16   discredit the self-reported facts as to height and

17   weight and use the facts in terms of the intake sheets

18   of the juveniles from a month later when it suits her.

19             The fact of the matter is we have six

20   individuals, young black males with similar approximate

21   ages, similar approximate heights, seated and similar

22   build and the witness immediately identified who the

23   person was.

24             Finally, Judge, just to bolster my point, I

25   cited to and I have provided a copy to counsel and

1        Court, the case of People v Barnes.  It's cited at 107

2        Mich App 386, also at 310 NW 2nd 5.  It's a 1981 case

3        from the Court of Appeals in Michigan.  And I want to

4        cite to you the opinion in terms of page three of five

5        of the printout.  And this was a line-up case as well,

6        Judge.

7                     And in dicta, it first discusses the facts.

8        But we already know it's the defendant's burden because

9        counsel was present at a live line-up.  They also

10       discuss that it's a totality of the circumstances.

11                    "The analysis the Court must make" -- And

12       I'm quoting on the right side column, second numbered

13       paragraph:

14                    "Is that it must be added that the procedure

15                    was 'so impermissibly suggestive as to give

16                    rise to a very substantial likelihood of

17                    irreparable misidentification'".

18                    Later on in subparagraphs three and four, it

19       goes on to Ms. Rock's direct analysis, her argument in

20       this case.

21                    "Quizzical differences between a suspect and

22                    other line-up participants do not in and of

23                    themselves constitute impermissible

24                    suggestiveness."

25                    Citing to a People v Richmond case, a 1978

                                -89-

1          Michigan Appeals, 84 Mich App 178 at 181.  And it quotes
2          the People v Richmond case.  And this quote I think is
3          very apropos to our case.

4                         "Line-ups are conducted in police stations.
5                         And persons who participate in the line-up
6                         are taken from those who are being held in
7                         custody.  It would be unusual indeed if
8                         police had five persons with similar
9                         physical characteristics locked up in the
10                        same jail.  Moreover, the purpose of a line-
11                        up is identification.  If the defendant is
12                        the tallest man in the line-up and if he
13                        believes that this impairs the validity of
14                        the identification, he should see that the
15                        jury is apprised of that fact.  This is a
16                        question of the weight to be given to the
17                        line-up identification, not its
18                        admissibility."

19                       And that analysis presented no basis for a
20         new trial.  The facts in this line-up case and in the
21         Barnes case was the defendant was among the two
22         smallest, the two shortest people in the line-up.  And
23         that's the argument that that attorney had tried to make
24         in terms of why it was impermissibly suggestive.  And
25         the Court of Appeals said it wasn't, the same way that

-90-

1      I'm asking this Court to say that this was not
2      impermissible.
3                  THE COURT:  Anything more?
4                  MS. ROCK:  The only thing I would say, your
5      Honor, is it just seems to me that the prosecutor is
6      trying to have his cake and eat it, too.  Well, he was
7      groggy, but you know, he made this statement to the
8      police.
9                  And my thinking is, why would a detective
10     conduct a photo line-up of somebody who's so groggy?
11     Why wouldn't he say, well, listen.  Why don't I come
12     back when you're not groggy?  Because this a first-
13     degree murder case and you will be identifying someone
14     for first degree murder.
15                 So, I would suggest to the Court that he
16     wasn't so groggy, unless the Detroit Police Department
17     doesn't care who the witness selects unless it's
18     somebody who they think committed the crime.  And so, I
19     would argue that this particular line-up was unduly
20     suggestive based on the totality of the circumstances.
21     And it must be suppressed.
22                 THE COURT:  Okay.  The only thing I find
23     unusual in this particular case is that the youth home
24     can dictate the photographs of line-ups.  Give me a
25     break.  And that the police say, okay.  We'll go along

1    with that.  That's just, to me, a little unusual and

2    outrageous.

3            And I'm sure it has something to do with

4    wanting to protect juveniles, but I would say their

5    rights to protection are superseded by the

6    identification process, or should be.  Because you roll

7    out their pictures anyway, which were exhibits.  And so,

8    I'm not quite sure I can understand how that can assist

9    in helping the prosecution prove that something wasn't

10   impermissibly suggestive.

11           But back to this case.  We're not talking

12   about Dwight Howard being seated next to Stephan Curry

13   or Will Bynum being next to Ben Wallace sitting in a

14   chair.  Come on.  Then, sitting in a chair would not

15   matter at all.  But these are slight, in my opinion,

16   distinctions.  And, again, who even knows if the heights

17   and weights given on the intake sheets are heights and

18   weights taken by the persons being asked questions or

19   somebody else looking at them and guessing their height

20   and weight.

21           We certainly know that the ones that appear

22   on the live line-ups, that their height and weight isn't

23   taken by some non-interested party.  It's self-

24   reporting, you know.  I don't -- Heck.  Ask anybody

25   what's your real weight, you know.  They're going to lie

1     to you.  They're going to lie.  And everybody I know

2     wants to be slimmer.

3                    So, you know, if it's a matter of five

4     pounds, I mean, at what point does something vary so

5     that it's significant?  Is there a significance between

6     5'9" and 5'7" when you're sitting down?  Some people

7     would say, oh, well, they sat up higher in the chair.

8     Well, what?  Is the person's torso taller than the

9     person's legs?  Do you have your height in your legs?  I

10    mean, you know, your perception is that they flowed a

11    little.  You know, certainly a camera would have shown

12    us a little better.  But the question didn't get to the

13    point.

14                    I don't think anything was impermissibly

15    suggestive.  I think it is and will be an excellent

16    thing to argue at trial, that, you know, Mr. Allen says

17    that he picked the People's suspect and then again he

18    picked the People's suspect as it relates to identifying

19    Deonte Miller.  And if there's some similarity between

20    Deonte Miller and Deonte Howard.

21                    But other than that, I don't think that

22    there was anything that the police did that was so

23    impermissibly suggestive as to make this Court grant

24    your motion.  And so I will not.

25                    MS. ROCK:  Your Honor, I have, you had held

-93-

1      my motion for appointment of a weapons expert in

2      abeyance.  They now have a lab report with the gun.  I

3      would like a weapons expert--

4                  THE COURT:  (Interposing)  I don't know what

5      the lab report says.

6                  MS. ROCK:  Do you want to review it, your

7      Honor?

8                  THE COURT:  Well, why would you need an

9      expert if I don't know what it says and if I don't know

10     what you're contesting in it?

11                 MS. ROCK:  Well, I would like someone to

12     help me interpret it in terms of they said that items

13     four through eight and then they list other bullets, if

14     they -- They said they were fired from the same weapon.

15     And then two, nine and thirteen are consistent with, you

16     know, metal jacketed fired bullets.  And then one is

17     most consistent with, you know, .38 or .40 caliber

18     metal.  I'd like somebody to consult.  It's a first

19     degree murder case--

20                 THE COURT:  (Interposing)  No.  No.  I

21     understand that, you know.  The point of the matter is,

22     is any of that relevant?  Or is it just material?

23                 MS. ROCK:  I'd like to know.  I'd like to

24     know if--

25                 THE COURT:  (Interposing)  Well, no.  I'm

-94-

1      asking, are you saying that there were three weapons

2      there, four weapons there, five weapons there?  I mean,

3      what is your claim?

4              MS. ROCK:  Well, I don't have a claim.  I

5      want to, I want to be able to understand the evidence.

6      And if they're saying -- They vary.  We've got one

7      witness saying--

8              THE COURT:  (Interposing)  No.  No.  No.

9      No.  You're talking about -- Let's keep it limited to

10     the firearm.  Because that's what I'm trying to keep it

11     limited to.  So, is your claim that there was more than

12     one weapon and that you think that somehow the report is

13     wrong?  Because you're more than free to call the person

14     to have them explain.  And if you're not satisfied with

15     their explanation, just like with anything, then you can

16     call somebody else to see if they can interpret -- I

17     mean, because to me it might be consistent, but it's not

18     really material.  It just might corroborate what their

19     theory is as opposed to establish their theory.

20             So, let me tell you, you're free to contact

21     the person.  Tell the person that Ms. Rock will be

22     contacting them, please--

23             MR. PRASAD:  (Interposing)  Yes, sir.

24             THE COURT:  And asking them questions.  And

25     if there's another examiner in the office that they can

1    have them review the findings and ask the same questions

2    to see if the answers are consistent.  And then if, at

3    that point, you think that it's necessary because you

4    disbelieve them or have some reason to disbelieve them,

5    then I'll be happy to entertain a motion.

6              MS. ROCK:  Thank you, your Honor.  Your

7    Honor, my only other final argument is to bond.  And

8    I've been trying to find my bond motion.  I thought I

9    had filed a motion for bond in this particular case.

10   I know we have a DSU report that the Court asked for,

11             THE COURT:  And what was their

12   recommendation?

13             MS. ROCK:  You know, I'm not sure that I

14   had, now that I'm thinking about it, I'm not sure that I

15   had an obligation, or an opportunity to look at it.

16             THE COURT:  They're saying keep him in

17   remand status.  That's their recommendation.

18             MS. ROCK:  May I look at the report, your

19   Honor?

20             THE COURT:  You may.

21             (At 12:06 p.m. proceedings concluded.)

22

23

24

25

R E P O R T E R ' S   C E R T I F I C A T E

STATE OF MICHIGAN  )
                SS )
COUNTY OF WAYNE    )

I, SEAN E. ALLEN, CSMR 5265, Certified Court Reporter acting in and for the Third Judicial circuit, Wayne County, State of Michigan, do hereby certify that the foregoing pages 1 through 97, inclusive, were reduced to typewritten form and comprise a true rendition of the proceedings taken in the above-entitled matter on May 27, 2004.

I FURTHER CERTIFY THAT MY CERTIFICATION ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN, SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED COPIES NOT MADE UNDER MY CONTROL AND SUPERVISION.

_____
SEAN E. ALLEN -- CSMR 5265
Official Court Reporter.

DATED:  This 2nd day of April 2012.

-97-