STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN

       v                     Case Number
                               10-5562-01

DEONTE HOWARD

                        Defendant.

_____/

JURY TRIAL

PROCEEDINGS HELD BEFORE THE HONORABLE BRUCE U. MORROW

Judge, Third Circuit Court, Detroit, Michigan, on

January 10, 2011.

APPEARANCES:

RAJ PRASAD P68519
Assistant Prosecuting Attorney
Wayne County Prosecutor's Office
1441 St. Antoine
Detroit, MI 48226
(313) 224-5818

SUSAN ROCK P34497
24500 Ford Rd.
Dearborn Heights, MI 48127
(313) 967-4444

Sean Allen
Official Court Reporter
CSMR 5265

TABLE OF CONTENTS

WITNESSES:   NONE.

EXHIBITS:   NONE.

1

2

3

4

5

6

7

8

9

1

2                     Detroit, Michigan.

3                     January 10, 2011.

4                     (At 10:54 a.m. court in session.)

5                     THE COURT:  We all ready to go?

6                     MR. PRASAD:  Yes, Judge.  We are.  In terms

7        of sequestration, Judge, I've already sequestered my

8        witnesses, your Honor.

9                     THE COURT:  Thank you.

10                    MR. PRASAD:  The exception I'm asking for is

11       the officer in charge, Sergeant Mackie, who's present.

12       And then I informed defense counsel about this, Sergeant

13       Mackie is actually going to be leaving us Wednesday

14       night to go to an out-of-state training.  And I was

15       going to ask if--

16                    THE COURT:  (Interposing)  Should we be

17       happy or sad for him leaving?  Some people don't want to

18       go.  Some people can't wait to go.

19                    MR. PRASAD:  I was going to ask that, if the

20       case goes onto Thursday, that Sergeant Lalone, who just

21       left the courtroom, to be, if he could substitute in as

22       the officer in charge at that point.

23                    THE COURT:  Is there any objection?

24                    MS. ROCK:  Your Honor, I don't think so.

25                    THE COURT:  I'll take that as a no.  And

1    that's fine.  If you have witnesses, they need to be

2    sequestered, Ms. Rock.

3              MS. ROCK:  Yes.  Mr. Parr is right here.

4    He's going to be leaving in a minute.  Your Honor--

5              THE COURT:  (Interposing)  If he's your only

6    witness, you can tell him he doesn't even need to come

7    back until Wednesday probably.

8              MS. ROCK:  All right.  All right.  I have

9    his cell phone number, your Honor.  Your Honor, with

10   regard to -- The prosecutor was supposed to find out if

11   Mr. Allen had a warrant out.  I did a little extra

12   research in terms of -- Apparently, he has a juvenile

13   adjudication for home invasion.  And I don't know

14   whether that was reduced to entering without owner's

15   permission or whether it stayed as a home invasion.

16   I probably have to go over some time during lunch and

17   get the file and look at it--

18             THE COURT:  (Interposing)  Okay.  What's the

19   point?  Get to the point.

20             MS. ROCK:  Well, that's it, I guess.  I have

21   to go over there myself and look at the file.

22             THE COURT:  Okay.

23             MS. ROCK:  Sorry.

24             THE COURT:  Just trying to figure out what

25   the point was.

                          -4-

1              MS. ROCK:  Yeah.  I know.  Sorry.

2              THE COURT:  Anything else?

3              MR. PRASAD:  No, sir.

4              MS. ROCK:  Your Honor, my only concern is I

5    noticed that the prosecutor I think is going to call a

6    James Wiencek.

7              THE COURT:  Not in the next two hours.

8              MR. PRASAD:  Not in the next two hours.

9    Yes.

10             MS. ROCK:  Oh.  Okay.  Because I was a

11   little concerned that he, he went to my client's

12   mother's house to look for my client.  And I'm not sure

13   what the purpose of that witness is other than to imply

14   that somehow my client--

15             THE COURT:  (Interposing)  Well, there must

16   be some discovery, right, that you have?

17             MS. ROCK:  Yes, your Honor.

18             THE COURT:  That would let you know.  And

19   so--

20             MR. PRASAD:  (Interposing)  There's a PCR

21   that the officer made.

22             THE COURT:  Young people, please be aware

23   that your voir dire is going to be like really, really,

24   really, really short.  So, you need to have your

25   favorite six questions, or whatever they're going to be,

 1     and hit them.  Because we're not going to be here
 2     forever, not even close to forever.
 3                    (At 10:59 a.m. panel enters the courtroom.)
 4                    THE COURT:  Howdy do, everybody?  Finally.
 5     Finally you're on this side.  Now, I do not want anybody
 6     to say, to look around and say, oh, I thought you were
 7     having the place cleaned.
 8                    With the cutbacks that everybody's been
 9     trying to adjust to, they came out with a little
10     schedule that told us when they would be doing just
11     general cleaning in this building.  And it was kind of a
12     laugher because they said that they were going to vacuum
13     on Monday, Wednesday and Friday.  And I was thinking,
14     when have they ever vacuumed on Monday, Wednesday and
15     Friday.  But still, you know, you appreciate the fact
16     that people are making adjustments and at least
17     notifying you.
18                    Well, it wasn't done Friday.  You should
19     have seen it when I came back at the beginning of the
20     new year.  I thought for sure, courtroom closed down for
21     about three weeks -- I guess everybody went on vacation.
22     I mean, because there wasn't a lot done.  And I just
23     couldn't stand it for your sake anymore.  So, I hope you
24     all don't mind the small inconvenience of being out
25     there in the hallway.

                                -6-

1          Well, let me welcome everybody, tell you my

2     name is Bruce Morrow.  It's a pleasure for you all to be

3     here.  Let's start with a question.  How far into

4     January does it have to go before we quit saying Happy

5     New Year?

6               UNIDENTIFIED PROSPECTIVE JUROR:  The 2nd.

7               THE COURT:  January 2nd?  When you see

8     somebody for the first time, oh in the first half of the

9     month of January, should you still say Happy New Year?

10              UNIDENTIFIED PROSPECTIVE JUROR:  Sure.

11              THE COURT:  Or especially if you haven't

12    been at work and you might come back and see people,

13    Happy New Year.  The question that I asked somebody else

14    was, how old do your kids have to be before you're not a

15    stay-at-home mom anymore?  And that question couldn't be

16    answered either.  They're like, well, you know, I still

17    consider myself that.  I say, well, your kids are in

18    school now?  Yes.  They're in school.  So, but she still

19    saw herself as a stay-at-home mom even when they were in

20    high school.  And she then switched her identity to

21    single parent when her kid went to college.

22              Sometimes we're stuck with perceptions of

23    ourselves or descriptions and perceptions that other

24    people give us, we kind of incorporate them onto

25    ourselves.  And I guess it has a lot to do in terms of

                              -7-

1          how we see the world and how we function in the world.

2                    The strangest thing about this whole jury

3          process is I think everybody comes here and assumes a

4          particular way that the court is going to run or what

5          their duties might be or how they're going to perform

6          their duties.  And even when you have prior experience

7          as a juror, sometimes that doesn't mean anything in

8          terms of how you're supposed to function or how the jury

9          will be functioning the next time.

10                   What happened to you out in that hallway I

11         think in terms of the waiting was a negative thing that

12         I hope became positive.  When you were first called

13         downstairs, you all were probably called as individual

14         names and told to line up to the right.  That probably

15         takes forever.  If I can remember, that takes forever.

16                   And then that out there in the hallway

17         situation.  I kind of usually make my jurors stay out

18         there for at least five or ten minutes.  I want the

19         conversation to kind of be like this, for the men or for

20         younger people to ask the women or older people, would

21         you rather sit.  Because I know the seating is limited.

22         And there is no music, so you know it's not a musical

23         chairs situation.  Because sometimes if a person does go

24         up to the bathroom, somebody else will take their seat.

25         And I'm sure they're not coming back expecting that seat

1    to be empty.

2              But it should change, from some point, that

3    your conversation with the person that came up with you,

4    it changes to a we, a group concept.  The question might

5    be, how long do you think we're going to be out here?

6              We have two jurors too many.  Imagine that.

7    I've never had excess.  So, we're going to have to do a

8    little roll call, if you don't mind.  Okay?  Mark, you

9    going to be the one?

10             THE CLERK:  Yeah.  Okay.  What I'm going to

11   do, I'm just going to call out names--

12             THE DEPUTY:  (Interposing)  Who belongs to

13   courtroom 403?  Are you in the right place?  403?

14             THE COURT:  If they knew that...

15             THE DEPUTY:  They don't know?  Okay.

16             THE CLERK:  As I started to say, I'll call

17   out your names and just say, if you're here, just say

18   here.  And if you don't hear your name, then you're

19   obviously in the wrong place.  Okay.

20             THE CLERK:  Gregory Adkins?

21             PROSPECTIVE JUROR ADKINS:  Here.

22             THE CLERK:  Okay.  Ronald Balliet?

23             PROSPECTIVE JUROR BALLIET:  Here.

24             THE CLERK:  Joseph Bologna?

25             PROSPECTIVE JUROR BOLOGNA:  Here.

-9-

```
 1                    THE CLERK:  Anthony Brenner?

 2                    PROSPECTIVE JUROR BRENNER:  Here.

 3                    THE CLERK:  Sheryl Brown?

 4                    PROSPECTIVE JUROR BROWN:  Here.

 5                    THE CLERK:  John Brownfiel?

 6                    PROSPECTIVE JUROR BROWNFIEL:  Here.

 7                    THE CLERK:  Charles -- Is it Buege?

 8                    PROSPECTIVE JUROR BUEGE:  Buege.  Here.

 9                    THE CLERK:  Buege.  Okay.  Ronnie Clopton?

10                    PROSPECTIVE JUROR CLOPTON:  Present.

11                    THE CLERK:  Okay.  Michelle Colarossi?

12                    PROSPECTIVE JUROR COLAROSSI:  Here.

13                    THE CLERK:  Margaret Collet?

14                    PROSPECTIVE JUROR COLLET:  Here.

15                    THE CLERK:  Paula Constantino?

16                    PROSPECTIVE JUROR CONSTANTINO:  Here.

17                    THE CLERK:  Augustine Creamer?

18                    PROSPECTIVE JUROR CREAMER:  Present.

19                    THE CLERK:  Okay.  Lasaintee Curry?

20                    PROSPECTIVE JUROR CURRY:  Present.

21                    THE CLERK:  Julio Distefano?

22                    PROSPECTIVE JUROR DISTEFANO:  Yeah.  Right

23        here.

24                    THE CLERK:  Okay.  Jack Eldridge?

25                    PROSPECTIVE JUROR ELDRIDGE:  Here.
```

```
1                     THE CLERK:  Margaret Elock?

2                     PROSPECTIVE JUROR ELOCK:  Here.

3                     THE CLERK:  Dianer -- Is it Hajdyla.

4                     PROSPECTIVE JUROR HAJDYLA:  Hajdyla.

5                     THE CLERK:  Hajdyla.  Okay.  Nathan Halley?

6                     PROSPECTIVE JUROR HALLEY:  Here.

7                     THE CLERK:  Dana Hightower?

8                     PROSPECTIVE JUROR HIGHTOWER:  Here.

9                     THE CLERK:  Rita Hoy?

10                    PROSPECTIVE JUROR HOY:  Here.

11                    THE CLERK:  Rachel Ingle?

12                    PROSPECTIVE JUROR INGLE:  Here.

13                    THE CLERK:  Elmo Jensen?

14                    PROSPECTIVE JUROR JENSEN:  Here.

15                    THE CLERK:  Okay.  Trevor Kamin?

16                    PROSPECTIVE JUROR KAMIN:  Here.

17                    THE CLERK:  Okay.  Maureen Keast?

18                    PROSPECTIVE JUROR KEAST:  Here.

19                    THE CLERK:  Okay.  Now, here's my problem.

20     It's either a Dean Kim or a Dawn Kim.

21                    PROSPECTIVE JUROR KIM:  Dean.  Here.

22                    THE CLERK:  You're Dean?

23                    PROSPECTIVE JUROR KIM:  Yes.  Here.

24                    THE CLERK:  Okay.  That was my problem.

25     Okay.  Glenn Kremer?  Kremer?
```

-11-

```
 1                    PROSPECTIVE JUROR KREMER:  Here.

 2                    THE CLERK:  Kremer.  Okay.  Vernon Lilly?

 3                    PROSPECTIVE JUROR LILLY:  Here.

 4                    THE CLERK:  Jean Matelic?

 5                    PROSPECTIVE JUROR MATELIC:  Here.

 6                    THE CLERK:  Jillian McDade?

 7                    PROSPECTIVE JUROR McDADE:  Here.

 8                    THE CLERK:  Jessica Meltzer?

 9                    PROSPECTIVE JUROR MELTZER:  Here.

10                    THE CLERK:  Darren Nester?

11                    PROSPECTIVE JUROR NESTER:  Here.

12                    THE CLERK:  Lisa Niemic or Niemic?

13                    PROSPECTIVE JUROR NIEMIC:  Here.

14                    THE CLERK:  Okay.  Catherine Paris?

15                    PROSPECTIVE JUROR PARIS:  Here.

16                    THE CLERK:  Darlene Posh?

17                    PROSPECTIVE JUROR POSH:  Here.

18                    THE CLERK:  Angela Reeves?

19                    PROSPECTIVE JUROR REEVES:  Here.

20                    THE CLERK:  John Sample?

21                    PROSPECTIVE JUROR SAMPLE:  Here.

22                    THE CLERK:  Michael Schneider?

23                    PROSPECTIVE JUROR SCHNEIDER:  Here.

24                    THE CLERK:  Debra Setzler?

25                    PROSPECTIVE JUROR SETZLER:  Here.
```

```
 1                    THE CLERK:  Colleen Shaw?

 2                    PROSPECTIVE JUROR SHAW:  Here.

 3                    THE CLERK:  James Slebodnik?

 4                    PROSPECTIVE JUROR SLEBODNIK:  Here.

 5                    THE CLERK:  Joanne Szot?

 6                    PROSPECTIVE JUROR SZOT:  Here.

 7                    THE CLERK:  Maureen Thomas?  Maureen Thomas?

 8                    PROSPECTIVE JUROR THOMAS:  Yes.  Here.

 9                    THE CLERK:  Okay.  That's all I have.

10                    THE COURT:  Waive goodbye to them.

11                    MS. ROCK:  Your Honor?  Excuse me, Judge,

12          can I talk with you with the prosecutor just for a

13          minute before we start voir dire?

14                    (Bench conference 11:09 a.m. to 11:10 a.m.)

15                    THE COURT:  So, we were talking about this

16          commonality, this concept, this social group that you

17          were forming out in the hall.  Usually, when my

18          prospective jurors are out in the hall and they don't

19          see me, the first thing they usually assume if they're

20          sitting out in the hall is that the Judge isn't there

21          yet.  I don't know why that's the first assumption that

22          people probably think.  But it's always, oh, he's

23          probably not here.  That's why we're out here.  So, I

24          try to put that to rest.

25                    But the conversation does change.  And it
```

-13-

1     changes in ways that, to me, are expected, but always

2     good when they do change.  Because, ultimately, thirteen

3     of you all are going to be chosen to sit and listen.

4     Twelve are going to be chosen to deliberate.  And it's

5     important that at that time everybody's functioning in

6     the same capacity using the same guidelines to consider

7     whatever it is that you're going to be asked to

8     consider.

9             The method that is used in the legal system

10    is called -- It's a method of limitation.  I'm limiting

11    you, when you consider whatever it is that you think

12    that is important to this case, to simply and only use

13    reasonableness and common sense.

14            And when I say that, it's just an

15    interesting weird thing to say to people, I only want

16    you to use common sense and reasonableness in making

17    this decision because I get the same look that I'm

18    getting from you now.  Well, what did you think we were

19    going to use?

20            And the answer to that is that sometimes if

21    you don't caution us from being who we are, we will be

22    who we are.  And when we are who we are, we use common

23    sense and reasonableness, but we take the liberty to use

24    everything else that we wish to use.

25            How many of you all have ever used a gut

-14-

1    decision or gut feelings to do something that was

2    important, to make an important decision?  Right.  I

3    mean, I know I have.

4              My mother used to call it, sometimes when

5    she was asked to explain, she would tell us, I can't put

6    my finger on the reason.  So, she couldn't even identify

7    that which was supposed to be consistent with

8    reasonableness and common sense to explain why it is

9    that we had to do what we did.

10             And you know how parents are, as we are

11   parents and as we have experienced as children,

12   sometimes you get the explanation, I'm the parent,

13   you're the child.  That's the reason.

14             There are so many instances that I can point

15   to as a child, as a young adult, as an adult, as a

16   middle-aged person and as I round the corner on mature

17   citizen/senior citizen for the discount prices at

18   McDonald's and Tim Horton's and everywhere else, and

19   Meijer on Tuesday, that this is a hard concept, one that

20   I grapple with all the time.

21             Quick story about how hard it is sometimes

22   just to adhere to reasonableness and common sense.  And

23   it's an old story that I've told a million times.  I

24   just haven't -- I've found more recent ones, but nothing

25   that describes it quite like this.

 1                  Years ago, I was asked to go with a friend

 2          to help him decide which SUV to buy, millions of years

 3          ago.  But the place was Bob Saks, Ten and a half and

 4          Grand River over in Farmington.  And Bob Saks has like

 5          eighty acres.  And the limitation was, we're only going

 6          to pick four cars and you're going to have to choose

 7          between these four SUVs. I'm not driving in every SUV.

 8                  But what I thought was only going to be an

 9          hour and a half turned out to be four hours.  I mean, I

10          was either driving in the front seat, passenger's seat

11          or in the back seat of these four SUVs.  And we went

12          like the Casons.  We went over hill, over dale, we hit

13          the -- I mean, we just drove this SUV like he was going

14          to drive it.

15                  At the end of the four hours, not only did I

16          know what did zero to sixty the fastest and who had the

17          largest tank capacity, but it was so specific that I

18          knew the pounds per square inch in the tires for the

19          different models.  All of them were top of the line.

20          And the only difference between options was whether you

21          were going to get the luggage rack or whether you were

22          going to get the moon roof.  And so, we had the drive

23          train warranties.  We had the amount of head roof

24          clearance, leg room, storage capacity.

25                  Then we went back to the house, called the

1        credit union, gave them the four cars.  They gave us the

2        present value so that we knew what they would depreciate

3        or which ones depreciated, called four different

4        insurance companies to get the price of insurance for

5        those SUVs in the neighborhood that he lived in so that

6        he would have all this information.  And then we started

7        compiling it, put in the pros and cons where they

8        belonged.  And after another three hours and a couple

9        Bud Lights, he had the decision.

10               I know you all weren't there, but I just

11       need, for the sake of this demonstration, for you to

12       tell me what factor or factors you thought he made the

13       choice that he made.  Young lady, can you tell me what

14       factor you believe influenced his decision?  And I know,

15       it could be what?  It could be price.  It could be

16       mileage.  It could be whatever.

17               UNIDENTIFIED PROSPECTIVE JUROR:  The foot

18       room.

19               THE COURT:  Okay.  Foot room.  How about

20       you, young lady?  What do you think?

21               UNIDENTIFIED PROSPECTIVE JUROR:  The price.

22               THE COURT:  The price.  We'll stay with

23       ladies for a while.

24               UNIDENTIFIED PROSPECTIVE JUROR:  The color.

25               THE COURT:  The color.  Young lady?

-17-

```
 1                    UNIDENTIFIED PROSPECTIVE JUROR:  The ride.

 2                    THE COURT:  The ride.

 3                    UNIDENTIFIED PROSPECTIVE JUROR:  Insurance.

 4                    THE COURT:  Insurance cost.

 5                    UNIDENTIFIED PROSPECTIVE JUROR:  Comfort.

 6                    THE COURT:  Comfort.  Comfort's important.

 7      Black coat?

 8                    UNIDENTIFIED PROSPECTIVE JUROR:  I was

 9      thinking how it rode.

10                    THE COURT:  Okay.  Last, but not least.

11      Young lady?

12                    UNIDENTIFIED PROSPECTIVE JUROR:  Comfort.

13                    THE COURT:  Comfort.  Let's go to the men.

14      Sir?

15                    UNIDENTIFIED PROSPECTIVE JUROR:  Fuel

16      consumption.

17                    THE COURT:  Fuel consumption.

18                    UNIDENTIFIED PROSPECTIVE JUROR:  How he

19      looked in it.

20                    THE COURT:  How he looked in it?  Sir?

21                    UNIDENTIFIED PROSPECTIVE JUROR:  How about

22      driving?

23                    THE COURT:  Maneuverability or comfort.  How

24      about you, sir?

25                    UNIDENTIFIED PROSPECTIVE JUROR:  The
```

1    warranty.

2              THE COURT:  The warranty.

3              UNIDENTIFIED PROSPECTIVE JUROR:  The one

4    that just caught my eye.

5              THE COURT:  The one that caught his eye.

6    Last, but not least, in the back, sir.

7              UNIDENTIFIED PROSPECTIVE JUROR:  Price.

8              THE COURT:  Price.  Who's the young man that

9    said how he looked in it?  Right there?  That's what he

10   said.  And you know that old expression when a person's

11   jaw drops to the floor.  After six hours, my jaw

12   literally -- I tried to control myself and contain

13   myself.

14              Initially, I was made at him.  But,

15   ultimately, I was mad at myself because I had agreed and

16   I thought that this guy was one who was going to make a

17   decision that was based on reasonableness and common

18   sense.

19              Because the conversation, after he said

20   that, went like, you said what?  And he says, well,

21   Bruce, listen.  He says, I'm forty years old.  I've

22   never had the car that I wanted.  Don't you think I

23   deserve to buy the car that I want?  Wouldn't you agree

24   that I don't have a gambling habit, alcohol?  I'm

25   careful with my money.  I deserve to have a car.  I work

1    hard for my money.

2            Every three or four years he used to trade

3    it in.  This was this one:  I'm gonna wear this one down

4    to the bumper.  This isn't going back.  I didn't care

5    about, you know, it's value.  And just on and on and on.

6    And I just picked up, happy I had got the Bud Light

7    because I took the four with me on my way out the door

8    and just stewed for about three or four days.

9            But this is what I came to appreciate about

10   that encounter, that at least he told me the truth.

11   Because what it turned out was the one he thought he

12   looked best in had the best mileage.  He could have

13   hidden the truth from me, his bias and replaced it with

14   something else that made it look like the decision was

15   based on common sense and reasonableness.

16            Because isn't that how we hide our biases

17   sometimes?  We don't want somebody to know our bias and

18   so mentally we go through this checklist of, okay, what

19   can I tell this person that won't get this weird

20   reaction that I know that if I told them the truth this

21   reaction would get?

22            And so, sometimes, we'll search and search

23   and search and find something that a person can't argue

24   or have a negative opinion about us and we'll give them

25   that opinion and that reason.  Nobody wants to be seen

1    as bias or prejudice or racist or sexist.  So, we

2    search.  We don't care about what the truth really is.

3    I mean, we'll make up stuff.

4              I had a chance to come to a Piston's game.

5    And this guy was going to give me the tickets and, you

6    know, at first I was real happy.  And then I started

7    thinking about the guy.  And this is a guy that there is

8    nothing free.  And I was just thinking, okay.  How long

9    will it take for him to call me and ask for a favor in

10   return?

11             But what explanation did I give him?  Sorry.

12   I got something else to do that night.  I can't make it.

13   Now, the truth was I couldn't make it.  I wasn't going

14   to make it.  But the reason was substituted.  Because I

15   know if I told him what I really thought about him, we

16   would have had an argument, a disagreement.  And I'm

17   trying to avoid that.

18             And so, sometimes it is how we reach our

19   decision that enlightens us whether we're being, using

20   common sense and reasonableness or if we're using a bias

21   and sometimes we can get to the same ends the same way.

22   But in the criminal justice system, what you're asked to

23   do here is to come to a conclusion only based on reason

24   and common sense.  And so, that throws out gut feelings.

25             How many of you are about my age who used to

-21-

1        make decisions based on vibes?  If you even know what a

2        vibe is, then you're old enough to know that you used to

3        make decisions based on the vibes you were getting.  Can

4        anything else be so funny?  I got some weird vibes from

5        them.  I'm like, come on.

6              But it's so ingrained in our culture,

7        sometimes we even substitute them for being reasonable.

8        Well, you know, a lot of people make decisions on vibes

9        or gut reactions.  And so, we accept it as being a part

10       of how we make decisions.  But not here.

11             So, we get a chance to -- I think half the

12       reason why we do that now, say but not here, is because

13       we have a vested interest in the outcome.  We start

14       wanting a particular outcome and then we work and think

15       towards that outcome.  And if we don't get it, we can

16       negate something or give something less value.  And then

17       there are some things that have nothing to do with

18       common sense and reasonableness and we embrace them as,

19       well, that's just the way it is.  And so, instead of

20       stepping back and just being reasonable and common, and

21       using common sense, we embrace it anyway.

22             That one thing -- And just a quick example.

23       That's like buying glasses.  Think about it.  What is

24       the most crucial part of a pair of glasses?  It's the

25       lens, correct?  Okay.  What do people spend most of

1        their time shopping for?

2                    UNIDENTIFIED PROSPECTIVE JUROR:  The frames.

3                    THE COURT:  The frames.  Right.  And the

4        clerk gets asked what question the most any day, any

5        week, any month?  How do these look on me?  And if

6        you've ever been with somebody that really buys frames,

7        in the old days they used to be on carousals.  I don't

8        know what they're in now.  I haven't been in awhile,

9        probably just racks on the wall.  But the carousals

10       would have a little price on them.  I stay out of the

11       place now because it was a no-win situation in my house.

12       I would not let my wife take me.  It's just not a

13       pleasant experience.  It's always unhappy.

14                    But they used to have like the fifty-nine

15       dollar carousel and then it would graduate to the

16       eighty-nine, one twenty-nine, one fifty-nine and my

17       sweet, loving wife would never believe that she made the

18       glasses look good.  She believed the glasses made her

19       look good.

20                    And the fifty-nine dollar frames couldn't

21       make her look good, and the eighty-nine dollar frames.

22       She could walk past those three carousals and just kind

23       of plot herself right in front of the one fifty-nines

24       and start there.  And it was all vanity.  It had nothing

25       to do with common sense and reasonableness.  Because

-23-

1      then it would have been about, well, any pair that kind

2      of fits.

3              But is this long exercise in the

4      unreasonable sometimes or the second reason.  And it

5      manifests itself.  How many times do we judge people by

6      their appearance?  And we judge whether they're serious

7      about something by how they look.  Sometimes by their

8      gender, sometimes by their height, sometimes by what

9      school they went to.

10             Can anybody give me a reason why the person

11     at Wayne County Community College in their freshman year

12     is smarter than the same individual, another individual

13     at the University of Michigan in their freshman year?

14     Can anybody just make up a reason why that Wayne County

15     Community College person is smarter?

16             UNIDENTIFIED PROSPECTIVE JUROR:  Well,

17     because it's not as expensive.

18             THE COURT:  It's not as expensive, went to

19     the cheaper school.  Most people would automatically

20     assume if there's a person at WCCC-D versus U of M, the

21     U of M person is smarter.  Right?  Isn't that the

22     assumption that we would make?  Come on.  Yeah.  We

23     wouldn't say, well, maybe she has a sick mother or a

24     sick father or he has a sick mother or a sick father and

25     they do some health care, maybe it's an economic issue,

-24-

1      maybe her boyfriend or his girlfriend go there and they

2      wanted -- How many people have followed girlfriends and

3      boyfriends to college?

4              Sometimes our automatic assumption is where

5      we first see our own bias.  And then we let people

6      convince us that our bias isn't true.  I'm afraid of you

7      until you prove that I shouldn't be afraid of you.  I

8      can't tell you how many people I scare in the course of

9      a day, how many security people at Macy's I attract

10     during the course of a shopping experience at Macy's.

11     And I'm thinking, I'm almost sixty.  Don't they have

12     anybody young to follow?  But I'll still get followed.

13     I'm like, what profile can I possible be fitting at this

14     age?

15              UNIDENTIFIED PROSPECTIVE JUROR:  No hair.

16              THE COURT:  Ah.  That's the profile of a man

17     that's trying to look younger than what he really is and

18     doesn't want to dye his hair and let everybody see that

19     it's gray and he dyes it.  That one.  That one is a man

20     that doesn't believe that Lady Clairol, the slogan for

21     Lady Clairol fits men.  Remember Lady Clairol.  They're

22     the only people I know that can say, we're going to let

23     you say a lie and we're going to back you up and then

24     we're going to sell some products based on that.  Their

25     slogan back in the day was only your hairdresser will

1       know for sure.

2               And look how many people have adopted that.

3       I mean, Beyonce' and her crew who throw the weaves in.

4       And they'll say it's their hair, but you know different.

5       The colored lenses for people, contact lenses, people

6       throwing around tans.  I remember the people that used

7       to have curly hair would always try to say their hair

8       was naturally curly, but we knew that they got little

9       perms to make it curly and all of that.  Everybody's

10      teeth were naturally straight, nobody wore braces,

11      unless you remember them.  And nobody got their teeth

12      lightened.  Nobody got other enhancements to their

13      bodies.  They always had those kind of bodies.  I'm

14      like, get out of here.

15              Why are we always trying to impress people

16      that, even though we say we're enlightened and we don't

17      let appearance affect what we think or how we believe?

18      We know we do.

19              And so, it becomes a very difficult kind of

20      experience when people tell you just make a decision

21      based on reasonableness and common sense.  Because, to

22      some extent, our reasonable is even different.  Anybody

23      think that one child is a lot of children or is a lot?

24      Anybody think ten children is a lot of children?

25              I'm sure that in the right group we could

1        find somebody that thinks that one is too many because

2        their experience with one just overwhelms them.  And

3        that's how we would rank a lot.  The number one under

4        what could overwhelm us.  Once we get to overwhelming,

5        that would be our number for a lot of kids.  To some,

6        it's one.  To some, it's two.  It escalates, but it's

7        still different.  And so, you all as a group will have a

8        chance to make some definitions that fit for your group.

9

10               The situation is just that.  And you should

11       be with me -- Today, we'll probably just pick the jury,

12       unfortunately, since we're starting so late.  But I

13       suspect that the testimony will probably last all

14       Tuesday, half of Wednesday and, by Wednesday afternoon,

15       you all will be deliberating.  And so, it's probably

16       going to be a four-day process.

17               Every day we start at 9:00.  Every day we're

18       out of here some time between 3:30 and four o'clock,

19       just so that you know how we function and how we're

20       expecting you to help us function.  I'll explain the

21       rest after you all take an oath.  So, Mark, could you

22       give these young people an oath, please?

23               THE CLERK:  Sure.  I just need everybody to

24       stand and raise your right hands, please?

25               (At 11:30 a.m. panel sworn.)

-27-

1                    THE CLERK:  Do you promise, swear or affirm

2          that you will truthfully answer all questions put

3          forward to you as to your qualifications to serve as

4          jurors on this case?

5                    PROSPECTIVE JURORS:  I do.

6                    THE CLERK:  Okay.  You can be seated.

7                    THE COURT:  Okay.  I'm sorry about one other

8          thing.  I didn't mean to throw you off by offering you

9          all candy when you came in.  Some people are a little

10         thrown off about candy because they don't think that

11         that's proper protocol in a courtroom.

12                   But I'm sure you're the same people that

13         think that it's not proper protocol to eat candy and

14         chew gum in church, right?  Right?  How many of us eat

15         candy in church beside me?  How many of us have given

16         our children candy or gum in church beside me?  Okay.

17         So, I'm thinking, if it's good enough for church, then

18         it's got to be good enough for a courtroom.  What do you

19         think?  How about coffee and tea and pop and water?  Do

20         you think that's good enough for a courtroom?

21                   UNIDENTIFIED PROSPECTIVE JUROR:  It's your

22         courtroom.

23                   THE COURT:  No.  It's our courtroom.  Right?

24                   UNIDENTIFIED PROSPECTIVE JUROR:  I'm a

25         visitor, so -- First time.  So, whatever you say.

-28-

1           THE COURT:  Well, you know, some would say

2      that I'm a visitor.  I just have a longer visit from the

3      time you get elected until the election cycle is over.

4      So -- And they remind us all the time that the name is

5      on the door with screws.  So, in that context, I'm a

6      visitor, too.  I mean, how long do you have to be

7      somewhere before you're not a visitor?  How many of you

8      all remember Arsenio Hall?  That would be things that

9      make you go hmm.

10          But no.  You are invited, please, to bring

11     water, if that's what you'd like, coffee, tea, anything

12     that's non-alcoholic.  When I go back there and see the

13     trash, I got five-hour energy things and Monsters and

14     Red Bull.

15          And the reason that I encourage you to do

16     this is because I need you to stay awake.  And I know

17     usually that if we're doing some oral gratification,

18     we're a little more awake than when we're not.  And

19     candy, to me, is harmless, except for the calories, of

20     course.  So, if you don't like the Jolly Ranchers,

21     please bring your own.

22          And you can never out eat me.  I get five-

23     pound bags from Gordon Food Service.  So, you know, I've

24     got two more in the back.  So, I'm loaded.  This is not

25     some after Halloween sale candy.  I know that's what you

1    all were thinking, Halloween candy that he didn't give

2    away.

3              Oh, what people imagine all the time.  We

4    have to tell them.  Because, if not, people will make up

5    reasons that they think make sense, or based on whatever

6    their experiences is [sic], they'll apply that to you,

7    not even knowing.  They'll just say, oh, okay.  This is

8    my experience.  So, I'm going to apply it.

9              This is what we're about to do.  I want

10   everybody to go to lunch.  So, I'm going to do some

11   general stuff until 12:00.  Usually, if you go to lunch

12   at 12:00, early, the food actually tastes like lunch.

13   Usually, around here it starts at about 11:30, but the

14   courtrooms usually let out at 12:30.  But if you go out

15   there and there's a line, sometimes lunch becomes and

16   tastes like unch.  Sometimes like at our houses if you

17   leave the broccoli on too long, what was firm now is

18   mushy.  So, I want you all to get the good experience,

19   no lines, food that actually tastes a little more like

20   the food.  And hamburgers, you don't have to worry about

21   stuff like that.  But the soups and all, it makes a

22   difference when you eat the soup, and sometimes the

23   salad.

24             So, we're going to take a little break from

25   12:00 to 1:00 and get back in here and work.  So, I want

-30-

1    you all to do something nutritious.  If you're not

2    hungry and you're afraid of outside and you like

3    activity, I've designed this building specifically for

4    exercises in mind.  If you start out this door and

5    either go left or right, you'll see that there is a

6    walking oval.  And you can walk as many laps as you like

7    and then come back here and rest and then go back out

8    and walk some more laps.

9             If it gets a little too boring or you get so

10   that that candy isn't working and -- You know it's a sin

11   to fall asleep in church, right?  So, you know what kind

12   of a sin it is to fall asleep in court, when a lot of

13   what you have to make decisions about is what you hear.

14   You just can't wake up and Amen me, you know, and think

15   that I think that I'm doing something.

16            So, if you're a little tired and you need to

17   do a couple of laps, please, I encourage you, do a

18   couple of laps.  If that's not working, just tell your

19   neighbor next to you, pinch me if you see me nodding and

20   hope that that works.

21            After I give you a little foundational

22   information, the process is this.  Twelve people -- I'm

23   sorry.  Fourteen people will be seated.  We're only

24   going to carry thirteen.  But I will ask those fourteen

25   people questions about your personal background, you

1        know, not so personal that you're going to feel like

2        I'm, you know, slipping into some areas that I shouldn't

3        slip in.  But they're designed so the lawyers can get a

4        general idea of what kind of person you are and

5        sometimes beliefs that you hold.

6                 The reason that it's important for the

7        lawyers is because each side has what we call peremptory

8        challenges.  That means -- And that's why there are so

9        many of you.  Each side can ask me to dismiss twelve of

10       the persons that get seated up here.  So, that's twenty-

11       four that could be eliminated.  And I certainly need

12       another thirteen.  So, that's already up to thirty-

13       seven.  And there are forty-two of you.  So, I guess

14       they just give me a few extra just in case there are

15       some situations that are developing or have developed

16       where it would be more difficult for you to be a juror

17       that's fair and impartial.

18                 And then, in this case, I'll allow the

19       lawyers to ask a question or two in some area that they

20       might think is important to what decision that they make

21       in terms of how they want to exercise their

22       preemptories.  We kind of go back and forth.  Do you

23       have any preemptories?  And ultimately, either they use

24       them all or they say, both sides say that they're

25       satisfied.

1          And if there are any remaining, you all get

2     to go back downstairs, maybe get put on a jury that's

3     going to last three, four, five months and you're happy

4     that you were chosen only for four days instead of for

5     four months, or something else happens.  But that's kind

6     of the process.  And then we'll hear testimony and the

7     trial part begins.

8          Do you all have any questions about anything

9     up to this point?  Do chime in if you have questions

10    along the way.  I don't think that there's any like

11    period of interruption that matters.  This isn't one

12    where, oh, I can't interrupt.  Okay.

13         The name of this case is the People of the

14    state of Michigan versus Mr. Deonte Howard.  And in this

15    particular case, there are two sides, as there are in

16    every criminal case.  One side is the People of the

17    state of Michigan.  And the other side is the side that

18    Mr. Howard sits at.

19         And would you be kind enough to introduce

20    yourself, the gentleman next to him [sic]?  You can

21    explain to them what your role is, if you like, and the

22    name of the witnesses--

23         MR. PRASAD:  (Interposing)  Yes.

24         THE COURT:  That you might be calling.

25         MR. PRASAD:  Thank you, your Honor.  Good

-33-

1    morning, everyone.

2              PROSPECTIVE JURORS:  Good morning.

3              MR. PRASAD:  My name is Raj Prasad.  I'm

4    with the Wayne County Prosecutor's Office.  I'm an

5    assistant prosecutor here.  Alongside with me is

6    Sergeant Samuel Mackie.  Sergeant Mackie works in the

7    Detroit Police Department in the homicide unit.

8              I'm going to read you a list of names of

9    potential witnesses in this case.  And please listen up

10   because, obviously, the question is whether or not you

11   recognize any of these people.

12             Dr. Cheryl Loewe from the Wayne County

13   Medical Examiner's Office, Delfera Hunt, Aundrey Allen,

14   Bobby Bailey, Macario Andrew Harris, Kimberly Thompson,

15   Frederick McFadden, Shannon Palmer -- Excuse me.  Not

16   Shannon Palmer.  Not Shannon Palmer.  Sergeant Mackie,

17   as I mentioned.  Officer Rodney Cushingberry, Officer

18   Brandon Pettit, Officer Jeffrey Banks, Officer James --

19   And I'm going to be butchering this, Wiencek, W-I-E-N-C-

20   E-K.  Officer Eugene Fitzhugh, Officer Latrelle McNairy,

21   Investigator Barbara Simon, Sergeant Robert Lalone,

22   Investigator Myron Love, Officer Johnell White, Officer

23   Derrick Thomas.  All those officers that I just

24   mentioned were part of the Detroit Police Department in

25   one capacity or the other.

-34-

1         And then there's Detective Lieutenant Jeff

2    Crump, Detective Sergeant James England.  Both of them

3    are with the Michigan State Police in the Grand Rapids

4    lab.  And I think that's all of them.  Thank you.

5         THE COURT:  Thank you.  Representing Mr.

6    Howard is this young lady in front of me.  Would you

7    introduce yourself and your client, please?

8         MS. ROCK:  Good morning, ladies and

9    gentlemen.  My name is Susan Rock.  And this is my

10   client, Deonte Howard.

11        THE DEFENDANT:  Good morning.

12        MS. ROCK:  Good morning.  The witnesses that

13   I propose that we may be calling are Mr. Dixon or any

14   employee who maybe acted as a keeper of the records at

15   the juvenile detention facility across the street.  We

16   have Dr. L.J. Dragovich, we may be calling, in Oakland

17   County.  We have Steven Howard, Roland Parr.  We have

18   Lisa Murray, Joel Iverson, Damon Nathaniel, Sergeant

19   Michael Martel, Detective Love, Police Officer Danl

20   Barnes, Police Officer Pesmark, Sergeant David

21   Wilkerson, T. Williams.  I think that's Theolious?

22        MR. PRASAD:  Theopolis.

23        MS. ROCK:  Theopolis Williams, Sergeant

24   Kenneth Gardner, Sergeant B. Rogers, Terry Graves,

25   Robert Lalone and possibly Logan Cavatalli (sp.),

-35-

1      forensic pathologist.  Do any of you know--

2                    THE COURT:  (Interposing)  Thank you.  I'll,

3      I'll--

4                    MS. ROCK:  (Interposing)  Oh.  Excuse me,

5      your Honor.

6                    THE COURT:  Okay.  Thank you.

7                    MS. ROCK:  Thank you.

8                    THE COURT:  A lot of names, huh?  Right.

9      You know, I always tell people, you know, people start

10     freaking out when they hear all those names.  And

11     they're like, the Judge told us we'd be out of there by

12     Thursday.  It's just like of like watching a movie and

13     you see all the credits roll and you see all the people

14     that were in the movie.  You think, wow, a lot of people

15     in the movie.  But, you know, they have little cameo

16     appearances.  Everybody's not going to be up here

17     talking for hours on end, little cameo appearances,

18     short and sweet, sometimes not even cross-examined.  So,

19     don't let the number scare you.

20                    MS. ROCK:  Your Honor, I have maybe possibly

21     one more would be Donald Ingram.  Does anybody know--

22                    THE COURT:  (Interposing)  Ah, ah.

23                    MS. ROCK:  Oh.  Sorry.  Sorry.

24                    THE COURT:  It's all right.  Sometimes they

25     listen, but they don't hear.  I just said simply

                                   -36-

1          introduce the names of the possible witnesses, right?

2          Sometimes you're in one place, so you assume that the

3          next place is like the other place, unless you're a

4          smart person.

5                    How many of you all know that your children

6          know which parent to ask for the answer they want to

7          get?  See, they make the appropriate distinctions about

8          who and what, kind of also like doctors.  They don't

9          assume before they do any sort of questioning, any sort

10         of exam that a certain thing is there.  They ask a bunch

11         of questions so they can make a decision about how it

12         goes.

13                   In every case, there's a sheet of paper that

14         is filed.  And I'm going to read to you from this sheet

15         of paper.  Please understand the purpose of this sheet

16         of paper is just to kind of tell you what it is that is

17         alleged in this case.  I say alleged because, at this

18         point, one of the legal principles that you are to

19         accept is that Mr. Howard is presumed to be not guilty.

20                   This information reads:  In the name of the

21         People of the state of Michigan, the prosecuting

22         attorney appears here today and says back on the date of

23         April the 10th of 2010, in front of 16228 Tireman in the

24         city of Detroit that Mr. Howard did deliberately, with

25         the intent to kill and with premeditation, kill and

1    murder one Tyrone Simpson.

2                    And that he did, in count two, assault an

3    Aundrey Simpson with the intent to commit the crime of

4    murder.

5                    And in count three that he had in his

6    possession a gun at the time that he attempted or

7    committed the murder of Tyrone Simpson and attempted or

8    did make an assault upon Aundrey Simpson with the intent

9    to commit the crime of murder.

10                    To these three counts, Mr. Howard has

11   entered a plea of not guilty.  The first legal concept

12   is the presumption of innocence.  And the presumption of

13   innocence says that a person that is accused of a crime

14   is presumed to be not guilty.  That presumption begins

15   at the beginning of the case, it continues throughout

16   the case and entitles Mr. Howard to a verdict of not

17   guilty unless you're satisfied beyond a reasonable doubt

18   that he is guilty.

19                    Every crime has elements.  The prosecution

20   has to prove those elements beyond a reasonable doubt.

21   They don't have to prove one of the elements, two of the

22   elements, but however many elements there are, they have

23   to prove each and every element beyond a reasonable

24   doubt.  So, if you find that the prosecution has not met

25   that burden, your duty is to return a verdict of not

-38-

1    guilty.

2         A reasonable doubt is defined as a fair,

3    honest doubt growing out of the evidence, the lack of

4    evidence or the inadequate nature of the evidence.  It's

5    not merely an imaginary or a possible doubt, but a doubt

6    that's based on reason and common sense, one you can

7    assign a reason for.

8         So, if you find that the prosecution has not

9    met that burden, after considering all of the evidence,

10   your duty is to return a verdict of not guilty.

11        The presumption of innocence, in its

12   definition, it is implicit that the defendant has the

13   presumption of innocence and has no burden.  So, Mr.

14   Howard, by sitting here, is presumed to be not guilty.

15   And I will tell you now, there is no obligation on a

16   person charged with a crime to do anything.  The

17   obligation rests with the prosecution at each and every

18   stage in the proceeding.

19        So, let me call a few names, be directed to

20   a few seats.  That young man there, that's Brother Sean,

21   Sean Allen.  That's Mr. Frank Wood, the young man

22   standing up.  And that's Frederick Dupree, that other

23   man with that beautiful smile.  I don't know why every

24   day they dress up like they're twins.  I'm still trying

25   to figure that out.

1           But you all don't have to worry about a

2     change of clothes.  I'll still be in the same tattered

3     robe tomorrow and they'll be in the same color.  So,

4     don't feel compelled to show off your wardrobe.  Just

5     make sure you wear something comfortable that will

6     ensure that you stay awake.

7           When your name is called, please, the first

8     person, this is seat number one in the front.  They go

9     to four and then we start in the back row.  And this is

10    Mark Ulatowski.  And these are the best people in this

11    building, not that there aren't other good people, but

12    you're being treated to the best today.

13          THE CLERK:  When I call your name, there's a

14    set of steps right over there.  So, if you just want to

15    walk around that way, that'd be great.

16          Rachel Ingle, could you please take seat

17    number one?  Sheryl Brown, could you please take seat

18    number two?  Angela Reeves, could you please take seat

19    number three?  Michele Colarossi, could you please take

20    seat number four?  Catherine Paris, could you please

21    take seat number five?  Jeanne Matelic, Matelic?

22          PROSPECTIVE JUROR MATELIC:  Matelic.

23          THE CLERK:  Matelic.  Could you please take

24    seat number six?  Michael Schneider, could you please

25    take seat number seven?  Augustine Creamer, could you

-40-

1        please take seat number eight?  Maureen Keast, could you

2        please take seat number nine?  Jessica Meltzer, could

3        you please take seat number ten?  Joseph Bologna, could

4        you please take seat number eleven?  I hope I say this

5        right.  Lasaintee Curry?  Could you please take seat

6        number twelve?  Nathan -- Is it Halley?  Could you

7        please take seat number thirteen?  And Margarette Elock,

8        could you please take seat number fourteen?

9                    THE COURT:  Well, welcome to the seats that

10       are a little more comfortable on first impression.

11       These seats are kind of like movie seats.  After about

12       two hours, they, you know, then you'll start rocking a

13       little and rolling a little.  But, by that time, I hope

14       that you're not in them and we're doing something else.

15       But that somebody's in them.

16                    I'm going to ask these people the same

17       questions that some of you are going to be asked when

18       you replace them.  I'm going to ask them to speak loudly

19       enough so that you all can hear.  Because the first set

20       of answers are identical, introduce yourself, tell us

21       what you do for a living, if you're married or have a

22       significant other, we just need their occupation.

23                    Significant other implies -- Well, a

24       significant other is maybe somebody that you're intimate

25       with that doesn't live with you, somebody that's

-41-

1       intimate that does live with you, brothers, sisters,

2       parents.  I'm worried about your household.  Who are the

3       people that make up your household or that you spend a

4       lot of time with?

5              The only reason for that is sometimes people

6       believe that occupations of our loved ones, because

7       they're our loved ones, those occupations then create

8       some sort of bias towards us in a positive or a negative

9       way.  If your brother's a nurse, you might think nurses

10      are just nice people since your brother's a nurse, that

11      kind of thing.

12             You're going to be asked, have you ever

13      served on a jury before?  And there's a ten-year cap

14      with that.  I don't care what happened eleven years from

15      now [sic].  I just need to know if you've served on a

16      jury before.  I need to know if the jury that you served

17      on reached a verdict.  The verdict is not important.

18      But jury service, for my purposes, means you were

19      called, you served, you all reached a verdict.

20             The reason the names were given, so that if

21      any of them sounded familiar, you could let us know the

22      one that might have sounded familiar, or that one of the

23      names sounded familiar.  Because oftentimes we try not

24      to have jurors listen to testimony from people that they

25      know, obviously because there would be some sort of

                                -42-

1     bias.

2           Let's see, anything else generally I'm going

3     to ask?  No.  That's about all the questions that I'm

4     going to expect the person after Ms. Ingle to just say

5     my name is so and so and I do such and such for a

6     living.  I'm married and my husband...  Or I'm married

7     and my wife...  Or I'm married and my partner.  Or

8     whatever the case might be.  This is the occupation.

9     And we'll go from one to the other to the other.  And by

10    the time we finish that, it will be time for lunch.  So,

11    Ms. Ingle, why don't we start with you, please?

12    Introduce yourself to us in a loud voice.

13          PROSPECTIVE JUROR INGLE:  My name is Rachel

14    Ingle.  I'm a retail manager.  And I am married.

15          THE COURT:  Your husband works outside of

16    the home?

17          MR. PRASAD:  He is a veterinary technician.

18          THE COURT:  Have you ever served as a juror

19    before?

20          PROSPECTIVE JUROR INGLE:  I have not.

21          THE COURT:  You have not.  Any of the names

22    of the witnesses that were called sound familiar?

23          PROSPECTIVE JUROR INGLE:  No.

24          THE COURT:  Okay.  Next, please.

25          PROSPECTIVE JUROR BROWN:  My name is Sheryl

-43-

1        Brown.  I work in a factory.  I have two children.  I've
2        been single for a while.  None of the names sounded
3        familiar, never served on a jury before.
4                    THE COURT:  Oh.  You hit all of them.  Thank
5        you.  Thank you.  Next, please.
6                    PROSPECTIVE JUROR REEVES:  Angela Reeves.
7        I'm a head start preschool teacher.  I'm married.  And
8        my husband is an unemployed hi-lo driver.  And I've
9        never served on a jury.
10                   THE COURT:  Okay.  Any of the names sound
11       familiar, Ms. Reeves?
12                   PROSPECTIVE JUROR REEVES:  No.
13                   THE COURT:  Okay.  Next, please.
14                   PROSPECTIVE JUROR COLAROSSI:  My name is
15       Michele Colarossi.  I'm an attorney.  My husband is a
16       railroad conductor.  The names did not sound familiar.
17       And I've never served on a jury.
18                   THE COURT:  Okay.  Thank you.  Next, please.
19                   PROSPECTIVE JUROR PARIS:  My name's
20       Catherine Paris.  I'm a retired, four years, from
21       McGraw-Hill, Incorporated, was a reporter and a sales
22       rep.  I'm single.  I'm not familiar with any of the
23       names on the jury [sic].  And I've never -- I mean,
24       excuse me.  I have not served on a jury.
25                   THE COURT:  You all are cooking with gas.

-44-

1     Next, please.

2               PROSPECTIVE JUROR MATELIC:  My name is

3     Jeanne Matelic.  And I am married.  I'm retired from the

4     banking industry.  My husband is retired and--

5               THE COURT:  (Interposing)  From what

6     industry, ma'am?

7               PROSPECTIVE JUROR MATELIC:  It was like,

8     with, it's like...

9               THE COURT:  That's all right.  Take your

10    time.

11              PROSPECTIVE JUROR MATELIC:  They, they

12    process the bones and guts of the animals.

13              THE COURT:  Okay.

14              PROSPECTIVE JUROR MATELIC:  And I don't

15    recognize any names.

16              THE COURT:  And you've never served as a

17    juror in the last ten years?

18              PROSPECTIVE JUROR MATELIC:  No.

19              THE COURT:  Okay.  Thank you.  Next, please.

20              PROSPECTIVE JUROR SCHNEIDER:  I'm Michael

21    Schneider.  I'm an engineering program manager.  My wife

22    runs a small non-profit.  I've never served on a jury.

23    And I do not recognize any names.

24              THE COURT:  Thank you.  Next, please.

25              PROSPECTIVE JUROR CREAMER:  I'm Augustine

                              -45-

```
 1        Creamer.  I'm an assistant director at a senior
 2        community in Livonia.  I'm married.  My husband's a
 3        design welding engineer.  I have served on a jury
 4        before.
 5                    THE COURT:  What was the subject matter?
 6        Stolen car?  Drugs?  Assault?
 7                    PROSPECTIVE JUROR CREAMER:  DUI.
 8                    THE COURT:  D -- Oh.
 9                    PROSPECTIVE JUROR CREAMER:  DUI.
10                    THE COURT:  Okay.  Any of the names sound--
11                    PROSPECTIVE JUROR CREAMER:  (Interposing)
12        And there was a, there was a verdict.
13                    THE COURT:  Okay.  Any of the names--
14                    PROSPECTIVE JUROR CREAMER:  (Interposing)
15        No.
16                    THE COURT:  Sound familiar to you, Ms.
17        Creamer?
18                    PROSPECTIVE JUROR CREAMER:  No.  They do
19        not.
20                    THE COURT:  Up top, please.
21                    PROSPECTIVE JUROR KEAST:  I'm Maureen Keast.
22        And I'm married.  I'm a housewife.  My husband is in
23        manufacturing.  And I was in the courtroom, one of these
24        courtrooms before, but then I was dismissed before--
25                    THE COURT:  (Interposing)  So, you've never
```

-46-

1       served as a juror?

2                   PROSPECTIVE JUROR KEAST:  Right.  And none

3       of the names are familiar.

4                   THE COURT:  Thank you.  Next, please.

5                   PROSPECTIVE JUROR MELTZER:  My name is

6       Jessica Meltzer.  I work with -- I'm a medical

7       assistant.  I work with developmentally-challenged kids.

8       And my fiance' works in a factory.  He bags salt.  And

9       I've never been on a jury before.

10                  THE COURT:  Okay.  Thank you.  Next, please.

11                  PROSPECTIVE JUROR BOLOGNA:  My name is

12      Joseph Bologna.  I'm currently unemployed.  I'm also

13      divorced.  I live by myself.  And I've never been on a

14      jury before.  And I don't recognize any of the names

15      that were presented.

16                  THE COURT:  What is your area of employment

17      when you're working, sir?

18                  PROSPECTIVE JUROR BOLOGNA:  I worked for

19      thirty years in the accountant...

20                  THE COURT:  Thank you.  Next, please.

21                  PROSPECTIVE JUROR CURRY:  My name is

22      Lasaintee Curry.  I am married.  My husband is a teacher

23      and a gospel recording artist.  I don't recognize any of

24      the names.  And I've never served on a jury.

25                  THE COURT:  Thank you.  Next, please.

```
 1                    PROSPECTIVE JUROR HALLEY:  Nathan Halley,
 2     Jr.  Married for fifty-nine years, father of four sons.
 3     And I'm presently, I'm a retiree, but I worked for
 4     Chrysler for thirty-four years, many, many jobs, the
 5     last being in security.
 6                    THE COURT:  Okay.
 7                    PROSPECTIVE JUROR HALLEY:  And I have served
 8     several times.
 9                    THE COURT:  Any times in the last ten years,
10     Mr. Halley--
11                    PROSPECTIVE JUROR HALLEY:  (Interposing)
12     No, sir.
13                    THE COURT:  That you remember?  Any of that
14     service in the last ten years?
15                    PROSPECTIVE JUROR HALLEY:  No, sir.
16                    THE COURT:  Okay.  Last, but not least.
17                    PROSPECTIVE JUROR ELOCK:  Margarette Elock.
18     I'm single.  I don't recognize any of the names.  I've
19     never been on a jury.  I'm an executive assistant for a
20     real estate development company.
21                    THE COURT:  Okay.  With you then, Ms. Elock,
22     that means that it's lunch time, doesn't it?  Okay.  I
23     need to ask one more favor.  I know I'm asking a lot.
24     Can you all just return to the same seats?  The reason
25     for that is is that that way we can take attendance very
```

-48-

1     easily.  I'll just ask you, look next to you and it's,
2     was that the person sitting next to you earlier?  That
3     way we don't have to go through the roll call bit.  And
4     hopefully, we will save a little time.
5             In the outside chance -- And I am not
6     recommending going downstairs to the cantina there.  But
7     the courtroom will stay open.  So, if you want to grab
8     something and come back, you can come back.  You can
9     come to the jury room.  We have a table for fourteen in
10    there.  We're going to have coffee for you, if you want
11    some coffee.  Like I said, you cannot eat me out of
12    candy, but I don't want that candy to be anybody's
13    lunch.  But it's always here.
14            If you have any questions about anything
15    pertaining to the trial, Mr. Dupree and Mr. Woods will
16    be happy to answer them.  So, please, approach those two
17    gentlemen with whatever questions you have.
18            Oh, and the last thing -- I'm sorry.  I'm
19    glad I'm thinking of it.  There are observers that
20    probably you saw standing up, coming out of the
21    courtroom.  They have been directed not to have any
22    speech when they see you that would either address you
23    or talking about the case or what they might think about
24    the case.
25            But they won't know it's you unless they see

-49-

 1        that jury badge.  And that's why we ask it to be

 2        displayed in a prominent place so people will know that

 3        you're jurors.  And even when you have lunch and even

 4        coming back, just come right on in and have a seat here.

 5        There's no reason to hang out in that hallway, unless

 6        you think the hallway is better than hanging out here.

 7                   So, we'll look for you back by one o'clock

 8        according to this clock here up on the wall, please.

 9        Enjoy yourselves.

10                        (At 12:01 p.m. panel leaves the courtroom.)

11                        (At 12:01 p.m. off the record.)

12                        (At 12:04 p.m. back on the record.)

13                        THE COURT:  Ms. Rock, what do you want to

14        say?

15                        MS. ROCK:  Your Honor, my concern was is

16        that when I looked at the jury pool there's I think

17        approximately four African-American people.  And that's

18        not a fair representation of the community.  I believe

19        that when there was a census done, at least in 1992,

20        there was at least forty percent African-American

21        people--

22                        THE COURT:  (Interposing)  Okay.

23                        MS. ROCK:  In the, Wayne County.  And I

24        don't think there's a fair representation on the jury.

25                        THE COURT:  I'm going to be silly and say,

                              -50-

1    you think you can judge an African-American by how they

2    look?

3              MS. ROCK:  Not always.

4              THE COURT:  Neither do I.  So, I've learned

5    to be smarter than with my eyes.  Everything that looks

6    up, doesn't go up.  Everything that looks down, doesn't

7    look down.  I haven't counted how many I would assume

8    would be African-American.  But I can't even assume the

9    ones that I might say by appearance aren't Hispanic.

10             MS. ROCK:  True.  But--

11             THE COURT:  (Interposing)  So, they're not

12   even African-Americans.

13             MS. ROCK:  I think we need more African-

14   Americans in our jury pool.

15             THE COURT:  How many do you think we need?

16   Or we need more people to think like African-Americans?

17   Because do we want the Clarence Thomas's or do you want

18   the Barack Obama blacks?

19             MS. ROCK:  I want a fair representation of

20   the community.

21             THE COURT:  I got you.  So, what does that

22   mean?

23             MS. ROCK:  That means--

24             THE COURT:  (Interposing)  How they think or

25   what their racial make-up is?

1                    MS. ROCK:  I think what their racial make-up

2          is because I want--

3                    THE COURT:  (Interposing)  So, what

4          percentage of Hispanics are we looking for also, if I

5          might add?

6                    MS. ROCK:  Well, I think we're talking about

7          a jury of my client's peers.

8                    THE COURT:  I got you.  But you were citing

9          to me some percentages and saying that you believe and

10         that's what should guide us.  So, my question is, what

11         percentages of Hispanics would you say that this jury

12         composition needs, just to be out in the gallery?

13                   MS. ROCK:  Well, at least within that forty

14         percent.

15                   THE COURT:  You mean forty percent of

16         African-Americans should include Hispanics also?  Or

17         should it be a separate class?

18                   MS. ROCK:  Well, I think, actually, I think

19         the forty percent should just be African-American.

20                   THE COURT:  Okay.  So, any percentage of

21         Hispanics that would represent--

22                   MS. ROCK:  (Interposing)  I'm not concerned

23         about that.  I'm concerned about my client having a fair

24         jury.

25                   THE COURT:  Okay.  But you were citing fair

                              -52-

1     jury makes up a meaningful representation of all the

2     ethnic groups that comprise Wayne County, yes?  Or just

3     African-Americans?  You don't care about whether there

4     are any Asians or Hispanics, if there is a number that's

5     represented in the census as in terms of their

6     percentage in our county?

7              MS. ROCK:  I'm concerned about the African-

8     American representation because my client's African-

9     American.

10              THE COURT:  Okay.  It is noted for the

11     record.

12              MR. PRASAD:  Judge, if I may?

13              THE COURT:  Yes.  You may.

14              MR. PRASAD:  Not this issue.  Not this issue

15     at all.  As to the information, I know I noted for the

16     Court way, way back when we did the original arraignment

17     on this case, it's a typographical error.  In count two,

18     the victim's name is Aundrey Allen.  It's correctly

19     reflected on the top of the information, but not in the

20     body of the count.  And I did make that -- And I think

21     it was granted at the time of the exam.  But what I'm

22     asking is--

23              THE COURT:  (Interposing)  Okay.  But there

24     was no new amended information?

25              MR. PRASAD:  No.  And that's my, that's my

                                -53-

```
 1     fault.  Does the Court want me to create one?
 2              THE COURT:  Let me just say it should have
 3     been created after these months, but...
 4              MR. PRASAD:  Yes, sir.
 5              THE COURT:  I guess you wanted me to catch
 6     that and ask that question.  Or you wanted me to read
 7     the transcript to see that, huh?
 8              MR. PRASAD:  No.  No.  I mean, it's
 9     something that completely slipped my mind after, after
10     these many months.  But the Court's right.  I should
11     have done that previously.  But do you want me to create
12     an amended one with the...
13              THE COURT:  I just created it.
14              MR. PRASAD:  Okay.  Thank you.  There's one
15     other thing of note, Judge.  Both counsel and I both had
16     indicated an interest in Investigator Myron Love being
17     present.  I told defense counsel, and she actually found
18     out as well last week, Investigator Love's wife died of
19     a sudden heart attack unexpectedly on Thursday?  Early
20     Friday morning.  He has not been back to work.  We just
21     found out that his, the funeral services for his wife is
22     going to be Friday.
23              I told defense counsel that, if at all
24     possible, we're going to try to get him here.  But I
25     think, quite frankly, we don't know if he's coming back
```

1    this week.

2              The other possibility is that Investigator

3    Love did testify I believe, or at least spoke at one

4    point at one of our hearings.  I told Ms. Rock that

5    there's something he said at one of our hearings that

6    she wanted put in front of the jury.  If Investigator

7    Love can't come in, then I could possibly stipulate to

8    some prior testimony or something like that.  But I

9    wanted the Court to be aware that he's not skirting any

10   court subpoena.  His wife did suddenly die of a heart

11   attack on Friday morning.

12             THE COURT:  Well, I don't have any

13   transcripts with Officer Love in it.  Let me look at the

14   preliminary exam transcript.

15             MR. PRASAD:  It wouldn't have been there.

16   Ms. Rock, do you remember when he testified?

17             MS. ROCK:  It's the motion to dismiss or

18   the, the motion to dismiss, your Honor.  It's that

19   transcript.

20             THE COURT:  I just have motion, motion,

21   motion, motion.  Let me see.  Maybe this one.  Witnesses

22   none, exhibits none on this one.

23             MS. ROCK:  It's the September 23rd, 2010,

24   transcript, your Honor.

25             THE COURT:  Maybe I should have my producer

-55-

1     look at them and look at the table of contents and let

2     me know if anybody testified.

3                 MS. ROCK:  Your Honor, no one did testify.

4                 THE COURT:  Okay.  Well, then how is it

5     testimony then?

6                 MS. ROCK:  Yeah.  It's not, it's not

7     testimony.  You were asking him questions on page

8     twelve, thirteen and fourteen.

9                 THE COURT:  So, you moving to strike him

10    because of unavailability?

11                MR. PRASAD:  Judge, my honest answer is I

12    don't know if he's going to be available yet.  We're

13    still trying to, I mean, the contact with him is he's

14    pretty emotional at this point.  He's not--

15                THE COURT:  (Interposing)  I got you.  I got

16    you.  I got you.

17                MR. PRASAD:  So, it might come to that.

18    Yes, sir.  He might be unavailable this week.  I just

19    don't know.  We are going to try to get him here.

20                THE COURT:  Well, does anybody know if he

21    got a subpoena?

22                MS. ROCK:  Yes.  Your Honor, pursuant to our

23    substitute of service--

24                THE COURT:  (Interposing)  Yes works.  Yes

25    works.

                              -56-

1                    MS. ROCK:  Okay.  Thank you.

2                    THE COURT:  I don't, I just need--

3                    MS. ROCK:  (Interposing)  Sorry.

4                    THE COURT:  The answer.  I don't need the

5        story behind the answer.  I don't need the back story.

6                    MR. PRASAD:  To answer the Court's question,

7        he wasn't personally served, but I'm not objecting to

8        that because she served the Detroit Police Department

9        with the subpoena.  But he hasn't physically been there.

10                   THE COURT:  Right.  Because I see him also

11       checked on the People's amended witness list, so--

12                   MR. PRASAD:  (Interposing)  Right.

13                   THE COURT:  I was also asking if he's been

14       served by the prosecution.

15                   MR. PRASAD:  The problem is, Judge, he would

16       have been served, but he hasn't been here.  But it's not

17       as if he doesn't know about it.  I'm not trying to--

18                   THE COURT:  (Interposing)  No.  No.

19                   MR. PRASAD:  I'm not--

20                   THE COURT:  (Interposing)  No.  No.  No.

21       No.  See, you're trying to explain.  And all I want is

22       an answer.

23                   MR. PRASAD:  Judge, he wasn't served.

24                   THE COURT:  Okay.  And that's all I'm

25       asking.  Because when I see names checked on the witness

                                   -57-

1          list, I assume that the names checked were names that

2          were people who were served to testify in the People's

3          case.

4                    MR. PRASAD:  Right.

5                    THE COURT:  Because that's what I thought

6          that it meant.

7                    MR. PRASAD:  Right.

8                    THE COURT:  Are there any other names that

9          are checked where they haven't been served by the

10         prosecution that appear on the witness list?

11                   MR. PRASAD:  No.

12                   THE COURT:  Okay.  So, it would only be Mr.

13         Love who hasn't been served as a result of being

14         checked.

15                   MR. PRASAD:  Right.

16                   THE COURT:  Okay.  But you're aware that

17         he's aware of the trial date?  So, how does anybody know

18         that he knows that today, I mean, that there's a trial

19         this week?

20                   MR. PRASAD:  Judge, I know I -- I mean,

21         we've talked about this case in the past.  I mean,

22         that's  how I know he's aware of this case.

23                   THE COURT:  Oh, no.  No.  No.  And I'm with

24         you.  He might be aware of the case.  But does anybody

25         know if he's aware that this is the week for the case?

-58-

1              MR. PRASAD:  No, sir.  I don't, I mean, I
2     can't answer that.
3              THE COURT:  Okay.  And he hasn't been served
4     And there was substitute of service.  So, I mean, I
5     don't know if we can even assume that somebody's going
6     to open their mail.  It was first-class mail that was
7     approved as substitute of service?
8              MS. ROCK:  No, your Honor.  We dropped the
9     subpoena off at the police station.
10             THE COURT:  Okay.  And who signed for
11    receiving it?
12             MS. ROCK:  That would be -- I'd have to call
13    my investigator.  She told me the name of a sergeant or
14    lieutenant who accepted the, the subpoena.
15             THE COURT:  And what day was that?
16             MS. ROCK:  That would have been Friday.
17             THE COURT:  And so...
18             MS. ROCK:  We had tried to serve it
19    earlier--
20             THE COURT:  (Interposing)  No.  No.  No.  I
21    got you.
22             MS. ROCK:  Okay.
23             THE COURT:  But then that's a matter of
24    Sergeant Mackie finding out -- And you served it where?
25    Northwest District?

                          -59-

1           MS. ROCK:  The homicide on Lesure.

2           THE COURT:  Lahser?

3           MS. ROCK:  Lesure.  Lesure.  L-E-S-U-R-E.

4           THE COURT:  Lesure.

5           MS. ROCK:  Lesure.

6           THE COURT:  Yeah.  Lesure and Grand River.

7    Mr. Mackie, you aware of any subpoena being dropped off

8    for Mr. Love?

9           SERGEANT MACKIE:  No, sir.  Our department

10   policy is we can't accept a subpoena for another

11   officer.  They have to be personally served.  So, nobody

12   would have or should have accepted any subpoena on

13   behalf of anybody.

14          THE COURT:  Unless the Court ordered them

15   to, which is what an order for substitute of service is.

16          MR. PRASAD:  And, Judge, to be clear, and I

17   told Ms. Rock this, I wasn't contesting her substitute

18   of service part of it.  I wasn't going to suggest to the

19   Court that by her dropping it off it's an improper

20   service for the purpose of the substitute of service.

21          THE COURT:  Yeah.  But now you're hearing

22   that they're not going to do anything because their

23   policy is they don't have to obey a Court order.  If the

24   order says deliver this to or make sure Mr. Love gets

25   this, they're not going to do it because they think that

-60-

1     policy trumps a Court order.

2          SERGEANT MACKIE:  No, sir.  Then I'm

3     misspeaking.  Because if somebody shows up to a precinct

4     and has a valid subpoena to drop off, a process server

5     shows up and says I have a subpoena for Sergeant Mackie,

6     they'd have to serve it to me because there's no

7     guarantee that someone, that it's going to get back to

8     me in time.  That's our department policy.

9          But if you're saying there's a special

10    order, which I've never heard of before, that says we

11    have to accept it and serve it to this person, then that

12    would have been carried out.  But I wasn't made aware of

13    that.

14         THE COURT:  Well, we don't need process

15    servers who don't have people's home address camping out

16    at precincts and waiting 'til somebody shows up to work.

17    That wouldn't be a good utilization of time.  And that

18    would prove to be inefficient.

19         SERGEANT MACKIE:  I'm just telling you what

20    our department policy is.  Because if I accept it for

21    another officer and I don't see that other officer, then

22    is that officer in trouble or am I in trouble?  I don't

23    know.  I don't make the policy.  I'm just telling you

24    what it is as a general rule.  But if you issued a Court

25    order that somebody was to accept it and do something, I

 1    wasn't made aware of that.

 2              THE COURT:  We know that it's at the police

 3    department, so -- Based on what Ms. Rock says.  So, we

 4    need you to call, find out who has it, I mean, who it

 5    was served with.  And then, Mr. Mackie, we need for you

 6    to find out what that person did with it.  If they

 7    stuffed it in the circular file or in the top drawer, I

 8    would say that that's not smart.  They can say, oh,

 9    well, this is our policy.  Policy doesn't trump a Court

10    order.  I'd change the policy.

11              SERGEANT MACKIE:  I can tell you I spoke to

12    Investigator Love yesterday to check in on him.  He does

13    know that there's a trial today, but he indicated he

14    hasn't left his home since this happened.  And he's

15    pretty distraught about the loss of his wife.

16              THE COURT:  Oh, as he should be.

17              SERGEANT MACKIE:  Right.

18              THE COURT:  I mean, as he should be.

19              SERGEANT MACKIE:  He did -- The prosecutor

20    asked me to find out about funeral services.  Those are

21    taking place Friday.  I don't know if he'd be any better

22    after Friday.  He indicated he probably won't be coming

23    back to work, he's expecting, for three to four weeks,

24    if at all, because he has his time in.  So, this may be

25    his retirement.  But I can't speak on that.

 1                    THE COURT:  Well, I appreciate all that

 2        information.  But I'm sure everybody is expected to put

 3        something aside in order to make themselves available

 4        for court.  And sometimes it's something that's no big

 5        deal and other times it is a big deal.  Sometimes it's

 6        you can't take that trip.  Sometimes, you know, it's an

 7        imposition, just like calling people to serve as jurors.

 8        They'll tell you it's an imposition.  So, we'll play it

 9        by ear.  But in the meantime, is there something in

10        particular you want Mr. Love to testify to?

11                    MS. ROCK:  Well, your Honor--

12                    THE COURT:  (Interposing)  And I would say,

13        if there is, put it in some sort of a stipulation and

14        see if the prosecution will agree to it.  But put it in

15        writing.

16                    MS. ROCK:  Okay.

17                    THE COURT:  I don't want it orally.

18                    MS. ROCK:  All right, your Honor.

19                    MR. PRASAD:  We'll try to work that out.

20                    THE COURT:  Okay.  In the meantime, see you

21        in forty minutes.

22                    (At 12:18 p.m. off the record.)

23                    (At 1:00 p.m. back on the record.)

24                    (At 1:00 p.m. panel enters the courtroom.)

25                    THE COURT:  Anybody go out for a walk?

                                -63-

1        Excellent.  Excellent.  Was it invigorating?  Great.

2        That's about the only thing that I don't like about

3        progress -- Well, you know, there are many things.  But

4        the one thing that I really miss was I miss being able,

5        in office buildings, to open windows.  Remember how we

6        used to just open windows, get that breeze in and it

7        just smelled like good, old outdoors.

8                We talk about schools nowadays that have the

9        encased windows and I guess the grade E dual glass.

10       And, you know, the nicest thing about living through

11       change is that you can remember older stuff and your

12       kids always think you're lying.  And so, I was

13       explaining to them how they used to have these hug,

14       little window openers, much like you'll see at Kohl's to

15       get the stuff off the top rack.  Remember how you had to

16       put it in through the little circular thing and then

17       push the lock up?  And then, you know, break the window

18       by trying to push the window up?  And, you know, we had

19       some windows break.  Boom.

20               And sitting next to that seat would just

21       bring in all the smells from outside.  One particular

22       season, I stayed hungry because I don't know whose house

23       it was, but there were some great smells that used to

24       come out of that house and would whiff over to the

25       school.  And I'd just be there little salivating Bruce

-64-

 1     Morrow just sitting there salivating.

 2               That neighborhood also we had, on one of our

 3     walks, by the Awry's Bakery.  Did any of you all live by

 4     bakeries and you know how it could just fill up the

 5     whole neighborhood?  Or live next to a restaurant or

 6     above a restaurant.  Oh, man.  Okay.  I made myself

 7     hungry and all I had was cashews.  Yeah.  Trying to do

 8     some protein.

 9               The one negative about this job, I'm sure

10     it's like with most jobs that require a lot of sitting,

11     you know, you can get bench buns.  You know what bench

12     buns are?  And I have always said that I did not want

13     bench buns.  But stuff is starting to crunch together,

14     waist is disappearing.  And, you know, when you have

15     chest, hips and waist all the same, it's just, it's hard

16     to look in the mirror and not see room for improvement.

17     And so, you stop going in front of the mirrors as often

18     as you used to.  Or you put them higher so you only see

19     the stuff that doesn't change as much.   There's nothing

20     like a little work.  Okay.

21               Let me start asking you a few questions just

22     to see where we are in terms of what we might want to

23     explore.  I'll start with Ms. Elock.  Ms. Elock, is

24     there a gender that you think is more honest than

25     another gender?  Do you think males are more honest than

                                  -65-

1    females?

2                    PROSPECTIVE JUROR ELOCK:  No.

3                    THE COURT:  Okay.  What is the word on the

4    street?  Who lies the most, men or women?

5                    PROSPECTIVE JUROR ELOCK:  Men.

6                    THE COURT:  Men.  And what is the word on

7    the street as it relates to kids and adults?  And let's

8    just say for kids, they're thirteen and under.  Do kids

9    lie more than adults or do adults lie more than kids?

10                    PROSPECTIVE JUROR ELOCK:  I don't think they

11   lie, but they make up stories.

12                    THE COURT:  Make up stories.  Ah.  That's

13   one of those socially-acceptable kind of situations

14   where we can deal with some deviance and we don't

15   attribute it to some negative behavior.  Is that a

16   pretty good summarization of it, Ms. Brown?  Deviant

17   behavior that we all accept and just consider normal?

18                    PROSPECTIVE JUROR BROWN:  I wouldn't say

19   that.

20                    THE COURT:  You don't think so?  You're

21   familiar with the term that gives dimension and color?

22   Little white lie?

23                    PROSPECTIVE JUROR BROWN:  Oh, yeah.

24                    THE COURT:  Why does it have a dimension and

25   a color?

```
 1                    PROSPECTIVE JUROR BROWN:  I don't know why
 2          there's a distinction at all.  A lie is a lie.
 3                    THE COURT:  Well, don't you think it's to
 4          sanitize it and make it acceptable?  Because that's the
 5          only reason why somebody will say, oh, I made a big
 6          mistake, as opposed to a little mistake.  Aren't they
 7          trying to categorize one as not being as detrimental?
 8                    PROSPECTIVE JUROR BROWN:  Yup.
 9                    THE COURT:  And how about with color?  What
10          do they do with color in our society?  Isn't something
11          perceived to be--
12                    PROSPECTIVE JUROR BROWN:  (Interposing)  Bad
13          if it's black and good guys if it's white.
14                    THE COURT:  So, don't you think that that
15          has anything to do with the designation of a color?
16          Because have you ever heard of a little black lie?
17                    PROSPECTIVE JUROR BROWN:  No.
18                    THE COURT:  Usually, a black lie is
19          considered what?  A big, black lie?
20                    PROSPECTIVE JUROR BROWN:  But there is no
21          little while--
22                    THE COURT:  (Interposing)  Yeah.  But if
23          we're going to contrast.  Because there are some things
24          that are acceptable when they're seen as small.  I made
25          a minor error.
```

 1                    PROSPECTIVE JUROR BROWN:  True.

 2                    THE COURT:  And that's the way we minimize

 3          them, by making them small.  Right?

 4                    PROSPECTIVE JUROR BROWN:  That's true.

 5                    THE COURT:  Right.  And if somebody says,

 6          man, I made a huge boo-boo, we'd be looking for

 7          something huge.

 8                    PROSPECTIVE JUROR BROWN:  Right.  That's

 9          right.

10                    THE COURT:  So, you know, I think when we

11          characterize things in terms of size, we're trying to

12          create an impression that it's not as bad.

13                    PROSPECTIVE JUROR BROWN:  That's true.

14                    THE COURT:  But you said we can't categorize

15          lying.  But do we?

16                    PROSPECTIVE JUROR BROWN:  We do.

17                    THE COURT:  Okay.  Who benefits from the

18          categorization of the lie?  The lie teller or the lie

19          hearer?

20                    PROSPECTIVE JUROR BROWN:  The teller.

21                    THE COURT:  The teller.  Do we accept lies,

22          little, white lies, as a society?

23                    PROSPECTIVE JUROR BROWN:  Yes.

24                    THE COURT:  Ms. Inge [sic], do you agree

25          with that?  Inge?

                              -68-

```
 1                    PROSPECTIVE JUROR INGLE:  Ingle.
 2                    THE COURT:  Ingle.  Sorry.  Ingle.  Ms.
 3       Ingle, do we accept lying in our society?
 4                    PROSPECTIVE JUROR INGLE:  Yeah.  I think we
 5       do.
 6                    THE COURT:  Do we do it as a general rule or
 7       do you think we do it -- You tell me why we accept lying
 8       in our society?
 9                    PROSPECTIVE JUROR INGLE:  Because we avoid
10       the conflict and confronting it.
11                    THE COURT:  Oh.  You're saying like I
12       avoided that conflict when I lied?  Is that what you're
13       saying?
14                    PROSPECTIVE JUROR INGLE:  Sometimes.
15                    THE COURT:  Okay.  So, if somebody -- If you
16       had to say point blank, would you consider that I lie?
17                    PROSPECTIVE JUROR INGLE:  In which, which
18       example?
19                    THE COURT:  Well, first of all, let me go
20       the easy way.  Ms. Reeves, how many lies to you have to
21       tell to be a liar?
22                    PROSPECTIVE JUROR REEVES:  One.
23                    THE COURT:  Do you believe that, Ms.
24       Creamer?
25                    PROSPECTIVE JUROR CREAMER:  Yes.
```

1            THE COURT:  Okay.  So, I've given you an

2    example.  So, if you were going to help Ms. Ingle answer

3    that question, am I a liar or not?

4            PROSPECTIVE JUROR CREAMER:  Yes.

5            THE COURT:  Yes.  Okay.  That's kind of a

6    hard concept to swallow, isn't it?  Do you think there's

7    any area, Ms. Keats [sic], that I might particularly lie

8    in?  Okay.  Let me help you with some areas.  I'm a

9    coach, baseball and soccer.  I have a wife and I have

10   lots of children.  So, just in those three areas.  Do

11   you think I lie to any of those kids I coach?

12           PROSPECTIVE JUROR KEAST:  Perhaps.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR KEAST:  Perhaps telling

15   them--

16           THE COURT:  (Interposing)  She's being

17   diplomatic.

18           PROSPECTIVE JUROR KEAST:  How good they are.

19           THE COURT:  Ms. Matelic, do I lie to those

20   kids?

21           PROSPECTIVE JUROR MATELIC:  I would say yes.

22           THE COURT:  Okay.  Do I lie to my wife?

23           PROSPECTIVE JUROR MATELIC:  I would say yes.

24           THE COURT:  Okay.  And do I lie to my kids?

25           PROSPECTIVE JUROR MATELIC:  I would say yes.

1              THE COURT:  Okay.  Anybody not lie to

2       coworkers or their children or their spouse sitting up

3       there, or when you had a spouse?  Okay.  Would it be

4       true, though, that we don't think of ourselves as liars,

5       that we think that we're these nice, honest people who

6       are kind of bias free and, you know, high integrity?

7       It's a difficult world.  Ms. Colarossi, who taught you

8       how to lie?

9              PROSPECTIVE JUROR COLAROSSI:  Who taught me?

10              THE COURT:  Yes.  It's a learned behavior.

11              PROSPECTIVE JUROR COLAROSSI:  Well, I guess

12      they didn't really tell me to lie, but just maybe

13      opinions differ and maybe you, like you said before,

14      avoid confrontations.

15              THE COURT:  Okay.  So, who taught you is my

16      question?

17              PROSPECTIVE JUROR COLAROSSI:  I don't know

18      any particular person, but just watching other people do

19      it and see that you don't want to hurt other people's

20      feelings.  And when you come to that situation, you may

21      hedge a little bit.

22              THE COURT:  Okay.  Mr. Schneider, who taught

23      you how to lie?

24              PROSPECTIVE JUROR SCHNEIDER:  I'd say from

25      watching the grownups.

1                    THE COURT:  Watching the grownups.  Okay.

2       Ms. Meltzer, anybody in particular teach you how to lie?

3                    PROSPECTIVE JUROR MELTZER:  I don't think in

4       particular.  It's just something you, as a child, you

5       develop, I think, from watching maybe older -- I'm, I'm

6       the youngest, so I have two older sisters.  So, blame

7       them.

8                    THE COURT:  Ms. Curry, anybody teach you how

9       to lie, in particular?

10                   PROSPECTIVE JUROR CURRY:  Myself.

11                   THE COURT:  Yourself?  Ms. Paris, how about

12      you?

13                   PROSPECTIVE JUROR PARIS:  No one in

14      particular.

15                   THE COURT:  Okay.  How many of you all were

16      born before answering services were invented?  Okay.

17      How many of you all were your parents answering service?

18      You all used to take directions from your parents about

19      what to say when you answered the phone?  I mean, have

20      you had to say that somebody wasn't home and they were

21      standing right next to you?  My father would come in

22      tired and beat and say, I don't care if your mama calls

23      me.  I'm not home yet.

24                   If you needed something, Ms. Elock, at Home

25      Depot, and you had a man and a woman clerk wearing the

                                  -72-

1        orange aprons and both of them were standing the same

2        distance away and you didn't know what you wanted, would

3        you address one of them in particular as opposed to the

4        other to go up and ask for help?

5                    PROSPECTIVE JUROR ELOCK:  Probably ask the

6        man.

7                    THE COURT:  And that would be based on your

8        presumption that?

9                    PROSPECTIVE JUROR ELOCK:  He would know

10       more.

11                   THE COURT:  Because it's what kind of a

12       store?

13                   PROSPECTIVE JUROR ELOCK:  Home improvement.

14                   THE COURT:  Home improvement.  How about if

15       we were at Minnesota Fabric or Joanne and the same

16       situation?

17                   PROSPECTIVE JUROR ELOCK:  Then I would ask a

18       woman.

19                   THE COURT:  Just regular old sexism, huh?

20                   PROSPECTIVE JUROR ELOCK:  Yup.  And I have

21       four brothers.  That's why I would probably ask for a

22       man.

23                   THE COURT:  One person told me it all

24       depended what I wanted at Home Depot.  Because if I was

25       looking for bedroom trim, I would go ask a woman.  I

-73-

1     said, oh, that's interesting.

2              Mr. Halley, the Detroit Police Department

3     has a policy that if a female is stopped that if she has

4     to be searched, they call a scout car that has a female

5     police officer to search the person.  What is their

6     presumption that drives that policy?  What do you think

7     the presumption is that drives that policy?

8              PROSPECTIVE JUROR HALLEY:  Well, really, I

9     don't know because a lot of the shows that I've been

10    looking at lately, I realize you said Detroit, that,

11    that--

12             THE COURT:  (Interposing)  Well, I'm sure

13    it's nation-wide they have that policy.  I'm not for

14    sure.

15             PROSPECTIVE JUROR HALLEY:  Well, I watch

16    Cops on Saturday night.  And they, men searching women

17    just like they do men.

18             THE COURT:  Mr. Bologna, what--

19             PROSPECTIVE JUROR HALLEY:  (Interposing)

20    Now, as for the Detroit Police Department, I cannot

21    address that.  I don't know.

22             THE COURT:  Okay.  But I was just saying,

23    can you attribute any reason to that policy, sir?

24             PROSPECTIVE JUROR BOLOGNA:  You would just

25    think that a female officer would, you know, not have

1     the same sexual tendencies as a male officer.

2             THE COURT:  Perhaps it's keeping them from a

3     lawsuit that a man might have inappropriately touched

4     them.  But isn't that presumption based on just another

5     particular presumption?  And what presumption might that

6     be, Ms. Meltzer?

7             PROSPECTIVE JUROR MELTZER:  That all men are

8     like that and...

9             THE COURT:  Isn't that right?  That the male

10    is heterosexual and that the female that they're calling

11    to frisk the female is heterosexual.  So, tell me that

12    policies aren't based on biases.  And people are like,

13    oh, yeah.  That makes sense.

14            Does it make sense to just generally

15    consider somebody -- Ms. Colarossa [sic], do you think

16    that the ability to speak affects credibility?

17            PROSPECTIVE JUROR COLAROSSI:  I think it

18    does affect credibility.  I don't necessarily think it

19    should, but I think it does.

20            THE COURT:  Can you give me an example of

21    where you think that the ability to speak would make a

22    person more credible as opposed to less credible?

23            PROSPECTIVE JUROR COLAROSSI:  An example?  I

24    just think every day when you listen to somebody, if

25    they sound educated, just naturally you believe that

1    they're educated and maybe have, are educated.  I don't

2    necessarily think that it's true.  I think a person who

3    can speak can lie, but you just, you have that feeling

4    that if you speak well, like you speak, you have a

5    wonderful speaking voice, you have credibility.

6              If you were up there and you were slurring

7    and you were and you were, you know, weren't putting two

8    sentences together or two words together, then we might

9    be a little worried.

10             THE COURT:  Okay.  How about the extent of

11   ones vernacular or vocabulary?  Do you think that that

12   makes a difference sometimes in their credibility?

13             PROSPECTIVE JUROR COLAROSSI:  Vocabulary?  I

14   think it does.  It just may show--

15             THE COURT:  (Interposing)  So, the more

16   educated have an advantage over the less educated?

17             PROSPECTIVE JUROR COLAROSSI:  I think it is.

18   I don't think it's right--

19             THE COURT:  (Interposing)  Well, I'm just

20   asking--

21             PROSPECTIVE JUROR COLAROSSI:  (Interposing)

22   But I think--

23             THE COURT:  (Interposing)  I mean, I happen

24   to agree.  Because I'm certain that if you only knew two

25   words for describing and said, and one of those words,

1    Ms. Meltzer, was tree trunk and the other one was a

2    twig, let's say that those -- And you were trying to

3    describe that somebody picked something up and hit you

4    with it.  And you testified under oath that somebody

5    picked up a tree trunk and chased you down the street

6    and hit you with it, we would say, yeah, right.

7         But if you knew kindling and tinder and

8    twigs and sticks and limbs and tree trunk and you said

9    somebody picked up a stick, now because you chose a word

10   that everybody has a general definition of and said that

11   you were chased, it becomes just more believable just

12   based on the choice of words.  I mean, just simply.

13        We have this connection, also, with how a

14   person looks.  The better dressed they are, Ms. Creamer,

15   we think that they're going to be telling you the truth

16   a little more.  Do you think that people get told what

17   to wear to court?

18        PROSPECTIVE JUROR CREAMER:  Well, proper

19   attire.  What's proper attire for one person isn't

20   proper--

21        THE COURT:  (Interposing)  Okay.  Let's say

22   that you were the lawyer.  What would you tell your

23   client to wear?

24        PROSPECTIVE JUROR CREAMER:  I would tell my

25   client to come in a suit or proper attire, something

1    that...

2              THE COURT:  Because you would tell them--

3              PROSPECTIVE JUROR CREAMER:  (Interposing)

4    They represent themselves--

5              THE COURT:  (Interposing)  That the jurors

6    are going to be biased.  They're going to look at you

7    and base some of what they decide on how you look.  So,

8    they think that you all are shallow.

9              PROSPECTIVE JUROR CREAMER:  Right.  Exactly.

10   Right.

11             THE COURT:  Okay.  No.  No.  I'm just

12   saying.

13             PROSPECTIVE JUROR CREAMER:  Yeah.  Because

14   you got a suit on they're going to think more of you

15   than--

16             THE COURT:  (Interposing)  What do they

17   think about you in terms of what you think about a

18   person's occupation?  Do they make -- Do you get the

19   impression that people think that you will gauge one

20   occupation as being more credible than another

21   occupation?

22             PROSPECTIVE JUROR CREAMER:  I think so.

23             THE COURT:  Usually, the second question.

24   What is your name?  That's the first question.  The

25   second question is what?

1                    PROSPECTIVE JUROR CREAMER:  What is your
2        occupation?
3                    THE COURT:  What do you do for a living?
4        What possibly could that point be but to try to show
5        you, see, they're smart, they have an occupation that
6        smart people go into?  Ms. Elock, where does half of the
7        class finish?  In the top.  Where does the other half
8        finish?
9                    PROSPECTIVE JUROR ELOCK:  In the bottom.
10                   THE COURT:  In the bottom.  How many people
11       will admit that they have a seventy average doctor?  Or
12       that they have the dentist that got a seventy in dent.
13       school?  Or the lawyer that got the lowest possible
14       score to pass the bar?  Or the child that got the thank
15       you lordy degree.  You know that's the one that's the
16       seventy where they just graduate and say it's not magna
17       cum and it's not summa cum, it's thank you lordy.
18                   But everybody always assumes that the person
19       is the smartest fish in the tank.  Dress up.  Speak
20       well.  Look them in the eye.  Add some credibility to
21       yourself.  Because they're going to think that the
22       person that went to the best school and the one that's
23       dressed the best, the one that looks the neatest, the
24       one that looks the cleanest, the one that talks the
25       best, the one that looks you in the eye when they speak

                                -79-

1       will be the one that will be more believable, that the

2       more different you look than the composition of the

3       jury, the more likely it is that you're not credible.

4               Ask most people what's the most credible

5       occupation and some of them, a large majority will say

6       the occupation that they are in.  If we had to poll

7       ourselves, what occupation, seriously, seriously do we

8       think -- Ms. Keast, what occupation do you think is the

9       most dishonest?  Most dishonest?

10              PROSPECTIVE JUROR KEAST:  You threw me one

11      there.  Most dishonest.  I think a bookie.

12              THE COURT:  Okay.  Except that's not one

13      that usually files taxes.  Let's stay with legal

14      occupations.  Ms. Brown?  Mr. Schneider?  Any particular

15      occupation?

16              PROSPECTIVE JUROR BROWN:  The most

17      dishonest?

18              THE COURT:  Most dishonest.

19              PROSPECTIVE JUROR BROWN:  I can give you...

20              THE COURT:  Okay.  Give me one.

21              PROSPECTIVE JUROR BROWN:  Hairdresser.

22              THE COURT:  A hairdresser.  Mr. Schneider?

23              PROSPECTIVE JUROR SCHNEIDER:  A salesperson.

24              THE COURT:  Used car salesman.  We're just

25      talking about in terms of perception.  Because whenever

1        anybody uses this term, it always, it would be like my

2        friend when they say it runs just like new.  Mr. Halley,

3        what is the only thing that runs just like new?  New.

4                    PROSPECTIVE JUROR HALLEY:  That's correct.

5        Brand new.

6                    THE COURT:  Brand new.  And look what

7        they've tried to do, Mr. Schneider, with those

8        terminologies.  Before, the word for a not new car was a

9        used car.  But the word used, the implications are what?

10       There has been some abuse.  There hasn't been any care.

11       So, they changed it to previously owned.  Because it

12       sounds better.

13                    And if we can get it to sound better, guess

14       what mentally that's going to trigger?  It's going to

15       trigger a different response.  The right word used is

16       going to trigger a different response.  Or what if they

17       call it not previously owned, pre-certified 21-point

18       inspection whatever?  You know, now trying to build

19       credibility back into it so that you will more than

20       likely now not look at it as you would have and would

21       consider now buying it.

22                    Sometimes, like myself, you know, used car

23       salesman, the first thing that popped into your head.

24       And then like, except for this last car, the three

25       before then I bought were used.  So, sometimes you have

                                -81-

1          to say, okay.  I'm being crazy.  But you have to admit

2          it in order to move past it.  Because, if not, it just

3          stops people.  Oh, they'll start, oh that's somebody's

4          headache.  That's the only reason they want to get rid

5          of it.  Okay.  Until you ask the guy.

6                    Because I was interested in this hybrid car,

7          I can't even think of the name of it, before I bought

8          this other one.  And the people had only had it for four

9          months.  And I was trying to figure out, okay, why do

10         you trade in a car after four months?  Something must

11         have gone wrong.  And so, I had conjured up all of these

12         stories.  You know how we conjure up stories.

13                   And the guy saw me thinking and he's like,

14         mm-mmm.  He said, when they came in, the woman didn't

15         know that she was going to be pregnant in the next five

16         years.  They brought car seats in, didn't fit well in

17         the back.  They're getting a mini-van.  And I said, oh.

18         Okay.  Because I had a whole different story in my head.

19         So, it made me look at the car -- Now, I didn't know if

20         he was telling the truth, but it certainly, that's what

21         I'm saying, changed my perception and how I was

22         approaching it.

23                   Ever notice when somebody has your name and

24         you're introduced to them how you'll compliment them on

25         their name?  Oh.  That's a nice name you have.  Or how

1     if somebody's driving a car that you own or if somebody

2     has the occupation that you have, you kind of compliment

3     them on it.  And they'll say, oh, yeah.  Sometimes

4     children's names.  Somebody will say, oh, what's your

5     name, first name?  And say, my daughter's name is the

6     same thing, or my son's name.  You know, familiarity

7     creates a great, great, great structure for belief.

8     It's tremendous.

9             We will believe friends because of our

10    relationships with them over strangers, asking them

11    questions that we don't really think that our friends

12    would even know the real answer to.  But because of the

13    relationship, we're more likely to believe them than

14    strangers.  And it's only because of the relationship.

15    It's interesting how we make all of these connections

16    sometimes that have absolutely nothing to do with

17    whether the information that we're receiving is right or

18    wrong.

19            Let's play a small guessing game, can we?

20    Okay.  The truth is that I played a sport in college.

21    That's the truth.  Now, the guessing game is now which

22    game was that?  So -- Oh.  And let me give you some more

23    basis just so that we'll have an accurate, at least,

24    historical relationship.  I went to school in 1970.  So,

25    that was forty-one years ago.  So, we'll just go there.

1                       So, Ms. Curry, what sport did I play?

2                       PROSPECTIVE JUROR CURRY:  Baseball.

3                       THE COURT:  Baseball.  Bless your heart.

4       Mr. Halley, what sport did I play in college?

5                       PROSPECTIVE JUROR HALLEY:  I would say

6       basketball.

7                       THE COURT:  Basketball.  Ms. Brown, what do

8       you think?

9                       PROSPECTIVE JUROR BROWN:  Soccer.

10                      THE COURT:  Soccer.  That's why I said 1970,

11      just to give it a little perspective.  That's fine.  Ms.

12      Reeves, what do you think?

13                      PROSPECTIVE JUROR REEVES:  Basketball.

14                      THE COURT:  Basketball.  How about you, Ms.

15      Elock?

16                      PROSPECTIVE JUROR ELOCK:  Basketball.

17                      THE COURT:  Okay.  Let's say that I was born

18      and raised and, until I went to college, I lived in

19      Canada.  Ms. Paris, what sport?

20                      PROSPECTIVE JUROR PARIS:  Hockey.

21                      THE COURT:  Ms. Matelic?

22                      PROSPECTIVE JUROR MATELIC:  Hockey.

23                      THE COURT:  Mr. Bologna?

24                      PROSPECTIVE JUROR BOLOGNA:  Hockey.

25                      THE COURT:  Let's say that my vertical jump

1       was thirty-seven inches.  What say you now, Ms. Elock?

2       Did it change?

3                   PROSPECTIVE JUROR ELOCK:  Hockey.

4                   THE COURT:  Okay.  Ms. Creamer?

5                   PROSPECTIVE JUROR CREAMER:  I don't know.

6       I--

7                   THE COURT:  (Interposing)  Okay.

8                   PROSPECTIVE JUROR CREAMER:  I'm thinking.

9       I'm trying to picture you doing a high jump.

10                  THE COURT:  Okay.  Mr. Schneider, let's say

11      that in addition to all of that information you found

12      out that I could run a hundred yards in nine point nine

13      seconds.

14                  PROSPECTIVE JUROR SCHNEIDER:  Track and

15      field.

16                  THE COURT:  Let me add one other thing, if I

17      can, Ms. Meltzer.  That I've had forty facial sutures

18      and that seven teeth have been knocked out.

19                  PROSPECTIVE JUROR MELTZER:  I don't know.

20      Hockey, maybe?  Football?

21                  THE COURT:  Football when you were one of

22      those leatherheads.  Okay.  Would you agree that what

23      we've been doing is what can only be best described as

24      doing something oxymoronic?  And that is you've been

25      trying to make educated guesses.  You see the oxymoron?

1    If it's a guess, you know, how educated can it be if

2    you're guessing.  Because, if not, it would be something

3    that would be called inductive or deductive logic.

4              So, and what you were doing, were you not,

5    was trying to apply the facts that I gave you to some

6    bias that accompanied it?  You know, fast people run

7    track.  You know, people that jump, you know, play

8    basketball.  Some might have just gone, my man, if it

9    was 1970, brothers only played basketball or football.

10   So, we can forget all the rest of it.

11             And if it was in college, probably it had to

12   be basketball or football.  I didn't know too many

13   baseball teams with black people back in the '70s.

14   There was no soccer and you all weren't swimming and

15   there was no Tiger Woods back then.  And so, we can

16   eliminate all of those real quickly.  Come on, Ms.

17   Reeves.  You know that's what people do.  Because nobody

18   said swimming.

19             When Canada trotted out their national

20   soccer team and when they were trying to qualify for the

21   World Cup before they played the World Cup last year,

22   try to describe the people that I saw, their background

23   for me, from the Canada National Soccer Team.

24             PROSPECTIVE JUROR REEVES:  You want me to

25   describe the people for the Canada...

-86-

1                    THE COURT:  So, what was I looking for when

2        they said, okay, presenting Canada's National Soccer

3        Team?  What do you think I was looking for in terms of

4        ethnic background and race?

5                    PROSPECTIVE JUROR REEVES:  What were you

6        personally--

7                    THE COURT:  (Interposing)  Yeah.  What do

8        you think I was looking...

9                    PROSPECTIVE JUROR REEVES:  All races.  I

10       mean...

11                   THE COURT:  Okay.  Mrs. Colarossi, what was

12       I looking for?

13                   PROSPECTIVE JUROR COLAROSSI:  Well, you were

14       thinking, meaning you were thinking what was gonna -- A

15       white team.

16                   THE COURT:  Okay.

17                   PROSPECTIVE JUROR REEVES:  Oh.  Okay.

18                   THE COURT:  They showed up with an all West

19       Indian team.  And I'm like, oh.  They made a mistake.

20       That can't be the Canadian National Soccer Team.  And,

21       seriously, out of the twenty-one, fifteen of them had

22       some Caribbean, West Indian, Jamaican, Bohemian, you

23       know.  They had been there like two generations.  And

24       I'm thinking, wow.  I just would have just messed myself

25       up if they had asked me to go and make a fool of myself.

                              -87-

1          Just like one of my children was busting

2     back to see this commercial because this person was

3     speaking something that they were interested in.  And,

4     Ms. Curry, the English was impeccable.  And they were

5     beating it back from the kitchen.  And they looked in

6     and said, wow, daddy.  That's an Asian person.  Because

7     they just heard English and assumed that it was from

8     somebody that was white.

9          Just like sometimes if you go to a

10    particular country that's not an American country and

11    the national language is French and you see somebody

12    that's black as coal speaking French.  The first time it

13    freaks you out.  You're like, whoa.  Whoa.  Okay.  Now,

14    I remember where I am.

15         Or like if you've ever been to New York or

16    someplace that's like multi-lingual.  You know, all of

17    our biases just come out in terms of what face we expect

18    to be speaking that language.  It's like strange.

19         And so, it's -- I say all of this, Ms.

20    Paris, to say our biases attack us even when we think

21    we're being smart, even when we think we're being smart.

22    And sometimes we have to just continue to search and

23    search and search to see if it's consistent with

24    reasonableness and common sense and not based on a bias.

25         So, ready to take a test?  And then I'm

1   going to be finished with what I have to talk about.

2   You all ready to take the unbiased test?  Okay.  You all

3   get to help, though.  Because they're going to need some

4   help.

5            This is the situation.  We have two

6   witnesses that are going to testify.  One of the

7   witnesses is a police officer and one of the witnesses

8   is a civilian.  Okay.  What they are testifying to --

9   Both of them are under oath.  And they're testifying to

10  the exact same thing.  So, it's -- And their vision is

11  unobscured.  So, nothing is in the way and everybody's

12  got a sober mind.  So, there's no alcohol or drugs

13  influencing anything.  It is identical.  Okay?

14           So, the police officer testifies that the

15  woman that he saw on the porch of the home was a rather

16  short woman because the police officer said that they

17  were short, said the woman was maybe 5'0" to 5'2".  She

18  was wearing dark-colored shorts and a dark-colored top,

19  but it was a short-sleeved top.  And she had long, black

20  hair and was carrying a black purse.

21           The civilian testified that the woman they

22  saw on the porch was a rather tall woman because the

23  witness said I'm tall.  That witness said that lady had

24  to be at least 5'10".  And she had short, blonde hair

25  and was wearing, you know, a light pair of shorts, a

-89-

1       light shirt and was carrying a backpack.

2                    And that's all the information you have.

3       And you have to decide which one to believe.  So, Ms.

4       Paris, which one would you believe?

5                    PROSPECTIVE JUROR PARIS:  I have to have

6       more--

7                    THE COURT:  (Interposing)  That's it.

8       That's it.  Who do you believe?  Got to pick.  This is a

9       got to.  I'm pushing you in the corner.

10                   PROSPECTIVE JUROR PARIS:  I can't.  They're

11      so different.

12                   THE COURT:  That's all right.  Ms. Meltzer?

13      Yes.

14                   PROSPECTIVE JUROR MELTZER:  I probably would

15      pick the police.

16                   THE COURT:  Okay.  Ms. Reeves?

17                   PROSPECTIVE JUROR REEVES:  Police officer.

18                   THE COURT:  Ms. Brown?

19                   PROSPECTIVE JUROR BROWN:  The officer.

20                   THE COURT:  Mr. Schneider?

21                   PROSPECTIVE JUROR SCHNEIDER:  The officer.

22                   THE COURT:  Ms. Elock?

23                   PROSPECTIVE JUROR ELOCK:  Officer.

24                   THE COURT:  Okay.  Can you give me a reason,

25      you can make up a reason, but it has to be based on

```
1      reasonableness and common sense, to believe the

2      civilian?

3                  PROSPECTIVE JUROR BROWN:  They knew the

4      person that was on the porch.

5                  THE COURT:  Bam.

6                  PROSPECTIVE JUROR MELTZER:  I didn't hear

7      what she said.

8                  PROSPECTIVE JUROR BROWN:  They knew the

9      person that was on the porch.

10                 THE COURT:  They were describing a person

11     that they knew.  I'm describing my next door neighbor.

12     And we've been neighbors for fifteen years.  I'm

13     describing--

14                 PROSPECTIVE JUROR MELTZER:  (Interposing)

15     If they knew the person--

16                 THE COURT:  (Interposing)  I said you could

17     make up a reason to believe the civilian.  Because, if

18     not, people will believe that there is a profession that

19     is more accurate or honest.  Why did you believe the

20     policeman?

21                 PROSPECTIVE JUROR BROWN:  Because they're

22     trained.

23                 THE COURT:  Okay.  Can anybody tell me the

24     amount of training that a police officer gets?  No.  Can

25     you all tell me how, if it's a pass-fail course?  Or
```

1     does a seventy pass?

2                    PROSPECTIVE JUROR BROWN:  I believe--

3                    THE COURT:  (Interposing)  Ah, tell me.

4                    PROSPECTIVE JUROR BROWN:  It's just their

5     job to be observant because they do that every day.

6                    THE COURT:  And how many wide receivers are

7     their jobs to catch footballs and they dropped those

8     passes that Mr. Vick was throwing to them?  And whose

9     job was it to find those weapons of mass destruction

10    that they're still looking for to this date?  So, if

11    it's your job, you do it better than if it's not your

12    job?

13                   PROSPECTIVE JUROR BROWN:  That's the

14    perception.

15                   THE COURT:  That's the perception.  Okay.

16    But, seriously, anybody know about police training?

17    Anybody know if it's pass-fail, if you can take it six

18    times before you pass?  Or if you can be a seventy, like

19    in college, and get the old thank you lordy?  Or if

20    everybody's a hundred percent?

21                   PROSPECTIVE JUROR BROWN:  Isn't there like a

22    top percentage and a lower percentage of the class?

23                   THE COURT:  Well, see, this is what I

24    believe.  I believe whatever you believe, you make up

25    reasons why you think that it has validity.  Because

-92-

1    isn't that what you do when you, oh, well, policemen

2    would testify more accurately?  And you start making up

3    reasons why you think that that should be true.

4              And equally, you don't make up reasons why

5    you think that the civilian is accurate, until asked to.

6    Well, okay.  You made a case for the police now.  Okay.

7    Now, make a case for the other one.  So, absent the

8    occupation...

9              PROSPECTIVE JUROR BROWN:  Then it's a toss-

10   up, really.

11             THE COURT:  Then it's a toss-up.  Because

12   what if the other one is an artist specializing in

13   women?  Photography.  Architect.

14             PROSPECTIVE JUROR BROWN:  Detail.

15             THE COURT:  Accountant.

16             PROSPECTIVE JUROR BROWN:  Specificity.

17             THE COURT:  Or detail.  Ladies man.  A

18   ladies lady, probably as well.  So, but usually whenever

19   we decide, we can construct an argument for why that

20   makes sense, you know, to make it so that our bias is

21   now, Ms. Paris, supported by what we think is

22   reasonable.  Because we just don't want it to hang out

23   there and be perceived as not reasonable.

24             We gonna go to the man at Home Depot

25   because, you know, this is a man's play store.  We're

-93-

1    not gonna say, you know, if there's a woman working here

2    that woman has to know at least as much as the men

3    because if not they wouldn't want to hire her.  Or we

4    could go the other way.  Oh, I bet you the manager's a

5    man and he hired his girlfriend.  So, it depends on

6    where you want to go with what reason you give to

7    support your particular opinion.

8              But when it comes down to reasonableness and

9    common sense, do we say that, you know, one person can

10   do the job just as well as another?  The man might have

11   been hired because his brother was the manager or his

12   sister might be the manager.  Or do we attribute that to

13   one gender and not the other?  I mean, how do we work it

14   out so that it works for us, is kind of how it goes, as

15   opposed to if it has any relationship to what's

16   consistent with reasonableness and common sense.

17             How many women here can trace back on their

18   maternal side four generations of women voting?  Can

19   anybody?  And what if I just made up a statement people

20   who can trace back on their maternal side, women that

21   can trace back on their maternal side voters in four

22   generations are good citizens, how many of you all would

23   be good citizens, according to how I'm going to define

24   it?  And if you can, let me know why you can.  And if

25   you can't, tell me why you can't.

1                    PROSPECTIVE JUROR ELOCK:  First generation

2          American.

3                    THE COURT:  That would be one good reason.

4          How about if you're a seventh-generation American, if

5          you can trace them over to the Mayflower or Jamestown or

6          the thirteen colonies or the Lewis & Clark expedition.

7                    PROSPECTIVE JUROR COLAROSSI:  Women weren't

8          allowed to vote.

9                    THE COURT:  Until

10                    PROSPECTIVE JUROR COLAROSSI:  I don't know

11          the exact--

12                    THE COURT:  (Interposing)  Until?  And it

13          was the what amendment?  The 20th.  Not the 1st, not the

14          2nd.  Women were precluded.  So, sometimes you can

15          appear credible because you were included.  And other

16          times you can appear to not be credible -- Like if we

17          said that doctors were credible and we found out that

18          schools still weren't admitting women to medical

19          schools.  Then how in the world could women be more

20          credible than men if our perception was that doctors

21          were more credible?

22                    So, sometimes it's how we set things up.  We

23          can set up a group or a class of people to always be

24          more credible.  Almost like if we're the employer and we

25          want to set up a criteria so that we get a particular

1    class to only be able to apply.  We could do it like

2    they do qualifications to be a President.  What are

3    those qualifications by the way?

4              PROSPECTIVE JUROR COLAROSSI:  Don't you have

5    to be thirty-five?

6              THE COURT:  Over thirty-five.  And?  U.S.

7    citizen.  Hold it.  You mean there are more

8    qualifications to be an elementary school teacher than

9    to be the President of the United States?  What job is

10   most important?  Oh.  There's that myth that any person

11   can be President.  Yeah.  I got you.  But the reality is

12   is that it isn't anybody and everybody.  But isn't that

13   strange?

14             And we can exclude the foreign born, but

15   still let them be politicians, can't we?  A good example

16   of that is our ex-governor.  Canadian-born woman.  But

17   she can serve as governor, but not as President.  Arnold

18   over there in California.  Depending on who's in

19   control, they can tweak stuff so that some are included.

20             And what person did we used to assume was

21   one of the most credible until we got into this weird

22   permissiveness of insanity where, you know, if you

23   wanted to jump up in the middle of a Presidential speech

24   and accuse somebody of lying?  But it used to be the

25   highest office we held in esteem, until Barack, was

1    President.

2              So, foreign-born people could be

3    politicians, but they could never elevate themselves to

4    the position that we thought was most credible, and some

5    still do,  but whether you do or not.  Sometimes that

6    permissiveness that we do with lying is infiltrating

7    other areas.

8              So, being a juror is a little more harder

9    [sic] Ms. Reeves, than first it appears.  It's, you

10   know, people say, oh, all I have to do is decide, you

11   know, what the facts in the case are.  And that's easy.

12   But you've got this internal battle with yourselves of,

13   okay.  How do I make a decision about who to believe?

14   What do I base it on?  Do I base it on age?  Older

15   people are more likely to be truthful than younger

16   people.

17             Any of you all remember Candid Camera?

18   Didn't you love Candid Camera?  Because it showed us

19   inside of our biases and we got a chance to laugh at

20   somebody else's bias thinking that, wow.  We escaped

21   some embarrassment ourselves because sometimes we would

22   have done the exact same thing.  And it's great to be

23   able to laugh at somebody else's expense.  I'm telling

24   you.

25             But I always say, just imagine if it's a

1      real hot day in Detroit, eighty, ninety degrees, and

2      we're sent to buy some ice and we go to the little mini-

3      mart and there's two coolers.  One says fresh ice from

4      Alaska.  And the other one in the other cooler says

5      fresh ice from sunny Orlando.  Ninety-nine cents a bag

6      each one.  Which cooler do you think is going to be

7      empty first?

8               And what you going to do is Candid Camera

9      would see people saying...  And then they would open

10     this one and then they would close and they would go

11     open this one and then go pay for it.  They would

12     actually think that it is colder, the ice from Alaska is

13     going to be colder than the ice from Florida.

14               And you know we do it all the time.  How

15     many of you all have actually taken the time to do that

16     Meijer challenge?  Read the back of something at Meijer

17     versus the brand, you know, with yourself or with the

18     spouse or a friend.  And you're like ingredient-by-

19     ingredient.  And they're the same in the same

20     percentage.  Then you put back the Meijer brand.  And

21     for two dollars more, you're taking home Advil.  And

22     you're like...

23               And you make this weird explanation to

24     yourself.  Well, you know, this is a better brand.  It's

25     not generic because generic has negative connotations.

1            And at some point you just have to, you know, hit

2       yourself in the head and say what am I doing?  Why did I

3       take the time to read the ingredients?  Because if I was

4       going to take the time and then make it not make a

5       difference, I didn't even need to pick it up.

6                    But somehow you explain that spending two

7       dollars more makes sense.  Because that was the only

8       reason for the comparison, right?  To try to base it on

9       common sense and reasonableness.

10                   But remember when I first said it?  We

11      always investigate with an outcome already kind of where

12      we want to.  And then we work our way to the outcome

13      that we want, this predesired or this desired outcome.

14                   Man, if common sense and reasonableness

15      guided us all the time, I don't know how great we would

16      be, you know.  How many barriers would be broken?  How

17      advanced we would be?  But as long as we're letting

18      those other things in the way...

19                   See, that's why it's so great to be you.

20      You can cast all of that aside and be that fair and

21      impartial person you always wanted to be.  Being a juror

22      is challenging.  I think you all are ready.  Are you all

23      ready for the challenge?

24                   They're going to ask you a few questions.

25      The questions will probably go like, does anybody here

-99-

1       have a family member that has been a victim of a

2       homicide?  Because it would be a crazy question to ask

3       if you or a family member has been a victim of a

4       homicide.  I've heard that question asked.  And I said

5       to myself, they really weren't listening.  They were not

6       listening to the question they asked.

7                       Some will, you know, there will be some

8       questions I'm sure about, you know, some alleged bias or

9       perceived bias that you might have and how it will

10      affect something.  Sometimes people are asked do they

11      have any young, black sons or cousins around the

12      defendant's age because they think that age sometimes

13      might affect somebody's ability to improperly use race

14      or age as a bias.  Occupation, never been on another

15      trial.

16                      Some people think radio station listening

17      will create a bias, you know, if you listen to a lot of

18      talk radio or if you listen to too much hip hop.  They

19      don't ask who sets the stations?  That's probably a

20      little more important.  Who sets the stations?  And

21      who's in the car controlling the radio?  Because you'd

22      be surprised what I listen to or am forced to listen to.

23                      So, they'll have a couple questions for you,

24      I'm sure.  Would that be true?  Do you want to ask them

25      a few questions?

```
1                    MR. PRASAD:  Yes.  Thank you.

2                    THE COURT:  He's on a short time limit.  I

3         told them all four, five or six questions and we're

4         going to move on.  But if there is really a few more

5         that you think that are important, by all means.

6                    MR. PRASAD:  Thank you, your Honor.  Good

7         afternoon, again, ladies and gentlemen.  This is a rare

8         opportunity we have because there's really no other time

9         that there's actually a dialogue between the attorneys

10        and the Judge and the potential jury.  From the rest

11        part, from the rest of this, from now and onwards,

12        you'll only be hearing the evidence or whenever there's

13        an opening or closing statement, we're going to be

14        talking to you and not with you.

15                    This is our only chance, also, as the Judge

16        has been going through this, to try to find a fair and

17        impartial jury.  And that's the hard part.  Because what

18        are we trying to do?  We don't know you as well as you

19        know yourself.  Right?  I mean, that's clearly true.

20        And as the Judge has been doing for several hours now is

21        to try to--

22                    THE COURT:  (Interposing)  Careful now.

23                    MR. PRASAD:  Oh.  I'm sorry.

24                    THE COURT:  For less than one.

25                    MR. PRASAD:  Right.
```

                              -101-

1              THE COURT:  Didn't we start at 1:00?

2              MR. PRASAD:  Yes, sir.

3              THE COURT:  Okay.  Then I -- So, it's only

4        1:54.

5              MR. PRASAD:  There was the morning, too, but

6        okay.

7              THE COURT:  I wasn't questioning them in the

8        morning.

9              MR. PRASAD:  All right.  True.  But what

10       we're trying to do is we're trying to find a fair and

11       impartial jury.  And we're trying to have you ask

12       yourself about these biases.  That's really what we're

13       trying to do.

14              And so, if at any time after, you know, with

15       the Judge's questions, with my questions, with Ms.

16       Rock's questions, you think about it and you realize,

17       well, maybe my biases might sway me in this case and I

18       can't set those aside, please let us know.  Because

19       letting us know now is the only really appropriate time.

20       If you find that out in the jury room several days from

21       now, that's the wrong time.  And that's what we're

22       trying to avoid.

23              Going into some of those issues about

24       biases, I want to bring up, I want to bring up this

25       case.  First, I mean, yes.  This is a homicide case.

1    That's what it is.  That's the charge that is being

2    charged by the people on this case.

3             One of the instructions you're going to have

4    about, about, about this case, like any other criminal

5    case, is that the only person in charge of sentencing is

6    the Judge.  It is not a jury's responsibility.  It's not

7    nothing that you really ever consider.  Is that

8    something that's going to affect your thinking, the

9    potential sentence in this case?  Because we are talking

10   about a homicide case.

11            Would that affect the way you fairly look at

12   the evidence?  Would that affect the way you fairly look

13   at the law in this case?  Anyone here in the first row?

14   Anyone in the second row?  Anyone in the third row?

15   And you understand what I'm asking about that, right?

16            The second thing about it, and this is

17   something that the Judge just touched on a second ago,

18   is that Mr. Howard is a young man.  He is, at the time

19   of the incident, he was sixteen years old.  I believe he

20   is seventeen now.  So, the question to you then is, will

21   his age affect your ability to be fair and impartial in

22   this case?

23            And this is, once again, one of those hard,

24   honest questions that you have to ask yourself.  Because

25   as Judge Morrow did a very good job of showing us is

1     that it's hard to admit to ourselves, if we're honest,

2     about certain tough issues.  It's easy to create an

3     excuse to give an answer.  But the hard question is, can

4     you be honest with yourself?  Does Mr. Howard's age

5     affect your ability to be fair and impartial?  Anyone

6     here in the first row?  Anyone here in the second row?

7     Anyone in the third row?

8               PROSPECTIVE JUROR MELTZER:  A little.

9               MR. PRASAD:  Who was that?  Okay.  Ma'am,

10    let me get your name, for the record.  Is it--

11              PROSPECTIVE JUROR MELTZER:  (Interposing)

12    Jessica.

13              MR. PRASAD:  Ms. Meltzer, is that correct?

14              PROSPECTIVE JUROR MELTZER:  Mm-hmm.

15              MR. PRASAD:  Okay.  I don't want to delve

16    too deep into this, but that is the crucial question.

17    Can you be fair to both sides?  Meaning, can you set

18    aside any sympathy or bias for him or against him

19    because of his age?  Or for the prosecution or against

20    the prosecution because of his age?

21              PROSPECTIVE JUROR MELTZER:  I think that

22    it's -- I don't know.  Because I, you know, I'm kind of

23    young myself.  I feel like even at sixteen if I would

24    have -- I wouldn't want it to affect the rest of my life

25    if I made a mistake at sixteen.  I mean...

 1            MR. PRASAD:  And that's what I'm trying to

 2     get an honest answer about.  I appreciate your honesty.

 3            PROSPECTIVE JUROR MELTZER:  Well, to be

 4     honest.  No.  I don't, I'm not sure.

 5            MR. PRASAD:  That's exactly, that's exactly

 6     what I'm asking for.  Was there anyone else in the third

 7     row?  And, ma'am, you are Ms. Creamer, is that correct?

 8            PROSPECTIVE JUROR ELOCK:  Margarette Elock.

 9            MR. PRASAD:  Oh.  I'm sorry.  Did I get that

10     wrong?  I apologize.  Ms. Elock.  Is that right?

11            PROSPECTIVE JUROR ELOCK:  That's correct.

12            MR. PRASAD:  Same question, ma'am.  Can you

13     set aside any sympathy or prejudice you might have

14     because of his age?

15            PROSPECTIVE JUROR ELOCK:  I don't know.

16     When I walked in and I seen how young he was, you know,

17     I just felt a great deal of sympathy for him.  I didn't

18     know at the time, you know, what he had done or anything

19     like that.

20            MR. PRASAD:  Ma'am, let's be clear.  We're

21     not saying what he did.  We're saying--

22            PROSPECTIVE JUROR ELOCK:  (Interposing)

23     Correct.

24            MR. PRASAD:  What he's accused of.

25            PROSPECTIVE JUROR ELOCK:  Accused of--

                              -105-

 1                    MR. PRASAD:  (Interposing)  Right.

 2                    PROSPECTIVE JUROR ELOCK:  (Interposing)  At

 3       the time or anything that was going on.  I just seen

 4       this, you know, this young man.

 5                    MR. PRASAD:  Thank you, ma'am.  I appreciate

 6       that.  Anyone else before I leave the topic?

 7                    Another topic I do want to touch on, as the

 8       Judge did say, is anyone had anyone close to them,

 9       friends or family, been the victim of a homicide?

10                    PROSPECTIVE JUROR INGLE:  Yes.

11                    MR. PRASAD:  Ma'am, and...

12                    PROSPECTIVE JUROR INGLE:  Yes.

13                    MR. PRASAD:  And you are Ms. Ingle?

14                    PROSPECTIVE JUROR INGLE:  Yes.

15                    MR. PRASAD:  How long ago was this?

16                    PROSPECTIVE JUROR INGLE:  I was probably

17       eleven years old.

18                    MR. PRASAD:  Okay.  Sp--

19                    PROSPECTIVE JUROR INGLE:  (Interposing)  It

20       was my uncle.

21                    MR. PRASAD:  It's been a while.

22                    PROSPECTIVE JUROR INGLE:  Mm-hmm.

23                    MR. PRASAD:  Do you have specific memories

24       about this?

25                    PROSPECTIVE JUROR INGLE:  Just recollections

```
1     of my parents reaction, especially my father's because

2     it was his brother.

3               MR. PRASAD:  Okay.  Can you be fair and

4     impartial?  Can you set aside what happened to your

5     uncle and be fair and impartial to this case?

6               PROSPECTIVE JUROR INGLE:  I don't know.

7               MR. PRASAD:  Can you, can you think about

8     it?  And here's, and here's why I'm asking you--

9               THE COURT:  (Interposing)  Can I stop you

10    for just two seconds?

11              MR. PRASAD:  Yes, sir.

12              THE COURT:  Okay.  Most people say, I'll

13    try.  Because, you know, that's under the premise that

14    nobody knows what they're going to be able to do.  But

15    we make vows, do you promise to keep this man healthy,

16    wealthy and wise all of his life?  And we'll say I do.

17    And, you know, what we're saying is we will do the best

18    that we can in order to stay married to this person that

19    we're taking these vows with.  I mean, the truth is, who

20    knows?

21              But the question is really, will you make

22    every effort to make sure that you're fair and

23    impartial?  That's the question.   And it's assumed that

24    your answer will incorporate your desire and what you,

25    what efforts you will give towards that desire?
```

-107-

1                    PROSPECTIVE JUROR INGLE:  Yes.  I will make

2          every effort.

3                    MR. PRASAD:  Thank you.  Anyone else?  In

4          the second row?  Or in the third row?  I'll ask the flip

5          side of that question.  Anyone close to you ever been

6          accused of homicide, of this kind of crime?

7                    PROSPECTIVE JUROR REEVES:   Yes.

8                    MR. PRASAD:  First row?

9                    PROSPECTIVE JUROR REEVES:   Yes.

10                   MR. PRASAD:  Yes, ma'am.  And you're Ms.

11         Reeves?

12                   PROSPECTIVE JUROR REEVES:   Yes.

13                   MR. PRASAD:  Okay.  Who -- How close was the

14         relationship to you?

15                   PROSPECTIVE JUROR REEVES:   It was my niece,

16         my sister's daughter.

17                   MR. PRASAD:  And how long ago was this?

18                   PROSPECTIVE JUROR REEVES:   This was about

19         ten years ago.

20                   MR. PRASAD:  Okay.  Here in Wayne County?

21                   PROSPECTIVE JUROR REEVES:   Yes.

22                   MR. PRASAD:  Was my office involved?

23                   PROSPECTIVE JUROR REEVES:   I'm not sure.

24                   MR. PRASAD:  Okay.

25                   PROSPECTIVE JUROR REEVES:   Because I was

-108-

1    not at the trial or anything.

2                  MR. PRASAD:  Okay.  Do you have a set of any

3    prejudices or biases from that experience?  Can you set

4    those aside?

5                  PROSPECTIVE JUROR REEVES:  I will try my

6    best just to decide everything and look at all the, look

7    at all the evidence and...

8                  MR. PRASAD:  Good.  Good.  Do you -- Were

9    you emotionally involved in it?

10                 PROSPECTIVE JUROR REEVES:  Well, yes,

11   because it was my niece, you know.  I don't know how

12   much I should say, but I believe my niece, you know.

13   So...

14                 MR. PRASAD:  Thank you.  I appreciate that.

15   Anyone else in the first row?  Anyone in the second row?

16   Anyone in the third row?

17                 Two last topics and I'm done.  First topic

18   is -- And, sir, it's a dovetail on a comment I heard you

19   make Mr. Halley, or Mr. Halley, TV.  We watch a lot of

20   TV and movies nowadays.  And cop shows and courtroom

21   dramas are the rave.  And, of course, there's always the

22   whole slew of CSI's and all those shows, right?  Anyone

23   a fan of watching TV involving cops and CSI and all --

24   Okay.

25                 The reason I ask you all this is because we

```
 1      know that the entertainment industry is out there,

 2      right?  I mean, they have us down.  They have the movies

 3      that have us.  It's been in books forever.  This is not

 4      TV, right?  This is not the movies.  This is not

 5      fiction.  This is -- We're here in the real world.

 6              For those of you that are avid readers or

 7      watchers of these kind of things, what I'm asking you is

 8      can you promise to set aside what you might think should

 9      happen because of what you see on TV and actually focus

10      on the facts and law that appear in this courtroom?  Is

11      that a fair, is that fair for me to ask that of you?

12              Even those of us that love CSI and want to

13      see all this great, crazy DNA stuff and all this stuff

14      that comes out -- I don't know what it comes out of, but

15      it just seems to come out.  Can you set that aside and

16      focus on the real world here?  Is there anyone who

17      can't?  Is there anyone who can't do this?  Who is so

18      affected by what they see or read in the TV or the

19      entertainment industry that it would make it difficult

20      to be fair and impartial here?  Okay.

21              Before I get to my last topic, I'd be remiss

22      if I didn't ask.  Ms. Colarossi, you're an attorney?

23              PROSPECTIVE JUROR COLAROSSI:  Yes.

24              MR. PRASAD:  Did you ever do criminal law

25      before, ma'am?
```

```
 1                    PROSPECTIVE JUROR COLAROSSI:  In law school,
 2          I did the urban law clinic, which was criminal
 3                    MR. PRASAD:  Excellent.  Excellent.  I mean,
 4          did you ever work in the juvenile system or anything
 5          like that?
 6                    PROSPECTIVE JUROR COLAROSSI:  Oh, yeah.  I
 7          did.  When I first got out of law school, I did work in
 8          the juvenile system.
 9                    MR. PRASAD:  The reason I'm asking is,
10          obviously, because of your background, do you have any
11          biases or prejudices based on your personal work, your--
12                    PROSPECTIVE JUROR COLAROSSI:  (Interposing)
13          Against the juvenile system?
14                    MR. PRASAD:  For anybody, you know, criminal
15          or, I mean--
16                    PROSPECTIVE JUROR COLAROSSI:  (Interposing)
17          No.
18                    MR. PRASAD:  You're an attorney, so we --
19          So, it's a question I normally ask attorneys.  So, is
20          there anything that you have?
21                    PROSPECTIVE JUROR COLAROSSI:  I can't think
22          of anything.
23                    MR. PRASAD:  Okay.  Thank you.  Thank you.
24          Last topic I wanted to get into before I sit down is,
25          what we're doing here -- You're in a different, you're
```

1        in a difficult position.  We make judgement calls on

2        people every day of our lives.  And sometimes they're

3        just simple judgement calls about, you know, which

4        checkout line to go into, you know, when you're going to

5        check out in the grocery store.  We make judgement calls

6        when we meet, when we meet a stranger and we want to

7        know whether we want to listen to them or not or just

8        walk on by.  We make all sorts of judgement calls

9        everyday.

10              You're going to be asked to make a judgement

11       call in a very different and unique way.  Because the

12       law, as Judge Morrow's going to give it to you, is going

13       to strongly control how you make a judgement call.  But

14       what I have to know and what I really want to know, is

15       there anything in your own make-up, whether it's a

16       religious reason, an ethical reason, a moral reason that

17       gives you pause in the ability to make a judgement in

18       this case, in this forum, listening to the facts and

19       evidence, listening to the law?  Is there anything about

20       what you're going to have to do today, or today,

21       tomorrow or the rest of this week as jurors and make a

22       judgement decision that's going to affect you that you

23       think maybe you're not the right juror for this case?

24       First row?  Second row?  And the last row?  Ma'am?  Ms.

25       Curry?

1                    PROSPECTIVE JUROR CURRY:  Yes.

2                    MR. PRASAD:  Is that correct?  Do you have a

3        hesitation or do you have something you feel would

4        affect your ability to sit in judgement in the way the

5        law requires you to?

6                    PROSPECTIVE JUROR CURRY:  Yeah.  I have a, I

7        have a hard time I guess having to make a decision

8        whether to put someone away or not.  I know that's part

9        of my responsibility--

10                   MR. PRASAD:  (Interposing)  It is.  But--

11                   PROSPECTIVE JUROR CURRY:  (Interposing)  I'm

12       not -- I think I would have a hard time.

13                   MR. PRASAD:  I appreciate--

14                   PROSPECTIVE JUROR CURRY:  (Interposing)  I

15       don't know for sure because I've never had to do it.

16                   MR. PRASAD:  I appreciate that.  Thank you.

17       Anyone else?  Okay.  Thank you very much.

18                   THE COURT:  Ms. Rock, any questions you'd

19       like to ask them?

20                   MS. ROCK:  Yes, your Honor.  Thank you.

21                   THE COURT:  In a condensed manner or

22       abridged manner?

23                   MS. ROCK:  I'm sorry?  What was that, your

24       Honor?

25                   THE COURT:  In a condensed and abridged--

-113-

1          MS. ROCK:  (Interposing)  Yes.  Yes, your

2     Honor.  Excuse me.  I'm going to ask you, ladies and

3     gentlemen -- Ms. Meltzer, would you agree that memory,

4     our memories aren't always concrete, that sometimes they

5     can be fuzzy?

6          PROSPECTIVE JUROR MELTZER:  I don't think

7     that your memory is fuzzy for something that happened

8     so, you know, like not very far in the past.  No.  When

9     you're child, yes.  But, no.  Not a recent event.  No.

10          MS. ROCK:  Well, have you ever heard a story

11     so many times that you couldn't remember if you were

12     there or not?

13          PROSPECTIVE JUROR MELTZER:  No.

14          MS. ROCK:  Anybody else on the jury ever had

15     that experience, where they thought -- I see you're

16     shaking your head, Ms. Keast?  You've had that

17     experience?

18          PROSPECTIVE JUROR KEAST:  Sure.

19          MS. ROCK:  Can you describe it for us, if

20     you don't mind?

21          PROSPECTIVE JUROR KEAST:  When people

22     describe something that happened in my childhood with my

23     sister or whatever and then somebody else would finish

24     the story and then it's like, wait a minute.  Was I

25     there or was that your story?

                              -114-

1          MS. ROCK:  Exactly.  You have that, like
2     especially at family parties, you've heard the story
3     over so many times that pretty soon you're not sure
4     whether you were there or not.  So, why do you think
5     that happens?  Do you think that maybe, Ms. Paris, it's
6     because our brains aren't recorders, that certain facts
7     can interfere, we have events that interfere with our
8     memories so--
9          PROSPECTIVE JUROR PARIS:  (Interposing)  It
10     could.  It could be.
11          MS. ROCK:  So, have you ever had that
12     experience?  You ever had the experience where -- No?
13          PROSPECTIVE JUROR PARIS:  No.
14          MS. ROCK:  How about you, Ms. Brown?  Have
15     you ever had that experience?
16          PROSPECTIVE JUROR BROWN:  No.
17          MS. ROCK:  Where you thought that?
18          PROSPECTIVE JUROR BROWN:  No.
19          MS. ROCK:  Ms. Ingle?
20          PROSPECTIVE JUROR INGLE:  No.
21          MS. ROCK:  Never had that?  Anybody else had
22     that experience besides Ms. Keast and myself?
23          PROSPECTIVE JUROR COLAROSSI:  My kids do it
24     all the time.  I see where they, one of them will think
25     that something happened to them, but it really happened

-115-

1    to the other one who had told the story.  I know what

2    you mean.

3              MS. ROCK:  The other issue I wanted to ask

4    you was, is lying.  I'm going to be saying, or accusing

5    the police of lying and cheating in this case.  Is there

6    anybody on this jury that's going to be uncomfortable

7    with me accusing the police of lying and cheating?

8    Anybody offended?  Mr. Bologna?

9              PROSPECTIVE JUROR BOLOGNA:  No.  I'm not

10   offended.

11             MS. ROCK:  Okay.  So, as the Judge was

12   pointing out, lying, cheating or, it's not unique to any

13   particular profession, correct?  Or telling the truth is

14   not unique to any particular profession.  Would you

15   agree with that, Ms. Brown?

16             PROSPECTIVE JUROR BROWN:  Yes.

17             MS. ROCK:  How about you, Ms. Matelic?

18             PROSPECTIVE JUROR MATELIC:  Yes.  I would

19   agree.

20             MS. ROCK:  Okay.  Now, do you, Ms. Reeves,

21   do you think that it's okay to lie in order to get what

22   you want?

23             PROSPECTIVE JUROR REEVES:  No.

24             MS. ROCK:  Right?  That's pretty common

25   sense.  What if you think it's a lie that's going to

-116-

1    help people?

2              PROSPECTIVE JUROR REEVES:  No.

3              MS. ROCK:  So, you still think, even if the

4    lie might help people, you think that's not good, right?

5    Okay.  Because what is that expression, and forgive me

6    for putting you on the hot seat, the road to hell is

7    paved with good intentions?

8              PROSPECTIVE JUROR REEVES:  What about it?

9    What do I think--

10             MS. ROCK:  (Interposing)  Yeah.  I mean,

11   what does that mean to you?

12             PROSPECTIVE JUROR REEVES:  That means that

13   somebody would, that you would, that somebody -- That

14   you could lie and do a good, do good, lying and go to

15   hell for it.  You could be punished for the lies.

16             MS. ROCK:  Do you -- Because, well, I

17   actually Googled it.  Because I thought they had a good

18   definition, which was a person could have good

19   intentions, but still take actions that are harmful and

20   have negative consequences.  Do you agree with that?

21   Ms. Brown, do you think it would be okay for police

22   officers or the government to lie or not follow the

23   rules or cheat if they believed that in doing so they

24   would end up catching the bad guy?

25             PROSPECTIVE JUROR BROWN:  No.  I don't.

```
 1                    MS. ROCK:  Okay.  What about you, Mr.
 2      Halley?  Are you following -- Okay.  So, you don't think
 3      that would be okay.  Ms. Elock?
 4                    PROSPECTIVE JUROR ELOCK:  No.
 5                    MS. ROCK:  Okay.  Ms. Colarossi?  Okay.  How
 6      about you, Ms. -- Is it Creamer or Cramer?
 7                    PROSPECTIVE JUROR CREAMER:  It's Creamer
 8      just like cream and sugar.
 9                    MS. ROCK:  That's what I thought.  It's
10      creamer.  Ms. Creamer, what about you?  Do you think
11      it's okay?
12                    PROSPECTIVE JUROR CREAMER:  Is it okay for
13      them--
14                    MS. ROCK:  (Interposing)  For -- Yeah.  If
15      they think that in the end they're just going to end up
16      catching the bad guy.  Do the ends justify the means, in
17      other words?
18                    PROSPECTIVE JUROR CREAMER:  No.
19                    MS. ROCK:  Okay.  Now, if I say to you, if I
20      point to this chair and say it's an elephant, does that
21      make it an elephant?  Ms. -- Excuse me.  I'm sorry.  Ms.
22      Curry?
23                    PROSPECTIVE JUROR CURRY:  No.
24                    MS. ROCK:  Okay.  So, ma'am, no matter how
25      many times I say it's an elephant, it's still going to
```

1    be a chair, right?

2              PROSPECTIVE JUROR CURRY:  Correct.

3              MS. ROCK:  Okay.  So, what's the difference

4    between an attack and a fight?

5              PROSPECTIVE JUROR CURRY:  An attack is when

6    someone approaches you violently.  And a fight -- Well,

7    they could be almost the same, just fight back.  Well, a

8    fight is when two people or more are engaged in a

9    violent act.  An attack is when a person being, the

10   violence is thrust upon them.

11             MS. ROCK:  All right.  So, that's a good

12   definition.  And so, if one person is hitting the other

13   and the other person isn't fighting back, what you've

14   said that's attack--

15             PROSPECTIVE JUROR CURRY:  (Interposing)

16   Yes.

17             MS. ROCK:  Right?  Okay.  So, calling it a

18   fight doesn't make it a fight, right?

19             PROSPECTIVE JUROR CURRY:  No.

20             MS. ROCK:  Calling an attack a fight doesn't

21   make it a fight, right?

22             PROSPECTIVE JUROR CURRY:  Right.

23             MS. ROCK:  Okay.  Still not an elephant.  Do

24   you ever -- Mr. Schneider, did you ever get bullied or

25   scared into saying something that wasn't true or you

1    know someone who did?

2                    PROSPECTIVE JUROR SCHNEIDER:  Not that I

3    recall.

4                    MS. ROCK:  What about you get stopped by the

5    police?  This is kind of a minor -- You get stopped by

6    the -- Mr. Schneider, how fast were you going?  Oh, I

7    was going eighty.  Right?  So, most people, oh, I was

8    going thirty-five, possibly, right?  So, that's kind of

9    a minor level.

10                   But do you think that people can get bullied

11   and scared into saying something that's not true because

12   they're being threatened?

13                   PROSPECTIVE JUROR SCHNEIDER:  I think it's

14   possible.  Sure.

15                   MS. ROCK:  Okay.  So, do you -- Can you

16   think of any example where that's ever happened to

17   somebody you know or yourself?

18                   PROSPECTIVE JUROR SCHNEIDER:  Not that I

19   recall.

20                   MS. ROCK:  I know it's hard when you're put

21   on the hot seat.  Is there anybody that has an example

22   of where they've been bullied or scared or somebody else

23   they know was bullied or scared into saying something

24   that wasn't true?  Let me see.  I'm trying to think who

25   I haven't called on yet in terms of -- Ms. Ingle, I

1       don't think I called on you yet.  Can you think of any

2       example where that's ever happened to you, where you

3       were bullied or intimidated?

4                   PROSPECTIVE JUROR INGLE:  Not that I recall.

5       But I usually stand up to that.

6                   MS. ROCK:  Do you think it's possible where

7       under some circumstances that someone might be bullied

8       into saying something that wasn't true?

9                   PROSPECTIVE JUROR INGLE:  Yeah.  I--

10                  MS. ROCK:  (Interposing)  Or intimidated?

11                  PROSPECTIVE JUROR INGLE:  Anything is

12      possible.  Yeah.

13                  MS. ROCK:  But I don't mean in that anything

14      is possible type of realm.  I think that's a good

15      response.  But I don't, I don't mean there.  But do you

16      think it's realistic?

17                  PROSPECTIVE JUROR INGLE:  Yeah.

18                  MS. ROCK:  Okay.  Did you ever hear the

19      story where there was a night manager in Kalamazoo and

20      he had deposited some money and he -- In the bank.  And

21      the deposit didn't show up.  Well, he ended up getting

22      charged with a crime.  And so, he was charged with

23      stealing and he ends up, and he ends up pleading to the

24      crime and getting probation.

25                      So, then I think six months later an owner

-121-

```
 1      of the business deposits money in the bank and the

 2      deposit doesn't show up.  And he says, where's my

 3      deposit?  And they go inside the bank and they see the

 4      money lodged in the bank deposit, the bank deposit box.

 5      And, lo and behold, there's the night manager money.

 6      True story in this -- True story.

 7                  So, he pled to a crime that he didn't

 8      commit, obviously, out of fear possibly of, you know,

 9      receiving a higher sentence.  Do you think that -- So,

10      there are circumstances, would you agree, Ms. Meltzer,

11      where that can happen?

12                  PROSPECTIVE JUROR MELTZER:  Where what can

13      happen?

14                  MS. ROCK:  Where someone will be bullied or

15      intimidated or scared into saying something or doing

16      something that's not true?

17                  PROSPECTIVE JUROR MELTZER:  I think it's

18      possible that, you know, that could happen, you're

19      scared of the consequences or something.  But I've never

20      had it personally happen to me or anything.  So...

21                  MS. ROCK:  Has it happened to anybody that

22      you know?

23                  PROSPECTIVE JUROR MELTZER:  No.

24                  MS. ROCK:  No?  How about you, Ms. Keast?

25      No?
```

-122-

```
 1                    PROSPECTIVE JUROR KEAST:  No.
 2                    MS. ROCK:  Now, does anybody have any
 3        members of law enforcement in their family?  Okay.  Ms.
 4        Brown, who's in your family?
 5                    PROSPECTIVE JUROR BROWN:  My stepbrother.
 6                    MS. ROCK:  Do you have a close relationship
 7        with your stepbrother?
 8                    PROSPECTIVE JUROR BROWN:  Yes.
 9                    MS. ROCK:  Do you think that if you came
10        home with a verdict of not guilty you'd have to justify
11        that verdict to your stepbrother?
12                    PROSPECTIVE JUROR BROWN:  No.
13                    MS. ROCK:  And what does he do?
14                    PROSPECTIVE JUROR BROWN:  He's a sergeant on
15        the Detroit Police Department.
16                    MS. ROCK:  Okay.  Do you know what area?
17                    PROSPECTIVE JUROR BROWN:  He moved around.
18        I'm not sure where he is right now.
19                    MS. ROCK:  All right.  Thank you.  Ms.
20        Matelic?
21                    PROSPECTIVE JUROR MATELIC:  I had a brother-
22        in-law.  He's retired now.
23                    MS. ROCK:  And where did he work?
24                    PROSPECTIVE JUROR MATELIC:  In Detroit.
25                    MS. ROCK:  And what was his -- Do you know
```

1        what his rank was or...

2                    PROSPECTIVE JUROR MATELIC:  He was head of

3        the cadet school, training new officers.

4                    MS. ROCK:  And as a result of having that

5        relationship with him, do you have a particular attitude

6        towards people accused of crimes?

7                    PROSPECTIVE JUROR MATELIC:  No.

8                    MS. ROCK:  How about you, Ms. Brown?  Do

9        you--

10                   PROSPECTIVE JUROR BROWN:  (Interposing)  Do

11       I have an attitude?

12                   MS. ROCK:  Yeah.  I mean, do you have a

13       particular viewpoint, based on your conversation with

14       your stepbrother, about people accused of crimes?

15                   PROSPECTIVE JUROR BROWN:  No.  My opinion is

16       mine.  His is his.

17                   MS. ROCK:  Thank you.  And I believe, Ms.

18       Keast, you raised your hand?  Did -- Oh.  I'm sorry.

19                   PROSPECTIVE JUROR PARIS:  Yes.

20                   MS. ROCK:  That would be Ms. Paris.  Ms.

21       Paris?

22                   PROSPECTIVE JUROR PARIS:  My brother is now

23       retired, but he was a Michigan State Trooper for over

24       twenty years.  He's retired now.

25                   MS. ROCK:  And the fact that he was a

-124-

1         Michigan State, or Michigan State Trooper, does that,

2         would that impact your attitude in this particular case?

3                    PROSPECTIVE JUROR PARIS:  No.

4                    MS. ROCK:  You wouldn't feel like you'd have

5         to go back and justify a not guilty verdict?

6                    PROSPECTIVE JUROR PARIS:  No.

7                    MS. ROCK:  How about -- I'm sorry.  It was

8         Ms. Meltzer?

9                    PROSPECTIVE JUROR MELTZER:  My uncle.

10                   MS. ROCK:  And where does he work?

11                   PROSPECTIVE JUROR MELTZER:  He's retired

12        now.  He was a Detroit Cop.

13                   MS. ROCK:  And where did he work?  What's

14        that?

15                   PROSPECTIVE JUROR MELTZER:  I'm not sure.

16                   MS. ROCK:  Okay.  Did you ever discuss his

17        job with him?

18                   PROSPECTIVE JUROR MELTZER:  On occasion, but

19        not really.  I mean, not really.

20                   MS. ROCK:  And so, would the fact that your

21        uncle is a retired Detroit Police Officer, would that

22        impact you at all?

23                   PROSPECTIVE JUROR MELTZER:  I don't think

24        so.

25                   MS. ROCK:  Okay.  Did anybody else raise

-125-

1    their hand with regard to law enforcement?  Oh.  Ms.

2    Keast.

3                PROSPECTIVE JUROR KEAST:  I don't know if

4    this is the time or not, but my son is an assistant

5    prosecuting attorney in Oakland County.  I don't know if

6    that's considered part of the question or not.

7                MS. ROCK:  No.  It is.  Thank you.  And the

8    fact that your son is an assistant prosecutor, does that

9    impact your viewpoint of the criminal justice system?

10               PROSPECTIVE JUROR KEAST:  I think it would.

11   I think I would be leaning toward the prosecutor,

12   telling you the truth.

13               MS. ROCK:  Well, thank you so much for

14   saying that.

15               PROSPECTIVE JUROR KEAST:  I'm sorry.  But

16   it's true.

17               MS. ROCK:  No.  No.  I understand.  And you

18   have conversations with him, he probably discusses his

19   cases with you?

20               PROSPECTIVE JUROR KEAST:  Not specifics.  I

21   know which type of case he's on, but not specific--

22               MS. ROCK:  (Interposing)  He's got to tell

23   you the good stories.

24               PROSPECTIVE JUROR KEAST:  No.  I -- The

25   least I know is usually the better.

-126-

1              MS. ROCK:  Oh.

2              PROSPECTIVE JUROR KEAST:  For me.  And I

3      think he knows that.

4              MS. ROCK:  All right.  And that would be --

5      Did I miss anyone at all, by any chance?  Okay.

6              THE COURT:  Anything more, Ms. Rock?

7              MS. ROCK:  The prosecutor was just telling

8      me something, your Honor.  Ms. Brown, did you -- Who was

9      it?  Matelic?  Okay.  Ms. Matelic, were you aware that

10     Sergeant Mackie was at the academy that your brother

11     was--

12             PROSPECTIVE JUROR MATELIC:  (Interposing)

13     No.

14             MS. ROCK:  Okay.  Of course, now having

15     known that, would that make any difference to you?

16             PROSPECTIVE JUROR MATELIC:  No.

17             MS. ROCK:  Would you side with Sergeant

18     Mackie or feel--

19             PROSPECTIVE JUROR MATELIC:  (Interposing)

20     No.

21             MS. ROCK:  I think that's it, your Honor.

22     Thank you for your time.

23             THE COURT:  Okay.  Any challenges for cause

24     from the People?

25             MR. PRASAD:  Yes, your Honor.  Would the

1      Court like us to do multiple preemptories at a time or--

2                   THE COURT:  (Interposing)  No.  No.

3      Challenges for cause.

4                   MR. PRASAD:  I'm sorry.  For cause?  None,

5      your Honor.  Thank you.

6                   THE COURT:  Okay.  It's all right.

7                   MR. PRASAD:  Sorry.

8                   THE COURT:  Any for cause, Ms. Rock?

9                   MS. ROCK:  Your Honor, just based on what

10     Ms. Keast was saying, that she thought she would lean

11     towards the prosecutor, we would thank and excuse Ms.

12     Keast.

13                  THE COURT:  Okay.  Ms. Keast, this is the

14     way I interpret words.  You tell me if you interpret

15     them -- Do you do sports at all?

16                  PROSPECTIVE JUROR KEAST:  Do I do sports at

17     all?  No.

18                  THE COURT:  Do you watch them at all?

19                  PROSPECTIVE JUROR KEAST:  Yeah.

20                  THE COURT:  Okay.  On any given Sunday, do

21     you want the Lions to actually win?

22                  PROSPECTIVE JUROR KEAST:  Uh-huh.

23                  THE COURT:  Okay.

24                  PROSPECTIVE JUROR KEAST:  I do.

25                  THE COURT:  Do you realize that if the Lions

-128-

1      played the New England Patriots, who would win?

2                    PROSPECTIVE JUROR KEAST:  I don't know.  I'm

3      sorry.

4                    THE COURT:  Okay.  I know.  If they played

5      the Packers, the Chicago -- If they played mostly

6      anybody, who do you think would win?

7                    PROSPECTIVE JUROR KEAST:  But they haven't

8      done very well, have they?

9                    THE COURT:  They have not.  I'm saying,

10     sometimes we have a preference, but that preference will

11     not interfere with our ability to be fair and impartial.

12     So, if we're going to evaluate talent and we decide that

13     talent wins, while we might say, okay, we're Detroiters,

14     we're going to pull for the -- But talent would

15     override, you know, a desire.

16                    I remember hearing this commentator one

17     time.  And I cannot remember how long ago the Lions were

18     on actually a Monday night game.  But, trust me, you

19     know it had to have been thousands of years ago, based

20     on their past.  And they hadn't won squat.  And the

21     commentator, to get everybody interested, came up with

22     this, well, do you know that after you have lost the

23     last several, da-da-da-da-da, and you next appear on

24     Monday night, eighty percent of the teams that come in

25     with losing records and appear on Monday night win.  And

-129-

1     that was the reason that he gave that the Lions were

2     gonna win.

3               And I couldn't stop myself from rolling on

4     the ground just laughing.  I said, he mights as well

5     have said Venus was in the second house of Mars and

6     whenever Venus is in the second house of Mars, the team

7     that's logo starts with the closest one in the alphabet

8     to A wins.  Because it just, it just wasn't going to

9     happen that year.

10              We all have a preference or going in biases.

11    And that's what we talked about.  And I talked about my

12    biases for used cars.  The question is, can you set

13    aside that bias and be fair and impartial?  That's the

14    question.

15              Because I don't, you know, used cars scare

16    me.  That's my bias.  But if I bought three used cars

17    and I've taken that bias and said, okay, I recognize my

18    bias.  Now, let me look at things in a common sense and

19    reasonable approach and make a decision.  So, are you

20    able to do that, you know, given that your son is a

21    prosecutor in another county?  What does that have to do

22    with beans?

23              PROSPECTIVE JUROR KEAST:  With beans?  I

24    don't know.  But I would try to set my--

25              THE COURT:  (Interposing)  Okay.

-130-

```
 1                    PROSPECTIVE JUROR KEAST:  Preferences aside.

 2                    THE COURT:  Does your love for your son

 3          override the presumption of innocence?

 4                    PROSPECTIVE JUROR KEAST:  No.  No.

 5                    THE COURT:  Okay.  Is this the same son that

 6          you caught lying and you spanked in his youth?

 7                    PROSPECTIVE JUROR KEAST:  Probably.

 8                    THE COURT:  And the same son you know still

 9          lies to you on occasion?

10                    PROSPECTIVE JUROR KEAST:  Probably.

11                    THE COURT:  I'm just saying.  I know that's

12          a very stark way to just describe relationships

13          sometimes.  But I'm so glad my parents haven't found out

14          some of those.  I'd still get in trouble.  So, what do

15          you think?  Do you think you can put it aside?  You've

16          explained you have a bias.  Do you believe that you can

17          put it aside and be fair and impartial?

18                    PROSPECTIVE JUROR KEAST:  I certainly will

19          try.  Yes.

20                    THE COURT:  Okay.  So, I'm going to deny it.

21          Preemptories to the People?

22                    MR. PRASAD:  Yes, your Honor.  And would the

23          Court like us to use multiple preemptories?

24                    THE COURT:  As you please, sir.

25                    MR. PRASAD:  Okay.  Thank you.  The People
```

1        are going to thank and excuse juror number twelve, Ms.

2        Curry, juror number fourteen, Ms. Elock, juror number

3        ten, Ms. Meltzer and juror number three, Ms. Reeves.

4               THE COURT:  Okay.  Let me thank all four of

5        those young people, Ms. Reeves, Meltzer, Ms. Curry and

6        Ms. Elock for your service thus far.  You're going to be

7        released from here with our love and thanks and asked to

8        go down to the general jury room, please.  What's your

9        pleasure, Ms. Rock?  Do you want to exercise

10       preemptories?  Do you want me to fill them?  What's your

11       pleasure?  Do you know some--

12              MS. ROCK:  (Interposing)  Your Honor--

13              THE COURT:  (Interposing)  For sure?

14              MS. ROCK:  I'd appreciate it if you'd fill

15       them and then I can exercise my preemptories.

16              THE COURT:  If you'd like.

17              THE CLERK:  Ronnie Clopton, Jr.  Would you

18       please take seat number three?  That'd be the first row.

19       Elmo Jensen, could you please take seat number ten?

20       Jillian McDade, could you please take seat number

21       twelve?  And Dong Kim, could you please take seat number

22       fourteen?  That's the wrong person on the -- The last

23       name is right.  The first name is wrong.

24              THE COURT:  Mr. Clopton, can we go to you,

25       sir?  Please identify yourself?  Introduce yourself,

1     tell us who you are.

2                    PROSPECTIVE JUROR CLOPTON:  My name is

3     Ronnie Clopton.  I'm currently a student at WCCC, Wayne

4     County Community College.  I've never served on a jury

5     before.

6                    THE COURT:  Okay.  Who do you live with,

7     young man?

8                    PROSPECTIVE JUROR CLOPTON:  Right now, I'm

9     temporarily living with my grandmother, me and my mother

10    at the time.  And I live with an aunt of mine as well.

11                   THE COURT:  Aunt working or grandmother

12    working?

13                   PROSPECTIVE JUROR CLOPTON:  Grandmother's

14    not working and--

15                   THE COURT:  (Interposing)  Where does she

16    work?

17                   PROSPECTIVE JUROR CLOPTON:  My aunt?  My

18    aunt works at, my aunt is a manager at Rite Aid.

19                   THE COURT:  Okay.  What are you studying at

20    school?  And what year are you?

21                   PROSPECTIVE JUROR CLOPTON:  This is my

22    second year.  I'm just doing liberal arts right now

23    until I can figure something out.

24                   THE COURT:  Here's a laugher.  What do you

25    want to be when you grow up?

-133-

1                    PROSPECTIVE JUROR CLOPTON:  I still don't

2        know yet.

3                    THE COURT:  Okay.  How old do you want to

4        grow to?  You want to be at least eighty?

5                    PROSPECTIVE JUROR CLOPTON:  As long as

6        possible.

7                    THE COURT:  Okay.  So, at least ninety.  And

8        you're under twenty now?

9                    PROSPECTIVE JUROR CLOPTON:  I'm twenty.

10       I've been twenty since November.

11                   THE COURT:  Okay.  Well, you got fifty-five

12       years to figure it out, my man.  Never too old.

13       Wouldn't you agree with that statement?

14                   PROSPECTIVE JUROR CLOPTON:  I agree with it.

15                   THE COURT:  Okay.  Mr. Jensen, please

16       introduce yourself to us, sir.

17                   PROSPECTIVE JUROR JENSEN:  Elmo Jensen.  I'm

18       married, three children.  I'm an arborist.  I've never

19       served on a jury before.  And I don't know what the

20       other questions are.

21                   THE COURT:  Okay.  What does your wife do,

22       sir?

23                   PROSPECTIVE JUROR JENSEN:  My wife is a

24       stay-at-home mom.  Even though the children are gone,

25       she's not working.

1                    THE COURT:  Okay.  Was she trained or

2       certified to be anything in particular outside of the

3       house?

4                    PROSPECTIVE JUROR JENSEN:  At one time, she

5       was, she taught aerobics and worked for Vic Tanny years

6       ago.

7                    THE COURT:  Okay.

8                    PROSPECTIVE JUROR JENSEN:  In other

9       capacities.

10                   THE COURT:  I like that word, Mr. Jensen.

11      Vic Tanny's.  Yeah.  Bally's.  I like that.  Ms. McDade,

12      please introduce yourself to us.

13                   PROSPECTIVE JUROR McDADE:  My name is

14      Jillian McDade.  I'm a customer service representative

15      for medical supplies.  So, is my husband.  And I've

16      never served on a jury before.

17                   THE COURT:  How long have you been married?

18                   PROSPECTIVE JUROR McDADE:  Seven years.

19                   THE COURT:  Who had the job first?

20                   PROSPECTIVE JUROR McDADE:  I did.

21                   THE COURT:  Did you get him on?

22                   PROSPECTIVE JUROR McDADE:  Yeah.

23                   THE COURT:  Was he your love interest at

24      that time?  Or did that like guilt him into being your

25      love interest at that time?

-135-

1                    PROSPECTIVE JUROR McDADE:  No.  We were, we
2          were together before and there was an opening in my
3          company, so...
4                    THE COURT:  So, how did he approach that?
5          Eagerly or with a little hesitation?
6                    PROSPECTIVE JUROR McDADE:  Eagerly at first.
7          Then I left that company and now we will probably not
8          work at the same place again.  I work at a competing
9          company.
10                   THE COURT:  So, how was love on the job
11         site?
12                   PROSPECTIVE JUROR McDADE:  It was not good
13         when I was a supervisor because I'm management and
14         couldn't really like come home and talk.
15                   THE COURT:  But let me ask this.  Who's in
16         management at the house?  Aren't you in management at
17         the house?
18                   PROSPECTIVE JUROR McDADE:  Yes.
19                   THE COURT:  I'm thinking, what was the
20         difference?
21                   PROSPECTIVE JUROR McDADE:  I couldn't
22         complain to him about my subordinates because they were
23         his coworkers.
24                   THE COURT:  So, you don't talk about his
25         friends either, right?  Or his relatives?  So, which one

-136-

1      of his relatives do you dislike the most?

2                  PROSPECTIVE JUROR McDADE:  None of them.

3                  THE COURT:  Ms. Brown can't believe I went

4      there.  You didn't ask her which one did she hate the

5      most.  Which one do you get along with the best?

6                  PROSPECTIVE JUROR McDADE:  His mother.  I

7      love his mom.

8                  THE COURT:  And why is that?  Why do you get

9      along with the mom?

10                 PROSPECTIVE JUROR McDADE:  She takes care of

11     my kids.  So, I see her every day.

12                 THE COURT:  Okay.  So, what quality about

13     her did you not realize before you married him that you

14     realize and appreciate now more than ever?

15                 PROSPECTIVE JUROR McDADE:  Her caretaking

16     and old-fashion momness.

17                 THE COURT:  So, she actually cooks using a

18     stove?

19                 PROSPECTIVE JUROR McDADE:  And bakes.

20                 THE COURT:  There's a little story that's

21     told about this kid that was helping his mom get

22     groceries.  And she would send the kid out to get

23     groceries and he'd bring it back and put it in the

24     basket.  And on one of these trips, she went out and got

25     some groceries and was about to throw it back in the

```
1       basket.  And mom says, look at that.  She says, oh, no.
2       You have to take this back.  We have to cook this, you
3       know.  She was just getting everything that was
4       microwaveable.  So, do you bake?
5                       PROSPECTIVE JUROR McDADE:  Yeah.
6                       THE COURT:  What is your favorite thing to
7       bake?
8                       PROSPECTIVE JUROR McDADE:  Crusty French
9       loaf.
10                      THE COURT:  Okay.  So, if you're picked as a
11      juror, your fellow jurors tomorrow expect...
12                      PROSPECTIVE JUROR McDADE:  That would be too
13      long.
14                      THE COURT:  Oh.  Now you're saying that your
15      fellow jurors aren't going to be worth it.
16                      PROSPECTIVE JUROR McDADE:  I only do that on
17      the weekend.
18                      THE COURT:  Well, we'll try to make this so
19      that it lasts until next Monday.  So, how about
20      Wednesday?  Does Wednesday sound good?  Last, but not
21      least, Mr. Kim, please introduce yourself to us.
22                      PROSPECTIVE JUROR KIM:  Yes.  My name is
23      Dong Yonghood Kim.  I'm Korean.  I'm a licensed
24      engineer, licensed HVAC special contractor.  Now, I'm
25      retired and I joined the United Methodist Church
```

1      Seminary in Chicago, I'm a seminary graduate student

2      right now.  My wife and I, we have forty-three years of

3      marriage still.  My wife is retired from JP Morgan Bank.

4      She's at home.  I have three daughter and one boy, one

5      granddaughter.  That's it.

6                  THE COURT:  Okay.  How often do you -- Is

7      there a satellite seminary school here or do you travel

8      back and forth?

9                  PROSPECTIVE JUROR KIM:  Last two years, I

10     started downtown.

11                 THE COURT:  Okay.

12                 PROSPECTIVE JUROR KIM:  And I started last

13     year on-line--

14                 THE COURT:  (Interposing)  Okay.  On-line

15     classes.  Okay.

16                 PROSPECTIVE JUROR KIM:  One year left.

17                 THE COURT:  Okay.  And what are you going to

18     do once you get your degree?

19                 PROSPECTIVE JUROR KIM:  My Korean church

20     for, be a minister.  And now I'm too old.  That's why I

21     want to be a missionary.

22                 THE COURT:  Okay.  Do you have any countries

23     in mind that you would like to be a missionary to?

24                 PROSPECTIVE JUROR KIM:  Yeah.  Back to

25     Korea.

```
 1                    THE COURT:  Okay.

 2                    PROSPECTIVE JUROR KIM:  Yes.

 3                    THE COURT:  What city were you born in?

 4                    PROSPECTIVE JUROR KIM:  Actually, I was born

 5      in China, Manchuria.  But my parents moved to South

 6      Korea.  I graduate in the school, in high school.  In

 7      Seoul, Korea, I graduate at the university.

 8                    THE COURT:  Okay.

 9                    PROSPECTIVE JUROR KIM:  In 1972, I move to

10      United States, here in Detroit.  I went to Henry Ford

11      Community College for HVAC specialist.

12                    THE COURT:  When did you meet your wife?

13                    PROSPECTIVE JUROR KIM:  I met wife in Korea

14      in 1967.

15                    THE COURT:  Okay.

16                    PROSPECTIVE JUROR KIM:  Yeah.

17                    THE COURT:  Can I ask you a question out of

18      ignorance?  Was the marriage arranged, the courtship or

19      was it your free choice?

20                    PROSPECTIVE JUROR KIM:  Arranged marriage.

21      Yes.  Arranged.

22                    THE COURT:  I'm just making sure.  And what

23      did you do for your children?

24                    PROSPECTIVE JUROR KIM:  My first daughter

25      graduate U of M and she's a manager of a door
```

1    manufacturer in Ann Arbor.

2              THE COURT:  Okay.  Is she married?

3              PROSPECTIVE JUROR KIM:  No.  Not yet.

4    Second daughter is graduate law school.  She's preparing

5    for the test coming, bar test.  And third daughter is a

6    fashion designer.  And she work part time at a company.

7    And I forgot what name, but she graduate Michigan State.

8    And my son, he graduate medical school at Wayne State

9    University.  He's still working at DMA.

10              THE COURT:  What influence do you want to

11   have over who your daughters pick to be their husbands?

12              PROSPECTIVE JUROR KIM:  Background is

13   Christian religion.  My parents are very religious in

14   Korea.  So, that's why I name everybody Christian name,

15   Ester and Ezra -- So, I'm influencing the Christian

16   religion moral.

17              THE COURT:  Okay.  Is there a place or

18   country that you want to retire in when that time comes

19   that you, you take your traveling shoes off and put your

20   leg-weary feet up and say, okay, this is going to be

21   home now?  Is there a place that you and your wife have

22   chosen to do that?

23              PROSPECTIVE JUROR KIM:  Yeah.  I -- Excuse

24   me.  Even though her parents arranged when we eighteen,

25   we are religious background, so they checking up certain

-141-

1      generations what's going on.  So, that's our custom,

2      too.

3                  THE COURT:  Okay.  Mr. Jensen, we talked

4      about many concepts that sometimes we change our

5      perceptions after our initial perceptions.  It would be

6      true for you that, from time to time, or every now and

7      then, that you misjudge people?

8                  PROSPECTIVE JUROR JENSEN:  Yes.

9                  THE COURT:  Okay.  When that occurs, do you

10     find that it is the same source that caused you to

11     misjudge somebody?  Or is it from time to time something

12     different that causes you to, when you misjudge people?

13                 PROSPECTIVE JUROR JENSEN:  It could be

14     different things.

15                 THE COURT:  Okay.  If it was the same thing,

16     would you think that then it would be more of a bias as

17     opposed to a misconfiguration, if you will?

18                 PROSPECTIVE JUROR JENSEN:  If it was the

19     same thing over and over again, I'd probably say it was

20     a bias.

21                 THE COURT:  Right.  It's more likely that it

22     would be that.

23                 PROSPECTIVE JUROR JENSEN:  Right.

24                 THE COURT:  Okay.  Ms. McDade, let me ask

25     you a question.  You are the trained observer.  Your

1    eyes are watching me.  And I need you to tell me why it

2    is that I did the following.  Okay.  This is the story.

3              We have this five-minute rule in my family,

4    that if I'm driving for five minutes and I haven't found

5    the address after I've come up to where I think it is, I

6    have to declare myself lost.  And then I have to ask for

7    some directions.  And that's because in my car I don't

8    have a GPS.  I don't let Tom Tom come in.  I can't stand

9    those voices.  And when we're going somewhere, we take

10   my car.  Other than that, the GPS can get us wherever it

11   wants to in the wife's car.

12             So, I'm shooting out off of 96 and I pop off

13   at Middlebelt.  And I go North and I'm looking for

14   whatever I'm looking for, the street.  And I can't find

15   it.  And I'm like looking at the time and I'm looking

16   over.  Because I know pretty soon I'm going to hear

17   buzz, you know.  The five-minute bell going off.

18             So, I pull into this gas station that's

19   right on the corner.  And all I do is just look towards

20   where the attendant is in the gas station.  That's all.

21   And then I turn out of that gas station and go to the

22   one right across the street.  I look at the attendant in

23   that gas station.  I jump on to go through the little

24   turn around, go to the one on the other corner.  And I

25   look at that attendant.  And I'm like, dang.  And then I

-143-

1       go to the one across the street from there.

2                     Why do you think I got out of there and left

3       the first gas station after looking at the attendant?

4                     PROSPECTIVE JUROR McDADE:  Because you

5       didn't think they'd be able to give you directions.

6                     THE COURT:  What was it that you think I saw

7       that made me reach that conclusion?

8                     PROSPECTIVE JUROR McDADE:  Maybe they were

9       too young.

10                    THE COURT:  Okay.  Age.  How about the

11      second one?  Why'd I leave the second one?

12                    PROSPECTIVE JUROR McDADE:  Same thing.

13                    THE COURT:  Same thing?  Oh.  So, you think

14      I'm biased.  See, you're not following the question.

15      Okay.  I'm good.  Okay.  How about the third one?

16                    PROSPECTIVE JUROR McDADE:  Same.

17                    THE COURT:  Same?

18                    PROSPECTIVE JUROR McDADE:  Yes.

19                    THE COURT:  You think they have young people

20      behind the glass in all of those, huh?  Okay.  You made

21      it real simple.  Mr. Clopton, give me a different reason

22      for why I might have left the second gas station?

23                    PROSPECTIVE JUROR CLOPTON:  Perhaps they

24      just looked like they weren't used to the area.

25                    THE COURT:  They looked like?

-144-

```
1                    PROSPECTIVE JUROR CLOPTON:  Perhaps you just
2        judged them by looking at them and just assumed that
3        they didn't look like they would know--
4                    THE COURT:  (Interposing)  Okay.  What look
5        would that have been?
6                    PROSPECTIVE JUROR CLOPTON:  No.  I'm just--
7                    THE COURT:  (Interposing)  What would I have
8        seen that would have made me conclude that?  That's what
9        I'm asking.
10                   PROSPECTIVE JUROR CLOPTON:  I don't know.
11       I just assumed that there was a bias.
12                   THE COURT:  Okay.  And that's good.  But
13       what was the bias based on?
14                   PROSPECTIVE JUROR CLOPTON:  They could, they
15       could be looking around a lot--
16                   THE COURT:  (Interposing)  What?  Have a
17       third eye in the middle of their head?  What was it
18       based on?
19                   PROSPECTIVE JUROR CLOPTON:  No.  I mean it,
20       no I mean, no I mean they could be like perhaps they
21       would look foreign or something, like they may not be
22       from around there or something.
23                   THE COURT:  Look foreign.  Like what?
24                   PROSPECTIVE JUROR CLOPTON:  I mean--
25                   THE COURT:  (Interposing)  Like Mr. Kim?
```

```
 1              PROSPECTIVE JUROR CLOPTON:  Well, no.  I
 2    mean like anything, anything that perhaps would--
 3              THE COURT:  (Interposing)  Well, what?
 4    Could I have seen a black person and say the black
 5    person looked foreign?  What did I see, man?
 6              PROSPECTIVE JUROR CLOPTON:  I don't, I don't
 7    know what you saw.  I just mean like you could have
 8    biased him perhaps by race, perhaps, age was already
 9    said.
10              THE COURT:  Okay.  Biased by race.  Okay.
11    Mr. Schneider, that was like pulling teeth, wasn't it?
12              PROSPECTIVE JUROR SCHNEIDER:  I don't know.
13              THE COURT:  Yeah.  But see sometimes how
14    uncomfortable we are about talking about biases?
15              PROSPECTIVE JUROR CLOPTON:  I would say so.
16              THE COURT:  Right.  But isn't it a fact that
17    you, or somebody you know, or you watched or overheard
18    somebody you were in a car with say, oh, man, they don't
19    know nothing, I bet you they don't even live in this
20    area?  You know, or you see the wrong ethnic group.
21              You know, age bias is so funny because, Mr.
22    Jensen and Ms. McDade and Mr. Kim, when I'm thinking
23    about age bias, as a kid, because I walked and rode my
24    bike, I knew block after block after block after block
25    after block after block after block.  And had somebody
```

1    stopped me at ten, I could have told you the next

2    twenty-five blocks in a row.

3             Now, as an older person, I'm looking for

4    landmarks, you know.  If you ask me somebody's address,

5    I'll be the last person to tell you their address, but I

6    can describe the house.  Years ago, I could tell you the

7    address and probably not describe the house.  Do you

8    remember, Ms. McDade -- Do you have any friends that you

9    don't know their last name?

10             PROSPECTIVE JUROR McDADE:  Yes.

11             THE COURT:  Get out of here.  How long have

12   you known them?

13             PROSPECTIVE JUROR McDADE:  Not, not too

14   long, just people that I work with now.  So, less than a

15   year.

16             THE COURT:  Less than a year.  Is there any

17   phone number or person that you call that belongs to a

18   phone number that you've called over a hundred times?

19   Okay.  What's their phone number?

20             PROSPECTIVE JUROR McDADE:  I don't know.

21             THE COURT:  You don't know.  She doesn't

22   know the phone number of somebody she's called over a

23   hundred times.  Well, you go to contacts and you push T.

24   And then you scroll down five numbers and then you push

25   send.

-147-

1            Now, if that question's asked of somebody up

2      on the witness stand, you mean they're your friend and

3      you've called them a hundred times and you don't know

4      their phone number, would somebody doubt that they're

5      your friend?  Would they doubt if you know this phone

6      number?  Or what would that do?

7            How do you think that plays out on the

8      witness stand when you're asked a question that you

9      should know and you don't know?  And when you get our

10     age, we call that a senior moment every now and then.

11     But your head is freezed.  You're like, oh, golly.  Now,

12     young people, they'll say, oh, well, they're pausing

13     because, you know, they're trying to think up something,

14     as if to give something that's not true.

15           I had a juror that did the same thing.  I

16     passed him by because he could not remember where his

17     wife worked.  Mr. Jensen, he drove her every day for

18     eighteen years.  And what he was doing was he was like,

19     hold it, Judge.  Hold it.  Let me, let me drive her

20     there.  So, we watched as he looked up in the ceiling

21     trying to drive her there.  And he still couldn't get

22     it.  And so, we said, that's all right.  Mr. Kim, I

23     said, that's all right.  Twenty minutes later he screams

24     the name of the employment place out.

25           But under other circumstances, we would see

```
 1      that on the witness stand and decide that that person
 2      wasn't going to tell us the truth because of the
 3      hesitation or some other thing that we factored into,
 4      well, you know, the truth should roll out like this.
 5      Everybody should know the truth.  If you called them a
 6      hundred times, heck, you should know their number.  If
 7      they work right next to you every day and you talk, you
 8      should know them more than Suzy.
 9              A lady I'd known for three years, thought
10      her name was always Emmy.  ME were her initials.  I
11      thought it was for Emily, right?  Emmy?  Or Emma?  Emmy.
12      And she was like, no.  No.  Elizabeth Marie.  Okay.
13      Sometimes you don't know.  But the impression would be -
14      - I don't know.  Mr. Jensen, you ever run into people
15      that will tell you that you met somebody that knows you?
16              PROSPECTIVE JUROR JENSEN:  Yes.
17              THE COURT:  Yeah.  They'll say, yeah.  I
18      know you.  And I'm like, they said that they're your
19      friend.  Recently, that happened to me.  Oh, yeah,
20      Bruce.  Man, I ran into a friend of yours.  And I was
21      like, who?  And so, they told me.  And I said, I said, I
22      haven't seen that person in over thirty years.  I'm
23      like, I haven't called them and I haven't seen them.
24      How are they, you know, using this word friend?  But he
25      came back with like this guy and I knew each other
```

-149-

1       really, really well.  And I'm thinking, man.  I'm

2       certainly not who I was thirty years ago.  I think I'm

3       smarter, more handsome.  I certainly got more kids and

4       more dependents, been through a few animals that I

5       didn't like.  But not even close.  Different

6       occupations.  But they'll claim that they know you.  The

7       ability sometimes to put what you know in a proper

8       relationship is probably one of the most difficult

9       things that you'll have to do.

10                  Mr. Kim, they had this study that they did

11      with school children because they were under the

12      impression that teachers would think that if the kids

13      raised their hands when they're asked a question that

14      those kids would answer correctly.  And, over time, they

15      found out that the kids that were raising their hands

16      versus the kids that didn't raise their hand, there was

17      no difference in who knew the answer, that the same

18      number of kids that raised their hand and said yes, yes,

19      me, me that they were wrong just as often or right just

20      as often as the kids that didn't raise their hand.

21                  But the general conception would be what?

22      That the ones that raise their hands, Ms. Paris, would

23      know the answer.  That's what we think.  If you -- And

24      they were like, wow.  Never could be wrong, or more

25      wrong.

                              -150-

1                Just like sometimes, Ms. McDade, Mr.

2       Clopton, we think that if a person looks you in the eye

3       that they're being more truthful than if they try to

4       avoid your glare.  But we use those things.

5                Sometimes the way that we say no, people

6       will think that we mean no than just regular no.  You

7       know, like can I slap you?  No.  Versus, can I slap you?

8       No.  It's like, okay.  Which one is the real no?  And

9       some people would say, no is no.  But others equate

10      emotion and volume to sincerity.

11               We go through this whole thing about which

12      one is more real and which one is more persuasive.  And

13      if we think shouting and hollering will be more

14      persuasive, guess what you're gonna get from up there?

15      Hollering and shouting.  We'll draw whatever we want to.

16               If a person was going, Mr. Clopton, what

17      gender would we expect to cry from the witness stand?

18      If one gender was going to cry, which gender would we

19      expect?

20               PROSPECTIVE JUROR CLOPTON:  Well, typically,

21      a woman.

22               THE COURT:  Typically, a woman.  So, what

23      would we surmise, Mr. Kim, if we saw a man crying?  If

24      we saw a man crying while he testified, what would we

25      think?  Would we think that the testimony was more

                               -151-

1          truthful or that it was probably more made up?

2                    PROSPECTIVE JUROR KIM:  Truthful.

3                    THE COURT:  Wouldn't you agree, Mr. Jensen?

4          Because we would think that men really don't want to

5          cry.  They don't want to show that side in front of a

6          bunch of strangers.

7                    PROSPECTIVE JUROR JENSEN:  I would think

8          that possibly they might be trying to sway someone.  It

9          might not be a real cry.

10                   THE COURT:  Yeah.  There always would be

11         that is it real or not?  But the first instance that

12         it's coming out, wouldn't we go through the same thing

13         if it was a woman that started to cry?

14                   PROSPECTIVE JUROR JENSEN:  Not necessarily.

15                   THE COURT:  Okay.

16                   PROSPECTIVE JUROR JENSEN:  It just depends

17         how sharp they are, or they think they're sharp.

18                   THE COURT:  Or it could go the way that the

19         political commercials went, right?  Who would you rather

20         have answer the phone at three o'clock in the morning?

21         Remember that one?

22                   Or, you know, who would you want?  A man or

23         a woman?  Oh, well, you know how women are.  I'm

24         thinking, okay.  My mama was a woman.  She was a great

25         woman.  Mostly we have women teachers.  They taught me

1        right from wrong.  I married a woman.  I'm like so good

2        so far.  Three out of four kids females.  I'm thinking,

3        okay.  What's wrong with a woman?  And it's like, Bruce.

4        You know how they are.  They don't believe in war.  I'm

5        like, none of the sons would be drafted.  I'm like, they

6        approach stuff differently.

7                   But people think that women shouldn't be in

8        situations that involve a high degree of intellect.

9        Wouldn't you agree, Mr. Clopton?

10                  PROSPECTIVE JUROR CLOPTON:  I don't agree

11       with that.

12                  THE COURT:  Well, how come we haven't had a

13       woman President yet?

14                  PROSPECTIVE JUROR CLOPTON:  Nobody has, I

15       guess nobody agreed that they found one that was

16       qualified.

17                  THE COURT:  Well, they said that about

18       Barack until -- Oh, we can't find no qualified negroes.

19       Didn't they?

20                  PROSPECTIVE JUROR CLOPTON:  Yes.

21                  THE COURT:  Didn't they?  Yeah.  So, so much

22       for they couldn't find.  I mean, because what are the

23       qualifications for President?  I'm sorry.

24                  PROSPECTIVE JUROR COLAROSSI:  Thirty-five

25       and a citizen.

1              THE COURT:  And they couldn't find any women

2       that were over thirty-five and a citizen?

3              PROSPECTIVE JUROR CREAMER:  That you'd be

4       willing to vote for.

5              THE COURT:  Oh, well, you know, there were

6       some women that believed the hype and then there's those

7       that don't.  And then there's women that spread the

8       hype.  There were women that wouldn't vote for a woman.

9       Period.  Forget politics.  Women can't do that job.

10      That's a man's job.  I don't know.  Probably, well, I

11      know a lot of people didn't think women could be

12      policemen and firemen.  They had to sue to get women to

13      have the ability.

14             They didn't think that women should vote for

15      a long, long time, right?  Because you all weren't smart

16      enough to vote, apparently.  Because what other reason

17      would women be denied the right to vote?  Ms. McDade,

18      can you think of any other reason?  Oh.  I can think of

19      a reason why women shouldn't be allowed to vote, if I

20      was the party that was in control.  Give me a reason why

21      you wouldn't expand voting rights if you were in

22      control.

23             PROSPECTIVE JUROR McDADE:  They didn't want

24      the women to get in charge.

25             THE COURT:  And how do you prevent the other

-154-

1        side from getting in charge?  You make them believe that

2        women are inferior and women can't do the same job.

3        Right?  So, then it's settled.  If there's ever a woman

4        that runs against a man and that's what you were taught

5        and that's what you believe, then women are a threat.

6        Because most people don't like to give up power.  So, I

7        think that's what it is.

8                And I also think that men realized that,

9        because it was a male dominated culture, for real, for

10       real, that it was like having two votes in the house

11       instead of one.  You were not going to get Maria Shriver

12       and Arnold Schwarzenegger over here.  You were not going

13       to get the donkey and the elephant.  It was either going

14       to be two donkeys or two elephants.

15               You think it had anything to do with, you

16       know, altruistic aims and goals that women deserved to

17       vote?  You think so?  We would like to think that man

18       became enlightened.  But my goodness.  1920?  It took

19       that long?  Since the Constitution, it took eighteen

20       amendments to get there?  Anybody gets enlightened way

21       before then.  You don't think so?  Think about it.  I'll

22       give you a second to think about it.  What do you think,

23       Mr. Jensen.  That's a long time, isn't it?

24                       PROSPECTIVE JUROR JENSEN:  Yes.

25                       THE COURT:  I mean, that's a long time.

1      1776, 1919.  That's a long time.  Okay.  You think you

2      four will be able to be fair and impartial jurors, Mr.

3      Kim, Mr. Clopton?  How about you two?  You think you'll

4      be able to be fair and impartial?

5                    PROSPECTIVE JUROR CLOPTON:  Yes.

6                    THE COURT:  Okay.  Ms. McDade, Mr. Jensen?

7                    PROSPECTIVE JUROR JENSEN:  I was going to

8      ask you that -- Remember before you asked about all the

9      names, if you knew anybody?

10                   THE COURT:  Did any of them sound familiar

11     to you?

12                   PROSPECTIVE JUROR JENSEN:  Detective Love,

13     possibly, only if he was a patrolman for the Detroit

14     Police Department years ago.

15                   THE COURT:  I'm sure years ago everybody

16     started out as a patrolman.  So, I'm going to...

17                   PROSPECTIVE JUROR JENSEN:  Was he Mr.

18     Michigan?

19                   THE COURT:  No.  That was Ron Love.

20                   PROSPECTIVE JUROR JENSEN:  It might be Ron.

21                   THE COURT:  No.  No.  Yeah.  That was the

22     body builder.  Right.

23                   PROSPECTIVE JUROR JENSEN:  He was Mr.

24     Michigan.  I knew him.

25                   THE COURT:  Okay.  No.  No.  A lot of people

1     don't even know that.  I was in a gym this summer,

2     Powerhouse over in Highland Park on Woodward and I saw

3     some old pictures of Love and his -- Yeah.  I'm just

4     happy that I don't wear a Speedo.  That's all that I was

5     thinking.  Thank God for them surfer shorts.  Oh, no.  I

6     know you all tried to picture me with a -- Don't do

7     that.  It's not a good picture.  Mr. Prasad.

8          MR. PRASAD:  Thank you, sir.  For the four

9     new ones, did you guys hear all the questions I was

10    asking the group before?  Do you remember those

11    questions?  I was trying to ask about some of the fair

12    and impartial issues that you know yourself best for.

13         The first one being this is a homicide case,

14    obviously.  So, understanding that sentencing has

15    nothing to do with your job, will that affect you?

16    Because this is a homicide case, will the thought of the

17    sentence or possible sentence, will that affect your

18    ability to be fair and impartial in this case?  Sir?

19         PROSPECTIVE JUROR CLOPTON:  No.

20         MR. PRASAD:  Mr. Kim?

21         PROSPECTIVE JUROR KIM:  No.

22         MR. PRASAD:  No?  Okay.  Sir?

23         PROSPECTIVE JUROR JENSEN:  You know, I have

24    a twenty-four-year-old son.

25         MR. PRASAD:  And that was my next question I

```
 1    was going to get to.  And we can jump to that if you
 2    want--
 3                    PROSPECTIVE JUROR JENSEN:  (Interposing)
 4    No.  No.  I can wait.
 5                    MR. PRASAD:  In terms of sentencing, you're
 6    okay with the fact that -- You're not going to be
 7    thinking about the sentence when you're doing your job
 8    about trying to evaluate the facts and the law, anything
 9    like that?  Ma'am?
10                    PROSPECTIVE JUROR McDADE:  I don't know what
11    the sentencing could be--
12                    MR. PRASAD:  (Interposing)  And really it's
13    not -- It really has nothing -- And that's the whole
14    point is that you should really not concern yourself
15    with that.
16                    PROSPECTIVE JUROR McDADE:  Okay.
17                    MR. PRASAD:  Is that okay?
18                    PROSPECTIVE JUROR McDADE:  I think so.
19                    MR. PRASAD:  Okay.  Then let's go to the
20    next question, which is a harder question, is that at
21    the time of the incident Mr. Howard was sixteen years
22    old, he's seventeen now.  Sir, going back to what you
23    were saying, can you be fair and impartial given the age
24    of the defendant?
25                    PROSPECTIVE JUROR CLOPTON:  Yes.  I think I-
```

1        --

2                    PROSPECTIVE JUROR JENSEN:  (Interposing)  As

3        I stated before--

4                    MR. PRASAD:  (Interposing)  I'm sorry.  Him.

5                    PROSPECTIVE JUROR CLOPTON:  Oh.  I'm sorry.

6                    MR. PRASAD:  It's okay.

7                    PROSPECTIVE JUROR JENSEN:  As I stated

8        before, I have a young son and grandsons that are

9        twenty-one.  And just knowing what the outcome can be,

10       how you can affect someone for the rest of -- It would

11       be -- I don't want to say impossible, maybe difficult.

12                   MR. PRASAD:  And I appreciate your honesty.

13       And that's really what I'm trying to get at.  Do you

14       feel, do you feel that that's going to affect your

15       decision process?  Is that something that's going to be

16       in the back of your mind while you're trying to follow

17       the instructions that only Judge Morrow can give you?

18                   PROSPECTIVE JUROR JENSEN:  I believe it

19       could be in the back of my mind.

20                   MR. PRASAD:  Okay.  Ma'am?

21                   PROSPECTIVE JUROR McDADE:  Yeah.  It may be

22       in the back of my mind.

23                   MR. PRASAD:  But I'm trying to -- Can you

24       set that aside?  Could you give a fair--

25                   PROSPECTIVE JUROR McDADE:  (Interposing)  I

-159-

1    could.

2                    MR. PRASAD:  Okay.  Mr. Kim?

3                    PROSPECTIVE JUROR KIM:  Based on his

4    history.  If it's the first time...

5                    MR. PRASAD:  And let me be honest about it.

6    You don't, you don't get into the history of people.  We

7    focus on the incident that happened.

8                    PROSPECTIVE JUROR KIM:  I will follow just

9    the law.

10                   PROSPECTIVE JUROR CLOPTON:  Could I add a

11   little to my statement?

12                   MR. PRASAD:  Yeah.  I was going to--

13                   PROSPECTIVE JUROR CLOPTON:  (Interposing)

14   Oh.  Okay.

15                   MR. PRASAD:  I'm going in a circle.  I was

16   going to come right to you.  Go ahead, Mr. Kim.

17                   PROSPECTIVE JUROR KIM:  Actually, I like to

18   follow the law, justice.

19                   MR. PRASAD:  Okay.

20                   PROSPECTIVE JUROR KIM:  One side is his age,

21   depends on sympathy.

22                   MR. PRASAD:  Right.  Right.

23                   PROSPECTIVE JUROR KIM:  Which is the more

24   heavy.

25                   MR. PRASAD:  Right.

1          PROSPECTIVE JUROR KIM:  It depends on which

2     is--

3          MR. PRASAD:  (Interposing)  And that's

4     exactly what I'm asking is that -- Because the Judge is

5     going to instruct you to set aside your sympathy and

6     follow the law and the facts.  Can you do that?  Can you

7     set aside the sympathy for his age and follow the facts

8     and the law?

9          PROSPECTIVE JUROR KIM:  It depends on which

10    more heavier.  That's what I'm saying.

11         MR. PRASAD:  Mr. Clopton, I'm sorry.  I

12    didn't meant to interrupt you.

13         PROSPECTIVE JUROR CLOPTON:  That's okay.

14    I'm going to go with what I said before, but I think

15    that it might, and it may be fair to state that I'm not

16    really, I haven't always been very comfortable judging

17    people.  I try not to be the most judgmental person.

18    So, I've never done anything like this before  I, I

19    think I could, but I just wanted to state that for the

20    record.

21         MR. PRASAD:  I appreciate that.  And that

22    was one of the other topics I did bring up with the

23    whole panel as a whole, which was, you know, it's weird

24    the way that we ask jurors to sit in judgement of

25    people.  I mean, because you do sit in judgement, but

1     it's not--

2                    THE COURT:  (Interposing)  Hold it.  Hold

3     it.  Hold it.  Hold it.  Hold it.  Nobody sits in

4     judgement of nobody.  People are not judging whether

5     somebody's good or bad or indifferent.  You don't sit in

6     judgement if somebody says I just left outside and it's

7     cold.  I just left outside and it's warm.  If they have

8     to prove beyond a reasonable doubt that it's cold, how

9     is that judging a person?

10                   PROSPECTIVE JUROR CLOPTON:  I guess I can

11    see what, I can see what you mean.

12                   THE COURT:  A priest could come in here and

13    say it was eighty degrees outside.  And a homeless

14    person could come out here and say it was nineteen

15    degrees.  Now, the homeless person could have just bit

16    five children, stepped on twelve ants and urinated on

17    the steps.  And the question wouldn't be which is the

18    good person and which is the bad person?

19                   PROSPECTIVE JUROR CLOPTON:  I guess perhaps

20    maybe I miscommunicated what I was trying to state--

21                   THE COURT:  (Interposing)  Well, no.  He

22    said you are going to be able to judge people.  And

23    you'll be able to use other corroborating evidence

24    sometimes to decide if what you believe is true.

25    Sometimes it's a picture.

-162-

1          If somebody says, okay.  I was just outside

2     ten minutes ago and it was five inches of snow.  And

3     then they bring in a picture that has the date and the

4     time and said, look.  I just took a picture on my phone.

5     That information on the phone would corroborate the

6     person's testimony.  You don't have to decide if the

7     person's good or bad.  You might decide if that's really

8     the time that's in there or when the picture was taken.

9     But there is never any decision about judging people.

10    So, their instructions are going to be different, not to

11    judge people.

12          MR. PRASAD:  No.  And, Judge, I'm not

13    disagreeing with what your Honor's saying.  I'm saying

14    that the law and facts create very specific rules on

15    what you're doing.  You're actually judging what

16    happened on a specific day.  But as part of that, you

17    have to be comfortable in making that decision.  That's

18    really what I'm trying to get at, is that, you know,

19    it's not like a normal, everyday occurrence when you

20    meet someone on the street.  It's not like that at all

21    because the law is very specific in the way you do this

22    process.

23          I mean, there's the evidence, as the Judge

24    said, that I have to present to prove my elements beyond

25    a reasonable doubt.  That's how you judge.  That's how

-163-

```
 1        you judge this case.  That's how you judge the charges

 2        that Mr. Howard's facing.  Can you -- Do you feel

 3        comfortable doing that is really what I'm trying to get

 4        at?

 5                    PROSPECTIVE JUROR CLOPTON:  Okay.  I believe

 6        I, I believe I can.  I can't say for sure.

 7                    MR. PRASAD:  Okay.

 8                    PROSPECTIVE JUROR CLOPTON:  But I believe I

 9        can.

10                    MR. PRASAD:  And the reason I bring that up

11        is sometimes people have moral or ethical or religious

12        hesitations in doing that.  I mean, that's the best way

13        to describe it, is that it's a hesitation.  It's

14        something that makes them uncomfortable in doing that,

15        and doing our job as jurors.  That's really why I asked

16        that question.  Mr. Kim, do you understand that, sir?

17                    PROSPECTIVE JUROR KIM:  Yes.

18                    MR. PRASAD:  Do you have any problems?

19                    PROSPECTIVE JUROR KIM:  Actually, it depends

20        ont he proof and the evidence.

21                    MR. PRASAD:  Right.  Exactly.

22                    PROSPECTIVE JUROR KIM:  Yeah.

23                    MR. PRASAD:  Exactly.  Ma'am, any problems

24        with that?

25                    PROSPECTIVE JUROR McDADE:  I don't think so.
```

-164-

1           MR. PRASAD:  Okay.  And, sir?  Okay.

2           PROSPECTIVE JUROR JENSEN:  Yes.

3           MR. PRASAD:  Yes?

4           PROSPECTIVE JUROR JENSEN:  I think I'm going

5     to have a problem with that.

6           MR. PRASAD:  Okay.  In making a decision--

7           PROSPECTIVE JUROR JENSEN:  (Interposing)

8     Due to, due to the fact just, like I said before, I have

9     grandchildren--

10          MR. PRASAD:  (Interposing)  Okay.

11          PROSPECTIVE JUROR JENSEN:  And children all

12    around the gentleman's age here.  I've got four

13    grandchildren.  I think it would be, I think it would be

14    in the back of my mind.

15          MR. PRASAD:  Okay.  Thank you.

16          PROSPECTIVE JUROR JENSEN:  I might have an

17    issue.

18          MR. PRASAD:  One last thing.  And I want to

19    ask the whole panel because I forgot to ask you before,

20    this question before.  Anyone have any medical issues or

21    hearing issues or anything like that that prevents them

22    from being able to sit for, for a good stretch of time

23    and focus on the evidence that's presented?  Everyone

24    can hear okay?

25          PROSPECTIVE JUROR CLOPTON:  I have, I have a

-165-

```
 1        slight hearing deficiency in one of my ears, but it's
 2        never really caused that big a problem for me.
 3                    MR. PRASAD:  Are you able to follow
 4        everything so far?
 5                    PROSPECTIVE JUROR CLOPTON:  Yeah.  For the
 6        most part.
 7                    MR. PRASAD:  Okay.  Good.  Thank you.  Thank
 8        you, your Honor.
 9                    THE COURT:  Go ahead, Ms. Rock.
10                    MS. ROCK:  Oh.  Okay.  Ms. Paris, you
11        started to say something about--
12                    PROSPECTIVE JUROR PARIS:  (Interposing)  No.
13        I was just saying it's hard for me to sit long periods
14        because I had a hip replacement.
15                    MS. ROCK:  How long do you think you could
16        sit during, for a trial?
17                    THE COURT:  She doesn't have to sit.  You
18        can stand whenever you want to, ma'am.
19                    PROSPECTIVE JUROR PARIS:  All right.  I can
20        stand--
21                    THE COURT:  (Interposing)  I stand and I
22        walk in the afternoon--
23                    PROSPECTIVE JUROR PARIS:  (Interposing)  All
24        right.  I'm fine.
25                    THE COURT:  So I don't fall asleep.
```

-166-

```
1              MS. ROCK:  So, you're all set?

2              PROSPECTIVE JUROR PARIS:  Yeah.

3              MS. ROCK:  Now, Mr. Jensen, Mr. Kim, Mr.

4      Clopton and Ms. McDade, in this particular case, there's

5      allegations that things happened really fast.  There was

6      a fight.  There was gunshots.  Would you agree, Mr.

7      Jensen, that adrenaline or anger can make you forget

8      facts?

9              PROSPECTIVE JUROR JENSEN:  Yes.

10             MS. ROCK:  Okay.  Would you agree with that,

11     Ms. McDade?

12             PROSPECTIVE JUROR McDADE:  I suppose.

13             MS. ROCK:  And how about you, Mr. King?

14     Kim.  Excuse me.

15             PROSPECTIVE JUROR KIM:  Yes.

16             MS. ROCK:  Oh.  And Mr. Clopton--

17             PROSPECTIVE JUROR JENSEN:  (Interposing)

18     Pardon me.  I'd like to say that I don't know if you

19     could forget the facts, but they might become cloudy.

20             MS. ROCK:  Cloudy.

21             PROSPECTIVE JUROR JENSEN:  I think you're

22     still going to remember something, but...

23             MS. ROCK:  Well, have you ever had the

24     experience where you got in an argument with like the

25     gas station attendant or somebody at a store and you get
```

1    in this fast argument and all of a sudden you can't

2    remember -- I mean, it was just a weird argument that

3    you can't remember who started it or what you said?  You

4    ever have that experience?

5            PROSPECTIVE JUROR JENSEN:  I'd probably

6    think so.  Not that specific experience, but maybe

7    something similar.

8            MS. ROCK:  Where you start recounting,

9    geeze, how did this argument start?  How about you, Mr.

10   Clopton?  Did you ever have that experience?

11           PROSPECTIVE JUROR CLOPTON:  I have had that

12   experience a few times.

13           MS. ROCK:  Where you -- Okay.  And Ms.

14   McDade, you would also agree that sometimes adrenaline

15   and anger can affect our memory or our view of what

16   happened?

17           PROSPECTIVE JUROR McDADE:  I guess so.

18           MS. ROCK:  Okay.  And do you -- I asked this

19   question before and I just really need to know the

20   answer to it, of course.  I'm going to be accusing the

21   police, and some of the witnesses, as a matter of fact,

22   of lying or cheating.  Any problem with that?  Anybody

23   feel uncomfortable with me doing that?  Ms. McDade?

24           PROSPECTIVE JUROR McDADE:  No.

25           MS. ROCK:  Okay.  How about you, Mr.

1    Clopton?

2              PROSPECTIVE JUROR CLOPTON:  No.

3              MS. ROCK:  Mr. Jensen?

4              PROSPECTIVE JUROR JENSEN:  That's your,

5    that's your tactic?  You're going to be accusing them?

6              MS. ROCK:  Well, yeah.  I'm going to be, you

7    know, when they're on the witness stand.  When, when I'm

8    going to be making my arguments.

9              PROSPECTIVE JUROR JENSEN:  That's your job.

10             MS. ROCK:  Okay.  Thank you.  How about you,

11   Mr. Kim?  Any problem with that?

12             PROSPECTIVE JUROR KIM:  No.  Actually, but

13   what is the reason why?  So, yes.  So, I will scrutinize

14   the points.

15             MS. ROCK:  Absolutely.

16             PROSPECTIVE JUROR KIM:  Yeah.

17             MS. ROCK:  So, you'd be listening to the

18   evidence to see if what I, what, the allegations, that

19   what I was saying was true, correct?

20             PROSPECTIVE JUROR KIM:  Yes.

21             MS. ROCK:  Okay.  That's fair.  Does anybody

22   have anybody in law enforcement in their family or a

23   close friend?  Mr. Jensen?

24             PROSPECTIVE JUROR JENSEN:  My two brother-

25   in-laws are enforcement officers at the national parks.

 1                    MS. ROCK:  National parks?

 2                    PROSPECTIVE JUROR JENSEN:  Like maybe

 3       Yosemite.  They carry a pistol.

 4                    MS. ROCK:  Okay.

 5                    PROSPECTIVE JUROR JENSEN:  Two of them.

 6                    MS. ROCK:  Two brother-in-laws.

 7                    PROSPECTIVE JUROR JENSEN:  Plus, my other

 8       brother-in-law is a lawyer in California.

 9                    MS. ROCK:  The fact that these individuals

10       are, you know, one's a lawyer and two are national

11       enforcement officers, would that impact how you view

12       this case?  Or would you bring anything, any information

13       that they may have given you into this case where you

14       don't think you could be fair?

15                    PROSPECTIVE JUROR JENSEN:  No.

16                    MS. ROCK:  Okay.  Mr. Kim?

17                    PROSPECTIVE JUROR KIM:  Yes.

18                    MS. ROCK:  Any law enforcement members?

19                    PROSPECTIVE JUROR KIM:  No.

20                    MS. ROCK:  Ms. McDade?

21                    PROSPECTIVE JUROR McDADE:  No.

22                    MS. ROCK:  Mr. Clopton?

23                    PROSPECTIVE JUROR CLOPTON:  There's a police

24       officer in my family.  It's my cousin.  But I probably

25       seen him like four times in my life.  And the last time

1      I saw him was, I had to be about thirteen.

2              MS. ROCK:  Okay.  Thank you.  And then

3      finally, what I wanted to ask you.  Mr. Kim, do you

4      think it's possible for somebody to be bullied or scared

5      or intimidated into doing something that wasn't true,

6      saying something that wasn't true?  Do you think that's

7      possible?  I don't mean in the, you know, like

8      everything's possible sense.  But do you think that,

9      that that can happen?

10              PROSPECTIVE JUROR KIM:  I believe sometimes,

11     in my opinion, it's impossible.

12              MS. ROCK:  So you think it's impossible?

13              PROSPECTIVE JUROR KIM:  Yeah.

14              MS. ROCK:  You think that generally no

15     matter how bullied or threatened somebody is that they

16     would still just tell the truth?

17              PROSPECTIVE JUROR KIM:  Oh, yes.  Still tell

18     the truth.  Yes.

19              MS. ROCK:  Okay.  Even if they were bullied

20     or threatened?

21              PROSPECTIVE JUROR KIM:  Yes.

22              MS. ROCK:  Family threatened?

23              PROSPECTIVE JUROR KIM:  Yes.

24              MS. ROCK:  Okay.  How about you, Mr.

25     Clopton?  Do you think it's possible that somebody could

-171-

1   be bullied and intimidated into not telling the truth?

2              PROSPECTIVE JUROR CLOPTON:  I think it's

3   possible.

4              MS. ROCK:  Okay.  But I mean realistically

5   possible.  Do you think it happens?

6              PROSPECTIVE JUROR CLOPTON:  I do think it

7   happens.

8              MS. ROCK:  Do you -- Have you ever had any

9   experience -- Not you personally, maybe, but friends or

10  family?

11             PROSPECTIVE JUROR CLOPTON:  I can't, I can't

12  remember any right now for sure.  I want to say this

13  happened before, but I can't remember anything for

14  certain right now.

15             MS. ROCK:  Gotcha.  Mr. Jensen?

16             PROSPECTIVE JUROR JENSEN:  I believe it's

17  possible.

18             MS. ROCK:  Okay.  Ms. McDade?

19             PROSPECTIVE JUROR McDADE:  Yes.

20             MS. ROCK:  Do you think that that, that

21  somebody could be bullied or intimidated or scared into

22  saying something that wasn't true?

23             PROSPECTIVE JUROR McDADE:  I suppose so.

24             MS. ROCK:  And when you say I suppose so, it

25  sounds like you have some doubt.  Is that true?  Do you

1        have some doubt about that?  Do you think I'm, you know,

2        just...

3                        PROSPECTIVE JUROR McDADE:  I'm sure it

4        happens.  I don't know how often, but I'm sure it

5        happens.

6                        MS. ROCK:  Okay.  You just can't think of

7        any specific instance, is that right?

8                        PROSPECTIVE JUROR McDADE:  Yes.

9                        MS. ROCK:  Is that how I'm reading it?

10                       PROSPECTIVE JUROR McDADE:  Yes.

11                       MS. ROCK:  Your Honor, I don't have any

12       further questions of the witness.  And thank you.

13                       THE COURT:  Any challenges for cause for the

14       People?

15                       MR. PRASAD:  None for cause, Judge.

16                       THE COURT:  How about from the prosecution?

17       I'm sorry.  The defense.

18                       MS. ROCK:  Yes, your Honor.  We would like

19       to thank and excuse Ms. Keast.  And we would like to

20       thank and excuse Ms. Brown, Ms. Ingle and Mr. Kim

21                       THE COURT:  Okay.  I'm asking for cause.

22                       MS. ROCK:  Oh.  No.  None for cause.  Thank

23       you.

24                       THE COURT:  That's all right.  You're ahead

25       of the game.  And preemptories would be to you.  And who

-173-

1      would you like to exercise preemptories--

2                    MS. ROCK:  (Interposing)  That would be Ms.

3      Keast.  Thank you.  Ms. Brown.  Thank you.  Ms. Ingle

4      and Mr. Kim.

5                    THE COURT:  Let me thank you four for

6      helping us today.  I appreciated your help, your concern

7      and wish everybody a wonderful new year.  What would be

8      your pleasure, sir?  You want me to fill them or you--

9                    MR. PRASAD:  (Interposing)  Judge, I'll, I'd

10     just like to thank and excuse Mr. Jensen.

11                   THE COURT:  Mr. Jensen, up top.  Thank you,

12     sir.  Either way you want to leave.  It's up to you.

13     You can go this way or that way.

14                   MR. PRASAD:  That's it for now.  Thank you.

15                   THE COURT:  Okay.  Thank you, sir.

16                   THE CLERK:  Dana Hightower, could you please

17     take seat number one?  Ronald Balliet, could you please

18     take seat number two?  Noreen Thomas, could you please

19     take seat number nine.

20                   UNIDENTIFIED PROSPECTIVE JUROR:  Excuse me,

21     your Honor?

22                   THE COURT:  Yes?

23                   UNIDENTIFIED PROSPECTIVE JUROR:  Can I go to

24     the rest room?

25                   THE COURT:  Oh, certainly.  Thank you.  I'm

-174-

1        sorry.  Anybody else that's out here, if you need to go

2        to the rest room, simply go out.  There's no, no hall

3        passer out there.  I'm sorry.

4                        THE CLERK:  Darren Nester, could you please

5        take seat number ten?  And John Brownfiel, could you

6        please take seat number fourteen?

7                        THE COURT:  Mr. Hightower, in the meantime,

8        why don't you tell us who you are?  Introduce yourself

9        to us.

10                       PROSPECTIVE JUROR HIGHTOWER:  My name is

11       Dana Hightower.  I'm twenty-four.  I work for Fed Ex

12       ground in Livonia.  I stay in Livonia with my

13       girlfriend.  We have an apartment.  She works at AT & T.

14                       THE COURT:  Have you ever served as a juror

15       before?

16                       PROSPECTIVE JUROR HIGHTOWER:  No.  This is

17       my first time.

18                       THE COURT:  Okay.  Any of the names of the

19       witnesses sound familiar to you?

20                       PROSPECTIVE JUROR HIGHTOWER:  No.  They

21       don't.

22                       THE COURT:  Okay.  So, let me ask you what

23       is a crazy question.  Okay.  Have you been able to see

24       me up close?

25                       PROSPECTIVE JUROR HIGHTOWER:  Yeah.

-175-

1              THE COURT:  Okay.  Do I wear earrings?

2              PROSPECTIVE JUROR HIGHTOWER:  Yeah.  Two.

3              THE COURT:  Okay.  What do you think

4    people's impression is about me being a Judge wearing

5    earrings?

6              PROSPECTIVE JUROR HIGHTOWER:  You know, I

7    actually was looking at that and I was thinking that

8    because you're a guy and you do have two earrings on one

9    ear.  But you speak well.  You're a Judge.  I didn't

10   judge you at all.  I didn't think anything about it at

11   all.

12             THE COURT:  What do you think other, how do

13   you think other people read that?

14             PROSPECTIVE JUROR HIGHTOWER:  They might

15   think differently.  I mean, I'm a fashion-type person.

16   So, I was looking at it as maybe that's your style

17   outside of work.

18             THE COURT:  Okay.

19             PROSPECTIVE JUROR HIGHTOWER:  Maybe that

20   makes you who you are outside of work.

21             THE COURT:  How do you think other people

22   might look at it?

23             PROSPECTIVE JUROR HIGHTOWER:  I don't know.

24             THE COURT:  You don't think some people say,

25   man, what's a Judge doing wearing earrings?

```
1                    PROSPECTIVE JUROR HIGHTOWER:  Maybe they

2        think you grew up in the hood or something.  I don't

3        know.

4                    THE COURT:  Well, what if they knew that the

5        earrings were forty-one, the holes in the ears were

6        forty-one years old?  Then what do you think they'd

7        think?

8                    PROSPECTIVE JUROR HIGHTOWER:  I don't know.

9                    THE COURT:  Okay.  Because--

10                   PROSPECTIVE JUROR HIGHTOWER:  (Interposing)

11       You was young and -- I don't know.

12                   THE COURT:  Ahead of the curve.  They might

13       think that I was the style setter rather than the trend

14       follower.  Right?

15                   PROSPECTIVE JUROR HIGHTOWER:  Yeah.

16                   THE COURT:  Or what if everybody in my crew

17       had earrings and I was the last one?  Then they would

18       think that I was a follower.

19                   PROSPECTIVE JUROR HIGHTOWER:  You're right.

20       I actually would say you're a trend setter.  I don't see

21       many guys wearing two earrings on one ear.

22                   THE COURT:  All right.  How about if I told

23       you I had another one over on the other side that I

24       usually don't, unless I'm really stepping out trying to

25       do my thing, I don't put anything in that one?
```

1                    PROSPECTIVE JUROR HIGHTOWER:  Everyone's
2       different.  I mean, you know...
3                    THE COURT:  Well, you want me to tell you
4       what the perception was in 1971?  Folks thought I was
5       gay.
6                    PROSPECTIVE JUROR HIGHTOWER:  Yeah.
7                    THE COURT:  And then the other group thought
8       I was this militant radical.  And then still people will
9       say, I don't know very many Judges that have earrings.
10      And then I'll point them to all of my female
11      colleagues.  I say, I know a lot.  Just like this summer
12      people used to always comment that I wore flip flops or
13      thongs, right?  And, you know, I'm thinking almost every
14      female colleague wears thongs.  They wear some sort of
15      shoe that there's something that goes between the big
16      toe and the other four.
17                   And I'm thinking, they still have a really
18      tremendous double standard in terms of appearance
19      sometimes for how they expect men Judges to look.  I
20      know that I used to.  When I was a kid, every Judge I
21      saw on TV was old, white and bald-headed or had what we
22      call ear muffs on the side.
23                   But it was interesting because they did a
24      little study, Mr. Hightower, about, oh I guess it was
25      about fifteen years ago.  And they asked just kids that

-178-

1   were twenty and under, they said describe a Judge for

2   us, what you think a Judge looks like.  Those kids said

3   that the Judge, the majority of them said was Asian-

4   American.

5              And that so was vastly different.  And you

6   know why?  Because of the O.J. Simpson trial.  They saw

7   Judge Ito on TV all the time.  And so, that became their

8   concept of what a Judge was.  And I said, man.  It

9   taught me that if somebody can keep feeding you an

10  image, that's what you'll believe.  And the number, the

11  percentage of Asian-American Judges in America at that

12  time was less than one-fifth of one percent.  And so,

13  they adopted one-fifth of one percent for what they

14  believed the majority was.  Oh, the power of media.  The

15  power of the media.

16             If they give you enough of that image,

17  that's the image you carry, and especially if you

18  haven't had an experience yourself.  So, it's

19  interesting.  Sir, your name, please.

20             PROSPECTIVE JUROR BALLIET:  Yes.  My name is

21  Ron Balliet.  I'm retired from the state of Michigan.  I

22  was a social worker for thirty years.

23             THE COURT:  How long have you been retired?

24             PROSPECTIVE JUROR BALLIET:  I've been

25  retired since 2004.  I took an early buyout.

 1                    THE COURT:  You are making me more and more

 2        jealous.  So, what have you been doing with these six

 3        years?

 4                    PROSPECTIVE JUROR BALLIET:  Well, the last

 5        few years, I delivered flowers, part-time in a flower

 6        shop.  And I've been divorced for many years.  I have

 7        two grown children and two young grandchildren.

 8                    THE COURT:  Okay.  Did you have--

 9                    PROSPECTIVE JUROR BALLIET:  (Interposing)  I

10        live alone.

11                    THE COURT:  Like kind of a plan you wanted

12        to follow when you were retired?  Did you--

13                    PROSPECTIVE JUROR BALLIET:  (Interposing)

14        Yeah.  I wanted to play golf everyday.

15                    THE COURT:  Okay.  And--

16                    PROSPECTIVE JUROR BALLIET:  (Interposing)

17        And I did for a few years, for a couple years.  I

18        realized I needed some more balance in my life.

19                    THE COURT:  All right.

20                    PROSPECTIVE JUROR BALLIET:  So, I got a

21        part-time job.  I play golf when I don't work.  I play

22        once or twice a week as opposed to five days a week.

23                    THE COURT:  All right.

24                    PROSPECTIVE JUROR BALLIET:  Which just way

25        too much out of balance.

                                  -180-

 1                    THE COURT:  Do you do something in the
 2          spring to get yourself ready for the Michigan season?  I
 3          mean, I had some friends every year that used to go down
 4          to South Carolina.  And--
 5                    PROSPECTIVE JUROR BALLIET:  (Interposing)
 6          My son lives in Florida.  My son lives in Florida.  In
 7          fact, I have a, my brother is a golf professional in
 8          Phoenix.  And my son is a golf professional in Florida,
 9          as opposed to a professional golfer.
10                    THE COURT:  I got you.  Does the uncle have
11          anything to do with the son choosing the profession?
12                    PROSPECTIVE JUROR BALLIET:  Yeah.  Golf's
13          been in the family for, for years.
14                    THE COURT:  Okay.
15                    PROSPECTIVE JUROR BALLIET:  My father was
16          really into it big time and so...
17                    THE COURT:  So, as a child, you got treated
18          to greens.
19                    PROSPECTIVE JUROR BALLIET:  Oh, yeah.  Oh,
20          yeah.  My father was a member of a golf course, public
21          course.  Well, actually, he was on a golf team.  They
22          don't have that anymore.  At least I don't think they
23          do, golf teams at public courses.  So, the family could
24          play for free at that time.
25                    THE COURT:  So, what was your favorite

                              -181-

1      course in Southeastern Michigan?

2                    PROSPECTIVE JUROR BALLIET:  Well, I didn't

3      play at any private courses.  I didn't have that kind of

4      money.  But gee whiz.

5                    THE COURT:  We used to call it access

6      because--

7                    PROSPECTIVE JUROR BALLIET:  (Interposing)

8      Access.  Yeah.

9                    THE COURT:  Money was such a word straight

10     to the heart.

11                    PROSPECTIVE JUROR BALLIET:  Sure.

12                    THE COURT:  Something about being poor.  It

13     was easier to say we didn't have access.

14                    PROSPECTIVE JUROR BALLIET:  Right.  Right.

15     Yeah.  Well, there's a lot of nice courses.  Probably

16     the nicest I've played is up in Arcadia, up in Arcadia.

17     If that's what you were asking when you said--

18                    THE COURT:  (Interposing)  I am.  No.  No.

19                    PROSPECTIVE JUROR BALLIET:  Yeah.

20                    THE COURT:  Okay.  You ever served as a

21     juror before?

22                    PROSPECTIVE JUROR BALLIET:  No.  Never.

23                    THE COURT:  Before you took the buyout, did

24     you "a retirement car", one that was supposed to last

25     you for ten years or more?

1                    PROSPECTIVE JUROR BALLIET:  I don't think
2        there's any such thing.
3                    THE COURT:  I know some people say, I'm
4        trying to get this car and have it paid off so when I
5        retire I won't have this car note.
6                    PROSPECTIVE JUROR BALLIET:  I see what you
7        mean.  Okay.  I thought you meant the longevity of the--
8                    THE COURT:  (Interposing)  Oh, man.  The
9        only thing that's going to hold up is public
10       transportation.  And that's just because you know that
11       if it breaks down there's another one coming behind it
12       that they'll let you ride free.  That's about that way.
13       Good afternoon.
14                   PROSPECTIVE JUROR THOMAS:  Good afternoon.
15                   THE COURT:  Please, introduce yourself and
16       tell us about yourself.
17                   PROSPECTIVE JUROR THOMAS:  My name's Noreen
18       Thomas.  I--
19                   THE COURT:  (Interposing)  Can you all hear
20       Noreen Thomas or is she a little soft-spoken today?
21                   PROSPECTIVE JUROR THOMAS:  My bad.
22                   THE COURT:  Give us that outdoor voice.
23                   PROSPECTIVE JUROR THOMAS:  My name's Noreen
24       Thomas.  I'm working at, I work at the post office.  I'm
25       a letter carrier.  I've been there for eighteen years.

                              -183-

1          I'm divorced.  I have two children.  My daughter is

2     twenty-five.  My son is twenty-six.  And he's, my son's

3     a professional bike rider, BMX bike rider and--

4                    THE COURT:  (Interposing)  Isn't he a little

5     big for those little bikes?

6                    PROSPECTIVE JUROR THOMAS:  Oh, no.  He's

7     been doing it forever, so--

8                    THE COURT:  (Interposing)  I know.  But

9     isn't he a little big for those little, bitty bikes?

10                    PROSPECTIVE JUROR THOMAS:  No.  Not really.

11                    THE COURT:  Okay.

12                    PROSPECTIVE JUROR THOMAS:  No.  He has his

13     own company and he builds, he builds the ramps and he

14     goes around the country, which is, with his shows and

15     stuff.

16                    THE COURT:  Okay.  What did you want him to

17     be when he was a kid?

18                    PROSPECTIVE JUROR THOMAS:  Whatever he

19     wanted to be.

20                    THE COURT:  Okay.

21                    PROSPECTIVE JUROR THOMAS:  Seriously.  I

22     mean, he's--

23                    THE COURT:  (Interposing)  No.  I know you

24     wanted him to be happy, right?

25                    PROSPECTIVE JUROR THOMAS:  He loves what

1    he's--

2              THE COURT:  (Interposing)  No.  No.  Forget

3    -- I know you wanted him to be happy.  But what

4    occupation did you envision him with?  None?

5              PROSPECTIVE JUROR THOMAS:  Probably an

6    engineer.

7              THE COURT:  Okay.  Yeah.  That's what I was

8    saying.

9              PROSPECTIVE JUROR THOMAS:  Yeah.

10              THE COURT:  Because there was this other

11    lady who's son, much like yours, a professional yo-

12    yo'er.  And the yo-yo company, Imperial Yo-Yo in Duncan

13    hires this guy and he goes around to public schools and

14    he can do these amazing things with a yo-yo.  And I

15    didn't know that there was such a job.  I'm thinking, a

16    professional yo-yo'er?  I mean, makes a great living,

17    you know, did a couple DVDs of yo-yo tricks, much like

18    the folks with magic.  And so -- No.  But I only thought

19    BMX bikes were those little, itty, bitty bikes.  And we

20    always laugh--

21              PROSPECTIVE JUROR THOMAS:  (Interposing)

22    They're not, well, they're not that small.

23              THE COURT:  Well, they're not twenty-seven-

24    inch Schwins.

25              PROSPECTIVE JUROR THOMAS:  No.

-185-

1                    THE COURT:  With, you know, with the memory

2          foam seats.

3                    PROSPECTIVE JUROR THOMAS:  No.

4                    THE COURT:  Right.

5                    PROSPECTIVE JUROR THOMAS:  I have the, I

6          have the Could Nine, thank you very much.

7                    THE COURT:  So, how many times did you and

8          he go to the hospital between eight and sixteen?

9                    PROSPECTIVE JUROR THOMAS:  Actually, four.

10                   THE COURT:  Four?

11                   PROSPECTIVE JUROR THOMAS:  Four.

12                   THE COURT:  What?  Wrist and ankles?  Or

13         just wrist and nose stitches--

14                   PROSPECTIVE JUROR THOMAS:  (Interposing)

15         No.  Actually, he got hit by a car.  He was going across

16         the street and he got hit by a car.  And he hasn't

17         broken anything, except for his teeth.  He broke -- And

18         those are all replaced, so... And I don't think he's

19         broken any arms or legs or anything.

20                   THE COURT:  Okay.  Well, that's good.  But

21         who would have thought just giving that boy that first

22         bicycle would lead to this?

23                   PROSPECTIVE JUROR THOMAS:  No.  I never--

24                   THE COURT:  (Interposing)  You just never

25         imagine.

-186-

```
 1                     PROSPECTIVE JUROR THOMAS:  But he's doing
 2     very well for himself.
 3                     THE COURT:  That's a cool story.
 4                     PROSPECTIVE JUROR THOMAS:  Yeah.  My
 5     daughter is, she works for with an endodontist.  They do
 6     root canals and--
 7                     THE COURT:  (Interposing)  So, he had the
 8     hook with the--
 9                     PROSPECTIVE JUROR THOMAS:  (Interposing)
10     Basically.
11                     THE COURT:  Getting the implants.
12                     PROSPECTIVE JUROR THOMAS:  She fixes him up.
13                     THE COURT:  That's cool.
14                     PROSPECTIVE JUROR THOMAS:  She hasn't
15     really.  But yeah.  She could.
16                     THE COURT:  So, nieces, I mean,
17     grandchildren?
18                     PROSPECTIVE JUROR THOMAS:  No grandchildren.
19     My daughter just got engaged in November and she's
20     getting married in September.
21                     THE COURT:  Okay.  So, you like the
22     intended?
23                     PROSPECTIVE JUROR THOMAS:  Yes.  Very much.
24                     THE COURT:  Has he impressed with that, you
25     know, that facade or do you think it's genuine?
```

```
1                    PROSPECTIVE JUROR THOMAS:  Oh, I--
2                    THE COURT:  (Interposing)  Because we're
3          always nicer when we're in front of the mom's?
4                    PROSPECTIVE JUROR THOMAS:  It's genuine.
5          Yeah.  It's very genuine.  I mean, he tells me the bad
6          things, too, not just the good things.  So, yeah.  It's
7          good.
8                    THE COURT:  Okay.
9                    PROSPECTIVE JUROR THOMAS:  It's all good.
10                   THE COURT:  So--
11                   PROSPECTIVE JUROR THOMAS:  (Interposing)
12         And no, I didn't, I don't know any of the names.  And
13         I've never been on a jury before.
14                   THE COURT:  Okay.  So, are you going to do
15         the mother thing before the wedding?
16                   PROSPECTIVE JUROR THOMAS:  Which mother
17         thing?
18                   THE COURT:  Well, you know, usually, the
19         mother thing is, you know, they have this picture of how
20         they want to see themselves that's not related to how
21         they are now.  And so, you know, whether--
22                   PROSPECTIVE JUROR THOMAS:  (Interposing)
23         Oh, yeah.  You betcha.  You betcha.  Yes.
24                   THE COURT:  So, what's the goal?  Tell me.
25         Share it with me, please.
```

1              PROSPECTIVE JUROR THOMAS:  At least twenty.

2              THE COURT:  Okay.  Did you all know what I

3    was referring to without referring to it?  The mother

4    thing?  Okay.

5              PROSPECTIVE JUROR THOMAS:  How much weight

6    do I want to lose before the wedding.

7              THE COURT:  Always concerned about, oh, I

8    got to look like this for the wedding.  Oh.  I've got to

9    --Okay.  Young man?

10             PROSPECTIVE JUROR NESTER:  My name is Darren

11   Nester.  I'm an electrical engineer at Ford Motor

12   Company.  I'm married.  No children.  My wife is a

13   pharmacy technician.  And I have not served on a jury

14   before.

15             THE COURT:  If people were looking at you

16   and just trying to assess you and figure you out, what

17   thing would they least likely, based on how you look,

18   guess about you?

19             PROSPECTIVE JUROR NESTER:  That I'm an

20   engineer.

21             THE COURT:  What would they look at to

22   determine that you, that you were -- What do you think

23   people perceive you as?

24             PROSPECTIVE JUROR NESTER:  I don't know.

25             THE COURT:  But are you amazed when they

1      come up and just don't take you for what you are?

2                   PROSPECTIVE JUROR NESTER:  I deal with it

3      every day.

4                   THE COURT:  Okay.  I deal with it, too.

5      Some people tell me I don't look like a Judge.  I'm

6      like, what?  What?  I see myself -- You know, I open the

7      dictionary.  Judge.  There's Bruce's picture right

8      there.  What do you mean I don't look like a Judge?  So,

9      they take you to be much younger, too?

10                  PROSPECTIVE JUROR NESTER:  Correct.

11                  THE COURT:  Okay.  Like you should be on

12     that BMX bike getting to work and not drive.  How long

13     have you been married?

14                  PROSPECTIVE JUROR NESTER:  Three and a half

15     years.

16                  THE COURT:  Okay.  How do you deal with

17     that, that bias?  Is it, is it--

18                  PROSPECTIVE JUROR NESTER:  (Interposing)

19     You know, at the end of the day, the results speak for

20     themselves, you know.  I'm very logical.  I'm an

21     engineer.  So, it's fact-based and, you know, my work

22     speaks for itself.

23                  THE COURT:  Does it make you less likely to

24     be judgmental based on how many people are judgmental

25     towards you?

1                    PROSPECTIVE JUROR NESTER:  That's a good

2        question.

3                    THE COURT:  Oh.  I'm throwing hard balls

4        now.  Now, I'm throwing high and tight.

5                    PROSPECTIVE JUROR NESTER:  Am I more

6        judgmental...

7                    THE COURT:  Are you less judgmental--

8                    PROSPECTIVE JUROR NESTER:  (Interposing)

9        Less.

10                    THE COURT:  Because more people are

11        judgmental towards you?

12                    PROSPECTIVE JUROR NESTER:  Maybe.  Maybe.

13        Yeah.

14                    THE COURT:  Right.  Because sometimes they

15        say that women have a greater sensibility sometimes in

16        some things because they're usually always caught in

17        some sexist, young, don't look old, people are always

18        judging them.  And sometimes that's why they, instead of

19        just saying forget it, spend twenty hours in front of

20        the mirror trying to get it together, because they think

21        they're going to be judged like that.  Sir, please

22        introduce yourself to us.

23                    PROSPECTIVE JUROR BROWNFIEL:  My name's John

24        Brownfiel.  I'm a Wayne County Sheriff's Deputy, sixteen

25        years.  I've been married twenty-one years.

-191-

1               THE COURT:  Did she pick you or did you pick

2       her?  Tell me the truth.

3               PROSPECTIVE JUROR BROWNFIEL:  I picked her.

4               THE COURT:  That's great.  How did you find

5       her?

6               PROSPECTIVE JUROR BROWNFIEL:  Knocked her

7       down ice skating.

8               THE COURT:  We had a run-in.  And so, I

9       mean, after you apologized and helped her out, was it do

10      you want some hot coco or--

11              PROSPECTIVE JUROR BROWNFIEL:  (Interposing)

12      I got her phone number and called her, and called her

13      the wrong name.

14              THE COURT:  Have you lived that down yet?

15              PROSPECTIVE JUROR BROWNFIEL:  No.

16              THE COURT:  Okay.  There are certain things

17      you just have to deal with, right?

18              PROSPECTIVE JUROR BROWNFIEL:  Yes, sir.

19              THE COURT:  Okay.  So, what got you into the

20      Wayne County Sheriff's Department?

21              PROSPECTIVE JUROR BROWNFIEL:  Well, I tried

22      to be firefighter first and, in the meantime, went

23      through the police academy and got hired at Wayne

24      County.

25              THE COURT:  Okay.  What had you having

-192-

1    firefighter aspirations?  Where did that come from?

2                    PROSPECTIVE JUROR BROWNFIEL:  I'm not sure.

3                    THE COURT:  Okay.  No firemen in the family?

4                    PROSPECTIVE JUROR BROWNFIEL:  No.

5                    THE COURT:  No fire trucks when you were a

6    kid?

7                    PROSPECTIVE JUROR BROWNFIEL:  No.

8                    THE COURT:  And just--

9                    PROSPECTIVE JUROR BROWNFIEL:  (Interposing)

10    No.

11                    THE COURT:  Okay.  No friends that were it

12    first and--

13                    PROSPECTIVE JUROR BROWNFIEL:  (Interposing)

14    No.

15                    THE COURT:  What's the hardest thing about

16    being married?

17                    PROSPECTIVE JUROR BROWNFIEL:  Deciding what

18    you're going to have for dinner.

19                    THE COURT:  They once called the remote

20    control the one technical device that saved a lot of

21    marriages.  Because there used to be this big thing way

22    before then about who was going to get up and turn and

23    off the TV.  Can you imagine that?  Oh, yeah.  We lived

24    through that.  What are you talking about?  That's what

25    caused the first divorce.  You impressed with any

-193-

1      particular invention in the last five years that has

2      made your personal life easier, or ten years?

3                  PROSPECTIVE JUROR BROWNFIEL:  Well, I'm a

4      gadget person, so I like everything.  I'm not sure.

5                  THE COURT:  How many cell phones have you

6      had?

7                  PROSPECTIVE JUROR BROWNFIEL:  Cell phones?

8                  THE COURT:  Do you like them as gadgets?

9                  PROSPECTIVE JUROR BROWNFIEL:  No.

10                 THE COURT:  Okay.

11                 PROSPECTIVE JUROR BROWNFIEL:  No.

12                 THE COURT:  So, how many have you had

13     anyway, though?

14                 PROSPECTIVE JUROR BROWNFIEL:  Since cell

15     phones have been around?

16                 THE COURT:  Yeah.

17                 PROSPECTIVE JUROR BROWNFIEL:  I've had one

18     since '94.

19                 THE COURT:  Okay.  So, how many, in terms of

20     have you owned in the last five years, let's say?

21                 PROSPECTIVE JUROR BROWNFIEL:  One.

22                 THE COURT:  One?  Because the question was,

23     when the contract is renewed and they say you can get a

24     free phone, do you upgrade?

25                 PROSPECTIVE JUROR BROWNFIEL:  Not if it

-194-

1    still works.

2              THE COURT:  Okay.  So, you don't have a

3    QWERTY board then?  A who?

4              PROSPECTIVE JUROR BROWNFIEL:  A what?

5              THE COURT:  Okay.  He doesn't have one.  Do

6    you text a lot?

7              PROSPECTIVE JUROR BROWNFIEL:  No.

8              THE COURT:  Okay.  What's so funny?  Okay.

9    This is how I picked out my last phone.  And it was, and

10   I'm, four days old.  It was which one had the largest

11   print in receiving E-mails.  Because I was tired of

12   putting on the reading glasses in order to read the

13   texts.  It's like, it's killing me.  It's like, okay.

14   Which one has the largest print?  That was it.  I didn't

15   care about any of the rest.

16             Perceptions that you think you're going to

17   bring once you told everybody your occupation?  Who

18   wants you?  Who doesn't want you?

19             PROSPECTIVE JUROR BROWNFIEL:  I know who, I

20   believe I know who would want me.

21             THE COURT:  Okay.  Well, tell me.

22             PROSPECTIVE JUROR BROWNFIEL:  I believe the

23   prosecutor.

24             THE COURT:  Okay.  Why do you think that he

25   thinks that you're an advantage?

1                PROSPECTIVE JUROR BROWNFIEL:  Because I'm a

2     police officer.

3                THE COURT:  So, he thinks that you're going

4     to be biased for the police officers?

5                PROSPECTIVE JUROR BROWNFIEL:  More than

6     likely.

7                THE COURT:  Right.  And would that be the

8     same reason why you would guess that the defense

9     attorney doesn't want you?

10               PROSPECTIVE JUROR BROWNFIEL:  Yes, sir.

11               THE COURT:  All right.  Everybody thinks

12    everybody's biased towards the occupation.

13               PROSPECTIVE JUROR BROWNFIEL:  Right.

14               THE COURT:  Okay.  So, what is your

15    response?

16               PROSPECTIVE JUROR BROWNFIEL:  Well, I do --

17    I'm a marine patrol safety officer and a rescue diver.

18    I do the job according to the law.

19               THE COURT:  Okay.  So, would you tell the

20    prosecutor that it's an advantage to have you or it's

21    not an advantage or a disadvantage?

22               PROSPECTIVE JUROR BROWNFIEL:  It's not an

23    advantage or a disadvantage.

24               THE COURT:  What would you tell the defense

25    attorney?

-196-

1                    PROSPECTIVE JUROR BROWNFIEL:  The same

2        thing.

3                    THE COURT:  Okay.  The most honest

4        profession you believe is a Judge, right?  Don't answer

5        that.  Okay.  Mr. Prasad?

6                    MR. PRASAD:  Thank you.  There's five new

7        ones, looking around.  You guys all hear the questions I

8        was asking the previous two groups that were with you?

9        Okay.  Good.  I want to just touch on the same issues.

10                   One thing I forgot to mention to the

11       previous new group that joined us as well, so I'll ask

12       all of you again, is the -- I'm sorry.  I've got a Jolly

13       Rancher in my mouth.  I apologize for that.  But--

14                   THE COURT:  (Interposing)  It comes with it.

15       They'll excuse you.  Because I've asked them to talk

16       after I put candy in their mouth.  So, we're there.

17                   MR. PRASAD:  Okay.  Thank you.  It's the,

18       it's the whole concept of TV shows, like CSI and

19       watching cop shows and watching court shows on TV.  You

20       know, we have a lot, a lot in the entertainment industry

21       that covers our, that covers what we do here in court.

22       But it's just that.  It's entertainment.

23                   Just by a show of hands, any of the new

24       people, either in this group or the group just before,

25       fans of shows like, like CSI or any of those shows?  I'm

 1          going to pick on you, if I can.  Is it Mr. Balliet?  Am

 2          I pronouncing that correctly?

 3                     PROSPECTIVE JUROR BALLIET:  It's pronounced

 4          Balliet.

 5                     MR. PRASAD:  Balliet.  The French way.

 6          Okay.  Mr. Balliet, there's this academy of science

 7          fiction fantasy and horror that's sort of like the

 8          Oscars group, you know.  They're the academy of motion

 9          pictures.  The academy of science fiction, fantasy and

10          horror once a year gives out these awards called the

11          Saturn awards.  You ever hear of those?

12                     PROSPECTIVE JUROR BALLIET:  Vaguely.

13                     MR. PRASAD:  Okay.  I want to take you back.

14          I always forget if it's 2003 or 2004.  One of those

15          years, the best, best science fiction TV show, guess

16          what tied for best show that year.

17                     PROSPECTIVE JUROR BALLIET:  For science

18          fiction.  Well, it would be something like Star Trek or-

19          -

20                     MR. PRASAD:  (Interposing)  You would think

21          so.  But--

22                     PROSPECTIVE JUROR BALLIET:  (Interposing)

23          Battlestar Galactica.

24                     MR. PRASAD:  Think of the reason I'm asking

25          the question.

-198-

1                    THE COURT:  Battlestar Galactica.  Great

2        series.

3                    MR. PRASAD:  CSI.

4                    PROSPECTIVE JUROR BALLIET:  That's not

5        really in the science fiction category--

6                    MR. PRASAD:  (Interposing)  It is--

7                    PROSPECTIVE JUROR BALLIET:  (Interposing)

8        Although it is fiction.  Well, science.  Yeah.  I guess

9        they're scientists.  Okay.

10                   MR. PRASAD:  And that's my point, is that TV

11       shows like that embody -- I mean, they're fiction.  They

12       embody what, you know, not only what we can do, but also

13       what we hope to one day do, you know, with science.  But

14       this is real life.  This is what we're here to talk

15       about.

16                   You're going to be given evidence that

17       you're going to have to evaluate in all different forms.

18       What I'm asking you or what I'm asking the group as a

19       whole is to not hold me to some scientific or science

20       fiction type thing that you believe based on just TVs or

21       movies or books of what should be there.  But hold me to

22       the facts and law and common sense that you have of

23       everyday life.  That's what I'm asking.  Is that fair?

24       Everybody agree with that?  Okay.  Anyone have a problem

25       with that?  All right.  Very good.

-199-

1            A couple of the other issues I touched on

2    with the group as a whole, and this is what I focus now

3    on the five new people, is first the issue of the

4    charges themselves and the law that the Judge is going

5    to give you that penalty is not your decision at all.

6            We are talking about a homicide case.  You

7    cannot let the penalty of a crime affect the way you

8    decide a case.  You cannot.  I mean, that's the law.

9    That's also why you're not told anything about the

10   penalty in the case because it's exclusively the Judge's

11   decision to make.  Will that, in this case, affect your

12   ability to be fair and impartial?  That's what I'm

13   asking.  Will it affect your ability to be fair and

14   impartial?

15           PROSPECTIVE JUROR HIGHTOWER:  Honestly, this

16   case has hit home with me.  I had a couple of friends

17   that was murdered.

18           MR. PRASAD:  Oh.

19           MR. PRASAD:  Back in high school when I

20   was--

21           MR. PRASAD:  (Interposing)  I'm sorry.

22           PROSPECTIVE JUROR HIGHTOWER:  Younger.  So,

23   it's kind of difficult for me, honestly.

24           MR. PRASAD:  And that's a, that's a

25   different issue.  But yeah.  That -- And let me ask you

1      anything -- Let's just go to it right now.  How long ago

2      was this?

3                  PROSPECTIVE JUROR HIGHTOWER:  One was in

4      2004 the other one was in 2006.

5                  MR. PRASAD:  Okay.  So, wow.  Four years

6      ago, six years ago.

7                  PROSPECTIVE JUROR HIGHTOWER:  Both of them

8      were my best friends.

9                  MR. PRASAD:  I'm sorry.  Can you set those,

10     can you set those situations aside?

11                 PROSPECTIVE JUROR HIGHTOWER:  When you was

12     asking other people, I was--

13                 MR. PRASAD:  (Interposing)  Right.

14                 PROSPECTIVE JUROR HIGHTOWER:  I was sitting

15     over there thinking to myself like could I or couldn't

16     I?  I don't feel comfortable in this case at all.

17                 MR. PRASAD:  I appreciate that.  Thank you.

18     Thank you.  Sir, Mr. Balliet, back to the other question

19     about the charges, about the penalty.  Can you -- Is

20     that going to affect your ability to be fair and

21     impartial?

22                 PROSPECTIVE JUROR BALLIET:  No.

23                 MR. PRASAD:  In the third, in the last row I

24     think we got three, two over here and one over here.  Is

25     that going to affect your ability to be fair and

                              -201-

1      impartial?  Ma'am?

2                      PROSPECTIVE JUROR THOMAS:  No.

3                      MR. PRASAD:  Sir?

4                      PROSPECTIVE JUROR NESTER:  No.

5                      MR. PRASAD:  Okay.  Very good.  The next

6      part about this case that I've been asking everyone

7      about is the fact of the age of the defendant.  I mean,

8      he was sixteen at the time of the incident, seventeen

9      now.  Would your sympathies affect your ability to be

10     fair and impartial because of his age?  Ma'am?

11                     PROSPECTIVE JUROR THOMAS:  No.

12                     MR. PRASAD:  Sir?

13                     PROSPECTIVE JUROR NESTER:  No.

14                     MR. PRASAD:  Mr. Balliet?

15                     PROSPECTIVE JUROR BALLIET:  Well, I

16     certainly think that, you know, when you're sixteen,

17     you're not going to have the same thought process as if

18     you're twenty-five or thirty.  Now, again, I don't know

19     what kind of evidence, you know, will address that.  But

20     I guess it just depends on what evidence--

21                     MR. PRASAD:  (Interposing)  And we don't--

22                     PROSPECTIVE JUROR BALLIET:  (Interposing)

23     Is presented because I think that, you know, someone

24     sixteen isn't going to make as many good decisions as

25     someone older--

-202-

1              MR. PRASAD:  (Interposing)  And that--

2              PROSPECTIVE JUROR BALLIET:  (Interposing)

3    That's just pretty common knowledge.

4              MR. PRASAD:  And I think that's the crux.  I

5    think it was Mr. Kim who was seated over there earlier

6    was trying to talk about that balance between the two,

7    between the facts and between the sympathies.  The

8    question is, can you set your sympathies aside and focus

9    on the facts and the law of this case?

10             PROSPECTIVE JUROR BALLIET:  Yes.

11             MR. PRASAD:  Okay.  Very good.

12             PROSPECTIVE JUROR HIGHTOWER:  It's like I

13   understand what he's saying with the whole, you know,

14   sixteen.  When I was sixteen, I did a lot of stupid

15   things.  I'm twenty-four.  I'll be twenty-five this

16   year.  I think a lot differently than I did when I was

17   sixteen.  So, I mean, yeah.  I can set my thoughts aside

18   and how I feel personally and focus on this case.

19             MR. PRASAD:  Okay.  And that's what I'm

20   asking.  Thank you.  Thank you.  And the last one I was

21   going into -- And I know the Judge disagrees about the

22   way I was wording it earlier.  And I want to be clear.

23   I agree with the way the Judge was saying it about,

24   about sitting in judgement.  You're not sitting in

25   judgement of a person, trying to determine good or bad--

1                    THE COURT:  (Interposing)  I was right.

2                    MR. PRASAD:  But what I was trying to get is

3       that you are sitting in judgement in a sense, in a very

4       narrow sense of the way that the law requires you to do

5       it, which is you're sitting in judgement, evaluating

6       what happened on a specific day, trying to see if I've

7       proven my case, my elements beyond a reasonable doubt.

8                    Does that process, the fact that you have to

9       make those decisions, does that, do you have any

10      hesitation for, to do that, you know, for whatever

11      reason, whether it be, you know, ethical, religious,

12      whatever, moral?  Ma'am?

13                   PROSPECTIVE JUROR THOMAS:  No.

14                   MR. PRASAD:  Sir?

15                   PROSPECTIVE JUROR NESTER:  No.

16                   MR. PRASAD:  Sir?  Mr. Balliet?

17                   PROSPECTIVE JUROR BALLIET:  No.

18                   PROSPECTIVE JUROR HIGHTOWER:  Well, like I

19      said earlier--

20                   MR. PRASAD:  (Interposing)  Yeah.  I know

21      it's the other issues involving, involving your friend.

22                   PROSPECTIVE JUROR HIGHTOWER:  Yeah.

23                   MR. PRASAD:  Okay.  I would be, I would be

24      remiss, Mr. Brownfiel, to ask you did you ever work on

25      any sort of homicide type of detail?

                              -204-

1              PROSPECTIVE JUROR BROWNFIEL:  No, sir.

2              MR. PRASAD:  Okay.  So, your experiences, I

3    mean, as you just said, are marine--

4              PROSPECTIVE JUROR BROWNFIEL:  (Interposing)

5    Well, death investigations, but undetermined if they

6    were homicides or otherwise.

7              MR. PRASAD:  Okay.  But you were never in

8    the -- I can't even remember if the Wayne County

9    Sheriff's Department does not have a specific, exclusive

10   homicide unit.

11             PROSPECTIVE JUROR BROWNFIEL:  No.

12             MR. PRASAD:  Very good.  Thank you.  Thank

13   you, your Honor.

14             THE COURT:  Ms. Rock?

15             MS. ROCK:  Thank you, your Honor.  All

16   right.  Officer Brownfiel -- I'm sorry.  That's deputy,

17   isn't it?  Deputy sheriff.  I apologize--

18             THE COURT:  (Interposing)  No.  That's his

19   occupation.  That's not his name.

20             MS. ROCK:  Yeah.  And I'm sorry.  That's

21   habit on my part.  I apologize.  You said that, the

22   prosecutor talked to you about, I believe, about not

23   holding him to a science fiction level, is that correct?

24             PROSPECTIVE JUROR BROWNFIEL:  Yes.

25             MS. ROCK:  And but do you think there's a

-205-

1      level of competence in every profession that people have

2      to meet, like your profession?

3                    PROSPECTIVE JUROR BROWNFIEL:  Yes, ma'am.

4                    MS. ROCK:  Okay.  And so, in your

5      profession, it's important -- You probably have to write

6      reports, right?

7                    PROSPECTIVE JUROR BROWNFIEL:  Yes, ma'am.

8                    MS. ROCK:  Okay.  And the purpose of those

9      reports is to document what's, what you see, what you've

10     observed, is that correct?

11                   PROSPECTIVE JUROR BROWNFIEL:  That's

12     correct.

13                   MS. ROCK:  And that's so your superiors know

14     what's going on?  Is that true?

15                   PROSPECTIVE JUROR BROWNFIEL:  Yes.

16                   MS. ROCK:  Okay.  And also so, for your own

17     memory, to refresh your memory as to what happened,

18     correct?

19                   PROSPECTIVE JUROR BROWNFIEL:  Correct.

20                   MS. ROCK:  So, documentation is very

21     important in your profession, correct?  And so, in any,

22     in any occupation, you would agree that drafting

23     complete reports or accurate reports is important.

24     Would you agree with that?

25                   PROSPECTIVE JUROR BROWNFIEL:  Yes, ma'am.

1                    MS. ROCK:  What about you, Mr. Ballet?  I'm

2          sorry.

3                    PROSPECTIVE JUROR BALLIET:  It's pronounced

4          Balliet.

5                    MS. ROCK:  Balliet.  I repeated it to

6          myself, swore I was going to say it correctly.  Do you,

7          in your job, do you have to do documentation?

8                    PROSPECTIVE JUROR BALLIET:  I've been

9          retired for a while, but--

10                   MS. ROCK:  (Interposing)  But I mean you--

11                   PROSPECTIVE JUROR BALLIET:  (Interposing)

12         When I did the job at, when I worked for the state of

13         Michigan, yes.  I documented a lot of things.

14         Absolutely.

15                   MS. ROCK:  So, it was important because you

16         wanted to also protect yourself, correct?

17                   PROSPECTIVE JUROR BALLIET:  Sure.

18                   MS. ROCK:  In terms of as a social worker--

19                   PROSPECTIVE JUROR BALLIET:  (Interposing)

20         Yes.

21                   MS. ROCK:  Client says this, you said this.

22         Supervisor is going to be reading over your shoulder,

23         reading your reports.  Is that correct?

24                   PROSPECTIVE JUROR BALLIET:  That's correct.

25                   MS. ROCK:  So, documentation, being accurate

                              -207-

1      is important?

2                   PROSPECTIVE JUROR BALLIET:  That was a lot

3      of the job.

4                   MS. ROCK:  The -- And I would assume, Mr.

5      Nester, would that be true in your job as well?

6                   PROSPECTIVE JUROR NESTER:  Yes.

7                   MS. ROCK:  That -- Writing accurate reports,

8      telling the full, as complete story as you can of what

9      you're doing?

10                  PROSPECTIVE JUROR NESTER:  Yes.

11                  MS. ROCK:  Okay.  What about you, Mr.

12     Hightower?  You're in Fed Ex.  Do you have to write

13     reports at all or--

14                  PROSPECTIVE JUROR HIGHTOWER:  (Interposing)

15     No.  I don't.  Actually, I have a second job where I

16     work down at the football stadium and we have to write a

17     lot of reports there when we eject people.  So, that's

18     probably the only writing I do.

19                  MS. ROCK:  So, it's your word against

20     whoever you're ejecting--

21                  PROSPECTIVE JUROR HIGHTOWER:  (Interposing)

22     Yes.

23                  MS. ROCK:  So, it's important for you to

24     document--

25                  PROSPECTIVE JUROR HIGHTOWER:  (Interposing)

                              -208-

1      Yes.  Very important.

2                  MS. ROCK:  The reason why you did what you

3      did, is that right?

4                  PROSPECTIVE JUROR HIGHTOWER:  Yes.

5                  MS. ROCK:  Okay.  The -- What would be the

6      reason why you think somebody might not accurately

7      document something?

8                  PROSPECTIVE JUROR BROWNFIEL:  Stress.

9                  MS. ROCK:  What else?  Anything else?  Any

10     other things that you can think of?

11                 PROSPECTIVE JUROR BROWNFIEL:  Environmental

12     conditions.

13                 MS. ROCK:  How about you, Mr. Nester?  Can

14     you think of a reason why somebody might not write a

15     complete report?

16                 PROSPECTIVE JUROR NESTER:  Well, from an

17     engineering standpoint, that would be, it could be the

18     data was skewed somehow, they had the wrong test

19     configuration, something like that.

20                 MS. ROCK:  Mr. Hightower, can you think of a

21     reason why somebody might draft a report differently?

22                 PROSPECTIVE JUROR HIGHTOWER:  Maybe they

23     didn't quite get all the facts right.

24                 MS. ROCK:  Made a mistake?

25                 PROSPECTIVE JUROR HIGHTOWER:  Usually when

1        we have to write something up, we do it right then and

2        there, like right after it happened so the facts are

3        fresh in our mind and we know exactly what's going on.

4        Or sometimes as something is happening, you know,

5        jotting down little things so that we won't forget.

6        Because then if you, you know, document something later

7        it's possible, you know, you've been doing so many

8        things you could have forgot an important detail about

9        something.

10               MS. ROCK:  Do you think somebody might leave

11       something out, Mr. Balliet, because they don't want

12       their supervisor to see it, they're hiding something?

13               PROSPECTIVE JUROR BALLIET:  That certainly

14       has been done, I'm sure.  Yes.

15               MS. ROCK:  How about you, Mr. Brownfiel?

16               PROSPECTIVE JUROR BROWNFIEL:  I would think

17       no.

18               MS. ROCK:  Oh.  You wouldn't think somebody

19       would hide something in a, leave something out to hide

20       it?

21               PROSPECTIVE JUROR BROWNFIEL:  No.

22               MS. ROCK:  You don't think that if a deputy

23       did something wrong, maybe screamed at somebody that

24       they shouldn't have screamed at or handled a situation

25       poorly, they might not document that in a report?

                              -210-

1                    PROSPECTIVE JUROR BROWNFIEL:  Speaking for

2        myself, I wouldn't do that.

3                    MS. ROCK:  What about, do you think there's

4        other people in your profession that might do that?

5                    PROSPECTIVE JUROR BROWNFIEL:  It's possible.

6                    MS. ROCK:  But unlikely?

7                    PROSPECTIVE JUROR BROWNFIEL:  I would think

8        unlikely.

9                    MS. ROCK:  Why do you think it's unlikely?

10                   PROSPECTIVE JUROR BROWNFIEL:  Just for

11       myself, if you're not doing anything wrong, you don't

12       have anything to hide.

13                   MS. ROCK:  But you said it's unlikely.  So,

14       that suggests to me that you have a certain opinion

15       about Wayne County Sheriffs, that you think that they're

16       unlikely to write a false report, leave something out

17       that may not be flattering or favorable to them.  Do you

18       think that's true?

19                   PROSPECTIVE JUROR BROWNFIEL:  I believe so.

20                   MS. ROCK:  Okay.  Mr. Hightower, this is

21       what I wanted to ask you.  You said that you had that

22       unfortunate situation where you had two people who were

23       murdered.

24                   PROSPECTIVE JUROR HIGHTOWER:  Two different

25       times.

-211-

```
1              MS. ROCK:  Two different times.

2              PROSPECTIVE JUROR HIGHTOWER:  Yes.

3              MS. ROCK:  You felt that that would impact

4      your feelings on this case?

5              PROSPECTIVE JUROR HIGHTOWER:  I just don't

6      feel comfortable about the whole homicide case and

7      making a decision.  Even if I am listening to the

8      evidence, I just don't feel comfortable doing it.

9              MS. ROCK:  And when you say comfortable, you

10     think that might have -- Because I think that a fair

11     person is able to admit their bias, you know.  Where

12     they're able to say, you know, I don't care how you call

13     it, I just can't sit on this case.  Is that where you're

14     at?

15             PROSPECTIVE JUROR HIGHTOWER:  Something like

16     that.  I wouldn't necessarily say I'm biased.  I

17     probably could be fair and actually listen to the case

18     and hear all the details.  I just don't feel comfortable

19     doing it.

20             MS. ROCK:  All right.  Thank you.  Thank

21     you, your Honor.

22             THE COURT:  Any challenges for cause from

23     the People?

24             MR. PRASAD:  No, your Honor.  Thank you.

25             THE COURT:  Defense?
```

-212-

1              MS. ROCK:  Your Honor, I guess we would --
2     Excuse me.  Your Honor, we would challenge for cause Mr.
3     Hightower, based on some of his statements with regard
4     to his experience.
5              THE COURT:  Okay.  I believe I'll dismiss
6     Mr. Hightower for cause.  So, Mr. Hightower, thank you
7     for helping us out today, sir.
8              PROSPECTIVE JUROR HIGHTOWER:  I appreciate
9     it.
10             THE COURT:  Have fun at those dual jobs?
11    You work at Ford Field, huh?
12             PROSPECTIVE JUROR HIGHTOWER:  Yes.  I do.
13             THE COURT:  Boy, you don't see very many
14    Lion victories, do you?  How long have you worked there?
15             PROSPECTIVE JUROR HIGHTOWER:  I've been
16    there almost six years.
17             THE COURT:  And you can count the Lion
18    victories on one hand and not run out of fingers, right?
19    Are you a Lions fan?
20             PROSPECTIVE JUROR HIGHTOWER:  They won five
21    this year, right?
22             THE COURT:  Yeah.  But not home games, man.
23    Any preemptories the defense wishes to use?
24             MS. ROCK:  Yes, your Honor.  We would like
25    to thank and excuse Mr. Brownfiel.  And that would also

1    be -- And Mr. Nester.  Thank you.

2              THE COURT:  Let me thank the two of you for

3    participating and helping us today.  Mr. Wood said

4    you're the man.

5              PROSPECTIVE JUROR BROWNFIEL:  He is, too.

6              THE COURT:  No.  No.  No.  He said you are

7    the man.  He compared you to an excellent movie that

8    highlighted Cuba Gooding where he portrayed the first

9    black -- I can't even think of the name of the movie,

10   but I saw scuba, I mean not scuba, but deep sea diver

11   that was -- What was the portrait?  Was it in the Navy?

12   Right it was the Navy.  But it was the first black guy

13   who was certified in the Navy.  And he said you were

14   that kind of guy.  So, that's pretty amazing.

15             PROSPECTIVE JUROR BROWNFIEL:  Thank you,

16   sir.

17             THE COURT:  All right.  He's been in the

18   Detroit Rive more than a lots of other people.  What

19   would you like to do?  I'm sorry.

20             MR. PRASAD:  I'm sorry, your Honor.  I'd

21   just like to thank and excuse juror number four, Ms.

22   Colarossi.

23             PROSPECTIVE JUROR COLAROSSI:  Thank you.

24             THE COURT:  What are you rushing back to do?

25             PROSPECTIVE JUROR COLAROSSI:  Oh, I could

1    pick up my kids.

2              THE COURT:  Indeed you can.

3              PROSPECTIVE JUROR COLAROSSI:  Thank you very

4    much.

5              MR. PRASAD:  I'd like to thank--

6              THE COURT:  (Interposing)  Okay.  Well, I'm

7    about to call it a day because it seems like you all are

8    dragging your heels in terms of this.  So, is there

9    anybody else that you don't think that -- So, we won't

10   have to say tomorrow, oh, well, thank you, see you?

11             MR. PRASAD:  No, sir.  Thank you.

12             THE COURT:  We could sit here and slug it

13   out.  I don't like sitting here and slugging it out.  It

14   makes all of us tired.  It makes all of us edgy.  And

15   the small inconvenience of bringing some of you back

16   tomorrow that won't be here outweighs the attitude that

17   everybody would give us.

18             I know you think it's a waste of time and

19   that it's a long process.  It is a long process.  But

20   it's like cooking versus microwave.  I could ask

21   everybody, do you think you could be fair?  Raise your

22   hand if you think you can be fair.  And say, okay.

23   Exactly.  We can all be fair.  Or we can ask people

24   questions and let them exercise their own bias in

25   kicking people off, watch it happen.

1              So, any of you have any real, real attitude?

2       And I can get you free parking tomorrow.  How can you do

3       that?  Would that make life easier?  Yeah.  Okay.  I

4       could say 9:30 and make sure you park in the casino.

5       Because any time after 9:00, it's free.  They don't care

6       if you go in there or not.  And then it's only a two-

7       block walk.  Isn't that true?  That's true.

8              UNIDENTIFIED PROSPECTIVE JUROR:  It's been a

9       while since I heard the list, but I believe I know one

10      of the Detroit Officers--

11             THE COURT:  (Interposing)  I know a couple

12      of them, too, but it wouldn't make me biased or

13      prejudice.  I know Mr. Halley.  I went to school with

14      all of his kids.

15             UNIDENTIFIED PROSPECTIVE JUROR:  It was a

16      witness that I think--

17             THE COURT:  (Interposing)  Okay.  Other than

18      that, I will see everybody in the morning bright and

19      early.  Do you want to say 9:30 so that you can take

20      advantage of a little free parking over there?

21             PROSPECTIVE JURORS:  Yes.

22             THE COURT:  Okay.  You all don't have to sit

23      in the same seats tomorrow.  We'll do roll call.  No.

24      We'll do roll call.  But they'll be in the same seats

25      so.  Okay.  You all have a great evening.

                              -216-

1               Please remember that it is probably easier

2        to bring a little something to lunch tomorrow.  Because,

3        not that the forecasters are ever right, but that would

4        be one job I would want because you can be wrong and

5        still

6                         (At 3:55 p.m. panel leaves the courtroom.)

7                         (At 3:55 p.m. proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R E P O R T E R ' S   C E R T I F I C A T E

STATE OF MICHIGAN  )
                SS )
COUNTY OF WAYNE    )

        I, SEAN E. ALLEN, CSMR 5265, Certified Court

Reporter acting in and for the Third Judicial circuit,

Wayne County, State of Michigan, do hereby certify that

the foregoing pages 1 through 218, inclusive, were

reduced to typewritten form and comprise a true

rendition of the proceedings taken in the above-entitled

matter on January 10, 2011.

        I FURTHER CERTIFY THAT MY CERTIFICATION

ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN,

SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES

NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED

COPIES NOT MADE UNDER MY CONTROL AND SUPERVISION.

                        _____
                        SEAN E. ALLEN -- CSMR 5265
                        Official Court Reporter.

DATED:  This 6th day of June 2012.

-218-