STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN

       v               Case Number
                        10-5562-01


DEONTE HOWARD

                     Defendant.

_____/

JURY TRIAL

PROCEEDINGS HELD BEFORE THE HONORABLE BRUCE U. MORROW

Judge, Third Circuit Court, Detroit, Michigan, on

January 11, 2011.

APPEARANCES:

RAJ PRASAD P68519
Assistant Prosecuting Attorney
Wayne County Prosecutor's Office
1441 St. Antoine
Detroit, MI 48226
(313) 224-5818



SUSAN ROCK P34497
24500 Ford Rd.
Dearborn Heights, MI 48127
(313) 967-4444



Sean Allen
Official Court Reporter
CSMR 5265

TABLE OF CONTENTS

OPENING STATEMENT BY MR. PRASAD.....................101
OPENING STATEMENT BY MS. ROCK......................108


WITNESSES:
DELFERA HUNT
     Direct Examination by Mr. Prasad..............112

AUNDREY ALLEN
     Direct Examination by Mr. Prasad..............114
     Cross-Examination by Ms. Rock.................151
     Redirect Examination by Mr. Prasad............174
     Recross-Examination by Ms. Rock...............178
     Re-redirect Examination by Mr. Prasad.........179

FREDERICK McFADDEN
     Direct Examination by Mr. Prasad..............184
     Cross-Examination by Ms. Rock.................200
     Redirect Examination by Mr. Prasad............209

EXHIBITS:
Defendant's Exhibit A..............................166

```
 1                    Detroit, Michigan.
 2                    Tuesday, January 11, 2011.
 3               (At 9:49 a.m. witness court in session.)
 4               (At 9:49 a.m. panel enters the courtroom.)
 5               THE CLERK:  Vernon Lilly, take seat number
 6       one, please.  Joanne Szot, could you please take seat
 7       number four?  At the end of the row.  Okay.  Margaret
 8       Collet?  Walked in the door at the right time.  Seat
 9       number ten.  That'll be right underneath the portrait up
10       there.  If you need a minute to take your coat off...
11       Okay.  And Rita Hoy, seat number fourteen.
12               THE COURT:  We are missing Mr. Clopton, but
13       we can start questioning the new jurors, if there's no
14       objection.  Is there any objection?
15               MR. PRASAD:  No, your Honor.
16               MS. ROCK:  No, your Honor.
17               THE COURT:  Let's start with--
18               PROSPECTIVE JUROR McDADE:  (Interposing)  He
19       was here, too.  I walked in the building right behind
20       him.
21               THE COURT:  He's roaming around, Ms. McDade?
22               PROSPECTIVE JUROR McDADE:  If might be out
23       in the hallway.  I think he's waiting out there.
24               THE COURT:  You know, why don't we just
25       check the men's room out there.  Just holler in and say,
```

1     young Mr. Clopton.  He'll find his way in.  In the

2     meantime, Mr. Lilly, please introduce yourself to us.

3              PROSPECTIVE JUROR LILLY:  I'm Vernon Lilly.

4     I work at -- I'm a robotic technician.  I'm married.  I

5     have three children at home and two that are grown.

6     And--

7              THE COURT:  (Interposing)  Does your wife

8     work outside or in the home?

9              PROSPECTIVE JUROR LILLY:  No.  She does not.

10             THE COURT:  Okay.

11             PROSPECTIVE JUROR LILLY:  She's just a stay-

12    at-home mom.

13             THE COURT:  Okay.  Have you ever served as a

14    juror before?

15             PROSPECTIVE JUROR LILLY:  No, sir.

16             THE COURT:  And I know the names were

17    mentioned what seems like an eternity ago.  But did any

18    of them, when you were listening, have any significance

19    at the time?

20             PROSPECTIVE JUROR LILLY:  I'm not totally

21    for sure about this, but Steve Howard, I used to know a

22    guy named Gary Howard, which he passed away.  But he had

23    a brother named Steve Howard.

24             THE COURT:  And how long ago was that?

25             PROSPECTIVE JUROR LILLY:  The last time I

                            -4-

1     seen Steve was probably four years ago.

2                THE COURT:  And you just know he had a

3     brother or do you know the brother?

4                PROSPECTIVE JUROR LILLY:  I don't really

5     know him that good.

6                THE COURT:  Okay.  You would recognize him

7     if you saw him?

8                PROSPECTIVE JUROR LILLY:  Yes.

9                THE COURT:  And do you know where that

10    brother might have lived, Steve?

11               PROSPECTIVE JUROR LILLY:  His -- I'm not

12    sure where -- His brother lived in Dearborn Heights.

13               THE COURT:  Any similarity?

14               MS. ROCK:  Your Honor, I don't know if he

15    has a brother.  Sorry.

16               THE COURT:  Okay.  Thank you, sir.  Ms.

17    Szot, please introduce yourself to us.

18               PROSPECTIVE JUROR SZOT:  My name is Joanne

19    Szot.  I work for a small company, basically doing

20    office work.  I have not served on a jury in the last

21    ten years.  I'm a widow.  My sister-in-law lives with

22    me.  And no, none of the names seem familiar to you me.

23               MS. ROCK:  I'm sorry, your Honor.  I didn't

24    hear that last part.

25               PROSPECTIVE JUROR SZOT:  None of the names

-5-

1    on the list sounded familiar to me.

2              MS. ROCK:  Thank you.

3              THE COURT:  We'll give Ms. Collet a second

4    more.  Ms. Hoy, please introduce yourself to us.

5              PROSPECTIVE JUROR HOY:  Hi.  My name is Rita

6    Hoy.  I'm a homemaker.  I'm married.  My husband is

7    retired from General Motors.  I have a daughter, who's

8    twenty-six, got married two years ago.  None of the

9    names sound familiar.  And I've never served on a jury.

10             THE COURT:  Okay.  Last, but not least now.

11   Ms. take a breath.

12             PROSPECTIVE JUROR COLLET:  My name is

13   Margaret Collet.  I'm a teacher for grades ten through

14   twelve at a charter school here in Detroit.  My husband

15   is an engineer.  We've been married for twenty-two

16   years.  I've never served on a jury.  I don't know any

17   of the names.

18             THE COURT:  You pronounce your name Collet?

19             PROSPECTIVE JUROR COLLET:  Collet.

20             THE COURT:  Collet.

21             PROSPECTIVE JUROR COLLET:  Like

22   whatchamacallit.

23             THE COURT:  What do you call it.  What took

24   you into the field of education, Ms. Collet?

25             PROSPECTIVE JUROR COLLET:  Initially, I

1      taught history.  I taught adult ed students--

2                  THE COURT:  (Interposing)  Why did you

3      teach?

4                  PROSPECTIVE JUROR COLLET:  I enjoyed

5      studying history.  That was the first part.

6                  THE COURT:  Okay.  Why did you think that it

7      would be a good thing to teach?  I mean, was there a

8      teacher that influenced you?  Was it something at home?

9                  PROSPECTIVE JUROR COLLET:  My parents were

10     both teachers.

11                 THE COURT:  So, were you kind of pre-

12     destined, it was in your genes?

13                 PROSPECTIVE JUROR COLLET:  Maybe.

14                 THE COURT:  Were those the expectations in

15     the household?

16                 PROSPECTIVE JUROR COLLET:  No.  It was just

17     an area of interest.

18                 THE COURT:  Why history?

19                 PROSPECTIVE JUROR COLLET:  I don't know.  I

20     just like studying it.

21                 THE COURT:  So, any of those questions we

22     talked about that has some historical significance

23     yesterday interest you?

24                 PROSPECTIVE JUROR COLLET:  Yes.

25                 THE COURT:  Okay.  Like which one?

1                    PROSPECTIVE JUROR COLLET:  Well, I knew when

2         women got the right to vote.

3                    THE COURT:  Oh.  You like that one, huh?

4                    PROSPECTIVE JUROR COLLET:  Yeah.

5                    THE COURT:  Why do you think women got the

6         right to vote?

7                    PROSPECTIVE JUROR COLLET:  Well, they fought

8         for it.  And then, obviously, someone had an interest in

9         getting in elected, so they thought they could probably

10        get elected if they allowed women to vote.

11                   THE COURT:  Yeah.  But do you really think

12        that the women's interests, the suffrage movement made a

13        difference to anybody that was important?

14                   PROSPECTIVE JUROR COLLET:  Yes.  I do.

15                   THE COURT:  Really?  What period did the

16        suffrage, I mean, how long was that agitation period

17        before they got the right to vote?  I mean, was it in

18        the 1700s, in the 1800s or was it something that started

19        in the 1900s?  How long do you--

20                   PROSPECTIVE JUROR COLLET:  (Interposing)

21        Well, you had some people pushing for it in the 1700s,

22        but, you know, really the 1800s I guess you could say it

23        gathered a lot of speed.  In London, in England they got

24        the right to vote before women did here.

25                   THE COURT:  Yeah.  But they were still

-8-

```
 1    branding people for crimes that they had committed over
 2    in England.  And, you know, some of the atrocities that
 3    were visited upon the Native American Indians, people
 4    would say that American society wasn't too civilized.  I
 5    mean, and so--
 6              PROSPECTIVE JUROR COLLET:  (Interposing)  It
 7    all comes in increments.  Like nothing's all at once.
 8    It has to change over time.
 9              THE COURT:  Nothing is all at once.
10              PROSPECTIVE JUROR COLLET:  It doesn't seem
11    like it.  Look at history.  It seems like things take
12    forever to change.
13              THE COURT:  Why do you think history--
14              PROSPECTIVE JUROR COLLET:  (Interposing)
15    Everything slowly, but surely changes.  I don't know
16    why.
17              THE COURT:  Thank you for joining us, young
18    man.  I know that you were here early.
19              PROSPECTIVE JUROR CLOPTON:  I had a lot of
20    problems this morning.
21              THE COURT:  Yeah.  Well, you persevered.  Is
22    that true?
23              PROSPECTIVE JUROR CLOPTON:  Yes, sir.
24              THE COURT:  That's all it's about, being a
25    victor.  So, why do you think history is incremental,
```

1    Ms. Collet?

2            PROSPECTIVE JUROR COLLET:  Well, sometimes

3    change takes time.

4            THE COURT:  Why does it take?

5            PROSPECTIVE JUROR COLLET:  It's the way

6    people are.  Sometimes it's in an instant.  Sometimes it

7    takes a long time.

8            THE COURT:  You mean, we just couldn't all

9    decide that smoking cigarettes is bad?  It causes early

10    death--

11            PROSPECTIVE JUROR COLLET:  (Interposing)  We

12    have decided that--

13            THE COURT:  (Interposing)  No.  No.  No.

14    But let's just say--

15            PROSPECTIVE JUROR COLLET:  (Interposing)

16    See, slowly but surely.  You can't smoke in public and--

17            THE COURT:  (Interposing)  Yeah.  But let's

18    just say that we all know that smoking contributes to

19    premature death.

20            PROSPECTIVE JUROR COLLET:  Right.  Some

21    people will argue that, though, but...

22            THE COURT:  Well, there are people that will

23    argue that one plus one is not two.  So, we're not

24    concerned with what people can argue because they can

25    argue anything.  But the facts are that it leads to

1       premature death, that there's an increase in medical

2       costs affiliated with smokers and that there is no

3       general good or benefit to smoking.  So, why don't we

4       just ban it, period?  Ban the production and the sale

5       of.

6                   PROSPECTIVE JUROR COLLET:  That's because

7       some individuals think they should have the right to

8       smoke.

9                   THE COURT:  I'm sorry?

10                  PROSPECTIVE JUROR COLLET:  Some individuals

11      think they should have that right to choose their

12      destiny and then other people--

13                  THE COURT:  (Interposing)  Yeah.  But aren't

14      those--

15                  PROSPECTIVE JUROR COLLET:  (Interposing)

16      And the corporations want to be able to sell--

17                  THE COURT:  (Interposing)  But Ms. Collet,

18      aren't those the same people that think they have the

19      same right to drive down the expressway as fast as they

20      want to?

21                  PROSPECTIVE JUROR COLLET:  Probably.  Yeah.

22                  THE COURT:  And we still make a law and say,

23      so what?  You know, and aren't those the same people

24      that probably think that they should be able to go in

25      the theater and, under the guise of freedom of speech,

                              -11-

```
 1    holler out fire?  No?
 2                PROSPECTIVE JUROR COLLET:  Still have
 3    individuals rights.  I mean -- Well, if you're harming
 4    yourself and not others, then why can't you do it?
 5                THE COURT:  Yeah.  But the manufacturers are
 6    harming others.
 7                PROSPECTIVE JUROR COLLET:  Only by your
 8    choice.  You can say that with alcohol, too.  Ban
 9    alcohol.
10                THE COURT:  So, let's produce poison.  Let's
11    not regulate the sale of safe meat and put it on the
12    meat buyers and go with the all caveat let the buyer
13    beware, right?  Because then we can always say, well,
14    they don't have to buy the rotten meat.
15                PROSPECTIVE JUROR COLLET:  Well, they don't.
16                THE COURT:  So, the USDA shouldn't try to
17    regulate safe meat?
18                PROSPECTIVE JUROR COLLET:  If they know it's
19    rotten, they don't have to buy it.  When you know that
20    cigarettes are bad for you, why do you buy it?
21                THE COURT:  Okay.  Don't buy the -- Lawyers
22    would go crazy if that was the rule.  Then they wouldn't
23    be able to sue car manufacturer's.  They'd say, you
24    know, all the cars have some problems.
25                So, if you buy them, you're buying them
```

1   knowing that there's some problem with it.  See how

2   dangerous that would be, if we didn't hold them to some

3   standard of safety?

4           Ms. Hoy, what do you think about the

5   situations that change slowly versus -- Well, we're

6   talking about the incremental change and then things

7   that just should change period.  Do you see a difference

8   between things that should change, but can't change?

9           PROSPECTIVE JUROR HOY:  I think everything

10  changes.

11          THE COURT:  Right.  This is the conversation

12  that I was having, my four new people, just yesterday.

13  We were talking about the difference between animals and

14  humans.  And we were saying that animals don't evolve.

15  For each generation of dog, you have to train that darn

16  dog just like the generation before.  There's nothing

17  that evolves.  They just come right back to zero and you

18  have to start from zero.

19          And they were thinking that, okay, do human

20  beings really evolve?  Do we evolve?  And, if so, why do

21  we have some of the same problems that we had four

22  generations ago if we evolved?  And, you know, we were

23  talking about the isms, racism, sexism, classism.  Where

24  is this evolution?

25          Even with people judging people by how they

-13-

1    look.  We'll say that we don't and it's a good thing

2    that we don't.  But how much money is spent on just

3    cosmetic surgery alone, elective cosmetic surgery in the

4    United States?  It's just an incredible amount of money.

5    It's continuing to climb.

6              And, obviously, people are trying to change

7    the way they look because they think that other people

8    make determinations about them based on how they look.

9    So, where's the evolutionary process?  Where is this

10   grown that we're supposed to be experiencing, that we

11   don't judge the book by the cover, that we're not

12   influenced by all of these outside sources when we make

13   important decisions?  Where is that?  When is that going

14   to change?

15             PROSPECTIVE JUROR LILLY:  Never.

16             THE COURT:  Hmm?

17             PROSPECTIVE JUROR LILLY:  Never.

18             But aren't we supposed to evolve?  Aren't we

19   supposed to--

20             PROSPECTIVE JUROR LILLY:  (Interposing)

21   We're supposed to, but it'll never change--

22             THE COURT:  (Interposing)  Be smart enough

23   to know that how a person looks should have absolutely

24   nothing to do with who they are?

25             PROSPECTIVE JUROR LILLY:  The only way

-14-

1      that'll ever change is if someone puts a cover over the

2      top of the people that's not wanting to be seen or--

3                  THE COURT:  (Interposing)  So, the visually

4      challenged have it the best in terms of--

5                  PROSPECTIVE JUROR LILLY:  (Interposing)

6      Yes.  They do.  Yes.  Yes.  They do.

7                  THE COURT:  I would agree with that.  But I

8      would also say children.  Because remember the Jimmy

9      Carter story at one time?  He said that he didn't know

10     the ethnic background of his best friend until he was

11     like eight or nine or ten.  And his mom says, you know,

12     you can't play with that guy down there anymore.  And he

13     was like, how come I can't play with him?  Well, you

14     know, that's a little black kid.  And he didn't realize

15     it.

16                 And they'll say that children don't, you

17     know.  That older people and the media and all of that

18     is what teaches children to develop the attitudes that

19     they have.  And, as an educator, we teach kids

20     everything.  Yes?  If that's what you want to call it.

21     Don't we teach them everything?  Values, morals.

22                 Because they come kind of like them animals,

23     undeveloped.  And it's up to us to put stuff in them.

24     So, incrementally is just how we want to change.  I

25     don't think that's how we have to change.  What do you

                              -15-

1     think?

2          PROSPECTIVE JUROR COLLET:  I think it is

3     with people.

4          THE COURT:  Okay.  Well, how about this that

5     doesn't make sense that took a long time to change, if

6     we want to talk about incremental?

7          A long time ago in England when they didn't

8     have real systems of government and they kind of were

9     like in feudal states, Judges -- Which is why we call

10    ourselves Circuit Court Judges.  We're called Circuit

11    Court Judges because you would actually ride from one

12    village to another and complete a circuit and handle

13    disputes that regular people couldn't handle.

14         And the tradition and custom was when you

15    committed a crime, the name of the crime would be

16    branded into your right hand.  And so when the Judge

17    would come into that circuit when he was handling these

18    disputes, the first thing they'd say was raise your

19    right hand, before you offered any testimony so that the

20    person could make an assessment of what kind of person

21    you were based on whether you had some convictions.

22         And, obviously, if they couldn't raise the

23    right hand because it was missing, you could draw your

24    own conclusion.  But the point was is that's how they

25    did it in England.  That's how they did it in the US.

-16-

1    And at some point in time, somebody says, okay.  Enough.

2    Enough.  We have to -- That's just too barbaric.  We

3    have to figure out another way.  Okay.

4              Now, if we just fast forward that to 2011,

5    what did Mark have you do when you stood up?

6              PROSPECTIVE JURORS:  Raise your right hand.

7              THE COURT:  Okay.  What's that related to?

8    Absolutely nothing.  When it's eliminated, people feel

9    like something's missing.  I'm not taking a real oath.

10             Well, for income taxes, how do we do an oath

11   then?  Sign that affidavit, right?  Right on the bottom,

12   we affirm that the information contained in there is

13   accurate.

14             And you know that if anybody wanted to serve

15   as a juror and they were a paraplegic or quadriplegic,

16   they couldn't even stand or raise anything.  But

17   likewise, they would be equally qualified to serve as a

18   juror as long as they said they could be fair and

19   impartial.

20             And so a lot of these little nuances or pomp

21   and circumstance things that we think are essential are

22   not essential.  But you're right.  Some things won't

23   change even though they lose any and all relevance.

24   Period.  I mean, what part does it play?  Right, Ms.

25   Hoy?  We don't need to go get the Bible and have people

-17-

1      put their left hand on the Bible, raise their right hand

2      and say -- Because we'll run into some atheists, right?

3                     PROSPECTIVE JUROR HOY:  Right.

4                     THE COURT:  And then so what relevance is

5      the Bible?  Or some people that don't use the Bible as

6      their book of faith.

7                     PROSPECTIVE JUROR HOY:  Right.

8                     THE COURT:  It comes down to what we want to

9      do as a society.  How do we want ourselves to be

10     perceived and how do we want to perceive ourselves,

11     which is why we lie.  Because we lie because we want to

12     sometimes have ourselves as perceived as being fair.

13     So, we won't tell the truth.  We want ourselves to be

14     seen as having a certain level of integrity or morality.

15     And so, we'll lie and make ourselves that or we'll open

16     up this little white lie area so that when we go in

17     there it's still a good area to go.

18                    Or we'll do something that's dastardly and

19     we'll say that we're doing it under the guise of

20     national security, where we overthrow other governments

21     or have other people assassinated.  Right?  Don't we do

22     some pretty amazing things under the guise of national

23     security?  Sure we do.

24                    But if you can paint it under a good

25     picture, then you can say you're not a bad person.

-18-

```
1        Because otherwise that's some, that's some way out there
2        kind of stuff.  I'm going to help this government, this
3        little portion overthrow the other people.  We're going
4        to give them arms and money.
5                  It's hard to go to church on Sunday, you
6        know, and say you're a good person.  No?  Yes?  Kind of
7        difficult?
8                  PROSPECTIVE JUROR COLLET:  For some people
9        it is.
10                 THE COURT:  Hmm?
11                 PROSPECTIVE JUROR COLLET:  I think for some
12       people I think it's how they look at it.  They think
13       they're doing an overall good.  In their mind, they
14       think, okay.  We're doing the right thing.
15                 THE COURT:  Yeah.  But, again, it's when we
16       have a goal in mind.  If we have a good goal in mind,
17       then we can justify everything that we do.
18                 PROSPECTIVE JUROR COLLET:  Probably.
19                 THE COURT:  We're trying to not hurt
20       people's feelings so, you know, the dress looks good or
21       your hairstyle looks good.  Or your new shoes look good
22       because we're not trying to hurt anybody's feelings.  I
23       don't want to tell them I don't want to go to their
24       parties because their parties are real boring, so I tell
25       them that, you know, I couldn't get a babysitter, when I
```

-19-

1      didn't even try.

2             Or we blame our children for having a

3      sickness and we don't want to bring the disease or the

4      infection to anybody else.  I mean, I have lied using my

5      children being sick for not going to social events.

6      Anybody else done that?  Yeah.  I mean, because we think

7      that that's not anything major.  It's just a little lie.

8             But we start making these allowances.  And

9      next thing you know sometimes they just kind of get out

10     of control.  Because where do you stop?  Once you start,

11     where do you stop.  And certainly everybody has a

12     different starting or stopping point.

13            The perspective sometimes that we're

14     required to take in assessing stuff, like I said, is so

15     different than, than how we require ourselves on an

16     individual level.

17            Ms. Hoy and I had a small conversation

18     yesterday.  She informed me that this was emotionally

19     heavy for her.  And in just trying to tell me the

20     heaviness that it brought, I could see that there was

21     some emotion that was passing from her back to me back

22     to -- And so, I told her I would make you aware of that

23     and just let you know that.  But I don't have anymore

24     questions.

25            MR. PRASAD:  Thank you.  Thank you, your

-20-

1        Honor.  Good morning, again, ladies and gentlemen.

2                PROSPECTIVE JURORS:  Good morning.

3                MR. PRASAD:  Before we get into some of that

4        deeper stuff, I just want to -- As we sit here, I think

5        about some of these things.  Ms. Collet, what fascinates

6        me about our discussion is the concept of political and

7        social will.  And I really find it interesting how, how

8        communication and our mass communication now, it seems

9        to me it's going to increase the speed of these

10       incremental changes to make more sudden changes.

11               And I think the biggest example of that is

12       China and the way they're trying to limit Google.  It's

13       just something I, you know, I've always just thought of.

14       But I just wanted to throw that in there.  I'm sorry.

15       Let me go back to, let me go back to the real, let me go

16       back to the questions about what we were talking about.

17               For the four new ones, did you guys hear the

18       questions I was asking yesterday?

19               PROSPECTIVE JURORS:  Yes.

20               MR. PRASAD:  Ms. Hoy, let me start with you.

21       What is the emotional impact?  Can you understand that

22       what we're trying to do is find fair and impartial

23       jurors who can keep the sympathies and biases away from

24       their analysis?  How do you feel?

25               PROSPECTIVE JUROR HOY:  I had a cousin that

-21-

1    was murdered.  He was beaten and left on the street to

2    die.

3              MR. PRASAD:  I'm sorry.

4              PROSPECTIVE JUROR HOY:  And I'm a two-time

5    cancer survivor, so life is precious.  And I had to

6    fight for that.  And a life was taken.  And it's just

7    hard to, you know, when you fight for your own life,

8    it's hard to, you know, think a life was taken.

9              MR. PRASAD:  Is this the right case for you

10   or should you be better served on a different type of

11   jury?

12             PROSPECTIVE JUROR HOY:  I mean, I would try

13   to stay partial [sic], I just, it just, you know--

14             MR. PRASAD:  (Interposing)  Try to stay

15   impartial?  I don't want to put words in your mouth.

16             PROSPECTIVE JUROR HOY:  Yeah.  Yeah.  I

17   mean, I'd try, I would try to keep an open mind.

18             MR. PRASAD:  Okay.

19             PROSPECTIVE JUROR HOY:  I just, like I said,

20   I think life is precious.  And when somebody takes a

21   life, I mean, I don't know the case, nothing about it,

22   it's just senseless when you fight for your life.

23             MR. PRASAD:  I appreciate that.  Thank you.

24   Thank you.  Let me go jump on some of those topics that

25   I was discussing with, with everyone yesterday, the

-22-

1    first of which, of course, is the charge itself.  It's a

2    homicide charge.  And the penalty, and the fact that

3    only the Judge deals with the penalty and that it is not

4    your job to really consider penalty.

5              Can you do that in this case?  Can you set

6    aside any thoughts of possible penalties and still focus

7    on your job, which is deciding whether or not I've

8    proven my case or not?  Is that okay, sir?

9              PROSPECTIVE JUROR LILLY:  Yes.

10             MR. PRASAD:  Ma'am, is that all right?  Ms.

11   Collet, is that all right?

12             PROSPECTIVE JUROR COLLET:  Yes.

13             MR. PRASAD:  And Ms. Hoy, is that okay?

14             PROSPECTIVE JUROR HOY:  Yes.

15             MR. PRASAD:  Okay.  The second aspect I was

16   bringing up, Ms. Collet, I'm going to pick on you a

17   little bit about this.  Because we're talking about the

18   age of the defendant.  I mean, he was sixteen at the

19   time, seventeen today.  You work in ten to twelfth

20   graders.  I mean, this is--

21             PROSPECTIVE JUROR COLLET:  (Interposing)

22   Right.

23             MR. PRASAD:  This is exactly the grade range

24   that we're talking about of people you see.  Will the

25   age of the defendant affect you based on -- I mean,

-23-

```
 1      you've got a much greater breadth of experience with
 2      that age range than I think most of us do.  Could you be
 3      fair and impartial or would you have sympathies or
 4      biases because of his age?
 5                PROSPECTIVE JUROR COLLET:  No.  I could be
 6      fair.
 7                MR. PRASAD:  And you understand my question
 8      about that?
 9                PROSPECTIVE JUROR COLLET:  Mm-hmm.  I do.
10                MR. PRASAD:  Ms. Hoy, is that okay?
11                PROSPECTIVE JUROR HOY:  Yes.
12                MR. PRASAD:  Okay.  And, sir?  It's Mr.
13      Lilly, is that correct?
14                PROSPECTIVE JUROR LILLY:  Yes.
15                MR. PRASAD:  Anything about the defendant's
16      age?  Can you be fair and impartial?
17                PROSPECTIVE JUROR LILLY:  I think so.
18      Excuse me.  I have a, I have a daughter just about his
19      age.  So--
20                MR. PRASAD:  (Interposing)  And that's the
21      reason why I, that's why I'm asking the question.
22                PROSPECTIVE JUROR LILLY:  Yeah.  I think I'd
23      be all right with it.
24                MR. PRASAD:  Okay.  Very good.  And then Ms.
25      Szot, is that, is that correct?
```

-24-

```
 1                    PROSPECTIVE JUROR SZOT:  Yes.
 2                    MR. PRASAD:  What about you, ma'am?  Can you
 3          be fair and impartial given his age?
 4                    PROSPECTIVE JUROR SZOT:  Yes.
 5                    MR. PRASAD:  Okay.  Very good.  Very good.
 6          The other question I was asking people, and I
 7          appreciate, Ms. Hoy, for your, for your candor.  Has
 8          anyone themselves been, have someone close to them been
 9          a victim of this type of crime?  Sir?
10                    PROSPECTIVE JUROR LILLY:  No.
11                    MR. PRASAD:  Ma'am?  Ma'am?  And on the flip
12          side of that, anyone that you know been accused of this
13          type of crime?  Ma'am?
14                    PROSPECTIVE JUROR SZOT:  No.
15                    MR. PRASAD:  Sir?
16                    PROSPECTIVE JUROR LILLY:  No.
17                    MR. PRASAD:  Ms. Collet?
18                    PROSPECTIVE JUROR COLLET:  No.
19                    MR. PRASAD:  Ms. Hoy?
20                    PROSPECTIVE JUROR HOY:  No.
21                    MR. PRASAD:  Very good.  Very good.  And the
22          last real issue that I was bringing up with everyone was
23          the issue of, and it's how you look at it, but in
24          sitting in judgement the way the law requires you to in
25          this case by evaluating the facts and trying to evaluate
```

1       whether or not, using the law, I have proven the charges

2       beyond a reasonable doubt, proven the elements beyond a

3       reasonable doubt.

4                   Does anyone have any hesitation in doing

5       that job, for whatever reason, moral, emotional, ethical

6       reason?  Sir?

7                   PROSPECTIVE JUROR LILLY:  No.  I think I'd

8       be all right with it.

9                   MR. PRASAD:  You paused.

10                  PROSPECTIVE JUROR LILLY:  Yeah.

11                  MR. PRASAD:  What was the pause for?

12                  PROSPECTIVE JUROR LILLY:  Well, you know, it

13      goes back to the same question that you just asked

14      previously.  He's a young man.

15                  MR. PRASAD:  Mm-hmm.

16                  PROSPECTIVE JUROR LILLY:  His whole life is

17      on the line, you know.  So, it's, it's a -- It's not

18      going to be anything that's going to be easy for

19      anybody.

20                  MR. PRASAD:  Right.  I grant you, I

21      absolutely grant you that.  And that's why, and it goes

22      back to what Judge Morrow was saying yesterday and today

23      and what I've been saying all along.  You know yourself

24      best.  You've got to tell us now.  Do you have any

25      hesitation?  Or do you think you can do it fairly and

```
 1      impartially?
 2                  PROSPECTIVE JUROR LILLY:  Yes.  I believe I
 3      can.
 4                  MR. PRASAD:  Thank you.  Ms.  Szot?
 5                  PROSPECTIVE JUROR SZOT:  I think I can be
 6      fair if -- I guess the word, to me, reasonable there's
 7      kind of a fine line.  I'm the kind of person who worries
 8      about what is reasonable and how does, does that
 9      stretch.  And sometimes that will hesitation about
10      things.  And I would worry about it, about doing the
11      right thing.
12                  MR. PRASAD:  And I appreciate that.  And
13      we're all different in how we make decisions.  Some of
14      them are more deliberate.  Some, you know make quick
15      decisions.  And I appreciate the way you're describing
16      it.
17                  So, do you think because of the way you make
18      decisions, do you think that would create a bias for or
19      against one side?
20                  PROSPECTIVE JUROR SZOT:  I don't think so.
21                  MR. PRASAD:  Okay.
22                  PROSPECTIVE JUROR SZOT:  I think it's more
23      in my mind of feeling sure that my decision is correct.
24                  MR. PRASAD:  Okay.
25                  PROSPECTIVE JUROR SZOT:  I guess my problem
```

1     would be--

2                   MR. PRASAD:  (Interposing)  And then that's

3     -- Thank you.  I appreciate that.  I guess -- And this

4     is the hard part about this, this dialogue we're having

5     is how do you -- With the way you, the way you make

6     decisions and the hesitation you have, would that, would

7     that create a problem for you to make a decision one way

8     or the other?

9                   PROSPECTIVE JUROR SZOT:  It might

10                  MR. PRASAD:  Okay.

11                  PROSPECTIVE JUROR SZOT:  Again, without

12    hearing--

13                  MR. PRASAD:  (Interposing)  I know.  And

14    that's, that's the hard part is I'm asking you all these

15    questions without going into the evidence at all.  It's

16    not like you go into the evidence now.  I mean, it's

17    not--

18                  PROSPECTIVE JUROR SZOT:  (Interposing)  I

19    mean, I obviously will do what I feel is fair, if I feel

20    one way or another particularly strongly.  But like you

21    said, that reasonable doubt, that's different.

22                  MR. PRASAD:  Thank you.  Thank you, ma'am.

23    Ms. Collet, do you have any of those hesitations or any

24    of those issues that we were discussing?  Can you be

25    fair and impartial?

1                      PROSPECTIVE JUROR COLLET:  I can be fair and

2          impartial.  And if you prove it beyond a reasonable

3          doubt, I wouldn't have a problem.

4                      MR. PRASAD:  Thank you.  Ms. Hoy?

5                      PROSPECTIVE JUROR HOY:  I guess I would look

6          at the facts and that facts will make my decision.

7                      MR. PRASAD:  Thank you.  Thank you.  Thank

8          you, your Honor.

9                      THE COURT:  Ms. Rock?

10                     MS. ROCK:  Good morning.

11                     PROSPECTIVE JURORS:  Good morning.

12                     MS. ROCK:  So, one day I'm in volleyball

13         class and I'm called to the principal's office.  And the

14         principal, Mr. King, informs me that someone said I took

15         five dollars out of somebody's pocket or purse.

16                     And so, I said, I don't have any money on

17         me.  My dollar for lunch I left in my bathrobe pocket.

18         So, he calls home and he verifies that, in fact, there

19         was a dollar in my bathroom pocket, bath robe pocket.

20         So, that was me being accused of something I didn't do.

21                     And what I'm asking you, Mr. Lilly, Ms. Hoy,

22         Ms. Szot and Ms. Collet, have you ever had that

23         experience of being accused of something that you didn't

24         do?

25                     PROSPECTIVE JUROR HOY:  No.  I haven't.

-29-

 1                    MS. ROCK:  No?  How about you, Ms. Collet?

 2      Collet.  Excuse me.

 3                    PROSPECTIVE JUROR COLLET:  No.  Unless it's

 4      by my parents.

 5                    MS. ROCK:  Mr. Lilly?

 6                    PROSPECTIVE JUROR LILLY:  No.

 7                    MS. ROCK:  Do you know anybody who's ever

 8      been accused of doing, accused of doing something they

 9      didn't do?  Probably news stories maybe might come to

10      mind.  But anybody personally?  Can you think for me,

11      Ms. Hoy, a reason why somebody might accuse somebody of

12      doing something that they didn't do?

13                    PROSPECTIVE JUROR HOY:  I mean, I don't

14      know.

15                    MS. ROCK:  Thank you.  How about you, Mr.

16      Lilly?  Do you -- Why would somebody -- What kind of

17      reasons do you think there would be for somebody

18      accusing somebody of something they didn't do?

19                    PROSPECTIVE JUROR LILLY:  I have no idea.

20      There's no personal gain there if they're accusing

21      somebody of doing something, unless they just absolutely

22      don't like the person.

23                    MS. ROCK:  Not liking the person.  How about

24      you, Mr. Collet?

25                    PROSPECTIVE JUROR COLLET:  Maybe someone

                              -30-

```
 1    else accused the person, you know, to take blame off

 2    themselves.

 3              MS. ROCK:  So, covering their own tracks,

 4    right?

 5              PROSPECTIVE JUROR COLLET:  If someone tells

 6    me who's actually stole the money, oh I saw Johnny do

 7    it.

 8              MS. ROCK:  Right.  Right.  They're guilty so

 9    they're blaming somebody else.  How about you, Ms. Szot?

10    And forgive me for not asking you a question.  What do

11    you think?  Do you think there might be reasons why--

12              PROSPECTIVE JUROR SZOT:  (Interposing)

13    Yeah.  If somebody's angry at somebody, they might do

14    something to try to get them in trouble.

15              MS. ROCK:  So, there might be some reasons

16    why someone would do that.  Because I always thought the

17    person who took the five dollars blamed me.  But part of

18    that problem, wouldn't you agree that part of the

19    problem is I could never disprove that I didn't take the

20    five dollars.  That would be difficult for me to do.

21    Wouldn't you agree, Mr. Lilly?

22              PROSPECTIVE JUROR LILLY:  Yes.

23              MS. ROCK:  Okay.  What about you, Ms. Szot?

24    You would agree with that?

25              PROSPECTIVE JUROR SZOT:  Yes.
```

-31-

1            MS. ROCK:  That would be -- And why, Ms.

2      Collet, would you think that that would be difficult for

3      me to disprove that I didn't take the five dollars?

4            PROSPECTIVE JUROR SZOT:  There was no

5      evidence or any witnesses.  It would be hard to disprove

6      that you didn't take it.

7            MS. ROCK:  So, because -- So, it would be

8      important -- And that's why when the Judge was talking

9      about the burden of proof, that the burden of proof was

10      on the government.  That's why it's important for the

11      government to carry that burden, correct?

12            PROSPECTIVE JUROR LILLY:  Right.

13            MS. ROCK:  Would you agree with that, Ms.

14      Hoy?

15            PROSPECTIVE JUROR HOY:  Yes.

16            MS. ROCK:  And with regard to -- Does

17      anybody have any law enforcement -- Well, I don't mean

18      anybody.  I'm sorry.  It would be the four new jurors.

19      Anybody have any law enforcement connection?  Ms. Hoy?

20            PROSPECTIVE JUROR HOY:  My cousin is married

21      to a Monroe County Police Officer.

22            MS. ROCK:  Do you spend a lot of time with

23      that Monroe County Police Officer?

24            PROSPECTIVE JUROR HOY:  No.  Just family

25      gatherings or, you know, stuff like that.

                              -32-

1                    MS. ROCK:  Okay.  Mr. Lilly?

2                    PROSPECTIVE JUROR LILLY:  No.

3                    MS. ROCK:  Ms. Collet?

4                    PROSPECTIVE JUROR COLLET:  Yes.

5                    MS. ROCK:  I do have a friend who's a

6     retired police officer.  I don't spend a lot of time

7     with him.

8                    MS. ROCK:  Okay.  So, the fact that you have

9     this connection wouldn't, you don't think it would

10    influence you one way or another?

11                   PROSPECTIVE JUROR COLLET:  No.

12                   MS. ROCK:  Okay.  Szot -- Is it Szot?

13                   PROSPECTIVE JUROR SZOT:  Yes.

14                   MS. ROCK:  I'm sorry.  Okay.  And is there -

15    - Mr. Lilly, Ms. Collet, Ms. Szot and Ms. Hoy, would you

16    have a tendency, would you believe the police over non-

17    police witnesses or would you give everybody a level

18    playing field?

19                   PROSPECTIVE JUROR COLLET:  Me?

20                   MS. ROCK:  Sure.

21                   PROSPECTIVE JUROR COLLET:  I'd give

22    everybody a chance to tell their sides.

23                   MS. ROCK:  Okay.  So, you wouldn't say,

24    well, this is a police officer, they're obviously

25    telling the truth?

-33-

```
 1                    PROSPECTIVE JUROR COLLET:  I wouldn't say
 2      like -- I'd be open to hearing both sides.  And then
 3      whatever evidence is there.  I mean, I don't think
 4      police lie all the time--
 5                    MS. ROCK:  (Interposing)  Sure.
 6                    PROSPECTIVE JUROR COLLET:  And are bad,
 7      but--
 8                    MS. ROCK:  (Interposing)  Of course.
 9                    PROSPECTIVE JUROR COLLET:  But I think, in
10      general, those professions have honest people.  But--
11                    THE COURT:  (Interposing)  Right.
12                    PROSPECTIVE JUROR COLLET:  But you have
13      professions that don't tell the truth.  But, for the
14      most part, most people tell the truth, I suppose--
15                    MS. ROCK:  (Interposing)  I'm sorry.  I
16      didn't hear that last part.
17                    PROSPECTIVE JUROR COLLET:  I think most
18      people are honest, I guess.  But you can still have the
19      chance that somebody is dishonest.  That's my point.
20                    MS. ROCK:  Thank you.  Thank you.  Mr.
21      Lilly?
22                    PROSPECTIVE JUROR LILLY:  I need to go back
23      and re-visit the first question, I mean, the previous
24      question.
25                    MS. ROCK:  Sure.
```

```
1                    PROSPECTIVE JUROR LILLY:  Because my stepson
2        did marry, the girl that he married, her father is a
3        retired Wayne County Sheriff.
4                    MS. ROCK:  Would that have any impact on you
5        at all?
6                    PROSPECTIVE JUROR LILLY:  No.
7                    MS. ROCK:  Okay.  And, and when I asked that
8        question about would all witnesses have a level playing
9        field for you, would that be true?
10                    PROSPECTIVE JUROR LILLY:  Yes.  That is
11        true.
12                    MS. ROCK:  Oh.  Okay.  Thank you.  I always
13        call you last, but this time I'm going to call you
14        before Ms. Hoy.  Ms. Szot, what's your opinion?  All
15        witnesses have a level playing field?
16                    PROSPECTIVE JUROR SZOT:  I think so.
17                    MS. ROCK:  Okay.  Ms. Hoy?
18                    PROSPECTIVE JUROR HOY:  Yes.  I'd listen to
19        both sides.
20                    MS. ROCK:  Thank you.  All right, your
21        Honor.  I don't have any further questions.  Thank you.
22                    THE COURT:  Okay.  Are there any, the new
23        seated ones, any challenges for cause?
24                    MR. PRASAD:  None for cause, your Honor.
25                    THE COURT:  How about--
```

```
 1              MS. ROCK:  (Interposing)  None for cause,
 2    your Honor.
 3              THE COURT:  Any peremptories the -- I'm
 4    sorry.  I'm not even -- I've lost track of who they are
 5    to.
 6              MS. ROCK:  I think it's me, your Honor,
 7    actually.
 8              THE COURT:  Okay.  Any peremptories you'd
 9    like to use today?
10              MS. ROCK:  Your Honor, I would, we'd like to
11    thank and excuse Ms. Hoy.  Thank you.
12              THE COURT:  Ms. Hoy, thank you for your help
13    today, ma'am, and yesterday.  The prosecution wish to
14    exercise any peremptories?
15              MR. PRASAD:  Yes, your Honor.  Thank you.
16    The People would like to thank and excuse Ms. Szot, your
17    Honor.
18              THE COURT:  Ms. Szot, thank you for your
19    help today, ma'am, and your patience yesterday.
20              THE CLERK:  Trevor Kamin, Kamin, please take
21    seat number four.  And Jack Eldridge, could you please
22    take seat number fourteen?
23              THE COURT:  Mr. Kamin, good morning, sir.
24              PROSPECTIVE JUROR KAMIN:  Good morning.
25              THE COURT:  Please introduce yourself to us,
```

1    please?

2                  PROSPECTIVE JUROR KAMIN:  My name is Trevor

3    Kamin.  I'm a tattoo artist.  My wife works at a bank as

4    a teller.  I have two sons, one teenaged, one three.

5    And I have served on a jury.  We did reach a verdict.

6                  THE COURT:  What was the subject matter?

7                  PROSPECTIVE JUROR KAMIN:  It was a rape

8    case.

9                  THE COURT:  Okay.  It's Kamin or Kamin?

10                 PROSPECTIVE JUROR KAMIN:  Kamin.

11                 THE COURT:  Kamin.  Okay.  Let me get that.

12    So, what is your opinion about tattoos?

13                 PROSPECTIVE JUROR KAMIN:  They're okay.

14                 THE COURT:  Okay.  Have they had any

15    elevation in having a social redeeming value in the last

16    ten years?

17                 PROSPECTIVE JUROR KAMIN:  In the last ten

18    years, it's somewhat more acceptable.

19                 THE COURT:  One of my favorite tattoo movies

20    is Officer and a Gentleman.  Did you happen to see that

21    one?

22                 PROSPECTIVE JUROR KAMIN:  I did.

23                 THE COURT:  Did you see that before you

24    became the artist known as tattoo or...

25                 PROSPECTIVE JUROR KAMIN:  I saw that movie

-37-

1      when I was a child.

2                  THE COURT:  Before any tattoos?

3                  PROSPECTIVE JUROR KAMIN:  Yes.

4                  THE COURT:  So, what did you think?

5                  PROSPECTIVE JUROR KAMIN:  I liked the movie

6      in general, by itself.

7                  THE COURT:  Right.  The only part I think I

8      didn't like is when he kicked Lou Gossett's butt.  I'm

9      like, ain't no young kid supposed to be able to whip no

10     old kid.  Kind of consistent with what I remember

11     tattoos being as a child, you know, kind of being

12     generally on servicemen.

13                 PROSPECTIVE JUROR KAMIN:  Typically

14     servicemen and criminals and bikers.

15                 THE COURT:  And women associated with.

16                 PROSPECTIVE JUROR KAMIN:  Yes.

17                 THE COURT:  Who are not criminal.

18                 PROSPECTIVE JUROR KAMIN:  Right.

19                 THE COURT:  So, the women clientele has

20     always been different.  So, who changed that?  What

21     famous person do you think got a tattoo that started

22     trying to change how people generally thought of

23     tattoos?  Anybody come to mind?

24                 PROSPECTIVE JUROR KAMIN:  Well, you had some

25     of the people who brought it more forefront like Saylor

                                -38-

1      Jerry (sp.) from Hawaii and Ed Hardy who has clothing

2      everywhere now, thanks to Christian Augiere (sp.).

3             THE COURT:  I also think the resurrection of

4      certain cultures getting back to tattooing.

5             PROSPECTIVE JUROR KAMIN:  Yeah.  Polynesians

6      and Japanese.  Because in Japan and China, is was more

7      triad and ecuza (sp.) that were into tattoos.

8             THE COURT:  I think that had a little

9      something to do with it.

10            PROSPECTIVE JUROR KAMIN:  Yeah.

11            THE COURT:  And now I'm pretty sure that

12     everybody has a relative who has a tattoo and that

13     hasn't changed their opinion about them except maybe

14     thinking that on a certain part they should have put a

15     little small rosebud instead of a watermelon.  Because

16     now the watermelon looks like a basketball, you know,

17     over time.

18            Do you think it's a good thing that they've

19     incorporated some health features the field of

20     tattooing?

21            PROSPECTIVE JUROR KAMIN:  Most definitely.

22            THE COURT:  Sometimes a bad one or two

23     people can spoil it for the whole industry.

24            PROSPECTIVE JUROR KAMIN:  We actually work

25     with the Wayne County Health Department on a task force.

-39-

```
 1                    THE COURT:  Okay.  So, I'm really
 2      interested.  What person have you tattooed that has
 3      accumulated the most expense for whatever they've done,
 4      one singular person?
 5                    PROSPECTIVE JUROR KAMIN:  Are you looking
 6      for like a dollar figure?
 7                    THE COURT:  Yeah.  Like a dollar figure.
 8      Okay.  They have like--
 9                    PROSPECTIVE JUROR KAMIN:  (Interposing)
10      It's into the thousands.
11                    THE COURT:  I mean, you've tattooed somebody
12      now and generated income from them like more than five
13      thousand dollars?
14                    PROSPECTIVE JUROR KAMIN:  It's probably in
15      that range.
16                    THE COURT:  It's more likely to be male,
17      female or no gender distinction?
18                    PROSPECTIVE JUROR KAMIN:  No gender
19      distinction at all.
20                    THE COURT:  So, what do you think about
21      scalp tattooing?
22                    PROSPECTIVE JUROR KAMIN:  I don't like
23      scalpels.  Well, scalpels are illegal in Michigan,
24      period, unless you're a physician.
25                    THE COURT:  So, you have to go out of
```

-40-

 1    Michigan to get your scalp tattooed?

 2                PROSPECTIVE JUROR KAMIN:  Yes.  Do you mean

 3    scalp as far as your head?

 4                THE COURT:  Yes.

 5                PROSPECTIVE JUROR KAMIN:  Oh.  I thought you

 6    mean with a, like--

 7                THE COURT:  (Interposing)  No.  No.

 8                PROSPECTIVE JUROR KAMIN:  Scarification.

 9                THE COURT:  No.  No.  Like in your head.

10                PROSPECTIVE JUROR KAMIN:  Oh.  I don't have

11    a problem with that.

12                THE COURT:  Okay.

13                PROSPECTIVE JUROR KAMIN:  I tattooed my

14    mom's head.

15                THE COURT:  Is there any place on the body

16    in Michigan where is it forbidden to have a tattoo?

17                PROSPECTIVE JUROR KAMIN:  No.

18                THE COURT:  Okay.  Any places other than

19    Michigan that you know that place restrictions on where

20    to tattoo?

21                PROSPECTIVE JUROR KAMIN:  No.  I think the

22    strictest county would be Clark County in Las Vegas.

23    But I don't believe they have an area of the body that--

24                THE COURT:  (Interposing)  Okay.  And your

25    understanding is everybody at least has an age limit?

-41-

1          PROSPECTIVE JUROR KAMIN:  Really, in

2     Michigan, there is no age limit.  As long as you have

3     parental consent, there is no age limit.

4          THE COURT:  Oh.  Okay.  Well, what I meant

5     was parental consent or--

6          PROSPECTIVE JUROR KAMIN:  (Interposing)

7     Yes.  We, as artists, have our own values and our own

8     morals.

9          THE COURT:  Right.  And there -- Is there an

10    age that they think that kids can't consent?  For

11    instance, if somebody brought in their five year old

12    child.

13         PROSPECTIVE JUROR KAMIN:  We personally, at

14    Artist Reveal, will not tattoo anybody under the age of

15    sixteen with parental consent just because of body

16    development.  What looks good on you today, in ten

17    years, may not because--

18         THE COURT:  (Interposing)  Oh, isn't that

19    true almost for everybody though?  Depending on the

20    place, for sure.

21         PROSPECTIVE JUROR KAMIN:  Well, I mean,

22    like, for instance, if a young fellow came in and got a

23    tattoo on his arm.  And it may be centered today, but by

24    the time he graduates college it would be on the back of

25    his arm now because he was still developing.

1              THE COURT:  Okay.  Unless somebody wanted to

2      get one circular.  And the it doesn't matter.

3              PROSPECTIVE JUROR KAMIN:  Well, it still

4      matters.  What if the wrist gets bigger?  Because then

5      you go back to the basketball.

6              THE COURT:  Gotcha.  Young man, please

7      introduce yourself to us.

8              PROSPECTIVE JUROR ELDRIDGE:  My name is Jack

9      Eldridge, single, retired, never been on a jury before.

10     I made it this far, but never been selected.  That's

11     about it.

12             THE COURT:  What do you do with the bulk of

13     your, I'm going to call it non-working time?  Because I

14     made a mistake one time and called it free time and

15     somebody said, it's not free time.  Like, I work harder

16     now that I'm not working than when I worked.  So, your

17     non-working time.

18             PROSPECTIVE JUROR ELDRIDGE:  Yeah.  For ten

19     years.

20             THE COURT:  What do you do with that time?

21             PROSPECTIVE JUROR ELDRIDGE:  Not much.  And

22     the day goes by so fast.

23             THE COURT:  Okay.  No hobbies?  Any hobbies

24     that take up that time?

25             PROSPECTIVE JUROR ELDRIDGE:  No.

                            -43-

1                    THE COURT:  Okay.  You like to travel, sir?

2                    PROSPECTIVE JUROR ELDRIDGE:  Yes.  I love

3      it.

4                    THE COURT:  You been on any good trips

5      recently?

6                    PROSPECTIVE JUROR ELDRIDGE:  Let's see.  I

7      was in LA last year for a couple months.  I like LA.

8                    THE COURT:  Oh.  You can go and stay months,

9      huh?

10                   PROSPECTIVE JUROR ELDRIDGE:  Yeah.  Well,

11     got nothing else to do.

12                   THE COURT:  That's pretty all right.  What

13     did you retire from again?

14                   PROSPECTIVE JUROR ELDRIDGE:  A place called

15     Detroit Diesel.

16                   THE COURT:  I know it.

17                   PROSPECTIVE JUROR ELDRIDGE:  Yeah.

18                   THE COURT:  Okay.  And you worked there for

19     how long?

20                   PROSPECTIVE JUROR ELDRIDGE:  Thirty-five

21     years.

22                   THE COURT:  Okay.  What do they give a

23     person when they retire for thirty-five years at Detroit

24     Diesel?

25                   PROSPECTIVE JUROR ELDRIDGE:  A watch.

-44-

1                    THE COURT:  Okay.  I mean, is it a good

2       watch or is like one of my Timexes that take a licking

3       and keep on ticking?  Is it a good watch?

4                    PROSPECTIVE JUROR ELDRIDGE:  Yeah.

5                    THE COURT:  Okay.

6                    PROSPECTIVE JUROR ELDRIDGE:  Sorry.  It's

7       kind of hard to hear you from that far away.

8                    THE COURT:  That's all right.  What kind of

9       watch is it?

10                   PROSPECTIVE JUROR ELDRIDGE:  I think it is a

11      Timex.

12                   THE COURT:  Okay.  But does it have Detroit

13      Diesel on the face?  Is it--

14                   PROSPECTIVE JUROR ELDRIDGE:  (Interposing)

15      Well, they engrave it on the back with your name and

16      your years of service and Detroit Diesel.

17                   THE COURT:  Okay.  Any presentation they

18      give you or just like you the watch, give you a pat on

19      your rump--

20                   PROSPECTIVE JUROR ELDRIDGE:  (Interposing)

21      They come down and give us it.

22                   THE COURT:  Okay.

23                   PROSPECTIVE JUROR ELDRIDGE:  Shake your

24      hand, say thanks a lot and there's the door.

25                   THE COURT:  And the next man brings in his

-45-

```
1    lunch bucket.  They still call them lunch buckets?
2              PROSPECTIVE JUROR THOMAS:  They do.
3              THE COURT:  They do?  Old school?  I was
4    just -- This is just, you know, kind of off the track,
5    but weird anyway.  We were talking about the expression
6    polishing your teeth.  And we were trying to go back and
7    see how many generations ago somebody in their family
8    might have said polish your teeth instead brush your
9    teeth.  And see if, in people's backgrounds, that word
10   was spoken.  Because I know my grandmother used to tell
11   us, go polish your teeth, you know.  And off you go with
12   the toothbrush.  But you're not that old, right?  Nobody
13   in your--
14             PROSPECTIVE JUROR ELDRIDGE:  (Interposing)
15   No.  I've heard the term.
16             THE COURT:  Okay.  You watch the history
17   channel, like so many of us do.  Mr. Prasad, if you want
18   to ask any one of them questions, you're free, sir.
19             MR. PRASAD:  Yes, your Honor.
20             MS. ROCK:  Excuse me, your Honor.  Before he
21   does, may I have a run to the rest room?  I'll be fast.
22             THE COURT:  You may.
23             MS. ROCK:  Okay.  Thank you.
24             THE COURT:  Anybody else want to make a run?
25   You can use this one, that one, whatever.
```

-46-

```
 1                    (At 10:40 a.m. off the record.)

 2                    (At 10:44 a.m. back on the record.)

 3              MS. ROCK:  Thank you, your Honor.

 4              THE COURT:  You're quite welcome.  We were

 5      just discussing sometimes the difference -- But now that

 6      even Ms. Rock brought that up.  That's one of the

 7      hardest things I found when I first became a Judge,

 8      trying to coordinate everybody's bladder.  And at first,

 9      I used to use my bladder.  But I was always told that I

10      had a surgeon's bladder, you know, and so that I could

11      stand somewhere and I guess that just comes from too

12      many walks out in the park and being afraid of being

13      arrested for public urination.  That'll make you be able

14      to hold it.  I'm telling you.

15                   But then that didn't work well.  And

16      certainly you know age is a factor.  And after I started

17      getting a little older, I'm like man.  And then, you

18      know, we've encountered the pregnant juror who, like

19      every two minutes, it was like -- So, you know, you just

20      say, if you have to go let me know.  Or just get up.

21      I'll see you moving.  I'll get the message.

22                   So, you know, just, just let me know.  We

23      all take different medication from time to time that

24      affects us differently.  And so, let's just celebrate

25      our differences.
```

-47-

1                    PROSPECTIVE JUROR ELDRIDGE:  So, if you're

2          sitting on the jury and you gotta go--

3                    THE COURT:  (Interposing)  And you gotta go,

4          you gotta go.  And we'll just celebrate.  Okay?

5                    MR. PRASAD:  Ms. Kamin, did I pronounce that

6          right?

7                    PROSPECTIVE JUROR KAMIN:  Yes.

8                    MR. PRASAD:  Okay.  Your previous jury

9          experience, was that here in this building, sir?

10                    PROSPECTIVE JUROR KAMIN:  Yes.  It was.

11                    MR. PRASAD:  Okay.  Anything about that

12          experience that would affect you today?  Any feelings

13          negative or positive that would affect--

14                    PROSPECTIVE JUROR KAMIN:  (Interposing)  It

15          was not a pleasant experience.

16                    MR. PRASAD:  Okay.

17                    PROSPECTIVE JUROR KAMIN:  But I don't --

18          Different Judge, different case.

19                    MR. PRASAD:  Was it the subject matter of

20          that case?

21                    PROSPECTIVE JUROR KAMIN:  It was not the

22          subject matter of the case.

23                    MR. PRASAD:  It was the way you were

24          treated?

25                    PROSPECTIVE JUROR KAMIN:  We entered, we

-48-

1      entered a verdict of not guilty and we got reprimanded

2      by the Judge after.

3                     THE COURT:  You know there are Judges that

4      think they're smarter than the juries.

5                     MR. PRASAD:  Yeah.  I can completely

6      understand that.

7                     THE COURT:  Just like the lawyers that think

8      that they're smarter than the Judges.

9                     MR. PRASAD:  A got a couple stories about

10     being yelled at by Judges.  But that's besides the

11     point.  Anything about those questions I was talking

12     about today and yesterday, the issues that come across

13     with either the sentencing in this charge, the fact that

14     you have to keep the sentencing away from your thoughts?

15                    PROSPECTIVE JUROR KAMIN:  The sentencing I

16     would not have an issue with because it is not our duty.

17     However, the age is a big impact on me.  I have a son

18     that's very close to his age.

19                    MR. PRASAD:  Okay.

20                    PROSPECTIVE JUROR KAMIN:  And I did find

21     myself yesterday sympathizing with him sitting there.

22                    MR. PRASAD:  And you understand why I'm

23     asking these questions?

24                    PROSPECTIVE JUROR KAMIN:  Very much so.

25                    MR. PRASAD:  Okay.

-49-

 1                    PROSPECTIVE JUROR KAMIN:  Because it could

 2         sway a decision.

 3                    MR. PRASAD:  Right.

 4                    PROSPECTIVE JUROR KAMIN:  I don't know that

 5         I could definitively say that no I wouldn't be

 6         sympathetic.

 7                    MR. PRASAD:  Okay.  Well, thank you, sir.

 8         Thank you for your candor.  Mr Eldridge, anything about

 9         those issues we were talking about?  First, about the

10         sentencing.  Can you set aside sentencing in this issue,

11         keep that out of your mind and just focus on the facts

12         and the law of this case?

13                    PROSPECTIVE JUROR ELDRIDGE:  I would hope

14         so.

15                    MR. PRASAD:  You understand what I'm saying?

16         I mean, it's not in your, it's not your duty, it's not

17         your job, so you really can't take that into account

18         when you make your decision.  Is that okay?

19                    PROSPECTIVE JUROR ELDRIDGE:  Yeah.

20                    MR. PRASAD:  Okay.  What about the age of

21         the defendant?  Would that affect you or sway you in any

22         way?

23                    PROSPECTIVE JUROR ELDRIDGE:  Oh, I don't

24         think so.

25                    MR. PRASAD:  And I think one of your

                                -50-

1   predecessors yesterday sitting in that seat was talking

2   about the balancing, the balancing between the sympathy,

3   but looking at the evidence itself.  Can you ignore the

4   sympathy and focus on the evidence is what I'm asking?

5                PROSPECTIVE JUROR ELDRIDGE:  Well, it all

6   comes down to the evidence.

7                MR. PRASAD:  Absolutely.  Absolutely.  Okay.

8   Very good.  And then the last thing I was asking, you

9   know, in general was, any hesitancy in making the

10   decision that you're going to have to make and the way

11   that you have to make it, listen to the law, seeing if

12   I've proven the elements beyond a reasonable doubt.  Do

13   you have any hesitation in making that decision, either

14   of you?

15                PROSPECTIVE JUROR KAMIN:  Outside of the

16   sympathy issue, no.

17                MR. PRASAD:  Mr. Eldridge?

18                PROSPECTIVE JUROR ELDRIDGE:  No.

19                MR. PRASAD:  Okay.  Very good.  Very good.

20   Thank you, sir.  Thank you, your Honor.

21                THE COURT:  Thank you.  Ms. Rock?

22                MS. ROCK:  Thank you.  Good morning,

23   gentlemen.

24                PROSPECTIVE JUROR KAMIN:  Good morning.

25                THE COURT:  Mr. Eldridge, I was a little

-51-

1      concerned when you mentioned your hearing, that you

2      couldn't hear the Judge from the bench or were having

3      difficulty hearing him.  Did I hear you right?

4              MS. ROCK:  Yes.  Also like when, you know, I

5      was sitting back there in the peanut gallery and you

6      people are talking.  You're not facing us.  You know

7      what I mean?

8              MS. ROCK:  Yes.  I do.

9              PROSPECTIVE JUROR ELDRIDGE:  It's a little

10     hard to hear.

11             MS. ROCK:  Okay.  Did you--

12             PROSPECTIVE JUROR ELDRIDGE:  (Interposing)

13     When you're not facing us.  I can hear you now, looking

14     at you.

15             MS. ROCK:  Right.  So, did you miss part of

16     the, the discussion then?

17             PROSPECTIVE JUROR ELDRIDGE:  A little bit.

18             MS. ROCK:  Okay.  Do you think if you sat on

19     this jury you might have some difficulty with hearing

20     what was being said?

21             PROSPECTIVE JUROR ELDRIDGE:  Not if they use

22     the microphones and stuff.

23             THE COURT:  And the witnesses will use the

24     microphone.

25             MS. ROCK:  Did I -- In any of my previous

-52-

1       questions about law -- Do you have any law enforcement

2       connection or...

3                       PROSPECTIVE JUROR ELDRIDGE:  Homeland

4       Security.  Is that the same thing?  My nephew is, works

5       for Homeland Security.

6                       MS. ROCK:  I think it kind of qualifies.

7       Would that have an impact on you at all in terms of

8       which side you're going to root for?  Are you going to

9       root for a side or are you just gonna listen to the

10      evidence and?

11                      PROSPECTIVE JUROR KAMIN:  Try to listen.

12                      MS. ROCK:  Okay.  Listen to the evidence.

13      Do you -- Are you going to give all the witnesses a

14      level playing field?  I'm sorry.  Are you going to give

15      all the witnesses a level playing field?

16                      PROSPECTIVE JUROR ELDRIDGE:  Right.

17                      MS. ROCK:  Okay.  All right.  And was there

18      anything, any issue that I raised before that you felt

19      that you and I should have a discussion on?

20                      PROSPECTIVE JUROR ELDRIDGE:  Nothing that I

21      can think of.

22                      MS. ROCK:  All right.  Thank you.  Mr.

23      Kamin, same questions to you.  Do you have any law

24      enforcement connection at all?

25                      PROSPECTIVE JUROR KAMIN:  Not family-wise.

-53-

1     Customer-wise and other business relations.  Yes.  I

2     would not put them higher than anybody.

3                 MS. ROCK:  What's family-wise?

4                 PROSPECTIVE JUROR KAMIN:  No.  I don't have

5     any family-wise.

6                 MS. ROCK:  Oh.  You don't.  Okay.  I guess I

7     should have been listening.  And in terms of level

8     playing field, you would give all witnesses a level--

9                 PROSPECTIVE JUROR KAMIN:  (Interposing)

10    Yes.

11                MS. ROCK:  And are you going to be worried

12    that if you come back with a certain verdict that you

13    might get reprimanded by the Judge, having had that

14    experience before?  Is that going to influence you?

15                PROSPECTIVE JUROR KAMIN:  Judging his

16    attitude, no.  I would not say so.

17                MS. ROCK:  Okay.  So, you're going to listen

18    and--

19                PROSPECTIVE JUROR KAMIN:  (Interposing)

20    Yes.

21                MS. ROCK:  Okay.  Was there any question

22    that I raised before that you think you and I should

23    have a discussion on or you had a problem with at all?

24                PROSPECTIVE JUROR KAMIN:  No.

25                MS. ROCK:  No?  Your Honor, I don't have any

1     further questions of these two gentleman.

2              THE COURT:  Thank you.  I need to go back

3     over just two concepts really, really quickly to just

4     either elevate or to dissipate some feelings.

5              Number one, there is no question about it.

6     Everybody expects jurors to do something.  What do you

7     think one side expects?  Well, they expect you to find

8     their client not guilty.  That's their hopes, anyway.

9              And the other side, what do you think they

10    expect?  They expect to get a conviction.  They expect

11    that you'll find that they've proven -- So, yeah.

12    Everybody wants something.  And very few people want you

13    to -- They want you to make an independent decision, but

14    they want you to decide in their favor.  Right?  I mean,

15    isn't that the truth?  The truth is -- Right.

16              You know, the process of trying to find a

17    fair and impartial jury, that's true.  But also, each

18    side would love it if they think and feel that somehow

19    they have the ability to influence you to show you that

20    they've done that they would like to do.  Okay.  So

21    that's true.

22              Now, in some cases, Mr. Kamin, you're

23    absolutely right.  There are jurors that go in there and

24    say, let's try to please the Judge.  I understand that.

25    But they'll say, you know, what do you think the Judge

1     wants us to do?

2              Because I've talked to some jurors.  And

3     sometimes they want affirmation.  They will ask me after

4     the, after the jury thing--

5              PROSPECTIVE JUROR KAMIN:  (Interposing)  How

6     did we do?

7              THE COURT:  Do you agree with us?  I've

8     tried cases in front of one of those persons that used

9     to ream juries from the front, point fingers.  You're

10    the reason for why there's crime.  I mean, just, you

11    know, just went crazy on juries if those jurors decided.

12    And I knew that those Judges were a little strange.

13             This is what happened to me the first time,

14    my very first case.  There were three people that I had

15    that were on trial, two different juries and one wanted

16    me to decide without a jury.  And for two weeks we

17    listened to testimony, for two weeks.

18             And my mom was constantly asking me, so

19    how's the trial going?  How's the trial going?  How's

20    the trial going?  And finally when it was over, I called

21    and said, bizarre.  I mean, I was like drained and first

22    trial.  And so, she was like so what'd they do?  And so,

23    I told her what the first jury had decided and I told

24    her what I decided.

25             And then in explaining to her what the jury

1    decided, what I hadn't told the jury, I said, mom, you

2    know, I think the second jury made a mistake.  And so, I

3    went on to explain the situation.

4              And these are like the questions that she

5    asked me.  She says, how old are you again?  Now, when

6    she usually asked me how old I was, somebody wanted to

7    know how long she had been married.  And what she would

8    do is take my age and add onto it and tell people that's

9    how long she's been married.

10             I'm like, who's with you?  She's like, I'm

11   at home.  I said, well, why are you trying to figure out

12   how long you've been married?  She says, just tell me

13   how old you are?  And I said, okay.  I'm forty.  She

14   said, what do you think the total number of years that's

15   represented by the ages of the jurors?  I said, I

16   thought about it, I said, probably close to six hundred

17   and twenty.  And she didn't ask another question.  And

18   so, that just simmered for about, well since I know the

19   woman, it simmered about five seconds, you know.  I got

20   it.  Six-twenty is way smarter than forty, way smarter

21   than forty.

22             So, please understand that whatever happens,

23   it's way smarter than me.  Make sense?  It makes a lot

24   of sense, doesn't it?  Call it what you want, but it

25   makes sense.  Any challenges for cause from either side?

-57-

1                    MR. PRASAD:  None for cause, your Honor.

2                    MS. ROCK:  No, your Honor.

3                    THE COURT:  Any peremptory challenges that

4        the defense would like to use?

5                    MS. ROCK:  Your Honor, I would like to thank

6        and excuse Mr. Eldridge.  Thank you.

7                    THE COURT:  Thank you for being with us, Mr.

8        Eldridge.  Mr. Prasad?

9                    MR. PRASAD:  Thank you, your Honor.  I'd

10       like to thank and excuse Mr. Kamin.

11                   THE COURT:  Thank you, Mr. Kamin.  What's

12       the name of the shop, Mr. Kamin?

13                   PROSPECTIVE JUROR KAMIN:  Ink Addiction.

14       Ink Addiction.

15                   THE COURT:  And it's in which one of our

16       fair cities in Wayne County?

17                   PROSPECTIVE JUROR KAMIN:  Taylor and Garden

18       City.

19                   THE COURT:  Ink Addiction.

20                   THE CLERK:  Paula Constantino, could you

21       please take seat number four?  And Darlene Posh, could

22       you please take seat number fourteen.

23                   THE COURT:  Let's try the first shall be

24       last and the last shall be first.  Ms. Posh, introduce

25       yourself to us.

                              -58-

1                    PROSPECTIVE JUROR POSH:  My name is Darlene

2       Posh.  I am married to a display carpenter, union.  And

3       I have two children, one who lives in Cullen (sp.) and a

4       twelve-year-old.  And I don't refer to myself as a stay-

5       at-home mom.  I'm a fun mom.  And--

6                    THE COURT:  (Interposing)  So, you can stay

7       in that status forever.

8                    PROSPECTIVE JUROR POSH:  I have the perfect

9       job.  I didn't recognize any of the names.  I've never

10      served on a jury.  And I can't think if there was any

11      other questions.

12                   THE COURT:  What was your maiden name?

13                   PROSPECTIVE JUROR POSH:  Deschamp.  Looks

14      like Deschamps.  French.

15                   THE COURT:  Okay.  So, did you like Posh?

16                   PROSPECTIVE JUROR POSH:  I had my -- I did

17      just what my mom did.  And my name is Darlene Deschamp-

18      Posh, taken as my middle name.

19                   THE COURT:  Okay.  How long did you know

20      your husband before you decided to accept his proposal?

21                   PROSPECTIVE JUROR POSH:  Sixteen months

22      after the time that he asked me before I accepted it and

23      about two years that we dated.

24                   THE COURT:  Okay.  At any point before you

25      said yes, did you practice writing Posh?

-59-

```
1                    PROSPECTIVE JUROR POSH:  No.
2                    THE COURT:  I'm just asking.  Is that a
3          silly question to ask?
4                    PROSPECTIVE JUROR POSH:  No.  I love my
5          maiden name, so...
6                    THE COURT:  Okay.  Ms. Constantino, please
7          introduce yourself to us.
8                    PROSPECTIVE JUROR CONSTANTINO:  My name is
9          Paula Constantino.  I own a tanning salon.  My husband
10         runs a restaurant.  I have two kids.  My daughter is
11         twelve and my son is ten.  I have never served on a jury
12         before and I do not recognize any of the names on the
13         list.
14                   THE COURT:  So, what was Mr. Kamin's
15         problem?  Why did she kick him off?  I mean, he kicked
16         him off.
17                   PROSPECTIVE JUROR CONSTANTINO:  I don't
18         know.
19                   THE COURT:  Come on.  Weren't you sitting
20         back there trying to figure out who was going to go?
21         No?
22                   PROSPECTIVE JUROR CONSTANTINO:  I assumed
23         they were both going to stay.
24                   THE COURT:  You can't account for any
25         particular thought as to why somebody left?  You weren't
```

1      doing that as people were dismissing--

2                      PROSPECTIVE JUROR CONSTANTINO:

3      (Interposing)  Well, the age.  I mean, you're talking

4      about the age of...

5                      THE COURT:  You think that was it?

6                      PROSPECTIVE JUROR CONSTANTINO:  Well, no.

7      But there were some questions about, you know, how you

8      would tattoo somebody.

9                      THE COURT:  Okay.

10                     PROSPECTIVE JUROR CONSTANTINO:  For an age

11     and, you know, how they would change or whatever.

12                     THE COURT:  What do you think, Ms. Posh?

13     What do you think it was about Mr. Kamin?

14                     PROSPECTIVE JUROR POSH:  Possibly the

15     visual.  I mean with him having tattoos on his hands and

16     his fingers and everywhere else.

17                     THE COURT:  Do you think it had anything to

18     do with his report that, you know, he had sympathy that

19     might accord to age?

20                     PROSPECTIVE JUROR POSH:  No.  I don't know.

21     I mean, one thing that struck with me that he'd been on

22     a previous jury and it wasn't great and so, I mean, that

23     had to have been a hard decision and -- I don't know.

24     Actually, when both gentlemen got up, I thought no.

25     They're not staying, neither one of them.

                                -61-

             1                    THE COURT:  You think they're looking for
             2      women?
             3                    PROSPECTIVE JUROR POSH:  I don't necessarily
             4      think so.  I think we're fair and impartial.
             5                    THE COURT:  No.  I mean, some people's, you
             6      know, basic premise is that women can be more fair than
             7      men or that a woman's mind is more open, you know, and
             8      men come with pre-set thoughts and opinions and when you
             9      have an opinion it's harder to change that opinion than
            10      if you're more open-minded.
            11                    But can we talk about sympathy for a second?
            12      Can you give me some reasons, Ms. Constantino, that you
            13      might sympathize with somebody, if you chose to?  Let's
            14      say we want to sympathize--
            15                    PROSPECTIVE JUROR CONSTANTINO:
            16      (Interposing)  It would depend on the circumstances, to
            17      be honest with you.
            18                    THE COURT:  Okay.  But make up a
            19      circumstance that would cause you to sympathize with
            20      somebody.
            21                    PROSPECTIVE JUROR CONSTANTINO:  Maybe their
            22      upbringing and their background, you know.  If they had
            23      a rough life or a tough time, you know, trying to get
            24      where they're at.  And they would like to go, you know,
            25      down the right path, but they don't have the

1          opportunities to do that.

2                   THE COURT:  Okay.  What would make you

3          sympathize with somebody, Ms. Posh?

4                   PROSPECTIVE JUROR POSH:  Handicapped person.

5                   THE COURT:  Okay.  Physically challenged.

6                   PROSPECTIVE JUROR POSH:  Always.

7                   THE COURT:  Okay.  Give me another one.

8                   PROSPECTIVE JUROR POSH:  I mean, that's just

9          the one that always comes, I always have a soft spot in

10         my heart for.

11                  THE COURT:  Okay.  Ms.  Constantino, we're

12         going to go back and forth in this.  She's going to give

13         me one and then you're going to think of another and

14         then Ms. Posh is going to give me another one.  And

15         let's just go back and forth until we run out, almost

16         like Family Feud.  The number one answer is...  Okay.

17         Ms. Constantino, can you give me another one?  Or can we

18         play a three-person game?  Can I get in?

19                  PROSPECTIVE JUROR CONSTANTINO:  Sure.

20                  THE COURT:  Elderly.  The age of a person.

21         I go the other way, if I see somebody ninety and

22         struggling.

23                  PROSPECTIVE JUROR POSH:  Absolutely.

24                  THE COURT:  So age.

25                  PROSPECTIVE JUROR POSH:  Alzheimer's.

1                    THE COURT:  Mental condition.  That's what
2       you just said.  Okay.  Now it's on you.
3                    PROSPECTIVE JUROR CONSTANTINO:  Well, the
4       young struggle, too.
5                    THE COURT:  Okay.  So, we go to the opposite
6       end.  Gender.
7                    MS. ROCK:  I
8                    PROSPECTIVE JUROR CONSTANTINO:  I feel that
9       someone who's been abused.
10                   THE COURT:  Okay.  And what kind?  Are we
11      talking about--
12                   PROSPECTIVE JUROR CONSTANTINO:
13      (Interposing)  Anything.
14                   THE COURT:  Domestic violence?  Women on
15      men?  Or are we talking about child about?  Or just
16      physical and mental abuse?
17                   PROSPECTIVE JUROR CONSTANTINO:  The whole
18      spectrum.
19                   THE COURT:  Okay.  Anything else?  Oh.  Can
20      we include animals?  Doesn't that kind of draw your
21      sympathy?  I mean, a lot of people are upset with
22      Michael Vick.
23                   PROSPECTIVE JUROR POSH:  Oh, yeah.  Yeah.
24      They're defenseless.  So, people who can't help
25      themselves, you think you would have a little more

                              -64-

1     sympathy for--

2            THE COURT:  (Interposing)  So,

3     vulnerability.  Anybody that's vulnerable.  Okay.  Let

4     me see.  How about race?

5            PROSPECTIVE JUROR POSH:  I mean, everyone

6     has--

7            THE COURT:  (Interposing)  Yeah.  But

8     there's -- Don't you feel any special sympathy for

9     Native American Indians?

10            PROSPECTIVE JUROR CONSTANTINO:  No.

11            THE COURT:  No?

12            PROSPECTIVE JUROR CONSTANTINO:  No.  Why?

13            THE COURT:  Because they live on

14     reservations and they've had many, many, many -- Their

15     living, their living area was kind of taken from them.

16     Discovered by -- It's like me coming to your house and

17     discovering your house.

18            PROSPECTIVE JUROR POSH:  Right.  I was

19     explaining that to my twelve year old son.

20            THE COURT:  How do you discover somebody

21     else's house and then say, okay.  I'll let you live in

22     the back yard, but these are the rules.  And then five

23     years later, say, well, I changed my mind.  You can't

24     live in the back yard.  I feel a special compassion for

25     Native American Indians versus somebody else.

```
 1                    I mean, somebody, if we're talking about
 2        upbringing, you know, like the kid that had all the
 3        baseballs and bats versus the one that always had to
 4        borrow one, you know.  So, again, social upbringing.
 5                    PROSPECTIVE JUROR CONSTANTINO:  I mean,
 6        those living on reservations today, don't they have the
 7        choice to leave?
 8                    THE COURT:  There's tribal laws.  Yeah.  You
 9        leave and go to what?  You don't leave and go live with
10        a relative.  And they kind of go to substandard schools.
11        And you know, there's a real, real, real poor -- You
12        know, they ain't living in Miami.  That's for sure.  The
13        reservations are in places like North Dakota and Arizona
14        and New Mexico.  They're not, they're not living large.
15                    At some point, they didn't have a choice.
16        It's just like saying that slaves have a choice in terms
17        of being slaves.  No.  Not really.
18                    I'm thinking -- Let's use the term victim.
19        In a criminal justice concept, who's the victim, Ms.
20        Posh?  Who would be the victim?
21                    PROSPECTIVE JUROR POSH:  It could be either
22        person.
23                    THE COURT:  It could be either person.
24                    PROSPECTIVE JUROR POSH:  Mm-hmm.
25                    THE COURT:  Do you agree?
```

-66-

1              PROSPECTIVE JUROR CONSTANTINO:  Yes.  I do.

2              THE COURT:  Right.  Sometimes people see the

3    victim as one side.  It's just like if we're talking

4    about weird words that are used.  Because we've been

5    talking about words and the concepts that they conjure

6    up.  Mr. Howard will be called by the system, but you

7    won't hear me call him the defendant.  Because if we

8    want to do the English kind of thing, the root word of

9    defendant is what?  Defend.  And it means that you have

10   to do something.  It's a verb, isn't it?  Yeah.  But

11   it's used as a noun.  But it still conjures up verb, you

12   know.  He has to defend himself.

13              And so, that's contradictory then if we look

14   at that word and see it as a verb, that there's

15   something that he has to do.  Because I'm constantly

16   saying that the prosecution has to do stuff.  So, why is

17   a person called a verb, using it as a noun?

18              Presumption of innocence.  Burden of proof.

19   But sometimes the word itself creates an expectation.

20   Because we have to talk about the expectation based

21   sometimes on just the word.  They don't say the accused.

22   In our system, he's called the defendant.

23              Sometimes it just paints a picture and

24   creates an expectation.  And we have to then diffuse the

25   expectation instead of just changing the word.  I'm an

1    advocate for changing the word, but it's not my system.

2                    PROSPECTIVE JUROR POSH:  It's a preconceived

3    notion.

4                    THE COURT:  Ah.  That incremental change.

5    That's been the word for centuries.  So, what kind of

6    juror you going to make, Ms. Posh?

7                    PROSPECTIVE JUROR POSH:  I believe an

8    interesting one because I do have a little bit of

9    history on both sides of the table.

10                   I have a sister who was a military police in

11   the Air Force, retired, worked as a juvenile officer in

12   a juvenile detention type thing, not in this state, but

13   in California.  I have a brother, an ex-brother-in-law

14   who was a prison guard in California.  I have another

15   ex-brother-in-law who was in the Air Force.  And there

16   was stealing in the service and some wrong doing and he

17   went into a really foo-foo prison.

18                   I have a brother was involved in the law in

19   Garden City years and years ago that the police officer

20   I don't think was very honest.  And I don't know enough

21   about it.  But I know that there was some stuff that

22   happened with that.

23                   THE COURT:  So, you have perspective then.

24                   PROSPECTIVE JUROR POSH:  Yup.  I have a

25   cousin by marriage who is a police officer in Detroit

-68-

1      that I only see a couple times a year.  And I used to be

2      a loan officer way back when where I had to make

3      decisions.  I grew up never really very good at making

4      decisions.  It blew my mind to think I was a loan

5      officer for years and had to make those decisions every

6      day.

7                    THE COURT:  She opened Pandora's box with

8      the loan officer.  Because there's this example that was

9      used.  On an application, there was a person that put

10     down that they made a hundred thousand dollars and they

11     only made eighty-seven thousand dollars.  And that

12     person was given a loan, even though there was this

13     embellishment.  I call it lying, but they called it

14     embellishing.

15                    And the same person, if they had only made

16     fifteen thousand and used the same percentage for what

17     they really made wouldn't get the loan even though the

18     lie involved the same percentage of, of estimation that

19     was over.  And there are certain lies they will forgive

20     and lies that they won't forgive on applications.  Is

21     that right?

22                    PROSPECTIVE JUROR POSH:  Yes.

23                    THE COURT:  Interesting, isn't it?  You can

24     lie and still get the loan.  But if you don't make

25     enough money and you do the same percentage of lying

                                   -69-

1      that somebody else used, you won't get the loan.  Any

2      other ways that the loan officers--

3                    PROSPECTIVE JUROR POSH:  (Interposing)

4      Yeah.  But a lot of those people who got those loans, a

5      lot of them lost their house.

6                    THE COURT:  No.  Those were the people that

7      got lied to.  Oh, you can afford it.

8                    PROSPECTIVE JUROR POSH:  In those

9      circumstances probably.

10                   THE COURT:  They wanted, they wanted to

11     believe it.  That's like the person that asks somebody,

12     do you think that this dress is too tight?  Now, by

13     asking that question, they already know the answer.  And

14     you tell them, no.  The dress isn't too tight.  And then

15     they go out.  And then they'll say at some point in the

16     evening you should have told me this dress is too tight.

17                   One of my favorite commercials was the one

18     where the mother and the son, and the mother asked the

19     son, you know, sweety, does this dress make my hips too

20     big?  And he says, mom.  It's your hips that make your

21     hips look too big.  The dress has nothing to do with it.

22     But they had a good relationship.  Because somebody

23     would have taken the Fifth on that one.

24                   Ms. Constantino, what kind of juror will you

25     make?

1            PROSPECTIVE JUROR CONSTANTINO:  I would like

2      to think a good one.  I will take all the evidence into

3      consideration.  That's what it's about.  I mean, if I

4      was on trial for something, I would hope that someone

5      would give me, you know, a fair trial.

6            THE COURT:  Those things that we talked

7      about yesterday, some of our preconceived biases, when

8      we were going over them, did you say to yourself, wow, I

9      got that one?  I've done that one?  Did you do any of

10     that?

11           PROSPECTIVE JUROR CONSTANTINO:  Yeah.  Sure.

12     I mean, there are times, you know, like you said, you

13     judge someone by how they look, you know.  I, I think we

14     all do that.  And I do think it's wrong because, I mean,

15     judge a book by its cover.  When you get to know that

16     person, it's a lot different than what you thought just

17     looking at them from the outside.

18           THE COURT:  I'm thinking the tanning

19     business.  When you said that, I was smiling.  Oh.  That

20     tan doesn't look good on them.  Or they think that's a

21     Florida tan.  That's a machine tan--

22           PROSPECTIVE JUROR CONSTANTINO:

23     (Interposing)  Well, there are some differences.  Those

24     spray tans, you know, there's a gentleman who comes into

25     restaurant, my husband's restaurant all the time.  He

-71-

1          goes and gets a spray tan somewhere.  And the whole back

2          of his neck is orange.  And I would love to say--

3                    THE COURT:  (Interposing)  Hey, orange neck.

4                    PROSPECTIVE JUROR CONSTANTINO:  Don't do

5          that, you know.

6                    THE COURT:  Cousin of a red neck.

7                    PROSPECTIVE JUROR CONSTANTINO:  I mean,

8          maybe he likes that look.  I don't know.

9                    THE COURT:  The thing that I always look at

10         and it makes me smile are the people that have the

11         goggle spots.  Have you seen them?  With the bright

12         eyes?  And it's just, just makes you smile.  And I'm

13         sure there's a speedo line somewhere, too.  So, do they

14         have to wear clothes?

15                   PROSPECTIVE JUROR CONSTANTINO:  It's

16         optional.

17                   THE COURT:  Okay.  No health restrictions.

18         Just make sure you bring a towel.

19                   PROSPECTIVE JUROR CONSTANTINO:  Well, we

20         clean the bed after everyone's in there.  We don't leave

21         it up to the customer to do that.  So, that way we know

22         that it's been cleaned and sanitized.

23                   THE COURT:  Okay.  Has there been an upgrade

24         in the type of tanning machines or -- What do they call

25         it?  Machines or booths?

-72-

```
 1                    PROSPECTIVE JUROR CONSTANTINO:  Booths are
 2      usually the stand-ups.  We just call the lay-downs
 3      tanning beds.  There's all different kinds out there
 4      from your few thousand to your, you know, fifty-thousand
 5      dollar bed where you've got a massage and everything
 6      else.
 7                    THE COURT:  What do you find to be better,
 8      booths or the beds?
 9                    PROSPECTIVE JUROR CONSTANTINO:  It's a
10      preference for the customer.  Some people like their
11      twenty-minute catnap every day.  And then there's people
12      who are on their lunch hour and go in the stand up
13      because it's a quicker tan.  So, they're in and they're
14      out and they can still do whatever.
15                    THE COURT:  Are there instructions inside?
16                    PROSPECTIVE JUROR CONSTANTINO:  There are
17      instructions inside.
18                    THE COURT:  I mean, you know, because I'm
19      sure the first time people will probably have their arms
20      in one position and they'll go somewhere and they'll
21      raise their arm and you'll see the, you know, the suntan
22      line.  So, is there something like make sure you raise
23      your arms or--
24                    PROSPECTIVE JUROR CONSTANTINO:
25      (Interposing)  Yes.  Well, whenever a customer is new to
```

1      the salon, they're taken through and everything's

2      explained to them.

3                  THE COURT:  Okay.  Employees get free

4      tanning?

5                  PROSPECTIVE JUROR CONSTANTINO:  They do.

6                  THE COURT:  Does everybody take advantage of

7      that?

8                  PROSPECTIVE JUROR CONSTANTINO:  They do.

9                  THE COURT:  That would be considered one of

10     the perks.

11                 PROSPECTIVE JUROR CONSTANTINO:  Yes.  And we

12     would like them to look like they tan in a tanning

13     salon.

14                 THE COURT:  It's like the customers [sic] at

15     a clothing store want you to wear the clothes.

16                 MR. PRASAD:  Thank you.  I'm just curious,

17     do you get people of my color that go in to get darker?

18                 PROSPECTIVE JUROR CONSTANTINO:  Actually, we

19     do.

20                 MR. PRASAD:  Really?

21                 PROSPECTIVE JUROR CONSTANTINO:  Mm-hmm.

22     There are some people who like to get darker than what

23     they are.  Not too many.  But then there are some girls

24     who are dancers who, that is, you know, their industry,

25     so to speak.  So, they do come in and tan.

-74-

1             MR. PRASAD:  Oh, wow.

2             PROSPECTIVE JUROR CONSTANTINO:  Mm-hmm.

3             MR. PRASAD:  I mean, I like the summer just

4     being outside, just three or four shades or whatever

5     difference.  But just curiosity.

6             The questions that I was asking everyone

7     else earlier, things about like the sentencing, is that

8     something you can set aside and put aside?

9             PROSPECTIVE JUROR CONSTANTINO:  I can set

10    that aside.  Yes.

11            MR. PRASAD:  Okay.  That's something you

12    wouldn't be focused on?

13            PROSPECTIVE JUROR CONSTANTINO:  No.

14            MR. PRASAD:  The type of question, you know,

15    and obviously the question we've been hearing a lot and

16    the Judge was just talking about is that sympathy for

17    the defendant's age.  Is that an issue to you?

18            PROSPECTIVE JUROR CONSTANTINO:  I don't

19    think so.

20            MR. PRASAD:  Okay.

21            PROSPECTIVE JUROR CONSTANTINO:  I mean,

22    based upon the evidence presented, I don't think the age

23    is going to have, you know, any impact on, you know, my

24    decision.  I'd hope that it wouldn't.

25            MR. PRASAD:  Have you had any experience

-75-

 1       with this type of crime, other family member, other--

 2                      PROSPECTIVE JUROR CONSTANTINO:

 3       (Interposing)  No.  I have not.

 4                      MR. PRASAD:  Either side, victim or accused?

 5                      PROSPECTIVE JUROR CONSTANTINO:  No.

 6                      MR. PRASAD:  Okay.  Very good.  Very good.

 7       Anything about you serving as a juror, ma'am, that you,

 8       after we've discussed everything?  I know you've been

 9       listening yesterday and today.  Anything that would

10       affect your ability to be fair and impartial to make a

11       decision in this case?

12                      PROSPECTIVE JUROR CONSTANTINO:  No.

13                      MR. PRASAD:  All right.  Good.  Thank you.

14       Ms. Posh, it's interesting you were saying all the

15       different sides of your background.  After, after

16       acknowledging -- With these, all of these different

17       contacts, obviously you're closer to some sides or

18       others or others, you know, some family members and

19       their experiences, maybe one you've heard more of than

20       others.  Can you set that aside?  Can you set aside all

21       the different experiences you might have been told about

22       or the contacts with all the different family members?

23                      PROSPECTIVE JUROR POSH:  Yes.  Because my

24       brother, ex-brother-in-laws were not in this area.  They

25       were much older than myself.  And I was much younger

                              -76-

1    when it happened.  So, yeah.  I don't think that would

2    really have any bearing.

3                MR. PRASAD:  And the two ones I really want

4    to focus on, and which I saw as the big opposite ones,

5    were one was it was your sister that was in the Air

6    Force, that, I believe, worked in the juvenile facility?

7                PROSPECTIVE JUROR POSH:  Yes.

8                MR. PRASAD:  Did you have much discussions

9    with her about her work?

10               PROSPECTIVE JUROR POSH:  No.

11               MR. PRASAD:  And then the other situation

12   was -- Let me look at this--

13               PROSPECTIVE JUROR POSH:  (Interposing)  It

14   was in California.

15               MR. PRASAD:  Okay.  And the other situation

16   was the, was the brother that was, you felt was treated

17   unfairly by law enforcement officers?

18               PROSPECTIVE JUROR POSH:  Mm-hmm.

19               MR. PRASAD:  Were you close to that

20   situation?

21               PROSPECTIVE JUROR POSH:  No.  Just heard

22   about it.

23               MR. PRASAD:  So, putting that all together,

24   any biases for law enforcement--

25               PROSPECTIVE JUROR POSH:  (Interposing)  No.

```
1              MR. PRASAD:  Or for the system either way?
2              PROSPECTIVE JUROR POSH:  No.
3              MR. PRASAD:  Very good.  What about those
4    other issues we were talking about in terms of
5    sentencing, given these charges?  Can you set aside
6    sentencing and not include that into your decision?
7              PROSPECTIVE JUROR POSH:  Yes.
8              MR. PRASAD:  Okay.  And what about the
9    defendant's age?  Does that affect your ability to make
10   a decision in this case?
11             PROSPECTIVE JUROR POSH:  No.
12             MR. PRASAD:  Very good.  Anything -- Oh.
13   And I forgot to ask you.  Any other familiarity with
14   this type of charge, either family member or friend been
15   the victim or accused of this?
16             PROSPECTIVE JUROR POSH:  I have a -- When I
17   was seventeen, my very good friend was murdered.
18             MR. PRASAD:  I'm sorry.  Anything about that
19   experience that would affect you?
20             PROSPECTIVE JUROR POSH:  It was a -- No.
21   Just other than, you know, it was a friend of like a
22   family member.  And that person is out already.
23             MR. PRASAD:  Okay.  Anything -- After you've
24   gone through all this, and I appreciate you telling us
25   about the loan officer part, too.  Anything about this
```

1          that would affect your ability to make a decision in

2          this case or be fair and impartial?

3                    PROSPECTIVE JUROR POSH:  I don't believe so.

4          No.

5                    MR. PRASAD:  All right.  Thank you very

6          much.  Thank you, your Honor.

7                    THE COURT:  Ms. Rock?

8                    MS. ROCK:  Ms. Posh, I guess, as I

9          understand it, you're going to give the witnesses a

10         level playing field then is--

11                   PROSPECTIVE JUROR POSH:  (Interposing)  Yes.

12                   MS. ROCK:  Is what I'm hearing?

13                   PROSPECTIVE JUROR POSH:  Mm-hmm.

14                   MS. ROCK:  Okay.  And what did you say your

15         husband did?  I'm sorry.

16                   PROSPECTIVE JUROR POSH:  He's a display

17         carpenter.

18                   MS. ROCK:  All right.

19                   PROSPECTIVE JUROR POSH:  In the past, has

20         built the displays for the auto show, in charge of stuff

21         like that.

22                   MS. ROCK:  That sounds interesting.  Did any

23         questions that I raised -- Have you ever been accused of

24         something that you didn't do?

25                   PROSPECTIVE JUROR POSH:  I don't believe so.

-79-

```
1    What comes to my mind really instantly is where my
2    twelve-year-old son was accused of taking something by
3    his friend's older brother and he didn't.  And I'm like,
4    you've got to stand up for yourself.  Tell him you
5    didn't do it.  And I don't, I don't appreciate when
6    people are accused of something like that when it's not
7    true.
8              MS. ROCK:  What, what was the motivation, do
9    you think, why he was accused?
10             PROSPECTIVE JUROR POSH:  He may have a
11   tendency to kind of do things like that, but in this
12   situation is was the older brother that thought he saw
13   him in the garage and he took a figure.
14             MS. ROCK:  And he didn't?
15             PROSPECTIVE JUROR POSH:  He did not.
16             MS. ROCK:  Okay.  How did you determine that
17   he didn't do it?
18             PROSPECTIVE JUROR POSH:  He didn't have
19   anything on him.  The car was in the driveway in the
20   time.  My son has made mistakes.  And I believed him.
21   And I checked to make sure he hadn't taken something.
22             MS. ROCK:  Thank you.
23             PROSPECTIVE JUROR POSH:  Mm-hmm.
24             MS. ROCK:  Ms. -- I apologize.  I lost the -
25   - Nice.  Ms. Constantino.  Thank you.  Have you ever
```

-80-

1       been accused of something you didn't do or someone you

2       know was accused of doing something?

3                   PROSPECTIVE JUROR CONSTANTINO:  No.

4                   MS. ROCK:  Never had that experience?

5       Never, hey--

6                   PROSPECTIVE JUROR CONSTANTINO:

7       (Interposing)  Well, I guess I was accused of saying

8       something that I didn't say years ago, I mean, you know,

9       based on, you know, hearsay and say so.  It's hard to

10      prove that you didn't say something.

11                  MS. ROCK:  Absolutely.

12                  PROSPECTIVE JUROR CONSTANTINO:  And the only

13      other person there was the person who said that you did.

14                  MS. ROCK:  Right.  Absolutely.  And what do

15      you think the motivation was for that person to say

16      that?

17                  PROSPECTIVE JUROR CONSTANTINO:  I'm not

18      sure.

19                  MS. ROCK:  So, we don't always understand.

20      So, we don't always know what the motivation is behind

21      the accusations, true?

22                  PROSPECTIVE JUROR CONSTANTINO:  Yes.

23                  MS. ROCK:  You're not from Michigan?

24                  PROSPECTIVE JUROR CONSTANTINO:  No.

25                  MS. ROCK:  Where are you from?

1              PROSPECTIVE JUROR CONSTANTINO:  I grew up in

2       Boston.  I've been hear for thirteen years.

3              MS. ROCK:  Because I'm hearing that.

4              PROSPECTIVE JUROR CONSTANTINO:  It's still

5       there.  I know.

6              MS. ROCK:  Okay.  Some of the questions I

7       asked, did you have any strong feelings one way or

8       another, you're thinking like I don't agree with what

9       she said or anything that you want to bring to my

10      attention?

11             PROSPECTIVE JUROR CONSTANTINO:  No.

12             MS. ROCK:  Okay.  And I know that Ms. Posh

13      talked about her law enforcement connection.  Did you

14      talk about it at all?

15             PROSPECTIVE JUROR CONSTANTINO:  I don't have

16      any.

17             MS. ROCK:  Okay.  All right.  Thank you so

18      much.

19             THE COURT:  Any challenges for cause from

20      either side?

21             MR. PRASAD:  None for cause, your Honor.

22             MS. ROCK:  None for cause, your Honor.

23             THE COURT:  Any peremptories that the

24      People, the defense wishes to use?

25             MR. PRASAD:  You want us to go first, Judge?

```
 1                    THE COURT:  I just made, I just misspoke.
 2                    MS. ROCK:  Your Honor, we'd like to thank
 3          and excuse Ms. Posh.
 4                    THE COURT:  Ms. Posh, thank you for hanging
 5          out with us for a couple days.  Nice having you around.
 6                    MR. PRASAD:  None for the People, Judge.
 7                    THE COURT:  Ms. Rock, I'm good with
 8          thirteen, like I said.
 9                    MS. ROCK:  Your Honor, defense is satisfied
10          with regard to the, not leaving any previous issue
11          preservations.
12                    THE COURT:  Okay.  You all are the chosen
13          ones after a day and a little bit more.  But would you
14          like to do this?  Because this is what I'd like to do.
15          I'd like to get you to lunch now.  Usually it starts at
16          12:30.  I mean, I'm sorry.  Places open up at 11:30.  By
17          the time you get there, you'll be first in line.  If I
18          could get you back at 12:30, my goal is to work from
19          12:30 to 3:30.
20                    Some of you might have heard.  If I ever had
21          to do another job, meteorologist.  Right?  Because you
22          can be wrong and still have a job.  If you predict snow
23          and it doesn't come, people are happy with you.  They
24          are happy with you.  And so, you know that that's the
25          prediction, that it's supposed to start really, really
```

-83-

1       snowing around 3:00 to 5:00.  I would like to have

2       everybody well on their way if that proves to be true.

3                   If we can work from 12:30 to 3:30, then we

4       can accomplish at least a little something and, you

5       know, get ourselves home, you know, in less time than it

6       would take if we just extended it another forty-five

7       minutes.  So, can we do that?

8                   And can I ask you all to go that way when

9       you leave?  Because I'm going to talk to these people

10      for a second.  You'll give them some badges.  And you're

11      free to -- I mean, like I said, we have coffee.  Take a

12      look in the jury room.  You might just have brought

13      something and want to stay.  Can I ask you all just to

14      scrunch closer?

15                  (At 11:24 a.m. panel leaves the courtroom.)

16                  (At 11:24 a.m. court in recess.)

17                  (At 12:36 p.m. back on the record.)

18                  THE COURT:  What did you want to put on the

19      record?

20                  MR. PRASAD:  A motion in limine counsel

21      filed last week.  And at the end of the motion in limine

22      regarding the photographs from the cell phone, the Court

23      said it would be dependant on whether or not he would

24      like the defense.  I was talking to counsel beforehand.

25      And -- Because I wanted to -- In regards to my opening

-84-

1        and what I would say about the cell phone.

2              Counsel indicated to me, I want to be clear,

3        I don't want to speak for you, Ms. Rock, correct me if

4        I'm wrong, that she's not contesting the defendant

5        wasn't there at the scene.

6              MS. ROCK:  Correct?

7              MR. PRASAD:  Is that, is that right?

8              MS. ROCK:  Yes.  And the only other thing I

9        wanted to bring up, your Honor, I think I tried to bring

10       this up before.  The prosecutor's going to try to have

11       James Winciek testify that he went to my client's

12       mother's home--

13             THE COURT:  (Interposing)  Hold it.  Does

14       any of that affect the jury right now?

15             MS. ROCK:  No.

16             THE COURT:  Okay.

17             MS. ROCK:  Unless he's going to mention that

18       in his opening.

19             MR. PRASAD:  That's not a focus--

20             MS. ROCK:  (Interposing)  Okay.  Thank you.

21             (At 12:39 p.m. panel enters the courtroom.)

22             THE COURT:  Welcome, young people.  You

23       haven't been told this, but there are really no seat

24       assignments.  So, you are free to sit in whatever seat

25       you want to sit in.  The danger now is that some people

-85-

1       think that this is their seat.  You ever gone to church

2       and sat and someone's like, they're sitting in my seat.

3                    So, you know, we don't care where you sit.

4       I know that thirteen of you will be here is there's an

5       open chair.  All I'm  worried about is the numbers.  A

6       little cold?  We can turn up the heat.  In there behind

7       one of the pictures closest to the water cooler is the

8       thermostat.  So, if you get too hot or too cold, just

9       remove the picture.  Leave the other pictures alone

10      because there's the safe where I keep the jewels and the

11      money.  So, if I see any of the rest of them tilted,

12      you're in trouble.  Mr. U, would you give them this last

13      oath, please?  And let us begin.

14                   THE CLERK:  Sure.  I need you to stand and

15      raise your right hand one more time.

16                   (At 12:40 p.m. jury sworn.)

17                   THE CLERK:  Do you promise, swear or affirm

18      that you will truly try to make a true decision between

19      the People of the state of Michigan and the defendant at

20      the bar whom you shall have in your charge according to

21      the evidence and the laws of this state?

22                   THE JURORS:  I do.

23                   THE COURT:  Gets you every time, don't you?

24      [sic]  Now, you start thinking about it when you raise

25      that hand.  It's like what's that?

1          Trials in Michigan go the same way in terms

2     of the process.  And how that process is going to go is

3     that I'll give you some instructions.  After I finish

4     the instructions, the prosecution is mandated, has to do

5     certain things.

6          They have to give an opening statement.  He

7     has to call witnesses.  Everything for the defense is

8     optional.  What that means is that they have a choice.

9     Now, usually they choose to do something.  But it's only

10    because of their choice.

11         The prosecution's going to give an opening

12    statement.  Ms. Rock gets a chance to respond if she

13    wants to.  And she can save the response for if she

14    wants to put on a case.

15         The prosecution calls witnesses.  The

16    defense has a chance to cross-examine, or ask those

17    witnesses questions, if they so choose.  But there's no

18    obligation.  After the prosecutor has presented all of

19    his evidence through witnesses or exhibits, he will say

20    he rests.  The People of the state of Michigan rest,

21    something of that nature.

22         And then if Ms. Rock hadn't given an

23    opening, she can give an opening at that point.  If she

24    wants to present witnesses, exhibits, she can do that.

25    Or if she chooses to do nothing, she can do that, too.

1       She can just say we rest.

2              After that, the prosecution will give a

3       closing statement.  Again, Ms. Rock has the option of

4       offering a closing statement to you in terms of how to

5       view the evidence or how not to view the evidence.  And

6       because the burden of proof is with the prosecution,

7       they get a chance to respond last, since they are the

8       moving party, the party that has the burden.

9              After that, I'll come up and give you some

10      instructions on the deliberation process, things that

11      are important to reaching a decision.  We will, by

12      random selection, eliminate one of you fine thirteen

13      people so that only twelve deliberate.  And then the

14      deliberation process works its way eventually, we hope,

15      to a verdict.  And that's the process everywhere.

16             So, in order to accomplish that and to fill

17      in the gaps, what happens is that my instructions, first

18      of all, tell you about the trial, burden of proof.  We

19      go back over legal concepts.  And then I sit my behind

20      down.  That's it for me.  After that, I'm only answering

21      objections or something minor is the role.  The action

22      flips to the lawyers and ultimately to you.

23             And so in that regard, I don't know if you

24      all saw me making little, picking up pencils and pens

25      and markers, sometimes all I am doing is writing letters

1     to people who have written me letters.  I'm not taking

2     notes.  Because anything about the trial that's a fact,

3     you all get to decide.  I don't care what color the car

4     was.  So, if you're taking clues from me about what to

5     listen to and what not to listen to, please don't.  My

6     job, once you are here, is just to make sure that the

7     trial runs fairly and efficiently.  Period.

8              And as I told you before yesterday, I was

9     kidding somebody about sitting.  Usually, in the

10    afternoon, you will see me just get up.  And I walk

11    sometimes.  And I'll be back there listening or looking.

12    We usually keep the jury room ajar.  If I want a little

13    cup of coffee, I'll go in there, since everybody's mic'd

14    up, I'm listening while I'm pouring my cup of coffee.

15             If you want a cup of coffee, you know, we

16    don't have to do a timeout.  We'll just open the door so

17    that you can hear.  Because the point is to hear and

18    see.  We've had jurors that decided that these

19    comfortable chairs just weren't for them and they sat

20    over there on the bench.  Some person had a bad back one

21    time and just kind of laid down.  Yeah.

22             And then people say, well, they can't see

23    the witnesses.  Nor can a person that's visually

24    handicapped.  But a visually handicapped person isn't

25    automatically eliminated from serving as jurors.  We've

1    had Judges that have been blind.

2              So, we try to accommodate whatever it is.

3    Because our end is just to make sure that the trial runs

4    fair and efficiently.

5              So, let's start with the first legal

6    concept, the presumption of innocence.  Again, the

7    presumption of innocence says that a person that is

8    charged with a crime is presumed to be not guilty.  That

9    presumption begins at the beginning of the trial.  It

10   continues throughout the trial and entitles Mr. Howard

11   to a verdict of not guilty unless you're satisfied

12   beyond a reasonable doubt that he is guilty.

13             The prosecution has the burden of proving

14   each and every element beyond a reasonable doubt.  So,

15   if you find that the prosecution has not met their

16   burden, your duty is to return a verdict of not guilty.

17             A reasonable doubt is a fair, honest doubt

18   that grows out of the evidence, the lack of evidence or

19   the inadequate nature of the evidence.  It's not merely

20   an imaginary or a possible doubt, but one that's based

21   on reason and common sense.

22             And, therefore, a reasonable doubt is just

23   that, it's a doubt that's reasonable after you've

24   considered the evidence, and all of the evidence in this

25   particular case.  Your job, as jurors, are to decide

-90-

1      what the facts of the case are.  And whatever decision

2      that you make is a final decision.

3                  And the evidence comes from these following

4      places.  Evidence comes from the witness stand.  It is

5      what the witnesses say.  You get to evaluate if you

6      believe it or not at a later date, but that's what the

7      evidence is.  Evidence is what witnesses say.

8                  So, evidence then, by implication, and now

9      explicitly, is not what the lawyers say.  Anything that

10     a lawyer says is not evidence.  Anything that I say is

11     not evidence.  Eventually, they're going to get up and

12     give opening statements.  And they're going to tell you

13     what they think the witnesses will say and how that's

14     consistent with the theory that they want you to accept.

15     And at the end, they're going to get up again and say,

16     well, this is what Ms. So-and-so or Mr. So-and-so said.

17                 Mr. Schneider, if you remember that

18     testimony differently, I want you to go by what you

19     remember their testimony being as opposed to what the

20     lawyers say that they remember.  It's what you remember.

21     So, what they say isn't testimony.

22                 Lawyers are allowed to ask leading

23     questions.  That could ask a question that implies that

24     they think that they know something to make that

25     implication.  They could say, for instance, so, Bruce,

1        when you and Ms. McDade went to lunch and were raising

2        that brown paper bag drinking out of it, what was in

3        there?  Was that gin or was that just some wine?

4                Now, the question, the question makes it

5        seem like something really happened or something

6        occurred.  Because why would they ask a question like

7        that?  Well, because they can ask leading questions.  It

8        doesn't have anything to do with the answer.  It's the

9        answer that gives context to the question.

10               As it relates to evidence, there are

11       different types of evidence.  And the only reason it is

12       mentioned, because some people think that one type of

13       evidence is superior to another type.  Two types of

14       evidence, basically, direct and indirect.  That's no

15       surprise.

16               The indirect is sometimes called -- I just

17       had a senior moment.  I'll get to it in a second.  But

18       the difference is, you know, when we're going to be

19       driving home, we're going to be watching it snow.  So,

20       tomorrow, you would be able to come in and testify that

21       at three o'clock or yesterday afternoon, it snowed.

22               Let's say that somebody at twelve o'clock

23       goes to take a nap.  And they haven't seen anything.

24       And when they went to sleep, there was no snow anywhere.

25       And they woke up at six o'clock.  They would be able to

1       testify that it snowed yesterday.  Now, did they see it?

2       No.  But what was it that they based the fact that it

3       snowed on?  It was on some other evidence that

4       corroborated it.  You know, bare ground when you went to

5       sleep, twelve inches when you woke up.  It did something

6       while they slept.

7                So, it is asking you to use logic and common

8       sense to reach reasonable conclusions.  And it's called

9       circumstantial.  I knew it would come back.  You all

10      have senior moments from time to time?  Yeah.

11               Man, we were down visiting some friends or

12      some family members in Georgia for Thanksgiving.  And I

13      had never seen a staircase that was so steep with so

14      many steps in this one house without a landing.  And

15      when I got to the top, I was smiling.  And I told my

16      wife, I said, if we ever lived in a house this big, I

17      said, I could actually forget what I went to get

18      upstairs and remember by the time I got to the top, you

19      know.

20               Because I'll stay upstairs for a while

21      trying to say, I'm not going back downstairs because as

22      soon as I hit that bottom step, I'm going to remember

23      and have to come back up, you know.  So, I'll stay up.

24      Did you find the so-and-so yet?  The so-and-so.  So,

25      yeah.  Circumstantial evidence.

1                     These are kinds of things that generally

2          affect how we perceive things.  Sometimes if twenty

3          people say the same thing, we think because twenty

4          people said it, it's more likely to be true.

5                     So, when everybody was saying the world was

6          flat, the world, of course, was flat because so many

7          people said it was flat.  The number of people that say

8          anything doesn't make that thing more true or false.

9          Because if that was the case, we would have trials that

10         would never end.  The defense would say, hmm.  The

11         prosecution has seven witnesses.  Let me go with eight.

12         They would say, oh.  They have eight.  Let me go with

13         nine.  It would be endless.

14                    Instead, please concentrate on the content

15         of what it is that the people are testifying to as

16         opposed to the number of witnesses.

17                    We talked also a little yesterday about the

18         type of witnesses.  Some of the witnesses are going to

19         be police officers.  The fact that a person that might

20         be testifying is a police officer, it shouldn't make

21         their testimony more likely or less likely to be true,

22         you know.

23                    We talked about, okay.  What's the second

24         question people ask?  What do you do for a living?

25         Occupation shouldn't play any part in terms of who you

 1     decide is more honest or more credible.  Age shouldn't

 2     play a factor, those things that we talked about.

 3               And so, when you eliminate all of our biases

 4     in terms of, okay, so how do we do it?  Well, the

 5     instructions, this shouldn't surprise anybody, sometimes

 6     say go back to some of those biases.  Because the

 7     instructions that I'm supposed to tell you is:  How did

 8     they look and act while testifying?  Did they make an

 9     honest effort to tell the truth?  Were they evasive?

10     Were they argumentative?

11               Some of the ones that I think that are a

12     little more substantial are:  When the witness testified

13     about what they were seeing or hearing, how far away

14     were they?  What were the lighting conditions like?

15     What was the person's state of mind?  Had they been

16     involving themselves with any alcohol or drugs?  Is

17     there any special reason that they had to lie or special

18     reason to tell the truth?  Do you think that they might

19     have a personal interest in the outcome of the case?

20               Any special reason to lie?  Are they

21     reporting what they see according to some bias that they

22     might have?  Because sometimes people can testify about

23     what they honestly believe is true, but be mistaken

24     about what they remember seeing or hearing?

25               How many other witnesses are testifying

                              -95-

1    similarly?  What other evidence is there to corroborate

2    what that person is saying in terms of what they

3    remember perceiving or hearing?

4              Those sorts of things and anything else that

5    you use to judge credibility that's consistent with

6    reasonableness and common sense.  And so that might mean

7    that when the chair might be rocked this way, because

8    Lord help us the chair does move, does that get any

9    interpretation from you?  Or when a person is rocking

10   when they're testifying, is that any indication of

11   credibility?

12             Because people will say, oh, you know, if

13   they're rocking, they're, you know -- Or if you've read

14   any of Dwayne Dwyer's (sp.) books, my man in the '70s,

15   he talked about body language.  At one time, everybody

16   was into body language.  If a person is looking at you,

17   they're closed off.  Or if you put your leg in that

18   direction or if you're this, oh they're open.

19             There's tons of jury behaviorist specialists

20   that if we had lots of money they would be making

21   predictions already based on how you dressed today and

22   what zip code and how you looked.  Were you like Ms.

23   Collet way up here bundled up?  You know, they make all

24   these predictions on what that means.  And my first

25   thing was, are you comfortable?  Is it too cold?

1       Somebody else might see it, man, she's turned off by the

2       Judge.  She doesn't want to be here.  But, again,

3       anything that's consistent with reasonable and common

4       sense, please use in the assessment part.

5              The bid deal, though, is that I don't want

6       you all listening to the testimony to decide what you

7       believe, who's telling the truth.  That's the hardest

8       thing in the world.  How many of us, while listening to

9       somebody talk, decide if what we're hearing is accurate?

10      You all don't do that?  I'll ask somebody for some

11      instructions [sic].  Do you know how to get to so-and-

12      so?  Man, if they start out, what street you looking

13      for?  I'm like, Middlebelt.  Middlebelt?  Yeah.  I know.

14      I'm like, man.  Let me ask the next person.  I'm like

15      let me go ask somebody else.

16             But it's amazing sometimes that if we just

17      listen.  And the little story I used to tell people is

18      that if I'm late to work, which I try not to do often,

19      it's for a reason.  And Wednesday, last Wednesday when I

20      was late to work, it was simply because I park my car on

21      the street, never in the driveway.

22             Because if I get pinned in and I don't have

23      that three minutes, I'm not the nicest, most patient,

24      loving guy that I'm presenting myself to be.  I'll be

25      like, who parked behind me?  You know I have to leave

1    first.  So, I park on the front just so I can be a nice

2    guy in the morning.

3              But anyway, this particular morning, I'm

4    hearing all this noise to the North, to my right when I

5    step out on the porch.  And I look, look and I see

6    running between my porch and the median, the berm where

7    I park like twelve or fifteen elephants.  I mean, they

8    were just like running crazy.

9              And, of course, I'm not going to run.  The

10   gray ones were really, really running fast.  But it was

11   the green and the pink ones who were running tail to

12   hoof, I mean, tail to snout that were just taking their

13   time.  So, it took like twenty minutes for them to pass.

14   What happens when there's elephants?  You're right.  So,

15   I had to shovel, not snow, but you know, to get to my

16   car.

17             Now, I know at some point you all decided

18   that I was lying and stopped listening, right?  Okay.

19   See what happens?  And I was just testing you.  I just

20   told you not to do that and you did it anyway.  But the

21   question becomes:  What direction did I have to look in

22   when I observed these elephants?  To the right.  And

23   that would be what?  East?  West?  North.  Okay.

24             What did I see when I looked North?  How

25   many elephants?  See what happens when you don't listen?

1      What color were they?  Okay.  Which ones were the fast

2      ones?  The gray ones.  And how were the other ones

3      walking?  Tail to snout.  Or trunk -- I tried to get out

4      trunk.  It went off on me.

5              Now, if you all just heard that, you would

6      half listen and stop listening.  What if the next

7      witness said, Bruce lives a half mile from the zoo and

8      they had some elephants yesterday escape from the zoo?

9      Ah.  Then you say, oops.  Oops.

10             What if you also -- You still say, okay.

11     That makes up for the gray ones.  And the next witness

12     says, you know, we're park of Ringling Brothers and

13     because that circus, we had to bring the elephants and

14     we had them decorated in a particular way.  And you

15     would say, well, Bruce might have got the color wrong,

16     but they were decorated.  And is color something

17     significant or that they were gray?  Or that the zoo's

18     gray were mixed in with these for Ringling.

19             So, there's a huge danger in trying to

20     decide if something is true when you're listening to it.

21     The other thing that's really, really interesting about

22     what you all have to do is sometimes you won't have an

23     individual memory.  And so, we're allowed to use the

24     collective memory of the group.

25             Because what if somebody couldn't remember

1    how the -- Pink and gray ones?  Or was it blue and

2    Green?  I don't even remember.  But anyway, remember how

3    they were walking.  And somebody else says, I remember

4    that.  Eight or ten people say, yeah.  Okay.  The group

5    has a memory, too.  So, you can use your individual

6    memory and the group memory to decide what the facts of

7    the case are.  So, nobody has to be dependent on hearing

8    it all.

9            You can take notes if you want to.  That's

10   fine.  I've got paper.  I've got pens, if that's what

11   you'd like.  One caveat for taking notes.  What do

12   people usually do when they take notes and somebody

13   doesn't take notes?  They assume that the person that

14   took the notes, that it's more accurate than somebody

15   else's memory, right?  Most of us do that.

16           But my admonition would be that one does not

17   trump the other.  You don't know the other person's note

18   taking skills.  And you don't know the other person's

19   memory abilities.  How are you going to assign one to be

20   more trustworthy than the other without knowing that?

21   And knowing also that you've taken some notes and

22   interposed some stuff or left off some stuff.

23           So, if you want to take notes, when you

24   consider them in the jury room, notes do not trump

25   memory just for the fact that they were notes.

-100-

```
 1                    Okay.  Do you have any questions about
 2          anything we discussed?  If you get too hot, too cold let
 3          me know.  Again, if you need to go to the rest room, I'm
 4          going to keep that door open.  You'll see me disappear
 5          from time to time.  But within hearing shot of
 6          everything.  You ready to go, sir?
 7                    MR. PRASAD:  Yes, sir.  Thank you.
 8                    THE COURT:  It's yours.
 9                    OPENING STATEMENT
10   BY MR. PRASAD:
11                    MR. PRASAD:  Good afternoon, ladies and
12          gentlemen.
13                    THE JURORS:  Good afternoon.
14                    MR. PRASAD:  We're here to talk about April
15          10th, 2010.  We're here to talk about Tireman Street
16          here in the city of Detroit, specifically at 16228
17          Tireman.
18                    In front of that area, that's a business.
19          It's called a smoke shop.  They sell, I think it's just
20          a barbecue place.  It's at the corner or in the area of
21          a residential neighborhood.
22                    We're here to talk about Tyrone Simpson.
23          Tyrone Simpson was nineteen years old on that day.  He
24          was nineteen.  He had been there earlier in that day.
25          He'd been there with his friend Aundrey Allen, who you
```

1       will get a chance to meet.

2                     Mr. Simpson and Mr. Allen were there for

3       some time.  You're going to hear about how Mr. Simpson

4       got into an argument with a gentleman who is commonly

5       known as Freak.  I think his real name is Donald Ingram.

6       But you're going to hear about how Mr. Simpson had

7       gotten into an argument with Freak, actually got into a

8       fight with Freak.

9                     You're going to hear about how earlier that

10      day at some point the defendant, Mr. Howard, was at that

11      same area in front of the smoke shop on Tireman.  You're

12      going to hear about how Mr. Howard had left that area

13      and how Mr. Howard came back.

14                    And the focus is going to be about what

15      happened at that point, when Mr. Howard came back to

16      that area in front of 16228 Tireman.  We're talking

17      about approximately 4:30, 4:45 in the afternoon,

18      daylight hours.  We're talking about April, so bright

19      daylight out.

20                    You're going to have the testimony from the

21      vantage point of different witnesses who saw it from

22      different angles.  As I mentioned to you before, you're

23      going to hear from Aundrey Allen--

24                    MS. ROCK:  (Interposing)  Excuse me.  I'm

25      sorry.  One of your witnesses is in the courtroom.

-102-

1             MR. PRASAD:  Go in the witness room.  Thank
2      you.

3             MS. ROCK:  Sure.  Excuse me.

4             MR. PRASAD:  Thank you.  You're going to
5      hear from Mr. Allen.  He was standing right behind Mr.
6      Simpson when the whole fight that ended up with Mr.
7      Simpson getting hurt.

8             You're going to hear from Bobby Bailey.
9      Bobby Bailey is the owner of the smoke shop.  He wasn't
10     there for the earlier part, but he was asked to come
11     over, to call over because something was going on.  And
12     he came over and he was there for the part in which
13     ultimately Mr. Simpson lost his life.

14            You're going to hear from a gentleman by the
15     name of Mr. McFadden.  And Mr. McFadden was at his
16     mother's house.  His mother is about a hundred feet
17     away, lives about a hundred feet away from the address
18     of the smoke shop.

19            Mr. McFadden was working on his mother's
20     car.  He was doing an engine job that day, so he was
21     actually out in front of his mother's house working on
22     the car.  You're going to hear from his vantage point of
23     what he was able to observe and what he was able to
24     hear.

25            And finally, you're also going to hear from

1     a couple of witnesses who lived across the street, an

2     elderly couple, Mr. Harris and Ms. Thompson.  Mr. Harris

3     and Ms. Thompson didn't see the first part of what

4     happened because they were alerted to the situation when

5     they heard gunshots.  And then you're going to hear them

6     tell you about what they observed when they went to the

7     window to go see what was going.

8              Ultimately, from the different vantage

9     points that you get, from the different viewpoints that

10    you're going to get, you're going to have different

11    variations of the same story.

12             Now, I grant you that all the different

13    witnesses you hear will not give you the exact same

14    story.  But I ask you, as the Judge has been asking you

15    throughout this whole process, to use your common sense

16    and reasonableness.  You've got different people

17    watching the same thing at different times from

18    different angles.

19             So, they're going to tell you as best they

20    remember what they saw.  And you're going to have

21    different people being able to identify a couple of key

22    points.

23             Two people were involved in the scuffle.

24    You're going to have Mr. Bailey and you're going to have

25    Mr. Allen identify the two people who were involved in

-104-

1        this fight, this scuffle beforehand.  This fight was

2        between Mr. Simpson, the deceased, and Mr. Howard,

3        Deonte Howard.

4                You're going to hear from a couple of

5        witnesses, Mr. Bailey chiefly, who's going to be able to

6        tell you that Mr. Howard had returned to that location

7        asking about his phone, where his phone was.  You're

8        going to hear Mr. Simpson, you're going to hear that Mr.

9        Simpson was yelling at the top of his lungs about his

10       glasses.

11               You're going to hear from several of the

12       different witnesses that Mr. Simpson first punched Mr.

13       Howard, punched him a couple of times, I think a total

14       of maybe even five times in the face, thinking he took

15       his glasses.  And you're going to hear, chiefly from Mr.

16       Allen, that Mr. Simpson, excuse me, Mr. Howard, then

17       stepped back, pulled out a gun and started firing at Mr.

18       Simpson.

19               But it doesn't end there.  Because as you

20       listen to some of the other witnesses, you're going to

21       hear how the other witnesses who just heard things, like

22       for example Mr. McFadden who heard a couple of gunshots,

23       he'll explain to you how he heard some shots, but then

24       there was a pause.

25               You're going to hear how the shooter, Mr.

-105-

1    Howard, at one point, gets in a vehicle and starts to,

2    starts to move, the vehicle starts to move away, at

3    which point the victim, Mr. Simpson, gets up, starts to

4    move.

5              When the victim starts to do that, you're

6    going to hear that the vehicle that the shooter had

7    gotten into, that Mr. Howard had gotten into, stops.

8    That the shooter gets back outside of the vehicle.  And

9    you're going to hear that there were multiple, many more

10   shots were fired.  Ultimately, ultimately with several

11   shots with the shooter standing above the deceased

12   firing several shots into the deceased.

13             Ladies and gentlemen, you're going to hear

14   from different forms of investigation, chiefly that were

15   done after the fact, to see, to evaluate the scene after

16   the fact.  And from these difference pieces of the

17   investigation, you're going to have corroboration to the

18   different testimony that you're going to hear.

19             You're going to hear from evidence

20   technicians and on-scene officers who describe all the

21   different shell casings that they found out there.

22             You're going to hear about a cell phone that

23   was found across the street.  Let's not forget the

24   shooter had come back looking for his cell phone.  It's

25   not going to be disputed that the cell phone that was

-106-

1       found across the street belonged to Mr. Howard.

2                   You're going to hear about the testing that

3       was done regarding the shell casings that were all

4       found, all the multiple different shell casings found in

5       the scene area and in different places.

6                   You're going to hear from an expert from the

7       Michigan State Police who analyzed the shell casings and

8       is going to be able to tell you that all the shell

9       casings came from the same gun.

10                  Finally, ladies and gentlemen, you're going

11      to hear from the medical examiner's office, who did an

12      evaluation on Mr. Simpson's body.  And they're going to

13      be able to describe to you in much greater detail the

14      different wounds found all over the body of the deceased

15      in this case.

16                  After this case, after all the witnesses and

17      after all of the evidence is presented to you and after

18      the case is done, I'm going to be asking for you to find

19      a verdict of guilty in this case to the charge in this

20      case, specifically first degree murder premeditated and

21      deliberate.

22                  And I'll be the first to caution you.  I

23      understand this initially started out as a mutual fight.

24      I understand that the victim initially was the aggressor

25      punching the defendant.  I'm not, I'm not, I'm not

1    disputing any of that.

2            But as you follow the actions of that day,

3    especially once the shooter went into the vehicle and

4    the victim got back up, once that shooter got back

5    outside that vehicle and decided to finish the job,

6    that's what I'm asking you to look at, ultimately to

7    look at and to make a decision whether or not this was,

8    in fact, first degree murder and the associated crime of

9    felony firearm.  Thank you.

10           THE COURT:  Ms. Rock, what's your pleasure,

11   ma'am?

12           MS. ROCK:  Thank you.

13           OPENING STATEMENT

14  BY MS. ROCK:

15           MS. ROCK:  Good afternoon, ladies and

16   gentlemen of the jury.

17           THE JURORS:  Good afternoon.

18           MS. ROCK:  No one is going anywhere until my

19   glasses come up, no one leaving.  I'm about to shoot

20   this bitch up.  On April 10th, 2010, my sixteen year old

21   client, who stands 5'4", was at the Smokehouse Barbecue,

22   also known as the Garden Cafe, ordering food when a

23   ruckus broke out.

24           Tyrone Simpson began attacking Donald

25   Ingram, also known as Freaky [sic].  Deonte Howard

-108-

1    thinks, time to go.  There were a group of guys and he

2    wanted, he wanted to leave.  So, as he heads to the

3    through, he hears Tyrone Simpson accuse him of taking

4    his glasses.

5            Some guys start to circle him.  And Bobby

6    Bailey was there.  And Bobby Bailey puts his hand on

7    Deonte Howard's shoulder and says, if you have the

8    glasses, give them back.  And Deonte Howard says, Bob.

9    I don't have his glasses.

10            And then, at that point, Tyrone Simpson

11    rushes him, punches him and then other guys join in and

12    he goes to the ground.  When  Deonte Howard hears

13    gunshots, he thinks they're trying to kill him.  So, he

14    takes off like everybody else and gets out of there.

15            Mr. Howard lost his phone while he was

16    attacked.  When Deonte Howard was arrested, he asked

17    Detective Mackie, why are you doing this to me?  And

18    Detective Mackie said, if you didn't do this, you know

19    who did.

20            We believe that the bullying by the police

21    and the cheating and because of those factors, Deonte

22    Howard has been falsely accused.

23            You will learn through the evidence that a

24    photo line-up is a series of pictures shown to a person

25    to see if they can identify anyone among those pictures.

-109-

1        When a photo show-up was shown by Officer Diaz to an

2    alleged eyewitness named Aundrey Allen, he -- Aundrey

3    Allen first identifies a person by the name of Deonte

4    Miller as the shooter.  Aundrey Allen later claimed the

5    police kept directing him to pick out Deonte Miller as

6    the shooter.

7            Mr. Allen signs his name to the photo line-

8    up and says that Deonte Miller was the man who shot me

9    and my friend.  Now, Officer Diaz testified at a

10   previous hearing that Aundrey picked out Deonte Miller

11   right away and Officer Diaz says, well, I didn't tell

12   him who to pick out.

13           So, we believe the evidence will show that

14   Mr. Allen only guessed at what happened because when he

15   talked to EMS when they arrived he said it was a

16   possible drive-by shooting.

17           When you listen to the testimony of the

18   other witnesses, you're going to hear varying

19   descriptions of the shooter.  And, in fact, one

20   prosecution witness, Frederick McFadden, said that he

21   looked at a photo show-up, or line-up, showed to him by

22   Detective Myron Love.  And he said that he picked out

23   the shooter and two people.

24           My client, Deonte Howard, according to

25   Detective Love, was not in that photo line-up.  That

```
1    information was not in the police reports.  And the only
2    way we found out about that was interviewing Mr.
3    McFadden ourselves.  Now, will the evidence show that
4    the left hand didn't know what the right hand was doing?
5    Or was there a more sinister motive?
6              At the conclusion of this trial, we're going
7    to be asking you for a verdict of not guilty because my
8    client did not commit these crimes.
9              THE COURT:  Call your first witness, please.
10             MR. PRASAD:  Thank you, your Honor.  The
11   People are going to call Delfera Hunt.
12             THE COURT:  Step in, please, young lady, all
13   the way up to the young man here in the checked shirt.
14   If you'll give him your name, that guy there?
15             (At 1:15 p.m. witness DELFERA MONIQUE
16             HUNT was sworn.)
17             THE COURT:  Young lady, do you promise to
18   tell the truth today?
19             THE WITNESS:  Yes.
20             THE COURT:  Okay.  Please have a seat there.
21   You'll have to just swing the top part of that
22   microphone out.
23             MR. PRASAD:  May I, your Honor?
24             THE COURT:  You may.
25             MR. PRASAD:  Thank you.
```

```
 1                     DIRECT EXAMINATION

 2  BY MR. PRASAD:

 3  Q    Ma'am, please introduce yourself to the jury.

 4  A    Delfera Hunt.

 5  Q    Ms. Hunt, did you have a son?

 6  A    Yes.

 7  Q    What was his name, please?

 8  A    Tyrone Simpson.

 9  Q    Ms. Hunt, back in April of this year, did you have to go

10       to the Wayne County Medical Examiner's Office?

11  A    Yes.

12  Q    And what was the purpose of that, please?

13  A    My son was murdered.

14  Q    Okay.  Did you have to make an identification of a body?

15  A    Yes.

16  Q    And whose body did you identify?

17  A    Tyrone Simpson's, my son.

18  Q    Do you remember what day it was that you went down to

19       the medical examiner's office?

20  A    April 12th or 13th.

21  Q    Two or three days after the incident?

22  A    Yes.

23  Q    Ma'am, when was the last time you saw your son alive?

24  A    Easter, April 4th, I believe.

25  Q    And, ma'am, obviously, at the time you last saw your son
```

1      alive on April 4th, on Easter, did he suffer from any,

2      did he have any gunshot wounds or anything like that?

3  A   No.

4  Q   And how old was your son at the time?

5  A   Nineteen.

6               MR. PRASAD:  Thank you, ma'am.  Pass the

7      witness, your Honor.

8               MS. ROCK:  Your Honor, I have no questions

9      for Mrs. Hunt.

10              THE COURT:  Thank you, ma'am.  You can step

11     down.

12              (At 1:16 p.m witness excused.)

13              MR. PRASAD:  Judge, may this witness be

14     excused and--

15              THE COURT:  (Interposing)  She sure may.

16              MR. PRASAD:  And watch the remainder of the

17     trial.

18              THE COURT:  Whatever.

19              MR. PRASAD:  Thank you.

20              THE COURT:  And if you'll call your next

21     witness, please.

22              MR. PRASAD:  The People call Audrey Allen.

23              THE COURT:  Young man, step all the way in,

24     please.  And when you get to the man in the checked

25     shirt, if you will tell him what your name is.  Young

-113-

1      man, if you could look this way?

2                  (At 1:17 p.m. witness AUNDREY ALLEN

3                  was sworn.)

4                  THE COURT:  I need you to promise that your

5      testimony will be truthful.  Do you promise?

6                  THE WITNESS:  I promise.

7                  THE COURT:  Okay.  That gum is probably

8      going to get in your way.  He's going to give you a

9      little piece of tissue.  Thank you.

10                 MR. PRASAD:  Thank you, sir.

11                 DIRECT EXAMINATION

12  BY MR. PRASAD:

13  Q    Mr. Allen, please pull that microphone closer to you.

14       Thank you.  Introduce yourself to the jury.

15  A    I'm Aundrey Allen.

16  Q    Mr. Allen, how old are you?

17  A    Nineteen.

18  Q    Mr. Allen, do you know a person by the name of Tyrone

19       Simpson?

20  A    Yes.

21  Q    How did you know that person?

22  A    He was my friend.

23                 THE COURT:  If you'd pull that microphone a

24       little closer to you?  There you go.

25  Q    (By Mr. Prasad, continuing):  And how long had you known

                              -114-

```
 1        Mr. Simpson?

 2   A    About a year.

 3   Q    Back earlier this year in the time period of April --

 4        Excuse me.  Of last year, April of 2010, were you in a

 5        good relationship with Mr. Simpson?

 6   A    Yes.

 7   Q    What kind of relationship did you have with him?

 8   A    We was just friends.

 9   Q    I want to take you back to a specific date, sir, April

10        10th of 2010.  Do you remember that day, sir?

11   A    Yes.

12   Q    At some point in that day, sir, did you come in contact

13        with Mr. Simpson?

14   A    Yes.

15   Q    Tell us about that.  Where did you come in contact with

16        Mr. Simpson?

17   A    It was at the store earlier that day.

18   Q    What store are we talking about?

19   A    On Tireman, between St. Mary's and Mettetal.

20   Q    Okay.  Is that here in the city of Detroit?

21   A    Yes.

22   Q    Is that Wayne County, Michigan?

23   A    Yes.

24   Q    Do you know what the name of that store is?

25   A    No.  I really don't.
```

1  Q    What kind of store is it?

2  A    Like a party store.

3  Q    Okay.  And do they also sell food out of there, too?

4  A    Yeah.

5  Q    What kind of food do they sell out of there?

6  A    I don't know, like soul food or something.

7  Q    Are you familiar with that party store, with that place?

8  A    Yes.

9  Q    How do you know that place?

10  A    Because I live right next door to it.

11  Q    Have you ever been there before?

12  A    Yes.

13  Q    About how often?

14  A    Like all my life.

15  Q    Are you familiar with the owner of that store, sir?

16  A    Yeah.

17  Q    Do you know his name?

18  A    Yes.

19  Q    Who's that?

20  A    Bobby.

21  Q    Okay.  And do you know Bobby by sight?

22  A    Yes.

23  Q    I want to focus your attention back to this day, April

24       10th of 2010.  When was the first time you went to that

25       store and came in contact with Mr. Simpson?

-116-

```
 1  A    Like earlier in the day, like 11:00 or 12:00.

 2  Q    11:00 a.m.?

 3  A    Yeah.  Between that time.

 4  Q    Up until 12:00 noon?

 5  A    Yeah.

 6  Q    I'm just trying to be precise for the record, okay?  And

 7       tell us about that.  What happened when you went there

 8       at 11:00 a.m. to noon?

 9  A    Me and him was just sitting there just talking.

10  Q    Who's me and him?

11  A    Me and Tyrone.

12  Q    Did anything happen at that time?

13  A    No.

14  Q    Do you know a person by the nickname of Freak?

15  A    Not personally.

16  Q    Do you know of that person?

17  A    Yes.

18  Q    Do you know that person by sight?  Would you recognize

19       that person if you saw him?

20  A    Yes.

21  Q    Okay.  Was that person, that gentleman by the name of

22       Freak, there at this time between 11:00 a.m. and noon?

23  A    No.

24  Q    All right.  Please continue.  What happened next?  What

25       happened after noon, after you were at the store?
```

1  A     I left and he left.  I went home.  And I came back

2        towards that way a little later in the day.

3  Q     About how long later are we talking about?

4  A     About a couple hours, two, two or three hours.

5  Q     Okay.  Was it still daylight out?

6  A     Yes.

7  Q     So, we're talking about approximately two or three

8        o'clock in the afternoon?

9  A     Yes.

10 Q     All right.  Who was out at the store at this time, sir?

11 A     At this time, my boy Tyrell is down there.

12 Q     Who's that?

13 A     My friend Tyrell.

14 Q     Tyrell?

15 A     Yeah.  He called me down there.

16 Q     Okay.  Who else was out there?

17 A     And Tyrone was out there.

18 Q     And just so we're clear.  Tyrell and Tyrone are two

19       different people?

20 A     Yes.

21 Q     Okay.  And who else is out there, if you know, sir?

22 A     The people from the store.

23 Q     The employees?

24 A     The employees.  Yeah.

25 Q     What did you guys do when you were out there this time?

```
 1  A    When I was out there this time, there was like a
 2       conflict out there.
 3  Q    Who was the conflict between?
 4  A    Freak and Tyrone.
 5  Q    Now -- And maybe this will help us out.  When you got
 6       there, were people already out there?
 7  A    Yes.
 8  Q    Who -- All right.  Who was there when you got there?
 9  A    The defendant and some more people, the owners of the
10       store, I mean, the employees of the store, and my boy
11       Tyrell and Tyrone was out there.
12  Q    Okay.  You say the defendant.  Do you see someone here
13       in the courtroom that was out there on that day?
14  A    Yes.
15  Q    Can you please point to him and let us know what he's
16       wearing?
17  A    Gray and black.
18            MR. PRASAD:  Your Honor, may the record
19       reflect that the witness has identified the defendant?
20            THE COURT:  It will.
21  Q    (By Mr. Prasad, continuing):  So, you saw the defendant
22       out there.  You saw other people with him?
23  A    Yes.
24  Q    Do you know how many?
25  A    It was like three, three or four of them all together.
```

1  Q     All together including the defendant?

2  A     Yes.  Including -- Yeah.

3  Q     Okay.  You said you saw your friends Tyrone and Tyrell?

4  A     Yes.

5  Q     Right?  Was Bobby, the owner, there at this point?

6  A     No.  He wasn't there.

7  Q     And you said the employees were there, though?

8  A     Yes.

9  Q     How many employees were there?

10 A     I can't really remember, like two or three.

11 Q     At what point did there become an altercation involving

12       a gentleman by the name of Freak?

13 A     Like I was down there because he was saying something

14       about my sister.

15 Q     Hold on.  Who's he?

16 A     Freak was saying it.

17 Q     Okay.  You can't go into what Freak was saying.  Was

18       Freak saying something at that point?

19 A     No.  Not really.

20 Q     And I guess -- This is where I was confused.  Was Freak

21       already out there when you got there?

22 A     Yes.

23 Q     Okay.  Because you didn't mention him with the other

24       people.  So, who's Freak talking to at this point?

25 A     Him and Tyrone was going back and forth.

1  Q    Tyrone Simpson?

2  A    Yes.

3  Q    All right.  And what was the -- Don't go into what they

4       were saying.  But what was the tone?  Like were they

5       joking with each other?  Were they--

6  A    (Interposing)  Like arguing.

7  Q    They were arguing?  Was it loud?

8  A    Yes.

9  Q    So, what happened next?

10 A    And then I was approaching because I wanted to know what

11      was going, about my sister.  And he was like coming to

12      my house and my sister didn't even know him or whatever.

13 Q    Who?  Freak?

14 A    Yes.

15 Q    Okay.  The problem is there's a lot of males out there.

16      So, as best as you can, sir, when you're testifying,

17      please use their names, if you would, okay?

18 A    All right.

19 Q    So, you went over there to see what was going on, right?

20 A    Yes.

21 Q    What happened next?

22 A    Then I started approaching him in a violent way because

23      I was mad.

24 Q    Who were you mad at?

25 A    The boy, Freak.

-121-

1  Q    Okay.  And that was because of something that happened

2       between what?

3  A    My sister and him.

4  Q    All right.  So, what did you do?

5  A    Approached him like with violence.  I approached Freak

6       like in a violent...

7  Q    Did you hit him?

8  A    No.  I didn't get a chance.

9  Q    Why not?

10 A    Because he ran.

11 Q    Did anyone hit Freak at that point?

12 A    No.

13 Q    So, what happened after Freak ran?

14 A    Well, Tyrone was like telling me--

15             MS. ROCK:  (Interposing)  I'd object as to

16      hearsay, your Honor.

17             MR. PRASAD:  No argument, Judge.  I'll

18      direct the witness.

19 Q    (By Mr. Prasad, continuing):  You can't go into what

20      Tyrone was telling you at that point.  But did you have

21      a conversation with Tyrone at that point?

22 A    Yes.

23 Q    Okay.  Sir, at that point that we're talking about, do

24      you know if Tyrone had a pair of glasses?

25 A    Yes.

1  Q    And what kind of glasses were those?>

2  A    Carties.

3  Q    Like Cartiers?

4  A    Yes.

5  Q    Sunglasses?

6  A    Yeah.

7  Q    And when Freak had ran away, did Mr. Simpson still have

8       those glasses on?

9  A    No.

10 Q    Where were they?

11 A    Somebody took them.

12          MS. ROCK:  Well, no.  I'm going to object as

13      to that conclusion.

14          THE COURT:  Okay.  You'll be able to

15      challenge it through cross-examination, ma'am.

16 Q    (By Mr. Prasad, continuing):  Had you seen those Carty

17      glasses or those Cartier glasses on Mr. Simpson earlier

18      that day?

19 A    Yes.

20 Q    When?

21 A    Well, he always had them on, so--

22 Q    (Interposing)  Well, let's -- Focusing on when you were

23      out there between 11:00 a.m. and noon.

24 A    Yeah.  He had them on.

25 Q    Mr. Simpson had those on?

1    A    Yes.

2    Q    Okay.  And now when you're out there at this time, this

3         incident with Freak, does Mr. Simpson have his glasses

4         at that point?

5    A    No.

6    Q    What happened next, sir?

7    A    Well, we was still up there and his glasses was still

8         missing.  So, he wasn't leaving without his glasses?

9    A    Tyrone wasn't leaving without his glasses.

10   Q    So, then what happened?

11   A    So, they left--

12   Q    (Interposing)  Who's they?

13   A    The defendant and whoever else was with him.  It was

14        two, it was three other people with him, Freak and the

15        two people, other two people came back with him.

16   Q    So, okay.  And this is -- Maybe I misunderstood you,

17        sir.  When you were including the four people total that

18        was with the defendant, was Freak one of those people?

19   A    Yes.

20   Q    Okay.  And so, it's the defendant, Freak and two other

21        gentlemen?

22   A    Yes.

23   Q    Did you know these two other gentlemen that were with

24        the defendant and Freak?

25   A    No.

-124-

1  Q     And before this day, had you ever met the defendant

2        before?

3  A     No.

4  Q     So, this was the first time you met the defendant as

5        well?

6  A     Yes.

7  Q     Okay.  So, you were telling us about when the defendant

8        and the people that he was with were leaving.  Tell --

9        Walk us through that?  What happened?

10 A     Well, they was leaving.  They got into a car and left.

11 Q     Do you remember what kind of vehicle that was?

12 A     A Charger.

13 Q     A Charger?  Like a Dodge Charger?

14 A     Yes.

15 Q     Okay.  It's like a sports car type?

16 A     Yes.

17 Q     And who all were getting in that car?

18 A     The defendant and two other people.  And it was -- I

19       think the defendant and the two other people walked--

20              MS. ROCK:  (Interposing)  Your Honor, I'm

21       going to object as to the speculation, I think.

22              THE COURT:  You'll be able to cross-examine.

23       I think it's just a figure of speech, ma'am.

24 Q     (By Mr. Prasad, continuing):  Please continue, sir.  You

25       were telling us -- Who was getting into the Charger?

1  A    The boy Freak was getting in the car and they walked.

2  Q    Who is they?

3  A    The defendant and the two other guys.

4  Q    And did you see where they went to?

5  A    It was like almost just around the corner.

6  Q    Did you ever lose sight of them?

7  A    Yes.  I really wasn't paying no attention.

8  Q    All right.  What happened next, sir?

9  A    Then they came back up, they came back up the store.

10      The two other gentlemen that walked and the defendant

11      came back up to the store.

12 Q    Okay.  Let me stop you right there.  How much time had

13      passed between the time where they, where the defendant

14      and the two other gentlemen left and when the defendant

15      and the two other gentlemen came back?

16 A    No more than fifteen minutes.

17 Q    Fifteen minutes?  So, we're still talking about the

18      afternoon?

19 A    Yes.

20 Q    Still daylight out?

21 A    Yes.

22 Q    When the defendant and the other two gentlemen came

23      back, did they walk or come in a vehicle?

24 A    They came in a vehicle.

25 Q    What kind of vehicle was that?

1  A   Like a Mountaineer.

2  Q   Like a Mountaineer?  And can you describe what kind of

3      vehicle a Mountaineer is?  Is it like a--

4  A   (Interposing)  It's like a Jeep.

5  Q   Okay.  Can you remember what color it was?

6  A   Silver.

7  Q   Silver?  Walk us through it, sir.  Where did this

8      Mountaineer park?

9  A   We was in front of the store.  And like Tyrone's truck

10     was in front of the store.  So, he was like, not

11     blocking the driveway, like right behind, like the

12     little driveway in the store.

13 Q   Who was not blocking the driveway?

14 A   The defendant wasn't blocking the driveway.

15 Q   You're talking about the Mountaineer vehicle?

16 A   Yes, sir.  The Mountaineer vehicle.  Yes.

17 Q   It was not blocking the driveway of the store?

18 A   No.

19 Q   Was it in front of the store?

20 A   No.

21 Q   Where was it?

22 A   It was like, it was on the side of the store.

23 Q   And what about -- You mentioned that Tyrone Simpson had

24     a vehicle that day?

25 A   Yes.

1  Q    What kind of vehicle did he have?

2  A    A Suburban.

3  Q    And where was that parked at?

4  A    Like almost directly in front of the store.

5  Q    What happened next?

6  A    The defendant came up.  His purpose of coming back was

7       because he lost his phone.

8  Q    How do you know that?

9  A    Because he was asking about his phone.

10 Q    What was the defendant saying?

11 A    Have you all seen the phone?  I dropped my phone.  Or I

12       left my phone up here.

13 Q    You heard the defendant say have you all seen my phone,

14       I dropped my phone?

15 A    Yes.

16 Q    What was the next thing that happened?

17 A    Well, before that, the owner was pulling back up.

18 Q    Who's the owner?

19 A    Bobby.

20 Q    At what point did Bobby come there?

21 A    He got there before they did, before the defendant

22       pulled back up.

23 Q    Before the Mountaineer?

24 A    Yeah.  Before the Mountaineer pulled up.

25 Q    So, did Bobby get there in that fifteen minute--

1  A    (Interposing)  Yeah.

2  Q    That you're talking about?

3  A    Yes.

4  Q    Okay.  And I'm sorry, I'm sorry I didn't ask you about

5       that.  So, what did Bobby do when he got there?

6  A    He was asking like what happened at the store--

7  Q    (Interposing)  Don't go into what Bobby told you.  Okay?

8       Was Bobby asking you questions?

9  A    Yes.

10  Q   Okay.  So, now by the time the defendant and the other

11      two gentlemen in the Mountaineer are there and when the

12      defendant is asking about the phone, who all was out

13      there in front of the store?

14

15  A   Employees of the store and it was just me and Tyrone out

16      there and the defendant, and two other guys as well.

17  Q   What happened to your friend, Tyrell?

18  A   He had left.

19  Q   When did he leave?

20  A   He actually left, he actually left like while I was up

21      there, but after -- He left right after they left.

22  Q   After the defendant and the other people left?

23  A   After the defendant -- Yeah.

24  Q   The first time when they walked away?

25  A   Yes.

1  Q    Okay.  So, it's yourself and Tyrone, correct?

2  A    Yes.

3  Q    You say employees of the store.  Who are you talking

4       about?

5  A    I don't really know the employees like that, by they

6       name.  But I know the owner, Bobby, was out there.

7  Q    Bobby was there?

8  A    Yes.

9  Q    And you say it was the defendant and the other two

10      gentlemen he was with?

11 A    Yes.

12 Q    Is that correct?

13 A    Yes.

14 Q    Okay.  What happened next?

15 A    He was approaching asking for his phone--

16 Q    (Interposing)  When you say he, who are you talking

17      about?

18 A    Tyrone was approaching asking -- I mean, the defendant

19      was asking for his phone.

20 Q    Okay.

21 A    Tyrone was, at the time, was asking about his glasses.

22 Q    Where are -- Where is everyone positioned at this point?

23 A    Kind of like behind, like a couple feet away from the

24      driveway, more towards the store, more in front of the

25      store.

```
 1  Q    Okay.  Does the driveway for that store, does it go from

 2       the front of the store or the side of the store?

 3  A    It's the front of the store.

 4  Q    In the front of the store?  Where were you at that

 5       point?

 6  A    Behind Tyrone.

 7  Q    Where was Tyrone standing?

 8  A    Almost like in the driveway.

 9  Q    And how close to the store were you?

10  A    I was like at least five feet away from the store, by

11       the door.

12  Q    How far behind Tyrone were you?

13  A    Like two feet.

14  Q    All right.  Could you reach out and touch him if you

15       wanted to?

16  A    Yes.

17  Q    How far away from Tyrone was the defendant?

18  A    They was about another two to three feet away from each

19       other.

20  Q    (By Mr. Prasad, continuing):  Okay.  I want you to think

21       back, sir, to -- Think back to picture the positions of

22       everyone.  And, in your mind, position yourself where

23       Tyrone was.  Your Honor, may I approach the witness?

24            THE COURT:  You may.

25  Q    (By Mr. Prasad, continuing):  You tell me to stop when I
```

1    get to the point, the distance between Tyrone and the

2    defendant.

3  A    They was about that close.

4              MR. PRASAD:  Like this?  Counsel, about

5    three feet?

6              MS. ROCK:  I would say three to four feet,

7    maybe.

8  Q    (By Mr. Prasad, continuing):  What happened at that

9    point, sir?

10 A    At that point, the owner was directing the defendant to

11    give him his glasses back.

12             MS. ROCK:  Well, your Honor, I'm going to

13    object as to hearsay.

14             THE COURT:  Any response?

15             MR. PRASAD:  No, Judge.

16             THE COURT:  Okay.  Just disregard what he

17    was claiming happened.

18 Q    (By Mr. Prasad, continuing):  The owner said something

19    to who?

20 A    To the defendant.

21 Q    Okay.  Where was the owner in relation to where Tyrone

22    and the defendant were?

23 A    He was on the side of them like by the store.

24 Q    By the store?

25 A    Yeah.

-132-

1  Q    How far away from the two of them?

2  A    He was about three to four feet away from them.

3  Q    Okay.  Would it have made like a triangle if you were

4       looking on top?

5  A    Yes.

6  Q    What happened next after the owner said something to the

7       defendant?

8  A    He was asking about, the defendant was asking about his

9       phone.  And then Tyrone was yelling about his glasses.

10      And then Tyrone just hit him.

11 Q    Tyrone hit who?

12 A    The defendant.

13 Q    How did Tyrone hit the defendant?

14 A    He just hit him with his right hand and kept hitting

15      him.

16 Q    How many times did Tyrone hit the defendant?

17 A    About four or five times.

18 Q    And where did Tyrone hit the defendant?

19 A    In this face.

20 Q    Did Tyrone have any kind of weapon on him at that time

21      that you could see?

22 A    No.

23            MS. ROCK:  Well, your Honor, I'm going to

24      object.  It's speculation.

25            THE COURT:  That's not speculation.  Thank

1      you.

2  Q   (By Mr. Prasad, continuing):  How close to Tyrone and

3      the defendant were you at this point?

4  A   I was still about two or three feet away from Tyrone.

5  Q   Let's be clear.  Did you see anything in Tyrone's hands?

6  A   No.

7  Q   At all?

8  A   No.

9  Q   Is Tyrone hitting the defendant with an open fist, I

10     mean, an open hand or a closed fist?

11 A   Open and closed.

12 Q   Open and closed?  What happened?

13 A   The defendant was just, kept bagging back.

14 Q   Backing up?

15 A   Yes.  Never swung back.

16 Q   The defendant never swung -- What happened next?

17 A   Tyrone stopped hitting him.

18 Q   So, after four to five punches or slaps, what's the

19     ending position?  You said the defendant's backing up

20     and Tyrone stopped hitting him.  Where do they end up?

21 A   He ended up stopping.  And it was still about, then they

22     -- Like they got a little distance, about two to three

23     feet.

24 Q   Now, you had just showed the jury, you had just showed

25     the jury when I was walking up close to you about three

-134-

1       to four feet separation.

2  A    Yes.

3  Q    Right?  Was that when, was that when the fighting

4       started, with Tyrone first hit the defendant?

5  A    Yes.

6  Q    Okay.  When the fighting was, when the punching was over

7       and you said the defendant had backed up and Tyrone

8       stopped, were they closer or farther apart than what you

9       showed the jury?

10 A    They got about at that same distance apart.

11 Q    The same one that you just showed us?

12 A    Yes.

13 Q    Okay.  What happened next?

14 A    Then he pulled out the gun and just started shooting.

15 Q    Who's he?

16 A    The defendant pulled out the gun and just started

17       shooting.

18 Q    Where did he pull out the gun from?

19 A    From his right pocket.

20 Q    Did you see him pull it out of his pocket?

21 A    No.

22 Q    Tell me what you saw.

23 A    As he was pulling it out, he immediately started

24       shooting.

25 Q    Did you see a gun in his hand?

1  A    Yes.

2  Q    In the defendant's hand?

3  A    Yes.

4  Q    What kind of gun was it?

5  A    I'm not sure.  It was a handgun.

6  Q    It was a handgun?  Do you know the difference between a

7       revolver and a semi-automatic handgun?

8  A    Semi-automatic handgun.

9  Q    Let me ask the questions in sequence.  Do you know the

10      difference between a revolver and a semi-automatic?

11 A    Yes.

12 Q    Was this a semi-automatic or a revolver?

13 A    A semi-automatic.

14 Q    Okay.  Where were you standing when you saw the

15      defendant with the gun?

16 A    I was still like two to three feet away from Tyrone.

17 Q    And where were you positioned in relationship to where

18      Tyrone was?

19 A    Behind him.

20 Q    Behind him?  Were you directly behind Tyrone?

21 A    Yes.

22 Q    Could you tell which direction the defendant was

23      pointing the gun?

24 A    Like directly at Tyrone.  Yeah.  It was like direction

25      at Tyrone.

```
 1  Q    Can you demonstrate for the jury with your hands the way
 2       the defendant was holding the gun at that point?
 3  A    Like he was reaching like crazy in his pocket and then
 4       he just like, as soon as it came out, he just started
 5       shooting.
 6  Q    Okay.  For the record, you had your right hand towards
 7       your right--
 8  A    (Interposing)  Yeah.
 9  Q    Side, is that correct?
10  A    Yes.
11  Q    And is that where the pocket was that you were
12       describing?
13  A    Yes.
14  Q    And, for the record, you were pulling out, it seemed
15       like you were pulling out your right hand from the
16       pocket that it was in, right?
17  A    Yes.
18  Q    And at what point did the defendant start shooting?
19  A    It seemed like he started shooting as soon as it came
20       up.  Like he didn't even, it seemed like he didn't even
21       get it all the way out of his coat.
22  Q    How many times did Tyrone shoot -- Excuse me.  How many
23       times did the defendant shoot that gun?
24  A    I'm not sure.  It was a lot, like seven to eight times.
25       It was like five to three times before I went into the
```

```
 1      store.
 2  Q   Okay.  Let's break that down and explain that to the
 3      jury, okay?  When he first pulls out the gun, how many
 4      gunshots do you -- At that point, do you see the gun
 5      being fired?
 6  A   Yes.
 7  Q   How many gunshots do you see?
 8  A   I see about like one or two.
 9  Q   And how do you react?
10  A   I run.
11  Q   You run?  And which direction to you run?
12  A   Towards the store.
13  Q   Where is the store from where you were at?
14  A   It was like, almost like directly, it was behind me, but
15      to the left side of me.
16  Q   So, you see the first two gunshots, right?
17  A   Yes.
18  Q   How many more gunshots do you hear that time?
19  A   I hear about like two to three more after I see the
20      first two.
21  Q   So, we're talking about -- Is this approximately a total
22      of four to five gunshots at this point?
23  A   Yes.
24  Q   How did these gunshots get fired?  Do you understand my
25      question?
```

1  A    No.

2  Q    Are they in a sequence?  Are they all together?

3  A    Yes.  It was like the first two, then after that, the

4       next like two to three was just fast.

5  Q    That's what I'm asking you to describe.  Describe for

6       the jury -- Almost like, like almost give us a drum

7       beat.  Like how--

8  A    (Interposing)  Like it was like one two, then like one,

9       two three after that.

10 Q    So, was there a little pause between the one, two and

11      then the one, two three?

12 A    Yes.

13 Q    How long was that pause?

14 A    Two to three seconds.

15 Q    What do you do next?

16 A    After the first two, I run towards the store.  Everybody

17      else out there ran towards the store.

18 Q    You see other people running as well?

19 A    Yes.

20 Q    Did you get to the store?

21 A    Yes.  I got to the door of the store.

22 Q    And what happened when you got to the door?

23 A    Well, the door was open and I was still like running

24      almost.  By the time I, it's like when I got up the

25      stairs, I just like fell straight in the store.

-139-

1  Q    You fell into the store?

2  A    Yes.

3  Q    What stairs are you talking about, sir?

4  A    The stairs to get into the store.

5  Q    Are there steps to go into the store?

6  A    Yes.

7  Q    About how many of those?

8  A    Two.  Like two or three.

9  Q    And you said you fell into the store?

10  A    Yes.

11  Q    What happened next?

12  A    Well, I was like on the ground in the store.  And they

13       was like asking me, did anybody else get shot?

14  Q    Did you notice if you were injured at this point?

15             MS. ROCK:  Well, your Honor, I'm going to

16       object as to they.

17             THE COURT:  I'll allow the question to be

18       asked and the answer to be received.

19  Q    (By Mr. Prasad, continuing):  Did you notice if you were

20       injured at that point?

21  A    No.

22  Q    Okay.  Did you know if Tyrone Simpson had made it into

23       the store with you?

24  A    Yes.  I know he didn't make it into the store.

25  Q    Didn't make it into the store.  What's the next thing

1    that happened, sir?

2 A  Well, after that, I heard like more shots fired.

3 Q  Where were you when you heard these more shots fired?

4 A  The store, like it's a glass door.  And you can see

5    through it.  So, it was like the glass door, so I'm like

6    to the left of the glass door almost.

7 Q  Are you looking out the glass door?

8 A  No.  I can't really see out the glass door.

9 Q  Why not?

10 A  Because like I was on the opposite side, so I couldn't

11   see directly outside the store.

12 Q  Okay.  Could you hear what was going on outside?

13 A  Yes.

14 Q  What did you hear?

15 A  I just heard Tyrone on the ground.

16 Q  What do you mean you heard Tyrone on the ground?

17 A  Like I heard him like asking for his life, saying the

18   glasses weren't worth it.  He--

19         MS. ROCK:  (Interposing)  Your Honor, I'm

20   going to object as to this hearsay.

21         MR. PRASAD:  Judge, if I could lay a

22   foundation?

23         THE COURT:  I'll allow it.

24 Q  (By Mr. Prasad, continuing):  When you heard Tyrone make

25   those statements -- Let me back up a couple questions.

-141-

1     One, did you recognize Tyrone's voice?

2  A    Yes.

3  Q    I want to ask you about the tone of Tyrone's voice.  How

4     did -- Not what he said.  But how did it sound like he

5     was saying it?

6  A    Basically, it sounded like he was begging for his life.

7  Q    What makes you say that?

8  A    Because at that point in time, he didn't care about the

9     glasses no more.

10  Q    And what did you hear after you heard Tyrone say that?

11  A    I heard another shot go off.

12  Q    I want, Mr. Allen, to as best as I can, have you explain

13     to the jury the different groups of gunshots that you

14     saw or heard.  Okay?  We already discussed the first two

15     that you saw and the two-second pause and then the next

16     three, right?

17  A    Yeah.

18  Q    How long was the pause after that three before you heard

19     the next series of gunshots when you were inside the

20     store?

21  A    It seemed like it was like another three, it almost

22     sound like he had a whole 'nother clip.

23  Q    All right.  I don't want you to guess about, you know,

24     about if he a clip or anything.  I'm asking you how long

25     is the pause between -- You described two shots that you

1    saw, three that you heard.  And then you described shots

2    you heard while you were inside the store.

3  A    Yes.

4  Q    How long was the time difference between the three that

5    you heard when you were outside running inside and when

6    you were inside the store?

7  A    About like ten seconds.

8  Q    Okay.  And how many gunshots did you hear at the time

9    when you were inside the store?

10  A    Like three to four.

11  Q    And then how long was it after those three to four shots

12    was it before you heard Tyrone say those things?

13  A    It was about like, after I heard him say that, it was, I

14    mean, before I heard him say that, it was like another

15    fifteen seconds before I heard that last shot.

16  Q    Before the last shot?

17  A    Yeah.

18  Q    Mr. Allen, at some point, did you realize you were

19    injured?

20  A    Yes.

21  Q    Where was your injury?

22  A    My left upper leg.

23            MR. PRASAD:  Judge, may I have the witness

24    stand up, please?

25            THE COURT:  You may.

-143-

1  Q    (By Mr. Prasad, continuing):  Mr. Allen, could you

2       please stand up and show the part of body in which you

3       were injured?

4  A    In this left part of my leg.  Like almost right here.

5  Q    Is that your right leg?

6  A    Yeah.

7  Q    I thought you said -- It was your left leg or your right

8       leg?

9  A    My right leg.

10  Q    Okay.  And where are you pointing to?

11  A    Like right here

12              MR. PRASAD:  For the record, it's on the

13       right side below his hip on the upper part of his leg.

14       Is that correct?

15              MS. ROCK:  I would agree with that.

16              MR. PRASAD:  Okay.

17  Q    (By Mr. Prasad, continuing):  And how were you injured

18       there, sir?

19  A    It was with a gunshot.  And then like once I got to the

20       hospital, I realized that the bullet had damaged my

21       rectum.

22  Q    Did the bullet actually go into your body on that right

23       side, sir?

24  A    Yes.

25  Q    As a result of that, did you have to have any medical

1      care or surgery?

2   A   Yes.

3   Q   Tell us about that.

4   A   I had to have a colostomy placed and--

5   Q   (Interposing)  That's the bag?

6   A   Yes.  A colostomy bag.  And the bullet's still placed, I

7        mean, still inside my body.

8   Q   Where is it at right now?

9   A   I'm not sure.  It's lodged somewhere.

10  Q   How long were you in the hospital for, sir?

11  A   Eleven, twelve days.

12  Q   Taking us back to April 10th when you were inside the

13       store.  After that last gunshot you heard, did you hear

14       anything else going on outside at that point?

15  A   Yes.

16  Q   What did you hear?

17  A   I heard other people pulling up.  I heard people, after

18       they left, I assume, they--

19  Q   (Interposing)  I don't want you to assume.

20  A   All right.

21  Q   I just want to know what you were able to hear at that

22       point.

23  A   I heard them speed off.

24  Q   Did you hear a vehicle speed off?

25  A   Yes.  And then people, employees from the store came

```
 1      out.  I hear them, like they killed him.  We gone.
 2  Q   At some point, sir, did you come in contact with law
 3      enforcement officers or EMS out there?
 4  A   Yes.
 5  Q   Who was it?  Was it EMS or police officers?
 6  A   Police got there first.
 7  Q   Okay.  And at what point did you start getting treated
 8      for your wounds?
 9  A   What do you mean treated?  Like surgery or--
10  Q   (Interposing)  No.  No.  Just like being taken care of
11      at the scene.
12  A   The EMS?  Like about like fifteen, twenty minutes later.
13  Q   Were you bleeding at that point?
14  A   Yes.
15  Q   Was there a lot of blood at that point?
16  A   Yes.
17  Q   What was the condition of your clothes at that point?
18  A   They was all tore up.  The EMS had to tear my clothes
19      off.
20  Q   Was there blood on your clothes at this point, sir?
21  A   Yes.
22  Q   Taking you back to the point where the defendant pulled
23      out the gun.  Can you think back to that point, sir?
24  A   Yes.
25  Q   At that point, before the defendant pulled out the gun,
```

1      did Tyrone Simpson have any weapon on him that you can

2      think of?

3  A   Not at all.

4  Q   Was there anyone else besides Tyrone Simpson who had,

5      with his hands, attacked--

6              MS. ROCK:  (Interposing)  Your Honor, I'd

7      object as to how does he know what other people are

8      doing?

9              MR. PRASAD:  He's there.  He can see it.

10             THE COURT:  I'm going to guess she asked me

11     that question.  I'm not really -- That's not a real

12     objection.  But I would say that it's been asked and

13     answered.  So, let's move on.

14 Q   (By Mr. Prasad, continuing):  I guess what I'm asking,

15     sir, was there anyone else besides Tyrone Simpson

16     attacking the defendant at this point?

17 A   No.

18 Q   Where were the two people that had come with the

19     defendant?

20 A   They was like actually behind him.  They wasn't in front

21     of him.

22 Q   Were they doing anything?

23 A   No.  Not really.

24 Q   Where was Mr. Bailey?  Where was Bobby?

25 A   I actually don't even know where he was at.  I know he

1      wasn't inside of the store, though.

2  Q   Sir, at some point while you were in the hospital, did

3      you ever come in contact with Detroit Police Department

4      officers there?

5  A   Yes.

6  Q   And did you have an opportunity to give a statement to

7      the Detroit Police Department officers when you were in

8      the hospital?

9  A   Yes.

10 Q   Okay.  Do you remember what day that was?

11 A   I believe it was that night.

12 Q   Do you know what kind of condition you were in at that

13     point?

14 A   Yes.

15 Q   What kind of condition were you in?

16 A   I had like a lot of morphine inside of me.

17 Q   The first time you came in contact with Detroit Police

18     Department officers, what did you do?

19 A   Well, they was asking for a statement.  I really

20     couldn't write.

21 Q   So, what did you do?  How did you do it?

22 A   Like they was just telling me to explain like what had

23     happened.

24 Q   And did you do that?

25 A   Yes.

1  Q   And did someone else have to write it for me?

2  A   I think someone else did write it.  I can't remember.  I

3      don't remember writing, though.

4  Q   Okay.  At that point, that first time you came into

5      contact with them, did they show you any photographs?

6  A   Yes.

7  Q   Huh?

8  A   Yes.

9  Q   They did?  And how did they show you photographs, sir?

10 A   On a piece of paper.

11 Q   And on this piece of paper, how many photographs were

12     there?

13 A   Six.

14 Q   Were you able to identify anyone in those photographs?

15 A   Yes.

16 Q   And who was that person you identified?

17 A   At the time, I ain't know.  I was so out of it.

18 Q   Well, why did you identify someone at that time?

19 A   I identified somebody who was the closest to him.

20 Q   Closest to who?

21 A   Closest to the defendant.

22 Q   Okay.  And why is that?

23 A   Because I really didn't even know him.

24 Q   At some point later, sir, did you have an opportunity to

25     see a live line-up of people?

-149-

1  A    Yes.

2  Q    When was that, if you remember?

3  A    I don't remember when I did the live line-up.  But it

4       was some time, it was some time after I got out of the

5       hospital, though.

6  Q    You were out of the hospital at this point?

7  A    Yes.

8  Q    Okay.  And do you remember who you went, who you went

9       with to go look at the live line-up?

10  A   Yes.

11  Q   Who was that?

12  A   Detective Mackie.  And it was a lady.  I think she

13      retired or something.

14  Q   And when you, when you went to this live line-up, how

15      many people did you actually see live?

16  A   I think it was like six people.

17  Q   All right.  Were they standing or where they sitting?

18  A   They was all sitting.

19  Q   When you got there, sir, did you recognize anyone?

20  A   Yeah.

21  Q   Who did you recognize?

22  A   The defendant.

23  Q   How long did it take you to recognize him?

24  A   Almost as soon as they walked in.

25  Q   Why do you say that?

```
 1  A    I don't forget a face.

 2  Q    When you saw the live, when you saw those six people,

 3       when you saw the defendant, were you sure that was the

 4       same person you saw on April 10th, 2010?

 5  A    Yes.  I was positive then.

 6  Q    And are you sure it's the same person that you

 7       identified in court today?

 8  A    Yes.

 9  Q    Was it the same person you saw pull out that gun?

10  A    Yes.

11  Q    And fire those first two shots?

12  A    Yes.

13  Q    Was it the same person that was in the fight with

14       Tyrone?

15  A    Yes.

16            MR. PRASAD:  Thank you, your Honor.  I pass

17       the witness.

18                 CROSS-EXAMINATION

19  BY MS. ROCK:

20  Q    Mr. Allen. how tall are you?

21  A    I don't know, about 6'1", 6'2".

22  Q    Okay.  How much do you weigh?

23  A    Before the incident, I was about two hundred pounds.  I

24       don't know how much I am now.  I know I lost a lot of

25       weight.
```

1  Q    All right.  And your relationship with Tyrone Simpson

2       was pretty close, right?

3  A    Yes.

4  Q    Okay.  Because do you remember testifying at 36th

5       District?  Over at 36th District across the street?

6  A    No.  I don't remember.

7  Q    You don't remember testifying in front of a Judge and

8       going to the building across from the Music Hall?

9  A    No.  The only thing I remember is here, the exam or

10      whatever.

11  Q    Okay.  Well, at a previous hearing, do you remember

12      describing Tyrone as my man?

13  A    Yes.

14  Q    Okay.  So, at that hearing -- So, that would signify

15      that you had a close relationship with him, right?

16  A    Yes.

17  Q    Got a tattoo on your arm that says rest in peace, Ant?

18  A    Yes.

19  Q    That's Mr. Simpson?

20  A    Yes.

21  Q    Okay.  And you -- Tyrone Simpson told you that he had

22      been fighting with Freak, right?

23  A    Yes.

24              MR. PRASAD:  Objection.  Hearsay.

25              MS. ROCK:  Your Honor, it goes--

```
 1                    THE COURT:  (Interposing)  Excuse me, ma'am.
 2                    MS. ROCK:  I'm sorry.
 3                    THE COURT:  The objection was to me, right?
 4                    MS. ROCK:  Yes, your Honor.
 5                    THE COURT:  So that means I get a chance to
 6        answer.  I'll allow it.
 7                    MS. ROCK:  Thank you, your Honor.
 8   Q    (By Ms. Rock, continuing):  Okay.  So, he said he was
 9        fighting with Freak, right?
10   A    Yes.
11   Q    Okay.  And now, Freak ended up getting beaten up by
12        Tyrone?
13   A    I assume.  I wasn't there.
14   Q    Okay.  But Freak is about 5'10"?
15   A    Yes.
16   Q    Okay.  About a hundred and thirty pounds?
17   A    I guess.  I don't really know.
18   Q    Isn't that what you -- You made a statement in this
19        case, right?  That you said at the police, or at the
20        hospital?  Right?
21   A    Yes.
22   Q    Okay.  And you gave Freak's weight, right?
23   A    Yes.
24   Q    Okay.  One thirty, right?
25   A    Yes.
```

-153-

1  Q    Okay.  And so, knowing that Tyrone had just had a fight

2       with Freak, you were also going to go after him

3       violently, right?

4  A    Because of what was going on with me.

5  Q    Okay.  But the answer is yes?

6  A    Yes.

7  Q    Okay.  And in a written statement to the police, you

8       describe the shooter as being 5'7", 5'8", right?

9  A    Yes.  Around there.

10 Q    Okay.  And no more than a hundred and thirty pounds,

11      right?

12 A    Yes.

13 Q    Okay.  And you said the shooter had a small goatee,

14      right?

15 A    Yes.

16 Q    Okay.  And when you were -- Now, when Tyrone discovers

17      his glasses, glasses missing, I believe you testified

18      when the prosecutor was cross-examining [sic] you, he

19      says he's not going anywhere, right?

20 A    Yeah.  He said--

21 Q    (Interposing)  Okay.  And doesn't he say, no one's going

22      to go anywhere until my glasses come up?  Right?

23 A    No.

24 Q    He doesn't say that?

25 A    No.  He said, he said he not going nowhere until he get

-154-

```
 1      his glasses-

 2  Q   (Interposing)  He doesn't say no one's leaving because

 3      I'm about to shoot this bitch up?

 4  A   No.

 5  Q   He says there's going to be some gunplay.

 6  A   No.

 7  Q   Now, you never met my client before, Deonte Howard,

 8      right?

 9  A   No.

10  Q   And you said that Deonte Howard, your statement

11      previously under oath was Deonte Howard was there before

12      Bobby Bailey came to the restaurant, right?

13  A   Yes.

14  Q   And Tyrone Simpson doesn't start punching Deonte Howard

15      right away, right?

16  A   No.  Not right away.

17  Q   Okay.  And then when Bobby Bailey gets there, he talks

18      to Deonte Howard, right?

19  A   Yes.

20  Q   Okay.  And you said that there were two or three people

21      behind you and Tyrone, right?

22  A   Right.

23  Q   Okay.  And Tyrone keeps saying give me my glasses?

24  A   Right.

25  Q   Okay.  And at that point, Bobby Bailey is not within
```

-155-

1      your line of -- Now, Bobby Bailey, when there is a

2      shooting, Bobby Bailey is not within your sight, right?

3   A   Yes.  He was still out there, but I just know he ran,

4      too.

5   Q   Okay.  But when you -- During the shooting, when it

6      starts, Bobby Bailey is not within your line of sight,

7      is he?

8   A   Yes.  He was still on the side of me.

9   Q   Okay.  Okay.  I'm going to ask you to read page forty-

10     eight to pages forty-nine of this preliminary exam

11     transcript, lines thirteen through twenty-five.  Excuse

12     me.  And lines one through fifteen on page forty-nine,

13     the preliminary exam transcript.  Let me know when

14     you're done, please.

15  A   I'm done.

16  Q   Okay.  Thank you.  Now, you were asked at the

17     preliminary examination, question:

18               "You said you were behind, during the

19               shooting, you were behind Tyrone, is that

20               correct?"

21  A   Yes.

22  Q   Answer:     "Yes."

23     Question:   "Okay.  Where was the owner?"

24     Answer:     "He was like standing like close to the

25               door.  If you walk past the door, you see

-156-

```
 1                      the store, there's a window.  They've got
 2                      the open sign.  He was up under it."  Okay.
 3      Question:   "Okay.  So, you would have been between
 4                      Tyrone and Tay?"
 5      Answer:     "No.  In between them, not like directly in
 6                      between them, but"--
 7                      MR. PRASAD:  (Interposing)  Hold on.  I
 8  believe you misread that.
 9                      MS. ROCK:  Oh.  I'm sorry.
10                      "So, he would have been between Tyrone and
11                      Tay?"
12      Answer:     "Not in between them, not like directly in
13                      between them, but he was like up against the
14                      wall and they was like on the sidewalk."
15      Question;   "Well, that's what I'm saying.  I know he
16                      was against the wall.  But if you have
17                      Tyrone here and you have, you're saying Tay
18                      in front of Tyrone, is that right?"
19      Answer:     "Yes."
20      Question:   "Where's the owner?  Is he between them?
21                      Not between them, but he is"--
22      Answer:     "Off to the side."
23      Question:   "Is he in front of Tyrone or behind Tyrone?"
24      Answer:     "He like in the middle of him, but like off
25                      to the side."
```

```
 1     Question:    "Okay.  So, he's in the middle, but off to
 2                  the side right where the cashier"--
 3     Answer:      "I'm not too sure.  I think he was like on
 4                  the steps of the store."
 5     Question:    "You're guessing?"
 6     Answer:      "Yeah.  Because he wasn't nowhere in my
 7                  sight, so he had to be behind the--
 8                  So, you don't know if he was there or not?"
 9     Answer:      "No.  He was there.  It was more than just
10                  them there.  There was other people there,
11                  too."
12                  You were asked those questions and those
13     were your answers, right?
14  A  Yes.
15  Q  Okay.  And you were under oath?
16  A  Yes.
17  Q  Okay.  You were telling the truth?
18  A  Yes.
19  Q  You never saw my client take Tyrone Simpson's glasses,
20     correct?
21  A  No.  I wasn't out there.
22  Q  Okay.  And Tyrone punched him probably five times,
23     right?
24  A  Yes.
25  Q  Okay.  And he punched him in the face, right?
```

```
 1  A    Yes.

 2  Q    In the nose, the mouth and the eyes, right?

 3  A    Yes.

 4  Q    Okay.  And he punched him all over his face really hard

 5       and really fast, right?

 6  A    Yes.

 7  Q    Okay.  And Deonte Howard wasn't fighting back?

 8  A    No.

 9  Q    And Deonte Howard was being attacked by Tyrone Simpson?

10  A    Yes.

11  Q    Now, you hardly know anything about guns, but you know

12       the difference between a revolver and a semi-automatic,

13       right?

14  A    Yes.

15  Q    Okay.  You also made the comment that it sounded like a

16       whole other clip went off, right?

17  A    Yes.

18  Q    Okay.  Now, today you testified that you saw two shots,

19       correct?

20  A    Yes.

21  Q    Okay.  Have you ever testified -- I'm going to direct

22       your attention to page twenty-four and twenty-five of

23       the preliminary exam transcript.  And that would just be

24       page twenty-four, line twenty-five.  Page twenty-five,

25       line one.  If you could please just let me know when
```

-159-

```
 1      you're done.

 2  A   I'm done.

 3  Q   Right?  Okay.  Thank you.  So, at the preliminary

 4      examination hearing on May 26th, 2010, you were asked:

 5                  "How many gunshots did you see or hear?"

 6      And you said:

 7                  "I saw about like four or five."

 8                  You were asked that question and that was

 9      your answer, right?  Yes or no?

10  A   Yes.  It say see or hear.

11  Q   Well, you said I saw about like four or five, right?

12  A   But the question was see or hear.

13  Q   But your answer was I saw about four or five?

14  A   Right.

15  Q   Okay.

16  A   Ain't ask how many I hear.

17  Q   All right.  Now, do you see -- Your testimony is today

18      that you see Mr. Howard go for his gun, right?  Or go

19      for, go in his pocket?

20  A   Right.

21  Q   You know he's going for a gun, right?

22  A   No.

23  Q   Okay.  I'm going to direct your attention to page

24      thirty-three.  That would be lines nineteen through

25      twenty.  Okay.  Actually, I'm going to direct your
```

```
 1      attention to lines seventeen through twenty-five.  If
 2      you could read that, please.  So, you're asked,
 3      question:
 4               "Do you see anything at that point?"
 5      And your answer was:
 6               "Not at that point."
 7      Question:   "What do you think is happening?"
 8      Your answer:
 9               "I don't even know what's happening.   I
10               figured he was reaching for a gun."
11      Question:   "You don't run, though?"
12      Answer:     "No."
13      Question:   "You just stay there?"
14      Answer:     "Yes."
15               You were asked those questions and those
16      were your answers?
17  A   Yes.
18  Q   Now, when you -- This statement you testified today was
19      not in your handwriting.  But you testified previously
20      when you gave this statement you knew what you were
21      doing, right?
22  A   Sort of it.  But I was just out of it and tired.
23  Q   You're saying you were out of it entirely?
24  A   Yeah.  I was up under a lot of drugs.
25  Q   All right.  I'm going to direct your attention to page
```

```
 1      thirty-four, lines fourteen through fifteen.  And you

 2      let me know when you're done, please.

 3   A  I'm done.

 4   Q  All right.  So, you're asked:

 5              "Okay.  Did you know what you were doing

 6              when you made this statement?"

 7      And your answer was:

 8              "Yes."

 9              Correct?  You were asked that question and

10      that was your answer?

11   A  Yes.

12   Q  In fact, you give this two-page statement before you

13      make the identification out of that photo line-up,

14      correct?

15   A  Yes.

16   Q  Okay.  And now -- Excuse me just for a second.  And you

17      really don't know how many people were up there, right?

18   A  No.

19   Q  I mean, you don't know how many people were up there?

20   A  I don't.

21   Q  And now, when you were outside and Tyrone is out there

22      with Deonte Howard, you're out there and there's two or

23      three people behind you, right?

24   A  Yes.

25   Q  Okay.  And when you give your written statement to the
```

1    police, you don't give any description of the two guys

2    that are behind Mr. Howard, do you?

3  A    No.

4  Q    You don't?  Is that no?

5  A    No.

6  Q    Okay.  And when the punching was going on, no one tries

7    to break up the punching?

8  A    No.

9  Q    And your testimony was today, when the shots were fired,

10    you take off into the store, right?

11  A    Yes.

12  Q    Okay.  And you don't go back outside until the ambulance

13    arrives, right?

14  A    Yes.

15  Q    Okay.  And you didn't see who was doing the shooting

16    once you were in the store, did you?

17  A    No.

18  Q    And, according to you, Mr. Howard was wearing a black

19    coat, right?

20  A    Yes.

21  Q    Okay.  He wasn't wearing a hat?

22  A    I don't remember.  I don't think so.

23  Q    He wasn't -- Well, I'm going to direct your attention to

24    -- You, he wasn't -- You don't remember what type of

25    pants he was wearing, right?

-163-

1  A    No, not really.

2  Q    Okay.  And you don't remember the shirt?

3  A    No.  Because he had on a coat.

4  Q    Okay.  And, at some point, you're in the hospital and

5       that's when we talked about Officer Martel taking your

6       statement, right?

7  A    Yes.

8  Q    And you've testified on two occasions that you knew what

9       you were doing when you gave your statement, right?

10 A    Yes.

11 Q    And when you were shown -- I'm going to show you what's

12      been marked as Defense Exhibit A and ask you if you

13      recognize your signature on this document?

14 A    Yes.

15 Q    Okay.  This would be the photo show-up that you were

16      shown by Officer Diaz?

17 A    Yes.

18 Q    Okay.  And, in fact, this picture, number six, is

19      circled by you, right?

20 A    Yes.

21 Q    Okay.  And you were asked these questions and these are

22      your answers, right?  You were asked:

23              "Do you recognize anybody?"

24      And your answer was:

25              "Yes."

-164-

```
 1                   Correct?

 2  A    Yes.

 3  Q    And you were asked:

 4                   "If the answer to question one was yes,

 5                   identify by number the photo or photos you"

 6                   -- I'm sorry.  Let me slow down.

 7                   "If the answer to question one was yes,

 8                   identify by number the photo or photos you

 9                   recognize."

10                   You said number six.

11  A    Yes.

12  Q    Okay.  Is that yes?

13  A    Yes.

14  Q    You were asked:

15                   "From where do you recognize the person

16                   identified?"

17       Your answer was:

18                   "The shooting."

19                   Correct?

20  A    Yes.

21  Q    And then you said [sic]:

22                   "Do you have any additional comments?"

23       And your response was:

24                   "This is the man who shot me and my friend."

25                   Right?
```

-165-

1  A     Right.

2            MS. ROCK:  Okay.  Your Honor, I move to

3       admit Defense Exhibit A.

4            MR. PRASAD:  No objection.

5            THE COURT:  It'll be received.

6            (Whereupon Defendant's Exhibit A

7            was received into evidence.)

8            MS. ROCK:  Thank you

9  Q     (By Ms. Rock, continuing):  So, you know that you're

10       looking -- When you're at the hospital and you're

11       looking at these photos, you know that you're looking at

12       photos or you're trying to identify somebody who might

13       have killed your friend, correct?  And shot you?

14  A     Yes.

15  Q     Okay.  And the person you select, you know that the

16       person you select could be charged with murder, right?

17  A     Right.

18  Q     That's a serious charge, right?  Is that yes?

19  A     Yes.

20  Q     And I believe at the motion hearing, you testified that

21       you were tired and you just wanted Officer Diaz out of

22       your face, right?

23  A     Yes.

24  Q     Okay.  And, according to the photo show-up, according to

25       previous testimony or the testimony that you gave today,

-166-

1       you told the officer who showed you the photos that

2       number six was the closest one, right?

3   A   Yes.

4   Q   Is that yes?

5   A   Yes.

6   Q   And then you also told the officer that you didn't see

7       the shooter on the photo sheet, is that right?

8   A   Yes.

9   Q   Okay.  And then you looked at several pages of photos,

10      right?

11  A   Yes.

12  Q   And then the officers helped you pick out the photo at

13      the hospital?

14  A   Yes.

15  Q   Okay.  And they kept saying, when you're saying, well,

16      you know, I don't see him, they kept saying you sure it

17      ain't him?  Is that right?

18  A   They kept saying you sure you don't see him?

19  Q   Okay.  But you knew which photo they were pointing you

20      to, right?

21  A   No.  They ain't point me to a photo.  They just was

22      like, they was like kind of for sure that they had him

23      on the photo.

24  Q   Okay.  But they kept saying, you sure it ain't him?

25                  MR. PRASAD:  Objection.  Asked and answered.

-167-

1     She just asked that question.

2               MS. ROCK:  No.  No.  I didn't.  I'm

3     clarifying.

4               THE COURT:  You asked the same question

5     again, ma'am.

6               MS. ROCK:  Okay.  Thank you.

7  Q   (By Ms. Rock, continuing):  Now, you said it don't look

8     like him, but they kept asking and asking, right?

9  A   Right.

10 Q   Okay.  And you finally said yes?

11 A   Right.

12 Q   Is that yes?

13 A   Yes.

14 Q   Okay.  And that's when you said number six was the man

15    who shot and killed your, shot you and killed your

16    friend?

17 A   Yes.

18 Q   And so a live line-up is conducted a month and three

19    days later on May 13th?

20 A   Yes.

21 Q   And you're looking for someone who fits a description of

22    seventeen to eighteen years old, right?

23 A   Yes.

24 Q   5'7" to 5'8"?

25 A   Yes.

-168-

1  Q     No more than a hundred and thirty pounds?

2  A     Yes.

3  Q     Right?  With a small goatee?

4  A     Right.

5  Q     Okay.  Now, it took you, according to your previous

6        testimony, it took you fifteen minutes to identify

7        Deonte Howard as the shooter?

8  A     Before I actually told them.

9  Q     Okay.  So, it took you fifteen minutes?

10 A     Right.

11 Q     Is that yes?

12 A     Right.

13 Q     Now, before you go to this live line-up, the police tell

14       you that they have arrested the person they think who

15       did the shooting, right?

16 A     Right.

17 Q     Okay.  And the smallest person in that line-up is Deonte

18       Howard?

19 A     Well, they all was around the same height.

20 Q     Sir, I'm going to draw your attention to page twenty-

21       five of the transcript, August 19th, 2010, before the

22       Honorable Judge Morrow.  I'm going to ask you to read

23       the questions eleven through sixteen to yourself,

24       please.  Okay.  So, when you testified on that date, you

25       were under oath, weren't you?

1  A    Yes.

2  Q    Okay.  And you were telling the truth?

3  A    Yes.

4  Q    Okay.  And you were asked, question:

5            "So, when you look at this live line-up,

6            you're looking for a small person, right?"

7  Answer:    "Yes."

8  Question:   "Okay.  And the smallest person there was

9            Deonte Howard, right?"

10  Your answer was:

11            "Yes."

12            Right?

13  A    Right.

14  Q    Okay.  So, you were asked those questions, those were

15    your answers?

16  A    Right.

17  Q    Now, so after the live line-up, you go over to the

18    prosecutor's office to give testimony, right?

19  A    Yes.

20  Q    Okay.  The live line-up is, say ten to 1:00,

21    approximately?  Right?  1:00-ish?  Is that yes?

22  A    Yes.

23  Q    Okay.  And then you go to the prosecutor's office at two

24    o'clock on the same day, right?

25  A    Yes.

-170-

1  Q    Okay.  And an hour later, after this live line-up,

2       there's already a court reporter there to take your

3       testimony, right?

4  A    Right.

5  Q    Okay.  And Mr. Prasad is there, right?

6  A    Yes.

7  Q    And a female prosecutor by the name of Athina Siringas

8       is there?

9  A    Yes.

10 Q    Okay.  And then you got Officer Mackie there, right?

11 A    Yes.

12 Q    And then there's also Police Officer Brooks?

13 A    Yes.

14 Q    Another police officer, female?

15 A    Yes.

16 Q    Okay.  Now, while you're at the prosecutor's office,

17      they ask you about the description that you gave in your

18      statement, right?  Is that yes?

19 A    Yes.

20 Q    Okay.  The seventeen to eighteen years of age and the

21      5'7" to 5'8", is that right?

22 A    Yes.

23 Q    And you said, after seeing them today, he looked a

24      little younger than that.  Oops.  Excuse me.  He looked

25      a little younger than that, correct?

-171-

```
 1  A    Yes.

 2  Q    Okay.  And then you also said with his height:

 3            "Yeah.  Yeah, now that I seen him today, he

 4            looked a little shorter than that."

 5            Right?

 6  A    Yes.

 7  Q    Okay.  And the last time you testified, I asked you what

 8       facial hair Deonte Howard had on April 10th and you said

 9       when you were at the, the last time you testified on

10       August 19th, is that right?  Do you remember that?

11  A    Yes.

12  Q    Okay.  I asked you:

13            "What kind of facial hair did he have that

14            day?"

15       And you said he has the same facial hair that he had on

16       August 19th as on April 10th, right?

17  A    Yes.

18  Q    But you admitted and you agreed that he did not have a

19       goatee?

20  A    Yes.

21  Q    Now, after the shooting, an ambulance came.  That's what

22       you testified to, right?

23  A    Yes.

24  Q    Okay.  And you told the ambulance driver that you were

25       standing with your friend when a vehicle pulled up and
```

-172-

1      started shooting and you ran into the store?

2  A   Yes.

3  Q   Excuse me just for a second.  Today you testified that

4      you saw Deonte Howard walk away from the store, correct?

5      That's what your testimony was, right?  There was a

6      black Charger out there and--

7  A   (Interposing)  Oh, before the shooting?  Yeah.

8  Q   Yeah.  You said that he walked up, right?  But you, when

9      you made your statement to the police, you said that you

10     saw Deonte Howard get in a black Charger, didn't you?

11 A   Yes.

12 Q   And you testified that Tyrone said the glasses aren't

13     worth it and he was begging for his life, right?

14 A   Yes.

15 Q   You don't, you don't say that in your statement to the

16     police, do you?

17 A   No.

18 Q   And that's the first time you've testified to that,

19     isn't it?  You don't testify that he was begging for his

20     life?

21 A   No.

22 Q   And when you went to the hospital, you tested positive

23     for benzopanzines and opiates?

24 A   I don't even know what that is.  I ain't never heard of

25     that.

1  Q    In 2006, were you ever adjudicated on a felony involving

2       truth, dishonesty or falsehood?

3  A    No.

4            MS. ROCK:  Your Honor, I don't have any

5       further questions for Mr. Allen.

6            THE COURT:  Anything further, sir?

7            MR. PRASAD:  Yes, your Honor.  Thank you.

8            REDIRECT EXAMINATION

9  BY MR. PRASAD:

10 Q    Mr. Allen, do you happen to know whether or not the

11      morphine they gave you is an opiate?

12 A    I'm sorry?  What was that?

13 Q    Do you happen to know whether or not the morphine the

14      hospital gave you is an opiate?

15 A    I don't know what that is.  Never heard of it.

16 Q    Okay.  Let's talk about this live line-up in May.  Did

17      you pick out the defendant, Mr. Howard just because he

18      was five, because of a height description?

19 A    No.

20 Q    Did you pick him out just because of an age description?

21 A    No.

22 Q    Okay.  Weight description?

23 A    No.

24 Q    Why did you pick out Mr. Howard?

25 A    Because that's who I saw.

1  Q     Now, you say you were there for fifteen minutes.  Were
2        you fifteen minutes inside of the viewing area where you
3        looked at him?
4  A     Yeah.
5  Q     Well, why didn't you tell anyone for fifteen minutes who
6        it was?
7  A     I had to make sure.
8  Q     What do you mean you had to make sure?
9  A     I had to make sure I was seeing the right guy.
10 Q     And what makes you sure?
11 A     Because it's like I can't forget a face.
12 Q     You can't forget the face?  Why can't you forget his
13       face?
14             MS. ROCK:  Well, your Honor, objection.
15       Relevancy.
16             THE COURT:  I'll allow it.  Thank you.
17 Q     (By Mr. Prasad, continuing):  Why can't you forget his
18       face?
19 A     Because I'll never forget the face of somebody who
20       killed my boy and shot me.
21 Q     Sir, in these previous hearings that Ms. Rock was asking
22       you about, about the six, or the photo array, the six
23       photographs you saw, I think she marked it as Defense
24       Exhibit A?
25 A     Yes.

-175-

1  Q    Did you explain in the previous hearings as well that

2       you had, that you were tired?

3  A    Yes.

4  Q    Did you also explain that you were also under

5       medication?

6  A    Yes.

7  Q    Is that true?  I mean, as you told the jury today, is

8       that true that you were both tired and under medication

9       at that point?

10 A    Yes.

11 Q    Were you under medication or tired on the day you did

12      the live line-up in May?

13 A    No.

14 Q    Ms. Rock was asking you about the question in a

15      preliminary examination transcript at 36th District

16      Court about the initial gunshots and how, when you were

17      asked about how many gunshots did you see or hear and

18      you said four or five?

19 A    Yes.

20 Q    Is that the same four or five shots, the total shots you

21      were describing to the jury, the one to two, plus the

22      three after?

23 A    Yes.

24 Q    Do you know what color T-shirt, do you know what color

25      T-shirt Mr. Howard was wearing underneath that black

-176-

```
 1      coat?
 2  A   I really don't remember, but I think--
 3              MS. ROCK:  (Interposing)  Your Honor, I'm
 4      going to object as to I think.
 5  Q   (By Mr. Prasad, continuing):  Yeah.  I mean, if you
 6      don't remember, that's fine.
 7  A   Yeah.  No.  I don't remember.
 8  Q   Okay.  That's fine.  And then Ms. Howard -- Excuse me.
 9      Ms. Howard.  Ms. Rock was asking you about some of your
10      previous testimony and you referenced Tay and Tyrone.
11      Who's Tay?
12  A   The defendant.
13  Q   The defendant?  Is that nickname that he had?
14  A   Yes.  I assume.
15  Q   Okay.  And then Ms. Rock was asking you questions about
16      the testimony about when he was pulling the gun out of
17      his pocket.  And you indicated that you assumed there
18      was a gun and you thought you knew it was going to be a
19      gun?
20  A   Yes.
21  Q   Why didn't you run at that very moment?
22  A   I don't know.  Because -- I really don't know.  Because
23      Tyrone ain't run.
24  Q   Were you worried about what would happen to Tyrone?
25  A   Yes.
```

1  Q    Well, what made you run after the first two gunshots?

2  A    I thought he'd run, too.  He did.

3  Q    You thought that Tyrone would run, too.  Before Tyrone

4       starts punching the defendant, Mr. Howard, did Tyrone

5       ever say anything about using a gun or shooting this

6       bitch up or anything like that?

7  A    No.

8  Q    Any time at all that day, did you ever hear Tyrone say

9       that?

10 A    No.

11                  MR. PRASAD:  Thank you, your Honor.  Nothing

12      else.

13                  THE COURT:  Anything further?

14                  MS. ROCK:  Yes.

15                  RECROSS-EXAMINATION

16 BY MS. ROCK:

17 Q    You had said that -- You indicted in previous testimony

18      that they helped you pick out the photo, the person in

19      the photo line-up, correct?

20                  MR. PRASAD:  Objection, your Honor.  Beyond

21      the scope.

22                  MS. ROCK:  I thought he had started talking

23      about the photo line-up.

24                  THE COURT:  Okay.

25 Q    (By Ms. Rock, continuing):  Sir?

```
 1  A    No.

 2  Q    Okay.  I'm going to direct your attention to page forty-

 3       nine, line seven through seventeen and ask you to read

 4       that to yourself.  Right?  Are you done?

 5  A    Yes.

 6  Q    Okay.  So, you were asked, question:

 7                  "The photo here that you saw at the

 8                  hospital, did they help you pick out this

 9                  person in this photo line-up?"

10       Your answer was:

11                  "Yes."

12       Question:   "They did?"

13       Answer:     "Yes."

14       Question:   "What did they say?"

15       Answer:     "They like, they kept wanting me to look

16                  towards that photo."

17       Question:   "How did they do that?"

18       Answer:     "They kept saying, you sure it ain't him,

19                  like stuff like that."

20                  You were asked those questions and those

21       were your answers?

22  A    Yes.

23                  MS. ROCK:  I don't have any further

24       questions.

25                  RE-REDIRECT EXAMINATION
```

-179-

 1  BY MR. PRASAD:

 2  Q    Just to clarify that.  We're talking about the photo

 3       array that you were looking at when you were at the

 4       hospital?

 5  A    Yes.

 6  Q    Okay.  Were you told who to pick out when you went to

 7       the live line-up?

 8  A    No.

 9            THE COURT:  Now, we've gone way past the

10       redirect and recross and direct and redirect.

11            MR. PRASAD:  Thank you.  Nothing else.

12            THE COURT:  Thank you, sir.  You can step

13       down.

14            (At 2:34 p.m. witness excused.)

15            THE COURT:  You all want a break?  Okay.

16       How much of a break?  I know.  A Kit Kat bar.  I hear

17       you.  Give me a break.  Give me a break.  Young man you

18       can step down.  You want about 'til a quarter to and

19       then finish the last forty-five minutes and see where we

20       go?  Okay. Take about an eight-minute, nine-minute

21       break.

22            (At 2:34 p.m. jury leaves the courtroom.)

23            THE COURT:  How do you really think this

24       objection thing goes?  Do you think that one party makes

25       an objection and then what happens?  Hey, Mr. Prasad?

                              -180-

```
 1      Did he roll on me?

 2                  MS. ROCK:  I'm sorry, your Honor.  Were you

 3      directing that at me?

 4                  THE COURT:  Both of you.

 5                  MS. ROCK:  Oh.  Okay.  Mr. Prasad is

 6      outside.  But for me--

 7                  THE COURT:  (Interposing)  He was.

 8                  MS. ROCK:  Okay.

 9                  THE COURT:  He's on his way in.

10                  MS. ROCK:  Do you want me to wait until he

11      gets back?

12                  THE COURT:  Yeah.  I think it'd be

13      interesting to hear your take.

14                  MR. PRASAD:  Yes, sir?

15                  THE COURT:  How do you think, according to

16      your understanding of the Rules of Evidence and how

17      people operate, how do you think the objection thing

18      goes?  Do you think that a lawyer makes an objection and

19      then the other lawyer responds and then they talk back

20      and forth?  And when they finally decide what they're

21      going to say, then the Court chimes in?  Or do you

22      think--

23                  MR. PRASAD:  (Interposing)  No, sir.  I

24      actually prefer your method.  Unfortunately, I've been

25      in other courtrooms where Judges expect it.  But no.  I
```

1    absolutely prefer your method of--

2                THE COURT:  (Interposing)  Yeah.  But what

3    do you think is the practice?  Do you think the practice

4    is to wait until the lawyers decide that they want to

5    quit arguing amongst themselves?

6                MR. PRASAD:  Unfortunately, some Judges do--

7                THE COURT:  (Interposing)  Yeah.  But is, is

8    -- Not what is -- So, who do you think the objection is

9    made to?

10               MR. PRASAD:  No.

11               THE COURT:  To me, right?

12               MR. PRASAD:  Absolutely.

13               MS. ROCK:  Yes, your Honor.

14               THE COURT:  Okay.  So, I don't understand

15   why you all want to decide to chime in and--

16               MR. PRASAD:  (Interposing)  Your Honor, I

17   apologize for that.

18               THE COURT:  Usually, if I don't understand

19   it, I'll ask you to explain it.

20               MS. ROCK:  You're right.

21               THE COURT:  You know, the objection is to

22   me.  So, usually, that means that the other side should

23   pause and wait until it hears a response from me.

24               MS. ROCK:  Correct.

25               THE COURT:  It's not like a tipoff to the

1      other side to start bickering.

2                  MS. ROCK:  Right.

3                  THE COURT:  So, if you'll just kindly give

4      me the option of responding to the objection, then I

5      could feel a little more love for you.

6                  MR. PRASAD:  Absolutely.

7                  MS. ROCK:  Thank you, your Honor.

8                  MR. PRASAD:  Yes, sir.

9                  THE COURT:  Okay.

10                 (At 2:37 p.m. off the record.)

11                 (At 2:46 p.m. back on the record.)

12                 (At 2:46 p.m. jury enters the courtroom.)

13                 THE COURT:  So, you all looked out the

14     window, huh?  The weather people come and go, too.

15     Jerry Hodak had his last day recently after two hundred

16     years of being a forecaster.  Have a witness?

17                 MR. PRASAD:  Yes, sir.  Frederick McFadden,

18     your Honor.  Sergeant, you want to get Mr. McFadden?

19     Thank you.

20                 THE COURT:  Please step in and step up.

21     Would you make sure he spelled your name, correctly,

22     please?

23                 (At 2:47 witness FREDERICK McFADDEN

24                 was sworn.)

25                 THE COURT:  Okay.  Do you promise to tell

-183-

1       the truth today, young man?

2                       THE WITNESS:  Yes, sir.

3                       THE COURT:  Please have a seat in the

4       witness chair.  If you'll take the arm, the silver arm

5       and pull it towards you, of the microphone.  It's

6       supposed to squeak.

7                       DIRECT EXAMINATION

8  BY MR. PRASAD:

9  Q    Sir, if you would, please introduce yourself to the

10      jury.

11 A    My name is Frederick McFadden.

12 Q    Mr. McFadden, are you familiar with the area of tireman

13      in the city of Detroit?

14 A    Yes.  I am.

15 Q    Is there a specific reason why?

16 A    My parents used to live there.

17 Q    Okay.  Did your parents used to have a house there?

18 A    Yes.

19 Q    Is that house close to a store that also is a restaurant

20      as well located at 16228 Tireman?

21 A    Yes.  There is.

22 Q    And how far is that, your parents house, from that, or

23      was your parents house from that location?

24 A    Approximately, anywhere between fifty to a hundred feet.

25 Q    Okay.  How many houses down?

1  A      Two.

2  Q      So, there are two houses in between?

3  A      Yes.

4  Q      And are you on the same side of the street or the

5         opposite side of the street?

6  A      Same side.

7  Q      And I'm assuming there's a driveway, sir?

8  A      Pardon me?

9  Q      I'm assuming there's a driveway of the house?

10  A      At my house?

11  Q      Yes.

12  A      No.

13  Q      There's not a driveway?

14  A      No.

15  Q      Where would you have vehicles at your house then?

16  A      Right on the side of the house and in front of the

17         house.

18  Q      Okay.  I want to draw your attention to April 10th of

19         2010.  Are you familiar with that day?

20  A      Yes.  That's my mother's birthday.

21  Q      That was my very next question.  Does that date have any

22         special significance for you?  Back on April 10th of

23         2010, were you visiting your mother at her house?

24  A      Yes.  I was.

25  Q      And were you doing anything in particular for her

1    birthday?

2  A   Yes.  I was.

3  Q   What were you doing?

4  A   I was doing the motor on her vehicle.

5  Q   And where were you working on her vehicle at, sir?

6  A   On the side of the house.

7  Q   Okay.  Now, is the side of the house on Tireman itself

8      or is it on a cross-street?

9  A   It's on a cross-street.

10 Q   Which cross-street is that?

11 A   St. Mary's.

12 Q   Okay.  So, were you working, was the car that you were

13     working on actually on St. Mary's at that point?

14 A   Yes.  It was.

15 Q   All right.  And was it parked on the curb onto St.

16     Mary's or the grass onto St. Mary's?

17 A   Yes.

18 Q   All right.  How far off the corner of St. Mary's and

19     Tireman were you at that point, sir?

20 A   I was six feet from Tireman.

21 Q   Okay.  You're saying six feet from the corner?

22 A   Yeah.  From the corner of Tireman and St. Mary's.

23 Q   That would have been the back or the front of the car?

24 A   That would have been the back of the car.

25 Q   Okay.  Were you working on the back or the front of the

```
 1      car?
 2  A   I was working on the front and the back.
 3  Q   Okay.  So, both areas?
 4  A   Yes.
 5  Q   All right.  Very good.  When did you start working out
 6      there, sir, if you remember?
 7  A   Yeah.  I started at eight o'clock in the morning.
 8  Q   Okay.  And how long did you work that day on that
 9      vehicle?
10  A   'Til 11:30 at night.
11  Q   Wow.  So, for all the day?
12  A   All day.
13  Q   All right.  I want to draw your attention to the
14      afternoon hours, sir, of that time.  Was it daylight
15      still out then?
16  A   Yeah.
17  Q   Okay.  I mean, we're talking about April.  There's no
18      early sunsetting--
19  A   (Interposing)  Right.
20  Q   At that point, correct?
21  A   Right.
22  Q   Okay.  Did something happen that drew your attention to
23      that, to the restaurant/convenience store located at
24      16228 Tireman?
25  A   Yes.
```

1  Q    What was the first thing that happened that drew your

2       attention that way?

3  A    Well, I heard people hollering.

4  Q    Okay.  And you said you were about fifty to a hundred

5       feet away at this point?

6  A    Yes.

7  Q    Is that right?

8  A    Yes.

9  Q    Okay.  Could you tell how many people were hollering at

10      this point?

11 A    I seen two young men arguing.

12 Q    Okay.  And when you saw these two young men arguing,

13      were they, was it a verbal or a physical thing at that

14      point?

15 A    It was verbal and physical.

16 Q    Okay.  Tell us about that.  What do you mean by that?

17 A    Well, I seen the one gentleman, he was grabbing or

18      pushing or something.  And then the next, the next one

19      pushed him back.  And then he came back towards him.

20      And then they started saying give me -- They said

21      something -- I heard somebody say give me.  That's all I

22      heard.  I mean, he was hollering.

23 Q    Okay.  All right.  And I guess it will help us -- From

24      you vantage point, are you looking down Tireman at this

25      point?

-188-

1  A    Right.  Yes, sir.

2  Q    Is that correct?

3  A    Yes.

4  Q    Okay.  And if you're looking down Tireman, would the

5       business be on your left or on you right?

6  A    It would be right on the same side I'm on, the right

7       side.

8  Q    Okay.  So, on the right side.  So, as you're looking

9       down Tireman, on the right side is the business itself,

10      correct?

11  A   Yes, sir.

12  Q   And the left side would be what?

13  A   Two houses and a vacant field.

14  Q   Where's Tireman?  Where's the street of Tireman?

15  A   Right to my left.

16  Q   On your left.  So--

17  A   (Interposing)  I was right on the corner of St. Mary's

18      and Tireman when I heard it.

19  Q   I'm trying to, so that we're all in the same frame of

20      reference as you, I'm trying to put everyone in your

21      shoes at this point, if you follow.

22            THE COURT:  Are you making an air map?

23            MR. PRASAD:  Yes, sir.

24            THE COURT:  Oh.  An air map.  I got you.

25  Q   (By Mr. Prasad, continuing):  So, you're looking on --

1     Now, you described two gentleman.  Where were the two

2     gentlemen positioned in regards to the business?

3  A   In front of the party store.

4  Q   Okay.  And was either one of them closer to the door of

5     the party store?

6  A   Yes.

7  Q   Which one, sir?

8  A   The one that pushed the other person.

9  Q   Okay.  What's the next thing you saw, sir?

10  A   The next thing I saw was somebody taking a pair of

11     something out of somebody's hand or something like that.

12     I couldn't tell you at first what it was.  And when I

13     heard the other guy say give me back my glasses--

14  Q   (Interposing)  Who said that?

15  A   The gentleman that was leaving to go back into the

16     store, I guess.  I guess he was going back into the

17     store.

18  Q   I don't want you to guess.  Is it the gentleman that you

19     described that was pushing the other person?

20  A   No.

21  Q   Okay.  Who is it?

22  A   It would be that gentleman right there.

23  Q   In court today?

24  A   Yes.

25  Q   If you'd please identify him for the record?  Point to

-190-

 1      him and let us know what he's wearing.

 2  A   He's wearing a gray shirt with white stripes, same as

 3      mine.

 4              MR. PRASAD:  May the record reflect the

 5      witness identified the defendant.

 6  Q   (By Mr. Prasad, continuing):  What was the defendant

 7      doing?

 8  A   He walked up into the, walked up into the storeway and

 9      them came back out and he left.

10  Q   And then what happened?

11  A   Next thing I know, I didn't hear anything.  So, I

12      proceeded working on my vehicle some more.

13  Q   Okay.

14  A   And next thing I know I hear pop, pop, pop.

15  Q   All right.  I want to ask you about those next thing I

16      knows.  How much time transpired from after you saw the

17      defendant leave to when you heard the pop, pop, pops?

18  A   I would say approximately five to seven minutes.

19  Q   Okay.  After five to seven minutes, are you still

20      working on the vehicle in those five to seven minutes?

21  A   Yes.

22  Q   Okay.  You hear pop, pop, pop.  What do you do?

23  A   First thing I did, I thought somebody was lighting off

24      firecrackers.

25  Q   Okay.

1  A    And then when I heard some more popping, I knew exactly

2       what it was.

3  Q    What did it sound like?

4  A    Gunfire.

5  Q    Okay.  What's the next thing that you do?

6  A    I ran to my front door because I knew exactly what it

7       was.  And I didn't make it quite that way, so I started

8       to proceed across the street.

9  Q    Why did you go across the street, sir?

10 A    Because there was an elderly lady in a vehicle that was

11       getting out of her vehicle.

12 Q    Are you talking about across the street of Tireman or

13       across the street of St. Mary's?

14 A    Across the street of St. Mary's.

15 Q    Okay.  So, what happens next?

16 A    I escorted the lady into one of the houses.

17 Q    Okay.

18 A    And by the time I got there, all I heard was pop, pop,

19       pop, pop, pop, pop.

20 Q    Okay.  So, this is the third series of gunshots you're

21       talking about--

22 A    (Interposing)  Yes.

23 Q    Is that correct?

24 A    Yes.

25 Q    Okay.  I want to back up a second.  The first series of

-192-

1    gunshots that you heard, how many gunshots did you hear?

2  A  Two.

3  Q  Second series of gunshots that you heard, how many

4    gunshots did you hear?

5  A  I would say between five and seven.

6  Q  How much time transpired between the first and second

7    series of gunshots?

8  A  I would say maybe three, three to five minutes.

9  Q  How much time -- And then you heard a third series of

10   gunshots at this point?

11 A  Yes.  I did.

12 Q  How much time transpired between the second and third

13   series of gunshots?

14 A  About three minutes.

15 Q  Are we talking, are they all coming from the same, the

16   sounds coming from the same area?

17 A  Oh, yes.

18 Q  And we're still focusing on the area in front of Tireman

19   where the struggle was previously?

20 A  Yes.

21 Q  Okay.  After helping, after helping that lady into the

22   house and when you heard the third series of gunshots,

23   what do you do?

24 A  I run over to the fence.  I'm ducked down.

25 Q  What fence are we talking about now?

-193-

1  A    The fence line where the party store is.

2  Q    Okay.  How close to the party store are you?

3  A    Thirty feet.

4  Q    How much?

5  A    Thirty feet.

6  Q    Thirty feet.  Describe for the jury what you see at this

7       point?

8  A    At this point, I see a gentleman holding a handgun and

9       shooting the victim.  And I see the victim bowled over.

10  Q   Who's holding the handgun?  Can you tell?

11  A   The defendant.

12  Q   Okay.  Is holding the handgun?

13  A   Yes.

14  Q   Who's the victim?  Is it the same gentleman you saw

15      earlier fighting with the defendant?

16  A   Yes.

17  Q   Where are they?

18  A   The defendant was close to the store and the victim was

19      outside on the street part of the store holding himself.

20  Q   Describe for the jury exactly what you're seeing.

21  A   Well, the victim was holding himself and he was bending

22      over--

23  Q   (Interposing)  And, for the record, you have your hands

24      on your stomach area?

25  A   Yes.

1  Q     Is that correct?

2  A     Yes.

3  Q     Okay.  I'm sorry.  Your hat's there, so I couldn't--

4  A     (Interposing)  Oh.  I'm sorry.

5  Q     That's okay.  I just wanted to make sure I had it

6        correctly.  The victim had his hands on his stomach

7        area?

8  A     His stomach and right up in here.

9  Q     The lower chest area?

10 A     Yeah.  Lower chest.

11 Q     Okay.  Please continue.  What's the next thing you saw?

12 A     Then all of a sudden, I see this vehicle pull up.

13 Q     What kind of vehicle was it, sir?

14 A     It was a dark-colored Dodge Durango, I think it was.

15 Q     And for the--

16 A     (Interposing)  Or a Trailblazer.

17 Q     For those of us that are unfamiliar, what style of

18       vehicle is that?

19 A     It's an SUV.

20 Q     Okay.  So, what happens with this SUV?

21 A     SUV pulled up and the defendant, this other person

22       opened up a door and the person who did the shooting

23       jumped in the back seat.

24 Q     Is that the defendant you identified earlier?

25 A     That is the defendant.

-195-

1  Q    Okay.  And then what happens?

2  A    And something was said.  And he got back out.

3  Q    We need to be clear.  Who says something at this point?

4  A    I don't know.  I cannot tell you who said something.

5  Q    Okay.  Then we'll skip it.  If you don't know who said

6       it, we'll skip it.  After something is said, what's the

7       next thing that happened?

8  A    The person gets back out of the Durango.

9  Q    Who gets out of the Durango?

10  A    The defendant.

11  Q    Okay.

12  A    Gets back out of the Durango, walks back up.  By this

13       time, the victim is laying on the ground.

14  Q    Where is he laying on the ground?

15  A    In front of the store.

16  Q    In front of the store.  What part in front of the store

17       is he -- On the grass or the--

18  A    (Interposing)  No.  He's in the, he's in the street.

19  Q    He's in the street.

20  A    He's in the street.

21  Q    And what happens?

22  A    And he finally, you know, he fell.  He fell into the

23       street.  And come back out, the defendant came back out

24       of the Durango and shot him three more times.

25  Q    Where does the defendant go?

```
 1  A    He jumps back into the, he dove--

 2  Q    (Interposing)  I'm sorry.  I poorly phrased the

 3       question.  When the defendant shoots the victim three

 4       more times, where does the defendant go to do that?

 5       Like how close does he get to the victim?

 6  A    Oh, he walked right up to the victim.

 7  Q    Does he say anything to the victim at this point?

 8  A    Not that I can remember.

 9  Q    Do you remember at any point in this last series of

10       gunshots you describe the defendant saying anything at

11       all to the victim?

12  A    Yes.  I remember something -- I was close enough,

13       something was said, something about this--

14              MS. ROCK:  (Interposing)  Well, your Honor,

15       objection--

16              THE WITNESS:  (Interposing)  I don't want to

17       use the words.

18              MS. ROCK:  Objection to speculation.

19              THE COURT:  Well, let me hear what he got to

20       say.

21              THE WITNESS:  This MF, N isn't dead yet.

22  Q    (By Mr. Prasad, continuing):  Who said that?

23  A    The defendant.

24  Q    When did he say that?

25  A    While he was over the body.
```

-197-

```
 1   Q      At that last series of shots?

 2   A      Yes.

 3   Q      After the defendant had gotten out of the Durango again?

 4   A      Yes.

 5   Q      How much time -- You described when you were up against

 6          the fence of seeing the defendant shooting the victim

 7          when the victim was holding his body, correct?

 8   A      Yes.

 9   Q      How much time transpires from those gunshots to the

10          point where the defendant is standing over the victim

11          and saying those things and firing those last shots?

12   A      A couple minutes.

13   Q      And those couple minutes involve him going in and out of

14          the vehicle?

15   A      Yes.

16   Q      What happens after he shoots the victim the last time?

17   A      He runs back to the vehicle, jumps in, jumps in the back

18          seat--

19   Q      (Interposing)  You did something with your hands there

20          where you--

21   A      (Interposing)  Well, he dove.

22   Q      Were you showing--

23   A      (Interposing)  Yeah.  Yes.  I was trying to show you.

24          He dove into the back seat.

25   Q      Okay.
```

1  A    And the Durango took off.

2  Q    In what manner did it take off?

3  A    At a very high speed.  And it took off on a side street.

4  Q    If you could think back, sir, as best as you could, as

5       best as you know, sir, how many gunshots total did you

6       hear or see that day?

7  A    I would approximately say between ten to thirteen shots.

8  Q    And from the beginning of the gunshots when you first

9       heard them to the very last one that you saw, how much

10      time was that total time period?

11 A    I would say probably around ten minutes, approximately.

12 Q    Did you ever see anyone else with the weapon out there

13      that day?

14 A    No.

15 Q    And those last gunshots you were telling us about, sir,

16      when the defendant was standing over the victim, was the

17      victim -- What was the victim doing at that point?

18 A    He was laying on the ground.

19 Q    Was he moving or doing--

20 A    (Interposing)  Yes.  He was moving.

21 Q    At that point, he was still moving?

22 A    Yes.  He was.

23 Q    I'm sorry.  Thank you.  Was he still moving after the

24      gunshots, after the last gunshots?

25 A    After the last three, no.

```
 1                        MR. PRASAD:  Okay.  That's what I was trying

 2         to ask.  Thank you.  Nothing else, your Honor.  Pass the

 3         witness.

 4                        CROSS-EXAMINATION

 5    BY MS. ROCK:

 6    Q    Mr. McFadden, you were shown a mugshot book, is that

 7         right?

 8    A    Not a mugshot book.  No.

 9    Q    Well, you were shown pages with photos, right?

10    A    I was shown three pictures.

11    Q    Just three pictures?

12    A    Three pages.

13    Q    Three pages of pictures, right?

14    A    Yes, ma'am.

15    Q    By Detective Myron Love, right?

16    A    Yes, ma'am.

17    Q    Okay.  And there were three pictures per line, right?

18    A    Yes, ma'am.

19    Q    Okay.  And you picked out the shooter and two drivers,

20         right?

21    A    Yes, ma'am.

22    Q    And when you talked to my investigator, you described

23         the shooter as light-skinned 5'6", 5'7", right?

24    A    Approximately that.  Yes.

25    Q    Okay.  And you're about 5'9"?
```

1  A    I'm 5'10".

2  Q    Okay.  You're 5'10".  And in your written statement to

3        the police, you described the shooter as age twenty to

4        twenty-four, 5'11" to 6'0", right?

5  A    Not the shooter, I didn't.  The driver.

6  Q    Well, I'm going to show you two pages.  Let me know if

7        your signature is on the bottom of these two pages.

8  A    That's my signature.  Yes.

9  Q    Okay.  Sir, I'm going to direct your attention to this

10       question right here that starts with "Can you describe

11       the shooter?"  Just read it to yourself, please.  All

12       right.

13 A    Okay.

14 Q    So, sir, you gave a statement to the police, right?

15 A    Yes, ma'am.

16 Q    You signed your name at the bottom to establish this was

17       your statement, correct?

18 A    Yes, ma'am.

19 Q    Okay.  And you were asked:

20               "Can you describe the shooter?"

21       And your answer was:

22               "Black male, 20 to 24, 5'11" to 6'0", 140

23               pounds, medium complexion with tattoos on

24               his neck and two on his right arm wearing a

25               white T-shirt and red gym shoes."

-201-

```
1                    Correct?

2  A   Yes, ma'am.  But you also left something else, too, out

3      of there.  Beige, he was wearing beige pants.

4  Q   Okay.  So, he had beige pants in addition to this

5      description, right?

6  A   Yes, ma'am.

7  Q   Okay.  And when you were, when you were outside, you saw

8      about eight people up there, right?

9  A   Approximately six to eight.

10 Q   All right.  And you saw two people beating up on one

11     person?

12 A   I wouldn't say -- Pushing.  I don't know if they were

13     fighting.  I did see physical, physicalness.  Yes.  I

14     did.

15 Q   Well, you remember coming here to Frank Murphy Hall of

16     Justice talking with my investigator, right?

17 A   Yes.  I do.

18 Q   Okay.  And you were asked some questions?

19 A   Yes, ma'am.

20 Q   Is this your signature on this page here?

21 A   Yes, ma'am.

22 Q   Okay.  I'm going to direct your attention to the second

23     question, ask you to read it to yourself.

24         MR. PRASAD:  Ms. Rock, can I look at that?

25     Did you give me that one?
```

-202-

```
 1                    MS. ROCK:  Yes.  I did.

 2                    MR. PRASAD:  Can I see that one, please?

 3                    MS. ROCK:  Sure.

 4                    MR. PRASAD:  Thank you.

 5                    MS. ROCK:  Okay.  Thank you.

 6   Q    (By Ms. Rock, continuing):  So, you were asked:

 7                    "Did you see a group of people hitting" --

 8                    "Kicking, punching or hitting one person?"

 9        And your answer was:

10                    "Two people beating up on one person before

11                    shooting."

12   A    I should have worded that different.  Yes.  You're

13        right.

14   Q    Okay.  But that's what, that's what's there, right?

15   A    Right.

16   Q    Okay.  And you hear, at some point, Tyrone Simpson,

17        yelling give me my motherfucking glasses back, right?

18   A    I heard something about that.  Yes.

19   Q    And you said that Tyrone hits him and takes back his

20        glasses?

21   A    That's correct.

22   Q    Okay.

23   A    That was before.

24   Q    All right.  And you see the shooter get into a Dodge

25        Durango, correct?
```

1  A    That's correct.

2  Q    Okay.  And he returns in a Dodge Durango at some point,

3       right?  You see, during the day, the shooter leaves in a

4       Dodge Durango and returns in a Dodge Durango, right?

5  A    Yes, ma'am.

6  Q    Okay.  And, according to you, when you first talk to the

7       police, the first shot occurs inside the store?

8  A    I didn't say it was inside the store.  I said it might

9       have been inside the store.  The first shot happened

10      either in front or inside the store.

11 Q    Well, I'm going to show you your statement that you made

12      that you signed at the bottom to Officer Wilkerson,

13      second page.  Start reading this question right here and

14      then your response, to yourself, please.

15 A    Okay.

16 Q    Okay.  Let me get the statement back from you, please.

17      So, you said what happened -- You were asked:

18                  "What happened after the shooter entered the

19                  store at 16228 Tireman?"

20      And you said:

21                  "I heard one shot, then the shooter ran out

22                  of the store with the gun in his hand."

23                  Correct?  That was what you said in your

24      statement?

25 A    That's what I said in my statement.

-204-

1  Q    And then you said that, you also said that when Tyrone

2       comes out of the store you heard three shots and you saw

3       blood on the shooter.

4  A    When they were tussling.

5  Q    Well, you said you saw blood on the shooter, right?

6  A    That's correct.  On his pants.  Yes.

7  Q    Okay.  And that, at some point, the shooter hobbles off.

8       That's what you said.  The shooter hobbles off.

9  A    That is correct.

10 Q    Okay.  Now, you -- So, your testimony is you see this

11      shooting going on and while this shooting's going on,

12      you go across the street to help an elderly woman into

13      her home?

14 A    I was more concerned about her getting hit with a

15      bullet.

16 Q    Okay.  But you go across the street and help an elderly

17      woman into the, into her home?

18 A    That's correct.

19 Q    That's not in your statement, is it?

20 A    No.  That's not in my statement.

21 Q    Okay.  And then you say while the shooting's going on

22      you go over towards the store, right?

23 A    That's correct.

24 Q    You don't have a gun, right?

25 A    No.  I--

1  Q    (Interposing)  You weren't--

2  A    (Interposing)  I don't carry a gun.  No.

3  Q    Okay.  You didn't have a gun that day, right?

4  A    I had access.

5  Q    Did you have a gun, Mr. McFadden?

6  A    No.  Not on me.

7  Q    Okay.  Thanks for answering my question.  And in your

8       statement when you say that he says the MF, N isn't dead

9       yet, you don't put that in your statement, right?

10 A    I wasn't asked that question.

11 Q    But you don't add that, right?  You didn't add that?

12 A    No.  I didn't add nothing that I didn't, wasn't asked.

13 Q    And -- Well...  And according to you, the person that

14      was killed that day was wearing a red ballcap?

15 A    It was a red baseball cap with a D on the front, for

16      Detroit.

17 Q    And you said that the shooter had a patch of fur on his

18      chin?

19 A    Like a little goatee.  Yeah.

20 Q    Okay.  And the Durango that you saw the shooter drive

21      off on, off in was gold in color?

22 A    No.  It was black or blue.

23 Q    Well, okay.  I'm going to show you your statement here

24      and ask you to read where it says:

25                   "Can you describe the vehicle that the

-206-

```
 1                    shooter was in?"  And ask you if you can

 2          read that to yourself.  Okay.  So, according to your

 3          statement, it says:

 4                    "Can you describe the vehicle the shooter

 5                    was in?"

 6          And you said:

 7                    "A 1996 Durango, gold in color, license

 8                    plate BDD 94 or 975."   Right?

 9   A      That was one of the license plate numbers I got.  Yes.

10   Q      Yeah.  And you said it was gold?

11   A      That might have been another vehicle, but I didn't say

12          Dodge Durango.

13   Q      Well, you said a 1996 Durango, right?

14   A      That's correct.

15   Q      Okay.  That's in your statement?

16   A      Yes, ma'am.  But I never told them what color the

17          Durango was.

18   Q      And you -- Well, it says right here in your statement

19          that you signed, right?

20   A      Right.  There was another--

21   Q      (Interposing)  You signed--

22   A      (Interposing)  There was another vehicle there.

23   Q      He let you read the statement over, right?

24   A      Who?

25   Q      The officer.  You wouldn't have signed something that
```

```
 1       you didn't read, right?  Mr. McFadden?

 2  A    True.  True.  True.

 3  Q    Okay.  And this says you described the Durango as gold,

 4       right?

 5  A    That's possible.  Yes.

 6  Q    Well, possible.  It's right there in writing.

 7  A    I think there's a mix-up on that.  Because I didn't

 8       specify the Durango being gold.  I said it was either

 9       dark blue or black.

10  Q    The statement that you signed says gold, correct?

11  A    I understand that.

12  Q    Is that yes?

13  A    Yes.

14  Q    Thank you.  Now you're saying it wasn't a Dodge Durango,

15       but you said -- They asked you.  They said, can you tell

16       me what happened?  And I'm going to let you read that

17       paragraph of the document that you signed, first

18       paragraph, first question, first paragraph.  Okay.  Just

19       let me know when you're done.  I'm sorry.  Right?  So,

20       you were asked:

21                 "Can you tell me what happened concerning

22                 the shooting that took place in front of

23                 16228 Tireman?"

24       And you said:

25                 "I heard Tyrone Howard [sic] say give me my
```

```
 1                    motherfucking glasses back and then I saw
 2                    him hit the guy and take his glasses back.
 3                    The other guy got into his Dodge Durango
 4                    that was parked in front of the store and
 5                    said, I'll be back, bitch.  And about 3 to 5
 6                    minutes later he came back."  Right?  That
 7        was your statement?
 8   A    That was my statement.
 9              MS. ROCK:  Excuse me just for a second.
10        Your Honor, I don't have any further questions for Mr.
11        McFadden right now.
12              THE COURT:  Anything more, sir?
13              MR. PRASAD:  Just briefly, Judge.
14              REDIRECT EXAMINATION
15   BY MR. PRASAD:
16   Q    Just to clarify about the initial shots that Ms. Rock
17        was asking you about.  Did you hear or did you see the
18        initial shots?
19   A    Both.
20   Q    The first, the first set of pop, pop, pop that you
21        thought was firecrackers?
22   A    Yeah.  I heard -- No.  I heard, the first shots, the
23        first two shots, I heard.
24   Q    Okay.  And that's what I was trying to clarify.  Thank
25        you.  And, sir, Ms. Rock was asking you about how you
```

1     went up to the party store as the shots were occurring.

2     Do you have any training in combat situations?

3  A   Yes.  Seventeen years in the United States Army--

4           MS. ROCK:  (Interposing)  Well, your Honor,

5     I'm going to object as to relevancy.

6           THE COURT:  I'll allow the question.  Thank

7     you.

8  Q   (By Mr. Prasad, continuing):  Go ahead, sir.

9  A   Seventeen years in the United States Army.

10  Q   Okay.  And what was your mindset?  What was your reason

11     for going closer?

12  A   To try and -- The situation, I thought, you know, maybe

13     I can help in some way.

14           MR. PRASAD:  Thank you, sir.  Nothing else.

15           THE COURT:  Ms. Rock?

16           MS. ROCK:  Nothing, your Honor.

17           THE COURT:  Thank you, sir.  You can step

18     down.

19           (At 3:22 p.m. witness excused.)

20           MR. PRASAD:  Judge, timewise--

21           THE COURT:  (Interposing)  It is timewise.

22           MR. PRASAD:  Okay.

23           THE COURT:  I didn't know I was opening the

24     floor for suggestions, however.

25           MR. PRASAD:  I'll sit down.

1                    THE COURT:  But I like suggestion.  I wasn't

2      asking for them, but I had said we were going to leave

3      about this time.  Let me just take a look so I can...

4      I'll be the forecaster.  It's snowing out.  Drive safely

5      everybody.  See you back -- Did anybody take advantage

6      of the free parking or was that -- Oh.  Okay.  So, I'll

7      see you at 9:30 again tomorrow.

8                    (At 3:22 p.m. jury leaves the courtroom.)

9                    (At 3:22 p.m. proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-211-

R E P O R T E R ' S   C E R T I F I C A T E

STATE OF MICHIGAN  )
                SS )
COUNTY OF WAYNE    )

       I, SEAN E. ALLEN, CSMR 5265, Certified Court
Reporter acting in and for the Third Judicial circuit,
Wayne County, State of Michigan, do hereby certify that
the foregoing pages 1 through 212, inclusive, were
reduced to typewritten form and comprise a true
rendition of the proceedings taken in the above-entitled
matter on January 11, 2011.

       I FURTHER CERTIFY THAT MY CERTIFICATION
ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN,
SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES
NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED
COPIES NOT MADE UNDER MY CONTROL AND SUPERVISION.

                                _____
                                SEAN E. ALLEN -- CSMR 5265
                                Official Court Reporter.

DATED:  This 30th day of April 2012.