STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN

        v                    Case Number
                              10-5562-01


DEONTE HOWARD

                         Defendant.

_____/

JURY TRIAL

PROCEEDINGS HELD BEFORE THE HONORABLE BRUCE U. MORROW

Judge, Third Circuit Court, Detroit, Michigan, on

January 12, 2011.

APPEARANCES:

RAJ PRASAD P68519
Assistant Prosecuting Attorney
Wayne County Prosecutor's Office
1441 St. Antoine
Detroit, MI 48226
(313) 224-5818



SUSAN ROCK P34497
24500 Ford Rd.
Dearborn Heights, MI 48127
(313) 967-4444




Sean Allen
Official Court Reporter
CSMR 5265

-1-

TABLE OF CONTENTS

WITNESSES:
BOBBY BAILEY
     Direct Examination by Mr. Prasad.................6
     Cross-Examination by Ms. Rock...................23
     Redirect Examination by Mr. Prasad.............33
     Recross-Examination by Ms. Rock................36

SERGEANT ROBERT LALONE
     Direct Examination by Mr. Prasad...............37
     Cross-Examination by Ms. Rock...................65

MACARIO HARRIS
     Direct Examination by Mr. Prasad...............70
     Cross-Examination by Ms. Rock...................80

KIMBERLY THOMPSON
     Direct Examination by Mr. Prasad...............84
     Cross-Examination by Ms. Rock...................90
     Redirect Examination by Mr. Prasad.............97
     Recross-Examination by Ms. Rock................98

OFFICER LeTRELLE McNAIRY
     Direct Examination by Mr. Prasad..............100

OFFICER EUGENE FITZHUGH
     Direct Examination by Mr. Prasad..............110

OFFICER BRANDON PETTIT
     Direct Examination by Mr. Prasad..............114
     Cross-Examination by Ms. Rock..................120
     Redirect Examination by Mr. Prasad............121

OFFICER RODNEY CUSHINGBERRY
     Direct Examination by Mr. Prasad..............124

OFFICER JEFFREY BANKS
     Direct Examination by Mr. Prasad..............128

SERGEANT SAMUEL MACKIE
     Direct Examination by Mr. Prasad..............133
     Cross-Examination by Ms. Rock..................160
     Redirect Examination by Mr. Prasad............174
     Recross-Examination by Ms. Rock...............179

INVESTIGATOR BARBARA SIMON
     Direct Examination by Mr. Prasad..............181
     Cross-Examination by Ms. Rock..................189

```
EXHIBITS:
People's Exhibit Numbers 1-7.........................42
People's Exhibit Numbers 8-10.......................48
People's Exhibit Numbers 11-18......................50
People's Exhibit Numbers 19-46......................54
People's Exhibit Number 47.........................104
People's Exhibit Numbers 48-65.....................108
People's Exhibit Number 69.........................150
People's Exhibit Numbers 66-68.....................159
Defendant's Exhibit B..............................171
People's Exhibit Number 70.........................174
```

1

2

3

4

5

6

```
 1                    Detroit, Michigan.
 2                    Wednesday, January 12, 2011.
 3                    THE COURT:  Okay.  Let's go back on the
 4        record with People versus Howard.
 5                    (At 9:56 a.m. jury enters the courtroom.)
 6                    THE COURT:  Good morning.
 7                    THE JURORS:  Good morning.
 8                    THE COURT:  Dashing through the snow in a
 9        one-horse open sleigh.  We're still gonna -- You know,
10        even though my promise was I thought we would end it
11        early, we're still going to go home a little early.
12        Because wasn't it a lot less stressful?
13                    THE JURORS:  Yes.
14                    THE COURT:  You know, and this thing carries
15        enough stress with it.  I mean, I was thinking this
16        morning, I said, I hope everybody reallizes that it was
17        just I hope we get here by 9:30, that it wasn't any
18        cutoff and you would be seen as being bad or -- Because
19        even leaving early, I didn't get here as early as I
20        thought I was going to get here.
21                    So, but I'm glad.  You know, and if it's
22        snowing tomorrow, please, the most important thing is
23        that you take your time and you're safe and you're with
24        as little stress as possible when you get here.  Because
25        that's the important part.  Nothing is that important
```

1    that we challenge ourselves in terms of our safety, you

2    know, just to be here at 9:30.  So, I'm loving you for

3    that.  Call your next witness.

4              MR. PRASAD:  Thank you.  We're going to call

5    Bobby Bailey.

6              THE COURT:  And should I turn up the heat a

7    little?  Got it.  Okay.  It fluctuates.  It fluctuates.

8    You know, some people say the best thing in the world

9    are those heated blankets in the bedroom.  I've never

10   been one for heated seats.  In the car that I drive,

11   heated seats isn't an option.  But if it was up to my

12   wife, she would have heated seats and turn them on in

13   the summer time.  Seriously.

14             If you deal with menopause and you see a

15   fluctuation, you know -- My mom would put on the sweater

16   and then the Kleenex lining the sweater and then it's

17   too cold and it's too hot.

18             Young man, how are you today?

19             MR. BAILEY:  I'm well.  And you?

20             THE COURT:  I'm well.  Thank you.

21             (At 10:00 a.m. witness BOBBY BAILEY

22             was sworn.)

23             THE COURT:  I need you to promise to tell

24   the truth today.  So, can I get that promise from you?

25             THE WITNESS:  Yes.

-5-

```
 1                    THE COURT:  Thank you.  Let me get out of
 2       the way.
 3                    MR. PRASAD:  Yes, sir.
 4                    THE COURT:  When you are ready.
 5                    MR. PRASAD:  Thank you, Judge.
 6                    DIRECT EXAMINATION
 7  BY MR. PRASAD:
 8  Q    Sir, introduce yourself to the jury, please?
 9  A    My name is Bobby Bailey.
10  Q    Mr. Bailey, how old are you?
11  A    Thirty-nine.
12  Q    Mr. Bailey, are you familiar with a business that's
13       located on Tireman here in the city of Detroit?
14  A    Yes.  I am.
15  Q    How are you familiar with that business, sir?
16  A    I'm the owner.
17  Q    And what's the name of that business?
18  A    Garden Cafe.
19  Q    And where is the Garden Cafe located?
20  A    16228 Tireman.
21  Q    Okay.  How long have you had that business, sir?
22  A    About ten years.
23  Q    Ten years.  And it's been at that location for about ten
24       years?
25  A    Correct.
```

-6-

 1  Q    Just briefly, in general, what kind of business is it?

 2  A    Carry out restaurant.

 3  Q    Do you use it also, I mean, do you also sell food,

 4       convenience store type items there as well?

 5  A    Yes.

 6  Q    Okay.  The area around you, describe that a little bit

 7       to the jury, please.  Around that business, what is it?

 8  A    Homeowners, a lot of houses.

 9  Q    Are you chiefly in a residential area at that point?

10  A    Yes.

11  Q    Okay.  And what cross streets on Tireman are you near,

12       sir?

13  A    St. Mary's and Mettetal.

14  Q    All right.  Which directions are they, please?

15  A    St. Mary's is to, St. Mary's to the East, Mettetal to

16       the West.

17  Q    Okay.  And about how far away are they?

18

19  A    A block.

20  Q    I mean, are you -- I guess the question is, where are

21       you situated on the block?

22  A    In the middle of it.

23  Q    Okay.  So, you're about half way between the two?

24  A    Correct.

25  Q    All right.  How often do you go actually work at the

-7-

1      restaurant, at the store?

2   A   Every day.

3   Q   Every day?  Are you familiar with more of the regular

4       customers that come by?

5   A   Yes.

6   Q   I want to draw your attention to April of this year,

7       sir, specifically the date of April 10th, 2010.  I keep

8       saying this year.  I keep forgetting that we're in 2011.

9       Of last year.  April 10th, 2010, do you remember that

10      day, sir?

11  A   Yes.

12  Q   Did something happen at or in front of your store that

13      brought, you know, police attention and everything else?

14  A   Yes.

15  Q   Okay.  When was the first time that you became involved

16      or you came to the scene of your store on this day?

17  A   I got involved after I got a phone call saying it was--

18              MS. ROCK:  (Interposing)  Your Honor, I'm

19      going to object as to hearsay.

20              THE COURT:  We'll allow the -- It's not

21      offered for the truth of the matter asserted, but it's

22      after he got a call.

23              MR. PRASAD:  Yes, sir.

24  Q   (By Mr. Prasad, continuing):  And who did you get a call

25      from, sir?

-8-

1  A    My brother.

2  Q    All right.  Was your brother at the store at the time?

3  A    No.

4  Q    All right.  You got a call.  And, based on that call,

5       what did you do?

6  A    I got to the store.

7  Q    Okay.  And about how far away from the store were you at

8       this time?

9  A    A couple miles, right down at the Home Depot.

10  Q   So, you go back to the store.  Do you know approximately

11      what time we're talking about now?

12  A   Maybe about five o'clock.

13  Q   In the a.m. or p.m.?

14  A   P.M.

15  Q   Okay.  And is the Sun still out at this point?

16  A   Yes.

17  Q   Okay.  When you get to the store, what kind of vehicle

18      are you in, sir?

19  A   Cherokee.

20  Q   And where do you park your vehicle?

21  A   On the side of the restaurant.

22  Q   When you get there, describe the scene to the jury?

23      What do you see?

24  A   I see a few guys standing outside.

25  Q   And when you say a few guys, about how many do you see,

-9-

1      sir?

2  A   Four or five, I guess.

3  Q   Okay.  Do you recognize any of them as anyone that were

4      customers or people that you recognize coming through

5      the store?

6  A   Yes.

7  Q   Who do you recognize, sir?

8  A   One guy, Ant.

9  Q   Okay.

10 A   He was standing out there with a few of the guys that

11     come to the store.

12 Q   Eventually, just to fast forward, Ant is eventually the

13     guy that died that day--

14 A   (Interposing)  Correct.

15 Q   Correct?  Did you recognize any of the other people that

16     were, of the group of four or five guys?

17 A   Yeah.  All the guys that went to the store.  Yes.

18 Q   All right.  Anyone else as part of this case that you

19     recognize out, on that day?

20 A   No.  Not really.  No.

21 Q   When you got there, what was going on?

22 A   We were discussing about an incident that happened up at

23     the store.  And the one guy was complaining about his

24     glasses was missing.

25 Q   Who was talking about his glasses missing?

```
 1  A    Ant.

 2  Q    Okay.  What's the next thing that happens, sir?

 3  A    Ant asked me to call someone about the glasses.  I told

 4       him I don't know nothing about the glasses, who took the

 5       glasses.  We didn't know.  After that, Tay came up

 6       looking for his phone.

 7  Q    All right.  Let me stop you right there.  You mentioned

 8       a person by the name of Tay.  Is Tay someone who had

 9       been coming to the store regularly?

10  A    Yeah.  He come up there.

11  Q    Okay.  Did you recognize him as Tay?

12  A    Yes.

13  Q    Okay.  Do you see Tay in the courtroom today?

14  A    Yes.

15  Q    Can you please point to him and let us know what he's

16       wearing?

17  A    Black.

18                    MR. PRASAD:  Thank you.  Your Honor, may the

19       record reflect the witness has identified the defendant?

20                    THE COURT:  It will.

21  Q    (By Mr. Prasad, continuing):  Now, you say Tay got

22       there.  How did Tay come to the store at this point?

23  A    They pulled up.

24  Q    Who pulled up?

25  A    Tay.
```

 1  Q    And was he in a vehicle, sir?

 2  A    Yes.

 3  Q    Do you recall what kind of vehicle this way?

 4  A    Something like an SUV, I think.

 5  Q    It was an SUV?

 6  A    Yeah.

 7  Q    Do you know what color it was by any chance?

 8  A    No.

 9  Q    Okay.  And when you say they, was Tay alone or was he

10       with other people?

11  A    Well, all I seen was Tay at first.

12  Q    Okay.

13  A    And he asked me about the phone.  There was so much

14       stuff happening, so...

15  Q    Your attention wasn't focused--

16  A    (Interposing)  Yeah.

17  Q    On everybody.  But you said you had a conversation with

18       Tay?

19  A    Right.  Asking about the phone.  He asked me about his

20       phone, was it up there.  I asked him about the glasses,

21       if he had the glasses.

22  Q    What did he say to that?

23  A    He indicated no, he didn't have the glasses.

24  Q    Okay.  Now, about how many people do we have in front of

25       your store, sir?

```
 1  A    It was a crowd of people, roughly ten, fifteen guys.

 2  Q    And where is everyone situated?

 3  A    All around the area, in like a circle.

 4  Q    In a circle?

 5  A    Yeah.

 6  Q    Okay.  You described -- You told us that you had a

 7       conversation with Ant earlier about these glasses.

 8       Where was Ant at this time?

 9  A    Ant was standing right out there, too.

10  Q    Okay.  How far was Ant from you at this point?

11  A    Basically, right next to me.

12  Q    Right next -- Like is in arm's length of you, sir?

13  A    Yes.

14  Q    Okay.  And what about Tay.  You said you were talking to

15       Tay.  How far was Tay from you at this point?

16  A    About arm's length.

17  Q    Okay.  How far were they from each other?

18  A    They was about arm's length, too.

19  Q    Okay.  And when we say arm's, I mean, are you literally

20       talking about your arm's length, one arm's length?

21  A    About an arm and a half.  Yeah.

22            MR. PRASAD:  Okay.  Well, that's what I --

23       Your Honor, may I approach the witness?

24            THE COURT:  You may.

25  Q    (By Mr. Prasad, continuing):  I'm going to start walking
```

-13-

```
 1       up to you.  Okay?  You stop me when you, when I get to

 2       the point for the distance that they were from each

 3       other.

 4   A   Okay.  Well, he was close enough to hit.

 5   Q   Okay.  Ant was close enough to hit Tay at this point?

 6   A   Correct.

 7   Q   All right.  I'm going to walk close to you and you tell

 8       me to stop.

 9   A   Stop.

10   Q   Right here?

11   A   Yes.

12   Q   Okay.  About this distance?

13   A   Yes.

14               MR. PRASAD:  Counsel, about three feet?

15               MS. ROCK:  I would say three feet.  Thank

16       you.

17               MR. PRASAD:  Okay.

18   Q   (By Mr. Prasad, continuing):  Now, you told us about the

19       conversations that you were having about the glasses

20       with Tay and the phone with Tay and Ant.  Were they

21       having any conversation between the two of them?

22   A   Well, Tay was looking around on the ground for his

23       phone, looking or his phone.

24   Q   Okay.  What about Ant?

25   A   Ant was out there saying that I know you got my phone,
```

-14-

```
 1      my glasses.  I know you got my glasses.  He was mouthing

 2      off saying that.

 3  Q   What were you doing at this point?

 4  A   At that time, I'm just asking, if you got the glasses,

 5      give the glasses because I don't need no type of

 6      incidents up here at my restaurant.

 7  Q   Who are you saying that to?

 8  A   Tay.

 9  Q   Okay.  Are you in between them at this point?

10  A   Yes.

11  Q   And are you physically like in between them like--

12  A   (Interposing)  Correct.  Mm-hmm.

13  Q   Okay.  Did you stay in between them the whole time?

14  A   Not the whole time.  At that time, Ant walked closer to

15      stay, swung on him.  Well, he swung.  I turned around.

16  Q   Why did you turn around, sir?

17  A   Because other guys out there was going to try to jump in

18      it, so--

19  Q   (Interposing)  Okay.  I want to ask you about these

20      other guys.  So, you are -- When Ant comes over to Tay

21      and swings on Tay, how far away from the two of them are

22      you?

23  A   I guess maybe from here to maybe that table.

24  Q   Point to -- Tell me when to stop again.

25  A   I guess right about there.
```

```
 1                    MR. PRASAD:  About right here?  So, you're
 2        about, counsel, about six feet?
 3                    MS. ROCK:  I was going to say seven.
 4                    MR. PRASAD:  Seven feet?  That's fine.
 5   Q    (By Mr. Prasad, continuing):  So, if I'm standing where
 6        you were standing, where are Ant and Tay at this point?
 7   A    Well, they was right where you at.  I'm about right
 8        here.
 9   Q    Okay.  Let's reverse it.
10   A    Yeah.
11   Q    So, I am where Ant and Tay are?
12   A    Right.
13   Q    And you are where you were on that day?
14   A    Yeah, basically right here.
15   Q    Okay.  And were you facing their sides or their fronts
16        or what were you facing?
17   A    I was facing -- You talking about once they, once the
18        fight started?
19   Q    Yeah.  Once the fight started.
20   A    Well, I'm like, my back is turned towards--
21   Q    (Interposing)  Oh, okay.
22   A    Because I was going to stop the other guys.
23   Q    That's a good point.  That's a good point.  So, I guess
24        we should back up a half step.  Right before the fight
25        started, when you were about six, seven feet away, where
```

-16-

1     are you facing?

2  A    I'm facing Tay and Ant is like on the side.

3  Q    Okay.  So, you see Tay straight on?

4  A    Yes.

5  Q    Okay.  And Ant's to your side?

6  A    Yes.

7  Q    And he was within arm's length, as you described, about

8     three feet away?

9  A    Right.

10  Q    Right?

11  A    Yeah.  Ant came around, from around me and swung on Tay.

12  Q    Now, where are these guys that you were talking about,

13     sir, that you were focused on?

14  A    Right behind me.

15  Q    Okay.  And how many guys were there?

16  A    It was about six, maybe five or six.

17  Q    Do you know who these people were?

18  A    Just neighborhood guys.

19  Q    Okay.  Were they involved in the fight in any way?

20  A    No.  I turned around and stopped them from being

21     involved.

22  Q    Okay.  So, who were the only people fighting at this

23     point?

24  A    Well, the only one I seen get hit was Tay.  Ant hit Tay.

25  Q    Okay.  Is that the only party you saw, the only person

1      you saw assaulting anyone?

2  A   Yes.

3  Q   Okay.  What's the next thing that happened, sir?

4  A   I turned around to try to stop the fight, heard

5      gunshots.

6  Q   You heard gunshots?

7  A   Yes.

8  Q   Okay.

9  A   And then I got on the ground.

10 Q   You just dropped?

11 A   Dropped.  Yeah.

12 Q   Okay.  At any point, did you get a chance to look at who

13     was doing the shooting?

14 A   No.  I didn't try to look.  I just got down on the

15     ground and stayed down on the ground.

16 Q   Okay.  How many gunshots do you hear?

17 A   Roughly about, I'd say three or four.

18 Q   Okay.  What happens next then?

19 A   The gunshots stopped.  I got up, went into the

20     restaurant.

21 Q   Okay.  After you ran back into the restaurant, did you

22     hear anymore gunshots?

23 A   Yes.

24 Q   About how many more did you hear after that?

25 A   Maybe about three or four, three, four, five maybe.  I

```
 1      can't remember exactly how many.
 2  Q   Were there other people running into the store as well
 3      when you went into the store?
 4  A   Yes.
 5  Q   About how many other people were running into the store?
 6  A   I couldn't tell you.  It happened so fast.
 7  Q   Well, then, I guess let me ask you this.  Did you ever
 8      see Ant run into the store?
 9  A   No.
10  Q   Okay.  What about the other people that were around you,
11      the gentlemen you turned around and faced?  Did they run
12      into the store?
13  A   Not that I can remember.  I can't remember what guys was
14      out there.  Everybody was just -- It was just so hectic.
15      I just know we ran in, slammed the door and ran to the
16      back of the store.
17  Q   Why'd you run to the back of the store?
18  A   I guess we heard bullets and I ain't want to stray
19      bullet come in.  I ran all the way to the back.  I had
20      my son up there, so we just ran to the back.
21  Q   Did -- Where the shooting was occurring, where the fight
22      and the shooting was occurring, how close was that to
23      the front of your store?
24  A   The fight and the shooting?  I don't know how close the
25      shooting was.  I mean, it's all right, not far.  So, I
```

-19-

```
 1       couldn't see it, so -- I was down on the ground.

 2  Q    Sir, at any point before you went into the store, did

 3       you ever see anything metallic or anything indicative of

 4       any type of weapon?

 5  A    No.

 6  Q    At all?

 7  A    I never seen a weapon.

 8  Q    Okay.  And when Ant, when you saw Ant punch Tay, did you

 9       ever see anything in Ant's hands or any weapon that Ant

10       had?

11  A    No.

12  Q    At any time earlier when you were talking to Ant when

13       you got to the store, did you ever seen him with a

14       weapon of any sort?

15  A    No.

16  Q    All right.  Now, on that day, sir, police officers came

17       to the scene, to the store?

18  A    Correct.

19  Q    And did you talk to them at that time?

20  A    Yes.

21  Q    How forthright were you on that first day when you spoke

22       to them?

23  A    I told them I didn't see anything.

24  Q    And was that actually the truth at that point?

25  A    No.  It wasn't the truth.
```

-20-

1  Q    Okay.  Why did you say that, sir?

2  A    Because i didn't want to get involved in it at all.  My

3       business was there. I know my kids be up there.  So, I

4       didn't want to have anything to do with it.

5  Q    Okay.  At some point, did you speak with the police

6       again?

7  A    Yes.

8  Q    About how many days afterwards?

9  A    It might have been the next day or no more than two

10      days, I think.

11 Q    Okay.  And what happened this time when you talked with

12      the police the second time?

13 A    They came into the store, took me up out of the store,

14      said they knew I was lying.  I guess someone told them

15      that I was there.  And they took me to the precinct.

16 Q    And did you have another discussion with them?

17 A    Correct.

18 Q    Were you more forthright the second time?

19 A    Yeah.  I basically told them what I seen.  Yes.

20 Q    Did you tell them about--

21 A    (Interposing)  The fight.

22 Q    The fighting and the people you identified as

23      participating in the fight?

24 A    Correct.  Mm-hmm.

25 Q    Okay.  On this day, on the second time you talked to the

-21-

```
 1        police, were you shown any photographs on this day?
 2   A    Yes.
 3   Q    Okay.  And this first time you were shown photographs,
 4        were you able to identify anyone?
 5   A    No.
 6   Q    Okay.  At some point later, sir, did the police come
 7        back again to show you a different set of photographs?
 8   A    Yes.
 9   Q    When was that?
10   A    I don't know if it was a week later or I don't know how
11        many days.  About a week later.
12   Q    Some time later?
13   A    Yeah.  Some time later.
14   Q    Okay.  When they came back the second time with
15        photographs, were you able to identify someone?
16   A    Yes.
17   Q    Who did you identify?
18   A    Tay.
19   Q    Okay.  And he was one of the people in the photographs
20        the second time around?
21   A    Yeah.  They had a cell phone of his picture and they had
22        a line-up with some pictures.
23   Q    Okay.  And this was the person that you'd known
24        previously as Tay?
25   A    Correct.
```

-22-

```
 1  Q    Okay.  Was Tay in the first set of photographs when you
 2       couldn't identify anyone?  Was he in that first set of
 3       photographs at all?
 4  A    Not that I can remember.
 5                 MR. PRASAD:  Okay.  Pass the witness, your
 6       Honor.
 7                 CROSS-EXAMINATION
 8  BY MS. ROCK:
 9  Q    Good morning, Mr. Bailey.
10  A    Good morning.
11  Q    Mr. Bailey, can we just get one thing straight?  That
12       wasn't a fight, right?  That was an attack?
13  A    Right.
14  Q    Tyrone, or Ant, attacked Deonte Howard, right?
15  A    Correct.
16  Q    Okay.  Now, when you arrive at the store, you're
17       probably feeling pretty anxious, right?
18  A    Yes.
19  Q    Okay.  And you don't know what you're walking into,
20       right?  You don't want -- You want to stop whatever's
21       going to start, right?
22  A    Right.
23  Q    Okay.  And you return because some guys had been chasing
24       away some customers?
25  A    Yes.  They said it was an incident up there and some
```

-23-

1      customers had got ran off.

2  Q   Okay.  And so, when you arrive, you testified that you

3      saw five or six guys out front?

4  A   Yes.

5  Q   Okay.  And actually there were a whole lot of guys out

6      there, right?

7  A   Yes.

8  Q   Okay.  And Tyrone Simpson is mad about his glasses being

9      missing?

10 A   Correct.

11 Q   Okay.  And he announces that he is not leaving until he

12     gets his glasses, right?

13 A   Right.

14 Q   Okay.  And he says that he ain't a ho, he wasn't a ho,

15     right?  Doesn't he say he ain't a ho--

16              MR. PRASAD:  (Interposing)  Objection.

17     Hearsay.

18              MS. ROCK:  I'm not trying to prove the truth

19     of the matter asserted.

20              THE COURT:  I'm sure she's not trying to

21     prove that he's a ho.  So, it's not hearsay.

22 Q   (By Ms. Rock continuing):  So, he says, I ain't a ho,

23     ain't nobody going to try to take my glasses, from him.

24     Doesn't he say that, ain't nobody going to try to take

25     my glasses, from him?

-24-

```
 1  A    Yes.

 2  Q    Okay.  And then he said, Tyrone Simpson said there's

 3       going to be gunplay?

 4  A    There's going to be trouble, or something like that.

 5  Q    Well, you remember testifying--

 6  A    (Interposing)  I mean, he might have said that.  I can't

 7       remember exactly what was said that day, but I knew it

 8       was something like it going to be trouble if I don't get

 9       my glasses or...

10  Q    Okay.  Can I show you page thirteen and fourteen of your

11       testimony at the, when you went over and talked to the

12       prosecutor's office and ask you just to read it to

13       yourself?  That would be page thirteen and fourteen.

14            MR. PRASAD:  I'm objecting to hearsay

15       because this is no longer offered -- This is being

16       offered--

17            THE COURT:  (Interposing)  I don't know what

18       it's being offered for at this juncture.

19            MS. ROCK:  Your Honor--

20            THE COURT:  (Interposing)  And he's reading

21       it.

22            MS. ROCK:  Oh.  I'm sorry.  Excuse me.

23  Q    (By Ms. Rock continuing):  All right.  And when you were

24       testifying at the prosecutor's office, you had testified

25       that he said that there's going to be gunplay, correct?
```

-25-

```
 1                      MR. PRASAD:  Objection, your Honor.
 2          Hearsay.
 3                      THE COURT:  I'll allow it.
 4                      MS. ROCK:  Thank you.
 5    Q    (By Ms. Rock continuing):  Now, Tyrone Simpson had said
 6          that he had been fighting in your store with Freaky?
 7    A    Yes.
 8    Q    Okay.  And you testified that when Tyrone Simpson
 9          started attacking Deonte Howard some other guys tried to
10          join in and you tried to stop them, right?
11    A    Correct.
12    Q    Okay.  And you told -- Tyrone Simpson was punching
13          Deonte Howard pretty hard?
14    A    Yes.
15    Q    Okay.  And you did not see a gun, correct?  Is that
16          correct?
17    A    No.  I didn't see a gun.
18    Q    Okay.  And you later, or while you were out there, you
19          heard all the guys talking about how Tyrone Simpson had
20          knocked Deonte Howard down?
21    A    Yeah.  This was after the incident.
22                      MR. PRASAD:  Objection.  That calls for
23          hearsay.
24                      THE COURT:  It is a hearsay question and a
25          hearsay answer, ma'am.
```

1                    MS. ROCK:  I was going to--

2                    THE COURT:  (Interposing)  It still doesn't

3          matter.

4                    MS. ROCK:  Do you want me to move on, your

5          Honor, instead of--

6                    THE COURT:  (Interposing)  Please do.

7                    MS. ROCK:  All right.  Thank you.

8     Q    (By Ms. Rock continuing):  And you, at some point prior

9          to Tyrone Simpson attacking Deonte Howard, you see

10         Tyrone Simpson running towards Deonte Howard, right?

11    A    Yes.

12    Q    Okay.  And, in fact, Deonte Howard tries to back up,

13         right?

14    A    Yes.

15    Q    Okay.  And the other guys that you tried to stop from

16         getting involved were behind Tyrone Simpson, Ant, right?

17    A    Yes.

18    Q    Okay.  And you said that everybody was circling around?

19    A    Yes.

20    Q    Okay.  And your back was turned, so you don't know if

21         other people jumped or punched Deonte Howard, correct?

22    A    Correct.

23    Q    Okay.  And then once you turn around, that's when you

24         hear gunfire?

25    A    I never turned around.

                              -27-

```
 1  Q    Oh.  I meant, I mean when you turned your back to the--

 2  A    (Interposing)  Right.  Yes.

 3  Q    Okay.  That's what I meant.  Now, you were shown a line-

 4       up.  The prosecutor had talked to you about being shown

 5       a line-up, a first photo array, right?

 6  A    Right.

 7  Q    Okay.  And the officer had indicated that she believed

 8       the suspect was in that photo array, right?

 9  A    Right.

10  Q    As a matter of fact, when you said that you couldn't

11       identify anybody, the officer started arguing with you?

12  A    Yes.

13  Q    He's here, he's in there, right?  That's him?

14              MR. PRASAD:  Objection to hearsay, or the

15       argument.

16              MS. ROCK:  Your Honor--

17              THE COURT:  (Interposing)  Excuse me.

18              MS. ROCK:  Oh.  Excuse me.

19              THE COURT:  I'll allow it.

20              MS. ROCK:  My apologies.

21              THE WITNESS:  Yes.

22  Q    (By Ms. Rock continuing):  Correct?  She was saying

23       that's him, that's him?

24  A    Correct.

25  Q    And you were saying no?
```

1  A    Correct.

2  Q    Now, the prosecutor said that you then came in and made

3        a second statement.  When the police officers came a few

4        days later, did you voluntarily leave your business?

5  A    No.

6  Q    Okay.  And, in fact, was it a lady police officer who

7        showed up, maybe Investigator Simon, with three big

8        guys?

9  A    Yes.

10 Q    Okay.  So, three big guys and Investigator Simon show up

11       and you're removed from your restaurant, correct?

12 A    Correct.

13 Q    Okay.  And when they come, you're cooking, right?

14 A    Yes.

15 Q    Okay.  So, they take you to the -- Do they gently take

16       you to the car?  Do they throw you in the car?  Or how

17       do you get in the police car?

18 A    I just walk out to the car.

19 Q    Okay.

20 A    They told me I had to leave with them.

21 Q    They're making you leave, correct?

22 A    Correct.

23 Q    Okay.  And, at some point, the officer brings up the

24       fact that you were not as forthright in your first

25       statement, correct?

-29-

1   A    Correct.

2   Q    Okay.  And you started to explain, you know, well, I was

3        worried about my business, my children and so forth like

4        that, right?

5   A    Correct.

6   Q    And, in fact, she starts telling you to shut up, right?

7   A    Correct.

8             MR. PRASAD:  Objection to the hearsay of

9        what the officer is saying.

10            THE COURT:  It's not being used for the

11       truth of the matter asserted.

12  Q    (By Ms. Rock continuing):  And, in fact, she says fuck

13       your children?

14            MR. PRASAD:  Judge, objection.  Counsel, I

15       mean...

16            THE COURT:  I'm sure it's not being offered

17       for the truth of the matter asserted, so it's not

18       hearsay.

19  Q    (By Ms. Rock continuing):  She says fuck your children?

20  A    Yes.

21  Q    Okay.  And she keeps telling you shut up, shut up,

22       right?

23  A    Correct.

24  Q    Okay.  And then she threatens you, right?

25  A    Yes.

1  Q    Okay.  She threatens you with going to jail--

2  A    (Interposing)  Correct?

3  Q    Right?  Threatens you to ruin your business?

4  A    Yes.

5  Q    Is that right?

6  A    Yes.

7  Q    That's scary, right?

8  A    Yes.

9  Q    Okay.  And so, when you make the statement, the second

10      statement, you're not exactly forthright, right?  You

11      don't tell the truth in the second statement?

12 A    No.  Yes.

13 Q    Okay.  And, in fact, you tell Officer Simon what she

14      wants to hear, right?

15 A    Correct.

16 Q    Based on the threats that are made to you?

17 A    Correct.

18 Q    And so, when you looked at, when you looked at the

19      second photograph or the second photo array and that,

20      and you said you identified Deonte Howard, you were

21      identifying him as Deonte Howard, is that correct?

22 A    Yes.

23 Q    Okay.  You weren't identifying him as the shooter?

24 A    No.

25 Q    And under oath, you've never identified Deonte Howard as

-31-

1     the shooter, correct?

2  A  Correct.

3  Q  Your restaurant doesn't -- Isn't there a sign on it that

4     says Smokehouse Barbecue?

5  A  Yes.

6  Q  Okay.  That was the sign that was on it that day?

7  A  Yes.

8  Q  When did you change the name to Garden Cafe?

9  A  At the incident, it was already changed to Garden Cafe.

10    We didn't change the sign yet.

11 Q  Gotcha.  Do you recall what the officer looked like that

12    came with the three big guys?

13 A  She was a black lady...

14 Q  Tall?  Short?

15 A  Tall.

16             THE COURT:  Is there going to be a

17    stipulation to the identity?

18             MR. PRASAD:  Of the officer, Judge?  I think

19    counsel already said it was Officer Simon.

20             MS. ROCK:  All right.

21             MR. PRASAD:  It was Officer Simon.

22             MS. ROCK:  Yes, your Honor.

23             THE COURT:  He doesn't know her name.

24             MS. ROCK:  Gotcha.

25             MR. PRASAD:  Yes, sir.  I'll stipulate it

1        was Officer Simon.

2                      THE COURT:  Okay.  Anything more, Ms. Rock?

3                      MS. ROCK:  Your Honor, I don't think so.  I

4        just want to check with my client.  Thank you.

5                      THE COURT:  Any redirect?

6                      MR. PRASAD:  Yes, sir.  Thank you.

7                      REDIRECT EXAMINATION

8   BY MR. PRASAD:

9   Q    So, when Investigator Simon came to talk to you that

10       second time, she was right, you did lie to the police

11       the first time?

12  A    Correct.

13  Q    So, when she's, when she's being argumentative with you

14       because you were lying, it's not off base, is it?

15                     MS. ROCK:  Objection.  Relevancy.

16                     THE COURT:  I don't know if -- Do you want

17       him to describe what you think off base is?  Or do you

18       want to describe to him what off base is?

19                     MR. PRASAD:  I can be more specific, Judge.

20                     THE COURT:  Okay.  You want to ask him does

21       he think it's appropriate for an officer to cuss at him

22       and to say fuck his kids?  Is that what you're asking

23       him?

24                     MR. PRASAD:  Judge, no.  And I'm not saying

25       that--

                              -33-

```
 1                    THE COURT:  (Interposing)  Okay.  Because
 2        he--
 3                    MR. PRASAD:  She did say that.
 4                    THE COURT:  No.  But you said, you said off
 5        base with him.  So, what are you referring to when you
 6        say off base?  Because you've characterized something as
 7        off base.
 8                    MR. PRASAD:  Well, I'm trying to say, I was
 9        trying to say that it was based on, it was based on the
10        fact that there was merit to it.  It was based on the
11        fact that you had lied to her.
12                    THE WITNESS:  Yeah.  I might have lied to
13        her, but I don't think she had the right -- I tried to
14        explain to her the reason why because, at the end of the
15        day, my kids, they're the most important thing to me, so
16        I didn't want to be in the middle of that.  So, all the
17        cussing and fussing and her understanding that, knowing
18        that I'm in the community in the middle of all this, why
19        I told her I didn't want to be in the middle of this.
20   Q    (By Mr. Prasad, continuing):  And it put you in a tough
21        position, didn't it?
22   A    Correct.
23   Q    Okay.  When you were shown that first set of photographs
24        that Deonte Howard was not in, the one that we talked
25        about, correct?  Was Investigator Simon being
```

-34-

1    argumentative with you then, too, about whoever was in

2    the photograph?

3  A  Yes.

4  Q  Okay.  But you were clear that Tay was not in that first

5    set of photographs?

6  A  Right.  She thought I was lying.

7  Q  Right.  But you were not lying?

8  A  Correct.

9  Q  And when you were shown a second set of photographs

10   later, were you arguing with the officers then?

11 A  No.

12 Q  Was it the same officer at that point?

13 A  No.

14 Q  And were you able to clearly identify who Tay was at

15   that point?

16 A  Yeah.  Because they had a the cell phone with his

17   picture on it.  Yes.

18 Q  And was that the same person that you knew as Tay?

19 A  Yes.

20 Q  And was that the same person that you saw on that day

21   fighting with Ant?

22        MS. ROCK:  Well, your Honor, I'm going to

23   object as to the mischaracterization.  The witness has

24   stated that it wasn't a fight.

25        THE COURT:  So?  Can't he answer the

-35-

1    question?

2                MS. ROCK:  Yes, your Honor.

3   Q   (By Mr. Prasad, continuing):  And was it the same person

4       that had asked you about his phone when you first got to

5       the scene?

6   A   Yes.

7   Q   How long did you know Tay at that point, sir?

8   A   Maybe, he'd been coming into the store maybe like, I'd

9       say about six months from coming in the restaurant.

10  Q   He was a regular customer at that time period?

11  A   Yes.

12               MR. PRASAD:  Thank you.  Nothing else, your

13      Honor.

14               THE COURT:  Anything else, Ms. Rock?

15               MS. ROCK:  I just have one thing, your

16      Honor.

17               RECROSS-EXAMINATION

18  BY MS. ROCK:

19  Q   Mr. Bailey, didn't you know Ant as long as you knew Tay?

20  A   Yes.

21               MS. ROCK:  Okay.  And -- Your Honor, I think

22      that's it.  Thank you.

23               THE COURT:  Thank you, young man.  You can

24      step down.

25               (At 10:31 a.m. witness excused.)

```
 1                    THE COURT:  If you'll call your next
 2       witness, please.
 3                    MR. PRASAD:  Thank you.  The People are
 4       going to call Sergeant Lalone, your Honor.
 5                    THE COURT:  If you'll be kind enough to just
 6       make sure that your name is spelled right, please?
 7                    (At 10:32 SERGEANT ROBERT LALONE
 8                    was sworn.)
 9                    THE COURT:  Your testimony, do you promise
10       that it will be truthful?
11                    THE WITNESS:  Yes, sir.
12                    THE COURT:  Thank you.  Please have a seat
13       in the witness chair.
14                    DIRECT EXAMINATION
15  BY MR. PRASAD:
16  Q    Sergeant, please introduce yourself to the jury.
17  A    My name is Robert Lalone.  I'm a sergeant for the
18       Detroit Police Department, currently assigned to the
19       homicide section.
20  Q    Sergeant, how long have you been a police officer, sir?
21  A    Fifteen years.
22  Q    And, sergeant, you indicated you're currently assigned
23       to homicide?
24  A    Yes, sir.
25  Q    How long have you been in homicide itself?
```

1  A    Approximately, a year.

2  Q    What was your assignment before then?

3  A    The Northeast District Investigative Operations Unit.

4  Q    Sergeant, were you working on April 10th of 2010, sir?

5  A    Yes, sir.

6  Q    And what were you doing on that day, sir?

7  A    I was working 4:00 p.m to midnight, primary duties were

8       scene response.

9  Q    Okay.  At some time after, or approximately around or a

10      little bit after four o'clock, did you get a call to

11      respond to a scene on Tireman in the city of Detroit?

12 A    Yes, sir.

13 Q    And what did you do on, what did you in regards to that,

14      sir?

15 A    I took the lead from the scene processor.  I took notes

16      and later on prepared a team report to the scene.  I did

17      respond to the scene with Investigator Barbara Simon and

18      Officer Tanya Brooks.  Officer Brooks and Investigator

19      Simon were canvassing and taking witness statements.  I

20      primarily focused on the scene itself as far as getting

21      a description.

22 Q    The three of you were the homicide officers that went to

23      the scene, sir?

24 A    That is correct.  Yes.

25 Q    Were other officers already on the scene at this point?

-38-

```
 1  A    Yes, sir.  There were members from the detective bureau,
 2       from the Northwest District who had already responded
 3       and had initially started on the scene.  At the time of
 4       our response, they had already taken some witness
 5       statements.
 6  Q    Okay.  And what about EMS?  Had there already been
 7       paramedics to the scene?
 8  A    Yes, sir.  Both victims had been removed at the time of
 9       our arrival.
10  Q    Were you able to speak with the other officers to at
11       least catch up to find out what they had already
12       investigated?
13  A    Yes, sir.
14  Q    What is your primary duty at this point now that you got
15       to the scene?
16  A    To process the scene as far as denoting evidence and
17       coordinating the statements that were being taken.
18       Primarily, though, I was taking notes.  There was a
19       significant amount of evidence.  I was denoting that and
20       directing evidence techs--
21  Q    (Interposing)  Okay.
22  A    As to what we needed processed.  And trying to make
23       observations as far as where each piece of evidence was
24       so it could later be recorded in report.
25  Q    Sir, I was going to ask you about the evidence techs.
```

-39-

```
 1        Were they there before you got to the scene?
 2   A    I don't remember if they were there already or if we
 3        arrived at around the same time.  I don't remember who
 4        got there first exactly.
 5   Q    Okay.  And you already indicated to the jury that you
 6        directed them on what to do?
 7   A    Yes, sir.
 8   Q    What did you tell them?
 9   A    We needed photographs of everything.  They did demark
10        each item and helped us, I did walk the scene with them
11        to see if we could find additional evidence as we were
12        processing it.  They demarked each item, photographed
13        it, recovered it and I put it on evidence.
14   Q    When you say demark each item, what do you mean by
15        demarking it?
16   A    We have like little placards that we put out for each
17        item.
18   Q    What are you looking for?
19   A    Looking for shell casings, bullets, blood, clothing,
20        weapons, anything that would help us decipher what had
21        happened at the scene.
22   Q    And is the scene, at this point, secure?
23   A    Yes, sir.
24   Q    And what does that mean to you, sir, it being secured?
25   A    Well, it was the first responding officers that secured
```

```
 1      the scene for us.  They put up crime scene tape and they
 2      had a lot of area to keep additional civilians out of
 3      the scene and the police personnel to let them know so
 4      they don't come through and disturb any of the items.
 5      There was crime scene tape and then they form a
 6      perimeter where they stand there and make sure that
 7      people don't enter or leave.
 8  Q   And did you have an opportunity to both go inside and
 9      outside the business that was there?
10  A   Yes, sir.  I did.
11  Q   And did you have an opportunity to look around the
12      business as well?
13  A   Yes, sir.
14  Q   Okay.  There's a bunch of photographs.  I'm going to do
15      them in groups, if I can, sir, so I can have you explain
16      to the jury what it is exactly you observed, sir.
17  A   Yes, sir.
18  Q   Start with this first group.  Sir, I'm going to hand you
19      what's been pre-marked People's Proposed Exhibits One
20      through Seven.  First, take a chance and look at those
21      to yourself first, please.
22  A   Okay.
23  Q   Do you recognize People's Proposed Exhibits One through
24      Seven, sir?
25  A   Yes, sir.  I do.
```

-41-

1   Q     Do those photographs fairly and accurately depict the

2         scene as you saw it on the afternoon of April 10th of

3         2010?

4   A     Yes, sir.

5                 MR. PRASAD:  Judge, at this time, the People

6         are seeking to admit these into evidence as One through

7         Seven.

8                 THE COURT:  Any objection to One through

9         Seven being entered?

10                MS. ROCK:  No, your Honor.

11                THE COURT:  One through Seven will be

12        admitted.

13                (Whereupon People's Exhibits One through

14                Seven were received into evidence.)

15                MR. PRASAD:  Thank you.

16  Q     (By Mr. Prasad, continuing):  Sergeant, I'm going to

17        direct your attention to the television--

18  A     (Interposing)  Yes, sir.

19  Q     If that's okay?

20  A     Yes, sir.

21  Q     Starting with People's Exhibit Number One.  And let me

22        magnify it a bit.  Can you see that, sir?

23  A     Yes, sir.

24  Q     What are we looking at right there, sir?

25  A     That is Tireman Street.  To the left of the photograph,

                              -42-

1       there's myself standing in the middle of the street.

2   Q   This person right here is you?

3   A   Yes, sir.

4   Q   Okay.  To the left, there is like a Jeep vehicle, SUV.

5       Next to that is the Smokehouse business.  Directly in

6       front of that business on the sidewalk into the street

7       and inside of the business when you go in and turn to

8       the right is where the two scenes were.

9   Q   Okay.  I want to draw your attention to one other thing

10      before we lose this photograph, before we move on.  Do

11      you see this fencing area right here?

12  A   Yes, sir.

13  Q   Was that fencing area that bordered that, was the end of

14      the business property?

15  A   I don't know if it belonged to the property or not.  I

16      don't know how far the property went.  Next to the

17      business, if you come towards that fence, there was a

18      vacant lot.

19  Q   Did you come in contact with a witness, a Mr. McFadden--

20  A   (Interposing)  Yes.

21  Q   When you were there, sir?

22  A   Yes.

23  Q   All right.  Were you familiar with where Mr. McFadden's

24      family house, where his parents house was?

25  A   Yes, sir.  It's going to be across the street and

```
 1          towards the fence.  It's, basically, almost directly

 2          across the street by that fence area.  It's on the other

 3          side of Tireman.  It's kind of a diagonal from the

 4          business.

 5   Q      But in the area of this fence area in here, right?

 6   A      Yes.

 7   Q      Okay.  So, the vantage point that Mr. McFadden had

 8          looking down the street would be the same direction

 9          here?

10   A      Exactly.  Yes, sir.

11   Q      Okay.  Thank you, sir.  Drawing your attention to

12          People's Exhibit Number Two.  Do you want to come

13          around?

14                  MS. ROCK:  Yeah.  I was just going to...

15   Q      (By Mr. Prasad, continuing):  Who's this gentleman right

16          here?

17   A      That's myself.

18   Q      Is this a closer up view of the same angle we were

19          looking at?

20   A      That is the same angle, just a little bit closer view.

21          Yes, sir.

22   Q      All right.  Very good.  Number Three, a lot of the

23          people that were blocking the view have gone.

24   A      Yes, sir.

25   Q      We see a lot of these little, yellow marks all on the
```

-44-

```
 1      ground here.  What are those, sir?
 2   A  Those are the placards to any of the evidence.  So,
 3      there's a placard for each piece of evidence, whether
 4      there was shell casings, sunglasses, keys, clothing
 5      there's going to be placards, fired bullets, there's
 6      going to be a placard for each item.
 7   Q  And you observed each item by the placard as well?
 8   A  Yes, sir.
 9   Q  Okay.  People's Exhibit Number Four.  And let me widen
10      this out a little bit.  Do you see that, sir?
11   A  Yes, sir.
12   Q  What are we looking at here, sir?
13   A  That is a view of the business also from the South
14      facing North.  And there's a placard against the curb.
15   Q  And that placard indicates number one, sir?
16   A  Yes, sir.
17   Q  What was number one, if you recall, sir?
18   A  If my recollection's correct, that should be the cell
19      phone.  There was this black cell phone with the back
20      off of it.  It had come apart.  It was laying in between
21      like the curb right near the grass.
22   Q  And it was, it was in that position when you saw it,
23      sir?
24   A  Yes, sir.
25   Q  Across the street from the business?
```

1  A    That is correct.  It was directly across from that on a

2       slant.

3  Q    On a slant?  People's Exhibit Number Five.  What is that

4       angle of, sir?

5  A    That is on the opposite of Tireman from the business

6       facing the scene.

7  Q    Now, there are two vehicles that are parked a little bit

8       in front of the business, sir?

9  A    Yes, sir.  There's the burgundy SUV and I believe it was

10      a Tahoe.  And then there was a blue, I believe it was a

11      Buick.

12 Q    Okay.

13 A    Parked in front of there.

14 Q    And were those vehicles also inspected as part of your

15      investigation, sir?

16 A    Yes, sir.  Also, both of those vehicles were recovered

17      and placed on evidence and towed to our evidence garage.

18 Q    And we'll look at more pictures of those vehicles in a

19      second.  People's Exhibit Number Six.

20 A    That's an angle from the front of the Buick facing the

21      Tahoe and then the business is right behind it on the

22      lefthand side.

23 Q    Those are the two cars, the two vehicles you were just

24      talking about?

25 A    Yes, sir.

```
 1  Q    Okay.  And, finally, People's Exhibit Number Seven, sir.
 2       Actually, let me orient it this way to make it more
 3       logical.  What are we looking at here, sir?
 4  A    That was taken -- There's a skid mark.  You can see it
 5       begins at the bottom of the picture and continues on to
 6       the top of the picture.  It appeared to have been new.
 7       It didn't appear to be old.  It may have been part of
 8       the scene, so we had it photographed and documented.
 9  Q    And is that vehicle the same vehicle we had seen
10       previously?
11  A    Yes, sir.
12  Q    Okay.  I'd move onto our next group of photographs.  I'm
13       going to hand you what's been premarked as People's
14       Proposed Exhibits Eight, Nine and Ten.
15  A    Yes, sir.
16  Q    Can you look at those and tell me if you recognize
17       those, please?
18  A    Yes, sir.
19  Q    Do those photographs fairly and accurately depict what
20       you observed on April 10th of 2010?
21  A    Yes, sir.
22            MR. PRASAD:  I'd ask that these be admitted
23       into evidence, your Honor.
24            MS. ROCK:  No objection, your Honor.
25            THE COURT:  They'll be received without
```

-47-

```
 1      objection.
 2                   (Whereupon People's Exhibits Eight
 3                   through Ten were received into evidence.)
 4                   MR. PRASAD:  Thank you.
 5   Q   (By Mr. Prasad, continuing):  Starting with Number
 6       Eight, sir.
 7   A   It's a close-up picture of the front of the business
 8       that the scene had occurred in front of and inside of
 9       the Smokehouse Restaurant.
10   Q   Okay.  And there is an article of clothing on the bottom
11       left of that photograph?
12   A   Yes, sir.  That's a red hooded sweatshirt.  And it did
13       have a multi colored -- It was primarily red with a
14       multi-colored design on it.
15   Q   People's Exhibit Number Nine, sir.  What is this in
16       reference to, sir?
17   A   It's a photograph taken from the inside of the business
18       facing out towards Tireman Street.
19   Q   Is this the--
20   A   (Interposing)  That's the front door.
21   Q   Okay.  That's what I was going to ask you, is that the
22       front door.  And then we see those placards that we
23       talked about earlier?
24   A   Yes, sir.
25   Q   Still right in front?
```

1  A    That is correct.  Yes, sir.

2  Q    Oh, I'm sorry.  There's one thing I forgot to ask about

3       Number Eight.  Let me go back to it real quick.  Are

4       these the two steps that would lead up right into the

5       business, sir?

6  A    That is correct.  That front door is the door that was

7       shown in the next view from the inside out.

8  Q    Very good.  And jumping to People's Exhibit Number Ten.

9       Do you recognize this, sir?

10  A    Yes, sir.  That is the interior of the business.  You

11       can see the two tables to the left of the picture.  And

12       then in that there's like a sign in the window that's

13       blocking the window.

14  A    Yes.

15  A    Underneath that, there's clothing and there's paper and

16       wrapping.  That is where the surviving victim was.  The

17       wrapping, I believe, was from the EMS from treating them

18       and the clothing I believe was his.  There was two boots

19       and some pants.  They had to cut his clothing off while

20       they were treating him.

21  Q    Okay.  And that was left there all by the EMS?

22  A    That is correct, sir.  Yes.

23  Q    Okay.  Jumping to our next group, if I can.  I'm going

24       to hand you what's been premarked as People's Exhibits

25       Eleven through Eighteen, sir.  Can you look at those,

-49-

1       please?

2   A   Yes, sir.

3   Q   Sir, do Eleven through Eighteen fairly and accurately

4       show what you observed on April 10th of 2010, sir?

5   A   Yes, sir.

6                   MR. PRASAD:  Judge, I'd -- Sorry.

7                   THE COURT:  Go ahead.

8                   MR. PRASAD:  Seek to admit this into

9       evidence as Eleven through Eighteen, your Honor.

10                  THE COURT:  Any objection?

11                  MS. ROCK:  No, your Honor.

12                  THE COURT:  Eleven through Eighteen will be

13      admitted.

14                  (Whereupon People's Exhibits Eleven through

15                  Eighteen were received into evidence.)

16                  MR. PRASAD:  Thank you.

17  Q   (By Mr. Prasad, continuing):  Going back to some of the

18      more outside angles, sir.  I want to draw your attention

19      back to the red sweatshirt.

20  A   Yes, sir.

21  Q   Do you have an understand of what that red sweatshirt,

22      how it's related to the case, sir?

23  A   Yes, sir.  That red sweatshirt belonged to the deceased

24      victim.

25  Q   Number Twelve, sir.  It's a further, exterior view of

                              -50-

1      this, sir?

2  A   That is correct.  It's the burgundy SUV and the business

3      directly behind it.

4  Q   Okay.  Now, I'm drawing your attention to Number

5      Thirteen.  This is a close-up.  Do you see that, sir?

6  A   Yes, sir.

7  Q   Okay.  And that's a close-up of the same sweatshirt?

8  A   That is correct.  Yes, sir.

9  Q   Did you guys have a chance to look at the sweatshirt

10     more closely?

11 A   After it was photographed.  Yes, sir.

12 Q   And did you have a chance to actually inspect the

13     pockets of the sweatshirt?

14 A   Yes, sir.

15 Q   Okay.  Drawing your attention to Number Fourteen.  Is

16     this from the pocket of that sweatshirt?

17 A   Yeah.  That, I believe, was in the front pocket of the

18     sweatshirt.

19 Q   And what does that depict, or what is that, what's in

20     that photograph, sir?

21 A   It's a clear plastic bag containing suspected marijuana.

22 Q   Okay.  Number Fifteen, sir.  What is this?

23 A   That is the burgundy SUV.  You can still see the

24     business front in the back of it.

25 Q   Okay.  On the back of that same SUV, sir, did you find

1     anything of note?  And I'm sort of cheating because I'm

2     giving you the photograph.

3  A   Yes, sir.  There is a, there was a cellular phone on

4     there.  That's the rear bumper of the burgundy SUV on

5     the driver's side.  That cell phone was resting on that

6     bumper.

7  Q   Okay.  And that cell phone is different than the cell

8     phone that was found across the street?

9  A   That is correct.  There was two cell phones recovered

10    that day.

11  Q  The Grand Am, sir?

12  A  Yes, sir.  That vehicle was parked directly opposite of

13    the business.  It didn't have anything, I didn't believe

14    it had anything to do with the scene.  The owner asked

15    if he could remove it, so I had to have the evidence

16    technicians photograph it so we could have a photograph

17    of it as it sat at the scene.  And then I escorted him

18    out and let him pull away out of the scene so we could

19    finish processing the scene.

20  Q  This house back here, sir, with the gentleman sitting on

21    the porch of it or the steps of it?

22  A  Yes, sir.

23  Q  Where is -- How far is that from the scene, from the

24    store itself?

25  A  It's directly across, the opposite side of Tireman.  And

```
 1      as you're standing in front of the business facing that

 2      house, it's slightly to the left.

 3  Q   At a little bit of an angle?

 4  A   Yes, sir.

 5  Q   Okay.  And is this a close-up of the same house, sir?

 6  A   That is correct, sir.  Yes.

 7  Q   With the gentleman, the same gentleman in there?

 8  A   Yes, sir.

 9  Q   And who's he talking to?

10  A   He's talking to Investigator Barbara Simon.  She was

11      taking a statement from at the time.

12  Q   All right.  Very good.

13                  THE COURT:  Anybody else while they sort out

14      pictures?

15                  (At 10:52 a.m. off the record.)

16                  (At 11:00 a.m. back on the record.)

17                  THE COURT:  You all ready?

18                  MR. PRASAD:  Yes, sir.  We are.

19  Q   (By Mr. Prasad, continuing):  Sergeant, I'm going to

20      show you Nineteen--

21                  THE COURT:  (Interposing)  I need you all to

22      be quiet, please.

23  Q   (By Mr. Prasad, continuing):  Nineteen through Forty-

24      Six.  Ready, sir?

25  A   Yes, sir.
```

1  Q    Did you have a chance to look through Nineteen through

2       Forty-Six, sir?

3  A    Yes, sir.

4  Q    Do they fairly and accurately depict what you saw on

5       April 10th of 2010?

6  A    Yes, sir.

7            MR. PRASAD:  Judge, at this time, I'd submit

8       these into evidence as Nineteen through Forty-Six.

9            MS. ROCK:  No objection, your Honor.

10           THE COURT:  They'll be received.

11           (Whereupon People's Exhibits Nineteen

12           through Forty-Six were received into

13           evidence.)

14           MR. PRASAD:  Thank you.

15 Q    (By Mr. Prasad, continuing):  Some of these I'm going to

16      go through rather quickly, but in general, these are the

17      twenty-five difference pieces of evidence that were

18      marked off by the evidence techs that you observed, sir?

19 A    That is correct, sir.

20 Q    Are these all in the same position as you saw them when

21      you saw them on that day?

22 A    Yes, sir.

23 Q    Okay.  Let's go through them.  Let's move through them.

24      Starting, obviously, with number one.

25 A    Yes, sir.

-54-

1  Q    What is that?

2  A    That's the cell phone that was on the opposite side of

3       Tireman from the business, the cell phone.  You can see

4       the phone itself on the right side of the placard.  And

5       to the top of the placard, you can see the backing--

6  Q    (Interposing)  That right there?

7  A    That is the backing from that cell phone.

8  Q    This one right here?

9  A    Yes, sir.  That's the phone that was next to the curb

10      across the street from the scene.

11 Q    Very good.  This is the area where number two was found,

12      sir?

13 A    Yes, sir.

14 Q    And where is this -- Is this the business behind this?

15 A    Yes, sir.

16 Q    And this is, once again, we see the red, the victim's

17      red sweatshirt?

18 A    That is correct.  Yes, sir.

19 Q    And I'll show you a close-up of number two.  What is

20      number two, sir?

21 A    It's a spent .40 caliber casing.

22 Q    Okay.  And all these difference pieces of evidence, were

23      they ultimately collected by the evidence technicians?

24 A    That is correct, sir.

25 Q    We see number three?

1  A    Yes, sir.

2  Q    And we see the GMC truck we talked about earlier?

3  A    Yes, sir.

4  Q    And the sweatshirt of the victim, correct?

5  A    That is correct.

6  Q    All right.

7  A    And then you just see the business front of the--

8  Q    (Interposing)  The business front right up here?

9  A    Yes, sir.

10  Q   Okay.  This is a close-up of number three, sir?

11  A   That is a spent .40 caliber casing.

12  Q   Similarly, sir, we see number four?

13  A   Yes, sir.

14  Q   And what is number four?

15  A   That is a spent .40 caliber casing also.

16  Q   And just we're clear, each one of these casings is a

17      separate casing?

18  A   Correct.

19  Q   We're not duplicating casings?

20  A   No, sir.  Each one is demarked as, demarking a separate

21      casing.

22  Q   Are you familiar with semi-automatic handguns, sir?

23  A   Yes, sir.

24  Q   What is the casing in terms of a handgun?

25  A   The casing is -- There is a projectile inside a casing,

```
 1        gunpowder backing it.  The projectile is the bullet
 2        which is fired out the end.  The casing is expelled from
 3        the gun after it's fired.  And then a new, live round is
 4        placed into the chamber.
 5   Q    So, the casing was a part of the original live bullet?
 6   A    That is correct.
 7   Q    But after the bullet is fired, the casing is a separate
 8        part--
 9   A    (Interposing)  The casing is ejected from the weapon.
10   Q    We see number five, sir?
11   A    Yes, sir.
12   Q    And, once again, we're talking about the GMC truck and
13        we're talking about the red sweatshirt?
14   A    Yes, sir.
15   Q    Close-up of number five?
16   A    That is also a spent .40 caliber casing.
17   Q    That's this item right here?
18   A    Yes, sir.  The item next to it was a bolt.  It was
19        laying next to that.  I don't believe that was
20        recovered.  It wasn't part of the scene.  The reason for
21        that being marked was the casing itself.
22   Q    Okay.  Number six?
23   A    That is a spent .40 caliber casing also.
24   Q    And it's also by the tires of the same vehicle?
25   A    That is by the burgundy SUV.  Yes, sir.
```

1  Q   Okay.  And number seven, and I apologize, but there's

2      actually an item right there.  Let me show it to you so

3      I can see if you can see it.

4  A   Yes, sir.

5  Q   What is that in number seven?

6  A   Number seven is a fired bullet.

7  Q   All right.  And I'm going to take this actually out of

8      order because I've got a close-up of it.  This is

9      Exhibit Number Thirty.

10 A   Yes, sir.

11 Q   Do you see that?

12 A   Yes, sir.  That's a closer view of the same item.

13     That's actually, the copper metallic item right next to

14     the placard is a fired bullet.

15 Q   And a fired bullet is completely separate from the

16     casing?

17 A   Yes, sir.  That's what actually comes out of the weapon.

18 Q   The bullet is?

19 A   Yes, sir.

20 Q   Okay.  And the one that I skipped in between, Number

21     Twenty-Nine.  Number Twenty-Nine is a back-up photograph

22     or a farther back photograph of a bunch of placards.  Do

23     you see a group of placards?

24 A   Yes, sir.

25 Q   And that was all the scene area right behind the GMC

-58-

1       truck?

2   A   Yes, sir.  That's to the rear of the truck in front of

3       the business.

4   Q   Okay.

5   A   You can see the rear bumper of the truck on the

6       righthand side of that photograph.

7   Q   Okay.  And I want to show you this because the color

8       actually shows better on the actual picture itself.  Do

9       you see a dark-colored or a liquid substance there?

10  A   Yes, sir.

11  Q   What does that appear to be to you, sir?

12  A   Blood.

13  Q   And going back to Twenty-Nine, you're referencing this

14      stuff right here?

15  A   Yes, sir.  That is blood.

16  Q   I'm going to draw your attention to some of the specific

17      close-up items of that group of items we saw in that

18      last picture.

19  A   Yes, sir.

20  Q   Okay.  Number eight, what is that?

21  A   That is a spent .40 caliber casing.

22  Q   Number nine.

23  A   That is a lens to a pair of sunglasses.  There was a

24      frame with two lenses out there.  They were all

25      separated.  It appeared that the frame had to be either

-59-

1      stepped on or driven over.  That is one of the lenses

2      from the sunglasses.

3   Q   Why did you take note of that, sir?

4   A   The information I received was that the dispute prior to

5      the shooting was over a pair of sunglasses.  We weren't

6      sure at that time if those were the exact sunglasses

7      that were being fought over.  And that's why we made

8      sure that they were marked and recovered.

9   Q   This is another one of the photographs of that same area

10      from an opposite angle, is that correct, sir?

11  A   Yes, sir.  In the bottom, right corner is the bumper to

12      the SUV.  And there's the markers and the blood pattern

13      you can see to the left.

14  Q   And it includes items eight through thirteen, I believe?

15  A   Yes.  That's correct.

16  Q   And Number Ten is this item up here on the bumper?

17  A   It's the cellular phone that we looked at earlier that

18      was on the driver's side rear bumper of the burgundy

19      SUV.

20  Q   Separate than the one found across the street?

21  A   That is correct.

22  Q   Number eleven, sir?

23  A   It's a spent .40 caliber casing.

24  Q   And this is Exhibit Number Thirty-Five.  It shows item

25      number twelve.  What is that?

1  A    That is a portion of a fired bullet also.

2  Q    That's a fired bullet?

3  A    Yes, sir.

4  Q    Okay.  That's not a spent casing?

5  A    No, sir.

6  Q    And number thirteen, sir?

7  A    That is also a fired bullet.

8  Q    And going back to a couple of the other photographs that

9       we saw in a bigger sense, is that near that reddish pool

10      of liquid area that you described?

11  A   Yeah.  That fired bullet was actually next to the blood

12      pattern.

13  Q   Number fourteen I think we talked about a little bit

14      earlier.

15  A   That's the red hooded sweatshirt.

16  Q   And this is Exhibit Thirty-Eight.  And it shows placard

17      fifteen.  What was that?

18  A   That is the frame for the sunglasses that we believed

19      that the lens belonged to.

20  Q   Okay.  What is number sixteen, sir?

21  A   Those are a set of keys.  They were right next to the

22      curb in close proximity to the hooded sweatshirt.  I

23      believe they were almost directly in front of the front

24      door to the business, right on the curb and in the

25      street.

1  Q    Right.  And I think you can actually see the curb right

2       here.

3  A    Yes, sir.

4  Q    People's Exhibit Number Forty shows placards eighteen,

5       nineteen and twenty.  Do you see that, sir?

6  A    Yes, sir.

7  Q    And where are we looking at now, sir?

8  A    That's going to be, that yellow line on the bottom right

9       corner is going to be the dividing line for Tireman

10      Street directly in front of the business.

11 Q    So, what?  About half way across the street?

12 A    Half way through the street.  Right in the middle of the

13      street.

14 Q    Okay.  Number eighteen from those is?

15 A    That's going to be one of the lenses from the

16      sunglasses.

17 Q    Number nineteen is what, sir?

18 A    That's a spent .40 caliber casing.

19 Q    And number twenty as well?

20 A    That is also a spent .40 caliber casing.

21 Q    Okay.  Now, I'm going to show you a couple more.  Oh,

22      let me back up.  When you have the evidence techs come

23      out there, did you have any of them draw a map or a

24      sketch of the area?

25 A    Yes, sir.

-62-

1  Q    What's the purpose of that?

2  A    The purpose is that it denotes where each item was in

3       relation to everything so we have a reference to go off

4       of at a later date.

5  Q    Okay.  And do you recall offhand which officer it was

6       that did that?

7  A    I believe it may have been Officer McNairy.  I'm not

8       positive.  I believe it was Officer McNairy.

9  Q    We'll talk to her later, then.  People's Exhibit Number

10      Twenty-Four is item twenty-two.  Do you see that?

11 A    Yes, sir.  That's a spent .40 caliber casing also.

12 Q    And item twenty-three is what?

13 A    And that's a spent .40 caliber casing.

14 Q    And finally, sir, drawing your attention to People's

15      Exhibit Number Forty-Six.  What is that?

16 A    That's a spent .40 caliber casing also.  You didn't have

17      a reference for that one.  But it was in the grass.  If

18      you're facing the business, it would have been to the

19      right of the business in the grass in between the street

20      and the sidewalk.

21 Q    I'm going to go back to some of our earlier photographs

22      so you can actually explain that to the jury.  Are we

23      talking about -- Going back to People's Exhibit Number

24      Seven.  Are we talking about the grassy area back here,

25      sir?

-63-

```
 1  A    That is correct.  Yes, sir.  It's in close proximity.  I
 2       believe it's just this side of the telephone pole.
 3  Q    Okay.  Very good.  Very good, sergeant.  So, in terms of
 4       preserving the scene and documenting or trying to
 5       collect all of the evidence related to the scene, did
 6       that establish pretty much everything that you were
 7       trying to collect and document with regards to this
 8       scene?
 9  A    That is correct.  Yes, sir.
10  Q    Did you get an opportunity, at that time, to speak to
11       some of the witnesses?
12  A    I didn't personally speak to anybody directly.
13       Investigator Simon and Officer Brooks were speaking to
14       the witnesses and taking actual statements from them.
15  Q    Was there anyone on the scene at that time that was able
16       to immediately identify a person as this is the person
17       who did it?
18  A    There was--
19            MS. ROCK:  (Interposing)  Your Honor, I'm
20       going to object as to hearsay.
21            THE COURT:  Please advise the client, I mean
22       the witness, not to provide us with information that he
23       doesn't have personal knowledge of.
24            MR. PRASAD:  True.
25  Q    (By Mr. Prasad, continuing):  You didn't speak
```

-64-

```
 1      personally to any of the witnesses at that point?
 2  A   No, sir.  I did not.
 3  Q   Okay.  I guess what I'm trying to establish is, at that
 4      point, were you able to establish a suspect at that
 5      point?
 6  A   Yes, sir.
 7  Q   Okay.  What about the cell phones?  Did you use those
 8      cell phones in any way to try to establish a suspect?
 9  A   Later.  At first when we were initially at the scene, we
10      didn't realize, we didn't know who the cell phones
11      belonged to.
12  Q   Okay.  Did you attempt to utilize the -- Were you
13      involved in the part of trying to identify who the cell
14      phones belonged to?
15  A   Marginally.  There was other officers involved in
16      actually identifying whose cell phone was whose later
17      on.
18  Q   We'll ask those officers then.  Thanks, sergeant.
19      Anything else at the scene that you did, sir, before we
20      leave the scene?
21  A   No, sir.
22              MR. PRASAD:  All right.  Thank you very
23      much.  Pass the witness, your Honor.
24              CROSS-EXAMINATION
25  BY MS. ROCK:
```

1  Q    Officer Lalone, you don't have any control over the

2       groups of people that would be converging on or coming

3       up there before the scene is marked off, correct?

4  A    That's correct.  Yes.

5  Q    So, there were a lot of people up there before the

6       police got there, correct?

7  A    I do not have knowledge.  I don't know.  By the time I

8       responded there, it was taped off and the police had

9       control of the scene.  I can't tell you who was there

10      before I responded.

11 Q    All right.  So, oftentimes, evidence can get kicked,

12      moved by passerbyers, is that correct?  Or people,

13      interested parties?

14 A    That may happen, but I'd have to speculate.  I don't

15      know if that happened or not.

16 Q    Oh.  Okay.  But you didn't, you weren't the first on the

17      scene?

18 A    That's correct.  No.  I was not.

19 Q    And you don't know who was, what the type of crowd was

20      up there, is that correct?

21 A    I don't have personal knowledge it.  No, ma'am.

22 Q    Okay.  And you, at some point before you conducted your

23      investigation, you had witness statements, is that

24      correct?

25 A    While I was processing, taking notes myself,

```
 1        Investigator Simon and Officer Brooks were taking
 2        witness statements simultaneously, at the same time.
 3   Q    But you had access to those statements, correct?
 4   A    Afterwards.  Yes, ma'am.
 5   Q    Okay.  And so, Mr. McFadden would have been interviewed
 6        on the same day at 7:14 p.m.?
 7   A    Yes.  I believe Mr. McFadden was, I believe the person
 8        talking to him was one of the members from the
 9        investigative operations unit, not from the homicide
10        section.
11   Q    You also had interaction with Mr. McFadden, didn't you?
12   A    At a later date.  Yes.
13   Q    Yeah.  And it was your impression that Mr. McFadden
14        wasn't all there?
15             MR. PRASAD:  Objection, your Honor, to his
16        impression of Mr. McFadden being all there.
17             MS. ROCK:  Well--
18             THE COURT:  (Interposing)  I'll allow him to
19        answer.
20             THE WITNESS:  When you ask me all there, I
21        don't--
22   Q    (By Ms. Rock continuing):  (Interposing)  Well, that,
23        that was your statement.  When I interviewed you over
24        here with my investigator, your statement was you
25        thought that Mr. McFadden wasn't all there.
```

-67-

1  A   As far as?

2  Q   Mental, you know--

3  A   (Interposing)  Oh, mental facility?

4  Q   Yeah.

5  A   Yeah.  My impression was that he, I don't know what the

6      proper terminology would be, but he didn't appear to be

7      a hundred percent -- I wouldn't say he wasn't in his

8      faculties or anything like that, but yeah.

9  Q   But that was your statement is that he--

10 A   (Interposing)  Yes, ma'am.  That's correct.

11 Q   Didn't -- Okay.  That he was not all there.  All right.

12     And the sunglasses, you never verified whether those

13     were the exact sunglasses that were in dispute?

14 A   I later received information that they were not the

15     glasses in dispute.

16          MS. ROCK:  And based on your understanding -

17     - Excuse me, just for a second.  I don't have any

18     further questions of Officer Lalone.

19          THE COURT:  Anymore questions?

20          MR. PRASAD:  No, sir.

21          THE COURT:  Thank you, sir.

22          THE WITNESS:  Thank you.

23          (At 11:18 a.m. witness excused.)

24          THE COURT:  Young ones, what would you all

25     like to do?  Would you all like to -- Did going to lunch

1        early yesterday work out?  Because I'm looking at the

2        clock -- Who's your next witness, do you think?  And how

3        long do you believe?

4                    MR. PRASAD:  Judge, my next two witnesses

5        are Ms. Thompson and Mr. Harris.  They're the elderly

6        couple that was living across the street.

7                    THE COURT:  The ones that were being helped

8        into the house or whatever?

9                    MR. PRASAD:  No.

10                   THE COURT:  And are they short?

11                   MR. PRASAD:  Not that one.

12                   THE COURT:  Not that one?  Are they short

13       witnesses?  I don't care who they are.

14                   MR. PRASAD:  Yeah.  I would think so, Judge.

15                   THE COURT:  Okay.  Because there's no need

16       to just keep them if they're here.

17                   MR. PRASAD:  No.

18                   THE COURT:  Can we hear from these two short

19       witnesses and then we'll go to lunch?  Okay.  Why don't

20       you call those witnesses, please?  Well, one at a time.

21                   MR. PRASAD:  Yes.

22                   THE COURT:  We're talking about vertically

23       short as opposed to in time.  What do you mean by short?

24       Young man, can I get you to take an oath, please?

25                   MR. HARRIS:  Sure.

-69-

```
 1                      THE COURT:  Okay.  Either hand will do.
 2                      (At 11:21 a.m. witness MACARIO ANDREW HARRIS
 3                      was sworn.)
 4                      THE COURT:  Do you promise to tell the truth
 5         today?
 6                      THE WITNESS:  Yes.
 7                      THE COURT:  Thank you, sir.
 8                      MR. PRASAD:  May I, Judge?  Thank you.
 9                      DIRECT EXAMINATION
10    BY MR. PRASAD:
11    Q    Sir, introduce yourself to the jury, please.
12    A    Pardon me?
13    Q    Introduce yourself to the jury.
14    A    Hi.  I'm Macario Harris.
15    Q    And, Mr. Harris, at one time, sir, did you live on
16         Tireman?
17    A    Yes.
18    Q    What was your address over there, sir?
19    A    16215.
20    Q    And where is that in relation to a store, a restaurant,
21         Smokehouse there?
22    A    Directly across the street.
23    Q    Okay.  In fact, I'm going to show you what's in
24         evidence.  I'm going to show you what's in evidence as
25         People's Exhibits Seventeen and Eighteen.  Do you
```

 1      recognize anything in those photographs, sir?

 2   A  Yes.

 3   Q  That's Number Seventeen.  What do you recognize in

 4      Number Seventeen, sir?

 5   A  That's me sitting at my house.

 6   Q  Okay.  And I think Number Eighteen is a close-up of that

 7      same thing, sir?

 8   A  Yes.

 9   Q  Okay.  In Number Seventeen, can you also see your front

10      picture window there, sir?

11   A  Yes.

12   Q  And does that face out onto Tireman?

13   A  Onto Tireman.  Yes.

14   Q  Sir, I want to take you back to April 10th of last year,

15      2010.  Remember that day, sir?

16   A  Yes.

17   Q  Did something draw your attention in the late afternoon

18      hours that caused you to go look out your picture

19      window?

20   A  Yes.  I heard gunshots.

21   Q  Okay.  How many gunshots did you hear at that time, sir?

22   A  I think two at that time.

23   Q  So, where were you at the time when you heard the

24      gunshots?

25   A  I was watching TV in the living room.

1   Q    Okay.  Was there anyone else in the house with you?

2   A    Yes.

3   Q    Who?

4   A    My caregiver, Kimberly Thompson.

5   Q    Ms. Thompson was there with you?

6   A    Yes.

7   Q    Okay.  And when you heard those gunshots, what did you

8        do?

9   A    I went to the window to see what was going on.

10  Q    And is that the same window that we were just talking

11       about--

12  A    (Interposing)  Yes.

13  Q    In People's Exhibit Seventeen?

14  A    Yes.

15  Q    This window right here, sir?

16  A    Yes.

17  Q    Okay.  So, what did you do when you went out to that

18       window?

19  A    I looked out to see what was going on.  I looked over at

20       the store.

21  Q    What did you see?

22  A    When I looked over at the store, I saw somebody getting

23       in a car, a silver SUV--

24  Q    (Interposing)  Okay.

25  A    And close the door.  And I saw a guy getting up off the

-72-

1      ground.  He was right next to a Chevrolet Suburban.  He

2      was getting up off the ground, slow.

3   Q  Let me back you up.  Where was this car that the first

4      guy you said you saw get into?

5   A  It was behind the Suburban.

6   Q  Okay.  And the Suburban was in front of it?

7   A  Yes.

8   Q  Do you remember what color that Suburban was?

9   A  I think it was purple.

10  Q  Okay.  Give me one second, sir.  I'm going to show you

11     another photograph? I'm going to show you People's

12     Exhibit Number Twelve.  Actually, let me show this to

13     you up close first and then I'll put it up for the jury.

14     Do you recognize what's in Number Twelve, sir?

15  A  Yes.

16  Q  What do you see there, sir?

17  A  That's the Suburban I'm talking about.

18  Q  Okay.  That's the Suburban you're talking about?

19  A  Yeah.

20  Q  And do you see the store as well that's across the

21     street from your house?

22  A  Yes.

23  Q  Okay.  So, you were telling us that the other vehicle

24     where the guy got into was behind this Suburban?

25  A  Yes.  Not directly behind it, just a little ways back.

-73-

1  Q    Okay.

2  A    Behind it.

3  Q    It was back behind the Suburban itself?

4  A    Yeah.

5  Q    Okay.  And how many people did you see get into that

6       car?

7  A    Well, all I saw was the door close, one person get in.

8  Q    Okay.  And that's the silver--

9  A    (Interposing)  The silver SUV.  Yes.

10 Q    Okay.  And then tell me about the other person that you

11      saw getting up slowly.

12 A    Well, as they were getting into the -- I saw the door

13      close on the SUV.  And as the door closed, I saw the guy

14      by the back tire of the Suburban getting up slow off the

15      ground.

16 Q    Back here?

17 A    Yes.

18 Q    Okay.  And then what happened?

19 A    And then I saw the gray SUV pull off, speed off.  As the

20      guy was getting up off the ground, it slammed on the

21      brakes.

22 Q    The SUV slammed on the brakes?

23 A    Yeah.  It slammed on the brakes.

24 Q    And then what happened?

25 A    And then somebody jumped out the passenger's side.

-74-

1  Q    Okay.

2  A    And--

3  Q    (Interposing)  Do you remember if it was the front or

4       back passenger's side of the SUV?

5  A    No.  I don't -- I think it might have been a two-door.

6  Q    Okay.

7  A    Yeah.

8  Q    And is that the same side that the person, that the door

9       closed and the one person got into?

10 A    No.  It was a different side.

11 Q    Okay.

12 A    I saw the driver's side close when I first looked out

13      the window.  Okay.  And then when I looked out and saw

14      the guy getting up and the car drive off, the

15      passenger's side--

16 Q    (Interposing)  Let me back up because I think I have

17      something that we're miscommunicating.  When you first

18      saw that SUV, you just saw the driver close, side door

19      close?

20 A    Right.

21 Q    You didn't actually see anyone get in?

22 A    Right.

23 Q    Okay.

24 A    I just saw the door close.

25 Q    Okay.  I'm sorry.  That's where we're missing each

1      other.

2  A    Okay.

3  Q    So, now you said you see the SUV stop and it slammed on

4      its brakes.

5  A    Right.

6  Q    And then what happened?

7  A    Then somebody jumped out of the passenger's side.

8  Q    Okay.

9  A    And that's the person that started shooting at the guy

10      as he was getting up off the ground.  He'd gotten up and

11      the guy got out of the passenger's side and started

12      shooting at him--

13  Q    (Interposing)  The person that was shooting, was he

14      saying anything at this point?

15  A    I couldn't tell if he was saying anything or not, but--

16  Q    (Interposing)  Please continue.  What happened?

17  A    Well, the guy that was getting up, he was hollering.

18      And he went around the back and the guy ran on this side

19      shooting at him--

20  Q    (Interposing)  On what side--

21  A    (Interposing)  All the time he was shooting at him.

22  Q    On what side?

23  A    The guy that was hollering went to the back of the

24      Suburban here.

25  Q    Okay.

1  A    He went to the back and the guy who was shooting at him

2       went to the front--

3  Q    (Interposing)  Okay.

4  A    And was shooting around the Suburban at him from the

5       front.  So, this guy, he runs back on this side and he

6       chases him back over here and starts shooting at him

7       again.

8  Q    Okay.  Let me try to, let me try to work that with you

9       so we can get a good idea of this.  So, you have the

10      shooter in here in the front, right?

11 A    Right.

12 Q    And you have the person that's hobbling in the back,

13      right?

14 A    Right.

15 Q    Now, the person that's hobbling in the back, which

16      direction is he running?  Does he run closer to the

17      sidewalk or closer to the street?

18 A    Closer to the sidewalk.

19 Q    Okay.  He runs, he runs from the back closer to the

20      sidewalk?

21 A    Right.

22 Q    Where does the shooter go?

23 A    Over to the sidewalk shooting at him.

24 Q    So, he moves around--

25 A    (Interposing)  Shooting at him.

1  Q     They both go to the sidewalk side?

2  A     Right.

3  Q     Hold on.  Let me stop you right there, sir, and jump to

4        another photograph so we can make this clear.  I'm going

5        to show you People's Exhibit Number Eleven.  Do you see

6        where we are now, sir?

7  A     Yes.

8  Q     Do you see the same Suburban we were talking about?

9  A     Yes.

10 Q     Okay.  And this is the sidewalk, right?

11 A     Right.

12 Q     And this is the business?

13 A     Yes.

14 Q     All right.  Now, talk us through it.  What's going on?

15 A     Okay.  The guy, when he runs to the back, the shooter

16       runs to the back, you know, shooting at him.  And he

17       runs back towards the other side, you know, like this--

18 Q     (Interposing)  The victim or--

19 A     (Interposing)  And the guy is still shooting at him.

20       The victim.

21 Q     Which -- Where does he run to?

22 A     Back out into the street.

23 Q     Okay.

24 A     Like this.  They chasing each other and he's shooting at

25       him as he runs.  So, finally, the guy runs back towards

-78-

1      the sidewalk.  The shooter comes back around and shot

2      him.  When he shot him this time, I guess he hit him in

3      the leg or side and the guy spin and hit the ground.

4  Q   Did you see the victim fall to the ground at this point?

5  A   Yes.

6  Q   Okay.  What happens next?

7  A   And then the guy was dragging and the guy started

8      shooting him while he was on the ground.

9  Q   Who was -- What do you mean the guy was dragging?  Was

10     the victim--

11 A   (Interposing)  The guy, the victim was dragging himself

12     on the ground, right?  So, the shooter starts shooting

13     at him and he kept shooting.  He walked up on him

14     shooting at him and kept shooting until he got to him.

15     And then he stepped, walked over and then he shot him in

16     the head.

17 Q   Could you see that from where you were looking?

18 A   Yes.

19 Q   At any point, did you hear the shooter say anything?

20 A   No.  I couldn't tell if he was saying anything or not.

21 Q   Is your window open or closed?

22 A   It's closed.

23 Q   Okay.  The victim, the person that was being shot at,

24     did you ever see him, at any point throughout this whole

25     process, have any kind of weapon or anything?

-79-

1  A     No.

2  Q     Was the shooter the only person you saw with a weapon at

3        that point?

4  A     Yes.

5  Q     And could you guess how many gunshots total you heard?

6  A     I don't know, a lot.  At least fifteen, at least fifteen

7        shots, ten or fifteen shots.

8              MR. PRASAD:  Thank you, your Honor.  Pass

9        the witness.

10             MS. ROCK:  Thank you.

11             CROSS-EXAMINATION

12 BY MS. ROCK:

13 Q     Good morning, Mr. Harris.

14 A     Good morning.

15 Q     Mr. Harris, would you agree that your memory is better

16        the closer in time an event happens?

17 A     Pardon me?

18 Q     Would you agree that your memory is better if something

19        happened that same day versus, let's say four months

20        later, nine months later?

21 A     Yeah.  Of course.

22 Q     Okay.  And when you gave -- The officer came to talk to

23        you, took notes while you were talking, is that right?

24        Is that yes?

25 A     Yes.  I think so.

1  Q    All right.  And so, she wrote out a statement based on

2       what you told her?

3  A    Yes.

4  Q    And then you signed it, right?

5  A    Right.

6  Q    You reviewed the statement with her, correct?

7  A    Right.

8  Q    Okay.  Now, your written statement that you gave to her,

9       that was on the same day that this happened, right?

10 A    Right.

11 Q    At approximately 6:15 p.m.?

12 A    Yes.  I guess.

13 Q    Oh.  Okay.  And, in your statement, you describe the SUV

14      color as being gray, correct?

15 A    Yes, a silver, gray.

16 Q    Well, you said gray in your statement, correct?

17 A    Yes.

18 Q    Okay.  And then when you testified over at the

19      preliminary examination, you described the SUV as gray,

20      correct?

21 A    Yes.

22 Q    All right.  And it was the passenger of the SUV that was

23      doing all the shooting?

24 A    Yes.

25 Q    Okay.  And your description of the shooter was that he

-81-

1      was a brown-skinned black man, correct?

2  A    Yes.

3  Q    He was 5'10", correct?

4  A    Yes.

5  Q    You described him as thin built?

6  A    Yes.

7  Q    Tall?

8  A    Yes.

9  Q    Okay.

10  A    5'10".

11  Q    What's that?

12  A    5'10".

13  Q    Okay.  And he was wearing a white T-shirt?

14  A    Yes.

15  Q    And a white do-rag on his head?

16  A    Yes.

17  Q    Okay.  And the shooter had a silver gun?

18  A    Yes.

19              MS. ROCK:  Okay.  Your Honor, I don't have

20      any further questions of Mr. Harris?

21              THE COURT:  Anything more?

22              MR. PRASAD:  No, your Honor.  Thank you.

23              THE COURT:  Thank you, young man.  I

24      appreciate you coming down.

25              (At 11:34 a.m. witness excused.)

1                    THE COURT:  While he's leaving, could you

2        get the next witness, please?

3                    MS. ROCK:  Your Honor, may I run to the rest

4        room?  I'm sorry.  I'll be quick.

5                    (At 11:34 a.m. off the record.)

6                    (at 11:36 back on the record.)

7                    THE COURT:  Could you make sure that he has

8        your name spelled correctly?  In the meantime, why don't

9        you come on up and have a seat?  Can you grip the arm of

10       that?

11                   MS. THOMSPON:  Is that okay?

12                   THE COURT:  If you want to keep doing like

13       that.  Ah, there you go.

14                   MS. THOMPSON:  How's that?

15                   THE COURT:  How's that for you?

16                   MS. THOMPSON:  It's good for me, if you can

17       hear me.

18                   THE COURT:  It's good for me.  As soon as

19       the defense lawyer comes back in, I'll give you a little

20       oath and then we'll have some questions.

21                   MS. THOMPSON:  Thank you.

22                   MS. ROCK:  Thank you, your Honor.

23                   THE COURT:  No problem.

24                   (At 11:37 a.m. witness KIMBERLY THOMSPON

25                   was sworn.)

                                    -83-

```
 1                    THE COURT:  Ms. Thompson, I need you to

 2        promise to tell the truth.  Do you promise to tell the

 3        truth today?

 4                    THE WITNESS:  I do.

 5                    THE COURT:  Thank you.

 6                    MR. PRASAD:  May I, your Honor?

 7                    THE COURT:  When you're ready.

 8                    DIRECT EXAMINATION

 9   BY MR. PRASAD:

10   Q    Ma'am, if you would, introduce yourself to the jury,

11        please?

12   A    Pardon me?

13   Q    Introduce yourself to the jury, please.

14   A    Kimberly Thompson.

15   Q    And, ma'am, where do you work?

16   A    I work for Elder Care.

17   Q    As a home health care nurse?

18   A    Yes.

19   Q    Okay.  Ma'am, I want to take you back to April of last

20        year.  At the time, were you working in Tireman with a

21        Mr. Harris?

22   A    Yes.  I was.

23   Q    Okay.  And I think that address is 16215 Tireman?

24   A    Yes.

25   Q    Okay.  I want to talk about an incident on April 10th of
```

1       2010.  Do you remember that day, sir [sic]?

2  A    I do.

3  Q    And do you remember the incident in that late afternoon,

4       early evening hours?

5  A    I do.

6  Q    Okay.  Where were you, ma'am, when something was first

7       brought to your attention that something was going on?

8  A    I was in the front bedroom.  We were actually moving

9       that day, Mr. Harris, out of the house.  We had taken

10      one load in his van.  We came back home and we was in

11      the bedroom packing.

12 Q    What happened?  What drew your attention at that point?

13 A    Well, Mr. Harris hollered out to me, someone's shooting

14      at the store across the street.

15 Q    So, what did you do?

16 A    I ran into the living room and looked out the window.

17 Q    Okay.  I'm going to show, I'm going to show you on the

18      screen People's Exhibit Number Seventeen.  Can you see

19      the TV from there, ma'am?

20 A    Yes.

21 Q    Okay.  Do you recognize that house in the back there?

22 A    I do.

23 Q    And do you recognize this window over here?

24 A    Absolutely.

25 Q    Okay.  Is that the window that we're talking about?

1  A   Yes.  It is.

2  Q   Okay.  And where is the store in relation to the house?

3  A   Right across the street.

4  Q   What did you observe, ma'am?

5  A   Well, I saw a gentleman come out of the store and shoot

6      a gentleman that was in the street in the leg, I

7      believe, and he went down.

8          MS. ROCK:  Well, your Honor, I'm going to

9      object.  This is speculation.

10         THE COURT:  I think it's a term of art.

11         MS. ROCK:  Thank you, your Honor.

12 Q   (By Mr. Prasad, continuing):  Please continue, ma'am.

13     What did you see?

14 A   A gentleman came out of the store and there was a

15     gentleman in the street.  He got shot in the leg.  The

16     shooter got in the car.  The gentleman in the street

17     started to get up off the ground.  And the car had

18     started to take off.  When this guy was getting up, the

19     car slammed on its brakes.

20 Q   Do you remember what kind of car this was?

21 A   I don't.

22 Q   Okay.

23 A   I don't.

24 Q   Do you remember what side the shooter got in?

25 A   I believe the driver's side.

1  Q    What happened next?

2  A    The car slammed on its brakes.  Somebody jumped out of

3       the passenger's side, came running back.  This guy was

4       up, chased him around the car shooting at him.

5  Q    Was it the same person that you saw shooting earlier?

6  A    No.  No.  I don't believe so.  One got in the driver's

7       side--

8              MS. ROCK:  (Interposing)  At this time, I

9       don't think--

10             THE COURT:  (Interposing)  It's a term of

11      art, ma'am.

12             MS. ROCK:  All right, your Honor.

13      Objection.

14 Q    (By Mr. Prasad, continuing):  Please continue.

15 A    Chased the guy around the car shooting.  The guy went

16      down again.  He kept shooting, walked up to him shooting

17      and shooting.  I was, at some point, on the phone with

18      911.  Mr. Harris was hollering.  He--

19 Q    (Interposing)  What were you trying to do when you were

20      watching all this?

21 A    Pardon me?

22 Q    What were you trying to do?  Were you trying to contact

23      911?

24 A    Oh.  I was trying to get help for the man.  He was

25      begging for his life.  He was, he was--

-87-

1  Q    (Interposing)  How do you--

2  A    (Interposing)  Please don't shoot me.

3  Q    How do you know--

4  A    (Interposing)  Please don't kill me.  Because I could

5       hear him hollering.  He was right in front of my house.

6  Q    The victim was?

7  A    Yes.

8  Q    What was he saying?

9  A    He was saying, please don't kill me.  Please don't kill

10      me.  Then he went down and he just, it's like the guy

11      emptied the gun on him.  It was over.

12  Q   Did you hear anything from the person who was shooting?

13  A   No.

14  Q   And how close did the shooter ultimately get to the

15      person the ground?

16  A   He walked right up to him.  I think the last shot went

17      into his head.

18  Q   Why do you say that?

19  A   Because he just walked up, did that last shot and jumped

20      and ran and got in the car and they took off.

21  Q   And how did that car take off?

22  A   Fast.  I was crying.  I was hysterical.  I had never

23      seen anything like that in my life before.

24  Q   Ma'am, do you know, for a fact -- I guess let me ask you

25      it this way.  Do you know if the person who got in the

-88-

```
 1       driver's side actually was the driver?  Can you tell
 2       from what you were seeing?
 3   A   To be honest, I didn't focus, I couldn't -- I didn't
 4       focus on what they were wearing.  No.  I just know
 5       somebody got into the driver's side.  They slammed on
 6       the brakes, somebody got out of the passenger's side.
 7       Whether the driver slid over the seat and got out that
 8       door, I don't know.  I know it was two different doors.
 9   Q   You saw the driver door close?
10   A   Yes.
11   Q   And you saw someone get out of the passenger's side?
12   A   Absolutely.
13   Q   Okay.  I follow you.  Ma'am, the person who was being
14       shot, the victim, did you ever see that person with any
15       type of weapon?
16   A   No.
17   Q   Did you ever see that victim do anything in terms of
18       fighting back or anything against the--
19   A   (Interposing)  No.
20   Q   How much time went past between the time where the guy,
21       the first part where you say the victim was shot, went
22       to the ground and that's when you said the driver's
23       side, went in the driver's side and the door closed, how
24       much time before the car came back and the passenger
25       comes and the next series of shots happen?
```

1  A     Thirty seconds.  It just barely took off.

2  Q     Could you approximate how many gunshots you heard that

3        day or saw?

4  A     Probably eleven, twelve, thirteen.

5  Q     Thank you.

6  A     Quite a bit.

7              MR. PRASAD:  Thank you, Ms. Thompson.  Thank

8        you, your Honor.  Pass the witness.

9              THE COURT:  Ms. Rock?

10             MS. ROCK:  Thank you, your Honor.

11             CROSS-EXAMINATION

12 BY MS. ROCK:

13 Q     Good morning, Ms. Thompson.

14 A     Good morning.

15 Q     Ms. Thomspon, would you agree that your memory is better

16       on the same day that something happens versus four

17       months later?

18 A     Yes.

19 Q     All right.  Or nine months later.  You gave a statement

20       to the police on the same day as the shooting, is that

21       correct?

22 A     Yes.

23 Q     Okay.  Approximately one to two hours after it happened,

24       right?

25 A     Yes.

```
 1  Q    Okay.  And according to you, the first thing that you

 2       see is two people come running out of the Smokehouse

 3       Barbecue?

 4  A    I don't recall two people.  I recall one person.

 5  Q    All right.  I'm going to show you your statement--

 6  A    (Interposing)  Okay.

 7  Q    And if you could just read the first paragraph to

 8       yourself.  You -- When they talked to you about this

 9       statement, you signed it at the bottom.

10  A    Okay.

11  Q    You would have reviewed it before you signed it?  Yes?

12  A    Yes.  Probably.

13  Q    So, I'm going to ask you to read the first paragraph to

14       yourself.  And just let me know when you're done,

15       please.  Are you done?

16  A    Yes.

17  Q    Okay.  So, when they asked you what you observed, you

18       said that:

19                    "What happened today that brings you into

20                    police contact?"

21  Answer:      "I was inside my home when I heard four

22                    gunshots.  My husband looked out the front

23                    window and they [sic] said they are shooting

24                    at the store.  I looked out the front

25                    bedroom window and I saw two men come out of
```

1                      the Smokehouse Barbecue & Shrimp

2                      Restaurant."

3                      That's what you said, right?  You were asked

4       that question and that's what you said?

5  A    Yes.  I guess so.

6  Q    No.  Well, is that what's here?

7  A    Yes.

8  Q    Okay.

9  A    I was really upset that day.

10 Q    Oh.  I understand.

11 A    I was really upset.

12 Q    Oh, I bet.  But this is a document that you signed--

13 A    (Interposing)  Yes.

14 Q    Correct?

15 A    Yes.

16 Q    Okay.  And then you said there was a person that had a

17      gun in his hand that exited, correct?  Is that yes?

18 A    Yes.

19 Q    Okay.  And then, at some point, the shooter ran out and

20      circled the restaurant and ran behind the restaurant?

21 A    No.  There's a second person.  Now that I've read that

22      report, there was two people.  One guy ran to the back

23      of the restaurant.  The shooter that shot the man in the

24      leg got in the car in the driver's side.

25 Q    I'm sorry.  What was that?  What did you just say?

```
 1  A    The two people that came out of the store--

 2  Q    (Interposing)  Okay.

 3  A    I had forgotten about the man that had ran to the back

 4       of the store.

 5  Q    Okay.

 6  A    So, that did happen.

 7  Q    Okay.  So, there was a second man that ran to the back?

 8  A    Yes.  I never saw him after that.

 9  Q    Okay.  And then the shooter -- You described the shooter

10       as being a black male twenty to, in his twenty to, 20s

11       to 30s, is that correct?

12  A    Okay.  Yes.

13  Q    Okay.

14  A    Yes.

15  Q    And his height was approximately 5'9" to 5'10"?

16  A    Yes.

17  Q    Okay.  And he had a thin build?  Yes?

18  A    I don't recall a build.

19  Q    Well, didn't you give in your statement that the person

20       looked approximately a hundred and sixty to a hundred

21       and seventy pounds?

22  A    Yes.  I don't remember exactly -- Like I said, I'm just

23       being honest.  I don't remember exactly.

24  Q    I understand.  Well, I'm going to draw your attention to

25       your statement.
```

1  A      Okay.

2  Q      And just ask you to begin reading the question:

3                       "Can you describe the person who did the

4                       shooting?"

5                       And just read to this paragraph, your [sic]

6       question and then the answer, would you, please?  And

7       let me know when you're done.  Are you done?

8  A      Yeah.

9  Q      Okay.  So, you were asked by Officer Pesmark on April

10      10th at 5:57 p.m.:

11                      "Can you describe the person who did the

12                      shooting?"

13      And your answer was:

14                      "He was a black male, late 20's, early 30's

15                      approximately 5'9" to 5'10", thin build,

16                      approximately one sixty to a hundred and

17                      seventy pounds, medium brown, comparable to

18                      a milk chocolate bar in complexion.  He had

19                      a short afro that was approximately a half

20                      inch to an inch deep thick, no facial hair,

21                      no visible scars, marks or tattoos from my

22                      vantage point.  He had a thin, skinny face.

23                      He was wearing a plain, white T-shirt and

24                      darker blue jeans.  He was armed with a

25                      black handgun, semi-automatic like the

-94-

```
 1                     police use."

 2                     You were asked that question and that was

 3          your answer?

 4    A     Yes.

 5    Q     And you said today that the, the deceased was saying

 6          please don't kill me, correct?

 7    A     Yes.

 8    Q     But when you talked to the police, you said his words

 9          were stop, stop, stop, correct?

10    A     It's possible.

11    Q     Okay.  Well, I'm going to draw your attention to your

12          statement.

13    A     I'm sorry.

14    Q     No.  That's okay.

15                     THE COURT:  For what?

16    Q     (By Ms. Rock continuing):  Just start with:

17                     "Did the shooter say anything during the

18                     incident"-

19    A     (Interposing)  I mean, he was saying, I mean, it's

20          possible I told the officer he was saying stop, stop,

21          stop.  But he was begging for his life.

22    Q     Well, okay--

23    A     (Interposing)  Stop.  Please don't kill me.

24    Q     But the statement here that you wrote down is stop,

25          stop, stop, right?
```

1  A    Okay.

2  Q    Well, here.  Why don't you look at it?

3  A    So, you're asking me why I didn't tell him then please

4       don't kill me?  Is that your point?

5  Q    Can you please just look at it?

6  A    I just don't understand.

7  Q    Okay.

8  A    Okay.

9  Q    Okay.  So, the words that were reduced to writing were

10      stop, stop, stop, correct?

11 A    Pardon me?

12 Q    The words that -- The quote that you gave to the police

13      officer was stop, stop, stop, correct?

14 A    Yes.  He did say...

15 Q    Okay.  You had said he was, he asked:

16               "Did the shooter say anything during the

17               incident?"

18      You said:  "I don't recall hearing him say anything.  I

19               did hear the victim begging and pleading,

20               stop, stop, stop."  Correct?

21 A    Yes.

22 Q    That's what you said?  Is that yes?

23 A    The victim was saying stop, stop, stop.

24 Q    I understand.

25 A    Yes.

1   Q      That's what you said?

2   A      Absolutely.  He said, please don't kill me.

3   Q      But that's -- Ma'am, that's not in here though, is it?

4   A      Well...

5   Q      Ma'am, it's not in here?

6   A      It's not in there, but it was said.  Believe me, I'll

7          never forget those words the rest of my life.

8                  THE COURT:  Anything else you can think of,

9          Ms. Rock?

10                 MS. ROCK:  Your Honor, I don't think so.

11         Thank you.

12                 MR. PRASAD:  Just briefly, Judge, if I may.

13                 REDIRECT EXAMINATION

14  BY MR. PRASAD:

15  Q      Ms. Thompson, had you seen either the shooter or the

16         victim earlier that day?

17  A      You know, while we were moving, there's a vacant lot

18         next to the store and there were quite a few people.

19         They were hanging out and, no problems.  And we came

20         back to load up the second time, there was, that's when

21         trouble started.  But they had been there for a little

22         while.

23  Q      When you say they, which ones?

24  A      Well, the truck that was parked there.  The gentleman

25         that was, the victim that got killed, he was there.  It

-97-

```
 1     was a group of people out there.  When the shooting

 2     started, everybody took off.

 3  Q  Was the person who you later saw as the shooter, was he

 4     out there earlier as well?

 5  A  The truck, the car that they got into.  Yes.  It was

 6     there.  Absolutely.

 7  Q  Not the truck, the person himself.

 8  A  I couldn't tell you.

 9  Q  Okay.

10  A  I'm sorry.

11            MR. PRASAD:  That's okay.  Thank you.

12     Nothing else.

13            THE COURT:  Anything more?

14            RECROSS-EXAMINATION

15  BY MS. ROCK:

16  Q  Just after, after the incident or the shooting, a lot of

17     people came up to the restaurant -- Okay.  So, how many

18     would you say?  Fifty to a hundred or just--

19  A  (Interposing)  Less than fifty.

20  Q  Okay.  But they were civilians, regular people?

21  A  Yes.

22  Q  Okay.  And that was before the police got there?

23  A  Yes.

24            MS. ROCK:  Okay.  Thank you.

25            THE WITNESS:  You're welcome.
```

-98-

```
 1                    THE COURT:  Thank you, ma'am.  Appreciate
 2        you being here.
 3                    (At 11:54 a.m. witness excused.)
 4                    THE COURT:  One o'clock.  I will see
 5        everybody back from lunch at one o'clock.
 6                    (At 11:54 a.m. jury leaves the courtroom.)
 7                    (At 11:54 a.m. recess.)
 8                    (At 1:12 p.m. court back in session.)
 9                    THE COURT:  Okay.  We're ready.
10                    (At 1:12 p.m. jury enters the courtroom.)
11                    THE COURT:  My loved ones, it is not an act
12        of boldness to ask me to get some flavors that you don't
13        see in the bowl.  If you're partial like me -- I'm
14        partial to the watermelon and the blue ones, blue
15        raspberry.  If I don't see one, I'll go and -- So, if
16        you don't see what you want, I told you, I got you.
17        It's in the bag, which is in the drawer.  So, by all
18        means, just ask.  I hope everybody had a good lunch.
19        Thank you for being back promptly.
20                    MR. PRASAD:  We're ready, Judge.
21                    THE COURT:  You told me that.
22                    MR. PRASAD:  Officer McNairy, please.
23                    THE COURT:  Step on in, please, and then
24        step on up.  I need you to take a little oath.
25                    (At 1:15 p.m. witness OFFICER LeTRELLE
```

-99-

```
 1                    McNAIRY was sworn.)

 2                    THE COURT:  Do you promise to tell the

 3      truth?

 4                    THE WITNESS:  I do.

 5                    THE COURT:  Please have a seat.

 6                    DIRECT EXAMINATION

 7  BY MR. PRASAD:

 8  Q    Officer, please introduce yourself to the jury.

 9  A    LeTrelle McNairy.

10  Q    And, officer, where do you work?

11  A    For the Detroit Police Department.

12  Q    In what capacity do you work there?

13  A    I'm assigned to the evidence technician unit as an

14       evidence tech.

15  Q    And how long have you been an evidence tech, ma'am?

16  A    Eight years.

17  Q    Okay.  What are some of your duties as an evidence tech,

18       please?

19  A    As an evidence technician, I respond to crime scenes.  I

20       collect evidence relative to the crime.  I turn it over

21       to the officer in charge for further processing.

22  Q    Do you ever watch any of those shows like CSI or

23       anything like that?

24  A    All the time.

25  Q    Is it exactly like we see on TV?
```

1  A    No.

2  Q    Why not?  I mean, what's different?

3  A    One, they have commercials.  Here, it takes no break.

4       It takes no break.  The information that they receive,

5       they're able to do a lot more than what we are allowed

6       to do.  Here, we've learned to do more with less.  It's

7       a little gritty.

8  Q    Do you actually -- Are you in charge of the

9       investigation in any way?

10 A    The only thing I'm in charge of is the crime scene once

11      I arrive.

12 Q    Okay.  And what about documenting and collecting the

13      evidence?  Is that your role at that point?

14 A    Yes.  I document the crime scene as I see it once I

15      arrive by notes, photographs, diagram, pictures, photos.

16      Yes.

17 Q    Okay.  I want to take you to a specific scene, ma'am, on

18      April 10th of 2010, on Tireman here in the city of

19      Detroit.  Did you have an opportunity to respond to that

20      scene?

21 A    Yes.  I did.

22 Q    And do you know approximately what time it was that you

23      actually went out to that scene?

24 A    Referring to my notes, I arrived at 6:15 p.m.

25 Q    Okay.  Was it still daylight out when you got there,

1     ma'am?

2  A   Yes.  It was.

3  Q   All right.  Now, I know during the lunch break I had an

4      opportunity to show you what's already in evidence as

5      People's Exhibits One through Forty-Six, the

6      photographs.

7  A   Yes.

8  Q   Do you recognize those photographs, ma'am?

9  A   Yes.

10 Q   What are those photographs from?

11 A   Photographs from the location at 16228 Tireman.

12 Q   Okay.  There were yellow placards, numbers one through

13     twenty-five, put all over the scene for different items.

14     Did you recognize those, ma'am?

15 A   Yes.  I did.

16 Q   And did you have any involvement with that?

17 A   Yes.

18 Q   Tell us about that.

19 A   Those were the placards that were used for

20     identification and for noting where the evidence was

21     placed.

22 Q   And who is responsible for that?

23 A   I was.  And was also assisted by two other officers from

24     the evidence technician unit.

25 Q   All right.  Very good.  Is there anything else that you

1   did in terms of somehow diagraming or documenting the

2   scene as well?

3   A   I did a sketch.  It's considered a rough sketch at the

4   time.  And then I finalized it with placing measurements

5   in, identifying the information that I picked up.

6              MR. PRASAD:  Okay.  Ms. Rock?

7              MS. ROCK:  Thank you.

8              MR. PRASAD:  May I approach, your Honor?

9              THE COURT:  You may.  It's Exhibit what?

10             MR. PRASAD:  Forty-Seven, your Honor.

11             THE COURT:  Okay.

12  Q   (By Mr. Prasad, continuing):  Ma'am, I'm going to hand

13  you People's Proposed Exhibit Number Forty-Seven.  Will

14  you look at that for me?  Do you recognize that, please?

15  A   Yes.

16  Q   What is that?

17  A   This is the diagram that I made for the scene.

18  Q   All right.

19  A   For 16228 Tireman.

20  Q   And is that signed by you somewhere?

21  A   Yes.  It is.

22  Q   And I think that is one of the originals as well?

23  A   Yes.

24             MR. PRASAD:  Okay.  Your Honor, at this

25  time, the People would seek to admit this into evidence

                          -103-

```
 1        as People's Forty-Seven.
 2                    MS. ROCK:  No objection, your Honor.
 3                    THE COURT:  It'll be received without
 4        objection.
 5                    (Whereupon People's Exhibit Number Forty-
 6                    Seven was received into evidence.)
 7   Q    (By Mr. Prasad, continuing):  Well, let me jump ahead
 8        while we try to figure this out in a second.  I didn't
 9        turn the power on.  We're going to ignore that part
10        right now.  Ma'am, can you see what's on the TV here?
11   A    Yes.
12   Q    Okay.  Let me widen it out for you.  Okay.  So, what we
13        have here is People's Exhibit Forty-Seven, the sketch
14        that you created, ma'am?
15   A    That's correct.
16   Q    All right.  Can you explain to the jury what, in
17        general, you are trying to document or encompass in the
18        sketch?
19   A    That's a general overview of the location in front of
20        16228 Tireman.  In the upper righthand corner, there is
21        an N that indicates North.  So, North would be anything
22        going that way.  That's North.  That's like a
23        directional point.  And then the small circles on--
24                    THE COURT:  (Interposing)  Hold on for a
25        second, please.  Ms. Thomas, if you want to sit next to
```

```
 1        Mr. Haley, you're more than welcome to sit over there in
 2        fourteen.  Okay.  Go ahead.
 3                    THE WITNESS:   The circles indicate pieces of
 4        evidence.
 5   Q    (By Mr. Prasad, continuing):  Okay.
 6   A    Inside of each circle, there's a corresponding -- I
 7        can't -- I don't know if there's a number on that one.
 8   Q    I think you actually have two letters and everything
 9        else is numbers.
10   A    And everything that's in a circle indicates the
11        evidence.  And at the bottom of that is a sketch legend.
12        And that indicates what each letter represents.
13   Q    Okay.  And the numbers that you have in each one of
14        these circles, do they correspond to the yellow placards
15        we saw in the photographs?
16   A    That's correct.
17   Q    And do they also correspond to when you actually
18        collected the evidence as well?
19   A    That's correct.
20   Q    Did you try keep the numbers consistent throughout the
21        process?
22   A    Yes.
23   Q    Okay.  After you were able to photograph and document
24        the scene, did you try to actually collect all of the
25        different evidence?
```

1   A      Yes.  All the evidence was collected.

2   Q      I want to draw your attention specifically to the

3          firearm-related evidence, the evidence of shell casings

4          and spent bullets and such.  Did you find that in this

5          scene?

6   A      Yes.  I did.

7   Q      Okay.  And did you have an opportunity to collect each

8          one of these items?

9   A      Yes.  I did.

10  Q      All right.  Ms. McNairy, I guess I'll give them to you

11         in groups.   That way we don't have them falling over.

12         But start with the first batch, which is People's

13         Exhibits Forty-Eight through Fifty-Two.  Look at these,

14         if you would, please.

15  A      Okay.

16  Q      And what are you looking at right now?

17  A      This is an evidence tag--

18  Q      (Interposing)  Okay.

19  A      That identifies what's inside the envelope that is

20         placed on each piece of evidence that's collected.

21  Q      When is that tag placed there?

22  A      At the time of processing.  It's collected and then once

23         I get back to the respective location to process the

24         evidence, it's placed on there immediately after being

25         placed in the envelope.

1   Q     Okay.  So, you put it in the envelope and then you put

2         the tag right on top?

3   A     That's correct.

4   Q     Who fills out that tag?

5   A     I do.

6   Q     And is your name on each one of those that I've given

7         you so far?

8   A     That's correct.  Yes.

9   Q     All right.  I'm going to show you, I'm going to show you

10        each one of these envelopes.  That is really just the

11        question I have for each one, is if you can verify that

12        these envelopes are the ones that you, in fact,

13        collected from this scene, okay?

14  A     Yes.  They are.

15  Q     And these envelopes also have the numbers that

16        correspond to the placards on each one of them?

17  A     Yes.  They do.

18  Q     Okay.

19  A     They're on the tag.

20  Q     All right.  So, for example, just looking randomly at

21        Number Fifty-Three, People's Proposed Exhibit Fifty-

22        Three, there's a -- It says bullet fragment and number

23        seven and circles on it?

24  A     Yes.

25  Q     That would correspond to number seven on the diagram and

-107-

1    number seven in the photographs?

2  A    That's correct.

3              MR. PRASAD:  Okay.  Very good.  Your Honor,

4    at this time, the People would seek to admit these into

5    evidence as People's Exhibits, I believe we're at Forty-

6    Eight through Sixty-Five.

7              MS. ROCK:  Your Honor, no objection.

8              THE COURT:  They'll be received.

9              (Whereupon People's Exhibits Forty-Eight

10              through Sixty-Five were received into

11              evidence.)

12              MR. PRASAD:  Thank you.

13  Q    (By Mr. Prasad, continuing):  In addition, ma'am, to all

14    of the firearms evidence, all of the bullet evidence and

15    all of the casing evidence, what other types of evidence

16    did you collect in this case, ma'am?

17  A    There was cellular phones collected, lenses from glasses

18    and there was suspected narcotics also collected.

19  Q    Okay.  And I think those are referenced also in all the

20    photographs that I showed you at lunch time today?

21  A    That's correct.

22  Q    The suspected marijuana was the stuff that was in the

23    red, in the red--

24              THE COURT:  (Interposing)  You're testifying

25    now, sir.

-108-

1                    MR. PRASAD:  Oh, I'm sorry, Judge.  I'm

2      sorry, Judge.

3  Q   (By Mr. Prasad, continuing):  All the things you talked

4      about, ma'am, was the stuff that was documented in terms

5      of the photographs as well?

6  A   That's correct.

7  Q   Okay.  The cell phones themselves, were they turned over

8      to anyone?

9  A   They were placed on evidence tags and all of it was

10     turned over to the homicide section on a receipt number.

11                   MR. PRASAD:  Okay.  Very good.  Thank you,

12     officer.  Pass the witness.

13                   MS. ROCK:  Your Honor, I don't have any

14     questions of the officer.

15                   THE COURT:  Thank you, much.

16                   THE WITNESS:  You're welcome, sir.

17                   (At 1:25 p.m. witness excused.)

18                   MR. PRASAD:  The People call Officer

19     Fitzhugh.

20                   THE COURT:  No.  That's not your officer.

21     That's Mr. Fitzhugh.  I thought you said Pettit.

22                   MR. PRASAD:  Officer Fitzhugh.

23                   THE COURT:  Oh.  Okay.

24                   MR. PRASAD:  Is that what I said?

25                   THE COURT:  I heard something different, but

                              -109-

```
 1      -- No.  You're welcome.  Please come in.

 2                  (At 1:27 p.m. witness OFFICER EUGENE

 3                  FITZHUGH was sworn.)

 4                  THE COURT:  Promise to tell the truth today,

 5      sir?

 6                  THE WITNESS:  I do.

 7                  THE COURT:  Thank you.  Happy New Year to

 8      you.  Have a seat.

 9                  DIRECT EXAMINATION

10  BY MR. PRASAD:

11  Q   Sir, if you would, introduce yourself to the jury,

12      please.

13  A   Sure.  My name is Eugene Fitzhugh.  I'm a police officer

14      with the city of Detroit.

15  Q   And where do you work, sir?  In which unit?

16  A   The crime scene unit.

17  Q   And how long have you been working there, sir?

18  A   Since December of '98, in that unit.  Yes.

19  Q   So, twelve years about?

20  A   It'll be twelve years on -- Yeah.  Twelve years.

21  Q   I want to ask you, sir, about your involvement and the

22      assistance of processing a vehicle that was located at

23      Gene's Towing that was taken from Tireman here in the

24      city of Detroit.  And this would have occurred back in

25      April of 2010.  Are you familiar with that, sir?
```

1  A     I have a report that I can refer to, but yes.  I did

2        process a vehicle.

3  Q     Okay.  And do you know offhand, do you recall what kind

4        of vehicle this was?

5  A     It was a brown -- If I may refer to my report, please?

6  Q     Yes, sir.

7  A     It was a brown 1997 GMC Suburban.  Do you need the

8        license and the VIN number?

9  Q     No, sir.  I do not.  But I would like to show you a

10       photograph that's in evidence, if I may.  These are

11       already in evidence, Exhibits Eleven and Twelve.  Do you

12       see that vehicle in those photographs, sir?

13 A     Yes.

14 Q     Is that the same vehicle that you processed as well?

15 A     I can see the front and the driver's side on both of the

16       pictures, but it appears to be.  Yes.

17 Q     Okay.  And what was your purpose in processing it, sir?

18 A     I got a request from Sergeant Mackie via fax machine to

19       process the vehicle for latent fingerprints.

20 Q     Okay.  Tell us about that.  What are you doing in this

21       process?

22 A     Well, when we process a vehicle, usually the vehicle,

23       first of all, is stored at a facility that the city

24       authorizes.  In this particular case, it's Gene's Tow.

25       We get a specific work request from the officer in

1    charge of the case.  And Officer Mackie requested that

2    the vehicle be dusted for latent fingerprints.

3              That's a process where we use powders and we

4    use a powder that is opposite the color of the vehicle

5    and we dust, just like you see on TV, looking for

6    fingerprints.  If we find fingerprints, we lift the

7    fingerprint and send it off to latent fingerprints for

8    them to analyze.

9   Q   Were you able to dust the exterior of this vehicle, sir?

10  A   I did.

11  Q   Were you able to find any fingerprints?

12  A   I found, I believe, three.

13  Q   Okay.  Now, just because you find fingerprints, does

14     that mean that they're able to be analyzed?

15  A   No.

16  Q   Why is that?

17  A   Well, you have to have enough characteristics or enough

18     points to be able to identify the fingerprint.  And

19     usually, they request nine.  But we will collect what we

20     think is a good fingerprint and leave it up to latent

21     prints to analyze and determine whether or not they're

22     usable.

23  Q   Did you have any other involvement, sir, in terms of

24     processing this case?

25  A   No.  Just the car, or vehicle.

-112-

```
 1                    MR. PRASAD:  Thank you.  Pass the witness.
 2                    MS. ROCK:  Your Honor, I don't have any
 3        questions for Mr. Fitzhugh.
 4                    THE COURT:  Thank you, sir.
 5                    THE WITNESS:  Thank you.
 6                    THE COURT:  Enjoy the rest of the day.
 7                    THE WITNESS:  Okay.
 8                    (At :30 p.m. witness excused.O
 9                    THE COURT:  If you'll call your next
10        witness, please.
11                    MR. PRASAD:  Thank you, your Honor.  The
12        People are going to call Officer Pettit.
13                    THE COURT:  See, that's who I thought you
14        said at first, Fitzhugh, Pettit.  I mean, it was quiet.
15                    MS. ROCK:  Your Honor, can the prosecutor
16        and I approach?
17                    THE COURT:  No.  I don't want to speak to
18        you two.
19                    MS. ROCK:  All right.
20                    THE COURT:  They think I'm kidding.  Young
21        man, please give your name to him.  Do you need it now?
22                    MS. ROCK:  Just for a second.  Thank you.
23                    THE COURT:  Okay.
24                    (Bench conference 1:32 p.m.-1:33 p.m.)
25                    MR. PRASAD:  Your Honor, may I proceed?
```

-113-

1                    THE COURT:  You may, please.

2                    MR. PRASAD:  Sir, please introduce yourself

3       to the jury--

4                    THE COURT:  (Interposing)  Hold on.  I'm

5       sorry.  Young man, I need you to take an oath.

6                    (At 1:33 p.m. witness OFFICER BRANDON

7                    PETTIT was sworn.)

8                    THE COURT:  Do you promise that your

9       testimony today will be truthful?

10                   THE WITNESS:  Yes, sir.

11                   THE COURT:  Thank you.

12                   DIRECT EXAMINATION

13    BY MR. PRASAD:

14    Q    Please introduce yourself to the jury, sir.

15    A    Brandon Pettit.

16    Q    And, sir, where do you work?

17    A    City of Detroit Police Department.

18    Q    And in what capacity do you work there?

19    A    I'm a police officer.

20    Q    And how long have you been an officer?

21    A    For about four and a half years.

22    Q    And, sir, what kind of assignment do you have currently?

23    A    Currently, I'm a police officer assigned to the eighth

24         precinct, IOD.

25    Q    And what's the IOD?

```
 1  A    It's like the investigator's bureau.
 2  Q    Back in April of last year, April of 2010, what was your
 3       assignment back then?
 4  A    Patrol.
 5  Q    Patrol?
 6  A    Yes.
 7  Q    And back in April of 2010, what kind of shift were you
 8       working?
 9  A    I believe it was, I was working afternoons that day.
10  Q    Okay.  And what is the normal hours of an afternoon
11       shift?
12  A    4:00 to midnight.
13  Q    Specifically, I want to draw your attention to April
14       10th of 2010.  Were you working that day, sir?
15  A    Yes.
16  Q    And what kind of capacity were you working on that day?
17  A    Patrol.
18  Q    And when you say patrol, were you in a marked unit?
19  A    Yes.
20  Q    In a full uniform?
21  A    Yes.
22  Q    Were you working by yourself or with a partner?
23  A    I had a partner.
24  Q    Who was your partner on that day?
25  A    Officer Banks.
```

 1  Q    Sir, do yourself and Officer Banks have an occasion to

 2       be called out to a location on Tireman?

 3  A    Yes.

 4  Q    And what was the, what was the nature of that call?

 5  A    It was a possible shooting--

 6  Q    (Interposing)  Okay.

 7  A    That had just happened.

 8  Q    And did you respond to that location, sir?

 9  A    Yes.

10  Q    Where did you go to specifically?

11  A    I believe it was -- I'm going to have to look exactly.

12       Can I refresh my memory--

13  Q    (Interposing)  Do you have a report, sir?

14  A    Yes.

15  Q    Did you write a report in this case?

16  A    Yes.

17  Q    Can you do me a favor and tell me what point number your

18       report is?

19  A    It's point eight.

20  Q    Okay.  Please look at your report, if it will refresh

21       your recollection.

22  A    Okay.

23  Q    Where did you respond to, sir?

24  A    16228 Tireman.

25  Q    Okay.  And describe the scene when you got there, sir.

1  A    As we pulled up, we could see a large crowd in the area.

2       And once we further pulled up, I noticed a gentleman

3       laying on the sidewalk, sidewalk, half on the sidewalk,

4       half on the street.  And we stopped, got out of our

5       vehicles, went to tend to the victim, noticed that the

6       victim wasn't breathing and was motionless, no life in

7       him--

8  Q    (Interposing)  Is this the gentleman that you described

9       that's on the sidewalk, part on the sidewalk, part on

10      the street?

11 A    Yes.

12 Q    Please continue.  What was the condition he was in?

13 A    He was laying, laying half on the sidewalk, half on the

14      street.  And he had a large pool of blood by his head.

15      I checked him for any signs of life.  Nothing.

16 Q    Okay.

17 A    And then we started noticing a lot of people gathering

18      around.

19 Q    Were the people on top of the victim at this point?

20 A    No.

21 Q    Where were the people located at?

22 A    Just kind of scattered around, across the street, down

23      the street, in the general area, but not directly on top

24      of him or anything.

25 Q    Okay.  So, what did you decide to do at that point?

-117-

1  A    We decided to disburse the crowd to try to preserve the

2        scene so nothing got tampered with.

3  Q    Tell me about that.  What were you trying to do at this

4        point?

5  A    Push the crowd back to where, to a point to where the

6        investigation could not be tampered with--

7  Q    (Interposing)  Okay.

8  A    So, we could, all the evidence to be collected wasn't

9        disturbed.

10 Q    At this point, were you able to notice if there was

11       possible evidence at the scene?

12 A    Yes.

13 Q    And what were you able to notice at this point?

14 A    Multiple shell casings around, spots of blood, clothing,

15       stuff like that.

16 Q    What about in terms of assistance for the victim?  Was

17       there an EMS or anything at the scene at this point?

18 A    They were called, dispatched.  They arrived at a later

19       time.

20 Q    Okay.  You got there before the EMS did?

21 A    Yes.

22 Q    Were you successful and able to secure or preserve the

23       scene?

24 A    I believe so.  Yes.

25 Q    Now, I guess my question is, thinking back to when you

1   first arrive on the scene, were there people in the area

2   where you observed the evidence itself?

3  A   There was a couple people around when we first pulled

4   up.

5  Q   Okay.

6  A   As soon as they noticed us pulling up, everyone kind of

7   started walking away.

8  Q   And did you, in some way, do anything to note the area

9   that you were preserving?  Did you mark it off in any

10   way?

11  A   Yeah.  We positioned our scout car so no, no passing

12   vehicles could enter the area.  And me and my partner

13   also were kind of making like a circle, trying to make a

14   circle.  There was only two of us at the time.  And

15   tried to push everyone back.

16  Q   At some point, sir, did any other officers arrive?

17  A   Yes.

18  Q   About how long after you got there?

19  A   Maybe forty-five seconds to a minute and a half.

20  Q   Okay.  Soon after?

21  A   Yes.  Really soon after.

22  Q   And did these other officers also assist in preserving

23   the scene at the time?

24  A   Yes.

25  Q   Okay.  In addition to contacting EMS, was there any

1     other notifications you had to make for other types of

2     units to come out there?

3  A   I believe my partner did most of that--

4  Q   (Interposing)  Okay.

5  A   The notifications, but yes.  Notifications were made.

6            MR. PRASAD:  Wonderful.  Wonderful.  Thank

7     you.  Pass the witness.

8                 CROSS-EXAMINATION

9  BY MS. ROCK:

10  Q   Officer, how soon did you arrive after the incident?  Do

11     you know?  I'm sorry.

12  A   We were actually on another call kind of right down the

13     street.  We were on Orangelawn and Asbury Park when the

14     call came out.  So, maybe thirty seconds to a minute we

15     arrived once the, once the call was dispatched.

16  Q   Okay.  And when you arrived, there were approximately

17     about ten people out front?

18  A   You know, I can't say for sure.  I know under, under

19     twenty.  I know that for sure--

20  Q   (Interposing)  Okay.  But they would have been out in

21     front of the location?

22  A   Yeah.  They were kind of all scattered around, you know.

23     Not exactly in the area, but there.

24  Q   Okay.  And then the information that you received was

25     that a gray 1996 Dodge Ram was involved?

-120-

1  A    Yes.

2  Q    Shooting at the victim?

3  A    I believe he said -- Again, I'm trying to go from

4       independent recollection here.  But I believe that he

5       said a suspect may have gotten into that vehicle, who

6       was also shot.

7  Q    Okay.  And then -- But it was a 1996 Dodge Ram?

8  A    Yes.

9  Q    Shooting at both victims?

10 A    I can't remember exactly what he said, but--

11 Q    (Interposing)  Why don't you refer to your report,

12       please?

13                MR. PRASAD:  Judge, object to the hearsay.

14                THE COURT:  It is hearsay.  Any other

15       questions?

16                MS. ROCK:  No, your Honor.  Thank you.

17                THE COURT:  Anything more?

18                MR. PRASAD:  Just briefly, if I may, Judge.

19                REDIRECT EXAMINATION

20 BY MR. PRASAD:

21 Q    Officer, I'm going to show you People's Exhibit Forty-

22       Seven, a diagram created by the evidence technician

23       unit.  Can you see that, sir?

24 A    Yes.

25 Q    Does that look like the area that you were at, sir?

1  A    Yes.  It does.

2  Q    Okay.  And on lunch break, I had an opportunity to show

3        you the photographs, People's Exhibits One through

4        Forty-Six?

5  A    Yes.

6  Q    Did you look at those photographs as well, sir?

7  A    Yes.  I did.

8  Q    Did they fairly show the area that you were, that you

9        responded to and that you had kept the scene secure of?

10 A    Yes.

11 Q    I guess the question that I have, based on Ms. Rock's

12       question is you were talking about people being

13       scattered about.  You see the markings on the diagram,

14       on the sketch there.  The people that were scattered

15       about, were they interfering with what was--

16            MS. ROCK:  (Interposing)  Objection as to

17       leading.

18            THE COURT:  It is leading.

19 Q    (By Mr. Prasad, continuing):  Well, where were they in

20       relation, in terms to the diagram, sir?

21 A    You want me to pull it up and--

22 Q    (Interposing)  Either that or I can put it up on the TV.

23       Whatever is easier for you.

24 A    Whatever is easier for you guys.

25 Q    Let me do it that way.

-122-

```
 1  A    Okay.

 2                  MR. PRASAD:  Judge, can I have the witness

 3       step down?

 4                  THE COURT:  If you'd like.

 5                  MR. PRASAD:  Sure.  Thank you.

 6  Q    (By Mr. Prasad, continuing):  Officer, follow me.  And

 7       you can actually, if you just like mark on the pen [sic]

 8       it'll -- Do you see it?

 9  A    When we first pulled up, we were traveling this way.

10                  THE COURT:  Now, I can't hear.

11  Q    (By Mr. Prasad, continuing):  Speak up.

12  A    When we first pulled up, our vehicle was coming this

13       way.  And we stopped probably about right, right around

14       this area, stopped there, because we noticed the body

15       was laying like around this area.

16                  There was people like around walking down

17       this way.  And we were pulling up and walking this way

18       and there was a couple people across the street here,

19       but nothing like, nothing like right in here.

20  Q    Okay.  So, for the record, you indicated what would be

21       the sidewalk area in front of the, in front of the

22       building and the houses?

23  A    Yeah.  And there was also people, I believe, that were

24       inside.

25  Q    Inside the store itself?
```

```
 1  A     Yeah.  Yes.

 2  Q     Very good.  Thank you, officer.

 3  A     You're welcome.

 4              MR. PRASAD:  I have nothing else, your

 5        Honor.

 6              MS. ROCK:  I don't have anything, your

 7        Honor.  Thank you.

 8              THE COURT:  That's it.

 9              (At 1:41 p.m. witness excused.)

10              THE COURT:  Your next witness, please..

11              MR. PRASAD:  Thank you, your Honor.

12              (At 1:42 p.m. witness OFFICER RODNEY

13              CUSHINGBERRY  was sworn.)

14              THE COURT:  Do you promise that your

15        testimony today will be truthful?

16              THE WITNESS:  Yes.

17              THE COURT:  Please have a seat.

18              DIRECT EXAMINATION

19  BY MR. PRASAD:

20  Q     Pull that microphone, if you would, sir.  Officer,

21        please introduce yourself to the jury.

22  A     Hi.  My name is Officer Cushingberry.

23  Q     And where do you work, sir?

24  A     At the 6th precinct.

25  Q     And how long have you been an officer, sir?
```

-124-

```
 1  A    Six years.

 2  Q    Sir, I want to take you back to April of this past year,

 3       April 10th of 2010.  Were you working on that day, sir?

 4  A    Yes.

 5  Q    In what capacity were you working?

 6  A    I was working patrol.

 7  Q    And was that uniform patrol, sir?

 8  A    Yes.

 9  Q    And what shift were you working?

10  A    Afternoons.

11  Q    Okay.  Did you get a call to respond out to a scene on

12       Tireman?

13  A    Yes.

14  Q    And did you go there by yourself or with someone?

15  A    With my partner.

16  Q    Who was your partner at the time?

17  A    Steven Riley.

18  Q    All right.  When you came to the scene, sir, were you

19       the first vehicle there, first police vehicle there?

20  A    No.

21  Q    Which number vehicle were you?

22  A    I think I was number two.

23  Q    Okay.  What did you do when you got to the scene, sir?

24  A    We made the scene.  We observed two victims, one victim

25       laying on the ground.  And we tried to preserve the
```

1      scene as much as we can, keep the scene safe.

2  Q   Okay.  Tell me about the second victim.  Where did you

3      observe the second victim?

4  A   The second victim was inside the store.

5  Q   And did you have an opportunity to go inside the store

6      as well?

7  A   Yes.

8  Q   Okay.  What kind of condition was the second victim in

9      when you came in contact with him?

10 A   He was, I know he was shot in I believe his hip area.

11 Q   Okay.  Could you see any injury to him?

12 A   Yeah, blood.  I seen blood coming down from his hip.

13 Q   Okay.  What about the scene itself?  Did you make any

14     notice of the scene itself as you observed it?

15 A   It was casings everywhere.  It was two vehicles.  One

16     vehicle was a truck that was parked right in front of

17     the store.  There was another parked in front of the

18     truck.

19 Q   Okay.  Did you have anything to do with preserving any

20     of that part of the evidence?

21 A   Yes.

22 Q   What did you do?

23 A   Just block off the scene, make sure it was no traffic.

24 Q   And were you able to do that, sir?

25 A   Yes.  To the best of our capabilities.

1  Q    Okay.  And, ultimately, sir, at the end of the day, did

2       you have responsibility for any of the vehicles as well?

3  A    Yes.

4  Q    And what was that?

5  A    Yes.  The blue Park Avenue I impounded to Gene's.

6  Q    And that's the one that was in front of the GMC

7       Suburban?

8  A    Yes.  Yes.

9               MR. PRASAD:  Thank you.  Pass the witness,

10      your Honor.

11              MS. ROCK:  No questions, your Honor.

12              THE COURT:  Young man, thank you.

13              (At 145 p.m. witness excused.)

14              MR. PRASAD:  The People are going to call

15      Officer Banks.

16              THE COURT:  You doing all right today, young

17      man?

18              OFFICER BANKS:  Fine.  Thank you, sir.

19              THE COURT:  Okay.

20              (At 1:46 p.m. witness OFFICER JEFFREY

21              BANKS was sworn.)

22              THE COURT:  Do you promise to tell the truth

23      to the questions that are asked of you today?

24              THE WITNESS:  I do.

25              THE COURT:  Oh.  You wanted to say you do

                              -127-

1      before you heard the last part.  That's all right.  You

2      knew how it was going to end?

3                     THE WITNESS:  Yes, sir.

4                     THE COURT:  Okay.  How was it going to end?

5                     THE WITNESS:  I didn't know you were going

6      to say today.

7                     THE COURT:  Okay.  Pull the microphone to

8      you, sir.

9                     THE WITNESS:  Yes, sir.

10                     DIRECT EXAMINATION

11   BY MR. PRASAD:

12   Q     Sir, introduce yourself to the jury, please.

13   A     My name is Officer Jeffrey Banks.

14   Q     And where do you work?

15   A     Eighth precinct.

16   Q     In the Detroit Police Department?

17   A     Yes.

18   Q     Okay.  Sir, back on April 10th of 2010, where were you

19      working then, sir?

20   A     I was working at the eighth precinct.

21   Q     And did you get a respond [sic] to go to a scene on

22      Tireman?

23   A     Yes.  I did.

24   Q     And who were you working with on that day?

25   A     Officer Brandon Pettit.

1   Q    When you responded to the scene, sir, were you one of

2        the first, initial responders?

3   A    Yes.  We were.

4   Q    And what did you do when you first got there, sir?

5   A    As we were pulling up, we were lights and sirens.  We

6        observed the body standing -- Well, excuse me.  Not

7        standing.  But lying on the floor -- Excuse me.  The

8        ground.  And we stopped just East of the body, kept our

9        lights and sirens on and exited to see if the person

10       needed aid.

11  Q    Okay.  Did you actually go to the body at this point?

12  A    Yes.

13  Q    And what did you find?

14  A    He was unresponsive.

15  Q    What did you do next, sir?

16  A    We were informed that there was another person--

17              MS. ROCK:  (Interposing)  I'm going to

18       object as to hearsay.

19              THE COURT:  It's offered for the proof [sic]

20       of the matter asserted and it is hearsay.  Is it being

21       offered for anything other than that?

22              MR. PRASAD:  Just to explain the officer's

23       next actions, Judge.

24              THE COURT:  We got that.  Go ahead.

25  Q    (By Mr. Prasad, continuing):  What did you do next?

-129-

1  A    There were people on the scene and they informed us that

2       there was another person shot.

3  Q    Don't go into what they said.  What did they do?

4  A    I went inside the building.

5  Q    That's what I was asking.  So, you went inside the

6       building?

7  A    Yes.

8  Q    And that's the Smokehouse, the restaurant that's there--

9  A    (Interposing)  That's correct.

10 Q    What did you see when you got inside the vehicle?

11 A    Another -- A lot of blood and there was another person

12      sitting in the corner bleeding.

13 Q    What kind of condition was this person in?

14 A    He was unable to walk.

15 Q    What did you do once you saw that, sir?

16 A    I got on the radio and asked for an EMS.

17 Q    And how long was it before EMS arrived?

18 A    Five to ten minutes.

19 Q    Okay.  Did you make any other notifications in this

20      case, sir?

21 A    At that time, no.  We returned to render aid to the

22      victim.

23 Q    Okay.  At some point later when things were calmer, were

24      you able to make other notifications, sir?

25 A    Yes.

1   Q      And who was that for?

2   A      You have to notify the homicide desk when there's any

3          shootings.  You have to notify your own personal

4          precinct desk when there's any shootings and you have to

5          notify identification and control.

6   Q      Okay.  Sir, at some point, did you have an opportunity

7          to look at the area right in front of the business, in

8          front of 16228 Tireman?

9   A      Yes.

10  Q      And what did you observe there, sir?

11  A      I observed the black male unresponsive.  In addition,

12         there were some glasses that were near his body that

13         were kind of messed up.  They were tangled up.  I

14         believe there were some shell casings and blood.

15  Q      At any point, did you notice any other onlookers or

16         other people in the area around the scene?

17  A      Yes.

18  Q      And describe that, if you would.

19  A      There was a large crowd that developed while the body

20         was still there and the victim was still inside the

21         restaurant.

22  Q      What do you mean a crowd developed?

23  A      More and more people, as word spread, more and more

24         people started to come out to see what was going on.

25  Q      So, the people that were coming out, were they people

1    that were not there originally when you first got there?

2  A   Correct.

3  Q   Okay.

4             MS. ROCK:  Well, your Honor, I'm going to

5        object as to the speculative answer.  How does he know

6        that?

7             THE COURT:  You'll be able to cross-examine

8        him if you think it's something of some importance.

9             MS. ROCK:  Thank you.

10 Q   (By Mr. Prasad, continuing):  And by that point, sir,

11       had you had an opportunity -- You and the other

12       officers, had you already been trying to preserve the

13       scene?

14 A   Yes.

15 Q   Okay.  And how did you do that?

16 A   We called for other units.  We blocked off the corners.

17       We made sure no one came into the immediate area of that

18       block to disturb or mess with anything that was in the

19       scene.

20             MR. PRASAD:  Thank you.  Thank you, officer.

21       Pass the witness, your Honor.

22             MS. ROCK:  Your Honor, I don't have any

23       questions for Mr. Banks.

24             THE COURT:  That objection didn't matter

25       then.  Thank you, sir.

-132-

```
 1                    THE WITNESS:  Thank you.
 2                    (At 1:49 p.m. witness excused.)
 3                    THE COURT:  Your next witness, please.
 4                    MR. PRASAD:  Judge, the other witness that
 5        the Court was asking about, Investigator Simon, she is
 6        five minutes away.  Or I can call Officer Mackie.
 7                    THE COURT:  Whichever way.  Let's use the
 8        time.
 9                    MR. PRASAD:  Okay.  I'll call Officer
10        Mackie, please.
11                    (At 1:51 p.m. witness SERGEANT SAMUEL
12                    MACKIE was sworn.)
13                    THE COURT:  Young man, do you promise to
14        tell the truth today?
15                    THE WITNESS:  Yes, sir.
16                    THE COURT:  Thank you.
17                    DIRECT EXAMINATION
18   BY MR. PRASAD:
19   Q    Sir, please state your name, for the record.
20   A    Sergeant Samuel Mackie.
21   Q    And where do you work?
22   A    City of Detroit Police Department.
23   Q    How long have you been with DPD, sir?
24   A    I'm on my fifteenth year right now.
25   Q    And where are you currently assigned?
```

-133-

1  A    Homicide.

2  Q    And how long have you been with homicide?

3  A    Three years.

4  Q    I want to take you back to April of this year.  Sir, did

5        you become involved in the investigation of the death of

6        Tyrone Simpson?

7  A    Yes.

8  Q    How did you become involved in that case, sir?

9  A    I was the officer in charge.

10  Q    What does that mean?

11  A    The way things are done at homicide is as new cases come

12        in, they're rotated amongst different squads.  And this

13        particular case went to squad one, which I'm a part of.

14        And in squad one, there are seven or eight members which

15        get cases rotated to them.  So, basically, I was up next

16        for a case.  So, that's how I ended up being the officer

17        in charge.

18  Q    At what point do you get that designation or do you get

19        that case?

20  A    When that case comes in is when I come back, you know,

21        my first scheduled day back to work or when I'd be on

22        call.

23  Q    So, in regards to this specific case, investigating the

24        death of Tyrone Simpson, when did you physically,

25        actually get your hands on the case?

-134-

1  A    Not until the next day.

2  Q    So, the 11th of April?

3  A    Correct.

4  Q    Okay.

5  A    When I came in at midnight, so it would have been the

6       11th.

7  Q    Okay.

8  A    Because it came in on afternoons on the 10th.

9  Q    Now, were you privy to the information that had been

10      collected that day, on April 10th?

11 A    Yes.

12 Q    And in what form did you receive that information?

13 A    From the team assignment, which is a document completed

14      by one of the lead scene investigators.  And just from

15      talking to them, they, as it turned out in this

16      particular case, the investigators at the scene were

17      also part of squad one, which I'm a part of.

18 Q    Okay.

19 A    So, I had a chance to talk to them firsthand to see

20      what's going on with the case.

21 Q    Specifically, this morning, we heard from Sergeant Bob

22      Lalone?

23 A    Yes.

24 Q    Did he prepare that scene assignment, the document you

25      were talking about?

-135-

```
 1  A   Yes.

 2  Q   And did you have a chance to speak with Sergeant Lalone

 3      regarding this case when you got it?

 4  A   That's correct.

 5  Q   Okay.  What did you do decide to do at this point, sir?

 6  A   At that time, first and foremost, was getting the

 7      shooter identified.

 8  Q   Okay.  So, how did you start going about that?

 9  A   Well, I received information that there was--

10          MS. ROCK:  (Interposing)  Well, your Honor,

11      I'm going to object as to the hearsay.  It's a--

12          THE COURT:  (Interposing)  I don't know if

13      there's some hearsay.  I'll listen to it.  And if there

14      is an objection about anything that's being said, make

15      the objection and I'll rule and I'll tell the jury how

16      to, you know, abide by what the Court has said.

17          MS. ROCK:  Thank you, your Honor.

18  Q   (By Mr. Prasad, continuing):  Please continue, sir.

19  A   There was information that the shooter went by the

20      nickname of Tay--

21          MS. ROCK:  (Interposing)  Well, again,

22      objection hearsay.

23          THE COURT:  I'll allow it, ma'am.  It's not

24      for the truth of the matter asserted.  Continue, please.

25  Q   (By Mr. Prasad, continuing):  So, what do you do, at
```

-136-

1      that point?

2  A   Based on that nickname, I started running it in the

3      computer system to see if I could find out who this Tay

4      actually is.

5  Q   Okay.

6  A   And also the cell phone.  There was a cell phone at the

7      scene and it may have belonged to the shooter, so

8      getting information through that cell phone.

9  Q   Let's talk about the cell phone.  First, let's clarify.

10     There was more than one cell phone at the scene?

11 A   Yes.  There was two.

12 Q   Okay.  Were you able to determine if one of the cell

13     phones at the scene belonged to the victim in this case?

14 A   Not at that point.  It was too early in the

15     investigation.

16 Q   Okay.  Well, I don't want to jump ahead in the

17     investigation.  You take us through this step-by-step.

18     So, what do you do with the cell phone at this point?

19 A   Well, when something like this happens and we have a

20     cell phone, there's something called exigent

21     circumstances.  And there's a form we fill out and we

22     send to the cell phone company letting them know the

23     severity of the case and that we need to know who the

24     phone is registered under.  And we got a response from

25     Metro PCS from that.

1  Q    And, to be clear, you've had a chance to look at the

2       photographs in this case?

3  A    Yes.

4  Q    Let me go specifically to the photograph at issue.

5       Showing you what's in evidence as People's Nineteen.

6       Are you familiar with that phone that's in that

7       photograph, sir?

8  A    Yes.

9  Q    And how are you familiar with that, sir?

10 A    That's the phone that, at the time, we believed might be

11      the shooter's.

12 Q    Okay.  So, what did you do with that information and

13      with this phone?

14 A    So, then we contacted Metro PCS, let them know what was

15      going on.  And they gave us a name and some information

16      on who the, whatever information was provided to Metro

17      PCS by the person who obtained that phone.

18              MR. PRASAD:  Okay.  Judge, in speaking with

19      defense counsel previously, I think they are willing to

20      stipulate that the phone, according to Metro PCS, was

21      registered to a Deonte Miller.

22              THE COURT:  Okay.

23              MS. ROCK:  That's correct.

24 Q    (By Mr. Prasad, continuing):  Is that correct, sergeant?

25 A    Yes.  That's correct.

-138-

1   Q     So, what did you do with the information that it was

2         registered to a Deonte Miller?

3   A     Started running Deonte Miller into crime databases and

4         through our own database with the police department

5         based on approximate age, trying to nail down which

6         Deonte Miller, if any, was the actual owner of the cell

7         phone.

8   Q     Did that, doing all that kind of background and computer

9         work, were you able to find someone as a possible

10        suspect?

11  A     A possible suspect did come up, not through my computer

12        work, but one of my partners working on the case with

13        me.

14  Q     Okay.  And what did you do with that information now?

15  A     Well, at this point, it was too early to do anything

16        with it.  So we did obtain information on a person named

17        Deonte Miller, based on a picture that was in the cell

18        phone itself, compared that with a Deonte Miller that

19        came up on our database.  It was similar, but at that

20        point that's all we could do with it at that time.

21  Q     Okay.  And let me ask you about that.  This cell phone

22        that you had in evidence, the one in People's Exhibit

23        Nineteen or under placard one, did it have a photograph

24        on the cell phone itself?

25  A     Yes.

1   Q   So, the cell phone was still working, you could look at
2       it?
3   A   Yes.
4   Q   Okay.  So, what is your next step?  What was the next
5       thing you did in the investigation?
6   A   Well, for that night, during the midnight hour, that's
7       as far as we got--
8   Q   (Interposing)  Okay.
9   A   On the investigation as to who the shooter was.
10  Q   So, what was your next step?
11  A   My next step was the next step in the investigation.
12  Q   Well, what was the next step that you were in in the
13      investigation?
14  A   So, that was during the midnight hours.  When day shift
15      hours came, my shift was over.  The commanding officer
16      of homicide had members of the day shift pick up the
17      case and continue working in it trying to get the
18      shooter identified.
19  Q   You weren't at the station at work at this point?
20  A   No.  I was contacted by phone by my commanding officer.
21  Q   Okay.  Did you, were you -- When was the next time you
22      became involved in the case?
23  A   When I came back to work.
24  Q   When?
25  A   The next day.

```
 1  Q    Okay.  And--

 2  A    (Interposing)  That would have Monday, on days.

 3  Q    Okay.  And so, when would your day shift start?

 4  A    Eight o'clock.

 5  Q    So, in the interim, had any other investigation been

 6       done on the case?

 7  A    Yes.

 8  Q    Okay.  And, specifically, were you apprised of what was

 9       done in the interim?

10  A    Not until the following day.

11  Q    Well, I want you to take us to the following day.  I

12       want to -- What were you apprised of on the following

13       day?

14  A    So, when I returned to work on that Monday morning, I

15       was apprised that the surviving victim, Aundrey Allen,

16       was interviewed at the hospital.

17  Q    Okay.

18  A    On Sunday, the day before.

19  Q    Okay.

20  A    That he was shown a photo array, being six photos and he

21       made an identification of a possible shooter.

22  Q    Now, what was the photo array with who in it?

23  A    Someone named Deonte Miller.

24  Q    Okay.  Now, explain to the jury, if you would, the

25       concept of a photo array.
```

-141-

1  A    A photo array is when we show people that don't know the

2       person we're asking about.  So, what it is is it's six

3       photos of six entirely different people with the same

4       characteristics.  And the person we believe may be

5       involved would be one of those six photos, but they

6       don't know that ahead of time.

7              And it's shown to the person and the person

8       is asked to look at all six photos and see if they

9       recognize somebody out of those six photos and, if so,

10      where do they recognize them from.

11 Q    Now, the other five photographs that are included,

12      besides the one of the person who might be a possible

13      suspect, those other five, are they related to your case

14      at all?

15 A    No.  Not at all.

16 Q    Why are those five chosen or why are those five people

17      placed in there?

18 A    Just as fillers.  Because we can't -- You're not

19      supposed to show a witness a single photo of somebody

20      that was a stranger to them.  So, we put five other

21      photos with them so that no one person is singled out or

22      primarily the focus of your investigation isn't singled

23      out.  So, they have an opportunity to look at six

24      entirely different photos to see if they recognize one

25      out of the six or whatever the case may be.

1  Q    And, at this point, you had, not yourself, but other

2       officers had shown Mr. Allen, interviewed him and shown

3       Mr. Allen the one with Deonte Miller in it?

4  A    That's correct.

5  Q    What did you do at this point?

6  A    I was informed that, based on the identification, a

7       search warrant was obtained--

8  Q    (Interposing)  For who?

9  A    Deonte Miller's home.

10 Q    Okay.  And did that search warrant reveal anything?

11 A    That he didn't live in Michigan--

12              MS. ROCK:  (Interposing)  Well, I'm sorry.

13       What was that?  I think -- That was probably a little

14       quick.  I'm sorry, your Honor.

15              THE COURT:  Did the search warrant reveal

16       anything?  And sure.  He can answer that question.

17              THE WITNESS:  That Deonte Miller no longer

18       lived in Michigan.

19 Q    (By Mr. Prasad, continuing):  Okay.  So, what was your

20       next--

21              THE COURT:  (Interposing)  The search

22       warrant showed that, sir?  Or is that a conclusion that

23       you drew based on what you found, didn't find?  But you

24       didn't find him to tell you that, right?

25              THE WITNESS:  The occupants of the home that

-143-

1    the search warrant was--

2                    MS. ROCK:  (Interposing)  Well, your Honor--

3                    THE COURT:  (Interposing)  Oh.  So, that's

4    hearsay.  That's not admissible.

5                    MS. ROCK:  Thank you.

6  Q  (By Mr. Prasad, continuing):  I guess I should back up.

7    You weren't able to find Mr. Miller?

8  A  No.

9  Q  Okay.  So, what do you do next, sir?

10 A  So, again, that's what I was apprised of.  This is what

11   was going on in the investigation.  Some people believed

12   it was--

13                   MS. ROCK:  (Interposing)  Well, your Honor,

14   objection as to what some people believed.

15                   THE COURT:  Okay.  He asked you what did you

16   do next?

17                   THE WITNESS:  So, based on what I knew about

18   the case so far, I concluded that prior to submitting an

19   investigator's report on Deonte Miller as the possible

20   shooter that further investigation is still warranted.

21 Q  (By Mr. Prasad, continuing):  That was a decision that

22   you made at that point?

23 A  That is correct.

24 Q  So, and just so the jury understands, what do you mean

25   by submitting an investigator's report?

-144-

1  A    An investigator's report is when you have a suspect

2       identified and you believe that's the person that

3       committed the crime, as an investigator, we complete

4       what's called an investigator's report, which is then

5       presented to the prosecutor's office.  And the

6       prosecutor, at that time, will review the case and

7       review the report and make a determination as to whether

8       or not charges should be issued against a person.

9            So, the prosecutor's office doesn't get

10      involved in the case until we come forward with a

11      suspect and present the report.  But, at that time, I

12      didn't believe there was enough to go forward to the

13      prosecutor's, not yet.

14 Q    So, what did you do then?

15 A    So, as I originally wanted to do, is locate somebody

16      that identified the suspect at the scene by nickname

17      figuring that whoever gave us the nickname would know

18      who the person is.

19 Q    So, who did you want to talk to at this point?

20 A    Bobby Bailey.

21 Q    Okay.  And that was the store owner?

22 A    Yes.

23 Q    And so, what did you do in regards to contacting Mr.

24      Bailey?

25 A    Had Mr. Bailey come in.  I can't tell you the exact

-145-

1    dates and times.  But Mr. Bailey comes in and he's re-

2    interviewed--

3  Q  (Interposing)  This was the second interview of Mr.

4    Bailey?

5  A  Yes.  First being at the scene.

6  Q  Okay.

7  A  Second being down here at the office.

8  Q  Okay.  And were you part of that interview?

9  A  Not really.  I was there just as a supervision capacity.

10  Q  Who conducted that interview?

11  A  Investigator Simon.

12  Q  Okay.  And as a result of that interview, what did you

13    do next?

14  A  Had Mr. Bailey view a six pack, which is the photo array

15    and the six photos that I was discussing earlier.  And

16    this photo array included a picture of Deonte Miller,

17    who was originally identified by the surviving victim.

18  Q  And was Mr. Bailey able to identify Deonte Miller or

19    anyone of those six?

20  A  No.  And then, at that point, he was shown the cell

21    phone that was found at the scene and the picture on the

22    cell phone.

23  Q  And what did, what did he say in regards to--

24          MS. ROCK:  (Interposing)  Well, your Honor,

25    I'm going to object as to -- This is improper

-146-

```
 1    impeachment.  I don't think Mr. Bailey was-
 2              THE COURT:  (Interposing)  He's not
 3    impeaching him.
 4              MS. ROCK:  No, but -- Okay.  I think he's
 5    trying to impeach Bobby Bailey.
 6              THE COURT:  Go ahead, sir.
 7  Q  (By Mr. Prasad, continuing):  What does Mr. Bailey do
 8    when you show him the photographs?
 9  A  The photo on the cell phone itself is the person he
10    knows as Tay and that Tay wasn't out of the six photos
11    we had shown him.
12  Q  Okay.  So, what was the next thing that happened?
13  A  The next step was to get Tay identified.  So, further
14    investigation had to be conducted, basically starting
15    back from square one trying to.  Knowing that we didn't
16    have any luck so far with computers, so we started going
17    in the area trying to get, trying to get him identified.
18  Q  Okay.  So, what was your next contact or how were you
19    able to do that?
20  A  Going to schools, showing the photo, you know, showing
21    the photo from the cell phone, seeing if anybody knew
22    the photo, went and talked to some principals.
23  Q  Any luck from that?
24  A  No.
25  Q  What did you do after that?
```

-147-

1  A    Started eliciting help from other members from homicide.

2       And eventually, somebody at homicide that had access to

3       a special computer system was able to--

4                 MS. ROCK:  (Interposing)  Your Honor, I'm

5       going to object as to hearsay.

6                 THE COURT:  It's not hearsay, ma'am.

7       Continue, please.

8                 THE WITNESS:  The system's called AIMS.  And

9       it's basically, like I said, it's a special computer

10      system.  And we put a nickname in and it will pull up

11      people that have used that nickname in the past, along

12      with their photograph.

13  Q   (By Mr. Prasad, continuing):  And did that reveal

14      anyone?

15  A   Yes.

16  Q   Who did that reveal?

17  A   The defendant, Deonte Howard.

18  Q   Okay.  And were you able to, were you able to compare a

19      photograph that you got from the AIMS system to the

20      photograph that was in the cell phone?

21  A   Yes.

22  Q   And what did that show?

23  A   In my opinion, it was the exact same person.

24  Q   Okay.  So, what did you do at this point?

25  A   Because I can't go to the prosecutor saying I believe

-148-

```
 1      this is who the person is in the photograph, I had to

 2      bring in Mr. Bobby Bailey again because, at this point,

 3      he was the only one that I knew of that knew the shooter

 4      personally.

 5              MS. ROCK:  Well, your Honor, I'm going to

 6      object as to his conclusion when he says he knew the

 7      shooter personally--

 8              THE COURT:  (Interposing)  You can question

 9      him, based on his conclusion.  But he's entitled to his

10      conclusion.

11  Q   (By Mr. Prasad, continuing):  Please continue.  Sir, you

12      said you brought Mr. Bailey in?

13  A   That's correct.  Well, for the third time.  This time

14      there was the same thing, the six pack, six different

15      photos, one including Deonte Howard, the defendant.  And

16      Mr. Bobby Bailey positively identified him as the Tay

17      that he knew from the scene.

18              MR. PRASAD:  May I approach the witness,

19      your Honor?

20  Q   (By Mr. Prasad, continuing):  I'm going to hand you

21      what's been pre-marked as People's Proposed Exhibit

22      Number Sixty-Nine, sir.  Do you recognize that, sir?

23  A   Yes.  That's the six pack, what we sometimes call a

24      photo array.  And this particular time, it included a

25      picture of the defendant, Deonte Howard.
```

1  Q   And did you use that specific six pack, sir?

2  A   Yes.

3  Q   And who did you use that with?

4  A   Bobby Bailey.

5  Q   And did Mr. Bailey make any sort of marks in your

6      presence on there?

7  A   Yes.  Circled number four and then wrote on the sheet

8      this is Tay and then signed the bottom of it.

9  Q   Is that the original, sir?

10 A   Yes.

11         MR. PRASAD:  Your Honor, at this time, the

12 People would seek to admit into evidence People's

13 Exhibit Sixty-Nine.

14         THE COURT:  Any objections to Sixty-Nine

15 being received?

16         MS. ROCK:  None, your Honor.

17         THE COURT:  Sixty-Nine will be received.

18         (Whereupon People's Exhibit Number Sixty-

19            Nine was received into evidence.)

20 Q   (By Mr. Prasad, continuing):  So, what happens at this

21      point, sir?

22 A   Again, further research into the case needed to be

23      conducted in my opinion since we have some discrepancy

24      between a false pick with Deonte Miller and a positive

25      pick with Deonte Howard.  So, I relied back on the cell

-150-

```
 1      phone itself that was found at the scene and obtained a

 2      court order for the phone records.

 3  Q   And how did you do that, sir?

 4  A   Through a search warrant.

 5              MR. PRASAD:  Okay.  Judge, I think Ms. Rock

 6      and I are willing to stipulate at this time that the

 7      phone in question, of placard number one, it was in fact

 8      the defendant's phone.

 9              MS. ROCK:  That's correct, your Honor.

10              THE COURT:  Okay.

11  Q   (By Mr. Prasad, continuing):  And, sir, was that the sum

12      and substance of the information you received regarding

13      the phone, that it was, in fact, this defendant's phone?

14  A   Yes.  Based on the records.  Yes.

15  Q   Okay.  So, now what did you do?

16  A   At this point, the search began for Deonte Howard.

17  Q   And do you know approximately what date we're talking

18      about now, how far along are we?

19  A   I'd have to refer to my progress notes on the case.  I

20      couldn't tell you for certain.

21  Q   Did you actually type up progress notes in this case?

22  A   Yes.

23              MR. PRASAD:  Okay.  May I approach, your

24      Honor?

25              THE COURT:  You may.
```

1  Q    (By Mr. Prasad, continuing):  Do you recognize those,

2       sir?

3  A    Yes.

4  Q    What are those?

5  A    My progress notes on the case.

6  Q    Okay.  And if you would just look through the progress

7       notes and refresh your recollection as to where we are

8       now in your investigation, what date?

9  A    On April 14th is when Bobby Bailey made the positive

10      identification of Deonte Howard as Tay from the scene.

11 Q    And what about the follow-up work that you were just

12      talking about regarding the phone itself?

13            MS. ROCK:  Which number are we referring to,

14      please?

15            MR. PRASAD:  Which -- I'm sorry, ma'am?

16            MS. ROCK:  The time and date.

17 Q    (By Mr. Prasad, continuing):  Oh.  Can you give us the

18      time and date, sir, of the one that you were just

19      talking about?

20 A    For Bobby Bailey coming in for the photo array was April

21      14th.  I got on my notes approximately 5:45 p.m.

22            MS. ROCK:  Okay.  Thank you.

23            THE WITNESS:  And then approximately an hour

24      later is when I contacted members from the sixth

25      precinct where the shooting took place and asked them to

1    come in and help out with trying to help him located.

2 Q  (By Mr. Prasad, continuing):  So, we're talking April

3    14th still?

4 A  Correct.

5 Q  Possibly seven o'clock in the evening?

6 A  Correct.

7 Q  Okay.  And do your notes reflect who you talked to in

8    that, in that regard?

9 A  Officer Jim Wiencek.

10 Q  What was the next step in this process, sir?

11 A  The phone -- I went to Herman Keiffer, the health

12   department where birth certificates are kept because we

13   had different reports with Deonte Howard's name and

14   different dates of birth, so I went--

15           MS. ROCK:  (Interposing)  Your Honor, I'm

16   going to object to this.

17           THE COURT:  You can just tell us where you

18   went as opposed to why you went there.  That'll be fine.

19           THE WITNESS:  Okay.  I went to Herman

20   Keiffer medical records.

21 Q  (By Mr. Prasad, continuing):  And were you able to

22   ascertain the date of birth for Deonte Howard?

23 A  Yes.  I was.

24 Q  And when was that?

25 A  August 17th of '93.

-153-

1    Q    Okay.

2    A    Which would have made him sixteen years old at the time.

3    Q    And then what did you do?

4    A    The following day met with the lead prosecutor at the

5         youth home regarding the case because of his juvenile

6         status and obtained a search warrant for the actual

7         phone itself to do a forensic dump.

8    Q    And that's the issue regarding the phone records and

9         looking at the contents of the phone?

10   A    Correct.

11   Q    And that's how we, when we talked about in the

12        stipulation where you were able to determine that it was

13        his phone?

14   A    Correct.

15   Q    Okay.  Moving on past that.  What was the next part of

16        the process in your investigation?

17             MS. ROCK:  I'm going to ask that he not read

18        from his progress notes.  I mean, if he needs to refresh

19        his recollection, he needs to indicate that, your Honor.

20             THE WITNESS:  Okay.  I need to refresh my

21        recollection.  Okay.  The next step was getting Deonte

22        Howard into custody and then processing the paperwork.

23        We go through youth home prosecutors and your office

24        here at Frank Murphy.

25   Q    (By Mr. Prasad, continuing):  What day was Mr. Howard

-154-

1       taken into custody?

2   A   Referring to my notes to refresh my recollection, it was

3       May the 11th, 2010, approximately seven o'clock a.m.

4   Q   Okay.  Now that he was in custody, was there anything

5       else that you wanted to do in terms of his

6       identification?

7   A   A live line-up.

8   Q   What's a live line-up?

9   A   A live line-up is just as the word says.  It's, instead

10      of viewing the six photos, the witness will view six

11      live people standing together or sitting together and

12      see if they recognize anybody out of the six.

13  Q   And who was the person you wanted to show this to?

14  A   The surviving victim, Mr. Audrey Allen.

15  Q   Okay.  Now, because of Mr. Howard's age at the time,

16      since he was sixteen, did this have to happen in a

17      certain facility?

18  A   It had to take place at the youth home.

19  Q   At the youth home?

20  A   Correct.

21  Q   Okay.  Now, once again, talking about live line-ups in

22      general, how do you pick the other people involved in a

23      live line-up?

24  A   When it's done at a jail or a detention facility, the

25      officers in charge of the case or the -- We don't have

-155-

```
 1     any say in who gets picked to stand in the line-up as
 2     the other five people.
 3                 The people that work either at the jail or
 4     at the youth home, we contact them, which I did in this
 5     case, contacted the officer, and told them this is the
 6     person I want to do the line-up with.  And they make all
 7     the arrangements.  They pick the fillers and tell us
 8     what time to be there and then they have them ready for
 9     us to view.
10  Q  And, once again, like in the photo array, do those other
11     five people, the people you call fillers, do they have
12     any involvement with this case?
13  A  No.  None whatsoever.
14  Q  Okay.  So, what happened on that say, sir?  Take us
15     there.
16  A  So, we went to the youth home to do the live line-up.
17  Q  Who is we?
18  A  Myself and Officer Brooks and Aundrey Allen and Sergeant
19     Dena Leath.  When you get there, you have to meet with
20     the show-up attorney.
21  Q  What's a show-up attorney?
22  A  The show-up attorney is the defense attorney that
23     represents the accused person in the line-up.  So,
24     they're there to make sure that everything during the
25     line-up is done correctly and without bias towards the
```

```
 1      suspect.

 2  Q   And is that something you need for the live line-up

 3      situation?

 4  A   Yes.

 5  Q   Okay.

 6  A   The only time you would use it in a photo line-up is if

 7      the person's in custody and you had to use a photo line-

 8      up.

 9  Q   Okay.

10  A   Then you have to have the show-up attorney present for

11      that also.

12  Q   Okay.  And just so we're clear, the fact that you were

13      using the photo line-ups before, was that before you got

14      Mr. Howard in custody?

15  A   That's correct.  So, no show-up attorney was necessary

16      for those.

17  Q   Okay.  So, now let's fast forward to May when you're

18      doing the live line-up.  Describe the viewing room or

19      describe where you had Mr. Allen.

20  A   The way it's set up at this youth home is that you go

21      into a room where there's the glass, like you would see

22      in the movies.  But on the other side of the glass is

23      part of the courtroom.  So, it's not like you have the

24      numbers on the wall behind you like you would see in

25      movies sometimes.
```

-157-

1                      And in this particular instance, I had

2       everybody sit in chairs so that, regardless of how tall

3       they were standing, when everyone's seated in the

4       chairs, they're basically the same level from the tops

5       of their heads.

6  Q    Okay.

7  A    They're all wearing the same uniforms that are issued at

8       the youth home, so there's no discrepancy in one

9       particular piece of garment standing out or, or causing

10      prejudice toward the suspect.

11 Q    And did you help conduct this line-up in this case, sir?

12 A    Yes.  I did.

13 Q    And were you there when Mr. Allen made an

14      identification?

15 A    Yes.  I was.

16 Q    And did he identify anyone?

17 A    Yes.  He did, the defendant, Deonte Howard.

18 Q    Okay.  Sir, at some point, did you collect any evidence

19      specific to this case?

20 A    Yes.

21 Q    Tell me, tell us about that.

22 A    I wasn't at the scene when the evidence from the scene

23      was collected, but I did go to the morgue and pick up

24      the bullets that were removed during the autopsy of

25      Tyrone Simpson.

1  Q     Sergeant, I'm going to hand you what's been pre-marked

2        as People's Proposed Exhibits Sixty-Six, Sixty-Seven and

3        Sixty-Eight.  Can you look at those and tell me if you

4        recognize those, sir?

5  A     These are three individual bullets that were removed

6        from Tyrone Simpson during his autopsy.

7  Q     And who collected that and placed it into those evidence

8        envelopes?

9  A     I did.

10 Q     Okay.  And do they each have unique evidence tags with

11       them?

12 A     Yes.  They do.

13 Q     And who filled those out?

14 A     I did.

15              MR. PRASAD:  Your Honor, at this time, the

16       People would seek to admit these into evidence as Sixty-

17       Six, Sixty-Seven and Sixty-Eight.

18              THE COURT:  Any objection?

19              MS. ROCK:  No, your Honor.

20              THE COURT:  They'll be received.

21              (Whereupon People's Sixty-Six through

22              Sixty-Eight were received into evidence.)

23              MR. PRASAD:  Thank you.

24 Q     (By Mr. Prasad, continuing):  Finally, sergeant, did you

25       do anything regarding all the different firearm evidence

-159-

```
 1        in this case?  Did you do anything with that evidence?
 2   A    All of the evidence that was collected was sent to the
 3        Michigan State Police Crime Lab, all of the firearm
 4        evidence.
 5   Q    Okay.  And whatever testing or whatever was conducted by
 6        the Michigan State Police, they would be the ones to
 7        testify to that?
 8   A    That's correct.
 9   Q    Okay.
10   A    I only receive reports after they're completed.
11   Q    We'll here from them.  That's not a problem.  Anything
12        else that, anything else in your involvement at that
13        point of the identification or any evidence in this case
14        that I haven't asked you about?
15   A    No.
16             MR. PRASAD:  Okay.  Thank you, sir.  Pass
17        the witness, your Honor.
18             CROSS-EXAMINATION
19   BY MS. ROCK:
20   Q    Officer Mackie, part of your job as the officer in
21        charge and as a police officer in documenting evidence -
22        - I mean, part of your job is documenting evidence, is
23        that correct?  That's what you've been testifying to.
24   A    No.  I don't document evidence.
25   Q    Well, you're in charge of the file, right?  You keep
```

```
 1        track of the evidence as the officer in charge, right?

 2   A    Correct.

 3   Q    You write the investigator report, right?

 4   A    Most of the time.

 5   Q    Well, you did in this case, didn't you?

 6   A    Yes.

 7   Q    Okay.  And in this particular case, you're supposed to

 8        list, well, as the officer -- There's a policy.  You're

 9        trained in writing reports, correct?

10   A    What type of reports?

11   Q    Police reports.  Didn't you receive training at the

12        academy to write a report?

13   A    Yes.

14   Q    Okay.  And so, as part of writing that report, you're

15        trained to write accurate reports, correct?

16   A    Yes.

17   Q    And include the important details, correct?

18   A    Sometimes.  Yes.

19   Q    You leave out -- So, it's your testimony you leave out

20        some of the important details on purpose?

21   A    Again, it depends what kind of report we're referring

22        to.

23   Q    I'm talking about police reports.

24   A    That's so generic.  There's dozens.

25   Q    Okay.  How about your report, your investigator report?
```

1      You're basically, this investigator report, you draft

2      this with the idea of documenting what has been done in

3      the case, correct?

4   A   No.  Not what, all the steps that have been done in the

5      case.  No--

6   Q   (Interposing)  But, but--

7   A   (Interposing)  It's an outline of the crime itself.

8   Q   And when you turn over discovery to defense counsel,

9      you're just turning over police reports and so forth

10     like that as to what was done, correct?

11  A   No.  I don't turn over discovery to anybody.  My file

12     goes to the prosecutor's office.

13  Q   And the prosecutor does that?

14  A   The prosecutor distributes discovery.  Yes.

15  Q   Okay.  So, you, in your particular report, you were

16     aware that, as officer in charge, excuse me, you were

17     aware that Aundrey Allen identified Deonte Miller as the

18     shooter initially, correct?

19  A   Yes.

20  Q   Okay.  In your investigator report that you drafted, you

21     didn't put that in your report, did you?

22  A   No.

23  Q   Okay.  And you also, you have an investigator by the

24     name of Detective Myron Love?

25  A   That's correct.

-162-

1  Q    And as officer in charge, you later learned that he had

2       conducted a photo line-up with Fred McFadden, correct?

3  A    Later.  Yes.

4  Q    Okay.  He didn't tell you about that, is that right?

5  A    That's correct.

6  Q    Okay.  And in that photo array, Deonte Howard's picture

7       was not in there, was it?

8  A    You would have to ask Investigator Love about that.

9  Q    You were present in the courtroom when he said it.  You

10      telling me that you don't remember that?

11  A    Ma'am, I don't know if I was present during that.

12  Q    You were here--

13  A    (Interposing)  There was a hearing and I was

14      sequestered.

15  Q    Now, I'm talking about on September 23rd when there was

16      a motion filed by me about some concerns about not

17      receiving discovery.

18  A    Okay.  Then I don't know--

19  Q    (Interposing)  If I show you the transcript, do you

20      think that might refresh your recollection as to whether

21      you were present or not?

22  A    If it would say that I was there, maybe.

23  Q    I'm just going to ask you to draw your attention to

24      pages eleven through fourteen and see if that kind of

25      revives your memory.

```
 1  A    What day was this from?

 2  Q    Excuse me.  It's right on the front.  It says it's in

 3       front of Judge Morrow, September 23rd, 2010.

 4  A    Okay.  And what's the question?

 5  Q    Well, whether, A, whether you were there.  You said you

 6       don't have a memory of that.  And whether Mr. Howard's

 7       photo was in that photo array.

 8  A    This is a discussion between yourself and the

 9       prosecutor.

10  Q    And your name is on there.  Look on page eleven.

11                  MR. PRASAD:  Susan?  Susan?

12                  MS. ROCK:  What?

13                  MR. PRASAD:  Page twelve, line twenty-three.

14                  MS. ROCK:  What?

15                  MR. PRASAD:  That's what you want him to

16       refer to.

17  Q    (By Ms. Rock continuing):  Okay.  Page twelve, line

18       twenty-three, please.  See the...

19  A    Now, what was the question?

20  Q    Well, you were there.  You were there at that hearing,

21       correct?

22  A    Yes, ma'am.

23  Q    Okay.  And you were there when Detective Love said that

24       he had done this photo show-up with Frederick McFadden,

25       right?
```

-164-

1  A    Yes, ma'am.

2  Q    Okay.  You were there when he said the photos did not

3       include Deonte Howard?

4  A    Yes, ma'am.  That's what he said.

5  Q    Okay.  And he said that he didn't -- Can I get that,

6       please?

7  A    Yes.

8  Q    Thank you.  He said he didn't inform you of this, right?

9  A    Yes, ma'am.

10 Q    And one of the reasons we were at the hearing, as

11      officer in charge, as you know, is because defense

12      counsel was concerned because she, defense counsel

13      learned from Frederick McFadden that there had been a

14      photo array, correct?

15 A    Yes.

16 Q    Not from the Detroit Police Department.

17 A    Well, I don't know, ma'am.  You're telling me that.

18 Q    Well, wasn't that the subject of the hearing?

19 A    Correct.  But you're asking about my investigator's

20      report and why it didn't include that line-up.  This was

21      after the, I was made aware of it after the

22      investigator's report was submitted.

23 Q    When was that?

24 A    In May.

25 Q    So, you knew about it in May?

1  A    No, ma'am.  The investigator's report was submitted in

2       May.  You said that hearing--

3  Q    (Interposing)  Oh.

4  A    Was in September.

5  Q    So, if you want to, you can file a supplemental,

6       correct?

7  A    Well, I can't say yes or no, but I've never in my career

8       seen that done.  I don't know--

9  Q    (Interposing)  In your three years on the homicide unit,

10      you haven't seen it--

11 A    (Interposing)  I've been in major crimes for eleven

12      years.

13 Q    You never -- But there's that vehicle where you could

14      file a supplemental, correct?

15 A    I don't know.  You're saying there is.  You're an

16      attorney.  I don't -- But I'm saying I've never seen

17      one.

18 Q    The only thing that documents or documented in terms of

19      police reports about Aundrey Allen's identification of

20      Deonte Miller was just that photo sheet itself, correct?

21      My Defense Exhibit A?

22 A    I thought there was a witness statement or the witness

23      statement touched on that photo array.

24 Q    What witness statement?

25 A    You're saying Aundrey Allen when he was shown the six

-166-

1     pack at the hospital?

2  Q   That's correct.

3  A   A statement was taken from him at that time.

4  Q   You mean right on the photo itself, the photo sheet

5     itself?

6  A   And I thought on his witness statement he touched on it,

7     if I'm not mistaken.

8  Q   You're talking about this sheet, is that right?  Is it

9     too far away for you to see?  This would be Defense

10    Exhibit A.

11  A   Yes.

12  Q   So, there's no discussion in your -- I mean, that, the

13    line-up of Deonte Miller, photo array, took place before

14    you drafted your May report, correct?

15  A   That's correct.

16  Q   Okay.  Nothing in this report about him identifying

17    Deonte Miller, is there?

18  A   No.

19  Q   After the live line-up, you take Aundrey Allen right

20    over to the prosecutor's office?

21  A   That's correct.

22  Q   Within one hour's time, right?

23  A   Yes, ma'am.

24  Q   Am I hearing you correctly?  Mr. Howard gets arrested at

25    11:00 a.m.  There's a line-up.  And then one hour later,

```
1      you're over at the prosecutor's office.

2  A   Not on the same date.

3  Q   Oh, it's not on the same date?  When was Mr. Howard

4      arrested?  I'm sorry.  Maybe I--

5  A   (Interposing)  I'd have to go back to my progress notes.

6  Q   Okay.

7  A   Mr. Howard was taken into custody on May the 11th of

8      2010.

9  Q   Okay.  And what day was the live line-up?  Wasn't that -

10     - Oh.  It was the 13th.

11 A   May the 13th.

12 Q   I'm sorry.  There we go.

13 A   So, two days later.

14 Q   So, on May 13th, you do the line-up and then you go over

15     to the prosecutor's office one hour later, correct?

16 A   That's correct.

17 Q   That's for the investigative subpoena testimony?

18 Q   Court reporter already there?

19 A   I don't remember if she was waiting on us or not--

20 Q   (Interposing)  Well, it started -- Didn't you start the

21     hearing right at two o'clock?

22 A   I would say approximately, yes.

23 Q   Okay.  So, an hour later, right?

24 A   Approximately, yes.  It's right across the street.  The

25     youth home--
```

-168-

1  Q     (Interposing)  Well, I know it's right across the

2        street.  It's an hour later.  Right?

3  A     From the time -- Ma'am, I cannot tell you if it was or

4        not.

5  Q     Oh.  Okay.

6  A     It was just enough time to do the line-up, complete the

7        paperwork and then walk across the street and get

8        situated.

9  Q     All right.  Well, if I show you the transcript where it

10       shows even you talking on the transcript, that might

11       refresh your recollection as to the time?

12 A     If it says it on there, sure.  It's got 2:07 p.m.

13 Q     Right.

14 A     That Sounds about right.

15 Q     Right?  That sounds right?  2:07 p.m.  Yes?

16 A     Yes.

17 Q     And Deonte Miller fit the physical description.  There

18       was a determination that Deonte Miller fit the physical

19       description, correct?

20 A     Yes.

21 Q     Okay.  Because he was 5'11", a hundred and eighty-nine,

22       brown eyes?

23 A     Just looking at the face, the face on the phone and the

24       face of Deonte Miller.

25 Q     But also based on his height, right?  5'11", one eighty-

-169-

1       nine, brown eyes?

2  A    I'm just looking at the face of the photo and the face

3       on the picture.

4  Q    Isn't that the information that you had, that he was

5       5'8", a hundred and eighty-nine pounds?

6  A    There was varying descriptions, but again, I based it on

7       what the picture of Deonte Miller looked like and the

8       picture on the cell phone.  And I wasn't convinced.

9  Q    I'm sorry.  Is this -- I'm going to show you this

10      document.  And you can tell me who that is.

11 A    Deonte Miller.

12 Q    Okay.  Who obtained that?

13 A    I don't know if it was myself or somebody within the

14      squad when we were doing the computer work.

15 Q    Okay.

16 A    But this is a Secretary of State picture.

17 Q    Okay.  But you could have obtained it?

18 A    I might have.  I'm not sure.

19 Q    All right.  And...

20             MR. PRASAD:  You want a clean copy?

21             MS. ROCK:  What's that?

22             MR. PRASAD:  You want a clean copy of that?

23             MS. ROCK:  Yeah.  That might be a good idea.

24      My dog walked on it this morning.

25             MR. PRASAD:  I understand that.

1  Q    (By Ms. Rock continuing):  So, this would be one of the

2       photos that you were looking at for Deonte Miller, is

3       that correct?

4  A    One of the photos.  Yes.

5              MS. ROCK:  Yeah.  I would move to admit this

6       into evidence, your Honor, as Defense Exhibit B.

7              THE COURT:  Any objection?

8              MR. PRASAD:  No objection, Judge.

9              THE COURT:  It'll be received.

10             (Whereupon Defendant's Exhibit B was

11             received into evidence.)

12 Q    (By Ms. Rock continuing):  Now, according to your

13      previous testimony, Mr. Allen did not know that a live

14      line-up was going to take place, correct?

15 A    That's correct.

16 Q    You gave him no explanation, right?

17 A    That's correct.

18 Q    And so, after the line-up, he never says to you, hey,

19      wait a minute, I think I picked out the wrong guy?

20      Never says that to you?

21 A    In regards to Deonte Howard?

22 Q    Yes.

23 A    No.

24 Q    No.  I'm talking about Deonte Miller.  He never says,

25      hey, wait a minute, I picked out the wrong guy?

-171-

```
 1  A    No.  We never discussed anything.

 2  Q    Now, the reason police officers conduct line-ups or

 3       they're supposed to conduct line-ups this way is because

 4       it's one of the safeguards to present, prevent

 5       miscarriages of justice in terms of misidentification,

 6       is that right?

 7  A    Which way are you referring to?

 8  Q    I'm sorry?  What?

 9  A    Which way are you referring to?

10  Q    What do you mean way?

11  A    You said the reason they're conducted this way.  You

12       didn't say which way you were talking about.

13  Q    Well, any way.  The reason that line-ups are conducted

14       is to prevent a miscarriage of justice, to prevent

15       misidentification, correct?

16  A    Yes.  That sounds right.

17  Q    Okay.  You never interviewed Deonte Miller, is that

18       right?

19  A    That's correct.

20  Q    And in terms of the line-up with regard to the

21       individuals in the line-up, do you recall--

22  A    (Interposing)  Which line-up, ma'am?

23  Q    I'm sorry.  Thank you.  The live line-up.

24  A    Yes.

25  Q    The live line-up on May 13th.  Do you recall the weights
```

1      of the individuals at all?

2  A   Not offhand, but it was documented on the line-up sheet.

3

4  Q   So, I'm going to ask you to just review this, see if it

5      refreshes your recollection.

6  A   Yes, ma'am.

7  Q   Okay.  Can I see that?  Okay.  So, you have one

8      participant who was a hundred and fifty pounds, correct?

9  A   You know, I couldn't tell you one way or the other.

10     This is just what I was told.

11 Q   Okay.  So--

12 A   (Interposing)  That's what I documented.  Yes, ma'am.

13 Q   Okay.  Deshawn Harris, one fifty.  Right?

14 A   I'd have to look at it for each one you're asking me.

15 Q   All right.  According to this sheet, the smallest one,

16     in terms of weight, was Deonte Howard?

17 A   By his admission, yes, ma'am.

18 Q   Okay.  A hundred pounds?

19 A   That's what he told me at the time.  Yes, ma'am.

20 Q   Excuse me just for a second.  On the line-up sheet, is

21     that your handwriting with that quote?

22 A   I'd have to look at it.

23 Q   From Aundrey Allen?

24 A   Yes, ma'am.

25              MS. ROCK:  Your Honor, I don't have any

```
 1     further questions.

 2                 THE COURT:  Anything more?

 3                 MR. PRASAD:  Yes, your Honor, if I may.  May

 4     I approach, your Honor?

 5                 THE COURT:  You can.

 6                 REDIRECT EXAMINATION

 7  BY MR. PRASAD:

 8  Q   I'm going to show you what's been marked as People's

 9      Proposed Exhibit Seventy.  I think it's the original of

10      the document that counsel was showing you.

11  A   Yes.

12  Q   And is that the document you filled out as part of the

13      live line-up process?

14  A   That's correct.

15                 MR. PRASAD:  Okay.  Judge, at this time, the

16      People would seek to admit this into evidence as

17      People's Exhibit Seventy.

18                 THE COURT:  Any objection?

19                 MS. ROCK:  Your Honor, I don't have an

20      objection.

21                 THE COURT:  It'll be received then.

22                 (Whereupon People's Exhibit Seventy

23                 was received into evidence.)

24  Q   (By Mr. Prasad, continuing):  I'm going put it up on the

25      screen.  I want to do it in half just so it's legible or
```

```
 1        readable for people.  The top of the documentation, sir,

 2        is that the information you would have filled out, at

 3        the top?

 4   A    Yes.

 5   Q    Okay.  Now, in terms of the people in there, do you see

 6        them numbered one through six?

 7   A    Yes.

 8   Q    And first, going through it, on the left you put all in

 9        a seated position?  Why did you note that?

10   A    Because they were all sitting down, like I said earlier.

11        So, with a level playing field.  The top of everyone's

12        head is just about the same.

13   Q    Now, drawing your attention to the information to the

14        right.  You've got each individual's names, correct?

15   A    Yes.

16   Q    Now, what about that information regarding the age,

17        height and weight?  How did you get that information?

18   A    From each of the juveniles standing in the line-up, or

19        in this case sitting in the line-up.  After Mr. Howard

20        was given an opportunity to stand, or sit wherever he

21        wanted to out of the six spots, then starting from the

22        left, that would be number one.  And I asked that person

23        their name, how old they are, how tall they are and how

24        much they weighed.

25   Q    Okay.  It's not like you had a tape measure or a scale
```

```
 1      with you?

 2  A   No.  And I don't even know if those are their real

 3      names.  This is just what they're telling me.

 4  Q   Okay.  And in terms of a description and remarks, is

 5      that in your handwriting, sir?

 6  A   Yes.

 7  Q   Okay.  And the bottom half of this document indicates

 8      the quote regarding number two?

 9  A   Yes.

10  Q   Who wrote that?

11  A   I did.

12  Q   And who's signature is below that?

13  A   Aundrey Allen.

14  Q   Okay.  He signed that at that point?

15  A   Correct.

16  Q   Okay.  And, finally, the information at the bottom, who

17      filled out that information, sir?

18  A   The officer's information on the left where it says PO

19      Paul Smith--

20  Q   (Interposing)  Right.

21  A   PO LaTonya Brooks and Sergeant Dena Leath, I filled that

22      information about.  Paul Smith was the officer from the

23      youth home that pulled everybody together to do the

24      line-up.

25  Q   Okay.
```

1  A    The block on the right with the attorney's information

2       and, in the blue ink, the show up attorney that was

3       present filled that information out because they were

4       there during the entire process.

5  Q    Okay.  And then there's a time at the bottom.  Did you

6       fill that time out, sir?

7  A    Yes.

8  Q    And does that encompass the whole time of this line-up?

9  A    That is correct. 12:40 is from the time they brought

10      everybody in.  Then we started, I sat down and started

11      writing everybody's name and information and everything

12      'til the time Aundrey Allen signed his name making that

13      identification.

14 Q    And that's at 12:50?

15 A    Correct.

16 Q    Okay.

17 A    And at the very top, you'll see a time.  And it says

18      12:49.  That's the actual time of the identification.

19 Q    Okay.

20 A    So, when he said number two, that's the one that shot

21      me, that was at 12:49 p.m.

22 Q    Okay.  And just so we're clear, at what point does Mr.

23      Allen actually see the six individuals?  How are they

24      situated?  How are the six individuals situated?

25 A    They're already seated and told not to move, not to do

```
 1      anything to jeopardize the line-up.

 2  Q   Okay.  Very good, sir.  Going back to some other

 3      questions that defense counsel asked you, sir.  She

 4      asked you about ever interviewing Deonte Miller.  Did

 5      you ever actually find Deonte Miller?

 6  A   No.

 7             MR. PRASAD:  In regards to -- Can I look at

 8      Defense Exhibit B?

 9             MS. ROCK:  This one?

10             MR. PRASAD:  Yeah.  Are you putting the

11      whole packet in?

12             MS. ROCK:  Well, that's what I did.  Why?

13      What's the problem?

14             MR. PRASAD:  Okay.

15  Q   (By Mr. Prasad, continuing):  In reference to Defense

16      Exhibit A, you were making a comment when she was asking

17      you questions about comparing this photograph to the

18      photograph from the phone?

19  A   Yes.

20  Q   You were saying something and I wanted you to finish

21      saying what you were saying about that.

22  A   The image from the phone was on the phone itself.

23  Q   Okay.

24  A   It wasn't like a printed out picture like we're looking

25      at right now.  And I didn't believe that that was the
```

-178-

1      same person at the time.

2  Q    And that was, that was the reason you continued to

3      investigate?

4  A    Correct.

5              MR. PRASAD:  Okay.  Thank you, sergeant.  I

6      have nothing else, your Honor.

7              THE COURT:  Anything more?

8              MS. ROCK:  I do, your Honor, if I can.

9              RECROSS-EXAMINATION

10 BY MS. ROCK:

11 Q    Could I -- Okay.  So, this would be, so that's the

12     picture of Deonte Miller?

13 A    That's a picture of Deonte Miller.  Yes.

14 Q    Right.  A picture.  Thank you.

15 A    Yes, ma'am.

16 Q    Okay.  And then this would be the line-up of Deonte

17     Miller, correct?

18 A    Yes, ma'am.

19 Q    Okay.  And that would be the one with Aundrey Allen's

20     signature where it says this is the man who shot me and

21     my friend?

22 A    Yes, ma'am.

23             MS. ROCK:  All right.  Now, if I didn't

24     admit Defendant's Exhibit B, I do move to admit it.  I

25     think I did already.

-179-

 1                    THE COURT:  You did.  Anymore questions for

 2      this witness?

 3                    MS. ROCK:  No, your Honor.

 4                    THE COURT:  Thank you, sir.  You can step

 5      down.

 6                    (At 2:49 p.m. witness excused.)

 7                    MR. PRASAD:  Judge, I believe -- Can we have

 8      a minute to make sure Investigator Simms [sic] is here?

 9                    THE COURT:  Sure.  They might want to take

10      three or four minutes, too.

11                    MR. PRASAD:  Okay.

12                    THE COURT:  You all want to take one more

13      break?  We'll finish the day with the next witness?

14      Okay.  So, you all can just move freely about as you'd

15      like.

16                    (At 2:49 p.m. jury leaves the courtroom.)

17                    (At 3:03 p.m. jury enters the courtroom.)

18                    THE COURT:  All right.  For our last witness

19      of the day.  Come on in, Ms. Simon.  Please give your

20      name to this young man and stand ready for the oath.

21                    (At 3:04 p.m. witness INVESTIGATOR BARBARA

22                    SIMON was sworn.)

23                    THE COURT:  Do you promise to tell the truth

24      this afternoon?

25                    THE WITNESS:  I do.

                              -180-

1                    THE COURT:  The chair is yours.

2                    THE WITNESS:  Thank you.

3                    DIRECT EXAMINATION

4   BY MR. PRASAD:

5   Q    Ma'am, please introduce yourself to the jury.

6   A    My name is Barbara Simon.

7   Q    And, ma'am, up until last month, where did you work?

8   A    Detroit Police Department.

9   Q    And how long were you in the Detroit Police Department?

10  A    Thirty-two and a half years.

11  Q    And when did you retire?

12  A    The 7th of this month.

13  Q    Of January?

14  A    Yes.

15  Q    Okay.  Very good.  What was your last assignment there,

16       ma'am?

17  A    Homicide.

18  Q    And how long were you in homicide?

19  A    Seventeen and a half years.

20  Q    Okay.  I want to draw your attention to April of last

21       year, April, starting on April 10th, 2010.  Were you

22       involved in the investigation of the death of Tyrone

23       Simpson?

24  A    Yes.

25  Q    And at some point on April 10th, did you go out to the

                              -181-

1     scene on Tireman in this case?

2  A  Yes.

3  Q  And who did you go there with, ma'am, if you recall?

4  A  Sergeant Robert Lalone.

5  Q  And when you got to the scene, were you assigned a

6     specific task or duty?

7  A  I'm sorry?

8  Q  When you got to the scene, were you assigned a specific

9     duty or task?

10 A  No, sir.  Homicide was called out because it was a fatal

11    shooting.  So, we had to investigate, take statements.

12 Q  Okay.  And to that point, ma'am, did you, in fact, take

13    statements at the scene?

14 A  Yes.

15 Q  Okay.  I just want to show you this because I have it,

16    People's Exhibit Eighteen that's already in evidence.

17    Do you recognize anyone in that photograph?

18 A  Myself and -- I forgot the gentleman's name.  We were

19    sitting on his porch and I was taking a statement from

20    him.

21 Q  Okay.  So, that would have been an example of statements

22    you were taking at the scene?

23 A  That's correct.

24 Q  I think that was Mr. Harris, the guy across the street.

25 A  I don't remember his name, but it was across the street

1     from the store.  Yes, sir.

2  Q  Okay.  In addition to Mr. Harris, do you recall any

3     other people's statements you took, ma'am, in this case?

4  A  I think I took a few statements.  One guy's name, I

5     think his first name was Bobby.  I don't know his last

6     name.

7  Q  Okay.  Well, would that have been the store owner in

8     this case?

9  A  Yes.

10  Q  Okay.  That first statement, and going to the day of the

11     incident, how is Mr. -- I'm just going to tell you his

12     last name is Bailey.  How was Mr. Bailey's demeanor on

13     that day?

14  A  If I remember, when I went to talk to Mr. Bailey, he

15     first denied knowing anything about the shooting.

16          MS. ROCK:  Well, your Honor, I'm going to

17     object.  That doesn't, that's not his demeanor.

18          THE COURT:  The objection would be

19     unresponsive to the question?

20          MS. ROCK:  That's correct.  Thank you, your

21     Honor.

22          THE COURT:  Answer the question, please.

23  Q  (By Mr. Prasad, continuing):  I don't want to go into

24     what he was telling you.

25  A  Okay.

1  Q    I'm saying, how was he acting with you?

2  A    He was acting kind of nervous, like he didn't really

3       want to talk.

4             MS. ROCK:  Well, objection as to--

5             THE COURT:  (Interposing)  I'll let her draw

6       the conclusion based on what she perceives, ma'am.   You

7       can cross-examine, if you'd like.

8             MS. ROCK:  Thank you.

9  Q    (By Mr. Prasad, continuing):  After your work at the

10      scene, did you do some follow-up work in regards to this

11      case?

12 A    Yes.  I did.

13 Q    And, specifically, ma'am, in terms of a cell phone, did

14      you assist in developing some information on a cell

15      phone?

16 A    Yes, sir.  Once we got back to homicide.  Yes.

17 Q    What did you do in terms of that, ma'am?

18 A    We had the cell phone and we called Metro PCS to get

19      information regarding the cell phone that belonged to

20      the person.

21 Q    Okay.  And it's already been stipulated prior to your

22      testimony that the cell phone came back to a Deonte

23      Miller?

24 A    That's correct.

25 Q    Okay.  Now, I want to fast forward a couple of days to

-184-

```
 1        the 13th of April.  Did there come an occasion for you

 2        having to re-interview Mr. Bailey?

 3   A    Yes.

 4   Q    Tell us about that.

 5   A    I don't know who I was working with, but I had received

 6        information that Mr. Bailey had information.  We went

 7        back to the store--

 8               MS. ROCK:  (Interposing)  Your Honor, I'm

 9        going to object as to hearsay.

10               THE COURT:  Had information.  She didn't say

11        what information, so it's not hearsay.

12               MR. PRASAD:  Thank you.

13   Q    (By Mr. Prasad, continuing):  So, you went back to the

14        store?

15   A    That's correct.

16   Q    And when you went back to the store, what did you do?

17   A    Mr. Bailey was, if I remember correctly, was in the back

18        of the store.  We told him we needed to talk to him.

19   Q    Okay.

20   A    And he did not want to talk at the store, so we took him

21        to homicide.

22   Q    You keep saying we.  Who's we?

23   A    I believe Investigator Myron Love was with me.  And I

24        want to say Officer Wright, but I'm not for sure about

25        Officer Wright.
```

1   Q    Okay.  But it was yourself and two other officers?

2   A    Yes.

3   Q    All right.  At the time you took him back to, took him

4        back to homicide, was he under arrest at this point?

5   A    No.

6   Q    What was the -- Was he put in handcuffs or anything like

7        that?

8   A    No.

9   Q    How was he taken back to homicide?

10  A    We conveyed him in our car, our unmarked scout car.

11  Q    Okay.  And when you got back to homicide, what did you

12       do at this point?

13  A    Once we got back to homicide, I talked to Sergeant

14       Mackie, who was the officer in charge of the case.

15  Q    Okay.  And after talking to Sergeant Mackie, did you

16       have a chance to talk to Mr. Bailey?

17  A    Yes.

18  Q    I want to focus on you and your demeanor at this point,

19       ma'am.  What was your demeanor with Mr. Bailey at this

20       point in the second interview?

21  A    The second interview, I explained to Mr. Bailey that we

22       had information that he knew more about the fatal

23       shooting--

24                 MS. ROCK:  (Interposing)  Your Honor, again,

25       objection hearsay.

-186-

1           THE COURT:  It's not offered for the truth

2      of the matte, that he knew more.

3           MS. ROCK:  Okay.

4           THE COURT:  What does that mean, Ms. Rock?

5      What information does that tell you?

6           MS. ROCK:  That's exactly what I think it

7      is, that they're alleging that they had information that

8      he knew more.

9           THE COURT:  Okay.  What is the information,

10     though, that they're offering that's true?  There is

11     none.  Go ahead, please.

12  Q  (By Mr. Prasad, continuing):  So, how did you, how did

13     you start questioning him the second time?

14  A  Asking him, you know, what did he know about the

15     shooting and what could he tell us about the fatal

16     shooting.

17  Q  How were you acting with him?

18  A  What do you mean how was I acting with him?

19  Q  Were you threatening him?

20  A  No.

21  Q  Did you make any threats to arrest him?

22  A  No.

23  Q  Was Mr. Bailey being cooperative with you?

24  A  At first he was denying and then he came around and

25     started being cooperative with us.  Yes.

-187-

1  Q    Okay.  This second interview, ma'am, where did it take

2       place?

3  A    Homicide.  We were in -- I don't know if we was upstairs

4       in the conference room or if we were downstairs.  I

5       don't remember.

6  Q    But the room you were in, was it a small interview room

7       or was it a--

8  A    (Interposing)  That's what I don't remember, if we was

9       upstairs in the interview room or if we were downstairs

10      in like a medium-size room with several chairs in it.  I

11      don't remember.

12 Q    Okay.  And, ma'am, did you take a second full witness

13      statement from him at that point?

14 A    Yes.  I did.

15 Q    Okay.  And did he sign those statements for you, ma'am?

16 A    Yes, sir.

17 Q    Okay.  What happened after that interview was over?

18 A    After the interview was over, I believe someone conveyed

19      Mr. Bailey back to his store.

20 Q    Okay.  When you, when you went to his store on the 13th

21      on that second time, did you have three other non-

22      officer males there with you?

23 A    I know it was myself, Investigator Love and it was

24      another officer.  I don't remember who the other officer

25      was.  I believe it was Officer Wright, but I'm not for

-188-

1      sure.

2  Q   But those were all other officers?

3  A   That's correct.

4  Q   Do you know if they were identified as such?

5  A   What do you mean identified?

6  Q   I mean, did they acknowledge they were police officers?

7  A   Yes.

8  Q   Okay.  In your presence, did any of them threaten to

9      arrest Mr. Bailey?

10 A   Not in my presence, no, sir.

11 Q   At any time, ma'am, throughout this whole day on the

12     second interview, were you being belligerent with him?

13 A   No.

14 Q   Were you trying to force him to say something?

15 A   No.

16 Q   In particular and specifically?

17 A   No.

18 Q   Ma'am, was that the extent of your involvement in this

19     investigation at that point?

20 A   Yes, sir.

21              MR. PRASAD:  Okay.  Thank you, Ms. Simon.

22     Pass the witness.

23              CROSS-EXAMINATION

24 BY MS. ROCK:

25 Q   Ma'am, you said that you'd been in homicide for

1      seventeen and a half years?

2  A   Yes.

3  Q   How many women were in the homicide unit?

4  A   When I went to homicide?

5  Q   Yes.

6  A   I believe five or six.  I don't remember for sure.

7  Q   All right.  So, it's a hard job being a homicide

8      detective, wouldn't you agree?  Hard job.  Deal with

9      tough people?

10 A   Homicide is you have to investigate homicides.  So, you

11     could say it's a hard job.  Yes.

12 Q   Oh, okay.  Good.  And as part of your job, you conduct

13     interrogations, correct?

14 A   That's correct.

15 Q   Over the seventeen years, how many have you conducted?

16 A   Lots.

17 Q   Well, more than a hundred?

18 A   Yes.

19 Q   More than a thousand?

20 A   I'm going to say yes.

21 Q   Okay.  And, in fact, you receive training as to

22     interrogation tactics, right?  Don't you receive

23     training?

24 A   I did receive the training, some training.  Before I

25     went to homicide, I was in sex crimes.  So, a lot of my

1      training came through homicide, how to talk to people

2      and interrogate.  Yes.

3  Q   Okay.  So, there's specific interrogation tactics that

4      you use as a police officer, correct?

5  A   That's correct.

6  Q   Okay.  And your goal -- Not everybody that you talk to

7      wants to talk, right?

8  A   Correct.

9  Q   Okay.  And your goal is to make them talk, right?

10  A   Not to make them talk.  I can't make anybody do

11      anything.

12  Q   No.  But your goal is to have them make statements,

13      right?

14  A   To interview, correct.

15  Q   Okay.  That is your goal.  Okay.  And so, you -- One

16      technique as a police officer during an interrogation is

17      to lie to the suspect, right?

18  A   Yes.

19  Q   Okay.  And, in fact, you may something like, well, you

20      know, your partner flipped on you, right?

21  A   I don't remember using that term, but--

22  Q   (Interposing)  All right.  Well, whatever term.  You've

23      said, your partner ratted you out or put you in on it or

24      put you in the crime, right?  That would be one tactic?

25  A   Yes.

1  Q    That's common?  Yes?

2  A    I can't say common for everybody, but I have used that.

3       Yes.

4  Q    Okay.  So, in other words, you have lied to suspects?

5  A    Of course.

6  Q    Okay.  And then you've also sworn at suspects, right?

7       You've sworn?

8  A    Yes.

9  Q    Okay.  And part of that -- And you've threatened them,

10      right?

11 A    What do you mean threatened them?

12 Q    Well, you've said, if you don't talk you're going to go

13      to jail?

14 A    It's possible.  Yes.

15 Q    Okay.  And you've said things like you may not see your

16      family again, right?

17 A    To who, ma'am?  Suspects?

18 Q    To the suspects or even witnesses?  You've said that to

19      witnesses?

20 A    No.  A witness, no.  Why would I tell them they wouldn't

21      see their family again?

22 Q    Well, if they're not talking, if they're not telling you

23      the truth, you're saying that you wouldn't say that to a

24      witness or you didn't say that to a witness?

25 A    I didn't say that to the witness.  No, ma'am.

                        -192-

1  Q    Are you saying you didn't say that to Bobby Bailey?

2  A    That's what I'm telling you.

3  Q    Are you saying that you didn't say fuck your children to

4       Bobby Bailey--

5  A    (Interposing)  That is correct--

6  Q    (Interposing)  When he starts--

7  A    (Interposing)  That is correct, ma'am.

8  Q    All right.  So, when he said that he was concerned about

9       his family and his children, you didn't say shut up?

10      Did you say shut up to him?

11 A    No.

12 Q    You didn't say shut up?

13 A    No.

14 Q    And you didn't say fuck your children?

15 A    No.  I did not.

16 Q    And when you said -- It's like you have a foggy memory

17      about whether it's Officer Wright.  But you could have

18      showed up there with three officers versus two.

19 A    I remember Love and I believe it was Officer Wright and

20      myself.

21 Q    But you're guessing.  So, there could have been an

22      additional officer.

23 A    No.  I'm not saying it was an additional officer.  It

24      could have been write or someone else, but it wasn't

25      like four or five of us.

-193-

1   Q   Did you document that?  Did you put it in a report that

2       those officers went back with you?

3   A   I don't know if I did or not, ma'am.  I don't know.

4   Q   Okay.  And with regard to -- In this particular case,

5       you knew that Bobby Bailey owned a business, didn't you?

6   A   I--

7   Q   (Interposing)  He was the owner?

8   A   Excuse me.  If you'd let me answer the question--

9   Q   (Interposing)  Sure.  Go ahead.

10  A   I found out, yes.  He was the owner of the store.  Yes,

11      ma'am--

12  Q   (Interposing)  Okay.

13  A   He told me he owned the store.

14  Q   Right.  And you threatened to ruin his business because

15      he, he didn't tell you what you wanted to know, didn't

16      you?

17  A   That is not true, ma'am.

18  Q   So, you're saying today that he wants to go downtown?

19      Rather than talk at the comfort of his business where

20      his employees are, he wants to go to the homicide

21      section?  Is that your testimony?

22  A   We went to homicide, which is not downtown.

23  Q   Well, wherever it is.

24  A   He did not want to talk at the store, so we conveyed him

25      to homicide.  Yes.

-194-

```
 1  Q    Okay.  He wanted to go downtown and talk in an

 2       interrogation room with just you?

 3  A    No.  I didn't say that.  He did not want to talk at his

 4       store, so we took him to homicide.

 5  Q    So, where he has his employees, right?

 6  A    I don't know.  It was people in the store.  I don't know

 7       who they were.

 8  Q    Didn't you have a case with Damon Nathaniel where you

 9       told him that, you said, you told him if you don't start

10       giving me some answers that he'd never see his child and

11       his family again?

12            MR. PRASAD:  Objection to relevance.

13            THE COURT:  I'll let her ask the question.

14            THE WITNESS:  I don't know, ma'am.  I could

15       have.  He was a suspect in a homicide.

16  Q    (By Ms. Rock continuing):  Okay.

17  A    I could have told him that.  Yes.

18            MS. ROCK:  Okay.  So, you -- Okay.  Your

19       Honor, I don't have anything further of Ms. Simon.

20            THE COURT:  Anything more?

21            MR. PRASAD:  No, your Honor.  Thank you.

22            THE COURT:  Okay.  Thank you.

23            (At 3:21 p.m. witness excused.)

24            THE COURT:  Enjoy your retirement.

25            THE WITNESS:  I'm working.
```

-195-

1                    THE COURT:  Then enjoy your working
2       retirement.
3                    THE WITNESS:  Thank you.
4                    THE COURT:  It's retirement time that you're
5       choosing to work on, right?
6                    THE WITNESS:  I work for the Attorney
7       General.
8                    THE COURT:  I understand that.  But you're
9       retired, right?
10                   THE WITNESS:  Yes.
11                   THE COURT:  And so, you choose to work and--
12                   THE WITNESS:  (Interposing)  Yes.
13                   THE COURT:  That's how you spend your
14      retirement though.
15                   THE WITNESS:  Yes.
16                   THE COURT:  Okay.  Did I stutter, stammer?
17      Didn't she say she was retired?  Now, you can work when
18      you're retired, you can not work when you're retired.
19      Who's your next witness, sir?  Or did you follow what I
20      said and we're going home?
21                   MR. PRASAD:  Yes, sir.  I tried to time it
22      for what the Court was...
23                   THE COURT:  Okay.  So, who do we have
24      tomorrow?
25                   MR. PRASAD:  Judge, we have the two MSP

                              -196-

1    people, the medical examiner and one officer left.  So,

2    four.

3              THE COURT:  A little preview of coming

4    attractions.  Okay.  9:30 again tomorrow?  Okay.  I'm

5    glad it's working for us.  Okay.  I appreciate it.

6    Remember, I don't know what it's supposed to be, but

7    please, it's safety that is primarily important.  So,

8    let's all shoot for any time before 9:30, but don't

9    sweat it if it's not happening like that.

10             (At 3:21 p.m. jury leaves the court room.

11             (At 3:21 p.m. proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R E P O R T E R ' S   C E R T I F I C A T E

STATE OF MICHIGAN  )
                SS )
COUNTY OF WAYNE    )

       I, SEAN E. ALLEN, CSMR 5265, Certified Court Reporter acting in and for the Third Judicial circuit, Wayne County, State of Michigan, do hereby certify that the foregoing pages 1 through 198, inclusive, were reduced to typewritten form and comprise a true rendition of the proceedings taken in the above-entitled matter on January 12, 2011.

       I FURTHER CERTIFY THAT MY CERTIFICATION ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN, SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED COPIES NOT MADE UNDER MY CONTROL AND SUPERVISION.

                                     _____
                                     SEAN E. ALLEN -- CSMR 5265
                                     Official Court Reporter.

DATED:  This 30th day of April 2012.