STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN

       v                      Case Number
                               10-5562-01


DEONTE HOWARD

                            Defendant.

_____/

JURY TRIAL

PROCEEDINGS HELD BEFORE THE HONORABLE BRUCE U. MORROW

Judge, Third Circuit Court, Detroit, Michigan, on

January 13, 2011.

APPEARANCES:

RAJ PRASAD P68519
Assistant Prosecuting Attorney
Wayne County Prosecutor's Office
1441 St. Antoine
Detroit, MI 48226
(313) 224-5818



SUSAN ROCK P34497
24500 Ford Rd.
Dearborn Heights, MI 48127
(313) 967-4444




Sean Allen
Official Court Reporter
CSMR 5265


-1-

TABLE OF CONTENTS

WITNESSES:
DR. CHERYL LOEWE
      Direct Examination by Mr. Prasad.................5
      Cross-Examination by Ms. Rock...................15

DETECTIVE LIEUTENANT JEFF CRUMP
      Direct Examination by Mr. Prasad...............17
      Cross-Examination by Ms. Rock..................42

OFFICER JAMES WIENCEK
      Direct Examination by Mr. Prasad...............44

SERGEANT MICHAEL MARTEL
      Direct Examination by Ms Rock..................58


EXHIBITS:  None.

CLOSING ARGUMENT BY MR. PRASAD......................64
CLOSING ARGUMENT BY MS. ROCK........................92
REBUTTAL ARGUMENT BY MR. PRASAD....................107

1               Detroit, Michigan.

2               Thursday, January 13, 2011.

3               (At 10:35 a.m. court in session.)

4               THE COURT:  Back on the record.  Let's rock

5      and roll.

6               (At 10:35 a.m. jury enters the courtroom.)

7               THE COURT:  Oh, that was a long time in

8      there.  You know the one belief you all have to have by

9      now, I'm sure you all were saying, Bruce is doing

10     something.  Because he would have us out there.  He must

11     be doing something.  But I should have kept sticking my

12     -- Send somebody in there and tell you, okay.

13               The thing was is that the lawyers all came

14     at the same time.  And sometimes because, like you,

15     there's family members and friends.  And a couple of

16     them were sentencings.  They would have had to wait

17     until -- It's just to try to, you know, who should I

18     please today.  And so, I kind of had to do that.

19               But now that we're here -- And I'm going to

20     change a little.  What I've been told is that there are

21     three witnesses left in the People's case.  So, we'll

22     hear from the three witnesses of the People.  And I'm

23     looking at what time it is.  And in an hour and ten

24     minutes, it's going to be lunch time.  So, that's when

25     we'll just take a break.

                              -3-

```
 1                    I had told them something different,
 2         according to a plan yesterday that was in my head.  But
 3         I'm going to consider myself to be a little flexible
 4         now.  So, let's hear the rest of the witnesses that you
 5         have.
 6                    MR. PRASAD:  Yes, sir.
 7                    THE COURT:  Then we'll go from there.
 8                    MR. PRASAD:  The next witness is, your
 9         Honor, Dr. Loewe.
10                    THE COURT:  Come on in.  Happy New Year.
11                    DR. LOEWE:  Happy New Year.
12                    THE COURT:  You all right?
13                    DR. LOEWE:  A little bit of an absessed
14         tooth, but I think I'll make it.
15                    THE COURT:  If not, we have some salt water
16         that you can gargle with.
17                    (At 10:38 a.m. DR. CHERYL LOEWE was sworn.)
18                    THE COURT:  Do you to promise your testimony
19         will be truthful?
20                    THE WITNESS:  Yes, your Honor.
21                    THE COURT:  Thank you.  Come on up here.
22         You going to have to get it lanced?
23                    THE WITNESS:  I already did once and then it
24         kind of ballooned out last night.
25                    THE COURT:  Well, if you need a break, just
```

-4-

1      let me know.

2                      THE WITNESS:  Thank you.

3                      MR. PRASAD:  Thank you, Judge.

4                      DIRECT EXAMINATION

5   BY MR. PRASAD:

6   Q    Ma'am, if you would, please introduce yourself to the

7        jury?

8   A    Good morning.  I'm Dr. Cheryl Loewe.

9   Q    And where do you work, ma'am?

10  A    I'm the deputy chief medical examiner for Wayne County.

11  Q    How long have you been with the Wayne County Medical

12       Examiner's Office?

13  A    Fifteen and a half years.

14  Q    And what's your medical background?

15  A    I became a medical doctor in 1990.  And then I did five

16       years of residency training in pathology at St. John

17       Hospital, one year of fellowship training in forensic

18       pathology at the Wayne County Morgue.

19                      Then I was subsequently hired as an

20       assistant medical examiner and I was promoted to deputy

21       chief, which is essentially second in charge, about

22       seven years ago.

23  Q    As part of your duties as deputy chief, do you also

24       supervise the fellows that are training there as well?

25  A    Yes.  I do.

-5-

1  Q    Have you ever been considered an expert before in a

2       court of law, ma'am?

3  A    Yes.

4  Q    About how many times?

5  A    Every time I've testified which, on the average, is

6       about twice a week.

7  Q    Okay.  And, specifically, ma'am, have you ever been

8       considered an expert in forensic pathology?

9  A    Yes.

10             MR. PRASAD:  Your Honor, at this time, the

11     People would tender this witness as an expert in

12     forensic pathology.

13             THE COURT:  Is there any questions you would

14     like to ask her or do you want--

15             MS. ROCK:  (Interposing)  No, your Honor.

16             THE COURT:  To stipulate that she would be

17     allowed to testify in the field of forensic pathology--

18             MS. ROCK:  (Interposing)  Yes, your Honor--

19             THE COURT:  (Interposing)  As an expert?

20             MR. PRASAD:  Thank you, Judge.

21  Q   (By Mr. Prasad, continuing):  Dr. Loewe, I want to bring

22      your attention to a specific case.  I believe it's Wayne

23      County medical exam report number 10-3487 regarding the

24      post-mortem of a person identified as Tyrone Simpson.

25      Are you familiar with that case, ma'am?

-6-

1   A      Yes, sir.

2   Q      How are you familiar with this case, ma'am?

3   A      I supervised Dr. Tally, who is a doctor in training.  We

4          examined the body together and came to a proper

5          conclusion relative to the cause and manner of death of

6          Mr. Simpson.

7   Q      Okay.  I want you to explain, before you go into the

8          specific of this specific case, I want you to explain,

9          in general, what it is you do when you're examining a

10         body at the medical examiner's office.

11  A      The first thing we do is undress the body if applicable.

12         In this particular case, Mr. Simpson came in in a

13         hospital gown because he was pronounced dead at Sinai

14         Grace after minutes of resuscitation.  We examine the

15         body from head to toe, front to back and take photos and

16         document any injuries to the body.

17                  And then the body is opened and all of the

18         internal organs are examined for any evidence of disease

19         or injury.  Any sign of injuries are documented.  And

20         then we also recover any evidence in the body.  In this

21         particular case, three bullets were recovered from the

22         body of Mr. Simpson.  After that, then we certify death

23         and sign a death certificate relative to the cause and

24         manner of death.

25  Q      And I want to take that, exactly what you described,

-7-

1      your general process, and apply it to this case

2      specifically, first with your external examination.  Did

3      you conduct an external examination of Mr. Simpson?

4  A   Yes.  We did.

5  Q   What did that reveal to you, ma'am?

6  A   There were multiple gunshot wounds present to the body,

7      a total nine.

8  Q   Okay.  And we're going to need to take these one-by-one.

9      What is the easiest way for you to explain it to the

10     jury in terms of the different gunshot wounds?

11 A   Probably keep it very simple.

12 Q   Okay.

13 A   If that's okay with you.

14 Q   Please.  Just so that they understand where and how you

15     observed each gunshot wound.

16 A   Sure.  The wounds are arbitrarily numbered.  In other

17     words, they're given an arbitrary number, one through

18     nine.  And that is for organizational purposes and it

19     does not necessarily indicate the sequence in which Mr.

20     Simpson was shot.

21          The most immediately and severe, fatal wound

22     to his body was a gunshot wound to the head. And this

23     was located on the left side of the head -- I'm sorry.

24     The right side of the head just behind the ear.  And

25     this bullet passed into the skull and injured the brain.

1    And a bullet was recovered from within the skull cavity.

2  Q    Okay.  After that one, what's the next one you're going

3       to talk about?

4  A    There was a gunshot wound to the right arm.  There was a

5       gunshot wound to the left arm.  There was a gunshot

6       wound to the left shoulder.  There were three gunshot

7       wounds to the left leg and two gunshot wounds to the

8       right leg.

9  Q    Those gunshot wounds, I'm going to take them in groups.

10       The first ones to the arm, what parts of the arm were

11       shot at?

12  A    It was the right arm, sir.  And if I could refer to my

13       protocol?

14  Q    Please do, if it'll refresh your recollection.

15  A    Thank you.  That was wound designated number two, again

16       arbitrarily.  And this wound passed into the soft tissue

17       of the arm.  It fractured the right humorous, which is

18       the right upper arm bone.  And it exited the right arm.

19               And when a bullet enters and exits, it's

20       said to be a so called through and through wound.  In

21       other words, we don't expect to find a bullet in because

22       it came out of the body.

23  Q    Are you able to determine which side was the entrance

24       and which side was the exit?

25  A    It's described as being the posterior part of the right

1    arm, which means the back of the right arm.

2  Q   Is that -- Which one is that?  Is that the entrance or

3      the exit?

4  A   The entrance.

5  Q   Okay.  And so, and then where did it exit out of?

6  A   The anterior, which means the front of the right arm.

7  Q   Okay.  Very good.  You described another arm injury I

8      believe on the -- Actually, I take that back.  Is that

9      the only arm injury you described, ma'am?

10 A   There was a left arm injury, sir.

11 Q   Okay.  And similar questions, ma'am.

12 A   Yes.

13 Q   Was that a through and through as well?

14 A   This was arbitrarily designated wound number six.   The

15     entrance wound was located near the left elbow.

16 Q   Okay.

17 A   And the bullet passed into that area of the body and a

18     jacket, deformed bullet was recovered from the medial

19     side of the left elbow, which means the inner aspect of

20     the left elbow.

21 Q   So, this was one of the recovered bullets?

22 A   Correct.

23 Q   Okay.  And did it come into the front or the back of the

24     left arm?

25 A   It entered the back and a bullet was recovered near the

-10-

1        front.  I'm sorry.  The medial, the inner aspect.

2  Q     Very good.  Same type of questions, ma'am, to the leg

3        ones.  Can you describe the leg bullet wounds?

4  A     Yes.  There were actually three gunshot wounds to the

5        left leg, two of these were so-called through and

6        through wounds.  One of the entrance wounds did not

7        exit, so one bullet was recovered from the left leg.

8  Q     And these three bullet wounds, were they on the -- Did

9        they enter in the front or the back?

10  A    Okay.  Just a second.

11  Q    Sure.

12  A    We're referring to wound designated number four.  The

13       entrance is on the back of the left leg.  The bullet

14       passed through the soft tissue of the left leg and

15       exited also on the back of the left leg.  And this is

16       the one that we recovered a portion of a bullet.

17  Q    Okay.

18  A    And then there was a through and through gunshot wound

19       to the left leg arbitrarily designated wound five.  And

20       it entered on the anterior or front of the left leg and

21       then exited on the back of the left thigh.  And no

22       bullet was recovered, sir.

23  Q    Okay.

24  A    And then wound arbitrarily designated number eight was

25       also a through and through gunshot wound to the left

-11-

1       leg.  And the entrance wound was on the front of the

2       left leg and it exited on, also on the front of the left

3       leg.  And no bullet was recovered.

4    Q  And you mentioned the right leg as well.  Was there any

5       gunshot wound to the right leg?

6    A  Yes.  The wound arbitrarily designated number nine was a

7       through and through gunshot wound.  The entrance was on

8       the front of the right leg and the bullet exited on the

9       inner aspect of the right leg.

10   Q  And, finally, I think you described one to the shoulder,

11      is that correct?

12   A  Correct.  Wound arbitrarily designated number seven was

13      an entrance wound to the left shoulder about three and a

14      half inches below the armpit.  And this bullet passed

15      near the left scapula, which is our shoulder blade, near

16      the first rib space and exited near the left upper chest

17      without penetrating the chest cavity or injuring any of

18      the thoracic or chest organs.  And because the bullet

19      exited, no bullet was recovered.

20   Q  Ma'am, in addition to examinations externally, did you

21      do any internal examinations to follow up on the

22      external examination?

23   A  Yes.  All of the internal organs from the next down to

24      the bowels would have been removed, including the brain,

25      and examined for any evidence of disease or injury.

1          In this particular case, as I mentioned, the
2     majority of the wounds were to the extremities.  The
3     most significant finding would have been the wound to
4     the head, again, arbitrarily designated number one. And
5     the wound tract, or path of destruction, was followed.
6     And it was determined that the bullet hit the right
7     parietal skull bond, that's the right top of the head,
8     if you will, and then injured several vital structures
9     within the brain, including the corresponding portion of
10    the brain on the right top of the head, the right back
11    of the head and the right cerebellum, which is the back
12    portion of the brain.  And a bullet was recovered near
13    the left back of the skull bone and was retained.
14 Q  Doctor, in addition to the examination of the body
15    itself, are there any type of chemical testing done on
16    the fluids of the body?
17 A  Yes.  We routinely collect blood and urine and vitreous
18    fluid, which is the clear, colorless fluid from the eye.
19    And those fluids are all screened for drugs of abuse,
20    including cocaine and heroin as well as prescription
21    drugs and alcohol.  We do not test for marijuana.
22 Q  Of the things that were screened for, was there any
23    found in this case?
24 A  No.  The screening was completely negative for
25    everything I mentioned.

-13-

1  Q    Now, doctor, you mentioned to the jury earlier that

2       ultimately after all the analysis is done, you look for

3       a finding of cause and manner of death, right?

4  A    Correct.

5  Q    What is that?  What's the cause and manner of death in

6       general terms?

7  A    The cause of death is defined as the disease process or

8       the injury that immediately results in an individual's

9       death.

10 Q    And what was the cause of death in this case?

11 A    The cause of death of Mr. Tyrone Simpson, who was a

12      nineteen year old male, is multiple gunshot wounds.

13 Q    What about the manner of death?  What is that in general

14      terms?

15 A    The manner of death refers to the circumstances

16      surrounding an individual's death.  Relative to Mr.

17      Simpson, the manner of his death is classified as

18      homicide, which is defined by the medical examiner as

19      the killing of one person based on the actions of

20      another individual.

21              Other options include natural death, death

22      due to heart attack, for example.  Accidental death,

23      which is death that is unforeseen and unexpected, for

24      example, victims of car accidents, drowning, fire,

25      electrocution.  Suicide, which is self-explanatory.  And

-14-

1        when the exact manner of death cannot be determined or

2        may be ambiguous, an indeterminant is used as the fifth

3        option.

4   Q    In this case, do you have a clear manner of death?

5   A    The manner of death is homicide.

6                MR. PRASAD:  Thank you.  Pass the witness.

7                CROSS-EXAMINATION

8   BY MS. ROCK:

9   Q    Good morning.

10  A    Good morning.

11  Q    Ma'am, it's true that Tyrone Simpson was 5'5" and a

12       hundred and fifty pounds?

13  A    Again, if I can refer to my protocol, please.

14  Q    Please do.

15  A    5'5", one hundred fifty pounds.

16  Q    Okay.  And you noticed that he had some tattoos on his

17       right upper arm, is that right?

18  A    That's correct.

19  Q    Something R-L-P-G-R-N-D-A-L?

20  A    Correct.

21  Q    And Sam?

22  A    Correct.

23                MS. ROCK:  Okay.  Your Honor, I don't have

24       any further questions.  Thank you.

25                THE COURT:  Thank you, ma'am.

                          -15-

1                  MR. PRASAD:  Can this witness be excused,

2        your Honor?

3                  THE COURT:  She sure may.

4                  MR. PRASAD:  Thank you.

5                  THE WITNESS:  Thank you.

6                  (At 10:52 a.m. witness excused.)

7                  MR. PRASAD:  The People are going to call

8        Lieutenant Crump, your Honor.

9                  THE COURT:  Doing all right today?  What's

10       your hand doing up in the air?

11                 LT. CRUMP:  Waiting for you.

12                 THE COURT:  All right.

13                 (At 10:53 a.m. witness DETECTIVE LIEUTENANT

14                 JEFF CRUMP was sworn.)

15                 THE COURT:  Do you promise to tell the

16       truth?

17                 THE WITNESS:  I do.

18                 THE COURT:  Have a seat.  What time did you

19       have to leave this morning?

20                 THE WITNESS:  Pardon?

21                 THE COURT:  What time did you leave this

22       morning?

23                 THE WITNESS:  6:30.

24                 THE COURT:  Good drive?

25                 THE WITNESS:  Wasn't bad.

-16-

```
 1                    MR. PRASAD:  Thank you, Judge.
 2                    DIRECT EXAMINATION
 3  BY MR. PRASAD:
 4  Q    Lieutenant, can you pull that microphone a little bit
 5       closer to you?  Thank you.  Introduce yourself to the
 6       jury, sir.
 7  A    My name is Jeff Crump.  And I am a firearms examiner
 8       with the Michigan State Police currently assigned to the
 9       laboratory in Grand Rapids.
10  Q    Sir, what's your rank there currently?
11  A    I'm a lieutenant.  I'm the supervisor of the firearms
12       unit.
13  Q    And how long have you been doing firearms work, sir?
14  A    Thirteen years.
15  Q    Okay.  All with the Michigan State Police, sir?
16  A    Yes.
17  Q    Before you started with the Michigan State Police, tell
18       us a little bit about your training in the field?
19  A    Well, I have a master's degree from Michigan State
20       University in criminal justice with an emphasis in
21       forensic science.  After graduating, I went into the
22       state police academy.  I first started out as a road
23       trooper.  So, I was on the road for a couple years.  And
24       then I got selected to fill a firearms spot in the lab.
25       The training program for a firearms examiner is
```

-17-

1    basically an apprenticeship-type training program.  You

2    work under an experienced examiner.  It's a two-year

3    training program.  And, basically, it's hands-on

4    casework.  You're just working on actual casework under

5    the examiner.  And after the two-year training program,

6    you're given a proficiency test and competency test.

7    And if you pass those, then you're allowed to work on

8    cases on your own.  However, any identification that we

9    make is always seconded by another examiner.

10   Q    How long ago was it that you passed your proficiency

11        test and competency test?

12   A    Well, that was thirteen years ago.  Or, well, actually

13        it would have been after the two-year training program,

14        so it would be eleven years.  But we take competency

15        tests every year also.

16   Q    And have you had any problems passing those?

17   A    No.

18   Q    Okay.  How long have you been working -- Let me back up.

19        Have you been working chiefly in the firearms lab, sir,

20        this entire time?

21   A    Yeah.  Well, I started out doing firearms and bomb

22        squad, but I only did bomb squad for five years and it

23        was just strictly firearms after that.

24   Q    Okay.  Could you approximate the amount of casework

25        you've worked on up to this point?

-18-

```
 1  A    I probably do anywhere from four to five hundred cases a
 2       year, probably more so now.  But back then starting out,
 3       maybe two, three hundred cases a year.  So, quite a few,
 4       thousands of caseworks.
 5  Q    You ever testified in court before, sir?
 6  A    I have.
 7  Q    Have you ever been acknowledged in other courts as an
 8       expert in firearms analysis?
 9  A    I have.
10  Q    About how many times?
11  A    Approximately eighty times.
12            MR. PRASAD:  Your Honor, the People would
13       tender this witness as an expert in firearms analysis.
14            MS. ROCK:  No objection, your Honor.
15            THE COURT:  Okay.  He'll be qualified and
16       allowed to speak in firearms examination.
17            MR. PRASAD:  Thank you, sir.
18  Q    (By Mr. Prasad, continuing):  Lieutenant, I want to draw
19       your attention to a specific Michigan State Police lab
20       number.  That is N, as in Nancy, V, as in Victor, 10-
21       4734.  Are you familiar with this case, sir?
22  A    Yes.
23  Q    Have you worked on this case specifically?
24  A    I did.
25  Q    What kind of work did you do on this case?
```

1  A    Well, I had three separate case records on this.  The
2        first case record involved fired cartridge cases and
3        fired bullets or fragments thereof.  The second case
4        record involved some clothing to do gunshot residue
5        testing on it.  And the third case record was also a
6        gunshot residue testing on clothing.
7  Q    We'll take them one-by-one, if we can, sir.  I want to
8        draw your attention to the first one that you worked on
9        in regards to jacketed bullets and fired bullets and
10       cartridge casings.  I think before we go into the
11       details of the work, can you explain to the jury what it
12       is exactly about a bullet -- Tell us about a bullet.
13       Explain a bullet to the jury, please.
14 A    Well, if I may use a mock cartridge.  This would be an
15       unfired cartridge that we load into a firearm.  When you
16       fire a cartridge, the firing pin on the firearm will
17       strike the primer, ignite the primer, which ignites the
18       powder inside the cartridge, which then creates pressure
19       and pushes the bullet out the barrel.  If we're dealing
20       with a semi-automatic firearm, the fired cartridge case
21       will get ejected out of the firearm.  If we're dealing
22       with a revolver, then the fired cartridge case will stay
23       within the cylinder of the revolver until somebody opens
24       it up and dumps it out.
25 Q    The fired cartridge you're talking about, is that also

1      commonly called a casing, or shell casing?

2  A   Yeah.  Some people call it a casing, a spent case,

3      things of that nature.  Yes.

4  Q   Very good.  Now, when you have different items, such as

5      the ones that were submitted to you in this case, you

6      know, some of them are spent bullets, some of them are

7      cartridges, do you look at different things in regards

8      to each of these items?

9  A   Well, we're basically looking for identifying,

10     identifiable, unique, individual characteristics.

11 Q   How do you do that, sir?

12 A   Well, we use a comparison microscope--

13 Q   (Interposing)  Okay.

14 A   For that job.  The comparison microscope allows us to

15     look at two items at the same time.  There's two stages

16     on the comparison microscope, so you can put one item on

17     one stage and one item on another.  As you look through

18     the view finder, you have a split screen.  So, you can

19     manipulate those two items and see them at the same time

20     through the split screen.  So, then we look for the

21     individual characteristics, or some people call them

22     striations, or basically they're scratches left by the

23     firearm.  So, we'll look for those and we'll see if

24     there's a matching pattern.  If there is a matching

25     pattern of sufficient quality, then that allows us to

-21-

```
 1        give an opinion as to whether it's identified, whether
 2        it's inconclusive or whether it's eliminated.
 3   Q    Will a firearm that fires multiple bullets from the same
 4        gun, will it leave similar marks that you could look at
 5        under this microscope?
 6   A    It can.  Yes.
 7   Q    Okay.  And would that be unique to that gun?
 8   A    Yes.
 9   Q    Okay.
10   A    In theory, it is unique to that firearm.  Yes.
11   Q    Why is that?
12   A    Because of the manufacturing process.  As a firearm goes
13        through a manufacturing process at the company, the
14        tooling used to create that firearm, basically, you're
15        using a lot of cutting tools.  So, as you manufacture
16        one firearm with the cutting tool, you're cutting and
17        milling services on this firearm, well, you're changing
18        the surface of the tool as you make one firearm.  So,
19        then when you use that same tool to make another
20        firearm, you now have a difference face on the tool.
21        So, as it makes the next firearm, it leaves different
22        marks on the firearm.  So, those marks then that are
23        left on the firearm during manufacturing are transferred
24        over to any fired component that's fired in the firearm.
25   Q    All right.  In this specific case, what kind of items
```

-22-

 1      did you look at?

 2  A   On that first case record, I looked at fifteen .40

 3      caliber fired cartridge cases.  And it appears they all

 4      have the headstamp of Federal, which is the manufacturer

 5      and/or marketer of the cartridge.

 6  Q   Now, sir, there are, we have a large number in evidence.

 7      Do you make any specific markings in regards to the

 8      evidence packaging so that you know that this is the

 9      stuff that you actually looked at?

10  A   Well, when the, when an agency submits evidence and it

11      gets logged into the laboratory, there's supposed to be

12      a sticker that gets on the exterior of the package.

13      When I examine it, I will re-package it into a heat-

14      sealed envelope with my sticker inside of that envelope

15      with the date and my initials and the item number.

16              MR. PRASAD:  Very good, sir.  I'm going to

17      show him just a couple of them instead of going through

18      all of them.

19              MS. ROCK:  Sure.

20              MR. PRASAD:  I'm just going to show him

21      these three to start with.

22              MS. ROCK:  Thank you.

23  Q   (By Mr. Prasad, continuing):  Lieutenant, I'm going to

24      show you what's in evidence as People's Exhibits Sixty-

25      Three, Sixty-Four and Sixty-Five.  I'm going to show you

```
 1       a sampling of the array that we have in evidence, okay?
 2   A   Sure.
 3   Q   If you could do me a favor, open up each one and see if
 4       what you just described, the markings that you're
 5       talking about, are in each one.
 6   A   Sure.  This envelope has our lab sticker on it with the
 7       lab number and the container number on it.  If I open it
 8       further, do you want me to--
 9   Q   (Interposing)  Go ahead.
10   A   Okay.  As we open it further, this would be the envelope
11       that the agency packaged the piece of evidence in.  This
12       is the heat-sealed envelope that I'll re-package the
13       evidence in so it can be viewed.  Inside is the sticker
14       that I put in there with, it has our lab number, the
15       item number, the date and my initials.
16   Q   Very good, sir.  And that was, for the record, Number
17       Sixty-Three, I believe?
18   A   Yes.
19   Q   Okay.
20   A   People's Exhibit Sixty-Three.
21   Q   Very good.  Just do me a favor, since I already gave you
22       Sixty-Four and Sixty-Five, just look in each one of
23       those to confirm what you just showed the jury is also
24       there for those.  Thank you.  Have you looked in both
25       Sixty-Four and Sixty-Five, sir?
```

-24-

1   A   Yes.

2   Q   And similar to the way Sixty-Three was, do those both

3       contain the same packaging and markings and ultimately

4       the sticker with your initials on it as well?

5   A   They do.

6   Q   Okay.  Very good, sir.  Lieutenant, what did you do in

7       terms of your comparison of the fifteen cartridge shells

8       that you had?

9   A   Well, with the fired cartridge cases, since I don't have

10      a firearm to compare them to, the least I can do is

11      compare them to each other.  So, I can still put them on

12      the comparison microscope and look at two at the same

13      time and see if they have matching, individual

14      characteristics.

15              With a fired cartridge case, what we're

16      basically looking for is breachface marks that are going

17      to be left on the primer of the firearm, the primer of

18      the cartridge, which is right here.  So, when you fire

19      the cartridge, you get a lot of pressure.  If this is

20      the breachface of the firearm, you get a lot of pressure

21      when you fire this.

22              So, not only do you get forward pressure

23      that pushes the bullet out of the firearm, but you get

24      rearward, which cycles the slide on a firearm.  So, if

25      you have individual characteristics or any kind of

```
 1        scratches or imperfections on the breachface of the
 2        firearm after it's manufactured, then it can be
 3        transferred to the back of the cartridge case.  So,
 4        that's what we'll look for.
 5   Q    Did you look for that in this case, sir?
 6   A    Yes.  Mainly we'll use that for identification purposes.
 7   Q    And what was your results from doing that?
 8   A    The results were that all of those fired cartridge cases
 9        had matching individual characteristics.  So, in my
10        opinion, it is to say that they were all fired from a
11        common firearm or the same firearm.
12   Q    Very good.  Did you also receive bullets or bullet
13        fragments in this case as well, sir?
14   A    I did.
15   Q    Were you able to do any type of testing on those, sir?
16   A    Yes.  Basically, with bullets, what we'll do first is
17        classify them, and that is to try to determine what the
18        caliber is.  So, we'll weigh them.  We'll measure the
19        diameter.  We'll look at the lans and grooves on them
20        and see how many there are and what twist they are.
21        And, if we can, we'll measure the lan and groove
22        impressions.
23   Q    Can you explain what you were just saying in normal
24        terms?  What is lans and grooves and twists?
25   A    When you manufacture a barrel, the manufacturer puts in
```

1    rifling, what's called rifling inside the barrel.

2    Basically, what rifling is is these lans and grooves are

3    cut on the inside of the barrel.  And so you'll have a

4    raised portion and you'll have a lowered portion so the

5    lan is the raised portion and the groove is the lowered

6    portion of the barrel.

7             The purpose of the lans and grooves or the

8    rifling is that as the bullet travels through the

9    barrel, the lans and grooves kind of cut into the

10   surface of the bullet.  And the rifling is at a twist in

11   the barrel, so it starts twisting the bullet.  So, when

12   the bullet comes out of the barrel, it's spinning.  And

13   that gives the bullet greater accuracy and lets it, you

14   know, travel a farther distance.

15 Q  Is it like, using an everyday comparison, would that be

16   like a spiral to a football?

17 A  Yes.

18 Q  Okay.

19 A  Yes.

20 Q  So, do those leave, are those lans and grooves and

21   twists unique to a firearm as well?

22 A  Well, the lans and grooves are class characteristics.

23   So, those can be common to a number of different

24   firearms.

25 Q  Okay.

```
 1  A    Okay?  So, but we'll use that to classify a bullet.

 2       Again, we'll weigh the bullet, we'll take the diameter

 3       of the bullet and we'll count the lans and grooves and

 4       measure--

 5  Q    (Interposing)  Did you do that in this case?

 6  A    I did.  And beyond that, we'll also look for

 7       identifiable characteristics.  That is to say does it

 8       have individual characteristics on the lan impressions

 9       and the matching characteristics to say, yes, these were

10       all fired from the same firearm.  So, that's the process

11       of a fired bullet.

12  Q    Talk about this case, sir.  How many different fired

13       bullets did you look at?

14  A    Well, there were six bullets and/or fragments that were

15       looked at all together.

16  Q    And you said fragments.  What do you mean by fragments?

17  A    Well, when a bullet strikes an object, a hard object it

18       can fragment into smaller pieces.

19  Q    Okay.

20  A    So, a lot of times, those smaller pieces are hard to

21       classify and all we can say is, hey, this is consistent

22       with a bullet fragment.

23  Q    Of the six that you were looking at, were you able to

24       classify some of them?

25  A    Yes.
```

-28-

1  Q    How many of them?

2  A    Four.  Four of them are being consistent with a .40

3       caliber and/or 10mm caliber jacketed bullet, which

4       exhibits class rifling specifications of six polygonal

5       lans and grooves.

6  Q    What does that mean?

7  A    Polygonal means that it's not a traditional rifling.

8       The rifling of a polygonal barrel, basically, you have

9       humps instead of a distinct cut lan and groove.  So,

10      you'll see humps in the barrel.  And as the bullet goes

11      through there, the barrel, you don't get these nice, cut

12      out lan and groove impressions.  You basically get a

13      smudge on the surface of the bullet.  Okay?

14            But you can still, a lot of times, count

15      those and see is it a left twist or is it a right twist.

16      And there a handful of manufacturers that use polygonal

17      rifling instead of a conventional rifling in the

18      barrels.

19 Q    Those four that you did compare that were comparable,

20      they all exhibit these same characteristics that you

21      were just talking about?

22 A    Yes.

23 Q    And you mentioned a .40 caliber or a 10mm?

24 A    Yes.

25 Q    So, the cartridge casings you found in this case were

-29-

1     all .40 caliber cartridge casings?

2  A   Correct.

3  Q   Okay.  Okay.  The other ones, besides the four that you

4     were able to look at, what was the reason you were not

5     able to look at the other four?  Or excuse me.  The

6     other two.

7  A   Just because they were fragments, smaller portions to

8     work with.  I'm going to -- Like with item number one, I

9     have it listed as being consistent with a .38 class

10    caliber or a. 40 caliber.  Just because it was broken

11    up, I don't have the entire weight to measure.  I don't

12    have the entire diameter to measure.  But it did

13    exhibit, what was visible, it did have polygonal rifling

14    on it also.

15  Q  Similar to the other ones that you saw?

16  A  Correct.

17  Q  Okay.  And were you able to make a -- Excuse me.  Were

18    you able to make any determination with the other

19    fragments that you had?

20  A  Item number three consisted of two lead fragments and

21    one jacketed fragment.  And it was too damaged to give

22    any definitive classification to it.

23  Q  Give me one second, sir.  There's a couple specific ones

24    I want to ask you about.  Did you cross-reference your

25    item numbers with the lab number from the Detroit Police

```
 1        Department that was submitted to you?  Is there any way
 2        of noting which -- When you call it item one or item
 3        five or item ten, is their evidence tag number also
 4        noted somewhere?
 5   A    I list their evidence tag number in my breakdown of the
 6        evidence that was received.  Yes.
 7   Q    Okay.  So, there's a way that you could look at a
 8        Detroit Police Department evidence tag number and see if
 9        it corresponds to your number?
10   A    Yes.
11   Q    Okay.  That's what I wanted to ask you about, that
12        specifically.  Lieutenant, I'm going to show you what's
13        in evidence as People's Exhibit Sixty-Six, Sixty-Seven
14        and Sixty-Eight.  Those are three of the fired bullets
15        that were recovered from the morgue in this case.  They
16        have unique evidence tag numbers from DPD on the top of
17        each tag.  Do you see that, sir?
18   A    Yes.
19   Q    Do they correspond to specific ones that you looked at
20        in your case?  And I think it's one, two and three, just
21        to give you a hint.
22   A    Yes.  Do you, do you want me to read those out?
23   Q    Well, if you can tell me, your number one is which
24        number one in evidence, or which number in evidence?
25   A    People's Exhibit Sixty-Six would be my item number one.
```

1    Q    Okay.

2    A    And People's Exhibit Sixty-Seven would be my item number

3         two.  And then People's Exhibit Sixty-Eight would be my

4         item number three.

5    Q    Okay.  And you had just described to the jury different

6         things you found with one, two and three.  Starting off

7         with number two, People's Exhibit -- Which is People's

8         Exhibit Number Sixty-Seven?

9    A    Correct.

10   Q    What was your finding with regard to People's Exhibit

11        Number Two?  Excuse me.  Sixty-Seven, which is your

12        number two?

13   A    I found number two to be consistent with a .40

14        caliber/10mm caliber metal jacketed fired bullet, which

15        exhibits the six polygonal lans and grooves with a right

16        twist.

17   Q    And was that a similar finding to other bullets that

18        were found in this case?

19   A    It's also consistent with my item number nine, twelve

20        and thirteen.

21   Q    Okay.  Give me one second and we're going to go there

22        immediately.  Showing you People's Exhibit Number Fifty-

23        Three, a bullet fragment found from the scene.  That

24        should correspond to number nine on your list, correct?

25   A    Correct.

-32-

1  Q   And so that would be the same, that would be a bullet
2      fragment that shares the same characteristics as number
3      two, People's Exhibit Number Sixty-Seven?
4  A   A bullet.  Yes.  Just a bullet.  Yes.
5  Q   Okay.  Please correct me if I ever say anything that's
6      incorrect.
7  A   Yes.
8  Q   I want you to correct me.  Thank you.  Similar questions
9      to you, sir, regarding People's Exhibits Fifty-Six and
10     Fifty-Seven, two other bullets recovered from the scene.
11     If you would compare your number with the evidence tag
12     numbers, does that reflect your numbers twelve and
13     thirteen?
14 A   Yes.  It does.
15 Q   Okay.  Very good.  Draw your attention back to Sixty-Six
16     and Sixty-Eight.  I think those were the last two you
17     have there.  People's Exhibit Number Sixty-Six, you
18     testified that was number one on your list?
19 A   Yes.
20 Q   What was your finding on number one, please?
21 A   Number one is most consistent with being a .38 class or
22     .40 caliber metal jacketed fired bullet appearing to
23     exhibit six polygonal rifling lan and grooves with a
24     right twist.  Damage to item one prevented a more
25     definite classification.

-33-

1  Q    Because of the damage, you can't say, like you can for

2       your number two, our Sixty-Seven and the other one, you

3       can't say it as clearly as you can with the other one?

4  A    Correct.

5  Q    Okay.  And, finally, Number Sixty-Eight.  That

6       corresponds to your number three?  Was that the damaged

7       one, sir?

8  A    Yes.

9  Q    Were you able to make any sort of classification on that

10      one?

11 A    This was just two small lead fragments and one small

12      jacket fragment and I can't definitely classify it.

13 Q    Okay.  Any other determinations are you able to make,

14      sir, in looking at the evidence you looked at in this

15      case regarding the bullets and the cartridges?

16 A    Well, I wasn't able to identify them as having been

17      fired from the same firearm.  Typical in polygonal

18      rifling, doesn't leave individual characteristics

19      sufficient for an identification.

20 Q    Regarding the bullets themselves?

21 A    The bullets.  Yes.

22 Q    All you can say is they're consistent?

23 A    Yes.

24 Q    Okay.  Very good.  But you can make that determination

25      from the cartridges you described?

-34-

1  A    The cartridge cases.  Yes.

2  Q    Yes.  Very good.  Anything else regarding this first lab

3       work that you did in this case?

4  A    No, sir.

5  Q    All right.  Very good.  Let's move onto the second set

6       of lab work that you did in this case.  What were you

7       looking at in the second set, sir?

8  A    On this record number, my record number three, I was

9       given a pair of Parrish (sp.), the name brand on the

10      jeans, black jeans, size thirty-eight, which is my item

11      number twenty-two.

12 Q    And what was submitted for what purpose?

13 A    To see if I could find any gunshot residue on the pants

14      themselves.

15 Q    Tell the jury about that a little bit.  What are you

16      looking for in terms of gunshot residue?

17 A    Well, when we do a gunshot residue test or, basically,

18      for us, if we find gunshot residue, it's to see if we

19      can determine the distance from wherever the firearm was

20      away from the victim when it was fired.

21 Q    What do you need to do that?

22 A    Well, we need the firearm, the suspect firearm.  We need

23      the suspect ammunition.  And, obviously, the suspect

24      clothing, basically, in order to do this test properly.

25 Q    What about this case?

1 A    Here, all I had was the clothes to process.  So, I did

2      process the clothes looking for any gunshot residue that

3      might be on these jeans.

4 Q    Did you find anything?

5 A    I found holes that, basically, could be consistent with

6      having been produced by a fired bullet.  I didn't find

7      any gunpowder particles or any vapor residue to make any

8      gunshot residue determinations on this pair of jeans.

9 Q    What does that mean to you, sir, about not being able to

10     find lead, vaporous lead particles or anything like

11     that?

12 A   Well, it's hard to say, obviously, without having the

13     firearm or suspect ammunition to do any testing with.

14     But, in general, if I were to process clothing and find

15     these results and also have the firearm to, to compare

16     it to, when we, when we only see a hole and we don't see

17     any gunshot residue patterns around it, that suggests to

18     us that the firearm was probably beyond three or four

19     feet from the person when it was fired.  Because,

20     typically, beyond that, you're not getting any type of

21     pattern that's going to land on the clothing.

22 Q   Is that a scientific certainty of any sort, that three

23     or four feet distance?

24 A   No.  That's in general what we see in the field when we

25     do these tests.

1  Q    Are there factors that affect that?

2  A    Factors could include, you know, if this outside scene,

3       what are the weather conditions, the type of clothing

4       material that the victim is wearing, the firearm, how

5       long is the barrel, the ammunition, what kind of

6       powder's being used, what caliber is it.  Is there an

7       intervening object in between the shooter and the victim

8       that the powder could be striking that first and then

9       not being deposited on the victim.  So, there's a lot of

10      variables that can be involved.

11 Q    Was that the extent of the testing that you did on those

12      jeans, sir?

13 A    Yes.

14 Q    Okay.  Item number, or report number three, or the third

15      type of testing that you did in this case.

16 A    I'm sorry.  Did you ask a question?

17 Q    Yeah.  I'm sorry.  Would you tell us what the third one

18      was?

19 A    Oh, okay.

20 Q    You're right.  I just guided you there, but I didn't ask

21      you a question.  What was the third one?

22 A    The third one was a white T-shirt that had the brand

23      name of Bugle Boy.  It was a size large.  And it was my

24      item number twenty-three.

25              MR. PRASAD:  And, Judge, for the purposes of

                          -37-

```
 1        the record and for the jury, counsel and I willing to
 2        stipulate that this item, the shirt that the lieutenant
 3        looked at was that of Tyrone Simpson.
 4                  MS. ROCK:  That's correct, your Honor.
 5                  THE COURT:  Okay.
 6   Q    (By Mr. Prasad, continuing):  Please continue, sir.
 7        What did you do in terms of this T-shirt?
 8   A    Well, with this T-shirt, again, I'm looking for the
 9        holes in the T-shirt because, obviously, the area where
10        the holes are is the area where I'm going to process to
11        see if there's a pattern of gunshot residue around those
12        holes.
13                  So, first looked for the holes.  Once I find
14        the holes, we'll do a visual, I'll do a visual
15        examination and look for any particles that might be on
16        the clothing.  After doing visual, we do a chemical
17        test.
18   Q    Did you find holes in this case, sir?
19   A    Yes.  I found several holes in the shirt.
20   Q    How many?  Do you recall?
21   A    In the front of the shirt, in the right chest area,
22        there was a hole, which I labeled as my hole A.  In the
23        left upper shoulder area, I found another hole, which I
24        labeled as my hole B.
25                  Down in the lower left area, I found a
```

-38-

1      series of small holes, which I labeled that area as area

2      C.  And in the back of the shirt in the left shoulder

3      area, I found a hole, which I labeled as my hole D.

4  Q   Once you saw these holes, sir, what was your next step?

5  A   The next step is to -- Well, obviously document and

6      photograph it.  And the next step is to do chemical

7      testing of these areas to look for gunshot residue.

8  Q   Did you do that in this case?

9  A   Yes.

10  Q  What did you find?

11  A  I found some things that were inconclusive and some

12     things that were positive for gunshot residue,

13     specifically down in this lower left area which I

14     labeled as my hole C, this was a series of I think about

15     six small holes where it looked like a fragment of a

16     bullet kind of skipped through the material.

17             Down in that lower left area, that whole

18     area pretty much lit up positive for vaporous lead

19     residue.  And we do this testing, it's called a sodium

20     rhodizonate test.  So, we apply sodium rhodizonate to

21     this area.  If there's lead vapor in that area, it will

22     light up a nice purple color.  It makes it very visible.

23  Q  What does that signify to you, sir?

24  A  Well, vaporous lead is just that.  It's vapors.  So, it

25     doesn't, it's one of the residues that get dispelled

-39-

1        from the barrel of a firearm.

2                   Because it's vapor, it doesn't travel very

3        far.  So, typically, when we find vaporous lead on a

4        garment, that would signify to us that the firearm was

5        in close proximity to that garment when it was

6        discharged.

7   Q    And if you do, and I don't want to put words in your

8        mouth, do you have any approximation of what close

9        proximity means?

10  A    Well, again, without the firearm to really do any

11       testing, I have to keep it real broad.  And, in this

12       case, I would say that the firearm was at least greater

13       than contact.  I know it was not up against the garment.

14       And then because I know that typically gunshot residue

15       is not being deposited beyond three to four feet, I have

16       to limit myself to that distance.  So, it's greater than

17       contact and less than three to four feet.

18  Q    Okay.  Very good.  Please continue, sir.  What else did

19       you find?

20  A    Around the other holes, basically, it was pretty much

21       inconclusive.  I did get a little vaporous lead showing

22       up in this area.  But I say it's inconclusive because of

23       the way the garment was packaged.  It was all balled up

24       together.  And I think this area was in contact with the

25       bottom area, so I think we might have had some cross-

-40-

```
 1        contamination.  So, I can't say specifically if the
 2        vaporous lead that I saw there was actually from
 3        discharging a firearm or if it was transferred from that
 4        lower part of the shirt.
 5   Q    Similar to your analysis with those jeans, if you don't
 6        have evidence of the vaporous lead, would that take us
 7        beyond the three to four feet?  I know in general terms.
 8        We can't be precise.
 9   A    In general -- Right.  If we're not finding gunshot
10        residue, without that firearm to do the testing, then we
11        can probably make the assumption that the firearm was
12        beyond three to four feet, or there was an intervening
13        object.
14   Q    Okay.  Very good.  So, inconclusive results for both the
15        one in the shoulder and the one in the chest as well?
16   A    Yes.  Yes.  I -- The one in the shoulder and the one in
17        the chest, I did not observe any gunshot residue on
18        those areas.
19   Q    Lieutenant, any other analyses that we're missing in
20        this case that you performed, sir?
21   A    No, sir.  Not in this case.
22   Q    Okay.  Thank you, very much.
23   A    You're welcome.
24             MR. PRASAD:  Your Honor, pass the witness.
25             THE COURT:  Ms. Rock?
```

```
 1                    CROSS-EXAMINATION

 2   BY MS. ROCK:

 3   Q    Lieutenant, may I see those pictures, please?

 4   A    Sure.  This is for the shirt.  Do you want the pants?

 5   Q    Yes, please.  Thank you.  Lieutenant Crump, is there any

 6        number of ways to get lead on clothing?  Isn't there any

 7        number of ways to get lead on clothing?

 8   A    I'm not aware of getting vaporous lead on clothing in

 9        general public, if that's what you're asking.

10   Q    Well, you can't get it by handling tire weights or

11        soldering pipe or...

12   A    Vaporous lead?

13   Q    Well--

14   A    (Interposing)  There are probably some specific certain

15        situations where if you're in an environment where

16        you're working around lead that's being vaporized, then

17        yes.  You could probably get that on your clothing.

18   Q    All right.  Thank you.  And then, is it hard to get lead

19        out of clothing?  It's hard to get lead out of clothing,

20        isn't it?

21   A    I don't really know.  I don't know if, after washing it,

22        if it could come completely out or not.  We've never

23        tried that.

24   Q    Okay.  So, the vaporous lead could have been there for,

25        say, hours, weeks or months?
```

-42-

```
 1  A     Yes.  I cannot, I can't tell you a specific time limit
 2        as to when that was there.
 3              MS. ROCK:  All right.  And then -- I don't
 4        have any further questions.  Thank you.
 5              THE COURT:  Anything more, sir?
 6              MR. PRASAD:  No, your Honor.  Thank you.
 7              THE COURT:  Enjoy your drive back.
 8              (At 11:31 a.m. witness excused.)
 9              MR. PRASAD:  Officer Wiencek?
10              THE COURT:  Please.
11              MR. PRASAD:  Judge, there is -- Counsel
12        reminded me there was one other stipulation to present
13        to the jury.  I apologize.  I haven't put it in written
14        form yet, but I will put it down into writing.
15              And that stipulation was that the
16        fingerprints testified to by Officer Fitzhugh yesterday
17        were of no comparative value by the lab.
18              And then the other stipulation, Judge -- Is
19        that correct, Ms. Rock?
20              MS. ROCK:  That's correct.
21              MR. PRASAD:  And, Judge, the other
22        stipulation is that Michigan State Police also attempted
23        to get fingerprints analyzed regarding the firearms,
24        bullets and casings, cartridge casings.  And the lab
25        report in that case showed that there was, the listed
```

-43-

1       evidence was processed with no latent prints being

2       developed.  Ms. Rock?

3                   MS. ROCK:  In other words, there were no

4       fingerprints found on those cartridges.

5                   MR. PRASAD:  Right.  And, Judge, what I was

6       going to do at the end of it all was I was going to at

7       the end of it all is I was going to have them marked as

8       exhibits so that the jurors could have it.

9                   THE COURT:  That's fine.

10                  MR. PRASAD:  All right.  Thank you, Judge.

11                  (At 11:33 a.m. witness OFFICER JAMES

12                  WIENCEK was sworn.)

13                  THE COURT:  Do you promise to testify

14      truthfully today?

15                  THE WITNESS:  I do.

16                  THE COURT:  Please have a seat.

17                  DIRECT EXAMINATION

18  BY MR. PRASAD:

19  Q   Officer, please state your name for the record, sir.

20  A   James J. Wiencek, W-I-E-N-C-E-K.

21  Q   I was going to ask you how to pronounce your last name

22      because I've called it several different things so far.

23      Officer Wiencek, where are you currently assigned?

24  A   CVRP.

25  Q   What is that?

-44-

1   A   Comprehensive Violence Reduction Partnership.

2   Q   And is that out of a specific precinct or are you, is

3       that within DPS as a whole?

4   A   It's a Detroit Police Department task force with the ATF

5       based out of the Northwest District.

6   Q   Very good, sir.  How long have you been a police

7       officer?

8   A   Thirteen years.

9   Q   And how long have you been in this last assignment here?

10  A   A year and a half.

11  Q   I want to take you back to April of 2010.  Did you

12      become involved in the attempted apprehension of a

13      person by the name of Deonte Howard?

14  A   Yes.  I did.

15  Q   When did you first become involved with that, sir?

16          MS. ROCK:  Your Honor, I'm going to object

17      as to the testimony being irrelevant.

18          THE COURT:  I don't know.  I don't know what

19      he's going to testify to.

20  Q   (By Mr. Prasad, continuing):  When did you become

21      involved with that, sir?

22  A   It would have been the day after the shooting.  One of

23      our duties is to keep track of all violent acts that are

24      committed within the Northwest District and to contact

25      the unit that's in charge, whether it's homicide, armed

                              -45-

```
 1      robbery or sex crimes and see if we can be of
 2      assistance.
 3  Q   Okay.  And was that done in this case, sir?
 4  A   Yes.  It was.
 5  Q   And did you author a report in this case, sir?
 6  A   Yes.  I did.
 7  Q   Okay.  Would you looking at your report refresh your
 8      recollection as to the exact day that it was first --
 9      Well, let me back up.  Did you go work on this case that
10      very day?
11  A   I was in telephone conversation with Sergeant Mackie and
12      Sergeant Bowser (sp.)--
13  Q   (Interposing)  Okay.
14  A   But not actively.
15  Q   Okay.  When did you first work on this case?
16  A   I'd have to refer to my report on what day I started
17      actually doing street work.
18              MR. PRASAD:  Thank you.  Your Honor, may I
19      approach the witness?
20              THE COURT:  You may.
21  Q   (By Mr. Prasad, continuing):  The two-page document that
22      I'm handing you, sir, do you recognize it?
23  A   Yes.  I do.
24  Q   What is that?
25  A   It's a copy of my CRISNET report, which is our database
```

1       system for police reporting.

2   Q   Okay.  And looking at that, does that refresh your

3       recollection as to when you started working on the case?

4   A   Yes.  It does.

5   Q   What date was that?

6   A   4/15.

7   Q   2010?

8   A   Yes.

9   Q   All right.  Sir, did you make any attempts to try to

10      contact Deonte Howard?

11  A   Yes.  I did.

12  Q   Tell the jury about that.

13  A   Once I was in touch with the officer in charge from

14      homicide, we begin a computer work-up on whether it's a

15      person of interest or someone that's actually wanted by

16      warrant.  We begin running them in all our databases,

17      whether it's Secretary of State or our CRISNET, which is

18      our reporting system, if they've ever been a victim of a

19      crime or been arrested for something.

20              They would be entered into our database and

21      we'd have all addresses that they previously used.  And

22      then we'd begin a work-up on what address would they be

23      most likely to be in first and prioritize them and

24      respond to those locations physically.

25  Q   Did you have a list of addresses in this case?

-47-

```
1   A    Yes.

2   Q    And approximately how many different addresses did you

3        have?

4   A    Six or seven.

5   Q    Were you able to prioritize the addresses the way you

6        described?

7   A    Yes.

8   Q    What was the first priority address?

9   A    I know it was on Hayden, just North of Tireman--

10              MS. ROCK:  (Interposing)  Your Honor, once

11       again, I'd object as to relevance.

12              THE COURT:  I don't know the relevance, sir.

13       Why don't you approach?

14              MR. PRASAD:  Yes, sir.

15              (Bench conference 11:36 a.m.-11:39 .m.)

16              MR. PRASAD:  Your Honor, based on the

17       court's ruling then, I'd ask the opportunity to reserve

18       the officer.  We may need use the officer's testimony

19       for rebuttal, if necessary.

20              THE COURT:  That's fine.

21              MR. PRASAD:  Officer, you're free to go for

22       now.  Be on standby

23              THE WITNESS:  Not a problem.  Take care.

24              (At 11:40 a.m. witness excused.)

25              THE COURT:  With that, sir?
```

-48-

1          MR. PRASAD:  With that, Judge, I believe all

2     the stipulations have been orally made into the record

3     at this point.  There is going to be a written form for

4     each one of them so that the jury has them at the end.

5     But with that, the People rest.

6          THE COURT:  Okay.  See you all back at a

7     quarter to 1:00, please.  Enjoy your lunch.  Can I get

8     everybody in the front seat to move, I mean, front row

9     to move to the second or third?

10          (At 11:40 a.m. jury leaves the courtroom.)

11          THE COURT:  Okay.  Let's do a little look

12     forward.  What are we to expect?  I'll listen to a

13     motion for a directed verdict, if there is one, now.

14     What are we going to do, Ms. Rock?

15          MS. ROCK:  Your Honor, defense would be

16     making a motion for a directed--

17          THE COURT:  (Interposing)  I gotcha.  But I

18     just said that.

19          MS. ROCK:  Oh.  I'm sorry.

20          THE COURT:  So, after that.

21          MS. ROCK:  Oh, after that.  If the Court

22     doesn't grant the motion, then we're going to be

23     presenting a stipulation from Detective Love that the

24     prosecutor's agreed to.  I will probably be calling

25     Detective Martel.  And I don't think we have any other

-49-

1    witnesses after that.  I think it's just Martel and

2    Detective Love.

3              THE COURT:  Please be prepared to close.

4    Okay?  Anything you're going to be asking from, as it

5    relates to the verdict [sic]?

6              MS. ROCK:  Well, just the standard, you

7    know.  The--

8              THE COURT:  (Interposing)  I don't know

9    what--

10             MS. ROCK:  (Interposing)  Well, I guess we

11   would be always asking for lessers, you know.  Just

12   murder two, manslaughter maybe, not that we're admitting

13   anything, obviously, and GBH or AWIM.

14             THE COURT:  Okay.  Anything else?

15             MS. ROCK:  Not guilty, obviously.

16             THE COURT:  That's always the presumption.

17   You don't have to ask for that.

18             MS. ROCK:  I'm sorry.

19             THE COURT:  That's all right.

20             MR. PRASAD:  Always the first option.

21             THE COURT:  Right.  That's the first and

22   foremost option for all of them.

23             MS. ROCK:  Eyewitness identification on the

24   jury instructions, obviously.  Specific intent.

25             THE COURT:  And you don't see those as

-50-

1      conflicting defenses?

2                  MS. ROCK:  Oh, you mean in terms of -- Oh.

3      Yeah.  Probably.  I'm sorry.  Yeah.  I don't know why I

4      keep saying I'm sorry.

5                  THE COURT:  Neither do I.

6                  MS. ROCK:  Yeah.

7                  THE COURT:  I try not to say it.

8                  MS. ROCK:  Yeah.  Good idea.

9                  THE COURT:  I mean, it depends on what

10     you're going to argue.

11                 MS. ROCK:  Right.

12                 THE COURT:  I mean it's, in one sense, it's

13     a conflicting defense.  But at the same time, it's not.

14                 MS. ROCK:  I think that we had the same vibe

15     there just for that minute.  Because I was thinking

16     about the other witnesses, but then the, you know -- Or

17     maybe we didn't.  But that's what I was thinking--

18                 THE COURT:  (Interposing)  We can share the

19     same vibe.  I don't have any problem with that.  I mean,

20     it's, it's not, in terms of the prosecution has to prove

21     not only that the crime was committed, but that Mr.

22     Howard committed the crime.  So, in that regard, it's

23     not inconsistent.  But it's inconsistent if the argument

24     is somebody else did it.

25                 MS. ROCK:  Right.

1              THE COURT:  You know, and it's hard to argue

2       -- Well, it's not hard to argue.  You can argue

3       anything.  But, you know, it's inconsistent if you're

4       arguing that he did it and this is why he did it.

5              MS. ROCK:  Sure.

6              THE COURT:  In the heat of -- And then at

7       the same time arguing, well, but that's if you believe

8       that they proved it.  I mean, it's just a little

9       confusing.

10             MS. ROCK:  Right.

11             THE COURT:  I'm not saying that I won't give

12      it.  But I'm just asking is it -- I mean, do you see it,

13      I don't know if you see it as being inconsistent.

14             MS. ROCK:  I think it is.  I think it is, in

15      reflection.  I was thinking of some other things.  I

16      think it's inconsistent with our theory.  I do.

17             THE COURT:  So, your theory is more

18      consistent with the lesser includeds?

19             MS. ROCK:  No.  Our theory is more

20      consistent with he didn't do it.

21             THE COURT:  Okay.  So, misidentification.

22      That's what the verdict sheets are going to look like.

23             MR. PRASAD:  Judge, as to the verdict sheet,

24      I was going to reserve my voluntary manslaughter

25      argument in terms of what the defense presents.  But

-52-

1      ultimately, I just want preview to the Court that I

2      would, depending on how the defense case goes, I would

3      object to voluntary manslaughter.  I reserve the right

4      to do that at a later point

5                  THE COURT:  Sure.

6                  MR. PRASAD:  Okay.

7                  THE COURT:  But, you know, the bottom line

8      for that is if the jury believes whatever version, part

9      or whatever, they would see that the deceased was the

10     aggressor in it. And that could, I mean, they have a

11     chance to consider if that rises to emotional

12     excitement, if they make that kind of consideration.

13     Had their not been, I believe, some testimony that he

14     was the aggressor, then I believe that you might have

15     had an argument that would have based on some law rather

16     than just an opinion.

17                 MR. PRASAD:  Right.  I concede that point,

18     Judge.  I mean, the Court heard me.  From the very get

19     to, I wasn't going to hide from those facts.

20                 THE COURT:  But I'm just saying, you know,

21     sometimes we have opinions and then other times our

22     opinions have some reference to some case law or, you

23     know, statute or whatever.  Okay.  But that's where I

24     am.  So, see you back at a quarter to, please.

25                 MR. PRASAD:  Yes, sir.

                            -53-

 1                    THE COURT:  We'll have your witness, that
 2      stipulation and then we'll go right to closings.
 3                    (At 11:42 a.m court in recess.)
 4                    (At 12:55 p.m. court back in session.)
 5                    THE COURT:  Okay.  Well, I'll listen to your
 6      other motion, if you'd like.
 7                    MS. ROCK:  Yes, your Honor.  In this
 8      particular case, the prosecution has failed to meet the
 9      elements of premeditated murder, specifically murder two
10      -- Well, specifically, murder one.  And he's failed to
11      establish premeditation.
12                    The facts are that there was supposedly an
13      allegation that Mr. Howard was aggressively attacked.
14      And as a result of being aggressively attacked, he
15      defended himself or -- Defended himself.  Based on that,
16      we would argue that they have failed to prove
17      premeditated murder.
18                    Also, your Honor, based on the testimony,
19      the conflicting testimony, we would argue for a
20      dismissal altogether of the charges based on the
21      conflict in the testimony and based on the evidence
22      presented.
23                    THE COURT:  Response?
24                    MR. PRASAD:  Judge, taking the evidence in
25      the light most favorable to the prosecution at this

                              -54-

1       time, the People are asking the Court to deny their

2       motion in terms, specifically in terms of premeditation

3       and deliberation.

4              As I indicated to the jury in opening, my

5       perspective is, and I think the evidence shows, that

6       whereas there's an argument as far as the aggressor in

7       terms of the initial gunshots, once the defendant goes

8       inside his vehicle and the victim falls and then the

9       vehicle leaves and then once the victim rises and the

10      defendant comes back, the vehicle comes back, gets out,

11      you know, and then chases the defendant [sic] around,

12      shoots him multiple more times and then comes up and

13      kills him with a shot to the head, that's the part, that

14      last part is the evidence of premeditation and

15      deliberation

16             Whereas -- And that's where the argument for

17      and the evidence has shown premeditation and

18      deliberation.  And, in fact, his own comment is, by one

19      of the witnesses was that that MF N is still alive.  And

20      he goes and kills him.

21             So, for those purposes, there is

22      premeditation when he gets back out of that vehicle and

23      there's deliberation because he had time while he was in

24      that vehicle to deliberate what his actions were.  And

25      the multiple gunshots also evidence that fact.

-55-

1          MS. ROCK:  And, your Honor, I forgot to

2      argue that he failed to establish assault with intent to

3      murder with regard to the--

4          MR. PRASAD:  (Interposing)  That's -- I'm

5      sorry, Judge.  That was a transferred intent theory on

6      that.  There's no specific intent.  I'm not suggesting a

7      specific intent on the defendant's part to hit Mr.

8      Allen.  I'm arguing the specific intent to hit the

9      deceased, but that Mr. Allen was hit at the time.

10          THE COURT:  This is what I find.  The

11      standard that has to be used, of course, is in the light

12      most favorable to the People is there sufficient

13      evidence for a rational trier of fact to find proof

14      beyond a reasonable doubt the particular elements were

15      met.

16          I think the jury has a right to consider

17      what conduct they think deserves consideration as to the

18      elements of premeditation and deliberation.  Certainly,

19      the same as to the assault with the intent to commit the

20      crime of murder.

21          As you all are aware, you know, if there is

22      an injury, injury could be used to formulate an intent.

23      But the extent of the injury really isn't a determinant

24      factor, but something that could be considered, and as

25      well as the time between an act, how much time has to

-56-

1    pass before one can form the intent to deliberate and

2    premeditate.

3              Certainly, there is some evidence that there

4    was, Mr. Howard was attacked or was hit first and then

5    some consequences flowed.  So, they can consider that.

6    But they also have the ability to consider whether it

7    rose to the point that it diminished his ability, you

8    know.  It was a non, at least according to the evidence,

9    a non-fatal attack and he responded in a way with a

10   weapon with lethal force.

11             So, I think the jury has the ability and

12   should have the ability to consider the facts as it

13   relates to all of the elements.  Because, certainly, I

14   believe that a rational trier of fact could, based on

15   the facts that have been provided thus far, find that

16   there was, each of the elements have been met beyond a

17   reasonable doubt.  So, I'll deny your motion.  You

18   didn't bring him back with you, Mr. Mackie.

19             MR. PRASAD:  We sent another officer, Judge.

20   We sent Officer Barnes, who was in there, to go get him.

21             THE COURT:  Oh.  So, you think you sent a

22   man to do a man's job?  I don't know.  You might have

23   sent a boy to do a man's job.

24             MR. PRASAD:  I don't think so.  But, Judge,

25   as we were arguing, Sergeant Martell called me back.

                            -57-

1          Can I have a minute to call him back?

2                    THE COURT:  You can do it right now.

3                    MR. PRASAD:  Good.

4                    THE COURT:  As in, if you're outside the

5          door, no need to do anything but come in through the --

6          Look at that.

7                    (At 1:00 p.m. off the record.)

8                    (At 1:06 p.m. back on the record.)

9                    (At 1:06 p.m. jury enters the courtroom.)

10                   (At 1:07 p.m. witness SERGEANT MICHAEL

11                   MARTEL was sworn.)

12                   THE COURT:  Do you promise to tell the truth

13         today, sir?

14                   THE WITNESS:  I do.

15                   THE COURT:  Please have a seat.

16                   DIRECT EXAMINATION

17    BY MS. ROCK:

18    Q    Officer, could you state your name, for the record,

19         please?

20    A    Michael Martel.

21    Q    And your occupation?

22    A    I'm a sergeant with the Detroit Police Department, major

23         crimes division, homicide section.

24    Q    Okay.  And you were, for a brief period, you were a part

25         of the investigation of this case, is that correct?

                              -58-

1  A    Correct.

2  Q    Okay.  And you were present for part of the photo show-

3       up at the hospital with Aundrey Allen and Officer Diaz?

4  A    Correct.

5  Q    Okay.  And you were out of the room when Aundrey Allen

6       made the identification?

7  A    That's correct.

8  Q    Okay.  And you took a statement from him before the

9       line-up?

10 A    I'm pretty sure it was before the line-up.

11 Q    Two pages?

12 A    Yes.

13 Q    Okay.  And you think the statement was before the line-

14      up because?

15 A    Because if we had done the line-up first, I would have

16      indicated that somewhere in the report.

17 Q    He made an identification?

18 A    Yes.

19 Q    Okay.  Now, based on that ID, you prepared an affidavit

20      for a search warrant, is that correct?

21 A    Correct.

22 Q    And the search warrant was based on Aundrey Allen's ID

23      of Deonte Miller at the hospital?

24 A    Yes.

25 Q    Okay.  And this is -- A search warrant is a very

-59-

1        important document because it allows you legally to go

2        into somebody's house without their permission?

3   A    Yes.

4   Q    Okay.  And so, a Magistrate has to sign it, correct?

5   A    Correct.

6   Q    And it's a legal invasion of someone's privacy?

7   A    I wouldn't put it that way.  It's a commandment from a

8        Judge or Magistrate ordering me to search a particular

9        place described in the search warrant.

10  Q    Okay.  But I guess that anybody who's having their house

11       raided would think it would be an invasion of privacy,

12       right?

13  A    I don't know what they'd think, but that's a

14       possibility.

15  Q    All right.  And when you -- Because a Magistrate has to

16       rely on your word, you made a determination that Aundrey

17       Allen was coherent at the time that he gave his

18       statement to you?

19  A    Yes.

20  Q    Okay.  And you didn't think he was drugged?

21  A    He may have been on some sort of medication or

22       painkillers.  I'm not sure.  But he seemed coherent

23       enough to me to -- If I had believed he wasn't coherent,

24       I would not have taken his statement.

25  Q    Okay.  And you prepared the affidavit obtaining the

-60-

```
1       search warrant and executed it?

2   A   Yes.  I prepared it.  The special response team actually

3       made the entry.

4   Q   Okay.  And when you went to the hospital to see Aundrey

5       Allen, you'd already done a LEIN search on Deonte

6       Miller?

7   A   I don't know if we did a work-up on him before or after.

8   Q   Okay.

9   A   My guess would be after the line-up is when we did the

10      work-up on him.

11  Q   All right.  Wouldn't you have had to locate his home and

12      everything so you could do the search warrant and--

13  A   (Interposing)  Oh, for the search warrant, but I'm--

14  Q   (Interposing)  Yeah.

15  A   Talking about the photo line-up.  I thought that's what

16      you said.

17  Q   Oh.  No.  I meant -- Well, I was for the photo line-up.

18      Didn't you do the LEIN search before you got to the

19      hospital on Deonte Miller?

20  A   We may have.

21  Q   Okay.

22  A   Before or after, I don't know.

23  Q   Okay.  And before going to the hospital, you had

24      several, several witness statements had been taken?

25  A   That, I don't know.
```

1  Q    Oh.  Okay.

2  A    I had a very limited role in this, in this case.

3  Q    Okay.  And Allen had described Freaky as thirty, 5'10",

4       a beard and 130 pounds?

5  A    If that's what's in his statement.

6  Q    Did you need to look at it maybe just to--

7  A    (Interposing)  Yes.

8            MR. PRASAD:  Your Honor, I'd object to the

9       hearsay and proper impeachment at this point.

10            THE COURT:  I don't think it's being offered

11       for the truth of the matter asserted.

12            THE WITNESS:  Where was that--

13  Q    (By Ms. Rock, continuing):  (Interposing)  I'm sorry.

14       Right -- Can I look at this?  Otherwise, I'm going to be

15       -- Right there.

16  A    Okay.  Your question again is?

17  Q    He had described him as thirty, 5'10", beard, 130

18       pounds?

19  A    Yes.

20            MS. ROCK:  Okay.  Your Honor, I don't have

21       any further questions of Officer Martel.

22            THE COURT:  Any questions?

23            MR. PRASAD:  No questions, Judge.

24            THE COURT:  Thank you, sir.

25            (At 1:11 p.m. witness excused.)

-62-

 1            MS. ROCK:  Thank you, Officer Martell.  Your

 2      Honor, at this time, we're, the prosecutor and I, are

 3      entering into a stipulation as to what Detective Myron

 4      Love's testimony would be.

 5            And it is stipulated between Mr. Prasad and

 6      myself that if Detective Myron Love showed, the

 7      testimony would be Detective Myron Love showed Frederick

 8      McFadden a photographic line-up regarding the shooting

 9      of Tyrone Simpson.  In front of Detective Love,

10      Frederick McFadden picked out three people.  Detective

11      Love does not remember who Frederick McFadden

12      identified, but Deonte Howard was not one of those

13      people.

14            MR. PRASAD:  He was no in the line-up.

15            MS. ROCK:  What?

16            MR. PRASAD:  He was not even in the line-up.

17            MS. ROCK:  Right.  Deonte Howard was not in

18      the photographic line-up that was shown to Frederick

19      McFadden.  Detective Love did not keep the photographic

20      line-up shown by Frederick McFadden and he did not take

21      notes.  Detective Love did not tell the officer in

22      charge, Samuel Mackie, that he had conducted that

23      photographic line-up with Frederick McFadden.

24            MR. PRASAD:  That's correct, Judge.  And

25      I've sign the document to that effect.

-63-

 1                      THE COURT:  Okay.  Anything else, Ms. Rock?

 2                      MS. ROCK:  Your Honor, I think that's it.

 3                      THE COURT:  And it means the defense is

 4        resting?

 5                      MS. ROCK:  That's correct, your Honor.

 6                      THE COURT:  Okay.  Give me two seconds.

 7                      MR. PRASAD:  Yes, sir.

 8                      (At 1:13 p.m. off the record.)

 9                      (At 1:14 p.m. back on the record.)

10                      THE COURT:  Ready when you are, sir.

11                      MR. PRASAD:  Judge, I want to adjust the

12        television one second, sir.  And I'll be ready.

13                      THE COURT:  During the closing arguments,

14        young people, just stay in your seats.  Okay?  We don't

15        want them to be distracted.  If it gets a little tedious

16        and you need to stand up, you're free to stand up.  If

17        you need to fill up and have some more stay me awake,

18        you can have some stay me awake.

19                      MR. PRASAD:  May I, your Honor?

20                      THE COURT:  Whenever you're ready, sir.

21                      MR. PRASAD:  Thank you, sir.

22                      CLOSING ARGUMENT

23   BY MR. PRASAD:

24                      MR. PRASAD:  I want to start off by thanking

25        you guys.  Since Monday, you've been kind to give your

                                -64-

1    focus and attention to this process and to the trial.  I

2    want to thank you on behalf of both ourselves and I'm

3    sure the defense will thank you as well.

4              Let's jump into it.  See, you are in a

5    unique position right now.  Because as you saw as the

6    trial was presented to you, you got the trial in

7    piecemeal.  You got it from different witnesses, from

8    different vantage points.  And all the witnesses didn't

9    see the same time frames either, if you think about it.

10   And then you also got the follow-up investigation that

11   took place afterwards to tie up with the evidence that

12   was left afterwards and see how it goes back to the

13   witness statements.

14             Unfortunately, when we see a lot of TV and

15   movies and books about crimes and about things as they

16   happen, we get the full picture of the movie or the

17   television show.  And everyone gets to see what everyone

18   is doing at the same time.

19             But that's not how real live works, is it?

20   When you have a group of people who see the same event,

21   and when you have a group of people who see the same

22   event, but have different focuses for different parts of

23   that event, you're not going to get the same

24   perspective, are you?  The Judge talks about reason and

25   common sense.  That's just the clear part of reason and

-65-

1    common sense.

2              So, what is it the jurors roles are now?

3    Well, the first part of the jurors roles is you are the

4    judges of the facts.  It's up to you to decide on April

5    10th of 2010, in the late afternoon hours, some time

6    between 4:00 and 5:00 p.m. of April 10 of 2010, what

7    happened out there on Tireman?  What happened in front

8    of the Smoke Shop?

9              How are you going to do that?  Well, the

10   best thing to do is to look at the different sources of

11   evidence you have, look at the angles that they came

12   from, look at the time frames they came from, look at

13   who's talking about it and from which direction.  And

14   then start putting it together.

15             Because the key to the evidence, and I argue

16   to you the way the confidence is going to come from in

17   this case, is looking at what evidence corroborates

18   other pieces of evidence.  What evidence overlaps the

19   other evidence that shows you what happened, in fact, is

20   true.

21             You take that, you take your analysis of the

22   scene from the different angles, from looking at all of

23   the evidence together, and then you apply the law that

24   Judge Morrow gives you, to see if I have proven beyond a

25   reasonable doubt each and every one of my elements of

-66-

1    the crime.

2              Now, understand there's something about that

3    that's a little nuance that we don't really ever talk

4    about as much is that I don't have to prove every fact

5    of the case beyond a reasonable doubt.  It's just the

6    elements.  It's just the elements.

7              Why is that important?  Well, the elements

8    are the items that I have to prove to you for you to

9    find a conviction in this case.  That's the part that

10   ends the defendant's presumption of innocence.

11   Everything else are just factors or facts that are on

12   the side.  It could go to your decision on whether or

13   not I've proved the elements, but it's not necessary.

14             So, for example, if the SUV they were

15   driving, if the SUV that everyone talks about -- Because

16   we had multiple witnesses talk about that SUV, if it was

17   gray, if it was silver, if it was black, if it was blue,

18   that's not an element I have to prove beyond a

19   reasonable doubt.  But what are the elements I have to

20   prove beyond a reasonable doubt?  And does the evidence

21   show it?

22             The first crime that we're talking about is

23   first degree premeditated murder, first degree

24   premeditated murder.  That's a crime that's made up of

25   several different elements.

-67-

1           The first and foremost is that the

2     defendant, Deonte Howard, had a specific intent to kill

3     the victim in this case, Tyrone Simpson.  How do we know

4     that Deonte Howard had a specific intent to kill Tyrone

5     Simpson?

6           I told you from the get go that I wasn't

7     going to shy away from the fact that Tyrone Simpson was

8     the first initial assaulter in this case.  He was the

9     first person to throw a punch.  I think we all agree

10    upon that.  He was angry that he thought the defendant

11    took his glasses.  So, what did he do?  He punches the

12    defendant five times in the face.  No one's disputing

13    that.

14          As a result -- What was the testimony from

15    Mr. Allen?  As a result, Mr. Allen says out of his right

16    pocket, the defendant pulls out a gun and immediately

17    starts shooting.  What was the testimony, not only from

18    Mr. Allen, but from several other witnesses?  That they

19    immediately hear two shots, two shots, a quick pause and

20    then three more shots.  Right?  I mean, I think we had

21    that from several different pieces, several different

22    witnesses who heard that exact same sequence.  Two

23    shots, pause, three shots.

24          I think Mr. McFadden working on the engine

25    heard two what he thought at first were firecrackers and

1          then three more shots.  So, we know that first and
2          foremost was the first, immediate reaction.
3                    Is there other corroboration for Mr. Allen's
4          observations?  Because let's not forget Mr. Allen is
5          positioned -- He had said that the defendant and the
6          victim were about three feet apart.  And Mr. Bailey even
7          corroborated it.  They were about two, three feet apart,
8          a little more than arm's length or an arm's length and a
9          half apart.  Right?  And that Mr. Allen was a couple of
10         feet behind them.
11                   That's an interesting range right there, if
12         you really think about it.  Because put that together
13         with what Lieutenant Crump was testifying to today.
14         Lieutenant Crump looked at the clothing after the fact.
15         He looked at the jeans that Mr. Allen had on that day
16         and he looked at the T-shirt that the victim, Tyrone
17         Simpson, had on that day.
18                   The first gunshots when the defendant was
19         within two or, between two and three feet away from the
20         victim occurred when the defendant pulled out his
21         handgun from his right pocket and immediately started
22         shooting.
23                   Where did Lieutenant Crump say he found on
24         the victim a clear, a clear analysis of the residue?
25         Where was it?  Right here on the T-shirt.  Right?

-69-

1    Doesn't that corroborate directly as to what Mr. Allen

2    was saying?  And what did he say about that range when

3    he found, when you find that vapor, that lead vapor

4    right there?  That's farther away than contact, so we're

5    not saying it's right on the person, but within three or

6    four feet.

7            That matches up directly with what Mr. Allen

8    says, doesn't it?  That matches up directly with what

9    Mr. Bailey says, doesn't it?  But that's the exact way

10   those first two shots happened, right there when the

11   defendant immediately started shooting.

12           Mr. Allen, who's several feet behind him, is

13   beyond that three to four feet range.  Correct?  And he

14   also has the victim in front of him.  What did

15   Lieutenant Crump say today?  That either you're beyond

16   that range or there's something in between you.  There

17   was actually both in this case.

18           So, the first aspect, as you put the

19   evidence together from -- And this is what I'm talking

20   about, how we can put the evidence together from

21   different sources to point at, to verify, to

22   corroborate, to give you confidence in the truth of the

23   matter.

24           So, the first evidence we have here is that

25   the only armed person in this situation is Deonte

-70-

1    Howard.  And he decides to respond to punching with

2    gunfire, with immediate and direct gunfire.  But how do

3    we know there was a specific intent to kill that goes

4    beyond just the immediate response?  Because he doesn't

5    stop.  He doesn't stop.

6            The first two shots hit the victim right

7    here.  The victim's been struck at this point.  And then

8    he pauses.  And it's in this pause that Mr. Allen turns

9    around and starts running away.  It's in this pause that

10   Mr. Bailey starts starting to run away.  Three more

11   shots followed right behind, three more shots.

12           What do we know, at this point?  We know, at

13   this point, from the other evidence, from the other

14   people around that this is the point where the victim

15   drops to the ground and the defendant decides to go into

16   his vehicle.  Why is that important?  Because now we're

17   talking still about that specific intent to kill.

18           If it had ended just there, if this whole

19   scenario had just ended right then and there, the victim

20   falls to the ground, drops right there and the defendant

21   goes in his vehicle and drives away, could there have

22   been an argument to the specific intent to kill?

23   Perhaps.  Perhaps there could have been an argument

24   saying, well, he didn't really intend to kill him.  He

25   just wanted to get away and he got away.  It didn't end

1     there, did it?  It didn't end there.

2              Now, is where you have, as the different

3     witnesses described, a bigger pause.  Right?  There's a

4     bigger pause in time between the gunshots.  This is

5     where the second half of the witnesses testimonies come

6     in.

7              This is where Mr. McFadden comes in.

8     Because now Mr. McFadden had the time to hear the

9     initial gunshots, see the gunfire happen at a distance,

10    go help the lady across the street.  And now, while this

11    pause is going on, as he describes the vehicle, you

12    know, people getting in the vehicle and then coming

13    back, that's when he runs up to that fence.  And I

14    showed you guys the photograph of the fence.  And I'll

15    show you the photographs in a little bit, too, about,

16    you know, where that fence is and how close that is to

17    the scene.

18             But that's where Mr. McFadden says the

19    person comes back, the shooter comes back out.  The

20    person he identified as Deonte Howard comes back out,

21    starts chasing the victim around the vehicle as the

22    victim's trying -- And as Mr. McFadden showed you, he's

23    holding onto his side and he's trying, as he's trying to

24    hobble away as the defendant shoots him down, chases

25    him, shoots him down and then does that killing shot to

-72-

1    the head.

2              What did Dr. Loewe tell us this morning?

3    Dr. Loewe told us that the shot to the head was the

4    killing shot, was the shot that had the most severe

5    significance to the death of Mr. Simpson.  Right?  That

6    those other shots -- And the beauty of Dr. Loewe's

7    testimony is that Dr. Loewe's testimony, if you think

8    about it, and if you think about the elderly couple that

9    was living across the street, Mr. Harris and Ms.

10   Thompson, what they observed and what Mr. McFadden

11   observes, Dr. Loewe's testimony matches up directly with

12   each and every one of them, and also to the earlier

13   testimony that Mr. Allen said.

14             Mr. Allen talked about a couple of shots

15   that he saw coming in the front, in the left leg.  Dr.

16   Loewe talked about a couple of shots, two shots in the

17   left leg in the top area that went in from the front and

18   went out.  Right?

19             And then you have the testimony from the

20   elderly couple and Mr. McFadden about other shots about

21   the victim's body, about how he was dancing back and

22   forth and how he's being shot at around the vehicle.

23             Dr. Loewe's testimony is that you've got

24   shots in every direction to that victim's body.  You've

25   got shots coming on his back side, from the back of his

-73-

1     arms.  You've got shots from the back of his legs.
2     You've got this one shot that comes in through the
3     armpit and comes out through the chest.
4               So, as the victim is in all the different
5     places trying to get away, trying to escape from the
6     defendant here, you have, you have all the testimony
7     medically that shows it.  Nine gunshot wounds.  Nine.
8     Fifteen shell casings.
9               Is there a specific intent to kill?
10    Absolutely.  There's absolutely a specific intent to
11    kill in this case.  Whereas you might have had an
12    argument in the beginning that there might not have been
13    -- And I'll tell you, with five gunshots there's still
14    an intent to kill.  But if you had an argument about it,
15    that argument is gone when we're talking about the time
16    period when he comes back from that vehicle.
17              And let's not forget, ladies and gentlemen,
18    this is one point that's going to be made throughout
19    this whole process.  Every bullet was fired from the
20    same gun.  The shell casings showed us that fact.  Every
21    bullet was fired from that same gun.
22              So, let's go back to the corroboration.
23    Showing you People's Exhibit Forty-Seven, which is the
24    map.  Right?  And as you're going to see -- And you're
25    going to have a chance when you go back, you're going to

-74-

1    have all of these exhibits that we have here, all that

2    both the defense placed into evidence and I placed into

3    evidence.  It'll be yours to look at.  It'll be yours to

4    focus on as you want to see.  So, if you want to look at

5    the map in detail, it is yours to look at.

6               But as you look at the map and you look at

7    the different shell casings that are found all around,

8    all around here, you've got this whole series of shell

9    casings.  You've got the couple of shell casings that

10   are up by the steps, which we agree were those initial

11   shots, the first shell casings here.

12              But then as you look around and as the

13   photographs showed you yesterday as well, there are

14   shell casings all around this vehicle, corroborating

15   what both Mr. Harris and Ms. Thompson said, that the

16   defendant [sic] was being chased around and gunned down.

17              So, the first question is, was there a

18   specific intent to kill?  The answer is yes.

19              The second question is, was there a

20   premeditation or a thought-out plan to do this crime.

21              And the third part of that is was there

22   deliberation?  And that is, was there an opportunity to

23   reflect?  Was there a deliberation to think ahead of

24   time.

25              So, let's look at premeditation and

1     deliberation.  Premeditation, you know, often a lot of

2     times people want to think of, in terms of like an

3     assassination plan, you know, Lee Harvey Oswald up in

4     the warehouse planning, planning with the motorcade

5     coming down.  That is obviously premeditation.  I'm not

6     saying that's not premeditation.

7              But premeditation is not limited to those

8     kinds of circumstances.  Premeditation is for you to

9     decide how much time beforehand it requires to think

10    about a plan.  I will argue to you that there was no

11    premeditation at the initial gunshots.  Those first two

12    gunshots when he pulls that gun out, that wasn't

13    premeditation.  Those initial, those three shots that

14    happened right after the first two, the two, pause,

15    three, that second set of those three shots might not

16    have been premeditation either.

17             Getting out of that car though is

18    premeditation.  He gets out of that car for one purpose.

19    Let's think about it.  The victim gets back up and then

20    the car comes back.  And he gets up.  And what did Mr.

21    McFadden say?  That MF N, and we know what all the

22    initials stand for, that MF N is still up or still

23    alive.  He's not dead yet.

24             Ladies and gentlemen, common sense and

25    reason is going to tell you that he then had a plan.

-76-

1    And he followed through with that plan.  And how, the

2    reason we know he followed through with that plan is the

3    testimony from Ms. Harris and Ms., Mr. Harris and Ms.

4    Thompson.  Because that testimony was about how he would

5    go around, how he would dance around the vehicles to

6    follow through with that plan.

7              And ultimately, as Ms. Thompson painfully

8    told you, how he ultimately went on top of him and, as

9    the victim is pleading for his life, shoots him in the

10   head.

11             Deliberation, the second part about it, is

12   was there an opportunity to think about this plan?  Was

13   there an opportunity to deliberate?  An example that's

14   often used in talking about deliberation and making an

15   important decision is a traffic light.  If you're

16   driving a motor vehicle and you're, and you're coming up

17   to a traffic light and you see the light turns yellow,

18   do you go through an actual thought process to decide

19   whether or not you're going to run through that light or

20   stop?  Actually, you do, every single time.

21             And what are the things you think about?

22   You think about the speed you're going.  You think about

23   the other traffic around you, whether there's cars in

24   front of you, cars behind you.  You think about the icy

25   or snowy conditions on the road or if it's raining.  You

1       think about whether it's a long yellow or a short

2       yellow, if it's a light that you know of.  You think

3       about how far away from the yellow light are you when it

4       turns.  Right?  Those are all different aspects.  But

5       yet that's still enough time for you to deliberate, to

6       think about that decision before you make it.

7               Once again, I keep going to this point

8       because this is the point I made to you from the very

9       beginning.  It's that time he gets in that motor vehicle

10      where he has ample opportunity to deliberate.  But

11      there's even more than just that.  There's more than

12      just that.  It's more than just the deliberation in that

13      vehicle.  It's the deliberation of those other ten

14      gunshots.  That's really what it is.  Because he's still

15      pulling the trigger.

16              And it's not as if he's just standing in one

17      place just, you know, just pulling and pulling, you

18      know, click, click, click, click trying to shoot.  He

19      has to actively move around the vehicle to continue to

20      think about this process and to have time to think about

21      this process.

22              Is there deliberation?  Is there ample time

23      to consider the consequences of his actions and to

24      deliberate what he's about to do?  Yeah.  There is.

25      There is.

1              Now, there's one more aspect about it, the

2       Judge is going to tell you.  And this is the concept

3       that we have of lesser included crimes.  There is crimes

4       -- Because he's charged with first degree murder.  It'll

5       be up to you to, if you want to, also consider the

6       lesser crimes in this case of second degree murder and

7       voluntary manslaughter.

8              What's the major difference between those

9       crimes?  Well, second degree murder is similar to first

10      degree murder without premeditation and deliberation.

11             So, for example, let's say in this case, and

12      I'm not suggesting you do, but let's say in this case

13      you feel, well, there was premeditation, but there was

14      no deliberation.  Or you feel there was no premeditation

15      or deliberation, but he did specifically intend to kill

16      him by shooting Tyrone Simpson and he killed him by

17      multiple gunshots.  Say all of those other aspects are

18      true, but you don't believe the premeditation and

19      deliberation.

20             Well, then you start considering second

21      degree murder.  Did he do some act to kill Tyrone

22      Simpson?  Yes.  Did he shoot Tyrone Simpson multiple

23      times and kill him?  Yes.  Did he have a specific intent

24      to kill, to commit great bodily harm, to commit some

25      sort of reckless act that would have, that the natural

-79-

1    consequences were likely to cause great injury or death?

2    Sure.  Are all those aspects of murder two there?  Yes.

3    You can consider it.

4              So, even if you believe the specific intent

5    to kill, but if you have trouble with finding

6    premeditation and deliberation, you can convict him of

7    murder in the second degree.

8              Now, of course, I'm suggesting to you that

9    the evidence shows that he actually did intend,

10   especially with that second, with the second half of the

11   incident, intended to kill him and premeditated and

12   deliberated that.  But second degree is an option for

13   you.

14             There's one other option for you that you

15   should look at that the Judge is going to talk about.

16   And that's voluntary manslaughter.  What's the

17   difference there?  Well, voluntary manslaughter is

18   similar in many ways to second degree murder.  However,

19   voluntary manslaughter talks about a person's passions

20   and a person's emotions and whether the emotions and

21   passions of a situation causes them to commit the crime

22   and whether he's acting under those emotions and whether

23   or not there was a time to pause and reflect.

24             That's really, as the Judge -- And listen

25   clearly, closely to how Judge Morrow describes it to

1       you.  But it's really that point to reflect that's the

2       crucial analysis in terms of voluntary manslaughter.

3               If you were, if you believe that Mr. Howard

4       was working under the emotion and the excitement of the

5       situation at that time throughout the entire process,

6       then you look at voluntary, you know -- And we're going

7       back to the same murder two analysis, that this was

8       murder in the second degree.  Then you look at voluntary

9       manslaughter and you say, well, maybe the emotions

10      controlled and swayed him the whole time.

11              Once again, as I keep saying, that's

12      something that you might consider with the first half of

13      what happened.  I mean, that might be something in your

14      mind frame.

15              But we have the second half of the action.

16      And to answer the question of whether or not there was a

17      time to reflect.  Yeah.  Clearly, there was.  Everyone

18      talks about that pause.  Mr. Bailey talks about a whole

19      time span of ten minutes.  Mr. McFadden talks about

20      time, too.  And think about it.  It's the time that Mr.

21      McFadden had to have had to run from the old lady across

22      the street over to the fence area.  I mean, this is the

23      time where he's physically in his vehicle.  There is

24      time to reflect.

25              So, if there's time to reflect, then there

1    is no voluntary manslaughter because then he had time to

2    reflect on his emotions and it wasn't the emotion that

3    was swaying him anymore at that point, that his

4    decisions at that point to chase him around and gun him

5    down and ultimately go up and kill him were his own

6    decisions, not because of his emotion.  All right.

7            So, that's the way I suggest to you to look

8    at this as you start piecing the different elements of

9    the evidence together.

10           Now, there's another second count in this

11   case and I want to talk about it and touch on it.  It's

12   an assault with intent to murder count.  That is with

13   the victim of Mr. Allen, as the victim in this case.

14           Now, it also talks about, and the Judge is

15   going to tell you about a specific intent to kill

16   involved in that count, sort of like with the first

17   degree murder or, you know, possibly one of the ways to

18   look at second degree murder, a specific intent to kill,

19   with assault with intent to murder.

20           But the Judge is going to tell you about one

21   other aspect about the law.  And that's called

22   transferred intent.  And what that basically means is

23   that I'm not suggesting to you at that moment that he

24   shot Mr. Allen that he was trying to gun down Mr. Allen

25   as well.  I think the evidence is quite clear.  He was

1     focused on the guy that was punching him.  He was

2     focused on Mr. Simpson.  Mr. Allen happened to be a

3     person who was standing behind him who also got shot.

4             So, the transferred intent theory, or the

5     law that goes along with it, is that if you have the

6     intent for one person, but you happen to hit a second

7     person, that intent for the first person transfers to

8     the second.  Right?

9             And that makes sense in situations where

10    someone, you know, is shooting at one specifically, but

11    they accidentally hit someone else.  You still charge

12    them and you can still convict them for the act of

13    trying to kill this first person, even though they

14    happen to have shot the second person.

15            So, when you look at the assault with intent

16    to murder count, understand it from that perspective,

17    that yes, it requires a specific intent to kill.  But

18    I'm not suggesting to you that Mr. Howard was trying to

19    go after Mr. Allen at that point.  He was going only

20    after Mr. Simpson.

21            There's also, like we discussed, with the

22    lesser included crimes with murder in the first degree,

23    there's also a lesser included crime with assault with

24    intent to murder.  And that's called assault with intent

25    to commit great bodily harm, which is he didn't intend

-83-

```
 1        to kill him.  He intended to commit great bodily harm,

 2        put him in the hospital, you know, hurt him seriously.

 3                  And in this case, I mean, I think the

 4        evidence is quite clear, he had to have a colostomy bag.

 5        He had surgery.  He was in the hospital for quite some

 6        time.  I think the injuries corroborate what you could

 7        see in terms of the intent.  And I think quite simply

 8        it's more than just great bodily harm.  It was an intent

 9        to kill towards Mr. Simpson and Mr. Allen just happened

10        to get struck by a bullet there.

11                  The third crime that you're going to look at

12        is felony firearm.  And that's a related type of crime,

13        whether or not the person at the time they committed or

14        attempted to commit one of the other felonies in this

15        case, murder or assault with intent to murder, he

16        possessed or used a firearm in this case.  And I think

17        that's pretty self-explanatory.

18                  So, ladies and gentlemen, that's ultimately

19        how you're going to go decide.  But that's not going to

20        end your question there because you're going to have a

21        couple of key issues that you're going to have to

22        discuss as well.

23                  One of the other elements of the crime and

24        that I have to prove beyond a reasonable doubt is

25        identity, that in fact it was this defendant right
```

1    there, Mr. Howard, who was the gunman that day, who was

2    the killer that day, who was the person who committed

3    the murder that day.

4              And the Judge is going to give you some

5    instructions about identification and things to look at

6    in terms of identification.  I want you to think about

7    everything in terms of identification in this case.

8              I want you to think about Aundrey Allen and

9    his identifications.  And I say identifications, plural,

10   in terms of Mr. Allen.  Because let's not forget, Mr.

11   Allen, while he was in the hospital, was shown a photo

12   array that included not Deonte Howard, but Deonte

13   Miller, the first suspect.

14             And we need to talk about that because this

15   is clearly going to be something that you need to have

16   confidence about and be able to analyze yourself.

17   Deonte Miller was the first suspect because Metro PCS

18   had him as the registered owner of that phone.  Why is

19   that phone so important?  Because Mr. Bailey's

20   testimony, Mr. Bailey's testimony was that the person

21   who was Tay, the person who was in the fight with Mr.

22   Simpson, Tay, was the person who was looking for his

23   phone.

24             Why is that also important?  Because,

25   because Ms. Rock might have suggested something else in

1    opening, of some other way that the phone became

2    involved.  But let's be clear.  The statements we made

3    in opening is not evidence.

4                    What is the evidence in this case?  Both

5    from Mr. Bailey and from Mr. Allen is that the reason

6    Mr. Howard came back to the scene was that he lost that

7    phone.  So, that phone becomes a crucial piece of

8    evidence as to who we are looking for as the person that

9    was involved with the fight, in the fight with the

10   deceased and who ultimately was the killer of the

11   deceased.  Right?

12                   So, they go to that phone and they do look

13   and they contact Metro PCS to see whose phone it is.

14   And it comes up with the name of Deonte Miller as the

15   person it's registered to.  So, Deonte Miller is the

16   first suspect, right?

17                   And there's two aspects about that.  Deonte

18   Miller is put in a photo array.  And in that photo

19   array, it gets shown to two key people.  It's shown to

20   Aundrey Allen and it's shown to Bobby Bailey.

21                   Aundrey Allen, while in the hospital under

22   medication, picks out Deonte Miller.  And he says, as he

23   told, he explained to you guys, that it was the person

24   who looked the most like the defendant at the time.

25                   Bobby Bailey, the person who actually knows

-86-

1    Tay, who had known him for several months because he was

2    a customer said that's not him.  That's not him.

3              So, then they go back and say, well, what

4    about the guy on the phone?  I mean, this is the phone.

5    This is the key.  This is the person.  This is the one

6    physical thing that the person who was at the scene, the

7    person in the fight with the victim, the person who was

8    the killer left at the scene.  Whose phone is that?

9    Well, that's Deonte Howard's phone.  Looking into the

10   phone actually confirms that.  Mr. Bailey confirms that

11   when he looks at the picture in the phone.

12             So, when you're looking at the different

13   identifications in this case and when you talk about

14   Deonte Miller, let's understand that Deonte Miller, yes,

15   was an initial suspect, just because his name was

16   registered to the phone.  But he's not the person at all

17   that's suggested that committed this crime.  Because the

18   people at the scene who knew him, specifically Bobby

19   Bailey, the person who knew who the person who Tyrone

20   Simpson was fighting with that day said no.  Deonte

21   Howard was the person that was fighting with Tyrone

22   Simpson that day.

23             The phone records and the analysis of the

24   phone confirms that the phone itself belonged to Deonte

25   Howard.  And this is something that the defense has

1      never argued against.  And I'm not suggesting they did.

2                    And then ultimately, also it gets to the

3      last part about the identification, which is you have a

4      different set of scenarios.  You have first when the

5      photo array is shown in the hospital to Mr. Allen and

6      then you have approximately a month later when Mr. Allen

7      actually gets to see a live line-up.

8                    Let's go back to reason and common sense,

9      ladies and gentlemen.  Let's go back to reason and

10     common sense.  Why is there a preference or why is it

11     better to look at a live line-up than to see a

12     photograph?  How often is it that photographs don't

13     actually show a good picture of that person?  How often

14     is it that the photographs might resemble someone, but

15     not actually be that person?

16                    What about a live line-up?  What's the

17     benefit of a live line-up?  If you're four, five, six

18     feet away from a person and you're never going to forget

19     his face because he just killed your friend, seeing him

20     live is the best way possible to be able to make sure

21     that's true.

22                    And let's also look at some of the other

23     benefits of the procedure of the live line-up.  At the

24     live line-up, there was actually a show-up attorney

25     there to make sure that the live line-up was conducted

 1     fairly.

 2                 MS. ROCK:  Well, your Honor, I'm going to

 3     object as to that statement.

 4                 THE COURT:  Okay.  Thank you.  And you did.

 5                 MS. ROCK:  Thank you.

 6                 MR. PRASAD:  There was a show-up attorney

 7     there for the, for the process of the live line-up.

 8     Everyone there was seated.  Everyone there was wearing

 9     the same thing.  So, when you have the, when you have

10     Mr. Allen going to the juvenile facility to go look at

11     these six youths and he has in his mind who the person

12     was that he had seen that day and he looks on that face

13     and, as he told you, he wanted to make sure he was

14     absolutely correct, and when he was able to identify

15     clearly Deonte Howard as the person on that day who

16     fought with his friend Tyrone, pulled out the gun and

17     killed him, he was able to do so clearly and without

18     hesitation.

19                 And then you also have the testimony to

20     corroborate -- And I keep going back to the word

21     corroboration because that's what you want.  You want to

22     have the confidence in your decision.  You want to look

23     at other pieces of evidence that corroborate it.  What's

24     the other corroboration you clearly have in this case

25     besides Mr. Bailey saying that this is Tay who was

1      fighting with Ant, besides having Aundrey Allen saying

2      that he was five, six feet away, you know, in broad

3      daylight seeing this person and picking him out of a

4      live line-up?  What's the other key piece of

5      corroboration?  Or what was the corroboration of the

6      fact that it was his found that was found across the

7      street?  What's the last piece of corroboration you have

8      in this case?  You have Mr. McFadden who runs up to the

9      fence and sees him and says in court that that was the

10     killer.  That was the man with the gun shooting, that

11     Deonte Howard was the murderer.

12              So, when you look at the identification in

13     this case, look at every aspect about the

14     identification.  And I'd be remiss if I didn't mention

15     this one aspect about the identification and talking

16     about Deonte Miller.  It was Sergeant Mackie's decision

17     at that point when he first had the case -- He could

18     have run with the idea of Deonte Miller being picked out

19     as the person and going with it.  It was Sergeant

20     Mackie's decision to keep going at it, to make sure that

21     this was right.  Because he didn't think it was right.

22     And he explained how he didn't think it was right and

23     how the pictures might be similar, but they weren't

24     right.

25              It was Sergeant Mackie who went further and

-90-

1      to further start over and find who the real Tay was and

2      going back to Mr. Bailey and trying to find out who, who

3      Deonte Howard really is.

4              So, it was the efforts to make sure, as

5      everyone wants, to have the confidence that this is the

6      right person they pointed out, that Deonte Howard, as

7      the evidence shows in this case, was the person with the

8      gun.

9              And there's one last aspect about that that

10     I want you to think about while Ms. Rock speaks with

11     you.  And then when she's done, I get to come back up

12     briefly just to address anything she addresses.

13             Motive is not something that we, as

14     prosecutors, have to prove.  I don't have to prove

15     beyond a reasonable doubt the why, the motive of a

16     crime.  But motive is something you can use in your

17     decision process when you look at all the elements of

18     the crime.

19             Who is the only person that day who had a

20     motive to kill Tyrone Simpson who was there?  Because

21     Freak, the guy that had gotten into a fight with the,

22     who got into the fight with the victim earlier that day,

23     by all accounts, by all the testimony was gone.  He

24     wasn't there anymore.

25             Who was the only person left at that scene

-91-

1       when Deonte Howard came back who wanted, who had a

2       reason to kill Tyrone Simpson?  Who was the one who was

3       humiliated in public by being punched five times in the

4       face?  Deonte Howard.  Who was the only person who had

5       the motive then when the victim had the audacity to

6       stand and try to survive, to come back in that vehicle

7       and finish the job?  Deonte Howard.

8                   Ladies and gentlemen, thank you.  I'll come

9       back and speak with you again in a little while, but

10      please give Ms. Rock the same attention you've been

11      giving me.  Thank you.

12                  MS. ROCK:  Your Honor, I just need one

13      minute.

14                  CLOSING ARGUMENT

15  BY MS. ROCK:

16                  MS. ROCK:  There are actually two tragedies

17      in this case, the death of Tyrone Simpson and the fact

18      that Deonte Howard is being falsely accused of killing

19      him.

20                  There was a true story where a woman by the

21      name of Jennifer Thompson had accused a man by the name

22      of Robert Cotton of raping her.  And she had picked him

23      out of a line-up.  The DNA had proved that she was

24      wrong.  And I remember her hearing, I remember hearing

25      her on a talk show and she said she thinks the reason

-92-

1    that there was a wrong selection is she didn't want to

2    let the police down.  And she was floored that she had

3    picked out the wrong person.  And Mr. Cotton and Ms.

4    Thompson ended up writing a book together called Picking

5    Cotton.

6              The young man who you saw on the witness

7    stand with the tattoo on his arm, rest in peace Ant,

8    does not want to let his friend down.  He thinks he

9    knows who killed his friend, but the evidence shows that

10   he doesn't.  He's willing to lie and pick out whoever he

11   thinks did it.

12             Aundrey Allen should have been eliminated or

13   ruled out as an eyewitness when he told the EMS officer

14   or driver, Roland Parr, that he was standing there with

15   a friend when a vehicle pulled up and started shooting

16   and he ran into the store.  He admitted that's what he

17   said to the EMS driver.

18             But let's look more at Aundrey Allen's

19   version of what happened.  Here's somebody who's in the

20   hospital.  He gives a two-page statement before the

21   line-up.  He's shown a photo line-up of Deonte Miller.

22   And he says, he doesn't say that's the closest man or

23   that's the closest one.  He says this is the man who

24   shot me and my friend.  Excuse me.  Do you mind if I

25   borrow your--

```
 1                     MR. PRASAD:  (Interposing)  Oh, no.  No.
 2         No.  Please.
 3                     MS. ROCK:  Thank you.
 4                     MR. PRASAD:  Please.  Please.
 5                     MS. ROCK:  There's his signature.  This is
 6         the man who shot me and my friend.
 7                     Now, the photo here -- So, he admits that he
 8         testified previously that when he gave the two-page
 9         statement that he knew what he was doing.  At a previous
10         hearing in front of Judge Morrow, he testified that when
11         he was at the hospital that the police helped pick him
12         out, helped him pick out that photo.  And when I asked
13         him on the witness stand, I went through his previous
14         testimony, which was:
15                     "Did they help you pick the person out?"
16         He says:   "Yes.
17                     They did?
18                     Yes.
19                     What did they say?
20                     They like, they kept like wanting me to look
21                     toward that photo.
22                     How did they do that?
23                     They kept saying, you sure it ain't him?
24                     Like stuff like that.
25                     And what were you saying when you, when you,
```

-94-

```
 1                    when they said you sure it ain't him?
 2                    I was like, it don't look like him.  And
 3                    they kept asking and kept asking.  I was
 4                    like, yup.
 5                    Okay.  So, finally you said yes?
 6                    Yup.
 7                    Is that yes?
 8                    Yup."
 9                    So, we have somebody who testified -- He
10          tried to minimize it.  Oh.  I picked out the closest
11          one.  But in a previous hearing, he claims that the
12          police told him who to pick out, Deonte Miller, who he
13          says this is the man who shot me and my friend.  So, he
14          picked out the closest one and he said it was the
15          closest one.  He's implying that the police are in on it
16          with him.
17                    A month -- So, then, as the prosecutor
18          talked about, he goes to a live line-up and he picks out
19          my client, Deonte Howard.  And a month, this is a month
20          after the shooting.  He did not know my client until my
21          client, Deonte Howard, was attacked by his friend,
22          Tyrone Simpson.
23                    So, the reason I mention the Jennifer
24          Thompson case is, doesn't it seem really bizarre that
25          there isn't any soul searching by the police or Aundrey
```

1        Allen like Jennifer Thompson went through?  If the fix

2        wasn't in with regard to the identification, shouldn't

3        somebody have said, shouldn't there have been some kind

4        of legitimate soul searching like, oh, my God.  I picked

5        out the wrong guy.  Or oh, my God.  You picked out the

6        wrong guy.  There was no soul searching.  No soul

7        searching.  No agony.

8              Now, instead, Officer Mackie whisks him over

9        to the prosecutor's office within one hour of that line-

10       up with a waiting court reporter to give testimony.  If

11       they didn't already know that he was going to pick out

12       Deonte Howard, why is there a hearing set up one hour

13       right after the live line-up?  They wouldn't be taking

14       him over there if he hadn't selected somebody.

15             But here's the tipoff that Aundrey Allen

16       knew who, knew who to select.  When he goes over and he

17       gives testimony to the, at the prosecutor's office, he

18       says, after seeing him today, he looks shorter than I

19       remember.  And then he says, he also looks younger than

20       I remember.  Deonte Howard looked younger and shorter

21       because he's not the shooter.

22             On the stand the other day, Aundrey Allen

23       said it took him fifteen minutes to pick out Deonte

24       Howard.  And so, the prosecutor asks him, why?  And he

25       said, I wanted to make sure I'm seeing the right guy,

-96-

1     although the officer in charge said the total process
2     took approximately ten minutes.
3              He described the shooter as having a small
4     goatee.  At a previous hearing where you [sic] testified
5     that the police told him who to pick out, he claimed
6     that my client had the same, he had the same facial hair
7     that he did at the shooting.  And then I said, well, he
8     doesn't have a goatee, does he?  And Mr. Allen said, no.
9              As was discussed in voir dire, for many
10    people, the ends justify the means.  Let's go to Mr.
11    McFadden, Captain America wannabe and, quite frankly,
12    liar, the man who, according to Sergeant Lalone, was a
13    little off.  He's shown a photo array that doesn't
14    include my client.  He picks out the shooter and three
15    other people.
16             He then in court claims that my client was
17    the shooter.  But in his statement to the police, he
18    describes the shooter as 5'11", 6'0", 140 pounds, medium
19    complexion with tattoos on his neck, two on his right
20    arm, wearing a white T-shirt.
21             Does anybody really believe that he ran
22    across to help the elderly woman and then, without a
23    gun, ran over to the fence where he's like ten to
24    fifteen away from his horrible shooting?
25             And then when I tried to talk about it, he

-97-

1        tried to skirt the, he tried to skirt the issue.  I
2        said, you didn't have a gun.  And he goes, I had access
3        to one.  You didn't have a gun.  He goes, no.
4                Then he claims the shooter said, the MF N
5        isn't dead yet.  Now, every person said a different.
6        Aundrey Allen claimed Tyrone Simpson, Aundrey Allen
7        claimed that Tyrone Simpson was asking for his life and
8        saying his glasses aren't worth it, but he admitted that
9        he had never testified to that saying, testified to
10       saying that before, Mr. Allen.
11               Mr. Harris said he couldn't hear anything.
12       Now, Ms. Thompson, who's in the same house, said that
13       she heard him say, please don't kill me.  But in her
14       statement, she said he said stop, stop, stop.
15               Now, the reason I point that is I think
16       sometimes people are lying.  They want the drama, like I
17       raced across the street and helped an elderly woman and
18       then I ran to the fence.  Or they, over time, their
19       memory gets affected and they fill in gaps with what
20       they think happened.
21               I think that you also have to look at the
22       prosecutor said, oh, I don't have to prove, you know,
23       that the car was gold, black, blue.  But there may be a
24       fact that causes you to be, causes you to have a
25       reasonable doubt.  And those are facts you can use to

1    determine if he proved the element of identification or

2    any of the other elements.

3              You can use those facts to gauge the

4    credibility of the witnesses and whether they saw what

5    they claimed they saw or how they saw it.  And then the

6    prosecutor would like to sterilize the process, but the

7    bottom line is that those facts are important.

8              Now, Mr. Harris described the person as

9    being tall, 20s, 5'10", thin build, medium complexion.

10   There's no way you can describe Deonte Howard as being

11   tall.

12             Ms. Thompson described the shooter as a

13   black male, late 20s, early 30s, approximately 5'9" to

14   5'10", thin build, 160 to 170 pounds, approximately half

15   in to an inch deep thick afro, no facial hair, no

16   visible scars, marks or tattoos.  Now, there's no way

17   that you would ever describe Deonte Howard as late 20s,

18   early 30s, 5'9" to 5'10" or 160 to 170 pounds.

19             Mr. Harris saw a silver gun.  Ms. Thompson

20   saw a black gun.  And just as an aside, Mr. Harris

21   described Ms. Thompson as a caregiver.  And she called

22   him her husband in the statement, which was a little

23   odd.

24             Aundrey Allen said that Deonte Howard was

25   wearing a black jacket.  Mr. Harris and Ms. Thompson saw

1    a white T-shirt.  And Mr. Harris said the shooter was

2    wearing a white do rag.  Ms. Thompson said the shooter

3    was wearing black pants.  Mr. McFadden said the shooter

4    was wearing beige pants.  The vehicle was described as

5    gold, silver, gray, black.  At one point, it was

6    supposed to be a gray Dodge Durango.

7            Now, Bobby Bailey testified that Tyrone

8    Simpson said, about himself, I'm not a ho.  Nobody's

9    going to take my glasses from me.  There's going to be

10   gunplay.  That sets the tone for how, sets the tone of

11   what was taking place at that restaurant.  Both Aundrey

12   Allen and Bobby Bailey said that Deonte Howard was hit

13   fast and he was hit hard and he was hit five times.  How

14   do you recover from the shock of being punched five

15   times hard and fast?  You don't.

16           Bobby Bailey said he turned his back.

17   Tyrone rushed him and attacked Deonte Howard and he

18   heard shots.  Bailey heard all the guys talking about

19   how Tyrone Simpson had knocked Deonte Howard down.

20           Bailey said the guys were circling.  Based

21   on Bailey's testimony, Deonte Howard was down on the

22   ground when the shots were fired.  Deonte was rushed and

23   he was punched.

24           Tyrone Simpson and Aundrey Allen were very

25   violent men, aggressive and violent men.  Tyrone Simpson

1    had no narcotics in him.  So, what was the, what was the

2    excuse?  He had already fought Freaky [sic].  He was

3    having, he had fought Freaky inside the store.  Aundrey

4    Allen said he went after Freaky violently.  Those were

5    his words.  I went after Freaky violently.  Who talks

6    like that in court?  I went after someone violently.

7            Now, Bobby Bailey returns because customers

8    are being chased away from the store.  Do you think that

9    Freaky and Deonte Howard were the only ones that were

10   attacked?  Does it make sense that if you stole

11   someone's glasses you drive back to the scene?  Wouldn't

12   you just call the store and say, hey I think I left my

13   phone?  Could you hold it for me?

14           The conclusion has been that the person who

15   Tyrone attacked last shot him.  But the eyewitness

16   testimony and the description of the shooter does not

17   support that conclusion.  You have to ignore all kinds

18   of evidence to conclude that Deonte Howard is the

19   shooter.

20           Everyone agrees that two plus two is four.

21   But somehow if the description doesn't fit the shooter,

22   but someone says oh, yeah, that's the shooter that's,

23   that equals four?  And the only person that you have is

24   Mr. McFadden?  Bobby Bailey never testified that Deonte

25   Howard was the shooter.  You have Mr. McFadden, who

1      identified somebody else as the shooter in a line-up.

2              Shouldn't there have been a full

3      investigation?  There were other people who were out

4      there who allegedly saw this, but none of those people

5      were either interviewed or called as witnesses.  Isn't

6      it strange that the two people behind, that were

7      supposedly behind Deonte Howard when this punching took

8      place, we don't ever, we don't ever receive a

9      description of?

10             Did Freaky come back to extract revenge in

11     the vehicle, shooting Tyrone Simpson?  They never

12     interviewed Freaky, did they?

13             Mr. Thompson [sic] sees the shooter.  When

14     Ms. Thompson is on the stand, Ms. Thompson sees the

15     shooter run out of the store with the gun and fire the

16     gun into the leg of Tyrone Simpson.

17             As stipulated by the parties, as the

18     prosecutor mentioned to you, the phone was in the name

19     of Deonte Miller.  The phone -- The police could not do

20     a search warrant until Aundrey Allen identified Deonte

21     Miller as the shooter.  So, based on Aundrey Allen's

22     identification, they do a search warrant.  And they

23     execute that search warrant, meaning they go to a home

24     and they raid somebody's home based on this man's, this

25     is the man who shot me.

```
 1              So, the question is, if you look at this
 2     photo array, do the police help him?  Because he says,
 3     they helped me.  They told me who to pick out.  And the
 4     thing that's interesting is they can't do the search
 5     unless he identifies that person who, lo and behold,
 6     just by coincidence, the phone is in his name.  So, they
 7     need Aundrey Allen to pick out Deonte Miller so they can
 8     search the house.
 9              Officer Mackie, one of the issues I wanted
10     to point out to you, which I didn't think was a fair
11     investigation, is he doesn't put in the body of his
12     investigator's report that Deonte Miller was picked out
13     by Audrey Allen as the shooter, meaning somebody else
14     was picked out.  Detective Love never tells anybody that
15     McFadden picked out a shooter in another photo array
16     that didn't contain Deonte Howard.
17              And then you have Investigator Simon who
18     comes in and she's going to threaten and intimidate
19     people into saying what she thinks they saw.  Bailey
20     says, I was removed from my business and I was
21     threatened.  I was told I was going to jail.  I was told
22     I wasn't going to see my family.  And Investigator Simon
23     wants you to believe that she shows up there with two
24     other police officer to simply talk to Mr. Bailey.  And
25     Mr. Bailey said there were three officers.  And if
```

1    you're just going to chat, why are you showing up with

2    two other police officers?  And why would a person say,

3    yeah.  I think instead of talking to you in the comfort

4    of my business, I want to go down to the homicide

5    section and talk to you?

6              But Mr. Bailey, when he does -- Excuse me.

7    And she even admitted that she might have said that to

8    another suspect, that he'd never see his family and his

9    children again.

10             And then when Detective Mackie, you know --

11   The prosecutor says, oh, Detective Mackie, he knew it

12   wasn't right, that Deonte Miller was, you know, wasn't,

13   that wasn't the person.  What happened was is that Bobby

14   Bailey said Tay was present and he was being attacked.

15   Now, Bobby Bailey doesn't say that's who did the

16   shooting.  He says Tay was present.  And he identified

17   Deonte.  But he doesn't identify him as the shooter.

18   So, it wasn't Detective Mackie who, you know, based on

19   his investigation he was trying to do the right thing.

20             You cannot convict somebody on such a

21   dishonest investigation.  And, you know, it's like the

22   prosecutor, you know.  He stands up and he says, you

23   know, okay, you know, Tyrone hit him first.  And still

24   he refers to it as a fight.  It wasn't a fight.  It was

25   an attack.  Even Mr. Allen, who didn't even see

1    anything, who told the EMS driver it was a drive-by

2    shooting, he doesn't, he refers to it as an attack.

3    Even Bobby Bailey calls it an attack.  But we can't get

4    the prosecutor to call it an attack.  He calls it a

5    fight.  The only thing I was thinking as I was listening

6    to the prosecutor's argument, three words.  Used car

7    salesman.

8              They want you to believe that a sixteen year

9    old Deonte Howard turned into Jason Born or James Bond

10   and was able to swiftly and deftly pull out his gun

11   after being pummelled in the face.  It's not making

12   sense.  They want you to fit a square peg into a round

13   hole.  That's what they're asking you to do.  And this

14   is so serious.

15             When the police talked to Freaky, Freaky was

16   5'10", 130 pounds, thirty years old.

17             MR. PRASAD:  Objection, your Honor.  Facts

18   not in evidence.

19             THE COURT:  Stick to the facts, please.  And

20   make whatever arguments you think you can make from the

21   facts.

22             MS. ROCK:  Thank you, your Honor.

23             The bottom line is, according to some of the

24   witnesses or a few of the witnesses, there were several

25   close-range firings, especially Ms. Thompson when she

```
 1    says the shooter came out and shot into the deceased's
 2    leg out of the store.  And that's why I think the theme
 3    of the ends justify the means in this case because
 4    that's what this case represents, represents.
 5              And as the prosecutor told you, he has to
 6    prove beyond a reasonable doubt that my client committed
 7    these crimes.  Now, you don't have to go in there and
 8    agree on the same reasonable doubt.  You may have to,
 9    you may have different reasonable doubts.  Somebody may
10    say, you know, all those different descriptions bothered
11    me.  Somebody else, well, I don't have a problem with
12    the descriptions, but the police interference in this
13    case bothered me.  That's my reasonable doubt.
14              Or something, or something you pick, not
15    something necessarily I pick, maybe something you picked
16    up yourself during the course of this case that has
17    caused you to say, you know what?  I have a reasonable
18    doubt whether Deonte Howard committed these crimes.
19              I'm not going to get a chance to respond to
20    the prosecutor's rebuttal argument.  I can only grit my
21    teeth over here.  But I just want to say this in
22    parting.  I want to thank you for your time and your
23    patience in listening.
24              You wouldn't -- Excuse me.  You wouldn't
25    convict your own family on this evidence.  And I'm
```

1    asking you to find Deonte Howard not guilty.  Thank you

2    for your time.

3                      REBUTTAL ARGUMENT

4  BY MR. PRASAD:

5                      MR. PRASAD:  Used car salesman.  I try to

6    argue from the facts.  And I think I'll stick to that.

7    That's where I want to go.  I'm not going to bring in

8    other cases or other issues.  I'll try to stick to what

9    you heard from the witness stand here.

10                     I want to talk about descriptions first.

11   You know, it's an interesting concept about how the

12   witnesses are always asked to tell us how old a person

13   is, how tall they are and what weight they are.

14                     I really would like you to use your common

15   sense and reason to figure out how good and accurate

16   that process really is.  Really.  You have been with me

17   in this courtroom for four days now.  I wonder if you

18   all go back and take a poll about my height and weight.

19   I really would, I would love to know, especially after

20   the end of the first day, what you thought my height and

21   weight are.  I'll tell you what my height and weight is.

22   So, it wouldn't be that hard.

23                     But I'm just saying that if you were asked

24   after just the first hour of jury selection, that first

25   hour when the Judge was talking to the whole panel and

1    giving the description to the whole, you know, about the
2    general process, the whole panel for an hour and then we
3    had that lunch break.  And then you were given a sheet
4    outside and say, all right.  You met the prosecutor.
5    Describe the prosecutor.  Give us his height, his
6    weight.
7         A lot of you might guess I'm Indian.  I mean
8    I fairly look like an Indian, brown skin, straight hair,
9    that's all there.  Glasses.  Granted.  In a suit.  No
10   doubt.  Clean shaven.  Right?  All that's there.  A
11   little bit of salt and gray.  If you've got good eyes,
12   you can tell.
13        But my height and weight.  I'm 5'6" and a
14   half.  I say I'm 5'7", but I'm 5'6" and a half.  I'm
15   about 142 right now.  How many of you got that?  How
16   many of you would have gotten that after an hour?  And
17   the Judge raised his hand.  Height and weight are an
18   interesting concept because they're really misleading.
19   Clothes sort of hide your height and weight, if you're
20   wearing a jacket, if you're not wearing a jacket you
21   can't tell.  If you're wearing baggy clothes, if you're
22   not wearing baggie clothes.  Shoes will sort of mess up
23   your height and weight.
24        If you're next to a person, if you're across
25   the street from a person, if you're on a slant, if

1    you're on a step, if you're far away, if you're close.

2    All these different things affect a person's height and

3    weight and whether or not you're actually really good at

4    guessing a person's height and weight.

5              So, I ask you, when you look at things like

6    that and when you listen to counsel's argument about the

7    descriptions, take it with a grain of salt.  Because I

8    would suggest to you that your reason and common sense

9    will tell you the same thing.  Most people are good at

10   recognizing the same thing when they look at someone and

11   identify someone.  Their face.  Is this a situation

12   where there was a mask?  Is this a situation where it

13   was dark out?  Is this a situation where people didn't

14   have their glasses on?  No.  It was daylight.

15   Everyone's face was shown.  People were in close

16   proximity.

17             Was Mr. McFadden close enough to see a

18   person's face?  You've got the photographs right there.

19   In fact, in fact, when I get a chance, I'll find it.

20   But was Mr. McFadden in close enough proximity to see a

21   person's face?  Do you see the person right there?  The

22   fenceline is by that sign right there.  Do you see the

23   sign?  If you look closer up at the angle of where the

24   sign is, is Mr. McFadden close enough to see people

25   being shot at right here?  Yeah, he was.  In broad

                              -109-

1     daylight.  In broad daylight.  And he didn't need

2     glasses or he did not have them on.

3              Was Aundrey Allen close enough to see the

4     face of the person that killed his friend?  He was six

5     feet away.  Absolutely.  Absolutely.

6              Was Bobby Bailey close enough to identify

7     someone he knew, someone he'd met before as the person

8     in the fight with the victim?

9              So, when you look at concepts like this and

10    the defense tries to argue about items like descriptions

11    and reasons for reasonable doubt, I ask you to go back

12    to what the Judge told you from the get go.  Use your

13    common sense and reason.  Use your common sense and

14    reason.  The identifications in this case are solid.

15    But I'll go into that a little bit more.

16              Fixed by the police.  It's funny when

17    defense counsel makes her argument about the fix by the

18    police.  Focus on the aspect that she talks about the

19    fix by the police.  If there really was a fix by the

20    police, if Sergeant Diaz, Investigator Love,

21    Investigator Simon were on the fix to try to wrongfully

22    accuse someone of a crime, who was it they were in the

23    fix about?  It wouldn't have been Deonte Howard.  That's

24    not the person that she claims that these officers are

25    trying to get people to identify.  It was Deonte Miller,

-110-

1       this other person.  Fix by the police.

2                   And I disagree with the way defense counsel

3       categorizes Sergeant Mackie's work.  Sergeant Mackie's

4       work was independent of Aundrey Allen.  It was because

5       he didn't believe Aundrey Allen was correct when he

6       first identified Deonte Miller.  It was him going beyond

7       that and looking at the evidence at the scene.  It's him

8       focusing on the phone itself because he believed that

9       the phone, as the evidence came out, was left--

10                  MS. ROCK:  (Interposing)  Well, your Honor,

11      I'm going to object as to his belief was irrelevant.

12                  THE COURT:  Okay.  Continue, please.

13                  MR. PRASAD:  Thank you.  Because the phone

14      was left at the scene by the person who was in the fight

15      with the, with the deceased, the person who was the

16      killer.  That's why he continued his investigation.  And

17      that's how we ultimately got to Deonte Howard.

18                  So, if there is this fix by the police that

19      defense counsel wants to bring up, look at it with a

20      real, with a real light.  If there was anything

21      improperly done by the police, and if you want to

22      believe there was something improperly done -- I'm not

23      saying don't.  But if there was anything improperly

24      done, it wasn't about Mr. Howard at all.  It was about

25      this guy Deonte Miller, whoever the registered name for

1    was the phone, for the phone was.

2              The investigation into Deonte Howard was

3    sound.  The investigation into Deonte Howard was

4    thorough.  It was based on people at the scene who knew

5    him, specifically Mr. Bailey.  And it was based on

6    physical evidence left at the scene, specifically the

7    phone.  It was sound.

8              And it was confirmed and corroborated by a

9    live line-up, besides the fact that people came to the

10   witness stand and told you under oath that that was the

11   person who was out there that day.

12             Now, there's a couple other things that

13   defense counsel mentioned.  One thing she says about

14   Bobby Bailey's testimony is that Bobby Bailey's

15   testimony somehow implies that, that Deonte Howard was

16   on the ground.  I'm sorry.  I remember the evidence

17   differently.

18             And as the Judge told you from the get go,

19   focus on what you recall was evidence.  But there was no

20   evidence whatsoever that I recall that Deonte Howard was

21   on the ground.  Bobby Bailey said that when he first saw

22   the victim starting to attack the defendant, he then

23   turned to focus on the other people around so that they

24   wouldn't get involved, he heard gunshots, he went on the

25   ground.  He, being Bobby Bailey, went on the ground, not

1    Deonte Howard.  There was no evidence that Deonte Howard

2    was on the ground.

3              And let's also be clear about Bobby Bailey.

4    Bobby Bailey, you know -- Part of this whole fix

5    argument is that Bobby Bailey was being told what to

6    say.  Bobby Bailey was always very clear about the

7    identification, that it wasn't Deonte, the other one,

8    Miller.  It was Deonte Howard.  He told the

9    investigators.  No.  No.  No.  It's not any one in these

10   first photos.  It's this other guy.  And then Bobby

11   Bailey also tells us the key point that Deonte Howard

12   comes back there looking for his phone that he lost.

13             Why does that all add up?  Because I

14   disagree with defense counsel.  I absolutely want you to

15   believe Bobby Bailey was telling you the truth when he

16   testified in front of you.  But when you do and when you

17   look at it and you talk about Bobby Bailey's testimony,

18   you're going to find that it further corroborates the

19   other evidence in this case that Deonte Howard committed

20   the crime.

21             He never, Bobby Bailey -- Ms. Rock points

22   out that Bobby Bailey never identifies Deonte Howard as

23   the shooter.  He never identifies anyone else as the

24   shooter either.  But he does say that Deonte Howard was

25   the person that was in the fight.

-113-

1           And the timing of it?  Instant gunshots.

2    Right?  Bobby Bailey testifies that he sees the victim

3    throw the first initial punch.  We know from the other

4    evidence there's four more punches coming.  Bobby Bailey

5    turns around to face the other guys and then he

6    immediately hears gunshots.  Think of the timeline.

7    Five punches and then immediately hears gunshots.

8           Compare that to what Mr. Allen testified to.

9    Mr. Allen testified to five punches, defendant stepped

10   back, pulls out, immediately gunshots.  Bobby Bailey

11   just corroborates what Mr. Allen says, just corroborates

12   it completely.

13          Ms. Rock asked about the two others at the

14   scene with the defendant.  Let's be clear.  They, they

15   took off.  They took off in that SUV with the defendant.

16          Mr. McFadden is Captain America.  You know,

17   Sergeant Lalone did say that he was a little off

18   because, you know, the testimony was pretty clear.  Once

19   the gunshots go off, everyone else disperses.  There's

20   only one person in the entire block that actually comes

21   to the scene.  That's Mr. McFadden.  And that doesn't

22   make sense in a normal situation.  Right?  Most of us

23   would be saying, why would a person be doing that?  Why

24   would he be getting closer to the scene at this point?

25          If you didn't understand that Mr. McFadden

-114-

1    was a seventeen-year vet, and that's what he explained

2    to you, and if you didn't understand that Mr. McFadden,

3    at that point, was actually trying to help -- I'm a kid

4    of comic books.  We grew up with, you know, in my age we

5    grew up in comic books.  Captain America was a hero.  I

6    think Mr. McFadden is about the same thing.  He was

7    trying to help out.  So, I disagree with defense counsel

8    on that point as well.

9         I think -- I'm asking you ultimately to look

10   at all the evidence.  And as I've asked you throughout

11   this whole closing argument process, take the

12   opportunity to start comparing the evidence together.

13   And as you look at each piece, you'll find that each

14   major piece of this puzzle, each piece of evidence that

15   you realize is part of my elements of the crime, you'll

16   find is corroborated by something else, that we're not

17   just asking to hinge on one person's word.  Mr. Allen's

18   identification is corroborated by three other things:

19   By Mr. Bailey, by Mr. McFadden and by the cell phone at

20   the place.

21        The shooting, the intent to kill is

22   corroborated by all the physical evidence and the

23   medical examiner's office.  The specific murder in this

24   case at the end is corroborated by what Mr. Harris and

25   Ms. Thompson said at the end.

-115-

1                  Put it all together, ladies and gentlemen.

2          That's what I'm asking you to do.  And I'm asking to

3          seek justice in this case.  Thank you.

4                  THE COURT:  Anybody need a break?  It'll

5          take me about fifteen minutes to give you the

6          instructions.  So, if you need a break, why don't you

7          take a break?  You ready?  Okay.

8                  The instructions as I'm going to give them

9          to you, they actually break down into three parts.  The

10         first part of the instructions you're going to be

11         hearing for the third part [sic] because they deal with

12         some legal concepts.  The second part of the

13         instructions deal with the elements to the offense.  And

14         the third part just deals with the deliberation process.

15                 Stop me if I'm going too fast.  Stop me if

16         you would like to hear something over again.  And as it

17         relates to the elements of the offense, you don't have

18         to try to memorize them.  They're contained on something

19         and I can copy it and send you those elements in during

20         the deliberation process.  And so, you know, you don't

21         have to memorize it.  Most of it is just based on what

22         we've already talked about, and that is reasonableness

23         and common sense.

24                 So, can I start from the beginning with the

25         presumption of innocence?  The presumption of innocence

-116-

1      says that anybody, Mr. Howard, who is charged with a

2      crime is presumed to be not guilty.  That presumption

3      begins at the beginning of the trial, it continues

4      throughout the whole trial and now that presumption is

5      with him until he's proven by the evidence beyond a

6      reasonable doubt.

7                  The prosecution has to prove each and every

8      element, not just one, not just two, but each and every

9      element.  And if you find that he has not met that

10     burden, your duty is to return a verdict of not guilty.

11                 A reasonable doubt is a fair, honest doubt,

12     which grows out of the evidence, the lack of evidence or

13     the inadequate nature of the evidence.  It's not merely

14     an imaginary or a possible doubt, but a doubt that you

15     can assign a reason to.  And, therefore, a reasonable

16     doubt is a doubt that's reasonable after a careful and

17     considered examination of the facts and circumstances in

18     this case.

19                 Again, your job is to decide what the facts

20     are.  And any decision that you reach is a final

21     decision.  And the facts should be based on, must be

22     based on the evidence.  Evidence, once again, is

23     testimony from the witness stand.  That's considered

24     evidence.  The diagrams and exhibits, things that have

25     been -- You've heard the prosecution move exhibit

-117-

1    number...  These are now evidence and can be considered.

2    The stipulations that were entered into between the

3    parties can be considered as evidence.  Let me see.

4    What else?

5            What also can be used as evidence is prior

6    testimony from a different, a different judicial

7    hearing.  Ms. Rock put up something on the screen, which

8    was questions might have been asked did you testify this

9    way at another time?  That can also be used as evidence.

10           Now, just because it's evidence doesn't mean

11    that you have to believe it or disbelieve it.  You can

12    believe that which you think is accurate and truthful

13    and disregard other evidence.  But that's what evidence

14    is.

15           Evidence is not the statements of the

16    lawyers at any time.  Again, their openings statements

17    where they tell you what they believe the testimony will

18    show, how it was consistent and even their closing

19    arguments.  Because they don't agree with what witnesses

20    said or who said what.  And then will say, well, you all

21    believe, but what I heard was.  And so, it is true.  It

22    is what you remember being the testimony, the testimony

23    being which is the most important.  Just because they

24    said it was doesn't mean it was.  In their closings,

25    what they said the testimony is, if you think it was

1     different, use what you remember the testimony being in

2     trying to analyze if the prosecution has met their

3     burden of proof beyond a reasonable doubt.

4              Two types of evidence, circumstantial and

5     direct.  We went over the types.  And circumstantial

6     evidence is just asking you to make reasonable

7     conclusions based on the surrounding circumstances of

8     anything.  And it can be done by deductive or inductive

9     logic and reason.

10             The reason we even mention it is, again,

11    because some people think one type of testimony is more

12    persuasive than another.  If we have the chicken on the

13    counter and we see the dog on the chair eating the

14    chicken, then it's easy to say that dog ate the chicken.

15             But if we're the only ones living in that

16    house and we put that chicken up on that table and we

17    see the dog coming out of the chicken [sic] with the big

18    tongue licking the mouth and we go in there and we look

19    at that kitchen table and we see the chicken gone, the

20    conclusion that that dog ate the chicken is all right.

21    Nobody else in the house, the circumstances.  It would

22    be a reasonable conclusion to say that the dog at the

23    chicken.

24             So, make reasonable conclusions based on the

25    facts and the circumstances in the case.  And when you

1     do, understand that it is just the same as direct

2     evidence.  Because the prosecution has the option of

3     direct evidence, circumstantial evidence, mixed

4     circumstantial and direct.  Just like if the defense

5     wants to offer evidence.

6              There are some strange things that you all

7     have the ability to do.  Some of it -- Remember when we

8     were talking about reasonableness and common sense?

9     Okay.  Here's one that'll make you smile.  Just because

10    the two lawyers agree that this is what somebody would

11    testify to doesn't mean that you have to accept their

12    stipulation as true.  And the reason for that is nobody

13    can tell you what to believe or how much weight to give

14    to it.

15             Stipulations are just like witnesses, asking

16    them questions.  This is what they would say.  But

17    nobody can tell you what to believe.  So, just because

18    they stipulate and agree with it doesn't mean that you

19    have to accept it.  You can choose to accept it all,

20    accept none of it or accept parts of it.

21             And the other thing is just because I said

22    that somebody was an expert and allowed to testify in

23    some particular area, the only reason people are given

24    that status of being an expert is because they have

25    information that the general population doesn't have.

1        But qualifying them as an expert does not mean that you

2        have to believe what they say.

3                You can choose to believe some of what the

4        expert testified to, none of it.  You're to examine the

5        facts and circumstances.  Look at their educational

6        background.  Look at the reasons that they're basing

7        their conclusions on.  You might think that they're a

8        little off on how they should perceive it.  And you can

9        do that.  You don't have to -- The same way you assess

10       the credibility for non-experts you use with experts.

11       Nobody gets a free pass because they're called an

12       expert.  No.  There is no free pass just because things

13       are stipulated to.  You all are the jury.  You get the

14       chance to make the decision about what are the facts of

15       the case.  And nobody can tell you otherwise.

16               There are a couple of things that have been

17       used in this case.  And let me explain the purpose.

18       Because I'm sure you caught it as it was going along.

19               Sometimes the witness on the stand would say

20       one thing and they would be challenged.  Hold it.  Hold

21       it.  Didn't you tell somebody else something?  And then

22       the answer might have been yes or no.  People can be

23       challenged for what they say on the witness stand as

24       being true with out-of-court statements.

25               Out-of-court statements are used to test the

-121-

1     person's memory and credibility as to if what they are

2     telling, what they are reporting in front of you,

3     testifying in front of you is true.

4              Bruce, what's your favorite car?  Mach I

5     Mustang.  That's what I'll say in front of you all.

6     Hold it, Bruce.  Didn't you tell somebody else that a

7     Corvette was your favorite car?  I could say yes.  I

8     could say no.  It doesn't matter.  What you all can

9     consider is if the Mach I is my favorite.  You can't say

10    the Corvette is my favorite.

11             But in the same instance, let's say that at

12    a court hearing I told somebody:  Bruce, what's your

13    favorite car?  A Corvette.  And then in front of you I

14    say a Mach I.  And the prosecution is trying to prove

15    that it's really a Corvette and not a Mach I.  Because I

16    said that under oath at another court hearing, you can

17    substitute that testimony and believe what I said before

18    instead of what I said now, only because it was under

19    oath.  You get to take the testimony that I said before

20    as evidence.  The other, you can just use to decide if

21    what I'm telling you now is true.  So, one is to try to

22    impeach a person's credibility.  And the other can be

23    used as substantive evidence.

24             So, you've heard a lot about credibility,

25    credibility, credibility.  We talked about things such

-122-

1     as occupation having no effect on a person's

2     credibility.  The fact that people might be police

3     officers doesn't make them more reliable, less reliable.

4     We talked about education and does that matter, youth

5     and adults and that making no difference, what side

6     presented the most witnesses.  The fact that one side

7     might have presented more witnesses than another means

8     absolutely nothing because the critical test is to look

9     at the contents, content of what was said and does it

10    appear to be consistent with reasonableness and common

11    sense.  And you can consider whether there's other

12    things to help corroborate what it is that was said.

13          The credibility of witnesses can be gauged

14    by a combination of things.  And that's what I would

15    suggest.  Some of those things:  How did they look and

16    act while they were testifying?  Do you think they were

17    making an honest effort to tell the truth?  Do you think

18    that they were being evasive or argumentative?

19          When the witnesses testified what they

20    remembered seeing or hearing, what was their state of

21    mind at the time that things were happening?  Do you

22    think that they were confused because of distance or

23    because of their bias or because of the excitement of

24    what was happening?  Do you think they were being

25    distracted from seeing clearly or hearing clearly?

1               Do you think that the age and maturity of

2       some of those witnesses might have affected how they

3       remembered or how they testified?  Do you think anybody

4       had any special reason to lie, any special reason to

5       tell the truth?

6               Do you think anybody was interested in the

7       outcome of the case or they were trying to conform their

8       testimony for the approval of somebody else?  All in

9       all, how reasonable did the testimony seem when you

10      think about all the evidence in this case?

11              Somebody might decide that there were two

12      different versions of something that they think is

13      important to how they want to decide this case.  You

14      might think that the witnesses testified differently,

15      but the difference was based on somebody testifying

16      honestly, but simply being mistaken about what they

17      remember seeing or hearing.

18              You may determine that somebody lied to you

19      intentionally about something that's important to this

20      case.  When people lie to you intentionally, and that's

21      a decision that you make, you have the option of

22      disregarding everything that they testified to.

23              You also have the option of deciding that,

24      okay, I'm going to accept this because I think that this

25      is truthful and I'm going to disregard the rest of it

-124-

1    because I don't think the rest of it was worth anything.

2    You decide ultimately what you want to believe, who you

3    want to believe and how much weight you want to give to

4    that which you believe.

5              Each of the counts in this particular case,

6    count one and count two, have what we call the primary

7    charge and considerations for offenses that are what we

8    call lesser-included offenses.

9              To the first degree murder charge, after I

10   tell you what that is, there's also a second degree and

11   a voluntary manslaughter.  After assault with the intent

12   to commit murder, there's that and the assault with the

13   intent to do great bodily harm.  They are also

14   considered lesser-included offenses, which you can

15   consider.  And so, let me give you the elements and then

16   I'll tell you how you can consider those different

17   options.

18             The first count is murder in the first

19   degree.  To prove that, the prosecution has to prove

20   these elements.

21             First, that Mr. Howard caused the death of

22   Mr. Simpson.  That is that he died as a result of

23   multiple gunshot wounds.  That's the first element.

24             Second, that Mr. Howard intended to kill Mr.

25   Simpson.

1              Third, that the intent to kill was

2      premeditated.  And that is thought out beforehand.

3              And fourth, that the killing was deliberate,

4      which means that the defendant, Mr. Howard, considered

5      the pros and cons of the killing and thought about and

6      chose his actions before he did it.  There must have

7      been real and substantial reflection for long enough to

8      give a reasonable person a chance to think twice about

9      the intent to kill.

10             The law doesn't say how much time is needed.

11     It's for you to decide if enough time passed under the

12     circumstances in this case.  The killing cannot be the

13     result of a sudden impulse without thought or

14     reflection.

15             And fifth, that the killing cannot be

16     justified, excused or done under circumstances that

17     would reduce it to a lesser crime.

18             First degree murder is what is considered a

19     specific intent crime.  That means that at the time of

20     the action, Mr. Howard could only have had one intent.

21     And that is to kill.

22             When you think about the evidence in

23     deciding what the defendant's state of mind was at the

24     time of the alleged killing, the defendant's state of

25     mind may be inferred from the kind of weapon used, the

1    type of wounds inflicted, the words and acts of Mr.

2    Howard or any other circumstances that are surrounding

3    the alleged killing.

4              You can infer that the defendant, Mr.

5    Howard, intended to kill if he used a weapon in a way

6    that was likely to cause death.  Likewise, you may infer

7    that Mr. Howard intended the usual results that flow

8    from the use of a dangerous weapon.

9              Premeditation and deliberation may be

10   inferred from any action of Mr. Howard which shows

11   planning or from other circumstances surrounding the

12   killing.  The prosecution need not prove a motive for

13   the killing, but you may consider evidence of motive in

14   deciding if there was premeditation and deliberation.

15   Motive, by itself, does not prove premeditation and

16   deliberation.

17             The first lesser included after you consider

18   the crime of murder in the first degree is murder in the

19   second degree.  The elements are basically the same.

20             First, that Mr. Howard caused the death of

21   Mr. Simpson.  That is that he died as a result of

22   multiple gunshot wounds.

23             And second, that Mr. Howard had one of these

24   three states of mind:  He either intended to kill Mr.

25   Simpson, he either intended to do great bodily harm or

-127-

1     he knowingly created a high risk of death or great

2     bodily harm knowing that that was the likely consequence

3     of his action.

4              Now, those are three different intents, the

5     intent to kill or the intent to do great bodily harm or

6     knowingly creating a high risk of death.  You all do not

7     have to agree on which one of those three if you

8     consider that.  As a group, you just have to decide if

9     one of those three existed.

10             And, again, that the killing was not

11    justified or excused by a lesser-included offense.

12             And, of course, the last lesser-included

13    offense under there would be voluntary manslaughter.

14    The elements of voluntary manslaughter are as follows:

15             The crime of murder may be reduced to

16    voluntary manslaughter if Mr. Howard acted out or

17    passion or anger brought about by an adequate cause and

18    before Mr. Howard had a reasonable chance to calm down.

19             For manslaughter, the following two things

20    must be present.  First, that when Mr. Howard acted, his

21    thinking must have been disturbed by emotional

22    excitement to the point that a reasonable person might

23    have acted on impulse without thinking twice, from

24    passion instead of judgement.  This emotional excitement

25    must have been the result of something that would cause

-128-

1          a reasonable person to act rashly or on impulse.  The

2          law does not say what things are enough to do this.

3          That's for you to decide.

4                    Second, the killing itself must result from

5          the emotional excitement.  Mr. Howard must have acted

6          before a reasonable time had passed to calm down and

7          return to reason.  The law, again, does not say how much

8          time is needed.  That's for you to decide.  The test is

9          whether a reasonable time had passed under the

10         circumstances in this case.

11                   The second charge is assault with the intent

12         to commit murder.  To prove this, the prosecution has to

13         prove the following beyond a reasonable doubt.

14                   First, that Mr. Howard tried to physically

15         injure another person.

16                   Second, that when Mr. Howard committed the

17         assault, he had the ability to cause an injury or at

18         least believed that he could cause that injury.

19                   And third, that Mr. Howard intended to kill

20         the person.

21                   And, again, it was not done under

22         circumstances that excuse it or reduce it.

23                   In this particular case, if Mr. Howard

24         intended to kill one person, but by mistake killed

25         another person, the crime is the same as if the first

1        person had actually been killed.

2              The defendant, Mr. Howard, can only be

3        guilty of the crime of assault with the intent to murder

4        if he would have actually been guilty of murder had the

5        person assaulted actually died.  If the assault took

6        place under circumstances which would have reduced it to

7        manslaughter if the person had died, then Mr. Howard is

8        not guilty of assault with the intent to commit murder.

9              Voluntary manslaughter is different from

10       murder in that for manslaughter, again, the following

11       things must be true:

12             First, that when Mr. Howard acted, his

13       thinking must have been disturbed by emotional

14       excitement to the point that an ordinary person might

15       have acted on impulse without thinking twice, from

16       passion instead of judgement.  This emotional excitement

17       must have been caused by something that would cause an

18       ordinary person to act rashly or on impulse.  The law

19       does not say what those things are.  It is left for the

20       jury to decide.

21             Second, that the killing itself must have

22       resulted from this emotional excitement.  Mr. Howard

23       must have acted before reasonable time had passed to

24       calm down and before reason had taken over.  The law,

25       again, does not say the amount of time that is needed.

1          It is left to you.  The test is whether a reasonable

2          time passed under the circumstances of this case.

3                    If you find that the crime would have been

4          manslaughter had the person died, then you must find Mr.

5          Howard not guilty of assault with the intent to murder.

6                    As it relates to this particular case, you

7          may also consider the offense of assault with the intent

8          to do great bodily harm.  To prove this, the prosecution

9          has to prove these three elements.

10                    First, that Mr. Howard tried to physically

11         injure someone.

12                    Second, that at the time of the assault, he

13         had the ability to cause, that is Mr. Howard had the

14         ability to cause the injury or at least believed that he

15         had.

16                    And third, that Mr. Howard intended to cause

17         great bodily harm.  Actual harm is not necessary.  But

18         if there is an injury, you may consider that injury in

19         terms of trying to decide whether Mr. Howard intended to

20         cause great bodily harm.  Great bodily harm has been

21         defined as any physical injury that could seriously harm

22         the health or the function of the body.

23                    And the last offense is felony firearm.  To

24         prove this, the prosecution has to prove these elements.

25                    First, that Mr. Howard committed the crime

-131-

1       of murder in the first degree or any of the lesser-

2       includeds, murder in the second degree or voluntary

3       manslaughter.  Also, consider whether the assault with

4       the intent to commit murder was proven or the assault

5       with the intent to do great bodily harm.  It is not

6       necessary, however, that the defendant, Mr. Howard be

7       convicted of those crimes.

8                   And the second element for felony firearm is

9       that at the time that Mr. Howard committed either the

10      first, murder in the first degree or the lesser-

11      includeds or second, assault with the intent to murder

12      or the lesser-included, that he knowingly carried or

13      possessed a firearm.

14                  One of the issues in this case is the

15      identification of Mr. Howard as the person that

16      committed the crime.  The prosecution must prove beyond

17      a reasonable doubt that the crime not only was

18      committed, but that Mr. Howard was the person who

19      committed it.

20                  In deciding how dependable an identification

21      is, think about such things as how long the witness had

22      to see the offender at the time, how long the witness

23      was watching, whether the witness had seen or known the

24      offender, Mr. Howard, before, how far away the witness

25      was, whether the area was well-lit and the witness'

1     state of mind at the time.

2               Also, think about the circumstances at the

3     time of the identification, such as how much time had

4     passed since the crime, how sure was the witness about

5     the identification and the witness' state of mind during

6     the identification.

7               You may also consider any times that the

8     witnesses failed to identify the defendant or made an

9     identification or gave a description that did not agree

10    with the identification of Mr. Howard during the trial.

11              You should consider the witness'

12    identification carefully.  You may consider whether

13    other evidence supports the identification because then

14    it may be more reliable.  However, you may use the

15    identification testimony alone to convict Mr. Howard as

16    long as you believe the testimony and you find that it

17    proves beyond a reasonable doubt that Mr. Howard was the

18    person that committed the crime.

19              After one of you is randomly picked off, the

20    other twelve will go in there and start the deliberation

21    process.  I'll give you the verdict sheet and the candy

22    and whatever else you might want and away you will go.

23              Can I tell you what you will not get first,

24    please?  You will not get a transcript.  You've seen

25    Sean over there just talking into that thing and the

1    wheels spinning.  There is no transcript.  There is

2    nothing that you will be able to read.

3              When you come to an impasse about what

4    somebody testified to or did not testify to, I want you

5    to depend on your own independent memory and the memory

6    of the group.  If it comes push to shove and you really,

7    really, really need it, then I'll have to bring you out

8    there and we will have to listen to the direct, cross-

9    examination of the testimony.  You can't stop me when

10   you've heard what you've wanted to hear.  No transcript.

11             The other thing is you can't ask me

12   questions about, what color did they say that car was,

13   Judge?  You can't get evidence from me.  Now, what you

14   can get is you can get all the exhibits by simply

15   filling out a little slip of paper saying, Judge, send

16   in all the exhibits.  Or if it's something specific you

17   want, you can just specify what it is that you'd like

18   and then I'll send that in.

19             That's the way it is.  So, if there's

20   anything that you want, you know, other than that, just

21   ask for it in a written note because that's how we have

22   to communicate now, by written words.  There'll be some

23   paper, some pens, stuff on the table for you to write

24   whatever you want to write.

25             Even if you want the elements to the

                            -134-

1    offense?  Write, like the elements of the offense.  I'll

2    copy them.  They'll be cut a little because there's

3    commentary on the bottom.  But other than that, you'll

4    get exactly what I read you or spoke to you.  Okay.

5              The process is a very, very, very easy

6    process.  And we've been talking about it since the time

7    I met you.  Reasonableness and common sense.

8              Some courtrooms everywhere in this world

9    tell them go in there and pick a foreperson.  I want you

10   all to act as forepersons.  I've done a good job, I

11   think, in empowering you all in leadership positions.

12   So, I don't think you need to go and designate somebody

13   to be in control of the rest of the group.  I usually

14   find that once a person is in control, if it's not me,

15   then they can abuse that control and that power.

16   And then I've known people to say, be quiet.  We've

17   heard enough from you.  And I don't want anybody to have

18   to not talk as much as they want about the case.

19             Basically, you know, it's do we go

20   counterclockwise or clockwise around the table.  The

21   point is that everybody should have an opportunity to

22   speak, speak as long as they want to, tell people what

23   they think the evidence, I mean, what their conclusions

24   are based on the evidence.

25             It is most important in how you start the

-135-

1      deliberation process.  How many of you think it's your

2      job to convince the other eleven that you're right?

3      Some people think that that's their job as a juror.

4      Okay.  I know it's right, so let me convince everybody

5      else what I believe so that they'll agree with me.

6               It's a little different.  What I'd like you

7      to do is to go in there with the willingness to be

8      influenced.  Don't we listen differently if we're trying

9      to be influenced versus when we're trying to tell

10     somebody something?  I think we do.  And the willingness

11     to be influenced means that we listen because if

12     somebody's analysis makes more sense than ours, we

13     change our minds and we change our opinions.

14              You all remember long division, when you all

15     first learned long division?  Yeah.  It was an

16     interesting process because, you know, the first

17     admonition was always on your test to do what?  Show

18     your work.  You remember that?  And usually when you

19     handed the test paper back and you got the other

20     person's and it came time to doing that self-check, it

21     was easy to see where the mistakes were because people -

22     - It was either on the subtraction or on the remainder,

23     carrying up.

24              Sometimes when you're trying to be willing

25     to be influenced, you will say, okay.  We have a

1    difference of opinion.  Tell me how you reached yours.

2    Take me step-by-step over it.  And when people do that

3    step-by-step analysis, sometimes, Ms. Matelic, they'll

4    see the flaw in their own analysis.  They're like, oh.

5    Here's where I made my mistake.  Or you'll see the way

6    that they're doing it and you're like, that makes more

7    sense than the way that I was thinking about it.

8              So, by all means, you know, ask people to

9    explain the differences.  Talk it out.  Be truthful and

10   honest with each other when you're explaining what

11   you're explaining.  Change your mind if somebody's

12   opinion is different than yours and supported by the

13   evidence.  And don't change your mind.  I don't want

14   anybody to change their mind just for the sake of

15   reaching a unanimous verdict because your decision has

16   to be unanimous.  You all have to agree that the

17   prosecution has met their burden before you can return a

18   verdict of guilty.  Okay.

19             I want you all to start with the principle

20   count of murder in the first degree.  If you can reach a

21   conclusion on that that the prosecution has met their

22   burden beyond a reasonable doubt, then you needn't

23   consider the lesser-included offenses.  If you can't

24   reach a unanimous verdict, then you can start to

25   consider murder in the second degree or voluntary

-137-

1    manslaughter.

2              Same for count two.  If you all can reach a

3    unanimous decision about the prosecution having reached

4    their verdict [sic], then you don't need to consider the

5    lesser-included offense.

6              And there is no lesser-included offense for

7    count three.

8              And you don't have to go from one count

9    [sic] to count two to count three.  You can do it in any

10   order that you want to.  Okay?  And -- Oh.  And the

11   other thing is, let's say that in count one you decide

12   that the prosecution has met their burden beyond a

13   reasonable doubt as to manslaughter, then you would

14   indicate that and not guilties for the ones that are

15   above it.  So, hopefully, that explains that.

16             And if there are any questions along the

17   way, feel free to, you know, knock on the door, hand out

18   the note.  I'll respond.  They will knock on the door

19   and they will hand in whatever it is that you want us to

20   hand in.  Any questions?  Did I stumble and stutter

21   enough?  How about you all?  Any comments?  Any

22   objections?

23             MR. PRASAD:  No, sir.

24             MS. ROCK:  I think that there might have

25   been -- Did you discuss beyond, beyond a reasonable

1       doubt?  You did do that.

2                   THE COURT:  A few times.

3                   MS. ROCK:  What about the testimony?

4                   THE COURT:  Prior testimony and how to take

5       it?  Yeah.  I did that.

6                   MS. ROCK:  Okay.  Can I, can I go this way,

7       your Honor?

8                   THE COURT:  Let's just tell it.  It's all

9       right.  I can take it.

10                  MS. ROCK:  Well, I was just wondering.  I

11      don't think you discussed about the defendant

12      testifying.

13                  THE COURT:  I told them about the burden of

14      proof, but I'll be happy--

15                  MS. ROCK:  (Interposing)  Okay.

16                  THE COURT:  To go back over that.

17                  MS. ROCK:  Thank you.

18                  THE COURT:  Now, in the burden of proof,

19      there is never any obligation on anybody to do anything.

20      Options are exercised only because they're options.  And

21      those options are the options that the defense has.

22                  The fact that Mr. Howard chose not to take

23      the witness stand, his silence cannot and should not be

24      used in considering if the prosecution has met their

25      burden of proof.

1                    MS. ROCK:  Thank you.

2                    THE COURT:  Good?  No problem.

3                    MS. ROCK:  Thank you.

4                    THE COURT:  Anything else?

5                    MS. ROCK:  I don't think so, your Honor.  I

6        think that was good.

7                    THE COURT:  Okay.

8                    JUROR NUMBER TWO:  What kind of time frames

9        are we talking about here?

10                   THE COURT:  Ah.  Thank you.  Well,

11       certainly, you know, the deliberation process should

12       start.  We've been leaving at 3:30.  If we want to stay

13       leaving at 3:30, we'll just leave at 3:30, you know.

14       And then you can come back.

15                   Monday, you know, is an official holiday.

16       So, nobody's going to be open on Monday.  So, you have

17       the option of coming back tomorrow and deliberating at

18       9:30 until you reach your verdict or you can come back

19       on Tuesday.  Because I don't want anybody to say let's

20       stay until we reach a verdict tonight.  Because then we

21       all would be at the Marriott, you know, Motor City

22       Casino, catch a show, cater some food.  Next thing you

23       know, my family would be trying to get in on the deal.

24       Yes, Ms. Thomas.

25                   JUROR THOMAS:  So, there's no specific time

1    that we have to--

2              THE COURT:  (Interposing)  No.  No.  You

3    deliberate until you reach a verdict, you know.  Just

4    exhaust yourselves.  You can tell me now.  You can say,

5    Bruce.  I won't be able to do anything in a half an hour

6    except pick our seats.  Why don't we just go home and

7    start deliberating tomorrow?  And I'll say, you know,

8    you sat through a lot today.  I'm good with that.  You

9    can send me out a note.  We'd like to go home now.  See

10   you tomorrow.  It's all right.  However -- You're the

11   boss.  You tell me how you'd like to do it and what's

12   best for you all.  Okay.

13             That's an option.  There is no thing that is

14   not an option.  Okay?  And there is no option that you

15   can pick that's wrong.  Okay.  That's how powerful you

16   are as a group.  Mark, would you, please?  We will now

17   see who has to go home and be sad about it.  Oh.  The

18   deputies have to get sworn, too.

19             THE CLERK:  Joseph Bologna.

20             THE COURT:  Seat number nine, ten, eleven.

21   Mr. Bologna, I'm going to guess that you have at least a

22   jacket in there?

23             JUROR BOLOGNA:  Yes.  I do.

24             THE COURT:  Okay.  Why don't you get that?

25   In the meantime, Mr. U?

-141-

```
 1                    (At 2:58 p.m. deputies sworn.)

 2                    THE CLERK:  Deputies, do you promise to keep

 3          this jury in the manner prescribed by law?

 4                    THE DEPUTIES:  Yes.

 5                    THE COURT:  They even raise their hands.

 6          Mr. Lilly, could you just carry that in for me, please?

 7                    JUROR LILLY:  Yes, sir.

 8                    THE COURT:  Thank you.  All right, young

 9          people, let me know.

10                    JUROR HOLLY:  Your Honor?

11                    THE COURT:  Yes.

12                    JUROR HOLLY:  May we call this the

13          conclusion and come back tomorrow?

14                    THE COURT:  Well, why don't you all just

15          decide that as a group and then let me know.  And if I

16          see the knock on the door and the note and everybody

17          with their clothes on, I'll know what the note says.

18                    (At 2:59 p.m. jury leaves the courtroom.)

19                    MS. ROCK:  Your Honor, I'd like to put

20          something on the record, if I might.

21                    THE COURT:  Just a second, Ms. Rock.

22                    MS. ROCK:  All right.  Thank you, your

23          Honor.

24                    THE COURT:  Ms. Rock, what is it, please?

25                    MS. ROCK:  Your Honor, I just wanted to put
```

-142-

 1    on the record that I discussed my client's

 2    constitutional right to testify with him.  And he had

 3    advised me at the youth home and today that he did not

 4    wish to testify.  Is that correct?   Is that yes or no?

 5              THE DEFENDANT:  Yeah.

 6              MS. ROCK:  Yes.

 7              THE DEFENDANT:  Yes.

 8              MS. ROCK:  Okay.  And there were no other

 9    witnesses.  Is that correct?

10              THE DEFENDANT:  That's correct.

11              THE COURT:  Right.  I can assume that.

12              MS. ROCK:  Thank you.

13              THE COURT:  Okay.  This is what I need the

14    two of you to do, please, at this juncture.  Would you

15    do the, these are the exhibits, here they are, let's

16    double check them?  I'm sure Sean doesn't want to be the

17    recipient of them, but he's going to be anyway.  And as

18    it relates to if there's like a note to get the

19    evidence, I don't call you.  I just put the note in the

20    thing and just send in the evidence.

21              If they say they want the elements of the

22    offense, I give them the elements, not reasonable doubt,

23    not -- I give them the elements of the offense and cut

24    off the bottoms.  And you're happy that I make those a

25    part of the record.  And if there's anything else that

-143-

1    comes up that I think needs at least you to be present,

2    I will pull them out and we'll have a discussion on the

3    record.  And, of course, you all will get a chance to

4    say whatever you want to after I advise them.  Okay?

5    Anything else?

6                MR. PRASAD:  No, sir.

7                THE COURT:  Oh.  Availability tomorrow.  I

8    know it is going to be a little strange.  But I need

9    both of you all to have your phones on you at all times.

10               MR. PRASAD:  Yes, sir.

11               THE COURT:  And please know that you all

12   will have priority.  If another hearing is going on and

13   they have a question, we don't wait until witnesses

14   finish.  Because of the nature of tomorrow and next

15   week, let's hope that we can get them working all day

16   tomorrow.  Because you know what happens over the

17   weekend and Monday on the holiday.  This is one of those

18   weird kind of can't come back on Monday situations.  And

19   then they spend all Tuesday listening to the testimony

20   because, what did they say?  So, let's plan accordingly.

21               (At 3:04 p.m. proceedings concluded.)

22

23

24

25

1

2

3

4

5

R E P O R T E R ' S   C E R T I F I C A T E

STATE OF MICHIGAN  )
              SS )
COUNTY OF WAYNE    )

          I, SEAN E. ALLEN, CSMR 5265, Certified Court

Reporter acting in and for the Third Judicial circuit,

Wayne County, State of Michigan, do hereby certify that

the foregoing pages 1 through 145, inclusive, were

reduced to typewritten form and comprise a true

rendition of the proceedings taken in the above-entitled

matter on January 13, 2011.

          I FURTHER CERTIFY THAT MY CERTIFICATION

ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN,

SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES

NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED

COPIES NOT MADE UNDER MY CONTROL AND SUPERVISION.

                                 _____
                                 SEAN E. ALLEN -- CSMR 5265
                                 Official Court Reporter.

DATED:  This 4th day of May 2012.