STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN


v                         Case Number

                          10-5562-01


DEONTE HOWARD

                          Defendant.


_____/

JURY TRIAL -- DAY ONE

PROCEEDINGS HELD BEFORE THE HONORABLE BRUCE U. MORROW,

Judge, Third Circuit Court, Detroit, Michigan, on

May 9, 2011.

APPEARANCES:

              RAJ PRASAD P68519
              Assistant Prosecuting Attorney
              Wayne County Prosecutor's Office
              1441 St. Antoine
              Detroit, MI 48226
              (313) 224-6804

              W. FREDERICK MOORE P33341
              Attorney for the Defendant.
              11954 Wisconsin Street
              Detroit, MI 48204
              (313) 418-1253


SEAN E. ALLEN
Official Court Reporter
CSMR 5265
(313) 224-7044

-1-

TABLE OF CONTENTS

WITNESSES:   NONE.

EXHIBITS:   NONE.

1            Detroit, Michigan.

2            May 9, 2011.

3            (At 10:19 a.m.)

4            THE COURT:  On or off the record, it doesn't

5       matter.  Just about witnesses for our trial, please.

6            MR. PRASAD:  Yes, sir.

7            THE COURT:  I am looking at the information

8       from past Christmases.  And that information from past

9       Christmases has like eighteen, nineteen people on it?

10           MR. PRASAD:  Right.

11           THE COURT:  A couple waivers.  I see just

12      two waivers.  And I haven't compared it yet to the old

13      one.  But do you know if the witness list was prepared

14      identically or did you omit some folks that you didn't,

15      that you waived the last time out?

16           MR. PRASAD:  Judge, the witness list was

17      compared identically that were marked the last trial.

18      But the Court's correct, last time we actually tried the

19      case several of the witness in the process of the trial

20      we stipulated to their testimony.

21           THE COURT:  Well, yeah.  We stipped to some.

22      But we waived, flat out, Johnell White and Derrick

23      Thomas.

24           MR. PRASAD:  Correct.  We did.  I think

25      we're probably going to be doing the same.  I showed Mr.

1      Moore the stipulation in regards to Mr. Thomas'

2      testimony.  I think he's in agreement with it.

3                  THE COURT:  We're going to have this time

4      Mr. Love testify because there's no emergency?

5                  MR. PRASAD:  Correct.  He is present.

6                  THE COURT:  Okay.

7                  MR. PRASAD:  I mean, he is available.  And

8      yeah.  But Mr. White's testimony was purely on a line-

9      up, which we also stipulated to in terms of coming in.

10     So, the Court's correct.  Both Mr. White and Mr. Thomas

11     I don't believe we're going to need them again.  I think

12     we're going to be able to agree to their testimony.

13                 MR. MOORE:  I had an occasion to talk to the

14     prosecution.  And I believe we would stipulate to some

15     prior matters or testimony that was stipulated to--

16                 THE COURT:  (Interposing)  I was about to

17     say because Jeff Crump came in all the way from Grand

18     Rapids for a minute and a half of testimony.  And I

19     remember, I think we even broke because he wasn't here

20     one day and expecting him to come the next day.

21                 MR. PRASAD:  Jeff Crump is the one that I

22     would need, Judge.  The other -- There were two people

23     from the Michigan State Police.  Jame's England merely

24     found no prints and he was the one that I wouldn't need

25     so much.  Lieutenant Crump was the one who did all the

1    ballistics evidence in the case.  So, he is the one I am

2    still anticipating bringing.

3              THE COURT:  Yeah.  But didn't he testify for

4    a minute and a half?

5              MR. PRASAD:  I don't know the length.  I'm

6    sorry.

7              THE COURT:  A second and a half.  Let me see

8    who was the eighteenth.  Okay.  Doesn't matter.  Does

9    not matter.  Okay.  But we have all of them.

10             MR. MOORE:  And I'm sure during the course

11   of the case I'll get with the prosecution and we can

12   whittle down something, Judge.

13             THE COURT:  Yeah.  Well, we will make it all

14   work.  Are there any matters that we need to deal with

15   before I invite this jury in and we get the ball

16   rolling?

17             MR. PRASAD:  I spoke to Mr. Moore, Judge, in

18   terms of referencing the last trial.  Obviously, it's

19   the People's perspective that we don't want this jury to

20   know, obviously, there was another trial.

21             If we do need to cross-examine from the

22   previous transcript or anything like that, I would just

23   ask, and I think Mr. Moore is in agreement with that we

24   just ask that it be referred to as a prior court hearing

25   or anything like that.

-5-

 1              THE COURT:  Okay.

 2              MR. MOORE:  That'd be suitable.

 3              THE COURT:  The exhibits are going to be re-

 4     marked with new exhibit tags, right?

 5              MR. PRASAD:  They are, sir.

 6              THE COURT:  And you don't think some witness

 7     is going to say, well, at the other trial...

 8              MR. PRASAD:  I'm trying to warn everyone

 9     individually, but I'm hoping they don't.

10              THE COURT:  If they listen to you, always

11     keep your job.  Because they'll stop listening to you

12     and obeying you if you become something else.  But okay.

13     All of them are outside.  Let's welcome these young

14     people in.  Just for the record, this is the People of

15     the state of Michigan versus Deonte Howard.  This is

16     case number 10 5562.  Officially, if you'll put your

17     name on the record, please.

18              MR. PRASAD:  Good morning, your Honor.  Raj

19     Prasad for the People.  And we're ready to proceed.

20              MR. MOORE:  Good morning, your Honor.  May

21     it please this Honorable Court, W. Frederick Moore on

22     behalf of Mr. Howard, your Honor.

23              THE COURT:  Great.  And the information

24     charges him at this juncture with only one offense.  And

25     that is murder in the first degree.  Is that correct?

                            -6-

1          And so, that's what I will read from the information as
2     we prepare to pick this jury.
3                    MR. PRASAD:  Thank you, Judge.
4                    THE COURT:  Anybody have any special
5     concerns, considerations or can we just work?
6                    MR. PRASAD:  We can just go, sir.  I just
7     want to note, for the record, that Mr. Baywal will be
8     sitting with me through the trial.
9                    THE COURT:  He has a right.  He has a wrong.
10                    MR. PRASAD:  We have Sergeant Mackie here,
11     as well, in terms of sequestration.
12                    THE COURT:  It's already three against one,
13     Mr. Moore.
14                    MR. MOORE:  Just the nature of life, Judge,
15     just work with it.
16                    THE COURT:  You got more chairs.  That's
17     what I always say.
18                    (At 10:25 a.m. panel enters the courtroom.)
19                    THE COURT:  The back row is the lucky row.
20     A very good morning.  Let me apologize, first off, about
21     that horrible invitation that you all received.  I've
22     been trying to re-do the invitation, make it in
23     calligraphy, put it on a different color.  Because
24     sometimes presentation is everything.  And when it comes
25     in that form, doesn't that invitation for you to come

                              -7-

1      here look a little threatening?  Yeah.  It's like the

2      last piece of mail you want to open.  It's like that

3      Visa or that Master Charge and you are afraid to look at

4      what you owe because you know you had to put a pair of

5      tires on that sucker that you didn't expect to put and

6      the exhaust fell out the bottom of your car and the tail

7      pipe and that catalytic converter.  And you know they

8      wasn't telling the truth when they said they needed to

9      replace all of that.  But you were at their mercy.

10              So, I'm going to change that.  My name's

11      Bruce Morrow.  I thank you all for coming.  And I'm

12      going to give you something rather than, you know, not

13      give you something.  Please, take a little piece, pass

14      it down.  This is so you can never say you didn't get

15      anything.

16              I know some of you all might be a little

17      tentative in terms of thinking that this environment is

18      one where you can't eat candy.  How many of you think

19      that it's inappropriate to eat candy in a courtroom?  Go

20      ahead.  Just let me know.  Just put them up high.

21      Because usually if one person puts them up, the other

22      one is saying okay.  Keep them up for me just for a

23      second.

24              How many of you all that had your hands up

25      or where thinking about having your hands up also think

-8-

 1     eating candy is church is wrong?  Okay.  Now, how many

 2     people eat candy in church?  Everybody.  Haven't you all

 3     gone to churches where they give you a little peppermint

 4     or a little breathe mint so that you will stay awake

 5     during the sermon?

 6              I know my grandmother used to give us --

 7     This is how old I am.  Do you remember when Wrigley

 8     Spearmint and Doublemint actually was only with five

 9     sticks of gum and they were in some sort of aluminum

10     foil with some sort of sugary powder that kept it, well,

11     it was supposed to keep it fresh?

12              And there were like two thousand, billion

13     grandchildren.  And my grandmother could break it in

14     half and then break it in quarters and then break the

15     quarters in half and give everybody an eighth of a piece

16     of gum and just pass it down the rows when we were in

17     church.

18              And you were afraid to chew it because if

19     you chewed it, you knew you would swallow it.  And so,

20     we used to put a little piece of gum between our gum and

21     our lip just to get that little flavor.  But yeah.  You

22     can eat candy in churches to stay awake.

23              I do it to keep you awake, too.  You know

24     people fall asleep in courtrooms, don't you?  Jurors

25     fall asleep, some Judges fall asleep, some lawyers fall

1    asleep, some witnesses.  I mean, you know, you can only

2    liven your spirits up.  You can't get up when you want

3    to, like if you were at home or if you were at work.

4    And how many others fall asleep at home unintentionally?

5    And that's our own environment.  And you know how

6    important it is to be able to listen.  This is a

7    listening exercise.

8              And it is so unnatural.  When I go to

9    listen, I don't go sit in the jury chair.  So, we work

10   with what we have and then we try to supplement so

11   people will stay awake.  So, if you're lucky enough to

12   be picked as a juror, you're able to drink coffee, tea,

13   you know, pop, vitamin water, five-hour energy, anything

14   that you think will help you stay alert, anything but

15   alcohol.  You have to share the alcohol.

16             But other than that, we just try to make

17   sure to take enough breaks, do coffee.  I think we have

18   -- Anybody sleepy enough or not had a cup of coffee?

19   Because if we do have cups, there's at least sixteen

20   cups of coffee.  Go ahead.  You know what I said.  All

21   it takes is one.  You don't have one that was wishing

22   when you all were downstairs, man I wish I had another

23   cup of coffee?  Come on, now.  I read somebody's mind.

24   Thank you.  Anybody want to go to the bathroom, too,

25   before we start?  Because I have two of them back there,

-10-

1          too.  I have two fish and five loaves of bread.  I'm
2          looking for somebody that can pray and make it longer.
3                    We had, first of all, excellent weather.
4          I'm thinking just a week ago they were cranking up the
5          heat in my house, sneaking.  When I smelled that, I'm
6          like, oh, no.  It's May.  No.  No.  The furnace can't --
7          But, you know, people get crazy when they're cold.  So,
8          I had to make a choice.  Heat or eat?  So, we decided to
9          heat the house and everybody, you know, did their let's
10         fast for two days since you all wanted to turn on the
11         heat.  But no.  What a great weekend?
12                   Any of you all have special, special
13         children that did something amazing for Mother's Day
14         that you didn't expect?  Or was it more than usual?  You
15         know, the card and then run to the girlfriend's house or
16         the boyfriend's house.
17                   UNIDENTIFIED PROSPECTIVE JUROR:  My youngest
18         made me breakfast.
19                   THE COURT:  Excellent.  Was it something
20         that was very delicious?
21                   UNIDENTIFIED PROSPECTIVE JUROR:  It was.
22         Kind of.
23                   THE COURT:  Did they, you know, do something
24         regular or was it--
25                   UNIDENTIFIED PROSPECTIVE JUROR:

 1       (Interposing)  It was scrambled eggs and toast and

 2       coffee.

 3                 THE COURT:  How'd the coffee taste?

 4                 UNIDENTIFIED PROSPECTIVE JUROR:  Good.  They

 5       do know how to make a great cup of coffee.  I have a

 6       wonderful bouquet of roses.

 7                 THE COURT:  When my kids try to impress

 8       their mother, it's a Grande Americano at Starbucks.

 9       Because that's the drink.  It doesn't even matter what

10       she presses at home because we got the little press and

11       the coffee.  Nothing like Starbucks.  $2.39 when you

12       bring your personal cup, $2.49 if you don't.

13                 It's just amazing.  We have different coffee

14       tastes in our house because we have different pockets.

15       Her pockets are her pockets and my pockets.  My pockets

16       are just my pockets.  And I'm loving McDonald's because

17       a senior coffee at the McDonald's I go to is sixty-nine

18       cents.  And if you sit there and just wolf the first one

19       down, you get a free refill.  And they just have the

20       senior coffee.  Man, I'm glad they have senior drinks.

21                 They fooled me at IHOP, though.  When I

22       finally hit the senior limit there, I'm thinking all

23       right.  Man, they gave me a child's meal.  I'm like,

24       seniors eat.  I'm thinking, you know, I was going to get

25       the regular portions.  They reverted me back to a child.

                                -12-

1    And it instantly reminded me of what my uncle had said

2    once.  He said, in life, the circle of life makes you

3    twice a kid and once a grown up.  And I'm like, am I

4    that close to being a child again so I get child

5    portions?  Oh, no.  It was just not enough.  I had to

6    eat two children's portions.  Okay.  Mark, could you get

7    these young people to take an oath?  Let's start the

8    process.

9              THE CLERK:  I just need everybody to stand

10    and raise your right hand.

11              (At 10:39 a.m. panel sworn.)

12              THE CLERK:  Do you promise, swear or affirm

13    that you will truthfully answer all questions put

14    forward to you as to your qualifications to serve as

15    jurors in this case?

16              PROSPECTIVE JURORS:  Yes.

17              THE CLERK:  Okay.  You can be seated.

18              THE COURT:  Let me give you the good news,

19    first of all.  This trial will not take two weeks.  We

20    will do it within the time prescribed by that invitation

21    that we sent to you.  Most trials end in three to four

22    days.  And so, by Thursday, for sure, we will have this

23    thing finished.

24              And I know that everybody prepared

25    themselves for the worst-case scenario, like we always

-13-

1    do.  So, that's the way I am.  You go on vacation.  I

2    pack for the weather, for the worst weather and for the

3    best weather and hope that I get the best weather.  So,

4    I'm guessing since we're adults and the whole fairness

5    business to be warned in advance so that you can plan in

6    advance, I'm going to hope that's what you all did so

7    that that's not a, that becomes a non-issue.

8          Other than that, you all are about to embark

9    on an experience that I think is one of the most amazing

10   experiences in the world.  And that is to not have a

11   stake in something.  You know how sometimes we make

12   decisions based on how it's going to benefit us?  That's

13   the way I usually make assessments.  I look at the

14   situation, try to decide what's in it for me or what I'm

15   trying to get out of it.  And then I'll decide if I'm

16   going to participate and then how much I'm going to

17   participate.

18         Jury service is the only time you get to

19   make a decision without having a stake in it.  And so,

20   it's a lot easier to give, to listen and just be fair

21   and impartial.  Because most of the time, we bring a

22   bias into it.  There's something that we want out of it.

23   And so, this experience allows you to do what we all

24   like to do and what I think is the easiest thing in the

25   world to do, is just to use common sense and

-14-

1    reasonableness and reach your decision.

2              Most of us think that we use common sense

3    and reasonableness when we make all decisions.  And

4    yeah.  I'm sure we do, but I'm sure we use a little

5    something extra sometimes to try to get the results that

6    we want to get.

7              Have you all ever made a decision that was

8    an important decision based on your cut feeling?  Okay.

9    That feeling consistent with reasonableness and common

10   sense?  No.  Has nothing to do with it.

11             Any of you all ever made a decision based on

12   vibes?  Children of the '60s used to always make

13   decisions based on vibes.  And we would say it.  I'm not

14   getting good vibes.

15             My mother's generation used to make

16   decisions based on things she couldn't even put her

17   finger on.  And she would say that.  I just can't put my

18   finger on the reason.  You're scaring me.  You know, and

19   ultimately sometimes it would just be because I'm the

20   parent and I don't have to figure it out.  And I was

21   like, whoa.

22             But this is different.  This is decisions

23   based on common sense and reasonableness.  And if you

24   have common sense and reasonableness, you can

25   participate and you can fully participate.  It's not an

 1    age thing.  It's not an experience thing.  It's not an

 2    ethnic background thing.  It's not a height or weight

 3    thing.  It's a common sense and reasonableness thing.

 4    It's always easy.  It's easy to define, but it is hard

 5    in practice.  Let me know you how hard it is in

 6    practice, just with one, little example.  It's been

 7    years now, but this is the best example.  It happens all

 8    the time.

 9             But this guy wanted me to go and help him

10    pick out an SUV.  We went to Bob Saks at Ten and a half

11    and Farmington, and Grand River out in Farmington.  And

12    that lot is enormous.  So, you can imagine.  But the

13    limitation was to four SUVs.  We were limited to four.

14    And so, what I thought was just going to be a quick hour

15    was four and a half hours.  I either drove or rode in

16    the front seat or sat in the back seat.  And we went

17    over hill and over dale, we hit the dusty trail, we

18    drove and drove and drove.

19             And at the end of that four and a half

20    hours, this is how much information that I had.  I knew

21    the wheel size for those four cars, the pounds per

22    square inch in the tires.  I knew the storage cubic

23    square feet.  I knew zero to sixty.  I knew the tank

24    capacity and the trip capacity, the drive train

25    warranty, the head clearance, the leg space.  And the

                              -16-

1    only option in these jokers was whether you got the moon

2    roof or the luggage rack because everybody had CD

3    changers, tilt the seats, you know, all of that.

4              So, armed with all this information, we went

5    back to my house, called the credit union to get the

6    blue book value on the years before so we could see

7    which ones had retained their value the best.  I think

8    he called six different insurance companies to try to

9    get the rate for the car in the neighborhood that he

10   lived so that he could make that consideration.

11             And we sat down and went through the list

12   with the Bud Light.  After the six pack was gone, it was

13   time to announce a decision.  And so, I know that you

14   all weren't there, but what do you think was the

15   critical feature in this guy deciding on what car he

16   was, what SUV he was going to buy.  What do you think,

17   sir?

18             UNIDENTIFIED PROSPECTIVE JUROR:  Color.

19             THE COURT:  Color.  Sir, what do you think?

20             UNIDENTIFIED PROSPECTIVE JUROR:  Money.

21             THE COURT:  Oh.  The amount of money.  And

22   back then it was like a $2,000 difference and it was

23   over $40,000.  What do you think, sir?

24             UNIDENTIFIED PROSPECTIVE JUROR:  Probably

25   the spouse decided.

                            -17-

```
 1                    THE COURT:  Spouse decided.  Sir?
 2                    UNIDENTIFIED PROSPECTIVE JUROR:  Probably
 3       color.
 4                    THE COURT:  Color.  Young lady?
 5                    UNIDENTIFIED PROSPECTIVE JUROR:  The wife.
 6                    THE COURT:  The wife.  Sir?
 7                    UNIDENTIFIED PROSPECTIVE JUROR:  I'd say the
 8       wife.
 9                    THE COURT:  Wife.  No mileage?  No
10       insurance?  Young lady, what do you think?
11                    UNIDENTIFIED PROSPECTIVE JUROR:  How
12       comfortable the seats are.
13                    THE COURT:  Ah, there you go.  Comfortable.
14       What do you think, sir?
15                    UNIDENTIFIED PROSPECTIVE JUROR:  Spouse.
16                    THE COURT:  Spouse?
17                    UNIDENTIFIED PROSPECTIVE JUROR:  Sound
18       system.
19                    THE COURT:  Sound system.  What do you
20       think, ma'am?
21                    UNIDENTIFIED PROSPECTIVE JUROR:  Cupholders.
22                    THE COURT:  Cupholders.  How many
23       cupholders?  That's good.  What do you think?
24                    UNIDENTIFIED PROSPECTIVE JUROR:  Gas
25       consumption.
```

-18-

1                    THE COURT:  Gas consumption.  Okay.  One

2       last one.  What do you think, young lady?

3                    UNIDENTIFIED PROSPECTIVE JUROR:  The one

4       that you thought.

5                    THE COURT:  Put it back on me as he spent

6       this forty thousand dollars.  Okay.  The one he thought

7       he looked the best in.  Seriously.  Okay.

8                    So, you all chuckled.  I didn't chuckle.  I

9       didn't chuckle.  I had been four and a half hours with

10      my man out there, about two at the house.  Even the beer

11      didn't make it better, you know.  I was amazed, to say

12      the least.  I mean, just amazed.  I thought we had gone

13      through this critical process for a real reason.  I

14      didn't really know it was going to come down to this.

15                   And, you know, my face just said it.  I

16      mean, I was just like amazed.  And then you know how

17      when people do things that you don't expect they try to

18      explain it away or justify it?  Because it went like

19      this.  Bruce, I'm forty-three years old, man.  I've

20      never had a car that I really wanted.  Don't you think I

21      deserve to get -- I'm like, okay.  Yeah.  Everybody

22      deserves to get what they want.

23                   I work hard.  I don't mess around.  I don't

24      have any bad habits.  I work hard for my money.  Okay.

25      We all work hard for our money, you know.  He used to

-19-

1    trade the cars in every three, four, five years.  This

2    one, I'm going to keep 'til I wear it down to the

3    bumper.  Yeah.  Like that's possible.  But it was on and

4    on and on.  And I threw him out of my house mad.

5              This is where the light bulb in my mind went

6    off.  Two days later -- Because he left the stuff at my

7    house.  I was just going back through it.  And guess

8    what?  The one he chose had the best mileage.

9              Now, this is how bias works and how common

10   sense works and how you can make people think that

11   you're using common sense and reasonableness, but really

12   you're hiding a bias.  He expressed his bias, right?

13   This is why.  Had he been smart and didn't want to let

14   people, me, know he was biased, he could have tried to

15   find another reason that was consistent with

16   reasonableness and common sense and slipped it on me and

17   said, Bruce.  I'm buying this one because it has the

18   best mileage and actually hid is bias.

19             You know how some of us don't like somebody

20   and we just can't stand them.  And then we wait until

21   they do something and we use that for why we don't like

22   them?  See, I told you he couldn't be trusted.  See what

23   they -- And we're like, hold it.  It's your bias.

24   You're not using the fact that they're dishonest or

25   because -- You know, you don't like them because it's a

-20-

1          bias.  You can't make a bias right by finding something

2          after the fact that supports your bias.  Because that's

3          what most of us do anyway.  That's the way we groove.

4                    And so, this is an exercise to make a

5          decision strictly based on reasonableness and common

6          sense.  And it's difficult because most people don't

7          like to express bias in front of other people.  We want

8          to be thought of as intelligent and unmoved by bias and

9          capable of being reasonable and being fair.  Most of the

10         time, most of the time we're going to hide a bias or

11         make a decision and try to, you know, figure out how to

12         not show that bias.

13                    And that's what the challenge is.  The

14         process is easy, to be fair and impartial, to use common

15         sense and reasonableness.  It's all easy.  And we say we

16         can, but even when we spend $40,000 sometimes it has

17         nothing to do with reasonableness and common sense.

18         It's simply a bias.  And why?  Because we can.  We don't

19         feel that we're accountable to anybody but ourselves and

20         we don't have to explain it.  So much of what we do is

21         based on our desires.  So, this is a little different.

22                    The other thing that's so different about

23         it, it's pretty amazing, is the process.  How long did

24         you all stay outside in the hallway?  Just a short

25         period of time?  Usually, you know, if you all didn't

-21-

1          come up so early, I would at least have made you stay

2          out there half an hour.  And the only reason for that is

3          because the pronouns start to change.  Downstairs when

4          your name was called, you were like, man.  My name got

5          called.  I got called.  And it was the I or the my

6          pronoun.  If you were out there for a half an hour, you

7          all would have started speaking to each other in the

8          profile, I mean, pronoun we or us.  How long do you

9          think we are going to be out here?  You know, and you

10         would have started forming into this group that I need

11         you to be anyway.

12                    And you would have naturally done it because

13         you all would have been given a common experience that

14         everybody was receiving at the same time.  And that's

15         what bonds people.  You want to know why people are so

16         isolated?  Segregate them.  Segregate people and they'll

17         think that they have nothing in common.  Make them live

18         together, make them work together, put them in a social

19         organization and expose them to things at the same time

20         and all of a sudden the group dynamics change.  You all

21         are the jury.  Guess what?  Everybody came from a

22         different house, right?  Absolutely.  I know that.  You

23         know that.  But guess what?  Aren't you all the same

24         now?  So, welcome to the group.  I am your group leader.

25         I am.  I am.

-22-

 1                    Let me introduce you to some people.  The

 2         name of the case is the People of the state of Michigan

 3         Deonte Howard.  And representing the prosecutor today?

 4                    MR. PRASAD:  Good morning, your Honor.  May

 5         name is Raj Prasad with the Wayne County Prosecutor's

 6         Office.  Judge, should I introduce--

 7                    THE COURT:  (Interposing)  Yes.  Would you,

 8         please?  Everybody.

 9                    MR. PRASAD:  Thank you.  This is Tim Baywal.

10         He's also an assistant prosecutor with us at the office.

11         And this is Sergeant Samuel Mackie.  Sergeant Mackie's

12         with the -- Excuse me.  The Detroit Police Department,

13         the homicide unit.

14                    THE COURT:  Representing Mr. Howard is this

15         young man in front of me.  Why don't you introduce

16         yourself and your client, please?

17                    MR. MOORE:  Good morning, ladies and

18         gentlemen.

19                    PROSPECTIVE JURORS:  Good morning.

20                    MR. MOORE:  Good morning.

21                    PROSPECTIVE JURORS:  Good morning.

22                    MR. MOORE:  My name is Fred Moore.  During

23         the course of this case, I'll be representing Mr.

24         Howard.

25                    THE DEFENDANT:  How are you all doing?  My

-23-

 1      name is Deonte Howard.

 2                  PROSPECTIVE JURORS:  Good morning.

 3                  MR. MOORE:  Thank you.

 4                  THE COURT:  I need you to just listen to

 5      some names of witnesses that might testify.  Mr. Prasad,

 6      could you--

 7                  MR. PRASAD:  (Interposing)  Yes, sir.

 8                  THE COURT:  Roll out the names?  You don't

 9      have to memorize them.  It's not a test.  I'll just ask

10      you if any of them sounded familiar.

11                  MR. PRASAD:  Dr. Cheryl Loewe, or another

12      representative from the Wayne County Medical Examiner's

13      Office, Delfera Hunt, Aundrey Allen, Bobby Bailey,

14      Macario Andrew Harris, Kimberly Thompson, Frederick

15      McFadden.  Sergeant Mackie, who you met.  Officer Rodney

16      Cushingberry, Officer Brandon Petit, Officer Jeffrey

17      Banks, Officer James Wiencek, Officer Eugene Fitzhugh,

18      Officer LeTrelle McNairy, Investigator Barb Simon,

19      Sergeant Robert Lalone, Investigator Myron Love, Officer

20      Johnell White, Officer Derryck Thomas.  All those

21      officers I just mentioned are with the Detroit Police

22      Department.

23                  There's also a possibility of -- Excuse me.

24      Detective Lieutenant Jeff Crump, Detective Sergeant

25      James England.  Those are both Michigan State Police.

                                -24-

1          THE COURT:  And last, but not least, let me

2     introduce you to the men that I work with today.  That's

3     Mr. Sean Allen over there on the vocals, Mr. Mark

4     Ulatowski right there, the clerk of the court, would be

5     considered I'm his righthand man.  That's Mr. Davis

6     visiting with us today in place of Mr. Dupree, who

7     decided to extend Mother's Day for his wife one more

8     day.  And that's Frank Wood over there, you know, also I

9     could guess I'm considered his right man [sic] because

10    the two of them, they really run the courtroom.  Sean

11    and I just kind of come out when we're needed.

12          In every case, there is an information that

13    is filed.  And the information is as following [sic] in

14    this case.  The information is not evidence.  It's

15    simply a statement of what it is that the prosecutor is

16    charging Mr. Howard with and what they have to prove.

17          And so, in this case, it is the People of

18    the state of Michigan:  The prosecuting attorney appears

19    today and says back on the date of the 10th of April

20    2010, in front of 16228 Tireman that Mr. Howard did

21    deliberately, with the intent to kill and with

22    premeditation, kill and murder one Tyrone Simpson.  To

23    this charge, Mr. Howard has entered a plea of not

24    guilty.

25          The first legal concept is called the

-25-

1     presumption of innocence.  And it is as follows.

2     Everybody that is charged with a crime is presumed to be

3     not guilty.  That presumption begins at the beginning of

4     the trial and it continues throughout the trial and it

5     entitles Mr. Howard to a verdict of not guilty unless

6     you're satisfied beyond a reasonable doubt that he is

7     guilty.

8              Every crime has elements.  And the

9     prosecution has to prove each and every element beyond a

10    reasonable doubt.  If you find that they have not met

11    their burden, your duty is to return a verdict of not

12    guilty.

13             A reasonable doubt has been described as a

14    fair, honest doubt growing out of the evidence, the lack

15    of evidence or the inadequate nature of the evidence.

16    It's not merely an imaginary or a possible doubt, but a

17    doubt that's based on reason and common sense.  And,

18    therefore, reasonable doubt is a doubt that's reasonable

19    after you've considered all the evidence that is going

20    to be brought into this case.  So, that's it.

21             We're going to call fourteen names, have you

22    seated up there.  I'm going to ask you some questions

23    that I hope that are relevant and will touch one a

24    variety of subjects.

25                Those that are remaining out here are free

 1          to come and go as you want to as you make your way to

 2          and from the bathroom, which is right across the

 3          elevators.  Please know that we have cameras and hall

 4          monitors out there.  And so, if you're out there longer

 5          than what it takes, there's this little horn that goes

 6          off and people rushing in, will pull you out and tell

 7          you to get back in here to your seats.

 8                    If you're up there and you need to go, we

 9          put the door open to the Detroit Legal News.  And that's

10          where there's two bathrooms.  So, please feel free to

11          get up and go.  The goal is to make nobody

12          uncomfortable.

13                    Also, we're going to be taking a lunch break

14          at 12:00 today.  My thing is that if I'm going to feed

15          you, I would like the food to taste like food.

16          Sometimes if you wait until like 12:30, one o'clock,

17          some people will let them go and lunch becomes 'unch.

18          You know it's like after food has been on.  You don't

19          eat that broccoli in the steamer at the right time, it

20          becomes smush.  So, I don't want you all to have smush,

21          unless you like smush.  Because we'll be out of here by

22          12:00 to give you at least that opportunity from 12:00

23          until 1:00 to provide yourself with some nourishment to

24          go from like 1:00 to 4:15.  We'll be out of here by 4:15

25          today and back at nine o'clock tomorrow if we haven't

1   picked a jury.  Or for those that are here, you know,

2   we'll start usually at 9:00, any time before 9:00 and

3   end at 4:00, 4:15.  So, that's kind of the hours we

4   operate under.

5          And today is the only day for a long lunch

6   because other than that I try to keep it to about forty-

7   five minutes, a couple breaks in between, encourage

8   people to bring their own lunches or, you know, stay out

9   of the casinos.  The longer the lunch is, the more

10  inclined people are to go drop a dollar or two in the

11  casino.  True.  Okay.

12         So, Mr. U, if you'd be kind enough to call

13  some names, we'll sit them in some seats.  Oh.  I'm

14  sorry.  If, along the way, you have any questions, feel

15  free, just ask.  Okay?  Okay.  If you want some more

16  candy, you've got to be vocal about that, too.  That's

17  why we only gave you a little.  The ones that sit up

18  here, they'll get a free piece on the way to their

19  seats.

20         THE CLERK:  Okay.  When I call your name,

21  there's a set of stairs right over there by the clock if

22  you just want to go around.  Sally Oakley, could you

23  please take seat number one?

24         PROSPECTIVE JUROR OAKLEY:  On the top or the

25  bottom?

-28-

1              THE CLERK:  First row.  Maryanne Farkas,

2      could you please take seat number two?  Robert

3      Collinash, could you please take seat number three?

4      Andrea Traylor, could you please take seat number four?

5      Karen Bennett, could you please take seat number five?

6      William -- Is it Hollen or Hollen?

7              PROSPECTIVE JUROR HOLLEN:

8              THE CLERK:  Hollen.  Could you please take

9      seat number six?  James Rasberry, could you please take

10     seat number seven?  Christiana is it Cuyler?  Cuyler?

11             PROSPECTIVE JUROR CUYLER:  Cuyler.

12             THE CLERK:  Could you please take seat

13     number eight?  Robert Boyd, could you please take seat

14     number nine?  David Zyjewski?

15             PROSPECTIVE JUROR ZYJEWSKI:  Yes.

16             THE CLERK:  Could you please take seat

17     number ten?  Rachel Peeples, could you please take seat

18     number eleven?  Laura Neighbors, could you please take

19     seat number twelve?  Sylvia Spivey, could you please

20     take seat number thirteen?  David Walker, could you

21     please take seat number fourteen?

22             THE COURT:  I'm going to ask you all to

23     speak in large voices, large enough so that you think

24     the people in the back can hear you.  Okay?  You all, I

25     need you all to be engaged, be alert, kind of a

-29-

1    difficult thing because -- Oh.  I forgot to tell you.

2    The reason there's so many people here is because the

3    lawyers have what we call peremptory challenges where

4    they can thank and excuse a set number of jurors.  And

5    that number, if each side wants to use to their max, is

6    twelve.  So, that would be twenty-four people that would

7    be eliminated just because the lawyers decide to

8    exercise a preemptory challenge.  So, there's forty-two,

9    that makes twenty-four leave.  If I need at least

10   thirteen, that's thirty-seven.  So, we're scheduled just

11   to have five people never move from their seats.

12             Man, to be here all day and not move.  Isn't

13   that horrible?  So, we'll see what we can do.  We might

14   make you move anyway.  But that's why we have so many

15   people.

16             They're going to exercise some preemptories.

17   It always happens.  I've never been in a trial where the

18   first people that are seated, everybody's like oh, let's

19   do it.  Let's use those people.

20             So, some of the questions that they're going

21   to be asked, when you replace them, even the lawyers

22   will say, did you hear the questions that I asked the

23   other jurors?  What would you have responded?  So, you

24   need to stay engaged so we don't have to start the

25   process all over.

                              -30-

1              Because each person's going to introduce who

2       they are.  They're going to say what they do for a

3       living.  If they're married or have a significant other,

4       they're going to tell us what that person does for a

5       living.

6              They're going to tell us if you've served

7       jury duty before in the last ten years.  And, if you've

8       done it in the last ten years, what type of case?  It

9       was a case about guns.  It was an assault.  I don't need

10      details, just subject matter.

11             You'll let me know if any of the names that

12      were read sound familiar.  You'll let me know if you're

13      related to anybody that's involved in this lawsuit or if

14      you know any of us.  And other than that, then we go to

15      the next person.  Okay?  So, may be we start with you?

16             PROSPECTIVE JUROR OAKLEY:  You want me to

17      stand up?

18             THE COURT:  Anything that moves you.  If you

19      feel like standing up...

20             PROSPECTIVE JUROR OAKLEY:  My name is Sally

21      Oakley.  I actually just got married a month ago and--

22             THE COURT:  (Interposing)  So, is the new

23      name Oakley?

24             PROSPECTIVE JUROR OAKLEY:  Yes.

25             THE COURT:  Okay.  Well, congratulations.

                                -31-

```
 1                    PROSPECTIVE JUROR OAKLEY:  I'm still getting
 2        acclimated.
 3                    THE COURT:  That's great.  It's obvious you
 4        liked the person enough to marry them.
 5                    PROSPECTIVE JUROR OAKLEY:  He was a lifelong
 6        friend since I was eleven.
 7                    THE COURT:  Okay.  So, how did you reunite?
 8                    PROSPECTIVE JUROR OAKLEY:  We've been
 9        friends the entire time.  It sounds like a story line.
10        I know.
11                    THE COURT:  Okay.  At some point, though,
12        somebody threw a match onto something to get it burning.
13                    PROSPECTIVE JUROR OAKLEY:  Correct.
14                    THE COURT:  How long ago did the match get
15        thrown on the relationship?
16                    PROSPECTIVE JUROR OAKLEY:  Two and a half
17        years ago.
18                    THE COURT:  Okay.  What threw the -- Who
19        threw the match?
20                    PROSPECTIVE JUROR OAKLEY:  He did.  Yes.
21                    THE COURT:  What did he do to throw that
22        match?
23                    PROSPECTIVE JUROR OAKLEY:  Well, I agreed to
24        finally go on a date.
25                    THE COURT:  Oh.  Okay.
```

-32-

```
 1                    PROSPECTIVE JUROR OAKLEY:  And something
 2        good happened from there.
 3                    THE COURT:  Well, congratulations.
 4                    PROSPECTIVE JUROR OAKLEY:  Thank you.  I'm a
 5        project coordinator for Henry Ford Health System for ten
 6        years.  My husband is an electrician.
 7                    THE COURT:  Have you ever served jury duty
 8        before, Ms. Oakley, in the last ten years?
 9                    PROSPECTIVE JUROR OAKLEY:  No.
10                    THE COURT:  Okay.  Any of the names of the
11        people sound familiar to you?
12                    PROSPECTIVE JUROR OAKLEY:  No.
13                    THE COURT:  Okay.  Next, please.
14                    PROSPECTIVE JUROR FARKAS:  I'm Maryanne
15        Farkas.  I have been married to my husband for twenty-
16        three years.  I have two children.  I stay at home to
17        watch the kids.
18                    THE COURT:  How old are these children that
19        you're watching at home?
20                    PROSPECTIVE JUROR FARKAS:  They're nine.
21                    THE COURT:  Okay.  They go to school?
22                    PROSPECTIVE JUROR FARKAS:  Yes.
23                    THE COURT:  Okay.  So, when they're not
24        there, what do you watch?
25                    PROSPECTIVE JUROR FARKAS:  I volunteer.
```

-33-

1                    THE COURT:  Bless your heart.  Okay.

2                    PROSPECTIVE JUROR FARKAS:  At the school.

3        So, it keeps me busy.

4                    THE COURT:  What did you do before you had

5        children?  Did you work outside of the home?

6                    PROSPECTIVE JUROR FARKAS:  I worked at

7        Chrysler as an engineer.  That's where I met my husband.

8        So, he's an engineer at Chrysler.

9                    THE COURT:  Were you his superior?

10                   PROSPECTIVE JUROR FARKAS:  No.

11                   THE COURT:  Aren't you now his superior?

12                   PROSPECTIVE JUROR FARKAS:  I don't think so.

13                   THE COURT:  Usually, they give the title

14       wife to the superior being.

15                   PROSPECTIVE JUROR FARKAS:  So, I did serve

16       on, I was on, within ten years, my first one was here at

17       the Frank Murphy--

18                   THE COURT:  (Interposing)  Okay.  What type

19       of trial was that, Ms. Farkas?

20                   PROSPECTIVE JUROR FARKAS:  Some kind of bar

21       fight, that I recall.  But I was removed from the jury.

22                   THE COURT:  Okay.  When I meant serve on a

23       jury -- Thank you for that.  I mean you actually

24       deliberated and the jury that you deliberated with

25       reached a verdict.  So, let me just re-define some

-34-

1      stuff.  Okay.  Any of the names, Ms. Farkas, of any of

2      the witnesses sound familiar?  You acquainted with

3      anybody in the courtroom?

4                   PROSPECTIVE JUROR FARKAS:  No.

5                   THE COURT:  Okay.  Sir, please.

6                   PROSPECTIVE JUROR COLLINASH:  My name is Bob

7      Collinash.  I am a retired Detroit Police Officer.  I am

8      currently a Livonia Police Officer.  As a Livonia -- Or

9      as a Detroit Police Officer, I was an evidence

10     technician.  So, I have been down to Frank Murphy here

11     numerous times.

12                   THE COURT:  How long have we known each

13     other?

14                   PROSPECTIVE JUROR COLLINASH:  A number of

15     years, your Honor.

16                   THE COURT:  Exceeding thirty, huh?  Golly.

17     Are we that old, Mr. Collinash?

18                   PROSPECTIVE JUROR COLLINASH:  Unfortunately,

19     yes.

20                   THE COURT:  Or fortunately, yes.

21                   PROSPECTIVE JUROR COLLINASH:  Or

22     fortunately.

23                   THE COURT:  Yeah.  To have made it this far.

24                   PROSPECTIVE JUROR COLLINASH:  There are a

25     few officers that may testify in this trial that I am

1    aware of.  One of them being I think the evidence

2    technician, Eugene Fitzhugh.

3             THE COURT:  Did you train any of them or

4    have them work under you?

5             PROSPECTIVE JUROR COLLINASH:  Yes.  And I

6    believe I've been with the defense attorney a couple of

7    times.  He may not know me, but I know him.

8             THE COURT:  I knew you as soon as you popped

9    your head in that door.  I'm like, that's old Collinash.

10   Okay.  Let me ask you the real question.  Because

11   sometimes we deal with the real and then we deal with

12   this spooky area out here that's called the appearance

13   of impropriety.

14            That would be like if yesterday was Mother's

15   Day and you ate lunch with a single woman.  What would

16   it look like?  It would not look good, unless they knew

17   that it was actually your sister.  And then all of a

18   sudden, that would -- But in terms of appearance,

19   sometimes if one person has worked with one side or

20   another side or has had an antagonistic relationship,

21   and some people think that a defense attorney, if it's a

22   police officer case, that they are antagonistic towards

23   each other.

24            Some people would say that they don't

25   believe that Mr. Collinash could be fair and impartial.

                            -36-

1    Other people would say, oh, yeah, he could be.  But the
2    appearance of impropriety is great, you know, since he
3    was employed by a particular agency that's represented
4    by one side.  That about sums it up, would you say, Mr.
5    Collinash?

6              PROSPECTIVE JUROR COLLINASH:  I would agree,
7    your Honor.

8              THE COURT:  Okay.  So, in terms of your
9    integrity, this isn't a question of your integrity
10   because I believe your integrity remains strong.  But
11   the appearance of impropriety screams.

12             PROSPECTIVE JUROR COLLINASH:  That may be.

13             THE COURT:  I'm just saying.  What do you
14   think, Mr. Prosecutor, about the appearance of
15   impropriety?

16             MR. PRASAD:  Judge, there's no doubt we're
17   going to have Detroit Police Officers testify.  I'm not,
18   so I'm not objecting to anything.

19             THE COURT:  No.  I'm just saying, the
20   appearance.  Because we're concerned--

21             MR. PRASAD:  (Interposing)  Oh, yeah.

22             THE COURT:  With appearance, too, the little
23   past realities.  So, Mr. Collinash, we're just going to
24   thank you and, you know, tell you happy retirement.  And
25   we'll see you when Livonia has a case down here.

```
 1                    PROSPECTIVE JUROR COLLINASH:  Thank you,
 2        your Honor.
 3                    THE COURT:  But we'll go next to Ms.
 4        Traylor.  Please, introduce yourself to us.
 5                    PROSPECTIVE JUROR TRAYLOR:  My name is
 6        Andrea Traylor and I'm an administrative assistance at
 7        an appraisal auction company.  And I'm not married.
 8                    THE COURT:  Are you in a significant
 9        relationship?  Because see, you know, people aren't
10        married, but they have significant others even if --
11        Sometimes a significant other is the child that's fifty
12        living in their house.  Sometimes it's, you know, your
13        twenty year older.  Sometimes it's the person you're not
14        married to.  Sometimes it's your brother or your sister.
15        So, any significant others that live with you?
16                    PROSPECTIVE JUROR TRAYLOR:  Yes.
17                    THE COURT:  Okay.  What do they do for a
18        living, if they're employment age?
19                    PROSPECTIVE JUROR TRAYLOR:  She works at
20        Kroger.
21                    THE COURT:  Okay.  Ever sat as a juror
22        before?
23                    PROSPECTIVE JUROR TRAYLOR:  No.
24                    THE COURT:  Any of the names of the
25        witnesses here, Ms. Traylor, sound familiar to you?
```

-38-

 1                    PROSPECTIVE JUROR TRAYLOR:  No.

 2                    THE COURT:  Okay.  Let's go up top.  Please,

 3      young lady in the middle?

 4                    PROSPECTIVE JUROR BENNETT:  My name is Karen

 5      Bennett.  I work for Compuware.  I am divorced.  And I

 6      have two children.

 7                    THE COURT:  Okay.  Have you ever served as a

 8      juror before?

 9                    PROSPECTIVE JUROR BENNETT:  No.

10                    THE COURT:  What are the ages of those

11      children?

12                    PROSPECTIVE JUROR BENNETT:  Twenty and

13      sixteen.

14                    THE COURT:  Both of them still live at home?

15                    PROSPECTIVE JUROR BENNETT:  Yes.

16                    THE COURT:  Okay.

17                    PROSPECTIVE JUROR BENNETT:  Daughter's in

18      college and son is going to high school.

19                    THE COURT:  So, you like the one that's away

20      better than the one that's at home?

21                    PROSPECTIVE JUROR BENNETT:  Actually, she's

22      living at home--

23                    THE COURT:  (Interposing)  Okay.

24                    PROSPECTIVE JUROR BENNETT:  And attending

25      OCC.

                              -39-

```
 1                    THE COURT:  So, which one is your favorite?
 2                    PROSPECTIVE JUROR BENNETT:  I love them both
 3      equally.
 4                    THE COURT:  Okay.  Did you have brothers and
 5      sisters, Ms. Bennett?
 6                    PROSPECTIVE JUROR BENNETT:  I do.  Yes.
 7                    THE COURT:  How many?
 8                    PROSPECTIVE JUROR BENNETT:  I have four
 9      others.
10                    THE COURT:  Okay.  When you all get
11      together, you all don't talk about who was mama's
12      favorite and who was daddy's favorite?
13                    PROSPECTIVE JUROR BENNETT:  We do.
14                    THE COURT:  Okay.  So--
15                    PROSPECTIVE JUROR BENNETT:  (Interposing)  I
16      am always the favorite.
17                    THE COURT:  Okay.  So, when your daughter
18      and -- Is the sixteen year older a son?
19                    PROSPECTIVE JUROR BENNETT:  Yes.
20                    THE COURT:  When your daughter and son get
21      together, who do they think is the favorite?
22                    PROSPECTIVE JUROR BENNETT:  You know,
23      actually, I don't think that's ever come up.
24                    THE COURT:  Oh.  Oh.
25                    PROSPECTIVE JUROR BENNETT:  I don't.  My
```

1      presence--

2                    THE COURT:  (Interposing)  Oh.  No.  It

3      would be a conversation -- Yeah.  But your conversation

4      with your siblings don't involve your parents.  You

5      always just get around and say, oh, mama always liked

6      you better.  If I did the same thing, I'd been hit

7      upside the head.  She just looked at you and thought it

8      was so cute, just giggled when you did it.  So, who do

9      they think is your favorite?

10                    PROSPECTIVE JUROR BENNETT:  You know what?

11     I honestly don't think they think one way or another.  I

12     just hear a lot of, you know, mom gave you ten bucks, so

13     I get ten bucks, that sort of thing.

14                    THE COURT:  So, which one are you easiest

15     one?

16                    PROSPECTIVE JUROR BENNETT:  Neither one of

17     them.  I'm hard on both of them, for different reasons.

18                    THE COURT:  Of course.

19                    PROSPECTIVE JUROR BENNETT:  In different

20     parts of their life.

21                    THE COURT:  Yeah.  I mean, they're

22     different.

23                    PROSPECTIVE JUROR BENNETT:  Yeah.

24                    THE COURT:  Their worlds are different,

25     sixteen and twenty, they're different realities.  Okay.

                                -41-

1       Sir, please identify yourself and tell us what you do

2       for a living?

3                    PROSPECTIVE JUROR HOLLEN:  My name's William

4       Hollen.  I'm retired from Ford Motor Company.

5                    THE COURT:  What did you do at Ford, sir?

6                    PROSPECTIVE JUROR HOLLEN:  Security,

7       executive protection for the Ford family.

8                    THE COURT:  Okay.  That was interesting.

9                    PROSPECTIVE JUROR HOLLEN:  Very fun.

10                   THE COURT:  How many years did you do that

11      for?

12                   PROSPECTIVE JUROR HOLLEN:  Thirty-three.

13                   THE COURT:  Oh, the entire time.  Did you

14      drive, too?

15                   PROSPECTIVE JUROR HOLLEN:  No.  We had

16      drivers.

17                   THE COURT:  Okay.

18                   PROSPECTIVE JUROR HOLLEN:  I'm in, I have a

19      relationship with a, my significant other.  I have a

20      five year old son.

21                   THE COURT:  Okay.  What do they do for a

22      living?

23                   PROSPECTIVE JUROR HOLLEN:  My son's going to

24      daycare for a living right now.

25                   THE COURT:  Man, what a life?  Imagine.

                              -42-

1                    PROSPECTIVE JUROR HOLLEN:  My fiancee' is an

2           engineer at Ford Motor Company.

3                    THE COURT:  Do you know that they can still

4           have a bad day at daycare?

5                    PROSPECTIVE JUROR HOLLEN:  Absolutely.

6                    THE COURT:  I'm like, put me in daycare.

7           See if I would ever have a bad day at daycare.  Even if

8           the juice box was warm and leaked, that would still be a

9           good day.

10                    PROSPECTIVE JUROR HOLLEN:  Yeah.  But

11          daycare nowadays is like preschool.

12                    THE COURT:  Well, yeah.  It's age-geared,

13          I'm sure.  Next, please.

14                    PROSPECTIVE JUROR RASBERRY:  My name is

15          James Rasberry.  I work for Precision Motor Transport

16          Group as a truck driver, over the road.  Currently, I am

17          engaged.  I have three kids, three daughters.  I haven't

18          served any jury...

19                    THE COURT:  Okay.  Know any of the names of

20          the witnesses?

21                    PROSPECTIVE JUROR RASBERRY:  No.  None of

22          them sounded familiar.

23                    THE COURT:  Okay.  Tell me about the last

24          name.  Seriously.

25                    PROSPECTIVE JUROR RASBERRY:  You know, I get

-43-

1      this all my life, so I'm kind of used to it.

2                  THE COURT:  That's why I gave it to you.

3                  PROSPECTIVE JUROR RASBERRY:  But what I tell

4      people who don't really know me is that it's French and

5      that it happened to evolve when my father served

6      overseas.  So, he picked the name up.  And it works.

7                  THE COURT:  Okay.  But what's the real

8      story?

9                  PROSPECTIVE JUROR RASBERRY:  I don't know.

10     But it's no P in the name, so it's kind of unique.

11                 THE COURT:  Rasberry.

12                 PROSPECTIVE JUROR RASBERRY:  But no P in the

13     name, just R-A-S.

14                 THE COURT:  Okay.  But your grandfather had

15     the name, as far as you understand?

16                 PROSPECTIVE JUROR RASBERRY:  Yes.

17                 THE COURT:  Okay.  And how about his dad?

18                 PROSPECTIVE JUROR RASBERRY:  As far as I

19     understand, he had it also.  I know it's, it was derived

20     out in Greenville, Mississippi, that area around there.

21     So, I don't know too much farther than past my

22     grandfather.

23                 THE COURT:  Yeah.  Well, in my father's

24     line, his mother's maiden name was Rakestraw.  And, you

25     know, I knew my greatgrandfather, who was a Rakestraw.

                                -44-

1        But that name derived from their job assignment when

2        they were slaves.  And when they were emancipated, they

3        just took the name of their job assignment.  Rakestraw.

4                    PROSPECTIVE JUROR RASBERRY:  It might have

5        had something to do with a bush.

6                    THE COURT:  When he was running to freedom,

7        he got tripped up at the raspberry bush.

8                    PROSPECTIVE JUROR RASBERRY:  And forgot how

9        to spell it.

10                   THE COURT:  Right.  And ran so fast when he

11       slid into the free country, he got him a little

12       raspberry or strawberry on the side of him.

13                   PROSPECTIVE JUROR RASBERRY:  I'll have to go

14       with that, your Honor.

15                   THE COURT:  Almost like asking somebody when

16       you see them with a hurt arm, how'd you hurt your arm?

17       And, you know, they give you a little regular story.

18       And you're like, no, no.  But a twist in there.

19                   PROSPECTIVE JUROR RASBERRY:  I understand.

20                   THE COURT:  Young lady, please introduce

21       yourself.

22                   PROSPECTIVE JUROR CUYLER:  My name is

23       Christiana Cuyler.  I do private duty for home health

24       care.  I'm single.  I have a son about to graduate.

25                   THE COURT:  From?

-45-

```
1                    PROSPECTIVE JUROR CUYLER:  Fitzgerald.
2       And--
3                    THE COURT:  (Interposing)  So, when's the
4       party?
5                    PROSPECTIVE JUROR CUYLER:  Well, his prom is
6       Thursday.
7                    THE COURT:  Okay.
8                    PROSPECTIVE JUROR CUYLER:  No.  Friday.  I'm
9       sorry.  Friday.
10                   THE COURT:  How long has he known his date?
11                   PROSPECTIVE JUROR CUYLER:  Four years.
12                   THE COURT:  You like her?
13                   PROSPECTIVE JUROR CUYLER:  She's pretty
14      good.  She's on the basketball team.  She has three
15      scholarships waiting on her.
16                   THE COURT:  Okay.  So, what school is she
17      going to be attending?
18                   PROSPECTIVE JUROR CUYLER:  I'm not for sure.
19                   THE COURT:  How about him?
20                   PROSPECTIVE JUROR CUYLER:  He wants to go to
21      Wayne State.
22                   THE COURT:  And what do you say about that?
23                   PROSPECTIVE JUROR CUYLER:  It's his choice.
24      It's his choice right now.
25                   THE COURT:  Well, I mean, Wayne State kind
```

-46-

 1      of means he's going to live at home, right?

 2                  PROSPECTIVE JUROR CUYLER:  I don't mind, as

 3      long he's working, going to school.  I don't mind.

 4                  THE COURT:  Okay.

 5                  PROSPECTIVE JUROR CUYLER:  And I know

 6      Detective Derrick Thomas.

 7                  THE COURT:  Okay.  How well?

 8                  PROSPECTIVE JUROR CUYLER:  We used to date

 9      years ago.

10                  THE COURT:  So, when's the last time you've

11      seen him?

12                  PROSPECTIVE JUROR CUYLER:  About three

13      years, about three years ago.

14                  THE COURT:  So, there was no...

15                  PROSPECTIVE JUROR CUYLER:  We talked.  We

16      went out.

17                  THE COURT:  Oh.  Okay.  So, you all went out

18      socially?

19                  PROSPECTIVE JUROR CUYLER:  Yes.

20                  THE COURT:  Okay.  Gotcha.  Let's go up top.

21      Mr. Boyd, please introduce yourself to us.

22                  PROSPECTIVE JUROR BOYD:  My name is Rob

23      Boyd.  I'm married.  I have two children, twenty and

24      eighteen.  I work for an automotive supplier.  I've

25      never served on a jury.

                              -47-

1                    THE COURT:  Okay.  Wife work outside of the
2         home?
3                    PROSPECTIVE JUROR BOYD:  She does.  She
4         prepares taxes.
5                    THE COURT:  Okay.
6                    PROSPECTIVE JUROR BOYD:  I did not recognize
7         any of the names.
8                    THE COURT:  Next, please.
9                    PROSPECTIVE JUROR ZYJEWSKI:  My name is Dave
10        Zyjewski.  I'm a widower.  I'm retired from National
11        Steele Corporation.  And I don't recognize any of the
12        names.
13                   THE COURT:  What are your hobbies, Mr.
14        Zyjewski?
15                   PROSPECTIVE JUROR ZYJEWSKI:  Golf.
16                   THE COURT:  How long have you been playing
17        at the game?
18                   PROSPECTIVE JUROR ZYJEWSKI:  Thirty years.
19                   THE COURT:  What is your favorite course in
20        Southeastern Michigan?
21                   PROSPECTIVE JUROR ZYJEWSKI:  Don't really
22        play much in Southeastern Michigan.  I live up North.
23                   THE COURT:  And you just come down to Wayne
24        County to do jury duty and then you go back up North?
25                   PROSPECTIVE JUROR ZYJEWSKI:  I'll be on the

1    road as soon as I can be on the road.

2              THE COURT:  Okay.  I'm going to ask you a

3    really, really hard question, Mr. Zyjewski.  Where is

4    the boundary where up North starts?

5              PROSPECTIVE JUROR ZYJEWSKI:  Everybody has

6    their own idea.

7              THE COURT:  Yeah.  But I want yours.

8              PROSPECTIVE JUROR ZYJEWSKI:  My idea?  As

9    soon as I get on the road, then I start heading North.

10             THE COURT:  Okay.  So, that's up North?

11             PROSPECTIVE JUROR ZYJEWSKI:  That's, that's

12   -- Normally around Standish--

13             THE COURT:  (Interposing)  Okay.

14             PROSPECTIVE JUROR ZYJEWSKI:  I would say.

15   As soon as I start moving North, I don't even think

16   about this area anymore.

17             THE COURT:  Okay.  Why is it that up North

18   is thought to be kind of up the 75 corridor as opposed

19   to up the 94 corridor?

20             PROSPECTIVE JUROR ZYJEWSKI:  94 runs East

21   and West.

22             THE COURT:  It goes all the way -- Port

23   Huron is North.  And you take 94 to go North.

24             PROSPECTIVE JUROR ZYJEWSKI:  Road

25   designation are odd, odd designations run North and

-49-

1    South and even designations run East and West.

2                    THE COURT:  Right.  But people that like go

3    and have places like in the thumb consider themselves

4    going up North and they got to go 94, then to 25.  But

5    they--

6                    PROSPECTIVE JUROR ZYJEWSKI:  (Interposing)

7    25 is more northerly than--

8                    THE COURT:  (Interposing)  Sure it is.

9                    PROSPECTIVE JUROR ZYJEWSKI:  Than 94 is.

10                    THE COURT:  Yeah.  So, some people say as

11   soon as I hit New Baltimore.

12                    PROSPECTIVE JUROR ZYJEWSKI:  Yeah.

13                    THE COURT:  That's North.  Or some people

14   even say Metro Parkway, you know.  Hit Metro, anything

15   North of there is North, if they're using 94.  And I

16   guess the other people consider, what?  Grand Rapids

17   probably before you jump on like 127 or 131 to go North?

18                    PROSPECTIVE JUROR ZYJEWSKI:  Yeah.

19                    THE COURT:  Yeah.  You have to go East or

20   West a ways before you finally go North.

21                    PROSPECTIVE JUROR ZYJEWSKI:  Yeah.  North

22   for me is -- When I was a kid we had a place in Indian

23   River.

24                    THE COURT:  Okay.  Man, is it spring up

25   there yet?

                                -50-

```
 1                    PROSPECTIVE JUROR ZYJEWSKI:  We had five
 2        inches of snow a couple of weeks ago, but it was gone in
 3        two days.  I was in Florida in the winter.  So, I don't,
 4        didn't really have any winter.
 5                    THE COURT:  And I used to like you until you
 6        continued.  I'm going to call, see if we can give you a
 7        trial for about five more weeks, since you're down here.
 8        Young lady, please introduce yourself.
 9                    PROSPECTIVE JUROR PEEPLES:  My name is
10        Rachel Peeples.  I'm a student at College for Creative
11        Studies.  I work part time at a pharmacy.  I did not
12        recognize any of those names.  I have not served jury
13        duty before.
14                    THE COURT:  Okay.  And you have -- You're
15        not married or have a significant other?
16                    PROSPECTIVE JUROR PEEPLES:  No.
17                    THE COURT:  You don't have your eye on some
18        little budding artist of a CCS?
19                    PROSPECTIVE JUROR PEEPLES:  Well, I do have
20        a boyfriend.
21                    THE COURT:  He's not significant.  So, what
22        do you want to be?  What are you--
23                    PROSPECTIVE JUROR PEEPLES:  (Interposing)
24        Graphic designer.
25                    THE COURT:  Hmm?
```

-51-

1                    PROSPECTIVE JUROR PEEPLES:  Graphic design.
2                    THE COURT:  Are you any good?
3                    PROSPECTIVE JUROR PEEPLES:  I'd like to
4          think so.
5                    THE COURT:  Well, I'm asking you your
6          opinion, not somebody else's.  So, are you good?
7                    PROSPECTIVE JUROR PEEPLES:  Yes.  Very good.
8                    THE COURT:  What made you go to CCS?
9                    PROSPECTIVE JUROR PEEPLES:  Better school
10         for what I was going into.
11                   THE COURT:  You getting your money's worth?
12                   PROSPECTIVE JUROR PEEPLES:  Yes.
13                   THE COURT:  Okay.  Always go through CCS
14         noel night down in December, meander through the first
15         top three floors, listen to the carolers, always try to
16         pick up something unique, support one of you students,
17         usually have a good time.  You go down on Noel Night?
18                   PROSPECTIVE JUROR PEEPLES:  I went a couple
19         years ago, but I didn't last year.
20                   THE COURT:  Something about that kettle
21         corn, too, that they sell on Woodward that just, oh,
22         man.  Okay.  I'm hungry right now for kettle corn.
23         Sorry, you all.  Next, please.
24                   PROSPECTIVE JUROR NEIGHBORS:  My name is
25         Laura Neighbors.  I'm an engineering technician.  I've

                                -52-

1       been married for thirteen years.  He's an engineer for

2       Chrysler, two kids, thirteen and eight.  None of the

3       names sounded familiar and I've never served on a jury

4       before.

5                    THE COURT:  What was your maiden name before

6       it was Neighbors?

7                    PROSPECTIVE JUROR NEIGHBORS:  Kiskey (sp.).

8       Well, before Neighbors, it was Liberty.

9                    THE COURT:  Neighbors.

10                   PROSPECTIVE JUROR NEIGHBORS:  Neighbors.

11                   THE COURT:  What a friendly last name?

12                   PROSPECTIVE JUROR NEIGHBORS:  It is.

13                   THE COURT:  Reminds me of Gomer Pile,

14      however.

15                   PROSPECTIVE JUROR NEIGHBORS:  He's not

16      related.

17                   THE COURT:  No.  No.  No.  I didn't, I

18      wasn't going to ask that.  I was just saying that when I

19      heard Neighbors, I instantly thought golly, you know,

20      and Jim Neighbors just popped into my head.  I became

21      Gomer Pile for a second and then I worked my way out of

22      it until you brought me back to it again.

23                   PROSPECTIVE JUROR NEIGHBORS:  Not related.

24                   THE COURT:  Have you ever heard him sing?

25                   PROSPECTIVE JUROR NEIGHBORS:  Who?

 1                    THE COURT:  Jim Neighbors.

 2                    PROSPECTIVE JUROR NEIGHBORS:  No.

 3                    THE COURT:  Actually, he has a really,

 4        really good voice.

 5                    PROSPECTIVE JUROR NEIGHBORS:  He was kind of

 6        before my time.

 7                    THE COURT:  A lot is before a lot of

 8        people's time, no matter how long you've been here.  A

 9        lot has gone on before us.  I never bought any of his

10        stuff, but I heard it.

11                    PROSPECTIVE JUROR NEIGHBORS:  I haven't.

12                    THE COURT:  You know, like I've heard some

13        of Churchill's speeches.  They're before my time, but --

14        Okay.

15                    PROSPECTIVE JUROR NEIGHBORS:  I feel bad

16        now.

17                    THE COURT:  No.  No.  Don't.  Because before

18        you leave here, we'll find something on U Tube and we'll

19        have you sit and listen to Jim Neighbors singing

20        something before you get out of here.  I'll find

21        something on U Tube so that you can say I heard Jim

22        Neighbors.  I don't think he can sing.  But, next,

23        please.

24                    PROSPECTIVE JUROR SPIVEY:  Hi.  My name is

25        Sylvia Spivey.  I'm engaged to my significant other.

                              -54-

1    He's, he's unemployed right now.  I have two kids,

2    twenty-two and ten.

3              THE COURT:  Have you ever served as a juror,

4    Ms. Spivey?

5              PROSPECTIVE JUROR SPIVEY:  No.

6              THE COURT:  Any of the names of these people

7    sound familiar?

8              PROSPECTIVE JUROR SPIVEY:  No.

9              THE COURT:  Do you have a date for when

10   you're going to get married, Ms. Spivey?

11             PROSPECTIVE JUROR SPIVEY:  No.

12             THE COURT:  Did he do the Beyonce', at

13   least?

14             PROSPECTIVE JUROR SPIVEY:  No.

15             THE COURT:  Do you know what I mean when I

16   say the Beyonce'?

17             PROSPECTIVE JUROR SPIVEY:  Yes.

18             THE COURT:  What do I mean?

19             PROSPECTIVE JUROR SPIVEY:  When she bounce.

20             THE COURT:  No.  Anybody know what I'm

21   talking about when I say -- Thank you.  Put a ring on

22   it.  So, you got a little ring?

23             PROSPECTIVE JUROR SPIVEY:  Yeah.  I got a

24   ring.

25             THE COURT:  You just don't wear it?  You mad

-55-

1    at him?

2              PROSPECTIVE JUROR SPIVEY:  No.

3              THE COURT:  Okay.  How was Mother's Day?

4              PROSPECTIVE JUROR SPIVEY:  I was working.  I

5    just got off work this morning at seven o'clock.  I had

6    to leave an hour early.  I worked forty-eight hours,

7    Saturday morning until Monday morning.

8              THE COURT:  You have a cell phone, right?

9              PROSPECTIVE JUROR SPIVEY:  Yes.

10             THE COURT:  I know they were blowing up the

11   cell phone, Happy Mother's Day, we miss you, Happy

12   Mother's Day, we miss you.

13             PROSPECTIVE JUROR SPIVEY:  Yeah.  Yes.

14             THE COURT:  If not, you can give me their

15   names and I'll get, I'll tighten them up for you.  Last,

16   but not least, sir.

17             PROSPECTIVE JUROR WALKER:  My name is David

18   Walker.  And I've been married for a little over thirty-

19   four years.  Three kids, five grandkids.  I have served

20   on jury duty before, but I can't remember when.  And I

21   don't recognize none of the names.

22             THE COURT:  When is your wife's birthday,

23   Mr. Spivey?

24             PROSPECTIVE JUROR WALKER:  Mr. Walker.

25             THE COURT:  I'm sorry, Mr. Walker.  I'm

-56-

1      sorry.  I'm up here looking at Ms. Spivey.  I'm sorry.

2                  PROSPECTIVE JUROR WALKER:  September the

3      23rd.

4                  THE COURT:  How about your anniversary, Mr.

5      Walker?

6                  PROSPECTIVE JUROR WALKER:  April the 17th,

7      '77.

8                  THE COURT:  How many kids you say you have?

9                  PROSPECTIVE JUROR WALKER:  Three.

10                 THE COURT:  Who's the oldest?

11                 PROSPECTIVE JUROR WALKER:  Nathaniel.

12                 THE COURT:  When is Nathaniel's birthday?

13                 PROSPECTIVE JUROR WALKER:  His is April the

14     16th.

15                 THE COURT:  And how about the middle one?

16                 PROSPECTIVE JUROR WALKER:  June the 3rd.

17     And the last one is September the 17th.

18                 THE COURT:  So, how was Mother's Day in your

19     house?

20                 PROSPECTIVE JUROR WALKER:  It was good.  I

21     barbecued.

22                 THE COURT:  Oh, man.  You let them off the

23     hook?

24                 PROSPECTIVE JUROR WALKER:  I had to.  I

25     don't have a choice.

```
 1                    THE COURT:  Oh, man.  So, did she get a
 2       couple presents or just some good food and a couple
 3       cards?
 4                    PROSPECTIVE JUROR WALKER:  She got some
 5       cards, presents, good food, family came over.  It was
 6       nice.
 7                    THE COURT:  Right.  All on your dime.
 8                    MR. MOORE:  Yeah.
 9                    THE COURT:  Bless their hearts.  They don't
10       miss a meal when it's on your dime.  So, how is Father's
11       Day?  Is it anything like Mother's Day?
12                    PROSPECTIVE JUROR WALKER:  No.  I still have
13       to barbecue.  And it's still on my dime.
14                    THE COURT:  Man.  There was -- I'm going to
15       start this off with once upon a time.  Because it
16       really, Mr. Walker, it is once upon a time, you know.
17       The question was asked, what is the heaviest -- I mean,
18       what occasion do they send out the most greeting cards?
19       This is before E-mail, obviously, and all of that.  This
20       is a long time ago.  And the answer to that was Mother's
21       Day.
22                    And I'm thinking, only one, you know -- Some
23       people will send out like six Mother's Day cards to some
24       aunts or grandmothers.  But I always thought it would be
25       Christmas cards because everybody has a real Christmas
```

-58-

```
 1    list.  But it was Mother's Day, of all things, Mr.
 2    Walker and Mr. Rasberry.
 3              And then, even before then, when we only had
 4    telephones, there was a question, what day are there the
 5    most -- What is it when you reverse the phone?  Collect
 6    calls made.  You know what that holiday was?  Father's
 7    Day.  Can you imagine that?  Because when there was just
 8    phones, collect calls, more collect call Father's Day.
 9    I'm like, man oh man.  It's just amazing how life gets
10    really strange.
11              Mr. Walker, speaking of strange, what thing
12    do you think -- What cosmetic do you think is the number
13    one selling cosmetic for men?  What do you think?
14              PROSPECTIVE JUROR SPIVEY:  You talking to
15    me?
16              THE COURT:  Yes, Ms. Spivey.  Not Mr.
17    Walker, but Ms. Spivey.
18              PROSPECTIVE JUROR SPIVEY:  I'd say dye for
19    their hair.
20              THE COURT:  Dye for their hair.  What do
21    you think, Ms. Traylor?
22              PROSPECTIVE JUROR TRAYLOR:  Cosmetic?
23              THE COURT:  Cosmetic.  What number one
24    cosmetic would you name?  I mean, and this is what
25    cosmetic is to me, soap, toothpaste, cologne, fingernail
```

1      polish, lotion--

2                  PROSPECTIVE JUROR TRAYLOR:  (Interposing)  I

3      was going to say cologne.

4                  THE COURT:  Stuff like that.

5                  PROSPECTIVE JUROR TRAYLOR:  Cologne.

6                  THE COURT:  How about you, Mr. Rasberry?

7      What do you think?

8                  PROSPECTIVE JUROR RASBERRY:  I would hope it

9      would be deodorant.

10                 THE COURT:  Or soap, something like that.

11                 PROSPECTIVE JUROR RASBERRY:  Soap or

12     something like that.

13                 THE COURT:  Something like that.  Mr. Boyd,

14     what do you think?

15                 PROSPECTIVE JUROR BOYD:  I agree.  I would

16     hope it would be deodorant, too.  But I think it would

17     probably be hair color.

18                 THE COURT:  Ms. Oakley?

19                 PROSPECTIVE JUROR OAKLEY:  Shaving cream.

20                 THE COURT:  Shaving cream.  Well, you know,

21     the first person that answered was right.  It was hair

22     dye, hair dye.  Do you think, Ms. Farkas, that there's

23     a, that there's a concern that people have about how

24     they look?

25                 PROSPECTIVE JUROR FARKAS:  Oh, absolutely.

-60-

1                    THE COURT:  Do you think it's deeper than

2        who they really are?

3                    PROSPECTIVE JUROR FARKAS:  I would hope not.

4                    THE COURT:  Well, they'll say that more

5        people spend products like to beautify themselves and to

6        change how they look than like books.  And I'm thinking,

7        well, if people are really into who they are instead of

8        how they look -- Because we don't judge people based on

9        how they look anymore, do we, Ms. Farkas?  Not since

10       we've become enlightened.

11                   PROSPECTIVE JUROR FARKAS:  Right.

12                   THE COURT:  You think that's true?  I was

13       just being cynical.

14                   PROSPECTIVE JUROR FARKAS:  I hope people

15       don't judge people by their looks.

16                   THE COURT:  You don't think they do?

17                   PROSPECTIVE JUROR FARKAS:  I think that some

18       people do.  Yeah.

19                   THE COURT:  Do you know that I saw this

20       statistic the year 2000 that compared the number of

21       mommy makeovers.  Last night, what did I watch?  Some

22       news, maybe channel four news.  They called them mommy

23       makeovers.  And it was like the tummy tucks and the

24       breast augmentations.  And they compared the number from

25       2000 to 2010.  And it just, it just skyrocketed.

 1                  I'm thinking, okay.  There's enough about,
 2       you know, people not paying attention to how they look
 3       and people wanting to be judged based on the book, on
 4       the cover instead of on the contents.  You don't think
 5       there's a fascination now with trying to put a whole lot
 6       of money into appearance and perhaps because they think
 7       that they're being judged by their appearance?
 8                  PROSPECTIVE JUROR FARKAS:  I think they want
 9       to do it make themselves feel better, or they're not
10       happy with themselves.
11                  THE COURT:  Well, you know, that might be
12       true if it didn't accompany form-fitting clothes and a
13       lot of let me show you what I've been able to do.
14       They're not walking around in tents.
15                  PROSPECTIVE JUROR FARKAS:  No.
16                  THE COURT:  So, when you tell me they did it
17       to make themselves feel better, I'm like, well, why are
18       they intent on showing the rest of the world?  I think
19       that that's a rationale that they tell themselves that
20       really has nothing to do with the truth.
21                  PROSPECTIVE JUROR FARKAS:  It's possible.
22                  THE COURT:  I'm trying to figure out how
23       that works.  It's like the person that buys the new car.
24       The new car makes you feel better.  Well, maybe for a
25       year, if you're lucky.  But then, you know, are you

                                  -62-

 1       worried about the outside of the car or the inside?

 2       What are you riding in?  You're riding on the inside.

 3       Other people see the outside, right?  Ms. Bennett.

 4                    PROSPECTIVE JUROR BENNETT:  Yes.

 5                    THE COURT:  How long did it take you to pick

 6       out those glasses frames?

 7                    PROSPECTIVE JUROR BENNETT:  Probably a good

 8       forty-five minutes.

 9                    THE COURT:  Forty-five?  Ms. Peeples, how

10       about yourself?

11                    PROSPECTIVE JUROR PEEPLES:  Oh, I bought

12       these a while ago, but I tried on numerous pair before I

13       picked these.

14                    THE COURT:  What was your main concern?

15                    PROSPECTIVE JUROR PEEPLES:  How they look.

16                    THE COURT:  How they look.  You just

17       indulged in vanity, didn't you?  Have you seen my

18       glasses?

19                    PROSPECTIVE JUROR PEEPLES:  No.  I -- Yeah.

20       I did.  I like them.

21                    THE COURT:  Yeah.  They're Dollar Store

22       glasses.

23                    PROSPECTIVE JUROR PEEPLES:  I like them.

24                    THE COURT:  You know that?  Dollar Store

25       glasses.  So, if I tell you that these cost a dollar, do

                              -63-

1       you think I care about how they look or what I can do in

2       them?

3                       PROSPECTIVE JUROR PEEPLES:  No.

4                       THE COURT:  You want to see my other pair?

5                       PROSPECTIVE JUROR PEEPLES:  Yeah.

6                       THE COURT:  1.50.  I'll line them up.  I'll

7       just get them.  Because I just put them everywhere.

8       Because the reality is we get them for the vision,

9       right?  The lenses?  Right?  Not for the frame.  But

10      because we're vain, we pay a lot of attention to the

11      frame.  We even take people with us.  They look sweet

12      with this bald head, Mr. Rasberry.  It looks like, you

13      know, I got the look.

14                      But the point of the matter is that we spend

15      hours and hours.  And if you take somebody with you, Ms.

16      Oakley, you ask that person a kazillion times, do you

17      like this one better than this?  Do you like this one?

18      And the poor retail clerks behind, if you don't bring

19      anybody with them [sic], oh, Mr. Walker, you know they

20      get the blues.  They up there, well, that one looks

21      good, that one looks good.  Ms. Spivey, it's crazy.

22      Because people are concerned about appearance.

23                      And that  gets to the past reasonable and

24      common sense.  What do people spend on frames now?  A

25      couple thousand dollars.

1                    PROSPECTIVE JUROR PEEPLES:  It depends which

2          ones you get.

3                    THE COURT:  Right.

4                    PROSPECTIVE JUROR PEEPLES:  But yeah.

5          They're expensive.

6                    THE COURT:  Right.  I was thinking of

7          getting the wife some sunglasses.  I happen to go into

8          one of these places, I saw some sunglasses for two

9          hundred dollars.  I asked her, did they sing, dance and

10         could they do dishes?  They were some Prada or

11         something.  I was like two hundred dollars?  I was just

12         amazed that, you know, we can get so far away from

13         reasonableness and common sense if we want to.

14                   Reasonableness and common sense from the

15         witness stand is really interesting.  Because you all

16         have to make decisions about whether people are telling

17         you the truth or not.  That's one of your jobs.  Some

18         people think how a person looks can influence their

19         credibility.  You believe that?  Ms. Traylor, isn't it

20         easier to believe a man in a suit than a man wearing

21         some diapers?  Yes.  Just say flat out, with that

22         example.  If I saw somebody wearing some diapers, Judge,

23         I just would not believe anything that came out of their

24         mouth because that's just too weird.

25                   Appearances influence a lot.  Some people

 1        make decisions about whether they believe somebody just
 2        strictly based on appearance, how they look.
 3                    PROSPECTIVE JUROR NEIGHBORS:  They do do
 4        that.
 5                    THE COURT:  Sure, they do.  When you met
 6        somebody and they told you what they did for a living,
 7        what occupation made you say, wow, they must be smart?
 8        Any occupation, you met anybody and when they told you
 9        what they did for a living you were like impressed and
10        said, oh, wow?
11                    PROSPECTIVE JUROR NEIGHBORS:  Teachers.
12                    THE COURT:  Teachers.  Okay.  My boys were
13        always impressed, you know.  When I was just stupid,
14        they was impressed.  They would be like, Bruce is
15        stupid, man.  And then when I graduated, you know, Bruce
16        go to college.  Oh, man.  When I became a lawyer, this
17        is my boy, Bruce.  He's a lawyer, you know.  Because
18        that impressed people.  And then, oh, once I became a
19        Judge, this is my boy, Bruce.  He a Judge, man.  You
20        know, all of this.
21                    And if your kids are doctors, don't people
22        say, they a doctor.  People think even lawyers are
23        smart.  You all think lawyers are smart?  Okay.
24        Question:  If half of the class is in the top, where is
25        the rest of the class.

                              -66-

```
 1              PROSPECTIVE JUROR NEIGHBORS:  Bottom.
 2              THE COURT:  In the bottom.  In law school,
 3    you can get out with a sixty-nine, just like in every
 4    other occupation, I'm pretty sure.  You can graduate
 5    from college with -- As long as you got a 1.9, you can
 6    get out of there, right?  No matter where and what
 7    occupation, somebody always is at the bottom of the
 8    class.
 9              But we don't, you know, we hope that at
10    least our doctor is a smart doctor.  How many doctors
11    have we just disagreed with and got a second opinion
12    and, based on the same presentation of facts, we got a
13    completely different diagnosis?  And it's amazing
14    because you're like, whoa.  Same presentation, same
15    facts, you jokers are supposed to go to the same school,
16    learn the same stuff.  How can I get such extreme
17    opinions?  And what they'll tell you is, it's an
18    opinion.
19              And opinions, to me, can go from no truth to
20    being the truth.  It has nothing to do with the opinion.
21    It just happens to be -- It's almost like a clock, you
22    know.  We can stare at the clock and that clock could
23    just freeze right there, pull out the electricity.  And
24    that broken clock is going to be right how many times of
25    the day?
```

1           PROSPECTIVE JUROR HOLLEN:  Twice.

2           THE COURT:  Twice.  And we'll think because

3    it's right that it's not broken, but it's still broken.

4    It just is right by chance.  So, the assessment of how

5    we, how we make decisions about who to believe, it's

6    based on appearance.  Sometimes it's even based on

7    occupation because we think that there are certain

8    occupations that are smarter than other occupations.

9           Oh, when people tout out their credentials.

10   Oh.  I went to Harvard.  Oh, well, my child is going to

11   go to Wayne.  Now, which kid graduates from -- Which kid

12   do we think is the smartest, the one from Harvard or the

13   one from Wayne State?  Obviously, it's Harvard, right?

14          But how about if the Wayne State kid could

15   have gone to Harvard, it's just that he didn't have

16   fifty thousand dollars worth of tuition and had a full-

17   paid scholarship to Wayne?  That has nothing to do with

18   the kid's ability.  It's got everything to do with what

19   became more practical.

20          But our assumption would be that the Harvard

21   guy or girl is smarter than the Wayne State girl or guy

22   because kind of make these assumptions so that they will

23   fit whatever our perception might be.  And we have lots

24   of perceptions about how people should talk, how people

25   should dress, where people should go to school and we

                          -68-

1        filter and we measure all of that stuff against some

2        profile that we have to help us decide credibility.

3        There's always a profile that we have in place.

4                We'll avoid people on the street because

5        what we see meets a profile that says that's dangerous.

6        You ever look and see somebody and, women, clutch your

7        bag a little more or, you know, hit something to make

8        sure that -- Or even cross the street?  Or just pause

9        and stop and let it walk by you?  And you don't know

10       that person from Jake the Snake.  But they meet a

11       profile.  And you've made some decisions about folk that

12       meet that profile and how you're going to act.

13               And it doesn't matter.  Period.  You see

14       that profile, you act that way.  Period.  And sometimes

15       the slogan that we use, Ms. Oakley, is it's better to be

16       safe than sorry.  And that way we can just categorize

17       everybody, right?

18               PROSPECTIVE JUROR OAKLEY:  Right.

19               THE COURT:  Because we're only protecting

20       ourselves.  And we just default to that.  Oh.  I'm just

21       protecting myself.  I didn't know.  You can't blame

22       somebody for trying to be safe.  Well, yeah.  You can't

23       run from that person all the time, but if you're right

24       just once it usually will reinforce whatever your basic

25       bias was.  See, I told you.  I told you I should have.

1             Notice how sometimes being right once and

2     you just reinforce it.  And if you're wrong, you just

3     wait and see.  You just wait and see.  You'll see.

4             That kind of reminds me of trying to believe

5     that the Lions are going to have a winning season.  No.

6     Seriously.  There are people, and you know them, every

7     year, this is going to be their year.  This is going to

8     be -- And you're like -- And it's not that the talent

9     isn't there.  This is going to be the year.  I bet you.

10    I guarantee you, the first year they going to come back

11    and tell you, see I told you.  And you're like, nobody

12    is on any of those teams when you're first saying that.

13            But if you say something long enough, it's

14    going to happen.  And they think that they're right, but

15    it's just one of those occurrences like when the clock

16    is right.  And it just becomes a little more difficult

17    to imagine.

18            Mr. Hollen, I think that people who speak

19    the English language better, people tend to respect them

20    and, therefore, give them greater credibility if they

21    can speak the language well.  What do you think about

22    that?

23            PROSPECTIVE JUROR HOLLEN:  I agree.

24            THE COURT:  And so even the ability to

25    enunciate affects people's believability.  Or you get up

-70-

1    there and say, you know, well, it was like, you know,

2    too many of those, at the third you know, most people's

3    ears turn off.  We're not listening to even find out

4    what you know.

5            And it's no fault of the person that's

6    saying anything.  And it's like no fault of ours, for

7    real.  But these factors control how we perceive

8    information.

9            Ms. Neighbors, if I only knew the word stick

10   and tree trunk -- Okay.  Period.  Those are my two

11   words.  And I was testifying because somebody hit me and

12   I said junior, and junior's only about 5'8", picked up a

13   tree trunk and ran down the street whopping me with the

14   tree trunk, what would happen to be credibility?

15           PROSPECTIVE JUROR NEIGHBORS:  It would

16   confuse me.  That's for sure.

17           THE COURT:  Yeah.  But if you had to use the

18   words that I used and not interpret them any other way,

19   junior have any credibility?

20           PROSPECTIVE JUROR NEIGHBORS:  Not really.

21           THE COURT:  Okay.  But what if they knew

22   kindling and tinder and twigs and stick and limbs and

23   tree trunk and they said he picked up a stick and chased

24   me down the street with a stick and was whopping me in

25   the head, all of a sudden the choice of words and just

1    vocabulary makes what he says more possible.  And we can

2    say, oh, okay.  I can see that.  He picked up a stick.

3    So, vocabulary sometimes has a whole lot to do with a

4    person's credibility.

5           My favorite one, when I'm really, really

6    thinking about things, Ms. Oakley, is sometimes how when

7    people say that they haven't done something and then

8    they'll say, I told you I didn't do it.  So, now the

9    emphatic voice conveys significant meaning as opposed

10   to, no, I didn't do that.  Then, oh, they're not,

11   they're not really, you know, emphasizing.  And we'll

12   read into -- You with me, Ms. Spivey?

13           PROSPECTIVE JUROR SPIVEY:  Yes.

14           THE COURT:  Yeah.  Because if I did that,

15   you'd believe me a little more than if I said, no, I

16   didn't do it.  How about if I started crying?  Come on

17   now.  Tears have an effect.  Tell me they don't.

18           PROSPECTIVE JUROR SPIVEY:  Yeah.  Depending

19   on the circumstances.

20           THE COURT:  How about gender with tears?  If

21   a woman's crying on the witness stand, what are we going

22   to think, Mr. Boyd?  Anything unusual about a woman

23   crying on the witness stand?

24           PROSPECTIVE JUROR BOYD:  It's more

25   believable.

-72-

1            THE COURT:  More -- How about a man that
2       cries on the witness [sic]?  Even more believable?
3       Yeah.  We like it.  No?  You're like, you know that man
4       don't want to cry in front of these people.
5            You know, it's almost like when we, when our
6       kids, if normally we see a girl fall and she starts
7       crying and we see a boy fall and the boy starts crying,
8       which one do we think got really hurt the most?  The
9       boy, just gender assignment.  Boys don't like to cry.
10      Or it takes more for a boy to cry than it does a girl.
11           I mean, we make all these kind of -- Make
12      the world make sense.  All of our biases.  They just
13      flood right on up there.  And we think that we're
14      thinking things through.  I mean, how much more do we do
15      in terms of just being reasonable and using common
16      sense?  I don't think we apply it as much as we pretend,
17      Ms. Taylor [sic].  What do you think?  Traylor?
18           PROSPECTIVE JUROR TRAYLOR:  Yes.
19           THE COURT:  Taylor, Traylor.  Traylor.
20      Yeah.  They rhyme took quickly on me.  So, how do we
21      combat this?  What do we do?  What do we do to make the
22      approach, no matter if their female or male, tall or
23      short, nuclear physicist or a postal employee, work for
24      CVS or Costco, retired or still actively employed?  How
25      do we at least make those differences not affect who's

                                    -73-

1      credible and who's not credible?  I mean, because--

2                PROSPECTIVE JUROR HOLLEN:  (Interposing)

3      Get to know them.

4                THE COURT:  TV -- Oh.  You can't get to know

5      them.  They're not going to get up there and tell you

6      their background.  And if they do, you're going to ask

7      them, okay, tell me all your bad habits.  Man, it's just

8      like meeting a woman or a man for the first time you're

9      trying to impress.  You're going to put your best foot

10     forward.

11               Do you think they tell people come into the

12     courtroom musty?  It's like, come into the courtroom

13     like it's a job interview, dress to impress, as opposed

14     to dress to sweat.  Look at people and say yes, sir.

15     No, ma'am.  Yes, ma'am.  Take the gum out of your mouth.

16     Turn and face the jury when you talk to them.

17               Because, of course, I can't tell you that my

18     real name is Bruce Lee instead of Bruce Morrow if I'm

19     looking you dead in the eye because people can tell when

20     you look in the eye whether you're telling them the

21     truth or not, right?  Hold it.  Don't people use that?

22     Come on.  Yeah.  We used to use that.  Well, if you're

23     looking me dead in the eye, you can't tell me you're

24     really Bruce Morrow and I'm Denzel Washington or I'm

25     Bruce Springstein or Bruce Lee or whoever I am because

-74-

1    you're looking me dead in the eye and I can tell when

2    you're lying just by -- My mother could tell because

3    Jesus would talk to her through my eyes.

4              She had me afraid to lie for the longest

5    time.  I'm thinking, Jesus is going to work through my

6    eyes.  I'm going to be in trouble.  I'd better just tell

7    the truth on myself.  My brother, older, man, don't go

8    for that.  She can't tell.  She can't tell.  The same

9    guy that told me there was no Christmas, right?  No real

10   Santa Claus.  I was hating him.  I wasn't going to

11   believe anything that he said after that.  He just took

12   my joy.  Anybody's older brother or sister destroy

13   Christmas for them by taking?  Yeah.  Man.

14             So, what do we use for credibility?  How do

15   we decide if people are telling the truth, and we can't

16   get to know them?  Are we swayed by how they look?

17   Their ability to match nouns and verbs?  You see if

18   their knee is wiggling while he or she is testifying?

19             Or if like we do when we have to remember

20   things, we look up to the ceiling to find that answer

21   come down.  Or like I was trying to mess with my friend,

22   Mr. Walker, to get him confuse a couple things and make

23   him think that he really doesn't know his wife's

24   birthday or his kids names.

25             And, you know, if you got more than one kid,

1      you done called one by the other one's name a million

2      times.  Or been called one of your brother's or sister's

3      names a million times.   And they'll say, you know who

4      I'm talking to.

5                 Anybody up here have senior moments?  Oh.

6      Have a senior moment on the witness stand.  Right?  That

7      will affect your credibility.  Man because, you know,

8      you're supposed to know.  The truth is like supposed to

9      just like pop out.

10                We went to this house, we were in Atlanta

11     somewhere a couple years ago, this was the longest

12     staircase I had ever seen.  And it didn't have a

13     landing.  Right?  And I just kind of leaned over to my

14     wife by the time we got to the top and I said, baby, if

15     this was our house, I would never forget anything by the

16     time I got up to the top of the steps.  Because if I

17     forgot in the middle, I would remember by the time I got

18     back up to the top.

19                I don't come downstairs anymore empty-

20     handed.  I will stay up there until I remember so I

21     don't have to go back upstairs.  Or I'll wait until

22     somebody gives me a, you still looking for...   Ah.

23     That's what I was looking for.  Yeah.  I'm still looking

24     for it.  I got it now.

25                Boy.  But I could imagine having a senior

1    moment or a brain freeze up there.  Presentation

2    sometimes affects everything.  It is difficult to make a

3    decision just based on reasonableness and common sense.

4              Or consistency of story sometimes, the

5    detail one uses in trying to describe something

6    sometimes will assist.  You'll hear me say things that

7    I'm obligated to tell you in terms of witness

8    credibility.  You know, half a dozen in one and six in

9    one hand, half a dozen.

10             They will be things like, you know, how does

11   the person's age and maturity affect how you judge his

12   or her credibility?  What I think makes a bigger

13   difference is, you know, when the person is describing

14   something, how far away were they?  What were the

15   conditions?  Were there any distractions going on?

16   Because, you know, sometimes if there's noise and you're

17   trying to listen through the noise, you know, like when

18   we're watching TV and the kids is talking or somebody

19   else, you're like, whoa.  Nowadays, you just back that

20   joker up and you can hear it all over again.

21             So, you know, many things.  I hear better in

22   the morning than in the evening.  People, if they had a

23   little alcohol and they're tired, that affects what they

24   remember or affects what they say.

25             So, those kind of things that have some

1      direct relationship, I would suggest, you know, should

2      be used in determining people's credibility and whether

3      they remember seeing what they claim they saw.

4      Sometimes, you know, we never know how good people's

5      memories are.  Because all of us have kind of selective

6      memories.

7              Man, I've been some places where a friend

8      was a the same thing and we were trying to remember

9      something and we remembered completely different stuff.

10     I was like, she was there?  He was like, yeah, man.

11     Remember?  You danced with her.  I'm like, are you sure?

12     And he's like, man, yeah.  You danced with her.  Because

13     my wife was elbowing me talking about look at her.  I'm

14     like, for real?  You know, and I'm thinking, I was

15     there?

16             But it just reminded me of the story of the

17     two people that took the train to Chicago.  And one was

18     facing this way and the other one was facing that way.

19     And they got to the same place and they saw completely

20     different stuff based on where they were seated.

21             So, isn't it nice to know that you all were

22     hand-picked to undergo this task.  But it's 12:00.

23     Let's break for lunch.  Be back at 1:00.  And Mr. Prasad

24     will have a chance to ask you some questions.  Oh.  I'm

25     sorry.  Come back any time because the doors stay open.

1        If you want to grab what you want to grab and come back.

2        There's coffee.  You can sit in the jury room.  If you

3        just want to stick and stay.  There's more candy if you

4        want more candy.  But please be back in here by one

5        o'clock.

6                        (At 12:02 p.m. panel leaves the courtroom.)

7                        (AT 12:02 p.m. court in recess.)

8                        (At 1:02 p.m. panel enters the courtroom.)

9                        THE COURT:  It's strange.   There's a bunch

10       of wild protocol in this world.  The thing that used to

11       amaze me when I was a lawyer is that people would stand

12       up when the Judge came in.  I'd be like, what's that

13       about?  I'm like, the Judge gets paid.  He's our

14       servant, right?  So, I decided that, you know, that puts

15       one category of people over another category of people.

16       And I don't preach that one person deserves one way to

17       be treated and somebody else deserves -- That's why I

18       don't do that all rise.   You all believe in treating me

19       special?  I mean, I appreciate it because in many places

20       the deputies are, all rise.  I used to think that was

21       the weirdest thing in the world.

22                        For so long we just wanted to be treated

23       fair.  And it's like, you know -- Because there was

24       nothing special about being a Judge.  You know the thing

25       that was, that does, makes it special is not intellect.

1       It's who's, who can win an election.  You know, there's

2       no test.  The lawyers would always joke what do you call

3       a lawyer with the IQ of 1?  You know, the answer, of

4       course, was a Judge.  Right?  Because they think that

5       all of us are, have no smarts.

6              And no, no real, real qualification to be a

7       Judge.  All you have to do is practice for five years --

8       No.  Be licensed to practice for five years.  Kind of

9       spooky in that regard.

10             But it's almost like being President.  Being

11      President has two qualifications, age and citizenship.

12      Right?  That's it.  Me and Donald Trump, he thinks that

13      Harvard doesn't equip you to be President because

14      anybody can be President.  And, in theory, that's true.

15      You live to be thirty-five and a U.S. citizen, that

16      qualifies you to be President.  Good luck if that's all

17      you have going for you, right?  Good luck.  You need a

18      little more than that.

19             You may ask them anything in the world that

20      you want to that has some relevance to jury service.

21             MR. PRASAD:  Thank you, sir.  Good

22      afternoon, everyone.  Hope you all had a good lunch.

23      I'm going to start off, and I think the Judge mentioned

24      this to everyone that's out here.  I'm not ignoring you

25      on purpose, but if you find yourself up here, I promise

-80-

1    you I'll be asking the exact same question.  Good

2    afternoon, everyone.

3              So, as the Judge was trying to get at, and I

4    know he's explained this pretty well, we're looking for

5    a group of jurors that will be a fair and impartial

6    jury.  What do we mean by that?  What's a fair and

7    impartial jury?  We're looking for a group of people --

8    And we're not asking you to be robots.  But we're

9    looking for a group of people who will come in and

10   listen to the evidence fairly, with an open mind, and

11   then apply the law that Judge Morrow gives you to apply

12   and come with a fair verdict, a fair, just verdict.

13             Now, Judge Morrow did an excellent job

14   trying to describe to you we all come in here with our

15   own biases and prejudices.  We all come in with our own

16   life experience.

17             Our object right now in this part of the

18   process, in the jury selection process, both for myself

19   and for Mr. Moore is to look and talk to you guys.  And

20   this is the only time we actually get to talk with you,

21   with a dialogue.  But talk with you and try to ask you

22   to ask yourself, are you the right juror for this case?

23             And what I mean by that is, do you have some

24   biases and prejudices that would maybe make you not fair

25   to one side or the other side?  And let me, let's be

                                -81-

1          clear.  We want both sides to have a fair trial in this.

2                    So, that, that's what we're getting at.  So,

3          as we're thinking about these questions, as you think

4          about the topics that Judge Morrow brought up, as you're

5          thinking about the questions I might have or as you

6          think about the questions Mr. Moore has for you,

7          understand that underlying all of that is that very

8          question at the core.  Are you the right juror for this

9          case?  Can you be fair and impartial?

10                   And it's like what Judge Morrow was telling

11         us earlier this morning, is that, you know, it's easy

12         for us to come up with a logical reason why we have an

13         answer to something.  But the harder part is to ask

14         ourselves the real question, which is, yeah.  There's

15         this reason I can give you.  But am I truly biased?  Am

16         I truly hiding a bias?

17                   And to be honest with you, only you know

18         yourselves the best.  I can't give you that answer for

19         you.  No one really can.  So, as I ask you these

20         different questions, as I bring up different topics,

21         keep that all in mind.  And, please, like I said, you

22         know, as Judge Morrow said earlier, volunteer.  If

23         you've got something you think that's going to help us

24         make that decision as I'm asking questions and you think

25         that it's important for us to know, please raise your

1    hand and let us know.

2              So, I'm going to jump right into it.  The

3    first one is the obvious one.  We are here on a homicide

4    charge.  You all heard that.  You all heard the

5    charging, the allegations in this case of first degree

6    premeditated murder.

7              I want to talk a little bit about your

8    experiences with this if, unfortunately, you've had

9    some.  And I'm going to go row-by-row because it's the

10   easiest way.  I'll start with the first row right here,

11   with you three ladies.  In the first row, any of you had

12   any experience wherein someone close to you has been a

13   victim of this type of crime?  All right.  Very good.

14   Is that no, ma'am?

15             PROSPECTIVE JUROR TRAYLOR:  No.  That's yes.

16             MR. PRASAD:  That is a yes.  Okay.  I

17   thought I saw you nodding your head.  And it's Ms.

18   Traylor, correct?

19             PROSPECTIVE JUROR TRAYLOR:  Mm-hmm.

20             MR. PRASAD:  It was someone close to you?

21             PROSPECTIVE JUROR TRAYLOR:  Mm-hmm.

22             THE COURT REPORTER:  Yes?

23             MR. PRASAD:  Yes for the--

24             PROSPECTIVE JUROR TRAYLOR:  (Interposing)

25   Yes.

-83-

```
 1                    MR. PRASAD:  I'm sorry.

 2                    PROSPECTIVE JUROR TRAYLOR:  I'm sorry.

 3                    MR. PRASAD:  He's taking down every word we

 4      say and he can't take down uh-huh's--

 5                    PROSPECTIVE JUROR TRAYLOR:  (Interposing)

 6      Okay.

 7                    MR. PRASAD:  Or uh-uh's.

 8                    PROSPECTIVE JUROR TRAYLOR:  Yes.

 9                    MR. PRASAD:  Don't worry.  When you see

10      witnesses on the witness stand, we're going to be saying

11      the exact same things to them.  Was it a friend or a

12      family member?

13                    PROSPECTIVE JUROR TRAYLOR:  A family member.

14                    MR. PRASAD:  About how long ago was this?

15                    PROSPECTIVE JUROR TRAYLOR:  This was, it's

16      almost ten years ago.

17                    MR. PRASAD:  Ten years?

18                    PROSPECTIVE JUROR TRAYLOR:  Yeah.

19                    MR. PRASAD:  What was the family

20      relationship?

21                    PROSPECTIVE JUROR TRAYLOR:  Cousin.

22                    MR. PRASAD:  A cousin?

23                    PROSPECTIVE JUROR TRAYLOR:

24                    PROSPECTIVE JUROR TRAYLOR:  Mm-hmm.

25                    MR. PRASAD:  Was there police involvement
```

-84-

1      and prosecution and all that stuff?

2                   PROSPECTIVE JUROR TRAYLOR:  Yes.

3                   MR. PRASAD:  Were you part of any of that

4      process?

5                   PROSPECTIVE JUROR TRAYLOR:  No.

6                   MR. PRASAD:  Did you ever go to court or

7      anything like that?

8                   PROSPECTIVE JUROR TRAYLOR:  No.

9                   MR. PRASAD:  How do you think the police

10     work and the prosecution -- Was it done fairly, in your

11     mind, ma'am, as far as you know?

12                  PROSPECTIVE JUROR TRAYLOR:  As far as I

13     know.  Yes.

14                  MR. PRASAD:  Okay.  All right.  Here's the

15     harder question.  Can you separate that circumstance

16     involving your cousin and just focus on the facts and

17     the law of this case?

18                  PROSPECTIVE JUROR TRAYLOR:  Yes.

19                  MR. PRASAD:  Okay.  There's nothing that's

20     going to affect you from being fair and impartial with

21     that, with that incident?

22                  PROSPECTIVE JUROR TRAYLOR:  No.

23                  MR. PRASAD:  Very good.  Very good.  Jump to

24     the second row, the exact same question.  Anyone here in

25     the second row have had someone close to them, family

1    member or close friend, that's been a victim of this

2    type of crime?

3                    PROSPECTIVE JUROR RASBERRY:  Yes.

4                    MR. PRASAD:  We've got two yes's.  Mr

5    Rasberry?

6                    PROSPECTIVE JUROR RASBERRY:  Yes.

7                    MR. PRASAD:  How long ago was this, sir?

8                    PROSPECTIVE JUROR RASBERRY:  Probably about

9    thirty years ago.

10                    MR. PRASAD:  Okay.  And what was the family

11    relationship there?

12                    PROSPECTIVE JUROR RASBERRY:  Cousin.

13                    MR. PRASAD:  A cousin?

14                    PROSPECTIVE JUROR RASBERRY:  Yes.

15                    MR. PRASAD:  Anything about that

16    circumstance that would affect you from being fair and

17    impartial here today?

18                    PROSPECTIVE JUROR RASBERRY:  No.

19                    MR. PRASAD:  All right.  Very good.  Ms.

20    Coyler?

21                    PROSPECTIVE JUROR CUYLER:  Cuyler.

22                    MR. PRASAD:  Cuyler.  Thank you.  Was it a

23    friend or family member, sir?  Ma'am?

24                    PROSPECTIVE JUROR CUYLER:  My nephew.

25                    MR. PRASAD:  Your nephew?

1              PROSPECTIVE JUROR CUYLER:  Yes.

2              MR. PRASAD:  And how long ago was this?

3              PROSPECTIVE JUROR CUYLER:  Three years.

4              MR. PRASAD:  Three years ago?  Okay.  Same

5     question as I asked, as I was asking Ms. Traylor.  Was

6     there police involvement and prosecution in what

7     happened?

8              PROSPECTIVE JUROR CUYLER:  No.  He admitted

9     to everything, so it didn't go that far.

10             MR. PRASAD:  Okay.  And let me understand.

11    Was your nephew the victim?

12             PROSPECTIVE JUROR CUYLER:  No.  He was the--

13             MR. PRASAD:  (Interposing)  He was charged

14    with it?

15             PROSPECTIVE JUROR CUYLER:  Yes.

16             MR. PRASAD:  Okay.  I'm sorry.  That was

17    actually my very next question.  But since you're

18    already there, let's talk about it.  Were you involved

19    with the court process or the criminal process with your

20    nephew?

21             PROSPECTIVE JUROR CUYLER:  Well, I went to

22    every court session.

23             MR. PRASAD:  Okay.  And then do you know,

24    was it here in Wayne County?

25             PROSPECTIVE JUROR CUYLER:  Yes.  It was

-87-

1    here.

2              MR. PRASAD:  Do you know--

3              PROSPECTIVE JUROR CUYLER:  (Interposing)

4    Frank Murphy.  I forgot the floor and the room number.

5    It was years ago.

6              MR. PRASAD:  It was not Judge Morrow?

7              PROSPECTIVE JUROR CUYLER:  No.

8              MR. PRASAD:  And do you remember who the

9    prosecutor was?

10             PROSPECTIVE JUROR CUYLER:  No.

11             MR. PRASAD:  I wasn't, was I?

12             PROSPECTIVE JUROR CUYLER:  No.

13             MR. PRASAD:  Okay.  Just--

14             PROSPECTIVE JUROR CUYLER:  (Interposing)

15    No.

16             MR. PRASAD:  Want to make sure.  Anything

17    about that whole court process, what happened to your

18    nephew, anything about that that would affect you from

19    being fair and impartial here today?

20             PROSPECTIVE JUROR CUYLER:  No.

21             MR. PRASAD:  All right.  Very good.  Anyone

22    else in the second row?  Okay.  Let's jump to the last

23    row.  Anyone in the last row someone close to them been

24    the victim of this type of crime?

25             PROSPECTIVE JUROR WALKER:  Yes.

-88-

1                    MR. PRASAD:  Yes, sir?  And let me get your

2        name, for the record.  That's Mr. Walker?

3                    PROSPECTIVE JUROR WALKER:  Yes.

4                    MR. PRASAD:  How long ago was this, sir?

5                    PROSPECTIVE JUROR WALKER:  I'd say about

6        five or six years.

7                    MR. PRASAD:  Okay.  And what was the family,

8        or what was the relationship?

9                    PROSPECTIVE JUROR WALKER:  My son.

10                    MR. PRASAD:  Your son.  I'm sorry, sir.

11        Were you, was there, the court -- Was the court process

12        involved?  Were the police and prosecution involved?

13                    PROSPECTIVE JUROR WALKER:  Yes.

14                    MR. PRASAD:  Were you okay or were you

15        satisfied with the way everything was handled?

16                    PROSPECTIVE JUROR WALKER:  No.

17                    MR. PRASAD:  All right.  Do you think it was

18        not properly handled?

19                    PROSPECTIVE JUROR WALKER:  Yes.

20                    MR. PRASAD:  Okay.  Understand this very

21        next question, and I'm sure you know why I'm asking.

22        But would you hold that against me or the police in this

23        case?

24                    PROSPECTIVE JUROR WALKER:  I don't know.

25        It's hard to say.

-89-

```
 1                    MR. PRASAD:  Can you separate, can you
 2       separate what happened to your son when you listen to
 3       the facts and law of this case?
 4                    PROSPECTIVE JUROR WALKER:  Yes.
 5                    MR. PRASAD:  Okay.  Anyone else in the last
 6       row?  Okay.  I'm going to ask that flip side of that
 7       question, the question that Ms. Cuyler already gave us
 8       the answer to.  I'll start in the first row.  Anyone
 9       close to you ever been accused of this kind of crime?
10                    PROSPECTIVE JURORS:  No.
11                    MR. PRASAD:  Second row, Ms. Cuyler, you
12       told us about that.  Anyone else in the second row?
13       Anyone in the third row?
14                    PROSPECTIVE JURORS:  No.
15                    MR. PRASAD:  And, sir, Mr. Walker?
16                    PROSPECTIVE JUROR WALKER:  Yes.
17                    MR. PRASAD:  All right.  Who was that, sir?
18                    PROSPECTIVE JUROR WALKER:  My son was
19       accused of it.
20                    MR. PRASAD:  Oh.  I'm sorry.  Maybe -- I'm
21       sorry.  I misunderstood you, sir.  I thought you were
22       saying your son was the victim of this kind of crime.
23                    PROSPECTIVE JUROR WALKER:  No.
24                    MR. PRASAD:  He was--
25                    PROSPECTIVE JUROR WALKER:  (Interposing)  He
```

1        was accused.

2                   MR. PRASAD:  He was accused.  Okay.  And was

3        it my office that prosecuted him?

4                   PROSPECTIVE JUROR WALKER:  I'm not for sure.

5                   MR. PRASAD:  Was it here in Frank Murphy?

6                   PROSPECTIVE JUROR WALKER:  Yeah.  I think

7        so.

8                   MR. PRASAD:  Okay.  Okay.  Thank you, Mr.

9        Walker.  Let's jump to the next level of this crime, or

10       not level.  That's not the way I want to say it.  Let's

11       jump to the next aspect about this case, which is -- I'm

12       not going into the details of the case.  You're not

13       really -- That's not really appropriate for right now.

14       But there's an allegation of gun involvement.

15                   I want to know in the first row has anyone

16       close to them ever been a victim of a gun-related

17       assaultive type of crime?  Or themselves?

18                   PROSPECTIVE JURORS:  No.

19                   MR. PRASAD:  First row?

20                   PROSPECTIVE JUROR TRAYLOR:  Just the cousin.

21                   MR. PRASAD:  Just the cousin.

22                   PROSPECTIVE JUROR TRAYLOR:  Yeah.

23                   MR. PRASAD:  Okay.  What about the second

24       row?  Anyone themselves or someone close to them been

25       the victim of a gun-related assaultive crime.

1                    PROSPECTIVE JUROR RASBERRY:   The cousin I

2        was saying.

3                    MR. PRASAD:   Okay.   Same on you were telling

4        us?

5                    PROSPECTIVE JUROR RASBERRY:   Yup.

6                    MR. PRASAD:   All right.   And the last row?

7        Mr. Walker?

8                    PROSPECTIVE JUROR WALKER:   Yes.

9                    MR. PRASAD:   Is it different than the

10       situation with your son?

11                   PROSPECTIVE JUROR WALKER:   Yes.

12                   MR. PRASAD:   What was that, sir?

13                   PROSPECTIVE JUROR WALKER:   I was assaulted

14       by two police officers--

15                   MR. PRASAD:   (Interposing)   Okay.

16                   PROSPECTIVE JUROR WALKER:   With a gun.

17                   MR. PRASAD:   How long ago was that?

18                   PROSPECTIVE JUROR WALKER:   About thirty-five

19       years ago.

20                   MR. PRASAD:   Okay.   Can you separate that

21       incident or, or would you hold that against any officer

22       that testified in court in this case?

23                   PROSPECTIVE JUROR WALKER:   No.

24                   MR. PRASAD:   Okay.   You can be fair and

25       impartial to officers that testify?

                                -92-

1                    PROSPECTIVE JUROR WALKER:  Yes.

2                    MR. PRASAD:  All right.  Very good, Mr.

3        Walker.  Thank you.  Anyone else, last row?  All right.

4        Very good.  All right.  Here's a, here's a little fun

5        question.  Any of you fans of shows like CSI, by a show

6        of hands?  All right.  Very good.  I'm going to pick on

7        you, Mr. Hollen, because you had your hand raised there.

8        Mr. Hollen, are you familiar with the Saturn Awards?

9        You ever heard of those?

10                   PROSPECTIVE JUROR HOLLEN:  No, sir.

11                   MR. PRASAD:  Okay.  You know how there's the

12       Oscar Awards by the--

13                   PROSPECTIVE JUROR HOLLEN:  (Interposing)

14       Right.

15                   MR. PRASAD:  Academy of Motion Picture?

16       Right?

17                   PROSPECTIVE JUROR HOLLEN:  Right.

18                   MR. PRASAD:  There's an academy, and who

19       knows how real this academy is, but there's an academy

20       of science fiction and horror, I think it's called,

21       science fiction and horror.  And every year they come

22       out with the Saturn Awards.  And they come out with

23       Saturn Awards for both movies and for television.

24                   I'm going to ask you a question.  In 2004,

25       which show do you think tied for best science fiction TV

-93-

1     show?

2                    PROSPECTIVE JUROR HOLLEN:  Probably CSI.

3                    MR. PRASAD:  There you go.  You understand

4     why I'm saying that?

5                    PROSPECTIVE JUROR HOLLEN:  Right.

6                    MR. PRASAD:  Because can I get an agreement

7     from everyone that this is the court of law.  I'm asking

8     you not to hold me to some standard you might think that

9     you see from TV or movies or books that you read, but to

10    what Judge Morrow says and what real life and law is? Is

11    that fair?

12                   PROSPECTIVE JURORS:  Yes.

13                   MR. PRASAD:  Okay.  Even if you are a fan of

14    CSI, is that all right, Mr. Hollen?

15                   PROSPECTIVE JUROR HOLLEN:  That's fine.

16                   MR. PRASAD:  Okay.  I don't mean to pick on

17    you.  It's just--

18                   PROSPECTIVE JUROR HOLLEN:  (Interposing)

19    You can pick on me all you want.

20                   MR. PRASAD:  It's just I wanted to

21    illustrate the point.  Just branch that out a little bit

22    from a point that Mr. Walker was making, is that is

23    there anyone here -- I guess the easy question is how

24    many of us have ever been stopped by the police for a

25    speeding ticket or for anything else?  I think most of

-94-

1      us will raise our hand.

2              But I want to bring up the point that Mr.

3      Walker brought up, which is have any of us had, have any

4      of you in the jury panel or jury box had such a

5      negative, strong negative experience from your

6      interaction with the police that might affect you from

7      fair and impartial?  Anyone here in the first row?

8              PROSPECTIVE JURORS:  No.

9              MR. PRASAD:  Second row?

10             PROSPECTIVE JURORS:  No.

11             MR. PRASAD:  And third row?  And Mr. Walker,

12     you told us about that.  Was there something else

13     besides the one, the incident you were telling us?

14             PROSPECTIVE JUROR WALKER:  Well, there's

15     been quite a few incidents.

16             MR. PRASAD:  Okay.  Would those experiences

17     affect your ability to be fair and impartial, listening

18     to officers testify in this case?

19             PROSPECTIVE JUROR WALKER:  No.

20             MR. PRASAD:  Okay.  Thank you.  Anyone else

21     in the last row?  All right.  In the same vein, anyone

22     have any interactions with my office, and not -- In any

23     different format, as have you had to come here as a

24     witness, as a victim, as someone who was accused?

25     Anyone had any interaction with my office, with the

1       prosecutor's office here in Wayne County?  First row?

2                     PROSPECTIVE JURORS:  No.

3                     MR. PRASAD:  Second row?

4                     PROSPECTIVE JURORS:  No.

5                     MR. PRASAD:  Third row?

6                     PROSPECTIVE JURORS:  No.

7                     MR. PRASAD:  Okay.  Very good.  I think I

8       noticed when Judge Morrow was asking the questions that

9       some of -- We've got a bunch of parents on the panel,

10      right?  Just by a show of hands?  Okay.  Very good.

11      I think -- Mr. Rasberry, what's the age ranges of your

12      three kids?

13                    PROSPECTIVE JUROR RASBERRY:  Twenty-one,

14      sixteen and eleven.

15                    MR. PRASAD:  Okay.  And I think there was

16      only one other person who I didn't -- Mr. Walker, how

17      old are your kids, sir?  They're grown now, I'm

18      assuming.

19                    PROSPECTIVE JUROR WALKER:  Yeah.  Forty-two,

20      thirty-nine, thirty-two.

21                    MR. PRASAD:  Okay.  Here's the tougher

22      question.  You can probably tell from Mr. Howard's

23      youthful appearance that he's youthful, he's young.  At

24      the, according to the time of the allegations, he would

25      have been sixteen at the time, and today he's seventeen

1    years of age.

2              I want to go row-by-row and I want to ask

3    you, I want you to ask yourself this honest question.

4    As the Judge told us that we're not supposed to keep

5    certain biases, like age, from making our decision.

6    When we're talking about this case and this crime, would

7    the fact that Mr. Howard is seventeen years of age, or

8    sixteen at the time of the allegations, would that

9    affect you from being, making a fair and just verdict in

10   this case?  In the first row here?

11             PROSPECTIVE JURORS:  No.

12             MR. PRASAD:  No.  Second row?

13             PROSPECTIVE JURORS:  No.

14             MR. PRASAD:  Third row?

15             PROSPECTIVE JURORS:  No.

16             MR. PRASAD:  And you understand why I ask

17   that question.  I think there are several of you on the

18   jury who have kids in the exact same range.  I think Ms.

19   Bennett.

20             PROSPECTIVE JUROR BENNETT:  Mm-hmm.

21             MR. PRASAD:  You know, you have two kids,

22   one twenty, one sixteen?

23             PROSPECTIVE JUROR BENNETT:  Yes.

24             MR. PRASAD:  Right?  But that's not going to

25   affect you in this case?

1                      PROSPECTIVE JUROR BENNETT:  Not at all.

2                      MR. PRASAD:  Okay.  I think Mr. Rasberry,

3        you were just telling us you have--

4                      PROSPECTIVE JUROR RASBERRY:  (Interposing)

5        That's correct.

6                      MR. PRASAD:  Is it going to affect you in

7        any way, being able to sit in judgement in this case?

8                      PROSPECTIVE JUROR RASBERRY:  No.  No.

9                      MR. PRASAD:  Okay.  And I think, I think Ms.

10       Spivey, you were telling us, right?  Right there.  Ms.

11       Spivey, you have one that's twenty-two years old as

12       well, right?

13                     PROSPECTIVE JUROR SPIVEY:  Yes.

14                     MR. PRASAD:  Mr. Howard's age is not going

15       to affect you in making your decision in this case?

16                     PROSPECTIVE JUROR SPIVEY:  No.

17                     MR. PRASAD:  All right.  And finally, I

18       think it's Mr. Boyd?

19                     PROSPECTIVE JUROR BOYD:  Yes.

20                     MR. PRASAD:  Is that correct, sir?

21                     PROSPECTIVE JUROR BOYD:  Yes.

22                     MR. PRASAD:  And you have also children the

23       same age as well?

24                     PROSPECTIVE JUROR BOYD:  Yes.

25                     MR. PRASAD:  Anything about their ages or

                                -98-

1      your children's age and Mr. Howard's age that would

2      affect you from being fair and impartial?

3                   PROSPECTIVE JUROR BOYD:  No.

4                   MR. PRASAD:  Okay.  Last part about this,

5      ladies and gentlemen, is that, and I think Judge Morrow

6      touched on this topic as well, is that you're here to do

7      a very specific job.  You're here to decide the facts of

8      what happened on a certain day and certain time.  And

9      after you make your decision on the facts, it's your job

10     to apply the law that Judge Morrow gives you and come up

11     with a fair verdict.

12                   Here's a question, and it's a little bit

13     different than the type of questions I was asking

14     earlier, and this is also one that just requires you to

15     be introspective about yourself.  Are any of you

16     hesitant in making those type of decisions, the

17     decisions to decide on the facts and then apply them to

18     the law that Judge Morrow gives you?  And that can be

19     for a myriad of reasons.  It could just be the way you

20     are.  It could be for moral reasons, for religious

21     reasons.  Any of you in the first row have any hesitancy

22     in doing this job or making these decisions?

23                   PROSPECTIVE JURORS:  No.

24                   MR. PRASAD:  In the second row?

25                   PROSPECTIVE JURORS:  No.

```
1              MR. PRASAD:  And in the last row?

2              PROSPECTIVE JURORS:  No.

3              MR. PRASAD:  I don't know if you guys have

4       noticed this, but throughout this day, both, families

5       for both sides, both for the victim's side and for Mr.

6       Howard's side have been coming in and out of the

7       courtroom.  Do any of you know any of them or are

8       familiar with any of them?

9              PROSPECTIVE JURORS:  No.

10             MR. PRASAD:  Okay.  Thank you.

11             THE COURT:  Mr. Moore.

12             MR. MOORE:  Thank you, your Honor.  Good

13      afternoon, ladies and gentlemen.

14             PROSPECTIVE JURORS:  Good afternoon.

15             MR. MOORE:  Touching upon the more recent

16      things the prosecutor had indicated.  And I'll be a

17      little bit more blunt.  Is there any scenario which you

18      can see that you can find my client not guilty of this

19      offense?

20             Because the offense is homicide.  We all

21      complain about crimes in our various communities.  Now,

22      you know, you have an opportunity to sit on a jury in

23      which homicide is the charging offense, you know.  And

24      that sort of vigilantism, you know, we've had too many

25      shootings in the neighborhood.  I'm going to pin it on
```

1    this guy.

2              And the facts come in.  And let's just

3    assume that, you know, they're sort of weighted toward

4    not guilty, but you in your mind cannot conceive of

5    finding a person charged with this kind of offense not

6    guilty.  Does anybody have a mindset like that?  How

7    about you, Mr. Rasberry?

8              PROSPECTIVE JUROR RASBERRY:  No.  It would

9    be based on the facts.

10             MR. MOORE:  How about you, Mr. Boyd?

11             PROSPECTIVE JUROR BOYD:  Just the facts.

12             MR. MOORE:  Just the facts.  You know,

13   because this isn't like a shoplifting, you know.  This

14   is heavy duty.  So, sometimes, you know, heavy duty,

15   while I'd like to think that when we're talking about

16   reasonable doubt, we're talking about common sense and

17   reasonableness, you try to focus in a little bit more

18   because the stakes are a little bit higher, although it

19   should be the same just for a little shoplifting as it

20   is for murder.  But you understand how I'm saying it.

21             PROSPECTIVE JUROR BOYD:  Absolutely.

22             MR. MOORE:  Do you agree with that?

23             PROSPECTIVE JUROR BOYD:  Yes.

24             MR. MOORE:  Now, your neighbor.  Is it Mr...

25             PROSPECTIVE JUROR ZYJEWSKI:  Zyjewski.

1            MR. MOORE:  Mr. Zyjewski, do you agree with

2       that, sir?

3            PROSPECTIVE JUROR ZYJEWSKI:  Yes.

4            MR. MOORE:  Okay.  So, you could find -- You

5       could conceive of a scenario where you could find my

6       client, Mr. Howard, not guilty?

7            PROSPECTIVE JUROR ZYJEWSKI:  Yes.

8            MR. MOORE:  Okay.  Now, since I got you on

9       the witness stand, I'm going to ask you a very practical

10      question, sir.  Talked about being in Florida for the

11      winter.

12           PROSPECTIVE JUROR ZYJEWSKI:  Mm-hmm.

13           MR. MOORE:  Talked about being up summer,

14      being up North during the summer.  Is the county of

15      Wayne your primary residence.

16           PROSPECTIVE JUROR ZYJEWSKI:  I own a house

17      in Riverview, but I spend very little time there.

18           MR. MOORE:  Okay.  You say you spend very

19      little time there?

20           PROSPECTIVE JUROR ZYJEWSKI:  Yes.

21           MR. MOORE:  Okay.

22           PROSPECTIVE JUROR ZYJEWSKI:  My brother

23      lives there and I own the house and I spend the majority

24      of my time up North or out of state.

25           MR. MOORE:  Okay.  Does the Court have any

1       questions, your Honor, as it relates to what I asked

2       him?

3                   THE COURT:  No.  No.  That's where he's

4       registered to vote.

5                   MR. MOORE:  Okay.  Are you registered to

6       vote?

7                   PROSPECTIVE JUROR ZYJEWSKI:  Yes.

8                   THE COURT:  In Wayne County.

9                   PROSPECTIVE JUROR ZYJEWSKI:  Yes.

10                  MR. MOORE:  Okay.  All right.  Thank you

11      very much.  Ms. Bennett, good afternoon.

12                  PROSPECTIVE JUROR BENNETT:  Good afternoon.

13                  MR. MOORE:  The Court earlier was talking

14      about -- Well, let's change it up.  In the criminal

15      system, a defendant has a right not to testify.  You

16      aware of that?

17                  PROSPECTIVE JUROR BENNETT:  Yes.  I am.

18                  MR. MOORE:  Okay.  Now, oftentime in this

19      kind of proceeding, as reasonable individuals, we want

20      to know what does the other side have to say.  Would you

21      agree with that?

22                  PROSPECTIVE JUROR BENNETT:  Yes.

23                  MR. MOORE:  How about you, Ms. Farkas?

24                  PROSPECTIVE JUROR FARKAS:  Yes.

25                  MR. MOORE:  Okay.  Now, we've got special

                              -103-

```
1        rules.  And one of the rules is Mr. Howard has a right
2        to remain silent.  And you cannot use that silence
3        against him.  Do you have any problem with that
4        principle?
5                    PROSPECTIVE JUROR FARKAS:  None.
6                    MR. MOORE:  How about you, Ms. Peeples?
7                    PROSPECTIVE JUROR PEEPLES:  No.
8                    MR. MOORE:  Ms. Neighbors?
9                    PROSPECTIVE JUROR NEIGHBORS:  No.
10                   MR. MOORE:  Okay.  Now, you would agree, Ms.
11       Neighbors, that it sort of works you a little bit when
12       you just can't find out what happens on the other side
13       of a situation.  You know, you've got friends, two
14       friends are arguing and you hear from one side.  And you
15       just haven't had a chance to get to the other side, but
16       it's just sort of wearing you out mentally like, well, I
17       wonder what my other friend has to say about this
18       situation.  This doesn't sound like him or her.  Have
19       you ever been in that situation before?
20                   PROSPECTIVE JUROR NEIGHBORS:  Mm-hmm.
21                   MR. MOORE:  Okay.  That's -- Is that a yes?
22                   PROSPECTIVE JUROR NEIGHBORS:  Yes.
23                   MR. MOORE:  He's got to take this down.
24                   PROSPECTIVE JUROR NEIGHBORS:  Yes.  I'm
25       sorry.  Yes.
```

1              MR. MOORE:  Okay.  And sometimes you get to

2     leaning toward one side or the other, without having

3     heard both sides of the story, correct?

4              PROSPECTIVE JUROR NEIGHBORS:  Correct.

5              MR. MOORE:  Okay.  But in this instance, in

6     a criminal case, you don't always get the chance to hear

7     the other side.  And you've got to work with what the

8     People have presented if that happens to be the case.

9     And I can't tell you at this time whether or not it will

10    be.  But it's a possibility.  So, I want to ask you a

11    few questions.

12             PROSPECTIVE JUROR NEIGHBORS:  Okay.

13             MR. MOORE:  Ms. Cuyler, would you be able to

14    do that and not consider what the other side is and hold

15    the People to their burden of proof because they have to

16    prove it beyond a reasonable doubt?

17             PROSPECTIVE JUROR CUYLER:  Yes.

18             MR. MOORE:  Whoa.  Whoa.  You sort of

19    changed up your mouth there and gave me a look like,

20    that's going to be a little hard, Mr. Moore.

21             PROSPECTIVE JUROR CUYLER:  No.  Yes.  You

22    just have to learn this and the other side has the

23    burden.

24             MR. MOORE:  Okay.  Now, you think you're

25    going to be able to do that?

```
1                    PROSPECTIVE JUROR CUYLER:  Yes.

2                    MR. MOORE:  You gave me that look, and it

3       was probably a very honest look.  It was very honest.

4       It was like, hey.  This is a big-time case, this is a

5       big-time charge.  I want to know the whole story.

6                    PROSPECTIVE JUROR CUYLER:  Yes.

7                    MR. MOORE:  That's natural.  You agree with

8       that, Ms. Feiker [sic], right?

9                    PROSPECTIVE JUROR FARKAS:  Yes.

10                   MR. MOORE:  You want to know what the whole

11      story is.  But the law says you don't always get a

12      chance to hear the whole story because one side can just

13      sort of sit back.

14                   The only thing that I and my client have to

15      do is show up on time and behave ourselves.  I don't

16      have to ask you these questions at this point in time.

17      I don't have to ask a single question during the whole

18      proceeding because the burden of proof stays at this

19      table.  Anybody got a problem with that?

20                   PROSPECTIVE JURORS:  No.

21                   MR. MOORE:  Come on.  Raise your hands if

22      you do now.  I see people shaking their heads no.  Is

23      that a no for you, Ms. Neighbors?

24                   PROSPECTIVE JUROR NEIGHBORS:  Yes.  It is

25      for me.
```

1              MR. MOORE:  Okay.

2              PROSPECTIVE JUROR PEEPLES:  What kind of

3      biases do you have, Ms. Peeples?

4              PROSPECTIVE JUROR PEEPLES:  What biases do I

5      have?

6              MR. MOORE:  Yeah.  A simple question.  The

7      Judge spent about fifteen, twenty minutes talking about

8      biases.  I just want to ask you after you come back from

9      lunch.

10             PROSPECTIVE JUROR PEEPLES:  I suppose...

11             MR. MOORE:  I beg your pardon?  I mean, you

12     got something favorite that you like?  You got a

13     favorite cake?

14             PROSPECTIVE JUROR PEEPLES:  I like playing

15     tennis.

16             MR. MOORE:  Okay.  You like tennis, as a

17     sport, over other sports, is that correct

18             PROSPECTIVE JUROR PEEPLES:  Mm-hmm.

19             MR. MOORE:  Okay.  Sort of puts a smile on

20     your face, right?

21             PROSPECTIVE JUROR PEEPLES:  Yeah.

22             MR. MOORE:  Okay.  What about you, Ms.

23     Farkas?

24             PROSPECTIVE JUROR FARKAS:  I like my

25     children.

-107-

```
 1                    MR. MOORE:  Okay.  All right.  Okay.  You're
 2      biased in favor of children.  Children always tell you
 3      the truth?
 4                    PROSPECTIVE JUROR FARKAS:  No.
 5                    MR. MOORE:  Okay.  Sometimes they looked you
 6      right in the face and told you, ma, I didn't do that.
 7      And you know they did, right?
 8                    PROSPECTIVE JUROR FARKAS:  Sometimes they
 9      say they didn't tell you the truth in the past.
10                    MR. MOORE:  Okay.
11                    PROSPECTIVE JUROR FARKAS:  So, I really
12      don't know.
13                    MR. MOORE:  Have any adults ever got in your
14      face and told you a big, fat one, swore up and down
15      they're telling the truth?
16                    PROSPECTIVE JUROR FARKAS:  Yes.
17                    MR. MOORE:  And then find out, hold on, they
18      lied to me?
19                    PROSPECTIVE JUROR FARKAS:  Yes.
20                    MR. MOORE:  Okay.  So, we know just looking
21      at people, whether they look at you, you know, and say
22      something doesn't mean it's the truth?
23                    PROSPECTIVE JUROR FARKAS:  That's right.
24                    MR. MOORE:  Okay.  Sometimes you have to
25      match it up with other things, if you can match it up.
```

```
 1                    PROSPECTIVE JUROR FARKAS:  Correct.
 2                    MR. MOORE:  Would you agree with that, Mr.
 3        Hollen?
 4                    PROSPECTIVE JUROR HOLLEN:  Yes.
 5                    MR. MOORE:  Okay.  Because in your lifetime,
 6        people have lied to you?
 7                    PROSPECTIVE JUROR HOLLEN:  Numerous times.
 8                    MR. MOORE:  Okay.  How many lies does it
 9        take to make a liar?
10                    PROSPECTIVE JUROR HOLLEN:  One.
11                    MR. MOORE:  One?  Anybody got a higher
12        number than that?  How about you, Mr. Walker?
13                    PROSPECTIVE JUROR WALKER:  No.  One.
14                    MR. MOORE:  Okay.  Sometimes you give them a
15        pass and give them two, right?
16                    PROSPECTIVE JUROR WALKER:  No.
17                    MR. MOORE:  Okay.  What about you, Ms.
18        Traylor?
19                    PROSPECTIVE JUROR TRAYLOR:  How many lies
20        does it take for you to stop believing what a person has
21        to say?
22                    PROSPECTIVE JUROR TRAYLOR:  One.
23                    MR. MOORE:  One?  Okay.  Anything after that
24        first one, you become a little bit skeptical about what
25        they have to say?
```

1               PROSPECTIVE JUROR TRAYLOR:  Yes.

2               MR. MOORE:  Take it with a grain of salt,

3      right?

4               PROSPECTIVE JUROR TRAYLOR:  Yes.

5               MR. MOORE:  Sometimes a pound of salt,

6      right?

7               PROSPECTIVE JUROR TRAYLOR:  Yes.

8               MR. MOORE:  Okay.  And I'm going to try this

9      name.  Mr. Zyjewski?

10              PROSPECTIVE JUROR ZYJEWSKI:  Yes.

11              MR. MOORE:  Okay.  Is there anything you'd

12     like to tell me before I sit down and let the Judge take

13     over that makes you think that you could not be a fair

14     and impartial juror in this matter?

15              PROSPECTIVE JUROR ZYJEWSKI:  No.

16              MR. MOORE:  None?  You think you're up for

17     the task?

18              PROSPECTIVE JUROR ZYJEWSKI:  Yeah.  I think

19     so.

20              MR. MOORE:  Okay.  The Judge talked about

21     weighing credibility, which is really what the hardest

22     job you have is.  People get to testify and at the end

23     you have to figure out what the truth is or whether you

24     can even get to the truth.  Because, as the Court will

25     indicate, you can consider the evidence and lack of

```
1      evidence.  Sometimes you can't make a decision on what
2      the truth is.  And you're just sort of out there and
3      it's like, well, I guess they didn't make their burden
4      of proof.  You agree with that situation or concept, Mr.
5      Boyd?
6                PROSPECTIVE JUROR BOYD:  I do.
7                MR. MOORE:  Okay.  The Judge talked about
8      not considering dress, grammar, station in life.  I
9      believe he'll give you jury instructions for all of
10     those things.  But you have to use other, other manners
11     of reasonableness and common sense.  And as he indicated
12     sometimes we always are not reasonable in what we do.
13     But we're going to try to be reasonable.  You think
14     you're willing to do that job today, sir?
15               PROSPECTIVE JUROR BOYD:  I am.
16               MR. MOORE:  How about you, Mr. Hollen?
17               PROSPECTIVE JUROR HOLLEN:  Yes, sir.
18               MR. MOORE:  Okay.  Now, I'm going to ask you
19     this question that may seem funny.  Anybody taking a
20     significant other on vacation some time this week, by
21     boat, train, airplane?  Because sometimes when you sit
22     in a chair and you answer some questions, you're a
23     little frightened because most people haven't been in a
24     courtroom before.  And we pick you for a juror.  And the
25     next day you come back here and it's like oh, Judge, I
```

1        forgot.  At the end of the week, I'm taking the misses

2        to St. Louis or something like that, we booked the

3        tickets a month and a half ago.  It happens.  Trust me.

4        Anybody want to bring anything like that up, that you're

5        going to be unavailable?

6                    PROSPECTIVE JURORS:  No.

7                    MR. MOORE:  I take it no means everybody's

8        available.  Ms. Cuyler.

9                    PROSPECTIVE JUROR CUYLER:  My son's prom is

10       Friday.  So would that affect anything?

11                   MR. MOORE:  I don't know what the Judge's

12       schedule is, but generally speaking, you're not here on

13       Friday.  But he's the boss.  Anything else?  Thank you

14       very much.

15                   THE COURT:  Any challenges for cause from

16       either side?

17                   MR. PRASAD:  None for cause, your Honor.

18                   MR. MOORE:  None for cause, sir.

19                   THE COURT:  Any preemptories the People wish

20       to use?

21                   MR. PRASAD:  Yes, sir.  And may we use

22       multiple?

23                   THE COURT:  Your choice, sir.  Absolutely.

24                   MR. PRASAD:  Thank you.  The People wish to

25       thank and excuse Ms. Cuyler, juror number eight.

1           THE COURT:  Okay.

2           MR. PRASAD:  Ms. Farkas, juror number two.

3   And Mr. Walker, juror number fourteen.

4           THE COURT:  Let me thank all three of you

5   for your participation.  I hope that everybody has a

6   wonderful day.  And would you please report back to the

7   jury commission downstairs.  Thank you.  Mr. Moore,

8   what's your pleasure, sir?

9           MR. MOORE:  I'd like to thank and excuse the

10  juror in seat number six, Mr. Hollen, your Honor.

11          THE COURT:  Mr. Hollen, thank you so much

12  for your help today.

13          THE CLERK:  Christian Frank, could you

14  please take seat number two, please?  Robert Holt, could

15  you please take seat number three?  Andy Malonis, could

16  you please take seat number nine -- Six.  Christopher --

17  Is it Nizyborski?  Could you please take seat number

18  eight?  And John Wezner, Wezner, could you please take

19  seat number fourteen?

20          THE COURT:  Mr. Wezner, could you introduce

21  yourself to us, please?

22          PROSPECTIVE JUROR WEZNER:  Certainly.  All

23  right.  Let's see.  Program director at Brose (sp.) for

24  about thirty-three years, married for six and a half

25  years, blended family, two kids are mine, boys twenty-

-113-

1          eight and twenty-six, three kids are hers, oldest is a

2          daughter twenty-eight, then a son twenty-six and another

3          son twenty-two.

4                    She retired from DPS as a nurse and is now

5          back to work at Henry Ford Health System in the epilepsy

6          department.  All right?  And what else?

7                    THE COURT:  Prior jury service.

8                    PROSPECTIVE JUROR WEZNER:  Ah.  I was on a

9          jury trial, I think was about three years or so ago.

10                    THE COURT:  Subject matter?

11                    PROSPECTIVE JUROR WEZNER:  It was a twenty-

12          something year old that was molesting his, at that

13          point, twelve-year-old niece.

14                    THE COURT:  Okay.  Any of the people

15          involved in this trial familiar from the other

16          experience?

17                    PROSPECTIVE JUROR WEZNER:  No.

18                    THE COURT:  So, what sports did you coach

19          when they were growing up?

20                    PROSPECTIVE JUROR WEZNER:  What sports did I

21          coach?  I didn't coach any sports when I was growing up,

22          actually.  I kind of was a little more into the books.

23                    THE COURT:  No.  No.  When they were growing

24          up.

25                    PROSPECTIVE JUROR WEZNER:  Oh.  When they

-114-

1    were growing.  They did, let's see, basketball and they

2    did some baseball for a couple years.

3              THE COURT:  Did you get drafted?

4              PROSPECTIVE JUROR WEZNER:  I was a

5    timekeeper for basketball.  But things were a little

6    different in my household because my original wife

7    passed away when they were six and eight.  So, I was

8    kind of playing both roles.  So, some things I could do,

9    but you know, trying to work and do other stuff.

10             THE COURT:  Okay.  So, what do they do for a

11   living?

12             PROSPECTIVE JUROR WEZNER:  What do they do

13   for a living?

14             THE COURT:  Yes.  Your kids.

15             PROSPECTIVE JUROR WEZNER:  Let's see.  My

16   older one just got out of the Army after four years.  He

17   was in military intelligence.  He spent two years in

18   Korea and a year in Afghanistan.  He's not at the

19   University of Colorado at Boulder completing his

20   bachelor's, then going to go onto his master's.

21             The younger one is at Eastern Michigan

22   University.  He kind of putzed around and worked for a

23   bit, but he's now finishing his bachelor's.  It's his

24   last term and is planning to go on for his master's.

25             THE COURT:  What took the older one to

-115-

1    Boulder?

2                PROSPECTIVE JUROR WEZNER:  Well, while he

3    was in Afghanistan, since there wasn't a lot else you

4    could do but, you know, stay on base, he did research.

5    He was trying to look for some of the better business

6    schools.  And the University of Colorado-Boulder was one

7    of the better ones.  He applied to that, to Colorado at

8    Denver and to Colorado State.  And that was the best.

9    All three accepted him, so he took that.

10               THE COURT:  Oh.  He likes to snowboard, too?

11               PROSPECTIVE JUROR WEZNER:  They both

12   snowboard quite a bit.  Although I talked to him

13   yesterday and there was a friend that wanted to do a

14   five thousand foot up hike and then go snowboarding

15   yesterday.  And he said, that's okay.

16               THE COURT:  Were you a skier?

17               PROSPECTIVE JUROR WEZNER:  Skied a little

18   bit, but normal skis.  I tried snowboarding once and

19   almost killed myself.  So, I thought that was enough.

20               THE COURT:  Snowboarding will make you happy

21   you didn't take all the painkillers has directed the

22   last time that you had an illness so that you have

23   something to go to in the medicine cabinet.

24               PROSPECTIVE JUROR WEZNER:  Yeah.  I found

25   that out even on a bunny hill.

 1                    THE COURT:  I tried snowboarding to be cool
 2          three times.
 3                    PROSPECTIVE JUROR WEZNER:  I purposely sent
 4          my kids with an instructor and say try to make them fall
 5          just to get them scared because they do stupid things.
 6          But it didn't work.
 7                    THE COURT:  Mine wanted to pick colleges
 8          based on the ability to snowboard between classes and
 9          after classes.  And I wanted to ask his mom for a DNA
10          test to see if this was my kid.  I'm like we don't pick
11          colleges based on snowboarding, my man.
12                    PROSPECTIVE JUROR WEZNER:  You can almost do
13          that.
14                    THE COURT:  Oh.  He went out there, you
15          know, on one of his college visits, you know, Colorado
16          College and Boulder, to Colorado College and Colorado
17          State.  And went snowboarding in between college visits.
18          And mom was driving and I was like, whoa.  You're living
19          the life, my man.
20                    PROSPECTIVE JUROR WEZNER:  I figured he
21          deserved it after a year of a hundred and thirty degree
22          weather in Afghanistan.
23                    THE COURT:  Yeah.  He had some cooling out
24          to do for sure.
25                    PROSPECTIVE JUROR WEZNER:  Yeah.

```
1                    THE COURT:  Ms. Malonis, how are you today?

2                    PROSPECTIVE JUROR MALONIS:  Fine.  Thank

3        you.

4                    THE COURT:  Got any snowboarding stories for

5        us?

6                    PROSPECTIVE JUROR MALONIS:  No.  I'm sorry.

7        I don't.

8                    THE COURT:  Okay.  Well, we'll hear from you

9        anyway.  Please, introduce yourself to us, tell us what

10       you're about.

11                   PROSPECTIVE JUROR MALONIS:  My name's Andy

12       Malonis.  I'm the visual director for the Macy Stores.

13       I have two children, one thirty, one twenty-six.  I'm a

14       brand new grandmother.

15                   THE COURT:  Okay.

16                   PROSPECTIVE JUROR MALONIS:  And today's my

17       birthday.

18                   THE COURT:  How many people have sung to

19       you?

20                   PROSPECTIVE JUROR MALONIS:  Pardon me?

21                   THE COURT:  How many people have sung happy

22       birthday to you?

23                   PROSPECTIVE JUROR MALONIS:  No one yet.

24                   THE COURT:  Can we get a happy birthday

25       going?  We'll give you one at the end of the day.  How
```

-118-

1      about that?

2                      PROSPECTIVE JUROR MALONIS:  Thank you.

3                      THE COURT:  That's great.  What does a

4      visual director do?

5                      PROSPECTIVE JUROR MALONIS:  The mannequins,

6      the events, the Christmas trim, upgrading.

7                      THE COURT:  Okay.  You do anything for the

8      parade, too?

9                      PROSPECTIVE JUROR MALONIS:  I used to,

10     whenever it was Hudson's.

11                     THE COURT:  Okay.

12                     PROSPECTIVE JUROR MALONIS:  Used to dress

13     the marchers and walk.

14                     THE COURT:  So, where can you, other than

15     New York -- And I can't remember is it Macy's in New

16     York still that people will go and just--

17                     PROSPECTIVE JUROR MALONIS:  (Interposing)

18     Yes.

19                     THE COURT:  Look at the mannequins at

20     Christmas time?

21                     PROSPECTIVE JUROR MALONIS:  Mm-hmm.

22                     THE COURT:  Where can people do that in

23     Southeastern, Michigan, if they're--

24                     PROSPECTIVE JUROR MALONIS:  (Interposing)

25     Nieman's.

1              THE COURT:  Nieman's still?

2              PROSPECTIVE JUROR MALONIS:  Lord & Taylor.

3              THE COURT:  So, you have to go out to

4     Somerset?

5              PROSPECTIVE JUROR MALONIS:  No.  They can do

6     it.  A lot of the littler stores will have like a

7     traveling group that do the windows, like an Anne Taylor

8     or something like that.  They'll have a team that goes

9     around does all the visualties.

10             THE COURT:  Do you get that anywhere but

11    being taught inside the industry?  Do you get that from

12    some place to--

13             PROSPECTIVE JUROR MALONIS:  (Interposing)  I

14    always want, I always wanted to do it.  I've done it all

15    my life.  That's--

16             THE COURT:  (Interposing)  Right.  But I'm

17    saying that's kind of like a college career.

18             PROSPECTIVE JUROR MALONIS:  They do have

19    classes in it now.  But when I started out, that was --

20    In fact, I've taught classes at college visual

21    merchandising.  But when I started out, it was just...

22             THE COURT:  So, is that the reason why all

23    the ladies are the models for the car companies?  That's

24    visual merchandising?

25             PROSPECTIVE JUROR MALONIS:  No.  That's

1        probably a different level of it.

2                    THE COURT:  I mean, apparently, it takes

3        women to sell cars.  Back in the olden days, it was just

4        guys selling cars to guys, I guess.  So, why do they

5        make women stand by the cars?

6                    PROSPECTIVE JUROR MALONIS:  Oh, I don't

7        know.

8                    THE COURT:  Give me your thoughts on it.

9        Because you're the visual person.

10                   PROSPECTIVE JUROR MALONIS:  I guess if the

11       car looks good and the girl looks good, it gives you a

12       fantasy that you can look good, too.

13                   THE COURT:  Okay.  Well, what does it do for

14       the women?  I guess you're applying that for the men.

15                   PROSPECTIVE JUROR MALONIS:  Well, I look at

16       cupholders, you know.  I walk right by the pretty girl.

17                   THE COURT:  Reminds me of The Matrix.  Did

18       you see the movie The Matrix?

19                   PROSPECTIVE JUROR MALONIS:  Yes.

20                   THE COURT:  And the guy was making the

21       program.  And, of course, everybody looked at the woman

22       that walked by in the red dress.  And he bragged, I made

23       her.

24                   PROSPECTIVE JUROR MALONIS:  Really?

25                   THE COURT:  Yeah.  The ability to create a

                            -121-

1    distraction so that you take your eyes off what you're

2    supposed to be looking at.  So, how many distractions

3    have you found in this courtroom already, Ms. Malonis?

4              PROSPECTIVE JUROR MALONIS:  I don't know.

5    I'm just like a people watcher.  And I like the art.

6    And I look at what people are wearing.

7              THE COURT:  You know, one that's built in,

8    and if it was me, I don't know how I would have done it

9    a little differently, but I find that door is a

10   distraction.  Golly.  Every time that door opens, my

11   head and everybody else's head just looks.

12              And you can't arrange it any differently,

13   Mr. Boyd, because the public has a right to the court

14   rooms.  And so, you have to give them access.  But at

15   the same time, I mean, we could be looking and

16   listening, the witness could be testifying.  And that

17   door opens and everybody's head just goes straight to

18   that door.  It's just funny.

19              They put the big printer out here.  So, any

20   time the secretary's in her office and she wants to

21   print something off this, the printer starts humming and

22   starts going, staplers, the pones are out here.

23              This is the only place that I can think of

24   that's a real business that has the operating room and

25   the waiting room combined.  You hear the stapler?  I

-122-

```
 1      mean, after a while you start listening for these things
 2      and you're like, wow.  Can you think of any other
 3      business where the waiting room is the operating room?
 4                  PROSPECTIVE JUROR MALONIS:  Well, a store.
 5      You're working in a store, there's a lot of
 6      distractions.
 7                  THE COURT:  But there's no waiting room.
 8                  PROSPECTIVE JUROR MALONIS:  No.
 9                  THE COURT:  It's all an operating room.
10      Right.  You're not sitting here listening and it's a,
11      more of a participatory kind of situation rather than
12      just being talked to.
13                  PROSPECTIVE JUROR OAKLEY:  A sporting event.
14                  THE COURT:  Hmm?
15                  PROSPECTIVE JUROR OAKLEY:  A sporting event.
16                  THE COURT:  They serve alcohol.  And you can
17      throw your peanuts on the ground.  Your name, please,
18      sir?
19                  PROSPECTIVE JUROR NIZYBORSKI:  Chris
20      Nizyborski.
21                  THE COURT:  How are you today?
22                  PROSPECTIVE JUROR NIZYBORSKI:  Doing great.
23                  THE COURT:  Please introduce yourself to us.
24                  PROSPECTIVE JUROR NIZYBORSKI:  Two children.
25                  THE COURT:  Okay.  Well, what do you do for
```

-123-

1       a living?

2                   PROSPECTIVE JUROR NIZYBORSKI:  Oh, I'm

3       sorry.

4                   THE COURT:  Let's talk about you.

5                   PROSPECTIVE JUROR NIZYBORSKI:  I work in

6       lawn and landscape.

7                   THE COURT:  Okay.

8                   PROSPECTIVE JUROR NIZYBORSKI:  Done that for

9       quite a few years, just about every aspect of the

10      business, fourteen, fifteen years in that type of

11      business.  Right now, I basically do spring type of

12      work.  Two children at home, wife.

13                  THE COURT:  Does the wife work outside of

14      the home?

15                  PROSPECTIVE JUROR NIZYBORSKI:  Clerical,

16      outside of the home as well.

17                  THE COURT:  Okay.

18                  PROSPECTIVE JUROR NIZYBORSKI:  Ages of the

19      children are nineteen and fourteen.  Previous jury

20      service, I've been down here twice, actually had juries

21      here twice.

22                  THE COURT:  Okay.  Have they reached

23      verdicts that you were on?

24                  PROSPECTIVE JUROR NIZYBORSKI:  Yes.

25                  THE COURT:  Okay.  What were the subject

-124-

1     matters?

2                    PROSPECTIVE JUROR NIZYBORSKI:  One was a, I

3     believe it was a breaking and entering and the other one

4     was, I don't know if it was, it could have been nine

5     years ago, it could have been eleven years ago, it was a

6     homicide case.

7                    THE COURT:  Okay.  In terms of what you do

8     for your business, I'm sure -- First of all, are you a

9     small engine and motor man, too?  Do you do any repair

10    yourself?

11                   PROSPECTIVE JUROR NIZYBORSKI:  No.

12    Actually, it's not a strongpoint.  No.

13                   THE COURT:  Okay.  Have you found technology

14    has made your job simpler or made you work harder or...

15                   PROSPECTIVE JUROR NIZYBORSKI:  I would say,

16    I would say in my industry less than the rest of

17    society.

18                   THE COURT:  Okay.  Because sometimes, you

19    know you'll see the commercials where, oh, golly, I'm

20    thinking of the man that calls back to his office all

21    the time and the ones with the books.  They're keeping

22    now, phones can contain touchpads.  And I'm wondering,

23    has that come over into your side of the--

24                   PROSPECTIVE JUROR NIZYBORSKI:  (Interposing)

25    It has, not as much as it has in other types of

 1    businesses.

 2              THE COURT:  Okay.  So, what's the biggest

 3    improvement in your industry, probably, since when you

 4    first got into all aspects?  Is it the equipment?

 5              PROSPECTIVE JUROR NIZYBORSKI:  Equipment,

 6    technologies.  You deal with different types of

 7    materials and chemicals and things along that line more

 8    so in regards to types of products that you use.

 9    Obviously, a GPS when you don't know where you're going

10    is going to be huge for it.  I'd say mostly the products

11    more than anything.

12              THE COURT:  Okay.  Young man, please

13    introduce yourself.

14              PROSPECTIVE JUROR FRANK:  My name is Chris

15    Frank, married thirteen years.  I work at Ford Motor

16    Company in Labor Affairs, also a reserve police officer

17    for the city of Dearborn Heights.  My wife is an RN.

18    I've been on a jury once before in your courtroom,

19    probably about seven years ago.  It was an attempted

20    homicide case.

21              THE COURT:  Okay.

22              PROSPECTIVE JUROR FRANK:  And one thing I

23    should let you know, I know Sergeant Mackie.  Our sons

24    are in the same grade together.

25              THE COURT:  Not only do you all know each

-126-

1      other, but your sons know each other.

2                PROSPECTIVE JUROR FRANK:  Sons know each

3      other.  I'm actually the den leader of his son.

4                THE COURT:  Okay.  I won't ask you how he's

5      doing.  And you, young man, please introduce to us.

6                PROSPECTIVE JUROR HOLT:  Rob Holt.  I

7      retired from General Motors, skilled trades.  I have two

8      children of my own.  We were married nineteen years

9      before we had our first one, foster children prior to

10     that.  That boy, we got him when he was eleven months.

11     He's twenty-six now.

12               THE COURT:  Okay.

13               PROSPECTIVE JUROR HOLT:  Still at home.

14     He's working.  Still at home.  He's got a child.  I

15     consider him my grandchild.

16               THE COURT:  Excellent.

17               PROSPECTIVE JUROR HOLT:  And we've got two

18     other grandchildren by my oldest daughter.  And then my

19     youngest daughter goes to Albion.  And just completed

20     her third year and just came back from New York.  She

21     did a semester in New York.

22               THE COURT:  So, you can see the light at the

23     end of the tunnel, going into her senior year in the

24     fall.

25               PROSPECTIVE JUROR HOLT:  Yup.

                              -127-

1              THE COURT:  Right.  Now, when you heard that

2       Mr. Frank was in this courtroom seven years ago, did you

3       say, wow, what are the chances of somebody doing jury

4       service and ending up the same place?  That's pretty

5       unusual, wouldn't you agree, Mr. Holt?

6              PROSPECTIVE JUROR HOLT:  Yup.

7              THE COURT:  As crazy as it sounds, I've had

8       husbands that came and told their wives, you know, who

9       did jury service four or five years before them, you

10      know, I'm in -- And they look at them.  That's

11      impossible.  We had the same Judge.

12             I've had husbands and wives, you know.  I

13      guess that speaks about random as opposed to I've been

14      here a long time, you know, just how random stuff can be

15      sometimes.

16             PROSPECTIVE JUROR HOLT:  Well, you don't

17      look that age.

18             THE COURT:  Well, you know, don't look

19      closely.  So, that is the one benefit of poor age, I

20      mean, eyesight.  My wife is into trying to look as young

21      as possible.  And I told her, as long as I'm keeping bad

22      eyes, you'll always look good to me.  And she didn't

23      like that one.  She didn't like that one.

24             I didn't know how to make it work, but what

25      I was saying was I'm not paying attention to all of that

-128-

1      anyway.  And even if I did, I'd have to go get those

2      reading glasses to find some new wrinkles.  And I'm not

3      going to get reading glasses to look at some wrinkles.

4      Just doesn't make that much sense.  Make sense, Ms.

5      Neighbors?

6                      PROSPECTIVE JUROR NEIGHBORS:  For the most

7      part.

8                      THE COURT:  Right.  So, what do you think

9      about the ability to see?  You think that people without

10     glasses see just as well as people with glasses?  Or do

11     you think the impression that we get is people with

12     glasses, like Mr. Frank, see well and people without

13     glasses, Mr. -- Give me the last name again, please.

14                     PROSPECTIVE JUROR NIZYBORSKI:  Nizyborski.

15                     THE COURT:  Ziborski [sic] sees -- Who sees

16     the best?  Him or him?

17                     PROSPECTIVE JUROR NEIGHBORS:  I would guess

18     probably the one without glasses.

19                     THE COURT:  You think so?  I'm not sure.

20                     PROSPECTIVE JUROR NEIGHBORS:  It's a guess.

21                     THE COURT:  No.  No.  And it is a guess

22     because we do guess.  You know, sometimes glasses means

23     that you had poor vision and, therefore, you needed it

24     to be corrected and now that you're wearing glasses, you

25     really see well.

-129-

1            And, you know, at the same time, people

2    without glasses we kind of assume that they see well

3    because they don't have glasses.  Because if they didn't

4    see well, they would wear glasses.

5            PROSPECTIVE JUROR NEIGHBORS:  Maybe.

6            PROSPECTIVE JUROR WEZNER:  Or they're too

7    vain to wear glasses.

8            THE COURT:  Or they don't have health care.

9            PROSPECTIVE JUROR WEZNER:  Right.

10           THE COURT:  Or -- This is the other way

11   that, when I used to think I was smart and didn't know

12   much and later found out how little I knew as I got

13   smarter.

14           There was this, when I was a lawyer, and the

15   witness had on glasses and I wanted the witness to be

16   credible.  So, I said, sir, I see you're wearing

17   glasses.  I said, when you testified earlier that you

18   saw what you saw, you know, were you wearing your

19   glasses?  And the witness says, I certainly was wearing

20   these glasses.  And I sat down thinking that I had done

21   something, right?

22           Well, as I got to the point where I started

23   needing glasses, I realized that I had been in denial

24   for a long, long time.  And my youngest taught me that I

25   was in denial because she used to ask me to read Bazooka

1    Joe Comic Books to her.  And I would tell her, go ask

2    your brother to read it.  Go ask your sister.  Go ask

3    your mother.  And it occurred to me that she was growing

4    up probably thinking that I could not read, not that I

5    couldn't see.  And I needed to change that, so I went

6    and finally got reading glasses.

7              But it got me to the point where I think

8    people with glasses are on this end of the spectrum and

9    people without glasses are on this end and everybody

10   crashes to the middle where finally the people with the

11   glasses will say I can't see a thing in these glasses.

12   I need to get a new prescription.  And people without

13   glasses finally crash to that middle where they say, you

14   know, I can't see a thing.  I need to get some glasses.

15             But we never know where people are on that

16   scale.  And what I should have asked that witness to

17   show that I was smart was, when was the last time you

18   had an eye exam?  And then, are those glasses the

19   appropriate one for the prescription that was given?

20             Because, you know, living with somebody that

21   wears glasses, I know that the keep an old pair as an

22   emergency pair.  If they don't -- You know, and they'll

23   go and grab the emergency ones if you break the ones

24   that are for the new prescription.

25             But, you know, sometimes you think you're

1    smarter than you are and you don't ask the question that

2    you really want to know.  But you don't learn that

3    sometimes until you're put in a position where you can't

4    see jack and you have to finally surrender.  I even

5    resisted with reading glasses going from 1.25 to 1.50.

6    It's like the prescription is on the outside and people

7    will say, oh, you really need glasses because you're

8    wearing a 1. -- You know, nobody would have known.  And

9    I still didn't read for a while because I just needed to

10   up the magnification.

11          And I'm supposed to know this because this

12   is what I try to expose you to, craziness.  And I'm up

13   here acting crazy myself.  But that's probably why I can

14   so easily tell you about crazy because I life some of

15   it.

16          But it has an impact on how we act, what we

17   think, you know, how we perceive stuff.  And sometimes

18   you just have to get past yourself.  That's what I

19   always feel.  Let me get by myself because I'm the way.

20   I'm in the way of making sense.  It's nobody else.  It's

21   just me.

22          So, do you consider yourself, Mr. Holt, to

23   be a reasonable man?

24          PROSPECTIVE JUROR HOLT:  Sure.

25          THE COURT:  So, you have the same challenges

-132-

1          I have sometimes, acting crazy when you want to be

2          reasonable?

3                    PROSPECTIVE JUROR HOLT:  Oh, yeah.

4                    THE COURT:  Do you have any problems calling

5          yourself out and straightening yourself up?

6                    PROSPECTIVE JUROR HOLT:  Not a bit.

7                    THE COURT:  Every now and then, my wife

8          saves me when she sees me acting crazy.  Man, it's

9          amazing.  Who saves you from acting crazy?

10                   PROSPECTIVE JUROR NEIGHBORS:  Who are you

11         asking?  Me?

12                   THE COURT:  No.  No.  I'm asking....

13                   PROSPECTIVE JUROR NIZYBORSKI:  More of often

14         than not, me.

15                   THE COURT:  You do?

16                   PROSPECTIVE JUROR NIZYBORSKI:  Sometimes

17         you've got to.

18                   THE COURT:  Okay.

19                   PROSPECTIVE JUROR WEZNER:  Probably half and

20         half, me and my wife.

21                   THE COURT:  Yeah.  There was this crazy

22         experience.  I had, I had an old car at the time and I

23         left the lights on.  And nowadays, you leave the lights

24         on it'll whistle for you.  But back then, it just

25         didn't.  And we were going to try to see this movie.

1          And I got out of the movie and I saw that my

2     taillights were like, dim.  And I was like, oh, God.

3     And you know how you used to run in the old days and try

4     to start it.  I couldn't even get a click.  The battery

5     had just like completely died.  It was like a dollar

6     movie and it was 1:30 in the morning.

7          And we were either in Southfield or

8     somewhere.  And the reality is that here I am kind of a

9     tall, black man and it's at night and I'm going to have

10    to go up to people.  So, I'm thinking, okay.

11    Everybody's not going to think that I'm Mr. Friendly.

12         So, I was kind of approaching people trying

13    to ask for some battery cables and who would give me a

14    jump.  And the first couple people I went to, I didn't

15    get any response.  And so, I started trying to conceive

16    in my mind who looked like they might have battery

17    cables in their trunk.  Have you all ever been that

18    crazy?

19         Anyway, I was trying to.  So, I was drawing

20    up this profile of people that I thought.  So, there

21    were a couple of conservative-looking people coming out

22    of the movies.  So, I walked up to them because I'm

23    thinking they'll have the first-aid kit and the blanket

24    and all of that in the trunk.  And I got like no good

25    answers.

1          So, instead of saving myself, I went even

2    deeper into the nuthole.  Because I started looking for

3    people who might be driving a car that needed a battery.

4    See, how you just, you get lost?  I got lost.  So, I

5    walked up to some people I thought looked like that.

6          And my wife was watching me.  And finally,

7    she just stepped in and just asked, does anybody have

8    any battery cables?  Wow.  That simple.  That simple.

9    Okay.  Now, you know when you're too deep in the hole

10   where the person that says that they have the cables

11   where you even doubt them?  That's how deep I was in

12   that hole.

13         Because the guy -- This is the way the guy

14   looked.  And it's just strictly on looks.  He was the

15   trench coat guy with the button down trench coat, but he

16   buttoned it in the dark.  And so, when he's coming out

17   the theater, you're looking at this kind of thing.  And

18   it had the three belt loops.  And the belt was hanging

19   out of just one of the loops.  So the belt was just

20   dragging on the ground.

21         Now, belt dragging, missed button and the

22   collar, one end of the collar was tucked in and the

23   other was kind of flying out and he was by himself at a

24   night movie.  So, I'm thinking, this joker doesn't have

25   it.  My man had the cables, though.  And he'd been the

-135-

1    last guy coming out.  And if my wife hadn't saved me, I

2    would have looked at her and probably said, he don't

3    have no cables and would have had to go to plan Z.

4              But every now and then you need somebody to

5    save you.  And that's why there's a value in twelve

6    people discussing things.  Because you'll save each

7    other from acting crazy by saying, you know, how does

8    that really make sense?  Run that by me again.

9              Because, you know, it's interesting when we

10   have to vocalize reasons how sometimes even after it

11   comes out we'll say, oh, that didn't make sense.  And

12   it's just an interesting process that you all are going

13   to be involved in.  Did you enjoy the last time?

14             PROSPECTIVE JUROR FRANK:  It wasn't bad.

15             THE COURT:  I mean in terms of the process.

16             PROSPECTIVE JUROR FRANK:  Yeah.  The process

17   was interesting to see and be a part of.

18             THE COURT:  Was there any heavyweight person

19   in the jury room that tried to--

20             PROSPECTIVE JUROR FRANK:  (Interposing)  No.

21             THE COURT:  Elbow anybody else?

22             PROSPECTIVE JUROR FRANK:  No.

23             THE COURT:  See, you don't get anybody

24   cussing at you and kicking you under the table.  I'm

25   sure there are jurors like that everywhere, somewhere.

1    Have any of you all seen Twelve Angry Men, that movie?

2    Yeah.  That'll make you scared to do jury duty.

3              There's that other one, and I can't think of

4    it.  One about a crazy Judge that, at lunch time, used

5    to sit out in his window?  And Justice for All.  All I

6    can remember is crazy Judge sitting in the window, not

7    me.  But even if we could, they sealed the windows.  You

8    couldn't open a window around here if you tried.  Sir.

9              MR. PRASAD:  Thank you, sir.  It's good for

10   my side if you're playing Twelve Angry Men.  I'm just

11   saying.  Mr. Frank, you know Sergeant Mackie?

12             PROSPECTIVE JUROR FRANK:  Yes.

13             MR. PRASAD:  And I think Sergeant Mackie, at

14   least he was telling me that he has discussed some of

15   his cases with you in the past?

16             PROSPECTIVE JUROR FRANK:  Yes.

17             MR. PRASAD:  Do you have any idea if he's

18   discussed this case with you?

19             PROSPECTIVE JUROR FRANK:  Not to my, not to

20   my knowledge.

21             MR. PRASAD:  Okay.  And, Judge, just, I

22   think to make it simpler.  I talked with Sergeant

23   Mackie.  He's not sure if he has or not.  So, to be

24   cautious, I would ask to strike Mr. Frank for cause.

25             THE COURT:  The appearance.  Right.  Okay.

1      Mr. Frank, it's good to see you.  I'm glad you're back.

2      Sorry you can't hang with us.  Okay.

3                MR. PRASAD:  Before I jump to the new

4      jurors, Ms. Spivey, I forgot to ask you about this.  You

5      said you work double-shift?  You worked forty hours

6      coming today?

7                PROSPECTIVE JUROR SPIVEY:  Yes.  But I did

8      sleep.

9                MR. PRASAD:  Okay.  Well, that's what I was

10     going to make sure.  This week, are you -- You're not

11     working -- Are you working nights this week or are you--

12               PROSPECTIVE JUROR SPIVEY:  (Interposing)

13     No.  I just won't work.

14               MR. PRASAD:  Perfect.  Okay.  That's not a

15     worry then.  Thank you.  Let me jump to the new jurors.

16     I'll start with Mr. Wezner.  Did you hear the questions

17     I was asking everyone, sir?

18               PROSPECTIVE JUROR WEZNER:  Yup.

19               MR. PRASAD:  Anything about any of those

20     issues -- First of all, with homicide crimes, anyone

21     close to you been a victim or accused of that kind of

22     crime?

23               PROSPECTIVE JUROR WEZNER:  No.

24               MR. PRASAD:  Assaultive crimes with guns?

25               PROSPECTIVE JUROR WEZNER:  No.

```
1              MR. PRASAD:  Okay.  We also talked about--
2              PROSPECTIVE JUROR WEZNER:  (Interposing)  I
3    take that.  Or let me--
4              MR. PRASAD:  (Interposing)  Sure.
5              PROSPECTIVE JUROR WEZNER:  Specify just a
6    bit on that.  My wife was assaulted about three, three
7    and a half years ago.
8              MR. PRASAD:  Okay.
9              PROSPECTIVE JUROR WEZNER:  She was just
10   punched.  She was pulling into the school parking lot.
11   Two kids jumped out and grabbed her, and another person,
12   grabbed their purses.  I heard afterwards that they
13   thought it was a gun, but she wasn't assaulted with a
14   gun or anything of that nature.
15             MR. PRASAD:  Anything about that experience,
16   would that affect you from being fair and impartial here
17   in this case?
18             PROSPECTIVE JUROR WEZNER:  No.
19             MR. PRASAD:  Very good.  And then any
20   contact with law enforcement of such a negative nature
21   that would affect you?
22             PROSPECTIVE JUROR WEZNER:  No.
23             MR. PRASAD:  Any contact with my office,
24   either as a witness, as a victim or as an accused?
25             PROSPECTIVE JUROR WEZNER:  No, sir.
```

1           MR. PRASAD:  Okay.  Very good.  And I think

2     you indicated you had several children, ranges between

3     twenty-eight to twenty-two?

4           PROSPECTIVE JUROR WEZNER:  Right.  Two are

5     mine, three are my wife's.

6           MR. PRASAD:  Right.  Anything about the age

7     of Mr. Howard that would affect you from being fair and

8     impartial?

9           PROSPECTIVE JUROR WEZNER:  No.  Not that I

10     can think of.

11           MR. PRASAD:  And I'm asking you the harder

12     question based on that is, is his age going to affect

13     your decision on whether not, the way you look at the

14     evidence or what, the ultimate decision you make?

15           PROSPECTIVE JUROR WEZNER:  I don't believe

16     so.  No.

17           MR. PRASAD:  Very good.  Let's jump to the

18     second row.  I think we have two people.  Please help me

19     with your, the pronunciation of your name, sir.

20           PROSPECTIVE JUROR NIZYBORSKI:  Nizyborski

21           MR. PRASAD:  Nizyborski.  And Ms. Malonis,

22     is that right?

23           PROSPECTIVE JUROR MALONIS:  Yes.

24           MR. PRASAD:  Did you guys hear the questions

25     that I was asking everyone?  I'm just going to go

 1      through them fairly quickly.  Anyone close to you either

 2      been a, been a victim of this type of crime before?  For

 3      either of you?  And anyone close to you ever been

 4      accused of this type of crime?

 5                  PROSPECTIVE JUROR MALONIS:  No.

 6                  PROSPECTIVE JUROR NIZYBORSKI:  No.

 7                  MR. PRASAD:  Okay.  What about assaultive

 8      cases involving guns?

 9                  PROSPECTIVE JUROR NIZYBORSKI:  I was robbed

10      working at a fast food restaurant.

11                  MR. PRASAD:  Okay.

12                  PROSPECTIVE JUROR NIZYBORSKI:  Robbed with a

13      gun.

14                  MR. PRASAD:  How long ago was that, sir?

15                  PROSPECTIVE JUROR NIZYBORSKI:  Twenty,

16      twenty-one years ago.

17                  MR. PRASAD:  Okay.  Anything about that

18      situation that would affect you from being fair and

19      impartial here today?

20                  PROSPECTIVE JUROR NIZYBORSKI:  No.

21                  MR. PRASAD:  All right.  Very good.  And

22      then similarly, is there any, any negative contact with

23      law enforcement that would affect you from being fair

24      and impartial?

25                  PROSPECTIVE JUROR MALONIS:  No.

1              MR. PRASAD:  Okay.

2              PROSPECTIVE JUROR NIZYBORSKI:  No.

3              MR. PRASAD:  Any contact with my office, the

4       prosecutor's office, either as a witness, as a victim or

5       as an accused?

6              PROSPECTIVE JUROR MALONIS:  No.

7              PROSPECTIVE JUROR NIZYBORSKI:  No.

8              MR. PRASAD:  All right.  Very good.  I know

9       I think Mr. Nizyborski, your children are right around

10      that age range.  Anything about Mr. Howard's age that

11      would affect you from being fair and impartial?

12             PROSPECTIVE JUROR NIZYBORSKI:  No.

13             MR. PRASAD:  Okay.  And Ms. Malonis, your

14      children are a little bit older.  But is there anything

15      about Mr. Howard's age that would affect you from being

16      fair and impartial?

17             PROSPECTIVE JUROR MALONIS:  No.

18             MR. PRASAD:  Okay.  And I forgot to ask you,

19      Mr. Wezner.  And I'm going to ask you both as well.

20      Anything about this whole process of having to make a

21      decision in this format, listening to the facts,

22      deciding on the facts, listening to the law, anything

23      about that that you have any hesitation about, whether

24      it's yourself, whether it's a religious reason, whether

25      it's, you know, an ethical or moral reason?  Anything

-142-

 1    like that?

 2                    PROSPECTIVE JUROR MALONIS:  No.

 3                    PROSPECTIVE JUROR NIZYBORSKI:  No.

 4                    PROSPECTIVE JUROR WEZNER:  No.

 5                    MR. PRASAD:  Very good.  Let me jump to the

 6    first row, sir.  Mr. Holt, same questions to you, sir.

 7    First, I'll start, I guess I'll start with the end.

 8    Anything about this whole process and having to make a

 9    decision in these terms that affects you that you give

10    any hesitation to that?

11                    PROSPECTIVE JUROR HOLT:  No.

12                    MR. PRASAD:  And then -- Your children are a

13    little bit older.  But anything about Mr. Howard's age

14    that would affect you from being, making a fair and

15    impartial decision?

16                    PROSPECTIVE JUROR HOLT:  No.

17                    MR. PRASAD:  Okay.  Any experience, someone

18    close to you regarding a homicide, either as a victim or

19    as an accused?

20                    PROSPECTIVE JUROR HOLT:  No.

21                    MR. PRASAD:  Or assault with a gun?

22                    PROSPECTIVE JUROR HOLT:  No.

23                    MR. PRASAD:  Any experience with my office?

24                    PROSPECTIVE JUROR HOLT:  No.

25                    MR. PRASAD:  All right.  Very good, sir.

1    Thank you, your Honor.

2              THE COURT:  Mr. Moore.

3              MR. MOORE:  Thank you, your Honor.  Good

4    afternoon to the new prospective jurors.  The Judge --

5    I'll direct this question to you, Ms. Malonis.  The

6    Judge brought up the movie Twelve Angry Men.  And in it,

7    Henry Fonda played the lone juror when they came in that

8    felt that they needed to have some conversation.

9              But the point that I wanted to make was Mr.

10   Fonda, through his character, felt there was a

11   reasonable doubt at some point in time.  He felt there

12   was a reasonable doubt in this case.  He felt it, felt

13   it in his soul.  And he could articulate it.  And he

14   stuck to his guns.

15             And the burden of proof is on the People of

16   the state of Michigan and never shifts to that table.

17   But if you were in that situation, you know, it's

18   eleven-to-one, it's Thursday afternoon.  You figure,

19   man.  We've been talking about this for two days.  I'm

20   tired and I don't want to come back on Monday.  Are you

21   going to give Mr. Howard his due and continue sticking

22   to your guns?  Or are you going to give up saying I'm

23   going home?  I'm going to go with you guys?

24             PROSPECTIVE JUROR MALONIS:  No.  I feel like

25   I'd do what was right.

-144-

 1                    MR. MOORE:  Okay.  As long as you can

 2       articulate your reason for having a doubt, you'd be

 3       comfortable?

 4                    PROSPECTIVE JUROR MALONIS:  Mm-hmm.

 5                    MR. MOORE:  Is there anything -- You have to

 6       say yes or no.

 7                    PROSPECTIVE JUROR MALONIS:  Yes.

 8                    MR. MOORE:  Okay.  Is there anything about

 9       the nature of the charge that makes it that you cannot

10       conceive a finding of not guilty?

11                    PROSPECTIVE JUROR MALONIS:  It makes me sad.

12                    MR. MOORE:  What makes you sad?

13                    PROSPECTIVE JUROR MALONIS:  The whole

14       situation.

15                    MR. MOORE:  Well, we get sad about crime all

16       around the community, right?

17                    PROSPECTIVE JUROR MALONIS:  Yeah.

18                    MR. MOORE:  And ultimately taking a person's

19       life, you know, I guess that's the ultimate, right?

20                    PROSPECTIVE JUROR MALONIS:  Uh-huh.

21                    MR. MOORE:  But we don't know anything about

22       this case, correct?

23                    PROSPECTIVE JUROR MALONIS:  Correct.

24                    MR. MOORE:  Haven't presented any, a stitch

25       of evidence?

1           PROSPECTIVE JUROR MALONIS:  Correct.

2           MR. MOORE:  Okay.  And, of course, the

3    obvious question oftentimes you're asked, if the Judge

4    told you back there, to go back and come up with a

5    verdict, what would your verdict be?

6           PROSPECTIVE JUROR MALONIS:  I'd have to hear

7    the case.

8           MR. MOORE:  Yeah.  But if you hadn't heard

9    the case, what would your verdict be?

10          PROSPECTIVE JUROR MALONIS:  I can't say.

11          MR. MOORE:  It'd be not guilty.  You haven't

12   heard anything.  You would agree with that?

13          PROSPECTIVE JUROR MALONIS:  Yes.

14          MR. MOORE:  Okay.  It's just a certain way

15   of putting it, although you had conceptually the same

16   idea.  You hadn't heard anything.  But since we know the

17   burden resides here, they have to prove.

18          PROSPECTIVE JUROR MALONIS:  Right.

19          MR. MOORE:  You have any problem with that,

20   Mr. Holt?

21          PROSPECTIVE JUROR HOLT:  No, sir.

22          MR. MOORE:  Mr. Nizyborski?

23          PROSPECTIVE JUROR NIZYBORSKI:  Yes.

24          MR. MOORE:  Okay.  Anything that you can

25   think of why you couldn't be a fair and impartial juror?

-146-

```
 1                    PROSPECTIVE JUROR NIZYBORSKI:  No.
 2                    MR. MOORE:  As to the other questions I have
 3       previously asked the other jurors, is there any answer
 4       you'd like to bring to my attention?
 5                    PROSPECTIVE JUROR NIZYBORSKI:  No.
 6                    MR. MOORE:  Same for you, Ms. Malonis?
 7                    PROSPECTIVE JUROR MALONIS:  No.
 8                    MR. MOORE:  Mr. Holt?
 9                    PROSPECTIVE JUROR HOLT:  No.
10                    MR. MOORE:  Thank you very much.  No other
11       questions.
12                    THE COURT:  Any challenges for cause?
13                    MR. PRASAD:  None for cause, your Honor.
14                    MR. MOORE:  None for cause.
15                    THE COURT:  Okay.  Any preemptories the
16       People wish to use?
17                    MR. PRASAD:  Yes, your Honor.
18                    THE COURT:  Go ahead.
19                    MR. PRASAD:  Your Honor, the People would
20       like to thank and excuse juror number eleven, Ms.
21       Peeples, your Honor.
22                    THE COURT:  Ms. Peeples?
23                    MR. PRASAD:  Yup.
24                    THE COURT:  Thank you, Ms. Peeples.
25                    MR. PRASAD:  And that's it.
```

-147-

1                    THE COURT:  Okay.  What's your pleasure, Mr.

2        Moore?

3                    MR. MOORE:  I'd like to thank and excuse

4        juror in seat number three, Mr. Holt, your Honor.

5                    THE COURT:  Mr. Holt, thank you for being

6        with us the short time that you were, sir.  Appreciated

7        your help.  Mr. U, if you please.

8                    THE CLERK:  Elizabeth Stuttz, could you

9        please take seat number two?  Gloria Saluk, could you

10       please take seat number three?  And Shannon Purvis,

11       could you please take seat number eleven?

12                   THE COURT:  Our new juror in seat number

13       two, please introduce yourself to us.

14                   PROSPECTIVE JUROR STUTTZ:  My name is

15       Elizabeth Stuttz.

16                   THE COURT:  Okay.  You've got to talk louder

17       than that today.

18                   PROSPECTIVE JUROR STUTTZ:  I'm sorry.  My

19       name's Elizabeth Stuttz.  I work for family's craft

20       supply company.  I'm not married.  What was the other

21       questions?

22                   THE COURT:  Do you live at home?

23                   PROSPECTIVE JUROR STUTTZ:  Yeah.  I believe

24       at home.

25                   THE COURT:  Okay.  Who works in the house?

-148-

1                  PROSPECTIVE JUROR STUTTZ:  My mom and my

2       stepdad.

3                  THE COURT:  What does your mom do?

4                  PROSPECTIVE JUROR STUTTZ:  She works for the

5       same company.  It's a family-run company and we all do,

6       you know, work within the company.

7                  THE COURT:  Okay.  But what does she do?

8                  PROSPECTIVE JUROR STUTTZ:  She does like

9       search engine optimization, like advertising on line.

10                 THE COURT:  Okay.  Good.  Have you ever

11      served as a juror before?

12                 PROSPECTIVE JUROR STUTTZ:  No.

13                 THE COURT:  Any of the people familiar to

14      you?

15                 PROSPECTIVE JUROR STUTTZ:  No.

16                 THE COURT:  So, you excited to be in that

17      seat?

18                 PROSPECTIVE JUROR STUTTZ:  It's okay,

19      interesting.

20                 THE COURT:  Which is the better seat?  That

21      one or that one?

22                 PROSPECTIVE JUROR STUTTZ:  That one.

23                 THE COURT:  Okay.  Now, you have to tell me

24      why, since you made a choice.

25                 PROSPECTIVE JUROR STUTTZ:  I don't know.

1    Because I have a lot of anxiety and it makes me nervous

2    to be up here, so...

3              THE COURT:  Imagine if you were in that seat

4    there.  You think there's a little more anxiety in that

5    seat?

6              PROSPECTIVE JUROR STUTTZ:  Yeah.  That'd be

7    worse.

8              THE COURT:  Yeah.  Sometimes the closer you

9    get to me it makes people more anxious.

10             PROSPECTIVE JUROR STUTTZ:  Yes.

11             THE COURT:  I would like to think it's not

12   me.  It's just the distance.  But some people think

13   that.

14             PROSPECTIVE JUROR STUTTZ:  It could be you.

15             THE COURT:  Ms. Saluk, please introduce

16   yourself to us.

17             PROSPECTIVE JUROR SALUK:  My name is Gloria

18   Saluk.  I'm am unemployed bookkeeper.  I'm married.  My

19   husband is retired.

20             THE COURT:  From?

21             PROSPECTIVE JUROR SALUK:  He was a machinist

22   for several years and then he got laid off and he builds

23   and repairs computers.

24             THE COURT:  Okay.

25             PROSPECTIVE JUROR SALUK:  Out of the house.

-150-

1       I have not been on a jury.  I don't know any of the

2       parties involved.  What'd I miss?

3                   THE COURT:  Do you have grandkids?

4                   PROSPECTIVE JUROR SALUK:  I have grandkids

5       from -- I don't have any children of my own.  I have a

6       stepson and he's married with grandchildren.

7                   THE COURT:  Okay.  Can you explain the

8       concept to me, please, of lying by omission?

9                   PROSPECTIVE JUROR SALUK:  That's leaving

10      something out of testimony.

11                  THE COURT:  Okay.  Now, do you consider that

12      lying?

13                  PROSPECTIVE JUROR SALUK:  In a normal

14      circumstance, I would think it would be.  In a court of

15      law, I think it's up to the attorney to come back and

16      ask the question to get the rest of the answer, I guess.

17                  THE COURT:  Okay.  How about this?  Does

18      this make sense, this oath?  Do you promise to tell the

19      truth, the whole truth?  Does that make sense?

20                  PROSPECTIVE JUROR SALUK:  Yes.

21                  THE COURT:  Okay.  Because, to me, it

22      implies that the truth can be something other than the

23      whole, if you have to explain what you mean when you say

24      the whole truth.  Anybody with me?  I mean, because I'm

25      thinking the truth just means one thing.  But if you can

-151-

1    decide to tell parts of the truth and it's up to

2    somebody else to elicit the other parts of the truth,

3    then...

4              PROSPECTIVE JUROR SALUK:  Then that's not

5    the truth.

6              THE COURT:  That's what I'm thinking.  It's

7    just interesting.  Lying by omission I learned an

8    interesting way because I was given some money as a kid,

9    told to go to the store and get some bread.  And, of

10   course, I went to the store and got some bread.  And it

11   took me an hour and a half to go a block to the store.

12   And I played a little Parchisi on somebody's porch and a

13   little catch in the back yard and shot some basketballs.

14   And when I came back home, it was like where you been?

15   And what did I answer?

16             PROSPECTIVE JUROR SALUK:  I went to the

17   store.

18             THE COURT:  Absolutely.  And she looked at

19   me and she asked me one more time.  Where'd you go?  And

20   I said what?

21             PROSPECTIVE JUROR SALUK:  I went to the

22   store.

23             THE COURT:  Now, when I said that, I was

24   wearing pants that were so long I had to take a cuff in

25   them and I was wearing a sweatshirt that was three sizes

1    too big.  I woke up and those pants were now shorts and

2    that was a short sleeve shirt.  That's how far into the

3    future she knocked me when I answered I went to the

4    store.  I had grown that much.  I had became quickly

5    acquainted with lying by omission.  Like she didn't ask

6    me the right question.  She asked me the right question

7    all right.  I was the fool not to answer it right.

8            PROSPECTIVE JUROR SALUK:  You don't think

9    she should have asked you where else did you go?

10           THE COURT:  No.  No.

11           PROSPECTIVE JUROR SALUK:  Okay.

12           THE COURT:  Because it didn't say and omit

13   the places that you wanted to go, that you didn't want

14   to tell me.  It's just like if you were married and had

15   a husband and he left work and went by three

16   girlfriend's houses and then finally came home.  And you

17   asked him, so where'd you go today?  And he conveniently

18   left out those three places.  On your way home, where

19   did you go?  And he also got some gas, so he says, oh, I

20   went and got some gas.

21           Now, once you found out that he had -- Would

22   you call him a liar?  Would you have said you lied to

23   me?  I asked you where'd you go.

24           PROSPECTIVE JUROR SALUK:  Yeah.  Probably.

25           THE COURT:  Okay.  He said, well, you didn't

-153-

1    ask me if I went by my girlfriend's house.  So, yeah.

2    Yeah.  At some point, you've got to -- The truth has to

3    stand for something we all understand.  It's not

4    piecemeal.  It's not to the interpretation of the person

5    listening.  It has to be plain.

6            In fact, I was talking with somebody the

7    other day and they were telling me there's two types of

8    luck.  There's good luck and bad luck.  And I looked at

9    her and I said, for real?  They said, yeah.  I said,

10   listen.  There's luck.  And then there's the absence of

11   luck.  Because if you look under the definition of luck,

12   there's no room for bad luck.  Luck means good things.

13           So, the opposite of luck would be the

14   absence of luck.  It can't be -- It's like love.  Not

15   good love and bad love.  Good A's and bad A's.  There's

16   an A and an A.

17           PROSPECTIVE JUROR SALUK:  Gotcha.

18           THE COURT:  Right.  There's telling the

19   truth and then there's lying.  And it's not like gray

20   areas.  Like we do gray areas with lying, don't we?

21   Yeah.  Tell me some good lies.  What do we call good

22   lies?

23           PROSPECTIVE JUROR MALONIS:  White lies.

24           THE COURT:  Yeah.  We even give them a

25   color.  And now, the bad lie, of course, is the -- We

1        don't call it a bad, white lie.  When we want to

2        identify a bad lie, we give it a different color.

3        Right, Mr. Rasberry?

4                    PROSPECTIVE JUROR RASBERRY:  I would think

5        so.

6                    THE COURT:  What color is that bad lie?  Oh,

7        don't go there on me.

8                    PROSPECTIVE JUROR RASBERRY:  Other than

9        white.

10                   THE COURT:  See, it's called a black lie.

11                   PROSPECTIVE JUROR MALONIS:  No.  No.  It

12       isn't.

13                   THE COURT:  Hmm?

14                   PROSPECTIVE JUROR MALONIS:  I never heard of

15       a black lie.

16                   THE COURT:  Yeah.  Ask the culture that gets

17       told the black lies.

18                   PROSPECTIVE JUROR MALONIS:  Okay.

19                   THE COURT:  And then they have the nerve to

20       say they bald-faced lies or bare-faced lies.  You heard

21       of a bare-faced lie?

22                   PROSPECTIVE JUROR MALONIS:  Yes.

23                   THE COURT:  Yeah.  No.  Opposite of a white

24       lie is a black lie, big black lie.  Everything gets

25       color dimensions, gets sizes.  And in America the good,

1   of course, is not the big, black one.  It's America,

2   right?  The hero is going to be on what color horse?

3   Wearing what?

4              PROSPECTIVE JUROR MALONIS:  It's just a

5   phrase.

6              THE COURT:  Hmm.

7              PROSPECTIVE JUROR MALONIS:  Just a phrase.

8              THE COURT:  Oh, no.  There's nothing that's

9   just a phrase.  It carries symbols, you know.  If we're

10  looking for truth and virtue, we're not looking to my

11  man dressed in black on the black horse.  That might be

12  Peleton (sp.), but that ain't the Lone Ranger.  The Lone

13  Ranger's on that white horse, in all white, without no

14  dusty spots.

15             And those symbols have meaning because

16  that's how they got to be symbols because they're

17  symbolic of something.  They're symbolic.

18             It's even like every now and then these

19  people will slip up and call me your Honor.  It just

20  freaks me out.  You know, because any time you have to

21  say that you think more lofty of something instead like

22  my occupation is Judge.  Every now and then they'll call

23  me Judge.

24             I make people call me Judge Morrow instead

25  of your Honor because words imply, I mean, things happen

-156-

```
 1        to us when we hear words, you know.  You cannot -- If I
 2        say angel, there's no way you saw something in red with
 3        a pitchfork with little horns.  With a word, I made you
 4        make a mental conception of something.  You didn't see -
 5        - I can make you see what I want you to see.  I can make
 6        you feel what I want you to feel, just with words.
 7                 I mean, it's like that.  Sweety, you know.
 8        You look so beautiful.  You're so precious to hold.  I
 9        would like to just cradle you and love you and draw you
10        to my bosom.  I can make you feel things just with
11        words.  You felt it, didn't you?  Yeah.  I felt it
12        saying it.
13                 As opposed to you little, dirty varmint.
14        Didn't we all see a little, dirty varmint?  Yeah.   The
15        words they use even here.  They call him the defendant.
16        That's nice and abstract.  But if you really think about
17        it, the root word of defendant is to defend.  Right?
18        But didn't you hear he doesn't have to defend himself.
19        He's presumed to be innocent.  So, why didn't the court
20        system just call him the accused?  Because defendant has
21        negative connotations, doesn't it?  Who wants to be a
22        defendant?  But we take these words and we bandy them
23        about and they all have images, all of them.
24                 Your Honor.  Oh.  Your Honor.  Honor is due.
25        You all are the honorable ones.  How many people think
```

1    you getting paid the right amount of money?  So, to me,

2    you're underpaid and you're willing to do it, so that

3    makes you real honorable.  I get paid -- I get

4    underpaid, too.  No.  I'm just kidding.

5         Sometimes this place is about presentation.

6    It challenges us to try to slip everything and see it

7    through reasonable and common sense lenses.

8         I used to tell people there was this one

9    witness.  And every time I saw this witness, I just felt

10   like Brucey because she looked like my grandma.  And

11   whenever I saw her, I could just hear her saying,

12   Brucey.  Brucey.  And I just felt like a kid and like I

13   was going to get a cookie or a piece of pound cake or

14   that little eighth piece of gum from her.  And it just

15   made me feel like -- And I was like, man.  Just looking

16   at this person can just make me feel like a kid again.

17   I mean, didn't have to say a word.  And I was just happy

18   that they didn't have to testify all the time because

19   it's hard to evaluate somebody from a child's

20   perspective that has that kind of, you know, power, to

21   just push you there.

22         So, you know, it would have been interesting

23   if I had because then I would have had to remember how

24   manipulative my grandmother was, too.  She beat me with

25   that little backscratcher when I could barely defend

```
 1      myself.  Can you believe that?  You remember those
 2      little, plastic backscratchers?  My grandmother whipped
 3      me with it.  Good for her.  She hit me too hard and it
 4      broke.  And then she was madder.  Then she called my
 5      daddy.  And it's like, that was it.  You make grandma
 6      break her -- I'm like, I didn't tell her to spank me.
 7      It ain't like it was my fault.
 8                  I digress.  I'm talking about everything but
 9      jury service.  But at the same time, talking all about
10      jury service.  But it does challenge us to do some of
11      that soul searching that we used to think because it
12      benefitted us not to tell the whole truth, you know,
13      just how that plays into the whole, whole thing, you
14      know.  Is getting answers from them like pulling teeth?
15      You know, why is that?  Young man?
16                  MR. PRASAD:  Thank you, sir.  Ms. Purvis,
17      good afternoon.  Ma'am, did you hear the questions I was
18      asking everyone else?
19                  PROSPECTIVE JUROR PURVIS:  No.
20                  MR. PRASAD:  No?  That's okay.  We'll go
21      through them again.  I know it's been a long day.  Start
22      off about this type of crime itself, the homicide type
23      of crime.  Has someone close to you ever been a victim
24      or accused of this kind of crime?
25                  PROSPECTIVE JUROR PURVIS:  Yes.
```

```
 1                   MR. PRASAD:  And who is that, ma'am?

 2                   PROSPECTIVE JUROR PURVIS:  My ex-boyfriend.

 3                   THE COURT REPORTER:  I can't hear, at all.

 4                   PROSPECTIVE JUROR PURVIS:  My ex-boyfriend.

 5                   MR. PRASAD:  And was he the victim or was he

 6      accused of it?

 7                   PROSPECTIVE JUROR PURVIS:  He -- This just

 8      happened.  He, he actually just got killed.

 9                   MR. PRASAD:  Oh.  I'm sorry.  When was this?

10                   PROSPECTIVE JUROR PURVIS:  Like two weeks

11      ago.

12                   MR. PRASAD:  Okay.  Are you okay being here?

13                   PROSPECTIVE JUROR PURVIS:  Yeah.

14                   MR. PRASAD:  Okay.  I'm just -- How long ago

15      was it that you guys dated?

16                   PROSPECTIVE JUROR PURVIS:  Two years ago.

17                   MR. PRASAD:  Has someone been charged for

18      this or anything like that?

19                   PROSPECTIVE JUROR PURVIS:  They really don't

20      know who did it because it was like -- They had to be

21      his friend, whoever it was.  Because he let them in the

22      house.  So, they really don't know who.  They just --

23      And after, they burned the house down with him in it.

24                   MR. PRASAD:  So, the investigation's still

25      ongoing right now?
```

1                    PROSPECTIVE JUROR PURVIS:  Yeah.

2                    MR. PRASAD:  Okay.  Is the Detroit Police

3       Department doing the investigation, do you know?

4                    PROSPECTIVE JUROR PURVIS:  I think, I think

5       so.

6                    MR. PRASAD:  Are you involved with that at

7       all?

8                    PROSPECTIVE JUROR PURVIS:  No.

9                    MR. PRASAD:  All right.  Anything about that

10      situation, would it affect your ability to be fair and

11      impartial in this case?

12                   PROSPECTIVE JUROR PURVIS:  No.  I can be

13      fair.  I t don't got nothing to do with this.

14                   MR. PRASAD:  Okay.  And that's exactly what

15      I was asking, exactly what I was asking.  And I'm sorry.

16      Besides that situation, was there any other circumstance

17      that you're close to in that, either a victim or accused

18      of a homicide?

19                   PROSPECTIVE JUROR PURVIS:  No.

20                   MR. PRASAD:  All right.  What about--

21                   MR. MOORE:  (Interposing)  For the record,

22      that answer was?

23                   MR. PRASAD:  No.  What about an assaultive

24      crime involving guns?  Anyone close to you or yourself

25      ever been a victim or accused of that?

1          PROSPECTIVE JUROR PURVIS:  No.

2          MR. PRASAD:  Good.  The other things, some

3   of the other things we talked about was, have you ever

4   had any contact with law enforcement?

5          PROSPECTIVE JUROR PURVIS:  Like what do you

6   mean?

7          MR. PRASAD:  Just being pulled over or

8   anything like that.

9          PROSPECTIVE JUROR PURVIS:  Yeah.

10          MR. PRASAD:  Yeah.  Anything about your

11   contacts with law enforcement -- Has it ever been a

12   negative experience that would affect you from being

13   fair and impartial?

14          PROSPECTIVE JUROR PURVIS:  No.  They were

15   just doing their job.

16          MR. PRASAD:  Okay.  Very good.  And then

17   what about my office?  You ever been affiliated -- Have

18   you ever had any contact with the prosecutor's office,

19   either as a witness or a victim or someone that's been

20   accused?

21          PROSPECTIVE JUROR MALONIS:  No.

22          MR. PRASAD:  Okay.  Good.  Ms. Purvis, you

23   have any children?

24          PROSPECTIVE JUROR PURVIS:  I got a little

25   one-year-old.

-162-

```
 1                    MR. PRASAD:  Okay.  Congratulations.

 2                    PROSPECTIVE JUROR PURVIS:  He'll be two in

 3      August.

 4                    MR. PRASAD:  Congratulations.  And so,

 5      obviously, that part doesn't affect you.  But anything

 6      about Mr. Howard's age, the fact that he is seventeen

 7      years old now, he was sixteen when he was accused of

 8      this crime, would that affect you from being fair and

 9      impartial?

10                    PROSPECTIVE JUROR PURVIS:  I don't think it

11      would.

12                    MR. PRASAD:  Okay.  You have no problems

13      deciding this case, even though he's so young?

14                    PROSPECTIVE JUROR PURVIS:  No.

15                    MR. PRASAD:  All right.  Very good.  Very

16      good.  Ms. Saluk, is that right?  Did I pronounce that

17      correctly?

18                    PROSPECTIVE JUROR SALUK:  Yes.

19                    MR. PRASAD:  Going through those same

20      questions, ma'am.  And Ms. Stuttz, I'll ask you at the

21      same time because you guys are right next to each other.

22      Let's start with the homicide question itself.  Anyone

23      close to you ever been the victim of this type of crime?

24                    PROSPECTIVE JUROR SALUK:  No.

25                    PROSPECTIVE JUROR STUTTZ:  My uncle was
```

1     stabbed.  He used to work in the prison in Jackson--

2               MR. PRASAD:  (Interposing)  Okay.

3               PROSPECTIVE JUROR STUTTZ:  By two prisoners.

4               MR. PRASAD:  Okay.

5               PROSPECTIVE JUROR STUTTZ:  That broke out

6     and decided they were going to stab him for religious

7     reasons.

8               MR. PRASAD:  How long ago was this?

9               PROSPECTIVE JUROR STUTTZ:  I was about nine,

10    I think.

11              MR. PRASAD:  So, more than ten years ago?

12              PROSPECTIVE JUROR STUTTZ:  Yeah.  But I

13    mean, but you know, my family was really affected by it

14    and things like that.  And--

15              MR. PRASAD:  (Interposing)  Well, let me ask

16    you.  Do you think -- Can you set aside what happened to

17    your uncle?  Or would that affect you from making a fair

18    and impartial decision in this case?

19              PROSPECTIVE JUROR STUTTZ:  I could, I can

20    probably set it aside.

21              MR. PRASAD:  Okay.  You were younger, you

22    were saying.  You were nine years old?

23              PROSPECTIVE JUROR STUTTZ:  Right.

24              MR. PRASAD:  Anything about that process

25    that you -- You didn't, you weren't involved in the

-164-

```
1    court process?

2              PROSPECTIVE JUROR STUTTZ:  I wasn't, I

3    wasn't involved with it.

4              MR. PRASAD:  Yeah.  Okay.  Very good.  Let

5    me ask the flip side of that question.  Anyone close to

6    you ever been accused of this kind of crime?

7              PROSPECTIVE JUROR SALUK:  No.

8              PROSPECTIVE JUROR STUTTZ:  No.

9              MR. PRASAD:  And then the next question was

10   about assaultive crimes involving guns.  Anyone close to

11   you or yourself ever been a victim or accused of this

12   type of crime?

13             PROSPECTIVE JUROR SALUK:  No.

14             PROSPECTIVE JUROR STUTTZ:  No.

15             MR. PRASAD:  Good.  Any negative contacts

16   with law enforcement?

17             PROSPECTIVE JUROR SALUK:  No.

18             PROSPECTIVE JUROR STUTTZ:  No.

19             MR. PRASAD:  And any contacts with my

20   office, specifically as a victim or a witness or

21   accused?

22             PROSPECTIVE JUROR SALUK:  No.

23             PROSPECTIVE JUROR STUTTZ:  No.

24             MR. PRASAD:  All right.  And going back to

25   that, that last question about, about Mr. Howard's age.
```

```
 1    Ms. Saluk, you have children -- You said you had your
 2    stepson?
 3                PROSPECTIVE JUROR SALUK:  My stepson.
 4                MR. PRASAD:  Right.  So, anything about Mr.
 5    Howard's age that would affect your ability to be fair
 6    and impartial or make a fair decision in this case?
 7                PROSPECTIVE JUROR SALUK:  No.
 8                MR. PRASAD:  Okay.  Ms. Stuttz, I'll ask you
 9    the same question.
10                PROSPECTIVE JUROR STUTTZ:  No.
11                MR. PRASAD:  I'm asking it to you a little
12    bit differently because you're closer to his age.
13                PROSPECTIVE JUROR STUTTZ:  I mean, I -- No.
14    I don't have no sympathy because of it or anything.  No.
15                MR. PRASAD:  Okay.  Thank you.  Thank you,
16    your Honor.  Pass the witness [sic].
17                THE COURT:  Mr. Moore?
18                MR. MOORE:  No questions.
19                THE COURT:  Any challenges for cause from
20    either side?
21                MR. MOORE:  No, your Honor.
22                MR. PRASAD:  None, your Honor.
23                THE COURT:  Okay.  Preemptories are then
24    back to the prosecution [sic].
25                MR. MOORE:  I'd like to thank and excuse the
```

1       jurors in seat number two, six and eleven, Judge.

2                   THE COURT:  Two, six and eleven.  Ms.

3       Malonis, thank you.  Two, Ms. Stuttz, thank you.  And

4       eleven, Ms. Purvis, thank you.

5                   MR. PRASAD:  None from the People, your

6       Honor.

7                   THE COURT:  Okay.

8                   THE CLERK:  Steven Dehnke, could you please

9       take seat number two?  Christina Gaitley, could you

10      please take seat number seven?

11                  THE COURT:  Six.

12                  THE CLERK:  Oh.  I'm sorry.  Yeah.  Six.

13      And Linda -- Is it Gottron?  Gottron?  Could you please

14      take seat number eleven?

15                  THE COURT:  How do you pronounce that last

16      name, ma'am?

17                  PROSPECTIVE JUROR GOTTRON:  Gottron.

18                  THE COURT:  Gottron.  Mr. Dehnke, please

19      introduce yourself to us.

20                  PROSPECTIVE JUROR DEHNKE:  I'm Steven

21      Dehnke.  I'm a co-owner of MD Tooling, a tooling

22      business.  We supply tools for C & C Machinery.  We

23      import from overseas, Italy.  Married twenty-five years,

24      have two kids, a daughter that will be eighteen

25      tomorrow, a son that's eleven.

1                    THE COURT:  Wife work outside of the home?

2                    PROSPECTIVE JUROR DEHNKE:  Yup.  She works

3        at U of M in the Department of Psychiatry.  She's like

4        an inpatient coordinator.

5                    THE COURT:  Okay.

6                    PROSPECTIVE JUROR DEHNKE:  Never been on a,

7        a seated jury.  And don't know anybody.

8                    THE COURT:  How did you and your wife meet?

9                    PROSPECTIVE JUROR DEHNKE:  Working at

10       McDonald's when we were sixteen, seventeen years old.

11                   THE COURT:  So, what convinced you at some

12       point after being sixteen to ask her to marry you?

13       Because I'm sure I didn't do it at sixteen.

14                   PROSPECTIVE JUROR DEHNKE:  No.  No.  No.

15       But it was probably after a year or two of working

16       together when she blew up the milk shake machine -- You

17       used to have to re-assemble them.  And she forgot to put

18       the gaskets in.  And when we flipped it on, you had

19       liquid flowing all over, just the look on her face made

20       you want to give her a hug.

21                   THE COURT:  Yeah.  And you did and the rest

22       is history.

23                   PROSPECTIVE JUROR DEHNKE:  I was the crew

24       chief who had to clean it up and take care of it.

25                   THE COURT:  And tell her, oh, that's all

                                    -168-

1       right.  Anybody would have forgotten the gasket.

2                   PROSPECTIVE JUROR DEHNKE:  Yeah.  Yeah.  But

3       if you're not doing anything Friday, I'd like to take

4       you out.

5                   THE COURT:  Well, that's a pretty good

6       story.  That's a pretty good story.  So, how many

7       children again?  I'm sorry.

8                   PROSPECTIVE JUROR DEHNKE:  Two.

9                   THE COURT:  Two.

10                  PROSPECTIVE JUROR DEHNKE:  A girl who will

11      be eighteen and a boy who's eleven.

12                  THE COURT:  So, have you been recruited to

13      do any coaching?

14                  PROSPECTIVE JUROR DEHNKE:  Assistant soccer

15      coach.  And I knew nothing about soccer at the time.

16      But--

17                  THE COURT:  (Interposing)  So, what have you

18      done since to bring yourself up to speed?

19                  PROSPECTIVE JUROR DEHNKE:  I actually know

20      the rules now.  I  know what's good, what's bad.

21                  THE COURT:  That's a long -- I mean, that's

22      some progress.

23                  PROSPECTIVE JUROR DEHNKE:  Yeah.

24                  THE COURT:  That's some progress.  Ms.

25      Gaitley, please introduce yourself to us.

1                    PROSPECTIVE JUROR GAITLEY:  My name's

2          Christina Gaitley.  I'm an administrative assistant at a

3          brokerage firm.  I'm also a coach and tutor, volunteer

4          director of a food pantry.

5                    THE COURT:  Of a what?  I'm sorry.

6                    PROSPECTIVE JUROR GAITLEY:  Of a food

7          pantry.

8                    THE COURT:  What's the name of your food

9          pantry?

10                    PROSPECTIVE JUROR GAITLEY:  My father's

11          business.

12                    THE COURT:  Okay.

13                    PROSPECTIVE JUROR GAITLEY:  I'm married for

14          twenty-seven years.  I have three daughters, twenty-

15          four, twenty-two and sixteen.

16                    THE COURT:  What does the husband do for a

17          living?

18                    PROSPECTIVE JUROR GAITLEY:  Husband is a

19          stay-at-home parent and sometimes substitute teacher.

20                    THE COURT:  Okay.

21                    PROSPECTIVE JUROR GAITLEY:  I have not

22          served on a jury.  I don't know anyone here.

23                    THE COURT:  So, who's your favorite

24          musician?  Okay.  What's the last I Tune you downloaded?

25          What was the last--

-170-

```
1                    PROSPECTIVE JUROR GAITLEY:  (Interposing)  I
2       don't, I don't do that.  But Reliant K (sp.) right now
3       is one of my favorites.
4                    THE COURT:  Okay.  What's the last CD you
5       bought of them?  Don't make me say 8-track.
6                    PROSPECTIVE JUROR GAITLEY:  Reliant K.  No.
7       It'd be Reliant K.
8                    THE COURT:  Okay.  So, where'd you meet your
9       husband?
10                   PROSPECTIVE JUROR GAITLEY:  Blind date.
11                   THE COURT:  Was it blind-blind?
12                   PROSPECTIVE JUROR GAITLEY:  No.  It was
13      friendly blind.  I worked with his brother.
14                   THE COURT:  Do you know I don't think that -
15      - Do you think that there's such a concept as blind date
16      nowadays?
17                   PROSPECTIVE JUROR GAITLEY:  No.
18                   THE COURT:  I think they either go on
19      Facebook to find what you look like, to see who you're
20      friends with or whatever other little search engine they
21      can try to find out about you.  You know, just some of
22      the mystery is gone.  Would you like to be, you know,
23      eighteen all over again in 2011?
24                   PROSPECTIVE JUROR GAITLEY:  No.
25                   THE COURT:  No?
```

-171-

```
 1                    PROSPECTIVE JUROR GAITLEY:  No.  I enjoyed

 2        it the first time in my life.  I don't need to do it

 3        again.

 4                    THE COURT:  Some people want to go back for

 5        a moment.

 6                    PROSPECTIVE JUROR GAITLEY:  I'm good.

 7                    THE COURT:  You're okay?

 8                    PROSPECTIVE JUROR GAITLEY:  Yes.

 9                    THE COURT:  I don't know.  I don't know.

10        Maybe for a day, you know, and just hang out, just for a

11        day.

12                    PROSPECTIVE JUROR GAITLEY:  To compare it?

13                    THE COURT:  You know, I want to go back

14        though with everything I, with my knowledge base now.

15                    PROSPECTIVE JUROR GAITLEY:  See, that's

16        cheating.

17                    THE COURT:  Of course, it's cheating.

18                    PROSPECTIVE JUROR GAITLEY:  That's the way

19        you want it?  Okay.

20                    THE COURT:  Right.  No.  No.  Look.  That's

21        why you go on vacation to the same place the second

22        time, so you can cheat, so you won't have to make the

23        mistakes about restaurants, so that you can know what

24        villa is better or what beach is better.  No.  That's

25        not cheating.  That's called research and development.
```

-172-

1       Don't you see yourself repeating good vacation spots?

2                   PROSPECTIVE JUROR GAITLEY:  You definitely

3       repeat what works well.  Yeah.

4                   THE COURT:  Right.  And a good restaurant,

5       you know.  They say though that that's the -- There are

6       two things that prohibit progress, I mean, that really

7       stand in the way of progress.

8                   The first thing they say is tradition.  And

9       then they usually say your last success because your

10      last success usually makes you do the same thing the

11      same way because you succeeded.  And as long as you

12      succeeded you won't, you won't do more.

13                  And sometimes that was the bad thing about

14      going to the same place.  You do less exploring because

15      you found everything.  And you go to the places you tend

16      to have found and, unless they're closed, and then it

17      pushes you and you're disappointed that you have to

18      explore and find someplace after you had figured

19      everything out.  That's what they say.  Ms. Gottron,

20      please introduce yourself to us.

21                  PROSPECTIVE JUROR GOTTRON:  My name is Linda

22      Gottron.  I work as a nurse anaesthetist for the Oakland

23      Corporation (sp.) at Annapolis Hospital.  I'm single by

24      way of divorce about ten years ago.  I have two boys,

25      one is sixteen.  He'll be seventeen at the end of the

-173-

1    month, and a fourteen year old.

2                THE COURT:  Okay.  What took you into the

3    health field, health care field?

4                PROSPECTIVE JUROR GOTTRON:  I always wanted

5    to go into nursing.

6                THE COURT:  Really?

7                PROSPECTIVE JUROR GOTTRON:  Mm-hmm.

8                THE COURT:  Did you used to read the little

9    Nancy Drew novels as a kid?

10               PROSPECTIVE JUROR GOTTRON:  Actually, I did.

11   That is correct.

12               THE COURT:  Well, I mean, you know -- We

13   have to feed, feed it somehow in some way.  And if we

14   have a chance to live that life earlier and we don't

15   know anybody that does, books is a great way to do it.

16                    So, any influential people that got you

17   interested in the health care profession or--

18               PROSPECTIVE JUROR GOTTRON:  (Interposing)

19   Actually, my mom did medical billing for a pediatric

20   opthomologist from Children's.  And when I was in high

21   school, he got me in at Children's as a student

22   volunteer and I just, I loved every second I was in the

23   hospital.  So, I do.  That was -- It was either that or

24   being a teacher.  And once I was in the hospital, I

25   thought this was it.

-174-

```
 1                    THE COURT:  Okay.  Are you big into soaps
 2       and perfumes?
 3                    PROSPECTIVE JUROR GOTTRON:  No.
 4                    THE COURT:  Okay.  Because some people that
 5       work in that environment because it smells kind of
 6       sterile, they like to put smells on or put smells in--
 7                    PROSPECTIVE JUROR GOTTRON:  (Interposing)
 8       Yeah.
 9                    THE COURT:  Just so that they don't smell
10       like hospitals or--
11                    PROSPECTIVE JUROR GOTTRON:  (Interposing)
12       Well, in the OR, we wear scrubs.  So, I leave it all
13       there.
14                    THE COURT:  Okay.  So, what's your favorite
15       fragrance that you buy yourself?
16                    PROSPECTIVE JUROR GOTTRON:  Laire Detente
17       (sp.).  It's the only one for about twenty years.
18                    THE COURT:  I'm sorry, Ms. Gaitley.  How
19       about yourself?  See, if they quit making that, that
20       would push her out of her comfort--
21                    PROSPECTIVE JUROR GOTTRON:  (Interposing)  I
22       got to go to Paris.  We got to talk.
23                    THE COURT:  No.  No.  No.  Then you have to
24       find -- It's like my father-in-law.  My man, bless his
25       soul, if you look at a picture of him forty years ago,
```

-175-

1       he has on the same pair of docksiders that he's wearing

2       the next time you see him.  And  I swear, I tell him,

3       I'm going to buy the company and just close it down, my

4       man.  I'm like, get some new shoes.  But he won't.  I'm

5       like, I'm putting them things in the casket when you go.

6       I'm like tired of them.

7               But you all know people like that.  They'll

8       go back to the store and look for the -- And you just

9       hope that they can't find it.  I'm sure that there are

10      some things that my wife hopes that I can't find, you

11      know, the next time around.  She's probably mad at Levi

12      Strauss for sure.  I love them.  Oh.  Yeah.  I'm not

13      wearing my blue jeans.  I'm wearing some other kind of

14      jeans today.  Did you all see what I was wearing today,

15      my pants?  No.  They go with the shirt.

16              So, Ms. Gaitley, how did you expect a Judge

17      to dress underneath the robe today?

18              PROSPECTIVE JUROR GAITLEY:  I did not give

19      it a tremendous amount of thought.

20              THE COURT:  But you did not include in your

21      thinking the Wings T-shirt, did you?

22              PROSPECTIVE JUROR GAITLEY:  I didn't.  But

23      when I saw the red peeking out, I suspected.

24              THE COURT:  I gave you a clue.

25              PROSPECTIVE JUROR GAITLEY:  You did give a

-176-

1    clue--

2                    THE COURT:  (Interposing)  Okay.  What kind

3    of handshake did I give you?  A firm one?  A soft, limp

4    one?  Or a wet one?  Or--

5                    PROSPECTIVE JUROR GAITLEY:  (Interposing)

6    It was gentle.

7                    THE COURT:  Gentle.  And what did you take

8    from that?

9                    PROSPECTIVE JUROR GAITLEY:  Either your

10   hand's tired or you're a gentle man.

11                   THE COURT:  Did that surprise you at all?

12                   PROSPECTIVE JUROR GAITLEY:  No.

13                   THE COURT:  How about you, Ms. Gottron?  Did

14   I give you a decent handshake?

15                   PROSPECTIVE JUROR GOTTRON:  Yes.  You did.

16                   THE COURT:  Did I look at you in the eye

17   when I told you--

18                   PROSPECTIVE JUROR GOTTRON:  (Interposing)

19   Yes.  You did.  I was actually quite impressed because

20   the last time I was on a jury, there was no contact with

21   the Judge.

22                   THE COURT:  That's because they were afraid

23   to make contact.  They didn't want you to know the real

24   them.  I figure, Mr. Dehnke, that if I invite you to my

25   house, I at least need to shake your hand and welcome

-177-

1       you and give you a little hors d'oeuvres--

2                     PROSPECTIVE JUROR DEHNKE:  (Interposing)

3       Right.

4                     THE COURT:  Or two.  Plus, it's, you know,

5       it's designed to keep you off guard, break through that

6       first stereotype or first expectation that was built

7       somewhere to just let you know this is the way we should

8       do it.

9                     So, what about the candy now, Ms. Gottron?

10      Did you like my choice of candy?

11                    PROSPECTIVE JUROR GOTTRON:  Yes.  It was

12      very good.

13                    THE COURT:  Do you know what people think

14      after Halloween?  They think the candy is leftover candy

15      from Halloween.  I mean, sometimes you can't get people

16      to think right.  They'll think, oh.  It's probably left

17      over candy.  I'm thinking wow, you know.

18                    PROSPECTIVE JUROR GOTTRON:  Do you give

19      candy canes at Christmas?

20                    THE COURT:  No.  I don't.  You know, I used

21      to try to do that and little chocolates.  Drove me to

22      the poor house.  I'm like, you know, if it was your

23      money I was spending, we would have it.

24                    And then there was somebody that really

25      thought that I was using court money for candy, just

                              -178-

1          like they thought that the coffee was court money.  And

2          they were like, oh, so does the county buy the art?  And

3          I'm thinking, I wish.  But, you know, how can you

4          control what people want to try to see?

5                    So, what are you going to learn, Ms.

6          Gottron, from serving as a juror?  What are you going to

7          learn about yourself, do you think?  Anything in

8          particular?

9                    PROSPECTIVE JUROR GOTTRON:  No.

10                   THE COURT:  Okay.  Let's ask Ms. Gaitley.

11         Okay.  Ms. Gaitley, what have you thought about in terms

12         of, man, I'm glad I didn't get asked that question?  Or

13         hmm, you know, that kind of makes sense, I never thought

14         of it that way before?  Anything?

15                   PROSPECTIVE JUROR GAITLEY:  Nothing's really

16         taken me by surprise.  You've provided, you've provided

17         more depth of understanding of certain aspects because,

18         never having done this before, I think some of the

19         nuances, they're not readily apparent.

20                   THE COURT:  Well, you know, what I usually

21         learn from this process is how you all think.  And it

22         makes me think differently.  And the next jury gets

23         asked a bunch of different questions based on how you

24         respond and answer.

25                   Mr. Dehnke, isn't it so funny?":  I had

-179-

1       never examined until I -- You know and I've been doing

2       this for a while.  Maybe it was six years ago.  The

3       police were talking about a procedure.  And what they

4       had done is they had stopped a car where there was a man

5       driver and a woman passenger.

6               And when the man got out, he immediately

7       frisked the man.  But they had to call for a scout car

8       with a female it to come look in the female's purse and

9       to fisk -- Frisk.  Fisk.  It's late.  And to frisk the

10      female.

11              You know, and on first blush, as a policy,

12      it makes sense, right?  But that's only if you think

13      that the man is heterosexual and that the woman is

14      heterosexual.  Because there's an assumption of people's

15      sexuality because if the police officer who searched the

16      male is homosexual, then would you want him frisking the

17      heterosexual as well as the female that's called to

18      search?  Because what they're trying to prevent, they're

19      actually setting up.

20              But, you know, you think about how many

21      general assumptions do people proceed with?  I mean, and

22      at some point, you need a particular set because you

23      need to make guidelines.  But what things do you not

24      further think about that maybe should be considered in

25      that?  It's like, wow.

                                -180-

 1               I sometimes even think about stupid things
 2       like seating arrangements.  Why am I way up there?  I'd
 3       rather be down here.  Why does he get to sit closer to
 4       you instead of him?  And what is it saying, if anything?
 5       Why does the prosecutor get to sit closer than the
 6       defense attorney?  Do we put friends closer and things
 7       that we fear further away?  Are we move comfortable with
 8       something?
 9               And there is no sign that, I swear, that if
10       Mr. Moore came and sat over here, he probably would ask
11       him, man, you in my seat, kind of like in church when
12       you're a visitor and you go sit in somebody else's seat
13       and they look at you at the front of the aisle like, you
14       know that that's my seat?  I've been sitting here every
15       Sunday.  I paid good tide money to sit there.  But, I
16       mean, it's just the way things are -- At some point,
17       somebody has to say, why?  I don't know.  And I don't
18       know.
19               It's more than a notion.  It's almost like
20       marriage.  Remember how when we first got married
21       everybody thought, oh, this is cool.  It's all right.
22       And, at some point, we started saying, man, this is hard
23       work.  Right?  Do you remember when that moment hit?  It
24       was like, man.  It's hard work.  And then you're like,
25       oh, well, hell, no.  It would easier.  Oh.  I'm sorry.

-181-

```
1    I used that word.  I'm not supposed to use that word.
2    But that's just, you know, you're like, no, no.  This is
3    cool.  This is cool.  We'll do this.  The option just is
4    like, woo.  Right.
5              And that's what this whole thing is about.
6    Can you imagine not having you all, what that would be
7    like?  Not having twelve people to decide on reasonable
8    and common sense?  I can't imagine that.  Young man, any
9    questions?  This would be the time.
10             MR. PRASAD:  Briefly, Judge.  Thank you.
11   Quick story, of course.  I hate to admit this, but it's
12   true.  LA Law was the first reason I became a lawyer,
13   you know, as a kid watching it and you're mesmerized.
14             THE COURT:  Blair Underwood.
15             MR. PRASAD:  Yes.
16             THE COURT:  Wanted to be Blair.
17             MR. PRASAD:  Yes.  Because there's that one
18   scene--
19             THE COURT:  (Interposing)  Oh.  I'm sorry.
20   I just made you identify with a male.
21             MR. PRASAD:  No.  But it's true.  Because
22   there's that one scene where he's like doing, I think it
23   was a deposition or something.  And he like waved at
24   this smoke screen to come out because there was a guy
25   who claimed to be in a wheelchair who he thought was
```

 1    faking it and the guy in the wheelchair runs out.  I'm

 2    sorry.

 3              Of course then, you know, I'm Indian, so

 4    then it broke my mother's heart because the truth is, I

 5    mean, it is true, all Indian parents do want their kids

 6    to be doctors.  I mean, we're not going to admit this in

 7    public, but it's true.

 8              THE COURT:  Oh, we know.  The brothers, we

 9    know that.  And we know why.  Because we think that the

10    highest calling and that you won't be discriminated

11    against and treated like less than if you are

12    intellectually superior and in a position where they

13    need you.

14              MR. PRASAD:  Yup.  That's--

15              THE COURT:  (Interposing)  It's to put you

16    on the top shelf.

17              MR. PRASAD:  That's, that's right.  Ms.

18    Gottron, so did you hear the questions I was asking

19    everyone else, ma'am?

20              PROSPECTIVE JUROR GOTTRON:  Yes.

21              MR. PRASAD:  Okay.  Going through those

22    really quickly.  Any experience with homicide, either

23    someone close to you as a victim or accused?

24              PROSPECTIVE JUROR GOTTRON:  Not a homicide.

25    No.

                             -183-

```
1                    MR. PRASAD:  And assaultive crimes with a
2       gun?
3                    PROSPECTIVE JUROR GOTTRON:  Not with a gun.
4                    MR. PRASAD:  Assaultive crimes in general?
5                    PROSPECTIVE JUROR GOTTRON:  With a knife.
6                    MR. PRASAD:  Was it yourself or--
7                    PROSPECTIVE JUROR GOTTRON:  (Interposing)
8       Yes.
9                    MR. PRASAD:  How long ago was that, ma'am?
10                   PROSPECTIVE JUROR GOTTRON:  It was probably,
11      it was a year after my divorce with my ex-husband.
12                   MR. PRASAD:  Okay.
13                   PROSPECTIVE JUROR GOTTRON:  So, probably ten
14      years ago.
15                   MR. PRASAD:  Anything about that
16      circumstance that affects you from being fair and
17      impartial?  No?  You have to answer out loud.
18                   PROSPECTIVE JUROR GOTTRON:  No.  I'm sorry.
19                   MR. PRASAD:  I'm sorry.  He just -- He can't
20      get head nods.
21                   PROSPECTIVE JUROR GOTTRON:  Can't see my nod
22      real good?
23                   MR. PRASAD:  Right.  Okay.  And then any
24      negative experience with law enforcement officers,
25      ma'am?
```

```
 1                        PROSPECTIVE JUROR GOTTRON:  Not at all.
 2                        MR. PRASAD:  And then anything about my
 3          office, any contact as a witness, victim--
 4                        PROSPECTIVE JUROR GOTTRON:  (Interposing)
 5          No.
 6                        MR. PRASAD:  Accused?
 7                        PROSPECTIVE JUROR GOTTRON:  No.
 8                        MR. PRASAD:  Okay.  Very good.  Finally, the
 9          question about children and -- Do you have children,
10          ma'am?
11                        PROSPECTIVE JUROR GOTTRON:  Yes.
12                        MR. PRASAD:  Okay.
13                        PROSPECTIVE JUROR GOTTRON:  Almost seventeen
14          year old.  He'll be seventeen at the end of the month.
15                        MR. PRASAD:  Right.  Right.  So, this
16          question goes directly to you then.  Anything about Mr.
17          Howard's age that would affect you from being fair and
18          impartial?
19                        PROSPECTIVE JUROR GOTTRON:  I don't think
20          so.
21                        MR. PRASAD:  And I think one of the previous
22          jurors, who's no longer a witness [sic], actually said
23          it best.  Any sympathies that you're going to have
24          that's going to affect your decision?
25                        PROSPECTIVE JUROR GOTTRON:  I'll try not.
```

1        But it's sad-

2                   MR. PRASAD:  Yeah.

3                   PROSPECTIVE JUROR GOTTRON:  Because it could

4        be my son sitting there.

5                   MR. PRASAD:  That's why I'm asking the

6        question.  That's exactly why I'm asking the question.

7        Can you set aside whatever sympathy you might have

8        because of his age and just focus on the facts and the

9        law?

10                  PROSPECTIVE JUROR GOTTRON:  I can certainly

11       try.

12                  MR. PRASAD:  And I guess that's the best way

13       to phrase it.  Is that all right for the back row there?

14       And the second row?  And the first row?  I mean, that's

15       what I'm really asking about.  Let me go onto -- Ms.

16       Gaitley?  Is that correct, ma'am?

17                  PROSPECTIVE JUROR GAITLEY:  Yes.

18                  MR. PRASAD:  Same set of questions, ma'am.

19       Any experience with homicide crimes, whether it was

20       someone close to you been a victim or accused?

21                  PROSPECTIVE JUROR GAITLEY:  No.

22                  MR. PRASAD:  What about assaultive crimes

23       with a gun?

24                  PROSPECTIVE JUROR GAITLEY:  No.

25                  MR. PRASAD:  Okay.  Any experience, negative

1    experiences with law enforcement officers?

2               PROSPECTIVE JUROR GAITLEY:  No.

3               MR. PRASAD:  Or experience with my office in

4    general?

5               PROSPECTIVE JUROR GAITLEY:  No.

6               MR. PRASAD:  And the children -- And the

7    question about your children and, more specifically, Mr.

8    Howard's age.  Anything about that that would affect you

9    from making a fair decision?

10              PROSPECTIVE JUROR GAITLEY:  I don't believe

11    so.

12              MR. PRASAD:  Okay.  You can set aside

13    whatever sympathy you would have?

14              PROSPECTIVE JUROR GAITLEY:  Yes.

15              MR. PRASAD:  Okay.  Good.  Good.  Good.  And

16    Mr. Dehnke?

17              PROSPECTIVE JUROR DEHNKE:  Nobody with the

18    crimes or I've never been involved.  Positive with the

19    police as most of my family were policemen in my dad's

20    generation.

21              MR. PRASAD:  I guess a separate question

22    then to that, ask you about that.  You're going to hear

23    law enforcement officers testify.  And Judge Morrow's

24    going to give you this -- It's the law.  It's going to

25    be a rule that pretty much says that you must treat law

1      enforcement officers like you would any other witness,

2      meaning you can't give them extra bonus points for being

3      law enforcement officers and you can't automatically,

4      you know, knock them down a couple demerits for being

5      law enforcement officers.  Do you think you can follow

6      that?

7            PROSPECTIVE JUROR DEHNKE:  I guess that

8      would be hard to answer because I always respect them

9      and everything else.  So, I guess I maybe do have them

10     up a notch.

11           MR. PRASAD:  Well, let me ask you about it

12     this way.  We want you to hold every witness' feet to

13     the fire.  We want you to look at every witness and

14     evaluate every witness to see if they're credible or not

15     credible.  Right?

16           PROSPECTIVE JUROR DEHNKE:  Mm-hmm.

17           MR. PRASAD:  Is that fair?

18           PROSPECTIVE JUROR DEHNKE:  Yes.

19           MR. PRASAD:  We want you to use the same

20     rules that you would for every witness, no matter if

21     they're an officer or not an officer.  Is that fair?

22           PROSPECTIVE JUROR DEHNKE:  Yes.

23           MR. PRASAD:  Will you promise to do that?

24     Would you use the same set of analysis that you would as

25     you're analyzing one witness and another, irrespective

1    if they're a police officer or not?

2                PROSPECTIVE JUROR DEHNKE:  Yes.

3                MR. PRASAD:  Okay.  And that's what I'm

4    trying to get at.  And I know Judge Morrow gave a, I

5    don't know if it was this morning or if it was later

6    this afternoon, where Judge Morrow was giving the

7    example about different professions and some people

8    think certain professions automatically give you bonus

9    points or doesn't give you bonus points.  That's what

10   we're trying to argue about -- Or not argue about.  But

11   ask you about, is can you treat everyone the same?  And

12   can you analyze everyone equally, agree to do that?

13               PROSPECTIVE JUROR DEHNKE:  Yes.

14               MR. PRASAD:  Okay.  Good.  Thank you, sir.

15   And finally, sir, regarding Mr. Howard's age.

16   Sympathies aside, can you put those sympathies aside?

17               PROSPECTIVE JUROR DEHNKE:  Yes.  I can.

18   Yeah.

19               MR. PRASAD:  Great.

20               PROSPECTIVE JUROR DEHNKE:  It doesn't bother

21   me.

22               MR. PRASAD:  Thank you, your Honor.

23               THE COURT:  Mr. Moore?

24               MR. MOORE:  Thank you.  Good afternoon, Ms.

25   Gaitley.

```
1                    PROSPECTIVE JUROR GAITLEY:  Good afternoon.
2                    MR. MOORE:  I love your smile.  You heard
3          the questions I asked earlier?
4                    PROSPECTIVE JUROR GAITLEY:  Some of them.
5                    MR. MOORE:  Okay.  You remember the Court
6          talked about a lot of things earlier while you were
7          sitting down.  Anything you'd like to bring to my
8          attention based upon the questions that were asked or
9          some of the comments made by the Court?
10                   PROSPECTIVE JUROR GAITLEY:  Nothing comes to
11         mind.
12                   MR. MOORE:  Okay.  Now, we talked about you
13         might not hear my client.  And, you know, it's just
14         natural to hear the other side of the story.  It was
15         Paul Harvey, now the other side of the story.  Okay.
16         Now, you won't hold that against my client if he chooses
17         not to testify?
18                   PROSPECTIVE JUROR GAITLEY:  I won't hold it
19         against him.
20                   MR. MOORE:  Well, you know, it's like well,
21         hey, man.  This is serious.  I want to hear what the
22         other side has to say.  Because it's natural.  Would you
23         agree.
24                   PROSPECTIVE JUROR GAITLEY:  I think it is a
25         natural tendency.
```

1           MR. MOORE:  How about you, Ms. Gottron?

2    Natural tendency to want to hear the other side?

3           PROSPECTIVE JUROR GOTTRON:  Yes.  It is.

4           MR. MOORE:  Okay.  Now, if the Court gives

5    you an instruction, which I believe he will, you can't

6    hold that against him.  Because remember, as I said

7    earlier, the burden of proof remains at this table with

8    the prosecutor, who represents the People of the state

9    of Michigan.  It stays here.  He's going to prove it

10   with evidence or doesn't prove it because there's a lack

11   of evidence or the insufficiency of the evidence.  Now,

12   that's what we have.

13          You're going to listen to some witnesses,

14   might have some exhibits.  And he has to convince you

15   beyond a reasonable doubt, a doubt based upon common

16   sense and reason, something you can articulate, not a

17   fanciful doubt.  You have any problem with that, Ms.

18   Gaitley?

19          PROSPECTIVE JUROR GAITLEY:  No.

20          MR. MOORE:  Ms.  Gottron?

21          PROSPECTIVE JUROR GOTTRON:  No.

22          MR. MOORE:  Any reason why you two cannot be

23   fair and impartial jurors?

24          PROSPECTIVE JUROR GOTTRON:  No.  I think

25   we'd be fine.

-191-

 1              MR. MOORE:  Okay.  Speaking for Ms. Gaitley,

 2      too.

 3              PROSPECTIVE JUROR GOTTRON:  Yeah.  Sure.

 4              MR. MOORE:  Okay.  All right.  Thank you

 5      very much.  No other questions.

 6              THE COURT:  Any challenges for cause from

 7      either one of the parties?

 8              MR. PRASAD:  Nothing for cause, not from the

 9      People, your Honor.

10              MR. MOORE:  None, Judge.

11              THE COURT:  Okay.  Preemptories?

12              MR. PRASAD:  None.

13              MR. MOORE:  I'd like to thank and excuse the

14      juror in seat number two, Judge, Mr. Dehnke.

15              THE COURT:  Okay.  Mr. Dehnke, thank you so

16      much.  Well, I'm going with thirteen or twelve.  So,

17      anybody want to exercise anymore?  Or are we good?

18              MR. MOORE:  You're the Judge.

19              THE COURT:  No.  I go with any twelve or

20      above.  So, if we're twelve and you don't want to

21      exercise anymore preemptories.  You don't want to?

22              MR. PRASAD:  I'm good, your Honor.

23              MR. MOORE:  No.  I'm good, Judge.

24              THE COURT:  Could I ask you all to just --

25      Because I have to tell these people what's the next

                            -192-

1       stage.  Can I ask you all to just chill out in the jury

2       room for what might be only five more minutes?

3                       (At 2:55 p.m. panel leaves the courtroom.)

4                       (At 2:55 p.m. court in recess.)

5                       (AT 3:05 p.m. court back in session.)

6                       THE COURT:  Hey, young people.  Bring all

7       your stuff.  Have a seat.

8                       (At 3:05 p.m. panel enters the courtroom.)

9                       THE COURT:  We want to know, we want to if

10      Ms. Neighbors wants to cheat.  You want to cheat, Ms.

11      Neighbors?

12                      PROSPECTIVE JUROR NEIGHBORS:  Sure.

13                      THE COURT:  Okay.  Good.  Okay.  Now, this

14      is cheating.  Cheating means parking free.  So, would

15      you all like to cheat?

16                      PROSPECTIVE JURORS;  Yes.

17                      THE COURT:  So, the way to cheat is to start

18      at 9:30, and then to tell everybody to go park in the

19      casino and walk three blocks back.  Because it is free

20      in the casino after 9:00.  It's just right three blocks

21      South of here.  And they don't even ask you where are

22      you going?  It's just free--

23                      PROSPECTIVE JUROR NEIGHBORS:  (Interposing)

24      I have a jury tag on.

25                      THE COURT:  It doesn't matter, you know.

-193-

1      They've seen people with jury badges in there at lunch

2      time.  Trust me.  Oh.  There were some places where they

3      used to have to go look for court personnel.  Yeah.  I

4      mean, you know, it's like that.  So, why don't we start

5      at 9:30?  That way you can pop down there and, you know,

6      let's just try to all be here.

7             And the badges you have has our number on

8      the back so that if there's a traffic jam or something,

9      just give us a call so I don't have to worry about,

10     where are you, where are you, where are you?  And

11     anything else that we haven't an addressed, you can just

12     ask me tomorrow and we'll do that.  Wood is going to

13     send you home today.

14            PROSPECTIVE JUROR WEZNER:  So, one of us is

15     an alternate apparently, right?

16            THE COURT:  Yes.  But we don't tell anybody.

17     Because it used to be in the olden days you would tell

18     them and they would sleep.  This way, it's just random.

19     Everybody's card at the end, shake it up and we'll just

20     pull somebody and that's the person that, as weird as it

21     sounds, feels cheated.  Because they've listened and

22     they've wanted to engage in all of this discussion and

23     then they get sent home.

24            And usually, we'll say, have you befriended

25     a particular person?  And do you want me to give you

-194-

1    their number so they can call you afterwards and you all

2    can discuss the case?  Or they'll want to know, what did

3    they talk about in the back?

4            And at one time, what I did was I used to

5    let that person sit in the jury room to hear the

6    deliberations, but not be a part of it.  And I figured

7    that that was tortuous.  Exactly.  You know, the person

8    that hurt their ankle that sits on the bench and they

9    can't say anything.  So, I just said, okay.  Forget

10   that.  We'll just, I'll just say, you know, we'll do it

11   this other way.

12           But, you know, you just try things.  Because

13   you don't want anybody to be cheated out of the process

14   or to hear the process.  And most people would love to

15   hear jury deliberations anyway, especially these two.

16   They would love to know what you all talk about.  No.

17   You cannot sell your memoirs after jury service is over.

18   And you cannot blog.  How many laptops have you had?

19                   PROSPECTIVE JUROR TWO:  One.

20                   THE COURT:  One?  How old is it?

21                   PROSPECTIVE JUROR TWO:  About six months.

22                   THE COURT:  Six months.  Oh.  You're new to

23   the game.

24                   PROSPECTIVE JUROR TWO:  To toting something

25   around like that?  Yeah.

1                    THE COURT:  How about your -- You got a

2        Smart phone?

3                    PROSPECTIVE JUROR TWO:  Nope.

4                    THE COURT:  Your phone isn't smart?

5                    PROSPECTIVE JUROR TWO:  I'm already in touch

6        with people I want to talk to.

7                    THE COURT:  My phone was smart and I was

8        dumb with this smart phone and it was killing me.  I got

9        to have my secretary like do my work for me.  Do this

10       right quick.

11                   PROSPECTIVE JUROR FIVE:  I have a question,

12       just regarding the cell phones.  I mean, mine's in the

13       car.  Will I be able to bring it in now because--

14                   THE COURT:  (Interposing)  Why would you

15       want to?  I'm just asking a crazy question.

16                   PROSPECTIVE JUROR FIVE:  Well, just, just in

17       case, you know, my kids.

18                   THE COURT:  Well, you know, you're free at

19       any break to use any phone that we have, even if you

20       want to go on-line I'll let you use my laptop.  It

21       doesn't matter.  If you want to stay in there.  Phones

22       got distracting in that when jurors had them, they would

23       take calls during deliberations.

24                   PROSPECTIVE JUROR FIVE:  I wouldn't do that.

25                   THE COURT:  No.  No.  I'm just saying.  You

                                   -196-

1   know, they would, they would take calls.  You'd be

2   surprised what people think is appropriate etiquette

3   now.  They think that as long as they're not discussing,

4   they can text.  And they would use it as their undivided

5   attention.

6              But when they really got kicked out of

7   courtrooms was during the OJ Simpson trial because there

8   were people recording and taking pictures.  Because, at

9   first, we just eliminated picture phones, thinking that

10  that was going to solve the problem.  But once they

11  started recording and -- What did they kick off?  Four

12  jurors off because a couple had book deals already, you

13  know.  And they were just using it -- And we just said,

14  a distraction's a distraction.  Let's just let you all

15  go in there.

16             So, no.  You're free to use our phones.  If

17  there's something on-line that you want to look at, stay

18  for lunch, I'll, you know, my laptop actually is your

19  laptop, state of Michigan, county of Wayne.  It's our

20  laptop.  Just don't get me in trouble and go on some of

21  those sites.  But that's it.

22             So, I'll see everybody back in the morning.

23  And listen, the seats don't belong to anybody, you know.

24  It's first come, first serve.  You can change seats

25  whenever you want to.  All right.

-197-

1                        (At 3:11 p.m. panel leaves the courtroom.)

2                        (At 3:11 p.m. proceedings concluded.)

                    R E P O R T E R ' S   C E R T I F I C A T E

STATE OF MICHIGAN   )
                SS  )
COUNTY OF WAYNE     )

                    I, SEAN E. ALLEN, CSMR 5265, Certified Court

Reporter acting in and for the Third Judicial circuit,

Wayne County, State of Michigan, do hereby certify that

the foregoing pages 1 through 198, inclusive, were

reduced to typewritten form and comprise a true

rendition of the proceedings taken in the above-entitled

matter on May 9, 2011.

                    I FURTHER CERTIFY THAT MY CERTIFICATION

ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN,

SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES

NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED

COPIES NOT MADE UNDER MY CONTROL AND SUPERVISION.


                    _____
                    SEAN E. ALLEN -- CSMR 5265
                    Official Court Reporter.

DATED:  This 26th day of June 2012.