STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN


v                         Case Number

                          10-5562-01


DEONTE HOWARD

                          Defendant.


_____/

JURY TRIAL -- DAY TWO

PROCEEDINGS HELD BEFORE THE HONORABLE BRUCE U. MORROW,

Judge, Third Circuit Court, Detroit, Michigan, on

May 10, 2011.

APPEARANCES:

                RAJ PRASAD P68519
                Assistant Prosecuting Attorney
                Wayne County Prosecutor's Office
                1441 St. Antoine
                Detroit, MI 48226
                (313) 224-6804

                W. FREDERICK MOORE P33341
                Attorney for the Defendant.
                11954 Wisconsin Street
                Detroit, MI 48204
                (313) 418-1253


SEAN E. ALLEN
Official Court Reporter
CSMR 5265
(313) 224-7044

TABLE OF CONTENTS

OPENING STATEMENT BY MR. PRASAD......................18
OPENING STATEMENT BY MR. MOORE.......................22

WITNESSES:
SERGEANT ROBERT LALONE
        Direct Examination by Mr. Prasad..............25

BOBBY BAILEY
        Direct Examination by Mr. Prasad..............56
        Cross-Examination by Mr. Moore................80
        Redirect Examination by Mr. Prasad............93
        Recross-Examination by Mr. Moore..............99

FREDERICK McFADDEN
        Direct Examination by Mr. Prasad..............100
        Cross-Examination by Mr. Moore...............117

OFFICER RODNEY CUSHINGBERRY
        Direct Examination by Mr. Prasad..............135

OFFICER BRANDON PETTIT
        Direct Examination by Mr. Prasad..............141
        Cross-Examination by Mr. Moore...............146

SERGEANT SAMUEL MACKIE
        Direct Examination by Mr. Prasad..............156
        Cross-Examination by Mr. Moore...............174

MARCARIO HARRIS
        Direct Examination by Mr. Prasad..............184
        Cross-Examination by Mr. Moore...............194

KIMBERLY THOMPSON
        Direct Examination by Mr. Prasad..............201
        Cross-Examination by Mr. Moore...............212
        Redirect Examination by Mr. Prasad...........214
        Recross-Examination by Mr. Moore.............215

EXHIBITS:
People's Exhibits One through Twenty...............32
People's Exhibit Number Forty-Eight................80

1                    Detroit, Michigan.

2                    May 10, 2011.

3                    (At 9:36 a.m.)

4                    THE COURT:  We're recalling the case.

5        People of the state of Michigan versus Mr. Howard.  Your

6        appearances this morning, please.

7                    MR. PRASAD:  Good morning, your Honor.  Raj

8        Prasad for the People.

9                    MR. MOORE:  Good morning, your Honor.  May

10       it please this Honorable Court, W. Frederick Moore on

11       behalf of Mr. Howard.

12                   THE COURT:  Okay.  We are ready, are we not?

13                   MR. PRASAD:  We are, sir.

14                   MR. MOORE:  As the witnesses are leaving,

15       yes.

16                   THE COURT:  Okay.  Without further ado,

17       let's start the music and do the dance.

18                   THE DEPUTY:  Please rise for the jury.

19                   (At 9:36 a.m. panel enters the courtroom.)

20                   THE DEPUTY:  You may be seated.

21                   THE COURT:  Well, top of the morning,

22       everybody.  How many of you took advantage of the free

23       parking?  Ah.  Ha-ha.  You little, thrifty people.

24       Okay.  Well, you know, now we're about ready to start.

25       You have to take one more oath.

-2-

```
 1                    Oh, and the other thing is thank you for
 2        bringing the coffee out because you know you can bring
 3        coffee, water, you know.  This is your work space.
 4        Everything but smoking cigarettes and drinking alcohol,
 5        like I told you.  Other than that -- Yes.
 6                    PROSPECTIVE JUROR FOURTEEN:  So, we can take
 7        notes?
 8                    THE COURT:  You can, if you'd like.  Would
 9        you like?
10                    PROSPECTIVE JUROR FOURTEEN:  Yeah.  I'd
11        better.
12                    THE COURT:  Oh, I've got it.  I have legal
13        pads, pencils.  You don't, you don't have to -- In the
14        meantime, I need you to take one more oath.  So, Mr.
15        Ulatowski, if you please.
16                    THE CLERK:  Sure.  If everybody could
17        just stand and raise your right hands again?
18                    (At 9:38 a.m. jury sworn.)
19                    THE CLERK:  Do you promise, swear or affirm
20        that you will truly try to make a true decision between
21        the People of the state of Michigan and the defendant at
22        the bar, whom you shall have in your charge, according
23        to the evidence and the laws of this state?
24                    THE JURORS:  I do.
25                    THE COURT:  Taking notes means that
```

-3-

1    something is noteworthy.  I like that term.  Noteworthy.
2    Let me start out, because we've talked about taking
3    notes, about how notes are to be used.
4            Notes are to be used just like people's
5    memory.  One does not beat the other.  Sometimes we
6    think that notes trump people's memory.  And we'll say,
7    well, I wrote it down.  As if you wrote it down
8    correctly and somebody's memory is not as good because
9    you wrote it down.
10            But the truth of the matter is because
11    somebody writes it down and somebody memorizes it, the
12    one that writes it down doesn't get any more priority or
13    it doesn't make it any more right than somebody's
14    memory.  We don't know a person's ability to remember.
15    We don't know a person's ability to hear something and
16    then write it down correctly.
17            Because if you've been like me, I've heard
18    some stuff, wrote it down and couldn't believe what I
19    wrote down based on what I heard.  And especially with
20    phone numbers.  We all transpose numbers.  I love those
21    machines that play it twice for you now.  Because when
22    I'm scribbling, I don't know.  Most people want to think
23    that because they wrote it down, it's better than
24    somebody's memory.  Okay.
25            That oath that you just took, does it have

                              -4-

1      any real significance the way that you took that oath?

2      What do you think?  You think so?

3                 JUROR GAITLEY:  Sure.

4                 THE COURT:  Okay.  So, you think it makes it

5      more significant if I just told to stay seated, hold the

6      arm rest of your chair and promise to do your jobs as a

7      juror would do your jobs?  You think both of them are

8      the same, equivalent?  Okay.  How about if I passed a

9      piece of paper around and on that was the oath and I

10     asked you to sign your name at the bottom?  You don't

11     think so.  What does the IRS require us to do?  Sign

12     your name.  Do they ask you to stand up, raise the right

13     hand?  No.  So, think about it.  Does signing your name

14     mean the same thing?  Okay.

15                Let's look at it from the American

16     Disabilities Act point of view.  What if you couldn't

17     stand?  What if you didn't have the ability to raise

18     your right hand or your left hand?  Could you still take

19     an oath and serve as a juror?

20                So, what part of that oath is just pomp and

21     circumstance, if you will?  Everything but what you say.

22     The affirmation.  So, even though I talk about

23     reasonableness and common sense, I was showing you an

24     example of something that's not consistent sometimes

25     with what I even say.  A lot of things, as you go along,

-5-

1    you will find -- Okay.  You know, Bruce talks about

2    reasonableness and common sense.  How does this directly

3    go to something that he's been talking about?  All I can

4    say is forgive me because some things I'm required to

5    do.  And they don't make sense to me.

6              The raising of your right hand originated

7    back in England before there were good record keepings.

8    And so, when people committed a crime, they would brand

9    the name of the crime in the palm of their right hand.

10              And so, when Judges or Magistrates would go

11   out from villa to villa to villa to hear these little

12   disputes, if you will, the first thing that person would

13   do is say raise your right hand.  It would indicate if

14   they had any sort of convictions or had been, you know,

15   in trouble before.  And so, it would then give them a

16   way or a view to decide if what they were saying was

17   credible.

18              That even continued, Ms. Neighbors, into the

19   USA.  When the Brits came over here, they would still

20   brand the crimes in the palm of your hand.  Somebody

21   finally decided, a little inhumane.  Let's try something

22   different.

23              Or they -- Can you imagine going to a

24   village and somebody not being able to raise their right

25   hand because they had severed their hand at their risk?

-6-

1    It's like, what crime did you commit?

2           So, no relationship to anything.  It outgrew

3    whatever usefulness it had.  And like so many things, it

4    just continues.  And people almost feel like if it's not

5    there something's wrong.  You ever been in that

6    situation that if something doesn't happen that you

7    thought had some significance you think that what you're

8    doing is losing significance?

9           There's a joke about this couple that went

10   to this restaurant in South America and they asked for

11   some soup.  And when they got their soup, the soup had

12   this huge roach in it.  They were like mystified -- Not

13   mystified.  But they were amazed.  And they called the

14   waiter.  Waiter, there's a roach in my soup.  Waiter

15   took the roach out, they ate the soup.

16          On their return trip, they came back and

17   they ordered from the same restaurant because the soup

18   was great.  And guess what?  Bowl of soup, roach in the

19   soup.  They took the roach out themselves this time.

20   Ate the soup.

21          Recommended it, came back the third time,

22   ordered the soup again.  This time it wasn't, the soup

23   came without a roach.  Waiter.  Waiter.  Where's our

24   roach?

25          So used to seeing it that way that when they

-7-

1    didn't see it that way, the abnormal way became normal.

2    The frequency.  We think sometimes the frequency of

3    something makes it normal.  We don't think that abnormal

4    can happen frequently.  No?

5              JUROR GAITLEY:  That's makes sense.

6              THE COURT:  You with me?  Yeah.

7              JUROR GAITLEY:  Yeah.

8              THE COURT:  So, you know, you'll see

9    contradictions in almost everything, if you look long

10   enough.  And, you know, the main point in all of this is

11   the reasonableness and common sense.  Try to find it in

12   everything.  Because it's there.  Sometimes it's a

13   little harder to find.

14             I'm going to go over some legal concepts

15   with you, explain to you how the trial is supposed to

16   go, your role, my role and then I'm going to sit down

17   and basically steer the ship.

18             The first legal concept is the presumption

19   of innocence.  And, again, the law says that a person

20   that is accused of a crime is presumed to be not guilty.

21   That presumption begins at the beginning of the trial,

22   it continues throughout the trial and entitles Mr.

23   Howard to a verdict of not guilty unless...

24             MR. PRASAD:  I'm sorry.  Is it bothering

25   you?  You want me to turn off?

                              -8-

1                    THE COURT:  It's a little background noise

2        and the lights.  I feel like I'm on stage.

3                    JUROR NUMBER TWO:  Can you take the -- It's

4        very distracting.

5                    THE COURT:  Yeah.  Again, the presumption of

6        innocence says that Mr. Howard doesn't have to do

7        anything.  The People of the state of Michigan have to

8        prove each and every element beyond a reasonable doubt.

9                    Because the presumption of innocence says

10       that Mr. Howard is not guilty, he doesn't have to do

11       anything.  His job is complete just by being here.  And

12       the burden never shifts.  And if Mr. Howard, through Mr.

13       Moore, decides to do nothing, his silence cannot be used

14       against him.

15                    A reasonable doubt, again, is a fair, honest

16       doubt that grows out of the evidence, the lack of

17       evidence or the inadequate nature of the evidence.  It's

18       not merely an imaginary or a possible doubt, but a doubt

19       that's based on reason and common sense.  And,

20       therefore, a reasonable doubt is just that.  It's a

21       doubt that's reasonable after a careful and considered

22       examination of the facts and circumstances in this case.

23                    Your job is to decide the facts of the case.

24       And any decision that you make about the facts of the

25       case is a final decision.

                                    -9-

1            My job becomes much, much simpler because

2       you're here.  And that is just to make sure that the

3       trial runs fairly and efficiently.  So, I'm kind of the

4       timekeeper.  Sometimes I'll just chime out, let's move

5       along, you know, just try to keep them going.

6            The lawyers try to keep themselves in check

7       because they'll object from time to time to each other's

8       questions.  And sometimes they don't even wait for me to

9       make a ruling.  They'll just try to argue amongst

10      themselves.  And I'm trying to decide when's my turn?

11      And sometimes I'll ask, let me know when it's my turn.

12      A little cynical.

13           But, basically, I'll have to rule for one

14      side or the other.  And the fact that I ruled for one

15      side just means that they got lucky and they know how

16      I'm thinking.  It doesn't mean that one side is smarter

17      or less smart than the other.

18           So, that's what you'll see me do.  Other

19      than that, I'm not paying attention to too much.  I'm

20      not watching and listening and trying to remember what

21      the witnesses said because that's your job.  I'm not

22      trying to decide anybody's credibility.  That's your

23      job.  So, I'm just kind of managing because you all are

24      here.

25           The trial will start out, after I sit down,

-10-

1     with the prosecution having to do stuff.  They have to

2     give an opening statement, have to.  Mr. Moore, he can

3     elect to give one or he can decide not to give one.  Or

4     he can just say I want to reserve mine.  Anything and

5     everything the defense does it because they choose to

6     exercise an option.

7             They'll present witnesses.  If those

8     witnesses want to be asked questions, Mr. Moore will

9     have that opportunity.  If not, he'll just say no

10    questions.  And when all the witnesses or the evidence

11    from the prosecution's side is finished, they'll say

12    that, you know, we rest.

13            At that point, if Mr. Moore has witnesses

14    that he wants to introduce through testimony, exhibits,

15    he'll have an opportunity.  But again, if he chooses not

16    to, it is no big deal, no burden of proof, no obligation

17    to go forward.  The presumption still carries on.

18            At the end of when he rests, they'll give

19    closing statements.  Again, the prosecution will give a

20    closing statement.  Mr. Moore will have an opportunity,

21    if he wishes, to address it.  And the prosecution has

22    one more opportunity.  It's called a rebuttal, to answer

23    that statement.  And then I'll give up [sic] and give

24    some instructions.

25            The important thing to remember, well

1          another important thing to remember, is what the lawyers

2          say never, ever, ever is evidence.  Ever.  Evidence

3          comes from the witness stand.  And it's testimony.

4          That's what the evidence is.  Evidence is exhibits and

5          diagrams.  If this was marked as an exhibit, this would

6          be evidence.  If admitted into evidence, then this is

7          evidence.  That's it.

8                    Now, of course, evidence -- Then you get to

9          decide what you believe or not or how much you believe

10         what it is.  But that's what the evidence is.  These

11         opening statements, the lawyers are going to tell you

12         what they believe the witnesses will say and how it's

13         consistent with the theory that they want you to accept.

14                   At the end, they're going to tell you what

15         they remembered those witnesses saying.  Well, when Mr.

16         So-and-so got on the witness stand, do you remember when

17         he said so and so?  And you're like, nope.

18                   Now, so, would you rely on your own memory?

19         Or would you rely on what they tell you they remember?

20         You're to rely on your own memory.  Lawyers misspeak all

21         the time.  So, what they say is never, ever, ever

22         evidence.  Evidence comes from the witness stand.

23                   Evidence generally comes in two different

24         ways.  It's direct evidence and indirect.  Indirect is

25         also what we call circumstantial.  The only reason

-12-

1    people bother to mention it is because some people

2    believe one type of evidence is better than another type

3    of evidence.

4              In the winter time, you know, the people

5    that get up in the middle of the night and see the

6    blizzard, what are they going to say in the morning?

7    Wow.  It snowed last night, right?  And what are the

8    people going to say that slept through it, but see five

9    inches of snow in the morning when they wake up?

10   They're going to say the same thing.  Wow.  It snowed

11   last night.  Right?

12             One saw it, direct evidence.  The other,

13   circumstantial.  They looked at what was there before,

14   what's there now and they're like, okay.  Common sense

15   and reasonableness.  It must have snowed last night.

16             And so, you are to use common sense and

17   reasonableness in reaching conclusions that call for

18   that kind of thing.  And sometimes prosecutions and

19   defense lawyers use circumstance, sometimes it's direct

20   evidence and sometimes it's just mixed and

21   circumstantial.  But the point of the matter is is one

22   type of evidence is not superior to another type.

23             We talked about professions and how people

24   look.  And seriously, the fact that there's, you know,

25   police officers doesn't make their testimony more likely

-13-

1          or less likely to be true or not true.  And we'll talk

2          about that all the time.  But I can almost guarantee

3          you, as long as I've been doing this, the second

4          question after people get asked could you tell the jury

5          your name, what do you do for a living?

6                    Now, sometimes it gives context to what

7          they're going to testify to, but other times they're

8          hoping that the occupation will somehow impress you.

9          Because if they're unemployed, they're not asking what

10         do you do for a living.

11                   The number of witnesses.  Did you hear all

12         those witnesses yesterday?  And the list kept going on

13         and on and on.  Some people are impressed with numbers.

14         They're like, wow.  That's a lot of witnesses.  Remember

15         when the world thought that the world was flat and they

16         didn't know how many people thought the world was flat?

17         That did not make the world flat.

18                   So, it's not the number of witnesses.  It's

19         the common sense and reasonableness, the content of what

20         they say that's important that you judge, not how many

21         people say the sky is falling.  But some people believe,

22         wow, you know, seven people said that.  It must be true.

23         Why would, why would seven people say that if it wasn't

24         true?  So, numbers are not to be paid attention to.

25         It's the reasonableness of the testimony and the common

1    sense nature.

2            Another thing that's important, it's the

3    evaluation process.  How do we decide who's telling the

4    truth?  Now, a lot of this, again, deals with, you know,

5    take it as I give you.  How did the witness look and act

6    while testifying?  Did the witness seem to be making an

7    honest effort to tell the truth?  Did they appear to be

8    argumentative?  Or were they just trying to be evasive

9    in answering some of the questions?

10            How did the witness' age and maturity affect

11    how you judge their credibility?

12            When the witness testified about what they

13    remembered seeing, what was going on at the time?  A lot

14    of confusion?  What was the distance?  What was the

15    lighting condition?  When the witness remembered what

16    they were hearing, same thing.  What was going on?  What

17    was going on even with the witness?  Sometimes their

18    state of mind affects how they perceive stuff or what

19    they remember being said.

20            Sometimes through their lens, their lens

21    might be also biased.  Consider whether the witness had

22    any special reason to lie or any special reason to tell

23    the truth.  Consider if there's some influence that's

24    acting on how they decide to testify.

25            All in all, consider how reasonable their

-15-

```
1    testimony is when you think about all the other evidence
2    that's in the case.
3            If you need to go to the bathroom, please --
4    And I'm not looking up because I'm not looking up at the
5    time, you know, just kind of get up.  It's difficult to
6    coordinate -- How many people are all here?  About
7    twenty people?  Twenty people's bladders.  I don't do a
8    good job with my family.  Every time we get in the car
9    to go somewhere, we, oh, got to go back in the house.
10   I'm like, I just told you all we were leaving.  So, it's
11   no big deal.
12           If you want to have more candy, just pass it
13   around.  Anything you need, just speak on it and we'll
14   have it for you.  Okay?  You about ready, young man?
15           MR. PRASAD:  Yes, sir.
16           THE COURT:  Okay.  I'm going to crack this
17   door because I come and go and get coffee because, you
18   know, I don't have to be out here to hear.  A lot of
19   people think when I go behind the door that the Judge
20   left the courtroom.  My ears never left.  And they
21   assume because I'm not watching that I'm not listening.
22   And I'm thinking, okay.  You know we have Judges that
23   are visually impaired.  They sit in the courtroom and
24   can't see.  Because the job involves your ears.  The
25   Judge left.  Okay.  My ears are still in there.  Sir?
```

-16-

1                MR. PRASAD:  Thank you.

2                OPENING STATEMENT

3  BY MR. PRASAD:

4                MR. PRASAD:  Good morning, again, ladies and

5        gentlemen.

6                THE JURORS:  Good morning.

7                MR. PRASAD:  April 10th of last year, 2010.

8        16228 Tireman is a commercial address.  It's a business.

9        It was called the Smokehouse at the time.  It had

10       different names over different periods.  It's part

11       convenience store, part restaurant.  It's actually in or

12       near a much more residential area.  I mean, it's a

13       little local business there, like a little convenience

14       store, corner store surrounded by residences.

15               April 10th of 2010, you had young men out in

16       front of the business of Smokehouse.  And it's broad

17       daylight in the afternoon hours.  And this is going to

18       be a case -- I'm going to be up front with you straight

19       out.  This is a case where young men's tempers got a

20       hold of them.  And what started off as a fight, a

21       fistfight, what started off as our victim in this case,

22       Tyrone Simpson, nineteen years of age, attacking the

23       defendant in this case, Deonte Howard -- Deonte, as I

24       think I mentioned before to you yesterday was sixteen at

25       the time.

-17-

1                    Attacking Deonte Howard because he thought

2       Deonte Howard had stolen is glasses.  So, he starts

3       punching Deonte Howard four to five times about the

4       face.  Deonte Howard then takes out a gun and shoots

5       Tyrone Simpson.

6                    Now, I want to be very clear to you, ladies

7       and gentlemen, these initial gunshots -- Because you're

8       going to hear about a lot of gunshots.  These initial

9       gunshots by Mr. Howard is not the crime that you're here

10      to decide today.  It's not the first degree premeditated

11      murder.

12                   But what you're going to hear about is how,

13      after those initial gunshots, after he starts shooting

14      after the victim in this case and chasing after the

15      victim around other cars and continuously shooting after

16      him, at some point, the victim falls to the ground.  And

17      Mr. Howard gets in a vehicle, ostensibly to leave.  That

18      the vehicle that he gets into with a couple of other

19      gentlemen starts to drive away.  And then the victim

20      starts to get up again, at which point the vehicle

21      stops, backs up again and Mr. Howard gets back out.

22                   And now, we're here to talk about the crime

23      that you're here to decide today.  Because, at that

24      point, Mr. Howard guns down Mr. Simpson and shoots him

25      fatally in the head three times.  That, ladies and

-18-

1      gentlemen, is the sum and substance of what the evidence
2      I believe is going to show you from different witnesses.
3                You're going to have different types of
4      witnesses that you're going to hear from in this case
5      over the next couple of days.  You're going to have
6      civilian witnesses who were there, who observed
7      different parts of it.  You're going to have people who
8      were out at the store initially at the very beginning.
9      But then, of course, once the gunshots came, they
10     disbursed.  You're going to have neighbors around who,
11     when they hear the initial gunshots, start paying
12     attention and actually start looking to see what
13     happens.
14                So, you're going to have these different
15     witnesses from different perspectives.  So, you're going
16     to hear people, like Mr. Bobby Bailey, who was the, who
17     was the proprietor or the owner of the establishment who
18     was there in the beginning, but then, of course, once
19     gunshots start firing he takes off.
20                And then you're going to have neighbors,
21     like the neighbors that you're going to hear from who
22     lived across the street or who were down the street at
23     the time who, once the initial gunshots went off,
24     started paying attention to see what was going on.
25                You're going to have law enforcement

-19-

1     officers who are going to tell you about the scene that

2     they come to.  Because this is still broad daylight when

3     they get out there.  And they're going to tell you about

4     the different evidence and different things they find as

5     evidence left on the scene.

6              You're also going to have, you're also going

7     to hear from evidence, from a couple of experts in this

8     case, from the medical examiner's office, and from the

9     Michigan State Police, who examined the different

10    firearms, ballistics evidence in this case.

11             Finally, ladies and gentlemen, you're going

12    to hear in one form or another, of a cell phone that was

13    found right across the street from the incident here.

14    Because the issue initially at issue for law enforcement

15    was who was the shooter?  Because initially, the only

16    thing they had to go by was a nickname of Tay.  Who is

17    this Tay person that they had to find out?  Who was the,

18    in fact, shooter in this case?

19             You're going to find out that Tay is Deonte

20    Howard.  And we know Tay is Deonte Howard because Mr.

21    Bobby Bailey, the proprietor there, had -- Mr. Howard

22    was someone who had been coming to his business

23    frequently.  And so, he had recognized him as Tay when

24    he got out there.  You're also going to have

25    corroboration of that because of a cell phone.

-20-

 1                    Now, Mr. Bailey's going to be able to tell

 2          you how Mr. Howard came back to the scene because he'd

 3          lost his cell phone.  He didn't know where his cell

 4          phone was.  Well, lo and behold, when the police get

 5          there, as they cordon off the scene, keep it secure,

 6          they find this cell phone across the street.  And that

 7          cell phone is the cell phone of Deonte Howard.

 8                    So, you're going to have the identification

 9          of Deonte Howard as the shooter from all these different

10          sources, not only from the people that saw what

11          happened, but also from his own cell phone that he left

12          right there.  Thank you.

13                    THE COURT:  Mr. Moore, what's your pleasure

14          today?

15                    MR. MOORE:  I'll talk today, Judge.

16                    THE COURT:  Okay.

17                    MR. MOORE:  Thank you.

18                    OPENING STATEMENT

19  BY MR. MOORE:

20                    MR. MOORE:  Good morning, ladies and

21          gentlemen.

22                    THE JURORS:  Good morning.

23                    MR. MOORE:  This is my time to address you

24          regarding what I believe the facts are in this case.

25          But before I do that, I'd like to take time to thank you

                                -21-

1       for taking time out of your daily lives to serve as

2       jurors in this particular case.  We all come from

3       different communities.  We all complain about crime.

4       But you took the time to come down here, listen to a

5       case, decide what the facts are, apply the facts to the

6       law.  And on behalf of myself and my client, Mr. Howard,

7       we'd like to thank you.

8                   As the prosecution indicated, this crime

9       took place thirteen months ago to the date, the 10th of

10      May.  And the case that you'll hear is a rather

11      interesting case because, from a physical point of view,

12      I do not believe the People will be able to link a gun

13      to Mr. Howard.  They cannot link a vehicle that the

14      shooter supposedly left in to Mr. Howard.  And several

15      of the witness, in part with what the police did, will

16      leave you probably in a state of disbelief.

17                  Now, the people will produce a Mr. Allen.

18      Mr. Allen says he's right there within two or three

19      feet, sees everything.  And he described the shooter as

20      having on a black coat that I believe you'll hear.

21                  But the curious thing is I believe the

22      evidence is going to show that Mr. Allen looked at photo

23      line-up and identified somebody else.  Now, maybe about

24      a month later, he comes back and says, oh, well, yeah.

25      That's the shooter.  But he gives a very detailed

                                -22-

1    description while he's in the hospital because he was

2    shot, height, weight description and everything.  So,

3    they showed him some photos and he identified somebody

4    else.

5              Now, you'll also hear from a witness, a Mr.

6    McFadden.  You'll find out he gives a description of the

7    person and he looks at some photo arrays and he

8    identifies three other people.

9              Now, I believe you'll also hear from another

10   witness who described the shooter as a black male, late

11   '20s, early '30s.  And as the prosecution has indicated,

12   Mr. Howard was sixteen at the time that this occurred.

13             You're going to hear about some actions of

14   the police that will speak for themselves as the

15   testimony comes out.

16             But when all is said and done, ladies and

17   gentlemen, you've got to look at all the evidence, all

18   these non-identifications, no physical evidence linking

19   Mr. Howard to the gun or the car that supposedly takes

20   him away.  And you're going to have to make a

21   determination as to this sole count.

22             And I suggest to you, ladies and gentlemen,

23   after listening to it and going in the back and talking

24   about it, you'll come back with a verdict of not guilty.

25   Thank you very much.

-23-

1               THE COURT:  Will you call your first

2       witness, please?

3               MR. PRASAD:  Thank you, your Honor.  The

4       People are going to call Sergeant Robert Lalone.

5               THE COURT:  Step in, if you please.  Give

6       your -- You got it?

7               (At 10:06 a.m. witness SERGEANT ROBERT

8               LALONE was sworn.)

9               THE COURT:  You promise to tell the truth

10      today, sir?

11              THE WITNESS:  Yes, sir.

12              MR. PRASAD:  May I, your Honor?

13              DIRECT EXAMINATION

14  BY MR. PRASAD:

15  Q    Sir, introduce yourself to the jury, please?

16  A    My name is Robert Lalone.

17  Q    And what do you do for a living?

18  A    I'm a sergeant for the Detroit Police Department,

19       currently assigned to the homicide section.

20  Q    Sir, how long have you been a police officer?

21  A    Fifteen years.

22  Q    And how long have you been in the homicide unit?

23  A    About a year and half now.

24  Q    I want to take you back to April of last year,

25       specifically April 10th of 2010.  Were you working on

-24-

1      that day, sir?

2   A   Yes, sir.

3   Q   And, sir, did you have reason to go out to a scene

4       located at 16, or the area in front of 16228 Tireman?

5   A   Yes, sir.

6   Q   And why were you sent out there, sir?

7   A   It was a shooting scene.  There was a fatal victim and a

8       non-fatal victim.

9   Q   Okay.  Now, it might be helpful if you'd explain to the

10      jury.  Do homicide officers normally, are they normally

11      the first officers that respond to a scene?

12  A   Generally, no.  The first responders are going to be the

13      uniformed police officers.  They get a police run there.

14      Once it's established that there is a fatality at that

15      scene, then we respond afterwards.

16  Q   Okay.  Did you do that in this case, sir?

17  A   Yes, sir.

18  Q   And do you approximately what time it was that you got

19      out there?

20  A   It was a little bit after four o'clock.  I was working

21      4:00 p.m. 'til midnight was my scheduled shift.  And it

22      was shortly after we came on duty.

23  Q   So, you indicated 4:00 p.m.  So, it's still daylight

24      time, sir?

25  A   Yes, sir.

-25-

1  Q    Was it broad daylight?  Was it clear to see?

2  A    Yes, sir.

3  Q    Okay.  Describe the scene, in general, from when you

4       first got out there.

5  A    The scene took place both indoors inside of a small

6       restaurant and directly out in front of it along Tireman

7       Street running East and West.

8  Q    Okay.  And tell us a little bit about that, the

9       neighborhood there.  Is it a residential?  Is it

10      commercial?

11 A    It's primarily residential.  The restaurant is on the

12      North side of Tireman.  But on either side of it East

13      and West, there's residential.  And then there's

14      residential across the street from it.

15 Q    Okay.  And this is here in the city of Detroit?

16 A    Yes, sir.

17 Q    Wayne County, Michigan?

18 A    Yes, sir.

19 Q    Okay.  When you got out to the scene, sir, were any of

20      the injured victim or deceased persons still there?

21 A    No, sir.

22 Q    Both the decedent and the non-fatal victim had both been

23      removed by emergency medical services.

24 Q    Okay.  And in terms of the scene being preserved, can

25      you explain that, sir?

-26-

1  A    The responding officers but up crime scene tape and

2       sealed the crime scene.  It says police line, do not

3       cross.  And then they secured the perimeter, they set up

4       a perimeter and secured it, not allowing anybody to

5       enter into the scene.  And the officers are around the

6       perimeter.

7  Q    What's the purpose of that, sir?

8  A    The purpose of it is so that evidence doesn't get

9       disturbed before we come out, the evidence technicians

10      come out to recover the evidence.  That way things are--

11                 THE COURT:  (Interposing)  Can I ask you to

12      hold it for a second?  Remember when I talked about the

13      distractions yesterday, my doors and people moving and

14      the waiting room being the operating room?  Let's just

15      wait for that distraction just to...  Can you imagine

16      somebody coming in to fill the water cooler and the

17      surgeon's in the middle of some surgery?  It's just

18      interesting.  Continue with the meeting.  We'll just

19      clean the ashtrays.  Don't mind us.  Thank you,

20      gentlemen.

21                 MR. PRASAD:  Thank you, sir.

22  Q   (By Mr. Prasad, continuing):  Sergeant Lalone, you left

23      off, you were explaining the purpose of preserving a

24      scene.  Please continue.

25  A   Yes, sir.  We want to preserve things as they lay at the

-27-

1      time of the incident as accurate as possible.  So, when

2      we secure it, we don't allow people in and everything

3      shouldn't be moved and that nature.  Everything should

4      be as it was.

5  Q   Now, when you arrive to the scene, sir, what is your

6      role at that point?

7  A   I was in charge of the scene, meaning that I was

8      directing.  There was myself, Investigator Barbara Simon

9      and Officer LaTonya Brooks.  I took the lead, meaning

10     that I was in charge of the scene.  I directed Officer

11     Brooks and Investigator Simon to take witness

12     statements.

13            I, myself, was taking notes about the scene

14     so I could fill out a report later on denoting where

15     each piece of evidence was, any information pertaining

16     to that scene.  And then I also directed the evidence

17     technicians when they arrived.

18 Q   I want to ask you about the last two things that you

19     mentioned.  First is taking notes to look at the

20     evidence.  Did you have an opportunity to search the

21     area or look at the area for evidence, sir?

22 A   Yes, sir.

23 Q   And when the evidence techs arrive, what do you do with

24     regards to that?

25 A   I actually, this is a common practice of mine, I

-28-

```
 1        actually go along with them denoting the different

 2        evidence, showing them where things are.

 3                 Sometimes after they come to the scene also

 4        and I walk with them, there may be things that I or the

 5        other officers have not seen yet and we can pick up

 6        additional evidence.  So, I did walk the scene with them

 7        and discussed it.

 8   Q    And if you recall, sir, do you remember who the evidence

 9        technician officer was in this case?

10   A    There was Officer McNairy, Lieutenant Mohammad and

11        Sergeant Babcock.

12   Q    Okay.  And was it Officer McNairy who was the one that

13        ultimately collected all of the evidence?

14   A    Yes, sir.

15   Q    And that is after you had already pointed out and looked

16        at all of the evidence with her?

17   A    That is correct.  Yes.

18   Q    Okay.  Very good.  If you would, I want you to -- And

19        actually, just give me one moment, sir.  I'm going to

20        break these up in chunks, sir.  If you're aware, sir, do

21        you know if photographs were being taken while you guys

22        were out there?

23   A    Yes, sir.  They were.

24   Q    And who was taking those photographs, if you recall,

25        sir?
```

-29-

1  A    I believe it was Sergeant Babcock.

2              MR. PRASAD:  Okay.  I'm going to break these

3        up into chunks so that we don't have to go through all

4        of them at the same time.  May I approach, your Honor?

5              THE COURT:  You may.

6  Q    (By Mr. Prasad, continuing):  I'm going to start with

7        One through Twenty.  Officer, if you would, or sergeant,

8        if you would, just go through them.  And when you're

9        done looking through each one, let me know.  Sergeant,

10       do you recognize what's in People's Proposed Exhibits

11       One through Twenty.

12 A    Yes, sir.  These are various photographs of the crime

13       scene.

14 Q    And to be specific, sir, are these the photographs from

15       which you observed on April 10th, 2010, over at that

16       area on Tireman that we've been talking about?

17 A    Yes, sir.  The first one actually is, I'm in the middle

18       of the photograph actually taking notes at the time.

19 Q    And we'll talk about that in a second.  But do those

20       fairly and accurately show what you observed on April

21       10th, 2010, sir?All right.

22             MR. PRASAD:  Judge, at this time, the People

23       would seek to admit into evidence People's Exhibits One

24       through Twenty.

25             THE COURT:  Is there any objection?

                              -30-

```
 1                    MR. MOORE:  No objection.  I had an
 2         opportunity to look at them.
 3                    THE COURT:  One to Twenty will be received
 4         then.
 5                    (Whereupon People's Exhibits One through
 6                    Twenty were received into evidence.)
 7    Q    (By Mr. Prasad, continuing):  Sergeant, I'm going to do
 8         the same, exact series of questions, if I could have
 9         those, sir, for Twenty-One through Forty-Seven.  So, if
10         you could just take a moment and look through each one,
11         sir, please.  Sergeant Lalone, do you recognize what's
12         in People's Proposed Exhibits Twenty-One through Forty-
13         Seven?
14    A    Yes, sir.
15    Q    And similar to the previous question, sir, are those the
16         photographs taken that afternoon on April 10th of 2010,
17         in front of the area of Tireman?
18    A    Yes, sir.
19    Q    And do those fairly and accurately depict what you, in
20         fact, observed on April 10th of 2010?
21    A    Yes, sir.
22                    MR. PRASAD:  Judge, at this time, the People
23         would seek to admit the remainder of the photos as
24         Twenty-One through Forty-Seven into evidence.
25                    MR. MOORE:  No objection.
```

-31-

```
 1                    THE COURT:  They'll be admitted.
 2                    (Whereupon People's Exhibits Twenty-One
 3                    through Forty-Seven were received
 4                    into evidence.)
 5                    MR. PRASAD:  Deputy, could I ask you for a
 6          favor, sir?  Is there any way you could dim some of the
 7          lights, sir?  Your Honor, is that okay?  Well, I
 8          reversed the order of the questions.
 9                    THE COURT:  As long as you don't burn any
10          incense when they're dark, you're good with me.  Well,
11          let's see how they show up.
12                    MR. PRASAD:  Let me zoom and focus.
13     Q    (By Mr. Prasad, continuing):  Sergeant, I'm starting
14          with People's Exhibit Number One.  If you could explain
15          to the jury what it is we're looking at right here, sir.
16     A    The street, the two-lane highway here that is Tireman
17          Street.
18     Q    Sergeant I'm actually going to help you out in a second.
19          I'm going to give you a laser pointer.
20     A    Sure.
21     Q    It's this red button right here, if you would.
22     A    This runs East and West.  That is Tireman Street.  This
23          is the restaurant I was speaking off, commercial
24          building and then there's residential here and
25          residential on the other side and residential across.
```

```
 1        The actual scene takes place all throughout this whole
 2        area here.  That is myself there.
 3   Q    Sergeant, for the record, you were circling with the
 4        laser pointer the center part of People's Exhibit Number
 5        One?
 6   A    That is correct.
 7   Q    All right.  There's a couple features on here I want to
 8        ask you about, sir.  On People's Exhibit Number One, to
 9        the righthand side, we see a walkway, a sidewalk and a
10        fence.  Do you see that, sir?
11   A    Yes, sir.
12   Q    About -- Is that fence a fence line to a residential
13        area at that point, sir?
14   A    After the fence to, this would be to the East of it, is
15        residential.  This right here where this vehicle is
16        parked, that is a vacant field next to the business.
17   Q    Okay.  And then does that fence line match up closely to
18        that pole in the center with the pedestrian school
19        walking sign?
20   A    Yes, sir.
21   Q    Okay.  And you indicated that the, that the scene itself
22        or where most of the evidence was found was towards the
23        center, is that correct, sir?
24   A    Yes, sir.  You can actually see, all these little,
25        yellow marking are actually denoting evidence that runs
```

-33-

1        from approximately the end of this vehicle here to where
2        the -- This is a police vehicle there.
3    Q   And finally my last question about this photograph, sir,
4        is that you do see some of the yellow tape on the
5        borders both to the right side of the photograph and the
6        distance, is that correct, sir?
7    A   That is correct.  Yes, sir.
8    Q   And so the jury understands, would that tape have been
9        round like a pretty big area?
10   A   Yes, sir.  Around the perimeter, stopping pedestrian and
11       vehicular traffic.
12   Q   All right.  Very good, sir.  I'll move you to People's
13       Exhibit Number Two.  What are we look at here, sergeant?
14   A   That is the same angle East looking West on Tireman.
15       That is just a closer shot of the same vantage point.
16   Q   Now, I want to draw your attention to that center pole
17       that we saw with the yellow sign on it.  Is that the
18       same pole that we saw in a further distance?
19   A   That?
20   Q   In Exhibit One?
21   A   Yes, sir.
22   Q   So, the fence that we saw in Exhibit One, would that be
23       immediately to the right edge of this photograph?
24   A   That is correct.
25   Q   Okay.  You are still that gentleman that's standing

                              -34-

1      there writing notes?

2   A   Yes, sir.

3   Q   Okay.  And we can more clearly see the little, yellow

4       markers.  Explain those to the jury, please.

5   A   What the markers are, they're all numbered.  And what

6       they do is they denote pieces of evidence, anything

7       that's to be recorded.  And what we do is we demark

8       them.  That way, we know what they were later on, if you

9       take a close-up of it.  From a view like this, you can

10      see the area they were placed in, but you can't see

11      exactly what they are.  So, they'll take a closer

12      photograph of it so then you get both perspectives, both

13      you'll know where it was laying in the scene a direct

14      close-up of it so you know exactly what that piece of

15      evidence is.

16  Q   And -- Okay.  And we'll go on, we'll go on from there.

17      I'm going to try to go through these rather briefly, but

18      I miss anything, you know, please stop me, sergeant.

19      This is Number Three?

20  A   Yes, sir.

21  Q   What is trying to be, what is trying to be shown in

22      Number Three, sir?

23  A   Right here where it's noted for number one, we recovered

24      a cell phone.  It was broken in half.  The back comes

25      off.  Now, this is a view looking from South to North.

-35-

 1      This right here is that commercial building and this is

 2      directly across the street next to the curb at the South

 3      side of Tireman Street.

 4   Q  It might be helpful, sergeant, if you explain to the

 5      jury, how many cell phones were found at the scene?

 6   A  There were two cell phones.

 7   Q  Okay.

 8   A  There was this one here.  You can just barely see, this

 9      is a burgundy SUV.  On the bumper, it had a front-end

10      bumper surface, on the driver's side there was a second

11      cell phone recovered.  This cell phone -- That one was

12      intact.  This one was, appeared to be that the back was

13      off of it, like it had come apart.

14   Q  One second.  Sir, did both the cell phones become of

15      interest to you, sergeant, in terms of collecting the

16      evidence?

17   A  Yes, sir.

18   Q  And why was that?

19   A  Eventually, it assisted us in identifying the suspect.

20   Q  Okay.  And in terms of trying to--

21                  MR. MOORE:  (Interposing)  Objection to

22      suspect, other than it was some cell phones, Judge.

23                  THE COURT:  Well, you'll have a chance to

24      cross-examine if you'd like to figure out why he termed

25      it that.

```
 1                    MR. MOORE:  Thank you.
 2  Q   (By Mr. Prasad, continuing):  And in terms of that cell
 3      phone that's denoted in number one, was that taken, that
 4      specific cell phone taken into evidence for later
 5      analysis?
 6  A   Yes, sir.
 7  Q   Okay.  Very good, sergeant.  People's Exhibit Number
 8      Four, sir.  Explain to the jury what we're looking at
 9      here.
10  A   That is a view from the South side of Tireman looking
11      North.  That's the burgundy SUV.  That's the front of
12      the building.  That's the Jeep that's parked in the, the
13      silver Jeep that's parked in the vacant lot that runs
14      just East of the location.
15  Q   I want to draw your attention to left of center.  There
16      is reddish-colored clothing that's on the sidewalk.  Can
17      you talk about that, sir?
18  A   That is directly right here.  It's a red hooded
19      sweatshirt.  It's red on the outside with a white
20      background and multi-color on the inside.  That was,
21      belonged to the fatal victim.  The information I
22      received was that's where he was at when he was removed
23      by the--
24                    THE COURT:  (Interposing)  Okay.  You've got
25      to tell us what you know, not what somebody else told
```

-37-

1    you.  Come on.

2                 THE WITNESS:  Yes, sir.

3   Q  (By Mr. Prasad, continuing):  And that was, that

4      clothing was there when you found it, sir?

5   A  Yes, sir.

6   Q  Number Five, sergeant, what are we looking at here, sir?

7   A  This is a view of Tireman Street from the West looking

8      East.

9   Q  So, this would have been the opposite side of the first

10     series of photographs?

11  A  That is correct.  Yes.

12  Q  Okay.  And these vehicles that are present in the

13     photograph, are either of those two vehicles of note or

14     of interest to you, sir?

15  A  Yes.  This is a blue Buick and a burgundy SUV.  Both of

16     them were recovered and placed on evidence.

17  Q  Okay.  Drawing your attention to People's Exhibit Number

18     Six.  Let me see what's the best way to show this.  Like

19     this.  What is being depicted in People's Exhibit Number

20     Six, sir?

21  A  This is the driveway next to the commercial vehicle

22     [sic] looking Eastbound.  There is this tire track here

23     that looked fresh, so we noted it and photographed it.

24  Q  Okay.  And we can also see some of the yellow markers

25     there, sir?

                              -38-

1  A    That is correct.  yes.

2  Q    Now, where would the business establishment be from this

3       vantage point?

4  A    The business establishment would be right almost to the

5       left.  This is almost looking from the East corner of

6       the business looking East--

7  Q    (Interposing)  And where is the -- That burgundy SUV,

8       where would that be in relation to where this photograph

9       was taken?

10  A   That would be directly behind the person taking the

11      photograph.

12  Q   Just to give perspective, sir, I want to go back to

13      People's Exhibit Number One.  Do you see People's

14      Exhibit Number One overlaying on top?

15  A   Yes, sir.

16  Q   On People's Exhibit Number One, can you see that same

17      fresh tire marks?

18  A   Yes.  That's going to be right here.  And you can also

19      see the driveway here that leads up into that next to

20      the business.

21  Q   Okay.  So, putting these two exhibits together, Exhibit

22      Number One and Exhibit Number Six, we can see both

23      angles of those tire marks, sir?

24  A   That is correct.  Yes, sir.

25  Q   Okay.  Very good.  Tell us about Peoples Exhibit Seven,

-39-

1       sir.

2    A   That is a close-up photograph of the front of the

3        business.  Again, you can see the silver SUV.  You can

4        see the red hooded sweatshirt just to the left of the

5        entrance.

6    Q   And there are two steps going into that business, sir?

7    A   Yes, sir.

8    Q   And what kind of doorway was that that leads into the

9        business?

10   A   There is a steel security gate and then there's also an

11       entry door.  Both of them were open at the time when I

12       arrived at the scene.

13   Q   Okay.  Very good.  Specifically taking us through that

14       same doorway, sir.  Talk about People's Exhibit Number

15       Eight.  What are we looking at here?

16   A   That is a view from inside of the business looking out

17       onto Tireman Street.  This right here is Tireman Street.

18       So, it's just standing inside the doorway facing out.

19   Q   Now, what are all those little, yellow placards on the

20       ground and in the center of the photograph?

21   A   Again, all these placards are denoting pieces of

22       evidence.

23   Q   Number Nine, sir, tell us about that.

24   A   That is from inside of the building.  It's a commercial

25       business.  Directly behind the person taking the

-40-

```
 1        photograph was a glass partition that is looking from

 2        the glass partition out towards the front door.  There

 3        is blood and clothing here in this corner of the

 4        building.

 5   Q    Now, the white -- Actually, I'm going to go to the next

 6        photograph since it's a little bit closer up.  Let me go

 7        to Number Ten.  You see People's Exhibit Number Ten,

 8        sir?

 9   A    Yes, sir.

10   Q    And I want to draw your attention to the white items

11        there, the plastic gloves and stuff.  Are you familiar

12        with who would leave those kind of items?

13   A    Yes, sir.  Those appear to have been left by the EMS

14        technicians when they were working on the victim.

15   Q    Okay.  And the -- Let's be clear.  You talked about a

16        fatal victim and a non-fatal victim.

17   A    Yes, sir.

18   Q    Do you know if this items from the non-fatal or--

19               THE COURT:  (Interposing)  He would only be

20        able to tell what people told him, right?

21               MR. PRASAD:  Yes.

22               THE COURT:  Okay.

23   Q    (By Mr. Prasad, continuing):  And talk about People's

24        Exhibit Number Eleven, sir.  What is that?

25   A    That is inside of the business.  That would be a view
```

```
 1       from the front door.  It's just the glass partition I
 2       was talking about.  So, that is facing from the front
 3       door towards the back of the location.
 4   Q   Okay.  Very good.  Number Twelve, sir?
 5   A   That is a view from the sidewalk facing, standing West
 6       and facing East.  Again, there's the commercial
 7       business, the burgundy SUV and the red hooded
 8       sweatshirt.
 9   Q   Okay.  Number Thirteen, sir?
10   A   That is a view from the middle of the street, standing
11       West, facing East, the red SUV, the business and this is
12       Tireman.
13   Q   Now, Fourteen and Fifteen, I want to draw your attention
14       specifically to the red sweatshirt that was found on the
15       sidewalk.  If we do it like this, that'd make a lot
16       more sense.  Did you have a chance to take a closer
17       inspection of that red sweatshirt, sir?
18   A   Yes, sir.  After it was photographed.
19   Q   Okay.  And so, initially, this is how it was
20       photographed as it lay?
21   A   Yes, sir.
22   Q   All right.  Taking you then to Number Fifteen.  Was
23       there anything of note found in the pockets of it?
24   A   Yes, sir.  There was a clear, plastic baggie of
25       suspected marijuana that was inside one of the front
```

-42-

```
 1      pockets of the sweatshirt.

 2  Q   And did you take a photograph of that as well?

 3  A   Yes, sir.  And it was recovered.

 4  Q   Now, with Sixteen and Seventeen, I want to draw your

 5      attention specifically to the red GMC.

 6  A   Yes, sir.

 7  Q   Sixteen shows us the front view, sir?

 8  A   Yes, sir.

 9  Q   And I want to jump to Number Seventeen.  Number

10      Seventeen, what is depicted in Number Seventeen, sir?

11  A   This is the cell phone I spoke of earlier.  It's on the

12      -- The bumper has a flat surface to it.  And this is the

13      cell phone that was on the back of the burgundy SUV.

14      And that's on the driver's side.

15  Q   And that is a separate cell phone as to the one that was

16      found across the street?

17  A   That is correct.  Yes, sir.

18  Q   And was this cell phone collected as well?

19  A   Yes, sir.

20  Q   Draw your attention to Eighteen and Nineteen.  First,

21      Exhibit Number Eighteen.  Where are we looking at from,

22      sir?

23  A   This is standing in the street looking South.  This is

24      directly in front of the business.  This vehicle was

25      parked there initially, but we discovered it didn't have
```

-43-

```
 1      any evidentiary value to the scene.  The owner asked if
 2      he could remove it, so I had it photographed and let him
 3      pull off.
 4   Q  Now, I want to draw your attention to that house that's
 5      behind there.
 6   A  Yes, sir.
 7   Q  How close or what proximity was this house in relation
 8      to the business, sir?
 9   A  That's directly, this is directly across from the
10      business, just slightly to the East.  But it's directly
11      across from the business.
12   Q  And, sir, if you are -- Do you know if the gentleman
13      that's seated there, was he related to that residence or
14      that house?
15   A  Yes, sir.  That's where he lived.
16   Q  Okay.  And was that gentleman interviewed?
17   A  Yes.  He was interviewed by Investigator Simon.
18   Q  Which takes us to Exhibit Nineteen.  What's going on in
19      People's Exhibit Nineteen?
20   A  That, the person on the right, that's the same porch,
21      that's Investigator Simon.  And she's interviewing that
22      witness.
23   Q  Okay.  Now, sir, I want to start you with a series of
24      photographs, drawing your attention to the little
25      placards that were placed at the different point, sir,
```

                                   -44-

```
 1      if I can.
 2   A  Yes, sir.
 3   Q  I'm going to start with People's Exhibit Number Twenty,
 4      which shows us marker number one.
 5   A  Yes.
 6   Q  Can you tell us what the number one was marking, noting?
 7   A  This is the cell phone right here and that's the backing
 8      that I talked about that was off of it.  This is on the
 9      South side of Tireman directly across from the business
10      right next to the curb.
11   Q  And this is across the street from the business, sir?
12   A  That is correct.  Yes, sir.
13   Q  Number Twenty-One and Number Twenty-Two go together.
14      So, I'm going to start with Twenty-One.  What's going on
15      with Twenty-One, sir?
16   A  That is a placard demarking the evidence, number two.
17      This is the business here that is just South of the
18      dividing line on Tireman.
19   Q  Okay.  And Number Twenty-Two is a close-up of that, sir.
20      What is being shown in Number Twenty-Two?
21   A  The placard number two is demarking a .40 caliber shell
22      casing, spent shell casing.
23   Q  And was that ultimately recovered, sir?
24   A  Yes, sir.
25   Q  Similarly, sir, I want to do Number Twenty-Three and
```

-45-

1    Twenty-Four in sequence.  Number Twenty-Three, what are

2    we looking at here?

3  A  That's the front of that burgundy SUV.  The business is

4    there.  And number three is demarking a piece of

5    evidence directly in front of the vehicle.

6  Q  Number Twenty-Four, sir, what is that?

7  A  That is a spent .40 caliber shell casing.

8  Q  Similarly, sir, Number Four, what is that showing us,

9    sir?

10 A  That is demarking the spent .40 caliber shell casing.

11 Q  And I apologize.  I misstated that.  That's People's

12   Exhibit Twenty-Five, showing placard number four.

13 A  Placard number four.  Yes, sir.

14 Q  Okay.  People's Exhibit Number Twenty-Six.  We see two

15   placards there, sir?

16 A  Yes, sir.  There's placard number five and number six.

17   This is the burgundy SUV.  This is the sidewalk.  And

18   that is the business.

19 Q  And is that the red hooded sweatshirt?

20 A  And that's the red hooded sweatshirt.

21 Q  Okay.  Number Twenty-Seven shows a close-up of Exhibit

22   Number Five, sir?

23 A  Yes, sir.  Number Five is denoting the, it's a .40

24   caliber spent shell casing.

25 Q  And Number Twenty-Eight shows us placard six?

-46-

1  A    Again, placard number six is denoting the spent .40

2       caliber shell casing.

3  Q    And that's by the right rear tire of that SUV, sir?

4  A    That is correct.  This would be the -- The curb would be

5       right next to it.

6  Q    And Number Twenty-Nine, sir.

7  A    That is the sidewalk.  There's the privacy fence.  This

8       is the corner of the building, the red hooded

9       sweatshirt.  And that's a photograph with placard number

10      seven.

11 Q    And that -- What is number seven, sir?  Or actually, I

12      have a close up that I'll show you in a second.  But to

13      give us a little perspective, let's go to Number Thirty,

14      first.  What group of items are we looking at in Number

15      Thirty here?

16 A    I believe placard seven was there.  That's the red

17      sweatshirt.  I can't see the numbers on these.  I

18      apologize.

19 Q    No.  We'll go to those in a second.  Exhibit Number

20      Thirty-One, what is that, sir?

21 A    This is placard number seven.  This copper-colored item

22      right here is actually a fired bullet.

23 Q    Okay.  Is that different than the shell casings we were

24      seeing previously?

25 A    Yes, sir.

                              -47-

1  Q    How is that different, sir?

2  A    The fired bullet, this item here, is actually the

3       projectile that comes out of the weapon.  The shell

4       casing is, it holds the projectile, the powder and the

5       primer.  The shell casing ejects from the weapon and the

6       bullet actually comes out the barrel.

7  Q    Okay.  Sir, are you familiar with handguns?

8  A    Yes, sir.

9  Q    And do you know the difference between a revolver and a

10      semi-automatic handgun, sir?

11 A    Yes, sir.

12 Q    Can you explain to the jury the basic difference between

13      the two?

14 A    A revolver has a cylinder that turns.  I always tell

15      people it's like in the westerns, like a cowboy gun.

16      The automatic has a magazine that goes into the bottom

17      and a slide that comes across the top.

18             With a revolver, the cylinder turns and the

19      shell casings will stay inside of the weapon until

20      they're removed.  With an automatic, as the projectile

21      leaves, as the bullet leaves the gun, the empty shell

22      casing is ejected from the weapon, generally to the

23      right.  And then a new, a new round comes into the

24      chamber.

25 Q    We'll do these a little bit out of order just to give us

-48-

1      a little perspective.  Start with People's Exhibit

2      Thirty-Four.  Where is this area, sir?

3  A   This is going to be directly in front of the business.

4      This is the bumper of the burgundy SUV, placard number

5      ten is going to denote the cell phone that was on the

6      rear bumper.  Then there's eight, nine, eleven, twelve

7      and thirteen.  This would be the curb.  And then the

8      sidewalk would be right behind that, the business

9      directly in front of that.

10 Q   All right.  And then let's go to those other items that

11     we just talked about.  Exhibit Number Thirty-Two shows

12     us number eight.  What's number eight, sir?

13 A   Placard number eight is a spent .40 caliber casing.

14 Q   Okay.  Exhibit Number Thirty-Three shows us number nine.

15     What's number nine?

16 A   Number nine is denoting this item right here.  It is a

17     sunglass lens.

18 Q   Why did you take note of that, sir?

19 A   It was right in the middle of the field of scene.  There

20     was a broken pair of glasses with two lenses.  So, we

21     denoted them and had them recovered.

22 Q   Okay.  Number Thirty-Five shows us what, sir?

23 A   That is placard number eleven and that is a spent .40

24     caliber casing.

25 Q   Number Thirty-Six, sir, what are we looking at here?

-49-

1    A    That is placard twelve.  This is what's called a jacket.

2         Some of the bullets, the projectiles that come out of

3         the weapons, they'll have what they call a jacket on

4         them.  This is a copper jacket, meaning the inside of

5         this area here would have been the lead projectile.  And

6         when it's fired, it strikes an object, it separates from

7         it.  That is part of the projectile that comes out of

8         the weapon.

9    Q    People's Exhibit Number Thirty-Seven shows us what, sir?

10   A    This item right here for placard number thirteen is a

11        fired bullet.

12   Q    Just to go back to give us perspective, People's Exhibit

13        Number Thirty-Four.  Where were twelve and thirteen,

14        sir?

15   A    Twelve is right here and thirteen is right here.  Again,

16        the business will be right over here.  This is the curb,

17        then the little grass area and the sidewalk and the

18        business here next to it.

19   Q    Very good.  Thirty-Eight depicts what, sir?

20   A    This is placard number fourteen, which is what we used

21        to mark and denote the red hooded sweatshirt from the

22        business.

23   Q    And Thirty-Nine, sir?

24   A    Thirty-Nine is placard number fifteen.  This is the

25        frames for the glasses that I believe that the lens had

                              -50-

```
 1      come out of.
 2                  MR. MOORE:  Objection to the speculation,
 3      Judge.
 4                  THE COURT:  It'll be sustained.
 5   Q  (By Mr. Prasad, continuing):  Number Forty, sir.
 6   A  This is placard number sixteen.  This is a set of keys
 7      that were recovered.  This is the curb.  It's directly
 8      in front of the business.  And the keys are sitting next
 9      to the curb.  The red hooded sweatshirt would have been
10      right up on the sidewalk.
11   Q  In close proximity to these keys, sir?
12   A  Yes, sir.
13   Q  Show you Forty-One.
14   A  Yes, sir.
15   Q  Where are we looking at, sir?
16   A  This is Tireman Street on the North side.  The business
17      is right there.  It's denoted placard eighteen,
18      nineteen.  And I can't quite see the number on that, but
19      that would have been the sidewalk in front of the
20      business.
21   Q  Eighteen?
22   A  Placard eighteen is denoting another lens, sunglass
23      lens.
24   Q  This is People's Exhibit Forty-Three, which shows us
25      number nineteen.  What is that, sir?
```

-51-

1  A    Placard nineteen is for this .40 caliber spent shell
2       casing.
3  Q    Forty-Four, sir?
4  A    That is for placard number twenty.  And that's for this
5       .40 caliber spent shell casing.
6  Q    Forty-Five, sir, shows us number twenty-two?
7  A    Number twenty-two denotes this spent .40 caliber shell
8       casing.
9  Q    Number Forty-Six is for number twenty-three?
10 A    Placard number twenty-three denotes this .40 caliber
11      spent shell casing.
12 Q    And, finally, sir, in Number Forty-Seven.  Where are we
13      looking here?
14 A    That is in the grassy area.  It is on the North side of
15      Tireman.  This is going to be just East of the business.
16      This is in close proximity.  If you're facing in the
17      street and you're facing North towards the business,
18      this is going to be just to the left of the telephone
19      pole.  And this is in the grassy area.  It's a .40
20      caliber shell casing.  It's placard number twenty-five.
21 Q    And to give us perspective, sir, going back to People's
22      Exhibit Number Two.  Do you see there the placards in
23      the foreground representing the ones that we were just
24      looking at, twenty-five, twenty-three and twenty-two?
25 A    Yes.  This is twenty-five, twenty-three and twenty-two.

```
 1  Q    And the house with the gentleman that was seated that
 2       was being interviewed, how does that relate to this
 3       photograph, sir?
 4  A    It's going to be directly across the street on the South
 5       side of Tireman.
 6            MR. PRASAD:  Very good.  Deputy, if you
 7       would, sir?  I'll turn this off.  Thank you.
 8  Q    (By Mr. Prasad, continuing):  Sergeant, were you
 9       ultimately assigned this case to take over from this
10       stage forward?
11  A    No, sir.  The case was assigned to Sergeant Mackie.
12  Q    Okay.  And that's the gentleman seated to my left?
13  A    That's correct.  Yes, sir.
14  Q    Did you convey all of this information in some report
15       format?
16  A    Yes, sir.
17  Q    And how did you do that?
18  A    We have what's called a team.  Basically, it's broken
19       into sections.  It'll have date, time and location.
20       It'll have the area to denote where the evidence was.
21       Basically, you try to write a narrative as if when
22       Sergeant Mackie comes in he could read through it and,
23       and visualize where each item was.
24  Q    And, sir, at the time you arrived, sir, I think you
25       indicated that the, both of the victims, the fatal one
```

-53-

1      and the non-fatal one had already left, sir?

2   A   Yes, sir.

3   Q   Do you know where they had been taken to?

4   A   I don't recall.

5                  MR. PRASAD:  Okay.  That's fine.  Thank you,

6       sergeant.  Pass the witness, your Honor.

7                  MR. MOORE:  No questions.

8                  THE COURT:  Thank you, sir.  You can step

9       down.

10                 (At 10:44 a.m. witness excused.)

11                 THE COURT:  Call your next witness.

12                 MR. PRASAD:  The People are going to call

13      Bobby Bailey, your Honor.

14                 THE COURT:  Step on in, young man, all the

15      way to the court reporter.  Tell him what your name is

16      and how to spell it, please.  I need you to take an

17      oath, please.

18                 (At 10:45 a.m. witness BOBBY BAILEY

19                 was sworn.)

20                 THE COURT:  Do you promise that your

21      testimony today will be truthful?

22                 THE WITNESS:  Yes.

23                 THE COURT:  Please have a seat in the black

24      witness chair.

25                 MR. PRASAD:  May I, sir?

-54-

```
 1                    THE COURT:  Would you, please?
 2                    DIRECT EXAMINATION
 3 BY MR. PRASAD:
 4 Q    Mr. Bailey, please pull that microphone around, if you
 5      would, so it's close to your face.  Thank you.  We want
 6      to make sure everyone can hear.  Introduce yourself to
 7      the jury, please.
 8 A    Bobby Bailey.
 9 Q    Mr. Bailey, how old are you?
10 A    Forty.
11 Q    Mr. Bailey, are you familiar with an area, are you
12      familiar with an area on Tireman?  And I'm going to give
13      you a specific address.  16228 Tireman here in the city
14      of Detroit?
15 A    Yes.
16 Q    How are you familiar with that address, sir?
17 A    I'm the owner.
18 Q    And owner of what?
19 A    Restaurant--
20 Q    (Interposing)  Okay.
21 A    Convenience store.
22 Q    And how long have you had that restaurant/convenience
23      store, sir?
24 A    About ten years.
25 Q    About ten years?  Do you remember back in April of last
```

1      year, about thirteen months ago, what was the name of it

2      at that time?

3  A   Garden Cafe.

4  Q   Okay.  And what kind of -- You say

5      restaurant/convenience store.  What did you serve there?

6      Or what did you do there?

7  A   Served hot food, pops, cans and chips, stuff like that.

8  Q   And as the owner, sir, how often would you be at that

9      location?

10 A   Every day.

11 Q   Every day?  And how often -- Approximately, how many

12     hours a day would you work at that location, sir?

13 A   Work about eight hours.

14 Q   Okay.  Did you become familiar with some of the regular

15     customers from the neighborhood that would come there?

16 A   Yes.

17 Q   Okay.  I want to draw your attention, sir, to a specific

18     day of last year, that is April 10th of 2010.  Do you

19     remember that day, sir?

20 A   Yes.

21 Q   At some point in the early afternoon or afternoon time,

22     did you get a phone call to come to your store?

23 A   Yes.

24 Q   Who was that phone call from?

25 A   My brother.

-56-

```
 1  Q    And I don't want to go into any details of what your
 2       brother told you.  But as a result of that phone call,
 3       what did you do?
 4  A    Returned back to the property.
 5  Q    And you said returned back.  Originally, you were at
 6       that store earlier that day?
 7  A    Yes.
 8  Q    How long before were you at that store earlier that day?
 9  A    Maybe a couple hours before, I guess.
10  Q    Okay.  And when you left that store, sir, what was the,
11       what was going on there, if anything, that you remember?
12  A    Nothing out the usual.
13  Q    Nothing unusual?  Okay.  Take us back now.  About
14       approximately when was it that you went back to the
15       store?
16  A    I don't know the exact time, maybe about 5:00.
17  Q    And is it still daylight out, sir?
18  A    Yes.
19  Q    When you come to the store, sir, are you walking or
20       driving?
21  A    Driving.
22  Q    And what kind of vehicle did you have, sir?
23  A    Cherokee.
24  Q    And what color was your Cherokee?
25  A    Silver.
```

1  Q   And where did you park your silver Cherokee, sir?

2  A   On the side of the restaurant.

3  Q   Okay.  And as I understand it, sir, there's a lot on, on

4      -- If you're look at your business, there's a lot on the

5      righthand side?

6  A   Correct.

7  Q   Is that where you parked your vehicle, sir?

8  A   Yes.

9  Q   Okay.  I'm going to show you People's Exhibit Number

10     One.  Do you recognize that, sir?

11 A   Yes.

12 Q   What does People's Exhibit Number One show us?

13 A   The side of the property and my truck outside.,

14 Q   Okay.  And that's your truck that's parked on the lot to

15     the right side?

16 A   Correct.

17 Q   All right.  Very good.  So, you parked your Cherokee.

18     What do you do next, sir?

19 A   I get out.  Some guys are standing outside.

20 Q   All right.  And where -- I want to break this down for

21     everyone.  So, you get out.  Where are these people that

22     you see?

23 A   Standing right in front of the store.

24 Q   And about how many people are we talking about?

25 A   About five or six guys.

1  Q    Okay.  What's the, what's the formation or how are they

2       standing in relation to each other?

3  A    Just out there in a crowd, just all together.

4  Q    And what's the tenor or tone of the people as you get

5       out there?

6  A    Kind of hostile.

7  Q    Hostile?

8  A    Yeah.

9  Q    Okay.  At this point, sir, do you recognize anyone

10      that's in this group that's out there?

11 A    Yes.

12 Q    Okay.  Do you recognize -- How do you recognize these

13      people?

14 A    From coming in the store often.

15 Q    Often?

16 A    Yeah.

17 Q    Of all these people that are out there, how many of them

18      do you recognize as regular customers?

19 A    A few of them.

20 Q    A few of them?  Okay.  And we'll talk about each one.

21      First of all, sir, is there anyone in court today that

22      you recognize as one of you regular customers that was

23      there?

24 A    Yes.

25 Q    And who is that, sir?

-59-

```
 1  A    Ant.  I mean, not Ant.  Tay.

 2  Q    Tay?

 3  A    Yeah.

 4  Q    And you pointed to someone here in the courtroom when

 5       you said Tay?

 6  A    Yeah.

 7  Q    And is Tay wearing?

 8                MR. MOORE:  For the record, identified my

 9       client.

10                MR. PRASAD:  Thank you.

11                THE COURT:  Okay.

12                MR. PRASAD:  Thank you.

13  Q    (By Mr. Prasad, continuing):  And how did you, how did

14       you know Tay, sir?

15  A    From coming in the store.

16  Q    Okay.  And you say there was another person by the

17       nickname of Ant that you also recognized?

18  A    Correct.

19  Q    And who is he?

20  A    Another customer from the store.

21  Q    And was there anyone else besides Ant and Tay that you

22       had recognized as a regular customer?

23  A    Yeah.  But I don't know they names.

24  Q    Okay.  Okay.  Well, as we discuss what you observed,

25       maybe we can identify them with better detail.  But
```

-60-

1    let's start off with, let's start off with Tay.  What

2    was Tay doing when you first got out there?

3  A   Tay wasn't there when I got there.

4  Q   Okay.  Tell us about that.  Who was there when you first

5    got out there?

6  A   Ant and a few other guys.

7  Q   Okay.  And you said it was a hostile tenor at this

8    point?

9  A   Yeah.  They was upset about--

10  Q   (Interposing)  Don't go into what they say.  But just

11    people were upset about something?

12  A   Correct.

13  Q   Okay.  What's the next thing that happens?

14  A   The guy, Ant, was telling me that--

15         MR. MOORE:  (Interposing)  Objection.

16  Q   (By Mr. Prasad, continuing):  Don't go into what Ant's

17    telling you.  But are you talking to Ant at this time?

18  A   Correct.

19  Q   Okay.  And how is Ant acting emotionally?

20  A   Upset.

21  Q   Upset?  You said you've had contact with Ant before in

22    the past?

23  A   Yes.

24  Q   Is this how Ant normally is?

25  A   No.  Not normally upset.  No.

1  Q    Okay.  And what about, what about him said, makes you

2       say that he was upset?

3  A    He was talking in a hostile way.

4              MR. PRASAD:  Your Honor, I'd ask to proceed

5       under excited utterance at this point.

6              THE COURT:  I'm not sure, sir.  I'm not sure

7       that a foundation for hostile...

8  Q    (By Mr. Prasad, continuing):  Well, let me ask you about

9       Ant.  Describe how he's talking to you emotionally.

10      Like how's his demeanor?

11  A   Demeanor was like he was angry.

12  Q   Okay.  Was he calm in any way?

13  A   No.  He was very loud and moving around and stuff as he

14      was talking.

15  Q   Moving around in what way?

16  A   You know, upset, just talking with his hands and moving

17      around.  Upset.

18             MR. PRASAD:  Judge, I'd ask that, once

19      again, I'd ask to proceed under excited utterance.

20             MR. MOORE:  Sounds like they were having a

21      conversation to me, Judge.  That wouldn't be an excited

22      utterance.

23             THE COURT:  Go ahead, please.

24             MR. PRASAD:  May I?

25             THE COURT:  Yes.

```
 1                    MR. PRASAD:  Okay.  Thank you.

 2   Q   (By Mr. Prasad, continuing):  What is Ant telling you at

 3       this point?

 4   A   He was telling me his glasses, someone just stole his

 5       glasses and he wanted his glasses back.

 6   Q   Okay.  What happens next, sir?

 7   A   After the conversation with Ant about the glasses, Tay

 8       pulled up looking for his phone.

 9   Q   Okay.  Now, when Tay pulled up, does he pull up in a

10       vehicle or is he on foot?

11   A   Vehicle.

12   Q   Okay.  And do you recognize the vehicle he pulled up in?

13   A   No.  I didn't recognize whose vehicle it was.

14   Q   And was it a -- Do you know if it was an SUV or a sedan

15       or--

16   A   (Interposing)  SUV.

17   Q   It's an SUV.  And do you remember what color it was?

18   A   No.

19   Q   Okay.  And when Tay pulls up in the SUV is he, is he

20       alone or was he with other people?

21   A   I couldn't tell.  He just got out asking about his

22       phone.

23   Q   Okay.  And do you recall if he got out of the driver's

24       side or the passenger's side?

25   A   No.
```

1  Q    You don't recall.  Tay comes out.  He's asking -- Who's

2       he asking about his phone?  To whom is he asking, I

3       should say?

4  A    He may have asked me.  I can't remember who.  I know he

5       was just talking about a phone.  He was looking for his

6       phone.

7  Q    Okay.  What happens next, sir?

8  A    Ant started saying that you stole my glasses.  And Tay

9       was like, I ain't got nothing to do with your glasses.

10      I'm just looking for my phone.  And he was just looking

11      on the ground for his phone.

12 Q    What -- How far apart are Ant and Tay at this point?

13 A    Maybe arm's length.

14 Q    Arm's length?

15 A    Two arm's length maybe.  Yeah.

16 Q    Okay.  Showing you People's Exhibit Number Seven, sir.

17      Do you recognize that, sir?

18 A    Yes.

19 Q    What does People's Exhibit Number Seven show?

20 A    The front of the store.

21 Q    Okay.  Does People's Exhibit Number Seven contain the

22      area where you see Ant and Tay at this point?

23 A    Correct.

24 Q    And where would that be in People's Exhibit Number

25      Seven, if you could just point to it?  Mr. Moore, do you

                              -64-

1       want -- Okay.  Show me.  Yeah.

2   A   Right here in front of the store.

3                   MR. MOORE:  Let me get a little closer look.

4       If you'd point that out again,sir?

5                   THE WITNESS:  Right in front of the store.

6                   MR. MOORE:  Okay.  So, like toward the right

7       side of the entrance?

8                   THE WITNESS:  Yes.

9                   MR. MOORE:  Okay.  Thank you.

10  Q   (By Mr. Prasad, continuing):  That's this spot right

11      here, sir?

12  A   Yes.

13  Q   Is that about right?  And you say they were within one

14      or two arm's length away?

15  A   Correct.

16  Q   What's the tenor now?  What's the tone now?

17  A   Getting very hostile, a whole lot of other guys showed

18      up.  So, now it's like a lot of guys out there.

19  Q   How many guys are we talking about?

20  A   Maybe ten or more.  It's more guys out there.

21  Q   And where are these people?

22  A   Circling around.

23  Q   Circling around?

24  A   Correct.

25  Q   Circling around who?

```
 1  A    Ant and Tay.
 2  Q    Ant and Tay.  What do you decide to do at this point,
 3       sir?
 4  A    I'm getting in the middle of them telling them, ya'll
 5       not going to do this here at my store.  I asked him,
 6       Tay, if you have the glasses, give the glasses back.
 7       Tay's like, I don't have the glasses.  I'm just here for
 8       my phone.  I don't got nothing to do with the glasses.
 9  Q    How close do you get to Ant and Tay in order, in order
10       to do this, in order to try to diffuse the situation?
11  A    I'm right between them.
12  Q    Right between them?
13  A    Yes.
14  Q    Okay.  So, what's the next thing that happens, sir?
15  A    Ant is saying that someone's going to pay for his
16       glasses or it's going to be trouble.  Tay steady saying
17       I don't have your glasses.  Ant--
18  Q    (Interposing)  Is your attention at this point still to
19       Ant and Tay at this point?
20  A    At this point, it was.
21  Q    It was?
22  A    Yes.
23  Q    Then what happens?
24  A    At this time, Ant reached around me and hit Tay.
25  Q    Okay.  And Ant, when you say he hit Tay, did he use his
```

-66-

```
 1      hands?  How did he hit him?

 2  A   With his fist.

 3  Q   With his fist?

 4  A   Yes.

 5  Q   And could you see where -- Did he connect hitting Tay?

 6  A   Yeah.

 7  Q   And where did he hit Tay on?

 8  A   Well, it looked like in the face because he stumbled

 9      back.  And at that time, I turned around to try to

10      stop--

11  Q   (Interposing)  Okay.  And we're going to do this, we're

12      going to break this down slowly.  So, the first thing

13      you do is you see Ant hit Tay in the face, is that

14      right?

15  A   Correct.

16  Q   Okay.  And what happens to Tay at this point?

17  A   I don't know if he went down.  It looked like he fell

18      down.  I couldn't tell really.  It looked like he fell

19      back.

20  Q   Tay fell back?

21  A   Yes.

22  Q   About how many feet back did he go?

23  A   I couldn't say.

24  Q   Okay.  Did something else draw your attention at this

25      point?
```

-67-

 1  A    Yes.

 2  Q    What else draws your attention at this point?

 3  A    The other guys trying to join in.

 4  Q    Who were these other guys?

 5  A    I don't know who they were.

 6  Q    And where were they in relation to where you were just a

 7       second ago?

 8  A    Standing behind Ant.

 9  Q    Standing behind Ant?

10  A    Yes.

11  Q    So, what do you do?

12  A    I turn around and try to stop them from getting into it.

13  Q    Okay.  And how do you do that?

14  A    Just turn around and just throw my hands up.

15  Q    Okay.  What happens at this point?

16  A    I hear gunfire.

17  Q    You hear gunfire.  What do you do?

18  A    Get down.

19  Q    Why do you get down?

20  A    There's gunfire.  I didn't want to get shot.

21  Q    Fair enough.  Fair enough.  How many shots do you hear

22       at this point?

23  A    Maybe four or five.

24  Q    Okay.  And what do you do at this point?

25  A    Just get down on the ground.

1  Q    All right.  Do you stay on the ground?

2  A    Yes.

3  Q    And what do you do next?

4  A    I was waiting for the gunshots to stop and just got up

5       and ran into the restaurant.

6  Q    You ran into the store?

7  A    Yes.

8  Q    Okay.  When you ran into the store, did you see anyone

9       else run into the store with you?

10 A    No.  Not really.  I mean, everything happened so fast.

11      I just ran in, so--

12 Q    (Interposing)  Okay.  When you got into the store, sir,

13      at any point, did you hear or see anymore gunshots?

14 A    Yes.

15 Q    When was that?

16 A    A couple seconds later.

17 Q    A couple seconds later?  And how many gunshots do you

18      hear at this point?

19 A    I think about six or seven, I guess.

20 Q    All right.  And at this point, are you fully in the

21      store?

22 A    Yes.

23 Q    Are you looking out to see what's going on?

24 A    No.

25 Q    What's your concern?  Where's your focus?

-69-

1  A    Getting back to the back of the store, get out the way.

2  Q    After -- So, at first you hear about four or five shots,

3       correct?

4  A    Mm-hmm.

5  Q    Is that a yes?

6  A    Yes.

7  Q    And then what's the time difference between those first

8       four or five shots and the next series of six or seven

9       shots?

10 A    A minute, at the most, estimate.

11 Q    Okay.  So, approximately a minute between those two

12      shots?

13 A    Yeah.

14 Q    And then what happens next?

15 A    After the shooting stopped, that's when we looked out

16      the window and we seen--

17            MR. MOORE:  (Interposing)  Objection to we.

18 Q    (By Mr. Prasad, continuing):  I just want to focus on

19      what you saw, sir.  You looked out the window at this

20      point?

21 A    After the shooting stopped, yes.

22 Q    Yeah.  And what did you see?

23 A    I seen Ant on the ground.

24 Q    Okay.  Are those, those two series of shots the only two

25      series of gunshots you heard on this day, sir?

-70-

1   A      Yes.

2   Q      So, you have those first four or five shots, then

3          approximately a minute break and then those last six or

4          seven shots, sir?

5   A      Correct.

6   Q      Okay.  Did you notice if there was anyone else injured

7          inside your store?

8   A      Yes.

9   Q      Who was that?

10  A      Another neighborhood guy.  I don't know his name.

11  Q      You don't know his name?

12  A      Yes.

13  Q      But is he someone that you're familiar with that comes

14         to that store?

15  A      Yes.

16  Q      Okay.  And could you see where he was injured at this

17         point, where he was inside the store when he was

18         injured?

19  A      He's just in the corner to the left side of the door.

20  Q      Okay.  I'm going to show you two pictures, sir.

21         Exhibits Number Nine and Ten.  Look at those, sir, and

22         tell me if you recognize what's in Exhibits Nine and

23         Ten.

24  A      Yes.  And what's inside Exhibits Nine and Ten, sir?

25  A      It's inside the store.  To the left side of the door is

-71-

1       where the other shooting victim was at.  I see his

2       clothes and his jacket.

3   Q   And in that corner there in -- I think you get a better

4       view of it in Exhibit Number Ten, I believe, a closer up

5       shot.  Do you see the dark-colored clothing with a

6       little bit of what appears to be blood there?

7   A   Mm-hmm.

8   Q   Is that right?

9   A   Yes.

10  Q   Okay.  Sir, you were familiar with your store that day?

11  A   Yes.

12  Q   Was there any blood in that corner earlier that day?

13  A   No.

14  Q   Okay.  And as far as you know, sir, where did that

15      clothes and that blood come from?

16  A   From the other guy who was shot.

17  Q   And that is not Ant?

18  A   No.

19  Q   I want to take us now, sir, if I can -- Sir, you said

20      you looked outside and you saw Ant was on the ground?

21  A   Correct.

22  Q   Tell me about that.  What did you see?  What'd you

23      observe?

24  A   I observed Ant laying on the ground.

25  Q   Okay.  What was his condition at this point?

-72-

1  A    He looked like he was dead.

2  Q    What makes you say that?

3  A    It was a lot of blood coming out his head and he was

4       laying on the ground, wasn't moving.

5  Q    I want to show you a couple of photographs, sir, if I

6       can.  Start with People's Exhibit Number Thirty.  Do you

7       recognize that, sir?

8  A    Yes.

9  Q    What is that?

10 A    The street outside the store.

11 Q    Okay.  Do you see that red piece of clothing there on

12      the sidewalk?

13 A    Yes.

14 Q    Are you familiar with that, sir?

15 A    Yeah.  It's a jacket laying on the ground.

16 Q    Who's was that?

17 A    I don't know.

18 Q    Okay.  Do you know, in relation to People's Exhibit

19      Number Thirty, where Ant was when you saw him?

20 A    Laying right there in the street where the blood stain

21      at.

22 Q    Okay.  Mr. Moore, if you want to come up?  I'm going to

23      ask him to point out.  Can you point out, show it to the

24      jury as you're pointing it out, what stain are you

25      talking about right here?  So that's, that's the stain.

                              -73-

```
 1      That's the center of the photograph right by the curb.
 2  A   Yes.
 3  Q   Thank you, sir.  That's where you saw Ant lying at, sir?
 4  A   Correct.
 5  Q   Do you know if you called police or someone called
 6      police?
 7  A   Someone.  I don't know who exactly called.
 8  Q   About how long after this shooting took place was it
 9      before the police arrived?
10  A   Minutes.
11  Q   They were there within minutes?
12  A   Yes.
13  Q   Okay.  And what happened at that point?
14  A   The police came in and questioned everyone about what
15      happened.
16  Q   Okay.  Now, initially, on that day, sir, did you talk to
17      the police?
18  A   Yes.
19  Q   Initially on that day when you talked to the police,
20      were you fully forthright into all the details of what
21      you knew?
22  A   No.
23  Q   And what didn't you tell the police?
24  A   I didn't tell them anything.  I told them I didn't see
25      anything.
```

-74-

1    Q    And why was that?

2    A    Because I didn't want to be involved with it.  My

3         business is there.  My kids work in my business.  I

4         didn't want to have no parts of it.  So, for my safety.

5    Q    At some point, sir, did that change?

6    A    Yes.

7    Q    When was that, sir?

8    A    I want to say one or two days later, an officer came up

9         there, a female officer came up there with a couple

10        other officers and came into the store.  They said that

11        I lied to her and I knew more about the case than what I

12        said.

13   Q    What did you do at this point?

14   A    They took me out the store, took me up to the precinct.

15        And they asked me, why did I lie?  I told them the

16        reasons why.  And just questioned me.

17   Q    Okay.  At that point, Mr. Bailey, sir, were you shown

18        any photographs of anyone who might be the person you

19        described as Tay or that you called the nickname of Tay?

20   A    Yes.

21   Q    And what was -- How was that done?  Tell me about that.

22   A    They showed me some pictures.  Some guy asked me was any

23        of them Tay.

24   Q    And what did you say, sir?

25   A    I told him no.

```
 1  Q   Okay.  And this was, this was the second time you had

 2      talked with police, when they took you to the precinct?

 3  A   Yeah.  Came and took me to the precinct and said they

 4      were going to charge me with accessory to the murder

 5      because they think I had something to do with it.

 6  Q   Because you weren't being forthright the first time?

 7  A   Correct.

 8  Q   All right.  So, they show you some pictures and none of

 9      those pictures matched Tay?

10  A   Correct.

11  Q   Did there come another time, sir, where police came in

12      contact with you again?

13  A   Yes.

14  Q   And about how long later was that?  Do you recall?

15  A   I don't recall.  It wasn't that long, some days or a

16      week.  I can't really say.

17  Q   Days or a week later?

18  A   Yes.

19  Q   And this third time now, about--

20                  MR. MOORE:  (Interposing)  May I--

21                  MR. PRASAD:  (Interposing)  I'm sorry?

22                  MR. MOORE:  Take a look at that, please?

23                  MR. PRASAD:  Yes.  I was going to...  May I,

24      Judge?

25                  THE COURT:  Would you, please?
```

1  Q    (By Mr. Prasad, continuing):  So, now this is the third

2       time you talked to the police, is that correct, sir?

3  A    Correct.

4  Q    And this third time, where did that occur at?

5  A    At the precinct.

6  Q    At the precinct?  Okay.  And at that time, sir, this

7       third time, did they show you another series of

8       photographs?

9  A    Yeah.  They showed me a cell phone with his picture on

10      it and they also showed me a line-up picture.

11 Q    Okay.  When you saw the cell phone photograph, did you

12      recognize who that was?

13 A    Yes.

14 Q    And who did you recognize that as?

15 A    Tay.

16 Q    And that's the same person that you recognized who was

17      in the argument with Ant on April 10th?

18 A    Correct.

19           MR. PRASAD:  Okay.  May I approach the

20      witness, your Honor?

21           THE COURT:  You may.

22 Q    (By Mr. Prasad, continuing):  Showing you what's been

23      pre-marked as People's Proposed Exhibit Number Forty-

24      Eight.  Do you recognize that, sir?

25 A    Yes.

```
 1  Q    What is that, sir?

 2  A    It look like a line-up sheet.

 3  Q    And do you recognize your handwriting anywhere?

 4  A    Yes.

 5  Q    Where is your handwriting?

 6  A    At the bottom.

 7  Q    And is your signature there, too?

 8  A    Correct.

 9  Q    And is that the line-up sheet that you looked at on the

10       third time you spoke to the police where you identified

11       who Tay was?

12  A    Yeah.

13  Q    And did you do something on that line-up sheet to mark

14       that that person is Tay?

15  A    Yeah.  They had me circle.

16  Q    You circled it?

17  A    Yes.

18  Q    And did you write anything?

19  A    No.  I just signed it.

20  Q    Okay.  And that's your signature, sir?

21  A    Yes.

22            MR. PRASAD:  Your Honor, at this time, the

23       People would seek to admit this into evidence as

24       People's Exhibit Number Forty-Eight.

25            THE COURT:  Any objections to Forty-Eight
```

```
 1    being received?
 2              MR. MOORE:  No objection, Judge.
 3              THE COURT:  It'll be received.
 4              (Whereupon People's Exhibit Number Forty-
 5              Eight was received into evidence.)
 6  Q  (By Mr. Prasad, continuing):  I'm sorry, Mr. Bailey.  I
 7     may have misunderstood when I asked you this question.
 8     On People's Exhibit Number Forty-Eight, this writing
 9     right here, this is Tay?
10  A  That's not my handwriting.
11  Q  That's not your handwriting?
12  A  I can't remember writing that.  No.  That's not my
13     handwriting.
14  Q  Okay.  But this is the circle that you made indicating
15     who Tay was?
16  A  Correct.
17              MR. PRASAD:  Okay.  Thank you, your Honor.
18     Pass the witness.
19              CROSS-EXAMINATION
20  BY MR. MOORE:
21  Q  Good morning, Mr. Bailey.
22  A  Good morning.
23  Q  When were you first at the store that day?
24  A  Opening up earlier that day.
25  Q  Okay.  Because you indicate, at some point in time, you
```

-79-

```
 1      left--
 2  A   (Interposing)  Correct.
 3  Q   Correct?
 4  A   Correct.
 5  Q   Okay.  What time did you leave, if you recall?
 6  A   I don't recall exactly what time it was.
 7  Q   Roughly.  Just roughly.
 8  A   Roughly around maybe about, maybe about two o'clock.
 9  Q   Okay.  All right.  So, you were gone for about two,
10      three hours, right?
11  A   Correct.
12  Q   Okay.  And then you get a phone call saying you need to
13      come back, right?
14  A   Correct.
15  Q   Okay.  Who, who was it that called you?
16  A   My brother.
17  Q   Okay.  Would I be correct to say that your brother was
18      in some kind of distress or concern about something that
19      might have been going on at the store?
20  A   Yes.
21  Q   Okay.  About how long does it take you to get back, sir?
22  A   Twenty minutes or so.
23  Q   Okay.  So, when you get back you see a bunch of these
24      young guys outside of the store, right?
25  A   Right.
```

```
 1  Q    Okay.  And you indicated you know the guy who was

 2       killed, correct?

 3  A    Correct.

 4  Q    Okay.  You know him from coming in the store, being from

 5       the neighborhood, right?

 6  A    Correct.

 7  Q    You said you know my client, correct?

 8  A    Correct.

 9  Q    Stays somewhere in the neighborhood?

10  A    Yes.

11  Q    Correct?  I mean, you see him up in there quite often?

12  A    Right.

13  Q    Okay.  Basically, you sell things to cater to young

14       folks, food, chips?

15  A    Correct.

16  Q    And maybe some cooked food, right?

17  A    Yes.

18  Q    Okay.  Now, how long were you outside when Tate [sic]

19       and the deceased were jawjacking?

20  A    You talking about when they were outside?

21  Q    Yeah.  They were jawjacking--

22  A    (Interposing)  I was out there maybe about five or ten

23       minutes, I guess.

24  Q    Okay.  So, this is going on five to ten minutes.  Now,

25       when you arrived, the person you described as Ant, who's
```

-81-

1     the deceased, he was upset, right?

2  A   Right.

3  Q   He was fired up, right?

4  A   Right.

5  Q   He wanted to kick some tail, right?

6  A   Right.

7  Q   Or at least it appeared that way from his conversation?

8  A   Correct.

9  Q   Okay.  Now, at some point in time, you see my client

10     arrive?

11  A   Right.

12  Q   You don't recognize what vehicle he arrived in, correct?

13  A   Correct.

14  Q   Where did the vehicle stop?

15  A   Right in front of the store.

16  Q   Right in front of the store?  Right in front of the

17     front part of the store?

18  A   Yes.

19  Q   Okay.  Because we've seen some exhibits that showed

20     blood that's sort of right in front of the store, a big

21     spot where you indicated Ant came to rest at, right?

22  A   Right.

23  Q   So, was it above that?  Well, you know, before that or

24     after that or what?

25  A   I don't know.  Right in front of the store.  We were

-82-

```
 1      just standing in front of the store when the car pulled
 2      up.
 3  Q   Okay.  All right.  Now, when my client gets out, he's
 4      just asking about where, anybody seen my phone, right?
 5  A   Correct.
 6  Q   Okay.  He didn't seem to be concerned about those other
 7      individuals who were outside the store at the time,
 8      right?
 9  A   Right.
10  Q   It's just like, you know, where's my phone, anybody seen
11      my phone?  Was there any response given by anybody
12      relative to the phone?
13  A   Not that I know of.
14  Q   Okay.  So, how soon after my client arrived did Ant
15      start, you know, asking about these glasses?
16  A   As soon as your client pulled up.
17  Q   Pulled up?  Okay.  From your perspective, just looking
18      at Ant's reaction, Ant appeared to be quite sure my
19      client had some glasses, had his glasses?
20  A   Correct.
21  Q   Based upon his actions that he was undertaking, correct?
22  A   Correct.
23  Q   Based upon his statements to my client, right?
24  A   Right.
25  Q   He was accusing him real strong, real hard, right?
```

-83-

1  A    Right.

2  Q    Okay.  Now, at some point in time, you indicated another

3       group of men came, right?

4  A    Right.

5  Q    So, at this point in time, how many people are in front

6       of the store, if you can recall?

7  A    I can't recall.  It was a lot of guys out there.

8  Q    Okay.  Did all of them seem to know everybody?  Or were,

9       you know, it was sort of like a bunch of Ant's friends

10      rolled up and now we've got all of these people and just

11      my client?

12 A    Most of them were out of the neighborhood, so I guess

13      they might have been Ant's friends.

14 Q    Okay.  But it looked like a bunch of neighborhood guys,

15      right?

16 A    Yeah.  A whole lot of things was happening, so I

17      couldn't tell you who they was.

18 Q    You seen them, but you didn't particularly know what the

19      names were, right?

20 A    Yeah.

21 Q    Okay.  Now, you're in between maybe trying to settle

22      this dispute, wouldn't you say?

23 A    Correct.

24 Q    You know, like, you know, Ant you need to, you know,

25      chill out, you need to calm down, right?

-84-

1  A    Right.

2  Q    Okay.  And this guy reached around you and punched at my

3       man in the face?

4  A    Correct.

5  Q    Okay.  Now, at this point in time, you go in the store,

6       is that accurate?

7  A    No.

8  Q    What did you do then, sir?

9  A    At this point I turn around and stop the other guys from

10      trying to jump into the fight.

11  Q    Okay.  And you don't know whether they were out there to

12       defend Ant or defend my client, right?

13  A    Right.

14  Q    Okay.  Because, you know, my client didn't signal

15       anybody to come over, did he?

16  A    No.

17  Q    Okay.  All right.  So, what happens to make you go in

18       the store?

19  A    The gunshots.

20  Q    Okay.  Now, you didn't see who did the shooting, did

21       you?

22  A    No.

23  Q    Okay.  Now, at some point in time after the shooting --

24       Well, now let me back up.  How many people come into

25       your store after the initial gunshots?

```
 1  A    I can't remember.  I don't know.  Everybody just took

 2       off running.

 3  Q    Okay.  But we know one person came into the store

 4       because they were on your floor, right?

 5  A    Right.

 6  Q    Okay.  How soon did that person come in after you went

 7       into your store?

 8  A    I think he might have beat me in the store.

 9  Q    Okay.  Now, you talked to the police, correct?

10  A    Correct.

11  Q    Did you talk to an Investigator Simon, female?

12  A    Yes.

13  Q    Okay.  And now, did you write out a statement then or

14       was it written out later?

15  A    I wrote it out then.

16  Q    You wrote it out then?

17  A    Oh, no.  Not that day.  No.  Not that first day.  I'm

18       sorry.

19            MR. MOORE:  May I approach the witness, your

20       Honor?

21            THE COURT:  You may.

22  Q    (By Mr. Moore, continuing):  I'm handing a -- Why don't

23       you look at it for a second so you're familiar, see if

24       it looks familiar?

25  A    Yes.
```

1  Q    Okay.  And what does that appear to be?

2  A    It look like the first statement I made the day of the

3        shooting.

4  Q    Okay.  If you look at the second page -- You've got a

5        signature on each page, is that correct?

6  A    Correct.

7  Q    And on the second page, it talks about you signing on

8        the 13th of April, is that correct?

9  A    Correct.

10 Q    Okay.  And I know the front page talks about a statement

11       on the 10th of April, correct?

12 A    Correct.

13 Q    Now, in that statement -- That's four pages long, right?

14 A    Right.

15 Q    You talk about a conversation with Ant and all these

16       things at the scene and you mention some other

17       individuals, some guy by the name of Freak or what have

18       you.  Correct?

19 A    Correct.

20 Q    You've talked about the shooting, correct?

21 A    Correct.

22 Q    And you said Tate [sic] had a gun in that statement,

23       right?

24 A    No.  I never I seen a gun.

25 Q    Well, look about page three or four.

-87-

```
 1                   MR. PRASAD:  Judge, if we could just
 2          clarify, I think there's two different statements from
 3          two different dates.
 4                   THE COURT:  Well, he's having them -- Is
 5          that two different statements or is that one statement?
 6                   MR. MOORE:  That's what I have.  Now, if the
 7          People haven't given me the second one, if we have two
 8          statements--
 9                   MR. PRASAD:  (Interposing)  You have both
10          statements there.  If you look at the dates, there's--
11                   MR. MOORE:  (Interposing)  That's what I,
12          that's what I indicated.  So, if we could have a moment,
13          Judge--
14                   THE COURT:  (Interposing)  No.  No.  He can
15          identify what he has.  How about that?  We'll let the
16          witness say what he has.
17                   MR. MOORE:  All right.
18                   THE COURT:  As opposed to you two saying
19          what he has.
20   Q      (By Mr. Moore, continuing):  Now, on page two, three or
21          four of that that you signed on the 13th of April, it
22          talks about Tate [sic], you saw Tate [sic] with a gun?
23   A      Yeah.  I remember the conversation I had with the lady.
24   Q      Okay.  No.  No.  No.  Does that document indicate Tate
25          had a gun?
```

                              -88-

```
 1  A    I don't see it in here where you--

 2  Q    (Interposing)  The only person you saw with a gun was

 3       Tate?  And you answered, yes.  Is that about accurate?

 4       Somewhere on page three or four?

 5  A    Three or four?

 6  Q    Yes, sir.  Take your time.

 7  A    Okay.

 8  Q    You see it?

 9  A    Yup.

10  Q    Okay.  Now, about five months later, you talk to the

11       police again, right?

12  A    Almost five months later, yeah.  I did talk to the

13       police again.  Yeah.

14  Q    Yeah.  Yeah.  Let me hand you another document, see if

15       it refreshes your recollection.

16              MR. PRASAD:  Mr. Moore?

17              MR. MOORE:  Yes, sir.

18  Q    (By Mr. Moore, continuing):  See if you talked to

19       somebody in law enforcement on that, on that document.

20  A    Mm-hmm.

21              THE COURT REPORTER:  Yes?

22  Q    (By Mr. Moore, continuing):  Is that a yes?

23  A    Yes.

24  Q    Okay.  Now, five months later, you said you lied to the

25       police back in April, right?
```

-89-

1   A      Yes.

2   Q      Okay.  And why did you in September say you lied?

3   A      Well, in September, I lied because, like I said, when

4          she asked me the question, basically, I said, okay, it

5          looked like he had a hat in his hand.  And then she,

6          that's when she started saying she going to get me

7          violated because she knew I was on federal probation,

8          parole.  And I just came out from prison.  And she said

9          you could be violated.  So, basically, I just agreed to

10         whatever she was saying.

11  Q      Okay.  She was saying, she told you to shut up when you

12         were trying to explain something, didn't she?

13  A      Correct.

14  Q      Just shut up, shut up.  It happened this way.  Right?

15  A      Right.

16  Q      And so, the bottom line in all of this is you never saw

17         my client with a weapon?

18  A      Correct.

19  Q      Okay.  And Ms. Barbara Simon kept trying to put words in

20         your mouth, right?

21  A      She wouldn't let me talk, basically.

22  Q      Okay.  Because she was convinced this gentleman had a

23         weapon, right?

24  A      Because she was convinced that I called the shooter up

25         there.  She kept saying I called the shooter up there.

                              -90-

1  Q    You called the shooter up there and she wants to make

2       the shooter my client, Mr. Howard, right?

3  A    Correct.

4  Q    Okay.  All right.  Let me have those documents, if you

5       would, sir.  The bottom line is you don't know who did

6       the shooting, correct?

7  A    Correct.

8  Q    How long did you keep the store afterwards?

9  A    I still own it.  It's just not open now.

10 Q    Okay.  A lot of graffiti on that store now, isn't it?

11 A    Yes.

12 Q    Okay.  You don't know who did that either, do you?

13 A    No.

14              MR. MOORE:  Just if I may have a moment,

15       your Honor.

16 Q    (By Mr. Moore, continuing):  Is the name that you call

17       my client Tay or Tate, if you know?

18 A    Tay, from what I know.

19 Q    Like T-A-Y?

20 A    Yeah.

21 Q    Okay.  No.  No.  No.  I'm not trying for you to guess.

22 A    Oh, yeah.  Tay.

23 Q    This is about what you say.

24 A    Yeah.  Tay.

25 Q    All right.  Now, after all the shooting stopped, how

-91-

1       many people can you recall being in your store?

2  A    Probably about six.

3  Q    About six?  Okay.  And you can't really recall when they

4       came in, correct?

5  A    Correct.

6  Q    Okay.  Let me ask you one other question.  Did your

7       store appear the same at the time you went in it as it

8       was when you left?  Did it seem to be a little

9       disheveled, things moved around?

10 A    Yes.

11 Q    Okay.  That wasn't the condition you left it in, right?

12 A    Right.

13 Q    And that wasn't the condition these who came in would

14      leave it, correct?

15 A    Correct.

16            MR. MOORE:  Okay.  Thank you very much, sir.

17      No other questions.

18            THE COURT:  May I, your Honor?

19            MR. PRASAD:  Sure.

20            REDIRECT EXAMINATION

21 BY MR. PRASAD:

22 Q    I just wanted to clarify for the record, sir.  So, this

23      one here -- These are the documents that Mr. Moore was

24      showing you?

25 A    Yes.

1  Q    This first one here, is that the -- Do you see the date

2       on that one?

3  A    4/10.

4  Q    Yeah.  April 10th.  That was the day of the shooting

5       itself, correct?

6  A    I think that's the day.  I can't remember exactly what

7       date it was.

8  Q    Is that the statement where -- Is that the first

9       statement you gave to the police?

10 A    Yes.

11 Q    And is that the one where, I think you told the jury,

12      that you were not being forthright at all?

13 A    Right.

14 Q    And why was that?

15 A    For my safety.  And my family be there.  I didn't want

16      to be involved with it at all.

17 Q    Okay.  And then the next pages are pages two, three and

18      four, from a different interview, is that correct, sir?

19 A    Correct.

20 Q    And what date is that one?

21 A    The 13th, April 13th.

22 Q    And that's the interview with Investigator Simon, sir?

23 A    Yes.

24 Q    And is that one accurate?

25 A    No.

-93-

1  Q     And what's not accurate about that?

2  A     This the one I think said something about a gun.

3  Q     Okay.

4  A     This the one I was just telling her stuff she wanted to

5        hear because, like I say, she was talking about

6        violating me and accessory to the murder and--

7  Q     (Interposing)  Do you identify that Ant was fighting

8        with a person by the name of Tay?

9  A     Yes.

10 Q     Is that true?

11 A     Yes.

12 Q     Okay.  So, that part was true?

13 A     Yes.

14 Q     Is your identification of who Tay is, is that true?

15 A     Yes.

16 Q     Is Mr. Howard Tay?

17 A     Yes.

18 Q     And the last one is the statement from September, sir.

19        Do you see that?

20 A     Yes.

21 Q     Do you know who -- Was that -- Do you know if that was a

22        Detroit Police Department person or another investigator

23        that took that statement?

24 A     I assumed it was the police department.  I can't, can't

25        remember who took that statement.

-94-

1  Q    Do you remember meeting with an investigator for the

2       defense?

3  A    Yes.

4  Q    Do you know if that was the statement you gave to her?

5  A    It might be it.

6  Q    Now, Mr. Moore was asking you about what it is exactly

7       that you saw.  And he asked you if you saw anyone with a

8       gun.  You didn't see anyone with a gun?

9  A    No.

10 Q    Before the shots rang out.  At any point, did you glance

11      back at Tay and Ant fighting?

12 A    Yeah.

13 Q    And when you glanced back, sir, did you specifically see

14      Ant, the person who died, did you ever see him with a

15      weapon?

16 A    No.

17 Q    Did you ever see anything in Tay's hands?

18 A    No, not really.  I seen Tay look like he was knocked to

19      the ground, going to the ground.

20 Q    Right.  I'm talking about later after the shots went

21      off, after those first couple of shots went off.  Did

22      you hear -- Did you, did you glance back over there?

23 A    I glanced back, yeah.  So, I assumed he still had the

24      hat in his hand because I know he had a hat in his hand

25      when he got out the car looking for his phone.

```
 1  Q    What, what did it look like to you when you glanced back
 2       there?
 3  A    Looked like a hat or, I mean, I can't exactly remember
 4       what it looked like, just...
 5  Q    Sir, do you recall testifying at a preliminary
 6       examination across the street at 36th District Court?
 7  A    Yes.
 8  Q    Do you remember being asked what it is that you saw when
 9       you glanced back?
10  A    Yes.
11  Q    Do you remember what you said then?
12  A    I remember saying I think he had a hat in his hand or
13       something black, like a hat.
14            MR. PRASAD:  May I approach the witness,
15       Judge?
16            THE COURT:  You may.
17  Q    (By Mr. Prasad, continuing):  I'm going to show you --
18       This is, for the record, pages sixty-one and sixty-two
19       from when you testified at 36th District Court, sir.
20       And I'd like you to draw your attention to starting at
21       line sixteen and going on to the top of the next page.
22       Just read it to yourself.  Do you remember, do you
23       remember testifying at 36th District Court, sir?
24  A    Yes.
25  Q    And it was a situation where you on a witness stand,
```

1      right?

2  A    36th District?

3  Q    Yeah.  You sat on a witness stand to testify in a

4       courtroom?

5  A    No.  36th District, I know I sat at a table and talked.

6  Q    No.  Not that.  I'm talking about when you testified

7       across the street in front of a Judge.  Do you recall

8       that?

9  A    No.  I don't.

10 Q    Okay.  Looking at this transcript, sir, did that refresh

11      your recollection as to what you said was in Tay's hand?

12 A    Yes.  I remember saying that he got out with the hat, I

13      mean, he had a hat in his hand.  Then I turned around

14      and seen an object in his hand.

15 Q    And what color object was that?

16 A    The paper say black.  So, I assume the same hat.  I

17      mean, like it say on the paper, I can't say it was a

18      gun, that I saw a gun, so...

19 Q    You never said hat in here, did you?

20 A    I know I told one lady before being arrested, not

21      arrested, tooken down, he got out with a hat in his

22      hand.  But I never said a hat in here.  No.

23 Q    You never said at a hat in there?

24 A    No.  I never was asked.

25 Q    You described it as a black object?

-97-

1  A     Yeah.

2  Q     So, as far as you, from everything you saw that day, was

3        there anyone else fighting with Ant besides Tay?

4              MR. MOORE:  Objection, Judge.  I don't think

5        we had any testimony that Mr. Tay fought back.  He was

6        just hit.  I don't know if--

7              THE COURT:  (Interposing)  It's the

8        characterization.  He can characterize it any way he

9        wants to.  That doesn't make it testimony.

10 Q     (By Mr. Prasad, continuing):  Was there anyone else back

11       on that day that you saw fighting with Ant, besides Tay?

12 A     No.

13             MR. PRASAD:  Thank you.  I have nothing

14       else, your Honor.

15             RECROSS-EXAMINATION

16 BY MR. MOORE:

17 Q     You said you almost saw Tate, it appeared as though Tate

18       was falling to the ground, correct?

19 A     That's correct.

20 Q     After Ant swung at him, correct?

21 A     Correct.

22 Q     Okay.  Prior -- Well, I'll strike that.  What was my

23       client wearing?  If you can recall.

24 A     I can't recall.

25             MR. MOORE:  Okay.  All right.  No other

                        -98-

1       questions.

2                       THE COURT:  Thank you.  You can be, you're

3       excused.

4                       (At 11:31 a.m. witness excused.)

5                       THE COURT:  You all have twenty-five more

6       minutes in you?  And then we can go to lunch?  Let's go.

7       Next witness, please.

8                       MR. PRASAD:  Mr. McFadden, your Honor.

9                       THE COURT:  How are you today, young man?

10                      MR. McFADDEN:  All right.

11                      THE COURT:  Great.  Thank you.

12                      (At 11:33 a.m. witness FREDERICK McFADDEN

13                      was sworn.)

14                      THE COURT:  Could you promise to tell the

15      truth to the questions that are asked of you today?

16                      THE WITNESS:  Yes, your Honor.  I do.

17                      THE COURT:  Thank you so much.  Would you

18      have a seat in that black chair up there?

19                      DIRECT EXAMINATION

20  BY MR. PRASAD:

21  Q    Sir, please pull that microphone close to you, if you

22       would.  Thank you.  Introduce yourself to the jury,

23       please.

24  A    My name's Frederick McFadden, Sr.

25  Q    Mr. McFadden, how old are you?

```
1   A    Fifty-one years old.

2   Q    Mr. McFadden, I want to take you back to April of last

3        year, sir.  At that time, were you familiar with the

4        neighborhood of, the 16000 block of Tireman, that area?

5   A    Yes.  I was.

6   Q    And how were you familiar with that area, sir?

7   A    My parents used to live there.

8   Q    Okay.  And where did your parents live in that area, how

9        close by?

10  A    Right on the corner.

11  Q    Okay.

12  A    St. Mary's and Tireman.

13  Q    And what cross-streets were your parents living at, sir?

14  A    St. Mary's and Tireman.

15  Q    I'm sorry.  The first one?

16  A    St. Mary's and Tireman.

17  Q    St. Mary's and Tireman.  Thank you.  Now, that corner

18       house there, does the front door border St. Mary's or

19       does the front door border Tireman?

20  A    The front door borders Tireman, side door borders St.

21       Mary's.

22  Q    Okay.  Very good.  And do you have a driveway for that

23       house, sir?

24  A    No, sir.

25  Q    So, where are cars or vehicles normally parked?
```

1  A    Between in the front and on the side.

2  Q    Okay.  And that would be on either Tireman or St.

3       Mary's?

4  A    Yes, sir.

5  Q    All right.  I want to take you to a specific day, if I

6       could, sir, April 10th of last year, of 2010.  Do you

7       remember that day?

8  A    I sure do.

9  Q    Why do you remember that day?

10 A    That was my mother's birthday.

11 Q    Okay.  And as it was your mother's birthday, did you

12      happen to be at your mom's house on Tireman, sir?

13 A    Yes.  I was.  I was there.

14 Q    How long were you there that day?

15 A    All day I was working on her vehicle.

16 Q    And why were you working on her vehicle, sir?

17 A    She was having some problems with it.  She had some

18      motor problems.  I was there from like about eight

19      o'clock in the morning until about 11:30, twelve o'clock

20      at night.

21 Q    Wow.  So, during this entire time, for the most part,

22      were you working on the vehicle?

23 A    Yes.

24 Q    Okay.  I want to draw your attention to the late

25      afternoon, early evening hours, sir.  Where were you

                            -101-

1    during the late afternoon, early evening hours?

2 A  Outside.

3 Q  And was the car that you were working on, was it on

4    Tireman or was it on St. Mary's?

5 A  It was right on the corner of St. Mary's and Tireman.

6 Q  Okay.  As it's on the corner, which street is it

7    actually physically on?

8 A  St. Mary's.

9 Q  It's on St. Mary's, right by the corner?

10 A  Yes, sir.

11 Q  Okay.  And is the front of the, is the front of the

12    vehicle facing away from Tireman or is it facing towards

13    Tireman?

14 A  Towards Tireman.

15 Q  And are you working on the front of the vehicle or the

16    back of the vehicle?

17 A  I was working on both at that  time, but mostly in the

18    front.  I was redoing the motor.

19 Q  Okay.  Did something unusual happen that drew your

20    attention?

21 A  Yes.

22 Q  What happened?

23 A  Well, I heard a lot of arguing.

24 Q  Okay.

25 A  At the time.

-102-

1   Q   About how far away from you was this arguing?

2   A   Fifty, seventy-five feet.

3   Q   And do you know the location where this arguing was

4       happening at?

5   A   Yes.  I do.

6   Q   And what is this location?

7   A   There's one, two houses and then there was a party

8       store.

9   Q   Okay.

10  A   Not party store.  Barbecue place.

11  Q   Is this store, this party store, barbecue place,

12      whatever it is, is it on the same side of the street

13      that you are on?

14  A   Yes, sir.

15  Q   Now, you told us you were on the corner of St. Mary's

16      and Tireman.  Do you actually have to cross St. Mary's

17      to go to the area where the party store is?  Or is it on

18      the same part of St. Mary's where you're at?

19  A   I have to cross over the street and--

20  Q   (Interposing)  Okay.

21  A   Then there's the party.

22  Q   Okay.  And you say how many houses are there between you

23      and the party store?

24  A   Two.

25  Q   Two houses.  That second house there, sir, does that

```
1        second house have any sort of fencing or anything like
2        that right before you get to the party store?
3   A    It's a vacant house and then there's a fence there.
4        Yes.
5   Q    Okay.  And what kind of fence is that?
6   A    A four-foot cyclone fences.
7   Q    All right.  One of those chain-link, those chain fences?
8   A    Yes.
9   Q    So, you first, you see arguing going on, or you hear
10       arguing.  What do you do at that point?
11  A    I just look over there.
12  Q    And what do you see?
13  A    And I just seen, you know, they were arguing, at first.
14       And then--
15  Q    (Interposing)  How many, about how many people do you
16       see at that point?
17  A    Three people.
18  Q    Okay.  And then what happened?
19  A    And then I seen a person push another person.  And then
20       the other person pushed the other person back.
21  Q    Okay.  So, there's two people physically involved at
22       this point?
23  A    Yes.
24  Q    Okay.  And could you tell anything about the size
25       differential or anything like that from the distance you
```

-104-

1      were at?

2  A   Oh, yeah.

3  Q   Okay.  The person who did the first pushing that you

4      described, was he the bigger or the smaller person?

5  A   He was the smaller person.

6  Q   Okay.  And then what happened?

7  A   He pushed him and then the bigger person pushed him

8      back.

9  Q   Okay.

10 A   And I couldn't make out what was said at that time.

11 Q   Okay.

12 A   And I seen the bigger person reaching over to the

13     smaller person, grabbing something from him.

14 Q   Okay.  Is that about it, the end of the altercation at

15     this point?

16 A   For the time being.

17 Q   Okay.  What happens next?  Where is your attention drawn

18     next?

19 A   Back to the car.

20 Q   All right.  How much time passes before something else

21     happens?

22 A   Oh, about five or ten minutes.

23 Q   Okay.  What happens five or ten minutes later?

24 A   I hear gunshots.

25 Q   Okay.

                              -105-

1  A    I thought they were firecrackers at first.

2  Q    Okay.  How many do you hear?

3  A    Three, at that time.

4  Q    What happens at this point?

5  A    Well, I looked, you know, I looked over to where I heard

6       them and I seen two guys like wrestling around.  And

7       then after I seen that, you know, I'm up there saying to

8       myself, I says, maybe they're playing.  At that time, I

9       really didn't know if they were playing or if something

10      was really happening.

11 Q    Do you stay where you're at at the corner of St. Mary's

12      and Tireman at this point?

13 A    Yes.  I'm at my house now, at--

14 Q    (Interposing)  No.  No.  I'm sorry.  I misphrased.  At

15      this point, after you hear the first three shots and you

16      see what you think people that may be playing, maybe

17      they're not, are you still stationed at that same corner

18      or do you move yet?

19 A    No.  I'm right, I'm right there.

20 Q    Right where?

21 A    At the car.

22 Q    Okay.  What happens next?

23 A    Next thing I know, I see these people, these two people

24      tussling and I hear another gunshot.

25 Q    So, what do you do?

1  A    First thing I do, well, I go over across the street

2       because there was this elderly lady coming out of the

3       car.  At that time, I knew it was a gunshot.

4  Q    Okay.

5  A    And, you know, I told her to stay down and, you know,

6       she lived right there and got her into her house.

7  Q    What's the next thing you do?

8  A    Next thing I do, I go up to the fence.  I'm down low.  I

9       go up to the fence to see, you know, what's the problem.

10 Q    I'm going to show you something, sir.  This is what's in

11      evidence as People's Exhibit Number One.  Do you

12      recognize that, sir?

13 A    Yes.  I do.

14 Q    What is that, People's Number One, showing us?

15 A    That's the party store.

16 Q    Okay.  And do you see, on the righthand side of People's

17      Exhibit One, the cyclone fence?

18 A    Yes.  I do.

19 Q    Are you familiar with that?

20 A    I sure am.

21 Q    What is that?

22 A    That's the fence I was at.

23 Q    Okay.  You see how the fence is parallel to that post

24      with the sign, with the yellow sign on it?

25 A    Yup.

1  Q    I'm going to show you People's Exhibit Number Two.  Do

2       you recognize that?

3  A    Yes.  I do.

4  Q    What's People's Exhibit Number Two?

5  A    Party store.

6  Q    And does that have a good vantage point of what your

7       viewpoint would have been on that day?

8  A    I seen a lot better than this.

9  Q    You got to see clearer from, than what you actually

10      see--

11 A    (Interposing)  I got to see from the corner to right, to

12      the front door.

13 Q    From where you were able to look?

14 A    Yeah.

15 Q    Okay.  So, it's even better than what you can see in

16      People's--

17 A    (Interposing)  Mm-hmm.

18 Q    Exhibit Two?  Is that a yes?

19 A    Yes.

20 Q    Okay.  Very good, sir.  So, you get up to that cyclone

21      fence.  Tell us what you see.

22 A    I see a gentleman, like I said, they were tussling and

23      then I seen a gentleman, you know, I heard a shot and

24      then I seen the one, the victim I guess I would call

25      him, bend over.

-108-

1   Q     What happens to the victim at this point?

2   A     He just bent over and he like went back, like you know,

3         on his feet.  He stayed on his feet.

4   Q     Swaying or stumbling backward?

5   A     Yeah.  Stumbling.  That's what I would call it.

6         Stumbling.

7   Q     And then what happens?

8   A     And then next thing I know I hear pop, pop, pop, pop.

9         And right off the bat, he stumbled into the street off

10        the curb.  He was on the sidewalk.  And then after he

11        got shot again, he stumbled into the street.

12  Q     At this point when you hear the pop, pop, pop, pop, are

13        you at that fence at this point or are you still going

14        to the fence at this point?

15  A     No.  I'm at the fence at this point.

16  Q     Do you see--

17  A     (Interposing)  I'm down on the ground.

18  Q     Do you see who the shooter is?

19  A     Yes.  I do.

20  Q     Who's the shooter?

21  A     The defendant.

22  Q     Can you please point to him and let us know what he's

23        wearing?  What is he wearing, sir?

24  A     He's wearing a blue checkered shirt.

25              MR. PRASAD:  Your Honor, may the record

1       reflect the witness has identified the defendant?

2                    THE COURT:  It will.

3   Q   (By Mr. Prasad, continuing):  Where did you see the

4       defendant?  Where was he when he was shooting at the

5       victim?

6   A   The first three shots he was on the sidewalk.  And after

7       the second two shots, he was standing just before the

8       street.

9   Q   Who was standing just before the street?

10  A   The defendant.

11  Q   Okay.  And where was the victim at this point?

12  A   In the street.

13  Q   In the street.  Then what happens?

14  A   He walks up to him and, you know, gives him a couple

15      more shots.

16  Q   Who walks up to who?

17  A   The defendant walks up to the victim.

18  Q   And where does he give him a couple more shots?

19  A   He just shot two more times.  That's all I know.  I

20      don't know where exactly.  Then...

21  Q   Go ahead.

22  A   And then there was a vehicle that pulled up and the

23      defendant jumped in the back seat.  Somebody opened up

24      the back door of the vehicle.  He jumped in the back

25      seat.

                            -110-

1  Q    What kind of vehicle was this?

2  A    It was a Dodge Durango.  It was either black or dark

3       blue.

4  Q    This is an SUV?

5  A    An SUV.  Yes.

6  Q    Okay.  And what happens?

7  A    He jumps into the back seat.  Somebody opened up the

8       door.  I don't know who opened up the door.  I didn't

9       see that.

10 Q    Okay.

11 A    And next thing I know, he comes back out, walks up to

12      the defendant [sic] in the street--

13 Q    (Interposing)  Hold on.  The defendant jumps into the

14      Durango, right?

15 A    Yes.

16 Q    Does the Durango actually start moving or anything like

17      that?

18 A    No, sir.

19 Q    Okay.  What happens?

20 A    He gets back out--

21 Q    (Interposing)  Who's he?

22 A    The defendant.

23 Q    Okay.  I'm -- The reason I say that is because there's

24      two males that you were talking about.  We've got to be,

25      as much as possible, try to say the defendant or the

-111-

```
1      victim.  Okay?
2   A  Yes, sir.
3   Q  So, the defendant gets back out?
4   A  The defendant gets back out of the vehicle, walks up to
5      the victim.
6   Q  Where is the victim at this point?
7   A  Laying in the street.
8   Q  On the ground?
9   A  On the ground.
10  Q  Okay.  And what happens?
11  A  He walks back, the defendant walks back up to the victim
12     and shoots him three more times.
13  Q  Where?
14  A  I would say it was his upper -- I know one of them had
15     to be in the head.
16  Q  Okay.
17  A  And then another one maybe his chest or his -- I really,
18     you know...
19  Q  And at this point, the victim's on the ground?
20  A  The victim was on the ground.
21  Q  For these last three shots?
22  A  Yes.
23  Q  And then what happens?
24  A  Then the defendant jumps back into the back seat of the
25     Durango and they take off on the side street.
```

1  Q    How does the Durango drive away?

2  A    Oh, he drove away pretty quick.

3  Q    Mr. McFadden, I'm going to show you what's in evidence

4       as People's Exhibit Number Thirty.  Do you recognize

5       what's shown in there?

6  A    Yes.  I do.

7  Q    Sir, does People's Exhibit Number Thirty show you the

8       location of where the victim was laying when he was shot

9       when he was lying on the ground?

10 A    Yes.  It does.  I was standing right there.

11 Q    Where, where does it show you?

12 A    Right in the middle of the door of the store.

13 Q    Where is the, where's the victim, where would the victim

14       be when he was lying on the ground?

15 A    Where you see that mark right there.

16 Q    The bloody mark?

17 A    Yup.

18 Q    Okay.

19 A    Yes.

20 Q    I want to make sure I'm correct.  You're showing me

21       right here?

22 A    Yes, sir.  And I was standing, at that time, over here.

23 Q    You had moved at this point?

24 A    Yes.  I was told to move.

25 Q    Told to move by who?

1  A    An officer.

2  Q    Okay.  Oh, no.  When the photograph was being taken.

3  A    Oh.

4  Q    No.  No.  I'm trying to--

5  A    (Interposing)  Oh.

6  Q    I'm sorry.  I was confused.  When the photograph was

7       being taken, you were standing right here?

8  A    Yes.

9  Q    I'm not talking about the photograph.  I'm talking about

10      when it happened where were you?

11 A    Right there.

12 Q    Where?

13 A    I was right where that fence is right there.

14 Q    Up in the right?

15 A    Yes.

16 Q    Where you see the cyclone fence?

17 A    That's probably me that you see standing there.

18 Q    I can't -- My eyes aren't that good.  I can't tell.  So,

19      the cyclone fence is in the upper right, correct?

20 A    Yes, sir.

21 Q    Of that photograph.  And you've got the bloody mark in

22      the center?

23 A    Yes, sir.

24 Q    And that's where the victim was lying?

25 A    Yes, sir.

-114-

1  Q    And that's where he was shot those last three times?

2  A    Yes, sir.

3  Q    Mr. McFadden, the entire time that you watched the

4       scene, when you got closer and watched the scene, at any

5       point, did you see the victim with a weapon of any type?

6  A    The victim?  No.  Not the victim.  No.  He tried to take

7       the weapon like when they were tussling.  Because I did

8       see a weapon.

9  Q    Right.

10 A    He tried, you know, to protect hisself, I guess.

11 Q    Who had the weapon the entire time?

12 A    The defendant.

13 Q    Sir, all this occurred in the city of Detroit, that you

14      observed?

15 A    Yes, sir.

16 Q    Here in Wayne County, Michigan?

17 A    Yes, sir.

18 Q    Sir, when this shooting was going on, when the, the part

19      where you were getting closer and the shooting was going

20      on, did you ever hear the defendant say anything?

21 A    I -- Well, when I was up to the fence, that's when I

22      started hearing things.  Yes.

23 Q    What did the defendant say?

24 A    The first time when he jumped into the Durango and he

25      got back out.  I'm not going to use the words.

-115-

```
 1  Q    If you need to use initials to--
 2  A    (Interposing)  Okay.  He says, no.  This MF N isn't dead
 3       yet.
 4  Q    And then he gets out?
 5  A    Yes.
 6  Q    And does he say anything else?
 7  A    He said something, but I really couldn't make it out.
 8  Q    And it's after he says no, this MF N isn't dead yet, is
 9       that when he shoots the victim--
10  A    (Interposing)  Him three times.
11  Q    When he was lying on the ground?
12  A    Yes, sir.
13            MR. PRASAD:  Thank you, Mr. McFadden.  Pass
14       the witness, your Honor.
15            THE COURT:  Your pleasure, sir.
16            CROSS-EXAMINATION
17  BY MR. MOORE:
18  Q    Good morning, Mr. McFadden.
19  A    Good morning, sir.
20  Q    Now, what time of day was this that you sort of saw this
21       commotion going on down the street?
22  A    It was in the mid-afternoon, I would say, sir.
23  Q    Okay.  Now, and you were out in the yard working on a
24       car for your mother, right?
25  A    I wasn't in the yard.
```

-116-

1  Q    Excuse me.  On the street.

2  A    Yes, sir.

3  Q    Okay.  Now, at some point, you saw some young men in

4       front of the store, correct?

5  A    That's correct, sir.

6  Q    Okay.  And it appeared as though there was an argument

7       between two of the young men, correct?

8  A    Yes, sir.

9  Q    Okay.  Now, at any point in time, did you see some other

10      young men come into the vicinity, the area where these

11      three were at?

12 A    Only one.

13 Q    Okay.  So, the most you saw outside the store was four?

14 A    Three.

15 Q    You say -- We've got three and then--

16 A    (Interposing)  The defendant, victim and one more

17      person.

18 Q    Okay.  Did anybody else come after that?

19 A    Oh, not that I know of, sir.

20 Q    Okay.  Now, you indicate that you heard an argument.

21      You didn't hear what was being said, but you could tell

22      there was a little bit of an argument going on between

23      two of three people, correct?

24 A    At first, yes.

25 Q    At first.  Okay.  And there was a little pushing, I'll

-117-

```
 1      push you, you push me, right?

 2  A   Yes, sir.

 3  Q   Okay.  Did any punches get thrown between these two

 4      people?

 5  A   Yes, sir.

 6  Q   Okay.  And you described a bigger person and you

 7      described a smaller person?

 8  A   Yes, sir.

 9  Q   Do you have any description of the bigger person, if you

10      can recall?

11  A   The bigger person, yes, sir.

12  Q   Could you give that to us, please?

13  A   The bigger person was probably roughly around 5'8",

14      5'9".  He was a little bit bigger than the defendant.

15  Q   What was the person wearing, if you can recall?

16  A   Well, I can recall both people.

17  Q   Well, good.  Good.  Good.  Tell me what the big person

18      was wearing.

19  A   The big person was wearing a red ball cap with a striped

20      shirt and a pair of jeans.  The ball cap said D on it

21      for Detroit.

22  Q   Striped shirt, pair of jeans.

23  A   Yes, sir.

24  Q   Okay.  What about the smaller person?

25  A   The smaller person was wearing a white T-shirt, beige
```

```
 1        pants, red tennis shoes.
 2   Q    Now, would I be accurate to say that the smaller person
 3        is the one you described as the shooter?
 4   A    The defendant.  Yes.
 5   Q    Okay.  All right.  Now, you talked to the police back on
 6        that day, correct?
 7   A    I talked to several officers.
 8   Q    Okay.  All right.  Do you recall giving a description of
 9        the shooter?
10   A    Yes.  I did.
11   Q    Okay.  Would you like to review, for a full, complete
12        description you gave, would you like to review your
13        statement, see exactly what you told them?  See if it
14        refreshes your recollection?  Or should I ask you -- Do
15        you remember, do you remember the age?  Let's do it this
16        way.
17   A    Do I remember the age?
18   Q    Yeah.  Age, age range that you gave of the shooter?
19   A    I would say approximately, he would have been younger,
20        but I would say approximately twenty years old.
21   Q    Okay.
22   A    But he could have been younger.
23   Q    Okay.  If I told you you said twenty to twenty-four,
24        would you disagree?
25   A    Yes.  I would disagree with that.
```

```
 1                    MR. MOORE:  Okay.  May I approach the

 2        witness, your Honor?

 3                    THE COURT:  You may.

 4   Q    (By Mr. Moore, continuing):  Look down toward the

 5        bottom, sir.  Okay.  And what description did you give?

 6   A    Between 5'11" to 6'0", medium complected.

 7   Q    And what age?

 8   A    Twenty to twenty-four.

 9   Q    Okay.  And did you also tell them about any identifying

10        marks on this individual?

11   A    About the tattoos?

12   Q    Yes.

13   A    Yes.

14   Q    And what did you say about the tattoos?

15   A    He had a tattoo on his neck, I think I said.  And

16        tattoos on his arm.

17   Q    Now, you had gotten pretty close to see the tattoos,

18        would that be accurate?

19   A    Oh, I was pretty close.

20   Q    How far would you say you were, sir?

21   A    Maybe from here to where you are.

22   Q    For the record, we're talking about fifteen feet?

23   A    Twenty feet.

24   Q    Twenty feet?  Okay.  So, you could see the tattoo on his

25        neck.  What did the tattoo look like?  Was it writing, a
```

-120-

1      symbol or what, if you can recall?

2  A   Well, to be honest with you, I can't tell you what it

3      looked like, but it was a tattoo because I have enough

4      of them.

5  Q   Okay.  All right.  Now, had the smaller guy ever gotten

6      knocked down, when you talk about pushing and shoving

7      and maybe some hitting?

8  A   Yeah.  I think he did get knocked down one time.  And he

9      got back up.

10 Q   Okay.  Let me ask you this.  How long was this

11     individual you identified as the shooter, how long was

12     he in front of the store before some pushing and shoving

13     and fighting got started?

14 A   They were arguing at first.

15 Q   Okay.  All right.  So, how long did you think--

16 A   (Interposing)  Maybe about three to five minutes.

17 Q   Three to five minutes?  Okay.  How many punches did you

18     see thrown before you heard what you thought was

19     gunfire?

20 A   Well, I seen two punches from the defendant and then the

21     other person, the taller person, which I guess would be

22     the victim, I seen about two or three.

23 Q   Okay.

24 A   And then I seen the victim, I guess I would call him,

25     reaching towards the defendant grabbing something.

-121-

```
 1  Q    Okay.  Now, during the course of this three to five
 2       minutes that you heard this arguing, what was the third
 3       person doing?
 4  A    Standing there.
 5  Q    Okay.  Now, what did this individual look like, if you
 6       can recall?
 7  A    That individual right there was kind of tall.
 8  Q    Taller than the other two?
 9  A    I would say maybe, maybe about the same size.
10  Q    Okay.  Do you recall what he was wearing?  If you can?
11  A    No.  I can't.
12  Q    Okay.  Now, you heard, while you were at the, at the
13       house, you heard what you though were three, you heard
14       sounds, three sounds that you thought were firecrackers,
15       initially?
16  A    Yes, sir.
17  Q    Okay.  And you just sort of glanced up, looked over to
18       see what was going on because you saw arguing, correct?
19  A    That's correct, sir.
20  Q    Okay.  Now, at what point in time did your mind say,
21       those are not firecrackers, those are gunshots?
22  A    That's correct.
23  Q    No.  At what point in time did--
24  A    (Interposing)  Oh.  At what point in time?
25  Q    Yeah.
```

1  A    Oh, probably within maybe sixty seconds.

2  Q    Okay.  All right.  Now, what do you see happen at that

3       point in time?  I know you talked about you went across

4       the street to assist an elderly individual, correct?

5  A    Yes, sir.

6  Q    Okay.  Now, when you finished upon that chore, is that

7       when you heard an additional set of shots?

8  A    Yes, sir.

9  Q    Okay.  And can you recall exactly how many you heard at

10      that point in time?

11 A    I would say between seven and eight.  It was ten to

12      thirteen shots total.

13 Q    Okay.  All right.  We can try to break then down, if we

14      can.

15 A    Right.

16 Q    Okay.  So, you heard a second series of shots?

17 A    Yes, sir.

18 Q    Okay.  Where does the third guy go?

19 A    Third guy took off running.

20 Q    Do you know what direction?  Toward you?  The other end

21      of the block--

22 A    (Interposing)  He got into a car.

23 Q    Third guy got into a car?

24 A    Yes.

25 Q    Do you know what direction that motor vehicle might have

-123-

1      went in, sir?

2   A   Yes, sir.  I sure do.

3   Q   Okay.  Where'd it go?

4   A   Tireman towards Southfield.

5   Q   Okay.  It went West on Tireman?

6   A   West.

7   Q   Yeah.  Okay.  Do you ever see anybody go into the store?

8   A   No, sir.

9   Q   Okay.  Now, the victim, you say somewhat staggered and

10      fell, would that be correct?

11  A   Yes, sir.

12  Q   Okay.  And he's there on the ground.  He ain't going

13      anywhere.  Right?

14  A   Not after--

15  Q   (Interposing)  Okay.

16  A   That many shots.

17  Q   Okay.  Now, after all this is done, do you ever look at

18      any photographs?

19  A   Did I look at any photos?

20  Q   Yeah.  Anybody ever show you any photographs of any--

21  A   (Interposing)  Three pictures.

22  Q   Three pictures.

23  A   That's all I seen.

24  Q   Okay.  Did you pick anybody out?

25  A   I picked out two people.  Yes.

1   Q    Okay.  You pick out the defendant?

2   A    Picked out the defendant and I also picked out the

3        driver.

4   Q    Oh.  How were you able to see the driver?

5   A    The driver is the one that opened up the door.

6   Q    Okay.  Did that person get out of the vehicle to open it

7        up or did they open it up from the inside?

8   A    I cannot tell you.  There was two vehicles involved.

9   Q    There were two vehicles involved?

10  A    Mm-hmm.

11  Q    Okay.  Let's talk about this, Mr. McFadden.  Where was

12       the second vehicle at?  Well, no, no.  Before we even

13       get to there, the vehicle that drove Westbound on

14       Tireman, what was that vehicle, the one that went down

15       Tireman toward Southfield?

16  A    That was either a Toyota Celica or a Dodge Charger,

17       bluish gray.

18  Q    And that vehicle took off before the gunshots, before

19       the second set of gunshots or what?

20  A    That, that guy just took right off.

21  Q    Now, was this after--

22  A    (Interposing)  Before.  This was before everything.

23  Q    Okay.  Now, you talk about a blue Durango.  Now, what's

24       this other vehicle that--

25  A    (Interposing)  It was either blue or black, sir.

-125-

1   Q   Okay.  But what was the other car?  Because you said it
2       seemed like it was two cars involved?
3   A   Yes, sir.
4   Q   Okay.  Was the Charger the second car that you're
5       talking about that took off--
6   A   (Interposing)  It was either a Toyota Celica or a
7       Charger.
8   Q   Okay.  But that's the one you're making reference, just
9       to be--
10  A   (Interposing)  Right.  Yes.
11  Q   Clear.
12  A   Yes.
13  Q   Okay.  And we got the Durango.  And we're not talking
14      about any third vehicle, right?
15  A   Right.
16  Q   Okay.  All right.  Okay.  So, the Celica or Charger
17      takes off before any gunfire, correct?
18  A   That's correct.
19  Q   And at that point in time, all you saw was the victim
20      and my client, correct?
21  A   That's correct.
22  Q   Okay.  And you move up closer so you can see what was
23      going on, correct?
24  A   That's correct.
25  Q   All right.  And you were able to identify some tattoos

1      on my client's neck, correct?

2  A   That's correct.

3  Q   Okay.  Now, you gave a statement on the 10th or 11th?

4      What day is that?  If you look at the statement, sir, at

5      the top, top left.

6  A   Same day the shooting occurred.

7  Q   Okay.  Now, what was the day that you looked at some

8      photographs?

9  A   Two days later, a day later.

10 Q   I don't know--

11 A   (Interposing)  A day or two later.

12 Q   A day or two later?

13 A   Yes.

14 Q   Okay.  Now, was it three photos or three lines of three

15     photos or what?

16 A   It was just three photos.

17 Q   Just three photos.  And you're certain you picked out my

18     client in the photo?

19 A   I'm positive.

20 Q   Okay.  Now, the photos, did they just have head shots?

21 A   Yes, sir.

22 Q   Okay.  So, the head and a little bit of the neck, right?

23 A   No neck.

24 Q   No neck?  So, you can't say whether the person you

25     picked out had a tattoo upon their neck because you

1      never saw that in the photograph?

2   A   Just like a mugshot.  A regular mugshot would look

3      like--

4   Q   (Interposing)  Okay.

5   A   That's what it looked like.

6   Q   All right.  So, you didn't see any tattoos because--

7   A   (Interposing)  Not on that picture.

8   Q   Okay.  All right.  If I might just have your statement,

9      please, sir.  I have just a couple more questions.

10  A   Sure.

11                 MR. MOORE:  May I have a moment, your Honor?

12                 THE COURT:  Mm-hmm.

13  Q   (By Mr. Moore, continuing):  Okay.  If I can get you to

14     look at your, second page of your statement, sir.  Okay.

15     In your -- And that appears to be the statement that you

16     made to the police, correct?

17  A   Yes, sir.

18  Q   Okay.  Signature's at the bottom, right?  Okay.

19  A   Yes, sir.

20  Q   In that statement on the second page, you talked about

21     the shooter ran into the store and a person you

22     described as Tyrone running out of the store.  Do you

23     see that, sir?

24  A   Yes.  I see that.

25  Q   Okay.  Now, during the course of my examination, you

-128-

```
 1        didn't mention anything about anybody going into the
 2        store or running out of the store.  Where does that come
 3        into play, sir?
 4   A    That comes into play when they were fighting, I guess.
 5   Q    Well, no.  This is what you have to say.  We're not
 6        trying to guess about what happened.  We just want to
 7        know what went on.  Because the reason I asked is you
 8        didn't mention that to the prosecution nor any questions
 9        I asked.  So, I'm just trying to figure out where does
10        that come into play, that person going into the store
11        and out of the store.
12   A    Well, there was people that went into the store.  Yes.
13   Q    Okay.  Now, on cross-examination earlier, I asked you,
14        you saw three people that were outside the store, but
15        you didn't mention anybody else coming or going.
16        Because I asked you did anybody come around and you
17        said, no, it was just the three people.
18   A    Oh, there was a pregnant woman that was in the store
19        that I seen, you know, going to the store.
20   Q    Now, there may have been a pregnant woman going to the
21        store.  But the question was during the course of this
22        interaction between these two individuals who were
23        pushing, pushing and shoving and fighting each other.
24   A    Well, at that time, I didn't know if you meant if
25        somebody was going into the store while they were
```

1        pushing and fighting, sir.  There was people in the

2        store.  I know that.

3   Q    Well, you hadn't gone to the front of the store, had

4        you?

5   A    Pardon?

6   Q    You were looking at the store from the side, correct?

7   A    That's correct.

8   Q    Okay.  So, you hadn't looked to see whether there were

9        any other individuals in the store, had you?

10  A    That's correct.

11  Q    Okay.  I just want to be clear.  I just want to be

12       clear.  I'm not trying to trip you up.

13  A    That's understandable, sir.

14  Q    And just one other question, Mr. McFadden.  You say my

15       client was knocked down.  There was some fighting.  From

16       where did he pull the gun?

17  A    From where did he pull the gun?

18  Q    Yes, sir.

19  A    From in front of his pants.

20  Q    From the front of his pants?

21  A    Yup.  Right down in here.

22  Q    Okay.

23  A    That's where he had it.

24  Q    And how long had the fighting been going on prior to him

25       pulling it?

```
 1  A    Maybe about five minutes.
 2  Q    The fighting was going on five minutes before he pulled
 3       the gun?
 4  A    Well, the arguing, between the arguing, the hitting,
 5       about five minutes.
 6  Q    Okay.  And it's also your testimony that my client
 7       basically got in a vehicle, the vehicle attempted to
 8       leave--
 9  A    (Interposing)  The vehicle wasn't there yet, sir.
10  Q    The vehicle wasn't there yet?
11  A    No, sir.
12  Q    The truck?
13  A    The truck, Durango, black, it wasn't there at that time.
14       No.
15  Q    Let's talk about the Durango.  Now, these two
16       individuals are arguing.  And when exactly does the
17       Durango pull up?
18  A    Right after the gunshots.
19  Q    Right after the gunshots?
20  A    Yes, sir.
21  Q    Okay.  And how long was the Durango there before my
22       client supposedly got in it?
23  A    About three minutes.
24  Q    Three minutes.  Person in the Durango ever get out?
25  A    No.  The driver?  No.
```

-131-

1  Q    Yeah.  Okay.  And the Durango stopped and my client

2       basically got out, you know, this motherfucker ain't

3       dead yet and shot him a few more times?

4  A    Well, your client wasn't in the Durango at that time.

5  Q    He had gotten out, right?

6  A    The first time when he jumped in, he got back out.  Yes.

7  Q    Okay.

8  A    That's correct.

9  Q    Yeah.  That's what I'm talking about.

10  A   Okay.

11  Q   And he said what he said and shot a few more times,

12      right?

13  A   Three more times, sir.

14  Q   All right.  Thank you very much.  And in what direction

15      did the Durango go?

16  A   First street, took a left.

17  Q   And do you know what street that may have been?

18  A   Yes.  I do.

19  Q   What street might that have been, sir?

20  A   Mettetal.

21  Q   All right.  The street West of St. Mary's, correct?

22  A   No.  That would be South of St. Mary's.

23           MR. MOORE:  South of St. Mary's.  Okay.

24      Thank you very much.  No other questions.

25           THE COURT:  That'll be it.  Thank you.

-132-

```
 1                    (At 12:10 p.m. witness excused.)
 2                    THE COURT:  See everybody back at 1:00.
 3      You're not asking him anymore questions.  Have your next
 4      witness here.  Everybody have a good lunch.
 5                    MR. PRASAD:  Can I redirect after lunch?
 6                    THE COURT:  No.
 7                    (At 12:10 p.m. jury leaves the courtroom,
 8                    court in recess.)
 9                    (At 1:04 p.m. court back in session.)
10                    THE COURT:  Next witness, please.  We are
11      ready to roll.  They can come on out.
12                    (At 1:04 p.m. jury enters the courtroom.)
13                    THE COURT:  How was lunch?  Oh, man.  Is it
14      warm outside?  Oh, let me tell you about -- I'm sorry.
15      In the picture by the cooler hides a thermostat.  And in
16      this room and in this room, they both are individually
17      controlled.  So, Mark will just turn down -- And I don't
18      know who would have adjusted the thermostat up.  I'm
19      sorry.  Speak up.  And now out here it's like the
20      Antarctic.  Come on up, please.  We'll try to moderate
21      this.
22                    (At 1:07 p.m. witness OFFICER RODNEY
23                    CUSHINGBERRY was sworn.)
24                    THE COURT:  You promise to tell the truth
25      today, young man?
```

-133-

```
 1                    THE WITNESS:  Yes.  I do.

 2                    THE COURT:  Okay.  Thank you.

 3                    DIRECT EXAMINATION

 4  BY MR. PRASAD:

 5  Q    Officer, please bring that microphone closer to you.

 6       Thank you.

 7  A    Is that good?

 8  Q    Yes, sir.

 9                    MR. PRASAD:  May I, Judge?

10                    THE COURT:  Please.  Please.

11  Q    (By Mr. Prasad, continuing):  Officer, introduce

12       yourself to the jury, please.

13  A    My name is Officer Rodney Cushingberry.

14  Q    And where do you work, sir?

15  A    At the sixth precinct.

16  Q    And that's here in -- For the Detroit Police Department?

17  A    Yes.

18  Q    How long have you been a police officer?

19  A    Six years, going on seven years.

20  Q    All right.  Very good.  Take you back to April 10th of

21       last year, 2010.  Were you working on that day, sir?

22  A    Yes.

23  Q    Do you recall what shift you were working?

24  A    Yes.  Afternoons.

25  Q    And what are your normal hours for the afternoon shift?
```

1  A    4:00 p.m. to 12:00 p.m.

2  Q    Okay.  Sir, did you get a call to go out to a location

3       on Tireman some time early on in your shift on that day?

4  A    Yes.

5  Q    Approximately what time was it when you got a call--

6  A    (Interposing)  Around 5:00 p.m.

7  Q    I'm sorry.  5:00 p.m.?

8  A    Yes.

9  Q    Okay.  And did you respond to that location on Tireman?

10 A    Yes.

11 Q    And where was that location, sir, if you recall?

12 A    It was 16828 Tireman.

13 Q    Okay.  And when you went to that location, sir -- I'm

14      sorry.  The address, is it 16228 Tireman?

15 A    I got 828 in my report.

16 Q    We can correct that.  Okay.  What kind of location was

17      there?

18 A    It was a shooting scene.

19 Q    Okay.  And when you went there, sir, how were you

20      dressed?  What kind of--

21 A    (Interposing)  I was in full uniform.

22 Q    All right.  And did you have a police car or a scout

23      car?

24 A    Yeah.  Marked scout car.  Yes.

25 Q    And when you say marked, you mean the lights and the

```
 1        sirens?
 2  A     Yes, sir.  Detroit Police on the side of the car.
 3  Q     All right.  When you arrived on the scene, describe the
 4        way the scene was at that point.
 5  A     There was casings everywhere.  It was a truck there that
 6        was shot up and there was a victim that was laying on
 7        the ground.
 8  Q     Okay.  And that was on the outside of the building at
 9        that point?
10  A     Yes.
11  Q     Did you have an opportunity to go inside the building
12        itself?
13  A     Yes.
14  Q     Okay.  I want to draw your attention going inside the
15        building.  Did you come in contact with anyone who had
16        been injured inside the building?
17  A     Yes.  It was another victim inside the building that was
18        shot.
19  Q     Okay.  I want to ask you about that individual.
20        Describe that person for us, please.
21  A     The individual was shot.  He was, you know, of course he
22        was a little bit hysterical.  And he was just telling us
23        what happened, that somebody shot him.
24  Q     Okay.  And could you see him actively bleeding at this
25        point?
```

1  A     Yes.  Yes.

2  Q     Okay.  I'm going to show you People's Exhibit Numbers

3        Nine and Ten.  Do you recognize those photographs, sir?

4  A     Yes.

5  Q     And what do those photographs show us?

6  A     The inside of the location.

7  Q     Okay.  And inside both Exhibits Nine and Ten, is there

8        an area where it was you found this person who was shot?

9  A     Yes.

10  Q     Where was that?

11  A     Right here in the corner.

12  Q     Okay.  Is that indicated by any substance or equipment?

13  A     Yeah.

14  Q     And what is that?

15  A     Blood on the clothes and blood on the floor.

16  Q     Did that all appear fresh to you when you--

17  A     (Interposing)  Yes.

18  Q     Came in contact with the victim?  And sir, did you note

19        anywhere in your report the name of this individual?

20  A     Yes.

21  Q     And do you -- Let me ask you preliminary question.  Do

22        you remember his name offhand?

23  A     No.

24  Q     Would looking at your report help refresh your

25        recollection?

-137-

1  A    Yes.

2  Q    Please do, sir.

3  A    It was Mr. Allen.

4  Q    Okay.  And what's Mr. Allen's first name?

5  A    Aundrey.

6  Q    What did you in regards to Mr. Allen in terms of getting

7       him some help or treatment?

8  A    We called medic.

9  Q    And did medic arrive?

10 A    Yes.  It was, I believe medic two.  Medic two conveyed

11      him to Sinai Grace.

12 Q    Okay.  And that's my very next question is where he was

13      taken to.  Sinai Grace?

14 A    Mm-hmm.

15 Q    Is that a yes?

16 A    Yes.  I'm sorry.  Yes.

17 Q    Okay.  Now, let's draw our attention to the other

18      person, the person that was outside.  Did you, did you

19      go to that person outside as well?

20 A    Yes.  I went to that person first.

21 Q    The person that was outside?

22 A    Yes.

23 Q    All right.  Tell us about that person.

24 A    He was non-responsive.  I tried to check for any vitals,

25      couldn't get any.

1   Q    And what did you do with this gentleman at that point?

2   A    Just stood by and called the medic unit to make the

3        scene.

4   Q    And did they, in fact, convey him as well?

5   A    Yes.

6   Q    At any point did this person that was outside, did he

7        ever respond to anything?

8   A    No.

9   Q    Sir, you indicated that there was other evidence that

10       you saw on the scene--

11  A    (Interposing)  Yes.

12  Q    Like shell casings?

13  A    It was shell casings, cell phone.

14  Q    Okay.

15  A    Yeah.

16  Q    Did you have a concern of preserving the scene?

17  A    Yes.  Definitely.

18  Q    What did you do?

19  A    We started getting tape out, yellow tape, police tape

20       and just try to cover the scene, or around the scene to

21       keep it safe.

22  Q    And were you one of the people that was actually taking

23       the police tape and marking it off?

24  A    Yeah.

25                 MR. PRASAD:  Very good, officer.  Thank you

-139-

1    very much.  Pass the witness, Judge.

2              MR. MOORE:  No questions

3              THE COURT:  Young man, thank you so much.

4              (At 1:13 p.m. witness excused.)

5              THE COURT:  And if you'll call your next

6    witness.

7              MR. PRASAD:  The People are going to call

8    Officer Petit.

9              THE COURT:  Please step in and give your

10   name to the court reporter.

11             (At 1:13 p.m. witness OFFICER BRANDON

12             PETIT was sworn.)

13             THE COURT:  Young man, do you promise to

14   tell the truth today to the questions that get asked to

15   you?

16             THE WITNESS:  Yes.

17             THE COURT:  Thank you.  Pull the microphone

18   to yourself, please.

19             DIRECT EXAMINATION

20   BY MR. PRASAD:

21   Q    Sir, please introduce yourself to the jury.

22   A    Officer Brandon Petit.

23   Q    And where do you work?

24   A    Eighth precinct, Detroit Police.

25   Q    And how long have you been a police officer?

-140-

1  A    Approximately, five years.

2  Q    Take you back to April of last year, specifically April

3       10th of 2010.  Did you get a call to go to a scene

4       located on Tireman here in the city of Detroit?

5  A    Yes.

6  Q    And what was the reason for you go to there, sir?

7  A    There was a police run that came out about a possible

8       shooting that occurred.

9  Q    So, what did you do?

10 A    Me and my partner went to the location to assist the

11      units that were out and en route to the possible

12      shooting.  And we ended up being one of the first

13      responders on the scene.

14 Q    Okay.  When you got to the scene, what was your first

15      concern, sir?

16 A    The first concern is to locate a victim, if there was a

17      victim.

18 Q    And tell me exactly what it is you have to do.

19 A    I'm sorry?

20 Q    What did you go to do in terms of that?

21 A    As we arrived, we observed a couple people standing

22      about.  I observed a gentleman laying down half on the

23      sidewalk, half on the street.  I believe he was on his

24      stomach, if I can remember correctly.  But his face was

25      facing to the South.

-141-

1  Q    What do you mean by that, that his face was facing to

2       the South?

3  A    His, the way his body was positioned was he was, he was

4       laying -- I'm trying to go from independent recollection

5       here, so it's kind of hard.  But it was, I want to say

6       he was laying East to West, but he was kind of on his

7       side and facing towards a South direction.

8  Q    Could you see if that person was injured?

9  A    Yes.

10 Q    What did you see in terms of that, sir?

11 A    He had a lot of blood around his head.  And he was not

12      moving at all.

13 Q    Okay.  Was the blood pooling in any away?

14 A    Yes.  It was.

15 Q    Sir, I'm going to show you People's Exhibit Number

16      Thirty.  Do you recognize that, sir?

17 A    Yes.

18 Q    What is that, sir?

19 A    That is a picture taken of the approximate spot of where

20      the victim was laying with the large pool of blood that

21      was near his head.

22 Q    And is the blood that's reflected on People's Exhibit

23      Number Thirty reflective of the pool of the blood that

24      you saw on April 10th of 2010?

25 A    Yes.

1  Q     Okay.  What did you at that point, sir?

2  A     I got -- When we stopped the vehicle, we pretty much

3        knew from ninety-nine percent of the shootings that we

4        go to when we see someone laying on the ground that

5        there has been shots fired.  So, we positioned our

6        shots, our scout car in an area where it would kind of

7        seal off the scene.

8                   And once we did that, I exited the scout

9        car, went to the victim, noticed that he was motionless

10        and the large pool of blood and not breathing or any

11        signs of life.  We then -- As we got there, we noticed a

12        lot of people started coming to the scene.  So, we

13        wanted to push them back and make sure the scene stayed

14        non-contaminated.

15  Q     I'm going to show you People's Exhibit Number Two, if I

16        could, Officer Petit.  Do you see the police vehicles

17        that are in People's Exhibit Number Two?

18  A     Yes.

19  Q     Is that what you're describing to the jury about

20        positioning your vehicle to preserve the scene or keep

21        people away from the scene?

22  A     Yeah.  It's -- This scout car was our scout car--

23  Q     (Interposing)  Which one?  There's two cars there,

24        right?

25  A     Yes.

-143-

1  Q    Which one?  The one on the left or the one on the right?

2  A    The one on the left

3  Q    Okay.

4  A    That was -- We had since moved it, but when we first

5       approached the scene, we were on this side of the scene

6       so no other cars could go through.

7  Q    Blocking traffic?

8  A    Blocking traffic.  Yes.

9  Q    So, what did you then do next, sir?

10 A    After we made sure that no one would, that no one was in

11      the immediate area of where the scene was, my partner

12      tended to another victim I believe it was inside of the

13      location I think.  If I remember correctly, it was like

14      16228 Tireman was the address, I believe so.

15            And I made sure that, until other cars got

16      there, made sure that no one, you know, would come into

17      the area and take any part of the evidence or mess with

18      the, the body or anything.

19 Q    All right.  Did other officers start to arrive, sir?

20 A    Yes.

21 Q    And did you stay on the scene when the homicide and the

22      evidence tech officers arrived?

23 A    Yes.

24 Q    Okay.  And was the scene preserved from the moment you

25      got there to the point where the homicide and evidence

-144-

1      tech officers got there?

2  A    Yes.

3                  MR. PRASAD:  Thank you, officer.  I don't

4      have anything else.

5                  CROSS-EXAMINATION

6  BY MR. MOORE:

7  Q    Your name again, officer?

8  A    Brandon Petit.

9                  MR. MOORE:  Thank you.  No other questions.

10                 (At 1:18 p.m. witness excused.)

11                 THE COURT:  Call your next witness, please.

12     Good afternoon, young man.

13                 OFFICER FITZHUGH:  Good afternoon, sir.  How

14     are you today?

15                 THE COURT:  I'm good.  Thank you.

16                 (At 1:20 p.m. witness OFFICER EUGENE

17                 FITZHUGH was sworn.)

18                 THE COURT:  Do you promise to tell the truth

19     today?

20                 THE WITNESS:  I do.

21                 DIRECT EXAMINATION

22  BY MR. PRASAD:

23  Q    Sir, please introduce yourself.

24  A    Yes.  My name is Eugene Fitzhugh.  I'm a police officer

25     with the city of Detroit.

1   Q     Where do you work, sir?  I mean, what--

2   A     (Interposing)  Oh.  I'm sorry.  I work in the crime

3         scene services unit.

4   Q     Sir, how long have you been a police officer?

5   A     Twenty-three years.

6   Q     And how long have you been in the crime scene services

7         unit?

8   A     Thirteen years.

9   Q     Could you give some background to the jury in terms of

10        what it is a crime scene services officer does?

11  A     Certainly.  We respond to all kinds of crimes.  That

12        includes everything from a home invasion to homicide

13        scenes.  When we get to a scene, we work under the

14        direction of the officer that's in charge of the scene.

15              Our duties usually include taking

16        photographs, fingerprints, looking for evidence,

17        documenting the location of where we find that evidence,

18        documenting the scene.  We provide a sketch and a

19        report.

20  Q     Sir, I want to discuss a specific case with you, if I

21        can.  This is a case involving a vehicle that you were

22        asked to process, specifically a 1997 GMC Suburban,

23        brown in color.

24  A     Yes.

25  Q     Are you familiar with that, sir?

-146-

1  A    Yes.

2  Q    And this -- And I think your involvement was -- It

3       happened last year in April, mid-April?

4  A    I have the report.  I think it was April -- April 19th

5       was the date that I got involved.

6  Q    And what was, what were you request to do with that

7       vehicle, sir?

8  A    The request was to photograph the vehicle and

9       fingerprint it.

10 Q    That last part's what I wanted to ask you about,

11      fingerprinting that vehicle.  Why were you asked -- Not

12      why were you asked.  But what did you do when you were

13      asked to fingerprint the vehicle?

14 A    I'm sorry.  Repeat that again, please.

15 Q    What were you doing in terms of when you were asked to

16      fingerprint the vehicle?  What did you, in fact, do?

17 A    Well, when we fingerprint the vehicle, we put powder,

18      fingerprint powder on the vehicle to try and raise what

19      is a fingerprint.  When we raise the fingerprint, we

20      have some tape that we use to lift the fingerprint from

21      the surface of the vehicle, put it on a plastic lifter

22      and then submit it to latent prints for processing.

23 Q    Were you able to get any fingerprints in this case, sir?

24 A    I did.

25 Q    Okay.  What did you with those?

-147-

1    A     I submitted them to latent prints.

2    Q     And do you know the quality of those prints?

3    A     No.  I don't.  I mean, they looked pretty good to me.

4          That's the reason I collected them.

5    Q     Okay.  And what'd you do -- And at that point, sir, your

6          involvement with this case was done?

7    A     Was over.  Yeah.

8                    MR. PRASAD:  Very good, sir.  Pass the

9          witness.

10                   CROSS-EXAMINATION

11   BY MR. MOORE:

12   Q     This was a vehicle which was found where, sir?

13   A     I'm not certain where it was found, but when I got

14         involved with it, it was at Gene's Tow.

15   Q     Okay.  Where did you get the fingerprints from?

16   A     I got two fingerprints from the hood of the vehicle and

17         one fingerprint from the driver's door above the door

18         handle.

19   Q     And that was your only involvement?

20   A     Yes.  With the scene, yes.

21                   MR. MOORE:  Okay.  Thank you very much.  No

22         other questions.

23                   THE COURT:  Mr. Fitzhugh, thank you.  Good

24         to see you again.

25                   THE WITNESS:  Same here.

-148-

 1                    (At 1:23 p.m. witness excused.)

 2                    MR. PRASAD:  Judge, may Mr. Moore and I

 3       approach, briefly?

 4                    THE COURT:  Mm-hmm.

 5                    (Bench conference 1:23 p.m. to 1:26 p.m.)

 6                    THE COURT:  I need a minute.  Can I get two

 7       minutes so that we can talk out loud?  Because this

 8       whispering is killing me.

 9                    (At 1:26 p.m. jury leaves the courtroom.)

10                    THE COURT:  All right, guys.  Let's talk out

11       loud.

12                    MR. PRASAD:  Judge, what I was informing the

13       Court up at the bench, and informing defense counsel, is

14       that I ran into a snag in terms of the number of

15       witnesses today because Mr. Allen decided not to join us

16       today.  We found him finally at work.  He's asking if he

17       can come tomorrow, which is frustrating me to no end.

18       But I'm apologizing, first.

19                    I have -- Mr. Harris and Ms. Foster are on

20       their way here.  They should be here in less than five

21       minutes.  They'll be ready to testify this afternoon.

22       As well as Sergeant Mackie's always available to

23       testify.

24                    Some of the other witnesses, Judge, that are

25       either endorsed on the witness list -- I had them

                                -149-

```
 1    endorsed because, based on the prior attorney, Ms.

 2    Rock's request--

 3                THE COURT:  (Interposing)  I got you.  But

 4    when we started, I said, okay.  Who are you all going to

 5    waive?  I thought I tried to get--

 6                MR. PRASAD:  (Interposing)  Johnell White's

 7    waived--

 8                THE COURT:  (Interposing)  A decent count.

 9                MR. PRASAD:  Johnell White has been waived

10    because his only purpose was for the ID.  Defense did

11    not object.  That's his evidence.  I was asking defense

12    counsel just now at sidebar--

13                THE COURT:  (Interposing)  Can we, can we do

14    this, please?  Can we go page one, two and three--

15                MR. PRASAD:  (Interposing)  Yes, sir.

16                THE COURT:  Of the witness list?  Because

17    that'll just be simpler for me.

18                MR. PRASAD:  Yes, sir.

19                THE COURT:  Okay.  You told me that Ms.

20    Loewe, Dr. Loewe is going to be here tomorrow.

21                MR. PRASAD:  Well, it's actually going to be

22    Dr. Hlavaty because Dr. Loewe has gone to Macomb County.

23                THE COURT:  Okay.  So, tomorrow?

24                MR. PRASAD:  Yes, sir.

25                THE COURT:  You say Hunt is being waived?
```

1               MR. PRASAD:  She's just the identifier,

2     Judge--

3               THE COURT:  (Interposing)  Right.  But is

4     she going to testify or is she going to be...

5               MR. PRASAD:  Counsel?

6               MR. MOORE:  I mean, I can stipulate to the

7     fact that she identified that as her son, Judge.

8               THE COURT:  Stip and waive, S & W.  Then we

9     have Harris and Thompson on their way.

10              MR. PRASAD:  They're on their way, sir.

11              THE COURT:  And other than Allen, that was

12    the first page of--

13              MR. PRASAD:  (Interposing)  Correct.

14              THE COURT:  Last week, last year's and this

15    is this year's.  We had -- You say Banks is going to

16    testify on page two?

17              MR. PRASAD:  Right.  And Mr. Banks was here

18    earlier, then he went--

19              THE COURT:  (Interposing)  But we also had

20    James Wiencek testify the last time.  Is Wiencek

21    testifying this time?

22              MR. PRASAD:  Yes, sir.

23              THE COURT:  So, where is he?

24              MR. PRASAD:  He's getting, both Officer

25    Wiencek and Officer McNairy are training today.  They're

                              -151-

 1      both coming in tomorrow morning.

 2                  THE COURT:  Okay.  Gonna do it like that.

 3      Let's go to page three from last -- Okay.  You say

 4      McNairy's going to be here tomorrow.

 5                  MR. PRASAD:  Yes, sir.

 6                  THE COURT:  Okay.  So, you didn't save

 7      anything for today.  And then on page four, we had Ms.

 8      Simon who testified last time.  Is she testifying this

 9      time?

10                  MR. MOORE:  Yup.

11                  MR. PRASAD:  That was his call.

12                  THE COURT:  Okay.  That's good.  But she's

13      still checked.  And you checked her.  Okay.  Myron Love

14      is going to testify.

15                  MR. MOORE:  Yup.

16                  THE COURT:  And how about Johnell White and

17      Thomas?

18                  MR. PRASAD:  White -- Judge, I think we, we

19      already -- Counsel already stipulated to the admission

20      of that, so we don't need White.

21                  THE COURT:  Okay.  How about Thomas?

22                  MR. PRASAD:  That's what I was asking

23      counsel just now.  Officer Thomas' only role in this

24      role, in this case was doing the actual forensic cell

25      dump of the cell phone that showed all the

                                -152-

1    identification.  Last trial, Ms. Rock and I agreed to a

2    stipulation that it was, in fact, the defendant's phone.

3    I ask counsel, because I want to put that, you know --

4    It's counsel's call, how he wants to do it.

5            MR. MOORE:  I believe I can accommodate him.

6    I'm not trying to sandbag him, Judge.  I'll have an

7    answer for him in the morning.  But I think we can do

8    that.  That's a rather small matter, Judge.

9            THE COURT:  Okay.  So, the way this looks is

10   we only prepared for three witnesses today and two

11   zillion tomorrow.

12           MR. PRASAD:  Judge, to be -- What I prepared

13   for was Mr. Allen--

14           THE COURT:  (Interposing)  I gotcha, but

15   still--

16           MR. PRASAD:  (Interposing)  Also being here

17   today.

18           THE COURT:  It was two kazillion for

19   tomorrow.

20           MR. PRASAD:  Mr. Allen being here today

21   would have taken up the rest of the day because we would

22   have had the last three civilians.  Mr. Allen's the meat

23   of the cross-examination as well.

24           THE COURT:  Mr. Allen only took an hour last

25   time.

                          -153-

1          MR. PRASAD:  I know.  But...

2          THE COURT:  I'm looking at--

3          MR. PRASAD:  (Interposing)  Okay.

4          THE COURT:  Last years and -- I mean, last--

5          MR. MOORE:  (Interposing)  I'm short at to

6     the point, Judge, you know.  I get in and get out.

7          THE COURT:  Where are the people?  Where are

8     Bailey and Harris?

9          MR. PRASAD:  They're here now.

10         THE COURT:  Golly.  You know I'm really

11    complaining because I got to make a quick run tomorrow

12    like from 10:00 to 11:00.

13         MR. PRASAD:  Okay.

14         MR. MOORE:  I'm a servant, Judge.

15         THE COURT:  I'm a servant, too.  Okay.

16    Let's get those young people back out here.  Let's get

17    rid of Mr. Mackie, if we can, these two witnesses and

18    cry.

19              (At 1:32 p.m. jury enters the courtroom.)

20         THE COURT:  Was in there a little more

21    comfortable in terms of the heat?  Okay.  Okay.  If you

22    insist.

23              (At 1:33 p.m. witness SERGEANT SAMUEL

24              MACKIE was sworn.)

25         THE COURT:  Do you promise to tell the truth

                              -154-

1     today?

2                     THE WITNESS:  Yes, sir.

3                     THE COURT:  Thank you.

4                     DIRECT EXAMINATION

5   BY MR. PRASAD:

6   Q     Sir, please introduce yourself to the jury.

7   A     My name is Sergeant Samuel Mackie.

8   Q     And where do you work?

9   A     City of Detroit Police Department.

10  Q     And where are you working right now in there?

11  A     I'm currently assigned to homicide.

12  Q     How long have you been an officer, sir?

13  A     Fifteen years.

14  Q     And how long have you been in the homicide unit?

15  A     Three years.

16  Q     I want to take you back to April of last year, April

17        2010.  Sir, were you assigned the case involving the

18        investigation of the death of Tyrone Simpson?

19  A     Yes.  I was.

20  Q     At what point were you assigned this case?

21  A     The actual homicide took place in the afternoon of April

22        the 10th.  When I came into work for midnights for April

23        the 11th, that's when I was assigned the case.

24  Q     Okay.  So, it would have been hours or minutes after the

25        day?

                           -155-

1  A    Correct.

2  Q    Okay.  Sir, what's your role now, now that you're

3       actually assigned the case?  What do you do?

4  A    As the officer in charge of the case, it's my

5       responsibility to investigate the case, to establish a

6       suspect on whoever caused the death of a person.

7  Q    Does that include reviewing any witness statements or

8       anything that's already been taken at that point?

9  A    That's correct.  I'll review all the documents prepared

10      by the police officers and the witness statements that

11      were collected.

12 Q    Okay.  And does it also include the idea of possibly re-

13      interviewing some witnesses?

14 A    Correct.

15 Q    All right.  Initially, sir, what were you familiar with

16      in terms of what evidence was seized from the scene?

17 A    I knew there was two cell phones that were recovered

18      from the scene.  And one of them was believed to have

19      belonged to, well, possibly could have belonged to the

20      shooter.  That was still to be determined.

21 Q    So, what do you decide to do at this point with that,

22      with those two cell phones?

23 A    One of the cell phones was registered through Metro PCS.

24      So, we obtained what's called an exigent circumstance

25      form that we will out and we submit to the phone company

-156-

```
 1        letting them know that there's been a homicide and the
 2        severity of what's going on, asking for any, for the
 3        information as to who registered the phone.
 4   Q    And who was that phone registered to?
 5   A    According to them, it was a person by the name of
 6        Deonte Miller.
 7   Q    Okay.  Did you, do you know who this Deonte Miller
 8        person is?
 9   A    No.
10   Q    All right.  With that name in hand, that it's registered
11        to a Deonte Miller, what did you do at this point?
12   A    Just started doing some computer work, playing with the
13        name Deonte Miller.  One of the problems we have with
14        Metro PCS is you don't need identification for obtaining
15        one of their phones or using their service.  So, if I
16        went in there and said my name's Osama Bin Laden, they'd
17        give me a phone under that name.  So, I at that time, I
18        don't know if Deonte Miller is a real name or just, you
19        know, a name that somebody's using.
20   Q    But with that name of Deonte Miller, were you able to
21        come up with someone who has the name of Deonte Miller?
22   A    Yes.  I did locate a person named Deonte Miller.
23   Q    Okay.  And when you located that person, did you
24        physically locate that person or did you just locate the
25        computer records of that person?
```

1  A   No.  Just based on Secretary of State and another system

2      we call the LEIN, which is an acronym for Law

3      Enforcement Information Network.  That's just our

4      computer database that has people's names that we've

5      come into contact with and where they live at now.

6  Q   So, what did you do with that information, sir?

7  A   Pulled up a picture of what Deonte Miller looked like.

8  Q   Okay.  And, sir, when you're assigned a case, do you

9      work on a case alone or do you have other officers that

10     work on it with you?

11 A   No.  We have a squad concept.  So there's, at any given

12     time, at least seven of us in a squad.  So, when a new

13     case comes in, even though I'd be the officer in charge

14     of the case, all seven of us would work on it, including

15     our squad leader, and anyone else at homicide that

16     happens to be there when you need their assistance.

17 Q   So, these other approximately seven officers are all in

18     homicide with you?

19 A   Correct.

20 Q   Okay.  Did you ask anyone to do anything with the

21     photograph of Deonte Miller?

22 A   Not initially.  It was later, I was later instructed to

23     put Deonte Miller's photograph in what we call a six

24     pack.

25 Q   Can you explain to the jury what a six pack is?

1  A    A six pack is if I had suspect in mind, instead of

2       showing the witness who doesn't know who the person is,

3       instead of showing them a single photo, which would be

4       unfair to the person that I'm showing the photo to,

5       instead of showing them one photo, I show them six

6       photos.  And it usually comes on one piece of paper and

7       there will be six photos on it, three on the top row,

8       three on the bottom row.

9              The person that I'm, I'm trying to figure

10      out if that person is involved in the case or not,

11      they'd be one of the six numbers, but the person I'm

12      showing has no idea which of the six that I feel is

13      related to the case or not.  So, this way when they look

14      at it, there's nothing that singles out any one photo.

15 Q    Okay.  So, at that point in the investigation is this,

16      is this six pack, as you call it, created with the

17      person by the name of Deonte Miller in it?

18 A    That's done on the following day, on a Sunday.  The

19      shooting took place on a Saturday afternoon.  This was

20      done on a Sunday afternoon.

21 Q    So, the 11th of April at this point?

22 A    Correct.

23 Q    Okay.  And on the 11th of April, who was that six pack

24      shown to, sir?  Do you know?

25 A    The surviving victim.  His name is Deandre [sic] Allen.

-159-

1  Q   Okay.  And was it shown to anyone else at that point,
2      sir?
3  A   Not that I'm aware of.
4  Q   All right.  Were you the actual officer that showed it
5      to Mr. Allen?
6  A   No.  I didn't prepare it or show him.  It was other
7      officers at homicide.  Since I was working midnights,
8      our boss wanted the case to continue running.  So, he
9      had people from the day shift pick up the case and run
10     with it.
11 Q   What happened after the 11th, sir?
12 A   Well, after the 11th, there was, like I said, there was
13     a photo array shown to the surviving victim.  Based on
14     that, a search warrant for a person's residence was
15     obtained and then executed.
16 Q   That would have been for Mr. Miller's address?
17 A   That's correct.
18 Q   Deonte Miller?
19 A   That's correct.
20 Q   Anything come of that?
21 A   No.
22 Q   Okay.  So, then what happened?
23 A   Well, nothing of evidence related to this case came of
24     that.  But during that execution of the search warrant,
25     we received information that Deonte Miller didn't live

1     in Michigan anymore.  That he used to.  Now, he was

2     living in Ohio.

3 Q   So, what was the next, next step of your investigation?

4 A   When I came back to work and received that information,

5     then, you know, my opinion was Deonte Miller isn't the

6     guy we're looking for, that even though he may have

7     resembled the person -- Well, I can't say -- In my

8     opinion, he wasn't involved in it.

9          So, I knew the one piece of evidence that we

10    had was a cell phone with a picture on it and that there

11    was a witness at the scene that identified the shooter

12    as being someone they knew as Tay.  So, like I said,

13    what I originally wanted to do was to show the person

14    that knew the shooter, that was an acquaintance of his,

15    show him the photos to see whether or not we're on the

16    right track.

17 Q  And what photos are you talking about now, sir?

18 A  The same thing, the photo array, the six pack of photos.

19 Q  And the person at the scene you're talking about, is

20    that Bobby Bailey?

21 A  That's correct.

22 Q  Okay.  So, what happens next?

23 A  So, Bobby Bailey's brought back down and re-interviewed.

24 Q  This is the second interview of Bobby Bailey now, the

25    one that occurred on the 13th of April?

1  A    That's correct.

2  Q    Okay.  So, we're now -- The 10th was a Saturday.  So,

3       we're at Tuesday at this point, right sergeant?

4  A    That's correct.

5  Q    Okay.  Take us there.  What happens there on Tuesday?

6  A    So, he's brought back down.  He's re-interviewed.  And

7       he's shown a photo array.  It's a six pack that now this

8       has Deonte Miller's photo in it.  And he says that's

9       not, the Tay that he's referring to isn't any of the six

10      photos that were shown to him.

11 Q    Okay.  So, then what do you do?

12 A    Just as a precautionary, we want to make sure that Bobby

13      Bailey's not misleading us, so there was a resident at

14      Deonte Miller's house that's living there now who used

15      to live with Deonte Miller, I actually showed him the

16      photo on the cell phone to see if this was, in fact,

17      Deonte Miller.

18 Q    What photo on the cell phone, sir?

19 A    When you turn the phone on, on the home screen, you can

20      either have the background that the factory, when you

21      buy the phone it's already pre-programmed into the

22      phone.  Or you can take a photo and use that as your

23      background.  And there was a photo on the phone used as

24      a background showing the person on it.

25 Q    Sergeant, I think you indicated there was two phones

```
 1        taken from the scene?

 2   A    That's correct.

 3   Q    And do you recall how one was taken from the GMC truck

 4        on the back bumper and one was found across the street

 5        on the ground?

 6   A    That's correct.

 7   Q    Which phone are you talking about, sir?

 8   A    I'd have to look at the typed reports.

 9   Q    Okay.  Let me do this because I don't -- What reports

10        were you referring to that you wanted to look at?

11   A    There should be an evidence tech report that lists all

12        the evidence tag numbers and where the phones were

13        located.

14             MR. PRASAD:  Okay.  May I approach the

15        witness, your Honor?

16             THE COURT:  You may.

17   Q    (By Mr. Prasad, continuing):  Sir, is that the evidence

18        tech report you're referring to?

19   A    That's correct.

20   Q    Okay.  Just read it to yourself, sir, and let me know

21        when you're ready.

22   A    Okay.

23   Q    Are you ready, sir?  So, between the two, the two

24        different phones that we're discussing, which phone was

25        it that you were talking about that had the photograph
```

```
 1      of a person in the background screen?
 2  A   I have to see the photo with the evidence tag on it to
 3      know which one.
 4  Q   This is your case file, sir?
 5  A   Correct.
 6  Q   Is it in here?
 7  A   It should be right when you open it.
 8  Q   Okay.
 9  A   Okay.
10  Q   You ready, sir?
11  A   Yes.
12  Q   So, to answer that question, which phone are we talking
13      about?
14  A   The phone found on the curb.
15  Q   Okay.
16  A   The phone found on the curb, not on the, not on the
17      vehicle.
18  Q   Okay.  So, the one that was found across the street from
19      the business?
20  A   Correct.
21  Q   Okay.  That's the same Metro PCS phone that you got the
22      Deonte Miller name to?
23  A   Correct.
24  Q   Okay.  And you said the background -- What did the
25      background have a picture of?
```

-164-

1   A     Had a picture of a gentleman.

2   Q     Of a person?

3   A     Of a person.  Correct.

4   Q     Okay.  White?  Black?

5   A     I'm sorry.  A black male, in my opinion, late teens.

6   Q     Okay.  So, with this photograph from the phone, what did

7         you do?

8   A     From there, it was basically starting the investigation

9         all over, excluding Deonte Miller as having any

10        involvement in this.  So, in my opinion, the person who

11        registered the cell phone to Metro PCS just used a fake

12        name.

13              MR. MOORE:  Objection.  Speculation, Judge.

14        Ask that it be stricken.

15              THE COURT:  I'll let you cross-examine.

16  Q     (By Mr. Prasad, continuing):  Please continue, sergeant.

17  A     Okay.  So, like I said, in my opinion, that wasn't the

18        correct name of the person that actually registered the

19        phone or the correct address given because that address

20        didn't exist.

21              So, from there, we started the investigation

22        all over.  And instead of focusing on a name, focusing

23        on the picture on the phone to see if I could get the

24        person on that phone identified to see if that's the

25        person that was involved in the shooting or not.

-165-

1   Q   Sir, who did you decide to show this photograph from the
2       phone to?
3   A   Well, initially, the photograph was taken around the
4       neighborhood and shown to people to see if anybody
5       recognized the person, including I went to different
6       schools in the area of where the shooting happened,
7       showed the principal and the vice principal and the
8       security officers the picture and seen if they knew who
9       the person was, hoping maybe he attended school in that
10      area.  And, unfortunately, I wasn't able to come up with
11      anything from that.
12  Q   Okay.
13  A   So, the next step I took from trying to get him
14      identified was I reached out to the people at homicide
15      to see anybody had any, any way of getting this guy
16      identified that I didn't, you know, that I didn't think
17      of as of yet.  And, eventually, we -- Or his, the
18      nickname of Tay that we obtained from the night of the
19      shooting was put in a computer database that we call
20      AIMS, A-I-M-S.
21              And it's basically whenever somebody comes,
22      whenever an officer comes in contact with a person,
23      they'll take their information down and take their photo
24      and they'll enter it into AIMS.  It's not done by
25      everybody, but it is done by some.

-166-

```
 1              So, we put the nickname Tay into the
 2     database to see what names were associated with that
 3     nickname.  And then from there produced a list of names
 4     along with little photos next to the names of all the
 5     different people that use that nickname because it's, of
 6     course, it's a popular nickname.
 7              So, as I was going down looking through the
 8     names and the photos, I came across the photo that, in
 9     my opinion, was exactly the person on the phone.  There
10     was no question in my mind about it.
11  Q  So, it was a match to the person that was shown in the
12     phone?
13  A  That's correct.
14  Q  Okay.  So, now you have a name of a person, but you
15     still need to have someone else who was at the scene
16     look at this photo?
17  A  That's correct.  I can't move forward just based on my
18     opinion of whether or not that's the person.
19  Q  Right.  So, what's your next step?
20  A  My next step was to obtain the photo of the person who
21     we now identified as Deonte Howard, based on the AIMS
22     printout, took that photo, put that photo in a six pack,
23     including Deonte Howard as one of the photos and five
24     other people that were fillers who were put in the six
25     pack.  And then Bobby Bailey was called back in to show
```

-167-

1       him the photo array.

2  Q   And so, this is the third time Mr. Bailey came into

3       contact with law enforcement since the shooting?

4  A   That's correct.

5  Q   So, Sergeant Mackie, I'm going to show you what's in

6       evidence as People's Exhibit Number Forty-Eight.  Do you

7       recognize that, sir?

8  A   Yes.

9  Q   What is that?

10 A   That's the photo array that was shown to Bobby Bailey

11      with the suspect, Deonte Howard, being number four.

12 Q   Okay.  And is this what you mean by a six pack,

13      sergeant?

14 A   That's correct.  Three photos on the top, three on the

15      bottom.

16 Q   Now, explain to the jury, if you would, sir, why a photo

17      pack is, or a photo array is created this way?

18 A   It's for the fairness of the suspect.  Instead of just

19      showing the witness one photo where, of course, the

20      suspect would be seen without, because there's no one

21      else to compare him to, he's put in the photo array with

22      five other photos.

23              So, if the person that we're showing the

24      photo to, if they recognize them, it's because they

25      truly recognize them.  It's not because we're just

                                -168-

1    showing them one photo and trying to get them to agree

2    with us whether or not that's the person that they're

3    describing.

4  Q    Are you looking to have the other people -- Well, let me

5    back up with one question.  First of all, the other five

6    in the photograph [sic] that is not someone you're

7    interested in, do they have anything to do with this

8    case?

9  A    Nothing.  Nothing at all.  They're just fillers that we

10    get out of our computers.

11  Q    Okay.  And are you looking for people with similar

12    characteristics as the person who is the person of

13    interest?

14  A    Correct.  We try and get them to the same complexion,

15    same basically build, according to their facial

16    features.

17  Q    And, sergeant, I'm sure you heard Mr. Bailey testify

18    that he identified Mr. Howard?

19  A    That's correct.

20  Q    So, what did you do next?

21  A    Based on that, then I believed there was enough to pick

22    up Mr. Howard, bring him in.

23  Q    And when you picked up Mr. Howard, did you want to do

24    any other type of verification in terms of

25    identification of Mr. Howard?

1   A    Yes.  I wanted to do a live line-up.

2   Q    What's a live line-up?

3   A    A live line-up is what most people see on television

4        where you'll have six people standing and they'll have

5        maybe numbers above them or lines indicating how tall

6        they are.  And somebody will be on the other side of a

7        two-way glass where they look through and see if they

8        recognize a person that was involved in the crime.

9              In this particular instance, because Deonte

10       Howard is a juvenile, it wasn't done at the county jail.

11       It has to be done at the youth home.  They don't have

12       that kind of a set up.  They have two-way glass, but

13       when you look through the glass you're not looking at

14       numbers on top or dotted lines or anything like that.

15       Everybody is just sitting down.  And we're on the other

16       side of the glass in another room.

17             MR. PRASAD:  Okay.  One second, your Honor.

18   Q    (By Mr. Prasad, continuing):  Who did you show a live

19       line-up to, sir?

20   A    The surviving victim, Deandre Allen.

21   Q    Okay.  After that, sir, was there any other -- Well, let

22       me back up.  You talked about all these other, this one

23       avenue of your investigation.  I want to ask you about

24       another aspect of your investigation.  Were you made

25       aware, sir, of a lot of firearms evidence found at the

-170-

1      scene?

2  A   Yes.  I was.

3  Q   What did you do with that information, sir?

4  A   The spent casings and the fired rounds that were found

5      at the scene that were collected by the evidence techs,

6      they were submitted to the Michigan State Police Crime

7      Lab for them to analyze along with the morgues that

8      were, I'm sorry, the bullets that were recovered from

9      the morgue from the decedent.  Those were also

10     submitted.

11 Q   That was my very next question.  Is that -- Was there

12     any evidence recovered from the Wayne County Medical

13     Examiner's Office?

14 A   Yes.  There was three rounds recovered.

15 Q   Okay.  And those were what was, those were also sent to

16     the Michigan State Police Lab?

17 A   Correct.

18 Q   Okay.  Then what about any possible fingerprint

19     evidence, specifically from Officer Fitzhugh processing

20     the vehicle, that GMC Suburban?

21 A   I don't believe there was any usable prints lifted,

22     which means even though you may see something on a

23     window or on an object that appears to be a fingerprint,

24     when you lift it, it's got a certain number of

25     characteristics where you can make a determination as to

-171-

1      whether or not it belongs to a particular person.  And

2      in this particular case, I don't believe there was any.

3                MR. MOORE:  Well, your Honor, I'd move that

4      be stricken.  That seems to be a question for the

5      fingerprint examiner, Judge.

6                THE COURT:  Sounds like it to me.

7  Q   (By Mr. Prasad, continuing):  Sergeant, do you know if

8      the, if it was in fact submitted to anyone?

9  A   Yes.

10  Q   Who would it have been submitted to?

11  A   The Latent Print Unit.

12  Q   Okay.  And this is sort of a silly question.  But you

13      retained that original cell phone?

14  A   Yes.

15  Q   And why did you retain that original cell phone, sir?

16  A   Because of what was contained in it.  And it's a piece

17      of evidence from the crime.  The piece of the cell

18      phone, not only did I have photos, I had phone numbers

19      and call histories and things like that.  As part of the

20      investigation, I obtained a list of phone numbers from

21      Metro PCS for, dating back for a month prior to the

22      shooting.

23                And so, what they'll do is they'll E-mail

24      you all the phone numbers, outgoing and incoming calls.

25      Now that I had Deonte Howard identified as a suspect in

1    the case--

2                   MR. MOORE:  (Interposing)  Objection.

3    There's been no testimony to that at this point in time.

4    I move it be stricken.

5                   THE COURT:  It's what he thinks.  He's

6    testifying to what he believes.  Go ahead, please.

7                   THE WITNESS:  So, based on that, I took, I

8    ran computer work on Deonte Howard from police reports

9    with his name on it that he and his mom had actually

10   made and the phone number that his mom used as a means

11   for the police to get a hold of her appears in that cell

12   phone and those cell phone records.  So, in my opinion,

13   it was, that was definitely his cell phone.

14                  MR. PRASAD:  Very well, sergeant.  Judge, I

15   have all -- I've asked all the questions I have at this

16   time.  There's one, because of the way the legal issues

17   work, there's one question I cannot ask at this time

18   that I can ask tomorrow after Mr. Allen testifies.  So,

19   I just ask the ability to recall the sergeant--

20                  THE COURT:  (Interposing)  You can recall

21   him.

22                  MR. PRASAD:  Tomorrow if I have to.

23                  CROSS-EXAMINATION

24   BY MR. MOORE:

25   Q    Good afternoon, sergeant.

                              -173-

1  A    Yes, sir.

2  Q    Who did the vehicle, the SUV that was found out, left

3       outside the store belong to?

4  A    I'd have to look through the file and see what's on the

5       impound cards.

6  Q    If you would, please.

7  A    I'm not sure who it belonged to.  I don't see the

8       impound card.

9  Q    Do you know if you ever spoke to that person or not?

10  A    I don't recall because I'm not sure who it belongs to.

11       There was a couple of cars out there.

12  Q    Regarding the phone that was on the bumper of that

13       vehicle, who did that phone belong to?

14  A    I can't recall offhand.

15  Q    You're the officer in charge, are you not?

16  A    Yes.  I am.  But I wasn't expecting to testify right

17       now.  I thought I'd be testifying tomorrow.

18  Q    Okay.  We'll get to that tomorrow then.  We will ask you

19       a few questions, a few more questions.  Now, you went

20       and talked to Mr. Allen, is that correct?

21  A    Yes, sir.

22  Q    And Mr. Allen gave a statement, correct, to one of the

23       detectives?

24  A    Yes.  That's correct.

25  Q    Okay.  And in that statement, he talked about what

-174-

1        happened and a description of a possible shooter, is

2        that correct?

3    A   I believe so.  Yes.

4    Q   And let's just say a description that, that was detailed

5        enough to allow you to make you want to see if he could

6        identify somebody, correct?

7    A   Yes.

8    Q   Okay.  And so, you take this photo array to him,

9        correct?

10   A   No.

11   Q   No?

12   A   No.  I don't.

13   Q   Okay.  The photo array is taken to him, right?

14   A   That's correct.

15   Q   Okay.  And based upon information received from Mr.

16       Allen, you seek a search warrant regarding Mr. Miller's

17       house, correct?

18   A   I don't personally, but one was--

19   Q   (Interposing)  Okay.

20   A   Based on that.  Yes.

21   Q   All right.  And some information supposedly comes across

22       that says Mr. Miller doesn't live there, is that

23       correct?

24   A   That's correct.  That's my understanding.

25   Q   Okay.  What efforts did you then take to find Mr.

```
 1        Miller?  Or did you, or was this person's word just,
 2        hey, taken as the truth?
 3   A    Well, based on what the homeowner had told us, I took
 4        him for his word.
 5   Q    Okay.  So, no further efforts were made to find out
 6        about Mr. Miller?
 7   A    No.
 8   Q    Okay.  Now, you discussed this particular cell phone,
 9        which you believed belonged to Mr. Howard, correct?  You
10        had a discussion with the prosecutor about that,
11        correct, sir?
12   A    Yes.
13   Q    Okay.  And you said it was the name of Mr. Miller,
14        correct?
15   A    Yes.
16   Q    Okay.  Now, you said that there was a false address
17        given to the PCS place, correct?
18   A    That's correct.
19   Q    Do you know Mr. Miller's previous addresses?
20   A    Just what's registered through the Secretary of State.
21   Q    And what time frame was that, sir, in terms of when he
22        was supposed to have lived, at that address?
23   A    I don't understand what you're asking me.
24   Q    Well, you said the Secretary of State had him registered
25        at a particular address.
```

1  A    Yes.

2  Q    When was that identification issued?  For what years or

3       what have you?

4  A    I would have to look at his driver's license to tell

5       you.

6  Q    Okay.  So, needless to say, you really didn't do anymore

7       follow-up work?

8  A    Yes.  I did.

9  Q    Well, let me ask you this.  Did you do up any follow

10      work [sic] to find out where Mr. Miller currently stayed

11      at back in early April, excuse me, mid-April 2010?

12 A    In Ohio.  That's what I was told.

13 Q    Did you do anything yourself or have any people in the

14      squad try to confirm that, sir?

15 A    No.  I didn't.  I didn't believe he was, he was the

16      person involved.

17 Q    Well, sir, I'm not asking whether you believe it.  I'm

18      just trying to confirm it.  Did you do anything to

19      confirm it?

20 A    No.

21 Q    Now, getting back to what you said.  You didn't believe

22      he was involved, correct?

23 A    In my opinion, correct.

24 Q    Yeah.  But based on certain information from Mr. Allen,

25      you got a search warrant, approached a Judge to get a

                              -177-

1     search warrant, correct?

2  A  No.  I didn't.

3  Q  Well, someone approached?

4  A  Someone approached.  Yes.

5  Q  Okay.

6  A  But not with my instructions.  No.

7  Q  Not per your instructions?

8  A  That's correct.

9  Q  Did you produce a, did you get a copy of the photo of

10    Mr. Miller?  Is that in one of the photo arrays?  Maybe

11    somebody else was involved in that.  Excuse me.  Were

12    you involved in putting Mr. Miller's picture in a photo

13    array?

14 A  No.  I wasn't.  That was another member from another

15    squad the following day.

16 Q  Do you know who that may have been?

17 A  It was either Sergeant Michael Martel or Sergeant Gary

18    Diaz of homicide.

19 Q  Do you have anything in your pack there to let this jury

20    know what Mr. Miller looked like?

21 A  Just what would be on the, the photo array.

22             MR. MOORE:  Okay.  Mr. Prosecutor, will you

23    deal with that when he comes back up to the stand again?

24             MR. PRASAD:  Okay.

25 Q  (By Mr. Moore, continuing):  And you said you didn't

-178-

1      know who the other phone belonged to?

2  A   Not offhand.  I'd have to look through the file.

3  Q   Do you know if it could have been any of the individuals

4      who were outside of the store at the time a fight

5      supposedly occurred?

6  A   I can't tell you right now.

7  Q   When you finally located Mr. Howard, where was Mr.

8      Howard staying at the time?

9  A   When he was taken into custody?

10 Q   Yes, sir.

11 A   I'd have to refer to the police report for the exact

12     address.

13 Q   If you would, please.  I know this is a little different

14     because you didn't expect on testifying, but let's see

15     if we can work with it.

16 A   The address he was picked up at was 15625 Hayden.

17     That's in the city of Detroit.

18 Q   Okay.  Now, did he reside there or that's where he was

19     picked up at?

20 A   I don't think anybody resided there.  It was a narcotics

21     raid.

22 Q   Would it be accurate to say that Mr. Howard stayed a

23     couple blocks from where the shooting occurred?

24 A   The address, address he provided was 19520 Hayden.  That

25     address wouldn't be a couple blocks away.

```
 1   Q     Okay.  Where was his mother's address, if you recall?
 2         Because you indicated that you got a telephone number
 3         from his mother based upon reports previously filed by
 4         them.  What was the address that went along with that
 5         phone number?
 6   A     18520 Hayden.
 7   Q     You sure about that?
 8   A     Yes.  18520.
 9   Q     Okay.  Now, when suspects are arrested and you want to
10         interview him--
11   A     (Interposing)  He was detained.  He wasn't--
12   Q     (Interposing)  Okay.
13   A     He's a juvenile.  He was detained.
14   Q     Well, at some point in time, he was arrested though,
15         right?
16   A     Well, it's detention.  Yes.
17   Q     Okay.  Was an interrogation record ever used in terms
18         of--
19   A     (Interposing)  Yes.
20   Q     Okay.
21   A     Well, an advice of rights.
22   Q     Well, we're not talking about advice of rights.  We're
23         talking about an interrogation record.  You know what
24         that is, correct?
25   A     Yes.
```

1  Q    Okay.  In an interrogation record, you describe various

2       characteristics of a suspect, correct?

3  A    Yes.

4  Q    Okay.  And they talk about facial markings, facial

5       hairs, tattoos, correct?

6  A    Correct.

7  Q    Do you know if there's an interrogation record to say if

8       Mr. Howard had a tattoo on his neck?

9  A    I don't recall an interrogation record being filled out.

10 Q    Okay.

11 A    He asked for an attorney.

12              MR. MOORE:  Well, let me hand you People's

13     Exhibit Forty-Eight.  May I approach, your Honor?

14              THE COURT:  Yes.  You may.

15 Q    (By Mr. Moore, continuing):  Now, in there, in terms of

16     what a previous witness has identified, there's a

17     picture of Mr. Howard, is that correct?

18 A    Yes.

19 Q    Okay.  And it shows a frontal picture and has his neck,

20     correct?

21 A    Correct.

22 Q    Okay.  From that photograph, do you see anything to

23     suggest he had a tattoo around his neck, from what you

24     can see?

25 A    Not from what I can see.

                                   -181-

```
1                    MR. MOORE:  Okay.  Thank you.  No further

2       questions at this time.  I reserve the right to ask some

3       questions when he's recalled.

4                    THE COURT:  Anything more that you want to

5       ask today?

6                    MR. PRASAD:  Not today, Judge.

7                    THE COURT:  Thank you, Mr. Mackie.

8                    THE WITNESS:  Yes, sir.

9                    (At 2:09 p.m. witness excused.)

10                    THE COURT:  If you'd call your next witness,

11      please.

12                    MR. PRASAD:  Mr. Harris.

13                    (At 2:12 p.m. witness MARCARIO ANDREW

14                    HARRIS was sworn.)

15                    THE CLERK:  Do you promise the testimony you

16      give today will be truthful?

17                    THE WITNESS:  Yes.

18                    THE CLERK:  Okay.  Why don't you take the

19      seat and just wait a second 'til the Judge gets out?

20                    THE COURT:  How are you, sir?

21                    THE WITNESS:  Okay.

22                    THE COURT:  Young man, I need to ask you,

23      will you make sure that you answer the questions

24      truthfully.  Will you promise to do that?

25                    THE WITNESS:  Yes.
```

-182-

1                    THE COURT:  Thank you.

2                    DIRECT EXAMINATION

3  BY MR. PRASAD:

4  Q    Mr. Harris, can you pull that microphone a little bit

5       closer to you, sir, please?  Thank you.  Introduce

6       yourself to the jury, sir.

7  A    Hi.  I'm Marcario Harris.

8  Q    And Mr. Harris, back last year in April of 2010, did you

9       live on Tireman, sir?

10 A    Yes.

11 Q    And what was your address, sir, on Tireman?

12 A    16215 Tireman.

13 Q    And are you familiar with a Smokehouse type of

14      restaurant/convenience store that was located on

15      Tireman?

16 A    Yes.

17 Q    Where was that located compared to where you live?

18 A    Directly across the street.

19 Q    Okay.  I'm going to show you a couple of photographs, if

20      I can, sir.  I'm going to show you People's Exhibits

21      Eighteen and Nineteen.  Exhibit Number Eighteen, do you

22      recognize what's in the background there?

23 A    That's my house.

24 Q    And who's that sitting there?

25 A    Me.

                          -183-

1  Q     Okay.  And Number Nineteen, sir.  Do you recognize

2        that's a closer-up view of that?

3  A     Yes.  That's me.

4  Q     Okay.  And is that your house, too?

5  A     Yes.

6  Q     Okay.  How well can you see from your house at, how well

7        can you see the convenience store or the restaurant?

8  A     Pretty good.

9  Q     Do you have any front windows that face the front, sir?

10 A     Yes.  I have a picture window that faces the front.

11 Q     And the picture window is located in what room of your

12       house, sir?

13 A     My living room.

14 Q     Okay.  I want to take you back to April 10th of last

15       year, April 10th of 2010.  Do you remember that day,

16       sir?

17 A     Yes.

18 Q     Did something unusual happen that brings you to court

19       today?

20 A     Yes.

21 Q     What did you first see or hear that, that drew your

22       attention that day?

23 A     Well, that day I was watching TV and I heard gunshots.

24 Q     What room were you in in your house when you were

25       watching TV?

1   A    In the living room.

2   Q    And is that -- And what did you do once you heard

3        gunshots?

4   A    I got up to look out the window to see what was going

5        on.

6   Q    How many gunshots did you hear at first, sir?

7   A    Just a couple at first.

8   Q    Where did they seem to be coming from?

9   A    From the store.  Well, outside.  I'll say outside.

10       Before I got up, I could just tell they were coming from

11       outside, not nowhere.

12  Q    Okay.  Now, going back to People's Exhibit Number

13       Eighteen, sir.  Can you show me which of these two,

14       which of the windows, the big picture window you're

15       talking about?

16  A    This one on the right.

17  Q    The center, larger one?

18  A    Yes.

19  Q    Okay.  So, you go to your window, sir.  What is it, what

20       is the first thing you see, sir?

21  A    When I get to my window, I see a guy getting up off the

22       ground.  First, I see a guy getting in a car, or

23       somebody getting a car, just like the door closed of the

24       car.  And I saw a guy on the ground in front of a

25       purple, maroon SUV.

-185-

```
 1   Q    All right.  Let's break that up a little bit.  Let's
 2        talk about that.
 3   A    Okay.
 4   Q    First, you said you see a door close on a car?
 5   A    Yes.
 6   Q    What kind of car was this, sir?
 7   A    It was a gray, silver SUV.
 8   Q    Okay.  And do you -- When you see the door close, do you
 9        actually get a chance to see who it was that was getting
10        in the door?
11   A    No.  I didn't see who was getting in.
12   Q    Okay.  And does that SUV stay there at that moment?
13   A    It pulled off.
14   Q    Okay.  And then where -- And you said there was a second
15        gentleman you saw on the ground?
16   A    Yeah.  On the ground.
17   Q    Where was the second gentleman located?
18   A    By the rear of the Suburban.  It was, you had a Suburban
19        there, the purple, maroon Suburban.  He was getting up
20        from the rear tire, by the rear tire of the truth.
21   Q    Okay.  Hold on one second, sir.  I'm going to show you a
22        couple more photographs.  Number Four, do you recognize
23        what's in Number Four, sir?
24   A    Yes.
25   Q    What's in Number Four, sir?
```

1  A    That's the Suburban I'm talking about right here.

2  Q    Right here?  I'm going to show you a different angle of

3       the same thing, Number Thirteen.

4  A    Yes.

5  Q    Can you see that, sir?

6  A    Yes.  That's -- He was getting up from this rear wheel

7       right here.  That's where the guy was getting up off the

8       ground.

9  Q    Rear wheel behind the Suburban?

10 A    Yeah.  Right here.

11 Q    Okay.  I want to go back to Number Four for a second,

12      sir.

13 A    Okay.

14 Q    When you look at Number Four, do you recognize that

15      angle that you're looking at of the store?

16 A    Yes.

17 Q    Is that similar to the angle you had on that day, sir?

18 A    Yeah.  Mine's a little better, I think.  Mine's a little

19      further to the left--

20 Q    (Interposing)  Okay.

21 A    Than this.

22 Q    But this, it's a similar--

23 A    (Interposing)  It's basically the same one.

24 Q    Okay.  But certainly better than what we see in this

25      photograph?

-187-

```
 1  A    Yes.

 2  Q    Okay.  So, you saw this person on the ground--

 3  A    (Interposing)  Mm-hmm.

 4  Q    By the rear of the Suburban.

 5  A    Yeah.

 6  Q    What happened next, sir?

 7  A    Next, I saw the silver SUV drive off really fast.  And

 8       when he started to pull off, the guy on the ground

 9       started pulling hisself up off the ground.

10  Q    Okay.

11  A    And as he was getting up off the ground, the silver SUV

12       slammed on the brakes.

13  Q    How far away had the silver SUV gotten at this point?

14  A    Well, he was behind, behind the Suburban.  And as the

15       guy was getting up, he pulled off, shot off, drove off

16       at the same time the guy was getting up.  This was--

17  Q    (Interposing)  Okay.

18  A    You know, seconds, almost at the same time.

19  Q    Okay.

20  A    And as he drove off, the guy was getting up off the

21       ground and the silver SUV slammed on the brakes.

22  Q    Then what happened?

23  A    And then a gentleman got out of the SUV with a gun and--

24  Q    (Interposing)  Could you clearly see the gun from where

25       you were, sir?
```

```
 1  A    Yes.

 2  Q    This was broad daylight?

 3  A    Yes.  Broad daylight.

 4  Q    Was there anything blocking your view?

 5  A    No.

 6  Q    So, a guy gets out of the SUV with a gun.  What happens

 7       next?

 8  A    And he starts, the guy was getting up off the ground and

 9       he started shooting at the guy getting up off the

10       ground.

11  Q    Okay.

12  A    And they guy getting up off the ground, he runs behind

13       the Suburban trying to get away from the gunshots.  And

14       they guy chases him and tries to shoot him then and the

15       guy runs to the other side and the shooter runs to the

16       other side trying to shoot him, you know, like chasing

17       him and shooting him back and forth like this.

18  Q    So, let me ask you this, Mr. Harris.  Who's at the front

19       of the Suburban at this point?

20  A    The shooter.

21  Q    The shooter?  And who's at the back of the Suburban?

22  A    The, the guy who was getting shot.

23  Q    Okay.  And are they moving side-to-side?

24  A    Well, as he runs, this guy's chasing him, you know.

25       He's just trying to get away from the gunshots.
```

-189-

1  Q    Okay.  Is the chase happening around the silver--

2  ,A   (Interposing)  Not around it.  Back, you know--

3  Q    (Interposing)  Back and forth?

4  A    Back and forth more like.  Yeah.

5  Q    I follow you.  I follow you.  So, then what happens?

6  A    So, finally, the guy that was being shot at, he runs to

7       the right side of the Suburban and the shooter go to the

8       right, the front right side of the Suburban and shoots

9       him.  And when he shot him this time, the guy gets hit

10      in his side or his leg and he spun around and fell on

11      the ground.

12 Q    Okay.  I'm going to go back to picture number four

13      again, sir.  You said the right side of the Suburban.

14      So--

15 A    (Interposing)  On the right side.

16 Q    By the sidewalk?

17 A    Mm-hmm.

18 Q    Okay.

19              MR. MOORE:  Is that a yes, sir?

20              THE WITNESS:  Pardon me?

21              MR. MOORE:  Is that a yes?

22              THE WITNESS:  Yes.

23              MR. MOORE:  Okay.

24 Q    (By Mr. Prasad, continuing):  Okay.  So, he falls to the

25      right side by the sidewalk?

                        -190-

1  A    Yes.  And--

2  Q    (Interposing)  And what happens?

3  A    When he falls, the shooter is still shooting at him and

4       he walks up on him shooting at him, still shooting at

5       him, shooting him and--

6  Q    (Interposing)  Shooting at the person who'd fallen?

7  A    Yeah.  Had fallen.  And then as he shoots him, the guy

8       starts, you know, not moving--

9  Q    (Interposing)  Who's not moving?

10 A    The guy laying on the ground.

11 Q    Okay.

12 A    Starts not moving.  Then the shooter walked over to him

13      and shot him in the head.

14 Q    Could you clearly see that at this point?

15 A    Yes.

16 Q    At the point where the shooter is shooting the person on

17      the ground in the head, is the person on the ground

18      moving or doing anything--

19 A    (Interposing)  No.  He wasn't moving at this time, I

20      don't think.  No.

21 Q    Okay.  Could you hear anything from where you were at,

22      sir?

23 A    No.  I couldn't hear anything but gunshots.

24 Q    Okay.  How many gunshots do you think this whole episode

25      took place where, where the shooter got out of that

                              -191-

```
 1        vehicle, chased the person and then finally shot them
 2        down?  How many gunshots do you think that was?
 3   A    A lot, probably fifteen maybe.
 4   Q    Okay.
 5   A    Ten, fifteen shots.  It was a lot.
 6   Q    And this was after the first couple of shots you heard?
 7   A    Right.  Right.
 8   Q    After the shooter shoots the person on the ground in the
 9        head, what happens next?
10   A    He runs and jumps back in the SUV and they speed off
11        around the corner down -- I don't know what the street
12        is right there, but down that street.  They turned left
13        and--
14   Q    (Interposing)  If you're looking out your window, is it
15        to the right or to the left?
16   A    To the left.
17   Q    Okay.  And it's that same SUV he had gotten in earlier?
18   A    Yes.
19   Q    Not the--
20   A    (Interposing)  The one he had jumped out of--
21   Q    (Interposing)  Right.
22   A    Is the same car.  It was still sitting there as this was
23        going on.  It pulled up a little, but it was still
24        sitting there.
25   Q    The person that was shot, sir, that day, did you ever
```

1        see that person with a weapon of any kind?

2   A    No.

3   Q    Is the only gun that you saw that day the one that the

4        shooter had?

5   A    Yes.

6   Q    Mr. Harris, do you see the shooter in the courtroom

7        today?

8   A    Yes.  I do.

9   Q    Can you please point to him and let us know what he's

10       wearing?

11  A    The gentleman over here.

12              MR. MOORE:  For the record, identifying my

13       client, your Honor.

14  Q    (By Mr. Prasad, continuing):  How do you recognize him,

15       sir?

16  A    Slim build and short hair and brown skin.  I could see

17       him from where I was.

18  Q    Did you had a clear view of him, sir?

19  A    Yes.  I had a clear view.

20              MR. PRASAD:  Okay.  Thank you, Mr. Harris.

21       Pass the witness.

22              MR. MOORE:  Thank you.

23              CROSS-EXAMINATION

24  BY MR. MOORE:

25  Q    Good afternoon, sir.

-193-

1  A    Good afternoon.

2  Q    I notice you have some sort of glasses in your pocket.

3       Are those sunglasses or reading glasses?

4  A    Sunglasses.

5  Q    Okay.  Do you utilize any kind of reading glasses at

6       all, sir?

7  A    Sometimes, yeah.

8  Q    Okay.  Have you been to get a prescription for any

9       glasses or anything?

10 A    I don't need it.  I don't need it.

11 Q    Do you just go to Rite Aid to get some reading glasses

12      if you got to read?

13 A    No.  I just have some if I need them laying around.

14 Q    And what would make you need some sunglasses?  I know

15      you're in your upper '50s, Mr. Harris.  And we get a

16      little older--

17 A    (Interposing)  Sunglasses?

18 Q    No.  No.  Talking about--

19 A    (Interposing)  Reading glasses?

20 Q    Yeah.  We all get older.  Sometimes we got to utilize

21      something to help us see.

22 A    No.  Well, these sunglasses.  I don't read like I used

23      to, so I don't need them that much.

24 Q    Okay.  So, you can see across the street, right?

25 A    Yes.  I can.

                          -194-

```
 1  Q    Okay.  Did you see any young men out there across the
 2       street prior to hearing those two shots?
 3  A    Pardon me?
 4  Q    Did you hear any young men arguing across the street
 5       prior to seeing, hearing those two shots?
 6  A    No.  I didn't.
 7  Q    Okay.  Now, you said you were in the living room.  Had
 8       you had your door closed?  Was the door closed to your
 9       house?
10  A    Yes.
11  Q    Okay.  When your door is closed, does it muffle the
12       sounds of people across the street?
13  A    Yes.
14  Q    Okay.  Now, would I be correct to say that because the
15       store is across the street and young people have a
16       tendency to frequent it, sometimes you like to cut out
17       that chitter chatter by closing your door?
18  A    I had the air conditioner on.
19  Q    Oh.  You had the air conditioner on, too?  That makes
20       some noise in your house, sir?
21  A    Yeah.
22  Q    Okay.  Now, the--
23  A    (Interposing)  It didn't cover up gunshots, though.
24  Q    No.  No.  We'll get to that, Mr. Harris.  We'll get to
25       that.  Now, regarding the window, did you have any
```

1    covering over the window you had to pull back in order

2    to see out, sir?

3  A    No.  I had blinds, the vertical blinds.

4  Q    Okay.  Were they partly open?  Did you--

5  A    (Interposing)  Partly open.  Yes.

6  Q    Okay.  Did you have to like pull them back so you can

7    get a full, clear view, sir?

8  A    I don't -- Probably.  I don't remember.  Probably.

9  Q    All right.  I just want you to testify to the best of

10    your recollection.

11  A    And that's what I'm doing.

12  Q    Okay.  All right.  Okay.  We're going to get along just

13    fine, sir.  Now, when you look out, how many people do

14    you see, Mr. Harris?

15  A    When I look out at first, I only see the one guy getting

16    up off the ground.  And it was another heavy set guy, he

17    ran to the back of the store, through the back yard of

18    the store, a heavy-set guy.  I saw him running out the

19    store and run to the back of the store.  But he never

20    was, you know, he just came out of the store and was

21    getting away from the trouble.

22  Q    Okay.  But you saw somebody coming out of the store?

23  A    Mm-hmm.

24              THE COURT REPORTER:  Yes?

25  Q    (By Mr. Moore, continuing):  You have to say yes or no.

-196-

```
 1  A     Yes.  Yes.  I'm sorry.

 2  Q     No.  No.  No problem.  No problem.  We'll straighten you

 3        out if you do that.  How long did all this shooting take

 4        place?

 5  A     Minutes.

 6  Q     A couple minutes?

 7  A     It seemed like a long time.

 8  Q     Okay.  And you talked to the police back on that day in

 9        April, didn't you?

10  A     Yes.

11  Q     Tried to tell them what you, what you remembered, right?

12  A     Yes.

13  Q     Okay.  And do you recall the description you gave of

14        the, of the shooter?

15  A     Yes.

16  Q     You do?

17  A     I think so--

18  Q     (Interposing)  I can show you--

19  A     (Interposing)  I don't remember if I did or not--

20  Q     (Interposing)  Something that might refresh your

21        recollection.

22  A     I don't remember if I did or not.

23              MR. MOORE:  May I approach the witness, your

24        Honor?  May I approach?

25              THE COURT:  You may.
```

-197-

```
 1                    MR. MOORE:  Thank you.
 2  Q   (By Mr. Moore, continuing):  Look at that last question
 3      and answer.  Look at that for yourself, okay?
 4  A   Yes.
 5  Q   Okay.  And what was the description that you gave?
 6  A   A black, male, mid-20s, 5'10", thin build.
 7  Q   Don't you have tall in there, too?
 8  A   Tall?
 9  Q   Yeah.  Black male, '20s, tall?
10  A   Tall.  Yeah.  I guess it do.  Yes.
11  Q   Okay.  And the shooter was tall in relationship to the
12      person that got shot or just tall in general?
13  A   Well, he was tall in relationship to the guy that was on
14      the ground.
15  Q   Okay.  Well, that's--
16  A   (Interposing)  I don't know.
17  Q   Okay.
18  A   A lot of stuff was happening, you know.  You really
19      can't tell things.
20  Q   Okay.  And you never did look at a live line-up or a
21      photo line-up, is that correct?
22  A   No.  I didn't.
23  Q   You just came to court and said, hey that's the guy, is
24      that correct?
25  A   Yes.
```

1   Q    Okay.

2              MR. MOORE:  If I may have just a moment,

3        your Honor?

4              THE COURT:  You may.

5              THE WITNESS:  I didn't need to come to

6        court.  I could have recognized him on the street.

7   Q    (By Mr. Moore, continuing):  Okay.  What color was the

8        gun?

9   A    Pardon me?

10  Q    What color was the gun?

11  A    It was silver.

12  Q    Okay.  And you could see that clearly from your house?

13  A    Yes.

14  Q    Okay.  Thank you.  And how, how many times did these

15       guys sort of go around that SUV out there?

16  A    Oh, I don't know.  It was back and forth.

17  Q    Okay.  Sort of like when you were kids and folks was

18       trying to catch up with you, touch you playing tag and--

19  A    (Interposing)  Yeah.

20  Q    Sort of going back around like that?

21  A    Yeah.

22             MR. MOORE:  Okay.  Thank you very much, Mr.

23       Harris.

24             THE COURT:  Anything further?

25             MR. PRASAD:  No, sir.  Thank you.

                           -199-

```
1                    THE COURT:  Thank you, sir.  Let me take
2         that paper for you while you help yourself.
3                    MR. MOORE:  I'll take that, Judge.
4                    (At 2:29 p.m. witness excused.)
5                    THE COURT:  In the meantime, can you get
6         your next witness?
7                    MR. PRASAD:  Yes, sir.
8                    THE COURT:  One day, they'll make a little
9         incline ramp.  One day.  Or just put it there and let
10        you elevate the seat.  I like the seat elevation kind of
11        thing, six-way comfort seats.  Doing all right today?
12                   MS. THOMPSON:  Yes.  I am.
13                   THE COURT:  I need you to take a little
14        oath.
15                   MS. THOMPSON:  Okay.
16                   (At 2:30 p.m. witness KIMBERLY THOMPSON
17                   was sworn.)
18                   THE COURT:  I need you to promise to tell
19        the truth to the questions that these gentlemen will
20        ask--
21                   THE WITNESS:  (Interposing)  I promise.
22                   THE COURT:  Do you promise?
23                   THE WITNESS:  Absolutely.
24                   THE COURT:  Thank you.
25                   DIRECT EXAMINATION
```

-200-

1  BY MR. PRASAD:

2  Q    Ms. Thompson, can you give us your name, please?

3  A    Kimberly Thompson.

4  Q    And Ms. Thompson, last year, back in April of 2010,

5       where did you live, ma'am?

6  A    16215 Tireman.

7  Q    Okay.  And are you familiar with a store, a convenience

8       store or a restaurant called the Smokehouse?

9  A    Yes.

10 Q    Where was that located at, ma'am?

11 A    Directly across the street.

12 Q    Okay.  And who did you live with then?

13 A    Marcario Harris.

14 Q    All right.  I'm going to show you a couple of

15      photographs, if I can.  I'll start off with Eighteen and

16      Nineteen.  Do you recognize the house that's in these

17      pictures, ma'am?

18 A    Yes.  That's the house.

19 Q    That's the house?  And I want to show you Exhibit Number

20      Four.  Do you recognize this, ma'am?

21 A    Yeah.  That's the store across the street.

22 Q    And from the picture window in the living room of your

23      house, is that a similar angle or view that you would

24      have?

25 A    Absolutely.

                              -201-

```
 1  Q    Okay.  I want to take you back to a specific day, April
 2       10th of 2010, ma'am.  Did something unusual happen,
 3       ma'am, that brings you to court here today?
 4  A    Yeah.  We were moving that morning and had taken a load
 5       to the new place and came back.  And there was some
 6       gunshots.  And Drew said someone is shooting at the
 7       store across the street.
 8  Q    All right.  Let me stop you right there, ma'am.  And
 9       that's what we're going to talk about.
10  A    Okay.
11  Q    About what time of day are we talking about, ma'am?
12  A    Seems to me like it was noon, one o'clock, maybe.
13  Q    Was it still daylight out?
14  A    Yes.  Absolutely.
15  Q    Clear day?
16  A    Yes.
17  Q    Did you have any weather blocking your vision?
18  A    Not at all.
19  Q    All right.  And you said -- You called him Drew?
20  A    Yeah.  Mr. Harris.
21  Q    Is Andrew his middle name?
22  A    Marcario Andrew.  Yeah.
23  Q    Okay.  I wanted to know who you were talking about.
24       So, Drew drew your attention?
25  A    Yes.
```

1  Q    And what did he say that got your attention?

2  A    He said somebody's shooting inside the store.

3  Q    Where were you at this point when he said this to you?

4  A    In the bedroom.

5  Q    Okay.  So, when you heard him say that, where did you

6       go?

7  A    Came out of the bedroom and looked out the living room

8       window.

9  Q    All right.  And was Mr. Harris already in the living

10      room?

11 A    Yes.

12 Q    Okay.  So, you look out the living room window.  What do

13      you see at this point, ma'am?

14 A    A gentleman came out of the store...

15 Q    Okay.

16 A    Shot a gentleman that was in the street in the leg.

17 Q    Because we have two different men, I want to try to keep

18      the record--

19 A    (Interposing)  Okay.

20 Q    As clear as possible.  Can we call -- Let me ask you

21      this question before I go into this.  How many guns did

22      you see that day?

23 A    One.

24 Q    Okay.  And did the same person have the gun the entire

25      time?

1  A    Yes.

2  Q    Okay.  So, let's call that person the shooter, okay?

3  A    Okay.

4  Q    All right.  What do you see the shooter do?

5  A    He came out of the store, shot the gentleman in the

6       leg--

7  Q    (Interposing)  Okay.

8  A    The gentleman went down on the ground.  He fell.

9  Q    Can we call that person the victim?  Is that--

10 A    (Interposing)  Yes.

11 Q    Okay.  So, the victim fell on the ground.  Where did the

12      victim fall on the ground?

13 A    Near his car.  His car was parked in front of the store.

14 Q    Okay.  I'm going to go back to--

15 A    (Interposing)  In the street.

16 Q    I'm going to go back to picture number four.

17 A    Okay.

18 Q    Do you see the car that you're talking about?

19 A    The truck right here.

20 Q    That truck on the lefthand side right here?

21 A    Yes.

22 Q    Okay.  And where did he fall in the street?

23 A    He probably fell closer back here.

24 Q    Closer to--

25 A    (Interposing)  In this area.

-204-

1              MR. MOORE:  If I could take a look?

2              MR. PRASAD:  Yes, sir.

3  Q   (By Mr. Prasad, continuing):  Show Mr. Moore what you

4      were just showing me, ma'am?

5  A   I believe he fell right here in this area.

6              MR. MOORE:  That would be to the, if you

7      were in the store, to the left of the front of the

8      store?

9  Q   (By Mr. Prasad, continuing):  If you were looking at the

10     store, just a little bit to the left--

11 A   (Interposing)  Yes.  Yes.

12 Q   Okay.

13             MR. MOORE:  Thank you, your Honor.

14 Q   (By Mr. Prasad, continuing):  About here, ma'am?

15 A   Yes.

16 Q   I want to make sure I'm pointing to the right thing.

17 A   Yes.

18 Q   Okay.  So, you see the victim fall into the street?

19 A   Yes.

20 Q   What happens next, ma'am?

21 A   The shooter got in the car.

22 Q   What kind of car did he get into?

23 A   To be honest, I'm not sure.  I was--

24 Q   (Interposing)  Was it a car or an SUV, if you know?

25 A   SUV, I believe.

1  Q    Okay.

2  A    I'm not very well with makes of cars.

3  Q    That's okay.  That's okay.  I just want general--

4  A    (Interposing)  Right.

5  Q    He gets into the SUV.  And then what happens?

6  A    Starting to take off--

7  Q    (Interposing)  The SUV does?

8  A    Yes.

9  Q    Okay.

10 A    The gentleman in the street was getting up.

11 Q    Okay.

12 A    Car slams on his brakes, comes out, the gentleman, the

13       shooter came out of the car.

14 Q    Okay.

15 A    Came back to where the victim was.

16 Q    Okay.

17 A    Shooting at him, chasing him around his car--

18 Q    (Interposing)  Chasing him around back--

19 A    (Interposing)  That car that was parked in front of the

20       store.

21 Q    Let me show you another picture, ma'am.  This is Number

22       Thirteen.  Do you see the, the--

23 A    (Interposing)  Yes.  That's it.

24 Q    Is that what we're talking about?

25 A    That's what they chased him around.

-206-

1   Q      Okay.

2   A      He did.

3   Q      The shooter chased the victim around that?

4   A      Yes.

5   Q      Okay.  And, ma'am, do you recall if the shooter was

6          chasing him like in a circle or back and forth?  Like

7          how was the chase happening?

8   A      Around the car.

9   Q      Okay.  And was he firing this entire time?

10  A      Yes.  He was.

11  Q      What happens next, ma'am?

12  A      The victim fell on the ground.  And while they were

13         going around the car, I could hear the victim saying,

14         please--

15                     MR. MOORE:  (Interposing)  Objection.

16                     THE COURT:  I'll let her say what the victim

17         was saying.  Go ahead.

18  Q      (By Mr. Prasad, continuing):  You heard the victim say

19         something.

20  A      Yes.

21  Q      What was the tone of voice of the victim?  Not what he

22         said, what was the tone of voice?

23                     THE COURT:  We already have excited

24         utterance.  He's being shot at.

25                     MR. PRASAD:  Okay.  That's fine.

-207-

1   Q     (By Mr. Prasad, continuing):  So, the victim is saying

2         something at this point, ma'am.  What happens next?

3   A     He's saying please don't--

4   Q     (Interposing)  Hold on.  That's okay.  Just continue.

5         What happens after the victim was saying that?

6   A     Pardon me?

7   Q     What happens after the victim said that?

8   A     The guy was shooting at him, then when the guy went down

9         for the last time he walked up to him and shot him in

10        the head.

11  Q     The shooter walked up to the victim and shot him in the

12        head?  Is that a yes?

13  A     Yes.

14  Q     I'm sorry.  He can't take down nods.  Ma'am, I want to

15        show you Exhibit Number Fourteen.  Do you recognize

16        that, ma'am?

17  A     Yes.

18  Q     What are we looking at in Exhibit Fourteen?

19  A     The victim's blood in the street.

20  Q     And is that in reference to anything that you observed

21        that day?

22  A     It's where he died.

23  Q     That's where the victim--

24  A     (Interposing)  That's where he fell down for the last

25        time.

-208-

1  Q    Okay.  In the background, in the top part of that

2       photograph, do you see your house?

3  A    I do.

4  Q    And is that the angle or is that the viewpoint that you

5       had, ma'am?

6  A    Absolutely.

7             MR. PRASAD:  Judge, may hand this photograph

8       to the jury and have them pass it around?

9             THE COURT:  Do you have anymore questions

10      for her?

11            MR. PRASAD:  Yeah.  I'll do that after I'm

12      done with the questions.  Thank you, sir.

13            THE COURT:  Why don't you just put it on the

14      screen and show it?

15            MR. PRASAD:  I could.  I was just trying to

16      avoid the lighting.  But I'll do that.

17            THE COURT:  But in the meantime, you can ask

18      her some more questions.

19            MR. PRASAD:  I will.

20 Q    (By Mr. Prasad, continuing):  Ma'am, what happened to

21      the shooter after he did that, after he shot the person

22      on the ground in the head?

23 A    He went into the car that he'd gotten out of and they

24      took off, they took.  The car took off very quickly.

25 Q    All right.  For the record, I'm going to show up there

-209-

1      People's Exhibit Number Fourteen.  Do you see that,

2      ma'am?

3  A   Yes.

4  Q   Ms. Thompson, do you see the laser pointer at the top of

5      the photograph?

6  A   Yes.

7  Q   What window are we looking at right there?

8  A   This is my living room window.

9  Q   And is that the window you were looking out of?

10 A   Yes.

11 Q   Okay.  And the spot you saw on the ground right here in

12     the center, center right of the photograph?

13 A   It's the victim's blood.

14 Q   Very good, ma'am.  Ms. Thompson, do you see the shooter

15     here in the courtroom today?

16 A   Yes.  I do.

17 Q   Can you please point to him and let us know what he's

18     wearing?

19 A   He's at the table.

20            MR. PRASAD:  Your Honor, may the record

21     reflect the witness identified the defendant?

22            THE COURT:  It will.

23            MR. PRASAD:  Thank you.  Pass the witness.

24     Hold on, ma'am.  Mr. Moore is going to ask you some

25     questions.

                          -210-

```
 1                     CROSS-EXAMINATION

 2   BY MR. MOORE:

 3   Q    Regarding that photograph, did you see an item of

 4        clothing that was laying by the side?

 5   A    I did in the picture.  I don't know what that was.

 6   Q    Okay.  Do you recall whether or not the victim was

 7        wearing that clothing or that color clothing?

 8   A    I don't recall anybody taking anything off the victim or

 9        the victim taking anything off hisself.

10   Q    Okay.  And you talked to the police that day, correct?

11   A    Yes.

12   Q    Do you recall the description you gave of the shooter?

13        If showed you your statement, would that refresh your

14        recollection?

15   A    Yes.

16                     MR. MOORE:  Okay.  May I approach, your

17        Honor?

18                     THE COURT:  Would you, please?

19   Q    (By Mr. Moore, continuing):  Look at the very bottom, if

20        you would, ma'am.

21   A    Mm-hmm.  Okay.

22   Q    Okay.  That refresh your recollection of what you told

23        the police?

24   A    Yes.

25   Q    And what did you tell the police?
```

-211-

1  A    Pardon me?

2  Q    What did you tell the police, description of the

3       shooter?

4  A    Early 30s, 5'9" or 5'10", thin build.

5  Q    Okay.  Well, so why don't you start at the beginning?

6       Is that black male?

7  A    He was a black male, late 20s, early '30s.

8       Approximately, 5'9", 5'10", thin build, approximately

9       160, 170, medium-brown complexion.

10              MR. MOORE:  Thank you very much.  I have no

11      other questions of the witness.

12              MR. PRASAD:  Judge, I'd ask for her to

13      finish the description.

14              MR. MOORE:  Please.  I'm not--

15              THE COURT:  (Interposing)  If you'd like.

16              MR. PRASAD:  Ma'am, please continue reading

17      you description, if you would.

18              THE WITNESS:  Medium compared to a milk

19      chocolate bar.  And that's all it says.

20              MR. PRASAD:  Oh.  Can you give me that page?

21      I'm sorry.

22              MR. MOORE:  I'll take that one from you.

23              THE WITNESS:  Complexion.  He had a short

24      afro that was approximately a half inch to an inch deep

25      thick, no facial hair, no visible scars, marks or

```
 1        tattoos from my vantage point.  He had a thin, skinny

 2        face.  He was wearing a plain, white T-shirt and dark

 3        black jeans or dark blue jeans.  He was armed with a

 4        black handgun, semi-automatic like the police use.

 5                  MR. MOORE:  Okay.

 6                  MR. PRASAD:  Mr. Moore, were you done?

 7                  MR. MOORE:  Just maybe--

 8                  MR. PRASAD:  (Interposing)  Go ahead.

 9   Q    (By Mr. Moore, continuing):  You said no visible scars,

10        marks or tattoos?

11   A    Yes.

12   Q    So, he had no tattoos?

13   A    I didn't see any.

14                  MR. MOORE:  Okay.  All right.  Thank you.

15        No other questions.

16                  REDIRECT EXAMINATION

17   BY MR. PRASAD:

18   Q    Ms. Thompson, are you trained in giving approximate

19        heights and weights of people?

20   A    Not really.  No.  Especially when I'm seeing something

21        that was as terrible as it was.

22   Q    Okay.  Do you recognize this person's face?

23   A    I do.

24   Q    And where do you recognize him from?

25   A    Chasing the gentleman around the car and shooting him.
```

1  Q     Thank you, Ms. Thompson.

2  A     You're welcome.

3                MR. MOORE:  One other obvious question.

4                THE WITNESS:  Yes.

5                RECROSS-EXAMINATION

6  BY MR. MOORE:

7  Q     Were you wearing your glasses that day?

8  A     Absolutely.  I can't see without them.

9  Q     All right.  Thank you.  No other questions.

10 A     Thank you.

11               THE COURT:  All right.  Thank you, ma'am.

12               THE WITNESS:  Thank you.

13               (At 2:43 p.m. witness excused.)

14               THE COURT:  One of those discussions that we

15        had when you weren't here was who's on first, who's on

16        second and who's in the on-deck circle.  And I was told

17        that the on-deck circle is empty.  And that everybody

18        that was going testify is tomorrow.  That kind of ends

19        it for today.

20               Anything and everything that you have, we're

21        going to assemble them and put them in a little box and

22        I'll put the box in the back with me and you can put

23        your names on it or any other identifying mark that

24        you'd like.  And when you get here, I'll throw the box

25        in there tomorrow.

-214-

1           There's just one little glitch about

2    tomorrow.  If we could make it like 9:15 and end early

3    and then after one or two of the witnesses, depending on

4    which one is long and short, I have to disappear for

5    about fifty-five minutes.  I have to do an induction of

6    officers for the city-wide, city council, about an

7    eight-minute drive from here and it'll take me maybe

8    thirty-five minutes there and get back.

9           So, somewhere around ten o'clock, we'll take

10   a little break from 10:00 maybe 'til 11:15.  And I'll

11   make sure I represent.  And then I'll pop back in.  So,

12   you might not recognize me in a shirt and a tie.  I try

13   not to do that, but who knows?

14          So, let me get the little box, let you all

15   do that, then I'll see everybody.  You know, 9:15

16   doesn't mean I want you running from the parking lot.

17   That just means don't lollygag after you park down

18   there.  Come on back here.

19          (At 2:45 p.m. jury leaves the courtroom,

20          proceedings concluded.)

21

22

23

24

25

R E P O R T E R ' S   C E R T I F I C A T E

STATE OF MICHIGAN  )
                SS )
COUNTY OF WAYNE    )

        I, SEAN E. ALLEN, CSMR 5265, Certified Court Reporter acting in and for the Third Judicial circuit, Wayne County, State of Michigan, do hereby certify that the foregoing pages 1 through 217, inclusive, were reduced to typewritten form and comprise a true rendition of the proceedings taken in the above-entitled matter on May 10, 2011.

        I FURTHER CERTIFY THAT MY CERTIFICATION ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN, SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED COPIES NOT MADE UNDER MY CONTROL AND SUPERVISION.

                                      _____
                                        SEAN E. ALLEN -- CSMR 5265
                                        Official Court Reporter.

DATED:  This 6th day of July 2012.