STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN


                  v                    Case Number

                                       10-5562-01


DEONTE HOWARD

                              Defendant.


_____/

                JURY TRIAL -- DAY THREE

       PROCEEDINGS HELD BEFORE THE HONORABLE BRUCE U. MORROW,

       Judge, Third Circuit Court, Detroit, Michigan, on

       May 11, 2011.

APPEARANCES:

                 RAJ PRASAD P68519
                 Assistant Prosecuting Attorney
                 Wayne County Prosecutor's Office
                 1441 St. Antoine
                 Detroit, MI 48226
                 (313) 224-6804

                 W. FREDERICK MOORE P33341
                 Attorney for the Defendant.
                 11954 Wisconsin Street
                 Detroit, MI 48204
                 (313) 418-1253


SEAN E. ALLEN
Official Court Reporter
CSMR 5265
(313) 224-7044

                        -1-

TABLE OF CONTENTS

WITNESSES:
LIEUTENANT JEFF CRUMP
        Direct Examination by Mr. Prasad..................5
        Cross-Examination by Mr. Moore...................37


DELFERA HUNT
        Direct Examination by Mr. Prasad.................39

AUNDREY ALLEN
        Direct Examination by Mr. Prasad.................41
        Cross-Examination by Mr. Moore...................76
        Redirect Examination by Mr. Prasad.............104
        Recross-Examination by Mr. Moore...............107

OFFICER JEFFREY BANKS
        Direct Examination by Mr. Prasad...............109

OFFICER JAMES WIENCEK
        Direct Examination by Mr. Prasad...............112

OFFICER LeTRELLE McNAIRY
        Direct Examination by Mr. Prasad...............115
        Cross-Examination by Mr. Moore.................123

INVESTIGATOR MYRON LOVE
        Direct Examination by Mr. Prasad...............125
        Cross-Examination by Mr. Moore.................128

SERGEANT SAMUEL MACKIE
        Direct Examination by Mr. Prasad...............134
        Cross-Examination by Mr. Moore.................142

CLOSING ARGUMENT BY MR. PRASAD.......................150
CLOSING ARGUMENT BY MR. MOORE........................172
REBUTTAL ARGUMENT BY MR. PRASAD......................184

EXHIBITS:
People's Exhibit Number 71............................74
People's Exhibit Number 49...........................118
People's Exhibit Number 63...........................122
People's Exhibit Numbers 64-67.......................123
People's Exhibit Number 49...........................125
People's Exhibit Number 72...........................137
People's Exhibit Number 73...........................147
People's Exhibit Number 74-75........................149

```
 1                    Detroit, Michigan.
 2                    May 11, 2011.
 3                    (At 9:22 a.m.)
 4                    THE DEPUTY:  Rise for the jury.
 5                    (At 9:22 a.m. jury enters the courtroom.)
 6                    THE DEPUTY:  You may be seated, ladies and
 7      gentlemen.
 8                    THE COURT:  What a wonderful day to be a
 9      Wings fan.  I almost had to press the wrinkles out of
10      that red shirt again.  You know, but there's this
11      saying, how do you -- You know how we have ethnic jokes,
12      right?  And one of the ethnic jokes is how do you know
13      when you're a real negro?  And it's that you iron dirty
14      clothes.
15                    And, you know, it's the same thing about
16      college students.  When I was a college student, you
17      know, instead of -- You'd just iron that joker and you'd
18      iron a dirty shirt.  Because it was a lot easier to iron
19      that dirty shirt than to go upstairs on the 10th floor
20      and wash it and dry it.  Just one shirt?  It'd be like
21      let me hook that thing up.  So, that's when you know
22      you're a college student of you're broke.
23                    I almost had to revert back to, you know,
24      flattening it, putting a little hand and heat pressure
25      on it and wearing a dirty shirt just to go Wings.  Ms.
```

-3-

1    Gottron, you never worn anything dirty and just kind of

2    put it in the dryer and like blew the wrinkles out or

3    anything like that?  Golly.  Put a little sheet of

4    Fabreeze in there something or some Bounce.  Okay.

5              Or as I used to say, spot clean.  Because

6    they came up with that tube little thing where I guess

7    somebody was going somewhere -- Right.  That little Tide

8    stick.  You don't do that?  Right.  Even when I needed a

9    hem, I'd get the stapler.  Staple your hem.  Staples

10   were cheap.  Staple the bottom of those suckers.  It's

11   dark anyway.  And if you down there, you didn't have no

12   business being down there.  Oh, necessity.  That's

13   before they used to pre, you know, now they come with

14   pre-hemmed on everything.  You get whatever size you

15   wear as long as you wear under a thirty-six.  You have

16   a witness for us?

17             MR. PRASAD:  Yes, sir.  We do.  Lieutenant

18   Crump.

19             THE COURT:  Why don't we do that?

20             MR. PRASAD:  Yes, sir.  Let's go.

21             THE COURT:  You drove in from Grand Rapids.

22   Or did they fly you in by helicopter?

23             LIEUTENANT CRUMP:  No.  I'm not that

24   important.

25             THE COURT:  You know, it might be that they

-4-

```
 1      have the resource and so they have to use it.
 2                     (At 9:25 a.m. witness LIEUTENANT JEFF
 3                     CRUMP was sworn.)
 4                     THE COURT:  Do you promise to tell the
 5      truth?  And welcome back.
 6                     THE WITNESS:  I do.
 7                     DIRECT EXAMINATION
 8  BY MR. PRASAD:
 9  Q   Lieutenant, please, when you get a chance, pull that
10      microphone close to you, sir.  Thank you.  Sir,
11      introduce yourself to the jury.
12  A   My name's Jeff Crump.  I'm a lieutenant with the
13      Michigan State Police.  And I'm currently assigned to
14      the Grand Rapids laboratory, forensic lab.  And I'm the
15      unit supervisor of the firearms unit.
16  Q   Sir, how long have you been working in firearms
17      analysis?
18  A   I have been there for thirteen years.
19  Q   And what kind of training do you have to get into the
20      firearms analysis unit?
21  A   I have a master's degree from Michigan State University.
22      That's in criminal justice with an emphasis in forensic
23      science.  The training for a firearms examiner is
24      basically an apprenticeship type training.
25                     So, it's a two-year training program where
```

1    you're trained under an experience examiner.   And it's

2    basically hands-on casework under the guidance of that

3    examiner.   During that two-year process, you process all

4    kinds of different types of evidence, bullets, cartridge

5    cases, firearms, tool mark evidence, gunshot residue

6    evidence.

7              At the end of the training program, you're

8    given proficiency or competency tests.   If you pass

9    those tests, then you're allowed to work independently.

10   However, any identification that we make is still

11   verified by a second examiner.

12   Q   How long have you been doing actual casework, sir?

13   A   Well, minus the two-year training, it'll be eleven

14   years.

15   Q   Okay.   Could you approximate how many cases a year you

16   actually work on?

17   A   Probably the last five years, I've ranged around eight

18   hundred to eleven hundred cases, but not all those are

19   examinations.   They might just be test firing weapons.

20   So, it varies.

21   Q   Lieutenant, have you ever been asked to come to court

22   and testify as an expert in firearm examinations?

23   A   I have.

24   Q   And have you ever been qualified as an expert?

25   A   Yes.  I have.

1  Q    Approximately how many times is that, sir?

2  A    It's between eighty and eighty-five times right now.

3            MR. PRASAD:  Your Honor, at this time, the

4      People would submit this witness as an expert in

5      firearms examination.

6            MR. MOORE:  No objections.

7            THE COURT:  Okay.  He'll be allowed to

8      testify as an expert in the field of firearms

9      examination.

10           MR. PRASAD:  Thank you, sir.

11           THE COURT:  Mm-hmm.

12 Q    (By Mr. Prasad, continuing):  Lieutenant, I want to ask

13     you about a specific case.  I'm going to refer to the

14     Michigan State Police Laboratory number on this case.

15     It's N as in Nancy, V as in Victor 10-4734.  Are you

16     familiar with this case, sir?

17 A    Yes.  I am.

18 Q    How are you familiar with this case?

19 A    Our laboratory system received some evidence from the

20     Detroit Police Department.  And when it was logged in,

21     it was given that laboratory number.

22 Q    Okay.  And did you do some work specifically on this

23     case, sir?

24 A    I did.

25 Q    How many times did you do different work on this case?

-7-

1  A    Three different times where I issued three different

2       reports.

3  Q    All right.  We'll take them one-by-one, if I can.

4  A    Sure.

5  Q    The first time you worked on this case, what was the

6       nature of the work you were doing?

7  A    I was given some fired cartridge cases, some fired

8       bullets to examine.

9  Q    Okay.  I think it would be helpful right now, if you

10      could, before we get into the nitty gritty of this case,

11      could you explain to the jury, in general, the concept

12      of a bullet and what it is you actually examine?

13 A    If I may use a model, I can do that.

14               THE COURT:  You brought one?

15               THE WITNESS:  I did.  It might be a little

16      bit easier.

17               THE COURT:  We've been through this a few

18      times and so, you know, the suspense is gone.

19               THE WITNESS:  All right.  This would be

20      representative of an unfired cartridge.  So, that

21      basically contains the cartridge case, the bullet seated

22      inside the cartridge.  Inside that cartridge would be

23      powder.  And then the back is the primer.

24               So, this cartridge would be inside of a

25      firearm.  When you fire the firearm, the firing pin

-8-

1       strikes the primer, ignites the primer, which ignites

2       the powder inside and the powder starts burning and it

3       creates pressure, pushes the bullet out of the firearm.

4       So, then you have a fired bullet.

5              Then the cartridge, depending on what type

6       of firearm you have, the fired cartridge case will

7       either get kicked out of the firearm from a semi-

8       automatic weapon.  Or if it's, you know, a revolver it

9       will stay within the cylinder of the revolver.

10             So, basically, a fired cartridge case is

11      what's left after the bullet leaves it, the powder is

12      all burned out and then the fired bullet is just the

13      bullet itself.

14  Q   (By Mr. Prasad, continuing):  So, in a case like this

15      where you've received some cartridges, some spent

16      bullets, what do you do?  What are you looking to do?

17  A   Well, for fired bullets, well any of this evidence that

18      I first received, I didn't receive a firearm with it, so

19      I can't compare it back to a firearm.

20             So, what I'll do is I'll compare them to

21      each other, bullets to bullets, fired cartridge cases to

22      fired cartridge cases.  I can't compare a bullet back to

23      a fired cartridge case.  We don't do that.

24             So, I'll first look at all the bullets and

25      I'll fill out our worksheets for these bullets, which

```
 1          basically list the different types of things that I see
 2          about the bullet.  And so, we'll weigh it.  We'll
 3          measure the diameter of the base.  We'll count the land
 4          and groove impressions that are on it.
 5   Q      Can you explain that lieutenant, what you mean by that?
 6   A      Sure.  If this were part of the barrel and the bullet
 7          were to travel down the barrel out of the firearm,
 8          inside the barrel of the firearm are manufactured what
 9          is called rifling, or lands and grooves.  The purpose of
10          that is as the bullet comes out of the barrel it imparts
11          a spin to it because the lands and grooves are either on
12          a lefthand twist or righthand twist when they're put
13          inside the barrel.  Okay?
14                 So, the bullet comes out and it's spinning.
15          It gives it greater accuracy and lets it fly farther,
16          much like if you were to throw a football and you get a
17          nice spiral, it's going to go real far.  If it starts
18          wobbling all over the place, it's not going to go far.
19          All right?  So, that's the purpose of rifling.
20                 And we'll see that rifling on the surface of
21          the bullet after it's been fired.  So, we can count
22          those and we can measure those.  And so, basically, we
23          take those three things, the land and groove
24          impressions, the measurements, the weight and the
25          diameter and then we can classify the bullet as to what
```

-10-

1    possible caliber it could be.

2              And beyond that, we start looking at the

3    individual, what we call individual characteristics that

4    would be within the land impressions.  The individual

5    characteristics are those characteristics that would be

6    unique to the firearm.  Okay?  So, when the firearm is

7    manufactured, it's manufactured with tools.  And those

8    tools are always changing from one firearm to the next

9    because it's basically a cutting tool.

10             So, if we were to pull a, what we call a

11   broach through this barrel to cut the lands and grooves

12   in it, the cutting surfaces of that broach are --

13   Basically, you got metal-on-metal, so you're scraping.

14   The blades are getting dull on it.  And they're forming

15   chips.  And they're creating microscopic imperfections

16   through the barrel as you cut it.  Okay?  So, that's

17   unique to that firearm.

18             Then when you take that same broach, go to

19   the next firearm, cut it, you're leaving different marks

20   on it because the tool's changing for each firearm.

21             So, when you fire the bullet through there,

22   those individual characteristics on the surface of the

23   barrel are getting transferred over to the surface of

24   the bullet.

25             So, we'll look then, when I do a comparison

                              -11-

1        on a comparison microscope, I can put two objects.

2        There's two stages, so I can put either a test on one,

3        or evidence on one side and evidence on the other side

4        and compare those two pieces of evidence together.  And

5        we magnify this up quite a bit.  And look for the

6        individual characteristics that would be left on the

7        surface or could be left.  It's not always left on

8        there.  And we'll look for those and see, do they match?

9                 If there is a matching pattern and we can

10       see that matching pattern then it allows us to make an

11       identification.  If there is no matching pattern, then

12       it would be, we'd give an inconclusive result.  Or if we

13       have also an elimination type of result, which means

14       that that bullet was not fired from that firearm, if we

15       had a firearm.

16  Q    Lieutenant, let me ask you about this.  Spent bullets or

17       the actual bullet itself, is it common to find that

18       these bullets will change form or shape when they hit an

19       object?

20  A    Most certainly if they're obviously hitting harder

21       objects than itself.  Yes.

22  Q    Okay.  Does that complicate things for you?

23  A    It can.  You know, we can still make identifications,

24       even if we have a fragment of the bullet jacket, which

25       is usually copper.  Sometimes it's brass.  Sometimes

1      it's other metal.  But even if we have just a fragment

2      that gives us one land impression, and again if the, the

3      individual characteristics on that land impression are

4      unique enough and it has a matching pattern, then I can

5      identify that to a firearm or another bullet.  And yes.

6      We can still make an identification.

7   Q   Let's start our discussion about this case right where

8      we left off right here then.  Did you receive any spent

9      bullets or spent rounds to look at in this case?

10  A   I did receive fourteen fired cartridge cases.  And they

11     were .40 Smith & Wesson caliber and they were of various

12     headstamps, meaning different manufacturers.

13  Q   Okay.  And those are the -- Just so we're clear, that's

14     the cartridge part, the shell part, not the bullet part?

15  A   Right.  That would, that would just be this cartridge

16     right here, fired cartridge case.

17  Q   What else did you receive to look at, sir?

18  A   I also received some bullets, some fired bullets and

19     some fragments of fired bullets.

20  Q   Now, when you receive these bullets, are they labeled in

21     any way for you to look at?

22  A   Well, they're, they're in individual packaging that's

23     put in there by the agency collecting it, in this case

24     Detroit Police Department.  So, in all of these cases,

25     each one of those items was in a separate DPD envelope.

1   Q    I'm just going to show an example.  This is just an

2        example, sir.  And this is People's Proposed Exhibit

3        Number Sixty-Seven.  Do you see that, sir?

4   A    Yes.

5   Q    Is that similar to how you would receive a packaged item

6        in this, in this case?

7   A    It is similar.  It's the same type of envelope and tag.

8        But, obviously, normally there would be evidence tape

9        sealing that.

10  Q    Right.  And I guess the obvious question is when you

11       actually go to look into it, do you actually open up the

12       evidence tape and go into the package?

13  A    Yeah.  We'll, we'll cut it open in a different area.

14       Usually, I'll cut from the bottom and they'll have the

15       evidence sealed from the top.  I'll cut open the bottom,

16       take out the evidence, examine it.  When I'm finished,

17       seal it back up along the bottom with my evidence tape.

18  Q    And that red tag there, that's something you also

19       receive in all of these cases?

20  A    Correct.

21  Q    And what is that red tag?

22  A    This, this would be a tag that the Detroit Police

23       Department tags its evidence with.  And it has their

24       individually unique evidence tag number on that.

25  Q    And in your recording system, sir, do you note each

-14-

```
 1       individual evidence tag number, sir?
 2   A   Yes.  I do.
 3   Q   Okay.  Very good.  You told us about the fourteen
 4       cartridges.  How many different spent rounds or parts of
 5       spent bullets did you actually find?  Or did you
 6       receive, I should say, not find?
 7   A   Well, I, I received five that -- Well, let's say, I'll
 8       say four that I would consider basically full bullets or
 9       fired bullets.
10   Q   Okay.
11   A   One that was probably a separate bullet, but there was
12       just portions of it.  And then a third, which has
13       basically smaller fragments that I don't know if it was
14       from another bullet or if it'd maybe be small portions
15       of these bullets that were submitted with it.
16   Q   Okay.  So, you have at least five submissions and
17       possibly six total?
18   A   Correct.
19   Q   Okay.  Let's go to the different comparisons.  Let's
20       start with when you talk about the fourteen shell
21       cartridges themselves.  Did you compare the cartridges
22       to each other?
23   A   I did.
24   Q   And what did you find, sir?
25   A   Well, I found that they all had matching breachface
```

-15-

1       marks.  And I'll explain that because basically I just

2       talked about identifying bullets and not the fired

3       cartridge cases.  But when a fired cartridge case is

4       inside of a firearm, the back of the cartridge sits

5       against what's called the breachface of the firearm.

6               In the breachface of the firearm is a hole.

7       That's where the firing pin comes out of.  So, when I

8       fire the firearm, the firing pin comes through the

9       breachface, strikes the primer.

10              And, again, because you've got a lot of

11      pressure involved with the powder burning, and that's

12      what pushes the bullet out the barrel, and that's

13      forward pressure, which also some negative pressure,

14      which pushes back the firearm.  Okay?

15              So, if we have, during the manufacturing

16      process, any imperfections on the breachface of the

17      firearm, because now we put pressure on that, they can

18      be transferred over to the back of the fired cartridge

19      case.  Okay?

20              So, when I'm doing my examinations of the

21      fired cartridge cases, that's what I'm looking for is

22      the, the imperfections left by the breachface of the

23      firearm on the back of this cartridge.

24              When I examined these fourteen fired

25      cartridge cases, I found that they all did have matching

-16-

1    breachface marks, which allows me to say that they were

2    all fired from the same firearm.

3  Q  Very good, sir.  Let's draw your attention now to the,

4    to the spent bullets.  You described to us how there

5    were five, or possibly six, different spent bullets that

6    you came across, sir?

7  A  Yes.

8  Q  Do you know from the notations you have, did they come

9    from different sources, meaning were they found in

10   different places?

11 A  Different places at the scene?

12 Q  Or how they, when they got to you, I should say.

13 A  Well, they were in, they were in separate envelopes.

14   But I don't note where they were collected from in my

15   notes or anything like that.

16 Q  In your report, do you note the unique evidence tag

17   numbers for each one, sir?

18 A  Yes.  I do.

19 Q  Okay.  I'm going to, I'm going to -- This is a little

20   bit laborious, but I'm going to do this just for the

21   benefit of the record.  The first three submissions or

22   the first three jacketed five bullets, correct me if I'm

23   wrong, we're looking at evidence tag numbers E as in

24   Eric 38209804, E38209904 and E8210007 [sic], is that

25   correct, sir?

1   A    That third one is E382.

2   Q    Oh, did I say it wrong?

3   A    You said E8.

4   Q    Oh.  Thank you.  E38210004, is that correct?

5   A    That's correct.

6   Q    And the other ones we're talking about, sir, once again,

7        for the record, is E38213104, E38213604 and E38213704,

8        is that correct?

9   A    Yes.

10  Q    Okay.  Tell us what you found out about these different

11       submissions, sir.

12  A    Okay.  Four of those items, which I labeled, I give them

13       my own item numbers.  And they would be items 2, 9, 12

14       and 13.  I found those to be consistent with being .40

15       caliber or 10mm caliber metal jacketed fired bullets.

16       And they exhibit rifling specifications of six polygonal

17       lands and grooves with a righthand twist.

18  Q    What does that mean to you, sir?

19  A    Okay.  Polygonal rifling is different than conventional

20       rifling.  This, basically, would be conventional

21       rifling, where you'd basically have cut lands and

22       grooves in here and you have distinct edges to your land

23       and groove impressions.

24              Polygonal would be -- Polygonal rifling is

25       not cut into a barrel.  It's pounded into a barrel

-18-

1       because you set a mandrel in the barrel and, and then

2       it's pounded from the outside.  So, you don't get any

3       cutting action.  The lands and grooves you would see in

4       a polygonal barrel, these edges, the lands are rounded.

5       So, basically, it's like a little hump.  So, when the

6       bullet goes through there, you don't get these nice cut

7       land and groove impressions on the surface of the

8       bullet.  You just, basically, kind of see a smear mark.

9       Okay?

10              So, there's -- You can count the lands, but

11      you can't measure them because there's, again, they're

12      not cut into the bullet.  Okay?  I know it's kind of

13      hard to understand.  But it's basically a smeared

14      impression of the land on the surface of the bullet.

15              So, that's what I found on the surface of

16      these bullets was there's six lans and grooves, but

17      they're polygonal rifling.  It's not the cut rifling.

18  Q   And those four that you were talking about, your item

19      number two is from that first group of numbers I read,

20      is that correct, sir?

21  A   Yes.

22  Q   And your items, I think you said 9, 12 and 13 -- Which

23      were the last three numbers that I read, is that

24      correct, sir?

25  A   Yes.

                                -19-

1  Q    Those were, all had the same exact characteristics?

2  A    Yes.

3  Q    Okay.  What about these remaining two, the first and

4       third items that I read out?

5  A    The -- My item number one, which was the first one you

6       mentioned, those basically consisted of three fragments.

7       I didn't get a full weight of that bullet.  And I

8       couldn't get a full diameter of that bullet.

9            So, without that, I can't give a very

10      definite classification.  I can give a general, which is

11      that it's most consistent with being a .38 class or .40

12      caliber metal jacketed fired bullet.  And it appears to

13      have six lands and grooves.  They are polygonal.  But,

14      again, damage to that bullet prevents a definite

15      classification.

16 Q    And what about the lass item to talk about, the third

17      item--

18 A    (Interposing)  The third, that consists of two small,

19      lead fragments and one portion of a jacket fragment.

20      And those are too small for me to classify.  They're

21      just, just small fragments.  And they, they could be

22      from a different bullet or maybe portions of item number

23      one.  I'm just not sure.

24 Q    Okay.  Very good, sir.  So, sir, I know you indicated to

25      the jury that because you do not have a gun to examine

1    in this case, you're not able to match a bullet to a

2    gun, is that correct?  Or you're not able to match a

3    cartridge to a gun?

4  A  Correct.

5  Q  Are you able, when you -- You discussed with us a couple

6    of seconds ago before we were talking about the bullets,

7    when we were talking about the cartridges themselves,

8    you are able to match, compare the cartridges to each

9    other?

10 A  To each other.  Yes.

11 Q  So, do they, were they all fired from the same gun even

12   though you can't match it to a specific gun?

13 A  Yes.  They were all fired from the same firearm, based

14   on the matching breachface marks that were on the back

15   of the cartridge.

16 Q  Okay.  Very good.  Let's go to the next item that you,

17   the next topic or the next report that you did in this

18   case, sir.  What was the second issue that you examined

19   in this case?

20 A  The second item I examined was a pair of jeans.  They're

21   Parish brand and they were a side thirty-eight.

22 Q  And do you have an evidence tag number from Detroit

23   Police Department that goes with that?

24 A  Yes.  It was E38215104.

25 Q  Okay.  And what was your purpose for examining these

-21-

1      jeans, sir?

2  A    I was asked to determine if I could find any gunshot

3      residue on this pair of jeans.

4  Q    Can you explain to the jury briefly what gunshot residue

5      is?

6  A    Well, as I mentioned, in the cartridge, there's powder

7      inside the cartridge.  Okay?  That's, that's what

8      ignites when you fire the cartridge.

9              Not all of that powder is consumed within

10     the barrel when you fire it.  A lot of it gets, comes

11     out of the barrel when you fire it, comes out with the

12     bullet.  Okay?

13             So, if someone was near a firearm when it

14     went off, potentially you could get some of that powder

15     being deposited on your clothing.  And we can look for

16     that gunshot residue on clothing by means of microscopic

17     examination and chemical examination.  And we can

18     determine if, if there's a pattern of gunshot residue on

19     the clothing around a suspected bullet hole.

20             And if we get a pattern, then we try to

21     duplicate it with the suspect firearm and ammunition.

22     We'll try to duplicate that same pattern, whether it's a

23     real tight pattern or as it gets wider and wider the

24     further distance away the firearm is.  So, we'll try to

25     duplicate that pattern and see if we can come up with a

1       range of how far away the firearm was from the person

2       when it was discharged.

3   Q   What about this kind of case, though, when you don't

4       have the actual weapon?  How does that limit you?

5   A   Well, then basically we just have to speak in

6       generalities because we know that typically gunshot

7       residue does not go beyond three or four feet.  It's a

8       light, you're talking about small particles of gunshot

9       residue and also a vaporous lead.  It is a vapor that

10      also comes out.

11              So, the particles travel up to three, three,

12      four feet, in most instance.  And the vapor doesn't

13      quite go that far, but you also get this vaporous cloud

14      of lead that comes out and can be also deposited on

15      clothing.

16  Q   On this jeans [sic] that you were looking at, sir, were

17      there bullet holes that you were drawing your attention

18      to?

19  A   There, there was a hole that I found on the right hip

20      area of the jeans between the back pocket and front

21      pocket.

22  Q   Okay.

23  A   Now, when I examined this hole, I didn't see any gunshot

24      residue around it.  This was on visual exam.  When I

25      chemically examined it, I didn't get any presence of

-23-

1    gunshot residue particles or vaporous lead residue.

2  Q   Okay.

3  A   So, basically, I didn't get any gunshot residue around

4      this hole.

5  Q   Let's go to the third item, the third report you did in

6      this case, sir.  What was that?

7  A   The third item was a Bugle Boy white T-shirt, size

8      large.

9  Q   And do you have an evidence tag number from Detroit

10     Police on that one?

11 A   Yes.

12 Q   What's that?

13 A   Yes.  That was E38208904.

14 Q   Okay.  And what were you looking for in this, with this

15     item, sir?

16 A   Again, I was asked to see if I could find gunshot

17     residue on this article of clothing.

18 Q   And were there bullet holes, or a hole or holes that you

19     were looking at, sir?

20 A   There were holes that I found.  And, basically,

21     obviously we're looking for holes first because that's

22     where we'll concentrate our, our examination for the

23     residue.

24              On the front of the shirt, I found three

25     holes.   One I labeled hole A and that's, that was

-24-

```
 1        located in the upper right quadrant of the shirt or the
 2        chest area.  Hole B is located in the left shoulder
 3        area.  And hole C was in the lower, left quadrant of the
 4        shirt, which was actually a series of five very small
 5        holes, not just one, single hole.
 6   Q    Do you know why that would be, sir?
 7   A    Sometimes if you potentially get a projectile that not
 8        goes in straight into a garment, but kind of skims along
 9        the surface of it, it could maybe create that type of
10        damage, especially if the bullet is, maybe it's just a
11        fragment of a bullet that's doing that or if the bullet
12        is a hollow point bullet and it starts mushrooming.  So,
13        just a, you know, part of the bullet might be scraping
14        along there.  But--
15   Q    (Interposing)  Okay.
16   A    I can't tell for sure what, what caused that.
17   Q    Okay.  Very good.  Did you find any gunshot residue,
18        sir?
19   A    Well, on the back of the shirt, there was also another
20        hole.
21   Q    Oh.  I'm sorry.  Please.
22   A    Which is hole D.  And that was located in the, the upper
23        left quadrant of the shirt in the shoulder area.  So,
24        those were the four main areas that I concentrated my
25        gunshot residue examination on.
```

1   Q    And what did you find?

2   A    Four holes.  A, B and D I basically did not find the

3        presence of gunshot residue either in the form of a

4        pattern or any amount that would be conclusive to make a

5        determination of yes there is a gunshot residue pattern

6        here.

7   Q    What about hole C on the front lower--

8   A    (Interposing)  Hole C was the area where I did get a

9        large amount of vaporous lead.  And, again, that's one

10       form of gunshot residue.  And, again, that is a vapor.

11       And it can't -- When it's deposited on a shirt, it's not

12       visible with the naked eye, but when you process it

13       chemically, it turns a very bright purplish color that

14       was very evident on this white T-shirt that, it was just

15       a large purple lead area, vaporous lead area down on

16       that area of the shirt.

17  Q    And for the record, you were just demonstrating with

18       your hand your bottom left side of your body by, right

19       above the left hip area?

20  A    Correct.

21  Q    Is that correct?  So, sir, based on what you were

22       telling us earlier, does that mean in regards to hole C

23       in general terms that that shot was within three or four

24       feet?

25  A    Well, that would, that would be the general statement

-26-

```
 1      that I could give, is that -- Finding that vaporous lead
 2      residue on that area of the shirt in that amount would
 3      suggest that a firearm was discharged between contact
 4      and three, four feet.
 5              If I had a firearm to make some tests with,
 6      I probably could narrow it down.  But without the
 7      firearm, suspect firearm and ammunition, I just can't
 8      get any closer than that.
 9              MR. PRASAD:  Thank you, lieutenant.  Pass
10      the witness, your Honor.
11              MR. MOORE:  No questions.
12              THE COURT:  Thank you, sir.  Enjoy your ride
13      back.
14              THE WITNESS:  Thank you
15              (At 9:56 a.m. witness excused.)
16              MR. PRASAD:  Do you want me to call the
17      doctor in or you've got--
18              THE COURT:  (Interposing)  I've got to go.
19              MR. PRASAD:  Okay.
20              THE COURT:  See you all back about, I'll be
21      back about 11:10.  So, see you then.
22              (At 9:56 a.m. jury leaves the courtroom,
23              court in recess.)
24              (At 11:26 a.m. court back in session.)
25              THE COURT:  Please have a seat back at the
```

-27-

1    table.

2                THE DEPUTY:  Please rise for the jury.

3                (At 11:26 a.m. jury enters the courtroom.)

4                THE DEPUTY:  You may be seated.

5                THE COURT:  Welcome back.  How did you all

6    spend that time?  Outside was amazing.  Did anybody go

7    outside?  I see why they don't put windows in here.  I

8    would just like -- That was a big distraction for me

9    when I was in middle school, you know, sat next to the

10   window, spring time.  I didn't do well in the spring.

11   You know, it just -- And back then when I was in school,

12   I don't think there was any -- Was air conditioning

13   invented back then?  I don't even know if it was

14   invented.  But still, you know, the big thing to do was

15   to be on good behavior and be able to open the windows

16   and then be an audio-visual captain.

17               Any of you all -- We had these huge poles

18   because the windows were so tall.  They had little

19   window locks, the little round ones that you take the

20   pole and if you wanted to stall you would pretend like

21   you couldn't get the little thing.  But anyway, the

22   ability of sitting next to the window in the spring

23   time.  I just used get goose pimples thinking about it.

24               We have our next witness, do we not?  And

25   how have you been?  Would you come forward, please?

                            -28-

```
 1                      (At 11:29 a.m. witness DR. LEIGH HLAVATY
 2                      was sworn.)
 3                      THE COURT:  The oath that I'd like to
 4          administer is just to ask you to promise to tell the
 5          truth.  So, will you do you so?
 6                      THE WITNESS:  Yes.
 7                      THE COURT:  Please then have a seat in the
 8          witness chair.
 9                      DIRECT EXAMINATION
10   BY MR. PRASAD:
11   Q     Doctor, if you would, please introduce yourself and
12         spell your last name, if you would.
13   A     Certainly.  My name is Dr. Leigh Hlavaty.  The last name
14         is spelled H-L-A-V-A-T-Y.
15   Q     Ma'am, where do you work?
16   A     I am the Deputy Chief Medical Examiner at the Wayne
17         County Medical Examiner's Office.
18   Q     And how long have you been at the medical examiner's
19         office, ma'am?
20   A     In total, I've been there since July of 1998.
21   Q     Okay.  So, going almost to your thirteenth year?
22   A     Yes.
23   Q     Okay.  Very good.  Recently promoted, I believe?
24   A     Yes.
25   Q     Okay.
```

1  A      The previous deputy retired.

2  Q      Very good.  And your medical background, please, if you

3         would.

4  A      I graduated from medical school at Wayne State

5         University School of Medicine.  After that, I did my

6         residency in anatomic pathology at the Detroit Medical

7         Center.  After that, I then did my fellowship in

8         forensic pathology at the office at which I then stayed

9         on staff.  And at the end of all the training, I became

10         board-certified in both anatomic and forensic pathology.

11  Q      And could you help the jury and explain what forensic

12         pathology is, please?

13  A      Forensic pathology is the study of diseases and injuries

14         and specifically how they cause death.

15  Q      And about how much casework have you done up until this

16         point in forensic pathology, ma'am?

17  A      I've done over six thousand autopsies.

18  Q      Have you ever asked [sic] to come to court and testify

19         as an expert before?

20  A      Yes.

21  Q      About how many times now?

22  A      Over three hundred times now.

23              MR. PRASAD:  Your Honor, at this time, the

24         People would tender this witness as an expert in

25         forensic pathology.

-30-

```
 1                    MR. MOORE:  No objection, Judge.

 2                    THE COURT:  Okay.  She'll be qualified to

 3        render opinions in the field of forensic pathology.

 4                    MR. PRASAD:  Thank you, your Honor.

 5   Q    (By Mr. Prasad, continuing):  Dr. Hlavaty, I want to ask

 6        you about a specific case.  But I think we need to do a

 7        couple of introductory things about this first.  Ma'am,

 8        did your office conduct an autopsy on a Tyrone Simpson,

 9        ma'am?

10   A    Yes.

11   Q    And when was that autopsy done?

12   A    Done April 11th of the year 2010.

13   Q    Okay.  And to be clear, did you conduct this autopsy?

14   A    No.  I did not.

15   Q    All right.  Who, in fact, conducted the autopsy?

16   A    A fellow training in our office at that time.  Dr. Tally

17        (sp.) performed the autopsy under the direct supervision

18        of the then deputy chief medical examiner, who was Dr.

19        Loewe.  Neither of those two individuals are still at

20        our office.

21   Q    And Dr. Loewe you just told us had just recently

22        retired, correct?

23   A    Yes.

24   Q    Okay.  Are you familiar with this case?

25   A    Yes.
```

1    Q    How did you familiarize yourself with this case?

2    A    I spoke to you yesterday and was told that someone was

3         needed to testify.  And since we are keeper of the

4         record, we can, if we agree with the conclusions drawn

5         in a report, testify off of it if the individual no

6         longer is employed at our office.

7    Q    And did you review the report in this case?

8    A    Yes.  I did.

9    Q    And I want to be specific.  Is that your case number 10-

10        3487, ma'am?

11   A    Yes.  It is.

12   Q    And regarding the post-mortem of Tyrone Simpson?

13   A    Yes.

14   Q    Okay.  In addition to the report itself, did you get a

15        chance to look at other items, like photographs and

16        stuff like that?

17   A    Yes.

18   Q    Okay.  And these are all what was conducted at the time

19        of April of last year?

20   A    Yes.

21   Q    All right.  Very good.  Let's jump right to it, ma'am,

22        then.  First, according to your records, ma'am, what was

23        Mr. Simpson's height and weight, if you have that,

24        please?

25   A    Yes.  He was 5'5" inches tall and he weighed about 150

1        pounds.

2   Q    Okay.  And when the autopsy was conducted, can you tell

3        us about the injuries that Mr. Simpson had, please?

4   A    There were nine gunshot wounds present on the body,

5        starting from the head and going down to near the ankle.

6   Q    Let's do it from top to bottom then.  Let's start with

7        the first one, the highest up on and let's just go to

8        the bottom of the body.

9   A    Okay.  The first wound that was mentioned was an

10       entrance gunshot wound present behind the right here.

11       And that bullet went through the skull and the brain.

12       And the bullet was recovered from the left back of the

13       brain.

14  Q    Okay.  And just can you explain to the jury just briefly

15       what the difference between an entrance wound and an

16       exit wound is, please?

17  A    Certainly.  And entrance gunshot wound is an injury

18       caused by the bullet when it enters the body.  And that

19       wound is a punched-out hole with a marginal abrasion or

20       scraping of the sides of the wound.  And that is caused

21       by the bullet scraping the skin as it is perforating it

22       and going in.

23               An exit gunshot wound is caused by the

24       bullet exiting the body.  And that wound looks

25       completely different.  It is not a punched out hole.  It

-33-

1       can be slit-shaped or X-shaped or any shape that it

2       wants.  And there's no marking or abrasion to that

3       wound.

4   Q   Okay.  You indicated the first one that you talked

5       about, the one behind the right ear and that that one

6       did not actually exit the body?

7   A   Correct.  And the bullet was recovered from the head.

8   Q   Very good.  Next one, please.

9   A   The next wound is an entrance gunshot wound on the back

10      of the right upper arm.  And that bullet fractured the

11      arm bone and then exited the front of the right upper

12      arm.  So, there was no bullet recovered from that wound

13      tract.

14  Q   Okay.  The third one, please?

15  A   The next wound would be one on the back of the left

16      shoulder.  And that wound went through the shoulder and

17      the scapula and then exited the left upper chest.  And

18      there was no bullet recovered from that wound.

19  Q   Very good.  Four, please.

20  A   The next one was an entrance wound on the back of the

21      left elbow.  And that bullet simply entered the elbow

22      and it was recovered there.

23  Q   That's the second bullet you were able to recover at

24      this point?

25  A   That they were able to recover.  Yes.

```
 1  Q    Yes.  I'm sorry.  They.  I want to be clear.  Next?
 2  A    The next wound would be two gunshot wounds on the right
 3       lower leg.  They first entered the front of the right
 4       lower leg and then it exited the back of the right lower
 5       leg.  And the second entered the front of the right
 6       lower leg and then exited the inner part of the ankle.
 7       And no bullets were recovered from either of those two
 8       wound tracts.
 9  Q    So, we've gone through -- The sixth and seventh one,
10       please?
11  A    The remaining three are on the left lower leg.  There
12       was one that simply went through the left calf.  And
13       there was a bullet recovered from that wound.  There was
14       also one gunshot wound present on the front of the left
15       lower leg.  And there was no bullet recovered from that
16       wound.  And then there was finally a wound that entered
17       the left lower leg and then traveled up the leg and
18       entered the back of the left thigh.
19  Q    Okay.  Ma'am, in addition to looking at the physical
20       injuries to a, to a patient, do you also look at
21       toxicology or anything like that?
22  A    Yes.  We conduct a full autopsy to look for other
23       diseases.  And those were not present in this case.  And
24       then we take the bodily fluids and we test them for the
25       presence of any drugs.  There was nothing present in the
```

-35-

1       decedent's system.

2   Q   Just one second, please.  Ma'am, just going back to the

3       wounds.  I just want to be clear.  You were talking

4       about the three on the left leg?

5   A   Yes.

6   Q   Was one of them in the thigh area?

7   A   One of them exited the back of the thigh.

8   Q   Okay.  That's what I was trying to get.  Okay.

9       Excellent.  After all this analysis is done, how do you

10      divide up or how do you look at your conclusions in

11      this, in this type of case?

12  A   In this type of case, we had to look at anything

13      present, a disease or an injury that might have caused

14      death.  And in this case, the totality of the gunshot

15      wounds was the cause of death.  The head wound certainly

16      would have been the most immediately lethal wound that

17      the deceased received.  However, the other wounds taken

18      in totality would have resulted in his death.

19  Q   Okay.  And you talked about a cause of death.  Is there

20      any other distinction or any other type that you're able

21      to say about this case, about the manner of death?

22  A   We, by law, have to classify all deaths into one of five

23      manners of deaths.  And it's purely for statistical

24      purposes, meaning not to import any legal significance.

25                      The definition of homicide for the medical

-36-

```
 1      examiner is simply death caused by another person.  So,
 2      in this case, this death was ruled a homicide.  The
 3      other manners that could have been applied would have
 4      been accident, suicide, natural or indeterminant.
 5              MR. PRASAD:  Very good.  Thank you, doctor.
 6      Pass the witness, your Honor.
 7                    CROSS-EXAMINATION
 8  BY MR. MOORE:
 9  Q   Good morning, doctor.
10  A   Good morning.
11  Q   You talked about, I believe, a marginal abrasion?
12  A   Yes.
13  Q   What exactly is that?
14  A   That is scraping of the skin.  As the bullet perforates
15      it and pushes through the skin, it scrapes the side,
16      pardon me, of the hole as the bullet passes.
17  Q   Okay.  Now, regarding the single gunshot wound to the
18      head, using your hand, could you indicate to the jury
19      roughly where that wound would have been relative to the
20      head?
21  A   Certainly.  It was present behind the right ear.
22  Q   Okay.  Pointing behind the right ear.  Okay.  Thank you.
23      How many bullets did you recover?
24  A   Three.
25  Q   Okay.  And they were right calf?
```

1  A    The bullets recovered were from the left calf, the left

2       elbow and the head.

3  Q    Okay.  Now, you talked about the totality of the other

4       injuries, the other eight gunshot wounds.  You can't say

5       at the time of the examination of the body whether or

6       not he was dead, say before maybe he was shot in the

7       brain?

8  A    There was still hemorrhage and vital reaction noted in

9       the wound tract in the head.  Therefore, he was still

10      alive when that wound was inflicted.  But we do not know

11      the sequence of shots or how long someone would have

12      survived after receiving them.

13 Q    Could you explain exactly what the hemorrhaging issue is

14      in terms of why you say he was not dead at the time?

15 A    If you shoot somebody who is not living and their heart

16      is not beating, you will see the holes in the tissues

17      that the bullet caused, but there won't be any

18      hemorrhage or swelling or what we call a vital tissue

19      reaction because the heart is no longer beating.

20             If a wound is inflicted while your heart is

21      beating, even if you are unconscious or close to death,

22      we will see that vital tissue reaction.

23 Q    So, you can't say how close to death the person might

24      have been before they were shot in the head?

25 A    Correct.  That could have been the first shot or the

-38-

1       ninth shot.

2                       MR. MOORE:  Okay.  Thank you very much.

3                       THE COURT:  Anything more?

4                       MR. PRASAD:  No, your Honor.  Thank you.

5                       THE COURT:  See you later.

6                       (At 11:39 a.m. witness excused.)

7                       THE COURT:  Your next witness, please.

8                       MR. PRASAD:  We're going to call Delfera

9       Hunt, your Honor, briefly.

10                      (At 11:40 a.m. witness DELFERA HUNT

11                      was sworn.)

12                      THE COURT:  Young lady, do you promise that

13      your testimony today will be truthful?

14                      THE WITNESS:  Yes.

15                      THE COURT:  Thank you.

16                      DIRECT EXAMINATION

17   BY MR. PRASAD:

18   Q    Ma'am, bring that microphone close to you, please.  Give

19        us your name, please.

20   A    Delfera Hunt.

21   Q    And Ms. Hunt, did you have a son by the name of Tyrone

22        Simpson?

23   A    Yes.

24   Q    And how old was he last year?

25   A    Nineteen.

-39-

1  Q    And Ms. Simpson [sic], on April 10th or 11th, were you

2       asked to come to the Wayne County Medical Examiner's

3       Office?

4  A    Yes.

5  Q    And what was the reason you had to go there?

6  A    My son was murdered.

7  Q    Did you have an opportunity to look at a body there?

8  A    Yes.

9  Q    And did you identify who that was?

10 A    Yes.

11 Q    Who was that?

12 A    My son, Tyrone Simpson.

13 Q    And, ma'am, prior to April 10th of last year, are you

14      aware of any gunshot wound injuries that your son had?

15 A    Yes.

16 Q    Where did he have a gunshot wound injury?

17 A    One in the head--

18 Q    (Interposing)  No.  No.  Not as a result of this.  I

19      mean before this.

20 A    Oh.  No.  No.

21 Q    Was he ever shot before this?

22 A    No.

23           MR. PRASAD:  Thank you.  That's all I have,

24      ma'am.

25           MR. MOORE:  No questions.

```
 1                    THE COURT:  Thank you so much, ma'am.
 2      You're excused.
 3                    (At 11:41 a.m. witness excused.)
 4                    MR. PRASAD:  Judge, may Ms. Hunt watch the
 5      remainder of the trial?
 6                    THE COURT:  She's not under any sort of
 7      sequestration order.
 8                    MR. PRASAD:  All right.  Thank you, your
 9      Honor.  Judge, may we briefly approach for a second?
10                    THE COURT:  Yes.
11                    (Bench conference 11:41 a.m. to 11:42 a.m.)
12                    MR. PRASAD:  We'll call, the People call Mr.
13      Allen.
14                    THE COURT:  I need you to take an oath,
15      young man.
16                    (At 11:43 a.m. witness AUNDREY ALLEN
17                    was sworn.)
18                    THE COURT:  The testimony that you'll give,
19      you need to promise that it will be truthful.  So, do
20      you promise that you will testify truthfully?
21                    THE WITNESS:  I promise.
22                    THE COURT:  Thank you.  Pull the microphone
23      just a little closer.
24                    DIRECT EXAMINATION
25  BY MR. PRASAD:
```

-41-

1  Q    Sir, give us your name, please.

2  A    Aundrey Allen.

3  Q    Mr. Allen, how old are you?

4  A    Nineteen.

5  Q    Mr. Allen, did you know a person by the name of  Tyrone

6       Simpson?

7  A    Yes.

8  Q    How did you know him?

9  A    He was my friend.

10 Q    And how long had you guys been friends?

11 A    About a year.

12 Q    And just so we're clear, about a year from last year?

13 A    Yes.

14 Q    So, about two years ago?

15 A    Yes.

16 Q    Did he have a nickname?

17 A    Ant.

18 Q    And is that what people called him?  Is that a yes?

19 A    Yes.

20 Q    Remember you have to say everything out loud because

21       he's taking down everything you say, okay?  Sir, are you

22       familiar with the area of Tireman here in the city of

23       Detroit?

24 A    Yes.

25 Q    How are you familiar with that area, sir?

-42-

```
 1  A    I live in that area.

 2  Q    How long have you been living in that area, sir?

 3  A    All my life.

 4  Q    Sir, are you familiar with a Smokehouse, a convenience

 5       store/restaurant that's located in the 16000 block of

 6       Tireman?

 7  A    Yes.

 8  Q    How are you, how are you familiar with that place?

 9  A    I live two houses down from it.

10  Q    And have you ever had an occasion to go to that place?

11  A    Yes.

12  Q    How often?

13  A    Off and on because it's open and closed off and on.

14  Q    Okay.  Would you say you're a regular customer there,

15       sir?

16  A    Yes.

17  Q    Okay.  I want to take you back, sir, to April of last

18       year, specifically April 10th of 2010.  Do you remember

19       that day, sir?

20  A    Yes.

21  Q    Start us off that day.  What were you doing that day, in

22       general?  Anything particular that morning?

23  A    Earlier, me and Ant was at the store.

24  Q    You and Ant?

25  A    Yes.
```

-43-

1  Q    Okay.  And you were at what store when you say the

2       store?

3  A    The Smokehouse.

4  Q    That same one on Tireman?

5  A    Yes.

6  Q    Okay.  What were you doing there earlier?

7  A    Just sitting there chilling, eating food.

8  Q    Is that place a hangout type of place?

9  A    You can go there and eat.

10 Q    Do people just stay there and hang out in front or

11      inside?

12 A    No.

13 Q    Okay.  People usually go there just to eat?

14 A    Yes.

15 Q    All right.  When you say earlier that day, about what

16      time are we talking about?

17 A    Earlier, like me and him was up there 11:00, 12:00.

18 Q    11:00 a.m., 12:00 noon?

19 A    Yes.

20 Q    Okay.  And how long did you stay out there at that

21      point, sir?

22 A    We was up there probably like fifteen minutes, twenty

23      minutes.

24 Q    All right.  Did you leave together?

25 A    Yeah.  We both left at the same time.

1  Q     And where did you go?

2  A     I walked home.

3  Q     Okay.  Did Ant go home with you?

4  A     No.

5  Q     When's the next time you had any contact with Ant?

6  A     Later on that day, like a couple hours later.

7  Q     All right.  Well, tell us about that.  What happened?

8  A     I was pulling up to my house and then it was like a lot

9        of commotion going on down there.

10 Q     Down where, sir?

11 A     Down at the Smokehouse.

12 Q     Okay.  And you say you were pulling up.  Were you in a

13       vehicle at that point?

14 A     Yes.

15 Q     Okay.  And where did you park your vehicle at?

16 A     Well, when I saw the commotion, I was still at my house

17       and my boy, Tyrell, called me down there.

18 Q     Okay.  And your boy, Tyrell, did he call you down there

19       via phone?  Or how did he contact you?

20 A     He was standing outside when I got outside the car and I

21       pulled down there.

22 Q     Okay.  So, what did you do at this point?

23 A     I was trying to see what was going on.  It was involving

24       my sister, kind of.

25 Q     It was involving your sister?

                              -45-

1  A    Yes.

2  Q    Okay.  And about how many people are out there at the

3       Smokehouse at this point?

4  A    It was a few.  It was me, Ant, Tyrell and people from

5       the store.

6  Q    Okay.

7  A    And then the defendant and some dude named Freak.

8  Q    Okay.  You mentioned the defendant.  Do you see someone

9       in the courtroom today that was there at that point?

10 A    Yes.

11 Q    Can you please point to him and let us know, point him

12      out and let us know what he's wearing?

13 A    A blue shirt.

14            MR. PRASAD:  Your Honor, may the record

15      reflect the witness identified the defendant?

16            THE COURT:  It will.

17 Q    (By Mr. Prasad, continuing):  And you said another

18      person by the name of Freak?

19 A    Yes.

20 Q    Do you know who Freak is?

21 A    No.  I never met him.

22 Q    Okay.  Are you friends with Freak?

23 A    No.

24 Q    Do you know if -- Only if you know, sir.  Do you know if

25      Ant was friends with Freak?

-46-

```
 1  A    No.

 2  Q    Okay.  What's happening at this point at the Smokehouse?

 3  A    At this point, it's like arguing going on, was telling--

 4  Q    (Interposing)  Hold on.  Don't tell us what people are

 5       telling you.  Just -- You're saying there was arguments

 6       going on?

 7  A    Yes.

 8  Q    Who are the arguments between?

 9  A    Tyrone and Freak.

10  Q    Okay.  And what's happening?  Is anything physical

11       happening between Tyrone and Freak at this point?

12  A    Not, not physical.

13  Q    Okay.  It's just yelling at this point?

14  A    Yes.

15  Q    All right.  How long does this go on for?

16  A    About five, ten minutes.

17  Q    Sir, are you familiar with whether or not Tyrone had a

18       pair of glasses?

19  A    Yes.

20  Q    Did he have a pair of glasses on him that day?

21  A    Yes.

22  Q    What kind of glasses were those?

23  A    Carty's.

24  Q    And when you say Carty's, you mean Cartiers?

25  A    Yes.
```

1   Q    And were they sunglasses or, or prescription glasses?

2   A    Like just sunglasses.

3   Q    Okay.  At this point, sir, when Tyrone is having this

4        argument with this gentleman by the name of Freak, does

5        Tyrone have his glasses?

6   A    No.

7   Q    Do you know where the glasses are?

8   A    Somebody took them.

9   Q    Now, let's go back a couple hours.  When you went to the

10       restaurant earlier that day with Tyrone, did Tyrone have

11       his glasses then?

12  A    Yes.

13  Q    Okay.  So, now you were telling us about how Tyrone and

14       Freak were having an argument for five to ten minutes.

15       What goes on?

16  A    They going back and forth.  And then just arguing.  It

17       was about my sister, kind of.

18  Q    Okay.

19  A    And I stepped in, was wondering what was going on, why

20       he was at my house.

21  Q    You stepped in?

22  A    Yes.

23  Q    Did you get into an argument with anyone?

24  A    No.  Not really no argument, just was in a rage and was

25       ready to fight.

-48-

1  Q     You were ready to fight.  And who were you ready to

2        fight?

3  A     Freak.

4  Q     And it was something involving your family, your sister?

5  A     Yes.

6  Q     Okay.  Did you, in fact, fight Freak at this point?

7  A     No.

8  Q     What happened?  What ended up happening?

9  A     He ran.

10 Q     Who ran?

11 A     Freak.

12 Q     Okay.  You mentioned that the defendant was here, was

13       there during this first incident.  Was he, was the

14       defendant involved with any of this argument at this

15       point?

16 A     No.

17 Q     Okay.  What was he doing, if anything?

18 A     Sitting back, just around, just in the area.

19 Q     Okay.  He wasn't involved in anything?

20 A     No.

21 Q     Okay.  Sir, are you familiar with the vehicle that

22       Tyrone used to drive back then?

23 A     Yes.

24 Q     What kind of vehicle was that?

25 A     Suburban.

-49-

1  Q     And what color was that, if you recall?

2  A     Burgundy, purple.

3  Q     A burgundy one?  Okay.  Let me show you a photograph,

4        sir, if I can.  I'm going to show you People's Exhibit

5        Number Five.  Can you look at that, sir?  Do you

6        recognize what's in People's Exhibit Number Five?

7  A     Yes.

8  Q     And what do you see in People's Exhibit Number Five?

9  A     My car and Tyrone's truck.

10 Q     Okay.  Which one is your car and which one is Tyrone's

11        truck?

12 A     The Buick is my car.

13 Q     Okay.  And which one's Tyrone's truck?

14 A     The one behind my car.

15 Q     Just give it a second and it'll warm up.  As this is

16        happening, we'll talk.  So, did you see Tyrone's vehicle

17        there at that time, sir?

18 A     Yes.

19 Q     Where was it at?

20 A     It was in the same area as that.

21 Q     The same as it is in this photograph here?

22 A     It look like it's moved up a little.

23 Q     Okay.  Looking at People's Exhibit Number Five, sir.

24        You see both vehicles, right?  That you were just

25        referencing, sir?  Are the both vehicles there?

1  A     Yes.

2  Q     And this car that's in the front, who's car is that?

3  A     That's my car.

4  Q     Okay.  And the truck that's in the rear, who's is that?

5  A     Tyrone's.

6  Q     All right.  And you said that when you were there at

7        this point, when the arguing was going on with this

8        person by the name of Freak, the truck in the back, was

9        it farther back or farther forward?

10 A     It was like closer in front of the store.

11 Q     Closer in front of the store?  So, it was a little bit

12       farther back than where it is in this picture?

13 A     Yes.

14 Q     And did you park by this truck at this point when you

15       were there earlier with Freak?

16 A     My car was moved back, too.

17 Q     Okay.

18 A     My car was pulled, it look like it was pulled up.

19 Q     Okay.  So, your car was also a little bit farther back?

20 A     Yes.

21 Q     All right.  Very good, sir.  Thank you.  So, what we

22       have at this point -- So, at this point, you said Freak

23       left, he ran away?

24 A     Yes.

25 Q     What happens next?

1  A    Then when he ran, Tyrone told me not to fight him.

2  Q    Okay.  So, what happens?

3  A    We was still just sitting there, commotion still going

4       on, still looking for his glasses.

5  Q    Tyrone's still looking for his glasses?

6  A    Yes.

7  Q    Okay.  Is the defendant still there at this point?

8  A    Yes.

9  Q    Who else is there besides the defendant, Tyrone and

10      yourself?

11  A   My boy Ty was still up there.  I was up there.

12  Q   When you say your boy Ty, you mean the gentleman Tyrell

13      that you talked about earlier?

14  A   Yes.  Tyrell was up there.

15  Q   Who else was there?

16  A   And Ant was up there.

17  Q   Okay.  As Ant's still looking for his glasses, what's

18      the next thing that happens of significance?

19  A   They started leaving.

20  Q   Who started leaving?

21  A   The defendant and the people that he was with.

22  Q   How many people was the defendant with?

23  A   It was around three or two other people.

24  Q   And I want to be clear.  Are you saying that Freak was

25      with the defendant?

-52-

1  A    Yes.

2  Q    Because you told us how Freak ran away.

3  A    Yes.

4  Q    Did the defendant leave when Freak ran away?

5  A    Like he was running from me, not like ran away like.

6  Q    Oh.  I'm sorry.  That's where I'm confused.  We've got

7       to clear that up.  When you first told us that Freak ran

8       away, you didn't mean he was running physically away

9       from the store?

10 A    No.

11 Q    What did you mean?

12 A    He was like running from me, not, not away from the

13      scene.

14 Q    Because you said you wanted to fight him?

15 A    Right.

16 Q    And Tyrone's telling you not to?

17 A    Right.

18 Q    Okay.  So, now take us to this point.  Who's leaving the

19      store at this point?

20 A    The defendant, Freak and the two other people that was

21      with them.

22 Q    And are they leaving on foot or in a car?

23 A    I believe in a car.

24 Q    Do you know what kind of car this was?

25 A    A Charger.

1  Q    A Charger?  Okay.  Did they all leave in this vehicle,

2       sir?

3  A    I think they all left, except Freak.  I think he walked.

4  Q    Okay.  So, the other three individuals, the defendant

5       and two other people?

6  A    Yeah.

7  Q    Do you know who these two other people were, sir?

8  A    No.

9  Q    Had you ever met them before?

10  A   No.

11  Q   Had you ever met the defendant before this day?

12  A   No.

13  Q   What happens next?

14  A   Me and Tyrone was just still up there.  And my boys

15      started leaving.

16  Q   Who are your boys that started leaving?

17  A   Some people that was in the neighborhood came up there.

18      And they, they came up there to see what was going on.

19      They left.

20  Q   Okay.

21  A   So, we was still up there.  Then the owner, Bobby, had

22      pulled up.

23  Q   Okay.

24  A   Then when he pulled he was telling him like somebody

25      took his glasses.

-54-

```
 1  Q    Who was telling who?

 2  A    Tyrone was telling Bobby that.

 3  Q    Okay.  And then what happens?

 4  A    And then a few minutes later, the defendant and, not

 5       Freak, but the two other gentlemen that was with him,

 6       pulled up.

 7  Q    How much time had passed from when the defendant and the

 8       two other gentlemen left in the Charger to the point

 9       they return?

10  A    Like no more than fifteen minutes.

11  Q    And when they return, do they return back in the

12       Charger?

13  A    No.

14  Q    How did they get back there?

15  A    The defendant pulled up in a Mountaineer.

16  Q    A Mountaineer?  Is that a car or an SUV?

17  A    Like a Jeep.

18  Q    Okay.  And do you remember what color it was?

19  A    Yeah.

20  Q    What color was it?

21  A    Silver.

22  Q    Okay.  Did all three of these individuals come out of

23       that vehicle?

24  A    Yes.

25             MR. MOORE:  Which individuals?
```

-55-

```
 1                    MR. PRASAD:  I'm sorry.  I'll be specific.
 2  Q   (By Mr. Prasad, continuing):  So, the defendant and the
 3      other two people that were with him come out of this,
 4      this SUV?
 5  A   Yes.
 6  Q   Okay.  Where did the SUV park?
 7  A   It was parked not in the driveway up the store, but
 8      right behind the driveway where it wasn't blocking.
 9  Q   All right.  Hold on a second, sir.  This is People's
10      Exhibit Number One.  Can you see that, Mr. Allen?
11  A   Yeah.
12  Q   Do you recognize, do you recognize this building right
13      here?
14  A   Yes.
15  Q   What building is that?
16  A   The Smokehouse.
17  Q   Okay.  And do you recognize this parking area right to
18      the right of the Smokehouse?
19  A   Yeah.
20  Q   Okay.  Where was that SUV that you were talking about --
21      Let me give you this.  Just press that red button and
22      you get that red light, all right?
23  A   Like right in front of the telephone pole, but a little
24      bit further.
25  Q   Okay.  And then was it parked in the street?
```

-56-

1  A     Yes.

2  Q     Okay.  So, you see that little faded white line on the

3        floor, on the ground there?

4  A     Right here?

5  Q     Yeah.  Is that where it was parked?

6  A     Yeah.  Like in that area.

7  Q     All right.  So, the SUV parks there.  The defendant and

8        his two friends get out.  What happens next?

9  A     The defendant's purpose was, he was looking for his

10       phone.

11 Q     Did he say something that you heard?  Did you hear him

12       say something about looking for his phone?

13 A     He asked did we see a phone up there.

14 Q     And did you see a phone at this point?

15 A     No.

16 Q     So, what happens next?

17 A     Then the owner, Bobby, he was there trying to get

18       Tyrone's glasses back.

19 Q     Okay.

20 A     And he was still just, and the defendant was still

21       asking about his phone.

22 Q     Where is Tyrone and the defendant standing at this

23       point?

24 A     Like, probably like two or three feet away from each

25       other.

1  Q    Okay.  Within arm's length or nearby?

2  A    Yeah.  You could say arm's length.

3  Q    Okay.  And where, physically in relationship to the

4        store are they standing?

5  A    Not directly in front, but up, just like up under the

6        window of the store.

7  Q    Okay.  Showing you People's Exhibit Number Seven.  Do

8        you see that?

9  A    Yes.

10 Q    Does it -- Which window are you talking about in

11       People's Exhibit Number Seven?

12 A    The one to my right.

13 Q    The one on the right?  Am I pointing at it correctly

14       right here?

15 A    Yes.

16              MR. PRASAD:  Mr. Moore?

17              MR. MOORE:  Fine.

18 Q    (By Mr. Prasad, continuing):  So, were they standing on

19       the sidewalk by this window?

20 A    Yes.

21 Q    Okay.  And you said they were arm's length, about two or

22       three feet away?

23 A    Yes.

24 Q    Okay.  How was their tone or interaction going on at

25       that point?

1  A    They was going back and forth.  Tyrone was telling him
2       like I know you got my glasses.  And the defendant was
3       like, I ain't got your glasses.
4  Q    Now, you say they're going back and forth.  Is it said
5       in a friendly, joking way?
6  A    No.
7  Q    How was it being said?
8  A    Yelling back and forth at each other.
9  Q    Okay.  What was the emotion at this point?  What was the
10      emotional level that you could see?
11 A    Like Tyrone was mad and the defendant was mad.
12 Q    Where were you standing at this point?
13 A    Like arm's length away from Tyrone.
14 Q    What direction?  Are you behind him?  Are you at the
15      side of him?  Where are you?
16 A    Behind him.
17 Q    Behind him?  Are you closer to the store itself?
18 A    Yeah.
19 Q    What are you doing at this point?
20 A    I'm just sitting there, sitting back.
21 Q    Are you involved in this argument or conversation at
22      all?
23 A    No.
24 Q    How long is this going on for?
25 A    A couple of minutes.

-59-

1  Q    Where is Bobby Bailey?  Where's the owner at this point?

2  A    He to the left of them.

3  Q    What's he trying to do?

4  A    He was trying to ask him like just give him his glasses,

5       telling the defendant to give him his glasses.

6  Q    Okay.  What happens next?

7  A    And then Tyrone just got mad and just hit him.

8  Q    Tyrone hit who?

9  A    Hit the defendant.

10 Q    Where did Tyrone hit the defendant?

11 A    In his face.

12 Q    How many times?

13 A    Like four or five times.

14 Q    How did the defendant react?

15 A    Just, he ain't really have no reaction, just was falling

16       back.  He ain't swing, didn't try to fight back at all.

17 Q    The defendant did not try to fight back?

18 A    No.

19 Q    When you say the defendant was falling back, did he

20       actually fall to the ground?

21 A    No.  Like stumbling back like.

22 Q    How many feet back did he stumble?  How many steps back

23       did he stumble?

24 A    Probably like about four or five feet like not at the

25       beginning, but at the ending of the driveway.

-60-

1   Q     Okay.  What happens?

2   A     And then like I was moving closer and Tyrone just

3         stopped hitting him.  And instantly, he stopped hitting

4         him, he started shooting.

5   Q     All right.  Now, you've got to break this down for us,

6         sir.  How far away is Tyrone from the defendant at this

7         point?

8   A     Still like an arm's length.

9   Q     Okay.  When the defendant was falling back four or five

10        feet, was Tyrone moving?

11  A     Yeah.  He was still moving towards him kind of.

12  Q     Tyrone was moving towards who?

13  A     Towards the defendant.

14  Q     Okay.  Did you see a weapon in the defendant's hands?

15  A     Yes.

16  Q     When?  At what point do you see the weapon in the

17        defendant's hands?

18  A     At the point it actually came out his pocket.

19  Q     Okay.  Walk us through this, sir.  Where is the

20        defendant when you see the weapon coming out of his

21        pocket?

22  A     Like I'm like, at this time, I'm like still behind

23        Tyrone, but to the right side of him.

24  Q     You are to the right side of Tyrone?

25  A     Yes.

1  Q    Okay.  And Tyrone is still facing the defendant?

2  A    Yes.

3  Q    And is this still the two or three feet, the arm's

4       length that you were talking about?

5  A    Yes.

6  Q    Okay.  And what does the defendant do?  What do you see?

7  A    He started reaching for his pocket real crazy like--

8  Q    (Interposing)  Which pocket?

9  A    His right pocket.

10  Q    Okay.  And are we, are we talking like a pocket on a

11       shirt, pocket in jeans?  What are you -- Give us some

12       more information.

13  A    Pocket in like a jacket, like a jacket.

14  Q    Like the jacket you're wearing now?

15  A    Yeah.

16  Q    Okay.  What do you see the defendant do?

17  A    He started reaching.  And it happened so fast when he

18       got it out.  By the time he got it out of his pocket, he

19       was already shooting.

20  Q    And what was he, what did he pull out of his pocket?

21  A    A gun.

22  Q    What kind of gun was it?

23  A    It was like a semi-automatic.

24  Q    Was it a handgun or a long gun?

25  A    A hand gun.

1  Q    And what color was it?

2  A    I'm not sure what color it was.

3  Q    Did you see him shooting the gun, the weapon?

4  A    Yeah.

5  Q    And where was he pointing at?

6  A    At me and Tyrone's direction.

7  Q    How many gunshots did you see or hear?

8  A    I probably saw and heard about two before I took off

9       running.

10 Q    And where did you take off running?

11 A    Towards the store.

12 Q    And do you know if Tyrone was running?

13 A    No.  He ain't run.

14 Q    Did you see Tyrone get hit by any of the bullets?

15 A    Yeah.  The first, like the first two.

16 Q    Where did you see Tyrone get hit at?

17 A    Probably like in his stomach area, or even his hip area.

18 Q    What makes you say that?

19 A    Because the way he, the way his arm was, his arm was up.

20 Q    Whose arm was up?

21 A    Tyrone's arm still up like--

22 Q    (Interposing)  And for the record, you've got your right

23      arm above your shoulder in a fist?

24 A    Yeah.

25 Q    Right?  And then what happens?

1  A     And then, then he reached for his stomach.

2  Q     You saw Tyrone reach for his stomach?

3  A     Yes.

4  Q     And, for the record, you're showing us an area on the

5        bottom left?

6  A     Yes.

7  Q     Is that true?

8  A     Yes.

9  Q     Okay.  And this is with the first couple of gunshots?

10 A     Yes.

11 Q     You said after the second shot you take off running?

12 A     Yes.

13 Q     Do you hear anymore shots?

14 A     Yes.

15 Q     How many more shots do you hear?

16 A     Like right after them two, I heard like three more.

17 Q     Three more shots?

18 A     Yeah.

19 Q     Do you get hit by any of those shots?

20 A     I'm not sure which one hit me, but I got hit by one of

21       them before I went into the store.

22 Q     Okay.  Are you the only one running into the store at

23       this point?

24 A     No.

25 Q     Are there other people running to the store?

```
 1  A    The crowd, like the employees and me and a few like,
 2       kind of like bystanders was out there.
 3  Q    Does that include Mr. Bailey, the owner?
 4  A    Yes.  He was out there.
 5  Q    Okay.  I mean, does he, did he run into the store as
 6       well?
 7  A    Not when I was, not when I ran into the store.  He
 8       wasn't in the store.
 9  Q    Who got into the store first, you or Mr. Bailey?
10  A    I was in the store first.
11  Q    Okay.  When you got into the store, what did you do?
12  A    I couldn't do nothing.  I instantly fell.
13  Q    You fell?  Why did you fall?
14  A    Because I had got shot in my leg.
15  Q    Where'd you get shot in your leg?
16  A    In my hip area.
17  Q    And, for the record, you're showing us your right leg?
18  A    Yes.
19  Q    Were you bleeding at this point?
20  A    Yes.
21  Q    What did you do next?
22  A    At the time I didn't like, I thought it was just like a
23       pain, like somebody knee'd me.  I didn't, I didn't know
24       I was shot until somebody told me I was.
25  Q    Did you see, did you see anymore of what was going on
```

1      outside?

2  A    I was like at the glass.  Like I couldn't really see

3      out.

4  Q    You couldn't see outside the glass?

5  A    No.

6  Q    Were you trying to look to see what was going on?

7  A    No.  Not really.

8  Q    What was your concern at this point?

9  A    Not getting shot again.

10 Q    Could you hear what was going on?

11 A    Yeah.

12 Q    Showing you People's Exhibit Number Nine.  Do you

13     recognize this, sir?

14 A    Yes.

15 Q    What's that?

16 A    The door to the store and where I was laying and

17     bleeding.

18 Q    Where -- Does it show where you were laying bleeding?

19 A    Yes.

20 Q    Where was that?

21 A    In this picture, to the, to the left.

22 Q    And is it, is it in the corner that you see in that

23     picture there?

24 A    Yes.

25 Q    Do you see that red substance there in the corner there?

1       Is that right?

2   A   Yes.

3   Q   What is that?  Does that have any -- Does that show us

4       where you were laying, sir?

5   A   Yes.

6   Q   Okay.  And you talked about a window that you couldn't

7       really see through.  Can you see that window there in

8       the photograph?

9   A   Yes.

10  Q   Which window is that?

11  A   The glass door.

12  Q   Okay.  And that's the door with the security gate, the

13      security gate door, too?

14  A   Yes.

15  Q   And you could not see what was going on at this point?

16  A   No.

17  Q   Tell us about what you were hearing though.  What did

18      you hear?

19  A   It was just a lot of gunshots going on after I got into

20      the store.  Then I heard Tyrone on the ground like--

21  Q   (Interposing)  Let me stop you right there.  I want to

22      break it up a little bit to get the timeline down.  You

23      see two gunshots, correct?

24  A   Yes.

25  Q   And then you hear three gunshots before you make it into

```
 1      the store?

 2   A  Yes.

 3   Q  Right?  Once you're inside of the store, is there any

 4      pause between those three gunshots that you heard before

 5      getting into the store before the gunshots you hear?

 6   A  Yes.  It was like a big pause.

 7   Q  Okay.  About how much time takes place between the three

 8      gunshots that you heard before you got to the store and

 9      the next series of gunshots?

10   A  Probably like three to four seconds.

11   Q  Okay.  What's the next series of gunshots you hear?

12   A  It sounded like a whole clip went off after that.

13   Q  Maybe I misunderstood.  You said -- What's the three to

14      four seconds?

15   A  Like the first two and then it was like right when I was

16      running into the store, those three and then in like

17      three or four seconds I heard more shots.

18   Q  Okay.  And then what -- How many shots did you hear

19      then?

20   A  I heard about like another two or three then.

21   Q  Okay.  And then, and then what happens?

22   A  And then that's when I heard Tyrone outside.

23   Q  You said there was a big pause.  When was this big

24      pause?

25   A  After I made it into the store, that was the big pause.
```

-68-

1  Q    Okay.  And then after you made it into the store, after

2       the big pause, how many gunshots total did you hear

3       more?

4  A    Then that's when Bobby came running in, then I, then I

5       heard the more gunshots.

6  Q    Okay.  Just a second ago, you were telling me that you

7       heard like a whole clip going off?

8  A    Yes.

9  Q    How many shots, in your mind, is that?

10 A    Like eight or nine.

11 Q    Okay.  Had you heard Tyrone's voice at this point?

12 A    Yes.

13 Q    When did you hear Tyrone's voice?

14 A    I heard him saying like--

15 Q    (Interposing)  Not what he said.  When did you hear his

16      voice?

17 A    Like basically begging for his life.

18 Q    I don't want you to go into what he's saying.  I'm

19      saying at what point is he, do you hear him speaking?

20 A    Like all the shots went off, then I heard another pause,

21      then I just heard one shot.

22 Q    I want to ask you about that last shot.  You said you

23      heard like a clip going off, approximately eight shots,

24      right?

25 A    Yes.

-69-

```
1  Q    Is there a pause after those eight shots before you hear
2       that last shot?
3  A    Yes.
4  Q    What kind of pause was that?
5  A    Just like a, like a quick pause.  Just like pause, then
6       another shot.
7  Q    You hear another shot?
8  A    Just about that quick.
9  Q    And then what happened, sir?
10 A    And then I heard a car like mashing the gas real fast.
11 Q    What kind of sound did you hear when you say the car was
12      mashing its gas real fast?
13 A    You could, you could hear the motor.  I mean, I know
14      when a car is being floored.
15 Q    Did it sound like to you that a car was being floored?
16 A    Yes.
17 Q    Sir, what's the next thing that you see or hear at this
18      point?
19 A    At that point, people was coming in and out the store,
20      like going out, leaving out the store.  Then--
21 Q    (Interposing)  Did you leave out the store?
22 A    No.  I couldn't.
23 Q    Why couldn't you leave out the store?
24 A    I couldn't walk.
25 Q    Is that as a result of that gunshot?
```

1  A    Yes.

2  Q    Did you ever get a chance to check on Tyrone?

3  A    No.  But they said he was gone.

4  Q    I don't -- Yeah.  I know.  Sir, are you familiar with

5       some of the items that Tyrone had on him that day?

6  A    Yes.

7  Q    I want to show you a couple of photographs, if I can.

8       Sir, I'm going to show you People's Exhibit Number

9       Thirty-Eight.  Do you recognize that, sir?  Do you

10      recognize that?

11 A    No.  Not really.

12 Q    Okay.  You don't know whose this was?

13 A    No.

14 Q    That's fine.  People's Exhibit Number Forty.  Do you

15      recognize those keys, sir?

16 A    Yes.

17 Q    Whose keys are those?

18 A    Tyrone's.

19 Q    And they go to that Suburban that, that you were

20      describing earlier?

21 A    Yes.

22 Q    Showing you People's Exhibit Number Seventeen.  Do you

23      recognize that, sir?

24 A    Yes.

25 Q    What is that?

-71-

1  A     Tyrone's phone.

2  Q     That's Tyrone's phone?  Is that the one that was on the

3        back bumper of that same Suburban?

4  A     Yes.

5  Q     Mr. Allen, where did you go -- Well, let me back up.

6        Did the police arrive?

7  A     Yes.

8  Q     And you were eventually given treatment by EMS?

9  A     Yes.

10 Q     Where did you go, sir?  Where did the EMS take you?

11 A     They took me to Sinai.

12 Q     The hospital, Sinai Grace?

13 A     Yeah.

14 Q     How long did you stay at Sinai Grace, sir?

15 A     Probably like two weeks.

16 Q     While you were at Sinai Grace, sir, at some point early

17        on, did the police get a chance to talk with you?

18 A     Yes.

19 Q     And did they -- Did you give them a statement?

20 A     Yes.

21 Q     The first time the police came and talked with you, sir,

22        do you remember how soon after the incident this was?

23 A     I think that was the same night.

24 Q     And at that point, sir, do you know if you were under

25        any medication?

-72-

1   A    Yes.  I was on like morphine.

2   Q    At any point, sir, in your stay at Sinai Grace, did you

3        have to have surgery?

4   A    Yes.

5   Q    Was this before or after the surgery?

6   A    This was after surgery.

7   Q    After surgery?  And when you talked to the police, did

8        you try to give, as best you could, what happened that

9        day?

10  A    Yes.

11  Q    Now, sir, do you remember, do you remember at some point

12       early on being shown, do you remember being shown a

13       group of photographs, sir, when you were first at the

14       hospital?

15  A    Yes.

16  Q    I'm going to show you what's been premarked as Proposed

17       Exhibit Number Seventy-One.  Do you recognize that, sir?

18  A    Yes.

19  Q    Do you see your handwriting or signature on there?

20  A    Yes.

21  Q    And is that the photos that you looked at on I think

22       it's April 11th of 2010?  Is that correct?

23  A    Yes.

24  Q    Did you point someone out?

25  A    Yeah.

-73-

1  Q    And who did you point out on there?

2  A    Somebody that I thought looked like the defendant.

3  Q    And at the time you pointed this person out, sir, were

4       you still under this, the pain medication you were

5       telling us about?

6  A    Yes.

7  Q    Is this, in fact, the defendant?

8  A    No.

9  Q    Is this, in fact, the shooter that you saw on April

10      10th, 2010?

11 A    No.

12 Q    Why did you pick this person out?

13 A    Because he seemed like, he looked like him to me.

14              MR. PRASAD:  Your Honor, the People, at this

15      time, seek to admit this into evidence, People's

16      Seventy-One.

17              MR. MOORE:  Seventy-One, no problem, no

18      objection.

19              THE COURT:  It'll be admitted.

20              (Whereupon People's Exhibit Number Seventy-

21              One was received into evidence.)

22              MR. PRASAD:  Thank you.

23 Q    (By Mr. Prasad, continuing):  Now, Mr. Allen, did there

24      come a time after you got out of the hospital that

25      Sergeant Mackie came and met with you, sir?

-74-

1  A    Yes.

2  Q    And did Sergeant Mackie take you somewhere to go look at

3       a live line-up?

4  A    Yes.

5  Q    Tell us about that.  Tell us about what happened.

6  A    We was at a live line-up.  And it was like, I can't

7       remember how many people, I think about six.

8  Q    Okay.

9  A    They was all around the same height, same, all of them

10      was about the same complexion.

11  Q   Were they standing or sitting?

12  A   They was sitting.

13  Q   They were sitting.  And you said you saw six people?

14  A   Yes.

15  Q   Could you identify any of those six people?

16  A   Yes.

17  Q   Who did you identify?

18  A   The defendant.

19  Q   Mr. Howard?

20  A   Yes.

21  Q   And why did you identify him?

22  A   Because at the time I, I remembered.  I like knew who

23      shot me and I was not under no meds.

24  Q   You weren't under any morphine at this time?

25  A   Yes.

1  Q    You had a clear head?

2  A    Yes.

3  Q    And did you, did you -- How long did it take you to

4       recognize Mr. Howard?

5  A    I recognize him when I first walked in, or when they

6       first walked in.

7  Q    Did you say anything immediately?

8  A    No.

9  Q    Why not?

10 A    Because I had to make sure.

11 Q    And did you make sure?

12 A    Yes.

13 Q    The person you identified on that day, Mr. Howard, was

14      he the person you saw on April 10th of 2010 with the

15      gun?

16 A    Yes.

17 Q    Is he the person you saw that fired the gun?

18 A    Yeah.

19 Q    Is he the person that you saw fire the gun that shot

20      Tyrone Simpson?

21 A    Yes.

22             MR. PRASAD:  Thank you, your Honor.  I pass

23      the witness.

24             CROSS-EXAMINATION

25 BY MR. MOORE:

1  Q    Good afternoon, young man.

2  A    Good afternoon.

3  Q    You've indicated that -- What day of the week was this,

4       if you recall?

5  A    April 10th.

6  Q    What day of the week?

7  A    I believe like on a Saturday.

8  Q    Okay.  Are you sure about that?

9  A    No.  I'm not sure, but it was one of the weekends

10      because I wasn't in school.

11 Q    Okay.  Now, you said you had known Mr. Allen [sic],

12      about, about a year, is that correct?

13 A    Yes.  I known Tyrone about a year.

14 Q    Excuse me.  Mr. Simpson for about a year.  Is it okay if

15      I call him that?

16 A    Yes.

17 Q    Okay.  And, in fact, you all were very good friends,

18      right?

19 A    Yes.

20 Q    I mean, he was your man, right?

21 A    Yes.

22 Q    Okay.  All right.  Nothing wrong with that.  So, how

23      tall are you?  Back on April 10th, how tall were you?

24 A    About 6'2".

25 Q    Okay.  About 6'2.  And how much did you weigh?

1  A    Probably like one eighty-five.

2  Q    Okay.  And Ant was much shorter than you, he was about

3       5'5", right?

4  A    Yeah.  He was shorter than me.

5  Q    Okay.  Now, you indicated that -- Did you stay next

6       door, did you stay next door to the store or two houses

7       down from the store?

8  A    Two houses down.

9  Q    Okay.  And is that why your vehicle was parked in the

10      position it was when the prosecutor showed you a

11      picture?

12 A    No.

13 Q    Okay.  Well, wasn't the vehicle down by your house at

14      that point in time?

15 A    No.

16 Q    Okay.  Did you stay West or East of the store?

17 A    I don't really know.

18 Q    Well, no, no.  Let's do it another way.  Did you stay on

19      the Southfield side of Tireman going towards Southfield

20      or going toward Greenfield?

21 A    Going toward Greenfield.

22 Q    Okay.  So, that would be East.  And were you on the

23      corner house or right next to it?

24 A    The corner house.

25 Q    Okay.  Now, you pulled up and you saw a commotion

-78-

```
1     outside, would that be correct?
2  A   Yes.
3  Q   Okay.  And you saw your man Ant down there, right?
4  A   Yes.
5  Q   Okay.  So, you went down there to see what was going on,
6      right?
7  A   No.
8  Q   Well, that's your man.  You didn't go and find out
9      what's going on?  Because he was arguing with somebody,
10     right?
11 A   No.
12 Q   No?  So, you were just going to go in the house and
13     leave your man down there in an argument, correct?
14 A   No.
15 Q   Okay.  Now, you got a tattoo on your arm?
16 A   Yes.
17 Q   What's that tattoo say?
18 A   I got one that say Dre and I got one that say RIP Ant.
19 Q   And RIP what?  Rest in peace?
20 A   Yes.
21 Q   Okay.  Rest in peace Ant?
22 A   Yes.
23 Q   Okay.  So, you felt compelled to put a tattoo on your
24     arm because you were that close to this individual,
25     right?
```

```
 1  A    Yeah.

 2  Q    Okay.  All right.  Now, you said, you testified that

 3       Tyrell asked you to come on down, right?

 4  A    Yeah.

 5  Q    Okay.  Because outside of him asking, you would still go

 6       in the house, right?

 7  A    Yeah.

 8  Q    Okay.  So, you get down there.  Tell us how many people

 9       are down there.

10  A    I don't know how many exactly people was down there.

11  Q    Well--

12  A    (Interposing)  It was some people from the store who

13       worked there.

14  Q    Okay.

15  A    And it was Tyrone and, it was Tyrone and Tyrell down

16       there.

17  Q    Okay.  Now, somewhere during direct examination, you

18       said some people were with my client, Mr. Howard?

19  A    Yes.

20  Q    How did you know that, sir?

21  A    Well, I knew they was with him when they left together.

22  Q    Did you see them talking?

23  A    No.

24  Q    Okay.  And the fact is Freak drove away and my client

25       and two others walked away.  Would that be accurate?
```

1   A      No.

2   Q      It isn't?

3   A      No.

4              MR. MOORE:  Let's try page seventeen.  Can I

5       approach the witness, your Honor?

6              THE COURT:  You may.

7              MR. MOORE:  Page seventeen.

8              MR. PRASAD:  Thank you.

9   Q   (By Mr. Moore, continuing):  I want you to look at line

10      nine and read down about three questions to yourself.

11  A      Yes.

12  Q      Okay.  You read that to yourself?

13  A      Yes.

14  Q      Okay.  Do you recall testifying at a previous hearing--

15  A      (Interposing)  Yes.

16  Q      And being asked the question:

17              "Please continue, sir.  You were telling us

18              who was getting into the Charger?"

19      And you answered:

20              "The boy, Freak, was getting in the car and

21              they walked."

22  A      Yes.

23  Q      Do you recall being asked that question and giving,

24      giving that answer?

25  A      Yes.

1  Q    Okay.  Were you telling the truth then?

2  A    Yes.

3  Q    Okay.  Now, you also recall giving that statement that

4       the prosecution talked about.  Okay.  And do you recall

5       saying that the defendant was driving and told Freak to

6       walk?

7  A    When they pulled up, the defendant was driving.

8  Q    I want you to take a look at your statement.  Start with

9       that question right there.

10 A    Yes.

11 Q    Okay.  Do you recall being asked the question:

12                  "Do you know if the shooter knew Freak?"And you said:

13                  "Earlier in the day when we were at the

14                  scene, we were at the store, the shooter got

15                  in a black Charger.  Freak tried to get in

16                  the Charger.  The shooter told Freak to

17                  walk."

18                  Do you recall that?

19 A    Yes.

20 Q    You admit those two answers are different, right?

21 A    Yeah.

22 Q    Okay.  But you were under oath when you testified that

23       the defendant walked, correct?

24 A    Yeah.

25 Q    Okay.  Now, you say you went down there and your buddy,

-82-

1      Ant, he was mad, right?

2  A   Yes.

3  Q   He was fired up, right?  Is that a yes?

4  A   Yes.

5  Q   Okay.  In fact, Ant had a fight with Freak earlier,

6      right?

7  A   Yes.

8  Q   Okay.  And when you arrive, they're jawjacking at each

9      other real tough, right?

10 A   Yes.

11 Q   Okay.  And you're mad about something involving your

12     sister, right?

13 A   Yes.

14 Q   Okay.  Now, describe this gentleman called Freak.  Do

15     you recall how tall he is?

16 A   A little taller than the defendant.

17 Q   Okay.  What kind of age is he?

18 A   I really don't know.

19             MR. MOORE:  Let's take a look at your

20     statement again.  May I approach, your Honor?

21             THE COURT:  You may.

22             MR. MOORE:  Thank you.

23 Q   (By Mr. Moore, continuing):  Look at that question that

24     says describe Freak and that answer you gave to it.  You

25     can take it in your hands.

1  A    I see it.

2  Q    Okay.  You gave an age description of this gentleman,

3       right?

4  A    Yeah.

5  Q    You said he was thirty years old.

6  A    Yeah.

7  Q    Okay.  So, if we go along with your statement, you

8       telling me a sixteen year old told a thirty year old to

9       walk?

10 A    Yeah.

11 Q    Oh.  Okay.  Then you testified that the defendant walked

12      and this thirty year old drove away in this vehicle,

13      right?

14 A    Yeah.

15 Q    Okay.  Now, you talked about Freak ran.  Describe what

16      you mean by ran, if he just didn't run away, or run to

17      the motor vehicle.

18 A    Ran from me.

19 Q    When you say ran from me, what are you talking about?

20      He got away from you, went two feet, three feet, five

21      feet, back to that wall?

22 A    Ran a little distance where I wouldn't be able to hit

23      him.

24 Q    So, you was ready to fire him up, right?

25 A    Yeah.

-84-

1  Q    And your buddy, Ant, was ready to fire him up?

2  A    Yeah.

3  Q    And that would be your buddy, Ant, was ready to fire him

4       up again, right?

5  A    Yeah.

6  Q    Okay.  And you also gave the height.  You said this

7       Freak guy was taller than my client, right?

8  A    Yes.

9  Q    About 5'10"?

10 A    Yeah.

11 Q    Okay.  Freak's 5'5", about that, right?

12 A    I don't know.

13 Q    I mean, Ant's about 5'5"?

14 A    Yeah.  Ant about--

15 Q    (Interposing)  So, you're buddy's going to fire up this

16      big guy, right?

17 A    Yup.

18 Q    A bigger, older guy?

19 A    Yup.

20 Q    Okay.  Now, you described my client as being on the

21      scene, but he was in the background, correct?

22 A    Yeah.

23 Q    Okay.  And as far as you know, when he's out there,

24      there's nothing to suggest that my client has taken

25      anything at the time, right?

1  A    Not at the time.

2  Q    Okay.  Because he's just standing around watching,

3       seeing what's going on, right?

4  A    Yeah.

5  Q    And so, eventually, he walks away, right?

6  A    Yup.

7  Q    Okay.  So, how long is it before my client comes back,

8       to the best of your knowledge?

9  A    No longer than fifteen minutes.

10  Q   Comes back in fifteen minutes.  Now, you still outside?

11  A   Yes.

12  Q   Okay.  You trying to calm your buddy down?

13  A   No.

14  Q   Is he still just fired up, upset about his Cartier

15      glasses?

16  A   Yes.

17  Q   Okay.  Now, you testified when my client returned all he

18      was asking about was his phone, right?

19  A   Yes.

20  Q   And Ant confronts him, right?

21  A   Yes.

22  Q   And gets up in his face, right?

23  A   Yes.

24  Q   Ant's like ain't nobody leaving 'til I find my glasses,

25      right?

1  A     Yes.

2  Q     Okay.  And per your testimony, my client's like I don't

3        have your glasses, right?

4  A     Yes.

5  Q     And this argument goes on for what?  Three, four, five

6        minutes?

7  A     A couple minutes.

8  Q     A couple of minutes.  Then your boy, Ant, just bam, bust

9        him in the face?

10 A     Yes.

11 Q     Busted him again, right?

12 A     Yes.

13 Q     As a matter of fact, he hit him four, five times, right?

14 A     Yes.

15 Q     And my client hadn't done anything, right?

16 A     No.

17 Q     Okay.  What was my client wearing that day?

18 A     I'm not sure.  I know he had on black jacket or a coat.

19 Q     He had on a black coat, right?

20 A     Yes.

21 Q     And you're sure about that, right?

22 A     Yes.

23 Q     Okay.  What kind of shirt did he have on?

24 A     I'm not sure.

25 Q     The coat covered the shirt, right?

```
1  A    Somewhat.  Like the jacket was unzipped.

2  Q    Jacket was unzipped.  But it was a black jacket.  No

3       doubt about it.

4  A    Yeah.

5  Q    What color was the gun?

6  A    I'm not sure.

7  Q    Well, you're seeing what's going on because that's your

8       boy out there, Ant.  Right?

9  A    Yes.

10 Q    Okay.  Now, at what time did Mr. Bailey arrive?  What

11      time did Mr. Bailey arrive?  You described Mr. Bailey

12      out there, right?

13 A    Yeah.

14 Q    Okay.  Well, I mean, when did he, when did he arrive--

15 A    (Interposing)  Before, before he, before the defendant

16      pulled back up.

17 Q    Okay.  Was this while the argument was going on?

18 A    No.

19 Q    Was it after the argument?

20 A    Yeah.  He pulled up after.

21 Q    Okay.  Now, did Mr. Bailey ever try to get in the middle

22      like, hey you young fellas just calm down, everything

23      going to be all right?  Did he try to do anything like

24      that, play peacemaker?

25 A    Yes.
```

1  Q    Now, at the time that my client was falling, supposedly

2       falling backwards, what kind of distance was he front

3       Ant?

4  A    Like two or three feet.

5  Q    Okay.  Didn't you say he sort of fell back about four

6       feet?  Although he didn't fall down, he fell back.

7  A    He also was still walking up on him, too.

8  Q    Who was walking up on who?

9  A    Ant.

10 Q    Okay.  So, Ant's busted him four, five times and still

11      walking up on him?

12 A    Yes.

13 Q    And, at that time, my client hadn't showed any glasses,

14      right?

15 A    No.

16 Q    Had anybody patted him down for any glasses?

17 A    No.

18 Q    And how many times had Mr. Bailey told, you know, told

19      my client, hey do you have the glasses, give him the

20      glasses?  How many times did he say that?

21 A    He told, he said he ain't have them a couple times.

22 Q    Okay.  Now, you ran after the first shot.

23 A    After the second, I ran.

24 Q    I beg your pardon?

25 A    After the second, I ran.

1  Q    You ran after the second.  It's like two steps to the

2       store.  Did you just dive in or did you run in?

3  A    Run.

4  Q    And you were the first one in the store?

5  A    Not the first one in the store.

6  Q    Who was first?

7  A    I don't know who was the first one.  It was a lot of us

8       out there.

9  Q    Okay.  Now, at the time that you heard the first shots,

10      what was your position next to Ant relative to where Ant

11      was?

12 A    At the same spot, to the right of him.

13 Q    To the right of him?  You were within a foot of him?

14 A    About two, three feet from him.

15 Q    Okay.  Now, initially, you heard a couple shots, right?

16 A    Yes.

17 Q    And then there was a pause?

18 A    Yes.

19 Q    And this pause was about how long, young man?

20 A    A couple seconds.

21 Q    All right.  And it was during this pause you ran into

22      the store?

23 A    It was like two shots, quick pause, three shots.

24 Q    Okay.  And you don't know what was going on when that

25      third shot was going on because you went after the

1      second shot, correct?

2  A   Yes.

3  Q   Okay.

4  A   I ran after the second.

5  Q   Okay.  So, at that point in time, you don't know what's

6      going on outside, correct?

7  A   After the second, I ran.  Then them three.  Of them

8      three, one of them had to have hit me, so...

9  Q   Okay.  But you don't know what goes on after you go into

10     the store?

11 A   No.  I don't see, I don't see anything after that.

12 Q   Okay.  Now, eventually, they take you to the hospital,

13     correct?

14 A   Yes.

15 Q   Okay.  Just to clear something up.  Did you have on like

16     a red jacket that day?  A read sweater or a pullover or

17     a fleece or something like that?

18 A   No.

19 Q   Okay.  Did Ant have something on like that?

20 A   I don't remember him having no jacket on.

21 Q   Okay.  So, eventually, you go to the hospital, right?

22 A   Yes.

23 Q   Because you're shot and you're in the hospital almost

24     two weeks, shot in the hip, correct?

25 A   Yes.

1  Q    In fact, the bullet moved on where you had to have a

2       colostomy bag, right?

3  A    Yes.

4  Q    Okay.  Now, at some point in time, the police come and

5       see you, right?

6  A    Yes.

7  Q    Okay.  Now, you give a description of the shooter,

8       right?

9  A    Yes.

10 Q    In fact, not only was your boy shot, you were shot,

11      right?

12 A    Yes.

13 Q    Do you recall that description?  Do you recall the

14      description, young man?

15 A    What did you ask?

16 Q    Do you recall the description you gave to the police?

17 A    Yes.

18 Q    Okay.  Because you wanted to help the police find the

19      person who shot you, let alone your partner.  What was

20      the description you gave them?

21 A    I'm sure, I think I said a goatee or something.

22 Q    Goatee?  Okay.  Do you recall and age?

23 A    I think -- I don't remember the age, around fifteen,

24      seventeen.

25                  MR. MOORE:  Let me show you the statement

                            -92-

1       and see if it refreshes your recollection.  May I

2       approach, your Honor?

3                    THE COURT:  You may.

4                    MR. MOORE:  Thank you.

5   Q   (By Mr. Moore, continuing):  Take a look at that, sir.

6   A   Yes.

7   Q   Okay.  What description did you give them?

8   A   Seventeen, eighteen.

9   Q   Okay.  What else?

10  A   About 5'7", 5'8".

11  Q   Okay.  Now, a person of 5'7", 5'8", they would be taller

12      than your buddy, Ant, right?

13  A   No.

14  Q   Isn't 5'7", 5'8" taller than 5'5"?

15  A   I never said Ant was 5'5".

16  Q   We established that.

17                   MR. PRASAD:  Objection, your Honor.  That's

18      commenting on the evidence.

19                   THE COURT:  How can that be?

20                   MR. PRASAD:  He can't comment on the

21      evidence.

22                   THE COURT:  How can it be that it's been

23      established, sir?

24                   MR. MOORE:  The medical examiner, Judge.

25                   MR. PRASAD:  He's not the medical examiner,

                              -93-

1    Judge.

2              THE COURT:  And just because the medical

3    examiner said it doesn't make it true.  It's just

4    evidence.

5              MR. MOORE:  All right, Judge.  Thank you.

6    Leave that argument for later, Judge.  Thank you.

7  Q  (By Mr. Moore, continuing):  What else did you say?

8  A  That he was short, had like a short tapered -- And I put

9    a goatee.

10 Q  Okay.  All right.  Goatee or gold teeth?

11 A  T.

12 Q  Goatee?

13 A  Yes.

14 Q  Like some hair on the bottom of your chin.  Is that what

15   you're saying?

16 A  Yeah.

17 Q  Okay.  Now, you talked about you were on some medication

18   from your injuries, right?

19 A  Yes.

20 Q  You never told the police that, hey, come back tomorrow,

21   you know, I'm woozy, I'm dizzy, I'm under drugs, you

22   didn't say anything like that, did you?

23 A  No.

24 Q  You wanted to find, help the police find who shot you,

25   right?

-94-

 1  A    I just wanted them out of my face.

 2  Q    Well, didn't you -- You nineteen years of age.  You

 3       didn't tell the police, hey, come back later, get out of

 4       my face?

 5  A    No.

 6  Q    You know, we'll deal with this tomorrow, I'm in pain?

 7  A    No.

 8  Q    You didn't say anything like that?

 9  A    No.

10  Q    Okay.  Now, they asked you to look at some photos,

11       correct?

12  A    Yes.

13  Q    And you didn't say get out my face then, did you?

14  A    No.

15  Q    You didn't say I'm in pain, I'm under drugs, I'm not

16       sure who's who or what, did you?

17  A    No.

18  Q    So, they asked you to look at some photos and you knew

19       that these folks were trying to help find who shot you

20       and your buddy, right?

21  A    Yes.

22  Q    Okay.  And you knew, at this point in time, that Ant had

23       passed, right?

24  A    Yes.

25  Q    Okay.  So, you clearly want to find, you know, help them

1      find who did this, right?

2  A    Yes.

3  Q    And whoever did it you figure probably going to get

4      charged with murder, right?

5  A    Yeah.

6  Q    Or get locked up, right?

7  A    Yes.

8  Q    Okay.  And when they showed you this photo array, how

9      long did you look at it?

10 A    I was looking at it for a minute.

11 Q    Okay.  And then you circled somebody else, right?

12 A    Yes.

13 Q    And they asked you some questions that were printed on

14     this, like:

15             "Do you see anyone you recognize?"

16 A    Yeah.

17 Q    Do you recall what your answer was?

18 A    Yeah.

19 Q    Your answer was:  "Yes."  And they asked you:

20             "If the answer to question number one is

21             yes, identify by number the photo or photos

22             you recognize."

23             And you answered:  "Number six.".

24             Right?

25 A    Yes.

1  Q    Then they asked you the question:

2            "From where do you recognize the person

3            identified?"

4      And you gave the answer:  "The shooting."  Right?  Do

5      you remember saying that?

6  A    Yes.

7  Q    And then they had:

8            "Do you have any additional comments?"

9      You answered:

10           "This is the man who shot me and my friend."

11 A    Yes.

12 Q    Right?  You weren't trying to lie to the police, were

13     you?

14 A    No.

15 Q    You wanted to help find the person that shot you and

16     Ant, right?

17 A    Yes.

18 Q    You didn't say, I possibly recognize him, right?

19 A    Yes.

20 Q    Okay.  Now, during direct examination, you said, well, I

21     picked out the picture that looked like the defendant.

22 A    Yes.

23 Q    Well, at that point in time, there was no defendant,

24     right?  It was just the person who was the shooter?

25 A    Yes.

1  Q    Okay.  And that's the person you were trying to

2       identify?

3  A    Yes.

4  Q    Now, about over a month later, they asked you to look at

5       a live line-up, right?

6  A    Yes.

7  Q    And at that point in time, the police had already told

8       you they arrested somebody, right?

9  A    Yes.

10 Q    Okay.  And you go looking for a short person, would that

11      be accurate?

12 A    No.  Not looking for a short person.

13 Q    Didn't you tell, didn't you previously say that you were

14      looking for a short person in the line-up?

15 A    I said they was all around the same size, all, they was

16      all short, all the same complexion.

17            MR. MOORE:  Let me have a minute, your

18      Honor.

19 Q    (By Mr. Moore, continuing):  Now, understanding you were

20      looking at that, that live line-up -- Excuse me.  Page

21      sixty-one, counsel.

22            MR. PRASAD:  Thank you.

23            MR. MOORE:  Line fifteen.

24 Q    (By Mr. Moore, continuing):  The question and the

25      answer, if you will, line fifteen.  Thank you.  At a

```
 1      previous hearing, do you recall, asked the question:
 2                   "So, when you were looking at this live
 3                   line-up, you're looking for a small person,
 4                   right?"
 5      And giving the answer:
 6                   "Yes."?
 7  A   Yes.
 8  Q   Do you recall that?
 9  A   Yes.
10  Q                "Okay.  And the smallest person there was
11                   Deonte Howard, right?"
12      And your answer was:
13                   "Yes."
14                   Again, asked the question:
15                   "Right?"
16      And your answer was:
17                   "Yes."
18  A   Yes.
19  Q   So, you were looking for a small person?
20  A   They was all short, so--
21  Q   (Interposing)  Okay.  Now, they were seated in a chair,
22      correct?
23  A   Yes.
24  Q   Now, isn't it true it took you fifteen minutes before
25      you identified Mr. Howard?
```

```
 1 A    No.

 2 Q    No?

 3 A    No.

 4           MR. MOORE:  Just a minute, your Honor.  Page

 5      sixty, counsel.

 6 Q    (By Mr. Moore, continuing):  Start at line sixteen and

 7      read a couple questions down to yourself, please.

 8 A    Yes.

 9 Q    Hold on.  You went through that quick.  Take your time.

10 A    I see it.

11 Q    Okay.  Do you recall being asked the question:

12           "Okay.  Now, it took you, according to your

13            previous testimony, it took you fifteen

14            minutes to identify Deonte Howard as the

15            shooter."

16      Answer:   "Before I actually told them.

17            Okay.  So, it took you fifteen minutes."

18      And your answer was:

19           "Right."

20           And then they asked you:

21           "Is that yes?"

22      And you answered:

23           "Right."

24           Do you recall being asked those questions

25      and giving those answers?
```

                                -100-

```
 1  A    Yes.
 2              MR. PRASAD:  Judge, I object to just the
 3       reading of line nineteen from that transcript because
 4       counsel put it in the inflection of a question when it
 5       was not a question.  It was an assertive statement.
 6       It's actually followed by a period.  It was not a
 7       question.
 8              MR. MOORE:  No.  That was his answer.
 9              MR. PRASAD:  Right.
10              MR. MOORE:  Using that phrase in the
11       question.
12  Q    (By Mr. Moore, continuing):  So, you looked at this
13       line-up.  You've been shot.  You've been in the hospital
14       a couple weeks.  And you say it took you fifteen minutes
15       before you told them?
16  A    Yes.
17  Q    Now, during this fifteen minutes, were you just staring
18       at them, looking at them, decide to look away, get a cup
19       of coffee?
20  A    No.
21  Q    Get a drink or what?  What was going on during this
22       fifteen minutes, young man?
23  A    I was looking straight at them.
24  Q    You were looking at them, straight at them.  And you
25       wanted it to be right?  Correct?
```

-101-

1  A    Yeah.

2  Q    You wanted your identification to be accurate.  And it's

3       your testimony that you walked in, you saw him right

4       away, right?

5  A    Yes.

6  Q    Okay.  Well, weren't you mad at seeing the person who

7       shot you, put you in the hospital and killed your boy?

8  A    Yes.

9  Q    Okay.  So, after seeing him right away, you don't like,

10      hey, there he is?  You don't do anything like that, do

11      you?

12 A    Nope.

13 Q    Oh.  You just sit back, lay back, look, look.  Were you

14      certain when you first walked in?

15 A    Yes.

16 Q    Anybody tell you it was Mr. Howard?

17 A    No.

18 Q    Well, we know from your previous testimony you were

19      looking for a shorter person, right?

20 A    Yeah.

21 Q    Okay.

22 A    Yeah.

23 Q    Okay.  In your previous testimony, you said Mr. Howard

24      was the shortest person, right?

25 A    Yeah.

```
 1                    MR. PRASAD:  Objection, your Honor.  That's

 2          -- Well, I'll argue it in redirect.

 3   Q      (By Mr. Moore, continuing):  Now, going back toward the

 4          fight.  Upon questioning by the prosecution, you were

 5          describing a gun and you were like, oh, yeah, it was a

 6          semi-automatic.  Do you recall that?

 7   A      Yes.

 8   Q      And you got some -- You said you're nineteen years of

 9          age.  You had familiarity with firearms back in them,

10          back in the, back in April 2010?

11   A      Yes.

12   Q      And how is it you have such familiarity with firearms?

13                    MR. PRASAD:  Objection, your Honor.  What's

14          the relevance of that?

15                    MR. MOORE:  I'm trying to figure out how

16          come he knows a semi-automatic as opposed to a revolver.

17          That's all.

18                    THE COURT:  If it's relevant or not, it's

19          marginal at best.

20                    MR. MOORE:  All right, Judge.  I'll move on.

21          Just a moment, your Honor.

22   Q      (By Mr. Moore, continuing):  And it's your testimony the

23          defendant was wearing a black coat, correct?

24   A      Yes.

25                    MR. MOORE:  Thank you very much.  No other
```

-103-

1     questions.

2                     REDIRECT EXAMINATION

3  BY MR. PRASAD:

4  Q    Mr. Allen, let's clear a couple of things up.  Counsel,

5       page sixty-one.

6                     MR. MOORE:  Sixty-one.

7                     MR. PRASAD:  The previous--

8                     MR. MOORE:  (Interposing)  Okay.  All right.

9  Q    (By Mr. Prasad, continuing):  Going back to this.

10      Defense counsel asked you a couple of questions about

11      this section right here, correct?

12 A    Yes.

13 Q    Let's be clear.  Were you looking for the shortest

14      person when you viewed that live line-up?

15 A    No.

16 Q    Why are you looking for a small person?

17 A    Because who shot me was small.

18 Q    And when you walked into that line-up, sir, were they

19      already seated?

20 A    Yes.

21 Q    So, you didn't see anyone actually standing, did you?

22 A    No.

23                     MR. PRASAD:  Counsel, page two of two of his

24      statement.

25                     MR. MOORE:  Okay.  Thank you.

1   Q     (By Mr. Prasad, continuing):  Going back to the

2         statement you gave to the officers on April 11th, sir.

3         At the top there, Mr. Moore was asking you questions

4         about the description you gave of the shooter.  Do you

5         see that there?

6   A     Yes.

7               MR. PRASAD:  You only gave us a portion of

8         what you told us.  Judge, per the rule of completeness,

9         I'd ask that the witness be able to say the full part.

10              THE COURT:  Have him read it.  Or if he can

11        remember without reading it.

12  Q     (By Mr. Prasad, continuing):  Can you remember the full

13        thing without reading it?

14  A     Goatee or--

15  Q     (Interposing)  I want you to read the whole thing from

16        the very beginning where it says B/M.  Start there.

17  A     Seventeen, eighteen, 5'7", 5'8", no more than 130, short

18        tapered haircut, small goatee.  I said like just shaved

19        the side of his, of his face.  Then I said several

20        people there called him Tay.  Black coat, no hat, blue

21        jeans.  Can't remember the shoes.

22  Q     Thank you.  Sir, have you ever gone to any classes on

23        estimating a person's height or weight?

24  A     No.

25  Q     When you were giving us your time estimates throughout

-105-

1    your testimony today, when you were out there, did you

2    ever look at a watch?

3  A  No.

4  Q  Now, let's go back to the live line-up when Mr. Moore

5    was asking you about it taking you fifteen minutes.  And

6    you say, you said, you told us that right before you

7    told them?

8  A  Yeah.

9  Q  What do you mean by that?

10 A  Like I, I identified him when I first walked in, but I

11   just didn't say nothing until that time.

12 Q  Why not?

13 A  Just getting a look at who killed my boy.

14 Q  What was going through your head at that moment?

15 A  A lot of anger.

16 Q  Mr. Moore was asking you about whether or not you could

17   tell the color of the gun that you described, that you

18   saw, right?

19 A  Yes.

20 Q  Did you get a good enough look at the gun when you saw

21   those first two shots to see the color?

22 A  Not really, but it -- Nine times out of ten it was black

23   because I couldn't see it.  Because he had a black coat

24   on.

25 Q  But you're guessing just because you couldn't see it?

```
 1  A    Right.

 2  Q    What was your focus when you first saw those first two

 3       shots?

 4  A    Getting away from the gunshots.

 5  Q    Sir, is there any doubt in your mind you're confusing

 6       the defendant for Freak?

 7  A    No.

 8  Q    Are they two separate people?

 9  A    Yes.

10  Q    Did Freak shoot your -- Did Freak shoot you?

11  A    No.

12  Q    Did Freak shoot Tyrone Simpson that day?

13  A    No.

14  Q    And, sir, the entire time you were out there before you

15       ran into that store, the Smokeshop, who was the only

16       person you saw with a gun at that point?

17  A    The defendant.

18            MR. PRASAD:  Thank you.  I have nothing

19       else, your Honor.

20            MR. MOORE:  Just in response.

21            RECROSS-EXAMINATION

22  BY MR. MOORE:

23  Q    Regarding that description, you talk about a goatee.  At

24       a later court hearing, you admitted that the person did

25       not have a goatee, would that be accurate?
```

-107-

```
 1  A    Yes.  Once I saw him.

 2  Q    And regarding the live line-up, you said now that I've

 3       seen him today, he looked a little shorter than that.

 4       Would that be accurate when you said that at the live

 5       line-up?

 6  A    Yeah.  A little shorter than 5'8", ,5'7".

 7  Q    But this is what, that's what you testified.  You didn't

 8       say 5'7", 5'8".  You just said he looked a little

 9       shorter, right?

10  A    Than what I wrote down.  Yeah.

11             MR. MOORE:  Okay.  Thank you.  No other

12       questions, Judge.

13             MR. PRASAD:  Nothing else, your Honor.

14             THE COURT:  Thank you, young man.  You want

15       to take that little half an hour break and then start

16       back at 1:30?  Okay.  Thirty-five minutes.

17                  (At 12:54 p.m. jury leaves the courtroom,

18                  court in recess.)

19                  (At 1:44 p.m. court back in session, jury

20                  enters the courtroom.)

21                  (At 1:45 p.m. witness OFFICER JEFFREY

22                  BANKS was sworn.)

23             THE COURT:  Do you promise to tell the truth

24       to the questions that are going to be asked of you

25       today?
```

```
1                         THE WITNESS:  I do.

2                         THE COURT:  Okay.  Thank you.

3                         DIRECT EXAMINATION

4    BY MR. PRASAD:

5    Q    Sir, please introduce yourself to the jury?

6    A    My name is Jeffrey Banks.

7                         (TAPE MALFUNCTION.  TAPE CHANGED.)

8    Q    And sir, did you have a call to go out to Tireman in he

9         city of Detroit on that day?

10   A    Yes.  I did.

11   Q    What was the reason for that?

12   A    A shooting.

13   Q    And what -- Were you working alone or with someone at

14        that point?

15   A    I had a partner.

16   Q    Okay.  Now, did you respond to a scene?

17   A    Yes.

18   Q    Where did you go to?

19   A    Tireman, I believe between Tireman and Asbury Park.

20   Q    Okay.  And at that -- When you went to that location,

21        where specifically in that location did you go to?

22   A    It was in front of a restaurant.

23   Q    Okay.  And what was the condition of the scene when you

24        arrived, sir?

25   A    We came Westbound, coming from the East, and we observed
```

-109-

```
 1      a body laying in front of the restaurant on Tireman.

 2   Q  Okay.  Were you the first responders, sir?

 3   A  We were the first on the scene.

 4   Q  All right.  When you got out there, sir, tell me about

 5      the crowd that was around, if there was a crowd around

 6      the outside of the location.

 7   A  I wouldn't say it was a crowd, but there were

 8      individuals out.

 9   Q  What did you do in response to that, sir?

10   A  The first thing we did was, I went and checked on the

11      individual that was on the ground.

12   Q  Okay.  And what happened at that point?

13   A  He was unresponsive.

14   Q  And how was he laying there, sir?

15   A  He was laying face up.  His head was facing East.  His

16      feet were facing West.

17   Q  Okay.  And did it look, did it look like he had any

18      acute, or injury that you could see at that point?

19   A  Yes.  He had gunshot wounds on his body and head, I

20      believe.

21   Q  And were they visible to you, sir?

22   A  Yes.

23   Q  What did you do then, sir?

24   A  Got on the radio and asked for an EMS.

25   Q  I want to focus on the scene itself, sir.  What did you
```

-110-

1     do with the scene, regarding the scene at that point,

2     sir?

3  A  We parked our scout car East of the location blocking

4     off the area to prevent people from coming into the

5     scene.

6  Q  All right.  Was that a concern of yours at that point?

7  A  Yes.

8  Q  Okay.  Around the body of the unresponsive person that

9     you saw, was there other things of note that you saw

10    that you wanted to preserve?

11 A  Yes.

12 Q  What did you do in regards to that, sir?

13 A  There were shell casings there.

14 Q  So, how did you -- What did you do in order to preserve

15    that part?

16 A  We just blocked off the area and made sure no one

17    disturbed the shell casings or the body itself.

18 Q  Okay.  Focusing your attention, focusing your attention

19    to the deceased's body itself.  Was there anything else,

20    was there any other thing besides the shell casings

21    themselves that you noticed that was by him?

22 A  There was blood and there was a pair of glasses.

23 Q  That's what I wanted to ask you about, sir.  And what

24    was the condition of these glasses, sir?

25 A  They were mangled, tangled up.

-111-

1  Q    Okay.  And were they right by his body?

2  A    They were, they were very close to his body, yes.

3  Q    All right.  Thank you, sir.  Nothing else, your Honor.

4              MR. MOORE:  No questions.

5              THE COURT:  Thank you, sir.

6              (At 1:49 p.m. witness excused.)

7              THE COURT:  Call your next witness, please.

8              MR. PRASAD:  Officer Wiencek.

9              (At 1:50 p.m. witness OFFICER JAMES

10             WIENCEK was sworn.)

11             THE COURT:  Do you promise to tell the

12  truth?

13             THE WITNESS:  I do.

14             THE COURT:  Have a seat.

15             DIRECT EXAMINATION

16  BY MR. PRASAD:

17  Q    Sir, state your name, for the record, please.

18  A    James J. Wiencek, W-I-E-N-E-C-K.

19  Q    And where do you work?

20  A    Police officer, city of Detroit.

21  Q    And what's your current assignment, sir?

22  A    Cooperative Violence Reduction Partnership.

23  Q    And who is the partnership with?

24  A    It's a multi-jurisdictional, federally-funded task

25       force, primary partners being Detroit Police and Federal

-112-

```
 1        Bureau of Alcohol, Tobacco and Firearms & Explosives.
 2   Q    Very good, sir.  I want to take you back to May of last
 3        year, sir, May of 2010.  Were you given any information,
 4        sir, in actually April or May of 2010, regarding a
 5        suspect that you were trying to assist the apprehension
 6        of?
 7   A    Yes.
 8   Q    And, specifically, who is the suspect that you were
 9        trying to apprehend?
10   A    Deonte Howard.
11   Q    Okay.  In regards to Mr. Howard, sir, did you have
12        addresses that you were specifically trying to go to?
13   A    Yes.  Once I was apprised of the person that was, we
14        were looking for by Sergeant Mackie, who's the officer
15        in charge of the case, we did a CRISNET work-up, which
16        is the Detroit Police Department's reporting system, as
17        well as a LEIN work-up, which is Secretary of State
18        information and so on.  There was approximately five or
19        six addresses.  We had about five or six addresses we
20        developed.
21   Q    Okay.  Drawing your attention to those addresses, sir,
22        were there any of those addresses in the area of
23        Tireman, near the area of Tireman in the city of
24        Detroit?
25   A    Yes.  7480 Mansfield is about a block and a half South
```

```
1        of Tireman.

2   Q    And did you go to that address, sir?

3   A    Yes.

4   Q    And were you able to find anyone there?

5   A    Yes.

6   Q    And, specifically, sir, did you find anyone related to

7        Mr. Howard?

8   A    Yes.

9   Q    And who would that have been?

10  A    It was later identified to be the mother.

11  Q    Okay.  And, sir, just to be clear, of any of the five or

12       six addresses that you went to, did you ever come in

13       contact with Mr. Howard?

14  A    No.  I did not.

15                  MR. PRASAD:  Thank you, sir.

16                  MR. MOORE:  No questions.

17                  THE COURT:  Thank you, sir.

18                  (At 1:52 p.m. witness excused.)

19                  THE COURT:  Your next witness, please.

20                  MR. PRASAD:  Officer McNairy, your Honor.

21                  THE COURT:  Give your name to that young man

22       there, please.  Have a seat.

23                  OFFICER McNAIRY:  Thank you, sir.

24                  THE COURT:  I need you to take an oath.

25                  (At 1:53 p.m. witness OFFICER LeTRELLE
```

1                        McNAIRY was sworn.)

2                        THE COURT:  Do you promise to tell the truth

3        today?

4                        THE WITNESS:  I do.

5                        DIRECT EXAMINATION

6  BY MR. PRASAD:

7  Q    Officer, please state your name, for the record.

8  A    LeTrelle McNairy.

9  Q    Officer McNairy, where do you work?

10 A    Detroit Police Department.

11 Q    And what unit do you work in, sir?  Ma'am.

12 A    I'm assigned to the Crime Scene Unit.

13 Q    Ma'am, how long have you been with the Crime Scene Unit?

14 A    Eight years.

15 Q    Ma'am, I want to draw your attention to April of last

16       year, specifically April 10th of 2010.  Were you asked

17       to go out to an address on Tireman in the city of

18       Detroit?

19 A    Yes.  I was.

20 Q    And what was the reason for going to that address,

21       ma'am?

22 A    Responding to the scene of a double shooting.

23 Q    Okay.  Do you know approximately what time it was that

24       you arrived there, ma'am?

25 A    I would have to refer to my notes.

                              -115-

1  Q    Do you have them?

2  A    This is good.

3  Q    Hold on.  Ma'am, did you author an evidence tech report

4       in this case?

5  A    Yes.  I did.

6            MR. PRASAD:  May I approach the witness,

7       your Honor?

8            THE COURT:  You may.

9  Q    (By Mr. Prasad, continuing):  I'm going to hand you a

10      five, actually a four-page report.  Can you look at that

11      and see if you recognize that?

12 A    Yes.  I do.

13 Q    And on there, ma'am, does it indicate the time that you

14      arrived at the scene?

15 A    Yes.  I arrived at 6:15 p.m.

16 Q    Okay.  Thank you.  When you arrived, ma'am, was it still

17      daylight out there?

18 A    Yes.  It was.

19 Q    When you arrived at the scene, ma'am, do you start

20      working on your own or do you work under the supervision

21      of someone else?

22 A    Well, I'm directed to what's going on and I'm advised as

23      to what evidence needs to be collected and what areas I

24      should pay attention to.

25 Q    Do you recall who it was that advised you or directed

-116-

1      you on that day, ma'am?

2   A   It was several officers from homicide that day.

3   Q   Okay.

4   A   I believe I received all my direction from Investigator

5      Simon.

6   Q   Okay.  One of the homicide officers there?

7   A   Yes.

8   Q   Okay.  And, specifically, ma'am -- Excuse me.  Describe

9      to the jury what it is, in general, that you're trying

10      to do when you come to a scene?

11  A   I respond to the crime scene.  I look over, I do an

12      overview of the crime scene.  I look at the evidence

13      that is to be collected.  I collect the evidence.  I

14      preserve crime scenes.  I take photographs and sketch

15      the crime scene.  I take notes and later make a report.

16  Q   Regarding this specific crime scene, ma'am, did you have

17      an opportunity to try to create a sketch of the

18      evidence?

19  A   Yes.  I did.

20           MR. PRASAD:  Okay.  May I approach, your

21      Honor?

22           THE COURT:  Mm-hmm.  You may.

23  Q   (By Mr. Prasad, continuing):  I'm going to hand you

24      what's been pre-marked as People's Proposed Exhibit

25      Number Forty-Nine.  Do you recognize that, ma'am?

1  A    Yes.  I do.

2  Q    What is People's Proposed Exhibit Forty-Nine?

3  A    A sketch that was made of the location.

4  Q    And who created that sketch?

5  A    I did.

6  Q    Is that a fair and accurate representation of the sketch

7       you created in this case?

8  A    Yes.  It is.

9  Q    And just to be clear, this sketch is not to scale.

10  A   That's correct.

11           MR. PRASAD:  Okay.  Your Honor, at this

12      time, the People would seek to admit this into evidence

13      as People's Forty-Nine.

14           MR. MOORE:  No objection.

15           THE COURT:  It'll be received.

16           (Whereupon People's Exhibit Number Forty-

17            Nine was received into evidence.)

18  Q   (By Mr. Prasad, continuing):  Thank you, ma'am.  If I

19      can take that back from you.  Can you see that, ma'am?

20  A   Yes.

21  Q   Okay.  I'm going to give you a laser pointer.  Please

22      use the red button on top to utilize the laser pointer.

23  A   Okay.

24  Q   Explain to the jury, if you would, ma'am, what it is

25      you're trying to capture or show in this sketch?

-118-

1  A    This is the diagram of the location at 16228 Tireman.

2       In the upper righthand corner of the diagram, this

3       indicates North.  North is showing the direction, that

4       being North, South here, East back this way and then

5       West.

6              And it represents the scene as I saw it.

7       Evidence, these are placards, numbered placards that's

8       placed on the evidence.  Down there is the sketch legend

9       that tells you what each number is.

10 Q    Does that also correspond, ma'am, to, in the photographs

11      that we see the little, yellow placards with the numbers

12      on them?

13 A    That's correct.

14 Q    Okay.  Those are the exact same numbers as you have here

15      on the sketch?

16 A    Yes.  It is.

17 Q    All right.  Very good.  Thank you, ma'am.  So, then,

18      Officer McNairy, after you're able to document the scene

19      and make your sketch, do you also get a chance to

20      actually collect the evidence in the case?

21 A    Yes.  I collect the evidence.

22 Q    And is that your specific job, ma'am, to collect the

23      evidence?

24 A    Yes.  It is.

25 Q    Okay.  What do you do when you collect the evidence?

1  A    The evidence is -- I collect it and it's placed on an

2       evidence tag.  Then it's placed in the proper envelope

3       for whatever type of evidence that I have collected.

4       And then it's sealed and it's turned over to the

5       homicide section.

6  Q    Now, when you put something in an envelope, do you

7       create a unique tag for every evidence you're

8       collecting?

9  A    Yes.  I do.

10 Q    And do you sign the information to know that you're the

11      one that collected it?

12 A    Yes.

13 Q    And part of this information, ma'am, do you also provide

14      a general description of what's inside?

15 A    That's correct.  I do.

16 Q    Okay.  I'm going to hand you what's been pre-marked

17      People's Proposed Exhibits Fifty through Sixty-Three.

18      Just briefly look at those, ma'am, if you would.

19              MR. MOORE:  What numbers were those?

20              MR. PRASAD:  Fifty through Sixty-Three.

21              THE WITNESS:  Okay.

22 Q    (By Mr. Prasad, continuing):  Ma'am, do you recognize

23      what's marked People's Proposed Exhibits Fifty to Sixty-

24      Three?

25 A    Yes.  I do.

-120-

```
 1  Q    And how do you recognize them, ma'am?
 2  A    The evidence tag that's placed on each envelope with my
 3       signature and my pension number.
 4  Q    Okay.  And each one of those contains what type of item?
 5  A    You want the number and--
 6  Q    (Interposing)  No.  No.  I just want to know like the
 7       description you have on each tag.
 8  A    Shell casings.
 9  Q    Okay.  And if you would look, are all, Fifty through
10       Sixty-Three, different shell casings you took from the
11       scene?
12  A    I'd have to look at all of them again.
13  Q    Just look at them one at a time.  Just look at them to
14       yourself and make sure that's correct.
15  A    They're all the same caliber.  Yes.
16  Q    Okay.  And so, would these be the fourteen shell
17       casings, ma'am, that you took from the scene on April
18       10th of 2010?
19  A    Yes.
20            MR. PRASAD:  Your Honor, at this time, the
21       People would seek to admit these into evidence as Fifty
22       to Sixty-Three.
23            MR. MOORE:  No objection.
24            THE COURT:  They'll be received.
25            (Whereupon People's Exhibits Fifty
```

-121-

1           through Sixty-Three were received into

2           evidence.)

3                MR. PRASAD:  Thank you.

4  Q   (By Mr. Prasad, continuing):  Similarly, ma'am, I want

5      to show you People's Proposed Exhibits Sixty-Four

6      through Sixty-Seven.

7  A   Okay.

8  Q   Do you recognize People's Proposed Exhibits Sixty-Four

9      through Sixty-Seven?

10 A   Yes.  I do.

11 Q   How do you recognize them, ma'am?

12 A   The evidence tag that's placed on the envelope with my

13     signature and my pension number.

14 Q   Okay.  And similarly, ma'am, are these, are these four

15     items bullet or bullet type fragment items that you took

16     from the scene on April 10th of 2010?

17 A   Yes.  They are.

18                MR. PRASAD:  Your Honor, at this time, the

19     People would seek to admit these into evidence as

20     People's Exhibits--

21                THE COURT:  (Interposing)  Any objection,

22     sir?

23                MR. MOORE:  No objection at this time,

24     Judge.

25                MR. PRASAD:  Sixty-Four through Sixty-Seven.

-122-

1      Thank you.

2                          (Whereupon People's Exhibits Sixty-Four

3                          through Sixty-Seven were received into

4                          evidence.)

5   Q   (By Mr. Prasad, continuing):  Finally, Officer McNairy,

6       in addition to that, to the shell casings and the bullet

7       fragments themselves, did you have an opportunity to

8       take any other items, like a cell phones or sunglasses

9       into evidence?

10  A   Yes.  I did.

11  Q   Okay.  And did you use the same method as we've

12      described, put them into individual evidence tags?

13  A   Yes.  I did.

14  Q   All right.  And all this was documented with

15      photographs, ma'am?

16  A   Yes.

17                      MR. PRASAD:  Thank you, officer.  Nothing

18      else, your Honor.

19                      CROSS-EXAMINATION

20  BY MR. MOORE:

21  Q   Good afternoon, officer.

22  A   Good afternoon, sir.

23  Q   In looking at your, your sketch you only had three

24      bullet fragments on the scene, correct?

25  A   Referring to my report.

-123-

1   Q      Yup.

2   A      Yes.

3   Q      Okay.  So, at some point in time, you received a bullet

4          fragment from the medical examiner's office?

5   A      No, sir.

6   Q      A bullet?

7   A      No, sir.

8   Q      Okay.  All right.  So, these are just fragments?

9   A      Yes.  From the scene.

10                  MR. MOORE:  Okay.  Thank you.  No other

11          questions.

12                  MR. PRASAD:  Nothing else.

13                  THE COURT:  Thank you, ma'am.

14                  THE WITNESS:  Thank you, sir.

15                  (At 2:02 p.m. witness excused.)

16                  MR. PRASAD:  Judge, if I may, for the

17          record.  Because counsel and I -- I don't remember -- I

18          thought I did, but I'm moving for the admission of the

19          sketch as well, Number Forty-Nine.

20                  MR. MOORE:  No objection.

21                  THE COURT:  It'll be received.

22                  (Whereupon People's Exhibit Number Forty-

23                  Nine was received into evidence.)

24                  THE COURT:  Young man, how are you today?

25                  INVESTIGATOR LOVE:  Great, sir.

-124-

```
1                    THE COURT:  Great.
2                    (At 2:03 p.m. witness OFFICER INVESTIGATOR
3                    LOVE was sworn.)
4                    THE COURT:  Do you promise that your
5      testimony today will be truthful?
6                    THE WITNESS:  Yes, sir.
7                    THE COURT:  Thank you.
8                    DIRECT EXAMINATION
9  BY MR. PRASAD:
10 Q    Sir, please introduce yourself to the jury.
11 A    My name is Myron Love.  I'm an investigator with the
12      Detroit Police Department.
13 Q    And which unit are you in currently, sir?
14 A    Homicide.
15 Q    And how long have you been with the homicide unit, sir?
16 A    Five years.
17 Q    Sir, I want to take you back to April of last year, sir,
18      April 10th of 2010.  At that time, sir, were you working
19      on a squad with Sergeant Mackie and Sergeant Lalone?
20 A    Yes.
21 Q    Did you become involved in the investigation of the
22      death of Tyrone Simpson?
23 A    Yes.
24 Q    What was your involvement, sir?
25 A    I was part of the squad and I was given a photo array to
```

-125-

```
 1        show to -- I think his name was Davenport.  And I did do

 2        that.

 3   Q    Was it Mr. McFadden?

 4   A    McFadden, I'm sorry, was the name.

 5   Q    A white gentleman?

 6   A    Yes.

 7   Q    An older white gentleman?

 8   A    Yeah.  He had sunglasses on yesterday.

 9   Q    Okay.  In regards to Mr. McFadden, sir, I guess we need

10        to narrow down a time frame.  At the time that you were

11        given the photo array, sir, do you know who the suspect

12        was at this point?

13   A    Yes.

14   Q    Who was the suspect at that point?

15   A    It was the young man sitting at counsel's table.

16   Q    Okay.  Do you remember when it was, sir, that you did

17        the photo array?

18   A    The exact day, no, sir.

19   Q    Do you know how soon after the incident it was?

20   A    I would only be estimating.  It was a few days

21        afterwards.

22   Q    Okay.  The reason I'm asking, sir, is that, at some

23        point, there were two different suspects involved in

24        this case.  Do you know if you part of the first or the

25        second suspect?
```

1  A    I believe was part of the first subject.

2  Q    Okay.  And that's why I was asking that question.

3  A    Okay.

4  Q    Tell us about the circumstance of showing the photo

5       array to Mr. McFadden?

6  A    I had the photo with six individual people, sheet of

7       paper about this big.  Sergeant Lalone and I went in the

8       house and we spoke to Mr. McFadden, requested that he

9       look at the photo array and if he saw anybody that he

10      knew or recognized from that incident to point him out.

11      Mr. McFadden picked out three different people.

12  Q   Okay.  And what did you decide to do at that point, sir?

13  A   Well, at that point, Sergeant Lalone and I left.

14  Q   Okay.  Now, just so we're clear, in these photo arrays,

15      of the six different photographs, there's only one

16      actual target or person that you believe may or may not

17      be involved?

18  A   That's correct.

19  Q   Who are these other five people?

20  A   That's different people that we had, that might have

21      been locked up.  And we try to narrow it down as close

22      to the individual that we're looking at so if the person

23      recognizes the person, they recognize them.  If he

24      don't, he wouldn't.

25  Q   But is this, these other five individuals related to

-127-

1      what you're investigating?

2  A    No.  Just one individual suspect.

3  Q    Okay.

4  A    Per six.

5                   MR. PRASAD:  Okay.  Thank you, investigator.

6                   CROSS-EXAMINATION

7  BY MR. MOORE:

8  Q    Regarding this photo array, Mr. Howard was not in the

9       photo array, is that correct?

10 A    I'm not really positive.  I know I was part of the first

11      one and I think it was two individuals that they wound

12      up looking at.

13 Q    Okay.  Would the name Deonte Miller be, sound familiar?

14 A    To me, no, sir.

15 Q    Okay.  Do you have a copy of the photo array?

16 A    No.

17 Q    Okay.  Do you have anything, any paperwork anywhere in

18      the world to suggest Mr. McFadden picked out Mr. Howard

19      in the photo array?

20 A    No, sir.

21 Q    Okay.  And had Mr. McFadden picked out Mr. Howard, you

22      would have documentation of the same, is that correct?

23 A    Yes.

24                   MR. MOORE:  Okay.  Thank you very much.

25                   THE COURT:  Anything more?

                              -128-

```
 1                    MR. PRASAD:  No.

 2                    THE COURT:  Thank you, Mr. Love.

 3                    (At 2:07 p.m. witness excused.)

 4                    (At 2:08 p.m. witness INVESTIGATOR BARBARA

 5                    SIMON was sworn.)

 6                    THE COURT:  Do you promise that your

 7       testimony today will be truthful?

 8                    THE WITNESS:  I do.

 9                    THE COURT:  Thank you.  Please have a seat

10       in the witness chair.

11                    DIRECT EXAMINATION

12  BY MR. PRASAD:

13  Q    Ma'am, please introduce yourself to the jury.

14  A    My name is Barbara Simon.

15  Q    And where do you currently work?

16  A    For the Attorney General's Office.

17  Q    And as of earlier this year, where did you work before

18       that?

19  A    Detroit Police Department.

20  Q    And how long were you with the Detroit Police

21       Department?

22  A    Thirty-two and a half years.

23  Q    What was your last assignment with Detroit Police

24       Department?

25  A    Homicide.
```

-129-

1    Q     And how long were you in the homicide unit?

2    A     Seventeen and a half years.

3    Q     Okay.  I want to take you back to April of last year,

4          specifically April 10th of 2010.  Did you have an

5          occasion to go to a scene located on Tireman here in the

6          city of Detroit with Sergeant Lalone and investigator,

7          excuse me, Officer Brooks from the homicide unit?

8    A     It was Sergeant Lalone.  I don't remember Officer Brooks

9          being there.

10   Q     Okay.  You were there with Sergeant Lalone?

11   A     That's correct.

12   Q     Okay.  And arriving to that scene, ma'am, did you --

13         What did you do when you got to the scene?  What was

14         your assignment?

15   A     Once we got to the scene, we talked to the responding

16         officers to get the information what happened and then

17         we started interviewing witnesses.

18   Q     And did you have the opportunity to interview witnesses,

19         ma'am?

20   A     Yes.

21   Q     And specifically, did you interview witnesses that were

22         still around on the scene at the time?

23   A     That's correct.

24   Q     Do you recall, ma'am, who some of those witnesses were?

25   A     It was an elderly -- Well, middle-aged gentleman.  I

1      forgot his name.  He was on his porch.  He witnessed it.

2      And also, I think the gentleman's name was Bobby Bailey.

3  Q   Okay.  I'm going to ask you about both of them, ma'am.

4      Starting with People's Exhibit Number Nineteen.  Do you

5      see that, ma'am?

6  A   Yes.

7  Q   Who are the two individuals in that photograph?

8  A   Myself and the gentleman that stayed at this house.

9  Q   You mean the one that was across the street?

10 A   That's correct.

11 Q   Okay.  And this is actually a picture, I believe, while

12     you were interviewing Mr. Harris?

13 A   Yes.

14 Q   Okay.  I'm sorry.  I got it.  Now, let's talk about Mr.

15     Bailey, ma'am.  You did an initial interview with Mr.

16     Bailey?

17 A   Yes.

18 Q   After that initial interview, ma'am, did you have reason

19     to bring Mr. Bailey back in for another, a second

20     interview in the precinct?

21 A   Yes.

22 Q   Tell us about that circumstance of that second

23     interview, please.

24 A   I had received information that Mr. Bailey knew more

25     about the fatal shooting than he had told the first

-131-

```
 1      time.  So, we went back out there and brought him in.
 2  Q   Now, why bring him in as opposed to interviewing him
 3      again outside at the area?
 4  A   Because he said he didn't want to talk at the store.  It
 5      was people in the store.
 6  Q   Okay.  So, where did you bring him to?
 7  A   Homicide.
 8  Q   And where, where was homicide located back in April?
 9  A   Lesure and Grand River.
10  Q   All right.  Was he under arrest at this point?
11  A   No.
12  Q   Now, what was the tenor of your interview with him?
13  A   To find out exactly information that he knew about the
14      homicide.
15  Q   And how was the tone of this interview?
16  A   Normal.
17  Q   Did you threaten him, ma'am?
18  A   No.
19  Q   Did you yell at him?
20  A   No.
21  Q   Did you say you were going to charge him with conspiracy
22      if he didn't comply?
23  A   No.
24  Q   Was Mr. Bailey able to give you a full statement that
25      second time, ma'am?
```

-132-

```
 1  A     Yes.  He gave a statement.

 2  Q     And did he sign the statement that you took with him?

 3  A     Yes.

 4                   MR. PRASAD:  I have nothing else, your

 5        Honor.

 6                   MR. MOORE:  No questions.

 7                   THE COURT:  Thank you much.

 8                   (At 2:12 p.m. witness excused.)

 9                   MR. PRASAD:  Finally, Judge, we're going to

10        recall Sergeant Mackie.

11                   THE COURT:  If you'd like.

12                   MR. PRASAD:  Thank you.

13                   THE COURT:  So, Mr. Mackie, how long does an

14        oath last?

15                   THE WITNESS:  Forever, sir.

16                   THE COURT:  Okay.

17                   (At 2:12 witness SERGEANT SAMUEL MACKIE

18                   having been previously sworn took the

19                   witness stand and proceeded to testify

20                   as follows.)

21                   THE COURT:  Some people think it wears out

22        overnight and you have to swear people in the next day.

23        Just checking.

24                   DIRECT EXAMINATION

25  BY MR. PRASAD:
```

1  Q    Sergeant, I'm not going to do the introductions again.

2       We already remember who you are.  I want to jump back to

3       a couple of issues that we've discussed today so we can

4       go right to them.

5                 First, I want to show you People's Proposed

6       Exhibits Sixty-Eight, Sixty-Nine and Seventy.  Do you

7       recognize these, sir?

8  A    These are the three bullets I picked up from the Wayne

9       County Medical Examiner's Office that were taken during

10      the autopsy of Tyrone Simpson.

11 Q    And the red evidence tag is what you actually filled out

12      and signed, sir?

13 A    That's correct.

14                MR. PRASAD:  Okay.  Your Honor, at this

15      time, the People would seek to admit this into evidence

16      as People's Sixty-Eight, Sixty-Nine and Seventy.

17                MR. MOORE:  No objection.

18                THE COURT:  They will come in without

19      objection.

20                (Whereupon People's Exhibits Sixty-

21                Eight through Seventy were received

22                into evidence.)

23 Q    (By Mr. Prasad, continuing):  And, sir, just to ask the

24      follow up question that we were -- I think we mentioned

25      this briefly yesterday.  But all these tagged items that

1      we have put into evidence now, I think their numbers are

2      Fifty-through Seventy, are these the exact items that

3      you submitted to the Michigan State Police?

4   A   That's correct.

5   Q   And those were the items that Lieutenant Crump would

6      have looked at?

7   A   That's correct.

8   Q   Very good.  The other issue, sir, that I wanted to ask

9      you about now was the circumstances of the live line-up

10     with Mr. Allen.  Sir, is there any documentation you do

11     when you're conducting a live line-up that records the

12     live line-up?

13  A   Yes.  There's a form called show-up sheet, we call it.

14  Q   Who filled that out, sir?

15  A   The one doing the line-up.  I would be the one filling

16     it out.

17              MR. PRASAD:  Okay.  May I approach, your

18     Honor?

19              THE COURT:  You may.

20  Q   (By Mr. Prasad, continuing):  I'm going to hand you

21     People's Proposed Exhibit Number Seventy-Two.  Do you

22     recognize this item?

23  A   Yes.  That's the form that's titled show-up and photo

24     identification record.  That's a standardized Detroit

25     Police Department form that we use when we're doing

```
 1       line-ups, live line-ups.
 2   Q   And what's the purpose of the form, sir?
 3   A   To make a written record of what's going on during the
 4       line-up and who was involved in the line-up and those
 5       that are present.
 6   Q   Are you also trying to record the actual identification
 7       if there is one?
 8   A   Yes.
 9   Q   And do you do that with the person who is actually
10       looking at the line-up?
11   A   That's correct--
12   Q   (Interposing)  How -- I was just going to say, how do
13       you do that?
14   A   If the person makes an identification, whatever they
15       say, if they identify somebody by number and what, the
16       person that they're identifying, what their role was,
17       that's what we'll write down on the sheet and have that
18       person sign it.  And if it's a negative ID where they
19       didn't pick anybody, it'll say no ID made.
20   Q   All right.  Sir, did you do that in this case with Mr.
21       Allen?
22   A   Yes.  I did.
23   Q   And is that the actual document that you used?
24   A   Yes.  That's the original.
25                   MR. PRASAD:  All right.  Your Honor, at this
```

1      time, the People would seek to admit this into evidence

2      as Number Seventy-Two.

3                    MR. MOORE:  No objection.

4                    THE COURT:  It'll be received.

5                    (Whereupon People's Exhibit Number

6                    Seventy-Two was received into evidence.)

7   Q   (By Mr. Prasad, continuing):  Sir, tell us about the

8      document, sir.  What information did you capsulize and

9      then later tell us about, the information that was

10     between yourself and Mr. Allen?  You want me to put it

11     up there?  Would that be easier?  Sergeant, can you see

12     that?

13  A   I can see that.

14  Q   Okay.  I'll give you the laser pointer.  Walk us through

15     the document, if you would, sir.

16  A   Okay.  This is, this is the date that the line-up was

17     viewed on, being May 13th, 2010.  Where it says

18     complainant or witness, that's the person viewing the

19     line-up, in this case where it says Aundrey Allen.  For

20     an address, I just write see file because that's

21     confidential.  And the location being the juvenile

22     detention facility.  And the case is assigned to myself,

23     Mackie.

24  Q   Now, underneath there, you have six names?

25  A   That's correct.

-137-

```
 1  Q    Was Mr. Allen privy to those names at all?
 2  A    No.  No.  He doesn't see the sheet until the line-up is
 3       concluded.
 4  Q    Okay.  And you also have an age and height and weight
 5       description, sir?
 6  A    That's correct.  Everything, including the name where it
 7       says age, height, weight, that's provided by the people
 8       standing in the line-up.  So, I don't know if that's
 9       their real name.  I don't know if that's their real age.
10       That's how tall they are, how much they weigh.  This is
11       just information they provide me when I ask them how old
12       are you, how tall are you, how much do you weigh and
13       what your name is.
14  Q    Okay.  And you did that for each one these six people?
15  A    Correct.  Except the only thing I didn't ask them is
16       what they were wearing.  That's my own observation.
17       Because they were all wearing the same garments.
18  Q    Okay.  Now, you have noted in brackets they're all in a
19       seated position?
20  A    Yes.  That's correct, on the left of the names.  Just
21       because in most line-ups they're standing.  On this
22       particular line-up, I had them all sitting down because
23       that evens the top of their heads out.
24  Q    Okay.
25  A    So, it doesn't matter if someone's a little bit taller
```

1        or a little bit shorter, if they were standing based on

2        their shoes or whatever else.  But when they sit down,

3        most people just, it would be even right across the

4        board.

5   Q    When you had Mr., when you brought Mr. Allen into that

6        room, were these six individuals already sitting?

7   A    They were already seated.

8   Q    Okay.  Now, tell us about the part at the bottom there?

9   A    Once the line-up was viewed and he made an

10       identification, his response was number two.  He's the

11       one -- And I asked him "What about number two?"  His

12       response is "He's the one who pulled out the gun and

13       started shooting".  And then he signs his name

14       underneath that.  But that's my handwriting.  That's his

15       signature based on what he tells me.

16  Q    Okay.  And that would have been filled out at that time?

17  A    Once the identification was made, at that time.

18  Q    Okay.  Now, you have two other places where you noted

19       the time on there, at the very top.  Do you see that,

20       sir?

21  A    At the very top, it says 12:49.

22  Q    And then at the very bottom, you have some times down

23       there as well?

24  A    12:40 to 12:50.

25  Q    Tell us about those.

-139-

1  A    So, 12:40 is when I enter the room and the people that

2       are sitting in the line-up are already in there.  And

3       that's when I begin the line-up process.  So, that's

4       when I began writing down everybody's description, based

5       on the information they've given me.  And also, I've got

6       to have the show-up attorney fill out this block right

7       here.  And then I filled out whoever else is

8       participating in the line-up.

9  Q    Okay.  And that total time of 12:40 to 12:50, is that

10      the total time of the whole line-up procedure?

11 A    That's correct.  It started, I started writing at 12:40.

12      And then the witness was brought into the room.  And the

13      exact time for the identification is up at the top of

14      the paper where it says 12:49.

15 Q    Okay.

16 A    That's when he made the identification.  I wrote out

17      what he said.  He signed it.  And then that's why it's

18      finished at 12:50.

19 Q    Very good, sir.  And sergeant, did you, in any way,

20      suggest to Mr. Allen who the person was to pick out?

21 A    No.  We were sequestered.

22 Q    What do you mean by you were sequestered?

23 A    The witness is in a separate room.  And then when the

24      suspect and the five other fillers come in the room to

25      do the line-up, the suspect's given a chance to sit

-140-

1        anywhere he wants to sit out of the six positions.

2                  So, once he makes that decision and that's

3        where he wants to stay, that's when I start filling out

4        all the paperwork so the witness doesn't know what's

5        going on and there's no way that I can say, hey, listen.

6        When you go in the room, you know, look at number one.

7        Because I don't know what number the person's going to

8        pick when they come in there to sit down.

9    Q   Is the witness part of any of this pre-identification

10       process at all?

11   A   No.  The witness is in a separate room.  The only person

12       in the room on my side of the glass is myself, the

13       attorney.  There's a defense attorney who's there to

14       make sure everything's done properly and that the

15       suspects rights aren't violated.  And the officer in the

16       line-up, where it says Police Officer Paul Smith, that's

17       the -- We have a police officer from Detroit Police

18       that's assigned to the youth home just for this reason,

19       for making sure the, like the liaison between the police

20       department and the youth home.

21                  MR. PRASAD:  Thank you, sergeant.  I have

22       nothing else, sir.

23                  CROSS-EXAMINATION

24   BY MR. MOORE:

25   Q   Sergeant, did you take...

                          -141-

1              MR. PRASAD:  Do you want this?  I can leave

2         this on, if you want.

3              MR. MOORE:  No.

4              MR. PRASAD:  Okay.

5    Q    (By Mr. Moore, continuing):  Sergeant, did you take a

6         photograph to preserve the individuals who were in the

7         line-up?

8    A    No.  We're not allowed to.

9    Q    You're not allowed to have a photograph of, after the

10        fact, of these were the people in the line-up, this is

11        where a defendant or a suspect was in the line-up

12        showing these were the people that were in the line-up?

13   A    No.  We're not allowed to bring camera phones, phones or

14        cameras into the youth home.

15   Q    But you're the police?

16   A    I don't make the policy.  They make their policy.

17   Q    So, you're telling you can show a photo array and have a

18        permanent record of the people who are in the photo

19        array, but you do a line-up at the youth home and you

20        don't have a permanent record to show these were the who

21        were in the line-up, this is how they were seated,

22        seated?  And if you said like they were pretty much all

23        even, we have an identification, via photograph, of your

24        testimony?  Is that what you're saying?

25   A    That's correct.  That's, that's the youth home's policy.

                              -142-

```
 1        That's not my policy.
 2  Q     You indicated that the attorney's there to make sure
 3        things are done correctly?
 4  A     That's correct.
 5  Q     Can they order you to do some things?
 6  A     Did they order me to do some things?
 7  Q     No.  Would I be correct to say they're there to observe
 8        the line-up?
 9  A     Yes.
10  Q     Okay.  Now, if they tell you to do X, Y, Z, they don't
11        have that authority.  Would that be accurate?
12  A     I wouldn't say they had, whether or not they had the
13        authority.  If they say there's something wrong with the
14        line-up, that's why they're there.  That's--
15  Q     (Interposing)  Well, they would--
16  A     (Interposing)  They might correct it.
17  Q     They would generally noted it on the photo sheet, if
18        they have a problem, right?
19  A     That's correct.  And they make themselves available.
20  Q     And, generally speaking, they're biggest then is to
21        observe and ask the suspect are you comfortable in
22        whatever position that you're in, bottom line, right?
23  A     They're there to observe and make sure it's done fairly
24        and make sure the suspect has that opportunity--
25  Q     (Interposing)  Understanding Mr. Howard's in seat number
```

-143-

1       two, the attorney would be able to go up to Mr. Howard

2       and say, hey, are you comfortable in two?  You want to

3       be in five?  You want to be in position six?  Or what

4       have you, correct?

5   A   I'm -- Are you saying is that what happened this

6       particular time?  I can't--

7   Q   (Interposing)  No.  We're just talking about generally

8       speaking, right?  How many line-ups have you done,

9       sergeant?  Just generally speaking.

10  A   At least fifty.

11  Q   Okay.

12  A   At least.

13  Q   And most of them are where, when you do those line-ups?

14  A   Wayne County Jail or--

15  Q   (Interposing)  Okay.

16  A   At the Detroit Police Department.

17  Q   And theoretically, the defense attorney is there for the

18      suspect, correct?

19  A   I don't understand.  The defense, the show-up attorney--

20  Q   (Interposing)  Is there for the suspect.

21  A   They're there to ensure the suspect's rights.  Yes.

22  Q   Well, okay.  If they've got a problem, they might write

23      something down, but basically they're there for the

24      suspect and tell them, hey, where you want to be at?

25      Are you comfortable here?  Because you don't place the

-144-

1       suspect in a particular spot, right?

2   A   No.  I don't.

3   Q   Okay.  So, they just check with the suspect, you like

4       where you're at?

5   A   Well, you're asking to speak on, on--

6   Q   (Interposing)  You've done--

7   A   (Interposing)  Other cases.  I don't understand--

8   Q   (Interposing)  No.  You've done about fifty line-ups,

9       right?

10  A   Yes.

11  Q   Okay.  Attorney's there, right?

12  A   That's correct.

13  Q   Attorney generally checks with the suspect, hey, are you

14      comfortable in whatever position you're in, right?

15  A   Some do.  Some don't.  But the choice is always given to

16      the suspect in front of the defense attorney, when I do

17      line-ups.  I can't speak for when other people do them.

18  Q   So, it's your testimony the policy of the youth home is

19      you can't photograph a line-up that's going to be used

20      in a criminal case for a juvenile who's brought over as

21      an adult in the court system, right?

22  A   That's correct.  At least as of the date of that--

23  Q   (Interposing)  Back in April--

24  A   (Interposing)  May 13th--

25  Q   (Interposing)  May.

-145-

1  A    2010.

2  Q    Just from the other day, we've had testimony that the

3       SUV I was asking you about, the maroon, the burgundy--

4  A    (Interposing)  Yes.

5  Q    Belonged to Mr. Simpson, correct?

6  A    That belonged to Mr. Simpson's girlfriend.

7  Q    Oh.  Okay.  All right.  And there was testimony about a

8       phone that was on the bumper, right?

9  A    And that belonged to Mr. Simpson.

10           MR. MOORE:  Okay.  Thank you.  You answered

11      the question.  No other questions.

12           THE COURT:  Anything more?

13           MR. PRASAD:  No, sir.

14           THE COURT:  Thank you, sir.

15           THE WITNESS:  Yes, sir.

16           (At 2:25 p.m. witness excused.)

17           MR. PRASAD:  Judge, at this point, the

18      People have no further witnesses.  There are three

19      stipulations that I have with counsel that I would like

20      to proceed on, if I may, your Honor.

21           THE COURT:  Please do.

22           MR. PRASAD:  First, your Honor, is People's

23      Proposed Exhibit Number Seventy-Three.

24           MR. MOORE:  Oh, yeah.

25           MR. PRASAD:  Judge, this is the laboratory

-146-

1    report regarding, done, conducted by Michigan State

2    Police by Detective Sergeant James Haywood, at latent

3    print, fingerprint report regarding all the, all the

4    firearms evidence that was submitted, basically saying

5    there's no -- It was processed with no latent prints

6    being developed.  In lieu of Mr. Haywood's testimony,

7    counsel and I are offering to stipulate to Mr. Haywood's

8    report.

9               MR. MOORE:  That would be correct.

10              THE COURT:  The report will be entered as

11   People's Exhibit Number?

12              MR. PRASAD:  Seventy-Three.

13              (Whereupon People's Exhibit Number Seventy-

14              Three was received into evidence.)

15              MR. PRASAD:  Finally, sir, the People and

16   defense counsel have entered into two other stipulations

17   as to specific facts in this case, Number Seventy-Four

18   and Seventy-Five, if I may read them into the record,

19   your Honor.

20              THE COURT:  Would you, please?

21              MR. PRASAD:  Number Seventy-Four:

22              "Stipulation.

23              Both parties, the defendant, his counsel of

24              record and the People of the state of

25              Michigan stipulate that the latent prints

-147-

1                    taken from the GMC Suburban by Officer

2                    Eugene Fitzhugh were submitted to the

3                    Detroit Police Department latent print

4                    section and no usable prints were found.".

5                    MR. MOORE:  That would be a correct

6          stipulation.

7                    THE COURT:  As to Seventy-Four.

8                    MR. PRASAD:  And there's two other little,

9          bitty lines to that, sir, if I may.

10                   THE COURT:  Okay.

11                   MR. PRASAD:  "Both parties further stipulate

12                   the blue jeans tested by Lieutenant Jeff

13                   Crump of the Michigan State Police

14                   Department belonged to Aundrey Allen.  And

15                   both parties further stipulate the T-shirt

16                   tested by Lieutenant Jeff Crump of the

17                   Michigan State Police Department belong to

18                   Tyrone Simpson."

19                   MR. MOORE:  That would be a correct

20         stipulation.

21                   THE COURT:  It'll be received.

22                   (Whereupon People's Exhibit Number Seventy-

23                   Four was received into evidence.)

24                   MR. PRASAD:  Finally, sir, People's Exhibit

25         Number Seventy-Five:

-148-

```
 1                    "Stipulation
 2                    Both parties, the defendant, his counsel of
 3                    record and the People of the state of
 4                    Michigan stipulate that the Samsung cell
 5                    phone found at the scene across the street
 6                    from 16228 Tireman on April 10th of 2010,
 7                    labeled as item number one by evidence tech
 8                    Letrelle McNairy was registered to Deonte
 9                    Miller by Metro PCS.  Both parties further
10                    stipulation that the same cell phone, upon
11                    investigation of its contents and records,
12                    belonged to Defendant Deonte Howard.".
13                    MR. MOORE:  What exhibit was that?
14                    MR. PRASAD:  Number Seventy-Five.
15                    THE COURT:  Seventy-Five.
16                    MR. MOORE:  That would be a correct
17          stipulation.
18                    THE COURT:  It'll be received then.
19                    (Whereupon People's Exhibit Number Seventy-
20                    Five was received into evidence.)
21                    MR. MOORE:  What were the jeans and T-shirt?
22                    MR. PRASAD:  That was Seventy-Four.
23                    MR. MOORE:  Okay.  All right.  Thank you.
24                    MR. PRASAD:  Your Honor, at this time, the
25          People rest.
```

1                    THE COURT:  What's your pleasure, Mr. Moore?

2                    MR. MOORE:  At this time, the defense would

3          rest, your Honor.

4                    THE COURT:  Okay.  Are you all ready to

5          listen to closing statements?  Or do you want to take a

6          break?  Or do you need to caucus to let me know what you

7          want to do?  Sir, if you please.

8                    MR. PRASAD:  Thank you.

9                    CLOSING ARGUMENT

10    BY MR. PRASAD:

11                    MR. PRASAD:  Ladies and gentlemen, thank

12         you.  First off, I want to start off by thanking you

13         both for, both for your patience yesterday and today.

14                    I'm going to try to do this with the lights

15         on.  Deputy, could I ask you just to turn off the rim

16         lights maybe?  Maybe that'll help us when we do this.

17         Thank you, sir.

18                    So, here's the part where we give our

19         closing arguments.  And the case is soon going to be in

20         front of you for you to decide soon.  As the Judge told

21         you from the get to, your role in this case, first and

22         foremost, is to decide what happened on April 10th of

23         2010.

24                    So, the analysis in this case is going to

25         come through seven different things.  As the Judge has

                              -150-

1     told you several times already, and I'm sure he'll tell

2     you again, the burden is on my side.  There's no doubt

3     about it.  I have to prove to you beyond a reasonable

4     doubt the elements of the crime.  And that's the first

5     thing I want to highlight.

6              The Judge is going to read to you what the

7     elements of the crime are.  Understand that is what I

8     have to prove to you beyond a reasonable doubt.  Nothing

9     else.

10             Where does that come into play?  As we

11    discuss things and as you start discussing the facts

12    amongst yourselves, you're going to realize that, quite

13    truly, there is discrepancies in the evidence as about

14    to what someone might have observed from one, from one

15    position or another.  There's also discrepancies in the

16    evidence in terms of what one witness might have said

17    today versus what he might have said previously.

18             I'm not about to hide any of those facts.

19    I'm not trying to hide any of those facts.  But what I

20    want you to understand is I don't have to prove every

21    fact beyond a reasonable doubt.  I have to prove the

22    elements beyond a reasonable doubt.

23             So, for example, when Mr. Allen today says

24    he saw three individuals and not Freak get into a car

25    and when he might have said in the past that he saw

-151-

1      Freak get into the car and, you know, the other three

2      individuals walking away, or however way it's reversed,

3      that's not a fact I have to prove to you beyond a

4      reasonable doubt.

5              So, when we're looking at first degree

6      premeditated murder, what is that I have to prove to you

7      beyond a reasonable doubt?  And how is this going to be

8      what you're looking at?

9              There's also, besides first degree

10     premeditated murder, there's one other thing that I want

11     you to think about that the Judge is going to instruct

12     you on.  And that's the instruction on identification.

13             I have to prove to you, and this makes

14     absolute sense, the identification beyond a reasonable

15     doubt.  Right?  I have to prove to you that Deonte

16     Howard is the one that committed this crime beyond a

17     reasonable doubt.  Those are really going to be the two

18     key issues that you're going to have to decide in this

19     case.

20             It's -- The first question is did the

21     evidence convince you beyond a reasonable doubt that

22     Deonte Howard was the one that had that gun, was pulling

23     the trigger?  And the second question is, if you agree

24     that he is, beyond a reasonable doubt, the person that

25     was pulling the trigger, the second question is was it

1       first degree premeditated and deliberate murder?  So,

2       I'm going to take those in two different steps.

3              The first step is the identification.

4       Here's the interesting thing about the evidence as far

5       as identification, is that we have witnesses from almost

6       every angle of this case.  Right?  We've got witnesses

7       who were standing behind the victim.  We've got

8       witnesses who were standing on the side of the victim.

9       We've got witnesses who were living across the street.

10      And we've got a witness who was down the street and came

11      up.  So, we have a witness on almost every different

12      angle or side of the case.

13             Admittedly, the witnesses came at different

14      moments in time.  Right?  We've got two witnesses, Mr.

15      Bailey and Mr. Allen, who were there prior to the

16      shooting starting.  And once the first two shots ran

17      out, they were gone.  And they can't really tell you

18      much about what happened after that.

19             Then we've got witnesses who were either

20      across the street or down the street who can't tell you

21      about the first stuff.  They really don't know much

22      about the first shots.  Because that's what drew their

23      attention.  But they can tell you about what happened

24      after the first initial shots.  But what is absolutely

25      consistent about all five of those witnesses?  We're

                              -153-

1      talking five.  Deonte Howard was the one with the gun

2      who pulled the trigger.

3              But we're not just relying on that by

4      itself.  I'm not asking you just to say that alone is

5      the whole thing.  Tay, the shooter, Tay, was looking for

6      his phone.  Tay went back to that scene to get his

7      phone.  The whole reason he came back there, because he

8      forgot his phone.  You have it right now in evidence

9      right there and it's written down for you, People's

10     Exhibit Number Seventy-Four or Five.  I forgot which one

11     it was.  I think it's Seventy-Five, People's Exhibit

12     Number Seventy-Five.

13             That cell phone that we're talking about,

14     that cell phone that was across the street, the one that

15     you have pictures of -- In fact, it's right here in

16     Exhibit Number, People's Exhibit Number Three, that cell

17     phone, number one that's found across the street, you

18     put that together with the stipulation in People's

19     Exhibit Number Seventy-Five, that's the cell phone that

20     we're talking about.  That's Tay's phone.  That's why

21     the shooter came back to the scene.  And as the

22     stipulation tells you, that's Deonte Howard's cell

23     phone.

24             So, I'm not asking you just to listen to

25     just the live testimony, just the witnesses who were

1     there, I'm asking you to put that together with the
2     evidence left at the scene.
3              What else can we look at about this
4     identification?  What else can we say about this
5     identification?  Let's look at the conditions that the
6     identification was made in.  We're talking about broad
7     daylight.
8              There's no issue about people not being able
9     to see.  We're talking about people who had either good
10    vision or their corrective lenses on.  We're not talking
11    about a situation where someone's without their glasses.
12             We're talking about people who had excellent
13    vantage points to being able to see.  Let me show you a
14    different photograph, if I can.  Actually, I'll show you
15    a couple, a series of photographs.  I want to show you
16    Number Eighteen, Mr. Harris sitting on his front porch.
17             The reason I wanted to show you this
18    photograph and the reason this photograph is helpful is
19    that it shows you quite clearly Mr. Harris' window, his
20    big window that he's able to look out of.
21             If you add that together -- And this is the
22    beauty of it all, is at this point you get to put all
23    the evidence together.  And this is what we're here to
24    help you do.
25             Because, you know, trials are not like TV

1    and trials are not like movies.  In movies and TV, you

2    get a big, panoramic view of everything as it's coming

3    across and you get to see everything woven together so

4    nicely.  Trials, things come up piecemeal.  And you have

5    to weave them together yourself.  And that's what I'm

6    trying to help you do.  But let's weave some of these

7    photographs together.

8            After looking at that big bay window, let's

9    consider his angle of what he's able to see.  This is

10   People's Exhibit Number Four.  This is the angle --

11   That's not four.  That is Four.  Okay.  He's able, this

12   is the angle that Mr. Harris said.  Mr. Harris even told

13   you that that is the, that's about the right angle, but

14   he even had a better view than this of what he was

15   seeing.  And we can see it here.  Broad daylight,

16   nothing blocking his view of what he's seeing right

17   there out in front of the store.

18           And then when I asked Ms. Foster -- I'm

19   sorry, not Ms. Foster.  Ms. Thompson, on People's

20   Exhibit Number Fourteen, I can barely read Tim's

21   handwriting, on People's Exhibit Number Fourteen, I

22   asked Ms. Thompson about this photograph right here.

23   Because this photograph encompasses two very big facts.

24           It encompasses the blood spot where the

25   victim was ultimately killed in this case and it also

-156-

1    encompasses that house.  You've got the angle -- And

2    admittedly, this is a bit farther back.  I mean, she

3    actually has a closer view than this.  But it shows the

4    angle.

5              And, actually, when you get a chance to look

6    at this photo up close, which you guys will have a

7    chance during the, you'll look at it in the jury room,

8    you're going to see one very key fact.  You're going to

9    see how these blinds are easily open and how clear and

10   open that view is.

11             Ladies and gentlemen, Ms. Thompson and Mr.

12   Harris had a very clear view that day of who committed

13   this crime.  They had a very clear view of what they

14   could see.  And they saw Mr. Howard.

15             You have, in addition to that, you have the

16   testimony of Mr. McFadden.  Mr. McFadden has two

17   photographs.  I think we pretty much made these pretty

18   clear as to establishing his location and vantage point.

19   People's Exhibit Number One, People's Exhibit Number

20   Two.

21             Number One shows us the fence quite clearly

22   and how close it is.  But you get an even better view of

23   that in People's Exhibit Number Two because this is

24   taken from just behind that fence line.  The fence line

25   would be parallel to the pole and you're about two or

-157-

1     three feet behind that from where this photograph was

2     taken.

3              So, you actually get a slightly, if you can

4     imagine, a slightly better view than this is from where

5     Mr. McFadden's clearly able to see what's going on right

6     in front of him.

7              Now, this brings me to a point that I don't

8     want to, I don't want to lose sight of.  Mr. McFadden's

9     testimony and Mr. Harris' testimony and Ms. Thompson's

10    testimony did slightly differ.  Right?  There's no

11    question that, in general, they saw the same thing.

12    And, in general, they were able to describe the same

13    thing.  But to some slight details, they did differ.

14             Judge Morrow talks about, throughout this

15    whole trial, about reasonableness and common sense,

16    reasonableness and common sense.  Here's my first

17    question to you.

18             If you have a group of people, five, ten,

19    fifteen, twenty, seeing the same thing, might be

20    watching the same thing from different angles and

21    focusing on different things that are going on at the

22    same time, would you expect their memory to be exactly

23    the same or would you expect their memory to be slightly

24    different?

25             The example I always like to bring up is

1    imagine a football game, a high school football game.

2    You have hundreds, you know, maybe even a thousand

3    people that are in the stands watching a game.  They're

4    all on different sides watching different things.

5    They're at different lengths of the field watching

6    different things, but they're all watching the same

7    plays.

8               If you ask each and every one of them to

9    tell you afterwards what happened at a specific time or

10   a specific time frame of five, ten, fifteen minutes, do

11   you think you're going to get the exact, same answer?

12   Do you think the details are going to match up?  I'll

13   tell you no.  I'll tell you straight out with

14   reasonableness and common sense, you should expect they

15   won't tell you the exact, same thing.

16              But if there's a big, long touchdown pass

17   that was thrown, will they remember that the quarterback

18   went back and threw a long forty-yard bomb and the wide

19   receiver caught it and went to the end zone?

20   Absolutely.  Why would they all remember that point?

21   Because that's where their focus is.  And that's the

22   point that they're focusing on and that stands out to

23   them.

24              So, is Mr. McFadden necessarily, or Ms.

25   Thomas or Mr. Harris going to have the dancing around or

-159-

1        the circling around the SUV exactly the same?  Not

2        necessarily.  Are they going to have the same vantage

3        points to see whether there was a mark on his neck or a

4        tattoo on his neck or not?  No.  Are they clearly going

5        to be able to see his face though?  Yes.  Even from

6        their different vantage points, they're able to see his

7        face.

8                    Are they clearly going to be able to see

9        that gun?  And even more important to all that, are they

10       clearly going to be able to see him, the defendant,

11       walking towards the victim and shooting him in the head?

12       Yes.

13                   I don't want to leave us there though.  I

14       want us to also talk about the first, the identification

15       from the first people involved in this case, Mr. Bailey

16       and Mr. Allen.

17                   I want to start off from the get go and tell

18       you straight out Mr. Allen got it wrong when he was in

19       the hospital.  When he was in the hospital a day

20       afterwards, and you'll see the dates on all the, all

21       this information, it was April 11th, 2010, when he was

22       shown that first photo array with Deonte Miller in it,

23       not Deonte Howard, but Deonte Miller in it.  And you're

24       going to see it straight up there because it's in

25       evidence that Mr. Allen picked out Deonte Miller saying

                              -160-

1     that that was the person who was the shooter.

2            But I think the conditions of it -- And

3     we're always talking about the conditions, about what,

4     you know, what are the conditions of people when they

5     make these identifications.

6            To contrast Mr. McFadden and Mr. Harris and

7     Ms. Thompson who were not in any sort of medication

8     situation, weren't in any sort of situation where they

9     were not in their right frame of mind, you have Mr.

10    Allen who's in the hospital right after surgery when

11    he's under medication making this identification.

12           And then you have Bobby Bailey.  Bobby

13    Bailey knew Tay.  That's the big difference.  Everyone

14    else involved in this case, the other four people, are

15    looking at someone that they did not necessarily know.

16    Bobby Bailey knew who Tay was, actually knew who Tay

17    was.  So, when he's shown a picture of Deonte Miller, he

18    said that's not Tay.

19           I was thinking about what Sergeant Mackie

20    was saying yesterday.  Sergeant Mackie had an inkling,

21    based the way the evidence was proceeding out, that

22    Deonte Miller was not the person.  And then Sergeant

23    Mackie went back to Bobby, Bobby Bailey because Bobby

24    Bailey was the person who knew who Tay was.  And when

25    Bobby Bailey is finally shown a photograph of Deonte

1        Howard, he's able to clearly say, yes.  That's Tay.

2        That's Tay.

3                    And then finally, the last piece of that

4        puzzle in terms of identification, is that we have the

5        live line-up in May at the juvenile facility.  Now,

6        here's the thing about the live line-up.  Is there a

7        difference between looking at a head shot of someone and

8        looking at someone live?  Ask yourselves this very same

9        question.  If you had to look at driver's license

10       photographs of someone versus looking at a person live,

11       where do you think you'd be better able to recognize

12       someone?  Live or a driver's license photograph?

13                    I say that because I think the answer to

14       that is fairly obvious using your reason and common

15       sense.  Common sense is going to tell you looking at

16       someone live is a lot better and a lot easier and a lot

17       more accurate in terms of identifying who the person is

18       than when you're looking at a photograph.

19                    And there's one other aspect about this that

20       we need to discuss.  We have varying descriptions.

21       Right?  Everyone described, when they were talking to

22       the police, different heights and weights.  I, you know,

23       with a little bit of a smile I asked several of our

24       witnesses have they been trained in doing heights and

25       weights?

                              -162-

1             I mean, let's think about it.  If you're

2   asked on the street to give a height and weight of

3   someone you're familiar with, are you going to be able

4   to do that?  You've all had a chance to see Tim Baywal

5   here for about three days now.  Right?  I'd be curious

6   to take a poll back there about what his actual height

7   and weight is.  I'm going to tell you he's 6'1", 185.

8   How many of you got that?  How old do you think Tim is?

9   Tim's twenty-eight.  How many of you got that?

10            The point I'm making about that is quite

11  simple, is that we've had the opportunity to be in front

12  of you for three days now.  You've had the opportunity

13  to see us standing, sitting and all sorts of things.

14  And even then you might have had a description that

15  might have been close.

16            We're talking about physical height, weight,

17  age descriptions for people who saw someone for a period

18  of ten minutes, fifteen minutes.  So, don't get confused

19  or don't get, you know, don't get dissuaded by the fact

20  that they're not able to accurately tell the person's

21  height or weight.  What's the real question?  When they

22  see that person again, is that the face they're never

23  going to forget?  Is that the face of the person they

24  saw shoot and gun down Mr. Simpson?

25            So, when you look at all this identification

-163-

1   evidence and when you look at all the evidence in this

2   case, I think you're going to come to the clear

3   conclusion that beyond a reasonable doubt, in terms of

4   ID, in terms of the identification in this case, that

5   those five witnesses, plus the stipulated cell phone,

6   draw you to the same conclusion.  Mr. Howard was the

7   shooter that day.  Mr. Howard was the shooter.

8           So, then let's go to the next issue in this

9   case.  Is this first degree premeditated and deliberate

10  murder?  If you believe that he's the one who's the

11  shooter, there's no question he shot and killed Tyrone

12  Simpson.  But first degree premeditated murder, the

13  analysis just doesn't end there.  There's that

14  premeditated and deliberate part.

15          Back in opening statements I said to you

16  from the get go, I said to you that you're going to hear

17  about a shooting.  And the first part of the shooting is

18  about young men who had their, I don't know, anger,

19  testosterone, whatever you want to call it, they had

20  their juices flowing to the point where they let their

21  aggression get the better of them and they got into a

22  fight.  And I am not about to say that Mr. Simpson did

23  not punch Mr. Howard first.  Mr. Simpson absolutely

24  punched Mr. Howard first, four to five times.  There's

25  no doubt about that.

-164-

1              Which is also why I said to you that when

2       Mr. Howard first pulled out his gun and fired his first

3       two shots, I'm not about to tell you that that's first

4       degree premeditated and deliberate murder.  That's not

5       what I'm talking to you about.

6              What I want to talk to you about is those

7       other twelve shots afterwards.  That's what I want to

8       talk to you about, not the first two.  I want to talk to

9       you about the remaining twelve.

10             When you look at the crime of murder and you

11      look at premeditated and deliberate murder, one of the

12      first things you have to decide is did Mr. Howard cause

13      the death of Mr. Simpson?  That's an easy one.  By

14      firing the gun, he did.

15             Did Mr. Howard have a specific intent to

16      kill?  How do you know that Mr. Howard had a specific

17      intent to kill?  You know in two main ways.

18             First, you've got his own words, his own

19      words.  In the most clearest way, Mr. McFadden told you

20      that he heard the defendant when he stepped back out of

21      the SUV say, he said -- I want to get the word right.

22      No.  No.  No.  That MF N isn't dead yet.  And then he

23      goes to shoot him some more.  He had a specific intent

24      to kill.

25             But not only do we get that from his clear

1    words, we get that clearly from his actions.  Look at

2    the shell casings involved in this case and look at the

3    way that they, that they show up around.  I'd like to

4    use some of these photographs together because they give

5    you such a full picture.

6              Exhibit Number Twenty-Three.  We have item

7    number three, which is a shell casing right in front of

8    the GMC.  Exhibit Number Twenty-Six, you have the shell

9    casings that are found on the side of the GMC.  Exhibit

10   Number Twenty-Nine, you have the shell casing -- Well,

11   first the shell casing or spent round that's found in

12   the sidewalk itself.  Actually, it might be a spent

13   bullet.

14             We have Exhibit Number Thirty, which shows

15   you all the gunshot evidence that was found right behind

16   the GMC.  And another angle, that same thing in Number

17   Thirty-Four.

18             Remember what Ms. Thompson told you.

19   Remember what Mr. McFadden told you.  Remember what Mr.

20   Harris told you.  He was chasing down a person who was

21   already injured by gunshots and trying to gun him down.

22   And the most chilling aspect of all of that is this very

23   last photo right here.  The most chilling aspect of all

24   of that is the fact that in the bloody marks that he

25   comes up and guns him down in his head.

-166-

1          Remember what the doctor told us today?  The

2     medical examiner could not tell you what the order of

3     the bullets are or what the order of the injuries are.

4     All she could tell you is the most fatal injury would

5     most definitely be the shot to the head.

6          And she was very clear, that shot to the

7     head occurred when he was still alive, still alive.  And

8     she medically knew that.  That is the most telling fact

9     that there was a specific intent to kill.  Why else

10    would you walk up to a person who's already been shot at

11    this time we know eight other times by eight other

12    bullets, who's lying down on the ground not getting up

13    and you shoot him in the head.  What else are you trying

14    to do than kill him?

15         The next aspect about that though, about

16    this type of murder is that it has to be premeditated

17    and deliberate, premeditated and deliberate.

18         People's Exhibit Number Forty-nine is that

19    sketch, is a sketch that was created by Officer McNairy

20    in this case.  The reason I want for you to look at

21    People's Exhibit Number Forty-Nine -- And one thing that

22    might be very helpful for you is that if you choose to

23    look at the exhibits in this case, have Forty-Nine in

24    one hand and the photographs in the other because it

25    really ties in very well as to showing you exactly how

1     it is.

2              But premeditated and deliberate.  Remember

3     the testimony.  The vehicle that was parked somewhere

4     over here took off this way.  And then it stopped.  It

5     slammed on its brakes.  And the defendant got out again

6     and started walking back as the victim got up.

7              What do we know about this?  We know that

8     there's shell casings found here walking up this way.

9     Well, it doesn't actually tell us the direction.  I'm

10    arguing to you the evidence shows you he's walking up

11    this way based on what Ms. Thompson and Mr. Harris said.

12             Then you've got all the evidence of the

13    dancing around of the vehicle, as we discussed.  And

14    then the final evidence and the shots this way.

15             Ladies and gentlemen, when you look at some

16    of the bullet fragments involved as to where some of

17    these bullets are, and you're going to have the actual

18    close-up photographs, you have bullet fragments at

19    number seven, you have a bullet fragment at number

20    twelve, which is right, I think it's, I forget if it's

21    this one or this one.  I can't really tell from...

22    You'll see it in the photograph.  But you've got bullet

23    fragments.  You have it in number, like I said, you have

24    number seven.

25             You have number thirteen.  Number thirteen

1          which is the most telling of the bullet fragments.  Can

2          you have that with number thirteen, please?  This is

3          Exhibit Number Thirty-Seven.  Number thirteen is right

4          by the bloody marks.  And it is a bullet fragment.  If

5          you look at that bullet fragment closely, and I hate to

6          go into the detail about it, the gory detail about it,

7          but it is a blood bullet fragment.

8                   Remember the testimony from the doctor how

9          there were several shots that were through and through

10         that came out in the upper shoulder area.  Remember the

11         testimony from Ms. Harris and Mr. Thompson [sic] about

12         the last three shots coming up towards the upper body

13         area and the head.  This all adds up clearly to what

14         they're telling you in this story, is that his actions

15         were deliberate, that he was trying to specifically kill

16         and murder him at this point.

17                  And like I said, I'm focusing on the time

18         frame of when he gets back out of that vehicle.  That's

19         what I'm focusing on.

20                  So, how do we know it's premeditated?

21         That's the last aspect of that.  How do we know this is

22         premeditated?  The Judge is going to tell you about

23         premeditation.  Premeditation simply means thought out

24         beforehand.  The question of how long it takes for

25         someone to premeditate something is something that's

-169-

1          clearly up to you.  How long is enough time for it to be

2          a premeditated and deliberate act?

3                    And example that is often used that I like

4          to talk to juries about is when you are driving a

5          vehicle and you're on a city street and you see a

6          traffic light up ahead and the traffic light is green

7          and the traffic light turns yellow, do you do a

8          premeditated and deliberate act at that point whether or

9          not you're going to slam on the brakes or hit the

10         accelerator and go through that light?  Are you doing a

11         premeditated and deliberate act?  Absolutely you are.

12                   And you're not doing a premeditated and

13         deliberate act in a vacuum.  You're doing a premeditated

14         and deliberate act taking into, a lot of things into

15         account.  You look at the traffic around you.  You look

16         at the weather conditions around you.  You know the

17         vehicle you're driving, whether it's got good brakes or

18         bad brakes or whether it's got the power to kick through

19         that light or not.  You look at the other traffic that's

20         on the other side.  You're looking at all these other

21         conditions to make this decision on whether or not

22         you're going to do a premeditated and deliberate act,

23         whether slamming on your brakes or accelerating through

24         the light.

25                   We have even more time in this case.

1    Because not only does he shoot him to the point where he

2    falls on the ground, but as the car is driving away, the

3    victim is getting up.  And we're not talking about a

4    quick thing.  The victim is injured at this point in

5    getting up.  Let's not forget Lieutenant Crump's

6    testimony.  That first close-range shot, which matches

7    directly up with Mr. Allen's testimony, was that shot

8    that was down here.

9            What does Mr. Allen tell us?  That he, that

10   the victim went from holding his fist up here to

11   clutching down here.  That all matches up.  We know the

12   victim was bleeding and injured at that point.  We know

13   he already had a bullet hole at that point.

14           At this point, he's on the ground.  He's

15   getting up in that injured state.  So, it's not

16   something where he just hopped up and ran away.  The car

17   stops and the defendant has to come back and walk back -

18   - And I was showing you with the photographs and the,

19   and the map, the defendant has to come back, constantly

20   having a decision what to do, fire, fire, fire.  He gets

21   to chase him around the vehicle, shooting, shooting,

22   shooting, to the point where the victim's on the ground.

23   And he still has more time to decide what to do at the

24   very end for that last fateful shot.  And all this time

25   he has the time to think out beforehand what's going to

-171-

1     do.

2                      And the last thing I want to tell you about

3     that, and this is the clearest evidence that he did

4     think about what he was going to do before he got out of

5     that, as he was getting out of that SUV.  It was quite

6     simply the words that Mr. McFadden heard.  No.  That MF

7     N ain't dead yet.  He says that for a very specific

8     person.  Because he's getting out to finish him.  And he

9     did.

10                     Ladies and gentlemen, that is first degree

11    premeditated murder.  And that's what Mr. Howard is

12    guilty of.  Thank you.  Mr. Moore, do you...

13                     MR. MOORE:  No.  I do not.

14                     MR. PRASAD:  Okay.

15                     CLOSING ARGUMENT

16    BY MR. MOORE:

17                     MR. MOORE:  Well, ladies and gentlemen, this

18    is the time I get, the last time I get a chance to talk

19    to you.  The trial went rather quickly.  And I thank you

20    for your attentiveness during the course of this trail

21    because I noticed that you've been paying attention,

22    writing your notes and you seem to be listening

23    attentively.

24                     As the prosecutor indicated, there's only

25    two issues.  Was this Mr. Howard?  Was he the shooter?

1      And if he was, what was the offense?  But before we get

2      to the offense, we have to talk about identification.

3      But you have to think of identification in terms of the

4      burden of proof in this matter, proof beyond a

5      reasonable doubt.

6              You may consider the evidence, the lack of

7      evidence, the inadequate nature of the evidence.  And a

8      reasonable doubt was once described as a frame of mind

9      that would cause you to hesitate before making an

10     important decision in your life.

11             When we look at the identification of who

12     supposedly did the shooting, frankly, ladies and

13     gentlemen, we are all over the map in terms of what they

14     have presented to you.

15             I initially will start with Mr. Bailey.

16     Although he did not see the shooting, he sets the

17     scenario of understanding that there were a bunch of

18     young men outside of his store.  And he was called to

19     the store because something had occurred at the store.

20     And the only thing we can assume is that there was a

21     fight between Mr. Simpson and Freak, whoever that

22     individual is.  And it later moved outside because you

23     remember Mr. Bailey said his store was disheveled when

24     he went inside.  So, we don't know who did it, but yet

25     he does put my client there.

-173-

```
 1                  Now, you want to talk about Mr. McFadden.
 2        Now, Mr. McFadden seems to have a very good vantage
 3        point.  For some reason, he wanted to get closer.  But
 4        you have to look at his identification because he says
 5        the shooter had a tattoo around his neck.
 6                  Now, the sergeant said he didn't have a
 7        tattoo.  You see a photo array.  There's no evidence of
 8        a tattoo around his neck.  And Mr. McFadden says, oh,
 9        yes.  I identify him out a line-up.  Now, sergeant, or
10        Investigator Love said there's no evidence that he
11        identified my client Mr. Howard.  Mr. Howard wasn't even
12        the subject matter of the investigation at that point in
13        time because they were looking at a Deonte Miller.  Mr.
14        Howard didn't come up for a while.  So, Mr. McFadden
15        says, I identified Mr. Howard.  But we know there's no
16        evidence of that.
17                  He talks about a tall person and a short
18        person.  Now, we've been in court three different days.
19        Every time you come in, we rise.  Mr. Howard's a short
20        fellow.  He's a short fellow.  We know Mr. Simpson was
21        5'5".  And he seems to be a frisky guy because he had at
22        least two fights that day.
23                  But when you have to sit back and look at
24        what Mr. McFadden has to say and when you weigh his
25        credibility, are you going to say he's believable when
```

1        he's lied about having picked him out?  Is he believable

2        when he talks about a tattoo on the neck?  Is he

3        believable that there's a tall guy and a short guy?

4        Because it's up to your determination what the facts

5        are.  But it seems as though Mr. Howard and Mr. Simpson

6        were the same size.

7                Now, we go around across the street, ladies

8        and gentlemen.  You have Ms. Thompson and her initial

9        description of the shooter.  Black male.  I think she

10       said 5'10".  But she said late 20s, early 30s.  You've

11       been looking at my client for three days.  This offense

12       happened over thirteen months ago.  He still looks like

13       a baby.  There's no way he's going to be confused with a

14       person who's in their late 20s or early 30s

15               Now, we talk about Mr. Harris.  Mr. Harris

16       describes the shooter as in his 20s, but the shooter's

17       tall.  The shooter is tall.  And, again, you see Mr.

18       Howard every time you come in and out of court.  He is

19       not tall, no way you consider he's tall.

20               But another thing that they want to talk

21       about, those two witnesses, they indicate that the

22       shooter had on a white T-shirt, which brings us back to

23       Mr. Allen.

24               Mr. Allen, ladies and gentlemen, says the

25       shooter had on a black coat.  Now, Mr. Allen's right

1     next to Mr. Simpson, two feet away from the shooter.  I

2     don't know how you go from a white T-shirt to a black

3     coat.  Because underlying all of this is the People want

4     to say because Mr. Simpson popped my client four or five

5     times my client retaliated.  That's the underlying

6     theory.  He just didn't say it.

7              But my client, through the testimony, comes

8     back.  He's just looking for his phone.  There's no

9     testimony whatsoever on this record in this court that

10    he was mad at Mr. Simpson, had anything to do with Mr.

11    Simpson.  Supposedly he was there earlier, but wasn't

12    involved.  There's nothing that relates him being

13    involved in any prior activity whatsoever.

14             So, Mr. Allen, unfortunately got shot.

15    Sorry to hear that.  I hope the young man recovers.  He

16    gives this description about somebody 5'7", 5'8", la-

17    dee-dah, la-dee-dah, about the black coat.  He's sure

18    about the black coat.  And he gives this description the

19    next day.

20             Now, we understand the young man's shot.

21    And we understand he may have been on medication, based

22    upon his injuries.  But the police, if you like the

23    police, you believe the police, they will have to know

24    whether or not he's capable of providing a description

25    of the offense and whether he's capable of identifying

-176-

1          somebody.  Because they got a case here and they want to

2          make it stick.  They want, they don't want to have

3          anybody doped up giving a statement and identification.

4                    At no time did Mr. Allen say, hey.  Look.

5          Ya'll got to come back tomorrow.  I can't handle it

6          today.  I'm in too much pain.  Mr. Allen proceeds to

7          look at a photo array, six people.  Now, understanding

8          this young man was shot.  His boy is dead.  He wants to

9          help the police find this person.  He doesn't pick out

10         Mr. Howard.  He said this is the shooter.  Well, what

11         did this person do?  He shot me and Mr. Simpson.  This

12         is what he puts on it on the 11th.

13                    Now, a month later, a month, almost four and

14         a half weeks, all of a sudden, oh, my mind's better.

15         It's clear.  I can see it.  Well, you've been told that

16         they've arrested somebody.  You came in there with the

17         mindset of looking for a short guy.  And Mr. Howard's in

18         the line-up.

19                    Now, curiously, I can't seem to understand

20         why we don't even have photographs to show what these

21         individuals look like.  But he, all of a sudden, has

22         changed his mind.  Now, just that, ladies and gentlemen,

23         is that believable to you?  Are you going to put all

24         your eggs in that basket where a man has identified

25         somebody a day later and all of a sudden a month later

-177-

1    -- Because we know our minds, they're a lot better when

2    things happen.

3             That's why you write it down, assuring that

4    later on as we think, as we remember, as the Court

5    talked about, our reasoning process, we know what

6    happened and we can draw it up in our mind.  We don't

7    have that here ladies and gentlemen.

8             Now, the People can't even link my client to

9    a gun.  They don't have a gun.  They don't have a

10   confession.  They can't even link him to the motor

11   vehicle that drove away.  They have nothing.

12            And, again, when you consider the evidence

13   and the lack of evidence -- Because the burden of proof

14   never shifts.  My client has a right to remain silent.

15   He has exercised his right.  And as we talked about in

16   voir dire, we can't worry about what his side of the

17   story is.  You've got to worry about what they were able

18   to present.

19            You've got somebody that backtracked on

20   their statement.  You've got people who described him as

21   late 20s, early 30s, tall.  The medical examiner

22   indicated Mr. Simpson was 5'5".  And based upon your

23   ability to see my client standing next to me through the

24   course of these three days, I don't think you would use

25   the word tall to describe him.

1              There's always different ways to look at the

2       evidence, but I don't think you'd use that word.  So,

3       who really is most believable?  Who can you say who

4       testified from the stand you could believe beyond a

5       reasonable doubt?

6              Mr. Bailey said he didn't see anything.  And

7       that's all we know from this trial.  I didn't see the

8       shooter.  We know there's a crowd of people.  Who is to

9       say that someone else didn't pull out a weapon?  Who is

10      to say that?

11             And Mr. Simpson has already supposedly

12      fought my client, fought somebody else earlier.  Who is

13      to say somebody just got tired of Mr. Simpson buffaloing

14      people and starting fights?  That's something you have

15      to think about, you have to consider.

16             Because when you're talking about a cold,

17      hard identification, you know, the People of the state

18      of Michigan or the police department never, at any point

19      in time prior to the testimony, they never asked Ms.

20      Thompson or Mr. Harris to even look at a line-up.

21             Mr. Harris is talking about tall.  Ms.

22      Thompson's talking about late 20s, early 30s.  Well, we

23      ain't worried about them in a line-up.  Now, they come

24      to court -- And remind you both of them wear glasses.

25      And I think Mr. Harris was a little offended about the

1    fact that he has to wear glasses.  Oh, my eyes are good.

2    I only use them when I need them.  No.  He was backing

3    off the subject matter, wants you to think that his eyes

4    are good.  Yes.  They stay right across the street.  But

5    we know how people are vain about their eyesight and

6    whether they want to wear glasses or not.

7            You saw him.  You think of it amongst

8    yourselves.  But I suggest to you when you're talking

9    about proof beyond a reasonable doubt, the

10   identification of Mr. Howard is suspect.  And you can't

11   just say, I'm tossing this.  I'm tossing this one.  I'm

12   tossing -- I'm going to believe this young man here, Mr.

13   Allen, who identified somebody else before.

14           When you put it all in the bowl, you put it

15   all in the mix, you know, you've got to say, there's a

16   problem in this case.  I'd like to say he might have did

17   it, but the proof isn't there.

18           We often tell jurors, you know, if that was

19   your brother or sister sitting in the chair, you would

20   like to know that there was adequate proof if they

21   committed an offense.  And that's the frame of mind I

22   want you to think about.

23           Now, when we're talking about what is the

24   offense here?  Now, that sort of goes to a couple

25   different theories.  Now, one theory is, if you believe

1    he's the shooter, was it premeditated and deliberative.

2    Now, he's been busted in the face four or five times.

3    He doesn't know what Mr. Simpson did because if he saw a

4    fight earlier, which maybe he did, maybe he didn't, he

5    might think Mr. Simpson's just a crazy SOB.  I don't

6    know what he's going to do because I'm backing up.  I

7    don't have your glasses.  I don't have them.  Boom.

8    Boom.  Bam.  Bam.

9         Now, once you do that, you get in the frame

10   of mind of this guy's going to hurt you, who's to say he

11   didn't lose it?  He just lost it all.  And is that

12   reasonable to think and understand?  And if he lost it,

13   that's not premeditated and deliberate.  That's another

14   offense.   But, you know, you become out of control.

15        Now, the other theory if is this is not Mr.

16   Howard and this other person did the shooting, what was

17   on that person's mind?  I know they were chased around.

18   What was the reason that other person shot?

19        It's because, ladies and gentlemen, I'm not

20   going to leave it to just those two theories.  You still

21   have to talk about identification.  And from what we

22   have from the witness stand the last two days, you can't

23   really pick and choose, you know.

24        Allen said some other things.  Thompson,

25   Harris, Bailey didn't see anything and Mr. McFadden

-181-

1    fabricated the fact that he picked Mr. Howard out of a

2    line-up that didn't exist.

3            But if you want to believe something he has

4    to say, think about the evidence of tattoos.  He said

5    the shooter had a tattoo on the neck.  No evidence

6    whatsoever this young man had a tattoo.  And if you want

7    to believe that about what Mr. McFadden has to say, that

8    has to give you pause.  That has to give you a reason to

9    say, I've got a problem with this case.  Because he said

10   he had a tattoo, although he has the bigger guy and the

11   little guy and the bigger guy supposedly did the

12   shooting.  But when you're 5'5", 5'6", is there really

13   bigger and little?  It's just more of the same size.

14           So, I'm telling you, ladies and gentlemen,

15   the prosecutor spun a nice, little argument, but when

16   you get down to the identifications, when you really get

17   down to it, can you say you believed anyone more than

18   anybody else?  Somebody really, truly stood out like a

19   shining star?  No.  No.  You don't have that here.

20           It's unfortunate what happened to Mr.

21   Simpson.  But when we're talking about a criminal case,

22   the burden of proof, they must prove it to you.  And

23   when they give you witnesses who backtrack, seeing some

24   things they didn't see, have descriptions of a person

25   you don't have.  First they had a black coat, then a

1          white T-shirt, you can't mix up those two, ladies and

2          gentlemen.  And because you can't mix it up, you can't

3          reconcile them.

4                    And that's the biggest thing I'm trying to

5          say.  You can't reconcile all the things that you've

6          heard over the last two days.

7                    Maybe if they had a gun, maybe if they had a

8          confession, maybe if they could link him to the, either

9          the Mountaineer or the Durango or something or other.

10         We have nothing.  We have nothing.

11                   And it's going to be a tough call, a tough

12         shot.  But I'm confident.  That's why I put you up here.

13         Because I know you're a good group.  You're going to

14         talk about it.

15                   But I ask you, after you talk about it, you

16         know, hold onto you positions, talk it over with your

17         fellow jurors.  But don't give up on him just because

18         one person wants to say it was him.  Talk about it.  Get

19         loud if you have to.  But I ask you to find Mr. Deonte

20         Howard not guilty.  Thank you very much.

21                   MR. PRASAD:  Can we approach briefly, sir?

22                   THE COURT:  You may.

23                   (Bench conference 3:14 p.m. to 3:15 p.m.)

24                   REBUTTAL ARGUMENT

25    BY MR. PRASAD:

-183-

1                    MR. PRASAD:  Okay.  I've got to start off

2        with something, my error.  Tim's 215.  He's not 185.

3        I'm sorry.  But let's jump right to this.

4                    Let's first look at these witnesses.

5        Because if you listen to Mr. Moore's argument, and Mr.

6        Moore gives a great argument, but if you listen to his

7        argument he wants to try to pick apart each of the five

8        identifying witnesses and try to say that there's a flaw

9        in each one.  I'm not asking you to rely on one person.

10       I want you to rely on everyone and the fact that the

11       phone is there.

12                   But let's look at it, let's look at it, look

13       at in a couple different ways.  First, is there a reason

14       for any of them to mis-ID the shooter?  Does Ms.

15       Thompson, does Mr. Harris, does Mr. McFadden have any ax

16       to grind specifically against Mr. Howard?  Not at all.

17       Does Mr. Bailey have any ax to grind against Mr. Howard?

18       Mr. Howard, for all we know, was a good customer of his.

19

20                   Does Mr. Allen, and let's think about this

21       for a second, does Mr. Allen have a reason to lie and

22       misidentify Mr. Howard?  Mr. Allen wants justice for his

23       friend.  No question about it, right?  And if he wants

24       to pick someone out that's incorrect -- First of all, he

25       already did that, right?

-184-

1        But secondly, why would he pick out someone
2   wrong just to point someone as the, as the person who
3   committed this crime?  Why would he, if he truly wants
4   justice?  Because he did not know Mr. Allen [sic] any
5   time before.
6        In fact, as Mr. Moore had suggested in some
7   of his cross-examination of Mr. Allen, if he had a
8   vendetta against someone, someone he wanted to beat up,
9   like let's say Freak, why didn't he just pick Freak out
10  as the person who committed the crime?  He has no
11  vendetta against Mr. Allen [sic].  He did not know who
12  Mr. Allen was.  Excuse me.  Mr. Howard.  Because he
13  didn't know who Mr. Howard was before that day.
14       The only reason he would pick him out, which
15  is the only reason the other four would also pick him
16  out, is because that's the person they saw that day.
17       Now, some other aspects about Mr. Moore's
18  argument that I want to talk about.  First of all, the
19  clothing issue.  The difference between the black jacket
20  and the white T-shirt.  You're assuming in that argument
21  that the person didn't wear anything underneath the
22  jacket.  First of all, we know that's not true because
23  even, the person that saw the black jacket, said that
24  his jacket was open and he had something on underneath,
25  he just couldn't remember what it was.

1          But secondly, we're also assuming that they

2     saw the same time point or same time frame.  And they

3     didn't.  Mr. Allen and Mr. Bailey saw the defendant for

4     most of the shooting.  They saw him during the first two

5     shots and everything prior.  Everyone else saw in close-

6     up afterwards, after he'd already gotten in and out of

7     that SUV.  So, whether he took that jacket off in the

8     SUV is something we'll never know.

9          And that jumps right into another point that

10    Mr. Moore was trying to suggest to you, that there's no

11    SUV, there's no gun, there's no black jacket.  There's

12    one clear reason for that.  Because the shooter, Mr.

13    Howard, took off that day.  He took off.  That's why

14    there's no gun, no SUV, no black jacket to test.

15         He wasn't able to be find even in the next

16    couple of days, even when officers finally identified

17    him, like Officer Wiencek who went to look at five

18    different addresses to find out where he is, found his

19    mother, but couldn't find him.

20         So, let's be clear about certain things like

21    that.  In fact, I think it was Sergeant Mackie that said

22    they didn't get him until May.  So, we're talking a good

23    three or four weeks afterwards.  The reason there's none

24    of this stuff to compare is because he took off.  He

25    took off.

1           I wanted to talk about a couple of other

2    quick things first.  I want to talk about the

3    identification.  I know we talked a little about it

4    earlier, but I want to talk about the identification at

5    the juvenile facility in May.

6           When he walked in, when Mr. Allen walked

7    into the room after Sergeant Mackie had already gone

8    through and got all the information from all the people

9    involved in the line-up, they were already seated.  They

10   were already seated.  It's very hard to make a height

11   differentiation from a group of people that are seated.

12   Just look at yourselves around you guys.  You know, you

13   guys are all, you know, are all on a different level.

14   Even those in the same level, are you, by sitting next

15   to each other going to be able to get the same height

16   differentiation that you would if everyone was standing

17   next to each other?

18           That goes to another point, that the

19   witnesses are talking about what they saw at the scene.

20   You're not having the shooter and the victim standing

21   side-by-side to make a real comparison to their heights.

22   You've got two people chasing each other, first of all.

23   You don't have people standing tall.  You know, you've

24   got one guy injured, clutching his side, being chased

25   around.  You've got another guy running around with a

1          gun after him.  And you get the final shot, look of him,

2          the shooter, with Mr. Howard above the victim with his,

3          shooting him close, close up.  You're not going to get

4          that pretty, little height comparison that you'd like to

5          have, you know, in some sort of analysis.

6                    That's why I said way back when, don't hold

7          me to the mythical TV or movie proportions.  Hold me to

8          real life.  This is real life.  This is -- You've got

9          the description of what people really saw on that day,

10         really saw on that day.

11                   Let's talk about some of the observations.

12         I want to talk about Mr. McFadden for a second.  Mr.

13         McFadden talks about that fight he sees beforehand.  But

14         do you remember how Mr. McFadden describes it?  He talks

15         about the fight he sees beforehand down the street.  He

16         doesn't go down the street at this point.  He still

17         stays at his mom's house during the first fight.

18                   Then he says he goes back to the car for

19         five or ten minutes before he hears what he first

20         thought were firecrackers, which we now know are

21         gunshots.

22                   Let's now compare that testimony with the

23         testimony of both Mr. Bailey and testimony of Mr. Allen.

24         Mr. Allen tells you about when he first gets there

25         there's that fight with Freak that had already happened

1    and that there was still jawjacking going on between

2    Freak and the victim, Mr. Simpson and that there's a

3    break, that the defendant leaves, Mr. Bailey comes and

4    the other person comes.

5              And then finally you've got Mr. Bailey

6    telling you that when he gets there people are still

7    heated, talking about it and then you've got the

8    defendant who comes back to the scene.

9              All of that actually matches up.  I think,

10   and this is my suggestion to you only from looking at

11   the evidence, that what Mr. McFadden saw initially, that

12   first fight that he talks about before that five or ten

13   minute break was actually the fight with Freak that Mr.

14   Simpson had.  And that's my suggestion from looking at

15   the evidence.

16             And does that make sense?  Well, sure.

17   Because at that point he's still, you know, a block

18   away.  But what he observes later on when he gets closer

19   is the actual parts of this crime.  And that he sees

20   clearly.  That's what he sees clearly.

21             Finally, ladies and gentlemen, I want to

22   talk to you about two big things.  First is this concept

23   of lesser included crimes.

24             The Judge is going to tell you that when

25   we're looking at the crime of first degree murder, and

1        we've already gone past the, this is past the assumption

2        that you've all agreed that, beyond a reasonable doubt,

3        that Mr. Howard is the shooter.

4                When you look at the actual crime itself of

5        first degree murder, you're also allowed to consider two

6        lesser included crimes.  I want to talk to you about

7        those for a second.  And Mr. Moore alluded to that when

8        he was talking about the emotional state of the shooter,

9        of Mr. Howard.

10               The first crime is first degree premeditated

11       and deliberate murder.  And that's where we were talking

12       about needing the specific intent to kill, needing

13       premeditation and needing deliberation.  Those are the

14       three key aspects of first degree premeditated murder.

15               The next crime below that is second degree

16       murder.  What's the difference between first degree

17       murder and second degree murder?  The difference is

18       twofold.

19               First, no premeditation or deliberation.

20       So, if you say, for example, you say, yeah, we really

21       think there's deliberation in this case, but there

22       wasn't premeditation, you can still consider second

23       degree murder.  You don't need to prove premeditation or

24       deliberation.

25               And secondly, you look at the specific

-190-

1    intent to kill part as well.  In first degree murder,

2    it's very clear you need specific intent to kill and

3    nothing else.  He intended to kill Mr. Simpson that day.

4              Second degree murder, you look at three

5    different things.  He could have that intent to kill or

6    he could have an intent to commit great bodily harm or

7    he could have committed a reckless act knowing that

8    there's a substantial likelihood that that act would

9    cause great bodily harm or death.

10             Ladies and gentlemen, I think as we've

11   already discussed in the evidence before, I think that's

12   not going to be the tough part.  I think the specific

13   intent to kill, especially once he gets back out of the

14   SUV, is clear as day.

15             But that's what second degree murder is.

16   Second degree murder has those different intents and

17   does not require premeditation or deliberation.

18             So, I ask, if you believe that -- First, if

19   you agree that Mr. Howard's the shooter, second if you

20   have a problem with premeditation or deliberation, look

21   at second degree murder.  Look at second degree murder.

22   I think that's where the evidence will clearly fit.

23             The third thing, the third crime that you're

24   able to look at as a lesser included crime is voluntary

25   manslaughter.  What's voluntary manslaughter?

1            Voluntary manslaughter in large respects is
2    the same thing as second degree murder except for one
3    major point, one major aspect.  Involuntary
4    manslaughter, and this is what Mr. Moore was alluding
5    to, you have to be under the emotional excitement of the
6    situation that's causing you to commit these acts.
7    That's what voluntary manslaughter is.
8            So, it's the same elements as second degree
9    murder, but now you're doing this under this emotional,
10   heightened emotional excitement.
11           In involuntary manslaughter, it talks to you
12   about whether or not there was a moment to reflect, a
13   pause to reflect.  Ladies and gentlemen, it's come
14   through clear as day there was a pause to reflect.   And
15   I'm arguing to you as clear as, I'm arguing to you as
16   stressful, as strong as I can.  When he gets in that
17   vehicle to leave, there is a moment to reflect.
18   Absolutely.  He has the time to, whatever emotional
19   state he is in at this point.
20           He's already shot the person multiple times
21   because we know of the initial shots that already
22   occurred, the three other shots after that had already
23   occurred.  Five gunshots had already happened at this
24   point.  And he gets in that van.
25           And, of course, and we've already gone

                          -192-

1    through it, once the victim rises and the van -- Not the

2    van.  I keep calling it a van.  SUV.  Once the SUV stops

3    and he gets out, he's already beyond that moment to

4    reflect.  So, that emotional excitement of initially

5    getting punched in the face four or five times, that's

6    over.  That's over at this point.

7               So, yes.  You're allowed to consider

8    voluntary manslaughter.  I'd argue to you quite

9    stressfully that if you don't believe there's

10   premeditation or deliberation, focus your analysis on

11   second degree murder.  I think that's the clearest thing

12   there for you.

13              Lastly, ladies and gentlemen, I want you to

14   think back, as we always go back in this case, to

15   identification.  Because that's the first thing you have

16   to decide.

17              You had five different witnesses come in

18   here and from their different vantage points point out

19   who the shooter was that day.  No one came in here and

20   said that Mr. Howard was not the shooter.  That's clear

21   as day.

22              Because you had civilians who experienced a

23   traumatic situation, who witnessed a traumatic

24   situation, who have that indelible memory now in their

25   mind of what they saw.

1             And I can't say it any better than as Ms.

2       Thompson said it.  I asked Ms. Thompson, ma'am, do you

3       recognize his face?  She said yes.  And I said, where do

4       you recognize it from?  She said, from that day.  And

5       you heard the emotion in her voice.

6             Ladies and gentlemen, those witnesses are

7       not going to forget.  They told you the truth.  Deonte

8       Howard is the murder in this case.  Please find him

9       guilty.

10             THE COURT:  I'm not going to ask you to sit

11       still for another twenty minutes because then I think

12       that I would really wear your patience out and your

13       ability to focus.  So, I think we need to take a little

14       break, just shake our legs, you know, twist our necks.

15       I call it judicial aerobics.

16             So, this is the schedule.  It'll take me

17       maybe twenty minutes to do the instructions.  It'll be

18       four o'clock by the time we finish doing that.  And I'd

19       doubt seriously if we'll be able to do any sort of

20       deliberation because we're trying to get out of here no

21       later than 4:15.

22             The only problem with not doing that is

23       this, that if we did that, we would eliminate one of the

24       present jurors and then not have to bring all thirteen

25       back.  Somebody would stay home tomorrow because we

-194-

1      would have reduced it to the number that we need to

2      deliberate.  But in order to do that, we have to rush

3      through, push and not deliberate.

4              So, my suggestion is why don't we just go

5      home now and give you the instructions in the morning

6      and deliberate and find out which person actually just

7      has a short day on Thursday and, you know, suck up the

8      drive here and the parking here, you know, if you paid.

9              But that's just my suggestion.  I'll let you

10     all decide if you want to go home now or if you want to

11     go through the process and stop after the instructions

12     and we'll pull one person and not have them go home

13     [sic].  But, you know, you all have had a pretty long

14     day full of listening.  Just pretend like you're the

15     jury in deliberations.

16              (At 3:29 p.m. jury leaves the courtroom,

17               proceedings concluded.)

18

19

20

21

22




R E P O R T E R ' S   C E R T I F I C A T E

```
STATE OF MICHIGAN  )
               SS )
COUNTY OF WAYNE    )
```

        I, SEAN E. ALLEN, CSMR 5265, Certified Court Reporter acting in and for the Third Judicial circuit, Wayne County, State of Michigan, do hereby certify that the foregoing pages 1 through 196, inclusive, were reduced to typewritten form and comprise a true rendition of the proceedings taken in the above-entitled matter on May 11, 2011.

        I FURTHER CERTIFY THAT MY CERTIFICATION ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN, SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED COPIES NOT MADE UNDER MY CONTROL AND SUPERVISION.

```
                         _____
                         SEAN E. ALLEN -- CSMR 5265
                         Official Court Reporter.
DATED:  This 9th day of July 2012.
```