# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 16, 2014

　　　　　Plaintiff-Appellee,

v

No.  311169
Wayne Circuit Court
LC No.  10-005562-01-FJ

DEONTE HOWARD,

　　　　　Defendant-Appellant.

---

Before:  WILDER, P.J., and FORT HOOD and SERVITTO, JJ.

PER CURIAM.

　　　　Defendant appeals as of right his jury trial conviction of first degree murder, MCL 750.316.[1]  He was sentenced to a mandatory term of life imprisonment, with credit for 382 days served.  We therefore affirm defendant's conviction, but remand for resentencing pursuant to MCL 769.25(1)(b)(i).

　　　　Defendant was charged with first degree premeditated murder, assault with intent to murder and felony firearm in connection with the shooting death of 19-year-old Tyrone Simpson on April 10, 2010.  The shooting occurred in front of a combination convenience store/barbecue restaurant on the 1600 block of Tireman Street in the city of Detroit shortly after 4:00 p.m.  An argument broke out between defendant, who was 16 years old at the time, and Simpson when Simpson accused defendant of taking his Cartier sunglasses.  Defendant denied taking them and a verbal argument ensued.  Simpson then punched defendant in the face several times, at which point defendant drew a weapon and fired at Simpson, injuring him and one of Simpson's friends, Aundrey Allen.  Simpson attempted to run away from defendant, but defendant chased Simpson around a vehicle, shooting at and striking him with several shots until Simpson collapsed in the

---

[1] Defendant was initially charged with first degree murder, assault with intent to murder, MCL 750.83, and felony firearm, MCL 750.227b.  At trial, the jury convicted defendant of felony firearm and the lesser included offense of assault with intent to do great bodily harm, MCL 750.84, but was hung with respect to the first degree murder charge, leading to retrial on that charge only.  Defendant's retrial on the first degree murder charge is the focus of this appeal and we do not address his trial or, convictions, or sentences for felony firearm or assault with intent to do great bodily harm.

-1-

street.  An SUV driven by an unidentified friend of defendant's then pulled up and defendant jumped into the back seat.  The vehicle started to leave, and then abruptly slammed on its breaks.  Defendant got back out of the vehicle and shot Simpson in the head.  Defendant then got back into the vehicle and it sped away.  Simpson was dead when police arrived on the scene a short time later.  The medical examiner noted that Simpson had a total of nine gunshot wounds, including one to his head.

On appeal, defendant first contends that there was insufficient evidence to support his conviction.  We disagree.

We review a challenge to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the prosecution, to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.  *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001).  "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the [trier of fact's] verdict."  *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).  Circumstantial evidence and reasonable inferences arising from the evidence may constitute satisfactory proof of the elements of the offense.  *People v Warren (After Remand)*, 200 Mich App 586, 588; 504 NW2d 907 (1993).

Defendant challenges the sufficiency of the evidence on two grounds.  First, he contends there was insufficient evidence identifying him as the shooter.  The prosecution must prove the identity of the defendant as the perpetrator of a charged offense beyond a reasonable doubt.  *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976); *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967).  Circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to identify the accused as the perpetrator.  *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999).  The credibility of identification testimony is a question for the trier of fact that this Court will not decide over again.  *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000).  And, a positive identification by witnesses may be sufficient to support a conviction of a crime.  *Id.*

In this case, defendant was identified by no less than four eyewitnesses to the shooting.  Frederick McFadden testified that he had an unobstructed view of the scene from approximately 20 feet away, and saw defendant shoot Simpson several times.  His testimony was unequivocal that defendant was the only person with a gun and that defendant shot Simpson several times, including once in the head.  As pointed out by defendant, McFadden testified at trial that he picked out defendant and the driver of a car from a photo array, which was different from his testimony in a prior trial that he picked out the shooter and two drivers.  McFadden also described the shooter to the police as 20 to 24 years of age and 5'11 to 6' tall when defendant was 16 at the time of the shooting and is less than 5'6".  However, the credibility of identification testimony is a question for the trier of fact.  *Davis*, 241 Mich App at 700.

Marcario Harris and Kimberly Thompson, who live across the street from the store/restaurant where the shooting occurred, also identified defendant as the shooter.  Both testified that they had a clear view of the shooting through their front living room window, which faced the store and they could clearly see defendant in the broad daylight.  Both testified that defendant was only person they saw with a gun during the incident.  Neither was asked to view a

photo array or participate in a live lineup, but identified defendant for the first time at trial. Both Harris and Thompson described the shooter to the police immediately after the event as around 5"9 or 5'10", thin, and in his mid-20's. This description is not so far off as to be a misidentification and moreover, the jury is responsible for both credibility and evidentiary weight determinations. *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

Aundrey Allen also identified defendant as the shooter. He had been standing with Simpson while Simpson was arguing with defendant about his glasses and when Simpson punched defendant in the face. Allen testified that he was also standing behind and somewhat to the side of Simpson when defendant pulled a gun out of his pocket and started shooting at Simpson. Allen was shot in the leg as he tried to run. Allen described the shooter to the police as being around 5'7" or 5'8" and around 17 or 18 years old. Allen also told the police that several people at the incident called the shooter "Tay," which others witnesses confirmed was defendant's nickname. At the hospital after his surgery, Allen did view a photo array and identify another person as the shooter. Allen explained, however, that he was under the influence of morphine at the time of that identification. Allen thereafter participated in a live line up and identified defendant out of the lineup as the shooter.

The above was sufficient for a reasonable jury to find beyond a reasonable doubt that defendant was identified as the shooter.

Defendant next argues that the evidence was insufficient to establish that there was a premeditated, deliberate intent to kill such that his first degree murder conviction cannot stand. MCL 750.316(1)(a) provides:

> (1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:
>
> (a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

The elements of premeditated murder are (1) an intentional killing of a human being (2) with premeditation and deliberation. *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). With regard to premeditation and deliberation, this Court has explained:

> To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look." *[People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (citation omitted).]

"Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *Id*. at 301. There is no specific period of time that must pass for premeditation to be found; however, "[o]ne cannot instantaneously premeditate a murder." *Id*. at 305. Neither premeditation nor

deliberation need be established by direct evidence; the required state of mind can be inferred from all of the facts and circumstances on the record. *People v Boose*, 109 Mich App 455, 473; 311 NW2d 390 (1981). These elements may also be shown by consideration of the following factors: " '(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and, (4) the defendant's conduct after the homicide.' " *People v Orr*, 275 Mich App 587, 591; 739 NW2d 385 (2007), quoting *People v Schollaert*, 194 Mich App 158, 170; 486 NW2d 312 (1992).

No one disputes that Simpson approached defendant accusing him of stealing his glasses. It also appears that Simpson escalated the verbal altercation to a physical level by punching the defendant and that defendant did not punch him back. However, by all accounts, defendant was the only one with a weapon and the only one who shot. Most important to our analysis, several distinct rounds of shooting occurred. First, after Simpson punched defendant several times in the face and was approaching to punch him again, defendant shot at Simpson at least twice. Allen, who was standing next to Simpson at the time the first shots were fired, testified that defendant initially shot at Simpson twice.

The second round of shots came almost immediately thereafter. Allen testified that after the first two initial shots, he ran toward the store. As he ran, he heard three more shots. Bobby Bailey, another witness, also ran to the store after the initial shots.

The next round of shots occurred when both Bailey and Allen were inside the store. Bailey testified that he heard six or seven more shots while he was in the store. Allen testified that, he too, heard additional shots while he was in the store. Allen testified that he heard eight or nine shots right in a row, then a several second pause occurred. Allen testified that he next heard Simpson begging for his life and a final, single shot. According to Allen, he thereafter heard the sound of a car being floored and taking off.

McFadden similarly testified to distinct rounds of shots. He testified the he heard three initial shots, and then his attention was drawn to an elderly lady getting out of her car in the street. McFadden had time to help the woman to her home before he heard the next shot, which he testified he heard while at the same time seeing Simpson stumble backward. McFadden testified that he then heard several more shots and Simpson was lying in the street. According to McFadden, the defendant fired two more shots at Simpson as he lay in the street then got into an SUV. Defendant then got back out of the SUV, said "This m—f—n--- isn't dead yet" and shot defendant several more times, including once in the head. Defendant then got back in the SUV and left.

Witness Harris, testified that he saw defendant chasing Simpson around a Suburban, shooting at him. After Simpson fell to the ground, defendant walked toward him and shot at him several more times. Harris testified that defendant shot at Simpson approximately 15 times. Witness Thompson testified that defendant first shot at Simpson while both were in the street and Simpson fell to the ground. Defendant then got into an SUV and started to take off, then abruptly got back out of the vehicle when Simpson started to get up. Thompson testified that defendant chased Simpson around shooting at him. She heard Simpson begging for his life and saw defendant walk up to Simpson, shoot him in the head, and then get back into the SUV and leave.

The prosecution presented sufficient evidence of premeditation and deliberation to support defendant's first degree premeditated murder conviction.  The first shots fired by defendant could qualify as being brought about by "hot blood" without an opportunity to take a second thought.  Simpson had just punched defendant in the face several times and was advancing toward him again.  Allen testified that at that point, defendant started reaching for his pocket "real crazy like."  Were those the only shots fired, defendant's argument that his actions were rash, impulsive or a hot-blooded reaction to the circumstances would have some merit.  However, the testimony establishes that after the initial few shots, there was a minimum of a several second pause as Allen and others fled the scene.  The pause was long enough, if McFadden's testimony is to be believed, for him to assist an elderly lady from her car parked in the street up to her house and for him to then return to the street and witness the next round of shots.  Allen testified that he could see Simpson's hand go toward his stomach as though he had been shot in that area.  McFadden also testified that after one of the first several shots, he saw Simpson stumble backward.  By all witness accounts, then, Simpson was still alive after the first shots were fired.  Assuming defendant did not possess the requisite intent (premeditation or deliberation) to murder at the time the first shots were fired, he could have left at that point and the incident perhaps would have been over.

However, after a pause, more shots were fired and, by all witness accounts, Simpson was still alive.  According to Harris and Thompson, it was at that point that defendant got into an SUV and appeared to be about to leave the scene, but when Simpson started to get up out of the street, the SUV slammed on its brakes and defendant got back out.  According to these witnesses, defendant chased Simpson around a vehicle, firing more shots at him until he fell back into the street, then walked up to him and fired a final shot into his head.  While McFadden made no mention of defendant chasing Simpson around a vehicle as he fired shots at him, he did testify that defendant got into an SUV, then got back out, said "This m—f—n--- isn't dead yet" and shot defendant several more times, including once in the head.  The medical examiner testified that when the shot to his head was delivered, Simpson was still alive.

A reasonable jury could find that between the apparently non-fatal first shots and the final shot to Simpson's head, there was sufficient time for defendant to take a second look at the nature of his actions.  Defendant may have had no prior relationship with Simpson and may not have initially gone to the store/restaurant for anything other than his stated purpose of finding his phone.  Nevertheless, the circumstances of the killing itself show that defendant thought about taking Simpson's life before the he took the acts which actually caused the death and pondered the acts for some, albeit small, amount of time.  Defendant then got into an SUV and the vehicle started to leave.  But it then stopped as Simpson started to get up and defendant elected to shoot Simpson several more times while at least one witness testified that defendant made a statement concerning an intent to kill Simpson and while other witnesses testified they heard Simpson pleading with defendant for his life.  Defendant then stood over Simpson while he lay in the street and shot him in the head.  The location of this final shot, the positions of the parties, and the fact that defendant halted and got out of vehicle to deliver the final shots adequately suggest that although defendant had time to take a second look and perhaps leave Simpson injured, defendant deliberately chose to ensure that he killed Simpson.  Thus, even if defendant did not form a homicidal intent until he stopped the SUV and got back out to deliver the final round of shots, the time span between that moment and the time the initial shots were fired would be of a

sufficient amount to allow defendant to take a second look.  There was thus sufficient evidence of premeditation and deliberation to support defendant's first degree murder conviction.

Defendant next argues that he was deprived of the right to the effective assistance of counsel.  We disagree.  Defendant did not bring a motion for a new trial on the basis of ineffective assistance of counsel, and failed to request a *Ginther* hearing (*People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973)) before the trial court.  Accordingly, defendant's claim of ineffective assistance of counsel is unpreserved and we review his claim for mistakes apparent on the record.  *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

An ineffective assistance claim "is a mixed question of fact and constitutional law.  A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." *People v Grant*, 470 Mich 477, 484; 684 NW2d 686 (2004).  To merit a new trial because of ineffective assistance of counsel, the defendant has the heavy burden of demonstrating that defense counsel's performance was so deficient that he was not functioning as constitutionally guaranteed "counsel" and that defense counsel's performance prejudiced the defendant to the extent that it is reasonably probable that the outcome of the proceedings would have been different. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), quoting *Strickland v Washington*, 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).  To prevail on a claim of ineffective assistance of counsel, then, defendant must prove two components:  (1) that counsel's performance was deficient and that, under an objective standard of reasonableness, counsel made an error so serious that he was not performing as the attorney guaranteed by the constitution and (2) prejudice. *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994); *Strickland*, 466 US at 687.  To satisfy the first component, defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, *supra* at 687.  The second component requires the defendant to show "the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin*, 463 Mich at 600.  Defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy and must further show that he was prejudiced by the error in question. *Pickens*, 446 Mich at 312-314.  That a particular trial strategy does not work does not necessarily constitute ineffective assistance of counsel. *Id*. at 61.

Defendant directs us to three instances that he claims amount to ineffective assistance on trial counsel's part.  First, defendant asserts that counsel was deficient in failing to call Sergeant Martel as a witness at trial to refute Allen's testimony that when he identified someone other than defendant as the shooter in a photo array while he was in the hospital, it was because he was under the influence of morphine.  According to defendant, at his first trial, which resulted in a hung jury (and a mistrial) on the first degree murder charge, Martel's testimony had made it clear that Allen was coherent when he identified a Deonte *Miller* as the shooter and that based on Allen's identification, Martel prepared a search warrant for Miller's home.  Defendant contends that Allen's identification of him as the shooter was critical to the prosecution's case and, as such, it was critically important for defense counsel to properly challenge Allen's testimony through Martel.

At defendant's first trial Allen testified that on the date of the incident, when he first had contact with the police, he was in the hospital and "had like a lot of morphine inside me."  Allen

-6-

testified that he was unable to write at that time and the officers asked him to explain what had happened. Allen testified that officers also showed him six photographs and that he was able to identify someone in the photographs but that he does not know who he identified because "at the time . . . I was so out of it." Allen testified that he identified the person who looked closest to defendant because he really did not know defendant. It is undisputed that Allen identified someone other than defendant as the shooter in the photo array.

Martel testified that he was not in the room when Allen made an identification of someone in the photo lineup. He testified that he also took a statement from Allen. He testified that Allen may have been on some medication or painkillers when he gave the statement to Martel, but that Allen seemed coherent. Martel testified that he would not have taken his statement had he not believed Allen to be coherent.

It is true that Martel's testimony would have placed doubt on Allen's testimony that he mistakenly identified someone other than defendant in the photo lineup due to drug intoxication. However, decisions on whether to call or question witnesses are presumed to be matters of trial strategy that will not be second-guessed on appeal. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Even if counsel's failure to call Martel as a witness was in error, it cannot be said to have been outcome determinative. This is necessarily so, as Allen participated in a live lineup after being released from the hospital and identified defendant, who was irrefutably part of that lineup, as the shooter. Thus, Allen's later positive identification of defendant as the shooter would likely have negated any effect of his initial photo identification of another person as the shooter. Thus, counsel did not render ineffective assistance in failing to call Martel as a witness.

Defendant next contends that counsel was ineffective for failing to enter a stipulation that was entered at his first trial—that Detective Myron Love would testify that he showed McFadden a photo lineup; that defendant's picture was not included in the photo lineup; that McFadden picked out three people, and; that Love did not remember who McFadden picked out.

It is not clear from the record why the above stipulation was entered. However, it is clear that Love appeared at defendant's second trial and testified. Thus, a stipulation as to what he would have testified to was obviously not an option at that point. Defendant has also provided nothing to indicate that defense counsel failed to request the same stipulation, rather than that he perhaps sought the same stipulation and was denied the opportunity to present it at trial instead of Love's live testimony. Given the above, it cannot be found that counsel was ineffective for failing to procure the stipulation.

Moreover, the only way in which Love's testimony at trial differed from the stipulation was that at defendant's trial, Love testified that he *was unsure* whether defendant's photo was included in the photo array and the stipulation provided that defendant's photo *was not* in the photo array. While defendant makes much of this distinction and contends that the difference was significant in undermining McFadden's testimony at trial that he was positive he picked defendant's photo out of the photo array, defense counsel elicited from Love that had McFadden picked defendant out of a photo array they would have had documentation of the same and they did not. Thus, counsel effectively undermined McFadden's credibility in asserting that he had picked defendant out of a photo lineup despite the difference between the stipulation and the live

testimony.  Defense counsel was thus not ineffective in failing to procure the same stipulation regarding Love's testimony that was presented at his first trial.

Defendant also argues that counsel was ineffective in declining to cross-examine investigator Simon.  At his first trial, defendant points out that his trial counsel cross-examined Simon regarding her treatment of people she has interrogated.  Counsel elicited that Simon had lied to suspects during interrogations, had cursed at them, and had told them if they did not talk they were going to jail.  Counsel asked Simon if she had threatened witness Bobby Bailey during her questioning of him and Simon denied threatening him, telling him to shut up, or threatening to ruin his business because he did not tell her what she wanted to know.  While defendant argues that Simon's alleged threats were an important piece of the defense theory that the police engaged in misconduct, defendant has identified no other alleged acts of misconduct on the part of the police or further explained how any theory of misconduct was conveyed to the jury and influenced or was intended to influence his case.  And, any admissions that first trial counsel elicited form Simon about any untoward treatment of persons she questioned was limited to treatment of *suspects*—not of witnesses such as Bailey.

Additionally, because Simon unequivocally denied making any threat in any form to Bailey in the first trial, it was reasonable for defense counsel at defendant's second trial to conclude she would testify consistently and deny any wrongdoing.  And on direct examination by the prosecution, she, in fact, did.  Thus, it would be a reasonable trial strategy to elicit from Bailey, as defense counsel did, that Simon had threatened him and that Bailey had just agreed to whatever she said due to the threats, that Simon told him to shut up and would not let him talk and just wanted to make the shooter defendant, and let those accusations stand unanswered by Simon to the greatest degree possible.  Though the prosecutor asked Simon on direct whether she had threatened Bailey during her questioning of him and she again denied making any threats, there would be nothing gained by defense counsel again asking her the same questions and having her reiterate her denials.  This Court will not substitute its judgment for trial counsel's in matters of trial strategy.  *People v Avant*, 235 Mich App 499, 508; 597 NW2d 864 (1999).

Defendant's next argument on appeal is that his conviction was obtained through the use of false and/or perjured testimony, thus denying him his due process rights.  Specifically, defendant contends that witness McFadden testified at the second trial that he was positive he identified defendant in a photo array and that this testimony is contrary to the stipulation entered in the first trial of Detective Love that defendant was not in the photo array and of Love's testimony in the second trial that if McFadden had identified defendant, there would have been documentation of the same.  Defendant asserts that, similarly, Love's testimony at the second trial that he was unsure whether defendant's photo was in the array was false and/or perjured as it contrasted with the stipulation in the first trial that defendant's photo was not in the array.  We review this unpreserved allegation of constitutional error for plain error affecting the defendant's substantial rights.  *People v Carines*, 460 Mich 750, 763–764; 597 NW2d 130 (1999).

A conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment.  *Mooney v Holohan*, 294 US 103, 112; 55 S Ct 340; 79 L Ed 791 (1935); *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959); *People v Aceval*, 282 Mich App 379, 389-390; 764 NW2d 285 (2009).  If there is any reasonable likelihood that the false testimony could have affected the

judgment of the jury, the conviction must be set aside. *Aceval*, 282 Mich App at 389-390. Stated differently, a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment. *Id.*

Michigan courts have also recognized that the prosecutor has a duty to correct false evidence. See *People v Herndon*, 246 Mich App 371, 417; 633 NW2d 376 (2001). But the mere fact that a witness's testimony conflicts with earlier statements does not establish that a prosecutor knowingly presented perjured testimony. *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998). Perjury requires a material, willful false statement. *In re Contempt of Henry*, 282 Mich App 656, 677–678; 765 NW2d 44 (2009).

There is no indication in the record that the prosecutor, who was the same person for both trials, concealed any prior contradictory statements or elicited and allowed perjured testimony to stand, or even that the statements were, in fact contradictory or perjured. With respect to Love, as previously indicated, a stipulation was entered in the first trial that ". . . if Detective Myron Love showed, the testimony would be Detective Myron Love showed Frederick McFadden a photographic line-up regarding the shooting of Tyrone Simpson. In front of Detective Love, Frederick McFadden picked out three people. Detective Love does not remember who Frederick McFadden identified, but Deonte Howard was not one of those people." The prosecutor added, "He was no[t] in the line-up." At this point defense counsel stated, "Right. Deonte Howard was not in the photographic line-up that was shown to Frederick McFadden . . . ." The prosecutor stated, "That's correct, Judge. And I've sign[ed] the document to that effect."

At defendant's second trial, Love appeared as a witness and testified that he showed a photo array with six photos to McFadden. When advised that there were two different suspects involved in the case, Love indicated that he believed he was involved with the first suspect [Deonte Miller]. Love testified that when shown the photo array, McFadden picked out three people that he indicated he recognized. Love further testified that he was "not really positive" if defendant's photo was in the photo array. Love testified that he did not have a copy of the photo array and he had no documentation to show that McFadden had picked defendant out of the photo array. Love testified that had McFadden picked out defendant, they would have had documentation of the same.

Clearly, Love was not in charge of what the prosecutor and defense counsel in the first trial placed on the record as far as the stipulation that defendant was not part of the photo array shown to McFadden. The prosecutor was the individual who volunteered this information as part of the stipulation so likely had a basis for making such a statement, but that would be bare speculation at this point. In any event, Love's live testimony at defendant's second trial does not *contradict* this stipulation. Instead, Love simply stated he was "not positive" whether defendant's photo was or was not part of the array, indicating a lapse of memory, not a material, willful false statement. See *In re Contempt of Henry*, 282 Mich App at 677–678.

Concerning McFadden, at defendant's first trial McFadden testified that he was shown three pages of pictures and that he picked out "the shooter and two drivers." At defendant's second trial, McFadden testified that he saw three pictures and that he picked out two people. McFadden specifically testified that he picked out defendant and the driver. He testified that he was "positive" that he picked out defendant in the photos. Notably, the prosecution did not ask

McFadden any questions about the photo identification on direct examination—it was defense counsel who elicited this information on cross-examination. In any event, comparing the testimony at the two trials, while there are some differences, the significant factor is the absence of any mention of defendant in McFadden's first testimony. McFadden did not testify at the first trial that he picked defendant out of the photo array; he testified that he picked out the shooter. Thus there is no conflict with respect to defendant in his testimony at defendant's second trial.

According to defendant, McFadden's testimony that he identified defendant as the shooter in the photo array is nevertheless clearly false. However, all inconsistencies were disclosed to the jury and it was for the jury to determine whether McFadden's trial testimony, including his alleged identification of defendant in a photo array, was credible. *People v Davis*, 241 Mich App at 700.

Were we to find that the testimony was, in fact, false, it cannot be concluded that the admission of the testimony affected the jury's verdict and thus the outcome of the trial. Not only did McFadden identify defendant in court as the shooter, several other eyewitnesses, whose credibility defendant does not challenge, also unequivocally identified defendant as the shooter.

Defendant's final argument on appeal is that the Supreme Court's ruling in *Miller v Alabama* __ US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012) prohibits a sentence of life without the possibility of parole imposed under a statutory scheme that requires mandatory life for those, such as defendant, who were juveniles at the time of the offense. We review this unpreserved constitutional issue for plain error affecting defendant's substantial rights. See *Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

To avoid issue forfeiture under the plain-error rule, defendant must prove the following: (1) there was an error, (2) the error was plain, and (3) the plain error affected substantial rights, i.e., the outcome of the lower-court proceedings. *Id.* at 763. Once defendant has established these requirements, this Court "must exercise its discretion in deciding whether to reverse." *Id.* Reversal is warranted only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings or resulted in the conviction of an actually innocent person. *Id.*

In *Miller*, 132 S Ct 2455, the United States Supreme Court held that mandatory life imprisonment without the possibility of parole for those under the age of 18 when they committed a crime violated the Eighth Amendment's prohibition against cruel and unusual punishment. Looking to its precedents, the Supreme Court noted that it had historically treated juveniles differently from adults and, because of their lesser culpability, has barred capital punishments for juveniles and barred life imprisonment without the possibility of parole in non-homicide cases as violative of the Eighth Amendment's protection against cruel and unusual punishment. *Id.* at 2463-2465. The *Miller* Court further stated:

Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or

-10-

dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, e.g., *Graham*[*v Florida*], 560 US 48, [at 78], 130 S Ct [2011], at 2032 [176 L Ed 2d (2010)] ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J.D.B. v North Carolina*, 564 US ——, 131 S Ct 2394, 2400–2401, 180 L Ed 2d 310 (2011) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. *Id*. at 2468.

In holding that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, the *Miller* Court specifically declined to hold that the Eighth Amendment requires a categorical bar on life without parole for juveniles. *Id.* at 2469. The *Miller* Court did, however require a sentencing court in juvenile homicide cases to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*.

A panel of this Court recently considered the applicability of *Miller* to Michigan juvenile homicide cases. In *People v Eliason*, 300 Mich App 293, 295; 833 NW2d 357 (2013), this Court reviewed a 14- year-old's appeal of his conviction for first degree premeditated murder and the mandatory sentence of life imprisonment without the possibility of parole that was imposed. Referencing *Miller*, this Court held that because the defendant's case was pending on direct review at the time *Miller* was decided, "therefore, *Miller* applies and defendant's mandatory sentence of life imprisonment without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment*." Eliason*, 300 Mich App at 309. The *Eliason* Court also explained that a prior published Court of Appeals case discussing the effect of the *Miller* decision, *People v Carp*, 298 Mich App 472, 526–527; 828 NW2d 685 (2012), only determined that the "limited holding in *Miller* was that a juvenile cannot be *automatically* subjected to a punishment of life imprisonment without the possibility of parole" and that the actual holding in *Carp* was "that *Miller* did not apply retroactively to collateral challenges to sentences." *Eliason*, 300 Mich App at 309. The *Eliason* Court explained the remedy for juveniles convicted of homicide and sentenced to mandatory life in prison without parole after *Miller* as thus:

However, contrary to defendant's assertions, he is not entitled to a remand at which the trial court has unfettered discretion to impose a sentence for any term of years. In fact, he could still receive the same sentence on remand, as the *Miller* Court did not "foreclose a sentencer's ability" to sentence a juvenile in a homicide case to life imprisonment without parole, so long as the sentence "take[s] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at ——, 132 S Ct at 2469. In other words, a trial court can still sentence a juvenile who committed a homicide to life in prison without the possibility of parole, so long as that sentence is an individualized one that takes into consideration the factors outlined

in *Miller*. *Id.* at ——, 132 S Ct at 2466–2467, 2471. We recognized as much in *Carp*, 298 Mich App at 525, where we opined in dicta that the rule from *Miller* "does not . . . imply that a sentencing court has unfettered discretion when sentencing a juvenile. Rather, the focus is on the discretion of the sentencer to determine whether to impose the harshest penalty of life without the possibility of parole on a juvenile convicted of a homicide offense."

Therefore, the only discretion afforded to the trial court in light of our first-degree murder statutes and *Miller* is whether to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole. *Carp*, 298 Mich App at 527. In deciding whether to impose a life sentence with or without the possibility of parole, the trial court is to be guided by the following nonexclusive list of factors:

(a) the character and record of the individual offender [and] the circumstances of the offense, (b) the chronological age of the minor, (c) the background and mental and emotional development of a youthful defendant, (d) the family and home environment, (e) the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected [the juvenile], (f) whether the juvenile might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth, and (g) the potential for rehabilitation. [ *Id.* at 532, citing *Miller*, 567 US at ——, 132 S Ct at 2467–2468 (quotation marks and citations omitted).]

However, in response to *Miller*, and after *Eliason* was decided, the Legislature enacted MCL 769.25 and MCL 769.25a which "significantly altered Michigan's sentencing scheme for juvenile offenders convicted of crimes that had previously carried a sentence of life without parole." *People v Carp*, 496 Mich 440, 456; 852 NW2d 801 (2014). These statutes became effective on March 4, 2014, and apply to a criminal defendant who is less than 18 at the time he or she committed an offense either after the effective date of the amendatory act added the statutes or was less than 18 prior to that effective date and (1) either the case was still pending in the trial court or the applicable time periods for direct appellate review had not yet expired or (2) on June 25, 2012, (the day before *Miller* was decided) the case was pending in the trial court or the applicable time period for direct appellate review had not yet expired. MCL 769.25(1)(a)(i) and (ii). The effect of MCL 769.25 is that juveniles who commit even the most serious of offenses are no longer sentenced under the same fixed sentences as adults who commit the same offenses may be sentenced. Under this new law, absent a motion by the prosecutor seeking a sentence of life without parole, "the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25(4) and (9); *Carp*, 496 Mich at 458. If the prosecutor files a motion seeking life imprisonment without the possibility of parole for the allowed enumerated offenses, the trial court must hold a hearing, at which it must consider the factors listed in *Miller* and shall specify on the record any reasons supporting the sentence imposed. MCL 769.25(6) and (7). *Carp*, 496 Mich at 458-459.

More recently, in *Carp*, our Supreme Court considered the *Eliason* decision. That case, when consolidated with *People v Carp*, unpublished opinion per curiam of the Court of Appeals

issued November 15, 2012, (Docket No. 307758) and *People v Davis*, unpublished order of the Court of Appeals, entered June 15, 2000, (Docket No. 224046), called upon our Supreme Court to determine whether *Miller* should be applied retroactively to cases in which the defendant's sentence became final for purposes of direct appellate review before *Miller* was decided and (2) whether the Eighth Amendment of the United States Constitution or Const 1963, art 1, § 16 categorically bars the imposition of a life-without-parole sentence on a juvenile homicide offender. Our Supreme Court decided both questions in the negative. Relevant to the instant matter, however, the Supreme Court determined that while resentencing was indeed the proper directive in *Eliason*, the trial court was not, as the Court of Appeals in *Eliason* indicated, afforded with only the discretion to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole. Instead, because the defendant's case was on direct review at the time *Miller* was decided, he was entitled to resentencing pursuant to MCL 769.25(1)(b)(ii). The Supreme Court noted that:

> Under MCL 769.25(9), the default sentence for a juvenile convicted of first-degree murder is a sentence of a term of years within specific limits rather than life without parole. A juvenile defendant will only face a life-without-parole sentence if the prosecutor files a motion seeking that sentence and the trial court concludes following an individualized sentencing hearing in accordance with *Miller* that such a sentence is appropriate. MCL 769.25(2) through (7). *Carp*, 496 Mich at 528.

In this case, defendant committed the crime at issue when he was 16 years old and was sentenced on May 27, 2011, when he was 17 years of age. Due to a court error, it became necessary for the trial court to enter an order to reinstate his claim of appeal on May 31, 2012.[2] Defendant thereafter filed his timely claim of appeal on July 5, 2012. Because defendant's time for filing an appeal had not expired when *Miller* was decided (June 25, 2012), he is entitled to resentencing pursuant to MCL 769.25(1)(b)(i). See, *Carp*, supra.

We therefore affirm defendant's convictions, but remand for resentencing pursuant to MCL 769.25(1)(b)(i). We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Karen M. Fort Hood
/s/ Deborah A. Servitto

---

[2] Defendant signed a written request for appellate counsel on May 31, 2011, but, for reasons unknown, this form request was not processed by Wayne County. In January 2012, defendant wrote to the trial judge, again requesting the appointment of appellate counsel. His request and appeal were properly pursued at that point and his appeal, though now technically untimely through no fault of his own, was regarded as a claim of appeal.

| STATE OF MICHIGAN<br>3rd JUDICIAL CIRCUIT<br>WAYNE COUNTY | CLAIM OF APPEAL AND<br>ORDER APPOINTING COUNSEL<br><br>[X] Order Amended | CASE NO. AND SUFFIX<br>10-5562       01 |
|---|---|---|

Amended Reason:   AS TO FORM: NOW A CLAIM CASE PER JUDGE KENNY'S ORDER OF 5-31-12

| Court Address | Court Telephone No |
|---|---|
| 1441 ST. ANTOINE, ROOM 917 DETROIT, MI 48226 | (313) 224-6222 |

| **People of THE STATE OF MICHIGAN** | Date of Birth, address, and inmate number      08-17-1993<br>SAGINAW CORRECTIONAL FACILITY<br>9625      PIERCE ROAD<br>FREELAND                            MI      48623                793937 |
|---|---|

v

| Defendent Name, Last | First | Middle |
|---|---|---|
| HOWARD | DEONTE | |

| Offense Information | | | | | | Terms of Incarceration | | | | | | | | | | Intermediate Sanctions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Minimum | | | Maximum | | | | | | | Probation | | | | | | |
| Date | Description | PACC Code | H | C | A | S | Y | M | D | Y | M | D | K | P | J | Y | M | D | R | F | O |
| | HOMICIDE/MURDER 1ST DEG | 750.316-A | | | | | | | | LIFE | | | | X | | | | | | | |

H=Habitual   =Conspiracy A=Attempt S=Solicitation   =Year      =Month      =Day   =Consecutive P=Prison   =Jai   =Restitution F =Fine   =Other

The defendant claims an appeal from a final judgment or order entered on  in the 3rd Circuit Court, WAYNE COUNTY,
Michigan by Judge VIRGIL  SMITH 20714.  Copies of the judgment or order being appealed and docket entries are attached
for the Court of Appeals, appointed counsel, and Michigan Appellate Assigned Counsel System.

On 01-11-2012 the defendant filed a request for appointment of counsel and a declaration of indigency.

**IT IS ORDERED:**

| STATE APPELLATE DEFENDER OFFICE<br>Name of Appellate Counsel<br>DETROIT, MI 48226<br>City, State, Zip | 645 GRISWOLD, PENOBSCOT BLDG. SUITE 3300<br>Address<br>313-256-9833                              1<br>Telephone No.                              Bar No. |
|---|---|

is appointed counsel for the defendant in post-conviction proceedings.  If appointed counsel cannot or will not accept this appointment, counsel
shall notify the court immediately.

The court reporter(s)/recorder(s) shall file with the trial court clerk the transcripts indicated below and any other transcripts requested by counsel
in this case not previously transcribed.  Transcripts shall be filed within 28 days for pleas or 91 days for trials from the date ordered or requested
[MCR 7.210(B)]. Reporter(s)/recorder(s) shall be paid as provided by law.

| TRANSCRIPTS ORDERED | REPORTER/RECORDER NAME | OTHER DESCRIPTIO | PREVIOUSLY<br>ORDERED   FILED | | NUMBER | DATE(S) OF<br>PROCEEDING |
|---|---|---|---|---|---|---|
| SENTENCE | SEAN ALLEN | | X | X | | 02-09-2011 |
| SENTENCE | SEAN ALLEN | | X | X | | 05-27-2011 |
| OTHER | SEAN ALLEN | FC | X | X | | 06-03-2010 |
| OTHER | SEAN ALLEN | PRE TRIAL | X | X | | 07-19-2010 |
| OTHER | SEAN ALLEN | MH | X | X | | 08-19-2010 |
| OTHER | SEAN ALLEN | MH | X | X | | 09-07-2010 |
| OTHER | SEAN ALLEN | MH | X | X | | 09-23-2010 |
| OTHER | SEAN ALLEN | MH | X | X | | 10-06-2010 |
| OTHER | SEAN ALLEN | MH | X | X | | 12-01-2010 |
| OTHER | SEAN ALLEN | MH | X | X | | 12-14-2010 |
| OTHER | SEAN ALLEN | MH | X | X | | 01-05-2011 |
| OTHER | SEAN ALLEN | PRE TRIAL | X | X | | 04-22-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 01-10-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 01-11-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 01-12-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 01-13-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 01-14-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 01-18-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 05-09-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 05-10-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 05-11-2011 |
| JURY TRIAL | SEAN ALLEN | | X | X | | 05-12-2011 |

The clerk shall immediately send to counsel a copy of the transcripts ordered above or requested by counsel as they become available.  The clerk shall also forward documents upon request by counsel. [MCR 6.433]

*6-26-12*

Date

VIRGIL SMITH
Judge

20714
Bar No.

### CERTIFICATE OF MAILING

I certify that on this date I mailed a copy of this claim of appeal to appointed counsel, defendant, court reporter(s)/recorder(s), prosecutor, Court of Appeals, and The Michigan Appellate Assigned Counsel System (MAACS).  I also mailed a copy of the final judgment or order being appealed and the docket entries to appointed counsel, the Court of Appeals, and MAACS.  I also mailed a copy of the defendant's request for appointment of counsel to appointed counsel, the prosecutor, and MAACS.

*6-26-12*

Date

*C. Palmer*

Signature

2012 JUL -5  AM 10: 20

COURT OF APPEALS
DETROIT OFFICE
LARRY S. ROYSTER
CHIEF CLERK

RECEIVED

THIRD JUDICIAL CIRCUIT OF MICHIGAN

# REGISTER OF ACTIONS
## CASE NO. 10-005562-01-FJ

| State of Michigan v Deonte Howard | § | Location: | **Criminal Division** |
|---|---|---|---|
| | § | Judicial Officer: | **Morrow, Bruce U.** |
| | § | Filed on: | **05/26/2010** |
| | § | Case Number History: | **10059500-01** |
| | § | | **10709648-01** |
| | § | Case Tracking Number: | **10709648-01** |
| | § | CRISNET/Incident No.: | **1004100306** |
| | § | Transaction Control Number: | **DJ-10118913K** |

---

### CASE INFORMATION

**Offense** | **Deg** | **Date**
1. Homicide - Murder First Degree - Premeditated | . | 04/10/2010
   Arrest:  04/10/2010     DPHOM - Detroit Pd Homicide
2. Assault With Intent to Murder | . | 04/10/2010
   Arrest:  04/10/2010     DPHOM - Detroit Pd Homicide
3. Assault With Intent to Do Great Bodily Harm less Than Murder | . | 01/18/2011
4. Weapons Felony Firearm | . | 01/18/2011

Case Type:  **Juvenile Felonies**

Case Status:  **02/09/2011  Final**

Case Flags:  **Restitution**
**Case has PDF Electronic Transcripts**

**Statistical Closures**
01/18/2011     Jury Verdict

**Warrants**
Bench Warrant  -  Howard, Deonte (Judicial Officer: Barthwell, Sidney, Jr. )
05/17/2010                Warrant Cancelled/ Recalled (LC)
Fine: $0            Bond: $0

---

### PARTY INFORMATION

| | | *Lead Attorneys* |
|---|---|---|
| **Plaintiff** | **State of Michigan** | **Leick, Angela Renee** |
| | | (810) 623-2246(W) |
| **Defendant** | **Howard, Deonte** | **Moore, W. Frederick** |
| | *Black Male* | *Retained* |
| | *SID: M13423087E* | (313) 418-1253(W) |
| **Appellate Attorney** | **McCarthy, Michael J.** | |
| | **STATE APPELLATE DEFENDER OFFICE** | |

---

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 05/15/2010 | Recommendation for Warrant | |
| 05/15/2010 | Warrant Signed | |
| 05/16/2010 | Order Waiving Juvenile From Family Div. to Criminal Div. | |
| 05/17/2010 | **Arraignment on Warrant** (Judicial Officer: Sherman, Millicent D) *Defendant Stands Mute: Plea Of Not Guilty Entered By Court* | |
| 05/17/2010 | **Plea** (Judicial Officer: Sherman, Millicent D) 1. Homicide - Murder First Degree - Premeditated    Defendant Stand Mute: Plea of Not Guilty Entered by Court | |
| 05/17/2010 | **Plea** (Judicial Officer: Sherman, Millicent D) 2. Assault With Intent to Murder | |

*Printed on 06/26/2012 at 12:19 PM*

# REGISTER OF ACTIONS
## CASE NO. 10-005562-01-FJ

Defendant Stand Mute: Plea of Not Guilty Entered by Court

| | |
|---|---|
| 05/17/2010 | **Interim Condition for Howard, Deonte** (Judicial Officer: Barthwell, Sidney, Jr.) <br> - Remand <br> $0.00 |
| 05/17/2010 | **Interim Condition for Howard, Deonte** (Judicial Officer: Sherman, Millicent D) <br> - Remand <br> $0.00 |
| 05/17/2010 | **Interim Condition for Howard, Deonte** (Judicial Officer: Sherman, Millicent D) <br> - Remand <br> $0.00 |
| 05/26/2010 | **Preliminary Examination** (Judicial Officer: Hansen, Katherine L) <br> *05/26/2010 Reset by Court to 05/26/2010* <br> *Held: Bound Over* |
| 05/26/2010 | Motion to Assign Counsel Filed/ Signed |
| 05/26/2010 | Bound Over |
| 05/26/2010 | Order For Production Of Exam Transcript Signed and Filed      *88 pages* <br> *Beth Tomasi;05-26-10:0+1* |
| 06/03/2010 | **Arraignment On Information** (Judicial Officer: Morrow, Bruce U.) <br> Resource: Court Rpt/Rec 5265 Allen, Sean <br> Resource: Courtroom Clerk C5954 Ulatowski, Mark <br> *Held* |
| 06/03/2010 | **Disposition Conference** (Judicial Officer: Morrow, Bruce U.) <br> Resource: Court Rpt/Rec 5265 Allen, Sean <br> Resource: Courtroom Clerk C5954 Ulatowski, Mark <br> *Held* |
| 06/03/2010 | **Calendar Conference** (Judicial Officer: Morrow, Bruce U.) <br> Resource: Court Rpt/Rec 5265 Allen, Sean <br> Resource: Courtroom Clerk C5954 Ulatowski, Mark <br> *Held* |
| 06/03/2010 | **Final Conference** (Judicial Officer: Morrow, Bruce U.) <br> Resource: Court Rpt/Rec 5265 Allen, Sean <br> Resource: Courtroom Clerk C5954 Ulatowski, Mark <br> *Held* |
| 06/03/2010 | Scheduled AOI |
| 07/19/2010 | **Pre-Trial** (Judicial Officer: Morrow, Bruce U.) <br> Resource: Court Rpt/Rec 5265 Allen, Sean <br> Resource: Courtroom Clerk C5954 Ulatowski, Mark <br> *Held* |
| 07/19/2010 | Motion (Judicial Officer: Morrow, Bruce U. ) <br> *for additional discovery is signed and filed* |
| 07/19/2010 | Refer to Probation For Pre-Sentence Report (Judicial Officer: Morrow, Bruce U. ) |
| 07/19/2010 | Motion to Suppress |

THIRD JUDICIAL CIRCUIT OF MICHIGAN

# REGISTER OF ACTIONS
## CASE NO. 10-005562-01-FJ

|  |  |
|---|---|
|  | *Suppress out court ID* |
| 07/19/2010 | Motion To Show Cause<br>*Re: DMC Sinai Grace Hospital* |
| 07/21/2010 | Motion<br>*Amend motion to suppress* |
| 07/26/2010 | Motion To Quash Information<br>*First degree murder charge* |
| 07/26/2010 | Motion<br>*Appointment of weapons expert* |
| 07/28/2010 | **Motion Hearing** (Judicial Officer: Morrow, Bruce U.)<br>Resource: Court Rpt/Rec 5265 Allen, Sean<br>Resource: Courtroom Clerk C5954 Ulatowski, Mark<br>*Adjourned at the Request of the Prosecutor* |
| 07/28/2010 | Motion (Judicial Officer: Morrow, Bruce U. )<br>*to show cause Detroit Medical Center is withdrawn* |
| 08/19/2010 | **Motion Hearing** (Judicial Officer: Morrow, Bruce U.)<br>Resource: Court Rpt/Rec 5265 Allen, Sean<br>Resource: Courtroom Clerk C5954 Ulatowski, Mark<br>*Held* |
| 08/19/2010 | Motion to Suppress (Judicial Officer: Morrow, Bruce U. )<br>*the line-up is heard and denied* |
| 08/19/2010 | Motion To Quash Information (Judicial Officer: Morrow, Bruce U. )<br>*as to the Murder first degree charge is heard and denied* |
| 08/19/2010 | Motion (Judicial Officer: Morrow, Bruce U. )<br>*for production of transcripts of evidentiary hearing is granted* |
| 08/19/2010 | *CANCELED* **Motion Hearing**<br>*Scheduling Error* |
| 08/31/2010 | Motion To Compel<br>*For discovery* |
| 09/07/2010 | **Motion Hearing** (Judicial Officer: Morrow, Bruce U.)<br>Resource: Court Rpt/Rec 5265 Allen, Sean<br>Resource: Courtroom Clerk C5954 Ulatowski, Mark<br>*To Compel Discovery and/or Dismiss Case*<br>*Held* |
| 09/07/2010 | Motion (Judicial Officer: Morrow, Bruce U. )<br>*to compel additional discovery is granted. S/F* |
| 09/07/2010 | Order (Judicial Officer: Morrow, Bruce U. )<br>*for substituted service is signed and filed* |
| 09/07/2010 | Order (Judicial Officer: Morrow, Bruce U. )<br>*for interview of EMS/DFD medics is is signed and filed* |

# REGISTER OF ACTIONS
## CASE NO. 10-005562-01-FJ

| | | |
|---|---|---|
| 09/07/2010 | | Order (Judicial Officer: Morrow, Bruce U. )<br>*for autopsy photos and toxicology report is signed and filed* |
| 09/13/2010 | Order (Judicial Officer: Morrow, Bruce U. )<br>*third order for additional discovery is signed and filed.* | |
| 09/14/2010 | Motion to Dismiss<br>*Second motion* | |
| 09/23/2010 | **Motion Hearing** (Judicial Officer: Morrow, Bruce U.)<br>Resource: Court Rpt/Rec 5265 Allen, Sean<br>Resource: Courtroom Clerk C5954 Ulatowski, Mark<br>*Held* | |
| 09/23/2010 | | Motion to Dismiss (Judicial Officer: Morrow, Bruce U. )<br>*by defense. Is heard and denied* |
| 09/23/2010 | | Motion (Judicial Officer: Morrow, Bruce U. )<br>*to adjourn trial date is heard and granted* |
| 09/27/2010 | *CANCELED* **Jury Trial**<br>*discovery and evidence issues Adjourned at the Request of the Defense* | |
| 10/05/2010 | Bond<br>*To reduce* | |
| 10/06/2010 | **Motion Hearing** (Judicial Officer: Morrow, Bruce U.)<br>Resource: Court Rpt/Rec 5265 Allen, Sean<br>Resource: Courtroom Clerk C5954 Ulatowski, Mark<br>*Held* | |
| 10/06/2010 | | Bond (Judicial Officer: Morrow, Bruce U. )<br>*Motion to reduce bond is heard and granted. New bond is*<br>*$500,000 / 10%* |
| 10/06/2010 | **Interim Condition for Howard, Deonte** (Judicial Officer: Morrow, Bruce U.)<br>- 10% or Cash or Surety<br>  $500,000.00 | |
| 11/22/2010 | Motion<br>*To order testing of the deceased's clothing and hair* | |
| 11/22/2010 | Motion<br>*to produce transcript of 9/23/10 at county expense granted* | |
| 12/01/2010 | **Motion Hearing** (Judicial Officer: Morrow, Bruce U.)<br>Resource: Court Rpt/Rec 5265 Allen, Sean<br>Resource: Courtroom Clerk C5954 Ulatowski, Mark<br>*Held* | |
| 12/01/2010 | **Interim Condition for Howard, Deonte** (Judicial Officer: Morrow, Bruce U.)<br>- 10% or Cash or Surety<br>  $500,000.00 | |
| 12/06/2010 | Order (Judicial Officer: Morrow, Bruce U. )<br>*Order for production of LIEN computer data base search* | |

*Printed on 06/26/2012 at 12:19 PM*

# REGISTER OF ACTIONS
## CASE NO. 10-005562-01-FJ

| | | |
|---|---|---|
| 12/07/2010 | Motion | |
| | *For production of witnesses* | |

12/14/2010      **Motion Hearing** (Judicial Officer: Morrow, Bruce U.)
         Resource: Court Rpt/Rec 5265 Allen, Sean
         Resource: Courtroom Clerk C5954 Ulatowski, Mark
         *Held*

         12/14/2010          Motion (Judicial Officer: Morrow, Bruce U.)
                                    *to provide witnesses for interview is granted. signed and filed.*

12/16/2010      Order (Judicial Officer: Morrow, Bruce U.)
         *for substituted service is signed and filed*

01/05/2011      **Motion Hearing** (Judicial Officer: Morrow, Bruce U.)
         Resource: Court Rpt/Rec 5265 Allen, Sean
         Resource: Courtroom Clerk C5954 Ulatowski, Mark
         *Held*

         01/05/2011          Order (Judicial Officer: Morrow, Bruce U.)
                                    *defense order for progress notes, daily docket sheets and*
                                    *warrants is granted, signed and filed*

         01/05/2011          Order (Judicial Officer: Morrow, Bruce U.)
                                    *to produce victims file is heard and denied, signed and filed*

         01/05/2011          Order (Judicial Officer: Morrow, Bruce U.)
                                    *for weapons expert is granted. signed and filed.*

01/05/2011      Motion in Limine
         *filed;*

01/07/2011      Order (Judicial Officer: Morrow, Bruce U.)
         *Order for substituted service and booking photograph and file of Donald Ingram is*
         *signed and filed*

01/10/2011      **Jury Trial** (Judicial Officer: Morrow, Bruce U.)
         Resource: Court Rpt/Rec 5265 Allen. Sean
         Resource: Courtroom Clerk C5954 Ulatowski, Mark
         *In Progress*

01/11/2011      **Jury Trial in Progress** (Judicial Officer: Morrow, Bruce U.)
         Resource: Court Rpt/Rec 5265 Allen, Sean
         Resource: Courtroom Clerk C5954 Ulatowski, Mark
         *In Progress*

01/12/2011      **Jury Trial in Progress** (Judicial Officer: Morrow, Bruce U.)
         Resource: Court Rpt/Rec 5265 Allen, Sean
         Resource: Courtroom Clerk C5954 Ulatowski, Mark
         *In Progress*

01/13/2011      **Jury Trial in Progress** (Judicial Officer: Morrow, Bruce U.)
         Resource: Court Rpt/Rec 5265 Allen, Sean
         Resource: Courtroom Clerk C5954 Ulatowski, Mark
         *In Progress*

01/14/2011      **Jury Trial in Progress** (Judicial Officer: Morrow, Bruce U.)
         Resource: Court Rpt/Rec 5265 Allen, Sean

*Printed on 06/26/2012 at 12:19 PM*

Resource: Courtroom Clerk C5954 Ulatowski, Mark
*In Progress*

01/18/2011     **Jury Trial in Progress** (Judicial Officer: Morrow, Bruce U.)
Resource: Court Rpt/Rec 5265 Allen, Sean
Resource: Courtroom Clerk C5954 Ulatowski, Mark
*Held*

     01/18/2011     **Disposition** (Judicial Officer: Morrow, Bruce U.)
2. Assault With Intent to Murder
Not Guilty by Jury
3. Assault With Intent to Do Great Bodily Harm less Than Murder
Found Guilty by Jury
4. Weapons Felony Firearm
Found Guilty by Jury

     01/18/2011     Found Guilty By Jury (Judicial Officer: Morrow, Bruce U. )
*as to AGBH and Felony Firearm the jury was Hung as to count one Murder 1st degree*

     01/18/2011     Hung Jury (Judicial Officer: Morrow, Bruce U. )
*as to count one only*

     01/18/2011     Refer to Probation For Pre-Sentence Report (Judicial Officer: Morrow, Bruce U. )

02/02/2011     *CANCELED* **Sentencing**
*probation needs more time to generate pre Scheduling Error*

02/09/2011     **Sentencing** (Judicial Officer: Morrow, Bruce U.)
Resource: Court Rpt/Rec 5265 Allen, Sean
Resource: Courtroom Clerk C5954 Ulatowski, Mark
*Held*

     02/09/2011     **Sentence** (Judicial Officer: Morrow, Bruce U.)
3. Assault With Intent to Do Great Bodily Harm less Than Murder
Prison Sentence
Fee Totals:
- Crime Victims Fee - (FEL)     130.00
- State Minimum Cost (FEL)     68.00
Fee Totals $     198.00
Consecutive, Count to each other
State Confinement:
Agency: Michigan Department of Corrections
Effective 02/10/2011
Term: 23 Mo to 120 Mo

     02/09/2011     **Sentence** (Judicial Officer: Morrow, Bruce U.)
4. Weapons Felony Firearm
Prison Sentence
State Confinement:
Agency: Michigan Department of Corrections
Effective 02/09/2011
Term: 2 Yr to 2 Yr
Credit for Time Served: 285 Days
Consecutive, Count to each other

*Printed on 06/26/2012 at 12:19 PM*

# REGISTER OF ACTIONS
## CASE NO. 10-005562-01-FJ

| | | |
|---|---|---|
| 02/09/2011 | | Sentenced to Prison (Judicial Officer: Morrow, Bruce U.) |

03/16/2011    Writ Of Habeas Corpus
              *is signed and filed*

04/04/2011    *CANCELED* **Pre-Trial**
              *Case Disposed/Order Previously Entered*

04/22/2011    **Pre-Trial** (Judicial Officer: Morrow, Bruce U.)
              Resource: Court Rpt/Rec 5265 Allen, Sean
              Resource: Courtroom Clerk C5872 Roberts, Belinda
              *Held*

04/25/2011    *CANCELED* **Jury Trial**
              *Adjourned: At The Request Of The Prosecution*

05/09/2011    **Jury Trial** (Judicial Officer: Morrow, Bruce U.)
              Resource: Court Rpt/Rec 5265 Allen, Sean
              Resource: Courtroom Clerk C5954 Ulatowski, Mark
              *To commence at 8:30 a.m.*
              *In Progress*

05/10/2011    **Jury Trial in Progress** (Judicial Officer: Morrow, Bruce U.)
              Resource: Court Rpt/Rec 5265 Allen, Sean
              Resource: Courtroom Clerk C5954 Ulatowski, Mark
              *In Progress*

05/11/2011    **Jury Trial in Progress** (Judicial Officer: Morrow, Bruce U.)
              Resource: Court Rpt/Rec 5265 Allen, Sean
              Resource: Courtroom Clerk C5954 Ulatowski, Mark
              *In Progress*

05/12/2011    **Jury Trial in Progress** (Judicial Officer: Morrow, Bruce U.)
              Resource: Court Rpt/Rec 5265 Allen, Sean
              Resource: Courtroom Clerk C5954 Ulatowski, Mark
              *Held*

    05/12/2011    **Disposition** (Judicial Officer: Morrow, Bruce U.)
                  1. Homicide - Murder First Degree - Premeditated
                     Found Guilty by Jury

    05/12/2011    Refer to Probation For Pre-Sentence Report (Judicial Officer: Morrow, Bruce U.)

    05/12/2011    Order For DNA Sample (Judicial Officer: Morrow, Bruce U.)

05/27/2011    **Sentencing** (Judicial Officer: Morrow, Bruce U.)
              Resource: Court Rpt/Rec 5265 Allen, Sean
              Resource: Courtroom Clerk C5954 Ulatowski, Mark
              *Sentenced*

    05/27/2011    **Sentence** (Judicial Officer: Morrow, Bruce U.)
                  1. Homicide - Murder First Degree - Premeditated
                     Prison Sentence
                     Comment (State Fee of $68.00. Crime Victim Fee was

*Printed on 06/26/2012 at 12:19 PM*

# REGISTER OF ACTIONS
## CASE NO. 10-005562-01-FJ

already assessed. Restitution of $5,900.00)
State Confinement:
    Agency: Michigan Department of Corrections
    Effective 05/27/2011
    Term: Natural Life
    Credit for Time Served: 382 Days

| | | | |
|---|---|---|---|
| 06/22/2011 | Order (Judicial Officer: Kenny, Timothy M. ) | | |
| | *ORDER FOR EXTRAORDINARY FEES FOR INVESTIGATOR S/F* | | |
| 02/21/2012 | Order For Production Of Trial And Sentence Transcript | | |
| | *sean allen 5/9,10,11,12/11 jt, 5/27/11 se* | | |
| 02/21/2012 | Stenographer Certificate Required | | |
| 03/01/2012 | Stenographers Certificate Filed | | |
| | *sean allen: 5/9,10,11.12/12; 5/27/11* | | |
| 02/21/2012 | Appointment for Application for Leave to Appeal (Circuit) | | |
| 03/26/2012 | Order For Production Of Transcript | | |
| | *sean allen 6/3/10 fc, 7/19/10, 4/22/11 pretrial. 8/19,9/7,23,10/6.12/1,14/10.1/5/11 mh, 1/10,11,12,13,14,18/11 jt, 2/9/11 se* | | |
| 03/26/2012 | Stenographer Certificate Required | | |
| 03/28/2012 | Stenographers Certificate Filed | | |
| | *sean allen; 2/9/11; 6/3/10; 7/19/10; 8/19/10; 9/7,23/10; 10/6/10; 12/1,14/10; 1/5/11; 4/22/11: 1/10,11,12,13,14,18/11* | | |

04/02/2012      Notice of Transcript Filed                *Vol./Book 2 144 pages*
             *Sean Allen;08-19.09-23-10;E\*\**

04/30/2012      Notice of Transcript Filed                *Vol./Book 2 410 pages*
             *Sean Allen;01-11.12-11;E\*\**

05/04/2012      Notice of Transcript Filed                *Vol./Book 1 145 pages*
             *Sean Allen;01-13-11;E\*\**

05/31/2012      Notice of Transcript Filed                *Vol./Book 10 155 pages*
             *Sean Allen:6-3.7-19,9-7,10-6,12-1, 14-10,1-5,18,2-9,4-22-11:E\*\**

06/06/2012      Notice of Transcript Filed                *Vol./Book 1 218 pages*
             *Sean Allen;01-10-11;E\*\**

05/31/2012      Motion
             *motion and order to reinstate claim of appeal granted.*

| DATE | FINANCIAL INFORMATION | |
|---|---|---|
| | **Defendant** Howard. Deonte | |
| | Total Charges | 6,136.40 |
| | Total Payments and Credits | 384.80 |
| | **Balance Due as of 6/26/2012** | **5,751.60** |

# REGISTER OF ACTIONS

THIRD JUDICIAL CIRCUIT OF MICHIGAN

## CASE NO. 10-005562-01-FJ

| 02/10/2011 | Charge | | Defendant Howard, Deonte | 198.00 |
| 07/21/2011 | Mail Payment | Receipt # 2011-15784 | Defendant Howard, Deonte | (227.60) |
| 09/22/2011 | Charge | | Defendant Howard, Deonte | 38.40 |
| 09/22/2011 | Mail Payment | Receipt # 2011-20200 | Defendant Howard, Deonte | (38.40) |
| 11/02/2011 | Charge | | Defendant Howard, Deonte | 5,900.00 |
| 04/03/2012 | Mail Payment | Receipt # 2012-07714 | Defendant Howard, Deonte | (148.40) |

Approved, SCAO

| Original - Court | 3rd copy - Michigan State Police CJIC |
|---|---|
| 1st copy - Corrections | 4th copy - Defendant |
| 2nd copy - Corrections (for return) | 5th copy - Prosecutor |

| STATE OF MICHIGAN JUDICIAL CIRCUIT COUNTY | JUDGMENT OF SENTENCE COMMITMENT TO DEPARTMENT OF CORRECTIONS | CASE NO. 10-005562-01 |
|---|---|---|

| ORI MI- Police Report No. | Court address | FMHJ, 1441 St. Antoine, Rm 404 Detroit, MI 48226 | Court telephone no. (313) 224-0415 |
|---|---|---|---|

| THE PEOPLE OF THE STATE OF MICHIGAN | v | Defendant's name, address, and telephone no. **Deonte Howard** |
|---|---|---|

| CTN/TCN 82-10709648-01 | SID | DOB 8-17-1993 |
|---|---|---|

| Prosecuting attorney name **Timothy Baywal** | Bar no. **P-74049** | Defendant attorney name **Frederick Moore** | Bar no. **P-33341** |
|---|---|---|---|

## THE COURT FINDS:

1. The defendant was found guilty on _____ 5-12-2011 _____ of the crime(s) stated below:

| | CONVICTED BY | | | DISMISSED BY* | CRIME | CHARGE CODE(S) MCL citation/PACC Code |
|---|---|---|---|---|---|---|
| Count | Plea* | Court | Jury | | | |
| 1 | | | G | | **Homicide-Murder First Degree** | **750.316A** |
| | | | | | | |
| | | | | | | |
| | | | | | | |

*For plea: insert "G" for guilty plea, "NC" for nolo contendere, or "MI" for guilty but mentally ill, For dismissal; insert "D" for dismissed by court or "NP" for dismissed by prosecutor/plaintiff.

- ☐ 2. The conviction is reportable to the Secretary of State under MCL 257.625(20)(b).
- ☐ 3. HIV testing and sex offender registration is completed.
- ☐ 4. The defendant has been fingerprinted according to MCL 28.243.

Defendant's driver license number

## IT IS ORDERED:
- ☐ 5. Probation is revoked.
- 6. Participating in a special alternative incarceration unit is ☐ prohibited. ☐ permitted.
- 7. Defendant is sentenced to custody of Michigan Department of Corrections. This sentence shall be executed immediately.

| | SENTENCE DATE | MINIMUM | | | MAXIMUM | | DATE SENTENCE BEGINS | JAIL CREDIT | | OTHER INFORMATION |
|---|---|---|---|---|---|---|---|---|---|---|
| Count | | Years | Mos. | Days | Years | Mos. | | Mos. | Days | |
| 1 | 5-27-11 | NATURAL | LIFE | | | | 5-27-2011 | 0 | 382 | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

- ☐ 8. Sentence(s) to be served consecutively to: (if this item is not checked, the sentence is concurrent)
  - ☐ each other. ☐ case numbers _____ .
- 9. Defendant shall pay as follows: (specify fine and minimum state costs for each count; restitution; assessments for crime victim rights fund; reimbursement; attorney fees; and other costs) **State $68.00; Crime victims previously assessed; Restitution $5,900.00**

  The due date for payment is _____ . Fine, costs, and fees not paid within 56 days of the due date are subject to a 20% late penalty on the amount owed.
- ☐ 10. The concealed weapon board shall ☐ suspend for _____ days ☐ permanently revoke the concealed weapon license, permit number _____ , issued by _____ County.
- 11. Court recommendation:

_____ 5-27-2011 _____
Date

Judge **Bruce U. Morrow** P32526 Bar no.

I certify that this is a correct and complete abstract from the original court records. The sheriff shall, without needless delay, deliver defendant to the Michigan Department of Corrections at a place designated by the department.

(SEAL)

Deputy court clerk

MCL 765.15(2), MCL 769.16a, MCL 775.22, MCL 780.766 MCR 6.427(A)

**CC 219b** (6/05) **JUDGMENT OF SENTENCE, COMMITMENT TO DEPARTMENT OF CORRECTIONS**

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

Approved, Michigan Court of Appeals

| **LOWER COURT**<br><br>**Wayne County Circuit Court** | **Electronically Filed**<br><br>**BRIEF COVER PAGE** | **CASE NO.**<br>Lower Court  **10-5562-01**<br><br>Court of Appeals  **311169** |
|---|---|---|

(Short title of case)
Case Name: **People v. Deonte Howard**

1. Brief Type (select one):
   ☒ APPELLANT(S)  ☐ APPELLEE(S)  ☐ REPLY
   ☐ CROSS-APPELLANT(S)  ☐ CROSS-APPELLEE(S)  ☐ AMICUS
   ☐ OTHER [identify]:

2. This brief is filed by or on behalf of [insert party name(s)]: **Deonte Howard**

3. ☐  This brief is in response to a brief filed on          by          .

4. ORAL ARGUMENT:  ☒ REQUESTED  ☐ NOT REQUESTED

5. ☐  THE APPEAL INVOLVES A RULING THAT A PROVISION OF THE CONSTITUTION, A STATUTE, RULE OR REGULATION, OR OTHER STATE GOVERNMENTAL ACTION IS INVALID.
   [See MCR 7.212(C)(12) to determine if this applies.]

6. As required by MCR 7.212(C), this brief contains, in the following order: [check applicable boxes to verify]

   ☒ Table of Contents [MCR 7.212(C)(2)]
   ☒ Index of Authorities [MCR 7.212(C)(3)]
   ☒ Jurisdictional Statement [MCR 7.212(C)(4)]
   ☒ Statement of Questions [MCR 7.212(C)(5)]
   ☒ Statement of Facts (with citation to the record) [MCR 7.212(C)(6)]
   ☒ Arguments (with applicable standard of review) [MCR 7.212(C)(7)]
   ☒ Relief Requested [MCR 7.212(C)(9)]
   ☒ Signature [MCR 7.212(C)(9)]

7. This brief is signed by [type name]: **Susan M. Meinberg**
   Signing Attorney's Bar No. [if any]: **(P34433)**

# <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES.............................................................................. i

STATEMENT OF JURISDICTION................................................................v

STATEMENT OF QUESTIONS PRESENTED........................................ vi

STATEMENT OF FACTS .............................................................................1

STANDARD OF REVIEW .....................................................13, 21, 30, 38

I.   DEONTE HOWARD'S CONVICTION FOR FIRST-DEGREE MURDER MUST BE REVERSED WHERE THE PROSECUTION FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE THAT DEONTE HOWARD WAS THE PERSON WHO COMMITTED THE OFFENSE, AND WHERE THERE WAS INSUFFICIENT EVIDENCE OF PREMEDITATION AND DELIBERATION. ...........................................13

II.  DEONTE HOWARD WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE COUNSEL FAILED TO CALL SGT.  MARTEL AS A DEFENSE WITNESS, FAILED TO SUBMIT A CRITICAL STIPULATION THAT HAD BEEN ENTERED AT DEFENDANT'S FIRST TRIAL, AND FAILED TO CROSS-EXAMINE A KEY PROSECUTION WITNESS.................................................................21

III. DEONTE HOWARD IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED HIS STATE AND FEDERAL DUE PROCESS RIGHTS WHERE HIS CONVICTION WAS OBTAINED THROUGH THE USE OF FALSE AND/OR PERJURED TESTIMONY.....30

IV.  THE UNITED SUPREME COURT RULING IN *MILLER V ALABAMA* PROHIBITS A SENTENCE OF LIFE WITHOUT PAROLE IMPOSED UNDER A STATUTORY SCHEME THAT REQUIRES MANDATORY LIFE FOR THOSE WHO WERE JUVENILES AT THE TIME OF THE OFFENSE.  *MILLER* REQUIRES RESENTENCING FOR DEONTE HOWARD BECAUSE HE WAS SENTENCED UNDER PRECISELY THAT KIND OF SCHEME, IN VIOLATION OF BOTH HIS EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS TO A SENTENCE THAT IS PROPORTIONATE AND INDIVIDUALIZED.............................38

SUMMARY AND RELIEF AND REQUEST FOR ORAL ARGUMENT.................................41

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

# INDEX OF AUTHORITIES

## CASES

*Atkins v Virginia*, 536 US 304 (2002).................................................................. 39

*Austin v United States*, 127 US App DC 180; 382 F 2d 129 (1967)............................ 17

*Berger v United States*, 295 US 78 (1935) ............................................................. 32

*Bigelow v. Haviland*, 576 F.3d 284 (6th Cir.2009).................................................. 22

*Blackburn v Foltz*, 828 F 2d 1177 (CA 6, 1987) .................................................... 22

*Brady v Maryland*, 373 US 83 (1963) ................................................................... 32

*California v Trombetta*, 467 US 479 (1984)........................................................... 35

*Couch v Booker*, 632 F3d 241 (CA 6, 2011) ..................................................... 23, 28

*Evitts v Lucey*, 469 US 387; 105 S Ct 830; 83 L Ed 2d 821 (1985) ......................... 42

*Ewing v California*, 538 US 11 (2003) .................................................................. 39

*Giglio v United States*, 405 US 150 (1972) .............................................. 32, 33, 35, 36

*Graham v Florida*, 560 US ___ (2010) ................................................................. 42

*Horton v Zant*, 941 F 2d 1449 (CA 11, 1991) ....................................................... 22

*In re Winship*, 397 US 358 (1970) ....................................................................... 13

*Kennedy v Louisiana*, 128 S Ct 2641 (2008) ......................................................... 39

*Miller v Alabama,* ___ US ___; 132 S Ct 2455 (2012) ...................................... passim

*Mooney v Holohan*, 294 US 103 (1935) ............................................................ 32, 33

*Napue v Illinois*, 360 US 264 (1959) ...................................................... 32, 33, 35, 36

*Nye v People*, 35 Mich 16 (1876) ........................................................................ 19

*People v Anderson*, 44 Mich App 222 (1972) ..................................................... 34, 35

*People v Atkins*, 397 Mich 163 (1976).................................................................. 35

*People v Barbara*, 400 Mich 352 (1977) ............................................................... 35

*People v Barclay*, 208 Mich App 670 (1995) ........................................................ 21

i

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

*People v Cassell*, 63 Mich App 226 (1975) ............................................................... 34

*People v Clark*, 274 Mich App 248 (2007) ............................................................... 45

*People v Conklin*, 118 Mich App 90 ; 324 NW2d 537 (1982) ................................... 18

*People v Dalessandro*, 165 Mich App 569 (1988) ..................................................... 22

*People v Gill*, 43 Mich App 598 (1972) .................................................................... 16

*People v Grant*, 445 Mich 535 (1994) ...................................................................... 21

*People v Grant*, 470 Mich 477 (2004) ................................................................ 22, 28

*People v Hampton*, 407 Mich 354 (1979) ................................................................. 13

*People v Henry*, 239 Mich App 140 (1999) .............................................................. 21

*People v Hoffmeister*, 394 Mich 155 (1975) ................................................. 16, 17, 18

*People v Johnson*, 451 Mich 115 (1996) ................................................................... 28

*People v Johnson*, 99 Mich App 547 (1980) ............................................................. 16

*People v Kern*, 6 Mich App 406 (1967) .................................................................... 15

*People v LaVearn*, 448 Mich 207 (1995) ................................................................. 21

*People v Lester*, 232 Mich App 262 (1998) .............................................................. 32

*People v Meier*, 47 Mich App 179 ; 209 NW 2d 311 (1973) ..................................... 18

*People v Morrin*, 31 Mich App 301 (1971) ...................................................... 15, 19, 20

*People v Nimeth*, 236 Mich App 616 (1999) ............................................................. 38

*People v Noble*, 238 Mich App 647 (1999) ............................................................... 38

*People v Oster*, 67 Mich App 490 (1976) ........................................................ 17, 18, 19

*People v Plummer*, 229 Mich App 293 (1998) ................................................. 18, 19, 20

*People v Savvides*, 1 NY2d 554; 154 NYS2d 885, ; 136 NE2d 853, .......................... 32

*People v Stewart*, 163 Mich 1 (1910) ....................................................................... 15

*People v Sullivan*, 290 Mich 414 (1939) .................................................................. 15

*People v Thornton*, 80 Mich App 746 (1978) ............................................................ 35

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

*People v Tilley*, 405 Mich 38 (1979) ................................................................. 16, 19

*People v Vinunzo*, 212 Mich 472 ; 180 NW 502 (1920).................................... 17

*People v White*, 212 Mich App 298 (1995) ...................................................... 38

*People v Wiese*, 425 Mich 448 (1986) .............................................................. 35

*People v Wilson*, 230 Mich App 590 (1998)..................................................... 38

*People v Wolfe*, 440 Mich 508 (1992) ............................................................... 13

*People v Woods*, 416 Mich 581 (1982) ............................................................. 35

*Pyle v Kansas*, 317 US 213 (1942) ............................................................... 32, 33

*Ramonez v Berghuis*, 490 F3d 482 (CA 6, 2007) ............................................. 28

*Roe v Flores-Ortega*, 528 US 470 (2000) ......................................................... 22

*Rompilla v Beard*, 545 US 374 (2005)............................................................... 22

*Roper v Simmons,* 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005)........... 42

*Strickland v Washington*, 466 US 668 (1984) ...................................... 21, 22, 23, 28

*Towns v Smith*, 395 F3d 251 (CA 6, 2005) .................................................. 22, 28

*United States v Agurs*, 427 US 97 (1976) .................................................. 32, 33, 36

*United States v Bagley*, 473 US 667 & n 8 (1985) ........................................... 32

*United States v Barham*, 595 F2d 231 (CA 5, 1979) ....................................... 36

*United States v Leon,* 534 F 2d 660 (CA 6, 1975) ........................................... 14

*United States v Saunders*, 325 F 2d 840 (CA 6, 1964) ................................... 14

*Washington v Hofbauer*, 228 F3d 689 (CA 6, 2000) ....................................... 22

*Wiggins v Smith*, 539 US 510 (2003).................................................................. 22

## CONSTITUTIONS, STATUTES, COURT RULES

MCL 750.227b............................................................................................................. 1

MCL 750.316................................................................................................................ 1, 15

MCL 750.83.................................................................................................................. 1

MCL 750.84 ................................................................................................................... 1

MCL 769.1 ................................................................................................................... 44

MCL 769.1(1) ............................................................................................................. 44

MCL 769.34 ................................................................................................................. 44

MCL 769.8 ................................................................................................................... 44

MCL 769.9 ................................................................................................................... 44

MCL 777.1 et seq. ...................................................................................................... 44

Mich Const 1963, art 1, § 20 ............................................................................ 21, 23, 46

Mich Const 1963, art 1, §17 ................................................................................... 13, 32

US Const, Am VI ........................................................................................................ 21

US Const, Am XIV ................................................................................................ 21, 32

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

## <u>STATEMENT OF JURISDICTION</u>

Defendant-Appellant was convicted in the Wayne County Circuit Court by jury trial, and a Judgment of Sentence was entered on May 27, 2011. A Claim of Appeal was filed on July 5, 2012 by the trial court pursuant to the indigent defendant's request for the appointment of appellate counsel dated January 11, 2012, as authorized by MCR 6.425(F)(3). This Court has jurisdiction in this appeal as of right provided for by Mich Const 1963, art 1, §20, pursuant to MCL 600.308(1); MCL 770.3; MCR 7.203(A), MCR 7.204(A)(2).

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

## STATEMENT OF QUESTIONS PRESENTED

I.   MUST DEONTE HOWARD'S CONVICTION FOR FIRST-DEGREE MURDER MUST BE REVERSED WHERE THE PROSECUTION FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE THAT DEONTE HOWARD WAS THE PERSON WHO COMMITTED THE OFFENSE, AND WHERE THERE WAS INSUFFICIENT EVIDENCE OF PREMEDITATION AND DELIBERATION?

Trial Court made no answer.

Defendant-Appellant answers, "Yes".

II.   WAS DEONTE HOWARD DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE COUNSEL FAILED TO CALL SGT. MARTEL AS A DEFENSE WITNESS, FAILED TO SUBMIT A CRITICAL STIPULATION THAT HAD BEEN ENTERED AT DEFENDANT'S FIRST TRIAL, AND FAILED TO CROSS-EXAMINE A KEY PROSECUTION WITNESS?

Trial Court made no answer.

Defendant-Appellant answers, "Yes".

III.   IS DEONTE HOWARD IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED HIS STATE AND FEDERAL DUE PROCESS RIGHTS WHERE HIS CONVICTION WAS OBTAINED THROUGH THE USE OF FALSE AND/OR PERJURED TESTIMONY?

Trial Court made no answer.

Defendant-Appellant answers, "Yes".

IV.   THE UNITED SUPREME COURT RULING IN *MILLER V ALABAMA* PROHIBITS A SENTENCE OF LIFE WITHOUT PAROLE IMPOSED UNDER A STATUTORY SCHEME THAT REQUIRES MANDATORY LIFE FOR THOSE WHO WERE JUVENILES AT THE TIME OF THE OFFENSE. DOES *MILLER* REQUIRE RESENTENCING FOR DEONTE HOWARD BECAUSE HE WAS SENTENCED UNDER PRECISELY THAT KIND OF SCHEME, IN VIOLATION OF BOTH HIS EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS TO A SENTENCE THAT IS PROPORTIONATE AND INDIVIDUALIZED?

Trial Court made no answer.

Defendant-Appellant answers, "Yes".

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

## STATEMENT OF FACTS

Defendant-Appellant DEONTE HOWARD, age 16, was charged with first-degree murder, MCL 750.316, assault with intent to murder, MCL 750.83, and felony firearm, MCL 750.227b. After a jury trial in January 2011, he was convicted of assault with intent to commit great bodily harm, MCL 750.84, and felony firearm, but the jury hung with regard to the murder charge. On February 9, 2011, Defendant Howard was sentenced to 23-120 months for the assault and two years for felony firearm.  After a second trial in May 2011, a jury found Mr. Howard guilty of first-degree murder. On May 27, 2011, Judge Morrow sentenced Mr. Howard to mandatory, non-parolable life imprisonment.

**Pre-trial Motions**

Prior to trial, Defendant's motion to quash the first-degree murder count was denied on August 19, 2010 (MT 8/19/10, 14).  The defense also filed a motion to suppress the in-court and out of court identification by Aundrey Allen as being tainted.  After taking testimony, the motion was denied (MT 8/19/10, 91-93).

**Trial Testimony**

The instant case involved the death of Tyrone Simpson (a/k/a "Ant"), age 19, during the afternoon hours of April 10, 2010 in the parking lot of the Smokehouse restaurant/convenience store (a/k/a Garden Café) at 16228 Tireman in the city of Detroit.  Simpson accused Deonte Howard, age 16, of taking his Cartier glasses and they argued in front of a group of people outside the store. The argument escalated into Simpson attacking Howard and repeatedly punching Howard in the face.  The prosecution alleged that Deonte Howard then fired multiple

shots at Simpson.  The defense maintained that Mr. Howard was not the shooter, or alternatively, that he "lost his mind" and fired during an emotional event.

**Testimony of Witnesses Present at the Restaurant/Store**

**Bobby Bailey** was the owner of the Smokehouse restaurant/convenience store in 2010. He testified that when he returned to his store on April 10 about 5:00 p.m. he observed a regular customer, "Ant" and a group of guys in front of his store and they appeared to be hostile.  "Ant" was upset and angry.  He told Bailey that someone had just stolen his glasses and he wanted the glasses back.  During this conversation, Bailey observed another regular customer, "Tay", pull up in a SUV.  Tay exited the SUV and he was looking for his phone. He had a black hat in his hand. Ant accused Tay of stealing his glasses.  Tay said, "I ain't got nothing to do with your glasses," and he kept looking for his phone (T II, 55-64, 95-97).[1] Bailey identified Defendant Howard as the person he knew as Tay (T II, 60).

More guys showed up, as Ant and Tay were circling each other.  Ant started punching Tay in the face, and Tay fell back.  The guys standing behind Ant tried to join in, but Bailey tried to stop them.  Bailey then heard 4-5 gunshots; he got down on the ground until the shots stopped, and then he ran inside his store and went to the back.  About a minute later, he heard about 6-7 more gunshots (T II, 65-70).  After the shooting stopped, Bailey looked outside and saw Ant on the ground.  He also saw another neighborhood customer, who was inside the store and injured. The police arrived within minutes (T II, 70-74).  Bailey did not see a gun during the incident, he did not see Tay with a weapon, and he did not know who did the shooting (T II, 87, 90-91).

---

[1] The trial transcripts of the second trial are designated as follows: T I – 5/9/2011; T II – 5/10/2011; T III – 5/11/2011; T IV – 5/12/2011.

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

Bailey admitted that he initially told the police he did not see anything because he did not want to be involved. When the police questioned him a couple days later at the precinct, they threatened to charge him as an accessory to murder. They showed him some photographs, but none of them matched Tay (T II, 74-76). During an interview with Investigator Simon on April 13, Simon threatened to get Bailey's federal probation violated. When Bailey tried to explain, Simon told him, "Just shut up, shut up. It happened this way." (T II, 90, 93-94). She accused Bailey of calling the shooter up to the scene, and that Defendant Howard was the shooter (T II, 90-91). He told Simon what she wanted to hear because she was threatening to charge him and to violate his probation (T II, 94). He maintained that his identification of Defendant Howard as Tay was accurate (T II, 94).

During a third police interview at the precinct, Bailey was shown a cell phone photograph and a photographic lineup (Exhibit 48); he identified Tay as the person in the cell phone photograph, and he identified Tay in the photographic lineup (T II, 76-79).

During one of his statements to the police, Bailey mentioned a guy named Freak (T II, 87). Bailey made three statements prior to trial: the first statement to the police was on April 10, the second interview was on April 13, and a third was in September (T II, 92-95).

**Aundrey Allen,** age 19, was friends with Tyrone Simpson. Simpson's nickname was "Ant" (T III, 42). Allen lived two houses down from the Smokehouse store/restaurant. About 11:00 a.m. or noon on April 10, 2010, Allen and Simpson were eating at the Smokehouse. At this time, Simpson had a pair of Cartier sunglasses. When they finished eating, they split up, and Allen walked home (TIII, 43-45). A couple hours later, Allen saw a commotion at the Smokehouse. When he arrived at the Smokehouse, he saw Simpson, Tyrell, Defendant Howard, Freak, and people from the store. He identified the vehicles at the Smokehouse as follows:

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

Simpson's vehicle was the burgundy Suburban, and Allen's vehicle was the Buick (T III, 49-51). Simpson and Freak were arguing and yelling for 5-10 minutes; the argument was "kind of" about Allen's sister. Allen was ready to fight, but Freak ran away from him. Defendant Howard was present during this argument, but he was not involved (T III, 45-53). Freak was about 30 years old and a little taller than Defendant Howard (T III, 83-84).

Simpson resumed looked for his Cartier sunglasses. Defendant Howard, Freak and two other left. Allen's neighborhood friends also left. When the store owner pulled up, Simpson was telling him that someone had taken his glasses (T III, 52-55). A few minutes later, Howard and two others returned in a silver Mountaineer. When they exited the vehicle, Howard was looking for his phone. Simpson and Howard argued over whether Howard had Simpson's glasses. Simpson then hit Howard 4-5 times in the face, and Howard fell back (T III, 55-60).

As Simpson continued to move towards Howard, Allen saw Defendant Howard pull a gun out of his jacket pocket. After Allen heard two gunshots, Allen ran towards the store. Simpson's fist was still raised when he got hit by the shots. Allen heard three more shots. Allen was shot in the leg before he got into the store. Allen could not see what occurred after he got into the store (T III, 61-65, 91). After Bailey ran into the store, Allen heard about eight more shots. He could hear Simpson. There was a pause, and then a final shot. Allen then heard a vehicle being floored (T III, 65-70).

Allen testified that the keys in Exhibit 40 were Simpson's keys, and that the cell phone found on the back bumper of the Suburban (Exhibit 17) belonged to Simpson (T III, 71-72).

While Allen was in the hospital on April 11, 2010, he viewed a group of photographs and identified someone who was not Defendant Howard. Allen picked number 6 and wrote, "This is the man who shot me and my friend." (T III, 97). He admitted at trial that number 6 was not

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

4

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

Deonte Howard, and that number 6 was not the shooter (T III, 73-74, 95-97). Allen testified that he viewed the photo array after surgery and while he was on morphine (T III, 72-73). He picked number 6 because "he looked like him to me" (T III, 74).

About a month later, Allen attended a live lineup. Allen claimed he saw him right away, but he admitted that it took him 15 minutes to tell the police the shooter was Defendant Howard (T III, 74-76, 98, 101-102). The police had already told him they had arrested somebody (T III, 98).

On cross, Allen confirmed that when Howard returned, he was asking about his phone. Simpson confronted him about the glasses, they argued, and Simpson busted Howard in the face 4-5 times (T III, 86-87). After Howard fell back, Simpson was still walking up on Howard (T III, 89). Allen gave the police the following description of the shooter: 17 or 18 years old, 5'7" to 5'8", no more than 130 pounds, short tapered haircut, small goatee, and wearing a black coat, no hat, and blue jeans (T III, 87-88, 92-94, 105). Allen admitted that Defendant Howard did not have a goatee, and that he was a little shorter than 5'7" or 5'8" (T III, 108). On redirect, Allen maintained that he was not confusing Defendant Howard for Freak. He testified that Freak was not the shooter (T III, 107).

**Testimony of Neighbors**

**Frederick McFadden**, age 51, testified that his parents used to live on the corner of St. Marys and Tireman Streets (T II, 100). On April 10, 2010, during the mid-afternoon, McFadden was outside working on his mother's car when he heard arguing at the barbecue place that was about 50-75 feet away. When he looked, he saw a physical confrontation. About 5-10 minutes later, he heard three gunshots and he saw two guys who appeared to be wrestling. When he went

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

up to the cyclone fence, he saw a guy stumbling on the sidewalk. He testified he was about 20 feet away.   After four more shots, the guy stumbled into the street (T II, 100-109, 115-116, 120). McFadden identified Defendant Howard as the shooter, and said that Defendant pulled the gun from the front of his pants (T II, 109-110, 130).

A Dodge Durango then pulled up and Defendant jumped in the back seat. Defendant then exited the vehicle, and said "This MF N isn't dead yet." He then walked up to the man on the ground and shot him three more times. Defendant got back in the vehicle and it drove off down Mettetal Street (T II, 110-113, 115-116, 132).

According to McFadden, Defendant Howard had the gun the entire time, but the decedent was trying to take the weapon and they were tussling (T II, 115).  He testified there was only one other person outside, in addition to the two who were fighting (T II, 117).  He described the shooter as the smaller person; he was wearing a white T-shirt, beige pants and red tennis shoes. He gave the following description to the police:  5'11" to 6', medium complexion, 20-24 years old, with tattoos on his neck and arm (T II, 118-120, 126-127).  The larger person was wearing a red ball cap, a striped shirt and a pair of jeans (T II, 118). The third guy was about the same size; he took off running and got into a car after the second round of shots (T II, 122-123).

On cross, McFadden testified that a few days after the incident, he viewed an array of three photographs, and made two identifications. McFadden testified that he identified Defendant Howard as the shooter, and he identified another person as the driver of the vehicle (T II, 124-125, 127).  McFadden was "positive" that he identified Defendant Howard in the photo array (T II, 127).

**Investigator Myron Love** testified that McFadden identified three people from an array that contained six photographs, even though there was only one target individual in the array (T

III, 127-128).  Love could not recall the exact day of the photo array, but he believed it was regarding the first suspect (T III, 126-127).  Defense counsel's cross-examination of Love was as follows:

> "BY MR. MOORE:
>
> Q      Regarding this photo array, Mr. Howard was not in the photo array, is that correct?
>
> A      I'm not really positive.  I know I was part of the first one and I think it was two individuals that they wound up looking at.
>
> Q      Okay.  Would the name Deonte Miller be, sound familiar?
>
> A      To me, no, sir.
>
> Q      Okay.  Do you have anything, any paperwork anywhere in the world to suggest Mr. McFadden picked out Mr. Howard in the photo array?
>
> A      No, sir.
>
> Q      Okay.  And had Mr. McFadden picked out Mr. Howard, you would have documentation of the same, is that correct?
>
> A      Yes."  (T III, 128).

**Marcario Harris** testified that in April 2010 he lived at 16215 Tireman, which is directly across the street from the Smokehouse.  On April 10, he was watching television in his living room when he heard a couple of gunshots. When he looked outside, he saw one guy getting into a silver SUV, and another guy on the ground by the rear of a maroon Suburban. As the silver SUV started to pull off, the guy on the ground started pulling himself up.  The silver SUV then slammed on its brakes, and a guy exited the SUV with a gun and started shooting at the guy getting up.  The shooter chased the guy and fired shots.  After the guy fell by the sidewalk, the shooter continued to shoot at him; as the guy was lying on the ground, the shooter walked over to

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

him and shot him in the head. The shooter then got back in the SUV and it sped off around the corner. Harris estimated there were 10-15 shots fired after the shooter exited the vehicle. Harris did not see the victim with a gun (T II, 183-193). Harris identified Defendant Howard as the shooter (T II, 193). Harris gave the following description of the shooter to the police: black male, mid-20's, 5'10", and thin build. He did not view a photo lineup or a live lineup (T II, 198).

**Kimberly Thompson** lived with Harris at 16215 Tireman. She also looked out the window during the shooting. She confirmed that the shooter exited the SUV, and fired multiple shots at the victim (T II, 201-210). She identified Defendant Howard as the shooter (T II, 210). She gave the following description of the shooter to the police: black male, late 20's, early 30's, about 5'9" or 5'10", thin build, approximately 160 or 170 pounds, medium brown complexion, short afro that was about a half inch to an inch deep, no facial hair, no visible scars, marks or tattoos, a thin, skinny face, and he was wearing a white T-shirt and dark jeans (T II, 212-213).


**Police Investigation**

When Officer Cushingberry arrived, he first went to the shooting victim who was outside; he was unresponsive. He then attended to Aundrey Allen, who was inside the store. He had been shot and was bleeding. Cushingberry called the medics and Allen was conveyed to the hospital (T II, 134-138). When Officer Banks arrived, he noticed a pair of mangled glasses that was close to the deceased (T III, 111-112).

Witness statements and photographs were taken (T II, 28-52). Two cell phones were located and seized from the scene. One cell phone was broken and laying across the street, near the curb on the south side of Tireman. A second cell phone was found on the back bumper of a burgundy SUV (T II, 35-37, 43, 45). Two vehicles were present – a blue Buick and a burgundy

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

SUV (T II, 38). Simpson's red hooded sweatshirt was located on the sidewalk. A baggie containing suspected marijuana was found in the pocket (T II, 37, 42-43). Several spent .40 caliber shell casings were recovered (T II, 45-52, 136). A fired bullet was also recovered (T II, 47-48). A pair of broken sunglasses was found (T II, 49-51). Officer McNairy identified Exhibit 49 as the sketch of the scene she prepared (T III, 117-118). She also identified Exhibits 50-63 as the shell casings that she seized from the scene (T III, 120-122). She identified Exhibits 64-67 as the bullet fragments she seized (T III, 122-123). Officer Fitzhugh processed and collected prints from a 1997 GMC Suburban. The prints were obtained from the hood of the vehicle and the driver's door above the door handle (T II, 146-148).

Sgt. Mackie, the officer in charge of this case, confirmed that two cell phones were recovered from the scene. The phone found across the street by the curb was registered through Metro PCS to Deonte Miller (T II, 156-157, 164). Mackie subsequently located computer records for Deonte Miller. His photograph was placed in a photographic array on April 11 and shown to Aundrey Allen (T II, 157-160). A search warrant was then obtained and executed at Deonte Miller's address. Mackie then learned that Miller did not live in Michigan anymore, and that he stayed in Ohio (T II, 160-161).

The photograph found on the home screen of the same cell phone was shown around the neighborhood, but with no success (T II, 161-166). Mackie then ran the nickname of Tay through a computer database and obtained a list of names and photographs. He opined that one of the photos for Deonte Howard matched the photograph on the cell phone. Mackie then prepared a photo array (Exhibit 48) and it was shown to Bobby Bailey. He identified Deonte Howard (T II, 166-169). Howard was then brought in for a live lineup at the youth home, which was viewed by Allen (T II, 169-170). During the live lineup, the subjects were seated to even

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

out the tops of their heads (T III, 138-139).  Allen identified number two (Deonte Howard) as the shooter (T III, 139, 144). On cross, Mackie could not recall who owned the other cell that was found on the bumper of a vehicle at the scene (T II, 174). Mackie confirmed that the photograph of Deonte Howard did not show a tattoo around his neck (T II, 181).

Barbara Simon testified that she used to work for the Detroit Police Department, and that she was currently employed with the Attorney General's Office (T III, 129).  On April 10, 2010, she went to the scene of the instant shooting.  She interviewed witnesses, including Mr. Harris and Mr. Bailey (T III, 130-131).   She later brought Mr. Bailey in to the Homicide Department for a second interview.  She denied threatening him, yelling at him, or saying she would charge him with conspiracy if he did not comply.  Mr. Bailey made a statement during this interview (T III, 131-133).  Defense counsel did not cross examine Simon (T III, 133).

Lt. Jeff Crump of the MSP Grand Rapids forensic lab testified that he examined the fired cartridge cases and fired bullets in this case.  He did not receive a firearm (T III, 8-9).  He opined that the 14 fired .40 Smith & Wesson caliber cartridge cases had matching breachface marks and that they were all fired from the same firearm (T III, 13-17).  He opined that four of the spent bullets were consistent with being .40 caliber or 10mm caliber metal jacketed fired bullet, and they had the same exact characteristics (T III, 15-20).  The remaining two spent bullets were either too damaged or too small to classify (T III, 20).  Crump also examined a pair of jeans for gunshot residue.  He found a bullet hole on the right hip area of the jeans between the back pocket and the front pocket.  He did not see any gunshot residue around it (T III, 21-24).   He also examined a Bugle boy white T-shirt.  He found three holes on the front of the shirt, and one hole on the back of the shirt.  He did not find any evidence of gunshot residue on three of the holes.  However, on one hole on the front he found a large amount of vaporous lead, which is

one form of gunshot residue. He opined that generally it suggested that the firearm was discharged 3-4 feet away (T III, 24-27).

Dr. Leigh Hlavaty, the Deputy Chief Medical Examiner in Wayne County, testified that her office conducted the autopsy on Tyrone Simpson on April 11, 2010.  The autopsy was performed by Dr. Tally, under the supervision of Dr. Loewe.  However, at the time of trial they no longer were employed with Wayne County (T III, 31).  Dr. Hlavaty reviewed the autopsy report and the photographs in the file. Simpson was 5'5" tall and weighed about 150 pounds.  He sustained nine gunshot wounds that ranged from the head to the ankle (T III, 32-35).  The cause of death was the totality of the gunshot wounds (T III, 36).

Officer Wieneck arrested Deonte Howard in May 2010 at 7480 Mansfield in Detroit (T III, 113-114).

**Stipulations by the Parties**

The parties stipulated to the following:  1) Exhibit 73, the lab report by MSP Det. Sgt. Haywood, indicated that the firearms evidence was processed with no latent prints being developed;  2) Exhibit 74 indicating that the latent prints taken from the GMC Suburban by Officer Fitzhugh were submitted to the DPD latent print section and no usable prints were found; and 3) Exhibit 75 indicating that the Samsung cell phone found at the scene across the street from 16228 Tireman on April 10, 2010, was registered to Deonte Miller by Metro PCS.  Both parties further stipulated that the same cell phone, upon investigation of its contents and records, belonged to Defendant Deonte Howard (T III, 146-149).

After closing arguments by both parties, and instructions by the court, the jury deliberated and returned with a verdict of guilty of first-degree murder (T IV, 28-29).

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

On May 27, 2011, Judge Morrow sentenced Mr. Howard to the mandatory sentence of non-parolable life imprisonment (ST 4).

Mr. Howard now appeals as of right.

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

I.    **DEONTE HOWARD'S CONVICTION FOR FIRST-DEGREE MURDER MUST BE REVERSED WHERE THE PROSECUTION FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE THAT DEONTE HOWARD WAS THE PERSON WHO COMMITTED THE OFFENSE, AND WHERE THERE WAS INSUFFICIENT EVIDENCE OF PREMEDITATION AND DELIBERATION.**

**Standard of Review**

The standard of review is de novo. *People v Wolfe,* 440 Mich 508, 515 (1992); *People v Hampton,* 407 Mich 354, 368 (1979).

**Discussion**

The Due Process Clauses of the state and federal Constitutions prohibit a criminal conviction unless the prosecution establishes guilt of the essential elements of a criminal charge beyond a reasonable doubt.  US Const, Ams V, XIV; Mich Const 1963, art 1, §17; *In re Winship,* 397 US 358, 361-362 (1970); *People v Wolfe, supra,* 515; *People v Hampton, supra,* 368.  The reasonable doubt requirement is a due process safeguard which was developed to protect citizens from "dubious and unjust convictions, which result in improper forfeitures of life, liberty and property." *Winship, supra,* 362.  A conviction must be reversed if the evidence introduced was insufficient to satisfy a rational juror that each element of the offense had been proven beyond a reasonable doubt.  *Jackson v Virginia, supra*. "Some evidence" on an element is not enough. Rather, that evidence must be sufficient to prove each essential element beyond a reasonable doubt. *People v Hampton, supra*, 368, 377.

In reviewing a claim based upon the sufficiency of the evidence, this Court views the evidence in a light most favorable to the prosecution and determines whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.  *People v Hampton*, *supra*, 368; *People v Wolfe, supra*, 513.  Stated another way, where the proofs, taken most favorably to the prosecutor, present no more than a choice between competing probabilities, a

judgment of acquittal must enter.  *United States* v *Saunders*, 325 F 2d 840 (CA 6, 1964); *United States v Leon*, 534 F 2d 660 (CA 6, 1975).

Defendant Howard was charged with first-degree murder in the death of Tyrone Simpson. The medical examiner testified that the cause of death was multiple gunshot wounds.  Prosecution witnesses testified that there was an argument over glasses that escalated into a fight where Simpson attacked Howard and repeatedly punched Howard in the face.  The prosecution alleged that Howard then fired two separate series of shots at Simpson, with the last shot being fired into Simpson's head, after Howard exited the SUV.  The following witnesses identified Defendant Howard as the shooter:

> Aundrey Allen told the police the shooter was 17-18 years old, 5'7" to 5'8", no more than 130 pounds, short tapered haircut, small goatee, and wearing a black coat, no hat, and blue jeans (T III, 92-94, 105).  Allen initially identified someone else at a photographic array (T III, 73-74, 92-97, 105).  A month later, Allen identified Howard in a live lineup, but it took him 15 minutes to make the identification (T III, 74-76, 98, 101-102).  Allen admitted that Howard was shorter and did not have a goatee (T III, 108);

> Frederick McFadden told the police the shooter was 5'11" to 6', 20-24 years old, with tattoos on his neck and arms, and wearing a white T-shirt, beige pants and red tennis shoes (T II, 119-120). McFadden claimed he identified Defendant Howard as the shooter and another subject as the driver in a photographic array a few days after the incident, even though Officer Love could not recall if Howard was part of the array and he had no documentation that indicated McFadden had identified Howard in the photo array (T II, 124-127; T III, 125-128); Officer Mackie conceded that Deonte Howard did not have a tattoo around his neck (T II, 181);

> Marcario Harris described the shooter to the police as a black male, 5'10", mid 20's, and thin build (T II, 198);

> Kimberly Thompson described the shooter to the police as a black male, late 20's or early 30's, 5'9" or 5'10", thin build, 160-170 pounds, medium brown complexion, short afro, no facial hair, no visible scars, marks or tattoos, a thin, skinny face, and he was wearing a white T-shirt and dark jeans (T II, 212-213).

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

The defense maintained that Deonte Howard was not the shooter, and alternatively, that he "lost his mind" and fired during an emotional event. The defense did not deny that Howard returned to the store to look for his phone or that Simpson attacked him. However, the defense maintained that Howard was not the shooter (T III, 172-183).

The identity of the defendant as the perpetrator of the charged offense is an essential element of any offense that the prosecution must establish beyond a reasonable doubt. *People v Kern,* 6 Mich App 406, 409-10 (1967). The prosecution may establish identity by either direct testimony or circumstantial evidence. *Kern, supra,* at 409-10, citing *People v Sullivan,* 290 Mich 414, 418-19 (1939); *People v Stewart,* 163 Mich 1, 8 (1910). While the prosecution presented some evidence of identity, the evidence of identification presented at trial was rife with problems, and it does not satisfy the prosecution's burden of proving beyond a reasonable doubt that Defendant Howard was the shooter. The prosecution failed to present enough evidence to permit a reasonable trier of fact to find guilt. Therefore, the evidence was insufficient to convict Defendant Howard and his conviction must be reversed and dismissed.

Defendant Howard also submits that, even assuming arguendo that he was the shooter, the circumstances in this case do not allow for the inference of a premeditated, deliberate intent to kill Tyrone Simpson. The evidence was insufficient to support his conviction of first-degree premeditated murder.

First-degree murder is a statutory offense, MCL 750.316. It is distinguished from second-degree murder by the added element of premeditation and deliberation. Numerous Michigan cases have discussed the definition of the elements of premeditation and deliberation. Perhaps the best known definition is that in *People v Morrin,* 31 Mich App 301, 329-330 (1971):

> "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation

characterize a thought process undisturbed by hot blood.  While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a `second look'." (citations omitted)

Sufficient evidence of premeditation is not presented by evidence of a motive alone, without proof of some degree of planning or a preconceived design.  *People v Gill,* 43 Mich App 598 (1972).  The reviewing court should look at such factors as the prior relationship of the parties, the accused's actions both before and after the alleged offense, and the circumstances of the offense itself.  *People v Johnson,* 99 Mich App 547 (1980).  See also *People v Hoffmeister,* 394 Mich 155 (1975); *People v Tilley,* 405 Mich 38 (1979).

In *People v Hoffmeister, supra*, the decedent and a man alleged to be the defendant were seen in separate cars driving into a parking area.  Shortly thereafter, the decedent, suffering from numerous stab wounds, drove to a friend's house, but later died from the wounds.  The defendant was charged and convicted of premeditated murder, but on appeal the Michigan Supreme Court reversed that conviction, finding insufficient evidence in support of the premeditation element.  In its ruling, the Court stated:

> "Hoffmeister moved for a directed verdict, arguing that `there is no evidence from any witness that (Hoffmeister) did form or did any act with premeditation.'
>
> The prosecutor responded that `the nature of the wounds, (and) the number of wounds' inflicted on the deceased together with his `several moments with' her were sufficient facts from which the jury could reasonably infer premeditation and deliberation.
>
> The brutality of a killing does not itself justify an inference of premeditation and deliberation. `The mere fact that the killing was attended by much violence or that a great many wounds were inflicted *is not relevant [on the issue of premeditation and deliberation], as such a killing is just as likely (or perhaps more likely) to have been on impulse.'*
>
> *There is no basis on this record for an inference that between the successive, potentially lethal blows the killer calmly, in a cool state of mind, `measure[d] and evaluate[d]' and subjected `the nature of his response to a "second look."'*

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

`It is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation.' *People* v *Anderson*, *supra*, [70 Cal 2d 15; 447P 2d 942; 73 Cal Rptr 550 (1968)] p. 24.

`* * * [M]any murders most brutish and bestial are committed in a consuming frenzy or heat of passion, and that these are in law only murder in the second degree. The Government's evidence sufficed to establish an intentional and horrible murder--the kind that could be committed in a frenzy or heat of passion. However the core responsibility of the court requires it to reflect on the sufficiency of the Government's case. * * *

`The violence and multiple wounds, while more than ample to show an intent to kill, cannot standing alone support an inference of a calmly calculated plan to kill requisite for premeditation and deliberation, as contrasted with an impulsive and senseless, albeit sustained, frenzy.' *Austin v United States,* 127 US App DC 180, 190; 382 F 2d 129, 139 (1967).

While the murder weapon was never found, it appears to have been a knife. The use of a lethal weapon is supportive of a finding of second-degree murder. But alone it is not sufficient to support a conviction of first-degree murder:

`"The use of a lethal weapon is not in itself sufficient evidence to warrant a verdict of murder in the first degree but in addition to this there must be evidence in the case, as to circumstances surrounding the killing or the manner in which the weapon is used, from which a logical inference may be drawn that there was willfulness, deliberation and premeditation."' *People v Vinunzo,* 212 Mich 472, 475; 180 NW 502 (1920).

No motive for the crime was shown. It was not suggested that Hoffmeister and decedent had met before and there was no evidence that he had a larcenous or sexual purpose.

Some time span between initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation. The testimony that Hoffmeister and decedent were together for a short period of time leaves open the possibility of premeditation and deliberation. There is no basis, however, on this record for concluding that adequate time for reflection, for a 'second look', intervened between formation of the homicidal intent and commission of the crime." 394 Mich at 159-161. (Emphasis added). (Footnotes omitted).

The Court in *People v Oster,* 67 Mich App 490 (1976), used similar reasoning in finding insufficient evidence of premeditation:

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

"Reviewing the evidence presented at the preliminary examination and weighing it against the above guidelines, we can only conclude that the magistrate's finding of premeditation or deliberation was clearly erroneous. There was no evidence of planning or motive; indeed, it appears that defendant and Goodman were total strangers. The fact that a knife was used and that wounds were inflicted upon vital parts of the victim's body do not raise an inference of premeditation. *People v Hoffmeister,* 394 Mich 155, 159; 229 NW 2d 305 (1975), and the fact that defendant cleaned the knife soon after the stabbing does not suggest that there was a plan or scheme to kill. Nor does the fact that defendant was carrying a knife suggest premeditation, since evidence was presented that defendant carried the knife with him long before the stabbing.

Probably the strongest argument of the prosecutor is that premeditation could be inferred from the evidence that defendant, while lying on the stairs, made a conscious decision to murder the victim, produced the knife, opened it up, leaped upon the victim and stabbed him. It is extremely doubtful, however, that the inference could be drawn in this case. Five seconds may well be sufficient time for a `second look' during which one could premeditate murder, but we must view such lapse of time in light of the circumstances surrounding the killing. *People v Meier,* 47 Mich App 179, 191-192; 209 NW 2d 311 (1973). Further, *that time span necessary to establish premeditation and deliberation must occur between the initial homicidal intent and the ultimate action. People v Hoffmeister, supra.* In the instant case, the testimony was that the defendant was getting his knife out of his pouch and opening it during those five seconds. It would require too great a stretch of the imagination for one to infer that under those circumstances he was thinking over his intention to kill the victim. Besides the improbability of there being sufficient time to take a second look, there is no evidence that defendant in fact did so. We, therefore, must conclude that the examining magistrate abused his discretion in binding the defendant over to the circuit court on an open murder charge." 67 Mich App at 497-498.  (Emphasis added).

In *People* v *Plummer,* 229 Mich App 293 (1998), the Court reiterated that the proofs on the

essential element of premeditation require more than merely a showing of an intentional killing:

"Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation. *People v Conklin,* 118 Mich App 90, 94; 324 NW2d 537 (1982).

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

A pause *between the initial homicidal intent and the ultimate act* may, in the appropriate circumstances, be sufficient for premeditation and deliberation. See *People v Tilley,* 405 Mich 38, 45; 273 NW2d 471 (1979). However, the Legislature's use of the words `willful,' `deliberate,' and `premeditated' in the first-degree murder statute indicates its intent to require as an element of that offense substantially more reflection on and comprehension of the nature of the act than the mere amount of thought necessary to form the intent to kill. As the Supreme Court has stated, `when a homicide occurs during a sudden affray . . . it would be "a perversion of terms to apply the term deliberate to any act which is done on a sudden impulse."' *Tilley*, *supra* at 44-45, quoting *Nye v People,* 35 Mich 16, 18 (1876). To speak of premeditation and deliberation being instantaneous, or taking no appreciable time, destroys the statutory distinction between first- and second-degree murder. See *Morrin*, *supra* at 329; LaFave & Scott, Criminal Law (2d ed), § 7.7, p 643." 229 Mich App at 301.  (Emphasis added).

The principles expressed in the cited cases are directly applicable to Defendant Howard's prosecution. The only evidence alleged to show premeditation and deliberation was the allegation that Howard exited the vehicle and said he wasn't dead yet, that the second round of shots was fired as Howard allegedly chased Simpson around the SUV, and that the last shot was fired into Simpson's head. However, this ignores that Howard returned to the store to find his cell phone, that Simpson attacked him and repeatedly punched him in the face while accusing him of stealing his sunglasses, and that Simpson was still coming at Howard when the first shots were fired. Given this alleged scenario, Defendant Howard did not have sufficient time to subject his actions to a cool-headed second look.  The prosecution did not present any evidence alleging that Defendant Howard knew Simpson, or had ever threatened to do any harm to Simpson. There was no evidence of planning.

The case law cited above makes it clear the premeditation and deliberation must occur "between" the formulation of the specific intent to kill and the acts which cause the death.  *Oster, supra; Plummer, supra.*  There was insufficient evidence that Defendant Howard premeditated

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

an intent to kill prior to the acts which caused the death.  As in *Hoffmeister* and *Oster,* the record in the case at bar is insufficient to support the prosecution's burden to prove there was premeditation rather than merely negligent, rash or impulsive action.  Even viewed in a light most favorable to the prosecution, this record would not allow a rational trier of fact to find proof beyond a reasonable doubt that the killing was committed as part of a "thought process undisturbed by hot blood." *Morrin, supra.*  Absent any record support, the prosecution had only "mere speculation" that there was "a pause between the initial homicidal intent and the ultimate act * * * sufficient for premeditation and deliberation."  *Plummer, supra.*

Defendant Howard's conviction for first-degree murder must be reversed.

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

II.   **DEONTE HOWARD WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE COUNSEL FAILED TO CALL SGT. MARTEL AS A DEFENSE WITNESS, FAILED TO SUBMIT A CRITICAL STIPULATION THAT HAD BEEN ENTERED AT DEFENDANT'S FIRST TRIAL, AND FAILED TO CROSS-EXAMINE A KEY PROSECUTION WITNESS.**

**Standard of Review**

Mr. Howard did not raise this issue in the trial court.  However, a defendant may raise ineffective assistance of counsel for the first time on appeal, because it involves a claim of constitutional error which could have been decisive of the outcome.  *People v Grant,* 445 Mich 535, 547 (1994); *People v Henry,* 239 Mich App 140, 146 (1999) (defendant may raise ineffective assistance of counsel for the first time on appeal, with review limited to mistakes apparent in the existing record). The de novo standard of review applies to the existing record.  See, e.g., *People v Barclay,* 208 Mich App 670, 672 (1995); *People v Henry, supra.*

**Discussion**

A defendant has the right under the Federal and State Constitutions to the effective assistance of counsel. US Const, Am VI, XIV; Mich Const 1963, art 1, § 20; *Strickland v Washington,* 466 US 668, 687 (1984). To prevail on an ineffective assistance of counsel claim, a defendant must first "show that counsel's performance was deficient, that is, "outside the wide range of professionally competent assistance." *Strickland, supra* at 690. In so doing, the defendant must rebut a presumption that counsel's performance was the result of sound trial strategy.  *Id.* at 690. Second, the defendant must show the deficient performance was prejudicial. *Id.* at 687. Prejudice is established where there is a reasonable probability that, but for the error, the result of the proceeding would have been different. *Id.* at 694; *People v LaVearn,* 448 Mich 207, 216 (1995).

As to the reasonableness prong, defense counsel must at a minimum take reasonable steps to investigate, prepare, and present evidence to exculpate the defendant. *Strickland, supra* at 691; *People v Grant,* 470 Mich 477 (2004). "American Bar Association standards . . . also mandate counsel's duty to investigate all leads relevant to the merits of the case." *Blackburn v Foltz,* 828 F 2d 1177, 1183 (CA 6, 1987); see also *Rompilla v Beard,* 545 US 374, 387 (2005). "This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v Smith,* 395 F3d 251, 258 (CA 6, 2005).

Strategic decisions certainly are given deference; but simply labeling an action "strategic" does not shield a mistake from Sixth Amendment scrutiny. *People v Dalessandro,* 165 Mich App 569, 574 (1988); *Washington v Hofbauer,* 228 F3d 689, 704 (CA 6, 2000). Even when making strategic decisions, counsel's conduct must be reasonable. See *Roe v Flores-Ortega,* 528 US 470, 481 (2000); *Wiggins v Smith,* 539 US 510, 522-23 (2003). "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns v Smith,* 395 F3d 251, 258 (CA 6, 2005) (quoting *Horton v Zant,* 941 F 2d 1449, 1462 (CA 11, 1991). As the Sixth Circuit explained:

> Competent counsel can be expected to undertake a "thorough investigation of law and facts relevant to plausible options" for the defense. [*Strickland,* 466 U.S. at 690, 104 S.Ct. 2052]. And while this does not require counsel to investigate every conceivable defense, any limitation on counsel's investigation must be supported by a "reasonable professional judgment[ ]." *Id.* at 691, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.... To make a reasoned judgment about whether evidence is worth presenting, one must know what it says. While the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel's strategic decisions, a lawyer cannot make a protected strategic decision without investigating the potential bases for it. See *id.* at 690–91, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; see also *Bigelow v. Haviland,* 576 F.3d 284, 288 (6th Cir.2009).

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

*Couch v Booker,* 632 F3d 241, 246 (CA 6, 2011).

In the instant case, Defendant Howard was represented by defense attorney Susan Rock at the first jury trial conducted in January 2011.  After the jury hung on the first-degree murder charge, the second trial was conducted four months later in May 2011, and Defendant Howard was represented by defense attorney W. Frederick Moore.

Defendant Howard maintains he was deprived of his state and federal constitutional right to the effective assistance of counsel, where Mr. Moore failed to call Sgt. Martel as a defense witness, failed to submit a critical stipulation that had been entered at the first trial, and failed to cross-examine Investigator Simon. US Const, Ams VI, XIV; Mich Const 1963, art 1, §20; *Strickland v Washington, supra.*

### Regarding Aundrey Allen's identification of someone else at the photo array

At trial, Aundrey Allen tried to justify his identification of someone else at the photo array by saing that it was made while he was in the hospital, after surgery, and while he was on morphine (T III, 72-73).

*At the first trial,* attorney Rock called Sgt. Michael Martel as a defense witness. Martel was present for part of the photo array conducted with Aundrey Allen in his hospital room in April 2010 (T 1/13/2011, 58-62).  Martel testified that he interviewed Aundrey Allen prior to the photo array and took a two–page statement (T 1/13/2011, 59). Martel's testimony made it clear that Allen was coherent, and that based on his identification of Deonte Miller, Martel prepared an affidavit for a search warrant of Miller's home (T 1/13/2011, 59-61).

*At the second trial,* attorney Moore did not call Sgt. Martel as a defense witness.

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

**Regarding Frederick McFadden's claim of identification**

Frederick McFadden testified that a few days after the shooting, he viewed an array of three photographs, and made two identifications. McFadden testified that he identified Defendant Howard as the shooter, and he identified another person as the driver of the vehicle (T II, 124-125, 127). McFadden was "positive" that he identified Defendant Howard in the photo array (T II, 127).

*As part of the defense case at the first trial,* attorney Rock entered the following stipulation:

> "MS. ROCK: Your Honor, at this time, we're, the prosecutor and I, are entering into a stipulation as to what Detective Myron Love's testimony would be.
>
> And it is stipulated between Mr. Prasad and myself that if Detective Myrone Love showed, the testimony would be Detective Myron Love showed Frederick McFadden a photographic line-up regarding the shooting of Tyrone Simpson. In front of Detective Love, Frederick McFadden picked out three people. Detective Love does not remember who Frederick McFadden identified, but Deonte Howard was not one of those people.
>
> MR. PRASAD: He was no [sic] in the line-up.
>
> MS. ROCK: What?
>
> MR. PRASAD: He was not even in the line-up.
>
> MS. ROCK: Right. Deonte Howard was not in the photographic line-up that was shown to Frederick McFadden. Detective Love did not keep the photographic line-up shown by Frederick McFadden and he did not take notes. Detective Love did not tell the officer charge, Samuel Mackie, that he had conducted that photographic line-up with Frederick McFadden.
>
> MR. PRASAD: That's correct, Judge. And I've sign [sic] the document to that effect." (T 1/13/2011, 63).

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

*At the second trial,* Investigator Love appeared at trial and testified that McFadden identified three people from an array that contained six photographs, even though there was only one target individual in the array (T III, 127-128).  Love could not recall the exact day of the photo array, but he believed it was regarding the first suspect (T III, 126-127).  Defense counsel's cross-examination of Investigator Love was as follows:

"BY MR. MOORE:

Q        Regarding this photo array, Mr. Howard was not in the photo array, is that correct?

A        I'm not really positive.  I know I was part of the first one and I think it was two individuals that they wound up looking at.

Q        Okay.  Would the name Deonte Miller be, sound familiar?

A        To me, no, sir.

Q        Okay.  Do you have anything, any paperwork anywhere in the world to suggest Mr. McFadden picked out Mr. Howard in the photo array?

A        No, sir.

Q        Okay.  And had Mr. McFadden picked out Mr. Howard, you would have documentation of the same, is that correct?

A        Yes."  (T III, 128).

There was no discussion regarding the stipulation that was made at the first trial.

**Regarding alleged threats by Investigator Simon with regard to Bobby Bailey**

*At the first trial,* attorney Rock thoroughly cross-examined Investigator Barbara Simon about the testimony by Bobby Bailey that she had brought him down to Homicide for a second

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

interview and that she threatened him, his children and his business (T 1/12/2011, 189-195)(See Attachment #1).[2]

*At the second trial,* attorney Moore declined to cross examine Investigator Simon (T III, 133).

It is abundantly clear that attorney Moore's performance was deficient in all three instances noted above. Attorney Rock's performance at the first trial was stellar, and a clear example of an attorney vigorously representing her client. On the other hand, attorney Moore's performance was grossly lacking. Aundrey Allen's identification of Defendant Howard as the shooter was critically important to the prosecution's case. However, his identification of someone else at the photo array in the hospital was problematic for the prosecution. In trying to explain this identification in the hospital, Allen tried to suggest it was due to being on morphine and was after his surgery (T III, 72-73). Yet, by calling Sgt. Martel as a defense witness at the first trial, attorney Rock provided crucial testimony by a police officer that Allen was coherent at the time of the photo array (T 1/13/2011, 58-62). Attorney Moore's decision not to call Sgt. Martel at the second trial left Allen's claim unchallenged and constitutes deficient performance.

In addition, Frederick McFadden's identification of Defendant Howard at trial was another critical portion of the prosecution's case. McFadden's claim at trial that he had identified Defendant Howard as the shooter during a photo array held a few days after the shooting

---

[2] Bobby Bailey admitted at the second trial that he initially told the police he did not see anything because he did not want to be involved. When the police questioned him a couple days later at the precinct, they threatened to charge him as an accessory to murder. They showed him some photographs, but none of them matched Tay (T II, 74-76). During an interview with Investigator Simon on April 13, Simon threated to get Bailey's federal probation violated. When Bailey tried to explain, Simon told him, "Just shut up, shut up. It happened this way." (T II, 90, 93-94). She accused Bailey of calling the shooter up to the scene, and that Defendant Howard was the shooter (T II, 90-91). He told Simon what she wanted to hear because she was threatening to charge him and to violate his probation (T II, 94).

buttressed his in-court identification. However, this claim was clearly false and needed to be thoroughly addressed. At the first trial, attorney Rock left absolutely no doubt that McFadden's claim of a prior identification was false by entering into a stipulation with the prosecutor that Deonte Howard's photo was not in the photo array that McFadden viewed (T 1/13/2011, 63). At the second trial, attorney Moore made a very weak attempt by cross-examining Investigator Love about his lack of documentation, but attorney Moore failed miserably in this regard, as Investigator Love only testified that he was not positive about whether Deonte Howard's photo was in the photo array (T III, 128). At no point did attorney Moore enter a stipulation with the same assistant prosecutor that Deonte Howard's photo was not in the array that McFadden viewed. This clearly left the jury with the possibility that Howard's photo may have been in the array, and that McFadden's in-court identification of Howard was buttressed with his out of court identification of Howard.

Finally, Investigator Simon's alleged threats with regard to Bobby Bailey were an important piece of the defense theme that the police had engaged in misconduct. At the first trial, attorney Rock thoroughly cross-examined Simon about the threats that Bobby Bailey had testified to at the first trial (T 1/12/2011, 189-195)(See Attachment #1). Yet, at the second trial attorney Moore had absolutely no cross-examination of Simon (T III, 133).

It is apparent that attorney Moore gave short shrift to the defense presented at the second trial. Although attorney Moore was certainly not required to duplicate attorney Rock's efforts, he was required to present a defense and to attack the prosecution's case. His failure to at least do what attorney Rock had done to attack the identifications by Allen and McFadden and to dent the credibility of Investigator Simon constitutes deficient performance. Defense counsel's failure to do so was objectively unreasonable, as it was an abrogation of his duty to investigate and call

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

favorable defense witnesses. *Couch, supra* at 241; *Towns, supra* at 258; see also *Grant, supra* at 486-87 (failure to investigate or present medical evidence showing victim injured in bicycle accident rather than sexual assault was ineffective); *People v Johnson,* 451 Mich 115 (1996)(failure to investigate and call witnesses in murder case to support defense that decedent had been firing shots and was shot by someone other than defendant unreasonable).

Attorney Moore's failures cannot be excused as trial strategy. "Constitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of "strategy"— based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of an investigation." *Ramonez v Berghuis,* 490 F3d 482, 489 (CA 6, 2007).

The prejudice prong of the *Strickland* test is also met as attorney Moore's above failures deprived Deonte Howard of key support for his theory and likely affected the trial's outcome. *Grant, supra* at 486-87 (failure to investigate or present medical evidence showing victim was injured by bicycle accident rather than sexual assault was ineffective assistance); *People v Johnson, supra* (failure to call witnesses in murder case to support defense that the decedent had been firing shots and was shot by someone other than defendant held unreasonable). Identity was critical in this case. Allen was close to the fight before he got shot and ran into the store. McFadden claimed that he was a mere 20 feet away from the shooting. Their identifications of Defendant Howard as the shooter provided powerful inculpatory evidence for the prosecution. Attorney Moore's failures allowed the jury to assume that the identifications by Allen and McFadden were solid. There is a reasonable probability that but-for counsel's failures, the trial's outcome would have been different. *Strickland, supra* at 694.

Defendant Howard submits that his claim of ineffective assistance of counsel is clear from the existing record. However, if this Court deems that a remand for an evidentiary hearing is warranted, Defendant asks this Court to remand for an evidentiary hearing.

Defendant Howard is entitled to a new trial.

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

III.    **DEONTE HOWARD IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED HIS STATE AND FEDERAL DUE PROCESS RIGHTS WHERE HIS CONVICTION WAS OBTAINED THROUGH THE USE OF FALSE AND/OR PERJURED TESTIMONY.**

**Standard of Review**

This claim of false and perjured testimony is a constitutional claim. Appellate courts address constitutional issues under a *de novo* standard of review. *People v McRunels,* 237 Mich App168, 171 (1999).

**Discussion**

Frederick McFadden testified that a few days after the shooting, he viewed an array of three photographs, and made two identifications. McFadden testified that he identified Defendant Howard as the shooter, and he identified another person as the driver of the vehicle (T II, 124-125, 127).  McFadden was "positive" that he identified Defendant Howard in the photo array (T II, 127).

*As part of the defense case at the first trial,* attorney Rock entered the following stipulation:

> "MS. ROCK:  Your Honor, at this time, we're, the prosecutor and I, are entering into a stipulation as to what Detective Myron Love's testimony would be.
>
> And it is stipulated between Mr. Prasad and myself that if Detective Myrone Love showed, the testimony would be Detective Myron Love showed Frederick McFadden a photographic line-up regarding the shooting of Tyrone Simpson.   In front of Detective Love, Frederick McFadden picked out three people. Detective Love does not remember who Frederick McFadden identified, but Deonte Howard was not one of those people.
>
> MR. PRASAD:  He was no [sic] in the line-up.
>
> MS. ROCK:  What?
>
> MR. PRASAD:  He was not even in the line-up.

30

MS. ROCK:  Right.  Deonte Howard was not in the photographic line-up that was shown to Frederick McFadden. Detective Love did not keep the photographic line-up shown by Frederick McFadden and he did not take notes. Detective Love did not tell the officer charge, Samuel Mackie, that he had conducted that photographic line-up with Frederick McFadden.

MR. PRASAD:  That's correct, Judge. And I've sign [sic] the document to that effect."  (T 1/13/2011, 63).

*At the second trial,* Investigator Love appeared at trial and testified that McFadden identified three people from an array that contained six photographs, even though there was only one target individual in the array (T III, 127-128).  Love could not recall the exact day of the photo array, but he believed it was regarding the first suspect (T III, 126-127).  Defense counsel's cross-examination of Investigator Love was as follows:

"BY MR. MOORE:

Q     Regarding this photo array, Mr. Howard was not in the photo array, is that correct?

A     I'm not really positive.  I know I was part of the first one and I think it was two individuals that they wound up looking at.

Q     Okay.  Would the name Deonte Miller be, sound familiar?

A     To me, no, sir.

Q     Okay.  Do you have anything, any paperwork anywhere in the world to suggest Mr. McFadden picked out Mr. Howard in the photo array?

A     No, sir.

Q     Okay.  And had Mr. McFadden picked out Mr. Howard, you would have documentation of the same, is that correct?

A     Yes."  (T III, 128).

31

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

There was no discussion regarding the stipulation that was made at the first trial.

Defendant Howard submits that he was denied his state and federal constitutional right to due process where his conviction was obtained through the use of false and/or perjured testimony. US Const, Am XIV; Mich Const 1963, art 1, §17.

Due process requires that criminal prosecutions comport with prevailing notions of fundamental fairness. *Napue v Illinois,* 360 US 264, 269 (1959); *People v Lester,* 232 Mich App 262, 276 (1998). "'A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.'" *Napue, supra* at 269-270 *quoting People v Savvides,* 1 NY2d 554, 557; 154 NYS2d 885, 887; 136 NE2d 853, 854-855. The United States Supreme Court has clearly established that the Fourteenth Amendment Due Process Clause requires that a criminal defendant receive a new trial when his convictions are obtained through the use of material false and perjured testimony, which the prosecutor knew or should have known was perjured. See *Mooney v Holohan,* 294 US 103 (1935); *Berger v United States,* 295 US 78, 85-86 (1935); *Pyle v Kansas,* 317 US 213 (1942); *Napue v Illinois, supra; Brady v Maryland,* 373 US 83, 86-88 (1963); *Giglio v United States,* 405 US 150, 153-154 (1972); *United States v Agurs,* 427 US 97, 103-105 (1976); *United States v Bagley,* 473 US 667, 679 & n 8 (1985).

The "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v Illinois,* 360 US at 269; *Giglio v United States,* 405 US at 153. Furthermore, the prosecutor has a duty to correct perjured testimony not only going to the elements of the charged offense, but anything that affects the credibility of a witness. *Napue v Illinois,* 360 US at 269; *Giglio v United States,* 405 US at 153-155.

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

A new trial is warranted if there was any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Napue,* 360 US at 273; *Giglio,* 405 US at 154; *United States v Agurs,* 427 US at 103.

In *Giglio v United States,* 405 US at 154-155, the Supreme Court reversed the conviction where the prosecutor failed to disclose a promise of immunity. The Court explained its ruling as follows:

> "Here the Government's case depended almost entirely on [the alleged coconspirator's] testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [The coconspirator's] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."

The Court reversed even though the government's action might only have been negligent. The Court reversed stating:

> As long ago as *Mooney* v *Holohan,* 294 US 103, 112, 79 LEd 791, 794, 55 S Ct, 98 ALR 406 (1935), this Court made clear that *deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice."* This was reaffirmed in *Pyle v Kansas,* 317 US 213, 87 LEd 214, 63 S Ct 177 (1942). In *Napue v Illinois,* 360 US 264, 3 LEd 2d 1217, 79 S Ct 1173 (1959), we said, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.,* at 269, 79 S Ct at 1177.
>
> * * *
>
> When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. *Napue, supra,* at 269, 79 S Ct at 1177.
>
> * * *
>
> A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Napue, supra,* at 271, 79 S Ct at 1178.
>
> *Giglio,* 405 US at 153-154. (Emphasis added).

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

Michigan Courts have also condemned the use of false and perjured testimony to convict a defendant. In *People v Anderson,* 44 Mich App 222 (1972), the defendant was charged with larceny from a building. He raised as part of his defense, the fact that he had made a recent withdrawal from the bank and that is why he was found with a particular sum of money. The prosecutor called the bank manager as a rebuttal witness and obtained testimony indicating that the defendant never maintained an account with that particular bank. The prosecutor stressed this fact to the jury in his closing argument. His testimony proved false as defendant did have such an account. On appeal, the defendant questioned whether a conviction obtained through the use of false testimony could stand. The Court of Appeals held:

> "We are constrained to rule that even though the testimony ... may have been obtained by the prosecutor innocently and given by (the witness) in good faith it was not true, and in fact was used improperly to discredit defendant and obtain his conviction." *People v Anderson, supra*, 229.

In *People* v *Cassell*, 63 Mich App 226 (1975), a witness lied about his involvement with a narcotics unit. It was later stipulated by the parties that the prosecution's chief investigative officer, who was seated at the prosecutor's table at trial, had knowledge that the witness was lying. The prosecutor did not inform the trial judge or the jury that the witness was lying when he denied being an agent of the Metro Narcotics Unit. Furthermore, in his closing argument, the prosecutor treated the testimony of the witness as if it were completely true and urged the jury to believe it. In reversing the defendant's conviction, the Court of Appeals held that the officer's knowledge must be imputed to the prosecutor; however, the Court further found that reversal was compelled under *Anderson, supra,* even if the officer's knowledge was not imputed to the prosecutor:

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

"On the strength of *Anderson,* therefore, we would feel compelled to reverse this defendant's conviction even were the prosecution totally unaware of the falsehood.

\*\*\*The jury had a right to know that the witness was lying on the witness stand. The fact that the witness had not been called by the prosecution was likewise of no importance. The prosecution's duty to prevent lies from entering the evidence in the guise of truth stems not from any particular role in the adversary process; rather, it is derived from the prosecution's duty to represent the public interest, and to place the pursuit of truth and justice above the pursuit of conviction.

We cannot speculate in light of this substantial error whether or not the jury gave consideration to the erroneous testimony in reaching its verdict. A new trial is required. See *People v Anderson, supra,* at 44 Mich App pp 228-229; 205 NW2d pp 84-85." *People* v *Cassell, supra*, 229.

See also *People* v *Wiese*, 425 Mich 448, 453-454 (1986); *People v Woods,* 416 Mich 581, 601-604 (1982); *People v Atkins,* 397 Mich 163, 173-174 (1976); *People v Barbara,* 400 Mich 352, 363 (1977); *People v Thornton,* 80 Mich App 746 (1978).

The burden of disclosure is on the prosecutor, not on the witness or the defense attorney. "Whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Giglio,* 405 US at 154. See also *People v Wiese, supra,* 455. Prosecutors have a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath. *California v Trombetta,* 467 US 479, 485 (1984); *Napue v Illinois,* 360 US at 269-272; *People v Lester, supra,* 276.

In the instant case, both Frederick McFadden and Investigator Love gave false and/or perjured testimony. McFadden's testimony that he identified Defendant Howard as the shooter in the photographic array was clearly false. Investigator Love's testimony that he was not positive as to whether Howard's photo was in the array was also false. Furthermore, the assistant prosecutor was clearly aware that the testimony was false, as he was the same assistant

prosecutor who had entered the stipulation in the first trial that Deonte Howard's photo was not in the photo array that McFadden viewed (T 1/13/2011, 63). The assistant prosecutor had a duty to correct this false testimony.

Defendant Howard submits that he was denied due process, as it is clear that McFadden and Investigator Love testified falsely at Howard's trial and that this constitutes knowing use of false and perjured testimony, as the prosecution was well aware that this claim was false.

Furthermore, as noted above, the "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Giglio, supra,* at 153. There were no attempts by the prosecution to correct this false and perjured testimony in Defendant Howard's case.

A new trial is warranted if "there was any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v Agurs,* 427 US at 103; *Napue,* 360 US at 271; *Giglio,* 405 US at 154. As the Fifth Circuit has explained, the "reasonable likelihood" standard is a low one:

> "There is no doubt that the evidence in this case was sufficient to support a verdict of guilty. But the fact that we would sustain a conviction untainted by the false evidence is not the question. After all, we are not the body which, under the Constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, and again under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all of its ramifications." *United States v Barham,* 595 F2d 231, 242 (CA 5, 1979).

The false testimony at Defendant Howard's trial buttressed McFadden's identification of Defendant Howard as the shooter. The purpose of the *Giglio/Napue* rule is to prevent the prosecution from presenting to the jury a theory of the case that is false or misleading; a new trial is required here to allow the jury to undertake informed and meaningful deliberations. There is a

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

reasonable likelihood that it would have affected the judgment of the jury.  Mr. Howard is entitled

to a new trial.

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

**IV. THE UNITED SUPREME COURT RULING IN *MILLER V ALABAMA* PROHIBITS A SENTENCE OF LIFE WITHOUT PAROLE IMPOSED UNDER A STATUTORY SCHEME THAT REQUIRES MANDATORY LIFE FOR THOSE WHO WERE JUVENILES AT THE TIME OF THE OFFENSE. *MILLER* REQUIRES RESENTENCING FOR DEONTE HOWARD BECAUSE HE WAS SENTENCED UNDER PRECISELY THAT KIND OF SCHEME, IN VIOLATION OF BOTH HIS EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS TO A SENTENCE THAT IS PROPORTIONATE AND INDIVIDUALIZED.**

**Standard of Review**

No challenge was made to the constitutionality of Deonte Howard's sentence prior to sentencing. Regardless, a defendant may challenge the constitutional validity of a statute for the first time on appeal. *People v Noble,* 238 Mich App 647, 651 (1999) citing *People v Wilson,* 230 Mich App 590, 593 (1998).

The constitutionality of a statute is a question of law to be reviewed *de novo.* *People v White,* 212 Mich App 298, 304-305 (1995); *People v Nimeth,* 236 Mich App 616, 623 (1999).

**Discussion**

The Eighth Amendment bars sentences of life without the possibility of parole for juveniles convicted of murder. "Evolving standards of decency," as evidenced in state and national practice, psychological research, Supreme Court and Michigan precedent, and international opinion, all demonstrate that sentences of life without the possibility of parole, when imposed on juveniles, constitute cruel and unusual punishment under the Eighth Amendment.

In *Graham v Florida,* __ US __; 130 S Ct 2011; 176 L Ed 2d 825 (2010), the Supreme Court divided its precedent on proportionality into two categories: challenges to particular term-of-years (including LWOP) sentences, given all the circumstances in a particular case, *see*, *e.g.*, *Ewing v California,* 538 US 11 (2003)  and categorical challenges to sentencing practices as

38

applied to a category of offenders for a range of crimes, *see*, *e.g.*, *Atkins v Virginia*, 536 US 304 (2002).

For cases where a sentencing practice itself is in question, *Graham* outlined a two-prong proportionality analysis. The first prong is national consensus as measured by "objective indicia of society's standards, as expressed in legislative enactments and state practice." *Graham*, 130 S Ct at 2022. The second is the Court's independent judgment, guided by "the standards elaborated by controlling precedent and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose." *Id.* (quoting *Kennedy v Louisiana*, 128 S Ct 2641 (2008). This analysis "requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question . . . [and] whether the challenged sentencing practice serves legitimate penological goals." *Id.*, 130 S Ct at 2026 (citations omitted). Using these prongs, *Graham* found life without parole unconstitutional for juveniles convicted of non-homicide offenses.

Most recently, in *Miller v Alabama*, and *Jackson v Hobbs (Miller/Jackson)*, ___ US ___; 132 S Ct 2455 (2012), the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments." 132 S Ct at 2460. The Court considered the sentences of two individuals who were 14 at the time they committed their crimes. Justice Elena Kagan asked the question whether the Eighth Amendment's proportionality requirement can ever be satisfied in a case where there is a "mismatch between the culpability of a class of offenders and the severity of a penalty. *Id.* at 2463, citing *Graham*, 130 S Ct at 2022-2023. The Court also examined a second strand of Supreme Court jurisprudence which is convergent. That is, imposition of life without parole pursuant to a statutory scheme which *mandates* this sentence is

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

like imposing a death sentence without considering the "characteristics of a defendant and the details of his offense." The Court held that imposing the death penalty in this fashion is unconstitutional. *Id.* at 2464. Accordingly, "the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id.*

The Court also emphasized that mandatory life without parole does not meet the traditional purposes of sentencing. The retributive purpose of sentencing is not met with mandatory life sentences because ". . .the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences . . .even when they commit terrible crimes. *Miller/Jackson,* 132 S Ct at 2465:

> " ' Because [t]he heart of the retribution rationale' " relates to an offenders blameworthiness, " 'the case for retribution is not as strong with a minor as with an adult.'" *Graham,* 560 U.S. at ___, 130 S.Ct at 2028. Nor can deterrence do the work in this context because " 'the same characteristics that render juveniles less culpable than adults'" ---their immaturity, recklessness, and impetuosity---make them less likely to consider potential punishment. *Graham,* 560 U.S. at ___, 130 S.Ct at 2028 . . .Similarly, incapacitation could not support the life-without parole sentence in *Graham*: Deciding that a "juvenile offender forever will be a danger to society" would require "mak[ing] a judgment that [he] is incorrigible"—but " 'incorrigibility is inconsistent with youth.' " 560 U.S. at ___, 130 S.Ct at 2029. . . .And for the same reason, rehabilitation could not justify that sentence. Life without parole "forswears altogether the rehabilitative ideal." *Graham,* 560 U.S. at ___, 130 S.Ct at 2030. It reflects "an irrevocable judgment about [an offender's] value and place in society," at odds with a child's capacity for change." *Id.* (Some cites omitted).

Deonte Howard was 16 years old at the time of the instant offense. He was sentenced to mandatory non-parolable life imprisonment for first-degree murder. He is entitled to resentencing, as his case is pending on direct appeal. See *People v Carp,* ___ Mich App ___ (CA #307758, 11/15/2012), slip op, p 24.

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

## SUMMARY AND RELIEF AND REQUEST FOR ORAL ARGUMENT

**WHEREFORE**, for the foregoing reasons, Defendant-Appellant asks that this Honorable Court reverse his  conviction, or remand for resentencing.

Resolution of these issues will require that the Court have an accurate understanding of the proofs presented at trial.  Oral arguments are necessary to resolve any questions the Court may have regarding the complex facts and issues in this case, and to allow Defendant to apply any new, intervening case-law to his situation.  The Court should grant oral argument or, minimally, provide some mechanism for resolving factual and legal questions which may arise during the pendency of the instant appeal.  A refusal to do so would undermine Defendant's state constitutional right to appeal and infringe upon his federal constitutional right to the effective assistance of appellate counsel.  Mich Const 1963, art 1, § 20; _Evitts v Lucey,_ 469 US 387 (1985).

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

/s/ Susan M. Meinberg

BY:_____

**SUSAN M. MEINBERG (P34433)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

Dated: November 27, 2012

RECEIVED by Michigan Court of Appeals 11/27/2012 3:25:53 PM

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

| Lower Court or Tribunal | **STATE OF MICHIGAN**<br>**IN THE COURT OF APPEALS**<br>**Cover Sheet** | *CASE NO.* | | |
|---|---|---|---|---|
| WAYNE CIRCUIT COURT | | CIRCUIT: | Year **10** | Number **005562** | Case Type **FJ** |
| | | COURT OF APPEALS: | **311169** | |

## Filing Party

| Filing Party Last Name or Business/Entity/Agency Name | Attorney Last Name |
|---|---|
| PEOPLE OF MI | Williams |

Filing Party First Name | M.I. | Attorney First Name | M.I. | P Number
Jason | | 51503

Address (Street 1, Street 2, City, State, and ZIP Code)

Attorney Address (Street 1, Street 2, City, State, and ZIP Code)
1441 St. Antoine, 11th Floor
Detroit    MI    48226

Attorney Telephone Number
(313)224-8109

## Summary of Items Filed

| Type | Filename/Description | Filing Fee | Doc Fee | Total This Filing |
|---|---|---|---|---|
| Brief | Plaintiff-Appellee's BOA-NOAR | $5.00 | $0.00 | $5.00 |
| | | **3% Service Fee:** | | $0.15 |
| | | **Total All Filings:** | | $5.15 |

**Fee Substitute/Alternate Payment**

**Reason:**

- [ ] **Appointed Counsel**
- [ ] **Motion To Waive Fee**
- [ ] **Fees Waived in this Case**
- [ ] **MI InterAgency Transfer**
- [ ] **No Fee per MCR 7.203(F)(2)**

**Filer Office Use Only:**   10-005562

The documents listed above were electronically filed with the Michigan Court of Appeals at the date/time stated in the left margin.  As a recipient of service of these documents, you may wish to go to https://wiznet.wiznet.com/appealsmi to register as a user of the electronic filing system.
311169 - 322966

| Lower Court or Tribunal | **STATE OF MICHIGAN**<br>**IN THE COURT OF APPEALS**<br>**Proof of Service** | *CASE NO.* | | |
|---|---|---|---|---|
| | | CIRCUIT: | Year **10** | Number **005562** | Case Type **FJ** |
| WAYNE CIRCUIT COURT | | COURT OF APPEALS: | **311169** | |

Case Name: ___ PEOPLE OF MI V DEONTE HOWARD ___

On ___5/7/2013___ , one copy of the following documents:

Brief                    Plaintiff-Appellee's BOA-NOAR

was delivered to the persons listed below:

Date
___5/7/2013___

Signature
/s/Terrie Bishop

| Bar Number | Name | Delivery Method | Service Address |
|---|---|---|---|
| P- | AO, SADO | E-Serve | ao@sado.org |
| P- 34433 | Meinberg, Susan M | E-Serve | smeinberg@sado.org |

The documents listed above were electronically filed with the Michigan Court of Appeals at the date/time stated in the left margin. As a recipient of service of these documents, you may wish to go to https://wiznet.wiznet.com/appealsmi to register as a user of the electronic filing system.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

STATE OF MICHIGAN
IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                          No. 311169

DEONTE HOWARD,

     Defendant-Appellant.

Lower Court No.  10-005562-01-FJ

**PLAINTIFF-APPELLEE'S BRIEF ON APPEAL**

**ORAL ARGUMENT NOT REQUESTED**

KYM L. WORTHY
Prosecuting Attorney
County of Wayne

TIMOTHY A. BAUGHMAN
Chief of Research,
Training and Appeals

**JASON W. WILLIAMS (P-51503)**
Assistant Prosecuting Attorney
1441 St. Antoine, 11th Floor
Detroit, MI  48226
(313) 224-8109

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

## Table of Contents

Page

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Counter-Statement of Appellate Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Counter-Statement of Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Counter-Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I       To support a conviction of first-degree murder, the People must prove that
        the defendant intended to kill and the killing was premeditated and
        deliberate.  Defendant shot the victim nine times, pausing between volleys
        of shots and shooting the victim in the head upon realizing that he was not
        dead.   The evidence supports defendant's conviction of first-degree
        premeditated murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II      The Court may not second-guess counsel's reasonable strategic decisions
        regarding the presentation of evidence.  Counsel cross-examined Aundrey
        Allen regarding his prior identification of someone other than defendant,
        elicited evidence to rebut Frederick McFadden's claim that he identified
        defendant in a photo array, and presented evidence that Investigator Simon
        had threatened witness Bobby Bailey.   Counsel's strategic decisions
        regarding the questioning and calling of witnesses did not deny defendant
        the effective assistance of counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

III    A prosecutor's knowing use of perjured testimony may violate due process. Frederick McFadden maintained that he identified defendant in a photo array a few days after the shooting even though defendant was not even a suspect at that time, and Investigator Myron Love testified that he had no documentation indicating McFadden picked defendant but could not say for sure that defendant was not part of the array. Defendant has not shown perjury, let alone that the prosecutor knowingly used perjured testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV    A mandatory sentence of life with no parole eligibility for a juvenile is unconstitutional. Defendant did not object when the trial court sentenced him to life for first-degree murder. Defendant will be eligible for parole; he is not entitled to a resentencing hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

# INDEX OF AUTHORITIES

## FEDERAL CASES

Giglio v United States,
    405 US 150; 92 S Ct 763; 31 L Ed 2d 104 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Graham v Florida,
    560 US __; 130 S Ct 2011; 176 L Ed 2d 825 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Jacobs v Singletary,
    952 F2d 1282 (CA 11, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Killian v Poole,
    282 F3d 1204 (CA 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

King v Trippett,
    192 F3d 517 (CA 6, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Miller v Alabama,
    __ US __; 132 S Ct 2455; 183 L Ed 2d 407 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Napue v Illinois,
    360 US 264; 79 S Ct 1173; 3 L Ed 2d 1217 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Olden v United States,
    224 F3d 561 (CA 6, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Sanders v Sullivan,
    863 F2d 218 (CA 2, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Spivey v Rocha,
    194 F3d 971 (CA 9, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Strickland v Washington,
    466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984) . . . . . . . . . . . . . . . . . 15, 16, 18, 19

United States v Agurs,
    427 US 97; 96 S Ct 2392; 49 L Ed 2d 342 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v Ellisor,
    522 F3d 1255 (CA 11, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

United States v Griley,
    814 F2d 967 (CA 4, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v McNair,
    605 F3d 1152 (CA 8, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATE CASES**

In re Callahan,
    348 Mich 77; 81 NW2d 669 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Hopkins v Michigan Parole Board,
    237 Mich App 629; 604 NW2d 686 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Louisiana v Shaffer,
    77 So3d 939 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

People v Anderson,
    209 Mich App 527; 531 NW2d 780 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

People v Avant,
    235 Mich App 499; 597 NW2d 864 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

People v Berthiaume,
    59 Mich App 451; 229 NW2d 497 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

People v Bullock,
    440 Mich 15; 485 NW2d 866 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

People v Bulls,
    262 Mich App 618; 687 NW2d 159 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

People v Carines,
    460 Mich 750; 597 NW2d 130 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

People v Carp,
    __ Mich App __; __ NW2d __ (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

People v Chapo,
    283 Mich App 360; 770 NW2d 68 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

People v Davis,
    241 Mich App 697; 617 NW2d 381 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

People v Eliason,
     __ Mich App __; __ NW2d __ (Docket No. 302353; issued 4/4/13) . . . . . . . . . . . . . 26

People v Garza,
     246 Mich App 251; 631 NW2d 764 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

People v Gonzalez,
     468 Mich 636; 664 NW2d 159 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

People v Gratsch,
     __ Mich App __; __ NW2d __ (Docket No. 305040; Issued 2/28/13) . . . . . . . . . . . . 20

People v Hardiman,
     466 Mich 417; 646 NW2d 158 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

People v Hayton,
     28 Mich App 673; 184 NW2d 755 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

People v Hoffmeister,
     394 Mich 155; 229 NW2d 305 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

People v Johnson,
     74 Mich App 234; 253 NW2d 721 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

People v Kern,
     6 Mich App 406; 149 NW2d 216 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

People v Kramer,
     108 Mich App 240; 310 NW2d 347 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

People v LeBlanc,
     465 Mich 575; 640 NW2d 246 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

People v Lown,
     488 Mich 242; 794 NW2d 9 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

People v Matuszak,
     263 Mich App 42; 687 NW2d 342 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

People v Morris,
     80 Mich 634; 45 NW 591 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

People v Oliphant,
    399 Mich 472; 250 NW2d 443 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

People v Ortiz,
    249 Mich App 297; 642 NW2d 417 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

People v Pickens,
    446 Mich 298; 521 NW2d 797 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

People v Plummer,
    229 Mich App 293; 581 NW2d 753 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

People v Portellos,
    298 Mich App 431; 827 NW2d 725 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

People v Rockey,
    237 Mich App 74; 601 NW2d 887 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

People v Shively,
    230 Mich App 626; 584 NW2d 740 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

People v Yost,
    278 Mich App 341; 749 NW2d 753 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## STATUTES

MCL 750.83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

MCL 750.84 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

MCL 750.227b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

MCL 750.316(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

MCL 750.316(1)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

MCL 791.204(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

MCL 791.234(6)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

MCL 791.234(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

MCL 791.234(7)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

MCL 791.234(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

MCL 791.234(8)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

MCL 791.235(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**OTHER AUTHORITIES**

Const 1963, art 3, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

MCR 7.215(J)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

MCR 7.215(J)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

**STATEMENT OF APPELLATE JURISDICTION**

The People do not contest jurisdiction for purposes of this brief on appeal.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

## COUNTER-STATEMENT OF QUESTIONS PRESENTED

### I.

To support a conviction of first-degree murder, the People must prove that the defendant intended to kill and the killing was premeditated and deliberate.  Defendant shot the victim nine times, pausing between volleys of shots and shooting the victim in the head upon realizing that he was not dead.  Was there sufficient evidence to support defendant's conviction of first-degree premeditated murder?

The People answer:  Yes.
Defendant answers:  No.

### II.

The Court may not second-guess counsel's reasonable strategic decisions regarding the presentation of evidence.  Counsel cross-examined Aundrey Allen regarding his prior identification of someone other than defendant, elicited evidence to rebut Frederick McFadden's claim that he identified defendant in a photo array, and presented evidence that Investigator Simon had threatened witness Bobby Bailey.  Did counsel's strategic decisions regarding the questioning and calling of witnesses deny defendant the effective assistance of counsel?

The People answer:  No.
Defendant answers:  Yes.

### III.

A prosecutor's knowing use of perjured testimony may violate due process.  Frederick McFadden maintained that he identified defendant in a photo array a few days after the shooting even though defendant was not even a suspect at that time, and Investigator Myron Love testified that he had no documentation indicating McFadden picked defendant but could not say for sure that defendant was not part of the array.  Did the prosecutor knowingly use perjured testimony?

The People answer:  No.
Defendant answers:  Yes.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

## IV.

**A mandatory sentence of life with no parole eligibility for a juvenile is unconstitutional.  Defendant did not object when the trial court sentenced him to life for first-degree murder.  Is defendant entitled to a resentencing hearing at which the trial court determines whether he will be eligible for parole?**

**The People answer:  No.**
**Defendant requests resentencing.**

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

## COUNTER-STATEMENT OF FACTS

This case arises out of the death of nineteen-year-old Tyrone "Ant" Simpson during the afternoon of April 20, 2010, outside the Garden Café, a restaurant/convenience store located at 16228 Tireman in Detroit.  He was shot nine times–once in the head, behind the right ear, once in the back right upper arm, once in the back left shoulder, once in the back left elbow, twice in the right lower leg, and three times in the left lower leg.  5/10/11, 24-26, 54-56; 5/11/11, 13-17, 33-35, 39-40.[1]  Deputy Chief Medical Examiner Leigh Hlavaty testified that the shot to the head was the most immediately lethal, but the victim would still have died from his other wounds.  According to Dr. Hlavaty, the victim was alive when shot in the head.  5/11/11, 36, 38.

The victim's friend Aundrey Allen was with him at the restaurant during the late morning hours on the day of his death.  A few hours later, Allen was pulling up to his nearby house when he saw a commotion outside the restaurant.  He received a phone call, and drove to the restaurant.  Once there, he saw the victim, defendant Deonte Howard, and "Freak" outside.  The victim and Freak were arguing about something that involved Allen's sister.  Allen was ready to fight, but Freak started running away from him.  Defendant was not involved in the argument.  5/11/11, 41-49.

The victim told Allen not to fight Freak.  As the victim looked for his Cartier glasses, which he was wearing earlier in the day, defendant, Freak, and two others began to leave.  Freak walked away, while the others began to leave in a Charger.  5/11/11, 47-48, 52-54.  The owner of the restaurant arrived and the victim told him that someone took his glasses.  Within fifteen

---

[1] Transcripts are cited throughout this brief in the following form:  month/day/year of proceedings, page numbers.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

minutes, defendant and two others returned in a Jeep.  They got out, and defendant asked if they had seen his phone.  Defendant and the victim yelled at each other, with the victim accusing defendant of taking his glasses.  The victim then hit defendant.  5/11/11, 53-60.

The victim hit defendant four or five times in the face, causing him to stumble back.  Allen was behind the victim as the victim moved toward defendant.  Defendant then pulled a gun from his pocket and started shooting.  Allen saw the victim reach for his stomach and heard two gunshots.  As Allen ran toward the restaurant, he heard three more shots.  One of the bullets struck Allen in the hip.  There was a long pause in the shooting as Allen lay on the floor.  He then heard eight or nine shots, and heard the victim's voice.  After a short pause, he heard one more shot and then a car drive away.  5/11/11, 60-70.

The owner of the restaurant, Bobby Bailey, came to the store that afternoon and encountered the victim, who was upset and saying someone stole his glasses.  5/10/11, 61-63.  He testified that defendant, whom he knew as "Tay," pulled up in an SUV.  He was looking for his phone, and the victim accused defendant of stealing his glasses.  Defendant denied it and continued to look for his phone.  Bailey got between defendant and the victim.  Defendant was saying someone was going to pay for his glasses or there would be trouble, and defendant was saying that he did not have the glasses.  The victim then reached around Bailey and hit defendant in the face.  Defendant fell back, and Bailey attempted to stop others from joining in.  Bailey then heard four or five shots.  Bailey got on the ground, and on getting up, ran to the restaurant.  A couple of seconds later, he heard six or seven shots.  He looked out after the shooting had stopped and saw the victim on the ground.  5/10/11, 64-70.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

Frederick McFadden was working on his mother's car at her house located near the restaurant when he heard arguing that day.  He looked and saw a smaller person push a bigger person, and the bigger person push back.  He said the larger of the two grabbed something from the smaller man.  Five or ten minutes later he heard gunshots.  5/10/11, 99-105.  McFadden looked and saw the two guys wrestling.  He then heard another gunshot.  He went across the street and told an elderly woman to stay down before positioning himself near a fence to see what the problem was.  He heard a gunshot and saw one man bend over and stumble backward.  He then heard more shots and saw the man stumble into the street.  McFadden identified defendant as the shooter.  5/10/11, 106-110.

McFadden saw defendant walk up to the victim and shoot him two more times.  Defendant then jumped in the backseat of an SUV, but the SUV did not leave.  Defendant got out, said "this MF N isn't dead yet," and shot the victim three more times in the upper body, at least once in the head.  Defendant then jumped back in the SUV and the SUV drove away.  5/10/11, 109-112, 115-116.

Marcario Harris and Kimberly Thompson also heard the gunshots.  They lived across the street from the restaurant.  Harris heard a couple of shots and looked out the window.  He saw a man getting into a silver SUV that then pulled off.  A man who was on the ground by a purple or maroon Suburban began getting up, and the silver SUV slammed on its brakes.  A man got out of the SUV and started shooting at the man who was getting up.  The shooter chased the other man while shooting, eventually hitting him and causing him to fall on the ground.  The shooter walked up to the man on the ground and shot him in the head.  He then ran to the SUV, and the

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

SUV sped off.  5/10/11, 183-192.  Harris identified defendant as the shooter.  He heard a total of about fifteen gunshots.  5/10/11, 192-193.

Kimberly Thompson heard the gunshots and came into the living room after Harris said that someone was shooting.  She looked out the window and saw a man, whom she identified as defendant, shoot another man in the leg.  That man fell to the ground, and defendant got into an SUV.  As the man who was shot began to get up, the SUV braked.  Defendant got out and chased the other man around the car while shooting at him.  The man fell to the ground again.  Defendant then walked up to him and shot him in the head.  At that point, he got back into the SUV and left.  5/10/11, 200-210.

The police officers who responded to the scene found the unresponsive victim lying face up on the ground.[2]  Officers found a cell phone on the bumper of the burgundy SUV that the victim had driven to the restaurant, a broken cell phone, a broken pair of glasses, fourteen shell casings, and four bullets/fragments.[3]  5/10/11, 35-52, 138, 140-142; 5/11/11, 49-50, 71-72, 110 121-122.  Lt. Jeff Crump of the Michigan State Police opined that the cartridge cases were fired from the same weapon.  5/11/11, 13-17.

One of the phones was registered to Deonte Miller.  5/10/11, 156-157; 5/11/11, 149.  The officer-in-charge, Sgt. Samuel Mackie, obtained a photo of Miller which was then included in an array.  Other officers showed arrays to Allen on April 11th and Bailey on April 13th.  5/10/11,

---

[2] Evidence of gunshot residue was discovered around one of the holes in the t-shirt worn by the victim, which suggested that the firearm was discharged "between contact and three, four feet." No evidence of gunshot residue was discovered on the jeans worn by Allen.  5/10/11, 21-27; 5/11/11, 148.

[3] No usable fingerprints were collected from the Suburban, 5/10/11, 147-148; 5/11/11, 148, and no prints were discovered on the firearm evidence.  5/11/11, 147.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

157-162.  Bailey told the police that "Tay" was not in the photos.  5/10/11, 74-76.  Allen pointed out someone he thought looked like defendant.  5/11/11, 73-74.

Investigator Myron Love showed an array to McFadden a few days after the shooting.  Love "believe[d]" that the array concerned the first suspect.  He said McFadden picked out three people.  5/11/11, 126-127.  McFadden maintained nevertheless that he identified defendant and the driver.  5/10/11, 124-125, 127-128.  Although Love was "not really positive" that defendant was not in the array, Love knew he (Love) "was part of the first one."  He thought the investigation focused on two individuals.  The name Deonte Miller did not sound familiar and he did not have a copy of the array.  He had no paperwork to suggest McFadden picked out defendant and would have had documentation if he had.  5/11/11, 128.

After determining that Deonte Miller was not involved, Sgt. Mackie used cell phone records and a photo on the cell phone to connect defendant to the phone.[4]  He obtained a photo of defendant, placed it in an array, and showed that array to Bailey.  Bailey identified defendant.  After the police arrested defendant, Allen attended a live lineup and identified him.  5/10/11, 162-170; 5/11, 74-76.

The People charged defendant with first-degree premeditated murder, [5] assault with intent to murder,[6] and felony-firearm.[7]  On January 18, 2011, a jury convicted defendant of assault with

---

[4] At trial, the parties stipulated that the phone registered to Miller actually belonged to defendant.  5/11/11, 149.

[5] MCL 750.316(1)(a).

[6] MCL 750.83.

[7] MCL 750.227b.

intent to do great bodily harm[8] and felony-firearm, but could not reach a verdict on the murder charge.  On May 12, 2011, the jury in defendant's second trial convicted him of first-degree murder.  5/12/11, 28-29.  On May 27, 2011, the court sentenced defendant to life for murder.  Defendant appeals as of right from May 27 judgment of conviction.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

---

[8] MCL 780.84.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

**ARGUMENT**

**I.**

**To support a conviction of first-degree murder, the People must prove that the defendant intended to kill and the killing was premeditated and deliberate. Defendant shot the victim nine times, pausing between volleys of shots and shooting the victim in the head upon realizing that he was not dead. The evidence supports defendant's conviction of first-degree premeditated murder.**

**Standard of Review**

In reviewing the sufficiency of the evidence, the Court views all the evidence in a light most favorable to the People to determine whether a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt.[9]

**Discussion**

The evidence fully supports the jury's verdict of guilty of first-degree premeditated murder. In reviewing the sufficiency of the evidence, the Court views all the evidence in a light most favorable to the People to determine whether a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt.[10]  That review does not differ depending on the type of evidence presented. Rather, "courts should view all the evidence-whether direct or circumstantial-in a light most favorable to the prosecution to determine whether the prosecution sustained its burden."[11]  When undertaking that review, the court must also heed the caution of our Supreme Court that "[i]t is for the trier of fact, not the appellate court, to

---

[9] *People v Portellos,* 298 Mich App 431; 827 NW2d 725, 732 (2012).

[10] *Id.*

[11] *People v Hardiman,* 466 Mich 417, 428; 646 NW2d 158 (2002).

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences."[12]   The court must therefore draw all reasonable inferences and make credibility choices in support of the trier of fact's verdict.[13]

The elements of first-degree premeditated murder[14] are that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate.   [15]   Identity is an element of all offenses,   [16] and as with other elements, circumstantial evidence is sufficient to prove identity.[17]   In sustaining their burden of proof on that and the other elements, the People need not negate every theory consistent with innocence, but must only prove their own theory beyond a reasonable doubt in face of whatever contradictory evidence is proffered by the defense.[18]

A rational jury could easily find beyond a reasonable doubt that defendant was the person who shot and killed Tyrone "Ant" Simpson.   The victim's friend, Aundrey Allen, identified defendant as the man who argued with the victim and shot them both.   5/11/11, 46, 55-66.

---

[12] *Id.*

[13] See *People v Bulls,* 262 Mich App 618, 623-624; 687 NW2d 159 (2004); *People v Avant,* 235 Mich App 499, 506; 597 NW2d 864 (1999) (questions of witness credibility are left to trier of fact and will not be resolved anew by the appellate court).

[14] MCL 750.316(1)(a).

[15] *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995).

[16] *People v Oliphant,* 399 Mich 472, 489; 250 NW2d 443 (1976) (identity is "always an essential element in a criminal prosecution"); *People v Yost,* 278 Mich App 341, 356; 749 NW2d 753 (2008); *People v Kern,* 6 Mich App 406, 409; 149 NW2d 216 (1967).

[17] *People v Kramer,* 108 Mich App 240, 248-250; 310 NW2d 347 (1981).

[18] *Id.* at 250; see *People v Chapo,* 283 Mich App 360, 364; 770 NW2d 68 (2009).

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

Although Allen identified someone who looked like defendant in a photo array he viewed while on morphine in the hospital after surgery, he later identified defendant in a live lineup.  5/11/11, 72-76.  Three other witnesses also identified defendant as the shooter.  Frederick McFadden was working on his mother's car nearby when he heard an argument, looked up, and saw the shooting.  He identified defendant as the shooter.  5/10/11, 99-113.  Marcario Harris and Kimberly Thompson heard the gunshots and looked out the window of their home located across the street from the restaurant.  They too identified defendant as the shooter.  5/10/11, 183-193, 200-210.  All those identifications were supported by the testimony of Bobby Bailey, the owner of the restaurant.  He knew defendant, and while he did not see a gun in defendant's hand, he identified defendant as the person with whom the victim argued and who was struck by the victim before shots rang out.  5/10/11, 57-68, 90.  That defendant's cell phone was found at the crime scene further connected him to the murder.  5/11/11, 149.

The positive identification of defendant by four witnesses, in conjunction with the other evidence, was more than sufficient to support a finding that defendant was the person who shot and killed the victim.[19]  The credibility of the witnesses was a question for the jury.  [20]  It was for the jury, not the court, to consider discrepancies in the witnesses' descriptions of the perpetrator and the results of prior identification procedures, and determine the weight to accord that evidence.[21]

---

[19] See *People v Davis,* 241 Mich App 697, 700; 617 NW2d 381 (2000).

[20] *Id.*

[21] *People v Hayton,* 28 Mich App 673, 676; 184 NW2d 755 (1970).

-12-

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

A rational jury could also find beyond a reasonable doubt that the killing was premeditated and deliberate. Premeditation does not require that a defendant plan the killing far in advance. Indeed, no specific time requirement exists for premeditation and deliberation. The defendant merely must have had sufficient time to take a "second look." [22] While the brutal nature of a murder alone does not prove premeditation,[23] the trier of fact may infer premeditation and deliberation from *all* the facts and circumstances, and minimal circumstantial evidence is sufficient to prove the defendant's state of mind. [24] Among those circumstances are the relationship between the defendant and the victim, his actions before and after the crime, and the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted.[25]

Defendant's actions during the crime showed that the killing was premeditated and deliberate. The evidence, viewed in a light most favorable to the People, proved that defendant shot the victim and fired several more shots after the victim stumbled backward. Then, after a pause, defendant approached the victim and fired more shots. After the victim fell to the ground, defendant got into the SUV. But he did not leave. He said "this MF N isn't dead yet," got out, approached the victim, and shot the victim in the head as he lay on the ground. 5/10/11, 64-69, 104-113, 116, 183-191, 200-209; 5/11/11, 60-70.

---

[22] *People v Gonzalez,* 468 Mich 636, 641; 664 NW2d 159 (2003); *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998).

[23] *People v Hoffmeister*, 394 Mich 155, 159; 229 NW2d 305 (1975).

[24] *People v Ortiz,* 249 Mich App 297, 301; 642 NW2d 417 (2001).

[25] *Plummer*, 229 Mich App at 300-301.

-13-

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

The number of shots defendant fired and the location of the victim's wounds also supported an inference of premeditation. Fourteen fired cartridge cases were found at the scene, and the victim was shot nine times–once in the head, behind the right ear, once in the back right upper arm, once in the back left shoulder, once in the back left elbow, twice in the right lower leg, and three times in the left lower leg. 5/11/11, 13-17, 33-35, 121. Deputy Chief Medical Examiner Leigh Hlavaty testified that the shot to the head was the most immediately lethal, but he also would have died of the other wounds. He was alive when shot in the head. 5/11/11, 36, 38.

Defendant's argument on appeal seeks to minimize the deliberate and reasoned choices he made while shooting the victim,[26] contrary to well-established Michigan case law. The time required to premeditate a killing may be "merely seconds," [27] and defendant's act of pausing between the volleys of shots supported a finding of premeditation.[28] Moreover, defendant unquestionably contemplated his actions before shooting the victim the final time in the head, which was a fatal wound. Viewing the evidence in a light most favorable to the People, a rational trier of fact could find from the totality of the circumstances that defendant shot and killed the victim and that the killing was both premeditated and deliberate. This Court must therefore affirm defendant's conviction.

---

[26] The People's theory of premeditation focused not on the initial shots, but on the remaining shots and the final shot to the victim's head. 5/11/11, 165-172.

[27] *People v Berthiaume,* 59 Mich App 451, 456; 229 NW2d 497 (1975).

[28] *People v Johnson,* 74 Mich App 234, 235-236; 253 NW2d 721 (1977).

-14-

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

## II.

**The Court may not second-guess counsel's reasonable strategic decisions regarding the presentation of evidence. Counsel cross-examined Aundrey Allen regarding his prior identification of someone other than defendant, elicited evidence to rebut Frederick McFadden's claim that he identified defendant in a photo array, and presented evidence that Investigator Simon had threatened witness Bobby Bailey. Counsel's strategic decisions regarding the questioning and calling of witnesses did not deny defendant the effective assistance of counsel.**

**Standard of Review**

A claim of ineffective assistance of counsel presents a mixed question of law and fact that an appellate court reviews de novo.[29] In undertaking that review, the court ordinarily grants deference to a trial court's findings of fact by reviewing them for clear error.[30] When a defendant does not raise his claim in the trial court, however, the appellate court's review is limited to the existing record.[31]

**Discussion**

Defendant's argument that he was denied the effective assistance of counsel is essentially that trial counsel should have tried the case the same way as defendant's former attorney. That argument ignores the teachings of *Strickland v Washington*.[32] *Strickland* recognized that "[t]here

---

[29] *Olden v United States*, 224 F3d 561, 565 (CA 6, 2000); see *People v LeBlanc,* 465 Mich 575, 579; 640 NW2d 246 (2002); *People v Matuszak,* 263 Mich App 42, 48; 687 NW2d 342 (2004).

[30] *LeBlanc,* 465 Mich at 579.

[31] *Matuszak,* 263 Mich App at 48; *People v Shively,* 230 Mich App 626, 628, n 1; 584 NW2d 740 (1998).

[32] *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."[33]   The Court must "eliminate the distorting effects of hindsight" and evaluate counsel's decisions from his perspective at the time of trial.[34]   Counsel's decisions regarding the questioning and calling of witnesses are presumed to be trial strategy,[35] the Court may not "substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight."[36]   Application of these principles to this case leads to one conclusion–that counsel provided effective assistance when he cross-examined witnesses to support his theory of mistaken identification in this case.

Defendant first criticizes counsel for not calling Sgt. Michael Martel as a witness to testify regarding his interaction with Aundrey Allen at the time Allen viewed the first photo array.[37]   That criticism is unwarranted.  Counsel reasonably chose to address Allen's explanation for his initial misidentification during cross-examination as part of an overall effort to discount the more problematic live lineup in which Allen did identify defendant.  Counsel elicited Allen's admission that he never told the police he was woozy or under the influence of drugs at the time of the array.  5/11/11, 94.   Counsel was able to cast doubt on the lineup and in-court

---

[33] *Id.* at 689.

[34] *Id.*

[35] *People v Garza,* 246 Mich App 251, 255; 631 NW2d 764 (2001).

[36] *People v Rockey,* 237 Mich App 74, 76; 601 NW2d 887 (1999).

[37] Sgt. Martel testified at the first trial that Allen "may have been on some sort of medication or painkillers.  I'm not sure.  But he seemed coherent enough to me to – if I had believed he wasn't coherent, I would not have taken his statement."  1/13/11, 60.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

identifications through cross-examination regarding the description of the shooter Allen provided while at the hospital, his desire to help the police find the shooter, the certainty he expressed about the identification in the array, and the circumstances surrounding the lineup and delay in making an identification. 5/11/11, 92-102, 107-108. Armed with knowledge of Allen's prior testimony, counsel could have decided to rely on the jury's ability to evaluate Allen's credibility and weigh his testimony rather that calling Sgt. Martel as a witness.

Defendant next appears to argue that counsel should have pursued a stipulation regarding Investigator Love's testimony and the photo array shown to Frederick McFadden. But his criticism in that regard is impermissibly driven by hindsight. A stipulation was not an option because Love was available to testify at the second trial, and counsel cannot be faulted for failing to anticipate that Love would be unable to recall for sure whether defendant's photo was in the array. 5/11/11, 128. Love did testify that he showed the array to McFadden a few days after the shooting and believed the array pertained to the first suspect, which other testimony clearly established to have been Deonte Miller.[38] 5/10/11, 157-162; 5/11/11, 126-127. Although Love testified that he was "not really positive" whether defendant was not in the array, he did say he (Love) was "part of the first one and I think it was two individuals that they wound up looking

---

[38] The officer-in-charge, Sgt. Samuel Mackie, obtained a photo of Miller which was included in an array. Other officers showed arrays to Allen on April 11th and Bailey on April 13th. 5/10/11, 157-162. Bailey told the police that "Tay" was not in the photos. 5/10/11, 74-76. Allen pointed out someone he thought looked like defendant. 5/11/11, 73-74. After determining that Deonte Miller was not involved, Sgt. Mackie used cell phone records and a photo on the cell phone to connect defendant to the phone. He obtained a photo of defendant, placed it in an array, and showed that array to Bailey. Bailey identified defendant. After defendant was arrested, Allen attended a live lineup and identified defendant. 5/10/11, 162-170; 5/11, 74-76.

-17-

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

at." He also testified that he could have documented it if McFadden had picked out defendant, and that no paperwork suggested that McFadden picked defendant. 5/11/11, 128.

Defendant's final criticism likewise does not survive scrutiny. Counsel's decision whether to question Investigator Simon about Bobby Bailey's allegations of mistreatment was likewise sound trial strategy. Counsel elicited testimony from Bailey that he lied in his September statement about seeing defendant with a gun because Investigator Simon threaten to get him "violated" on his probation/parole, told him to shut up when he tried to explain, and accused him of calling "the shooter up there." 5/10/11, 89-91. Investigator Simon denied threatening Bailey when questioned by the People. 5/11/11, 132. Faced with that denial, counsel could have reasonably determined that providing Simon with additional opportunities to deny the allegations, just as she did when cross-examined at the first trial,[39] would only increase the likelihood that the jury would credit her testimony on that subject.

Defendant therefore has failed to carry his burden of showing his attorney made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment.[40] But even if he had made that showing, he would not be entitled to relief because he has not demonstrated that counsel's alleged errors so prejudiced him as to deny him a fair trial.[41] Defendant must show that a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different.[42] "It is not enough for the defendant to show that the errors had some

---

[39] 1/12/11, 189-195,

[40] *Strickland*, 466 US at 687.

[41] See *People v Pickens,* 446 Mich 298, 303; 521 NW2d 797 (1994).

[42] *LeBlanc*, 465 Mich at 578.

-18-

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

conceivable effect on the outcome of the proceeding."[43]   "A reasonable probability is a probability sufficient to undermine confidence in the outcome,"[44] and confidence in the verdict in this case is not undermined.

Defense counsel presented a vigorous defense through cross-examination in an effort to secure a not guilty verdict, but, in the end, the overwhelming evidence proved that defendant shot and killed the victim.   Four witnesses identified defendant as the shooter, and those identifications were supported by the testimony of Bobby Bailey, the owner of the restaurant.  He knew defendant, and while he did not see a gun in defendant's hand, he identified defendant as the person who argued with the victim and was struck by the victim before shots rang out.  That defendant's cell phone was found at the crime scene further connected him to the murder.

No reasonable probability of a different results exists had counsel made different strategic choices during trial.  While Sgt. Martel could say he thought Allen seemed coherent at the time he viewed the photo array, he had no knowledge of what pain medication Allen was taking and how it would have affected his ability to focus on the array.   Any cross-examination of Investigator Simon would have served only to provide her with additional opportunities to deny mistreating Bailey.  Finally, a stipulation regarding McFadden and the array would have added little, where other evidence indicated that McFadden did not identify defendant.[45]   Counsel's strategic decisions with regard to the presentation of evidence on those subjects therefore did not so prejudice defendant as to deny him a fair trial.

---

[43] *Strickland,* 466 US at 693.

[44] *Id.* at 694.

[45] See *supra* n. 38.

-19-

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

### III.

**A prosecutor's knowing use of perjured testimony may violate due process.   Frederick McFadden maintained that he identified defendant in a photo array a few days after the shooting even though defendant was not even a suspect at that time, and Investigator Myron Love testified that he had no documentation indicating McFadden picked defendant but could not say for sure that defendant was not part of the array. Defendant has not shown perjury, let alone that the prosecutor knowingly used perjured testimony.**

**Standard of Review**

This issue is not preserved because defendant did not raise it in the trial court.  To avoid forfeiture, defendant must show plain error that affected his substantial rights, i.e., that affected the outcome of the proceedings.  If those requirements are met, this Court must still exercise its discretion in deciding whether to reverse.  Reversal is warranted only when the plain error resulted in conviction of an actually innocent defendant or the error seriously affected the fairness, integrity or public reputation of judicial proceedings.[46]

**Discussion**

Defendant has not shown plain error in the testimony of Frederick McFadden and Investigator Myron Love regarding the photo array viewed by McFadden.  The People agree that a defendant's right to due process is violated where there is any reasonable likelihood that a conviction was obtained by the knowing use of perjured testimony.[47]  But it is defendant's burden

---

[46] *People v Carines,* 460 Mich 750, 763, 774; 597 NW2d 130 (1999).

[47] *People v Gratsch*, __ Mich App __; __ NW2d __ (Docket No. 305040; Issued 2/28/13), slip op p 7.

-20-

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

to show that testimony was perjured,[48] and "[p]erjury is defined as testimony 'given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.'"[49]   In this case, the record demonstrates the latter, not the former, with regard to McFadden and Investigator Love.

At the first trial, McFadden testified that he picked out the shooter and two drivers in the first array.  He was not asked if he picked defendant and did not say that he identified defendant in the array.  1/11/11, 200.  At the second trial, he testified he viewed three pictures and picked out two people–defendant and the driver.  5/10/11, 124-125.   He said he looked at the photographs a day or two after the shooting and was "positive" he picked out defendant.  5/10/11, 127.

That testimony does not show that McFadden willfully intended to provide false testimony at the second trial.  It suggests nothing other than that he truly believed that he identified defendant in the array.  A mistake in that regard does not show perjury.

Similarly, a careful reading of Investigator Love's testimony shows that his memory was faulty, not that he perjured himself.  Unlike McFadden, Love did not testify at the first trial.  At the second trial he testified that McFadden picked out three people in the photo array.  He estimated that he showed the array to McFadden a few days after the shooting and "believe[d]" that the array concerned the first suspect.  5/11/11, 126-127.  On cross-examination, he testified that he was "not really positive" that defendant was not in the array.  Love said he knew he

---

[48] *United States v Griley,* 814 F2d 967, 971 (CA 4, 1987).

[49] *United States v McNair,* 605 F3d 1152, 1208 (CA 8, 2010), quoting *United States v Ellisor,* 522 F3d 1255, 1277 n 34 (CA 11, 2008).

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

(Love) "was part of the first one" and thought "it was two individuals that they wound up looking at." The name Deonte Miller did not sound familiar and he did not have a copy of the array. He had no paperwork to suggest McFadden picked out defendant and would have had documentation if he had. 5/11/11, 128. Fairly read, Love's testimony shows that Love simply had no clear memory of the array, not that he intended to provide false testimony.

But even if defendant could make that showing he would still not be entitled to relief. Defendant has not demonstrated that the alleged error affected his substantial rights[50] where other evidence indicated that McFadden did not identify defendant in the array. The shooting occurred on April 10th. The officer-in-charge, Sgt. Samuel Mackie, testified that he obtained a photo of Deonte Miller, the photo was included in an array, and other officers showed arrays to Allen on April 11th and Bailey on April 13th. 5/10/11, 157-162. McFadden testified that he too looked at an array two or three days after the shooting. 5/10/11, 127-128. But it is clear that defendant was not a suspect at that time. According to Sgt. Mackie, only after determining that Miller was not involved did he use cell phone records and a photo on the cell phone found at the scene to

---

[50] When the issue is preserved, the same showing of prejudice is required whether the prosecutor knowingly uses perjury or simply false testimony. Reversal is required if there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury. *United States v Agurs,* 427 US 97, 103; 96 S Ct 2392; 49 L Ed 2d 342 (1976); *Giglio v United States,* 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972); see *Napue v Illinois,* 360 US 264, 269-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). A different standard applies when the prosecutor does not know the testimony is false. The Sixth Circuit and other circuits have held that the unknowing use of perjured testimony does not violate due process. *King v Trippett,* 192 F3d 517, 522-523 (CA 6, 1999); *Jacobs v Singletary,* 952 F2d 1282, 1287, n 3 (CA 11, 1992). Even the federal courts that have concluded otherwise demand a stronger showing of prejudice than required in the knowing use context. The Second Circuit will reverse only if the court is left with the "firm belief that but for the perjured testimony, the defendant most likely would not have been convicted," *Sanders v Sullivan,* 863 F2d 218, 226 (CA 2, 1988), and the Ninth Circuit will reverse only if there is a "reasonable probability" that, without the false evidence, the "result of the proceeding would be different." *Killian v Poole,* 282 F3d 1204, 1208 (CA 9, 2002); *Spivey v Rocha,* 194 F3d 971, 979 (CA 9, 1999).

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

connect defendant to the phone.  He then obtained a photo of defendant, placed it in an array, and showed that array to Bailey.  Bailey identified defendant.  5/10/11, 162-170.

Defense counsel used that testimony to discredit McFadden.  He argued the evidence as a factor demonstrating that McFadden's identification was not credible:

> And Mr. McFadden says, oh, yes.  I identify him out a line-up.  Now, sergeant, or Investigator Love said there's no evidence that he identified my client Mr. Howard.  Mr. Howard wasn't even the subject matter of the investigation at that point in time because they were looking at a Deonte Miller.  Mr. Howard didn't come up for a while.  So, Mr. McFadden says, I identified Mr. Howard.  But we know there's no evidence of that. [5/11/11, 174]

The People similarly never claimed that McFadden identified defendant when viewing the array.  The prosecutor only discussed McFadden's testimony about what he observed at the time of the shooting.  5/11/11, 157-160, 188-189.

A jury considering those arguments and the testimony of McFadden and Love would not be left with the belief that McFadden actually identified defendant's photo in the array.  A reasonable jury would not consider the array as a factor *supporting* McFadden's in-court identification of defendant.  Nor would a jury rest its verdict on McFadden's identification testimony.  Three other witnesses identified defendant as the shooter, and a fourth witness (Bailey) who knew defendant identified him as the man was involved in the physical altercation with the victim seconds before the shots rang out.  Because no reasonable likelihood exists that McFadden's testimony regarding the array affected the judgment of the jury, the alleged error did not affect defendant's substantial rights.

For similar reasons, the Court should not exercise its discretion to reverse defendant's conviction based on an unpreserved allegation of error.  Defendant is not actually innocent.  Four

-23-

witnesses identified him as the shooter.  Nor does the alleged error seriously affect the fairness, integrity or public reputation of judicial proceedings.  Love and McFadden did not commit perjury.  They simply had a lack of memory regarding the identification procedure, and the jury was not left with the impression that McFadden actually identified defendant's photo in the array.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

## IV.

**A mandatory sentence of life with no parole eligibility for a juvenile is unconstitutional.  Defendant did not object when the trial court sentenced him to life for first-degree murder. Defendant will be eligible for parole; he is not entitled to a resentencing hearing.**

**Standard of Review**

This issue is not preserved because defendant did not raise it in the trial court.  To avoid forfeiture, defendant must show plain error that affected his substantial rights, i.e., that affected the outcome of the proceedings.  If those requirements are met, this Court must still exercise its discretion in deciding whether to reverse.  Reversal is warranted only when the plain error resulted in conviction of an actually innocent defendant or the error seriously affected the fairness, integrity or public reputation of judicial proceedings.[51]

**Discussion**

The People agree that a mandatory sentence of life with no parole eligibility for defendant is unconstitutional under *Miller v Alabama*.[52]  But that was not the sentence imposed by the trial court.  The court sentenced defendant to "life," 5/27/11, 4, and defendant's judgment of sentence indicates that a sentence that is not set forth in MCL 750.316–"natural life."  The Court should correct that error, but resentencing is not the remedy.  The Court should instead remand for entry of an amended judgment of sentence that reflects a sentence of "life" for first-degree murder.

---

[51] *People v Carines,* 460 Mich 750, 763, 774; 597 NW2d 130 (1999).

[52] *Miller v Alabama,* __ US __; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

The question before the Court is whether defendant is entitled to a resentencing hearing at which the trial court makes a determination or recommendation about parole eligibility. In *People v Carp*,[53] the Court addressed that question even though its holding that *Miller* did not apply retroactively to convictions on collateral review resolved the case before it:

> In the interim, as guidance for our trial courts for those cases currently in process or on remand following direct appellate review, we find that MCL 791.234(6)(a) is unconstitutional as currently written and applied to juvenile homicide offenders. When sentencing a juvenile, defined now as an individual below 18 years of age, for a homicide offense, the sentencing court must, at the time of sentencing, evaluate and review those characteristics of youth and the circumstances of the offense as delineated in *Miller* and this opinion in determining whether following the imposition of a life sentence the juvenile is to be deemed eligible or not eligible for parole. We further hold that the Parole Board must respect the sentencing court's decision by also providing a meaningful determination and review when parole eligibility arises.

Although *Carp*'s holding was dicta and not binding precedent,[54] the Court followed it in *People v Eliason*.[55] The Court must follow *Eliason* even though the *Carp/Eliason* remedy exceeds the circuit court's statutory authority and violates the separation of powers by infringing on the Parole Board's exclusive jurisdiction over parole matters.[56]

---

[53] *People v Carp*, __ Mich App __; __ NW2d __ (2012), slip op pp 40-41.

[54] *People v Lown,* 488 Mich 242, 267 n 46; 794 NW2d 9 (2011).

[55] *People v Eliason,* __ Mich App __; __ NW2d __ (Docket No. 302353; issued 4/4/13).

[56] The first step in remedying that error would be for the Court to request that a special panel be convened to consider the question. MCR 7.215(J)(2) & (3).

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

The Legislature has the exclusive power to determine the length of imprisonment for a felony.[57]  When imposing sentence, a trial court "performs a ministerial function with discretion confined to the limits permitted by the statute."  The function of the court is to "impose sentence under and in accord with the statute."[58]

In Michigan, a defendant, juvenile or adult, convicted of first-degree murder is not sentenced to "life without parole."  While a sentencing judge has no discretion but to impose a sentence of life for someone convicted of first-  degree murder,[59] the judge does not determine eligibility for parole.  Whether a defendant is eligible for parole is determined by the parole statute, MCL 791.234, not by the judgment of sentence.  That statute provides that a prisoner sentenced to "imprisonment for life" for first-degree murder "is not eligible for parole."[60]

*Carp* correctly reasoned that for cases to which *Miller* applies, MCL 791.234(6)(a), not MCL 750.316, is unconstitutional,[61] but then erred in creating a remedy that exceeds the court's statutory authority and infringes upon the power of the Parole Board.  The Legislature has conferred on the Department of Corrections exclusive jurisdiction over paroles,[62] and has provided that the release of a prisoner on parole is granted "solely upon the initiative of the

---

[57] *In re Callahan,* 348 Mich 77, 80; 81 NW2d 669 (1957); *People v Morris,* 80 Mich 634, 641; 45 NW 591 (1890).

[58] *Callahan*, 348 Mich at 80.

[59] MCL 750.316(1).

[60] MCL 791.234(6)(b).

[61] *Carp*, slip op at 36.

[62] MCL 791.204(b).

-27-

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

parole board."[63]   While a trial court may object once the Parole Board provides notice of a public hearing on whether to parole a prisoner sentenced to life,[64] the court has no statutory authority to hold its own hearing on parole eligibility at the time of sentencing.  Holding that hearing would violate the separation of powers.[65]  The court must simply impose the statutory penalty for first-degree murder–life.

Until the Legislature creates a different procedure, the remedy for juvenile defendants who are subject to *Miller* is to request that the Parole Board consider them for parole when they are eligible after serving the required number of years.[66]  That was the remedy provided by our Supreme Court when it declared that life without the possibility of parole for those convicted of possession of over 650 grams of a controlled substance violated the Michigan Constitution.[67]  It is also the remedy defendants were afforded after the United States Supreme Court held in

---

[63] MCL 791.235(1).

[64] MCL 791.234(7) (granting of parole is subject to conditions prescribed in MCL 791.234(8)); MCL 791.234(8)(c) (notice of a public hearing must be given to the sentencing judge or his successor, and parole shall not be granted if the judge files written objections within 30 days of receiving the notice).

[65] Const 1963, art 3, § 2; see *Hopkins v Michigan Parole Board,* 237 Mich App 629, 647; 604 NW2d 686 (1999) (a court cannot compel the Parole Board to exercise its authority to release a prisoner).

[66] Under the current statute, defendant will be eligible after serving 15 years.   MCL 791.234(7)(a).

[67] *People v Bullock,* 440 Mich 15, 42; 485 NW2d 866 (1992).

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

*Graham v Florida*[68] that a sentence of life without the possibility of parole is impermissible for a juvenile offender convicted of a non-homicide offense.[69]

---

[68] *Graham v Florida*, 560 US __; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

[69] See *Louisiana v Shaffer,* 77 So3d 939, 942-943 (2011).

**RELIEF**

WHEREFORE, the People request that this Court affirm defendant's conviction and sentence.

Respectfully Submitted,

KYM L. WORTHY
Prosecuting Attorney
County of Wayne

TIMOTHY A. BAUGHMAN
Chief of Research,
Training and Appeals

/ s / **JASON W.  WILLIAMS**

Jason W. Williams (P-51503)
Assistant Prosecuting Attorney
1441 St. Antoine, 11th Floor
Detroit, Michigan 48226
(313) 224-8109

Dated: May 2, 2013.

RECEIVED by Michigan Court of Appeals 5/7/2013 11:06:42 AM

-30-

| Lower Court or Tribunal | STATE OF MICHIGAN IN THE COURT OF APPEALS Cover Sheet | CASE NO. |
|---|---|---|

**STATE OF MICHIGAN**
**IN THE COURT OF APPEALS**
**Cover Sheet**

**CASE NO.**

Lower Court or Tribunal
WAYNE CIRCUIT COURT

| CIRCUIT: | Year | Number | Case Type |
|---|---|---|---|
| | 10 | 005562 | FJ |
| COURT OF APPEALS: | 311169 | | |

*RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM*

## Filing Party

Filing Party Last Name or Business/Entity/Agency Name
HOWARD DEONTE

Filing Party First Name                    M.I.

Address (Street 1, Street 2, City, State, and ZIP Code)

Attorney Last Name
Meinberg

Attorney First Name                    M.I.   P Number
Susan                                  M    34433

Address(Street 1, Street 2, City, State, and ZIP Code)
645 Griswold Street
Suite 3300
Detroit                          MI    48226

Attorney Telephone Number
(313)256-9833

## Summary of Items Filed

| Type | Filename/Description | Filing Fee | Doc Fee | Total This Filing |
|---|---|---|---|---|
| Brief | Defendant-Appellant's Reply Brief | $5.00 | ---- | $5.00 |
| | | **3% Service Fee:** | | $0.15 |
| | | **Total All Filings:** | | $5.15 |

**Fee Substitute/Alternate Payment**

**Reason:**

| X | **Appointed Counsel** |
|---|---|
| | **Motion To Waive Fee** |
| | **Fees Waived in this Case** |
| | **MI InterAgency Transfer** |
| | **No Fee per MCR 7.203(F)(2)** |

**Filer Office Use Only:**    sado iden 26011

The documents listed above were electronically filed with the Michigan Court of Appeals at the date/time stated in the left margin.  As a recipient of service of these documents, you may wish to go to https://wiznet.wiznet.com/appealsmi to register as a user of the electronic filing system.
311169 - 326811

| Lower Court or Tribunal<br><br>WAYNE CIRCUIT COURT | **STATE OF MICHIGAN**<br>**IN THE COURT OF APPEALS**<br><br>**Proof of Service** | ***CASE NO.*** | | |
|---|---|---|---|---|
| | | CIRCUIT: | Year<br>10 | Number<br>005562 | Case Type<br>FJ |
| | | COURT OF APPEALS: | 311169 | |

Case Name:   PEOPLE OF MI V DEONTE HOWARD

On   5/28/2013   , one copy of the following documents:

Brief                              Defendant-Appellant's Reply Brief

was delivered to the persons listed below:

Date<br>5/28/2013

Signature<br>/s/Susan M. Meinberg

| Bar<br>Number | Name | Delivery<br>Method | Service Address |
|---|---|---|---|
| P- | AO, SADO | E-Serve | ao@sado.org |
| P- | AO Support, Wayne County | E-Serve | wcpaappeals@co.wayne.mi.us |
| P- 34433 | Meinberg, Susan M | E-Serve | smeinberg@sado.org |
| P- 51503 | Williams, Jason W. | E-Serve | jwilliam@co.wayne.mi.us |

*RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM*

The documents listed above were electronically filed with the Michigan Court of Appeals at the date/time stated in the left margin.  As a recipient of service of these documents, you may wish to go to https://wiznet.wiznet.com/appealsmi to register as a user of the electronic filing system.

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

Approved, Michigan Court of Appeals

| | | |
|---|---|---|
| **LOWER COURT**<br><br>**Wayne County Circuit Court** | **Electronically Filed**<br><br>**BRIEF COVER PAGE** | **CASE NO.**<br>Lower Court  10-5562-01<br><br>Court of Appeals  311169 |

(Short title of case)
Case Name: **People v. Deonte Howard**

---

1. Brief Type (select one):  ☒ APPELLANT(S)   ☐ APPELLEE(S)   ☒ REPLY
   ☐ CROSS-APPELLANT(S)   ☐ CROSS-APPELLEE(S)   ☐ AMICUS
   ☐ OTHER [identify]:

2. This brief is filed by or on behalf of [insert party name(s)]: **Deonte Howard**

3. ☐  This brief is in response to a brief filed on May 7, 2013 by Plaintiff-Appellee.

4. ORAL ARGUMENT:   ☒ REQUESTED   ☐ NOT REQUESTED

5. ☐  THE APPEAL INVOLVES A RULING THAT A PROVISION OF THE CONSTITUTION, A STATUTE, RULE OR REGULATION, OR OTHER STATE GOVERNMENTAL ACTION IS INVALID.
   [See MCR 7.212(C)(12) to determine if this applies.]

6. As required by MCR 7.212(C), this brief contains, in the following order: [check applicable boxes to verify]

   ☒ Table of Contents [MCR 7.212(C)(2)]
   ☒ Index of Authorities [MCR 7.212(C)(3)]
   ☐ Jurisdictional Statement [MCR 7.212(C)(4)]
   ☐ Statement of Questions [MCR 7.212(C)(5)]
   ☐ Statement of Facts (with citation to the record) [MCR 7.212(C)(6)]
   ☒ Arguments (with applicable standard of review) [MCR 7.212(C)(7)]
   ☒ Relief Requested [MCR 7.212(C)(9)]
   ☒ Signature [MCR 7.212(C)(9)]

7. This brief is signed by [type name]: **Susan M. Meinberg**
   Signing Attorney's Bar No. [if any]: **(P34433)**

(10/06) **E-File Brief Cover Page**                                                                 MCR 7.212(C)

# <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES..................................................................................... i

STANDARD OF REVIEW ...................................................................................1

IV.  THE UNITED SUPREME COURT RULING IN *MILLER V ALABAMA* PROHIBITS A
    SENTENCE OF LIFE WITHOUT PAROLE IMPOSED UNDER A STATUTORY
    SCHEME THAT REQUIRES MANDATORY LIFE FOR THOSE WHO WERE
    JUVENILES AT THE TIME OF THE OFFENSE.  *MILLER* REQUIRES
    RESENTENCING FOR DEONTE HOWARD BECAUSE HE WAS SENTENCED
    UNDER PRECISELY THAT KIND OF SCHEME, IN VIOLATION OF BOTH HIS
    EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS TO A
    SENTENCE THAT IS PROPORTIONATE AND INDIVIDUALIZED..............................1

SUMMARY AND RELIEF REQUESTED ....................................................................9

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

# <u>INDEX OF AUTHORITIES</u>

**Cases**

*Alexander v Birkett*, 228 Fed Appx 534 (CA 6 2007) ............................................... 6
*Foster Bey v Rubitschun*, No. 05-71318, 2007 WL 7705668 (E.D. Mich. October 23, 2007) ...... 6
*Foster-Bey v Booker*, 595 F3d 353 (CA 6 2010) ................................................... 6
*Miller v Alabama*, 567 US ___, 132 S Ct 2455, 183 L Ed 2d 407 (2012) ........................... passim
*People v Bullock*, 440 Mich 15 (1992) ............................................................... 2
*People v Carp*, ___ Mich App ___ (2012) ......................................................... passim
*People v Dowtin-El*, 481 Mich 909 (2008) ........................................................... 6
*People v Eliason,* ___ Mich App ___ (2013) ...................................................... passim
*People v Hill*, 267 Mich App 345 (2005) ............................................................. 6
*People v Nimeth*, 236 Mich App 616 (1999) .......................................................... 1
*People v Noble*, 238 Mich App 647 (1999) ........................................................... 1
*People v White*, 212 Mich App 298 (1995) ........................................................... 1
*People v Wilson*, 230 Mich App 590 (1998) .......................................................... 1

**Constitutions and Statutes**

MCL 750.316 ..................................................................................... 2
MCL 769.1 ....................................................................................... 2
MCL 791.233(1)(a) ............................................................................... 8
MCL 791.234 (8)(c) .............................................................................. 7
MCL 791.234(6) .................................................................................. 2

i

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

IV.   **THE UNITED SUPREME COURT RULING IN *MILLER V ALABAMA* PROHIBITS A SENTENCE OF LIFE WITHOUT PAROLE IMPOSED UNDER A STATUTORY SCHEME THAT REQUIRES MANDATORY LIFE FOR THOSE WHO WERE JUVENILES AT THE TIME OF THE OFFENSE. *MILLER* REQUIRES RESENTENCING FOR DEONTE HOWARD BECAUSE HE WAS SENTENCED UNDER PRECISELY THAT KIND OF SCHEME, IN VIOLATION OF BOTH HIS EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS TO A SENTENCE THAT IS PROPORTIONATE AND INDIVIDUALIZED.**

**Standard of Review**

No challenge was made to the constitutionality of Deonte Howard's sentence prior to sentencing in 2011. Regardless, a defendant may challenge the constitutional validity of a statute for the first time on appeal. *People v Noble,* 238 Mich App 647, 651 (1999) citing *People v Wilson,* 230 Mich App 590, 593 (1998).

The constitutionality of a statute is a question of law to be reviewed *de novo*. *People v White,* 212 Mich App 298, 304-305 (1995); *People v Nimeth,* 236 Mich App 616, 623 (1999).

**Discussion**

Plaintiff-Appellee asserts in their Brief on Appeal that Mr. Howard is only entitled to an amended Judgment of Sentence to reflect a life sentence. Plaintiff-Appellee maintains that Mr. Howard is not entitled to a resentencing. See Plaintiff-Appellee's Brief on Appeal, pp 25-29. The prosecution offers two basic arguments for why resentencing is not required in spite of the unconstitutional nature of Defendant's mandatory sentence of life without parole. First, the prosecution frames Michigan's unconstitutional practice as only the lack of Parole Board review, not the actual sentence of life without parole. As such, the prosecution suggests a remand for the judge to amend the Judgment of Sentence from "natural life" to "life". *Id.* at p 25.

This suggestion does not properly respond to the unconstitutional sentence. Defendant's sentence is unconstitutional not because of the Parole Board's inability to grant parole under the

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

current scheme, but because it is the result of multiple statutes that together impose a mandatory life without parole sentence. MCL 750.316 imposes a mandatory life sentence for first-degree murder; MCL 791.234(6) prohibits parole for a prisoner sentenced to first-degree murder; MCL 712.A2d allows the prosecution to charge a sixteen-year-old charged with murder as an adult; MCL 769.1 requires the court to sentence a juvenile convicted of murder as an adult.  It is this entire statutory scheme that *Miller v Alabama,* 567 US ___, 132 S Ct 2455, 183 L Ed 2d 407 (2012) found unconstitutional. Allowing the trial court to simply amend the Judgment of Sentence to "life" does not cure this unconstitutional mandatory sentencing scheme. Only a remand for resentencing pursuant to the requirements of *Miller* allows for a constitutional sentence.

The prosecution also argues that *Carp's* [ ___ Mich App ___ (2012)] remedy discussion was dicta and not binding precedent, that it was followed by *People v Eliason,* ___ Mich App ___ (2013), and that this Court is bound to follow *Eliason,* "even though the *Carp/Eliason* remedy exceeds the circuit court's statutory authority and violates the separation of powers by infringing on the Parole Board's exclusive jurisdiction over parole matters." Plaintiff-Appellee's Brief on Appeal, p 26.   The prosecution further maintains that the remedy in *People v Bullock,* 440 Mich 15, 42 (1992) is the appropriate remedy until the Legislature creates a different procedure. Plaintiff-Appellee's Brief on Appeal, p 28.

Defendant agrees that the portion of *Carp* that elected to "provide guidance" to the trial courts regarding the remedy is dicta; however, Defendant Howard submits that the prosecution's proposed remedy and the *Carp/Eliason* remedy are incorrect. As Judge Gleicher noted in her dissenting opinion in *People v Eliason,* "the majority's newly-created life-sentence option is no more tethered to Michigan's legislative sentencing scheme than a term-of-years sentence." See

2

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

*People v Eliason,* ___ Mich App ___ (2013)(Gleicher, P.J., concurring in part and dissenting in part), p 3.  Judge Gleicher wrote:

> In accordance with *Carp*, the majority circumscribes Dakotah's sentence alternatives to life imprisonment without parole or life imprisonment with parole. The majority predicates this rule on "the Michigan Legislature's judgment that a life sentence is the appropriate punishment for a juvenile who is lawfully convicted of first degree murder." Contrary to *Carp* and the majority, *Miller* mandates that a sentencing court retain discretion to fashion an individualized sentence that takes into account an offender's youth, his "distinctive (and transitory) mental traits and environmental vulnerabilities," and affords him a "meaningful opportunity to obtain release." *Miller,* 132 S Ct at 2465, 2469 (quotation marks and citation omitted). The sentencing calculus crafted by *Carp* violates *Miller* because it eliminates individualized sentencing and (as *Carp* concedes) it forecloses any meaningful opportunity for a reformed juvenile to obtain his or her freedom.
>
> Furthermore, while professing fidelity to legislative sentencing judgments, the majority (and *Carp*) fail to identify any statutory provision permitting a trial court to sentence a defendant convicted of first-degree murder to life imprisonment with the possibility of parole. Our Legislature has defined only one sentence for first-degree murder, and that sentence simply does not contemplate life with parole.
>
> The majority insists that *Miller* requires that when resentencing juveniles, judges must apply the legislative "policy choice" most consistent with life without parole. I find nothing in *Miller* even remotely consistent with this view. To the contrary, *Miller* holds that proportionality principles must guide juvenile sentencing, and that laws that disregard the charac-teristics of youth are flawed. *Miller,* 132 S Ct at 2465–2466. Moreover, the majority's newly-created life-sentence option is no more tethered to Michigan's legislative sentencing scheme than a term-of-years sentence. Absent any legislatively-approved sentence for first-degree murder other than life without parole, the real question is whether affording a sentencing court the ability to impose a term-of-years sentence is required to fulfill *Miller's* mandate. In my view, only this option permits an individualized sentence and offers a juvenile "some meaningful opportunity to obtain release." *Miller,* 132 S Ct at 2469 (emphasis added).

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

> Furthermore, article 1, § 16 of the Michigan Constitution (Const 1963, art 1, § 16) precludes sentencing Dakotah to life imprisonment. Michigan's constitutional prohibition of cruel or unusual punishment incorporates a proportionality analysis emphasizing evolving sentencing standards "enlightened by a humane justice," and focusing on rehabilitation rather than retribution. *People v. Lorentzen,* 387 Mich. 167, 178 (quotation marks and citation omitted), 179–181; 194 NW2d 827 (1972). Measured against this framework, a life sentence with or without the possibility of parole exceeds constitutional bounds.
>
> *People v Eliason,* ___ Mich App ___ (2013)(Gleicher, P.J., concurring in part and dissenting in part), p 3.

Furthermore, the *Carp/Eliason* remedy and the remedy proposed by the prosecution here ignore *Miller's* central teaching – that children are constitutionaly unique and that a youthful offender's sentence must be proportionate to the offender and the offense. *Miller,* 132 S Ct at 2465-2468.   Judge Gleicher correctly noted the following:

> This new rule is incorrect for two reasons. First, it ignores the United States Supreme Court's admonition in *Miller, Graham* and *Roper* that a youthful offender's sentence must be proportioned to the offender as well as the offense. While an automatic life sentence may be proportionate to the crime of murder, a life sentence may not be imposed on a juvenile absent meaningful consideration of whether such punishment fits the juvenile criminal. *Carp's* prescription—life with or without parole—nullifies the "foundational principle[ ] that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." FN1 *Miller,* 132 S Ct at 2466.
>
> FN1. *Carp's* conclusion that juveniles who commit murder deserve a life sentence because only a life sentence is proportionate to that crime disregards that just as all juveniles are not alike, neither are all murders. Kuntrell Jackson, one of the *Miller* defendants, had not fired the bullet that killed the victim and did not intend her death. He was convicted solely as an aider and abettor. *Miller,* 132 S Ct at 2468. These mitigating circumstances "go to Jackson's culpability for the offense." *Id.* Thus, sentencing a juvenile convicted of first-degree murder to life imprisonment without parole may sometimes qualify as inconsistent with substantial justice. Ultimately, that question is for a sentencing court to decide, not the Michigan Court of Appeals.

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

Pursuant to *Miller's* core proportionality principles, an offender's age possesses special relevance that necessarily factors prominently in a sentencing calculation. *Id.* at 2469. *Miller* instructs that because "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole," sentencing courts must consider "the background and mental and emotional development" of each individual youthful offender before passing sentence. *Id.* at 2465, 2467 (quotation marks and citation omitted). In other words, *Miller* compels a sentencing court to tailor punishment to an offender's personal responsibility and singular moral guilt. To comply with *Miller,* a judge must bear in mind that children under age 18 are "categorically less culpable," *Roper,* 543 U.S. at 567 (quotation marks and citation omitted), and more amenable to rehabilitation than adults who commit the same crimes. A sentencing scheme that forecloses sentencing proportionate to a child's culpability violates *Graham, Roper* and *Miller.*

For this reason, *Carp's* circumscription of sentence options to either of two life terms cannot be reconciled with *Miller's* central teaching: children are constitutionally unique. Judges sentencing children must consider the mitigating effects of youth and the specific circumstances of their crimes. These factors may counsel strongly against a life term, either with or without the possibility of parole. A sentencing rubric that fails to permit proportional and individualized mitigation does not pass constitutional muster.

In light of the "diminish[ed] ... penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes," *Miller,* 132 S Ct at 2465, different sentencing principles apply. Despite that Michigan law demands that an adult murderer serve a mandatory life sentence, *Miller* obligates sentencing courts to exercise meaningful discretion when sentencing a child who committed that same crime. Exercising discretion involves thoughtfully considering "the wealth of characteristics and circumstances attendant to" a defendant's youth, *id.* at 2467, which in turn means that a court must be permitted to reject that a child deserves to serve a life term. In my view, the exercise of discretion contemplated in *Miller* is simply inconsistent with a rule allowing only for life imprisonment with or without parole. The "two-sizes-fit-all" approach embraced by *Carp* offends the Eighth Amendment because it forecloses proportionality.

*People v Eliason, supra,* (Gleicher, P.J., concurring in part and dissenting in part), pp 4-5.

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

In addition, a parolable life sentence is a fiction in Michigan that does not satisfy *Miller,* which even the *Carp* Court acknowledged. See *Carp, supra,* 37-38.  The Michigan Parole Board has been candid about its current and longstanding policy not to consider parole for prisoners with parolable life terms pursuant to its "life means life" policy.  As the Sixth Circuit observed, the chairman of the Parole Board testified in 1999 that "a life sentence means just that-life in prison," and a spokesman publicly reiterated that policy in 2001.  *Alexander v Birkett*, 228 Fed Appx 534, 535 (CA 6 2007).  More recently, the Sixth Circuit observed that the percentage of prisoners with parolable life terms who were released was only 0.15% on average.  *Foster-Bey v Booker*, 595 F3d 353, 366 (CA 6 2010). These are just two examples of the Parole Board's policy to render parolable life the functional equivalent of LWOP.[1]

Setting aside the Parole Board's refusal to equitably consider parole for those sentenced to life terms, even if parole from a life sentence could be obtained it would be subject to an unregulated judicial veto from the sentencing judge or his successor.  MCL 791.234 (8)(c) ("[P]arole shall not be granted if the sentencing judge, or the judge's successor in office, files written objections to the granting of the parole within 30 days of receipt of the notice of hearing").  No standards are provided to guide sentencing judges in wielding this judicial veto, nor is the decision subject to appeal.

Judge Gleicher also noted the following problems with postponing the proportionality analysis until parole eligibility:

---

[1] *Foster-Bey v Rubitschun*, No. 05-71318, 2007 WL 7705668 (E.D. Mich. October 23, 2007) ("The testimony shows that the new Board's approach to nonmandatory lifers indeed became 'life means life.'"), *rev'd and remanded sub nom. Foster v Booker,* 595 F3d 353 (2010); *People v Dowtin-El*, 481 Mich 909 (2008) (Kelly, J., dissenting) ("would grant leave to appeal to consider whether the Parole Board's policy of 'life means life' improperly converted the defendant's sentence into a nonparolable life term"); *People v Hill*, 267 Mich App 345, 352 (2005) ("Further, it appears to have been well-known that most lifers were never granted parole [as early as 1976].").

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

*Miller* instructs that removing youth from the balance at the time of sentencing contravenes the Eighth Amendment by prohibiting a judge "from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Miller,* 132 S Ct at 2466.

FN3. See also *Alexander v. Birkett,* 228 Fed Appx 534 (CA 6, 2007).

Postponing proportionality analysis until parole eligibility is simply inconsistent with *Miller.* This is particularly true in Michigan, as the statutory and administrative standards governing our parole board's decision-making bear no resemblance to the most relevant mitigating factors identified in *Miller*: a juvenile's diminished moral culpability, the "wealth of characteristics and circumstances attendant to" an offender's youth at the time he committed the crime, and the harshness of a life sentence imposed on, for example, a 14–year–old child. *Miller,* 132 S Ct at 2467. Instead, Michigan's parole system focuses on "the prisoner's mental and social attitude" at the time parole is considered. MCL 791.233(1)(a). Although the parole guidelines examine the severity of the crime, they omit regard for a youthful offender's unique characteristics. See *In re Parole of Elias,* 294 Mich.App 507, 512–517; 811 NW2d 541 (2011). Uncertain, unpredictable and unlikely parole does not substitute for factoring in on the "front-end" a juvenile's lessened culpability. *Miller* does not contemplate that a parole board may substitute for a sentencing judge.

Because the alternative sentencing options set forth in *Carp* are materially indistinguishable and discretionary in name only, they do not satisfy *Miller.* In practice, they are but two sides of the same life-imprisonment coin. Confining a sentencing court's ability to commit a juvenile to life without parole or to life with but the barest possible prospect of parole defies *Miller's* mandate that when passing sentence, judges must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller,* 132 S Ct at 2469. Accordingly, implementing *Miller* entails more than mechanically applying adult sentencing practices to child offenders.

*Carp* declares that *Miller* "does not require Michigan or other states with similar mandatory sentencing schemes to abrogate or abandon a hierarchical methodology of sentencing for those convicted of first-degree murder or to necessitate a term-of-years sentence consistent with a lesser offense, such as second-degree murder." *Carp,* slip op at 33–34. I respectfully submit that this statement reflects a mis-understanding of *Miller. Miller* does not "abrogate or abandon" any

7

RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM

state's sentencing methodology. It simply requires that every state adjust that methodology in a manner that recognizes that "youth matters," allowing judges to implement that recognition by tailoring a sentence to fit the offender as well as the offense. Because a parolable life sentence in Michigan actually amounts to the imposition of a life-without-parole sentence, *Carp* has simply written mitigation out of the equation. Regardless whether a "term of years" sentence would correspond with a conviction of second-degree murder, it must remain an option for a sentencing court.

*People v Eliason, supra,* (Gleicher, P.J., concurring in part and dissenting in part), pp 5-6.

Defendant Howard asks this Court to reject the *Carp/Eliason* remedy and the proposed remedy by the prosecution.  Defendant is entitled to a remand for a resentencing that comports with *Miller* and allows the trial judge to impose a proportionate sentence to the offender and the offense, including the ability to impose a term of years sentence.

## <u>SUMMARY AND RELIEF REQUESTED</u>

**WHEREFORE**, for the foregoing reasons, Defendant-Appellant asks that this Honorable

Court reverse his conviction, or remand for resentencing.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

/s/ Susan M. Meinberg

BY:_____

**SUSAN M. MEINBERG (P34433)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

Dated: May 28, 2013

*RECEIVED by Michigan Court of Appeals 5/28/2013 3:51:12 PM*

9

# Court of Appeals, State of Michigan

## ORDER

People of MI v Deonte Howard

Docket No.   311169

LC No.   10-005562-FJ

Kurtis T. Wilder
Presiding Judge

Karen Fort Hood

Deborah A. Servitto
Judges

The Court orders that this case is HELD IN ABEYANCE pending a decision from the Michigan Supreme Court in *People v Dakotah Wolfgang Eliason,* Supreme Court No. 147428; *People v Carp,* Supreme Court No. 146478; and *People v Davis,* Supreme Court No. 146819.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

February 12, 2014
Date

Chief Clerk