**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DEONTE HOWARD,

      Petitioner,               Case No. 5:16-CV-13131

v.                            HONORABLE JOHN CORBETT O'MEARA
                                  UNITED STATES DISTRICT JUDGE

THOMAS MACKIE,

      Respondent,

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS

Deonte Howard, ("Petitioner"), confined at the Oaks Correctional Facility in

Manistee, Michigan, filed a *pro se* petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254, in which he challenges his conviction for first-degree premeditated

murder, M.C.L.A. 750.316; assault with intent to do great bodily harm less than murder,

M.C.L.A. 750.84; and felony-firearm, M.C.L.A. 750.227b. For the reasons stated below,

the petition for writ of habeas corpus is DENIED.

### I. Background

Petitioner was convicted in the Wayne County Circuit Court.[1] This Court recites

verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are

presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v.*

---

[1] Petitioner was convicted by a jury at a first trial of the assault and felony-firearm charges but the jury could not reach a verdict on the first-degree murder charge and a mistrial was declared on that count. Petitioner was convicted of first-degree murder by a jury following a retrial.

*Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant was charged with first degree premeditated murder, assault with intent to murder and felony firearm in connection with the shooting death of 19–year–old Tyrone Simpson on April 10, 2010. The shooting occurred in front of a combination convenience store/barbecue restaurant on the 1600 block of Tireman Street in the city of Detroit shortly after 4:00 p.m. An argument broke out between defendant, who was 16 years old at the time, and Simpson when Simpson accused defendant of taking his Cartier sunglasses. Defendant denied taking them and a verbal argument ensued. Simpson then punched defendant in the face several times, at which point defendant drew a weapon and fired at Simpson, injuring him and one of Simpson's friends, Aundrey Allen. Simpson attempted to run away from defendant, but defendant chased Simpson around a vehicle, shooting at and striking him with several shots until Simpson collapsed in the street. An SUV driven by an unidentified friend of defendant's then pulled up and defendant jumped into the back seat. The vehicle started to leave, and then abruptly slammed on its breaks. Defendant got back out of the vehicle and shot Simpson in the head. Defendant then got back into the vehicle and it sped away. Simpson was dead when police arrived on the scene a short time later. The medical examiner noted that Simpson had a total of nine gunshot wounds, including one to his head.

*People v. Howard*, No. 311169, 2014 WL 5305997, at *1 (Mich. Ct. App. Oct. 16, 2014).

Petitioner's conviction was affirmed on appeal, although the case was remanded for re-sentencing. *Id., lv. den.* 498 Mich. 852 (2015). [2]

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Howard's conviction for first-degree murder must be vacated where the prosecution failed to present legally sufficient evidence that he is who committed the offense and no evidence that he acted with premeditation and

---

[2] Petitioner is in the process of resentencing at the trial court due to the United States Supreme Court decision in *Miller v. Alabama*, 132 U.S. 2455, 2475 (2012), which prohibits mandatory nonparolable life sentences for a defendant who committed his or her offense when he or she was a juvenile, as petitioner was. Petitioner does not challenge his sentence or re-sentencing in this petition.

deliberation.

II. Howard was denied his state and federal right to effective assistance of counsel where defense counsel failed to call a police officer as a defense witness, failed to submit a critical stipulation at the first trial, and failed to cross-examine the prosecutor's key witness.

III. Howard is entitled to a new trial where he was denied his state and federal due process rights where his conviction was obtained through use of false and perjured testimony.

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A

federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

### III. Discussion

**A. Claim # 1. The sufficiency of evidence claim.**

Petitioner claims that there was insufficient evidence to convict him.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  This

inquiry, however, does not require a court to "ask itself whether *it* believes that the

evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant

question is whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote

omitted)(emphasis in the original).

More importantly, a federal habeas court may not overturn a state court decision

that rejects a sufficiency of the evidence claim simply because the federal court disagrees

with the state court's resolution of that claim.  Instead, a federal court may grant habeas

relief only if the state court decision was an objectively unreasonable application of the

*Jackson* standard. *See Cavazos v. Smith,* 565 U.S. 1, 2 (2011).  "Because rational people

can sometimes disagree, the inevitable consequence of this settled law is that judges will

sometimes encounter convictions that they believe to be mistaken, but that they must

nonetheless uphold." *Id.*  Indeed, for a federal habeas court reviewing a state court

conviction, "the only question under *Jackson* is whether that finding was so

insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*,

132 S. Ct. 2060, 2065 (2012).

Finally, on habeas review, a federal court does not reweigh the evidence or

redetermine the credibility of the witnesses whose demeanor was observed at trial.

*Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).  It is the province of the factfinder to

weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F. 2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F. 3d 780, 788 (6th Cir. 2003).

Petitioner first claims that there was insufficient evidence to establish his identity as the shooter. The Michigan Court of Appeals rejected petitioner's claim:

> In this case, defendant was identified by no less than four eyewitnesses to the shooting. Frederick McFadden testified that he had an unobstructed view of the scene from approximately 20 feet away, and saw defendant shoot Simpson several times. His testimony was unequivocal that defendant was the only person with a gun and that defendant shot Simpson several times, including once in the head. As pointed out by defendant, McFadden testified at trial that he picked out defendant and the driver of a car from a photo array, which was different from his testimony in a prior trial that he picked out the shooter and two drivers. McFadden also described the shooter to the police as 20 to 24 years of age and 5"11 to 6" tall when defendant was 16 at the time of the shooting and is less than 5'6". However, the credibility of identification testimony is a question for the trier of fact.

> Marcario Harris and Kimberly Thompson, who live across the street from the store/restaurant where the shooting occurred, also identified defendant as the shooter. Both testified that they had a clear view of the shooting through their front living room window, which faced the store and they could clearly see defendant in the broad daylight. Both testified that defendant was only person they saw with a gun during the incident. Neither was asked to view a photo array or participate in a live lineup, but identified defendant for the first time at trial. Both Harris and Thompson described the shooter to the police immediately after the event as around 5"9 or 5'10", thin, and in his mid–20's. This description is not so far off as to be a misidentification and moreover, the jury is responsible for both credibility and evidentiary weight determinations.

> Aundrey Allen also identified defendant as the shooter. He had been standing with Simpson while Simpson was arguing with defendant about his glasses and when Simpson punched defendant in the face. Allen testified that he was also standing behind and somewhat to the side of Simpson when defendant

pulled a gun out of his pocket and started shooting at Simpson. Allen was shot in the leg as he tried to run. Allen described the shooter to the police as being around 5'7" or 5'8" and around 17 or 18 years old. Allen also told the police that several people at the incident called the shooter "Tay," which others witnesses confirmed was defendant's nickname. At the hospital after his surgery, Allen did view a photo array and identify another person as the shooter. Allen explained, however, that he was under the influence of morphine at the time of that identification. Allen thereafter participated in a live line up and identified defendant out of the lineup as the shooter.

The above was sufficient for a reasonable jury to find beyond a reasonable doubt that defendant was identified as the shooter.

*People v. Howard*, 2014 WL 5305997, at * 2 (internal citations omitted).

Under Michigan law, "[T]he identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x. 147, 150 (6th Cir. 2003)(citing *People v. Turrell*, 25 Mich.App. 646, 181 N.W.2d 655, 656 (1970)).

In the present case, four eyewitnesses, including the surviving shooting victim, positively identified petitioner at trial as the shooter. The Court notes that "the testimony of a single, uncorroborated prosecuting witness or other eyewitness is generally sufficient to support a conviction." *Brown v. Davis,* 752 F. 2d 1142, 1144 (6th Cir. 1985)(internal citations omitted). Four eyewitnesses unequivocally identified petitioner at trial as being the shooter based on their personal observations. This evidence was sufficient to support petitioner's convictions. *See Thomas v. Perry,* 553 F. App'x. 485, 487–88 (6th Cir. 2014).

A federal court reviewing a state court conviction on habeas review that is "faced

with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos*, 565 U.S. at 7 (*quoting Jackson v. Virginia*, 443 U.S. at 326). Although there may have been conflicts between the witnesses concerning their descriptions of the shooter, this Court must presume that the trier of fact resolved these conflicts in favor of the prosecution and defer to that resolution.

Petitioner next claims that there was insufficient evidence of premeditation and deliberation to support his first-degree murder conviction. Petitioner claims that the evidence, at most, showed that he shot Mr. Simpson after the victim had punched him and was thus acting under a thought process influenced by "hot blood" that would negate the element of premeditation and deliberation.

The Michigan Court of Appeals rejected petitioner's claim:

No one disputes that Simpson approached defendant accusing him of stealing his glasses. It also appears that Simpson escalated the verbal altercation to a physical level by punching the defendant and that defendant did not punch him back. However, by all accounts, defendant was the only one with a weapon and the only one who shot. Most important to our analysis, several distinct rounds of shooting occurred. First, after Simpson punched defendant several times in the face and was approaching to punch him again, defendant shot at Simpson at least twice. Allen, who was standing next to Simpson at the time the first shots were fired, testified that defendant initially shot at Simpson twice.

The second round of shots came almost immediately thereafter. Allen testified that after the first two initial shots, he ran toward the store. As he ran, he heard three more shots. Bobby Bailey, another witness, also ran to the store after the initial shots.

The next round of shots occurred when both Bailey and Allen were inside the store. Bailey testified that he heard six or seven more shots while he was in the store. Allen testified that, he too, heard additional shots while he was in the store. Allen testified that he heard eight or nine shots right in a row, then a several second pause occurred. Allen testified that he next heard Simpson begging for his life and a final, single shot. According to Allen, he thereafter heard the sound of a car being floored and taking off.

McFadden similarly testified to distinct rounds of shots. He testified the he heard three initial shots, and then his attention was drawn to an elderly lady getting out of her car in the street. McFadden had time to help the woman to her home before he heard the next shot, which he testified he heard while at the same time seeing Simpson stumble backward. McFadden testified that he then heard several more shots and Simpson was lying in the street. According to McFadden, the defendant fired two more shots at Simpson as he lay in the street then got into an SUV. Defendant then got back out of the SUV, said "This m—f—n—isn't dead yet" and shot defendant several more times, including once in the head. Defendant then got back in the SUV and left.

Witness Harris, testified that he saw defendant chasing Simpson around a Suburban, shooting at him. After Simpson fell to the ground, defendant walked toward him and shot at him several more times. Harris testified that defendant shot at Simpson approximately 15 times. Witness Thompson testified that defendant first shot at Simpson while both were in the street and Simpson fell to the ground. Defendant then got into an SUV and started to take off, then abruptly got back out of the vehicle when Simpson started to get up. Thompson testified that defendant chased Simpson around shooting at him. She heard Simpson begging for his life and saw defendant walk up to Simpson, shoot him in the head, and then get back into the SUV and leave.

The prosecution presented sufficient evidence of premeditation and deliberation to support defendant's first degree premeditated murder conviction. The first shots fired by defendant could qualify as being brought about by "hot blood" without an opportunity to take a second thought. Simpson had just punched defendant in the face several times and was advancing toward him again. Allen testified that at that point, defendant started reaching for his pocket "real crazy like." Were those the only shots fired, defendant's argument that his actions were rash, impulsive or a hot-blooded reaction to the circumstances would have some merit. However, the testimony establishes that after the initial few shots, there was a minimum of a several second pause as Allen and others fled the scene. The pause was

long enough, if McFadden's testimony is to be believed, for him to assist an elderly lady from her car parked in the street up to her house and for him to then return to the street and witness the next round of shots. Allen testified that he could see Simpson's hand go toward his stomach as though he had been shot in that area. McFadden also testified that after one of the first several shots, he saw Simpson stumble backward. By all witness accounts, then, Simpson was still alive after the first shots were fired. Assuming defendant did not possess the requisite intent (premeditation or deliberation) to murder at the time the first shots were fired, he could have left at that point and the incident perhaps would have been over.

However, after a pause, more shots were fired and, by all witness accounts, Simpson was still alive. According to Harris and Thompson, it was at that point that defendant got into an SUV and appeared to be about to leave the scene, but when Simpson started to get up out of the street, the SUV slammed on its brakes and defendant got back out. According to these witnesses, defendant chased Simpson around a vehicle, firing more shots at him until he fell back into the street, then walked up to him and fired a final shot into his head. While McFadden made no mention of defendant chasing Simpson around a vehicle as he fired shots at him, he did testify that defendant got into an SUV, then got back out, said "This m—f—n—isn't dead yet" and shot defendant several more times, including once in the head. The medical examiner testified that when the shot to his head was delivered, Simpson was still alive.

A reasonable jury could find that between the apparently non-fatal first shots and the final shot to Simpson's head, there was sufficient time for defendant to take a second look at the nature of his actions. Defendant may have had no prior relationship with Simpson and may not have initially gone to the store/restaurant for anything other than his stated purpose of finding his phone. Nevertheless, the circumstances of the killing itself show that defendant thought about taking Simpson's life before the he took the acts which actually caused the death and pondered the acts for some, albeit small, amount of time. Defendant then got into an SUV and the vehicle started to leave. But it then stopped as Simpson started to get up and defendant elected to shoot Simpson several more times while at least one witness testified that defendant made a statement concerning an intent to kill Simpson and while other witnesses testified they heard Simpson pleading with defendant for his life. Defendant then stood over Simpson while he lay in the street and shot him in the head. The location of this final shot, the positions of the parties, and the fact that defendant halted and got out of vehicle to deliver the final

shots adequately suggest that although defendant had time to take a second look and perhaps leave Simpson injured, defendant deliberately chose to ensure that he killed Simpson. Thus, even if defendant did not form a homicidal intent until he stopped the SUV and got back out to deliver the final round of shots, the time span between that moment and the time the initial shots were fired would be of a sufficient amount to allow defendant to take a second look. There was thus sufficient evidence of premeditation and deliberation to support defendant's first degree murder conviction.

*People v. Howard*, No. 311169, 2014 WL 5305997, at * 3–5.

To constitute first-degree murder in Michigan, the state must establish that a defendant's intentional killing of another was deliberated and premeditated. *See Scott v. Elo*, 302 F. 3d 598, 602 (6th Cir. 2002)(citing *People v. Schollaert*, 194 Mich. App. 158; 486 N.W.2d 312, 318 (1992)). The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001)(*citing People v. Anderson*, 209 Mich. App. 527, 537; 531 N. W. 2d 780 (1995)). Premeditation may be established through evidence of the following factors:

1. the prior relationship of the parties;

2. the defendant's actions before the killing;

3. the circumstances of the killing itself;

4. the defendant's conduct after the homicide.

*Cyars v. Hofbauer*, 383 F.3d 485, 491 (6th Cir. 2004); *Anderson*, 209 Mich. App. at 527.

Although the minimum time required under Michigan law to premeditate "is

incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" *See Williams v. Jones*, 231 F. Supp. 2d 586, 594-95 (E.D. Mich. 2002)(*quoting People v. Vail*, 393 Mich. 460, 469; 227 N.W. 2d 535 (1975)). "A few seconds between the antagonistic action between the defendant and the victim and the defendant's decision to murder the victim may be sufficient to create a jury question on the issue of premeditation." *Alder v. Burt*, 240 F. Supp. 2d 651, 663 (E.D. Mich. 2003). "[A]n opportunity for a 'second look' may occur in a matter of seconds, minutes, or hours, depending upon the totality of the circumstances surrounding the killing." *Johnson*, 159 F. Supp. 2d at 596 (*quoting People v. Berthiaume*, 59 Mich. App. 451, 456 (1975)). Premeditation and deliberation may be inferred from the type of weapon used and the location of the wounds inflicted. *See People v. Berry*, 198 Mich. App. 123, 128; 497 N. W. 2d 202 (1993). Use of a lethal weapon will support an inference of an intent to kill. *Johnson*, 159 F. Supp. 2d at 596 (*citing People v. Turner*, 62 Mich. App. 467, 470; 233 N.W. 2d 617 (1975)). Finally, premeditation and intent to kill may be inferred from circumstantial evidence. *See DeLisle v. Rivers,* 161 F. 3d 370, 389 (6th Cir. 1998).

In the present case, there was sufficient evidence for a rational trier of fact to conclude that petitioner acted with premeditation and deliberation when he shot the victim. The evidence established that petitioner had been engaged in an argument with Mr. Simpson prior to the shooting. Evidence that petitioner had a prior dispute with the victim supports a reasonable inference that the subsequent shooting was premeditated.

*Scott*, 302 F. 3d at 603.  Testimony that petitioner fired multiple gunshots would also be sufficient to establish premeditation and deliberation. *See Thomas v. McKee*, 571 F. App'x. 403, 407 (6th Cir. 2014).  The testimony further established that petitioner did not fire all these shots at once, but paused between firing more shots on two separate occasions.  This evidence further supports an inference of premeditation and deliberation. *See McCullough v. Stegall,* 17 F. App'x. 292, 296 (6th Cir. 2001). Petitioner also shot the victim in the head.  Under Michigan law, premeditation may also be logically inferred from wounds inflicted on vital parts of the victim's body. *See Lundberg v. Buchkoe,* 338 F. 2d 62, 69 (6th Cir. 1964).  Petitioner ignored the victim's pleas not to shoot him while he was on the ground, further evidence of premeditation and deliberation. *See Thomas v. McKee*, 571 F. App'x. at 407.  The fact that petitioner fled the scene afterwards also supports a finding of premeditation. *See e.g. Marsack v. Howes*, 300 F. Supp. 2d 483, 492 (E.D. Mich. 2004).

A federal court's review on habeas is very deferential to the state courts regarding sufficiency of evidence claims and this Court cannot say that the insufficiency of evidence claim resulted in a decision that was contrary to, or involved an unreasonable application of *Jackson*. *Durr v. Mitchell,* 487 F. 3d 423, 448 (6th Cir. 2007).  "While there may have been other possible conclusions that the jury could have drawn from the evidence, a determination of premeditation 'beyond a reasonable doubt' does not require a jury to find that the evidence eliminates every other reasonable theory except that presented by the prosecution." *Titus v. Jackson*, 452 F. App'x. 647, 650 (6th Cir. 2011).

13

Petitioner is not entitled to relief on his first claim.

**B. Claim # 2. The ineffective assistance of counsel claim.**

Petitioner alleges that he was denied the effective assistance of counsel.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

More importantly, on habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" *Knowles*

*v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101.  Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664).  Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.*  This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."*Harrington*, 562 U.S. at 101.  "Surmounting *Strickland's* high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

Petitioner first contends that trial counsel was ineffective for failing to call Sergeant Martel as a witness at his re-trial to refute Allen's testimony that when he identified another suspect as the shooter in a photo array while he was in the hospital, it was because he was under the influence of morphine.  Petitioner contends that at his first trial, which resulted in a hung jury on the first degree murder charge, Sergeant Martel testified that Allen was coherent when he identified a Deonte Miller as the shooter and that based on this identification, Martel prepared a search warrant for Miller's home.

The Michigan Court of Appeals rejected petitioner's claim:

At defendant's first trial Allen testified that on the date of the incident, when he first had contact with the police, he was in the hospital and "had like a lot of morphine inside me." Allen testified that he was unable to write at that time and the officers asked him to explain what had happened. Allen testified that officers also showed him six photographs and that he was able to identify someone in the photographs but that he does not know who he identified because "at the time ... I was so out of it." Allen testified that he identified the person who looked closest to defendant because he really did not know defendant. It is undisputed that Allen identified someone other than defendant as the shooter in the photo array.

Martel testified [at petitioner's first trial] that he was not in the room when Allen made an identification of someone in the photo lineup. He testified that he also took a statement from Allen. He testified that Allen may have been on some medication or painkillers when he gave the statement to Martel, but that Allen seemed coherent. Martel testified that he would not have taken his statement had he not believed Allen to be coherent.

It is true that Martel's testimony would have placed doubt on Allen's testimony that he mistakenly identified someone other than defendant in the photo lineup due to drug intoxication. However, decisions on whether to call or question witnesses are presumed to be matters of trial strategy that will not be second-guessed on appeal. Even if counsel's failure to call Martel as a witness was in error, it cannot be said to have been outcome determinative. This is necessarily so, as Allen participated in a live lineup after being released from the hospital and identified defendant, who was irrefutably part of that lineup, as the shooter. Thus, Allen's later positive identification of defendant as the shooter would likely have negated any effect of his initial photo identification of another person as the shooter. Thus, counsel did not render ineffective assistance in failing to call Martel as a witness.

*People v. Howard*, 2014 WL 5305997, at * 7.

When defense counsel focuses on some issues to the exclusion of others, there is a strong presumption that he or she did so for tactical reasons, rather than through sheer neglect, and this presumption has particular force where an ineffective assistance of counsel claim is asserted by a federal habeas petitioner based solely on the trial record,

where a reviewing court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." *See Yarborough v. Gentry,* 540 U.S. 1, 5-6 (2003)(*quoting Massaro v. United States*, 538 U.S. 500, 505 (2003)).

In the present case, petitioner did not move for a *Ginther* [3] hearing on his ineffective assistance of counsel claim, thus, the Michigan Court of Appeals limited their review of petitioner's ineffective assistance of counsel claims to mistakes which were apparent from the record. *People v. Howard*, 2014 WL 5305997, at * 5.

Although trial counsel did not call Sergeant Martel at the second trial, he did question Mr. Allen extensively about his identification of petitioner. (Tr. 5/11/11, pp. 92-102, 107-08). Counsel obtained an admission from Mr. Allen that he never told the police that he was "woozy" or under the influence of medication at the time of the photo array, when he identified someone else as the shooter. Mr. Allen admitted he did not tell the police that he was in pain or ask them to come back the next day to conduct the photo show-up. (*Id.,* pp. 94-95). Mr. Allen admitted that he identified another suspect from the photo array. (*Id.,* pp. 96-97). Counsel obtained an admission from Mr. Allen that when he went to participate in the live line-up a month later, he was looking for the smallest person in the line-up. Mr. Allen admitted that petitioner was the smallest person in the live line-up. Mr. Allen admitted it took him fifteen minutes to identify petitioner at the live line-up. (*Id.,* pp. 98-102). On re-cross examination, Mr. Allen admitted that he

---

[3] *See People v. Ginther*, 390 Mich. 436, 443; 212 N.W. 2d 922 (1973).

described the shooter as having a goatee but admitted at a later hearing that the suspect did not have a goatee. Mr. Allen also admitted that petitioner seemed shorter than the description that Mr. Allen gave of the initial suspect. (*Id.,* pp. 107-08).

Petitioner was not prejudiced by counsel's failure to call Sergent Martel because his testimony would be cumulative of other evidence presented at trial in support of petitioner's claim that Mr. Allen's identification of him as the shooter was unreliable. *Wong,* 558 U.S. at 22-23; *See also United States v. Pierce,* 62 F. 3d 818, 833 (6th Cir. 1995). In this case, the jury had significant evidence presented to it that Mr. Allen's prior and in-court identifications of petitioner were less than accurate. Because the jury was "well acquainted" with evidence that would have supported petitioner's claim that Mr. Allen misidentified him, additional evidence in support of petitioner's defense "would have offered an insignificant benefit, if any at all." *Wong,* 558 U.S. at 23.

Petitioner next argues that counsel was ineffective for failing to enter a stipulation that was entered at his first trial, namely, that Detective Myron Love would testify that he showed Mr. McFadden a photo lineup; that petitioner's picture was not included in this photo lineup; that McFadden picked out three people, and that Detective Love could not remember who McFadden picked out.

The Michigan Court of Appeals rejected this claim:

> It is not clear from the record why the above stipulation [at the first trial] was entered. However, it is clear that Love appeared at defendant's second trial and testified. Thus, a stipulation as to what he would have testified to was obviously not an option at that point. Defendant has also provided nothing to indicate that defense counsel failed to request the same stipulation, rather

than that he perhaps sought the same stipulation and was denied the opportunity to present it at trial instead of Love's live testimony. Given the above, it cannot be found that counsel was ineffective for failing to procure the stipulation.

Moreover, the only way in which Love's testimony at trial differed from the stipulation was that at defendant's trial, Love testified that he was *unsure* whether defendant's photo was included in the photo array and the stipulation provided that defendant's photo *was not* in the photo array. While defendant makes much of this distinction and contends that the difference was significant in undermining McFadden's testimony at trial that he was positive he picked defendant's photo out of the photo array, defense counsel elicited from Love that had McFadden picked defendant out of a photo array they would have had documentation of the same and they did not. Thus, counsel effectively undermined McFadden's credibility in asserting that he had picked defendant out of a photo lineup despite the difference between the stipulation and the live testimony. Defense counsel was thus not ineffective in failing to procure the same stipulation regarding Love's testimony that was presented at his first trial.

*People v. Howard*, 2014 WL 5305997, at * 7–8 (emphasis original).

Petitioner is not entitled to relief on his second ineffective assistance of counsel claim for two reasons.

First, petitioner failed to show that counsel did not attempt to obtain a stipulation to Detective Love's testimony or that the prosecutor would have agreed to such a stipulation, thus counsel was not ineffective for failing to obtain such a stipulation. *See e.g. Hilliard v. Hudson*, 599 F. Supp. 2d 921, 931 (N.D. Ohio 2009)(defendant charged with having weapon under disability was not denied effective assistance of counsel due to trial counsel's failure to stipulate to his prior convictions, where state was required to prove prior conviction beyond reasonable doubt, and state and trial court were not required to accept defendant's stipulation to prior conviction).

Secondly, although Detective Love's testimony at trial was that he was unsure whether petitioner's photograph was in the photo array, as opposed to the stipulation which indicated that petitioner's photograph was definitely not in the array, trial counsel nonetheless obtained an admission from Detective Love that had McFadden identified petitioner at the photo array, the police would have had documentation of the same and they did not. This effectively undermined Mr. McFadden's trial testimony that he identified petitioner at the photo array. Any decision by counsel not to stipulate to the admission of Detective Love's testimony was a strategic choice that defeats petitioner's ineffective assistance of counsel claim. *Cf. Doss v. Bock*, 89 F. App'x. 964, 965 (6th Cir. 2004)(Defense counsel's stipulation to admission of witness's testimony from defendant's first trial was strategic choice that did not support claim of ineffective assistance of counsel, in murder prosecution, where counsel entered into stipulation both because witness was ill on day he was expected to testify and counsel wanted to avoid possibility that another witness would lie on the stand).

Petitioner finally claims that trial counsel was ineffective in declining to cross-examine Investigator Barbara Simon about her alleged mistreatment of the persons she interrogated. At petitioner's first trial, trial counsel obtained an admission from Simon that she lied to suspects during interrogations, had cursed at them, and had threatened them that if they did not talk they were going to jail. Counsel at petitioner's first trial asked Simon if she threatened witness Bobby Bailey while questioning him. Simon denied threatening him, telling him to shut up or threatening to ruin his business if

he did not offer incriminating information against petitioner.

The Michigan Court of Appeals rejected petitioner's claim:

> While defendant argues that Simon's alleged threats were an important piece of the defense theory that the police engaged in misconduct, defendant has identified no other alleged acts of misconduct on the part of the police or further explained how any theory of misconduct was conveyed to the jury and influenced or was intended to influence his case. And, any admissions that first trial counsel elicited form Simon about any untoward treatment of persons she questioned was limited to treatment of suspects—not of witnesses such as Bailey.
>
> Additionally, because Simon unequivocally denied making any threat in any form to Bailey in the first trial, it was reasonable for defense counsel at defendant's second trial to conclude she would testify consistently and deny any wrongdoing. And on direct examination by the prosecution, she, in fact, did. Thus, it would be a reasonable trial strategy to elicit from Bailey, as defense counsel did, that Simon had threatened him and that Bailey had just agreed to whatever she said due to the threats, that Simon told him to shut up and would not let him talk and just wanted to make the shooter defendant, and let those accusations stand unanswered by Simon to the greatest degree possible. Though the prosecutor asked Simon on direct whether she had threatened Bailey during her questioning of him and she again denied making any threats, there would be nothing gained by defense counsel again asking her the same questions and having her reiterate her denials. This Court will not substitute its judgment for trial counsel's in matters of trial strategy.

*People v. Howard*, 2014 WL 5305997, at * 8 (internal citation omitted).

In the present case, defense counsel elicited testimony from Mr. Bailey that Investigator Simon had threatened him and that he agreed to whatever she said because of these threats, that Simon told him to shut up and would not let him talk, and that she wanted Bailey to incriminate petitioner. Counsel was not ineffective in failing to cross-examine Investigator Simon about her poor treatment of witnesses because such impeachment would have been cumulative of evidence that counsel obtained through

another witness. *See Lint v. Prelesnik*, 542 F. App'x. 472, 478 (6th Cir. 2013). Petitioner is not entitled to relief on his second claim.

## C. Claim # 3. The perjury claim.

Petitioner claims that he is entitled to a new trial because the prosecutor introduced perjured testimony. Petitioner contends that Mr. McFadden committed perjury at the second trial when he testified that he positively identified petitioner in a photo array, because this testimony is contrary to the stipulation entered in the first trial of Detective Love that petitioner was not in the photo array, as well as Love's testimony in the second trial that if McFadden had identified petitioner, there would have been a record of the him doing so, but there was none. Petitioner further claims that Detective Love committed perjury at the second trial when he testified he was unsure whether petitioner's photo was in the array because it was contrary to the stipulation in the first trial that petitioner's photo was not in the array.

The Michigan Court of Appeals rejected petitioner's claim:

There is no indication in the record that the prosecutor, who was the same person for both trials, concealed any prior contradictory statements or elicited and allowed perjured testimony to stand, or even that the statements were, in fact contradictory or perjured. With respect to Love, as previously indicated, a stipulation was entered in the first trial that "... if Detective Myron Love showed, the testimony would be Detective Myron Love showed Frederick McFadden a photographic line-up regarding the shooting of Tyrone Simpson. In front of Detective Love, Frederick McFadden picked out three people. Detective Love does not remember who Frederick McFadden identified, but Deonte Howard was not one of those people." The prosecutor added, "He was no[t] in the line-up." At this point defense counsel stated, "Right. Deonte Howard was not in the photographic line-up that was shown to Frederick McFadden...." The prosecutor stated, "That's correct, Judge. And

I've sign[ed] the document to that effect."

At defendant's second trial, Love appeared as a witness and testified that he showed a photo array with six photos to McFadden. When advised that there were two different suspects involved in the case, Love indicated that he believed he was involved with the first suspect [Deonte Miller]. Love testified that when shown the photo array, McFadden picked out three people that he indicated he recognized. Love further testified that he was "not really positive" if defendant's photo was in the photo array. Love testified that he did not have a copy of the photo array and he had no documentation to show that McFadden had picked defendant out of the photo array. Love testified that had McFadden picked out defendant, they would have had documentation of the same.

Clearly, Love was not in charge of what the prosecutor and defense counsel in the first trial placed on the record as far as the stipulation that defendant was not part of the photo array shown to McFadden. The prosecutor was the individual who volunteered this information as part of the stipulation so likely had a basis for making such a statement, but that would be bare speculation at this point. In any event, Love's live testimony at defendant's second trial does not contradict this stipulation. Instead, Love simply stated he was "not positive" whether defendant's photo was or was not part of the array, indicating a lapse of memory, not a material, willful false statement.

Concerning McFadden, at defendant's first trial McFadden testified that he was shown three pages of pictures and that he picked out "the shooter and two drivers." At defendant's second trial, McFadden testified that he saw three pictures and that he picked out two people. McFadden specifically testified that he picked out defendant and the driver. He testified that he was "positive" that he picked out defendant in the photos. Notably, the prosecution did not ask McFadden any questions about the photo identification on direct examination—it was defense counsel who elicited this information on cross-examination. In any event, comparing the testimony at the two trials, while there are some differences, the significant factor is the absence of any mention of defendant in McFadden's first testimony. McFadden did not testify at the first trial that he picked defendant out of the photo array; he testified that he picked out the shooter. Thus there is no conflict with respect to defendant in his testimony at defendant's second trial.

According to defendant, McFadden's testimony that he identified defendant as the shooter in the photo array is nevertheless clearly false. However, all

inconsistencies were disclosed to the jury and it was for the jury to determine whether McFadden's trial testimony, including his alleged identification of defendant in a photo array, was credible.

Were we to find that the testimony was, in fact, false, it cannot be concluded that the admission of the testimony affected the jury's verdict and thus the outcome of the trial. Not only did McFadden identify defendant in court as the shooter, several other eyewitnesses, whose credibility defendant does not challenge, also unequivocally identified defendant as the shooter.

*People v. Howard*, 2014 WL 5305997, at * 9–10 (internal citations omitted).

The deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. *Giglio v. United States*, 405 U.S. 150, 153 (1972). There is also a denial of due process when the prosecutor allows false evidence or testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959)(internal citations omitted). To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F. 3d 320, 343 (6th Cir. 1998). However, a habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd v. Collins*, 209 F. 3d 486, 517-18 (6th Cir. 2000).

Mere inconsistencies in a witness' testimony do not establish the knowing use of false testimony by the prosecutor. *Coe*, 161 F. 3d at 343. Additionally, the fact that a witness contradicts himself or herself or changes his or her story also does not establish

perjury either. *Malcum v. Burt,* 276 F. Supp. 2d 664, 684 (E.D. Mich. 2003)(citing *Monroe v. Smith*, 197 F. Supp. 2d 753, 762 (E.D. Mich. 2001)). A habeas petition should be granted if perjury by a government witness undermines the confidence in the outcome of the trial. *Id.*

Petitioner failed to establish that Mr. McFadden or Detective Love committed perjury. Petitioner points to the fact that Mr. McFadden's testimony at the second trial was inconsistent with his testimony from the first trial and was contradicted by both the stipulation from the first trial regarding Detective Love's proposed testimony and Detective Love's testimony from the second trial. Petitioner also points to the fact that Detective Love's testimony at the second trial was contrary to the stipulation entered at the first trial. Petitioner merely alleges inconsistencies in these witnesses' testimony, thus, he has failed to establish that the witnesses committed perjury, so as to entitle him to habeas relief on this claim. *Malcum,* 276 F. Supp. 2d at 684. Conclusory allegations of perjury in a habeas corpus petition must be corroborated by some factual evidence. *Barnett v. United States*, 439 F.2d 801, 802 (6th Cir.1971). More importantly, assuming that Mr. McFadden or Detective Love testified falsely concerning Mr. McFadden's identification at the photo array, petitioner is still not entitled to habeas relief on his perjury claim, because he has failed to show that the prosecutor knew that these witnesses testified falsely on this matter. *See Rosencrantz v. Lafler,* 568 F. 3d 577, 587 (6th Cir. 2009).

Finally, in light of the fact that Mr. McFadden positively identified petitioner at

trial and at least three other eyewitnesses unequivocally identified him as the shooter,

testimony whether Mr. McFadden positively identified petitioner at a photo array was

not material to petitioner's conviction, because this evidence was not a "crucial link" in

the case against petitioner. *See e.g. Foley v. Parker,* 488 F.3d 377, 392 (6th Cir. 2007);

*See also Rosencrantz v. Lafler,* 568 F.3d at 588.  Petitioner is not entitled to relief on his

third claim.

### IV.  Conclusion

The Court will deny the petition for writ of habeas corpus.  The Court will also

deny a certificate of appealability to petitioner.  In order to obtain a certificate of

appealability, a prisoner must make a substantial showing of the denial of a

constitutional right. 28 U.S.C. § 2253(c)(2).  To demonstrate this denial, the applicant is

required to show that reasonable jurists could debate whether, or agree that, the petition

should have been resolved in a different manner, or that the issues presented were

adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473,

483-84 (2000).  When a district court rejects a habeas petitioner's constitutional claims

on the merits, the petitioner must demonstrate that reasonable jurists would find the

district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at

484.  "The district court must issue or deny a certificate of appealability when it enters a

final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28

U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny petitioner a certificate

of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right with respect to any of the claims. The Court will also deny petitioner leave to appeal *in forma pauperis,* because the appeal would be frivolous. *See Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma pauperis.*

s/John Corbett O'Meara
United States District Judge

Date: May 17, 2017

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, May 17, 2017, using the ECF system and/or ordinary mail.

s/William Barkholz
Case Manager